## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| NAVY SEAL 1, *et al.*, for themselves and all others similarly situated, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | )   No. _____ |
| | ) |
| JOSEPH R. BIDEN, in his official capacity as President of the United States, *et al.*, | ) ) ) ) |
| Defendants. | ) ) |

## PLAINTIFFS' MOTION FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
## WITH MEMORANDUM OF LAW IN SUPPORT

Plaintiffs, pursuant to Fed. R. Civ. P. 65, move the Court for a temporary restraining order (TRO) and preliminary injunction against Defendants' enforcement of the unconscionable, unconstitutional, and unlawful Federal COVID-19 Vaccine Mandate that all United States Armed Forces servicemembers, civilian federal employees, and civilian federal contractors accept or receive a COVID-19 vaccination in violation of their sincerely held religious beliefs. Plaintiffs incorporate by reference the facts stated in their Verified Complaint filed simultaneously herewith.[1] In further support hereof, Plaintiffs show the Court as follows:

---

[1]     Unless otherwise indicated, capitalized terms herein have the same meaning as in the Verified Complaint.

<u>**MEMORANDUM OF LAW**</u>

Injunctive relief is appropriate where, as here, Plaintiffs can establish that (1) they have a substantial likelihood of success on the merits, (2) irreparable injury will result absent injunctive relief, (3) the balance of the equities tips in their favor, and (4) the injunction would serve the public interest. *See, e.g.*, *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). And, the standard for a TRO is identical to that of a preliminary injunction. *See HSBC Bank USA, N.A. v. Cambria at Polos S. Condo. Ass'n, Inc.*, No. 6:14-cv-1149-Orl-31GJK, 2014 WL 3540766, at *1 (M.D. Fla. July 17, 2014). Plaintiffs easily satisfy this burden.

I.    **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS THAT THE FEDERAL COVID-19 VACCINE MANDATE VIOLATES THE EUA PROVISIONS OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT.**

Federal law has put safeguards in place to protect the health and safety of the men and women who voluntarily place their lives on the line to protect and defend this Nation. With respect to mandatory vaccines administered to military servicemembers, federal law begins with the presumption that "Congress has prohibited the administration of investigational drugs to service members without their consent." *Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 19 (D.D.C. 2004); 10 U.S.C. § 1107(f)(1). There are two purported exceptions to the requirement of informed consent. First, the President can waive the informed consent requirement. A presidential waiver must be in writing and demonstrate that the President has determined "that obtaining consent is not in the interests of national security." *Id.* A second purported exception exists

2

under the Project BioShield Act of 2004, PL 108–276 (July 21, 2004), which, *inter alia*, amended the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301–399i, to authorize the use of unapproved drugs and the unapproved use of approved drugs in certain emergencies. An emergency use authorization (EUA) requires both a declaration of emergency by the Secretary of Health and Human Services (HHS Secretary) and a separate determination by the HHS Secretary that necessitates the emergency use of an unapproved product or emergency unapproved use of an approved product. *See* 21 U.S.C. § 360bbb–3 (the "EUA Statute").

The strict criteria laid out in the EUA Statute demonstrates the limited scope of the exceptions to the informed consent requirement. To start, the initial emergency declaration by the HHS Secretary must be based on one of four statutorily listed justifications—none of which apply here. The first requires the Secretary of Defense to find a **domestic emergency**, or significant potential for a domestic emergency, based on heightened risk of attack with a **biological, chemical, radiological, or nuclear agent**.[2] The second requires a finding that there is a **military emergency** involving a heightened risk to US military forces of an attack with a **biological, chemical, radiological, or nuclear agent**, or an agent that may cause an imminently life-

---

[2]     A "determination by the Secretary of Homeland Security that there is a domestic emergency, or a significant potential for a domestic emergency, involving a heightened risk of attack with a biological, chemical, radiological, or nuclear agent or agents." 21 U.S.C.A. § 360bbb–3(b)(1)(A) (emphasis added).

threatening and specific risk to US military forces.[3] The third requires a finding that there is a public health emergency, or significant potential for a public health emergency, that affects national security or the health and security of US citizens abroad and involves a **biological, chemical, radiological, or nuclear agent or a disease or condition attributable to one of those agents**.[4] And, the fourth requires the identification of a material threat involving **chemical, biological, radiological, and nuclear agents** sufficient to affect national security or the health and security of US citizens living abroad.[5]

Even after the HHS Secretary establishes that one of the four criteria are satisfied, under the EUA Statute the HHS Secretary must then make a separate

---

[3]    A "determination by the Secretary of Defense that there is a **military emergency**, or a significant potential for a military emergency, involving a heightened risk to United States military forces, including personnel operating under the authority of title 10 or title 50, of **attack with a biological, chemical, radiological, or nuclear agent or agents**; or an agent or agents that may cause, or are otherwise associated with, **an imminently life-threatening and specific risk** to United States military forces." § 360bbb–3(b)(1)(B) (emphasis added).

[4]    A "determination by the Secretary that there is a **public health emergency**, or a significant potential for a public health emergency, **that affects**, or has a significant potential to affect, **national security** or the health and security of United States citizens living abroad, and that involves **a biological, chemical, radiological, or nuclear agent or agents, or a disease or condition that may be attributable to such agent or agents**." § 360bbb–3(b)(1)(C) (emphasis added).

[5]    The "identification of a **material threat** [involving chemical, biological, radiological, and nuclear agents] pursuant to section 319F–2 of the Public Health Service Act [42 U.S.C. 247d–6b] sufficient **to affect national security** or the health and security of United States citizens living abroad." § 360bbb–3(b)(1)(D) (emphasis added).

determination that an "agent" referred to in the declaration can cause a serious or life-threatening disease or condition, *and,* that based on the scientific evidence available the product authorized under the EUA, (i) it may be effective in diagnosing, treating, or preventing the disease or serious life-threatening disease, (ii) the known and potential benefits outweigh the risks; (iii) there is no adequate, approved, and available alternative to the product authorized under the EUA; (iv) in the case of a military emergency based on a biological, chemical, radiological, or nuclear agent, the Secretary of Defense made the emergency use request; and (v) other criteria established by regulation are satisfied.

The judicial response in 2004 to the government's efforts to mandatorily vaccinate military personnel against Anthrax demonstrates that courts are tasked with protecting our military personnel and, therefore, must narrowly construe any statutory authorization to administer investigational new drugs without voluntary consent. *See Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 6 (D.D.C. 2004), *modified by* 2005 WL 774857 (D.D.C. Feb. 06, 2005), *and* 2005 WL 1124589 (D.D.C. Apr. 6, 2005), *vacated on other grounds by* 172 Fed. Appx. 327 (D.C. Cir. Feb. 09, 2006). In *Rumsfeld*, the plaintiffs challenged the mandatory Anthrax vaccine based the FDA's failure to follow procedural requirements for notice and comment. In deciding to issue the preliminary injunction, the court made clear that the government lacked authority to mandatorily vaccinate military personnel with an investigational new drug without their consent. The *Rumsfeld* federal district court held:

> Unless and until FDA properly classifies AVA as a safe and effective drug for its intended use, an injunction shall remain in effect prohibiting defendants' use of AVA on the basis that the vaccine is either a drug unapproved for its intended use or an investigational new drug within the meaning of 10 U.S.C. § 1107. Accordingly, the involuntary anthrax vaccination program, as applied to all persons, is rendered illegal absent informed consent or a Presidential waiver . . . .

341 F. Supp. 2d 19.

Subsequently, when the government asserted that an exception to the voluntary consent requirement also existed when an EUA had been issued, the court again concluded that the vaccine could not be administered without the consent of the servicemembers. *Doe v. Rumsfeld*, No. Civ.A. 03-707(EGS), 2005 WL 1124589, at *1 (D.D.C. Apr. 6, 2005); *Rumsfeld*, 341 F. Supp. 2d at 19 ("The men and women of our armed forces deserve the assurance that the vaccines our government compels them to take into their bodies have been tested by the greatest scrutiny of all—public scrutiny. This is the process the FDA in its expert judgment has outlined, and this is the course this Court shall compel FDA to follow."). The court also made very clear that it was not deciding the legality of the government's efforts to mandate vaccines pursuant to an EUA. The court stated that it was not "ruling on the lawfulness or merits of any EUA" and permitted voluntary vaccinations under the EUA "without prejudice to a future challenge to the validity of any such EUA." 2005 WL 1124589, at *1

None of the requisite criteria for mandating vaccination with an unapproved EUA vaccine has been satisfied. There has been no Presidential declaration sufficient to invoke the exceptions to the EUA Statute. (V. Compl. ¶185.) There has been no domestic emergency, military emergency, public health emergency, or material threat

of a biological, chemical, radiological, or nuclear agent or a disease attributable to one of those conditions. (V. Compl. ¶186.) Because of those unquestionably unsatisfied criteria, Defendants are prohibited by the EUA Statute from mandating that Plaintiffs and all similarly situated military servicemembers receive or accept one of the COVID-19 vaccines. Put simply, the EUA Statute provides that, **as a condition of receiving authorization for emergency use, ALL individuals to whom the EUA product may be administered are given the right to accept or refuse administration of the product—and this includes members of the military. And, of course, the EUA Statute's right to accept or refuse applies and cannot be waived respecting the civilian federal employee and contractor Plaintiffs.**

The only currently available COVID-19 vaccines (Janssen/Johnson & Johnson, Moderna, and Pfizer-BioNTech) are only authorized for emergency use under the EUA Statute and have no general FDA approval under the United States Code. (V. Compl. ¶189.) Specifically, although BioNTech's name-brand COMIRNATY, COVID-19 Vaccine, mRNA received FDA approval, **there is no COMIRNATY available in the United States, and it is not likely to be available for a long time**. (*Id.* ¶¶123.) Defendant Biden's administration admits this. (*Id.* ¶124 (**In fact, the FDA Pfizer Letter expressly states that COMIRNATY is not available in the United States: "Although COMIRNATY (COVID-19 Vaccine, mRNA) is approved to prevent COVID-19 in individuals 16 years of age and older, there is no sufficient approved vaccine for distribution to the population**." (emphasis added).) Moreover,

the continually extended EUA for the Pfizer-BioNTech COVID-19 Vaccine is evidence itself of the unavailability of COMIRNATY because "in order for the FDA to have even continued the EUA for the Pfizer-BioNTech COVID-19 Vaccine, **it was required to find that there were no alternatives available for the Pfizer-BioNTech Vaccine.** (*Id.* ¶126.)

## II.   PLAINTIFFS ARE LIKELY TO SUCEED ON THE MERITS OF THEIR RFRA AND FIRST AMENDMENT CLAIMS AGAINST THE FEDERAL COVID-19 VACCINE MANDATE.

### A.   The Federal COVID-19 Vaccine Mandate Imposes A Substantial Burden on Plaintiffs' Sincerely Held Religious Belief and Requires Strict Scrutiny Under RFRA.

The Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb to 2000bb-4, requires the federal government to provide exemptions to the vaccine mandate for those who hold sincerely held religious beliefs against the COVID-19 vaccines. Congress enacted RFRA "to provide **very broad** protection for religious liberty," going "far beyond what [the Supreme Court] has held is constitutionally required" under the First Amendment. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693, 706 (2014) (emphasis added). Indeed, the Supreme Court has called RFRA as a "super statute." *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1754 (2020). RFRA prohibits the government from placing a "substantial burden on a person's exercise of religion even if the burden results from a rule of general applicability." *Hobby Lobby*, 573 U.S. at 695. Under RFRA, when the government substantially burdens a person's exercise of religion, "that person is entitled to an exemption from the rule unless the Government 'demonstrates that application of the burden to the person—(1) is in

8

furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Id.* (quoting 42 U.S.C. § 2000bb-1(b)).

### 1. Plaintiffs Have Sincere Religious Objections to The Federal COVID-19 Vaccine Mandate.

Under RFRA, the definition of the "exercise of religion" includes "'any exercise of religion, **whether or not compelled by, or central to, a system of religious belief**.'" *Hobby Lobby*, 573 U.S. at 696 (emphasis added) (quoting 42 U.S.C. § 2000cc-5(7)(A)). And, under RFRA, the only relevant inquiry is whether Plaintiffs have articulated a sincerely held religious belief that compels them to abstain from a particular action— acceptance of a COVID-19 vaccine that violates their religious convictions. In determining whether a belief is sincerely held, the Supreme Court has made clear that the protections under the Free Exercise Clause, which are more limited than under RFRA, are "'not limited to beliefs which are shared by all of the members of a religious sect.'" *Holt v. Hobbs*, 574 U.S. 356, 362 (2015). Courts cannot sit in judgment of whether a person's "religious beliefs are mistaken or insubstantial." *Hobby Lobby*, 573 U.S. at 725. Nor are courts to determine "'the plausibility of a religious claim.'" *Id.* at 724 (quoting *Emp't Div., Dept. of Human Res. of Or. v. Smith*, 494 U.S. 872, 887 (1990)). Rather, the "narrow function" of a court (and Defendants) "'is to determine' whether the line drawn [between conduct that is and is not permitted under one's religion] reflects an **honest conviction**.'" *Id.* (emphasis added) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.,* 450 U.S. 707, 716 (1981)). "It is not within the judicial ken to

9

question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r,* 490 U.S. 680, 699 (1989).

Here, Plaintiffs have plainly articulated sincerely held religious beliefs against the Federal COVID-19 Vaccine Mandate. (V. Compl. ¶¶58-88.)

### 2. The Federal COVID-19 Vaccine Mandate Substantially Burdens Plaintiffs' Sincere Religious Beliefs.

To determine whether the Federal COVID-19 Vaccine Mandate imposes a substantial burden on Plaintiffs' sincere religious beliefs, "the question that RFRA presents [is] whether the [vaccine] mandate imposes a substantial burden on the ability of the objecting parties to conduct business in accordance with **their religious beliefs**." *Hobby Lobby*, 573 U.S. at 724. Notably, the substantial burden inquiry does not address the "very different question that the federal courts have no business addressing (whether the religious belief asserted in a RFRA case is reasonable)." *Id.* The Eleventh Circuit has held that a substantial burden under RFRA is caused whenever the government's action "places more than an inconvenience on religious exercise," and "significantly hampers one's religious practice." *Davila v. Gladden*, 777 F.3d 1198, 1205 (11th Cir. 2015). As in *Hobby Lobby*, Plaintiffs here "believe that [accepting] the [product] demanded by the [vaccine mandate] is connected to the destruction of an embryo in a way that is sufficient to make it immoral for them to [accept] the [vaccine]." 573 U.S. at 724. And, Plaintiffs' "**belief implicated a difficult and important question of religion and moral philosophy, namely the circumstances**

**under which it is wrong for a person to perform an act that is innocent in itself but that has the effect of [benefitting from] the immoral act by another**." *Id.* (emphasis added). Just as in *Hobby Lobby*, "[a]rrogating the authority to provide a binding national answer to this religious and philosophical question, [Defendants] in effect tell the plaintiffs that their beliefs are flawed. **For good reason, we have repeatedly refused to take such a step**." *Id.* (emphasis added).

Forcing Plaintiffs to choose between compliance with a mandate that violates their most sincere religious convictions and their sacrificial and honorable service to this Nation that enables them to feed their families is unconscionable and unquestionably a substantial burden. Defendants' position of "take a jab or take a hike" is the very definition of a substantial burden on Plaintiffs' sincerely held religious beliefs. It therefore requires the application of strict scrutiny, which the Mandate cannot survive.

**B.    The Federal COVID-19 Vaccine Mandate Is neither Neutral nor Generally Applicable Because It Provides for Nonreligious Exemptions While Prohibiting Religious Exemptions and Therefore Is Subject to Strict Scrutiny Under the First Amendment.**

"**[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise**." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (bold emphasis added). In fact, "the regulations cannot be viewed as neutral because they single out [religion] for especially harsh treatment." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020).

"**When a state so obviously targets religion for differential treatment, our job becomes much clearer**." *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717 (Gorsuch, J.) (emphasis added). Here, the Federal COVID-19 Vaccine Mandate has plainly treated religiously motivated exemption requests with much less favor than the medically motivated. (V. Compl. ¶204.)

In *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, Justice (then-Judge) Alito wrote unequivocally for the Third Circuit that "**[b]ecause the Department makes exemptions from its [no beards] policy for secular reasons and has not offered any substantial justification for refusing to provide similar treatment for officers who are required to wear beards for religious reasons, we conclude that the Department's policy violates the First Amendment**." 170 F.3d 359, 360 (3d Cir. 1999) (emphasis added). There, like Defendants here, the city argued that it was required to provide medical accommodations under federal law but not religious accommodations. *Id.* at 365. The court squarely rejected that rationale: "**we cannot accept the Department's position that its differential treatment of medical exemptions and religious exemptions is premised on a good-faith belief that the former may be required by law while the latter are not**." *Id.* (emphasis added).

And, by creating a system of individualized exemptions from the COVID-19 Vaccine Mandate while excluding (at least in practice) all religious accommodations and exemptions from the same mandate, Defendants violate the First Amendment:

> We also reject the argument that, because the medical exemption is not an "individualized exemption," the *Smith / Lukumi* rule does not apply.

> While the Supreme Court did speak in terms of "individualized exemptions" in *Smith* and *Lukumi,* **it is clear from those decisions that the Court's concern was the prospect of the government's deciding that secular motivations are more important than religious motivations. If anything, this concern is only further implicated when the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a categorical exemption for individuals with a secular objection but not for individuals with a religious objection**.

*Fraternal Order of Police*, 170 F.3d at 365 (emphasis added) (cleaned up). Indeed, discriminatory rejection of a religious exemption while maintaining a medical exemption violates the First Amendment. 170 F.3d at 365 ("**Therefore, we conclude that the Department's decision to provide medical exemptions while refusing religious exemptions is sufficiently suggestive of discriminatory intent so as to trigger heightened scrutiny under *Smith* and *Lukumi*.**" (emphasis added)).

And, the reason for this is simple. Defendants are not permitted to make value judgments about whether requests for religious exemption should be treated the same as nonreligious requests for exemption:

> **[T]he medical exemption raises concern because it indicates that the Department has made a value judgment that secular (i.e., medical) motivations for wearing a beard are important enough to overcome its general interest in uniformity but that religious motivations are not. As discussed above, when the government makes a value judgment in favor of secular motivations, but not religious motivations, the government's actions must survive heightened scrutiny.**

170 F.3d at 366 (emphasis added). Like the Third Circuit in *Fraternal Order of Police*, this Court should "**conclude that the Department's policy cannot survive any degree of heightened scrutiny and thus cannot be sustained.**" *Id.* at 367 (emphasis added).

Justice Alito's opinion for the court in *Fraternal Order of Police* hardly represents a novel proposition. As the Sixth Circuit explained, "**a double standard is not a neutral standard**." *Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012) (emphasis added). And, as many courts have recognized, allowing medical exemptions while prohibiting religious exemptions is unconstitutional. *See, e.g.*, *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165–66 (3d Cir. 2002) ("[I]n situations where government officials exercise discretion in applying a facially neutral law, so that whether they enforce the law depends on their evaluation of the reasons underlying a violator's conduct, they contravene the neutrality requirement if they exempt some secularly motivated conduct but not comparable religiously motivated conduct."); *Litzman v. N.Y. City Police Dep't*, No. 12 Civ. 4681(HB), 2013 WL 6049066, at *3 (S.D.N.Y. Nov. 15, 2013) (holding that a policy that permits medical exemptions but not religious exemptions is neither neutral nor generally applicable and must be subject to strict scrutiny); *Singh v. McHugh*, 185 F. Supp. 3d 201, 225 (D.D.C. 2016) ("In sum, it is difficult to see how accommodating plaintiff's religious exercise would do greater damage to the Army's compelling interests in uniformity, discipline, credibility, unit cohesion, and training than the tens of thousands of medical shaving profiles the Army has already granted."); *Cunningham v. City of Shreveport*, 407 F. Supp. 3d 595, 607 (W.D. La. 2019) (allowing medical exemptions while precluding religious exemptions removes law from neutrality and general applicability). Defendants' discriminatory approval of medical exemptions while excluding religious exemptions must be

subjected to, and cannot withstand, strict scrutiny. Put simply, "**restrictions inexplicably applied to one group and exempted from another do little to further [the government's] goals and do much to burden religious freedom**." *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 615 (6th Cir. 2020) (emphasis added).

Thus, Defendants' explicit provision for medical exemptions while simultaneously disapproving religious exemptions and accommodations plainly requires that the Federal COVID-19 Vaccine Mandate survive strict scrutiny. It fails that test.

## C.   The Federal COVID-19 Vaccine Mandate Cannot Withstand Strict Scrutiny.

Because the Federal COVID-19 Vaccine Mandate is neither neutral nor generally applicable, and because it constitutes a substantial burden on Plaintiffs' religious beliefs under RFRA, it must satisfy strict scrutiny, meaning the restrictions must be narrowly tailored to serve a compelling interest. *Catholic Diocese*, 141 S. Ct. at 67; *Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228, 1233 (9th Cir. 2020) ("disparate treatment of religion triggers strict scrutiny"). Indeed, "[t]hat standard is not watered down; it really means what it says." *Tandon*, 141 S. Ct. at 1298. This is "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 US. 507, 534 (1997), which is rarely passed. *See Burson v. Freeman*, 504 U.S. 191, 200 (1992) ("[W]e readily acknowledge that a law rarely survives such scrutiny . . . ."). This is not that rare case.

Whatever interest Defendants claim, they cannot show the Federal COVID-19 Vaccine Mandate is the least restrictive means of protecting that interest. And it is Defendants' burden to make the showing because "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006); *see also Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (same).

### 1. The Federal COVID-19 Vaccine Mandate Is Not Supported by a Compelling Interest.

Where, as here, First Amendment rights are at issue, "**the government must shoulder a correspondingly heavier burden and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights**." *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2472 (2018) (emphasis added). Here, because the Vaccine Mandate and its effective exclusion of religious exemptions implicate Plaintiffs' First Amendment rights, Defendants "must do more than simply posit the existence of the disease sought to be cured. **It must demonstrate that the recited harms are real, not merely conjectural**." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994); *see also Edenfield v. Fane*, 507 U.S. 761, 770 (1993). This is so because "[d]eference to [the government] cannot limit judicial inquiry when First Amendment rights are at stake." *Landmark Commc'ns, Inc. v. Maine*, 435 U.S. 829, 843 (1978).

Defendants' allowing unvaccinated servicemembers and civilian federal employees and contractors with medical exemptions to continue in their same

positions while claiming unvaccinated employees with religious exemptions would put the federal workforce at risk undermines any claim that Defendants' interest is compelling. **If any unvaccinated federal employees pose a risk to Defendants because they are unvaccinated, then Defendants cannot assert the risk is greater if the reason they are unvaccinated is based on sincere religious beliefs**. Indeed, the Declaration of Dr. Peter McCullough further undermines Defendants' asserted interest because the global data (now acknowledged by the CDC) shows that the COVID-19 vaccines are not preventing infections from the Delta variant. (V. Compl., Ex. H at ¶23.) Yet, Defendants have allowed thousands of federal employees at the Department of Veterans Affairs, the United States Post Office, and the Internal Revenue Service to be exempt from the Vaccine Mandate. (V. Compl. ¶204.) Put simply, Defendants' mandate "cannot be regarded as protecting an interest of the highest order . . . **when it leaves appreciable damage to that supposedly vital interest unprohibited**." *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002) (emphasis added) (cleaned up). Where, as here (V. Compl. ¶208), the government permits exceptions, the Supreme Court has recognized that such exceptions "can raise doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 448 (2015) (cleaned up). Indeed, "**[w]here a regulation already provides an exception from the law for a particular group, the government will have a higher burden in**

**showing that the law . . . furthers a compelling interest**." *McAllen Grave Brethren Church v. Salazar*, 764 F.3d 465, 472 (5th Cir. 2014) (emphasis added).

### 2. The Federal COVID-19 Vaccine Mandate Is Not the Least Restrictive Means.

"As the Government bears the burden of proof on the ultimate question of [the Mandate's] constitutionality, **[Plaintiffs] must be deemed likely to prevail unless the Government has shown** that [Plaintiffs'] proposed less restrictive alternatives are less effective than [the Mandate]." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (emphasis added). Under this standard, "[n]arrow tailoring requires the government to demonstrate that a policy is the 'least restrictive means' of achieving its objectives." *Agudath Israel*, 983 F.3d at 633 (quoting *Thomas*, 450 U.S. at 718).

To meet this burden, the government must show it "**seriously** undertook to address the problem with less intrusive tools readily available to it," meaning that it "**considered different methods that other jurisdictions have found effective**." *McCullen v. Coakley*, 134 S. Ct. 2518, 2539 (2014) (emphasis added); *see also Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 633 (2d Cir. 2020) (same). And the Governor must "show either that **substantially less-restrictive alternatives were tried and failed**, or that the **alternatives were closely examined and ruled out for good reason**," *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2016) (emphasis added), and that "imposing lesser burdens on religious liberty 'would fail to achieve the government's interest, not simply that the chosen route was easier.'" *Agudath Israel*, 983 F.3d at 633 (quoting *McCullen*, 134 S. Ct. at 495).

As the Supreme Court said in *Tandon*,

> narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest in reducing the spread of COVID. **Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied.** Otherwise, precautions that suffice for other activities suffice for religious exercise too.

141 S. Ct. at 1296–97 (emphasis added).

In *Dr. A*, the Northern District of New York held that failure to explain "why they chose to depart from similar healthcare vaccination mandate issued in other jurisdictions that include the kind of religious exemption that was originally included" demonstrates a lack of narrow tailoring. *Dr. A v. Hochul*, No. 1:21-cv-1009, 2021 WL 4734404, *8 (N.D.N.Y. Oct. 12, 2021).

In *Dahl v. Bd. of Trustees of W. Mich. Univ.*, as is true here, the Sixth Circuit found that the university failed strict scrutiny under the narrow tailoring prong:

> the University falters on the narrow tailoring prong. For one, public health measures are not narrowly tailored if they allow similar conduct that creates a more serious health risk. That is the case at the University, which allows non-athletes—the vast majority of its students—to remain unvaccinated. One need not be a public health expert to recognize that the likelihood that a student-athlete contracts COVID-19 from an unvaccinated non-athlete with whom she lives, studies, works, exercises, socializes, or dines may well meet or exceed that of the athlete contracting the virus from a plaintiff who obtains a religious exemption to participate in team activities. For another, narrow tailoring is unlikely if the University's conduct is "more severe" than that of other institutions. **To that point, several other universities grant exemptions from their COVID-19 mandates.**

No. 21-2945, 2021 WL 4618519, *5 (6th Cir. 2021) (emphasis added) (cleaned up).

Defendants plainly fail that test. As demonstrated in the Verified Complaint, The United States Military Health System allows three different types of permanent *medical* exemptions from compulsory immunizations: (1) "Determination by a medical provider that further vaccination will seriously endanger patient's health;" (2) "Medical, Reactive exemption: Previously severe reaction after specific vaccine;" and (3) "Medical, Immune exemption: Evidence of existing immunity (e.g., by serologic antibody test, documentation of previous infection or natural infection presumed)." (V. Compl. ¶96 (citing Military Health System, *Immunization Exemption Guidance*, Health.mil,                            https://www.health.mil/Military-Health-Topics/Health-Readiness/Immunization-Healthcare/Clinical-Consultation-Services/Exemption-Guidance (last visited October 14, 2021).)

Moreover, as also demonstrated in the Verified Complaint, Defendants imposed the Vaccine Mandate on Plaintiffs while wholly exempting Congress, the Internal Revenue Service (IRS) and the United States Postal Service. (V. Compl. ¶204.) Indeed, a certain husband and wife are both federal employees. (*Id.*) One works for the IRS while the other works for the Veterans Administration (VA). (*Id.*) Although husband and wife are working as federal employees, one is under the Vaccine Mandate, and one is not. (*Id.*) The VA has used a simple one-page form on which an employee merely checks a box to request a religious exemption. Other federal employees are subject to a more burdensome process or have received no guidance on submitting religious exemption requests. The civilian federal contractors face a

deadline of November 22, but none have received any guidance on whether or where they might file a request for religious exemption and accommodation.

Thus, Defendants have demonstrated that they are perfectly willing to provide nonreligious medical exemptions to military servicemembers and civilian federal employees and contractors, and have even demonstrated that religious exemptions are available in some—but not all—federal agencies and departments. Defendants' allowing some exemptions demonstrates mandatory, universal vaccination is not the least restrictive means of serving their interest, and Defendants' refusal to honor all religious exemption requests on the same terms as certain religious requests and nonreligious requests demonstrate the Vaccine Mandate is unlawful under the First Amendment and RFRA. Put simply, "**restrictions inexplicably applied to one group and exempted from another do little to further [the government's] goals and do much to burden religious freedom**." *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 615 (6th Cir. 2020) (emphasis added).

## III.   PLAINTIFFS ARE SUFFERING IRREPARABLE HARM.

As the Supreme Court has just recently affirmed, "**there can be no question that the challenged restrictions, if enforced, will cause irreparable harm**. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 62, 67 (2020) (emphasis added) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Here, because of Defendants' refusal to grant religious exemptions to the mandatory

COVID-19 Vaccine Policy, Plaintiffs face the unconscionable choice of violating their sincerely held religious beliefs or facing dishonorable discharge from their faithful service to the Nation or, in the case of the civilian federal employees and contractors, termination of employment or contracts. Indeed, where Defendants' mandate "conflicts with plaintiffs' and other individuals' federally protected right to seek a religious accommodation from their individual employers," injunctive relief is appropriate. *Dr. A*, 2021 WL 4734404, at *10. As the Sixth Circuit held, "[e]nforcement of the [government's COVID-19 vaccine mandate] would deprive plaintiffs of their First Amendment rights, an irreparable injury." *Dahl*, 2021 WL 4618519, at *6.

Moreover, the Federal COVID-19 Vaccine Mandate is placing our United States Military heroes at grave risk of serious injury. A recent study conducted by the Department of Defense found "**higher than expected rates of heart inflammation following receipt of COVID-19 vaccines**" among United States Armed Forces servicemembers. (V. Compl. ¶138 (citing Patricia Kime, *DoD Confirms: Rare Heart Inflammation Cases Linked to COVID-19 Vaccines* Military.com (June 30, 2021), https://www.military.com/daily-news/2021/06/30/dod-confirms-rare-heart-inflammation-cases-linked-covid-19-vaccines.html (emphasis added).)

> In fact, on or about June 29, 2021, Defendants knew that the mRNA vaccines would causing myocarditis/pericarditis (a potentially serious and deadly heart inflammation) in certain members of the military, particularly in males 30 and under. In a study conducted by United States Army, Navy, and Air Force physicians specifically found: A total of 23 male patients (22 currently serving in the military and 1 retiree; median

[range] age, 25 [20-51] years) **presented with acute onset of marked chest pain within 4 days after receipt of an mRNA COVID-19 vaccine. All military members were previously healthy with a high level of fitness**. Seven received the BNT162b2-mRNA vaccine and 16 received the mRNA-1273 vaccine. A total of 20 patients had symptom onset following the second dose of an appropriately spaced 2-dose series. All patients had significantly elevated cardiac troponin levels. Among 8 patients who underwent cardiac magnetic resonance imaging within the acute phase of illness, all had findings consistent with the clinical diagnosis of myocarditis. . . . **While the observed number of myocarditis cases was small, the number was higher than expected among male military members after a second vaccine dose**.

(V. Compl. ¶138 (emphasis added).) And, Defendants have admitted as much. Dr. Matthew Oster, a member of the President's COVID-19 Task Force confirmed the link between the COVID-19 vaccines and myocarditis, stating: "It does appear that mRNA vaccines may be a new trigger for myocarditis yet it does have some different characteristics." (V. Compl. ¶139.)

Moreover, the threat of dishonorable discharge for these military heroes who have risked everything to defend our freedoms is the worst imaginable betrayal. Some military chaplains fear the pressure, abuse, and threats will increase the rate of suicide.

For the civilian federal employees and contractors, the threat of ending their careers and businesses is overwhelming. Some civilian contractors perform such specialized services for the military and other federal departments that there is no other market for them to pursue. The pressure mounts with each passing day.

There is simply no question that Plaintiffs have suffered, are suffering, and will continue to suffer irreparable injury absent injunctive relief.

## IV.   PLAINTIFFS SATISFY THE REMAINING TRO AND PRELIMINARY INJUNCTION REQUIREMENTS.

When Defendants impose a mandatory vaccine upon Plaintiffs and purport to strip such individuals of their abilities to receive (or even request) exemption and accommodation for the exercise of their sincerely held religious beliefs, courts "have a duty to conduct a serious examination of the need for such a drastic measure." *Catholic Diocese*, 141 S. Ct. at 68. And, as here, "it has not been shown that granting the applications will harm the public." *Id.* Nor could Defendants make such a showing, as Plaintiffs are merely seeking to rise each morning, don the same uniforms and protective equipment that sufficed to make them heroes for nearly two years, and continue to provide military defense, national security, and critical federal services to a Nation in need. Plaintiffs' vaccination status was irrelevant for nearly two years, and it is irrelevant today.

Moreover, the State "is in no way harmed by the issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011). Conversely, for Plaintiffs, even minimal infringements upon First Amendment values constitute irreparable injury. *Catholic Diocese*, 141 S. Ct. at 67. As *Dr. A* recognized when it enjoined New York's similar scheme, "the public interest lies with enforcing the guarantees enshrined in the Constitution and federal anti-discrimination laws." *Dr. A*, 2021 WL 4734404, at *10. Indeed, "**[p]roper application of the Constitution . . . serves the public interest**

**[because] it is always in the public interest to prevent a violation of a party's constitutional rights**." *Dahl*, 2021 WL 4618519, at *6 (emphasis added).

As such, there is no comparison between the irreparable injury suffered by Plaintiffs and the non-existent interest Defendants have in enforcing unconstitutional mandates and depriving Plaintiffs of federally required protection of the exercise of their sincerely held religious beliefs. Absent a TRO and preliminary injunction, Plaintiffs "face an impossible choice: [accept a vaccine] in violation of their sincere religious beliefs, or risk [termination] for practicing those sincere religious beliefs." *On Fire Christian Ctr., Inc. v. Fischer*, 453 F. Supp. 3d 901, 914 (W.D. Ky. 2020). The TRO and preliminary injunction should issue immediately to protect Plaintiffs' exercise of their sincerely held religious beliefs and ensure that federal protections afforded to them are honored by the Nation they faithfully and heroically serve each day.

## CONCLUSION

For the foregoing reasons, the TRO and preliminary injunction should issue immediately.

Respectfully submitted,

/s/ Roger K. Gannam
Mathew D. Staver
Horatio G. Mihet
Roger K. Gannam
Daniel J. Schmid*
Richard L. Mast*
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Facsimile: (407) 875-0770
Email: court@lc.org
hmihet@lc.org
rgannam@lc.org
dschmid@lc.org*
rmast@lc.org*
*Applications for Admission pro hac vice pending

*Attorneys for Plaintiffs*