**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

| |
|---|
| **NAVY SEAL # 1,** *et al.*, |
| Plaintiffs, |
| v. |
| **JOSEPH R. BIDEN, JR.**, in his official capacity as President of the United States, *et al.*, |
| Defendants. |

Case No. 8:21-cv-02429-SDM-TGW

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs—eighteen service members, four civilian government contractors, and one employer of federal contractors, all proceeding anonymously—seek an order enjoining the COVID-19 vaccination requirements for the armed forces, the federal civilian workforce, and the federal contracting force—together totaling approximately 8 million people—worldwide.  They also seek an order requiring Defendants to grant all requests for religious exemptions to these requirements before those requests are even adjudicated.  Such an injunction would be extraordinary and unprecedented, particularly in the military context where the Supreme Court has consistently cautioned against judicial interference.

Multiple jurisdictional obstacles preclude a finding that Plaintiffs are likely to succeed on their claims.  Plaintiffs' claims against the military are not justiciable, and even if they were, they are not ripe because Plaintiffs have not shown that their exemption requests have been fully adjudicated.  Nor have they shown that any individual Plaintiff is affected by the civilian and contractor requirements.

1

On the merits, Plaintiffs' claims—which are based on false premises—fare no better.  Plaintiffs' Federal Food, Drug, and Cosmetics Act ("FDCA") challenges fail because only FDA-approved vaccines are required under the relevant policies. And each challenged vaccine requirement explicitly allows for a religious accommodation, satisfying the requirements of the Religious Freedom Restoration Act ("RFRA").

The remaining injunction factors also favor Defendants.  Plaintiffs proceeding anonymously cannot show that they face irreparable harm or that the balance of equities tilts in their favor.  Moreover, vaccine requirements have been commonplace in the military for generations and are critical to reducing infectious disease morbidity and mortality in the armed forces where service members must routinely operate in close quarters.  Outside of the military, slowing the spread of COVID-19 among millions of federal employees and contractors is squarely in the public interest.  Even if applied just to the named Plaintiffs, an injunction would degrade military readiness, undermine the efforts to combat the deadly coronavirus, and harm national security.

For these reasons, set forth further below, Plaintiffs' motion should be denied.

## BACKGROUND

### I.   The COVID-19 Pandemic

On January 31, 2020, the Secretary of Health and Human Services ("HHS") declared a public health emergency because of COVID-19, a respiratory disease caused by the novel coronavirus, SARS-CoV-2.   HHS, *Determination that a Public Health Emergency Exists* (Jan. 31, 2020), https://perma.cc/VZ5X-CT5R.  On March 13, 2020, the President declared the COVID-19 outbreak a national emergency.  85 Fed. Reg.

15,337 (Mar. 13, 2020).  In July 2021, the United States began to experience "a rapid and alarming rise in . . . COVID-19 cases and hospitalization rates," driven by an especially contagious strain.  *See* Centers for Disease Control and Prevention ("CDC"), *Delta Variant* (updated Aug. 26, 2021), https://perma.cc/4RW6-7SGB.[1]

## II.   Federal Regulation of and Guidance Concerning COVID-19 Vaccines

FDA has authority to review and approve "biological products," including vaccines.  *See* 42 U.S.C. § 262(a)(1), (i)(1).  In an emergency, FDA may issue an "emergency use authorization" ("EUA"), which authorizes the marketing of vaccines (and other FDA-regulated products) "intended for use" in responding to the emergency.  21 U.S.C. § 360bbb-3.  In March 2020, the Secretary of HHS determined that "circumstances exist justifying the authorization of emergency use of drugs and biological products during the COVID-19 pandemic."  EUA Declaration, 85 Fed. Reg. 18,250, 18,250–51 (Apr. 1, 2020).  Based on that determination, FDA issued EUAs for COVID-19 vaccines developed by Pfizer, Inc., and two other manufacturers.  *See* Ex. 13 (Decl. of Peter Marks, M.D., Ph.D) Exs. B, C.[2]  These EUAs were based on FDA's review of extensive safety and efficacy data, including from a Pfizer clinical trial with approximately 46,000 participants.  *Id.*[3]

---

[1] The Court may take judicial notice of factual information available on government websites.  *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007).

[2] The Marks Declaration was prepared and submitted in connection with separate litigation.  Here, it provides useful background information on the Pfizer EUA and approval.

[3] On October 29, 2021, FDA amended the EUA to include a modified formulation of the Pfizer vaccine for use in children 5 through 11 years old.  FDA also authorized a modified formulation for those 12 years of age and older.  FDA determined that the "12 and older" modified formulation may

On August 23, 2021, Pfizer's COVID-19 vaccine, under the name Comirnaty, obtained FDA approval for its intended use by people aged 16 years and older. *Id.* at Ex. A. This means that the vaccine, having successfully completed "the agency's standard process for reviewing the quality, safety and effectiveness of medical products," is no longer available only through an EUA.[4] FDA, *News Release – FDA Approves First COVID-19 Vaccine* (Aug. 23, 2021), https://perma.cc/C4DD-PWE5.

## III.    Department of Defense COVID-19 Vaccine Directive

The U.S. military instituted its first immunization program in 1777 when General Washington directed the inoculation of the Continental Army for smallpox. Lemon S, et al., Protecting Our Forces: Improving Vaccine Acquisition and Availability in the US Military, National Academies Press, 2002, available at https://perma.cc/E545-TQ9G last check Oct. 21, 2021. Deaths due to infectious diseases outnumbered those due to direct combat injuries until World War II, after vaccines became widespread. *Id.* More recently, disease accounted for nearly 70% of U.S. Army Hospital admissions during the Persian Gulf War. *Id.* Military-mandated vaccines have played a key role in reducing infectious disease morbidity and mortality among military personnel. *Id.*, Table 1-1 (highlighting the historical use of vaccines in armed conflict). For decades, the military has implemented a variety of enduring or situational inoculation measures to maintain the readiness of the force. *Id.*, *see also* Ex.

---

be used interchangeably with Comirnaty and the originally formulated EUA vaccine. Letter of Authorization at 3-4 (Oct. 29, 2021), available at https://www.fda.gov/media/150386/download.

[4] "Even after FDA approved Comirnaty, FDA authorized continued use of the Pfizer-BioNTech Covid-19 vaccine under an EUA for indications that included the approved use." Ex. 13 ¶ 8.

12 (Congressional Research Report Defense Health Primer: Military Vaccinations).

The Department of Defense's ("DoD") current immunization program is governed by DoD Instruction ("DoDI") 6205.02. Nine vaccines are required for all service members, including the annual influenza vaccine, while eight others are required when certain elevated risk factors are present. *See* Ex. 5 (Army Regulation ("AR") 40-562), Table D-1. In general, DoD aligns its immunization requirements and eligibility determinations for service members with recommendations from the CDC and its Advisory Committee on Immunization Practices. Ex. 4 (DoDI 6205.02) at 3. The Military Services have separately issued regulatory guidance for the administration of vaccines to service members including processes to seek medical and religious exemptions. *See* Ex. 5, Chapter 2.6. DoD's immunization program also applies to the Coast Guard. Ex. 23 (ALCOAST 305-21) ¶¶ 2, 3.

On August 9, 2021, Secretary of Defense Lloyd Austin, noting the impact COVID-19 rates have on military readiness, announced that he would add the COVID-19 vaccine to the list of vaccines required for all service members by the earlier of mid-September or upon approval by the FDA. *See* Ex. 1 (Mem. for all Defense Employees (Aug. 9, 2021)). On August 24, 2021, after FDA announced the approval of the Pfizer COVID-19 vaccine, Secretary Austin directed the Secretaries of the Military Departments to immediately vaccinate all members of the armed forces under DoD authority who were not already fully vaccinated. *See* Ex. 2 (Mem. For Senior Pentagon Leadership, Commanders of the Combatant Commands, Defense Agency

5

and DoD Field Activity Directors (Aug. 24, 2021)).  Only FDA-licensed vaccines are required, in accordance with FDA labeling and guidance.  *Id.*

Shortly thereafter, the Military Services issued guidance for implementing the Secretary's directive.  As with other vaccine requirements, Service implementation guidance establishes a process to seek medical and religious exemptions.  *See* Ex. 6 (Fragmentary Order ("FRAGO") 5 to Army Executive Order 225-21) ¶ 3.D.8.B.6; Ex. 8 (NAVADMIN 190/21) ¶ 3.d; Ex. 9 (MARADMIN 462/21) ¶¶ 3j, 3k; Ex. 11 (Air Force COVID-19 Vaccine Implementation Guidance (Sept. 3, 2021)) ¶ 4.5, 5.1; Ex. 23 (ALCOAST 352-21) ¶ 7.  Each Service has an appeal process available to service members seeking religious exemptions if their initial requests are denied.  Ex. 16 (Decl. of Michele Soltis) ¶ 14 (Army); Ex. 17 (Decl. of William Merz) ¶ 14 (Navy); Ex. 18 (Decl. of David Furness), ¶ 12.c (Marines); Ex. 21 (Decl. of Matthew Streett) ¶¶ 12–13 (Air Force); Ex. 24 (Decl. of Shannon Gilreath) ¶ 10 (Coast Guard).

A service member who refuses vaccination without an approved exemption may be subject to discipline or adverse administrative action.  *See, e.g.*, Ex. 6 ¶¶ 3.D.8.B.1.D, 3.D.8.B.1.E.  But adverse action will not be taken against a service member with a pending exemption request.  *Id.*  Only senior military officers—O6 and above—may initiate adverse action for refusing vaccination.  *See* Ex. 6 ¶ 3.D.8.B.1; Ex. 8 ¶ 3.e.(5); Ex. 9 ¶ 3.n; Ex. 10 (Secretary of Air Force Memorandum for Air Force Commanders (Sept. 3, 2021)); Ex. 23 (ALCOAST 305-21) ¶ 7.

## IV.  Vaccine Requirements for Federal Civilian Employees and Contractors

On September 9, 2021, President Biden issued two executive orders addressing

COVID-19 vaccination requirements for federal employees and contractors. *See* Exec. Order 14043, 86 Fed. Reg. 50,989 (Sept. 14, 2021) (civilian federal employees); Exec. Order 14042, 86 Fed. Reg. 50,985 (Sept. 14, 2021) (federal contractors).

Executive Order No. ("EO") 14043 instructs each federal agency to "implement, to the extent consistent with applicable law, a program to require COVID-19 vaccination for all of its federal employees, with exceptions only as required by law." 86 Fed. Reg. at 50,990. The directive is based on "public health guidance" providing that "the best way to slow the spread of COVID-19 and to prevent infection by the Delta variant or other variants is to be vaccinated." *Id*. The EO directs the Safer Federal Workforce Task Force ("Task Force") to issue guidance on implementation of the vaccination requirement. *Id*. at 50,990.

The Task Force guidance, like the EO, recognizes that federal employees may be eligible for exceptions to the vaccination requirement based on a medical condition or religious objection, *see* Task Force, Frequently Asked Questions ("FAQs"), Vaccinations, Limited Exceptions to Vaccination Requirement, https://perma.cc/5Q6U-4CGG ("Exception FAQs"), and directs each agency to "follow its ordinary process to review and consider what, if any, accommodation it must offer" under applicable federal law, *see* Task Force, FAQs, Vaccinations, Enforcement of Vaccination Requirement for Federal Employees, https://perma.cc/YH2Z-CMDJ ("Enforcement FAQs"); *see also* Template: Request for a Medical Exception to the COVID-19 Vaccination Requirement, https://perma.cc/LD7Q-D5JZ; Template: Request for a Religious Exception to the

COVID-19 Vaccination Requirement, https://perma.cc/6W38-ASNN.

Federal employees without an exception should be fully vaccinated "no later than November 22, 2021." Task Force, COVID-19 Workplace Safety: Agency Model Safety Principles at 1 (updated Sept. 13, 2021), https://perma.cc/2GME-U67N. An employee who requests an exception will not be subject to discipline while the request is under consideration. *See* Enforcement FAQs. If an exception request is denied, the employee should be given two weeks from the denial to receive the first (or only) dose of a COVID-19 vaccine before being subject to discipline. *See* Exception FAQs.

The President issued EO 14042 to "promote[] economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument." 86 Fed. Reg. at 50,985. The President determined that new safeguards would "decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government." *Id*. EO 14042 directs federal executive departments and agencies, "to the extent permitted by law," to include in qualifying contracts a clause requiring compliance with workplace safety guidance issued by the Task Force. *Id*.; *see also id*. at 50,986-50,987 (listing the categories of contracts to which the EO applies). The EO further directs the Federal Acquisition Regulatory Council to make corresponding amendments to the Federal Acquisition Regulation ("FAR") and in the interim to issue guidance to federal agencies on how to use existing authority to include the new

provision in covered contracts. *Id*. at 50,986.

The Task Force issued safety guidance on September 24, 2021. Task Force, COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors, https://perma.cc/6DRV-LV2Q ("Contractor Guidance"). That guidance, which the Office of Management and Budget approved pursuant to the Executive Order, https://perma.cc/CL8P-YV5B, requires that covered contractor and subcontractor employees should receive a COVID-19 vaccination, except insofar as any such employee is legally entitled to an accommodation. *Id*. Consistent with the EO, the guidance has a phase-in period for the new requirements, generally keyed to new contracts awarded on or after November 14, 2021, and any changes to existing contracts made on or after October 15, 2021. *See id*. As of December 8, 2021, covered contractor employees must be vaccinated on the first day of a new contract or when there is a renewal, extension, or exercised option on an existing one. *Id*.

The guidance recognizes that covered contractors "may be required to provide an accommodation to covered contractor employees . . . because of a disability (which would include medical conditions) or because of a sincerely held religious belief, practice, or observance." *Id*. In assessing these requests, covered contractors are directed to "review and consider what, if any, accommodation it must offer." *Id*. "The contractor is responsible for considering, and dispositioning, such requests for accommodation." Task Force, FAQs, Federal Contractor, Vaccination and Safety Protocols, https://perma.cc/6DRV-LV2Q ("Contractor FAQs").

## V.    Procedural History

On October 15, 2021, eighteen service members, four government contractors, and one employer of federal contractors, all proceeding anonymously, filed their complaint challenging what they refer to as the "Federal COVID-19 vaccine mandate," which includes the two EOs governing Federal employees and Federal contractors and the DoD directive governing members of the Armed Forces.  Compl. ¶¶ 50–57, ECF No. 1.  Plaintiffs purport to bring a class action of "military servicemembers, civilian federal employees, and civilian federal contractors who have been denied religious exemption from the Federal COVID-19 Vaccine Mandate."  *Id.* ¶ 157.  Plaintiffs allege that the "Federal COVID-19 vaccine mandate" violates: (1) the FDCA, 21 U.S.C. § 360bbb-3, *id.* ¶¶ 166–193; (2) the First Amendment, *id.* ¶¶ 194–211; and (3) RFRA, 42 U.S.C. § 2000bb-1, *id.* ¶¶ 212–234.  Plaintiffs seek a nationwide injunction against the President and the military that would prevent implementation of the EOs and the DoD directive, require the government to grant all religious exemption requests, and prevent the government from taking any adverse action or discipline against service members, Federal employees, and Federal contractors.[5]  *Id.* at 93–96; *see also* Pls.' Mot., ECF No. 2.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of

---

[5] Plaintiffs also sought a temporary restraining order for this same relief.  In its October 18 Order, the Court stated that the motion for a temporary restraining order remains under advisement and directed Plaintiffs' counsel to confer with defense counsel prior to seeking temporary injunctive relief for any individual Plaintiff.  Order, ECF No. 9.  As of November 3, 2021, Plaintiffs' counsel has not done so.

right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). To justify this "drastic remedy," the movants must "clearly establish[] the burden of persuasion" on the following four elements: (1) Plaintiffs have a substantial likelihood of success on the merits; (2) there is a substantial threat that Plaintiffs will suffer irreparable injury absent an injunction; (3) the threatened injury to Plaintiffs outweighs the damage an injunction would cause to Defendants; and (4) the injunction would not be adverse to the public interest. *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001); *Ga. Advoc. Off. v. Jackson*, 4 F.4th 1200, 1208 (11th Cir. 2021); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225 (11th Cir. 2005) (same standard for a temporary restraining order). "Failure to show any of the four factors is fatal[.]" *ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

Judicial review of claims involving the "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force," *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973), is highly constrained. *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981) (Because of the "healthy deference to legislative and executive judgments in the area of military affairs," courts employ a relaxed scrutiny in reviewing military policy.); *Aktepe v. United States,* 105 F.3d 1400, 1403 (11th Cir. 1997) ("[T]he political branches of government are accorded a particularly high degree of deference in the area of military affairs."); *see also Winck v. England*, 327 F.3d 1296, 1302–04 (11th Cir. 2003). Such deference extends to constitutional claims and military decisions about the health and welfare of the troops. *E.g.*, *Solorio v. United States*, 483 U.S. 435, 448 (1987); *Mazares v. Dep't of Navy*, 302 F.3d 1382, 1385 (Fed. Cir. 2002).

## ARGUMENT

### I.    Plaintiffs' Anonymous Allegations Cannot Satisfy the Burden for a Preliminary Injunction.

Plaintiffs' Complaint is purportedly "verified" with the electronic signatures of pseudonymous Plaintiffs, and Plaintiffs filed two declarations from anonymous members of the Navy and the Coast Guard. *See* Compl., Decls., ECF Nos. 1-9, 1-10. But Plaintiffs have not alleged that any individual plaintiff wishes to keep his or her identity private, nor has anyone filed a motion to proceed anonymously or sought a protective order to keep their names under seal. *See Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir. 1992) ("Lawsuits are public events," and courts permit plaintiffs to use fictitious names only in "exceptional cases."). Plaintiffs have not identified themselves to Defendants, which inhibits Defendants from "contradict[ing] or explain[ing] assertions" in the Complaint and declarations. *See KeyView Labs, Inc. v. Barger*, 2020 WL 8224618, at *6 (M.D. Fla. Dec. 22, 2020), report & recommendation adopted, 2021 WL 510295 (Feb. 11, 2021). Moreover, Plaintiffs' attempt to rely on statements by unnamed officers who purportedly told them their religious exemption requests were futile or that they would face certain consequences for seeking an exemption. *See, e.g.*, Compl. ¶¶ 29, 31, 33; Decl. of Navy Chaplain ¶ 6, ECF No. 1-9; Decl. of Coast Guard Lieutenant ¶¶ 5, 12, ECF No. 1-10. But such "anonymous double hearsay" is "problematic," "unreliable and of little persuasive value." *Advance Am. v. FDIC*, 2017 WL 2672741, at *8 (D.D.C. Feb. 23, 2017) (plaintiffs could not establish a likelihood of success on the merits by relying on such evidence). By relying on

anonymous claims, Plaintiffs cannot "meet [their] high burden to obtain a preliminary injunction," and the Court can deny Plaintiffs' motion on this basis alone.  *KeyView Labs*, 2020 WL 8224618 at *6, *13 (anonymous declaration insufficient to show a likelihood of success on the merits and irreparable harm, as the declaration "lack[s] probative value") (citations omitted).  And, as a practical matter, it is unclear how Defendants could comply with a preliminary injunction directing the Government not to take any adverse action against Plaintiffs without knowing their identities.

## II.   Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims.

The Court lacks jurisdiction over this case for several reasons, and the lack of jurisdiction forecloses any finding of substantial likelihood of success on the merits.  *See Digital Properties, Inc. v. City of Plantation*, 121 F.3d 586, 591 n.5 (11th Cir. 1997).  Plaintiffs' challenge to the DoD mandate is not justiciable and not ripe because the service member Plaintiffs have not shown that they have completed the process for requesting exemptions.  And the Court may not enter the requested relief against the President.  Even if Plaintiffs could establish jurisdiction, they cannot show they are likely to succeed on the merits of any of their claims, which rest on factual and legal misconceptions about the President's, DoD's and FDA's policies and decisions.

### A.  Plaintiffs' Challenge to the DoD Mandate Is Not Ripe.

Plaintiffs' as-applied challenges to military policies are not justiciable in the Eleventh Circuit.  *Speigner v. Alexander*, 248 F.3d 1292 (11th Cir. 2001) ("doctrine of

nonjusticiability extends to cases for injunctive relief"); *id.* at 1297–98.[6]  The Court thus lacks jurisdiction over any claim that the military incorrectly decided a religious exemption request.  To the extent Plaintiffs raise facial challenges, this Court lacks jurisdiction over the service member Plaintiffs' challenges because none of those Plaintiffs have exhausted available administrative remedies.  *See Elend v. Basham*, 471 F.3d 1199, 1205 (11th Cir. 2006) (noting that the ripeness doctrine is jurisdictional).  Here, military Plaintiffs' claims must be particularly scrutinized because the "military occup[ies] a unique position" with "specialized regulations and procedures, including military administrative procedures." *Frame v. United States*, 2010 WL 883804, at *2 (N.D. Fla. Mar. 5, 2010).  "Until Plaintiff has received a decision from the military, judicial review of his claim, even if available, has not arisen."  *Id.* at *2.

Military Plaintiffs with pending exemption requests do not have ripe claims because any harm from receiving the vaccine or facing adverse action rests "upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).  If the military grants the requests, the service members will be exempted from the COVID-19 vaccination requirement, and while they wait for a determination, they are not subject to any adverse employment or disciplinary action.  Ex. 17 ¶¶ 9 n.6, 14 n.12; Ex. 18 ¶¶

---

[6] Plaintiffs' reliance on *Doe v. Rumsfeld* is misplaced for many reasons, but especially because the *Doe* court explicitly declined to follow the Eleventh Circuit's holding in *Speigner* that as-applied challenges to military regulations are not justiciable.  297 F. Supp. 2d 119, 126–27 (D.D.C. 2003).  While a D.C. District Court is not bound by the Eleventh Circuit, *Speigner* binds this court.  *United States v. Sanders*, 731 F. Supp. 2d 1261, 1267 (M.D. Fla. 2010).  Plaintiffs' as-applied claims are not justiciable in this Circuit.

9 n.5, 12 n.8; Ex. 16 ¶¶ 8, 17, 24; Ex. 21 ¶ 13; Ex. 24 ¶¶ 10–11.

Even if their exemption requests are denied, and the military Plaintiffs refuse to comply and face adverse action—a series of hypothetical, future events—the military has administrative appeal procedures that offer many opportunities for them to present their arguments and for their Service to respond. *See* Ex. 22 (Decl. of Elizabeth Hernandez) ¶¶ 3–14 (Air Force); Ex. 16 ¶¶ 21–23 (Army); Ex. 17 ¶¶ 15–22 (Navy); Ex. 18 ¶¶ 14–21 (Marines); Ex. 24 ¶ 10 (Coast Guard).  Until those military procedures are exhausted, the military Plaintiffs cannot seek relief in this court.  *Winck*, 327 F.3d at 1302 ("[O]ur respect for coordinate judicial systems and their autonomy, has led us, time and again, to require exhaustion in military cases.") (cleaned up); *Hodges v. Callaway*, 499 F.2d 417, 420 (5th Cir. 1974) ("[T]his Court has firmly adhered to the rule that a plaintiff challenging an administrative military discharge will find the doors of the federal courthouse closed pending exhaustion of available administrative remedies."); *Doe v. Ball*, 725 F. Supp. 1210, 1211 (M.D. Fla. 1989), *aff'd sub nom. Doe v. Garrett*, 903 F.2d 1455 (11th Cir. 1990) (requiring exhaustion of administrative remedies before bringing facial challenge to Navy's HIV regulations); *Shaw v. Austin*, 2021 WL 1840397, at *10 (D.D.C. May 1, 2021); *Standage v. Braithwaite*, WL 1060342, at *31 (D. Md. Mar. 18, 2021).

The majority of military Plaintiffs allege that their religious exemption requests are still pending, and suit by those Plaintiffs is plainly premature.  And as to the two military Plaintiffs who claim their religious exemption requests have been denied, the Plaintiffs have done so anonymously, Compl. ¶¶ 17, 30, and so have not met their

burden to show their claims are ripe. *Palmer v. Braun*, 155 F. Supp. 2d 1327, 1331 (M.D. Fla. 2001) ("vague or conclusory affidavits are insufficient to satisfy the plaintiff's burden"). Anonymous Plaintiff Navy Seal 1, for example, claims that his request for a religious exemption was denied, and that "he was immediately removed from his position."[7]  Compl. ¶ 17. Given the processing times for religious requests, the available appeals, and the administrative processes for any adverse personnel action, it is unlikely that Navy Seal 1 has exhausted his military remedies and was discharged for failing to comply with the DoD mandate.[8]  Ex. 17 ¶¶ 14–22. But Defendants cannot provide a record for this Court to review and can only speculate as to the veracity of these claims until Plaintiffs provide their identities. In this posture, no extraordinary preliminary injunctive relief could possibly be entered as to this Plaintiff.

### B. The Court Lacks Jurisdiction to Enter Relief Against the President.

Plaintiffs' remaining challenges also suffer from numerous jurisdictional defects. First, whatever claims Plaintiffs may pursue against the government officials who implement the President's executive orders, *see generally Made in the USA Foundation v. United States*, 242 F.3d 1300, 1310–11 (11th Cir. 2001), neither declaratory nor injunctive relief is proper against the President in his official capacity—

---

[7] To the extent that this allegation relates to a change in military duty assignment pending processing of Plaintiffs' exemption request, it is non-justiciable. *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953).

[8] Lance Corporal 1 also claims his request was denied. Compl. ¶¶ 30, 41. Similarly, it is doubtful that he has exhausted available military remedies, but Defendants and this Court cannot know for sure, and Defendants cannot even produce a record for the Court's review without knowing his identity.

as another court recently recognized in rejecting a challenge to Executive Order No. 14043, *see* Order, *Foley v. Biden*, No. 4:21-cv-01098-O (N.D. Tex. Oct. 6, 2021), ECF No. 18.  "With regard to the President, courts do not have jurisdiction to enjoin him and have never submitted the President to declaratory relief."  *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citations omitted); *see Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) ("[I]n general this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties." (quotation marks omitted)).

### C. No Plaintiff Has Standing to Challenge the Executive Order Pertaining to Federal Employees.

Plaintiffs' challenge to the vaccination requirement for federal employees fails because none of the anonymous Plaintiffs alleges that he is a federal civilian employee.[9]  Because no Plaintiffs are subject to EO 14043 or face any threat of having it applied to them, they lack standing to pursue any claim against it.  *See, e.g.*, *California v. Texas*, 141 S. Ct. 2104, 2114–16 (2021) (no standing where "there is no possible Government action that is causally connected to the plaintiffs' injury").

### D. No Plaintiff May Challenge the Federal Contractor Mandate.

(i)     The Civilian Contractor Employees Have Not Pleaded Any Claim.

The Court lacks jurisdiction over the civilian contractor employees' challenge to Executive Order 14042 because none of those contractor employees has alleged that

---

[9] The complaint describes one anonymous plaintiff as a "Civilian Nuclear Tech."  He does not allege that he is a government employee, however, and expressly alleges that he "requested a religious exemption and accommodation from Defendants' COVID-19 vaccine mandate on *federal civilian contractors*."  Compl. ¶ 41 (emphasis added).

he is subject to the requirement of that order.  As explained above, the EO generally applies to "new contracts," EO 14042 § 6(a), as well as "extensions or renewals of existing contracts," *id.*; *see also* Safer Federal Workforce Task Force: COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors (Sept. 24, 2021), at 11-12.  For existing contracts, agencies are "strongly encouraged, to the extent permitted by law" ensure that safety protocols under those contracts are consistent with the requirements of the Executive Order, *see* EO 14042 § 6(c).  But the EO is not self-effectuating and requires implementing action from each federal agency. *See, e.g.*, U.S. Dep't of Defense, Principal Director for Defense Pricing and Contracting Memorandum, https://perma.cc/4ZQW-Z2N3; U.S Dep't of Energy, Planning for implementing EO 14042, https://perma.cc/D3WH-QZMV.  Once the agencies take action to incorporate a vaccination requirement into qualifying existing and future contracts, contractors can then choose how to respond.  So it is impossible to know whether any employees of a federal contractor are even subject to the requirements of EO 14042 without evidence of the nature of their employment or their employer's contractual relationship with the government.

None of the four contractor employees listed in the Complaint—identified as "Defense Department Contractor," "Federal Civilian Engineer Contractor," "Federal Nuclear Contractor Employer," and "Department of Energy Civilian Nuclear Tech"—provides these details.  *See* Compl. ¶¶ 37, 38, 40, 41.  They do not provide the names of their respective employers or the details of any contract those employers might have with the federal government.  And none of the federal civilian contractor

employee Plaintiffs alleges—let alone provides evidence sufficient to warrant extraordinary injunctive relief—that they perform work on a covered contract or in a covered workplace, or that their employer that has chosen to impose the requirements of the clause and require vaccination of its covered employees. Without any such allegations, Plaintiffs fail to state a plausible claim (much less show a likelihood of success on the merits). *See, e.g.*, *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013); *see also, e.g.*, *Palmer,* 155 F. Supp. 2d at 1331 ("[A] plaintiff seeking a preliminary injunction must offer proof beyond unverified allegations in the pleadings.").[10]

    (ii)    <u>The Federal Civilian Contractor Employer Fails To Plausibly Allege Jurisdiction in this Court.</u>

The claims of the Plaintiff identified as Federal Civilian Contractor Employer ("FCCE") are also jurisdictionally defective.   According to the Complaint, this individual owns an engineering company that develops military weapons, and "would like to request a religious exemption" from COVID-19 vaccination requirements applicable to government contractors and to provide similar accommodations to his employees.   Compl. ¶ 39.   FCCE's justification for bringing suit now is that he is

---

[10] Department of Energy Civilian Nuclear Tech alleges that he submitted a religious exemption request and that the request was denied.  Compl. ¶ 41.  But the bare factual allegation that his employer denied his religious accommodation request does not establish either (1) that any vaccination requirement imposed by his employer was due the requirements of EO 14042, rather than some independent reason; or (2) that his recourse would be with the federal government instead of the employer that denied the request.  *See* Contractor FAQs (the federal "contractor is responsible for considering, and dispositioning, such requests for accommodations").  To the contrary, if this individual's employer wrongfully denied him an exception to which he is entitled by law, it is apparent that this injury would flow from the employer, not the Federal government.  *See, e.g.*, *Walters v. Winter*, 2008 WL 11342801, at *1 (N.D. Fla. July 13, 2008) (as a general matter, a "federal agency is not subject to Title VII liability for discrimination against employees of an independent contractor").

worried that he "faces termination of his current government contracts and disqualification from future contracts." *Id.* ¶ 111.

At the outset, this claim is vague and speculative, so it fails for the same reasons as the claims of the contractor employees discussed above. FCCE provides no information about his contract with the federal government—its duration, whether or when it is coming due for renewal, whether there are options to extend it, whether any contracting agency has communicated with him about the COVID-19 workplace safety clause, etc.—and so it is impossible to assess whether any potential injury is certainly impending. There is no way to know whether FCCE has sued the right defendant, because he does not identify the agency with whom he has a contract. Nor does FCCE explain why he thinks the EO would preclude him from providing his employees accommodations to which they are legally entitled. *See supra* Section C.[11]

Regardless, FCCE's claim rests on speculation about two hypothetical injuries: either that (1) his existing contracts might be terminated, or (2) he might be rendered ineligible for future contracts. This Court lacks jurisdiction to resolve either claim.

First, to the extent that FCCE is concerned that the government will terminate existing contracts, his exclusive remedy would arise under the Contract Disputes Act ("CDA"), which "applies to any express or implied contract entered into by an executive agency for the procurement of property, services, construction, repair, or the

---

[11] Insofar as FCCE refers to an individual rather than his company, it is also unclear that the right plaintiff has joined this action. A "basic tenet of American corporate law is that the corporation and its shareholders are distinct entities." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003).

disposal of personal property." *Anselma Crossing, L.P. v. USPS*, 637 F.3d, 238, 240 (3d Cir. 2011). The CDA provides the exclusive scheme for resolution of any dispute concerning a government contract. Actions under the CDA can be brought only to the Court of Federal Claims or an agency board of contract appeals. *See* 28 U.S.C. § 1346(a)(2); 41 U.S.C. § 7105(e); *see also* 28 U.S.C. § 1491(a)(2); *Texas Health Choice, L.C. v. OPM*, 400 F.3d 895, 898-99 (Fed. Cir. 2005).

Second, to the extent FCCE is asserting a claim that he would not meet the solicitation requirements for any new contracts with a COVID clause, only the Court of Federal Claims would have jurisdiction over such an action. *See* 28 U.S.C. § 1491(b); *Distributed Sol'ns, Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008).[12] FCCE's claims—all of which fundamentally relate to a hypothetical future contractual dispute with the government—are not cognizable in district court.

### E. The Vaccine Mandates Do Not Violate Informed Consent Requirements.

On the merits, Plaintiffs' challenges to the DoD mandate and the Executive Orders all fail. The military Plaintiffs' statutory challenge to the COVID-19 inoculation requirement is premised on the mistaken belief that DoD is requiring service members to receive vaccines that have not been approved by FDA as safe and

---

[12] The text of 28 U.S.C. § 1491(b) suggests that district courts and the Court of Federal Claims have concurrent jurisdiction over these matters. But as the Federal Circuit recognized, the Alternative Dispute Resolution Act of 1996 included a "sunset provision, which terminated federal district court jurisdiction over bid protests on January 1, 2001." *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1080 (Fed. Cir. 2001). As a result, there is "no longer . . . APA-based jurisdiction for the district courts in government bid protest cases." *Novell, Inc. v. United States*, 109 F. Supp. 2d 22, 24 (D.D.C. 2000); *Aeolus Sys., LLC v. SBA*, 2007 WL 1525700, at *1 (M.D. Fla. May 22, 2007).

effective for their intended use against COVID-19.  That is not correct:  DoD's mandate can be satisfied by using an FDA-approved COVID-19 vaccine.  Plaintiffs' challenge to the contractor mandate also rests on factual and legal misconceptions.

(i)    The FDCA Does Not Include a Private Right of Action.

As an initial matter, the Court need not consider Plaintiffs' arguments because they have not identified a proper cause of action.  Plaintiffs purport to challenge the DoD vaccine mandate and the EOs under the FDCA itself, *see* Compl. Count 1, but the FDCA contains neither a waiver of sovereign immunity nor a cause of action for these Plaintiffs.  *See, e.g.*, *Doe v. Franklin Square Union Free Sch. Dist.*, 2021 WL 4957893, at *20 (E.D.N.Y. Oct. 26, 2021); *Bridges v. Houston Methodist Hosp.*, 2021 WL 2399994, at *2 (S.D. Tex. June 12, 2021), appeal docketed, No. 21-20311 (5th Cir. June 14, 2021).  To the contrary, the FDCA retains exclusive enforcement authority to the United States, with one limited exception for enforcement by State governments.  21 U.S.C. § 337(a); *see Guilfoyle v. Beutner*, 2021 WL 4594780, at *26-27 (C.D. Cal. Sept. 14, 2021) (dismissing a claim under 21 U.S.C. § 360bbb-3 on this basis).  Plaintiffs assert no other claim and thus cannot show a likelihood of success.

(ii)    DoD Has Not Violated Informed Consent Requirements.

Congress has given the Secretary of Defense and the Services wide latitude to establish a vaccination program for the welfare of the troops.  *See* 10 U.S.C. §§ 113(b), 7013 (b)(9), 8013 (b)(9), 9013 (b)(9); Ex. 4.  To be sure, 10 U.S.C. § 1107a places conditions on that authority—in particular, by requiring a presidential waiver of a notification requirement—if the military seeks to require service members to take

products authorized only for "emergency use."  That condition, however, does not preclude any such vaccination requirement and, in any event, DoD's directive does not implicate that provision because, as the Secretary's memorandum makes clear, "Mandatory vaccination against COVID-19 will only use COVID-19 vaccines that receive full licensure . . . in accordance with FDA-approved labeling and guidance." Ex. 2. Implementation guidance from the Services contain similar provisions. *See* Ex. 6 ¶ 3.D.8.A; Ex. 7 (ALNAV 062/21) ¶ 3; Ex. 8 ¶ 2; Ex. 9 ¶ 3.b; Ex. 11 ¶ 3.1.1.[13]  The licensed vaccine is in fact available to these Plaintiffs.  On August 23, 2021, FDA fully licensed Pfizer's vaccine as safe and effective for use to prevent COVID-19 in individuals 16 years of age and older.  Ex. 13 ¶ 6.  According to FDA, vaccines produced at facilities listed in the Biologics License Application (BLA) that Pfizer submitted to obtain full approval [14]  In addition, FDA determined that "[t]he licensed vaccine has the same formulation as the EUA-authorized vaccine and the products

---

[13] Plaintiffs mistakenly cite 10 U.S.C. § 1107, which concerns "investigational new drug[s]" and "drug[s] unapproved for [their] applied use"; service members may not be required to take those drugs unless certain procedures are followed.  10 U.S.C. § 1107(a), (g); *see also* 21 U.S.C. § 355(i) (defining investigational new drugs as those used in clinical trials); *Gallagher v. FDA*, 2019 WL 6312008, at *2 (D.D.C. Nov. 25, 2019); Ex. 13 ¶ 7 n.2.  DoD's directive does not implicate this provision, as none of the COVID-19 vaccines provided to service members are provided as investigational new drugs in the context of clinical trials or drugs unapproved for their applied use.  *See* Ex. 13 ¶¶ 7, 7 n.2; *see also Doe v. Rumsfeld*, 297 F. Supp. 2d 119, 132 (D.D.C. 2003) ("Title 10 U.S.C. § 1107 and the attendant DoD regulation apply only if the FDA determines that [the vaccine] is an investigational drug or a drug unapproved for its present purpose.").

[14] FDA has recognized that these vaccines are BLA-compliant, even if they bear the EUA label on the vial.  Ex. 13 ¶ 13 ("[The] conditions in the Letter of Authorization for the EUA—including the condition requiring vaccination providers to provide recipients with the Fact Sheet for Recipients, which advises recipients that 'under the EUA, it is your choice to receive or not receive the vaccine'— do not apply when these lots or other BLA-compliant lots are used for the approved indication").  "As of October 16, 2021, the DoD has in its possession hundreds of thousands of BLA-compliant vaccine doses that are EUA-labeled, and is using them."  Ex. 14 ¶ 18.

can be used interchangeably to provide the vaccination series without presenting any safety or effectiveness concerns."  Ex. 13 ¶ 9.  DoD relied on this determination to instruct its health care providers.  Ex. 3 (Acting Assistant Secretary of Defense Memorandum).  In other words, numerous Pfizer-produced vaccine doses have received full FDA licensing.

Plaintiffs' contrary arguments rest on the incorrect claim that there are no FDA-approved vaccine doses "available in the United States."  Pls.' Mot. 7.  But in fact, DoD has a supply of the BLA-compliant vaccine, which Plaintiffs could use to become vaccinated.  Ex. 14 (Decl. of Colonel Tonya Rans) ¶ 18.[15]  Because the DoD directive can be satisfied by use of a vaccine that FDA has licensed as safe and effective for its intended use, Plaintiffs do not have a likelihood of success on the merits of their informed consent claim.  *See Norris v. Stanley*, 2021 WL 3891615, at *2 (W.D. Mich. Aug. 31, 2021) (no likelihood of success on EUA claim because it "would be moot" if offered the FDA-approved vaccine); *Valdez v. Grisham*, WL 4145746, at *4 (D.N.M. Sept. 13, 2021) (rejecting claim that state vaccine mandate violated the EUA statute because "the FDA has now given its full approval – not just emergency use authorization – to the Pfizer vaccine").

---

[15] Plaintiffs argue that FDA must have found that there was no Comirnaty available to continue the EUA for the Pfizer vaccine.  *See* Pls.' Mot. 7-8.  That is inaccurate.  First, even though FDA approved Comirnaty, the agency found that there remains "no adequate, approved, and available alternative" to the EUA vaccines (including Pfizer's) because (1) there is not sufficient approved vaccine available for the adult population; and (2) there are not products that are approved for other uses.  Ex. 13 ¶¶ 7–9 & Exs. B, C.  Second, even if the Comirnaty vaccine were an "adequate, approved, and available alternative" to the EUA vaccines, nothing in 21 U.S.C. § 360bbb-3 *requires* FDA to revoke existing EUAs.  *See* 21 U.S.C. § 360bbb-3(g)(2).  The statute contemplates that an EUA could continue after an approval of an equivalent product, even if the equivalent product is "available."

(iii)    <u>The Civilian Contractor Mandate Does Not Violate the EUA Statute</u>.

To the extent Plaintiffs argue that EO 14042 violates the EUA statute, that claim also fails.  First, any claim related to EUA-only vaccines is moot because—as just explained—FDA approved the Pfizer vaccine for use in adults.  *See* Marks Decl. ¶ 13. Affected contractors may use any of the COVID vaccines, including the FDA-approved vaccine.  *See supra* pp. 8-10, 23-24.  Second, Plaintiffs' reading of the EUA statute is incorrect because the law does not prohibit public or private entities from requiring vaccination as a condition of a contract.    By its terms, section 564(e)(1)(A)(ii)(III) directs only that potential vaccine recipients be "informed" of certain information, including "the option to accept or refuse administration of the product." 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III).  FDA implemented this provision by requiring that potential vaccine recipients receive a Fact Sheet informing them that they have a "choice to receive or not receive" the vaccine. *See, e.g.*, FDA, Moderna Fact Sheet for Recipients and Caregivers at 4 (revised Oct. 20, 2021), https://www.fda.gov/media/144638/download.  That is all that the EUA statute requires.  As numerous courts have held, this informed-consent requirement does not prevent any entity (including the government) from imposing workplace discipline, up to and including termination, for those who choose not to receive an EUA vaccine.  *See Valdez v. Grisham*, 2021 WL 4145746, at *4 (D.N.M. Sept. 13, 2021); *Norris v. Stanley*, 2021 WL 4738827, at *3 (W.D. Mich. Oct. 8, 2021); *Johnson v. Brown*, 2021 WL 4846060, at *18 (D. Or. Oct. 18, 2021); *Pelekai v. Hawaii*, 2021 WL 4944804, at *6 n.9 (D. Haw. Oct. 22, 2021); *Bridges v. Houston Methodist Hosp.*, 2021 WL 2399994, at *1–

25

2; *see generally* U.S. Dep't of Justice, Office of Legal Counsel, Whether Section 564 of the FDCA Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization, 45 Op. O.L.C. __, 2021 WL 3418599 (July 6, 2021).

  (iv) <u>The Court Lacks Jurisdiction Over a Challenge to the Emergency Declaration or EUA</u>.

    To the extent that Plaintiffs seek to challenge FDA's EUA itself, that challenge is fundamentally misconceived.  *See* Pls.' Mot. 3–7.  As an initial matter, Plaintiffs have not sued the FDA, and so there is no proper defendant in this action for such a claim.  And even if Plaintiffs had sued FDA, they could not challenge the EUA or the underlying emergency declaration because the EUA statute explicitly states that FDA's "[a]ctions under the authority of this section . . . are committed to agency discretion." 21 U.S.C. § 360bbb-3(i); *Ass'n of Am. Physicians & Surgeons v. FDA*, 2020 WL 5745974, at *3 (6th Cir. Sept. 24, 2020) (holding that EUAs are unreviewable); *see also* 5 U.S.C. § 701(a)(2) (agency action is unreviewable under the APA when it "is committed to agency discretion by law").  Even if review of the issuance of the EUAs were relevant to Plaintiffs' claims, the Court would lack jurisdiction.[16]

---

[16] In any event, both the Emergency Declaration and the EUAs are clearly proper under the statutory standards.  The February and March 2020 public health emergency determinations satisfy the standards for an emergency declaration under 21 U.S. Code § 360bbb–3(b)(1)(C) because they find a "public health emergency" that affects "national security or the health and security of United States citizens living abroad" that involves a "biological" agent – the novel coronavirus – and a disease caused by the coronavirus – COVID-19.  *See* Determination of Public Health Emergency, 85 Fed. Reg. 7316, 7317 (Feb. 7, 2020); Emergency Use Authorization Declaration, 85 Fed. Reg. 18,250, 18,250–51 (Apr. 1, 2020).  FDA has authorized three COVID-19 vaccines pursuant to EUAs, based on FDA's review of extensive safety and efficacy data.  *See, e.g.,* Marks Decl. Exs. B, C; *see also* https://perma.cc/5FWS-RJ5L.

### F.  Plaintiffs' First Amendment and RFRA Claims Are Unlikely To Succeed.

Plaintiffs' facial challenges to the DoD mandate under the First Amendment and RFRA are premised on incorrect facts and are otherwise meritless.[17]  Plaintiffs claim that the military is "Prohibiting Religious Exemptions."  Pls.' Mot. 11; *see also id.* at 14 (claiming DoD is "excluding religious exemptions" and arguing "prohibiting religious exemptions is unconstitutional"); Compl. ¶ 198.  That is not correct.  The military has a process to consider religious exemptions and is doing so.  *See* Ex. 21, ¶¶ 3–13; Ex. 16, ¶¶ 14–20; Ex. 17 ¶ 14; Ex. 24, ¶ 10.  Plaintiffs themselves have sought religious exemptions.  Compl. ¶¶ 98–108.  And nowhere in Plaintiffs' complaint or motion do they raise a facial challenge to any part of the existing military policies for considering religious accommodations.

To the extent Plaintiffs instead raise as-applied challenges by claiming that the military has wrongfully denied a religious exemption request (or might deny one in the future), that type of individualized, as-applied challenge to military regulations is not justiciable in the Eleventh Circuit.  *Speigner*, 248 F.3d at 1297–98.  And even if it were, anonymous declarations are not enough to show ripeness or a likelihood of success on the merits.  Anonymous claims are not enough to show that the mandate substantially burdens the exercise of Plaintiff's religion.  For one thing, "[t]o qualify

---

[17] The non-military Plaintiffs cannot challenge the government employee mandate under the First Amendment or RFRA.  *See supra*, Section II.C.  No Plaintiff is a federal employee.  *See id.*  And the anonymous government contractors and contractor employer cannot bring their claims against the Government in this forum.  *See supra*, Section I.

for RFRA's protection, an asserted belief must be 'sincere'; a [plaintiff's] pretextual assertion of a religious belief in order to obtain an exemption . . . would fail." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 717, n.28 (2014).  Until the Defendants and this Court can check their claims, "[n]either the government nor the court has to accept the [plaintiffs'] mere say-so." *United States v. Bauer*, 84 F.3d 1549, 1559 (9th Cir. 1996).  Also, because Plaintiffs have not provided their identities, Defendants do not know the status of each Plaintiff's request or whether they have exhausted available appeals.

Even if their claims were justiciable and the mandate did substantially burden a military Plaintiff's exercise of religion, their as-applied RFRA claim would likely still fail because the Government has a compelling interest and mandatory vaccinations are, at least in some circumstances, the least restrictive means to further that interest. This inquiry focuses on the "application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Hobby Lobby*, 573 U.S. at 726.  But neither Defendants nor the Court know who the Plaintiffs are or the details of their roles, making it impossible to conduct the required analysis—and thus impossible for Plaintiffs to meet their burden for an injunction.

Plaintiffs argue that the military does not have a compelling interest in mandating the COVID-19 vaccine mandate.  Mot. at 16.  But that position is untenable.  The Supreme Court has held that "[s]temming the spread of COVID–19 is unquestionably a compelling interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).  And "when evaluating whether military needs justify a particular restriction on religiously motivated conduct, courts must give great deference to the

professional judgment of military authorities concerning the relative importance of a particular military interest." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986).  In *Goldman*, for example, the Supreme Court held that the military can prohibit religious attire in a hospital based only on an interest in uniformity, *id.*, so here it can certainly require vaccines to promote military readiness and preventing disease.

Similarly, without any verifiable facts to back up their unripe, non-justiciable claims, Plaintiffs are left to argue in the abstract that there can be no circumstances where requiring vaccinations could be the least restrictive means of serving a compelling interest.  Here again, numerous courts have found, in non-military settings, that preventing infectious diseases through vaccines was the least restrictive means.  *See F.F. on behalf of Y.F. v. State*, 65 Misc. 3d 616, 633, (N.Y. Sup. Ct. 2019); *Brown v. Smith*, 24 Cal. App. 5th 1135, 1145; *Love v. State Dep't of Educ.*, 29 Cal. App. 5th 980, 996 (2018); *see also D.J. v. Mercer Cty. Bd. of Educ.*, No. 13-0237, 2013 WL 6152363, at *4 (W. Va. Nov. 22, 2013).  This reasoning has even greater force in the military setting, where health is paramount to military readiness.

In all events, any judicial review should wait until after the military decides whether to grant an individual Plaintiff's request for accommodation and review any remaining RFRA claim after available appeals have been exhausted.  In deciding a service member's request for an accommodation in the first instances, the military analyzes each request based on facts unique to the service member, their military duties, the risk they might pose to the military's mission, and the potential impacts on military readiness.  *See e.g.*, AFPD 52-2, §§ 1.2, 1.3, and 1.4; MILPERSMAN 1730-

020.   If the service member is dissatisfied with the military's decision, that service member may seek judicial review only after exhausting military appeals, allowing the military to make its decision and fully articulate its interests.  *Winck*, 327 F.3d at 1302–04 ("[W]e reaffirm the unflagging strength of the principles of comity and judicial noninterference with, and respect for, military operations.").

The military is best situated to assess whether a specific unvaccinated individual puts the military mission at risk, or whether feasible, less restrictive alternatives are available.  *See Orloff*, 345 U.S. at 94 ("Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in in judicial matters.").  After all, "the Supreme Court has indicated" that "military decisions and assessments of morale, discipline, and unit cohesion . . . are well beyond the competence of judges."  *Bryant v. Gates*, 532 F.3d 888, 899 (D.C. Cir. 2008) (Kavanaugh, J., concurring).

## III.    Plaintiffs Do Not Face Irreparable Harm.

"[E]ven if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper."  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citations omitted).   Irreparable harm "must be neither remote nor speculative, but actual and imminent."  *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990).  "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough."  *Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).

"The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson*, 415 U.S. at 90.  "In cases involving claims related to military personnel decisions, moreover, courts have held that the showing of irreparable harm must be especially strong before an injunction is warranted, given the national security interests weighing against judicial intervention in military affairs." *Shaw*, 2021 WL 1840397, at *9.  Plaintiffs make no such showing.

As an initial matter, because no Plaintiff is subject to the Executive Order governing Federal employees, no Plaintiff can show any harm from that order.

As to the remaining policies, Plaintiffs contend that they are irreparably harmed because they face the choice between taking the vaccine or facing dishonorable discharge from the military or termination of their employment or contracts.  Pls.' Mot. 22.  But at least three other courts have found that facing a choice among taking a vaccine, obtaining an exemption, and facing adverse employment consequences is not irreparable harm.  *See Beckerich v. St. Elizabeth Med. Ctr.*, 2021 WL 4398027, at *7 (E.D. Ky. Sept. 24, 2021); *Harsman v. Cincinnati Children's Hosp. Med. Ctr.*, 2021 WL 4504245, at *4 (S.D. Ohio Sept. 30, 2021); *Bauer v. Summey*, 2021 WL 4900922, at *18 (D.S.C. Oct. 21, 2021).  As those courts and numerous others have recognized, job loss is not irreparable because a discharged employee may, if successful on his claims, obtain reinstatement and back pay.  *See Sampson*, 415 U.S. at 92 n.68.  Courts have thus specifically applied *Sampson* to find that loss of employment due to refusal to comply with a vaccine mandate does not constitute irreparable harm.  *See, e.g.*, *Wise v.*

*Inslee*, 2021 WL 4951571, at *6 (E.D. Wash. Oct. 25, 2021); *Mass. Correction Officers Federated Union v. Baker*, 2021 WL 4822154, at *7 (D. Mass. Oct. 15, 2021); *Johnson v. Brown*, 2021 WL 4846060, at *23–25 (D. Or. Oct. 18, 2021). Courts have made such a finding even when, as here, *see* Pls.' Mot. 22–23, the plaintiff claims that the vaccine policy violates their constitutional rights, *see, e.g.*, *Norris*, 2021 WL 3891615, at *2–3. Nor is a loss of a contract an irreparable harm. *See Ne. Fla.*, 896 F.2d at 1286. And although Plaintiffs allege that "[s]ome civilian contractors perform such specialized services for the military and other federal departments that there is no other market for them to pursue," Pls.' Mot. 23, they do not support that statement with a citation. In any event, "difficulties in immediately obtaining other employment . . . will not support a finding of irreparable injury, however severely they may affect a particular individual." *Sampson*, 415 U.S. at 92 n.68; *Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 846 (7th Cir. 2005) ("[I]nability to find another job. . . is not irreparable harm.").

The service member Plaintiffs also argue they will suffer from irreparable harm from the "threat of dishonorable discharge." Pls.' Mot. 23. But, as Plaintiffs themselves acknowledge by the use of the word "threat," *id.*, it is entirely speculative that they will be discharged from the military, let alone dishonorably. If a service member refuses to take the vaccine, and they do not have a valid exemption, they may be subject to a "range of administrative and disciplinary actions."[18] Ex. 7 ¶ 5. A

---

[18] Plaintiffs do not appear to argue that any other administrative or disciplinary action taken against service members, including separation from service, is irreparable. Nor could they, as courts have consistently rejected such arguments. *See, e.g.*, *McCurdy v. Zuckert*, 359 F.2d 491 (5th Cir. 1966);

service member would only be dishonorably discharged as a result of being found guilty at a court-martial, which can take months.[19]  *See* Ex. 17 ¶ 20.  And service members can argue that the DoD directive is not a lawful order as part of their defense in a court martial proceeding.  *See United States v. Sterling*, 75 M.J. 407, 415-16 (C.A.A.F. 2016) (ability to raise "a prima facie RFRA defense").  Thus, a dishonorable discharge cannot be considered certain or imminent.  *See Shaw*, 2021 WL 1840397, at *10 (speculative that sailor faces harm where administrative procedures incomplete).

The service members and Defense Department Contractor who have pending exemption requests likewise cannot establish irreparable harm, as they suffer no harm while their requests are pending, *see, e.g.*, Ex. 16 ¶¶ 8, 17, 24, and if their requests are granted they will not face any adverse consequences from the vaccine mandate, *see Pelekai*, 2021 WL 4944804, at *1 (finding no injury where plaintiffs' religious exemption requests were granted); *Williams v. Brown*, 2021 WL 4894264 *10 (D. Or. Oct. 19, 2021) (finding no irreparable harm when exemption requests were pending); *Burcham v. City of Los Angeles*, 2021 WL 5049099, at *4 (C.D. Cal. Oct. 27, 2021) (same).[20]  And two Plaintiffs, Coast Guard Lieutenant and Technical Sergeant,

---

*Hartikka v. United States*, 754 F.2d 1516, 1518 (9th Cir. 1985); *Chilcott v. Orr*, 747 F.2d 29, 34 (1st Cir. 1984); *Guerra v. Scruggs*, 942 F.2d 270, 274 (4th Cir. 1991).

[19] Simply being subject to court martial is not irreparable injury.  *See Schlesinger v. Councilman*, 420 U.S. 738, 755 (1975); *Hall v. McHugh*, 2010 WL 596499, at *2 n.4 (S.D. Ga. Feb. 17, 2010).

[20] For two service member plaintiffs, Marine Corps Captain and Air Force Major, and two contractors, Federal Civilian Engineer Contractor, and Federal Nuclear Contractor Employee, it is unclear whether they have submitted religious exemption requests even though they claim to have religious objections to the vaccine.  Compl. ¶¶ 28, 32, 38, 40.  Plaintiff Navy Senior Chief Petty Officer also claims that he qualifies for a medical exemption but has not submitted an exemption request.  *Id.* ¶ 20.

currently have temporary medical exemptions, so they cannot show any imminent harm from the DoD directive.  *See* Compl. ¶¶ 34, 36.

Plaintiffs also argue that they face imminent, irreparable harm because the vaccines are not safe.  Pls.' Mot. 22–23.  This allegation of irreparable harm assumes that they would be forced to take the vaccine, and thereby suffer any irreparable ill effects from the vaccine.  But that is not the case.  *See* Ex. 6 ¶ 3.D.8.B.4 ("There will be no involuntary (forcible) immunizations."); Ex. 16 ¶¶ 6, 8, 17; Ex. 17 ¶ 3 n.2; Ex. 18 ¶ 4 n.2.  The vaccine (and any alleged attendant harm from it) would not be forced on them, and any adverse employment consequences for declining to be vaccinated (if imposed) are not irreparable nor warrant preliminary injunctive relief.

Moreover, their contention that the vaccine itself would, if taken, cause irreparable harm is not supported by credible evidence.  As another court stated, "[t]heir contention that they will be uniquely harmed from vaccines that, according to the CDC, more than 200 million people had received by the time Plaintiffs' Motion was filed, is specious."  Order at 5, *Robert v. Austin*, No. 1:21-cv-02228 (D. Colo. Sept. 1, 2021), ECF No. 12; *Wise*, 2021 WL 4951571, at *3 (finding "overwhelming evidence that the vaccines are safe and effective").  Indeed, two courts have rejected the opinions by Plaintiffs' purported expert, Dr. Peter McCullough, on this issue.  *See*

---

Those Plaintiffs cannot establish irreparable harm because they could seek an exemption and it might be granted.  *See Contech Casting, LLC v. ZF Steering Sys., LLC*, 931 F. Supp. 2d 809, 818 (E.D. Mich. 2013) ("[I]rreparable harm will not be found where alternatives already available to the plaintiff make an injunction unnecessary.").

*Harris v. Univ. of Mass., Lowell*, 2021 WL 3848012, at *3 n.5 (D. Mass. Aug. 27, 2021);

*Klaassen v. Trs. of Ind. Univ.*, 2021 WL 3073926, at *28–32 (N.D. Ind. July 18, 2021).

Although Plaintiffs point to a DoD study finding that 23 patients had myocarditis[21]

following an mRNA COVID-19 vaccination, *see* Pls.' Mot. 22–23, they ignore that the

study also stated that COVID-19 infection itself carries a "risk of cardiac injury" and

that the authors concluded that "[c]oncerns about rare adverse events following

immunization should not diminish overall confidence in the value of vaccination."

Montgomery, Jay, et al., *Myocarditis Following Immunization With mRNA COVID-19*

*Vaccines in Members of the US Military*, JAMA Cardiology 2021;6(10):1202–06 (June 29,

2021).   The FDA specifically considered the risk of myocarditis, finding that the

predicted benefits of avoiding impacts associated with COVID-19 clearly outweighed

the predicted risks associated with myocarditis.  *See* Ex. 13, Ex. D at 23–24.

Finally, Plaintiffs argue that "[s]ome military chaplains fear the pressure, abuse,

and threats [that] will increase the risk of suicide."  Pls.' Mot. 23.  But this argument

is based entirely on speculation and cannot establish a basis for emergency injunctive

relief.  *See Fails v. Sec'y, Dep't of Corr.*, 2013 WL 6068859, at *3 (N.D. Fla. Nov. 16,

2013) (rejecting a claim of irreparable harm based in part on "speculation that the

---

[21] "Myocarditis is inflammation of the heart muscle" and is "the body's immune system caus[ing] inflammation in response to an infection or some other trigger."  CDC, *Myocarditis and Pericarditis After mRNA COVID-19 Vaccination* (Sept. 8, 2021), *available at* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/myocarditis.html.   "COVID-19 is a strong and significant risk factor for myocarditis." Boehmer T., et al., *Association Between COVID-19 and Myocarditis Using Hospital-Based Administrative Data — United States, March 2020–January 2021*, MMWR Morb Mortal Wkly Rep 2021;70:1228–1232, *available at* https://www.cdc.gov/mmwr/volumes/70/wr/mm7035e5.htm.

unavailability of [certain] drugs will increase the risk of suicide").

## IV.  The Equities and the Public Interest Weigh Against a Preliminary Injunction.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  These factors tilt decisively in the government's favor.

First, enjoining the Executive Orders and the DoD directive would harm the public interest in slowing the spread of COVID-19 among millions of federal employees, contractors, service members, and the members of the public with whom they interact.  In recognition of the government's "compelling interest" in "stemming the spread of COVID-19," *Cuomo*, 141 S. Ct. at 67, numerous courts reviewing "executive action designed to slow the spread of COVID-19" have concluded that "[t]he public interest in protecting human life—particularly in the face of a global and unpredictable pandemic—would not be served by" an injunction.  *Tigges v. Northam*, 2020 WL 4197610, at *10 (E.D. Va. July 21, 2020); *see also, e.g.*, *Brown v. Azar*, 497 F. Supp. 3d 1270, 1298 (N.D. Ga. 2020), *aff'd*, 4 F.4th 1220 (11th Cir. 2021); *Am.'s Frontline Drs. v. Wilcox*, 2021 WL 4546923, at *8 (C.D. Cal. July 30, 2021); *Valdez*, 2021 WL 4145746, at *13; *Harris*, 2021 WL 3848012, at *8; *Williams*, 2021 WL 4894264, at *10–11; *Wise*, 2021 WL 4951571, at *6; *Mass. Correction Officers*, 2021 WL 4822154, at *7–8; *Johnson*, 2021 WL 4846060, at *26–27.

An injunction against the DoD directive would also adversely impact the public

interest and the national security of the United States.  The Secretary of Defense "determined that mandatory vaccination against [COVID-19] is necessary to protect the Force and defend the American people."  Ex. 2 (further stating that "[t]o defend this Nation, we need a healthy and ready Force").  The Secretary made this decision after consulting with "medical experts and military leadership," *id.*, including the "Chairman of the Joint Chiefs of Staff, the Secretaries of the Military Departments, [and] the Service Chiefs," Ex. 1.  The Service Secretaries and Coast Guard leadership likewise found that COVID-19 impacts military readiness and that mandatory vaccination is necessary to prevent the spread of COVID-19 in the Force.  *See, e.g.*, Ex. 6 ¶ 3.B.3; Ex. 7 ¶ 2; Ex. 10; Ex. 23 (ALCOAST 315/21) ¶ 1.  The Court must "give great deference" to the "professional military judgment" of these leaders when it comes to what is needed to ensure military readiness.  *See Winter*, 555 U.S. at 24–25.

These professional military judgments are supported by the evidence showing COVID-19's impact on the Force.  Hundreds of thousands of service members have been infected, thousands have been hospitalized, and dozens have died. Ex. 14 ¶ 11.  Plaintiffs argue that their "vaccination status was irrelevant for nearly two years, and it is irrelevant today."  Pls.' Mot. 24.  But that is plainly not the case.

COVID-19 has "impacted exercises, deployments, redeployments, and other global force management activities," Ex. 15 (Decl. of Major Scott Stanley) ¶ 6 (including rendering an aircraft carrier non-operational because of an outbreak, *id.* ¶ 8), caused the cancellation of "19 major training events, many of which involved preparation and training with our foreign partners," *id.* ¶ 9, and "required significant

operational oversight" by the most senior military leaders, *id.* ¶ 4.   COVID-19 outbreaks have also rendered 133 Coast Guard units incapable of performing their missions, which have impacted counter-narcotics operations, as well the maintenance and repair of navigational aids necessary to ensure the safety of commercial vessels. Ex. 25 (Decl. of Capt. Timothy J. Buchanan) ¶¶ 7, 8.   Further, vaccination requirements of other nations restrict the ability of unvaccinated service members to participate in joint training exercises, which are "vital to the preservation of national security and the protection of our foreign interests."  Ex. 15 ¶¶ 10–11.

Vaccinations have promoted readiness by reducing the risk of infections, hospitalizations, and deaths of service members, reducing the number of service members who are required to quarantine, and permitting the military to return to higher levels of occupancy in DoD facilities and hold in-person trainings. *Id.* ¶¶ 3, 14–19.  As another court recently found, "the public interest in the nation's military readiness may well be served by allowing military officials who are familiar with the unique challenges posed by the COVID-19 pandemic in a military setting to manage those challenges without this Court's intervention."  Order at 6, *Robert v. Austin*, No. 1:21-cv-02228 (D. Colo. Sept. 1, 2021), ECF No. 12.

Even an injunction of the DoD mandate limited solely to the named Plaintiffs would harm the national defense and the public interest.  If they are unvaccinated, Plaintiffs could get infected with COVID-19, become seriously ill, and face hospitalization and death—all of which would affect the readiness of their unit.  Ex. 14 ¶¶ 7–9.  Unvaccinated service members also could spread the coronavirus to others,

which is of particular concern for the military, given that many service members work in close quarters or in operational settings, such as Navy ships or Coast Guard cutters. *Id.* ¶ 9; Ex. 15 ¶ 8; Ex. 25 ¶ 4; *see Mass. Correction Officers*, 2021 WL 4822154, at *8 (noting the public interest in preventing the spread of COVID-19 in "congregate facilities"). Accordingly, even as it relates solely to individual Plaintiffs, enjoining the DoD mandate would impact readiness.

Enjoining Executive Orders 14042 and 14043 would harm the public interest by hampering the efficiency of the federal civil service. The COVID-19 pandemic has interfered with numerous aspects of the government's work by forcing office closures; interfering with employees' access to paper-based records; limiting official travel; and causing staffing shortages. *See generally* Pandemic Response Accountability Committee, Top Challenges Facing Federal Agencies (June 2020), https://perma.cc/754N-56S9. Thus, enjoining these orders would likely interfere with the government's ability to resume normal, pre-pandemic operations.

Plaintiffs also request that the Court enjoin the Government from taking any adverse employment action or discipline for non-compliance with the EOs and DoD directive. *See* Compl. 93–94. But the military has discretion to handle matters of good order and discipline without interference from the judiciary. *Chappell v. Wallace*, 462 U.S. 296, 300–01 (1983); *see also* Ex. 17 ¶ 23; Ex. 18 ¶ 23; Ex. 24 ¶ 17. An injunction prohibiting the military from initiating or completing its administrative and disciplinary processes "would be a disruptive force as to affairs peculiarly within the jurisdiction of the military authorities[,]" *Orloff*, 345 U.S. at 95, and contrary to the

public interest, *see Guerra*, 942 F.2d at 275.  For civilians, a preliminary injunction would harm the government's interest in handling employment disputes using the procedures established by Congress.  *See Garcia v. United States*, 680 F.2d 29, 32 (5th Cir. 1982) (finding it "quite clear" that that enjoining the discharge of a federal employee "would have a far more disruptive effect on the administrative processes established by the government to handle cases such as these than would, on balance, be the burden on the employee resulting from a refusal to grant the injunction").

Plaintiffs argue only that there is a public interest in ensuring that their constitutional rights are not violated.  Pls.' Mot. 24–25.  But as shown above, the Government is not violating their constitutional rights.  And in any event the balance of interests weighs heavily against the entry of preliminary injunctive relief in light of the harms that would result to the national defense, to the health of the federal civilian and contractor workforce, and to the public health of the United States.

## CONCLUSION

Accordingly, Plaintiffs' motion for a preliminary injunction should be denied.

Dated:  November 3, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

*/s/ Zachary A. Avallone*
ANDREW E. CARMICHAEL
AMY E. POWELL
Senior Trial Counsel
ZACHARY A. AVALLONE
COURTNEY D. ENLOW
R. CHARLIE MERRITT
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.

40

Washington, DC 20005
Tel: (202) 514-3346
Email: zachary.a.avallone@usdoj.gov
*Counsel for Defendants*