# Exhibit 16

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

———————————————————— )
NAVY SEAL #1, et al.,                              )
                                                   )
                    Plaintiffs,                    )
                                                   )
          v.                                       )        Civil Action No. 8:21-cv-02429-SDM-TGW
                                                   )
JOSEPH R. BIDEN, JR., in his official              )
capacity as President of the United States,        )
et al.,                                            )
                                                   )
                    Defendants.                    )
———————————————————— )

## DECLARATION OF COLONEL MICHELE SOLTIS

I, Colonel Michele Soltis, hereby state and declare as follows:

1.       I am currently employed by the U.S. Army as the Director of the Public Health Directorate for the Office of The Surgeon General/U.S. Army Medical Command (OTSG/USAMEDCOM), located in Falls Church, Virginia. I have held this position since March 2020. I previously served as the Preventive Medicine Staff Physician for this same office since September 2016. My responsibilities include supervising public health subject matter experts and advising The Surgeon General (TSG)/USAMEDCOM Commanding General on all aspects of public health practice at the population level. Our office develops and coordinates strategic Army public health policies, publications, and programs to optimize readiness and promote force health protection initiatives. Our office advocates for public health activities, provides oversight for public health programs, and promotes the public health interests and initiatives of OTSG/USAMEDCOM. Since 2016, as part of my duties, I have reviewed requests from Soldiers for administrative immunization exemptions to accommodate religious beliefs, which are processed through OTSG to TSG for action under existing Army Regulations, to include the Multi-

Service Regulation (AR 40–562, BUMEDINST 6230.15B, AFI 48–110_IP, CG COMDTINST M6230.4G), "Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases," dated October 7, 2013 and Army Regulation 600-20, "Army Command Policy," dated July 24, 2020.  In addition, I consult with other Military Health System healthcare providers, Public Health Emergency Officers, and Senior Leaders to detail, clarify, and apply evidence-based, public health recommendations from the Centers for Disease Control and Prevention, the United States Preventive Services Task Force, and other organizations to Department of Defense Service Member and beneficiary populations.

2.      I am generally aware of the allegations set forth in the pleadings filed in this matter. This declaration is based on my personal knowledge, as well as knowledge made available to me during the routine execution of my official duties.  Attached to this declaration are authentic copies of relevant military regulations, instructions, and directives, referenced throughout.

**Mandatory Coronavirus Disease 2019 (COVID-19) Vaccination**

3.      On August 24, 2021, the Secretary of Defense issued a memorandum directing the Secretaries of the Military Departments to immediately begin full vaccination of all members of the Armed Forces under Department of Defense (DoD) authority on active duty or in the Ready Reserve, including the National Guard, who are not fully vaccinated against COVID-19 (Secretary of Defense Memorandum, "Mandatory Coronavirus Disease 2019 Vaccination of Department of Defense Service Members," dated August 24, 2021).  The purpose of the directive is to protect the health of the force, optimize readiness, and defend the Nation.  To date, there have been more than 383,500 cases of COVID-19 and more than 575 deaths associated with COVID-19 reported across the DoD.  As of this time, 249,858 of those cases and 71 COVID-associated deaths have been reported among Service members. ("DoD COVID-19 Cumulative Totals,"

2

https://www.defense.gov/Explore/Spotlight/Coronavirus-DOD-Response/, accessed October 28, 2021). Persons who have not been fully vaccinated against COVID-19 are at higher risk of serious illness, hospitalization, and death. They are also at increased risk of post-COVID conditions (i.e., long-COVID or long-haul COVID). Under the directive, Service members are considered fully vaccinated two weeks after completing the second dose of a two-dose COVID-19 vaccine series (e.g., Moderna or Pfizer-BioNTech (COMIRNATY®) vaccines) or two weeks after receiving a single-dose COVID-19 vaccine (e.g., Johnson & Johnson/ Janssen vaccine). Those with a history of previous COVID-19 infection are not considered fully vaccinated.

4. In accordance with the directive, mandatory vaccination against COVID-19 will only use vaccines that received full licensure from the U.S. Food and Drug Administration (FDA), in accordance with FDA-approved labeling and guidance. The directive authorizes the Military Departments to promulgate appropriate guidance to execute the stated objectives. It further directs that mandatory vaccination requirements will be implemented consistent with DoD Instruction (DoDI) 6205.02, "DoD Immunization Program," dated July 23, 2019. Finally, the directive states that Military Departments should use existing policies and procedures to manage the mandatory vaccination of Service members to the extent practicable, and that mandatory vaccination of Service members will be subject to any identified contraindications, as well as any administrative or other exemptions established in Military Department policy.

## Command Authority to Immunize Soldiers

5. The Military Vaccination Program, and associated Army immunization programs, which include the processes and procedures by which vaccines and vaccinations are managed, as well as those by which vaccines are administered and exemption requests are reviewed and adjudicated, are implemented in accordance with several DoD, Defense Health Agency (DHA),

Multi-Service, and Army Instructions, Regulations, and other publications. In particular, Army Regulation (AR) 600-20, "Army Command Policy," dated July 24, 2020, authorizes Commanders to administer immunizations to Soldiers required by the Multi-Service Regulation (AR 40–562, BUMEDINST 6230.15B, AFI 48–110_IP, CG COMDTINST M6230.4G), "Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases," dated October 7, 2013, or "other legal directive," unless Soldiers are medically or administratively exempted from the immunization requirements.  AR 600-20, paragraph 5-4.g.(2) states Commanders will continually educate Soldiers "concerning the intent and rationale behind both routine and theater-specific or threat-specific military immunization requirements."  The paragraph also notes, "The intent of this authorization is to protect the health and overall effectiveness of the command, as well as the health and medical readiness of the individual Soldier."

6.      In more than 18 years of serving as an active duty preventive medicine physician, I have not experienced, nor do I have knowledge of a Commander involuntarily immunizing a Soldier.  On September 14, 2021, the U.S. Army implemented the Secretary of Defense's recent directive by way of Fragmentary Order 5 (FRAGO 5) to Headquarters Department of the Army (HQDA) Execution Order (EXORD) 225-21, "COVID-19 Steady State Operations," dated September 14, 2021.  Per FRAGO 5, paragraph 3.D.8.B.4., involuntary (i.e., forcible) COVID-19 immunization is prohibited.

**Army Implementation Order for Mandatory COVID-19 Vaccination**

7.      Pursuant to FRAGO 5, per paragraph 3.B.3., every Soldier who is not otherwise exempt will be fully vaccinated against COVID-19 to ensure Soldiers and units are ready to fight and win.  As the order makes clear in paragraph 3.B.3., "[t]his is a readiness, health, and welfare

4

priority for the total Army." Paragraph 3.B.3 further states that because the Secretary of Defense has issued a lawful order, "the Army has a responsibility to ensure good order and discipline."

8.      Per paragraph 3.B.3.A.1., the Army is executing the mandatory COVID-19 vaccination order in two phases: phase 1 began immediately, and phase 2 will begin "on order." Per FRAGO 5, specifically paragraph 3.D.8., the Army will conduct mandatory COVID-19 vaccination operations of unvaccinated Soldiers with the FDA-approved Pfizer/Comirnaty® vaccine, and continue voluntary vaccination with other vaccines authorized for emergency use. Soldiers are considered fully vaccinated two weeks after completion of a two-dose vaccine series or two weeks after receiving a single-dose vaccine. Per paragraph 3.D.8.B.1., Commanders will vaccinate all Soldiers who are not otherwise exempt. Soldiers requesting an exemption are not required to receive the vaccine pending the final decision on their exemption request, which is discussed in more detail below. Likewise, paragraph 3.D.8.B.1.F. notes Commanders will not take adverse action against Soldiers with pending exemption requests, which is also discussed in more detail below. Finally, per paragraph 3.D.8.B.4., there will be no involuntary (i.e., forcible) immunizations.

9.      As for the process itself, FRAGO 5 paragraph 3.D.8.B.5. notes that if a Soldier declines immunization, the Commander will counsel the Soldier in writing, then direct the Soldier to view a mandatory educational video on the benefits of the vaccine. Following the mandatory video, the Soldier's immediate Commander "will order the Soldier to comply with the order to receive the vaccine." Paragraph 3.D.8.B.5.A. states if the Soldier declines again, the immediate Commander will direct the Soldier to meet with a medical professional (i.e., physician, physician assistant, or nurse practitioner) to further discuss the benefits of vaccination and address the Soldier's concerns. The Soldier's immediate Commander will then order the Soldier again to

receive the vaccine.  If the Soldier declines immunization again, the Commander will consult with their servicing legal advisor.

### Immunization Exemptions and Procedures

10.     Soldiers may request exemptions from immunizations based on certain circumstances.  There are two types of exemptions:  medical and administrative.  Paragraph 3.D.8.B.6.A. states that for medical exemptions, healthcare providers will determine a medical exemption based on the health of the vaccine candidate and the nature of the immunization under consideration.  Per the Multi-Service Regulation (AR 40–562, BUMEDINST 6230.15B, AFI 48–110_IP, CG COMDTINST M6230.4G), paragraph 2-6.a., medical exemptions may be temporary (up to 365 days) or permanent.  Per paragraphs 2-6.a.(1)(a)-(c) of this same Regulation, general examples of medical exemptions include (1) the underlying health condition of the vaccine candidate (e.g., based on immune competence, pharmacologic or radiation therapy, pregnancy and/or previous adverse response to immunization), (2) evidence of immunity based on serologic tests, documented infection, or similar circumstances, and (3) if an individual's clinical case is not readily definable.

11.     As stated in paragraph 3.D.8.B.6., exemptions are not presumptive in nature, but rather are granted after review of an individual's circumstances and the nature of the request on a case-by-case basis.  For example, Soldiers with previous infections or positive serology are not automatically exempt from full vaccination requirements and should consult with their primary care manager (PCM).  A Defense Health Agency Immunization Healthcare Division Information Paper entitled, "Why can't documentation of COVID-19 disease or serology results meet the mandatory requirement?" and dated October 2, 2021, notes examples of circumstances where our immune systems do not mount long-lasting immunity from natural disease, to include influenza,

6

pertussis (whooping cough), and rotavirus, among others. As such, re-infection with such pathogens is possible. Multiple serotypes of certain pathogens may also make determination of a protective serologic level more difficult. Furthermore, the Paper notes the mere presence of antibodies against a disease does not equate to immunity and that, "[t]he medical immune exemption does not apply to SARS-CoV-2 infection like it does to other infections, like measles, where there are decades (or more) of data on the durability of immunity, and the viral characteristics (i.e., long incubation time, involvement of the reticuloendothelial system) allow for a sterilizing immunity to persist." The Paper does acknowledge that "[w]ith time, there may be evidence for durable immunity to SARS-CoV-2."

12.     Per FRAGO 5, paragraph 3.D.8.B.6.A., for all medical exemptions, Soldiers should consult with their PCM. If the PCM indicates a temporary exemption is valid, the PCM will approve it. If, on the other hand, no temporary exemption is identified, the PCM will disapprove the request and administer the vaccine if the Soldier agrees to voluntarily receive it. If the Soldier declines to be vaccinated by the PCM, the Soldier will be referred back to his or her Commander for further action. Appropriate exemption codes indicating temporary or permanent reasons for medical exemption are to be annotated in the individual's Service-specific Immunization Tracking System. Any adverse events following receipt of a vaccine are to be reported to the Department of Health and Human Services' Vaccine Adverse Event Reporting System (VAERS). Medical exemption codes are to be revoked if they are no longer clinically warranted.

13.     As stated in paragraph 3.D.8.B.6.A.1. and 3.D.8.B.6.A.2., the approval authority for permanent medical exemptions is TSG. TSG has delegated this authority to Regional Health Command-Commanding Generals (RHC-CG), with no further delegation authorized. All requests for permanent medical exemptions must be staffed to the RHC-CG with the PCM's

recommendation either to approve or deny the permanent exemption.  If the RHC-CG disapproves a permanent medical exemption, the Soldier can appeal to TSG, who is the final appeal authority. If TSG disapproves the permanent medical exemption and the Soldier still refuses vaccination, the Commander will consult with his or her legal advisor.

14.     The provisions of FRAGO 5 also address the procedures for Soldiers to submit requests for religious exemptions.  In paragraph 3.D.8.B.6.B., the FRAGO implements the procedures outlined in Appendix P-2b of AR 600-20, which discusses requirements for processing requests for religious exemptions from immunizations.  In particular, Soldiers who believe their religious practices conflict with immunization requirements may request an exemption through command channels, which is then processed from their company or immediate Commander through their battalion, brigade, division, and General Court-Martial Convening Authority Commanders (typically a General Officer) to TSG.  Intermediate Commanders are not permitted to approve or deny requests for religious exemptions from immunizations.  Exemption requests are submitted in memorandum format.  AR 600-20, Appendix P-2.b.(1) notes requests must include the Soldier's name, rank, military occupational specialty, and a description of the religious tenet or belief that is contrary to the immunization.  Other documentation, such as a letter from a religious leader, is optional, but may assist Commanders in evaluating the request.

15.     Per AR 600-20, Appendix P-2.b.(2), once such a request is submitted, the Commander will arrange for an in-person or telephonic interview between the Soldier and the assigned unit chaplain.  The chaplain must provide a memorandum that summarizes the interview and addresses the religious basis and sincerity of the Soldier's request.  The chaplain is not required to recommend approval or disapproval, but may do so.  Memoranda from other chaplains or

8

religious leaders may accompany the request as optional attachments, but do not meet the requirement for interview by the assigned unit chaplain.

16.     Additionally, when a religious exemption request is submitted, a licensed healthcare provider must counsel the Soldier to ensure that he or she is making an informed decision.  Pursuant to AR 600-20, Appendix P-2.b.(3), the healthcare provider should address, at a minimum, specific information about the disease concerned; specific vaccine information, including the benefits and risks of vaccination; and the potential risks of infection that may be incurred by unimmunized individuals.  AR 600-20, Appendix P-2.b.(4) notes that likewise, the Soldier's immediate Commander must counsel the Soldier and recommend approval or denial of the exemption request.  The Commander must also counsel the Soldier that noncompliance with immunization requirements may adversely impact deployability, assignment, or international travel, and that the exemption may be revoked under imminent risk conditions.

17.     Consistent with that policy, FRAGO 5 notes TSG is the only approval or disapproval authority for religious immunization exemption requests and the Assistant Secretary of the Army for Manpower and Reserve Affairs (ASA (M&RA)) is the final appeal authority.  Per paragraph 3.D.8.B.6.B.2., exemption request packets are routed through the chain of command to TSG for decision.  The immediate Commander, through the General Court-Martial Convening Authority, must review the request and recommend approval or denial to TSG, and must address the factors of military necessity described below.  A legal review must also be conducted prior to forwarding the request, and upon completion the packet must be uploaded into the Task Management Tool (TMT), which is the Army's system of record for tracking such requests to TSG.  Paragraph 3.D.8.B.6.C. states that as with medical exemption requests, Soldiers with

pending requests for religious immunization exemptions are temporarily deferred from immunization, pending the disposition of their request or any appeal of a denied request.

18.     As for the criteria by which religious exemption requests are resolved, AR 600-20 sets forth the Army's policy.  As stated in paragraph 5-6.a. of that Regulation, "The Army places a high value on the rights of its Soldiers to observe tenets of their respective religions or to observe no religion at all; while protecting the civil liberties of its personnel to the greatest extent possible, consistent with its military requirements."  Thus, pursuant to federal law and Department of Defense Instruction (DoDI) 1300.17, "Religious Liberty in the Military Services," dated September 1, 2020, requests for religious accommodations from a military policy, practice, or duty that substantially burdens a Soldier's exercise of religion may be denied only when the government action furthers a compelling government interest and is the least restrictive means of furthering that compelling government interest.  Per AR 600-20, paragraph 5-6.a.(2), it is the Soldier's responsibility to demonstrate he or she has a sincerely held religious belief and that the government policy, practice, or duty substantially burdens their religious exercise.  As it relates to the religious exemption process described above, that is accomplished through the Soldier's request and the chaplain's interview.

19.     If the Soldier demonstrates a sincerely held religious belief and a substantial burden on his or her religious exercise, the Commander must then demonstrate how the government action furthers a compelling government interest and is the least restrictive means of furthering that interest.  As reflected in AR 600-20, paragraph 5-6.a.(4), a religious exercise includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.  Likewise, compelling governmental interests may include safety, health, good order, discipline, uniformity, national security, and mission accomplishment.  All requests for religious exemptions must be

assessed on a case-by-case basis.  Likewise, each request must be considered based on its unique facts, the nature of the requested religious exemption, the effect of approval or denial on the Soldier's exercise of religion, and the effect of approval or denial on military necessity.  Per AR 600-20, Appendix P-2.b.(5), TSG will approve or disapprove each religious exemption request and return the decision to the Soldier's Commander through command channels, at which point the Soldier may appeal to the ASA (M&RA) for a final decision.  As with the exemption request itself, the chaplain's review, and the chain of command's recommendations, all decisions by TSG and the ASA (M&RA) are memorialized in memorandum format, not specific forms.

20.     The authorities described above are also set forth in Army Directive 2021-33, "Approval and Appeal Authorities for Military Medical and Administrative Immunization Exemptions" dated September 24, 2021.  In addition, FRAGO 5 (Annex XX) contains a depiction of the exemption process described above, as well as sample counseling statements (Annexes NN and OO) for Commanders to use if a Soldier initially declines immunization. FRAGO 5, paragraphs 3.D.8.B.1. and 3.D.8.B.4. again note that Soldiers requesting an exemption are not required to receive the COVID-19 vaccine pending the final decision on their exemption request and that involuntary (i.e., forcible) immunizations are prohibited.

### Adverse Administrative Actions

21.     As described above, the Army is providing Soldiers the opportunity to seek medical and administrative, to include religious, exemptions from the requirement to be vaccinated. However, for those who are not going to seek an exemption or who have their exemption requests denied and still refuse to be immunized, the Army has outlined a phased approach for the administration of adverse actions in furtherance of the maintenance of good order and discipline and the health of the force, which will be considered and adjudicated on a case-by-case basis.  As

11

explained in paragraph 3.D.8.B.1. of FRAGO 5, only certain adverse administrative actions are authorized during phase 1 for Soldiers who refuse the mandatory COVID-19 vaccine.  Any other adverse action based solely on COVID-19 vaccine refusal is withheld during this phase.

22.    FRAGO 5, paragraph 3.D.8.B.1.D. states that in particular, Commanders must request a General Officer Memorandum of Reprimand (GOMOR) be initiated for all Soldiers refusing the vaccine who are not pending a final decision regarding an exemption request.  The processes and procedures for issuing a GOMOR are governed by paragraph 3-5 of Army Regulation (AR) 600-37, "Unfavorable Information," dated October 2, 2020.  In short, GOMORs may be filed permanently in a Soldier's Army Military Human Resources Records (AMHRR), or temporarily in his or her "local" file to later be destroyed.  Either way, paragraphs 3-5 and 3-7 of this same Regulation detail substantive and procedural due process requirements that must be satisfied prior to any filing decision being made, including notification to the Soldier and an opportunity to respond.

23.    AR 600-37, paragraphs 6-3, 7-1, and 7-7 note Soldiers may appeal a decision to file a GOMOR in their AMHRR, or request to transfer it to the restricted portion of their personnel file, to the Department of the Army Suitability Evaluation Board (DASEB), which has the authority to revise, alter, or remove the unfavorable information if it is determined to be untrue or unjust.  AR 600-37, para. 6-2.  Further, a Soldier may appeal an adverse DASEB decision to the Army Board for Correction of Military Records (ABCMR).  Chapter 2 of Army Regulation 15-185, "Army Board for Correction of Military Records," dated March 31, 2006, contains the policy and procedures for applying to the ABCMR for the purpose of correcting military records.  Pursuant to 10 U.S.C. §1552, and per AR 15-185, paragraph 2-2a., the ABCMR may correct Department of the Army records, including GOMORs, in order to remove an error or injustice.

This includes the authority to remove a GOMOR entirely from a Soldier's records, which would eliminate future consideration of the removed record by promotion or other selection boards.

24.     Again, however, per FRAGO 5, paragraph 3.D.8.B.1.F., Commanders will not take adverse action against Soldiers with pending exemption requests as discussed above.

***************************

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 3, 2021, in Falls Church, Virginia

SOLTIS.MICHELE. Digitally signed by
AYN.1039840827 SOLTIS.MICHELE.AYN.10398408
27
Date: 2021.11.03 09:15:44 -04'00'

Michele A. Soltis
Colonel, Medical Corps, U.S. Army
Director, Public Health Directorate
Office of The Surgeon General/
U.S. Army Medical Command
Falls Church, Virginia

13

**Army Regulation 600–20**

**Personnel-General**

# Army Command Policy

**Headquarters**
**Department of the Army**
**Washington, DC**
**24 July 2020**

# UNCLASSIFIED

# *SUMMARY of CHANGE*

AR 600–20
Army Command Policy

This administrative revision, dated 1 July 2021—

o   Adds an email address for suggested improvement submissions (title page).

o   Updates the definition of "discrimination types" and removes the definition of "ethnic and racial categories" (glossary).

This administrative revision, dated 4 February 2021—

o   References DODD 1350.2 (para 6–9).

o   Removes appendix (app Q).

This administrative revision, dated 1 September 2020—

o   Updates information (table 1–1).

This administrative revision, dated 30 July 2020—

o   Updates information (fig 2–5).

This major revision, dated 24 July 2020—

o   Adds reference to DoDI 1342.22 which now serves as the primary source of Family readiness policy guidance (title page).

o   Adds and/or updates responsibilities for the Assistant Secretary of the Army (Installations, Environment and Energy); Deputy Chief of Staff, G–9; Commanding General, U.S. Army Materiel Command; and the Commanding General, U.S. Army Installation Management Command (paras 1–4*b*, 1–4*f*, 2–5*b*, 5–2*b*, 7–5*d*).

o   Requires command leadership to treat Soldiers and Department of the Army Civilians with dignity and respect at all times (para 1–6*c*).

o   Clarifies the written abbreviation for the grade of "Specialist" (table 1–1, note 5).

o   Updates roles and responsibilities for command of installations (para 2–5*b*).

o   Clarifies policy on assumptions of command during the temporary absence of the commander (paras 2–9*a*(3), 2–9*d*, 2–10, and 2–12).

o   Adds policy for command of installations, activities, and units on Joint bases (para 2–6).

o   Clarifies policy on the role of the reviewing commander regarding designation of junior in the same grade to command (para 2–8*c*).

o   Adds and/or updates the Army's Ready and Resilient efforts in the following manner: Defines Ready and Resilient Strategic Objectives; modifies the Ready and Resilient Governance Structure; and realigns responsibilities (chap 3).

o   Clarifies military authority for corrective training (para 4–6).

o   Adds policy that commanders will notify the provost marshal office (Director of Emergency Services) or provost marshal of military protective orders involving Soldiers (para 4–7*e*).

o   Adds policy regarding commander's actions toward deserters (para 4–7*f*).

o   Adds policy on extremist organizations, cyber activity, and social media (para 4–12*h*).

o   Clarifies that fraternization policy does not apply to married persons (para 4–14*c*(2)(*a*)).

o   Incorporates DoDI 1304.33 and Army Directive 2016–17, Protecting Against Prohibited Relations During Recruiting and Entry-Level Training, which prohibits relationships between recruiters and recruits, and trainers and trainees (para 4–15).

o   Adds online misconduct to harassment (hazing, bullying, or discriminatory harassment) (para 4–19).

o   Clarifies the reporting, investigation, and data recording of harassment cases pursuant to DoDI 1020.03, Harassment and Prevention and Response in the Armed Forces (paras 4–19*c*).

o   Clarifies The Army Harassment Prevention and  Response Program (hazing, bullying, and discriminatory harassment) and incorporates Army Directive 2018–23, Improving the Effectiveness of Essential and Important Army Programs: Sexual Harassment/Assault Response and Prevention, Equal Opportunity, Suicide Prevention, Alcohol and Drug Abuse Prevention, and Resilience (paras 4–19, 6–10, chap 7).

o   Adds policy that Army individuals report harassment (hazing, bullying, and discriminatory harassment) to their commander/supervisor, the Military Equal Opportunity, or law enforcement (para 4–19*f*).

o   Adds policy that commanders notify Soldiers of requirements in the Domestic Violence Amendment to the Gun Control Act of 1968 (para 4–22*c*(2)).

o   Adds policy for command responsibility under the law of war (para 4–24).

o   Adds policy for personnel recovery and code of conduct training (para 4–25).

o   Adds policy for combating trafficking in persons (para 4–26).

o   Adds Department of the Army Civilian Expeditionary Workforce to the list of those who may need a Family care plan (para 5–3).

o   Adds policy on the assistance role of Family readiness services in developing Family care plans (para 5–3*r*).

o   Adds policy for command aspects of medical readiness and medical care (para 5–4).

o   Incorporates Army Directive 2015–43, Revised Breastfeeding and Lactation Support policy (para 5–5).

o   Incorporates Army Directives 2016–34, Processing Religious Accommodation Requests Requiring a Waiver to Army Uniform or Grooming Policy and Army Directive 2018–19, Approval, Disapproval, and Elevation of Requests for Religious Accommodation (para 5–6).

o   Adds policy on Better Opportunities for Single Soldiers (para 5–8).

o   Adds policy on the Soldier for Life Transition Assistance Program (SFL–TAP) for Soldiers and Department of the Army Civilians (para 5–9).

o   Updates policy on complaints or accusations against military personnel, in accordance with AR 20–1 (para 5–12).

o   Updates policy on the Military Whistleblower Protection Act, in accordance with 10 USC 1034 and DoDD 7050.06 (para 5–12).

o   Incorporates Army Directive 2014–20, Prohibition of Retaliation Against Soldiers for Reporting a Criminal Offense (para 5–13).

o   Clarifies policy on political activities as contained in DoDD 1344.10 (para 5–15 and app B).

o   Adds policy on the Insider Threat Program (para 5–18).

o   Adds policy on risk management (5–19).

o   Adds policy for operations security (para 5–20).

o   Adds policy for the Adoption Reimbursement Program (para 5–21).

o   Updates Army Military Equal Opportunity Policy (chap 6).

o   Incorporates Army Directive 2018–07–9, Prioritizing Efforts-Readiness and Lethality (Update 9) (chap 6).

o   Removes sexual harassment from the Military Equal Opportunity Program (formerly discussed in chap 6).

o   Updates policy on the Military Equal Opportunity and Harassment (hazing, bullying, or discriminatory harassment) Complaint Processing System (para 6–6).

o   Incorporates Army Directive 2019–20, Implement Army Heritage Month in the Military Equal Opportunity Program (para 6–10*j*(5)).

o   Adds policy on the Sexual Harassment/Assault Response and Prevention Program (chap 7).

o   Incorporates DoDI 5505.18, Investigation of Adult Sexual Assault in the Department of Defense, and DoDI 6495.02, Sexual Assault Prevention and Response (SAPR) Program Procedures, (para 7–2).

o   Adds Sexual Assault Incident Response Oversight Report requirements and incorporates DoDD 6495.01, Sexual Assault Prevention and Response (SAPR) Program, and DoDI 6495.02, Sexual Assault Prevention and Response (SAPR) Program Procedures (para 7–2).

o   Incorporates Army Directive 2013–20, Assessing Officers and Noncommissioned Officers on Fostering Climates of Dignity and Respect and on Adhering to the Sexual Harassment/Assault Response and Prevention Program (para 7–5*o*(33)).

o   Incorporates Army Directive 2018–16, Suitability Criteria for Military Personnel in Specified Positions (paras 7–5*n*(1) and 7–5*o*(29)).

o   Prescribes DA Form 7746 (Sexual Harassment Complaint) and DA Form 7746–1 (Sexual Harassment Complaint Resolution Assessment) (paras 7 –5*y*(3) and 7–8*n*(6)).

o   Incorporates Army Directive 2015–16, Command Engagement to Prevent Retaliation (para 7–8 and app H).

o   Adds policy on military equal opportunity professional staffing (app C).

o   Adds policy on military equal opportunity, training, and education (app D.)

o   Incorporates Army Directive 2013–29, Army Command Climate Assessments (app E).

o   Incorporates Army Directive 2018–07–6, Prioritizing Efforts—Readiness and Lethality (Update 6) (app E).

o   Updates policy on the Sexual Assault Review Board for unrestricted reports of sexual assault (app F).

o   Adds Department of Defense Sexual Assault Advocate Certification Program requirements (app G).

o   Incorporates Army Directive 2011–19, Expedite Transfer or Reassignment Procedures for Victims of Sexual Assault (para 7–5 and app I).

o   Adds commander's critical information requirement(s) (app J).

o   Updates confidentiality guidelines for restricted/unrestricted reporting (app L).

o   Adds inspector general activities in support of the commander (app O).

o   Incorporates DA Pam 600–26 (hereby superseded) (app Q).

o   Adds an internal control evaluation (appQ).

o   Identifies a functional proponent for all command policies for which the Directorate of Military Personnel Policy, Deputy Chief of Staff, G–1 (DAPE–MPC) is not the primary subject matter expert (throughout).

o   Incorporates Army Directive 2013–17, Sexual Harassment/Assault Response and Prevention Program in Initial Military Training (throughout).

o   Incorporates Army Directive 2016–35, Army Policy on Military Service of Transgender Soldiers (throughout).

o   Incorporates Army Directive 2015–39, Inclusion of Sexual Orientation in the Military Equal Opportunity Program (throughout).

Headquarters
Department of the Army
Washington, DC
24 July 2020

*Army Regulation 600–20

Effective 24 July 2020

Personnel-General

# Army Command Policy

By Order of the Secretary of the Army:

JAMES C. MCCONVILLE
*General, United States Army*
*Chief of Staff*

Official:

KATHLEEN S. MILLER
*Administrative Assistant*
*to the Secretary of the Army*

**History.** This publication is an administrative revision. The portions affected by this administrative revision are listed in the summary of change.

**Summary.** This regulation implements DoDI 1020.03, DoDI 1300.17, DoDI 1325.02, DoDI 1325.06; DoDI 1342.22; DoDI 5240.22, DoDI 5240.26, DoDI 5505.18; DoDI 6495.02; DoDI 6495.03, DoDD 1350.2, DoDD 6495.01, DoDD 5205.16 and DoDD 7050.06. Also, it prescribes the policy and responsibility of command, which include the Army Ready and Resilient Campaign Plan, military discipline and conduct, the Army Equal Opportunity Program, and the Army Sexual Harassment/Assault Response and Prevention Program. The 30-day advanced publication requirement has been waived because the revision implements previously published law, DoD directives and instructions, and Army directives that need to be consolidated and communicated to the field as soon as possible.

**Applicability.** This regulation applies to the Regular Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve, unless otherwise stated. It also applies to all assigned, attached, or operationally controlled U.S. Army Corrections

Command personnel, and all Army Corrections System prisoners incarcerated in Army Corrections System facilities. Chapters 6 and 7 and appendix E apply to members of the Army National Guard of the United States when on active duty Title 10 orders, for 30 days or more. In all other cases, members of the Army National Guard are governed by regulations issued by the Chief, National Guard Bureau consistent with Chief, National Guard Bureau's authorities under 32 USC 110, 10 USC 10503, and DoDD 5105.77. It also applies where stated to Department of the Army Civilians. Portions of this regulation that prescribe specific conduct are punitive, and violations of these provisions may subject offenders to nonjudicial or judicial action under the Uniform Code of Military Justice. The equal opportunity terms found in the glossary are applicable only to uniformed personnel. AR 690–600 and AR 690–12 contains similar terms that are applicable to Department of the Army Civilians.

**Proponent and exception authority.** The proponent of this regulation is the Deputy Chief of Staff, G–1. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or its direct reporting unit or field operating agency in the grade of colonel or the civilian equivalent may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25–30 for specific guidance.

**Army internal control process.** This regulation contains internal control provisions in accordance with AR 11–2 and identifies key internal controls that must be evaluated (app Q).

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without prior approval from the Deputy Chief of Staff, G–1 (DAPE–MP), 300 Army Pentagon, Washington, DC 20310–0300.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to Deputy Chief of Staff, G–1 (DAPE–MP), 300 Army Pentagon, Washington, DC 20310–0300 or by email to usarmy.pentagon.hqda-dcs-g-1.mbx.command-policy@mail.mil.

**Committee management.** AR 15–39 requires the proponent to justify establishing/continuing committee(s), coordinate draft publications, and coordinate changes in committee status with the Office of the Administrative Assistant to the Secretary of the Army, Department of the Army Committee Management Office (AARP–ZA), 105 Army Pentagon, Washington DC, 20310–0105. Further, if it is determined that an established "group" identified within this regulation later takes on the characteristics of a committee as found in AR 15–39, then the proponent will follow AR 15–39 requirements for establishing and continuing the group as a committee.

**Distribution.** This regulation is available in electronic media only and is intended for the Regular Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve.

---

*This regulation supersedes AR 600-20, dated 6 November 2014; DA Pam 600-26, dated 23 May 1990. The following Army Directives rescind upon publication of this regulation; AD 2011-19, dated 3 October 2011; AD 2013-17, dated 22 July 2013; AD 2013-20, dated 27 September 2013; AD 2013-29, dated 23 December 2013; AD 2014-20, dated 19 June 2014; AD 2015-16, dated 4 March 2015; AD 2015-39, dated 14 October 2015; AD 2015-43, dated 10 November 2015; AD 2016-17, dated 22 June 2016; AD 2016-34, dated 6 October 2016; AD 2018-19, dated 8 November 2018; and AD 2019-20, dated 16 May 2019.

i

**UNCLASSIFIED**

**Contents—Continued**

## Contents (Listed by paragraph and page number)

**Chapter 1**
**Introduction,** *page 1*

Purpose • 1–1, *page 1*
References and forms • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Responsibilities • 1–4, *page 1*
Records management (recordkeeping) requirements • 1–5, *page 2*
Command • 1–6, *page 2*
Military grade and rank • 1–7, *page 3*
Precedence between Soldiers and other Servicemembers serving with the Army • 1–8, *page 7*
Precedence between members of the Army and members of foreign military services serving with the
    Army • 1–9, *page 8*

**Chapter 2**
**Command Policies,** *page 8*

Chain of command • 2–1, *page 8*
Open door policies • 2–2, *page 8*
Performance counseling • 2–3, *page 9*
Staff or technical channels • 2–4, *page 9*
Command of installations, activities, and units • 2–5, *page 9*
Command of installations, activities, and units of Joint bases • 2–6, *page 16*
Specialty immaterial commands • 2–7, *page 20*
Designation of junior in the same grade to command • 2–8, *page 20*
Death, disability, retirement, reassignment, or absence of the commander • 2–9, *page 21*
Absence or disability of all officers of a unit • 2–10, *page 21*
Emergency command • 2–11, *page 22*
Functions of an individual in temporary command • 2–12, *page 22*
Responsibility of successor • 2–13, *page 22*
Separate commands of the Army serving together • 2–14, *page 22*
Separate commands of the several military services of the United States serving together • 2–15, *page 22*
Ineligibility for command of post or activity • 2–16, *page 22*
Restrictions • 2–17, *page 23*
Relief for cause • 2–18, *page 23*
Noncommissioned officer support channel • 2–19, *page 24*

**Chapter 3**
**Ready and Resilient,** *page 25*

General • 3–1, *page 25*
The Army Ready and Resilient strategic governance process • 3–2, *page 25*
Responsibilities • 3–3, *page 26*

**Chapter 4**
**Military Discipline and Conduct,** *page 27*

Military discipline • 4–1, *page 27*
Obedience to orders • 4–2, *page 27*
Military courtesy • 4–3, *page 27*
Soldier conduct • 4–4, *page 27*
Maintenance of order • 4–5, *page 28*
Exercising military authority • 4–6, *page 28*
Disciplinary powers of the commanding officer • 4–7, *page 28*
Settlement of local accounts on change of station • 4–8, *page 29*
Civil status of members of the U.S. Army Reserve • 4–9, *page 29*

**Contents—Continued**

Participation in support of civilian law-enforcement agencies • 4–10, *page 30*
Membership campaigns • 4–11, *page 30*
Extremist organizations and activities • 4–12, *page 30*
Army language policy • 4–13, *page 34*
Relationships between Soldiers of different grades • 4–14, *page 34*
Other prohibited relationships • 4–15, *page 35*
Fraternization • 4–16, *page 38*
Standards of conduct • 4–17, *page 38*
Employment and volunteer work of spouse • 4–18, *page 38*
The Army Harassment Prevention and Response Program (hazing, bullying, and discriminatory harass-
    ment) • 4–19, *page 39*
Informal funds • 4–20, *page 42*
Misuse of government travel charge cards • 4–21, *page 42*
Domestic Violence Amendment to the Gun Control Act of 1968 • 4–22, *page 43*
Self-reporting of criminal convictions by officers and senior enlisted members • 4–23, *page 46*
Command responsibility under the law of war • 4–24, *page 47*
Personnel recovery and code of conduct training • 4–25, *page 47*
Combating trafficking in persons • 4–26, *page 47*

**Chapter 5**
**Other Responsibilities of Command,** *page 48*
General • 5–1, *page 48*
Army Family readiness • 5–2, *page 48*
Family care plans • 5–3, *page 49*
Command aspects of medical readiness and medical care • 5–4, *page 54*
Breastfeeding and lactation support policy • 5–5, *page 57*
Accommodating religious practices • 5–6, *page 57*
Unit memorial ceremonies and services policy • 5–7, *page 60*
Better Opportunities for Single Soldiers • 5–8, *page 62*
Soldier for Life–Transition Assistance Program • 5–9, *page 62*
Federal Parent Locator Service • 5–10, *page 63*
Complaints or accusations against military personnel • 5–11, *page 63*
Military Whistleblower Protection Act • 5–12, *page 64*
Retaliation • 5–13, *page 65*
Appearance before congressional committees • 5–14, *page 66*
Political activities • 5–15, *page 66*
Prohibition of military labor unions • 5–16, *page 67*
On-post distribution of non-government printed materials • 5–17, *page 69*
Insider Threat Program • 5–18, *page 70*
Risk management • 5–19, *page 71*
Operations security • 5–20, *page 71*
Adoption Reimbursement Program • 5–21, *page 71*

**Chapter 6**
**Military Equal Opportunity Policy and Program,** *page 72*
Purpose • 6–1, *page 72*
Military equal opportunity policies • 6–2, *page 72*
Military equal opportunity professional staffing • 6–3, *page 73*
Military equal opportunity training and education • 6–4, *page 73*
Command climate assessment • 6–5, *page 73*
Military Equal Opportunity and Harassment Complaint Processing System • 6–6, *page 73*
Retaliation Prevention and Response • 6–7, *page 83*
Military equal opportunity definitions • 6–8, *page 83*
Racial and ethnic categories • 6–9, *page 83*
Military Equal Opportunity Program and Harassment Prevention and Response Program responsibili-
    ties • 6–10, *page 83*

**Contents—Continued**

**Chapter 7**
**Sexual Harassment/Assault Response and Prevention Program,** *page 87*
Scope • 7–1, *page 87*
Policy • 7–2, *page 88*
Purpose • 7–3, *page 88*
Program eligibility • 7–4, *page 88*
Responsibilities • 7–5, *page 88*
Program fundamentals • 7–6, *page 103*
Sexual harassment • 7–7, *page 104*
Sexual Harassment Complaint Processing System • 7–8, *page 105*
Sexual assault • 7–9, *page 112*
Retaliation in response to reports of sexual assault and sexual harassment • 7–10, *page 113*
Commander actions upon notification of a sexual assault • 7–11, *page 113*

**Appendixes**

**A.**   References, *page 117*

**B.**   Political Activities, *page 130*

**C.**   Military Equal Opportunity Professional Staffing, *page 132*

**D.**   Military Equal Opportunity and Harassment Training and Education, *page 137*

**E.**   Command Climate Assessment, *page 139*

**F.**   Sexual Assault Review Board for Unrestricted Reports of Sexual Assault, *page 146*

**G.**   Department of Defense Sexual Assault Advocate Certification Program Requirements, Training, and Additional
Skill Identifier Assignment, *page 151*

**H.**   Retaliation Prevention and Response, *page 156*

**I.**   Expedited Transfer Victim Requests, *page 160*

**J.**   Sexual Harassment/Assault Response and Prevention Commander's Critical Information Require-
ment(s), *page 162*

**K.**   Sexual Assault Incident Response Oversight Report, *page 164*

**L.**   Confidentiality Guidelines for Restricted/Unrestricted Reporting, *page 167*

**M.**   24/7 Sexual Harassment/Assault Response and Prevention Hotline, *page 172*

**N.**   Sexual Harassment/Assault Response and Prevention Program Organization Inspection Program, *page 175*

**O.**   Inspector General Activities in Support of the Commander, *page 177*

**P.**   Religious Accommodation, *page 184*

**Q.**   Internal Control Evaluation, *page 191*

**Table List**

Table 1–1: Grades, Army, *page 3*
Table 1–2: Comparable grades among the Services, *page 7*
Table E–1: Command Climate Assessment guidance, *page 140*
Table G–1: Qualifications, *page 151*
Table I–1: Victim transfer processes, *page 161*
Table K–1: Sexual Assault Incident Response Oversight report reporting responsibilities, *page 165*
Table P–1: Process for General Court-Martial Convening Authority uniform and grooming requests and all waiver
requests, *page 189*

**Contents—Continued**

**Figure List**

Figure 2–1: Command and support relationships at U.S. Army Materiel Command-managed installations, *page 13*
Figure 2–2: Assumption of command, *page 14*
Figure 2–3: Appointment of commander, *page 15*
Figure 2–4: Command relationships at Joint bases, *page 18*
Figure 2–5: Joint Base Management Oversight Structure, *page 20*
Figure O–1: Right of Soldiers to present complaints to the inspector general, *page 181*
Figure O–1: Right of Soldiers to present complaints to the inspector general—Continued, *page 181*
Figure O–2: Right of Department of the Army Civilian employees to present complaints to the inspector general, *page 183*
Figure O–2: Right of Department of the Army Civilian employees to present complaints to the inspector general—Continued, *page 183*

**Glossary**

## Chapter 1
## Introduction

### 1–1. Purpose
This regulation prescribes the policies and responsibilities of command, which include the Army Ready and Resilient Campaign Plan, military discipline and conduct, the Army Military Equal Opportunity (MEO) Program, the Army Harassment Prevention and Response Program, and the Army Sexual Harassment/Assault Response and Prevention (SHARP) Program.

### 1–2. References and forms
See appendix A.

### 1–3. Explanation of abbreviations and terms
See the glossary.

### 1–4. Responsibilities
Detailed responsibilities are listed and described in separate chapters under specific programs and command functions. This paragraph outlines general or overarching responsibilities.

  *a.* The Principal Officials of Headquarters, Department of the Army (HQDA) direct policies, programs, and resources in support of command responsibilities.

  *b.* The Assistant Secretary of the Army (Installations, Energy and Environment) (ASA (IE&E)) is responsible for setting the strategic direction for and ensuring that Army policies and programs  related to installations, including Army real estate, joint basing, military construction, energy and water security and sustainability, and the environment, safety, and occupational health are executed consistent with law, regulation, and policy. In addition, the ASA (IE&E) is responsible for oversight of the execution functions performed by the Corps of Engineers related to the Army's military construction, real property, real estate, energy, and environmental safety and occupational health programs.

  *c.* The Assistant Secretary for the Army (Manpower and Reserve Affairs) (ASA (M&RA)) is responsible for setting the strategic direction for and ensuring Army policies, plans, and programs for personnel, force structure, manpower management, total force management, total force policy, training, military and personnel readiness, Reserve affairs, and Army protection are executed consistent with law, regulation, and policy. In addition, the ASA (M&RA) is specifically responsible for the Equal Employment Opportunity (EEO) and MEO Programs and morale, welfare, recreation (MWR) and Family support programs.

  *d.* The Vice Chief of Staff, Army (VCSA) tasks the Army Staff (ARSTAF) as necessary to coordinate the readiness and resiliency of the force.

  *e.* The Deputy Chief of Staff, G–1 (DCS, G–1) has ARSTAF responsibility for developing and executing Army strategy, policy, plans, and programs that relate to—

  (1) Chain of command (see para 2–1), designation of junior in the same grade to command (see para 2–8), and assumption of command by the senior regularly assigned Soldiers when the commander dies, is disabled, resigns, retires, or is absent (see para 2–9).

  (2) The Army Ready and Resilient Plan (see chap 3).

  (3) Extremist organizations and activities (see para 4–12), relationships between Soldiers of different grade (see para 4–14), and other prohibited relationships (see para 4–15).

  (4) Political activities (see para 5–16), Family care plans (see para 5–3), and accommodation of religious practices (see para 5–6).

  (5) The Army SHARP Program (see para 7–4).

  *f.* The Deputy Chief of Staff, G–9 (DCS, G–9) has ARSTAF responsibility for planning, developing, implementing, resourcing, overseeing, and evaluating the execution of strategies, policies, plans, and programs for the delivery of installation services and infrastructure to support readiness. The DCS, G–9 will—

  (1) Advise the ASA (IE&E) on planning, developing policy, resourcing, implementing, and evaluating—

  *(a)* Comprehensive installation management operations, facilities' investment, environmental programs, excess installation property, real property management, master planning, joint basing, and energy and water security and sustainability.

  *(b)* Army housing, nontactical vehicles, public and private partnerships, installation safety, and installation logistics.

(2)  Advise the ASA (M&RA) on planning, developing policy, resourcing, implementing, and evaluating MWR programs, nonappropriated fund instrumentalities, and Soldier and Family readiness programs.

*g.*  The Commanding General, Army Materiel Command (AMC) is responsible for the execution and delivery of Soldier, Civilian, and Family programs and services at the installation in support of total force Readiness and Resilience. Installation Management Command (IMCOM) is a major subordinate command to AMC.

*h.*  Commanding Generals of Army commands (ACOMs), Army service component commands (ASCCs), Chief, National Guard Bureau (CNGB), Chief, Army Reserve, and/or direct reporting units (DRUs) implement policies and programs within their respective commands to support the readiness and resilience of the force.

*i.*  Commanders at all levels will implement and enforce the chain of command and Army command policies.

## 1–5.  Records management (recordkeeping) requirements

The records management requirement for all record numbers, associated forms, and reports required by this regulation are addressed in the Army Records Retention Schedule-Army (RRS–A). Detailed information for all related record numbers, forms, and reports are located in Army Records Information Management System (ARIMS)/RRS–A at https://www.arims.army.mil. If any record numbers, forms, and reports are not current, addressed, and/or published correctly in ARIMS/RRS–A, see DA Pam 25–403 for guidance.

## 1–6.  Command

*a.  Privilege to command.*  Command is exercised by virtue of office and the special assignment of members of the Armed Forces of the United States holding military grade who are eligible to exercise command. A commander is, therefore, a commissioned or warrant officer (WO) who, by virtue of grade and assignment, exercises primary command authority over a military organization or a prescribed territorial area that is recognized as a "command" under pertinent official directives. The privilege to command is not limited solely by branch of Service, except as indicated in chapter 2. A civilian, other than the President as Commander-in-Chief (or National Command Authority), may not exercise command. However, a DA Civilian may be designated to exercise general supervision over an Army installation or activity (for example, Dugway Proving Ground).

*b.  Elements of command.*  The key elements of command are authority and responsibility. Formal authority for command is derived from the policies, procedures, and precedents presented in chapters 1 through 3.

*c.  Characteristics of command leadership.*  The commander is responsible for all aspects of unit readiness. Training is the cornerstone of unit readiness and must be the commander's top peacetime priority. Establishing a positive leadership climate within the unit and developing disciplined and cohesive units contributes to combat readiness and sets the tone for social and duty relationships and responsibilities within the command. As the primary unit trainers, commanders must develop their leaders to extract the greatest training value from every opportunity in every activity in order to build combat readiness and prepare their units and Soldiers to rapidly deploy and accomplish their decisive action missions. Commanders remain responsible for the professional development of their Soldiers at all ranks. Commanders and other leaders will treat their subordinates with dignity and respect at all times and establish a command and organizational climate that emphasizes the duty of others to act in a similar manner toward their subordinates in accomplishing the unit mission.

(1)  Commanders and other leaders committed to the professional Army Ethic promote a positive environment. If leaders show loyalty to their Soldiers, the Army, and the nation, they earn the loyalty of their Soldiers. If leaders consider their Soldiers' and DA Civilians' needs and care for their well-being, and if they demonstrate genuine concern, these leaders build a positive command climate.

(2)  Duty is obedient and disciplined performance. Soldiers with a sense of duty accomplish tasks given them, seize opportunities for self-improvement, and accept responsibility from their superiors. Soldiers, leader and led alike, work together to accomplish the mission rather than feed their self-interest.

(3)  Integrity is a way of life. Demonstrated integrity is the basis for dependable, consistent information, decision-making, and delegation of authority.

(4)  Professionally competent leaders will develop respect for their authority by—

*(a)*  Striving to develop, maintain, and use the full range of human potential in their organization. This potential is a critical factor in ensuring that the organization is capable of accomplishing its mission.

*(b)*  Giving troops constructive information on the need for and purpose of military discipline. Articles (Art.) in the Uniform Code of Military Justice (UCMJ) that require explanation will be presented in such a way to ensure that Soldiers are fully aware of the controls and obligations imposed on them by virtue of their military Service (see UCMJ, Art. 137).

*(c)*  Properly training their Soldiers and ensuring that both Soldiers and equipment are in the proper state of readiness at all times. Commanders must assess the command climate periodically to analyze the human dimension of

combat readiness. Soldiers must be committed to accomplishing the mission through the unit cohesion developed as a result of a healthy leadership climate established by the command. Leaders at all levels promote the individual readiness of their Soldiers by developing competence and confidence in their subordinates. In addition to being mentally, physically, tactically, and technically competent, Soldiers must have confidence in themselves, their equipment, their peers, and their leaders. A leadership climate in which all Soldiers and DA Civilians are treated with fairness, justice, and equity will be crucial to development of this confidence within Soldiers. Commanders are responsible for developing disciplined and cohesive units sustained at the highest readiness level possible. Command Climate Assessments (CCAs) will be conducted in accordance with appendix E.

*(d)* Requirement of exemplary conduct (Section 7233, Title 10, United States Code (10 USC 7233)). All commanding officers and others in authority in the Army are required—

1. To show in themselves a good example of virtue, honor, patriotism, and subordination.

2. To be vigilant in inspecting the conduct of all persons who are placed under their command.

3. To guard against and suppress all dissolute and immoral practices, and to correct, according to the laws and regulations of the Army, all persons who are guilty of them.

4. To take all necessary and proper measures, under the laws, regulations, and customs of the Army, to promote and safeguard the morale, the physical well-being, and the general welfare of the officers and enlisted persons under their command or charge.

*d. Assignment and command.* Soldiers are assigned to stations or units where their services are required. The commanding officer then assigns appropriate duties. Without orders from proper authority, a Soldier may only assume command when eligible according to chapter 2.

### 1–7. Military grade and rank

*a.* Military rank among officers of the same grade or of equivalent grade is determined by comparing dates of rank. An officer whose date of rank (DOR) is earlier than the DOR of another officer of the same or equivalent grade is senior to that officer (see 10 USC 741). Grade and precedence of rank confers eligibility to exercise command or authority in the U.S. military within limits prescribed by law.

*b.* Grade is generally held by virtue of office or position in the Army. For example, second lieutenant (2LT), captain (CPT), sergeant first class (SFC), chief warrant officer two (CW2) are grades. Table 1–1 shows the grades in the Army in order of their precedence. It indicates the grouping of grades into classes, pay grades, titles of address, and abbreviations.

*c.* The pay grade is also an abbreviated numerical device with useful applications in pay management, personnel accounting, automated data organization, and other administrative fields. However, the numerical pay grade will not be used as a form of address or title in place of the proper title of address of grade. A Soldier holding the numerical pay grade of E–5 will be addressed as "Sergeant," not as "E–5" (see table 1–1).

*d.* All chaplains are addressed as "Chaplain," regardless of military grade or professional title. When a chaplain is addressed in writing, grade is indicated in parentheses, for example, Chaplain (Major) John F. Doe.

*e.* Conferring honorary titles of military grade upon DA Civilians is prohibited. However, honorary titles already conferred will not be withdrawn.

**Table 1–1**
**Grades, Army**

**General officers**

Grade: General of the Army
Pay grade: Special
Title of address: General
Abbreviation: GA[1]

Grade: General
Pay grade: O–10
Title of address: General
Abbreviation: GEN

Grade: Lieutenant General
Pay grade: O–9
Title of address: General
Abbreviation: LTG

Grade: Major General

**Table 1–1**
**Grades, Army—Continued**

Pay grade: O–8
Title of address: General
Abbreviation: MG

Grade: Brigadier General
Pay grade: O–7
Title of address: General
Abbreviation: BG

**Senior field grade officers**

Grade: Colonel
Pay grade: O–6
Title of address: Colonel
Abbreviation: COL

**Field grade officers**

Grade: Lieutenant Colonel
Pay grade: O–5
Title of address: Colonel
Abbreviation: LTC

Grade: Major
Pay grade: O–4
Title of address: Major
Abbreviation: MAJ

**Company grade officers**

Grade: Captain
Pay grade: O–3
Title of address: Captain
Abbreviation: CPT

Grade: First Lieutenant
Pay grade: O–2
Title of address: Lieutenant
Abbreviation: 1LT

Grade: Second Lieutenant
Pay grade: O–1
Title of address: Lieutenant
Abbreviation: 2LT

**Senior field grade warrant officers**

Grade: Chief Warrant Officer, Five
Pay grade: W–5
Title of address: Chief/Mr./Mrs./Miss/Ms.
Abbreviation: CW5

**Field grade warrant officers**

Grade: Chief Warrant Officer, Four
Pay grade: W–4
Title of address: Chief/Mr./Mrs./Miss/Ms.
Abbreviation: CW4

Grade: Chief Warrant Officer, Three
Pay grade: W–3
Title of address: Chief/Mr./Mrs./Miss/Ms.
Abbreviation: CW3

**Company grade warrant officers**

Grade: Chief Warrant Officer, Two

**Table 1–1**
**Grades, Army—Continued**

Pay grade: W–2
Title of address: Chief/Mr./Mrs./Miss/Ms.
Abbreviation: CW2

Grade: Warrant Officer, One
Pay grade: W–1
Title of address: Mr./Mrs./Miss/Ms.
Abbreviation: WO1

**Cadets**

Grade: Cadet, U.S. Military Academy
Pay grade: Special
Title of address: Mr./Mrs./Miss/Ms./Cadet
Abbreviation: CDT

Grade: Cadet, Senior Advanced Reserve Officer's Training Corps (ROTC)
Pay grade: Special
Title of address: Mr./Mrs./Miss/Ms./Cadet
Abbreviation: CDT

**Candidates**

Grade: Officer Candidate
Pay grade: Special
Title of address: Candidate
Abbreviation: OC

Grade: Warrant Officer Candidate
Pay grade: Special
Title of address: Candidate
Abbreviation: WOC

**Enlisted noncommissioned officers**

Grade: Sergeant Major of the Army
Pay grade: E–9
Title of address: Sergeant Major
Abbreviation: SMA

Grade: Command Sergeant Major[2]
Pay grade: E–9
Title of address: Sergeant Major
Abbreviation: CSM

Grade: Sergeant Major[3]
Pay grade: E–9
Title of address: Sergeant Major
Abbreviation: SGM

Grade: First Sergeant
Pay grade: E–8
Title of address: First Sergeant
Abbreviation: 1SG

Grade: Master Sergeant
Pay grade: E–8
Title of address: Sergeant
Abbreviation: MSG

Grade: Sergeant First Class
Pay grade: E–7
Title of address: Sergeant
Abbreviation: SFC

Grade: Staff Sergeant

**Table 1–1**
**Grades, Army—Continued**

Pay grade: E–6
Title of address: Sergeant
Abbreviation: SSG

Grade: Sergeant
Pay grade: E–5
Title of address: Sergeant
Abbreviation: SGT

Grade: Corporal
Pay grade: E–4
Title of address: Corporal
Abbreviation: CPL

**Junior enlisted Soldiers**

Grade: Specialist[4]
Pay grade: E–4
Title of address: Specialist
Abbreviation: SPC[5]

Grade: Private first class
Pay grade: E–3
Title of address: Private
Abbreviation: PFC

Grade: Private
Pay grade: E–2
Title of address: Private
Abbreviation: PV2

Grade: Private
Pay grade: E–1
Title of address: Private
Abbreviation: PV1

Legend:
The following acronyms have been introduced:
Brigadier general (BG)
Cadet (CDT)
Colonel (COL)
Chief warrant officer four (CW4)
Chief warrant officer five (CW5)
First lieutenant (1LT)
First sergeant (1SG)
Command sergeant major (CSM)
Chief warrant officer three (CW3)
General (GEN)
Lieutenant colonel (LTC)
Lieutenant general (LTG)
Major (MAJ)
Major general (MG)
Master sergeant (MSG)
Officer candidate (OC)
Private enlisted one (PV1)
Private enlisted two (PV2)
Private first class (PFC)
Specialist (SPC)
Sergeant (SGT)
Staff Sergeant (SSG)
Sergeant First Class (SFC)
Sergeant Major of the Army (SMA)
Warrant officer candidate (WOC)
Warrant officer one (WO1)

Notes:

[1] Other abbreviations authorized for use in correspondence with the general public and agencies outside Department of Defense (DoD), on identification cards, and in personal correspondence are listed in AR 25–50.

[2] Personnel formally selected by DA for participation in the Command Sergeants Major Program.

[3] All E–9s not formally selected for the Command Sergeants Major Program.

[4] Specialist will rank immediately below corporal. This does not require or justify change to table of organization and equipment or table of distribution and allowances (TDA).

[5] Specialist and its abbreviation (SPC) will be used in written correspondence.

## 1–8.  Precedence between Soldiers and other Servicemembers serving with the Army

Members of other Services serving with the Army have equal status with Army Soldiers of equivalent grade. (Comparable grades among the Services are shown in table 1–2.)

**Table 1–2**
**Comparable grades among the Services**

| Army | Air Force | Marine Corps | Navy |
|---|---|---|---|
| **Officers** | | | |
| General of the Army | General of the Air Force | — | Fleet Admiral |
| General | General | General | Admiral |
| Lieutenant General | Lieutenant General | Lieutenant General | Vice Admiral |
| Major General | Major General | Major General | Rear Admiral (U) |
| Brigadier General | Brigadier General | Brigadier General | Rear Admiral (L) |
| Colonel | Colonel | Colonel | Captain |
| Lieutenant Colonel | Lieutenant Colonel | Lieutenant Colonel | Commander |
| Major | Major | Major | Lieutenant Commander |
| Captain | Captain | Captain | Lieutenant |
| First Lieutenant | First Lieutenant | First Lieutenant | Lieutenant (Junior Grade) |
| Second Lieutenant | Second Lieutenant | Second Lieutenant | Ensign |
| Chief Warrant Officer Five | — | Chief Warrant Officer Five | Chief Warrant Officer Five |
| Chief Warrant Officer Four | — | Chief Warrant Officer Four | Chief Warrant Officer Four |
| Chief Warrant Officer Three | — | Chief Warrant Officer Three | Chief Warrant Officer Three |
| Chief Warrant Officer Two | — | Chief Warrant Officer Two | Chief Warrant Officer Two |
| Warrant Officer One | — | Warrant Officer One | — |
| **Cadets** | | | |
| Cadet | Cadet | — | Midshipman |
| **Enlisted** | | | |
| Sergeant Major of the Army | Chief Master Sergeant of the Air Force | Sergeant Major of the Marine Corps | Master Chief Petty Officer of the Navy |
| Command Sergeant Major | Command Chief Master Sergeant | Sergeant Major | Command Master Chief Petty Officer |
| Sergeant Major | Chief Master Sergeant | Master Gunnery Sergeant | Master Chief Petty Officer |
| First Sergeant | Senior Master Sergeant | First Sergeant | Senior Chief Petty Officer |
| Master Sergeant | — | Master Sergeant | — |
| Sergeant First Class | Master Sergeant | Gunnery Sergeant | Chief Petty Officer |

**Table 1–2**
**Comparable grades among the Services—Continued**

| Army | Air Force | Marine Corps | Navy |
|------|-----------|--------------|------|
| Staff Sergeant | Technical Sergeant | Staff Sergeant | Petty Officer First Class |
| Sergeant | Staff Sergeant | Sergeant | Petty Officer Second Class |
| Corporal | — | Corporal | Petty Officer Third Class |
| Specialist | Senior Airman | — | — |
| Private First Class | Airman First Class | Lance Corporal | Seaman |
| Private | Airman | Private First Class | Seaman Apprentice |
| Private | Airman Basic | Private | Seaman Recruit |

## 1–9. Precedence between members of the Army and members of foreign military services serving with the Army

Members of foreign military services serving with the Army have equal status with Army members of equivalent grade. When authorized by the President or the Secretary of Defense, members of foreign military Service serving with the Army may exercise operational or tactical control over Army units, but they may not perform inherently governmental functions, to include exercising command over Soldiers of the U.S. Army or supervising Department of the Army Civilians.

# Chapter 2
# Command Policies

## 2–1. Chain of command

*a.* The chain of command assists commanders at all levels to achieve their primary function of accomplishing the unit's assigned mission while caring for personnel and property in their charge. A simple and direct chain of command facilitates the transmittal of orders from the highest to the lowest levels in a minimum of time and with the least chance of misinterpretation. The command channel extends upward in the same manner for matters requiring official communication from subordinate to senior.

*b.* Commanders are responsible for everything their command does or fails to do. However, commanders subdivide responsibility and authority and assign portions of both to various subordinate commanders and staff members. In this way, a proper degree of responsibility becomes inherent in each command echelon. Commanders delegate sufficient authority to Soldiers in the chain of command to accomplish their assigned duties, and commanders may hold these Soldiers responsible for their actions. Commanders who assign responsibility and authority to their subordinates still retain the overall responsibility for the actions of their commands.

*c.* Proper use of the chain of command is vital to the overall effectiveness of the Army. Commanders must acquaint all their Soldiers with its existence and proper function. Effective communication between senior and subordinate Soldiers within the chain of command is crucial to the proper functioning of all units. Therefore, Soldiers will use the chain of command when communicating issues and problems to their leaders and commanders.

## 2–2. Open door policies

Commanders will publish an open door command policy statement within their commands. Soldiers are responsible for ensuring that the commander is made aware of problems that affect discipline, morale, and mission effectiveness; and an open door policy allows members of the command to present facts, concerns, and problems of a personal or professional nature or other issues that the Soldier has been unable to resolve. The timing, conduct, and specific procedures of the open door policy are determined by the commander. They are responsible for ensuring that Soldiers are aware of the command's open door policy.

## 2–3.  Performance counseling

Commanders will ensure that all members of their command receive timely performance counseling. Effective performance counseling and feedback provided to officers, noncommissioned officers (NCO), enlisted Soldiers, and DA Civilian helps to ensure that they are prepared to carry out their duties efficiently and accomplish the mission.

*a.  Soldiers.*  AR 623–3 contains counseling requirements in conjunction with the evaluation reporting systems. Unit commanders will determine the timing and specific methods used to provide guidance and direction through counseling. ATP 6–22.1 provides advice and makes suggestions concerning effective counseling. Providing regular and effective performance counseling to all Soldiers, not just those whose performance fails to meet unit standards, is a command function. All commanders will ensure that their subordinate commanders have implemented and are maintaining an effective performance counseling program.

*b.  Department of the  Army Civilian.*  Commanders will refer to the applicable civilian performance management policies and regulation (for example, DoDI 1400.25, Volume 431; DoDI 1400.25, Volume 2011) for requirements for providing DA Civilian performance feedback during their performance cycle. All commanders will ensure that their subordinate leaders have implemented and are maintaining an effective performance management program.

## 2–4.  Staff or technical channels

Staff or technical channels may be used for sending reports, information, or instructions not involving variations from command policy and directives.

## 2–5.  Command of installations, activities, and units

*a.*  Responsibility.  Normally, the senior regularly assigned Army officer present for duty is responsible for the command of units, except as shown in paragraphs 2–8*a*, 2–13 and 2–15.

*b.*  Command of installations.  Command of Army installations is subject to policies, procedures, and regulations promulgated by HQDA.

(1)  A senior commander (SC), designated by Army senior leadership, exercises command of Army installations. The Command authority over the installation derives from the Title 10 authority of the Secretary of the Army (SECARMY) over installations. This is a direct delegation of command authority for the installation to the SC. The command authority of the SC includes all authorities inherent in command, including the authority to ensure the maintenance of good order and discipline for the installation.

(2)  Army installations are identified in one of two categories as follows:

*(a)  Army installations managed by AMC and AMC units, which include Garrison Commands, IMCOM Directorates and IMCOM Headquarters.*  Installations that AMC manages are discussed in paragraph 2–5*b*(3)(*d*).

*(b)  Army installations not managed by AMC.*  Installations that are not managed by AMC are discussed in paragraph 2–5*b*(3)(*e*).

(3)  Roles and responsibilities.

*(a)  Senior commander.*  The SC is normally, but not always, the senior General Officer (GO) at the installation. The mission of the SC is to care for Soldiers, Families, and DA Civilians, and to enable unit readiness. While the delegation of senior command authority is direct from HQDA, the SC will routinely resolve installation issues with AMC (normally, through AMC's subordinate organizations) and, as needed, the associated ACOM, ASCC, or DRU. The SC's higher headquarters (ACOM, ASCC, or DRU), on behalf of HQDA, will maintain oversight of the SC while executing installation missions. The SC uses the garrison command as the primary organization to provide services and resources to customers in support of accomplishing this mission. All applicable commands support the SC in the execution of SC responsibilities; therefore, the SC is the commander supported by AMC's Garrison Command and affiliated IMCOM Director, other installation service providers, and tenants as depicted in figure 2–1, Command and Support Relationships at AMC-managed Installations. The SC—

1.  Is normally a dual-hatted position. When this occurs, the commander exercises discrete authorities as the SC and as a mission commander. The SC responsibilities and authorities are installation focused; the responsibilities and authorities as the mission commander are mission focused.

2.  Can, in rare cases, be an HQDA-appointed DA Civilian instead of a uniformed SC, who will have the SC roles and responsibilities, except for UCMJ and command authority. In these instances, the individual will be referred to as the senior manager. Before the appointment of the senior manager, command and UCMJ authorities for the installation will be specified.

3.  Is responsible for synchronizing and integrating Army priorities and initiatives at the installation.

4.  Exercises the duties and responsibilities of the installation commander where that title is mentioned in the USC or DoD or Army policies, except on installations designated to be managed under DoD Joint Basing Guidance.

5. Exercises the duties and responsibilities of the senior commander when that title is mentioned in Army regulations, except for regulations involving operational duties and responsibilities. Mission commanders will retain operational duties and responsibilities.

6. May delegate, as necessary, unless prohibited by law, regulation, or HQDA general orders, assigned duties and responsibilities to the garrison commander (GC), subordinate GOs, or other GOs within the area of responsibility with the agreement of the parent organizations of those GOs. Such delegation will be made in writing and specifically state the duties and responsibilities delegated and the termination date of the delegation. SCs are not authorized to change rating chains for GCs, or delegate general court-martial convening authority (GCMCA).

7. Establishes installation priorities between all resident and supported units.

8. Prioritizes base operations support consistent with HQDA priorities and approved Army standards and minimum capability levels.

9. Oversees the base operation services and capabilities provided to customers. Ensures those services are provided within the HQDA guidance, designated priorities, and approved Army standards and coordinates with the Garrison Commander and, as needed, with the IMCOM Director or AMC to tailor the HQDA-approved minimum capability levels as required (either higher or lower), within available resources, to best meet local mission requirements.

10. Approves and submits the installation master plan consistent with HQDA long-range plans and goals through AMC's respective IMCOM Director to the ACOMs, ASCCs, or DRUs. For AMC-managed installations, the SC collaborates with the Garrison Commander and IMCOM Director before the SC submits the installation master plan.

11. Approves the Military Construction, Army and Military Construction, Army Reserve project priority list at the installation level. For AMC-managed installations, the SC collaborates with the Garrison Commander and IMCOM Director before the SC approves the project priority list for the installation. The IMCOM Director will consolidate and prioritize the SC-established priorities for their aligned installations and will gain appropriate ACOM, ASCC, or DRU agreement before submission to Commander, AMC. See AR 420–1 for additional information about military construction programs, master planning, and facilities operations and management.

12. Reviews and approves the prioritization of Family and installation programs consistent with law, regulation, and policy. For AMC-managed installations, the SC collaborates with the Garrison Commander and the IMCOM Directorate before the SC approves execution of Family and installation programs. The IMCOM Director will consolidate and prioritize the SC-established priorities for their aligned installations, and will gain appropriate ACOM, ASCC, or DRU agreement before submission to AMC.

13. Is, in coordination with the IMCOM Director, responsible for the FP of installations and facilities under his or her control. SCs will ensure local implementation of FP conditions is compliant with the ASCC minimum baseline, while assuming an adequate FP posture necessary to protect personnel and other vital assets from local threats. Commands with personnel residing on installations, regardless of military service, or whether on a permanent or temporary basis, will support and comply with the FP directives of the SC.

14. May be designated as a GCMCA pursuant to UCMJ, Art. 22(a). SCs who are not authorized to convene a general court-martial pursuant to UCMJ, Art. 22 and who the SECARMY has designated as a GCMCA may request designation as a GCMCA pursuant to AR 27–10, paragraph 5–2(a).

15. Submit appeals from administrative actions taken against individual Soldiers through ACOM, ASCC, or DRU channels, unless otherwise specified in Army regulations. The terms "next superior authority," "next higher authority," "next higher commander," and "next higher headquarters" as used in other Army regulations mean ACOM, ASCC, or DRU commander or headquarters.

16. Will follow command responsibilities for the Total Army Sponsorship Program in accordance with AR 600–8–8.

17. Serves as the senior Army representative to the surrounding community.

18. Is delegated, as an integral part of his command authority, oversight authority (including project prioritization) of all installation public works activities. Detailed descriptions of approval limits and project management are in AR 420–1, AR 140–483, and other facilities engineering publications (see AR 420–1 for a complete list).

19. Senior-rates the GC. On installations where that is not practical, an exception to this regulation should be obtained.

20. Consistent with applicable laws and policies, oversees, coordinates, and deconflicts resources to support mobilization operations on the installation; establishes installation priorities; and ensures mobilized units are supported to meet deployment requirements. These efforts may require the SC to reach out to AMC (for general support), or to the SC's ACOM, ASCC, or DRU (for command support).

*(b) Garrison commander.* The GC is a military officer, LTC/O–5 or COL/O–6, selected by HQDA. The GC commands the garrison, is the SC's senior executive for installation activities, is rated by the IMCOM Director, and is senior-rated by the SC. The GC and IMCOM organizations are the primary organizations to provide services to the

customers. The GC is responsible for the day-to-day operation and provision of base support services, which includes oversight of Government-owned, leased, and privatized housing and other services necessary to maintain installation readiness. The GC ensures that installation services and capabilities are provided in accordance with Army senior leader priorities, HQDA-directed programs, Army standard minimum capability levels, and SC and IMCOM guidance. The GC provides additional support in accordance with HQDA directives and provides reimbursable services in accordance with memoranda of agreement and/or installation support agreements as required by AR 5–9. The GC delivers Soldier and Family Readiness and installation programs, coordinates and integrates the delivery of support from other service providers, and obtains SC approval of the installation master plan. In some cases, the senior official on an installation may be the garrison manager. A garrison manager (the DA Civilian equivalent of a GC) has the same responsibility and authority as the military counterpart, except for UCMJ and command authority. Before the appointment of the garrison manager, command and UCMJ authorities for the garrison will be specified. The GC or garrison manager—

1. Represents the Army and the installation in the surrounding community as directed by the SC.

2. Serves as the Army's installation level representative in the Residential Communities Initiative's operating entity, on behalf of the Assistant Secretary of the Army (Installations, Energy, and Environment).

3. Approves and issues garrison policies in accordance with respective Army regulations or installation level policies involving tenant units as directed by the SC.

4. Implements policies for DA Civilians assigned to the garrison on the installation, subject to satisfaction of any applicable labor relations obligations.

5. Develops and implements an Integrated Protection Plan incorporating the functional elements of the Army Protection Program (such as anti-terrorism, critical infrastructure risk management, emergency management, physical security, law enforcement, fire and protection services, and continuity of operations).

6. Supports mobilization station requirements.

7. Integrates all installation services on the installation from all service providers.

*(c) ACOM, ASCC, or DRU commanders.* On AMC-managed installations, the commanders will—

1. Provide to AMC a prioritized list of Military Construction, Army and Military construction, Army Reserve projects and requirements that affect subordinate units to support the development of the military construction program and the program objective memorandum (POM).

2. Provide AMC with subordinate mission priority requirements for military construction and base operations.

3. Identify to AMC, through the base operations process and other requirements development processes, the required levels of garrison support needed to meet mission requirements, as well as any support requirements. Collaborate with IMCOM in developing garrison support requirements.

4. Evaluate the effectiveness of installation services and support and participate in the prioritization of these services and support.

5. Ensure the mobilization of subordinates as specified in AR 10–87 and Army executive orders.

6. Provide prioritization requirements for information technology (IT) and training enabler support to IMCOM.

7. Support and comply with the FP actions of the garrison as directed by the SC if they have personnel residing on installations, whether on a permanent or temporary basis.

8. Follow command responsibilities for the Total Army Sponsorship Program as stated in AR 600–8–8 and related official guidance.

9. Provide AMC protection requirements for critical infrastructure located on and off AMC-managed installations.

10. Provide installation services and support in direct support of the Army SC (ADRP 5.0 and FM 6–0). Modifications to installation service and support levels by these organizations will be coordinated through the SC and the respective ACOM, ASCC, DRU or other command before implementation on the installation. See figure 2–1.

*(d) Installations managed by Army Materiel Command.* The SECARMY designated IMCOM as a major subordinate command of Army Materiel Command (AMC) pursuant to General Orders No. 2019–13, Reassignment of the U.S. Army Installation Management Command as a Major Subordinate Command of the U.S. Army Material Command. U.S Army Environmental Command is a subordinate command of IMCOM. AMC manages Army garrisons assigned to it, executes installation readiness missions, provides equitable installation base operations services and facilities, optimizes resources, sustains the environment, and enhances the well-being of the military community. AMC integrates and delivers support to enable readiness within the strategic support area for a globally responsive Army through the supporting relationships illustrated in figure 2–1.

1. IMCOM, as a subordinate command to AMC, commands the garrisons assigned to it.

2. IMCOM and its subordinate organizations are in direct support (ADRP 5–0 and FM 6–0) to the SC on AMC-managed installations. A strong collaborative relationship between the SC and IMCOM Director is required. Directors are the first Senior Executive Service (SES) members in the IMCOM organizational structure and must know and

maintain a positive communication stream with SCs in their region. Directors can help shape expectations for instal-lation support, announce and explain emerging IMCOM policy and changes, and be the focal point for resolving conflicting priorities. The SC commands the installation, but funding and processes for most base operations flow through IMCOM.

3. The GC is rated by the IMCOM Director and senior-rated by the SC.

4. AMC, through IMCOM, ensures compliance with HQDA-directed programs and Army standard minimum ca-pability levels. AMC staffs and coordinates with HQDA funding requests for garrison support requirements identified by ACOMs, ASCCs, or DRUs that are not included in base operations services. The command and support relation-ships between HQDA; AMC; IMCOM; the ACOM, ASCC, or DRU; and the SC are shown in figure 2–1. Addition-ally, IMCOM—

a) Establishes the organizations and procedures for garrison public works operations and functions addressed in this regulation.

b) Manages and integrates the delivery of facilities engineering services across garrisons to ensure consistent qual-ity with optimal customer satisfaction.

c) Integrates safety and risk management in all installation operations (for example, facilities, utilities, nontactical vehicles, equipment, planning and design, and community activities and operations).

## Command & Support Relationship at IMCOM Managed Installations



**Figure 2–1. Command and support relationships at U.S. Army Materiel Command-managed installations**

*(e)* Army Material Command industrial base installations are managed in compliance with AR 700–90 and other appropriate industrial base authorities.

*(f)* Army installations not managed by AMC. The SC is designated in accordance with paragraphs 2–5*b*(3)(*a*) and 2–5*b*(3)(*f*). The SC roles and responsibilities are the same as for all other Army installations.

1. Army National Guard (ARNG) installations, facilities, and sites are managed in compliance with National Guard Bureau (NGB) requirements by commanders through individual U.S. Property and Fiscal Officers.

2. U.S. Army Military Surface Deployment and Distribution Command performs terminal management services as the ASCC for U.S. Transportation Command under the authority of DoDD 5158.04 and other appropriate authorities.

3. U.S. Army Training and Doctrine Command (TRADOC), ROTC detachments, and recruiting sites do not provide garrison support functions and do not have garrison activities.

4. U.S. Army Corps of Engineers-funded installations and separate facilities not on AMC-managed installations are managed in accordance with Federal law, AR 420–1, and other appropriate regulations.

*(g)* Change of senior commander.

1. Permanent change. Commanders of ACOMs (continental United States (CONUS)), ASCCs (CONUS and outside CONUS (OCONUS)), and DRUs (CONUS) may request a permanent change of SCs from the HQDA General Management Office (DACS–GOM) for the CSA's approval.

2. Temporary change. When commanders are temporarily absent from the installation, including for deployment, SCs may remain in command of installations or may relinquish command and designate an acting commander after coordination with the applicable ACOM, ASCC, or DRU commander. When designating an acting commander, the SC will notify senior Army leadership; AMC; IMCOM; and affected mission commands. Designation of an acting commander will be in accordance with the procedures established in this regulation for appointing acting commanders.

*c.* Uniform Code of Military Justice authority. UCMJ authority will be governed by AR 27–10.

*d.* Command by commanders in the grade of lieutenant general. Army commanders in the grade of lieutenant general or above may not assume command of Army installations, except when the installation serves as the location for a corps or higher headquarters. The CSA must approve exceptions to this policy and HQDA (DACS–GOM) will issue orders to implement the exception.

*e.* Announcement of assumption of command. Assumption of command will be announced in a memorandum and will contain the information in figure 2–2. Appointment orders that apply to only three- and four-star GOs, are shown in figure 2–3. SC designation will be indicated on the individual's permanent change of station (PCS) orders published by the General Officer Management Office.



**DEPARTMENT OF THE ARMY**
ORGANIZATION
STREET ADDRESS
CITY STATE ZIP

OFFICE SYMBOL                                                                [Date]

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT:  Assumption of Command by Authority of (appropriate subparagraph).

The undersigned assumes command of (complete unit designation and unit identification code (UIC)), effective (time/date).

(Signature block)
NAME, GRADE, BRANCH
Commanding
(or use the words "Acting Commander"
as appropriate [see paragraph 2-9a(3)]

**Figure 2–2.  Assumption of command**



**DEPARTMENT OF THE ARMY**
ORGANIZATION
STREET ADDRESS
CITY STATE ZIP

OFFICE SYMBOL                                                           [Date]

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: Appointment of Commander.

   By direction of the President, (grade, name, and branch) is appointed Commanding officer or commanding general of (complete unit designation and UIC), Effective (date).

**Figure 2–3.  Appointment of commander**

(1)  Oral assumption of command. Oral assumption of command may be used by units not using orders or other documentation to announce assumption of command or when other circumstances necessitate. Oral assumption of command should be followed by an assumption of command memorandum as expeditiously as possible.

(2)  Distribution. Distribution will be limited to one copy to each person concerned, subordinate commands or elements, interested commands, or agencies, and the next higher headquarters. A copy will be placed in the files of the issuing command and/or the affected command. When a GO, or GO designee, assumes permanent command, one copy will be provided to General Officer Management Office, Office of the Chief of Staff (DACS–GOM), 200 Army Pentagon, Washington, DC 20310–0200.

(3)  Filing. Organizations and units governed by AR 25–400–2 will file one copy of the assumption document under organizational history files. Disposition is shown in those documents.

(4)  Correction and amendments. Assumption of command documents will be amended, rescinded, or revoked by publishing the correct information in another assumption of command document. The document containing the correction will properly identify (by date) the document being corrected, and state to whom it pertains. The amended document will be distributed and filed, as appropriate.

*f.* Optimum length of command tours. The optimum length of command tours will be based on the needs of the Army, stability within units, need for officers with command experience, and availability of personnel. Normal optimum command tours are as follows:

(1)  Regular Army.

*(a)*  For company grade, 18 months with a minimum of 12 months.

*(b)*  For field grade, normal command tour length for battalion/brigade commanders is 18 to 24 months, or coincides with tour length for short tour and may be as long as 36 months or more for lifecycle manned units. Commanders who have completed 18 or more months of command as of 30 days before the unit's mission readiness exercise or culminating pre-deployment exercise will relinquish command. Officers who surpass 24 months because of deployment will relinquish command 30 to 90 days after redeployment. Extensions or curtailments will be coordinated through the officer's ACOM, ASCC, or DRU and then with the Colonel Management Office (DACS–CMO) for COLs or the Command Management Division, U.S. Army Human Resources Command (HRC) for LTCs.

*(c)*  Commanding generals (CGs) (MG or above) in coordination with the CG, HRC may curtail or extend field grade command tours up to 30 days. The ACOM, ASCC, or DRU commander in coordination with the CG, HRC, may curtail or extend field grade command tour for 31 to 60 days. The CSA must approve curtailments and extensions of field grade command tours for more than 61 days or for any extensions of field grade command beyond the normal 36 months.

*(d)* The policy in paragraph 2–5*f*(1)(*b*), does not apply to commands that have established 36 to 48 month tour lengths or to Army Acquisition Corps commands.

*(e)* In overseas areas where the tour length prevents such tenure of command, the command tour will coincide with the overseas tour.

*(f)* A COL will not normally hold a battalion-level command. Accordingly, if a promotable (P) LTC serving as a battalion commander has a projected promotion date during the command tour, ACOM, ASCC, or DRU commanders will coordinate with HRC to schedule a change of command date as close as possible to the projected promotion date of the officer. In cases when the change of command would adversely affect a significant operational requirement, the ACOM, ASCC, or DRU commander will submit a request through the Colonel Management Office to the Vice Chief of Staff, Army for an exception to policy.

(2)  Army Reserve. Army Reserve command tours are governed by AR 140–10.

*g.*  Command by general officers. Except as indicated in paragraph 2–7, a GO will not be assigned through the General Officer Management Office, Office of the Chief of Staff (DACS–GOM), without the prior approval of the CSA.

*h.*  Command of dental units. The senior Dental Corps officer, assigned or attached to a dental table of organization and equipment unit deployed to receive and treat patients, will assume command of that unit until properly relieved.

*i.*  Command of veterinary units. The senior veterinary officer assigned or attached to a veterinary unit deployed to care for Government-owned animals, for food inspection responsibilities, and/or for civic action programs, will assume command of that unit until properly relieved.

*j.*  Command of Regular Army training units. Army National Guard of the United States (ARNGUS) officers (when activated under 10 USC) and U.S. Army Reserve (USAR) officers, serving on active duty or active duty for training under 10 USC, may be assigned as acting commanders of Regular Army (RA) training units during annual training. This includes authority under the UCMJ, unless withheld by competent authority. SCs implementing the authority granted by this paragraph will ensure that—

(1)  Paragraphs 3–1 and 3–3 are followed.

(2)  USAR organizations have adequately trained their commanders according to the Manual for Courts-Martial (MCM) and AR 27–10.

(3)  USAR commanders receive orientation regarding the administration of military justice at the installation and unit levels.

(4)  Necessary attachment orders, direction of the Presidential authority, assumption of acting command letter, administrative measures, and appeal channels are accomplished.

(5)  Staff or command judge advocates monitor the fair and just administration of military justice.

*k.*  Active Guard Reserve personnel. Active Guard Reserve (AGR) personnel may be assigned duties (for example, serve as company commanders of RA units in U.S. Army Recruiting Command) that—

(1)  Support operations or missions assigned in whole or in part to RCs.

(2)  Support operations or missions performed or to be performed by a unit composed of elements from more than one component of the same Armed Force; or a joint forces unit that includes one or more USAR units; or a member of a USAR whose USAR assignment is in a position in an element of the joint forces unit.

(3)  Advise the Secretary of Defense, the Secretaries of the military departments, the Joint Chiefs of Staff, and the commanders of the unified combatant command regarding RC matters.

*l.*  All Commanders—

(1)  Commanders are required to fulfill applicable labor relations obligations before implementing policy for DA Civilians covered by collective bargaining agreements.

(2)  Commanders are reminded that AR 20–1 requires that complaints against a promotable COL, an active or retired GO, IGs of any component, members of the SES, or executive schedule personnel will be forwarded to the Department of the Army Inspector General's Investigation Division (SAIG–IN).

(3)  Commanders will conduct CCAs at the outset of and periodically during the command tenure (see app E).

(4)  Commanders are reminded that AR 614–100 and AR 614–200 prescribe procedures for transfer of victims of sexual assault. Requests for transfers and transfers must be accomplished within the timeframes included in these regulations.

## 2–6.  Command of installations, activities, and units of Joint bases

*a.  The senior authority for Army commands and units on installations derives from the Secretary of the Army and the Chief of Staff of the Army.*  The appointment is usually designated to the senior United States Army commander assigned for duty. Inherent in the appointment is the responsibility for the unity of effort of all Army commands and

units on the installations. Accordingly, Army commands and units of joint bases have, at minimum, a tactical operation/tactical control command relationship to the senior Army commander.

*b. Title 10 USC* commanding of Joint bases. DoD joint basing guidance sets forth the policy for operating a joint base. The designated supporting (lead) component is responsible for documenting force requirements for joint base organization structure including a joint base commander (JBC) billet (see fig 2–5). The JBC is responsible for the delivery of installation support to all components, both DoD and non-DoD tenants. The JBC reports to the next echelon of the supporting component's installation support organization. The Joint Management Oversight Structure (JMOS), established by DoD's joint basing guidance, provides a governing body that will resolve conflicts involving land and facilities use, installation support costs, competing demands for installation resources, and total obligatory authority transfers. A joint base MOA for each separate joint base, signed by the VCSA and the other Service components' VCSAs, provides the framework for component relationships.

*c. Authorities, roles, and responsibilities for joint bases.* Authorities, roles, and responsibilities for joint bases where the Army is the supporting component, such as Joint Base Lewis-McCord and Joint Base Myer-Henderson Hall, are executed in accordance with paragraph 2–5 to the extent they do not conflict with DoD joint basing requirements. Base operation services and 10 USC authorities, roles and responsibilities for installations where the Army is the supported component reside with the supporting component. In such cases, the senior Army commander is designated as the Senior Army Element Commander (SAEC) and fulfills the roles and responsibilities on the installation as defined in this paragraph. In rare cases, the senior Army representative is a DA Civilian. In this case, the individual will be referred to as the senior Army manager. Prior to the appointment of the senior Army manager, command and UCMJ authorities for the Army commands and units will be specified. Unless prohibited by law or regulation, the SAEC or senior Army manager may delegate, in writing, installation roles to an appropriate-level subordinate or officers/senior noncommissioned officers/DA Civilians in tactical control units with the concurrence from their unit's higher headquarters.



**Figure 2–4. Command relationships at Joint bases**

*d. Joint base governing process.* Army commands and units will operate in full compliance with DoD requirements. In the event of a discrepancy between this regulation and the DoD policies and procedures for Joint bases, the DoD policy or procedure takes precedence.

(1) Joint bases are governed by the JMOS (see fig 2–5).

(2) The SAEC has two formal avenues to influence base operations and mission readiness services through the JMOS. The first avenue is through representation on the Joint Base Partnership Council and the joint base installation collaboration forums mandated by DoD. The second avenue is through the support command relationship with IMCOM Directors, who represent Army interests on the Intermediate Command Summit and, when necessary, can elevate SAEC joint base issues to the Military Department level for resolution.

(3) For Army interests and equities on joint bases where the Army is the supported component, the SAEC is the supported command and the IMCOM Director is the supporting command.

*e. Senior Army Element Commander roles and responsibilities.*

(1) May be designated as the GCMCA pursuant to UCMJ, Art. 22(a). The appellate and review authority for administrative actions taken by the SAEC pertaining to individual Soldiers and DA Civilians will flow through ACOM, ASCC, or DRU channels, unless otherwise specified in Army regulations. The terms "next superior authority," "next higher authority," "next higher commander," and "next higher headquarters" as used in other Army regulations, mean ACOM, ASCC, or DRU commander or headquarters.

(2)  Establish and synchronize base operations and installation mission readiness priorities among Army commands, units, and residents. Communicate the Army's priorities to the JBC, AMC, and the supporting IMCOM Director.

(3)  Ensure the Army has appropriate representation and an active voice at all DoD mandated joint base forums, such as real property, morale and welfare, and force protection, and in all financial reviews to inform the JBC's decision cycles.

(4)  Review the joint base performance output to ensure the delivery of base operations and installation mission readiness services meet the needs of the Army mission, Soldiers, Families, and DA Civilians. Participates in updates to the joint base MOA.

(5)  Approve the Army's input into the joint base master plan.

(6)  Prioritize and submit Army commands' and units' restoration and modernization needs, minor military construction projects and military construction projects.

(7)  Advise the JBC, AMC, and IMCOM Director on new or changed base operations and installation mission readiness services for adjudication and implementation.

(8)  Serve as the senior Army representative to the joint base and the surrounding community.

(9)  Maintain good order and discipline.

(10)  Senior rate the Army support activity commander.

*f.  Army support activity commander.*

(1)  Army support activities (ASA) exist on joint bases where the Army is the supported component. The ASA provides services that are inherently Army mission and warfighter related, as well as Army-centric services excluded/exempted for transfer by DoD (see fig 2–4 for organization relationships on joint bases).

(2)  The ASA commander is a military officer in the grade of COL or LTC. The position is typically rated by the IMCOM Director and senior rated by the SAEC. The ASA commander is responsible for day-to-day operations and management of Army specific base operation services in accordance with HQDA programs, Army standards, and the SAEC's intent. Service to other entities may be provided on a reimbursable basis.

(3)  The ASA commander may be designated as a summary courts-martial convening authority or special courts-martial convening authority (SPCMCA) for the Army units and activities in the area of responsibility. In rare cases, the ASA commander may be designated by SECARMY as GCMCA.

(4)  In some cases, the senior official in an ASA may be a Garrison Manager. In this case, the individual will be referred to as the ASA manager. An ASA manager has the same responsibility and authority as an ASA commander, with the exception of UCMJ and command authority. Prior to the appointment of an ASA manager, command and UCMJ authorities for the Army units and activities will be specified.



Figure 2–5. Joint Base Management Oversight Structure

## 2–7. Specialty immaterial commands
The senior officer regularly assigned and present for duty with logistical commands (or communication zone head-quarters, sections, and areas) and similar specialty immaterial commands will assume command of the organization. (This provision applies unless the senior officer is ineligible under paras 2–16 or 2–17.)

## 2–8. Designation of junior in the same grade to command
The DCS, G–1 is responsible for policy on the designation of junior in the same grade to command.

*a.* When two or more commissioned officers of the same grade, both of whom are eligible to command, are as-signed to duty in the same command or organization, the President may assign the command of forces without regard to seniority by DOR.

*b.* GOs are authorized to announce by direction of the President, the designation of one of several officers of the same grade within a command under their jurisdiction as a commander thereof, subject to the following conditions:

(1) This refers to GOs commanding ACOMs, ASCCs, or DRUs, armies, corps, installations, divisions, separate brigades, regional support commands (RSCs), and heads of DA staff agencies. This may be done without regard to relative seniority. (See paras 2–5 and 2–9 for policy on GOs.) When an officer who is junior by DOR is designated to command, a memorandum will be used to announce the appointment and will contain the information shown in figure 2–2.

(2) This appointment is used only if the duties of the position require exercising command. It is not used to assign a junior officer to a staff position that requires supervising and controlling activities of an officer senior by DOR. In staff supervisory positions, commanders make such appointments merely by designation in a memorandum.

*c.* Commanders will not use the Presidential authority cited in this paragraph to appoint a junior member as their own successor, either temporarily or permanently. In some cases, a commander having authority under this paragraph may find it preferable to place a junior member in his or her position temporarily as acting commander. If so, a request stating the circumstances and asking for the appointment to be made will be sent to the next higher commander having authority under this paragraph. The next higher commander will review the request and approve or disapprove the request. Commanders will not issue a blanket designation without prior approval from the ACOM, ASCC, or DRU commander, and, in cases involving GOs, coordination with the General Officer Management Office (DACS–GOM), 200 Army Pentagon, Washington, DC 20310–0200 for CSA approval. Each designation of a junior to a command position requires a separate action by the appropriate authority, except when prior approval of a blanket designation has been authorized.

*d.* The authority in this paragraph will not be used to assign command functions to chaplains or, unless authorized by the SECARMY or their appointee, to officers of the Army Medical Department (AMEDD), except as authorized in paragraph 2–17.

*e.* Commanders and their staffs, at all levels of command, are responsible for ensuring proper delegation of authority to NCOs by their seniors. This policy applies whether the senior is an officer, WO, or another NCO.

## 2–9.  Death, disability, retirement, reassignment, or absence of the commander

*a. Commander of Army element.*

(1) Except as provided for in paragraphs 2–9*c* and 2–9*d*, if a commander of an Army element, other than a commander of a headquarters and headquarters element, dies, becomes disabled, retires, is reassigned, or is temporarily absent in any status other than present for duty, the senior regularly assigned Army Soldier will assume command.

(2) If the commander of a headquarters and headquarters element dies, becomes disabled, retires, is reassigned, or is temporarily absent in any status other than present for duty, the senior regularly assigned Army Soldier of the particular headquarters and headquarters element who performs duties within the element will assume command. For example, if a division headquarters and headquarters company commander is temporarily absent, the executive officer as the senior regularly assigned Army Soldier who performs duties within the headquarters company would assume command, rather than the division commander.

(3) Senior regularly assigned Army Soldier refers (in order of priority) to officers, WOs, cadets, NCOs, specialists, or privates present for duty unless they are ineligible under paragraphs 2–16 or 2–17. They assume command until relieved by proper authority, except as provided in paragraph 2–9*c*. Assumption of command under these conditions is announced per paragraph 2–5. However, the announcement will indicate assumption as acting commander unless designated as permanent by the proper authority. It is not necessary to rescind the announcement designating an acting commander to assume duties of the commander "during the temporary absence of the regularly assigned commander" if the announcement gives the time element involved. A rescinding announcement is required if the temporary assumption of command is for an indefinite period.

*b. Principal officials of the Headquarters, Department of the Army.*  On the death, disability, or temporary absence of a principal official of HQDA, the SECARMY will designate an acting principal official. This does not apply to those principal officials of HQDA who are Presidentially-appointed and Senate confirmed. The succession of Presidentially-appointed and Senate confirmed positions is governed by the Federal Vacancies Reform Act.

*c. Commanders of Army commands, Army service component commands, or direct reporting units.*  A commander of an ACOM, ASCC, or DRU may continue to discharge the functions of command while absent from the limits thereof, if—

(1) Such absence is for a short period only.

(2) The commander has reasonable communication with the ACOM, ASCC, or DRU headquarters.

(3) The absence is not caused by physical disability.

*d. General officers.*  During the temporary absence of the regularly assigned GO commander, ACOMs, ASCCs, or DRUs are authorized to assign GOs under their command to the vacant command position.

## 2–10.  Absence or disability of all officers of a unit

On death, disability, or absence of all officers (to include W2 to W5) of a unit normally commanded by an officer, the appropriate commander of the next higher command permanently assigns an officer to command, preferably of the branch to which the unit belongs. Higher commanders should continue to seek out officers to serve in this role before deferring to the permanent assignment of non-officers. Pending assignment and arrival of the new commander, a cadet, NCO, specialist, or private regularly assigned to the unit will exercise temporary command. Restrictions on assuming command in paragraphs 2–16 and 2–17 apply. Assumption of command will be as noted in paragraph 2–9.

## 2–11.  Emergency command

The senior officer, WO, cadet, NCO, or junior enlisted Soldier among troops at the scene of an emergency will assume temporary command and control of the Soldiers present. These provisions also apply to troops separated from their parent units under battlefield conditions. The senior person eligible for command, whether officer or enlisted, within a prisoner of war camp or among a group of prisoners of war, or a group of personnel detained by hostile forces or elements will assume command according to grade and DOR seniority without regard to Service.

## 2–12.  Functions of an individual in temporary command

A commander in temporary command will not, except in urgent cases, alter or annul the standing orders of the permanent commander without authority from the next higher command. Temporary command is defined to include command assumed under conditions outlined in paragraphs 2–9, 2–10, and 2–11. Such commanders will be considered temporary until designated as permanent, or until replaced by the proper appointing authority.

## 2–13.  Responsibility of successor

A commander who succeeds to any command or duty assumes the duties of his or her predecessor. The successor will assume responsibility for all orders in force and all the public property and funds pertaining to the command.

## 2–14.  Separate commands of the Army serving together

a.  When separate commands of the U.S. Army join (or perform duty) together, the senior officer present for duty on full-time duty in the active military service of the United States with the commands concerned will command the forces unless otherwise directed by the President. He or she must not be ineligible under paragraph 2–16 or 2–17.

b.  32 USC 317 states: "When any part of the National Guard that is not in Federal service participates in an encampment, maneuver, or other exercise for instruction, together with troops in Federal service, the command of the post, air base, or other place where it is held, and of the troops in Federal service on duty there, remains with the officers in Federal service who command that place and the Federal troops on duty there, without regard to the grade or DOR of the officers of the National Guard not in Federal service who are temporarily participating in the exercise."

c.  When USAR units take part in active duty for training or annual training at a post, the command of that post remains with the officers normally in command. This provision applies regardless of the rank of the officers of the USAR unit who are temporarily taking part in training there.

## 2–15.  Separate commands of the several military services of the United States serving together

a.  When separate commands of the several military services join (or perform duty) together, or personnel of another Service serve with the Army, operational control by an officer of one Service over the units or members of the other Services may be given by agreement between the Services concerned, or as directed by the National Command Authority, by the commander of a unified command to which the separate commands are assigned, or by agreement between two or more commanders of unified commands to which the separate commands are assigned. When the different commands of the Army, Navy, Air Force, Marine Corps, and Coast Guard join or serve together, the officer highest in grade in the Army, Navy, Air Force, Marine Corps, or Coast Guard, who is otherwise eligible to command, will command all those forces, unless otherwise directed by the President (see 10 USC 747).

b.  Unless otherwise directed by proper authority in the operational chain of command, the commander of the joint forces exercises operational control of the forces of each Service. This will be done through the commander of each component, who will retain responsibility for such intra-service matters as administration, discipline, internal organization, and unit training. Ordinarily, an accused will not be tried by a court-martial convened by a member of a different Armed Force unless the accused cannot be delivered to their own Service without manifest injury to the Armed Forces. However, commanders of unified combatant commands may convene courts-martial over members of any of the Armed Forces, and commanders of joint commands or joint task forces may convene general courts-martial for the trial of members of any of the Armed Forces assigned or attached to their command when specifically empowered to convene general courts-martial by the President or Secretary of Defense under UCMJ, Art. 22(a)(9) (see MCM, Rule for Courts-Martial (RCM) 201(e)).

## 2–16.  Ineligibility for command of post or activity

A person will be considered ineligible for command of an installation, a post or activity when—

a.  Quartered there, but has a headquarters or office elsewhere.

b.  A student at a Service school or DA Civilian institution or undergoing individual training, instruction, or temporary duty (TDY) enroute to a post where they are not a part of the command.

c.  Not permanently assigned, and/or the unit involved is not permanently assigned to the post.

*d.* Assigned primarily as a permanent member of a board.

*e.* Prohibited from assuming command by statute or by paragraph 2–17.

*f.* Assigned specific duty aboard a military vessel or aircraft where the officer's particular duty, specialty, or military occupational specialty (MOS) does not technically qualify him or her to assume the duty of ship's master or aircraft commander.

*g.* In arrest (a person under arrest is ineligible to exercise command of any kind).

## 2–17.  Restrictions

*a.  Officers on duty in Department of the Army Staff agencies.*  Officers on duty or detailed to any of the Services or staff agencies and bureaus of DA (including heads thereof) will not normally assume command of troops other than those of the Service, staff, or bureaus where they are on duty. Exceptions must be directed by proper authority.

*b.  Officers of the Army Medical Department.*

(1) Officers of the AMEDD may exercise command within the AMEDD according to AR 40–1.

(2) As an exception, officers of the Medical Service Corps may command troops not part of the AMEDD when authorized by the SECARMY; commanders of ACOMs, ASCCs, DRUs, Army groups, armies, corps, divisions, or comparable units; chiefs of the military services; or heads of other DA staff agencies.

*c.  Chaplains.*  A chaplain has rank without command. Although chaplains may not exercise command, they may exercise operational supervision and control.

*d.  Commanding officer of troops on transports.*  Military personnel embarking on Military Sealift Command vessels are available for command duty unless otherwise indicated in their travel orders or precluded from assuming command by reason of their branch of Service. GOs will be excluded from this requirement. Designation of colonels will be at the discretion of the terminal commander.

*e.  U.S. Army Reserve unit commanders.*  The authority delegated under paragraph 2–8 will apply in the following cases when it is not practical to assign the senior officer to command:

(1) When the USAR officer selected to command a USAR unit, while in Reserve duty training status, is junior in DOR to other officers of the same grade assigned to that unit (see AR 600–8–29).

(2) When a USAR unit is ordered to active duty, and the assigned unit commander is junior in DOR to other assigned officers of the same grade (see AR 600–8–29).

*f.  Warrant officers.*  When assigned duties as station, unit, or detachment commander, WOs are vested with all the powers usually exercised by other commissioned officers (see DA Pam 611–21 for exceptions).

*g.  Partially disabled officers.*  Partially disabled officers continued on active duty under AR 635–40 will be assigned to positions in which their special qualifications make them of particular value to the Service. Such officers will not be assigned to command positions unless the assigning authority determines that the person—

(1) Has the medical (physical) career potential to serve in combat situations.

(2) Able to serve until the age for mandatory retirement.

*h.  Inspectors general.*  An officer detailed to duty as an inspector general (IG) will not assume command of troops while so detailed. However, an IG is not precluded from assuming temporary command of an organization if he or she—

(1) Is the next senior regularly assigned Army officer of the organization.

(2) Is not otherwise ineligible.

(3) Has been relieved from detail as an IG during the period of temporary command.

*i.  Program executive officers.*  With the exception of the CG, U.S. Army Corps of Engineers and the CG, U.S. Army Space and Missile Defense Command, an officer assigned as a program executive officer will not assume command of troops, installations, or activities while so assigned. Requests for exceptions for GOs, other than those specified above, will be submitted to General Officer Management Office (DACS–GOM), 200 Army Pentagon, Washington, DC 20310–0200.

*j.  Professors at the U.S. Military Academy.*  Officers appointed as permanent professors at the U.S. Military Academy (USMA) exercise command only in the academic departments of the USMA.

## 2–18.  Relief for cause

*a.*  When a higher ranking commander loses confidence in a subordinate commander's ability to command due to misconduct, poor judgment, the subordinate's inability to complete assigned duties, or for other similar reasons, the higher ranking commander has the authority to relieve the subordinate commander. Relief is normally preceded with formal counseling by the commander or supervisor unless such action is not deemed appropriate or practical under the circumstances. Although any commander may temporarily suspend a subordinate from command, final action to relieve an officer from any command position will not be taken until after written approval is obtained from the first

GO (to include one frocked to the grade of BG) in the chain of command of the officer being relieved. Any action purporting to finally relieve an officer from any command position prior to the required written approval will be considered for all purposes as a temporary suspension from assigned duties, rather than a final relief from command for cause. If a GO (to include one frocked to the grade of BG) is the relieving official, no further approval of the relief action is required; however, the provisions of AR 623–3 concerning the administrative review of relief reports remain applicable.

*b.* When a commander loses confidence in a CSM's ability to perform duties due to any of the reasons outlined in subparagraph 2–18*a*, the procedures in AR 614–200 must be followed.

*c.* If a relief for cause is contemplated on the basis of an investigation under AR 15–6, the referral and comment procedures of that regulation must be followed before initiating or directing the relief. This does not preclude a temporary suspension from assigned duties pending completion of the procedural safeguards contained in AR 15–6. Any action purporting to initiate or direct a relief for cause on the basis of an investigation under AR 15–6 taken prior to completion of the procedural safeguards of AR 15–6 will be considered for all purposes as a temporary suspension from assigned duties.

### 2–19.  Noncommissioned officer support channel

*a.*  The NCO support channel (leadership chain) parallels and complements the chain of command. It is a channel of communication and supervision from the CSM to the 1SG, and then to other NCOs and enlisted personnel of the unit. Commanders will define the responsibilities and authority of their NCOs to their staffs and subordinates. This NCO support channel will assist the chain of command in accomplishing the following:

(1)  Transmitting, instilling, and ensuring the efficacy of the professional Army Ethic.

(2)  Planning and conducting the day-to-day unit operations within prescribed policies and directives.

(3)  Training enlisted Soldiers in their MOS, as well as in the basic skills and attributes of a Soldier.

(4)  Supervising unit physical fitness training and ensuring that unit Soldiers comply with the weight and appearance standards of AR 600–9 and AR 670–1.

(5)  Teaching Soldiers the history of the Army, to include military customs, courtesies, and traditions.

(6)  Caring for individual Soldiers and their Families both on and off-duty.

(7)  Teaching Soldiers the mission of the unit and developing individual training programs to support the mission.

(8)  Accounting for and maintaining individual arms and equipment of enlisted Soldiers and unit equipment under their control.

(9)  Administering and monitoring the Noncommissioned Officer's Development Program and other unit training programs.

(10)  Achieving and maintaining courage, candor, competence, commitment, and compassion.

(11)  Fostering initiatives through the NCO support channel that encourage first-line and junior leaders to take responsibility for building a team in a climate of respect and trust.

*b.*  DA Pam 611–21 and TC 7–22.7 contain specific information concerning the responsibilities, command functions, and scope of NCO duties.

(1)  *Sergeant Major of the Army.*  This is the senior SGM grade and designates the senior enlisted position of the Army. The SGM in this position serves as the senior enlisted advisor and consultant to the SECARMY and CSA, and advises senior Army leadership on matters affecting manning, equipping, training, quality of life, and other policies and programs that may affect the Army.

(2)  *Command sergeant major.*  This position title designates the senior NCO of the command at battalion or higher levels. They carry out policies, enforce standards, and advise the commander on the performance, training, appearance, and conduct of enlisted Soldiers. The CSM administers the unit Noncommissioned Officer's Development Program.

(3)  *First sergeant.*  The position of 1SG designates the senior NCO at company level. The 1SG of a separate company or equivalent level organization administers the unit Noncommissioned Officer's Professional Development Program.

(4)  *Platoon sergeant.*  The platoon SGT is the key assistant and advisor to the platoon leader. In the absence of the platoon leader, the platoon SGT leads the platoon.

(5)  *Section, squad, and team leaders.*  These direct leaders are the NCOs responsible at this level.

*c.*  NCO disciplinary policies are shown below:

(1)  NCOs are important to maintaining discipline in the Army. The policies prescribed in this subparagraph should be considered together with the provisions of chapter 4 of this regulation, AR 27–10, and the MCM.

*(a)*  NCOs have the authority to apprehend persons subject to the UCMJ pursuant UCMJ, Art. 7; RCM 302(b); and chapter 4.

*(b)* NCOs may be authorized by their commanders to order enlisted Soldiers of the commanding officer's command or enlisted Soldiers subject to the authority of that commanding officer into arrest or confinement pursuant to UCMJ, Art. 9 and RCM 304(b).

(2) NCOs do not have authority to impose nonjudicial punishment on other enlisted Soldiers under the MCM (UCMJ, Art. 15). However, the commander may authorize an NCO in the grade of SFC or above, provided such person is senior to the Soldier being notified, to deliver the DA Form 2627 (Record of Proceedings under Article 15, UCMJ) and inform the Soldier of his or her rights. In cases of nonjudicial punishment, the recommendations of NCOs should be sought and considered by the unit commanders.

(3) As enlisted leaders of Soldiers, NCOs are essential to furthering the efficiency of the company, battery, or troop. This function includes preventing incidents that make it necessary to resort to trial by courts-martial or the imposition of nonjudicial punishment. Thus, NCOs are assistants to commanders in administering minor nonpunitive corrective actions as found in AR 27–10 and Part V of the MCM. "Nonpunitive measures" are not "nonjudicial punishment."

(4) In taking corrective action with regard to subordinates, NCOs will be guided by and observe the principles listed in chapter 4.

*d.* NCO prerogatives and privileges are shown below. NCOs will—

(1) Function only in supervisory roles on work details and only as NCOs of the guard on guard duty, except when temporary personnel shortages require the NCO to actively participate in the work detail.

(2) Be granted such privileges as organizations and SCs are capable of granting and consider proper to enhance the prestige of their enlisted troop leaders.

# Chapter 3
# Ready and Resilient

## 3–1. General

*a.* The Deputy Chief of Staff, G–1 (DAPE–AR) executes the Ready and Resilient requirements, under the supervision of the Assistant Secretary of the Army, Manpower and Reserve Affairs (ASA M&RA), 300 Army Pentagon, Washington, DC 20310–0300.

*b.* The Army requires innovative and adaptive leaders of character and cohesive teams of fit, resilient individuals who are committed to the Army Profession and able to thrive in conditions of complexity and uncertainty. To sustain this vision, the Army provides commanders and leaders ready and resilient capabilities enabling them to strengthen resiliency and improve readiness. Sustaining personal readiness is a necessary component of maintaining the readiness of the Force. Personal readiness is an individual's physical, psychological, social, spiritual and Family preparedness to strengthen individual readiness and promote a culture of trust founded on the Army Values.

*c.* The Army has implemented a holistic, comprehensive prevention model to strengthen Soldiers, build protective factors, and foster a culture of trust to promote deployability, successful service, and unit cohesion. The prevention model empowers Army leaders to gain a holistic picture of personal readiness from entry to end-of-service and tailor and operationalize resources and training based on identified opportunities and evidence-informed practices that focus on strengthening the force. The Army is also focused on improving readiness of the Army through the development and enhancement of science and research, data collection and analysis, strategic communications, training, and policies that are designed to improve individual readiness and resilience and minimize suicide behaviors for Soldiers, DA Civilians, and Families.

*d.* R2 has four strategic objectives—

(1) Sustained personal readiness to meet operational requirements.

(2) Sustain a values-based organization of trusted Army professionals.

(3) Enhanced visibility of personal readiness throughout a career.

(4) R2 management that enables personal readiness.

## 3–2. The Army Ready and Resilient strategic governance process

The R2 governance process is one by which individual programs and processes, that once operated independently, provide senior leadership with a collaborative synthesis of information to oversee, identify and critically assess the attributes of personal readiness, as well as gaps and potential solutions that enhance R2 execution. The process evaluates and strengthens the Army through a comprehensive strategy that utilizes feedback and metrics that support timely decisions; identifies, synchronizes and improves efficiencies; and allocates the appropriate resources needed to increase the readiness of the Force. Overall, R2 governance streamlines and facilitates communication and provides

opportunities to implement emerging practices rapidly throughout the Army. The governance process consists of multiple entities including, but not limited to, the Senior Commanders' Ready and Resilient Council (CR2C) and ACOM/ASCC/DRU/Director ARNG CR2C.

*a.* At installations, the CR2C is a community-level governing body chaired by the SC to provide a comprehensive approach to readiness and resilience. The CR2C is the platform to determine, prioritize and elevate issues that impact personal readiness and health of the installation, as well as identify gaps and overlaps in capabilities and services to ensure appropriate resources are aligned to identified objectives.

*b.* The ACOM/ASCC/DRU/Director ARNG CR2C is a forum in which commanders assess personal readiness across the command, provide guidance, and establish priorities in support of operational objectives.

*c.* There are supporting R2 forums at HQDA. These include: the Council of Colonels, chaired by the DCS, G–1, The Surgeon General (TSG), and the DCS, G–9; and the General Officer Steering Committee, chaired by the DCS, G–1, TSG, and the DCS, G–9. The supporting governing process provides an avenue through which challenges and emerging practices are actioned by ARSTAF in support of R2 initiatives.

### 3–3. Responsibilities

*a.* The SECARMY establishes guidance to ensure Army policy, programs, processes, systems and resources are effectively targeted to promote Total Army readiness.

*b.* The CSA ensures the readiness of the Force by the effective and timely implementation of policy, program, and budget decisions necessary to enable the Army's R2 efforts.

*c.* The ASA (M&RA) oversees the implementation and execution of this chapter to ensure compliance with DoD and Army policy.

*d.* The VCSA—

(1) Supervises the ARSTAF in their coordinated efforts to develop an integrated and holistic approach to enable the resilience and readiness of the Force.

(2) Advises the SECARMY and CSA on recommendations and issues related to R2.

*e.* The office of the ASA (M&RA) provides strategic guidance and management of human capital, military, and DA Civilian, across all Army components and provides strategic guidance for R2 committees.

*f.* The DCS, G–1 is the proponent for personal readiness and resilience, and is responsible for integrating all R2 capabilities; identifying and developing policy changes necessary to achieve the Army's R2 end-state. Responsibilities include the following:

(1) Serves as proponent for R2.

(2) Establishes compliance requirements guidance for R2 initiatives.

(3) Appoints a R2 director.

(4) Provides staff and administrative support, and coordinates the agenda for and conducts meetings of the Army R2 Council.

(5) Maintains and updates the tools necessary to ensure a holistic approach to integrated strategic planning for R2 efforts.

(6) Represents the holistic perspective of Army R2 initiatives in the planning, programming, budgeting, and execution process.

*g.* ARSTAF principals provide strategic oversight and direct Army wide policy, programs and/or services, and associated resources in support of R2 goals and outcomes.

*h.* ACOM, ASCC, DRU commanders, USAR and ARNG.

(1) On an ongoing basis, monitor and submit to the DCS, G–1 required reports on installation, regional, and command personal readiness trends and initiatives to assist in identifying emerging practices.

(2) Request assistance from the U.S. Army Public Health Command with C2RCs, as needed.

(3) Provide additional reports to HQDA, as required.

(4) Require subordinate commanders to use R2 objectives as the focal point for their risk reduction and health promotion efforts.

(5) Emphasize R2 training, to that which builds physical, psychological, social, spiritual, and Family preparedness-military life.

*i.* Director, Army Resilience Directorate (ARD) —

(1) Provides strategic guidance and framework for policies, plans, training, and capabilities for all relevant matters pertaining to Army R2 to include R2 governance.

(2) Receives input, reports and issues from ACOM, ASCC, and DRU commanders and ARNG.

(3) Provides feedback to Army senior leaders and associated audiences through recurring forums, as required.

(4)  Conducts analysis and makes recommendations to governance bodies addressing the integration and synchronization of policy, programs, training, resources, and strategic messaging in support of R2.

(5)  Monitors R2 Portfolio programs and oversee biennial review of the R2 Portfolio.

# Chapter 4
# Military Discipline and Conduct

## 4–1.  Military discipline

*a.*  Military discipline is founded upon self-discipline, respect for properly constituted authority, and the embracing of the professional Army Ethic with its supporting individual values. Military discipline is instilled through positive leadership, reinforcing the regulatory standards for personnel, and the training readiness standards for individual and collective tasks, together, resulting in a mental attitude about proper conduct and obedience to lawful military authority.

*b.*  While military discipline is the result of effective training, it is affected by every feature of military life. It is manifested in individuals and units by cohesion, bonding, and a spirit of teamwork; by smartness of appearance and action; by cleanliness and maintenance of dress, equipment, and quarters; by deference to seniors and mutual respect between senior and subordinate personnel; by the prompt and willing execution of both the letter and the spirit of the legal orders of their lawful commanders; and by fairness, justice, and equity for all Soldiers, regardless of race, color, sex (including gender identity), national origin, religion, and sexual orientation.

*c.*  Commanders and other leaders will maintain discipline according to the policies of this chapter, applicable laws and regulations, and the orders of seniors.

## 4–2.  Obedience to orders

All personnel in the Army are required to strictly obey and promptly execute the legal orders of their lawful seniors.

## 4–3.  Military courtesy

*a.*  Courtesy among members of the Armed Forces is vital to maintaining military discipline. Respect to seniors will be extended at all times (see AR 600–25).

*b.*  The actions of military personnel will reflect respect to both the national anthem and the national colors. The courtesies listed in AR 600–25 should be rendered the national colors and national anthem at public events whether the Soldier is off or on duty, whether he or she is in or out of uniform. Intentional disrespect to the national colors or national anthem is conduct prejudicial to good order and discipline and discredits the Army.

## 4–4.  Soldier conduct

*a.*  Ensuring the proper conduct of Soldiers is a function of command. Commanders and leaders in the Army, whether on or off-duty or in a leave status, will—

(1)  Ensure all Soldiers present a neat, military appearance.

(2)  Take appropriate action, consistent with Army regulations, in any case where a Soldier's conduct violates good order and military discipline.

*b.*  On public conveyances in the absence of military police (MP), the person in charge of the conveyance will be asked to notify the nearest MP and arrange to have them, if necessary, take custody of military personnel. In serious situations, such as physical assault, the person in charge of the conveyance will be asked to stop at the first opportunity and request local police assistance. In all such cases, the local police will be advised to telephone the nearest Army post or Army headquarters.

*c.*  When an offense endangering the reputation of the Army is committed elsewhere (not on a public conveyance) and MP are not available, civilian police will be requested to take appropriate action.

*d.*  When the MP is not present, the senior officer, WO, or NCO present will obtain the Soldier's name, grade, organization, and station. The information and a statement of the circumstances will be sent to the Soldier's commanding officer without delay. If the Soldier is turned over to the civilian police, the above information will be sent to the civilian police for transmittal to the proper military authorities.

*e.*  The Director of Emergency Services (DES)/Provost Marshal Office (PMO) will conduct criminal history checks and provide monthly reports to brigade-level commanders of newly-assigned Soldiers. The DES/PMO will compile the brigade-level rosters and provide a consolidated list to the U.S. Army Criminal Investigation Command (USACIDC). USACIDC will check the newly assigned Soldiers against Army law-enforcement databases and provide

results to the installation DES/PMO via the USACIDC SharePoint portal monthly. The installation DES/PMO will then distribute individual criminal history reports to the Soldier's brigade-level commander.

(1) Commanders will use the information in the reports to ensure that, if required, Soldiers are in compliance with paragraph 4–22 (the Domestic Violence Amendment to the Gun Control Act of 1968, known as the Lautenberg Amendment) and have completed DD Form 2791 (Notice of Release/Acknowledgement of Convicted Sex Offender Registration Requirements) as required by AR 27–10.

(2) Commanders will not initiate judicial or adverse administrative actions based solely on the information in criminal history reports. Commanders will consult with their servicing legal advisor for assistance in determining available options and will not retain criminal history reports after the Soldier leaves the unit.

## 4–5. Maintenance of order

Army and Marine Corps MP, Air Force security police, and members of the Navy and Coast Guard shore patrols are authorized and directed to apprehend Armed Forces members who commit offenses punishable under the UCMJ. Officers, WOs, NCOs, and petty officers of the Armed Forces are authorized and directed to quell all quarrels, frays, and disorders among persons subject to military law and to apprehend participants. Those exercising this authority should do so with judgment and tact. Personnel so apprehended will be returned to the jurisdiction of their respective Service as soon as practical. Confinement of females will be according to AR 190–47.

## 4–6. Exercising military authority

a. Military authority is exercised promptly, firmly, courteously and fairly. Commanders should consider nonpunitive corrective measures before deciding to impose nonjudicial punishment. Trial by court-martial is ordinarily inappropriate for minor offenses unless lesser forms of administering discipline would be ineffective (see MCM, Part V, and AR 27–10). Nonpunitive corrective measures are the primary tools for teaching proper standards of conduct and performance and do not constitute punishment, nor are they required as a first step toward nonjudicial punishment. Included among nonpunitive measures are denial of pass or other privileges, counseling, administrative reduction in grade, administrative reprimands and admonitions, extra training, bar to continued service, and military occupational specialty (MOS) reclassification. Some of the administrative corrective actions cited may deteriorate into hazing and/or bullying; therefore, commanders should monitor whether the disciplinary efforts of their subordinates are appropriate.

b. One of the most effective nonpunitive corrective measures is extra training or instruction. For example, if Soldiers appear in an improper uniform, they are required to correct it immediately; if they do not maintain their Government housing area properly, they must correct the deficiency in a timely manner. If Soldiers have training deficiencies, they will be required to take extra training or instruction in subjects related to the shortcoming.

(1) The training or instruction given to a Soldier to correct deficiencies must be appropriately tailored to curing the deficiency. It must be oriented to improving the Soldier's performance in their problem area. Brief physical exercises are an acceptable form of corrective training for minor acts of indiscipline (for example, requiring the Soldier to do push-ups for arriving late to formation), so long as it does not violate the Army's policies prohibiting hazing, bullying, and unlawful punishment.

(2) Corrective measures may be taken after normal duty hours. Such measures assume the nature of training or instruction, not punishment. Corrective training should continue only until the training deficiency is overcome. Authority to use it is part of the inherent powers of command.

(3) Care should be taken at all levels of command to ensure that training and instruction are not used in an oppressive manner to evade the procedural safeguards inherent to the imposition of nonjudicial punishment. Deficiencies satisfactorily corrected by means of training and instruction will not be noted in the official records of the Soldiers concerned.

## 4–7. Disciplinary powers of the commanding officer

a. Commanders exercise broad disciplinary powers in furtherance of their command responsibilities. Discretion, fairness, and sound judgment are essential ingredients of military justice.

b. Commanders will familiarize themselves with their powers and responsibilities as outlined in MCM, AR 27–10, AR 600–37, AR 635–200, and other authorities. Legal advice is available from supporting judge advocates.

c. Disciplinary measures are tailored to specific offenses and individual offenders. Commanders will neither direct subordinates to take particular disciplinary actions, nor unnecessarily restrict the disciplinary authority of subordinates (see UCMJ, Art. 37 and AR 27–10 regarding the proper exercise of authority by commanders).

d. In accordance with the requirements and time limits listed in AR 190–45, commanders will submit a DA Form 4833 (Commander's Report of Disciplinary or Administrative Action) following offense notification from the PMO,

DES, or USACIDC. Commanders will refer to Army law-enforcement officials (MP investigation or USACIDC) allegations that an assigned Soldier committed a crime that falls outside of the commander's investigative purview. In accordance with AR 190–45 and AR 195–2, if a commander has reason to believe that a Soldier assigned to their unit has committed a criminal offense that commander will decide the appropriate authority to handle the investigation.

(1)  Commanders will report disposition of offenses investigated during a command investigation or inquiry under their authority, meeting the reporting requirements of AR 195–2, when a military law-enforcement activity is not involved. Commanders will ensure there is reason to believe an offense has been committed and that the person to be identified as the offender committed it. Commanders will complete a DA Form 4833 when they obtain legal review of the investigation or inquiry, and determine to take action (or no action) against the offender about an incident. Email the completed and signed DA Form 4833 with the required supporting documents (record of commander's inquiry, UCMJ, Art. 15, or court-martial paperwork) to the supporting installation PMO/DES. For commands not on an installation or commands on a joint base, the supporting PMO/DES can be found in AR 190–45.

(2)  The commander will complete and sign DA Form 5248–R (Report of Unfavorable Information for Security Determination) in accordance with AR 380–67. The DA Form 5248–R must include the results recorded on the DA Form 4833 as well as the commander's recommendation for security reliability. The security manager will submit the DA Form 5248–R to the Department of Defense Central Adjudication Facility (DoD CAF) via the Joint Personnel Adjudication System (JPAS) or successor system.

*e.*  Commanders will notify DES/PMO of DD Forms 2873 (Military Protective Order (MPO)) involving their Soldiers. The DES/PMO will notify the military and local civilian law enforcement.

*f.*  Commanders are responsible to take proper administrative action regarding Soldiers who have deserted. Classification of a Soldier as a deserter is based on intent and not the time the Soldier has been absent from his or her unit; however, the time a Soldier has been absent may be used as a factor when determining intent. A commander should seek the advice and counsel of their legal advisor when determining intent to be a deserter. Commanders will consider the circumstances surrounding unauthorized absences and request warrants via DD Form 553 (Deserter/Absentee Wanted by the Armed Forces) as directed in AR 190–9, and in DoDI 1325.02 for high-risk Soldiers who desert to avoid prosecution of charges, or when the commander believes there is a risk that the Soldier may commit violent acts, or harm themselves or others.

*g.*  Dual-hatting MP leaders as the installation DES. The installation SC may elect to assign the senior MP brigade or battalion commander to serve as the provost marshal officer and DES. As the DES, this officer advises and supports senior, installation, and GCs on issues relating to protection and installation emergency services. Exception to this may occur in the overseas areas, geographically dispersed regions, and locations where military brigades and battalions are not located.

## 4–8.  Settlement of local accounts on change of station

To ensure organizations and individuals have properly settled their accounts, commanders will—

*a.*  Make a reasonable effort to settle local accounts of their organizations before movement.

*b.*  Take action to promptly settle organizational accounts with local firms when unable to settle before movement.

*c.*  Take action as needed when Soldiers under their command fail to clear their personal accounts before departure from their stations. This includes consideration under UCMJ, Arts. 121, 123a, 133, or 134. When indebtedness information is received after a Soldier departs from the station consult the servicing judge advocate.

## 4–9.  Civil status of members of the U.S. Army Reserve

*a.*  The USAR members, not serving on active duty, are not for most purposes considered officers or employees of the United States solely by reason of their Reserve status. They may accept a civilian office or position in the federal service, and receive the pay of that office or position in addition to any pay and allowances they may be entitled to under the laws governing members of RCs.

*b.*  A member of the USAR, not serving on active duty, may generally practice his or her civilian profession or occupation before or in connection with any department of the Federal Government, unless prohibited by law (see 18 USC 205).

*c.*  Conflict-of-interest laws impose limitations on activities in which persons may engage after terminating active duty or employment by the United States. A Reservist who has handled a government matter will not, while in a civilian status, represent any party, other than the government, in connection with the same particular matter (see 18 USC 207). While handling government matters, reservists will not take any direct or indirect action in a particular matter in which they have an outside financial interest (see 18 USC 208 and DoD 5500.07–R).

*d.* ARNG and USAR Soldiers may accept and be paid for civil employment with any foreign government, when approved by the SECARMY and the Secretary of State. This includes any concern controlled in whole or in part by a foreign government. AR 600–291 is used for processing applications.

## 4–10.  Participation in support of civilian law-enforcement agencies

*a.* Military support of civilian law enforcement is governed by the Posse Comitatus Act (18 USC 1385) and DoDI 3025.21. Commanders will not sanction use of military personnel in support of civilian law-enforcement agencies in the 50 states, the District of Columbia, the Commonwealth of Puerto Rico, or United States Territories, except when authorized by law. Because this is a complex area of the law, commanders and law-enforcement personnel should consult with their servicing judge advocate or legal advisor.

*b.* Military personnel may report crimes or other suspicious activities to civilian police agencies or cooperate with civilian authorities in their capacities as private citizens. Military law-enforcement personnel may exchange information with civilian authorities according to AR 190–45.

## 4–11.  Membership campaigns

DA recognizes and benefits from the activities of many worthy organizations, associations, and clubs. Many of these organizations enjoy close, historical ties with the military community and are composed largely of active or retired military personnel. The DA support of private organizations is strictly regulated by DoDI 1000.15 and DoD 5500.07–R.

*a.* In supporting such organizations and associations, post commanders and heads of DA staff agencies will—

(1) Ensure membership among personnel under their jurisdiction is truly voluntary.

(2) Prohibit any practice that involves or implies compulsion, coercion, influence, or reprisal in the conduct of membership campaigns. This prohibition includes repeated orientations, meetings, or similar counseling of persons who have chosen not to join after given a chance to do so. It also includes using membership statistics in support of supervisory influence.

(3) Prohibit any practice that involves or implies DA sponsorship or endorsement of the organization and its activities.

(4) Prohibit the use of government property, facilities, or services, for example, golf course membership, as an inducement to join a private organization.

*b.* This policy does not prohibit commanders from informing personnel without coercion about membership in such organizations. When doing so, commanders will ensure they do not favor one organization over others.

## 4–12.  Extremist organizations and activities

Participation in extremist organizations and activities by Army personnel is inconsistent with the responsibilities of military service. It is the policy of the United States Army to provide EO and fair treatment for all Soldiers without regard to race, color, sex (including gender identity), national origin, religion, or sexual orientation. Enforcement of this policy is a responsibility of command, is vitally important to unit cohesion and morale, and is essential to the Army's ability to accomplish its mission. It is the commander's responsibility to maintain good order and discipline in the unit. Every commander has the inherent authority to take appropriate actions to accomplish this goal. This paragraph identifies prohibited actions by Soldiers involving extremist organizations, discusses the authority of the commander to establish other prohibitions, and establishes that violations of prohibitions contained in this paragraph or those established by a commander may result in prosecution under various provisions of the UCMJ. This paragraph must be used in conjunction with DoDI 1325.06.

*a. Participation.* Military personnel must reject participation in extremist organizations and activities. Extremist organizations and activities are ones that advocate—

(1) Racial, sex (including gender identity), sexual orientation, or ethnic hatred or intolerance.

(2) Creating or engaging in discrimination based on race, color, sex (including gender identity), national origin, religion, or sexual orientation.

(3) The use of force or violence or unlawful means to deprive individuals of their rights under the United States Constitution or the laws of the United States, or any State.

(4) Support for terrorist organizations or objectives.

(5) The use of unlawful violence or force to achieve goals that are political, religious, discriminatory, or ideological in nature.

(6) Expressing a duty to engage in violence against DoD or the United States in support of a terrorist or extremist cause.

(7) Support for persons or organizations that promote or threaten the unlawful use of force or violence or criminal activity.

(8) Encouraging military or civilian personnel to violate laws or disobey lawful orders or regulations for the purpose of disrupting military activities (subversion).

(9) Participating in activities advocating or teaching the overthrow of the U.S. Government by force or violence, or seeking to alter the form of government by unconstitutional means (sedition).

*b. Prohibitions.* Soldiers are prohibited from the following actions in support of extremist organizations or activities. Penalties for violations of these prohibitions include the full range of statutory and regulatory sanctions, both criminal (UCMJ), and administrative.

(1) Participating in public demonstrations or rallies.

(2) Attending a meeting or activity with the knowledge that the meeting or activity involves an extremist cause when—

*(a)* Whether on or off duty.

*(b)* Whether in or out of uniform.

*(c)* In a foreign country (whether on or off-duty or in or out of uniform).

*(d)* It constitutes a breach of law and order.

*(e)* It is likely to result in violence.

*(f)* In violation of off-limits sanctions.

*(g)* In violation of a commander's order.

(3) Fundraising activities.

(4) Recruiting or training members (including encouraging other Soldiers to join).

(5) Creating, organizing, or taking a visible leadership role in such an organization or activity.

(6) Distributing literature on or off a military installation, the primary purpose and content of which concerns advocacy or support of extremist causes, organizations, or activities; and it appears that the literature presents a clear danger to the loyalty, discipline, or morale of military personnel or the distribution would materially interfere with the accomplishment of a military mission.

(7) Receiving financial assistance from a person or organization who advocates terrorism, the unlawful use of force or violence to undermine or disrupt U.S. military operations, subversion, or sedition.

*c. Command authority.* Commanders have the authority to prohibit military personnel from engaging in or participating in any other activities that the commander determines will adversely affect readiness, good order and discipline, or morale within the command. This includes, but is not limited to, the authority to order the removal of symbols, flags, posters, or other displays from barracks, to place areas or activities off-limits (see AR 190–24), or to order Soldiers not to participate in those activities that are contrary to good order and discipline or morale of the unit or pose a threat to health, safety, and security of military personnel or a military installation.

*d. Command options.* Commander's options for dealing with a Soldier's violation of the prohibitions includes the following:

(1) UCMJ action—Possible punitive articles include the following:

*(a)* UCMJ, Art. 92—Failure to obey a lawful general order or regulation.

*(b)* UCMJ, Art. 116—Riot or breach of peace.

*(c)* UCMJ, Art. 117—Provoking speeches or gestures.

*(d)* UCMJ, Art. 133—Conduct unbecoming an officer.

*(e)* UCMJ, Art. 134—General article, specifically, conduct which is prejudicial to good order and discipline or service discrediting.

(2) Involuntary separation for unsatisfactory performance or misconduct or for conduct deemed prejudicial to good order and discipline or morale.

(3) Reclassification actions or bar to continued service actions, as appropriate.

(4) Other administrative or disciplinary action deemed appropriate by the commander, based on the specific facts and circumstances of the particular case.

*e. Command responsibility.* Any Soldier involvement with or in an extremist organization or activity (such as membership, receipt of literature, or presence at an event) could threaten the good order and discipline of a unit. In any case of apparent Soldier involvement with or in extremist organizations or activities, whether or not in violation of the prohibitions in paragraph 4–12*b*, commanders will take positive actions to educate Soldiers, putting them on notice of the potential adverse effects that participation in violation of Army policy may have upon good order and discipline in the unit and upon their military service. These positive actions includes the following:

(1) Educating Soldiers regarding the Army's MEO policy. Commanders will advise Soldiers that extremist organizations' goals are inconsistent with Army goals, beliefs, and values concerning MEO. The extremist organizations

and activities block of instruction, when presented by MEO professionals, will only be conducted by Defense EO Management Institute (DEOMI) graduate currently serving in an authorized MEO professional billet. The standardized plan of instruction and training slides are located on the Central Army Registry and may not be supplemented with other training material or slides. The training will be vetted by the commander (or their representative) after obtaining a local legal review prior to presentation of the training.

(2)  Commanders will ensure Soldiers understand the identification of extremist organizations or activities is the responsibility of USACIDC.

(3)  Commanders will report all incidents pertaining to extremist activities to the USACIDC and servicing legal advisor.

(4)  Advising Soldiers that any participation in extremist organizations or activities—

*(a)*  Will be taken into consideration when evaluating their overall duty performance, to include appropriate remarks on evaluation reports (officer evaluation reports (OERs) and noncommissioned officer evaluation reports (NCOERs) which include: DA Form 67–10–1 (Company Grade Plate (O1 - O3; WO1 - CW2) Officer Evaluation Report); DA Form 67–10–2 (Field Grade Plate (O4 - O5; CW3 - CW5) Officer Evaluation Report); DA Form 67–10–3 (Strategic Grade Plate (O6) Officer Evaluation Report); and DA Form 67–10–4 (Strategic Grade Plate General Officer Evaluation Report); hereafter referred to collectively as "DA Form 67–10 series (officer evaluation report (OER)" or "OER"). This also includes: DA Form 2166–9–1 (NCO Evaluation Report (SGT)); DA Form 2166–9–2 (NCO Evaluation Report (SSG–1SG/MSG)); DA Form 2166–9–3 (NCO Evaluation Report (CSM/SGM)); hereafter referred to collectively as "DA Form 2166–9 series (noncommissioned officer evaluation report (NCOER))" or "NCOER."  This also includes: DA Form 1059 (Service School Academic Evaluation Report); and DA Form 1059–1 (Civilian Institution Academic Evaluation Report); hereafter referred to collectively as academic evaluation reports). (DA Form 67–10 series, DA Form 2166–9 series, DA Form 1059, and DA Form 1059–1 are hereafter referred to collectively as "evaluation reports.")

*(b)*  Will be taken into consideration when selections for positions of leadership and responsibility are made.

*(c)*  May result in the suspension or revocation of security clearances or access to government-owned IT systems, as appropriate.

*(d)*  May result in reclassification actions or bar to continued service actions, as appropriate.

*(e)*  Will result in being reported to law-enforcement authorities.

(5)  The commander of an Army installation or other Army-controlled facility will prohibit any demonstration or activity on the installation or facility that could result in interference with or prevention of orderly accomplishment of the mission of the installation or facility, or present a clear danger to loyalty, discipline, or morale of the troops. Further, such commanders will deny requests for the use of Army- controlled facilities by individuals or groups that engage in discriminatory practices or for activities involving such practices.

(6)  Suspected affiliation or involvement in extremist activities may come to the attention of a commander in a number of ways, including reports through the chain of command, anonymous calls, or personal observation. A commander receiving such information should consult with their servicing Judge Advocate on how to proceed. Commanders who identify individuals as extremists will, at a minimum, counsel the individual on Army policy concerning extremism. Commanders may also consider taking other action, either administrative or judicial as listed in paragraph 4–12*d*.

*f.  Reporting requirement.*  Commanders will notify the supporting counterintelligence organization in cases where they know or suspect that Soldiers are engaging in the activities specified in paragraphs 4–12*a*(3) to (9) or when they become aware of any of the activities or behaviors defined in AR 381–12. If a Soldier possesses a security clearance, commanders will ensure the security manager records the derogatory information as an incident report in the JPAS (or subsequent system) in accordance with AR 380–67.

*g.  Criminal gangs and activity.*  Participation in criminal gangs and activities by Army personnel is inconsistent with the responsibilities of military service. This subparagraph identifies prohibited actions by Soldiers involving criminal gangs, discusses the authority of the commander to establish other prohibitions, and establishes that violations of prohibitions contained in this paragraph or those established by a commander may result in prosecution under various provisions of the UCMJ.

(1)  Criminal gangs and activities are ones that advocate the planning or commission of one or more criminal offenses, by persons who share a group identity, and may share a common name, slogan, tattoos, graffiti, clothing style or color, or other shared characteristics like the use of violence and intimidation to further its criminal objectives.

(2)  Participation, command authority, command options, and command responsibility are addressed above, in paragraph 4–12.

(3)  Soldiers are prohibited from active participation in gangs or their activities. Penalties for violations of these prohibitions include the full range of statutory and regulatory sanctions, both criminal (UCMJ), and administrative, as listed in paragraph 4–12*d*. Below are examples of active participation that are specific to criminal gangs:

*(a)*  Knowingly wearing gang colors or clothing.

*(b)*  Having tattoos or body markings associated with criminal gangs.

*(c)*  Engaging in activities in furtherance of the objective of such gangs or organizations that are detrimental to good order, discipline, or mission accomplishment.

*h.  Extremist organizations, criminal gangs, and associated cyber activity and social media.*  Army personnel are responsible for content they publish on all personal and public internet domains to include social media sites, blogs, and other websites. Participation in internet sites sponsored by extremist organizations and activities is inconsistent with the responsibilities of military service. Army personnel who maintain a presence on the internet could be perceived as representatives of the Army. This paragraph identifies prohibited actions by Soldiers involving participation in cyber activities sponsored by or promoting extremist organizations or criminal gangs and the use of social media to promote activities associated with extremism and criminal gangs, discusses the authority of the commander to establish other prohibitions, and establishes that violations of prohibitions contained in this paragraph or those established by a commander may result in prosecution under various provisions of the UCMJ.

(1)  *Participation.*  Military personnel must reject participation in extremist organizations and associated cyber activities. Extremist organizations and criminal gangs are described in paragraphs 4–12*a* and 4–12*g*.

(2)  *Prohibitions.*  Soldiers are prohibited from engaging in cyber-related activities in support of extremist organizations or criminal gangs. Penalties for violations of these prohibitions include the full range of statutory and regulatory sanctions, both criminal (UCMJ), and administrative. Examples of prohibited cyber-related activities include:

*(a)*  Participating in the promotion of demonstrations or rallies through the use of cyber activities and social media.

*(b)*  Promotion of a meeting or activity through the use of cyber activities and or social media with the knowledge that the meeting or activity involves an extremist cause.

*(c)*  Fundraising activities using cyber activity or social media.

*(d)*  Recruiting or training members (including encouraging other Soldiers to join) using cyber activity or social media.

*(e)*  Creating, organizing, or taking a visible leadership role in such a cyber or social media activity.

*(f)*  Promoting information through cyber activity, the primary purpose and content of which concerns advocacy or support of extremist causes, organizations, or activities; and it appears that the information presents a clear danger to the loyalty, discipline, or morale of military personnel or the distribution would materially interfere with the accomplishment of a military mission.

*(g)*  Browsing or visiting internet Web sites or engaging in cyber activities when on duty, without official sanction, that promote or advocate violence directed against the U.S. or DoD, or that promote international terrorism or terrorist themes.

(3)  *Command authority.*  Commanders have the authority to prohibit military personnel from engaging in or participating in any cyber or social media activities that the commander determines will adversely affect good order and discipline or morale within the command. This includes, but is not limited to, the authority to order the removal of images, symbols, flags, language, or other displays from social media and internet domains, or to order Soldiers not to participate in cyber and social media activities that are contrary to good order and discipline or morale of the unit or pose a threat to health, safety, and operational security of military personnel or a military installation.

(4)  *Command options.*  Commander's options for dealing with a Soldier's violation of these prohibitions include—

*(a)*  UCMJ action—Possible punitive articles include the following:

1.  UCMJ, Art. 92—Failure to obey a lawful general order or regulation.

2.  UCMJ, Art. 116—Riot or breach of peace.

3.  UCMJ, Art. 117—Provoking speeches or gestures.

4.  UCMJ, Art. 133—Conduct unbecoming an officer.

5.  UCMJ, Art. 134—General article, specifically, conduct which is prejudicial to good order and discipline or service discrediting.

*(b)*  Involuntary separation for unsatisfactory performance or misconduct or for conduct deemed prejudicial to good order and discipline or morale.

*(c)*  Reclassification actions or bar to reenlistment actions, as appropriate.

*(d)*  Other administrative or disciplinary action deemed appropriate by the commander, based on the specific facts and circumstances of the particular case to include removal of access to government-owned IT systems.

*i.  Command responsibility.*  Command responsibility is addressed in paragraph 4–12*e*.

*j. Social media or cyber activity.* Commanders of an Army installation or other Army-controlled facility have the authority to prohibit any social media or cyber activity that could result in interference with or prevention of orderly accomplishment of the mission of the installation or facility, or present a clear danger to loyalty, discipline, or morale of the troops. Further, such commanders will deny requests for the use of Army-controlled facilities by individuals or groups that engage in discriminatory practices or for activities involving such practices.

*k. Preventive activities.*

(1) Commanders should remain alert for signs of future prohibited activities. They should intervene early, primarily through counseling, when observing such signs even though the signs may not rise to active advocacy or active participation or may not threaten good order and discipline, but only suggest such potential. The goal of early intervention is to minimize the risk of future prohibited activities.

(2) Examples of such signs, which, in the absence of the active advocacy or active participation, could include mere membership in criminal gangs and extremist organizations. Signs could also include possession of literature associated with such gangs or organizations, or with related ideology, doctrine, or causes. While mere membership or possession of literature normally is not prohibited, it may merit further investigation and possibly counseling to emphasize the importance of adherence to the Army's values and to ensure that the Soldier understands what activities are prohibited.

*l. Legal advice and counsel.* Commanders should seek the advice and counsel of their legal advisor when taking actions pursuant to this policy.

## 4–13. Army language policy

English is the operational language of the Army. Soldiers must maintain sufficient proficiency in English to perform their military duties. Their operational communications must be understood by everyone who has an official need-to-know their content, and, therefore, will normally be in English. However, commanders may not require Soldiers to use English, unless such use is clearly necessary and proper for the performance of military functions. Accordingly, commanders may not require the use of English for personal communications that are unrelated to military functions.

## 4–14. Relationships between Soldiers of different grades

*a.* The term "officer" used in this paragraph includes both commissioned and WOs, unless otherwise stated. The term "noncommissioned officer" refers to a Soldier in the grade of corporal to CSM/SGM. The term "junior enlisted Soldier" refers to a Soldier in the grade of private to specialist. The provisions of this paragraph apply to both relationships between Soldiers in the RA and USAR, and between Soldiers and personnel of other military services.

*b.* Soldiers of different grades must be cognizant that their interactions do not create an actual or clearly predictable perception of undue familiarity between an officer and an enlisted Soldier, or between an NCO and a junior enlisted Soldier. Examples of familiarity between Soldiers that may become "undue" can include repeated visits to bars, nightclubs, eating establishments, or homes between an officer and an enlisted Soldier, or an NCO and a junior enlisted Soldier, except for social gatherings, that involve an entire unit, office, or work section. All relationships between Soldiers of different grades are prohibited if they—

(1) Compromise, or appear to compromise, the integrity of supervisory authority or the chain of command.

(2) Cause actual or perceived partiality or unfairness.

(3) Involve, or appear to involve, the improper use of grade or rank or position for personal gain.

(4) Are, or are perceived to be, exploitative or coercive in nature.

(5) Create an actual or clearly predictable adverse impact on discipline, authority, morale, or the ability of the command to accomplish its mission.

*c.* Certain types of personal relationships between officers and enlisted Soldiers, or NCOs and junior enlisted Soldiers, are prohibited. Prohibited relationships include the following:

(1) Ongoing business relationships between officers and enlisted personnel, or NCOs and junior enlisted Soldiers. This prohibition does not apply to landlord/tenant relationships or to one-time transactions such as the sale of an automobile or house, but does apply to borrowing or lending money, commercial solicitation, and any other type of ongoing financial or business relationship. Business relationships between NCOs and junior enlisted Soldiers that exist at the time this policy becomes effective and that were authorized under previously existing rules and regulations, are exempt provided the individuals are not in the same unit or chain of command and the relationship does not meet the criteria listed in paragraphs 4–14*b*(1) through (5). In the case of ARNG or USAR personnel, this prohibition does not apply to relationships that exist due to their civilian occupation or employment.

(2) Dating, shared living accommodations other than those directed by operational requirements, and intimate or sexual relationships between officers and enlisted personnel, or NCOs and junior enlisted Soldiers. This prohibition does not apply to the following:

*(a)* Marriages between an officer and an enlisted member or an NCO and a junior enlisted Soldier. However, when evidence of fraternization between an officer and enlisted member or an NCO and a junior enlisted Soldier prior to their marriage exists, their marriage does not preclude appropriate command action based on the prior fraternization. Commanders have a wide range of responses available including counseling, reprimand, order to cease a relationship prior to marriage, reassignment, administrative action, or adverse action. Commanders must carefully consider all of the facts and circumstances in reaching a disposition that is appropriate. Generally, the commander should take the minimum action necessary to ensure that the needs of good order and discipline are satisfied.

*(b)* Situations in which a relationship that complies with this policy would move into noncompliance due to a change in status of one of the members (for instance, a case where two junior enlisted members are dating and one is subsequently commissioned or selected to be a WO, commissioned officer, or NCO). In relationships where one of the enlisted members has entered into a program intended to result in a change in his or her status from enlisted to officer or junior enlisted Soldier to NCO, the couple must terminate the relationship permanently or marry within 1 year of the date of the appointment or the change in status occurs.

*(c)* Personal relationships between members of the ARNG or USAR, when the relationship primarily exists due to civilian acquaintanceships, unless the individuals are on active duty (other than annual training), on full-time National Guard Duty (FTNGD) (other than annual training), or serving as a dual status military technician.

*(d)* Personal relationships between members of the RA and members of the ARNG or USAR when the relationship primarily exists due to civilian association and the USAR member is not on active duty (other than annual training), on FTNGD (other than annual training), or serving as a dual status military technician.

*(e)* Soldiers and leaders share responsibility for ensuring that these personal relationships do not interfere with good order and discipline. Commanders will ensure that personal relationships that exist between Soldiers of different grades emanating from their civilian careers will not influence training, readiness, or personnel actions.

(3) Gambling between officers and enlisted personnel, or NCOs and junior enlisted Soldiers.

*d.* These prohibitions are not intended to preclude unit-based normal team building or activity based on interaction which occurs in the context of community based, religious, or fraternal associations such as scouting, youth or adult sports leagues or teams; membership in organizations such as the Masons or Elks; religious activities including chapel, church, synagogue, mosque, or religious education; Family gatherings; unit-based social functions; or athletic events.

*e.* All military personnel share the responsibility for maintaining professional relationships. However, in any relationship between Soldiers of different grade or rank, the senior member is generally in the best position to terminate or limit the extent of the relationship. Nevertheless, all members may be held accountable for relationships that violate this policy.

*f.* Commanders should seek to prevent inappropriate or unprofessional relationships through proper training and personal leadership. Commanders have a wide range of responses available should inappropriate relationships occur. These responses may include counseling, reprimand, order to cease, reassignment, or adverse action. Potential adverse action may include official reprimand, adverse evaluation report(s), nonjudicial punishment, separation, bar to continued service, promotion denial, demotion, and courts-martial. Commanders must carefully consider all of the facts and circumstances in reaching a disposition that is warranted, appropriate, and fair.

## 4–15. Other prohibited relationships

*a.* Army personnel will treat each prospect, applicant, recruit, and trainee with dignity and respect as they pursue their aspiration of serving in the military. Army policy prohibits inappropriate relations between recruiters and prospects, applicants, and/or recruits and between trainers providing entry-level training or permanent party personnel and trainees.

*b.* Inappropriate relationships and prohibited activities between recruiters and prospects, applicants, and/or recruits and between trainers providing entry-level training or permanent party personnel and trainees, are not permitted and appropriate action will be taken. Violations may be subject to punishment under the UCMJ and/or adverse administrative action. DA Civilians are subject to administrative or disciplinary actions under applicable Federal law and regulation.

*c.* These prohibitions apply from the first contact between a recruit and recruiter through entry-level training and for 6 months after the trainee completes entry-level training. This list is not all-inclusive. Training commands (for example, TRADOC, AMEDD Center and School, and U.S. Army Recruiting Command) are authorized to publish supplemental regulations to paragraph 4–15c(1), which further detail prohibited conduct within their respective organizations.

(1) Recruiters, permanent party personnel, and trainers providing entry-level training will not—

*(a)* Develop, attempt to develop, or conduct a personal, intimate, or sexual relationship with any prospect, applicant, recruit, or trainee. These relationships include, but are not limited to, dating, handholding, kissing, embracing,

caressing, and engaging in sexual activities. Prohibited personal, intimate, or sexual relationships include those relationships conducted in person; through a third person; or via cards, letters, emails, telephone calls, instant messaging, video, photographs, social media, social networking, and any other means of communication.

*(b)* Use rank or position, threats, pressure, or promise of return of favors or favorable treatment in an attempt to gain sexual favors from any prospect, applicant, recruit, or trainee.

*(c)* Make sexual advances toward, or seek or accept sexual advances or favors from, any prospect, applicant, recruit, or trainee. In addition, recruiters and trainers will report all offers of sexual favors or sexual advances any prospect, applicant, recruit, or trainee makes to their chain of command.

*(d)* Allow any prospect, applicant, recruit, or trainee to enter their dwelling.

*(e)* Establish a common household with any prospect, applicant, recruit, or trainee (that is, they will not share the same living area in an apartment, house, or other dwelling). This prohibition does not include facilities open to all members of a homeowners association or all tenants in an apartment complex.

*(f)* Allow any prospect, applicant, recruit, or trainee to enter their privately owned vehicles. Exceptions are permitted for official business when the safety or welfare of the prospect, applicant, recruit, or trainee is at risk. Recruiters and trainers will report all such instances to their chain of command as soon as practicable.

*(g)* Provide alcohol to, or consume alcohol with, any prospect, applicant, recruit, or trainee on a personal social basis. This prohibition does not apply to the practice of participation in religious services, rites, or rituals.

*(h)* Attend social gatherings, clubs, bars, theaters, or similar establishments on a personal social basis with any prospect, applicant, recruit, or trainee.

*(i)* Gamble with any prospect, applicant, recruit, or trainee.

*(j)* Lend money to, borrow money from, or otherwise become indebted to or by any prospect, applicant, recruit, or trainee.

*(k)* Solicit donations from any prospect, applicant, recruit, or trainee.

*(l)* Hire or otherwise employ, in an official or personal capacity, any prospect, applicant, recruit, or trainee (for example, for babysitting or maintenance jobs).

*(m)* Accept personal goods, in an official or personal capacity, from any prospect, applicant, recruit, or trainee for storage or any other reason.

*(n)* Participate in closed-door discussions with any prospect, applicant, recruit, or trainee. Recruiters and trainers will keep doors open when meeting with prospects, applicants, recruits, and trainees except when—

1. Another person at least 18 years of age or older is present;

2. Because of the proximity of others, it is necessary to protect personally identifiable, sensitive, or confidential information (these closed-door sessions will be short in duration); or

3. The design of the office is such that the door opens to a public area where the office is left unprotected from the elements or allows unwanted public interaction. In these cases, the door will be left unlocked and clearly marked that it is open for business and visitors are welcome.

(2) Recruits or trainees will not—

*(a)* Develop, attempt to develop, or conduct a personal, intimate, or sexual relationship with a recruiter, permanent party personnel, or trainer. These relationships include, but are not limited to, dating, handholding, kissing, embracing, caressing, and engaging in sexual activities. Prohibited personal, intimate, or sexual relationships include those relationships conducted in person; through a third party; or via cards, letters, emails, telephone calls, instant messaging, video, photographs, social media, social networking; or any other means of communication.

*(b)* Make sexual advances toward, or seek or accept sexual advances or favors from, a recruiter, permanent party personnel, or trainer.

*(c)* Allow any recruiter, permanent party personnel, or trainer to enter their dwelling or privately owned vehicles except to conduct official business. Exceptions are permitted for official business when the safety or welfare of a recruiter or trainer is at risk.

*(d)* Establish a common household with a recruiter, permanent party personnel, or trainer (that is, will not share the same living area in an apartment, house, or other dwelling). This prohibition does not include facilities open to all members of a homeowners association or all tenants in an apartment complex.

*(e)* Consume alcohol with a recruiter or trainer on a personal social basis.

*(f)* Attend social gatherings, clubs, bars, theaters, or similar establishments on a personal social basis with a recruiter or trainer.

*(g)* Gamble with a recruiter, permanent party personnel, or trainer.

*(h)* Lend money to, borrow money from, or otherwise become indebted to or by a recruiter, permanent party personnel, or trainer.

*d.* At a minimum and as required, the recruit, trainee, recruiter, permanent party personnel, or trainer will complete the following administrative actions. Commanders may add requirements to this list.

(1) Administrative requirements for recruiters and recruits.

*(a)* Before performing recruiter duties, recruiters will sign a DD Form 2982 (Recruiter/Trainer Prohibited Activities Acknowledgment) to acknowledge their understanding of the prohibitions listed in paragraph 4–15*c*(1) and their responsibilities to avoid the prohibited inappropriate behaviors and relations outlined in this regulation. Recruiters will recertify the DD Form 2982 annually. The DD Form 2982 will be locally filed and kept for 1 year after the recruiter has left the unit.

*(b)* During the initial visit, recruiters will provide all applicants with contact information they can use to notify someone if they believe their recruiter has acted improperly.

*(c)* No later than the first visit with a recruiter after a recruit's entry into the Delayed Entry Program (DEP), Future Soldier Program, Delayed Training Program, or Recruit Sustainment Program, a recruit must sign a DD Form 2983 (Recruit/Trainee Prohibited Activities Acknowledgment) to acknowledge their understanding of the prohibitions listed in paragraph 4–15*c*(2). The DD Form 2983 will be filed in the recruit's enlistment Electronic Records System and kept in accordance with system policy.

*(d)* Exceptions may be granted to accommodate relationships that existed before the recruit started the recruiting process. These relationships include, but are not limited to, Family members. Only the recruiter's commander in the rank of MAJ or higher, or a higher level authority, has the authority to approve these exceptions. Recruiters must request the exception in writing to their commander. Higher level commanders may withhold this authority from subordinate commanders. All exceptions will be documented on DD Form 2982 and DA Form 2983, as applicable.

(2) Administrative requirements for trainers, trainees, and permanent party personnel.

*(a)* Trainers providing entry-level training will sign a DD Form 2982 that acknowledges their understanding of the prohibitions listed in paragraph 4–15*c*(1) and their responsibilities regarding the policies to avoid the inappropriate behaviors and relations outlined in this directive. The DD Form 2982 will be recertified annually. The form will be locally filed and kept for 1 year after the trainer has left the unit.

*(b)* At the onset of the first training session, trainers will brief trainees on the policies in this regulation and provide information that trainees can use to contact someone in leadership if they wish to report any issue related to a trainer's inappropriate conduct.

*(c)* Trainees will sign a DD Form 2983 to acknowledge their understanding and responsibilities as   outlined in this regulation no later than the first day of entry-level training. The DD Form 2983 will be locally filed and kept until 6 months after the trainee has left the unit.

*(d)* Exceptions may be granted to accommodate relationships that existed before the trainee started formal training. An exception may be permitted for Family members. Commanders for the trainer or permanent party personnel and trainee will approve the exception for it to apply to both parties. Only the trainer's or permanent party personnel's and trainee's commanders in the rank of MAJ or higher, or higher level authority, have the authority to approve these exceptions. Higher level commanders may withhold this authority from subordinate commanders. Trainers, permanent party personnel, and trainees must request the exception in writing to their commander. All exceptions will be documented on DD Form 2982 and DA Form 2983, as applicable.

(3) Special consideration. The policy in this regulation is not intended to eliminate all opportunities for trainer and trainee external classroom professional development and mentorship because these opportunities are important to the learning process. Leaders are responsible for setting the right command climate and providing guidelines for outside the classroom mentoring and team-building activities. The prohibitions listed in paragraphs 4–15*c*(1) and 4–15*c*(2) related to private dwellings, privately owned vehicles, alcohol, and social gatherings do not apply to command-authorized programs such as the Military Academy's Cadet Sponsorship or Character Development programs or other similar social development programs within ROTC programs, which provide breadth and depth to the education of future leaders. The prohibitions in paragraphs 4–15*c*(1) and 4–15*c*(2) related to alcohol and social gatherings also do not apply to command-authorized unit social events, such as unit dining in/out events, holiday receptions, or hail and farewell events, or inclusive group social functions, such as those by team, squad, or platoon, to which all group members are invited. The policy in this directive will not infringe upon the right to the free exercise of religion for trainers and trainees.

*e.* Substantiated violations, of actions identified in paragraphs 4–15*c*(1) and 4–15*c*(2) by any military recruiter or military trainer providing entry-level training will require the Soldier to be processed for administrative separation from the Army, unless the Soldier is otherwise punitively discharged or dismissed from the Army for the violation as part of a court-martial sentence. The requirement to initiate administrative processing does not mean that the result of that processing must be administrative discharge; the specific facts of each individual case will determine whether administrative discharge is appropriate. In all other findings of wrongdoing for actions identified in paragraphs 4–

15c(1) and 4–15c(2), commanders will take appropriate action. If the separation authority approves retention, they may initiate action for Secretarial plenary separation authority under AR 135–178 or AR 635–200, as appropriate.

(1) Findings of wrongdoing for actions identified in paragraph 4–15c(1) against any military recruiter, permanent party personnel, or military trainer providing entry-level training will result in the recruiter, permanent party personnel, or trainer being held accountable at the discretion of their commander.

(2) DA Civilians who violate 4–15c(1) may be subject to administrative or disciplinary action up to and including removal from federal service.

(3) Contract employees with substantiated violations of paragraph 4–15c(1) (charges supported by a preponderance of the evidence), the command to whom the contractor provides recruiting or training services will immediately contact the cognizant contracting officer for the contract. The command should not take disciplinary action against either the contractor or the contractor employee. The contracting officer has authority to take such action against the contractor as is warranted under the contract to the extent that a substantiated violation by the contractor's employee is deemed a violation of the terms and conditions of the contractor's contract with the Army.

## 4–16. Fraternization
Violations of paragraphs 4–14b, 4–14c, and 4–15 may be punished under the UCMJ.

## 4–17. Standards of conduct
Public service is a public trust. DA personnel have a responsibility to the United States Government and its citizens to place loyalty to the Constitution, laws and ethical principles above private gain. The performance of their duties should be in keeping with the highest tradition of military and civilian service to the U.S. Government.

*a. Guidance.* Standards of conduct required of Soldiers and DA Civilians are prescribed by Part 2635, Title 5, Code of Federal Regulations, and DoD 5500.07–R. These regulations provide Army personnel with guidance on a multitude of ethical issues, including the avoidance of conflicts of interests between their commercial/financial interests and their official duties.

*b. Annual ethics training.* Commanders at all levels will ensure that all Army personnel required to file a public financial disclosure report, a confidential financial disclosure report, and contracting officers complete annual ethics training as required by DoD 5500.07–R and Part 2638 , Title 5, Code of Federal Regulations.

## 4–18. Employment and volunteer work of spouse
*a.* The Army affirms the rights of a spouse of a Soldier to pursue and hold a job, attend school, or perform volunteer services on or off a military installation. No DA official will, directly or indirectly, impede or otherwise interfere with these rights. Moreover, no DA official will use the preferences and requirements of the Army or any other DoD component to influence the employment, educational, or volunteer service decisions of a spouse. Neither will such decision of a spouse, nor the marital status of the Soldier, affect, favorably or adversely, the performance evaluations, assignments, or promotion opportunities of the Soldier.

(1) In discharging their responsibilities, members of military promotion, continuation, and similar personnel selection boards are prohibited from considering the marital status of a Soldier, or the employment, educational, or volunteer service activities of a Soldier's spouse. AR 135–155 and AR 600–8–29 provide specific policies governing board conduct.

(2) Personnel decisions, including those related to the assignments of Soldiers, will not be affected favorably or adversely, by the employment, educational, or volunteer services activities of a Soldier's spouse, or solely by reason of a Soldier's marital status. AR 140–10, AR 614–30, AR 614–100, AR 614–200, and AR 690–700 provide specific policies. Exceptions may be—

*(a)* Necessary to alleviate the personal hardship of a Soldier or spouse upon the request of the Soldier concerned, such as when a Family member requires specialized medical treatment or educational provisions or similar personal preference accommodations.

*(b)* Needed to facilitate the assignment of dual-military couples in the Army Married Couples Program to the same geographic area.

*(c)* Required by law, such as instances in which a prohibited conflict-of-interest may exist between the official duties of a Soldier and the employment of the Soldier's spouse. DoD 5500.07–R provides specific policies.

*(d)* Made by the Assistant Secretary of Defense (Personnel and Readiness), with the concurrence of the general counsel, on a case-by-case basis, for reasons of national security, that marital status is an essential assignment qualification for particular military billets or positions.

(3) Performance appraisals on Soldiers, including officer and enlisted evaluations reports, will not contain any information regarding the employment, educational or volunteer service activities of the Soldier's spouse, or reflect

favorably or adversely on the member based solely on the Soldier's marital status. AR 623–3 provides specific policies.

*b.* Violations of this policy provide a basis for disciplinary action under the UCMJ in addition to appropriate administrative sanctions.

### 4–19.  The Army Harassment Prevention and Response Program (hazing, bullying, and discriminatory harassment)

The Army is a values-based organization where everyone is expected to do what is right by treating all persons as they should be treated—with dignity and respect. Army personnel are expected to treat all people with respect in all aspects of life and forms of communication (for example, online or in person). Furthermore, Army personnel, especially those entrusted with the mantle of leadership, will lead by example and do what is right to prevent abusive treatment of others. Failure to do so brings discredit on the Army and may have strategic implications. Hazing, bullying, and discriminatory harassment of people or their property is prohibited; allegations of harassment will be addressed swiftly, individually, and in light of their circumstances. Hazing, bullying, online misconduct, and other acts of misconduct, undermine trust, violate our ethic, and negatively impact command climate and readiness. Paragraphs 4–19*a*(1) through (5) are punitive, and violators may be punished under the UCMJ or subject to administrative action. Commanders will seek the advice and counsel of their legal advisor when taking actions pursuant to this paragraph. This policy does not apply to DA Civilian employees wishing to file a harassment complaint; they should seek assistance from their appropriate servicing EEO office in accordance with DoDD 1440.1; DoDI 1400.25, Volume 771; Section 1561 of Title 10, United States Code (USC); AR 690–12 and AR 690–600.

*a.  Harassment.*

(1) *Hazing.*  A form of harassment that includes conduct through which Soldiers or DA Civilian employees (who haze Soldiers), without a proper military authority or other governmental purpose but with a nexus to military service, physically or psychologically injures or creates a risk of physical or psychological injury to Soldiers  for the purpose of: initiation into, admission into, affiliation with, change in status or position within, or a condition for continued membership in any military or DA Civilian organization. Hazing can be conducted through the use of electronic devices or communications, and by other means including social media, as well as in person.

*(a)* Hazing is evaluated by a reasonable person standard and includes, but is not limited to, the following when performed without proper military authority or other governmental purposes:

1.  Any form of initiation or congratulatory act that involves physically striking, beating, paddling, whipping, or burning another person in any manner or threatening to do the same;

2.  Pressing any object into another person's skin, regardless of whether it pierces the skin, such as "pinning" or "tacking on" of rank insignia, aviator wings, jump wings, diver insignia, badges, medals, or any other object;

3.  Oral or written berating of another person with the purpose of belittling or humiliating;

4.  Encouraging another person to engage in illegal, harmful, demeaning, or dangerous acts;

5.  Playing abusive or malicious tricks;

6.  Excessive physical exercise;

7.  Confinement to restricted areas, isolation, or sleep-deprivation;

8.  Immersion in noxious substances;

9.  Branding, handcuffing, duct taping, tattooing, shaving, greasing, or painting another person;

10.  Subjecting another person to excessive or abusive use of water; and

11.  Forcing another person to consume food, alcohol, drugs, or any other substance.

*(b)* Soliciting, coercing, or knowingly permitting another to participate, solicit or coerce such conduct, may be considered hazing. Soldiers will be held responsible for an act of hazing even if there was actual or implied consent from the victim, without regard to the Service, rank, status, or position of the victim.

(2) *Bullying.*  A form of harassment that includes acts of aggression by Soldiers or DA Civilian employees, with a nexus to military service, with the intent of harming a Soldier either physically or psychologically, without proper military authority or other governmental purpose. Bullying is the exposure of an individual or group to physical and/or emotional aggression with the intent to cause distress or harm. Bullying may involve the singling out of an individual from his or her coworkers, or unit, for ridicule because he or she is considered different or weak. It often is indirect or subtle in nature and involves an imbalance of power between the aggressor and the victim. Bullying can be conducted through the use of electronic devices or communications, and by other means including social media, as well as in person.

*(a)* Bullying is evaluated by a reasonable person standard and includes, but is not limited to, the following when performed without a proper military authority or other governmental purpose:

1.  Physically striking another person in any manner or threatening to do the same;

2. Intimidating, teasing, name calling, mockery, threats of violence, harassment, taunting, social exclusion,  isolating, manipulating, blackmailing, and spreading rumors in which there is often a power differential, whether by rank, position, physical stature, social standing or other measures, between the aggressor (one or more) and the victim (one or more);

3. Oral or written berating of another person with the purpose of belittling or humiliating;

4. Encouraging another person to engage in illegal, harmful, demeaning, or dangerous acts;

5. Playing abusive or malicious tricks;

6. Branding, handcuffing, duct taping, tattooing, shaving, greasing, painting, hitting, spitting, shoving another person;

7. Subjecting another person to excessive or abusive use of water;

8. Forcing another person to consume food, alcohol, drugs, or any other substance; and

9. Degrading or damaging another's property or reputation.

*(b)* Soliciting, coercing, or knowingly permitting another to participate, solicit or coerce such conduct, may be considered bullying. Soldiers will be held responsible for an act of bullying even if there was actual or implied consent from the victim, without regard to the Service, rank status, or position of the victim.

(3) *Discriminatory harassment.* A form of harassment that is unwelcome conduct based on race, color, religion, sex (including gender identity), national origin, or sexual orientation.

(4) *Other acts of misconduct.* Misconduct may or may not meet the definitions above for hazing or bullying, yet may violate the dignity and respect of others. Additionally, acts of reprisal or retaliation, as defined in paragraph 5–11 or other policy, regulation or law, and/or violations against persons as outlined in the UCMJ may violate the provisions of this paragraph.

*(a)* Harassment is prohibited in all circumstances and environments, including off-duty and "unofficial" unit functions and settings.

*(b)* Harassment is not limited to superior-subordinate relationships. They may occur between peers or, under certain circumstances, may involve actions directed toward senior personnel by those junior in rank, grade, or position to them.

*(c)* Incidents involving sexual assault, harassment, or discrimination must be addressed in accordance with the full display of laws, regulations, and policies pertaining to such allegations. In all cases, appropriate responding and investigative procedures will be followed.

(5) *Online misconduct.* The use of electronic communication to inflict harm. Electronic communication is the transfer of information (signs, writing, images, sounds, or data) transmitted by computer, phone or other electronic device. Electronic communications include, but are not limited to: text messages, emails, chats, instant messaging, screensavers, blogs, social media sites, electronic device applications, and Web/video conferencing. Examples of online misconduct include, but are not limited to: hazing, bullying, harassment, discriminatory harassment, stalking, retaliation, or any other types of misconduct that undermines dignity and respect. When using electronic communication devices, Army personnel should apply "Think, Type, and Post": "Think" about the message being communicated and who could potentially view it; "Type" a communication that is consistent with Army values; and "Post" only those messages that demonstrate dignity and respect for self and others.

*(a)* Commanders and leaders are to reinforce a climate where current and future Army personnel, including Soldiers and DA Civilian employees understand that online misconduct is inconsistent with Army values and where online-related incidents are prevented, reported, and where necessary addressed at the lowest possible level.

*(b)* Personnel experiencing or witnessing online misconduct should promptly report matters to the chain of command/supervision. Alternative avenues for reporting and information include: Family Support Services, Military Equal Opportunity, Equal Employment Opportunity, Sexual Harassment/Assault Response and Prevention, and Army Law Enforcement.

(6) *The imposition of necessary or proper duties and the requirement of their performance does not violate this policy even though the duties may be arduous, hazardous, or both.* Harassment does not include properly directed command activities that serve a legitimate purpose, or the requisite training activities required to prepare for such activities. When authorized by the chain of command and/or operationally required, the following activities do not constitute hazing or bullying:

*(a)* The physical and mental hardships associated with operations or operational training.

*(b)* Lawful punishment imposed pursuant to the UCMJ.

*(c)* Administrative corrective measures, including verbal reprimands and command-authorized physical exercises.

*(d)* Extra military instruction or corrective training that is a valid exercise of military authority intended to correct a Soldier's deficient performance in accordance with paragraph 4–6.

*(e)* Physical training (PT) and remedial PT.

*(f)* Other similar activities that are authorized by the chain of command and conducted in accordance with this or another applicable regulation.

(7) *Traditional events.* Many time-honored customs of the Army include traditional events that celebrate personal milestones and professional achievements. These events are part of our heritage and include hails and farewells, promotion and graduation ceremonies, and other official command functions. When properly organized and supervised, these events serve to enhance morale, esprit de corps, pride, professionalism, and unit cohesiveness. The chain of command will ensure these traditions and customs are carried out in accordance with the moral principles of the Army Ethic and reinforce a positive professional climate within the Army culture of trust.

*b. The Commanding General, U.S. Army Training and Doctrine Command.* Responsibilities outlined in paragraph 6–10.

*c. Commander (or equivalent) at all levels—*

(1) Enforce the Army's policy on harassment at all levels.

(2) Reinforce a climate where current and future Army personnel understand that harassment, including online misconduct, erode mission readiness by diminishing dignity and respect and negatively impacts morale.

(3) Hold leaders at all levels appropriately accountable for fostering a climate of inclusion within their organizations that supports diversity, is free from harassment, and does not tolerate retaliation for those reporting harassment allegations.

(4) Publish and post written command policy implementing The Army Harassment Prevention and Response Program. Statements will be consistent with the Army policy, include the local command's commitment to preventing harassment (including hazing, bullying, discriminatory harassment, online misconduct, and other misconduct). They will also include information regarding how to identify the types of harassment (hazing, bullying, discriminatory harassment, online misconduct, and other misconduct) and Army standard definitions, as outlined in paras 4–19*a*(1) through (5). The policy will reaffirm that such acts of harassment are prohibited, will explain how and where to file complaints, and will state that all complainants and victims will be protected from acts or threats of reprisal and/or retaliation. Each ACOM, ASCC, DRU, installation, unit, agency, and activity down to company, troop, or battery level will publish a harassment policy. Commanders must consult with their legal advisor prior to publishing.

(5) On an annual basis, commanders will conduct harassment training in combination with their annual MEO training requirement, in accordance with AR 350–1. Training will occur at all levels, from accessions to the assumption of senior leader rank and position. Command participation and emphasis is crucial in this effort. Harassment prevention and response training and education programs at all levels will include—

*(a)* Roles and responsibilities of Soldiers, including fostering a culture fee from harassment.

*(b)* Information on how to identify types of harassment and Army definitions.

*(c)* Options and procedures for submitting informal, formal, and anonymous harassment complaints.

*(d)* Information regarding how to identify and report retaliation in accordance with Army's Retaliation Strategy.

*(e)* Information regarding how to identify and report reprisal in accordance with DoDD 7050.06.

*(f)* Information regarding bystander intervention to ensure Soldiers have the skills to recognize when to intervene and the tools necessary to implement the intervention.

*(g)* Information regarding any administrative or disciplinary action that could be taken.

*(h)* Include examples of hazing, bullying, and discriminatory harassment and illustrate how these behaviors negatively impact the mission.

*(i)* Victim rights and resources.

(6) Conduct compliance reviews on an annual basis, to include—

*(a)* Assessment of subordinate commanders' impartiality, timeliness, and sufficiency of response to harassment complaints.

*(b)* Assessment of subordinate commanders' execution of harassment (hazing, bullying, and discriminatory harassment) prevention training.

*(c)* Assessment of subordinate commanders' organizational climate pursuant to appendix E. Assessments will consider whether organizations are free from harassment (hazing, bullying, and discriminatory harassment) and Soldiers are treated with dignity and respect.

*(d)* Assessment of the effectiveness of subordinate commanders' policies and programs in reducing incidents of harassment and providing appropriate victim services, care, and support.

(7) Ensure programs incorporate, at a minimum: long-term goals, objectives, and milestones; results-oriented performance measures to assess effectiveness; and compliance standards for promoting, supporting, and enforcing policies, plans, and programs.

(8) Collects, assesses, and analyzes information and data regarding harassment complaints received by the command and compiles and submits quarterly MEO database reports on a quarterly bases (prior to 30 days after each fiscal quarter) in preparation for HQDA data pull.

(9) Report allegations of criminal behavior to law enforcement authorities. Investigations of such allegations are recorded and tracked in the Army Law Enforcement Reporting and Tracking System (ALERTS) in accordance with AR 190–45 and AR 195–2. This regulation does not alter the investigative authority or responsibility of Army law-enforcement officials.

(10) Report allegations (all components) against a promotable COL, an active or retired GO, IG of any component, members of the SES, or executive schedule personnel, to the Investigations Division, U.S. Army Inspector General Agency (SAIG–IN), Pentagon, Washington, DC 20310–1700 by rapid but confidential means within 2 working days of receipt when practicable. The complaint may be emailed to the HQDA IG's investigations mailbox at usarmy.pentagon.hqda-otig.mbx.saig-in-office@mail.mil in order to provide timely submission.

(11) If a Soldier possesses a security clearance, commanders will ensure the security manager records the substantiated violations of this paragraph as an incident report in the JPAS (or subsequent system) in accordance with AR 380–67.

(12) Ensure MEO database is updated on a quarterly bases (prior to 30 days after each fiscal quarter) in preparation or HQDA data pull.

*d. Tracking and reporting—*

(1) Harassment complaints will be processed through the command MEO Program using the MEO and Harassment Complaint Processing System (see para 6–6).

(2) Tracking and reporting of criminal behavior in violation of this paragraph will be consolidated by the Office of the Provost Marshal General, and OTJAG, then forwarded to the HQDA MEO policy office on a quarterly basis.

(3) Harassment complaints against Soldiers reported via EEO channels in accordance with AR 690–600 will be reported to and tracked by the command MEO Program as required by DoDI 1020.03.

*e. 24 hour hotline.* See paragraph 6–6.

*f. Individual reporting.* Army personnel should report harassment (hazing, bullying, discriminatory harassment) to their commander/supervisor, the MEO, or law enforcement. Individuals should report cases of sexual assault and sexual harassment as described in chapter 7.

*g. Individual information.* Army personnel may seek information from the following agencies: Family support services, MEO office, EEO office, law enforcement, and the Army SHARP professional. These agencies will refer complainants to the commander, or law enforcement to file a complaint pertaining to harassment.

*h. Guidance.* Individuals should—

(1) Promptly report matters to the chain of command/supervision or their MEO professional if they experience or witness any incidents of harassment (hazing, bullying, discriminatory harassment, online misconduct, or other acts of misconduct).

(2) Conduct themselves in accordance with this paragraph and treat all persons as they should be treated with dignity and respect.

(3) Intervene or prevent harassment, if safe to do so, such that incidents are addressed at the lowest possible level.

## 4–20. Informal funds

HQDA Principal Officials and commanders may authorize informal funds. Examples of informal funds are office coffee, cup and flower, and annual picnic funds. These funds are subject to the following guidelines:

*a.* Use is limited to expenses consistent with the purpose and function of the fund.

*b.* Only one individual is to be responsible for fund custody, accounting, and documentation. Annually, this individual's supervisor is advised of the fund's financial status.

*c.* Operation of the fund will be consistent with Army Values and DoD 5500.07–R.

*d.* Fundraising solicitations conducted by organizations composed of DA Civilian employees and/or members of the Uniformed Services among their own members for organizational support or for the benefit of specific member welfare funds are permitted; however, such efforts should be limited in number and scope during the official Combined Federal Campaign and Army Emergency Relief fundraising periods, in order to minimize competition with Combined Federal Campaign/Army Emergency Relief.

## 4–21. Misuse of government travel charge cards

The functional proponent for policy on the misuse of government travel charge cards is the Assistant Secretary of the Army (Financial Management and Comptroller) (ASA (FM&C)). Members of the Army are provided government travel charge cards to facilitate official travel and official travel- related expenses away from the Soldier's official

duty station. Individual accountability for the management of the government travel charge card is vital for the continued success of the government charge card program. Personal use, misuse, abuse, or fraud of the travel card is prohibited.

*a. Definition.* Misuse of a government charge card includes any improper or fraudulent use of a government travel charge card, including any use at establishments or for purposes that are inconsistent with the official business of the Army or with applicable standards of conduct. Examples of misuse can include, but are not limited to: (a) expenses related to adult entertainment and gambling (including those expenses discovered by Inspector General audits), (b) purchases for personal, family or household purposes except for authorized PCS expenses, (c) cash withdrawals or advances used during non-travel periods or not related to official government travel requirements are not authorized (includes but is not limited to any withdrawal of a credit balance remaining on the card), (d) intentional failure to pay undisputed charges in a timely manner, and (e) cash withdrawals or advances taken more than three working days prior to official government travel.

*b. Scope.* Government charge cards are to be used in accordance with the DoD Government Travel Charge Card Regulations, (See DoDI 5154.31, Volume 4, and the terms of the application agreement for the government travel charge card.) Use of the government travel charge card is mandatory, unless an exception applies.

*c. Command responsibilities.* Enforcement of this policy is a responsibility of commanders at all levels. Commanders will ensure that all Soldiers issued government travel charge cards are properly counseled on the appropriate use of the charge card. The best way to curtail charge card misuse is to prevent it through proper selection of cardholders, training, and leadership by example. Commanders will further monitor use of the government travel charge card to detect abuse and take appropriate corrective or disciplinary action.

*d. Command options.* This paragraph is punitive with regards to Soldiers. Violators of this policy may be subject to UCMJ or administrative action. Commanders should seek the advice and counsel of their legal advisor when taking actions pursuant to this paragraph.

*e. Official travel related expenses.* While these cards will be used only for reimbursable expenses associated with official travel, the following (while not reimbursable) are considered to be related to official travel. Therefore, the travel card may be used for the following purposes:

(1) The cardholder, while in a travel status, may use the card for non-reimbursable incidental travel expenses, such as rental movies, personal telephone calls, exercise fees, and beverages, when these charges are part of a room billing or meal and are reasonable.

(2) The traveler will pay for incidental non-reimbursable personal expenses as part of the normal billing process.

## 4–22. Domestic Violence Amendment to the Gun Control Act of 1968

*a. General.* The Domestic Violence Amendment to the Gun Control Act of 1968 (18 USC 922), the Lautenberg Amendment, makes it unlawful for any person to transfer, issue, sell or otherwise dispose of firearms or ammunition to any person whom he or she knows or has reasonable cause to believe has been convicted of a misdemeanor crime of domestic violence. It is also unlawful for any person who has been convicted of a misdemeanor crime of domestic violence to receive any firearm or ammunition that has been shipped or transported in interstate or foreign commerce. This chapter applies to all Soldiers throughout the world, including those in hostile-fire areas.

*b. Definitions.* For the purpose of this paragraph only, the following definitions apply:

(1) *Crime of domestic violence.* An offense that involves the use or attempted use of physical force, or threatened use of a deadly weapon committed by a current or former spouse, parent, or guardian of the victim; by a person with whom the victim shares a child in common; by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian; or by a person who was similarly situated to a spouse, parent, or guardian of the victim. Persons who are similarly situated to a spouse include two persons who are residing at the same location in an intimate relationship with the intent to make that place their home.

(2) *Qualifying conviction.* A State or Federal conviction for a misdemeanor crime of domestic violence and any general or special court-martial for an offense that otherwise meets the elements of a crime of domestic violence, even though not classified as a misdemeanor or felony. A qualifying conviction does not include a summary court-martial conviction or the imposition of nonjudicial punishment under UCMJ, Art. 15. By DoD policy, a State or Federal conviction for a felony crime of domestic violence adjudged on or after 27 November 2002, will be considered a qualifying conviction for purposes of this regulation and will be subject to all the restrictions and prohibitions of this regulation. A person will not be considered to have a qualifying conviction unless the convicted offender was represented by counsel or knowingly and intelligently waived the right to counsel, and, if entitled to have the case tried by a jury, the case was actually tried by a jury, or the person knowingly and intelligently waived the right to have the case tried by a jury; and, the conviction has not been expunged or set aside, or the convicted offender has not been

pardoned for the offense, or had civil rights restored; unless the pardon, expungement, or restoration of civil rights provides that the person may not ship, transport, possess, or receive firearms.

(3) *Security clearance.* If a completed security clearance investigation reveals that a Soldier has a qualifying conviction, then the investigation will be referred to the Soldier's chain of command for appropriate action consistent with this regulation.

(4) *Commander.*

*(a)* Unless otherwise stated, the commander with responsibility is the senior commander. Delegation of authority is authorized.

*(b)* For the USAR, unless otherwise stated, the commander is the first general officer in command of the appropriate Reserve command (for example, 7th Mission Support Command; 9th Mission Support Command; or U.S. Army Civil Affairs and Psychological Operations Command). Delegation of authority is authorized.

*c. Commander's responsibilities.*

(1) The commander will ensure that all Soldiers who have a qualifying conviction are notified that it is unlawful to possess, ship, transport, or receive firearms and ammunition as prohibited in this regulation.

(2) Company and battery-level commanders will ensure that Soldiers in-processing to their unit are notified of the following requirements in the Domestic Violence Amendment to the Gun Control Act—

*(a)* It is unlawful for any person to transfer, issue, sell, or otherwise dispose of firearms or ammunition to any person whom he or she knows, or has reason to believe, has been convicted of a misdemeanor crime of domestic violence.

*(b)* It is unlawful for any person who has been convicted of a misdemeanor crime of domestic violence to receive any firearm or ammunition that has been shipped or transported in interstate or foreign commerce.

*(c)* Soldiers have an affirmative, continuing obligation to inform commanders or supervisors if they have, or later obtain, a conviction of a misdemeanor crime of domestic violence.

*(d)* Soldiers who report a conviction of a misdemeanor crime of domestic violence will be asked by company and battery-level commanders to complete DD Form 2760 (Qualification to Possess Firearms or Ammunition). Soldiers will be notified that neither the information nor evidence gained by filling out the DD Form 2760 may be used against them in any criminal prosecutions for a violation of 18 USC 922, including prosecution under the UCMJ, based on a violation of 18 USC 922 for conduct that occurred prior to completion of the DD Form 2760. Company and battery-level commanders will file the DD Form 2760 in the Soldier's local military personnel file in accordance with AR 600–8–104 and AR 25–400–2.

*(e)* A copy of paragraph 4–22 will be displayed outside unit arms rooms and all facilities in which government firearms or ammunition are stored, issued, disposed, or transported.

(3) The senior commander will ensure that policy and procedures are in place to enforce the provisions of this chapter if privately owned firearms or ammunition are permitted in government quarters. The senior commander will also ensure that policy and procedures are in place in MWR activities and other government sponsored or sanctioned activities on their installation that engage in the transfer or sale of firearms or ammunition.

(4) The senior commander will ensure that procedures are implemented to track domestic violence arrests and convictions in the civilian community. These procedures should include regular coordination with local law enforcement and judicial agencies.

(5) If a commander knows or has reasonable cause to believe that a Soldier has a qualifying conviction, then the commander should take all reasonable action to investigate. Soldiers with qualifying convictions must be identified and reported to HQDA to ensure compliance with the law. A commander at any level may initiate the investigation by ordering the Soldier to complete DD Form 2760. Soldiers who have or may have a qualifying conviction should be referred to a Trial Defense Service (TDS) attorney. A TDS attorney will also be available to assist the Soldier in seeking expungement of a qualifying conviction or a pardon.

(6) If a commander knows or has reasonable cause to believe that a Soldier has a qualifying conviction, then he or she will immediately retrieve all government-issued firearms and ammunition and advise the Soldier to consult with a legal assistance attorney for guidance on lawful disposal or sale of any privately owned firearms and ammunition. Individuals with qualifying convictions are exempt from weapons qualification in accordance with AR 350–1 and will not be assigned individual weapons or ammunition.

(7) Accommodation: Domestic violence is incompatible with Army Values. However, Soldiers will be given a reasonable time to seek expungement of, or to obtain a pardon for a qualifying conviction, and may request to extend up to one year for that purpose. The following factors will be considered in the commander's determination of the amount of time granted to seek expungement or pardon:

*(a)* Whether the Soldier attempted to conceal his conviction. In no event will Soldiers be accommodated who have made false statements on the DD Form 2760.

*(b)* Whether firearms or deadly weapons were used in the offense that formed the basis for the Soldier's domestic violence conviction.

*(c)* Whether the conviction is recent or remote in time.

*(d)* Whether there were incidents of domestic violence before or after the qualifying conviction. In no event will Soldiers be accommodated who have more than one qualifying conviction.

*(e)* Whether serious injury was caused during the crime of domestic violence.

*(f)* Whether the Soldier cooperated with law-enforcement or investigating authorities.

*(g)* Whether circumstances suggest the probability of future incidents of domestic violence.

*(h)* Whether the Soldier has expressed remorse or regret or has entered counseling.

*(i)* Whether the Soldier has satisfied the judgment of the court.

*(j)* The length and character of service of the Soldier, the ability and potential of the Soldier, and the needs of the Army for the skills of the Soldier.

*(k)* Whether accommodation of the Soldier is consistent with actions taken in similar cases.

*(l)* Whether accommodation of the Soldier would be consistent with good order and discipline and public safety.

(8) Commanders must detail Soldiers whom they have reason to believe have a qualifying conviction to meaningful duties that do not require bearing weapons or ammunition. Commanders may reassign Soldiers to local TDA unit positions that deny them access to weapons and ammunition. Commanders will not appoint or assign Soldiers with qualifying convictions to leadership, supervisory, or property accountability positions that would require access to firearms or ammunition.

*d. Personnel policies.*

(1) *Enlistment/reenlistment.* Enlistment of applicants with a qualifying conviction is prohibited and no waivers will be approved. Soldiers with a qualifying conviction will be barred from reenlistment and are not eligible for the indefinite reenlistment program. Soldiers in the indefinite reenlistment program will be given an expiration of term of service not to exceed 12 months from the date HQDA is notified of the qualifying conviction. Enlistment and reenlistment policy and procedures for RA are provided in AR 601–210. Reenlistment policy and procedures for USAR are provided in AR 140–111. Applicants who have enlisted in the DEP who are found to have a qualifying conviction will be separated from the DEP.

(2) *Commissioning/appointment.* Applicants with a qualifying conviction will not be approved for commissioning in accordance with AR 135–100. Officers with a qualifying conviction will be separated no later than 12 months from the date HQDA is notified of the qualifying conviction.

(3) *Flags.* Soldiers with a qualifying conviction will be denied favorable personnel action in accordance with AR 600–8–2. The flag may be removed if the qualifying conviction is expunged or set aside by competent authority.

(4) *Attendance at Service schools.* Soldiers with a qualifying conviction are not authorized to attend any Service school where instruction with firearms or ammunition is part of the curriculum. Commanders will counsel Soldiers that inability to complete service schools may affect future promotion or retention. Soldiers with a qualifying conviction may not attend any school that requires an active duty service obligation; AR 350–100 and AR 621–1 apply.

(5) *Department of the Army selection board guidance.* Selection boards for school, command, and promotion will be instructed that appropriate consideration should be given to qualifying convictions in evaluating the Soldier's potential for future service.

(6) *Promotion.* Enlisted Soldiers with a qualifying conviction may not be promoted to the next higher grade in accordance with AR 600–8–19. Officers with a qualifying conviction may not be promoted to the next higher grade in accordance with AR 135–155 and AR 600–8–29.

(7) *Separation/retention policy.* Officers on active duty may request release from active duty, submit requests for unqualified resignation, or be processed for elimination under the provisions of AR 600–8–24. The USAR officers not on active duty may submit requests for unqualified resignation or be processed for involuntary separation in accordance with AR 135–175. Enlisted Soldiers on active duty may request voluntary separation for the convenience of the government under Secretarial plenary authority as specified in AR 635–200. They also may be processed for involuntary discharge under the misconduct provisions of AR 635–200 on the basis of the misconduct that resulted in the qualifying conviction, or for involuntary separation under Secretarial plenary authority if the commander does not believe that discharge for misconduct is warranted. The misconduct and Secretarial plenary authority provisions of AR 135–178 also apply to voluntary or involuntary separation of USAR enlisted Soldiers not on active duty. The foregoing separation provisions do not apply to Soldiers within statutory military retirement sanctuaries.

(8) *Mobilization/deployment.* All Soldiers known to have, or whom commanders have reasonable cause to believe have, a qualifying conviction are not mobilization assets and are non-deployable for missions that require possession of firearms or ammunition.

(9) *Assignment.* All Soldiers will complete a DD Form 2760 prior to receipt of PCS orders. Soldiers with a quali-fying conviction are not eligible for overseas service in accordance with AR 614–30. Assignment of Soldiers with a qualifying conviction will be restricted in accordance with AR 600–8–11 and AR 140–10. Soldiers with a qualifying conviction will not be approved for entry into the AGR Program in accordance with AR 135–18.

(10) *Evaluation reports.* A qualifying conviction is an appropriate subject for comment in an evaluation report in accordance with AR 623–3.

(11) *"Sanctuary" statutes.* This regulation and its policies are subject to the "sanctuary" provisions of 10 USC 637(a), 580(a)(4)(C), 1176, and 12686.

*e. Reporting requirements.*

(1) Commanders will add Soldiers identified as non-deployable under this chapter to unit status reports. Personnel identified will be added to the non-deployable total under the code "L9" in accordance with AR 220–1 (commander's unit status report).

(2) The active RA will report qualifying convictions using assignment consideration code L9 (Lautenberg Amend-ment). Army Reserve will enter Lautenberg data as ASG–CONS "L9" in the Total Army Personnel Data Base-Re-serve, database table IAF–T. Refer to current military personnel messages for further guidance.

(3) The ARNG Directorate (NG–ARH–S) will report for ARNG. USARC will report for the USAR. Biannual reports will be made (15 January) and (15 July) to the DCS, G–1 (DAPE–MPE). The Individual Ready Reserve (IRR), Standby Reserve, and Retired Reserve are not subject to reporting requirements.

## 4–23. Self-reporting of criminal convictions by officers and senior enlisted members

*a.* All U.S. Army commissioned officers, WOs, and enlisted members above the grade of E–6 will report, in writ-ing, any conviction of such member for violation of a criminal law of the United States— whether or not the member is on active duty or inactive duty at the time of the conduct which provides the basis for the conviction. The member will report using either a DA Form 4187 (Personnel Action) or a memorandum (see AR 600–8–6). Reporting is re-quired for any criminal conviction announced on or after 1 March 2008.

*b.* The report will be made to the Soldier's commander within 15 days of the date the conviction is announced, even if sentence has not been imposed or the Soldier intends to appeal the conviction.

*c.* USAR Soldiers not on active duty but in an active status will submit reports under this policy at the first drill period after the date the conviction is announced, or within 30 days of the date the conviction is announced, whichever is earlier, even if sentence has not been imposed or the Soldier intends to appeal the conviction.

*d.* Soldiers in the IRR will submit their report to the Commander, U.S. Army Human Resources Command (AHRC–PDR–H), 1600 Spearhead Division Avenue, Fort Knox, KY 40122–5402 or by email to usarmy.knox.hrc.mbx.tagd-ask-hrc@mail.mil within 30 days of the date the conviction is announced.

*e.* The written report will be on a DA Form 4187 or in memorandum format and include: Soldier's name, rank, unit of assignment, date of offense(s), specified nature of the offense (charged offenses(s)), place and date of trial, result of the trial, sentence (if available at the time of conviction), and any other supporting documents. In addition, a copy of the conviction and sentencing documents will be submitted with the report. Soldiers may include statements of extenuation or mitigation with their report. Statements of extenuation or mitigation may be used by their chain of command and the GCMCA in determining the filing disposition of the conviction as outlined in paragraph 4–23*g*.

*f.* Understanding self-reporting terminology—

(1) *Conviction.* For the purposes of this policy, the term "conviction" includes a plea or finding of guilty, a plea of nolo contendere (plea of no contest–plead guilty to the charge(s) without admitting guilt), and all other actions tantamount to a finding of guilty, including adjudication withheld, deferred prosecution, entry into adult or juvenile pretrial intervention programs, and any similar disposition of charges.

(2) *Criminal Law of the United States.* Includes any conviction of Federal criminal law, or the law of any State, district, commonwealth, territories, or equivalent criminal law or ordinance, and any criminal law or ordinance of any county, parish, municipality, or local subdivision of any such authority, other than motor vehicle violations that do not require a court appearance.

(3) *Suspension of favorable personnel actions.* Suspension of favorable personnel actions is mandatory when an investigation (formal or informal) is initiated on a Soldier by military or civilian authorities.

*g.* Upon receipt of a report of a criminal conviction, the commander will forward that report to the SPCMCA and will include any statements of extenuation or mitigation, if provided. The SPCMCA, with the assistance of the servic-ing judge advocate, will obtain an authenticated copy of the conviction and the sentence, if available, from civilian authorities and all available supporting evidence. After review, the SPCMCA will forward the authenticated convic-tion (and sentence, if available) along with any supporting evidence, and statements of extenuation or mitigation, if provided, to the GCMCA with a recommendation on whether to file the conviction in the Soldier's official military

personnel file in accordance with AR 600–37. Commanders at all levels may consider the conviction for official purposes, to include, but not limited to, evaluation reports, assignments, selection for schools, awards, initiation of separation, and suspension of security clearance and access to government-owned IT systems. If the commander initiates separation action, the case will be processed through the chain of command to the separation authority for appropriate action.

*h.* In accordance with AR 380–67, commanders will forward a copy of the DA Form 4187, including all attachments and any statements of extenuation or mitigation provided by the Soldier, to the DoD CAF (Army Division) using derogatory information reporting procedures in the JPAS. The report will include the commander's recommendation regarding retention or revocation of the Soldier's security clearance.

*i.* In the event a commander or military law-enforcement official receives information that a covered member of the Armed Forces under the jurisdiction of another military department has become subject to a conviction for which a report is required by this section, the commander or military law-enforcement official receiving such information will forward it to the member's immediate commander. If the member's immediate commander cannot be readily identified, the commander or military law-enforcement official receiving the information will forward it to the appropriate Service point of contact listed below—

(1) U.S. Army: Army Operations Center, 3200 Army Pentagon, Washington, DC 20310–3200; (703) 697–0219/DSN 227–0219.

(2) U.S. Marine Corps active duty: Commandant of the Marine Corps (HQMC–JAM), 3000 Marine Corps Pentagon, Washington, DC 20350–3000; (703) 614–4250.

(3) U.S. Marine Corps Reserve: Staff Judge Advocate, Marine Corps Mobilization Command, 15303 Andrews Road, Building 100, Kansas City, MO 64147–1207; 1–800–255–5082.

(4) U.S. Air Force: Headquarters, Air Force Personnel Center (AFPC/DPISIM), Special Programs Office, 550 C Street West, Randolph Air Force Base, TX 78150–4745; (210) 585–2591/DSN 665–2591.

(5) U.S. Navy active duty: Commander, Navy Personnel (PER–83), 5720 Integrity Drive, Millington, TN 38055-8340. Officers: (901) 874–4424/DSN 882–4424. Senior enlisted: (901) 874–4433/DSN 882–4433.

(6) U.S. Navy Reserve: Commander, Navy Personnel Command (PERS–9), 5720 Integrity Drive, Millington, TN 38055–8340; (901) 874–3087/DSN 882–3087.

## 4–24. Command responsibility under the law of war
Commanders are legally responsible for war crimes they personally commit, order committed, or know or should have known about and take no action to prevent, stop, or punish. In order to prevent law of war violations, commanders are required to take all feasible measures within their power to prevent or repress breaches of the law of war from being committed by subordinates or other persons subject to their control. These measures include requirements to train their Soldiers on the law of land warfare, investigate suspected or alleged violations, report violations of the law of war, and take appropriate corrective actions when violations are substantiated.

## 4–25. Personnel recovery and code of conduct training
Commanders at all levels are responsible for maintaining compliance for the Army's Personnel Recovery Program in accordance with AR 525–28, to prevent or reduce any strategic advantage our enemies may gain due to a tactical event involving the isolation of Army personnel.

## 4–26. Combating trafficking in persons
Commanders are responsible for maintaining compliance for the DoD, Combating Trafficking in Persons Program in accordance with DoDI 2200.01 and Army policy as explained in Secretary, Chief of Staff, and Sergeant Major of the Army Memorandum, dated 24 July 2006, Subject: Combating Trafficking in Persons and implemented in AR 350–1. Trafficking in persons, often called human trafficking, is defined as recruitment, transportation, transfer, harboring, or receipt of persons by means of threat, use of force, coercion, abduction, fraud, deception, abuse, or exploitation. Trafficking in persons is a grave violation of human rights. Human trafficking is a world-wide criminal threat to security, civil rights, and stability, and a direct threat to our national foreign policy goals.

## Chapter 5
## Other Responsibilities of Command

**5–1. General**
This chapter discusses additional responsibilities concerning certain Soldier activities and practices whose regulation is an inherent aspect of command.

**5–2. Army Family readiness**
Commanders have an obligation to maintain Army Family readiness.

  *a. Concept.*

  (1) Family readiness is the state of being prepared to effectively navigate the challenges of daily living experienced in the unique context of the Army. A prepared Army Family understands the challenges they may face, is aware of supportive resources available to them, has the skills needed to function in the face of challenges, and uses those skills and resources to manage challenges.

  (2) The DCS, G–9 issues implementing guidance and develops programs; establishes and administers the resourcing through the budget process in support of the Family Readiness system including but not limited to Soldier and Family quality of life and MWR programs and services provided to garrisons and geographically dispersed members of the Total Army.

  *(a)* The type and level of Family readiness services provided focus on three domains: mobilization and deployment readiness, mobility and financial readiness, and personal and Family life readiness.

  *(b)* Family readiness services will be provided through a system that maximizes a network of agencies, programs, services, and individuals in a collaborative manner to promote Army Family readiness.

  *b. Responsibilities.*

  (1) Heads of HQDA staff agencies (and field operating agencies, if appropriate) are responsible for Army wide policies, plans and initiatives within their areas of proponency pertaining to the Family readiness system.

  (2) The CG, AMC through CG, IMCOM will—

  *(a)* Provide guidance, technical assistance, and consultation to support the execution and delivery of Soldier and Family readiness programs and services.

  *(b)* Identify needs and design and conduct Armywide Soldier, Family member, and survivor training and awareness events.

  *(c)* Determine requirements and develop training for individuals responsible for Family program execution.

  *(d)* Provide consultation and liaison with the ARNG and USAR to ensure interaction and synchronization among RA and USAR concerning Family assistance and readiness issues.

  (3) Army National Guard.

  *(a)* The NGB is the Army's lead agency for the establishment and execution of Family assistance for ARNG Soldiers at all levels of contingency and mobilization.

  *(b)* The Chief, NGB through the NGB Family PM will—

  1. Provide policy, guidance, technical assistance, and consultation to support the development and implementation of Family readiness programs and services within the ARNG.

  2. Identify, design, and provide ARNG Soldiers and Family members training and awareness support.

  3. Develop training for individuals responsible for Family program execution within the ARNG.

  (4) The Chief, Army Reserve (CAR), through the Office of the CAR Family PM will—

  *(a)* Provide policy, guidance, technical assistance, and consultation to support the development and implementation of programs and services within the USAR.

  *(b)* Identify, design, and provide USAR Soldier and Family member training and awareness support.

  *(c)* Develop training for individuals responsible for Family program execution within the USAR.

  *(d)* Ensure that regional readiness commands have staffed the centralized Family readiness office to meet assigned duties and responsibilities.

  (5) ACOM, ASCC, or DRU commanders will provide an environment that encourages an effective Family readiness system and will, at a minimum—

  *(a)* Ensure command emphasis at the unit level.

  *(b)* Identify and input fiscal and personnel resource requirements for programs and services as part of the command operating budget process.

  *(c)* Provide for Soldier, DA Civilian, survivor, retiree, and Family member participation in quality of life matters.

  *(d)* Ensure inclusion of single Soldiers in quality of life programs/initiatives.

(6)  USARC/CONUS Army/installation/Joint Forces Headquarters (JFHQ)/RSC commanders at all levels will provide an environment that encourages an effective Family readiness system and will, at a minimum—

*(a)*  Ensure command emphasis to the unit level.

*(b)*  Ensure the appointment of a Family readiness liaison point of contact as an additional duty in each unit below installation/JFHQ/RSC/level.

*(c)*  Identify and input fiscal and personnel resource requirements for programs and services as part of the command operating budget process.

*(d)*  Provide for Soldier, DA Civilian, retiree, and Family member awareness of available programs and services.

*(e)*  Provide for Soldier, DA Civilian, retiree, and Family member access to entitlements, Family programs, and Family services for which they are eligible.

*(f)*  Provide for Soldier, DA Civilian, retiree, and Family member participation in quality of life programs.

*(g)*  Ensure inclusion of single Soldiers in quality of life programs and initiatives.

*(h)*  Installations/JFHQs will ensure/facilitate appropriate coordination of program and service elements for all components within their geographical area of responsibility during peacetime and at any level of contingency or mobilization.

(7)  Unit commanders at all levels will provide an environment that encourages an effective Family readiness system and will, at a minimum—

*(a)*  Appoint a Family readiness liaison point of contact as an additional duty.

*(b)*  Complete an annual Family readiness evaluation and ensure subordinate commands complete their Family readiness evaluations annually. Provide pre-deployment, sustainment, and reunion briefings as required by rotational assignments.

*(c)*  Provide for Soldier and Family member awareness of available programs and services.

*(d)*  Provide for Soldier and Family member access to entitlements, Family programs, and Family services for which they are eligible.

*(e)*  Actively engage in the sponsorship of new Soldiers, Families, Youth, and DA Civilians arriving to their units.

*(f)*  Ensure the proper documenting and monitoring of personal affairs readiness of Soldiers, to include Family care plans (see para 5–3).

*(g)*  Ensure inclusion of single personnel in quality of life programs and initiatives.

*(h)*  Maintain, as appropriate to the needs of their units, a unit Soldier and Family Readiness Group (SFRG) to encourage self-sufficiency among its members by providing information, referral assistance, and mutual support. Refer to AR 608–1, appendix J, for information pertaining to SFRG fundraising, reporting, and informal funds activities.

(8)  Army Community Service Directors will—

*(a)*  Advise the commander concerning the impact of programs and services on retention, readiness, training, and rotational assignments.

*(b)*  Coordinate the development of programs and services according to needs assessment.

*(c)*  Coordinate the development of resource requirements to support programs and services.

*(d)*  Coordinate public/community/employer awareness and support of programs and services.

*(e)*  Serve as command liaison with military and civilian agencies involved in resourcing and supporting programs and services.

(9)  Soldiers bear primary responsibility for their own individual readiness and resiliency and that of their Families. At a minimum, Soldiers will—

*(a)*  Keep themselves and their Families informed concerning key (unit) personnel information, benefits, and programs.

*(b)*  Support and, where appropriate, encourage their Family members to participate in programs, services and activities that develop, strengthen and sustain the quality of life and well-being of all members of the Army Family, for example, Soldier and Family Readiness Groups, deployment cycle support training, and Army Family team building.

## 5–3.  Family care plans

*a.*  The DCS, G–1 is responsible for policy on Family care plans as follows:

(1)  Commanders oversee mission, readiness, and deployability as they affect RA and USAR Soldiers who are: single parents; dual-military couples with dependent Family members; married with custody or joint custody of children whose non-custodial biological or adoptive parent is not the current spouse of the Soldier, or who otherwise bears sole responsibility for the care of children under the age of 18 or others unable to care for themselves in the absence of the Soldier; or primarily responsible for dependent Family members. Plans must be made to ensure Family members are properly and adequately cared for when an RA Soldier is deployed, on TDY, or otherwise not available due to military requirements. USAR Soldiers will implement Family care plans during any period of absence for annual

training, regularly scheduled unit training assemblies, emergency mobilization and deployment, or other type of active duty. Members of the Department of Defense Expeditionary Civilian Workforce who meet the criteria in AR 690–11 must develop and maintain a current Family care plan in accordance with DoDI 1342.19.

(2) DA Form 5305 (Family Care Plan) is not a legal document that can change a court-mandated custodial arrangement, nor can it interfere with a parent's right to custody of their child. Its sole purpose is to document for Army purposes the plan by which Soldiers will provide for the care of their Family members when military or civilian duties prevent them from doing so. It will include proof that guardians and escorts have been thoroughly briefed on the responsibilities they will assume and the procedures for accessing military and civilian facilities and services on behalf of the Family members of the Soldier. It will attest that the guardian and escort agreed to provide care and have been provided all necessary legal authority and means to do so. It will include proof that the Soldier has obtained consent to the planned designation of guardianship from all parties with a legal interest in the custody and care of the minor child, or proof that reasonable efforts have been made to obtain consent to such designation.

(3) At a minimum, proof will consist of the following attachments to DA Form 5305:

*(a)* DA Form 5841 (Power of Attorney) or equivalent delegation of legal control.

*(b)* DA Form 5840 (Certificate of Acceptance as Guardian or Escort).

*(c)* DD Form 1172–2 (Application for Identification Card/DEERS Enrollment) for each Family member.

*Note.* AR 600–8–14 directs that identification cards will be issued for children under age 10 who reside with a single parent or dual-military couple.

*(d)* DD Form 2558 (Authorization to Start, Stop, or Change an Allotment) for active duty or retired personnel, unsigned until deployment, or other proof of financial support arrangements.

*(e)* A letter of instruction to the guardian/escort (see DA Form 5304 (Family Care Plan Counseling Checklist)).

*(f)* If appropriate, DA Form 7666 (Parental Consent) as evidence of consent to the Family care plan from all parties with a legal interest in the custody of the minor child.

(4) Soldiers are responsible for implementing the Family care plan and thus ensuring the care of their Family members. When operational or security considerations prevent them from implementing the plan, it will be used by appropriate military or civilian authorities to obtain care for such Family members. DA Form 5305 may be executed at any time when conditions warrant and Family care is necessary due to the required military absence of the Soldier.

*b.* Commanders of RA and USAR Soldiers, regardless of the members' rank, will conduct or arrange for Family care plan counseling and require a Family care plan be completed when any of the following apply:

(1) A pregnant member who—

*(a)* Has no spouse; is divorced, widowed, or separated; or is residing without her spouse.

*(b)* Is married to another Soldier of an RA or USAR of any Service (Army, Air Force, Navy, Marines, or Coast Guard).

(2) A Soldier who has no spouse or is residing apart from his or her spouse; who has joint or full legal custody as well as physical custody of one or more Family members under the age of 18; or who has adult Family members incapable of self-care regardless of age.

(3) A Soldier who is divorced, and who has visitation rights by court decree that allows Family members to be solely in the member's care in excess of 30 consecutive days.

(4) A Soldier whose spouse is incapable of self-care or is otherwise physically, mentally, or emotionally disabled so as to require special care or assistance.

(5) A Soldier categorized as half of a dual-military couple of the RA or USAR of any Service (Army, Air Force, Navy, Marines, or Coast Guard) who is married to a Soldier, who has joint or full legal custody of one or more Family members under age 19, or who has adult Family members incapable of self-care regardless of age.

*c.* Soldiers must arrange for the care of their Family members in order to be—

(1) Available for duty when and where the needs of the Army dictate.

(2) Able to perform assigned military or civilian duties without interference of Family responsibilities.

*d.* Enlisted Soldiers will be counseled on voluntary and involuntary separation whenever parenthood interferes with military responsibilities (see DA Form 5305) under provision of—

(1) AR 635–200 for RA Soldiers.

(2) AR 135–178 for ARNG and USAR Soldiers.

(3) AR 135–91 for ARNG and USAR Soldiers.

*e.* Officers will be counseled on voluntary and involuntary separations whenever parenthood interferes with military responsibilities (see DA Form 5305) under provision of—

(1) AR 600–8–24 for RA, USAR, ARNG Soldiers and officers serving on active duty or on active duty for training for a period in excess of 90 days.

(2)  AR 135–175 for ARNG and USAR Soldiers, except for officers serving on active duty or on active duty for training for a period in excess of 90 days.

*f.*  Pregnant Soldiers (who meet the criteria established in paragraph 5–3*b*(1)) will be counseled—

(1)  In the RA, according to AR 600–8–24 for officers and AR 635–200 for enlisted Soldiers.

(2)  In the ARNG and USAR, according to AR 135–91.

(3)  On costs of maternity care obtained from civilian sources and the limitations concerning maternity care in military medical facilities.

(4)  Using DA Form 5304 as soon as pregnancy is identified, but no later than 90 days prior to the expected date of birth of the child. Pregnant Soldiers should receive Family care plan counseling at the time of pregnancy counseling to ensure the Soldier is informed of the responsibilities if she chooses to remain on active duty.

(5)  That they must complete and have an approved DA Form 5305 showing their intentions for Family care no later than 60 days prior to the date of the birth of the child. DA Form 5840 and DA Form 5841 or other guardianship documents, DD Form 1172–2, and DD Form 2558, will be completed, and DA Form 5305 recertified no later than 45 days following the date of birth of the child.

*g.*  The unit commander or supervisor—

(1)  May designate an authorized representative to conduct Family care plan counseling using DA Form 5304, and to initial and sign the counseling form in the commander's behalf. The commander or authorized representative will use DA Form 7667 (Family Care Plan Preliminary Screening) to identify those members whose Family care plan may be at risk for failure in the event the plan is activated and who should consult with an attorney.

(2)  Is the sole approving authority for DA Form 5305. This responsibility will not be delegated.

(3)  May authorize an additional 30 days (60 days total from date of counseling) to all RA Soldiers and 60 days (90 days total from the date of counseling) to all USAR Soldiers for completion, including submission and final approval of DA Form 5305 with attendant documents.

(4)  Ensure that all required documents are in order, and must be satisfied that the Family care plan meets the requirements and appears to be workable and durable.

(5)  Should disapprove DA Form 5305 if the required attachments are not present unless extenuating circumstances exist.

(6)  May consider extenuating circumstances in approving DA Form 5305, but must understand that the Soldier is considered nondeployable until a Family care plan is validated and approved.

(7)  Must adequately test the validity and durability of the Family care plan, to include contacting the designated guardian(s) prior to final approval or recertification.

(8)  Will provide the Soldier 30 days from date of the first disapproval to submit additional documentation or evidence to support the Family care plan.

(9)  Will provide the Soldier a reasonable period of time to attempt to rework a Family care plan found to be deficient at time of mobilization, processing for overseas movement, or deployment. Ordinarily, a Soldier will be afforded at least 30 days to correct deficiencies in a plan unless a shorter period is specified by the unit commander due to the urgency and/or nature of the deployment, or due to the nature of the deficiencies.

(10)  May authorize leave per AR 600–8–10 for a deployed Soldier to return home when circumstances beyond the Soldier's control preclude the designated guardian from exercising those responsibilities.

(11)  Should consider initiating a bar to reenlistment against Soldiers who fail to properly manage personal, marital, or Family affairs, or who fail to provide or maintain adequate Family care plans.

(12)  Should consider initiating involuntary separation proceedings against Soldiers who fail to provide and maintain adequate Family care plans.

(13)  Should take action to ensure they are aware of other situations that may create changes in the status of their Soldiers with regard to the Soldier's responsibility to support Family members. These include, but are not limited to, the following:

*(a)*  Death or disability of spouse.

*(b)*  Legal separation when initial agreements have identified the Soldier as custodial parent or guardian of one or more Family members.

*(c)*  Divorce proceedings awarding joint or full custody of Family members to the Soldier.

*(d)*  Court decrees awarding visitation rights to the Soldier for more than 30 days.

*(e)*  Adoption.

*(f)*  Assumption of foster care responsibilities.

*(g)*  Guardianship agreement for children or adults incapable of self-care to temporarily or permanently reside with the Soldier.

*(h)* Extended periods of absence by the spouse for situations including, but not limited to, schooling, hospitalization, and employment.

*(i)* Expiration of current power of attorney, change in guardianship due to PCS, change of temporary care provider.

(14) Will review copies of all child custody orders or marital separation agreements currently in effect to ensure the Family care plan is not inconsistent with any such legal documents. If the Family care plan is inconsistent with any existing court orders, decrees, or marital separation agreements, or if the commander cannot determine if an inconsistency exists, the commander will seek advice from the servicing legal office and may advise the Soldier to contact a legal assistance attorney or an attorney they have retained at no expense to the government.

(15) Will ensure consent has been obtained pursuant to DA Form 7666 under appropriate circumstances, or proof of notice and/or reasonable efforts having been made to obtain consent to the Family care plan from all parties having a legal interest in the custody and care of the minor child. If consent has been denied, the commander will seek advice from the servicing legal office and may advise the Soldier to contact a legal assistance attorney or an attorney they have retained at no expense to the government.

*h.* The IRR, Individual Mobilization Augmentee, Standby Reserve, Category I and II retirees, and inactive ARNG personnel who meet the criteria outlined in paragraph 5–3*b*(1) through 5–3*b*(5) are required to maintain valid Family care plans to ensure their availability for active duty during a mobilization. Therefore—

(1) The CG, HRC will establish specific procedures for counseling, submission, validation, and recertification of Family care plans for USAR personnel and category I and II retirees.

(2) The CNGB, will establish specific procedures for the counseling, submission, validation, and recertification of Family care plans for inactive ARNG personnel.

*i.* All married Soldiers who have Family members are encouraged to complete and maintain a Family care plan, even if not specifically required to do so by this regulation. To do so assists the spouse, commander, rear detachment commander, Family assistance center, or next of kin providing care for dependent Family members in the event the spouse is injured, ill, incapacitated, or otherwise unable to provide care for the dependent Family member. Counseling of such is also encouraged.

*j.* Soldiers  must use the utmost care and consideration in the designation of guardians to care for Family members.

(1) The parent of any minor children normally has a superior right to the custody of the minor children. If the Soldier designates an individual other than a parent for guardianship in the Family care plan, the Soldier member must attempt, to the greatest extent possible, to obtain consent from the parent to such designation using the DA Form 7666.

*(a)* If this individual does not consent, the Soldier should explain the absence of such consent in writing and acknowledge the availability of legal counsel to discuss the associated risks and the best possible courses of action (including the possibility of incorporating the Family care plan into a temporary order by a court of competent jurisdiction).

*(b)* While such consent is not binding upon a court of law, it demonstrates the other parent is aware of the custodial arrangements set forth in the Family care plan and agrees with those arrangements. Should a Soldier designate a person contrary to the provisions of an existing Family law legal document (such as a divorce decree, court order, or marital separation agreement) the Soldier should seek legal assistance to modify the legal document.

(2) Guardians should be persons to whom the Soldier would have no reservations entrusting the total welfare of his or her child or other Family member. Guardians should be persons who are able to exercise that responsibility over extended periods of time, if necessary.

(3) Soldiers have the responsibility to thoroughly brief guardians on arrangements made by the Soldier, location of all pertinent documents, and procedures for accessing military and civilian facilities, services, entitlements, and benefits on behalf of the dependent and eligible Family members. Guardians should be made aware that such designation does not authorize them access to any of the military facilities, services, entitlement, or benefits for personal use, but only as the agent for the dependent and eligible Family members for whom they have been designated guardian. SCs are authorized to issue agents' letters to designated guardians upon request and presentation of proper documentation (such as DA Form 5841, DA Form 5840, children's identification cards, or application for same).

(4) If the guardian is located in an overseas area other than where the Soldier is stationed, the Family member's attendance at DoD dependent schools and other schools may require an exception to policy because of the lack of command sponsorship. The Soldier and/or guardian must request the exception; it is not automatic.

(5) Soldiers  must attempt, to the greatest extent possible, to inform the non-custodial biological or adoptive parent of his or her children, as applicable and as far in advance as practicable, of his or her impending absence due to military orders.

*k.* The following procedures will be used for completing DA Form 5304 and DA Form 5305. For all assignments, CONUS and OCONUS:

(1) The DA Form 5304 will be used for counseling Soldiers who fall into categories outlined in paragraph 5–3*b*, as soon as possible upon arrival at the unit of assignment, and it will be initialed and signed—

*(a)* During unit in-processing, after any event requiring completion of a Family care plan, or at pre-deployment processing.

*(b)* By pregnant Soldiers no later than 90 days prior to the expected date of birth of the child.

*(c)* By single parents, parents exercising custody pursuant to a court order or marital separation agreement, parents residing apart from their spouse and dual-military couples with Family members.

*(d)* By both members of the dual-military couple and the respective commanders or designated representative. (This assures both unit commanders that Soldiers and their military spouses have made necessary arrangements for the escort, temporary, and primary guardianship responsibilities for Family member. Dual-military couple Soldiers with Family members will be counseled together when practicable.)

*(e)* By the unit commander or a designated representative and held in the unit suspense files pending completion of DA Form 5305. (It will be returned to the Soldier when no longer needed for suspense action.)

(2) The DA Form 5305 will be—

*(a)* Completed and approved within 30 days for RA Soldiers and 60 days for ARNG and USAR Soldiers from the date of counseling.

*(b)* Signed by both members of a dual-military couple and, if possible, by both commanders. The same plan should be submitted by both members of the dual-military couple, and neither member should be identified in the plan as the temporary or long-term guardian. Once both commanders have approved and signed the plan, the commander whose Soldier is least likely to deploy should retain the original plan and forward a copy of the complete plan to the other commander. If both members are equally likely to deploy, but one is a Soldier and the spouse is a member of another Service, the original plan should be kept on file in the Soldier's unit and a copy forwarded to the spouse's unit. If both are Soldiers and equally likely to deploy, it is inconsequential which commander has the original copy of the plan.

*(c)* Recertified at least annually by initialing and dating the DA Form 5305. This must be done during the anniversary of the Soldier's birth month, after any change of circumstance requiring a change in the Family care plan, or whenever the Soldier is mobilized, deployed, or processed for pre-deployment. Commanders should ensure that all information is current and all documents are still up-to-date and legally valid.

(3) OCONUS assignment and deployment procedures are as follows:

*(a)* All Soldiers in categories outlined in paragraph 5–3*b* who receive assignment instructions for an OCONUS assignment will be counseled again and have their DA Form 5305 recertified no later than 30 days before the final out-processing date at the losing installation. If an adequate Family care plan is not submitted within 30 days, the Soldier is not considered deployable, will not depart the command, and the commander will consider initiating involuntary separation proceeding. A copy of the approved DA Form 5305 will be filed in the Soldier's out-processing file. The losing unit commander will retain a copy for 90 days after the Soldier departs.

*(b)* Soldiers will arrange for an escort and transportation for Family members and a guardian in CONUS or United States territory to care for their Family members in the event their Family members are evacuated from OCONUS. If noncombatant evacuation operation procedures are not initiated and Soldiers are alerted for deployment, Soldiers residing in government quarters may request approval for guardians to reside in those quarters in their absence. Noncombatant evacuation operation standing operations should make maximum use of Family care plans to ensure successful operations. Soldiers may also request that they, as a single parent or one member of a dual-military couple, be authorized to personally escort Family members back to CONUS-located guardian. They will be given the opportunity provided time allows and advanced return or early return of Family member paperwork is initiated per local command polices, the Joint Travel Regulation, and Department of Defense Foreign Clearance Guide guidance.

*(c)* Soldiers unable to provide the unit commander with the required DA Form 5305 and attendant documents will be ineligible for overseas assignment. They should be considered for processing for separation from the Army. Policies regarding eligibility for overseas assignment are contained in AR 614–30.

*(d)* Enlisted Soldiers without adequate Family care plans should be considered for separation processing by their unit commanders.

*(e)* The USAR Soldiers performing duty on an active duty status (annual training, active duty for training, active duty for special work, temporary tour of active duty, and AGR) OCONUS will re-certify DA Form 5305 with attendant documents before embarkation to show that adequate care for their Family members has been provided for during their absence and in the event that their return to CONUS is delayed. Soldiers unable to provide the required documentation will not deploy to perform annual training OCONUS.

*l.* DA Form 5305 with attachments will be filed in the unit files and destroyed 90 days after the Soldier departs on PCS orders. In CONUS and OCONUS, if the PCS move is a "same-installation" move and the Soldier can maintain the same Family care plan, the Soldier will be allowed to take the original DA Form 5305 to the gaining unit and need

not generate a new DA Form 5305. The gaining commander should certify the existing DA Form 5305 when the Soldier arrives in the new unit.

(1) Provide a copy of the DA Form 5305 to the Soldier, dual-military couple spouse, and dual-military spouse's commander.

(2) Place a copy of the DA Form 5305 in the out-processing record that accompanies the departing Soldier to the gaining unit.

(3) Ensure that, in the event of deployment, the Family care plan files remain with the rear detachment or, if no rear detachment remains, with the Family assistance center servicing the departing unit. ARNG and USAR commanders will ensure Family care plan files are transferred to JFHQ or the RSC before departing home station.

*m.* A copy of DA Form 5305 with copies of DA Form 5840 and DA Form 5841, and/or other appropriate documents, will be provided to the Child and Youth Services Program if the Child and Youth Services certified Family child care provider is designated as temporary guardian. AR 608–10 requires that a copy of DA Form 5305 be on file at the military Child Development Center if the Soldier's Family members are enrolled in the day care or extended care program.

*n.* Commanders and supervisors will stress the obligation of Soldiers to both them and to their Family members. Moreover, they will ensure Soldiers understand they will not receive special consideration in duty assignments or duty stations based on their responsibilities for Family members unless enrolled in the Exceptional Family Member Program (see AR 608–75 for more information).

*o.* Commanders will encourage Soldiers to consult with a legal assistance attorney about having a will prepared. The Family care plan does not require a will, and Soldiers will not be ordered to obtain a will. When a will is prepared, it will not be retained in the unit files. Soldiers will be encouraged, but not required, to ensure that information regarding the location of a Soldier's will is contained in the Family care plan.

*p.* Commanders will ensure that Soldiers who are required to have a Family care plan in accordance with paragraph 5–5*b* comply with the requirement. Commanders will utilize Army human resources data systems, such as the electronic military personnel office, the USAR Automation System, the Integrated Personnel and Pay System-Army, and other human resource computerized systems, in addition to local unit records, to identify Soldiers required to have a Family care plan.

*q.* Maximum feasible testing of the validity and durability of Family care plans will be accomplished (for example, during exercises, alerts, pre-deployment processing, mobilization, deployment, annual training, and other unit activities) to ensure information in a Soldier's DA Form 5305 is accurate, current, and executable. Family care plans found to be invalid during the above testing will be revised/recertified within 30 days of the finding. For ARNG and USAR Soldiers, it will be revised/recertified within 60 days, unless mobilization mission requirements preclude authorizing that amount of time.

*r.* As requested by the commanders or Soldiers, Family readiness services provide assistance in developing Family care plans in accordance with DoDI 1342.19.

## 5–4. Command aspects of medical readiness and medical care

The proponent for prevention against disease and injury is the OTSG. However, commanders at all levels are responsible and accountable for the health of their command in accordance with AR 40–5 and DA Pam 40–11. Roles of the commander with respect to medical readiness and medical care include the following—

*a. Preventive medicine.* Ensure that the health of all personnel in their command is sustained and protected in all military activities through aggressive implementation of preventive medicine activities. Command Preventive Medicine Program responsibilities include—

(1) Training on prevention of disease and injury (as determined by the commander).

(2) Hazard control.

(3) Proper use of personal protective measures and protective clothing and equipment.

(4) Immunization and chemoprophylaxis.

(5) Health risk and hazard communication.

(6) Worksite, occupational health, and environmental health surveillance.

(7) Workplace violence prevention.

(8) Incorporation of elements of preventive medicine into contingency and operational plans.

*b. Improving and sustaining.* Provide leadership and personal example in improving and sustaining individual and unit health and fitness.

*c. Risk management.* Minimize health risks using Army composite risk management principles.

*d. Commanders' responsibilities with respect to medical readiness.* See AR 220–1, and DA Pam 220–1 for reference. Commanders are responsible to—

(1) Continuously measure and assess the mission readiness status of their units or organizations for significant changes (see AR 220–1).

(2) Ensure Soldiers' medical fitness standards are met for the purposes of application to courses, continuation in their MOSs, for geographical area assignments, and for deployment.

(3) Assess Soldiers' physical profiles and assignment limitations against the duties of their grades and MOSs, and determine individual assignment or duties to be performed, to include deployment. Request reviews and reconsiderations of physical profiles in order to determine the most appropriate status for availability and deployability (see DA Pam 220–1).

(4) Ensure Soldiers complete annual periodic health assessments and deployment-related health assessments.

*e. Necessary medical care.* A Soldier on active duty or active duty for training will usually be required to submit to medical care considered necessary to preserve his or her life, alleviate undue suffering, or protect or maintain the health of others. Commanders may order the examination of any Soldier in their command when warranted for determining a Soldier's fitness to perform their military duties, with or without limitations, including assignment or deployment to certain geographic areas. A determination if hospitalization of the Soldier is appropriate will be made by military medical providers.

*f. Behavioral health evaluation requirements.* When a commander determines it is necessary to refer a Soldier for a behavioral health evaluation, it is the commander's responsibility to ensure compliance with the administrative provisions of DoDI 6490.04, which establish procedures to protect the rights of Soldiers to include whistleblower protections. DoDI 6490.04 assigns responsibility and prescribes procedures for commanders for the referral, evaluation, treatment, and administrative management of Soldiers who may require behavioral health evaluation, psychiatric hospitalization, and/or assessment of risk for potentially dangerous behavior.

*g. Command authority - medical care with or without the Soldier's permission.*

(1) *Emergency medical care.* Emergency medical care, defined as immediate intervention to prevent the loss of life, limb, sight, or body tissue, or to prevent undue suffering may be performed. This is determined by the attending physician.

(2) *Immunizations.* Commanders will ensure that Soldiers are continually educated concerning the intent and rationale behind both routine and theater-specific or threat-specific military immunization requirements. Immunizations required by AR 40–562 or other legal directive may be given involuntarily (except as prescribed in para 5–6 or para P–3*b* regarding religious accommodation). The intent of this authorization is to protect the health and overall effectiveness of the command, as well as the health and medical readiness of the individual Soldier. In cases where involuntary immunization is being considered, the following procedures and limitations apply:

*(a)* Under normal circumstances, actions will not be taken to involuntarily immunize Soldiers. If a Soldier declines to be immunized the commander will—

1. Ensure that the Soldier understands the purpose of the vaccine.

2. Ensure that the Soldier has been advised of the possibility that the disease may be naturally present in a possible area of operation or may be used as a biological weapon against the United States and its allies.

3. Ensure that the Soldier is educated about the vaccine and has been able to discuss any objections with medical authorities.

4. Counsel the Soldier, in writing, that he or she is legally required to be immunized; that if the Soldier continues to refuse to be immunized that he or she will be legally ordered to do so, and that failure to obey the order may result in UCMJ and/or administrative action for failure to obey a lawful order (UCMJ, Art. 92) as deemed appropriate by the commander.

5. Order the Soldier to receive the immunization.

*(b)* If, after any of the steps listed in paragraph 5–4*g*(2)(*a*), a Soldier elects to be immunized, adverse action will not normally be taken based solely on the initial declination.

*(c)* When a GCMCA or the delegated representative determines that conditions of imminent threat exist (where the threat of naturally occurring disease or use of biological weapons is reasonably possible), Soldiers may be involuntarily immunized. Involuntary immunization(s) will not be ordered by a commander below the GCMCA unless authority to do so has been properly delegated by the GCMCA. Prior to ordering involuntary immunizations, all of the steps outlined in paragraph 5–4*g*(2)(*a*) should be followed and documented, situation permitting. In performing this duty, unit personnel will only use the amount of force necessary to assist medical personnel in administering the immunization.

(3) *Isolation and quarantine.* Isolation and quarantine for cases of suspected or proven communicable disease may be appropriate.

(4) *Detention.* Detention on closed wards may be required when needed to ensure proper medical supervision or to protect the Soldier or others from harmful acts.

(5) *Medical care for behavioral disorders.* Medical care related to the behavioral disorders of Soldiers who are found incompetent by a medical board may be given, provided life or health is not likely to be endangered by such procedures or care. (This provision also applies if the Soldier is believed incompetent and medical board action is pending.) These Soldiers may also be given routine medical care needed to treat minor ailments.

(6) *Diagnostic medical care.* Medical care of a diagnostic nature may be undertaken in order to determine whether a situation exists that would authorize other medical care to be performed.

(7) *Physical and other examinations.* Physical examinations and associated procedures, and dental or radiological examinations may be required when one or more of the following apply:

*(a)* Required by law or regulation.

*(b)* Authorized to be performed without consent by law or other regulations.

*(c)* Directed by an individual's commander or other appropriate official in order to determine the individual's fitness for duty.

(8) *Obtaining evidence.* Nothing in this paragraph limits the authority of appropriate officials to order the performance of medical procedures for the purpose of obtaining evidence without the consent of the individual concerned, and without board action in cases where such procedures are authorized under other regulations or the Military Rules of Evidence (MRE), MCM.

*h. Refusal to submit to medical care other than care described in paragraph 5–4g.*

(1) Soldiers who refuse to submit (or whose court-appointed guardian or other legal representative objects) to recommended medical care will be referred to a medical board.

(2) Soldiers will be referred to a medical board if they refuse to submit to dental care and/or radiographic (X-ray) procedures deemed necessary by the installation dental surgeon to create dental record and panographic records of the oral dentition to—

*(a)* Aid in remains identification.

*(b)* Treat dental conditions judged to be prejudicial to military operations or deployment because they require urgent or emergent dental treatment or are expected to require urgent or emergent treatment within the next 12 months.

(3) When a Soldier refuses to submit to recommended care because of religious practices, the provisions of paragraph 5–6 apply.

*i. Medical board proceedings when medical care other than care described in paragraph 5-4g is refused for other than religious reasons.*

(1) The BDE commander will convene a medical board to assess any request to withhold recommended medical treatment for other than religious reasons; refusal of medical care on the grounds of religion will be handled in accordance with appendix P. The board will be chaired by a Medical Corps officer and should include at least one member with medical expertise regarding the medical care being considered. All board members will be officers or full-time employees of the Federal Government.

(2) The board will prepare a report which includes the following information:

*(a)* The membership of the board.

*(b)* Proposed treatment to relieve incapacity and aid the Soldier's return to duty status.

*(c)* The need for the treatment, including whether the proposed treatment is an established procedure that qualified and experienced physicians ordinarily would recommend and undertake.

*(d)* An assessment of the likely medical outcome and potential risks to the Soldier's health of withholding treatment, based on the Soldier's age and general physical condition.

*(e)* An assessment of the possible effects of withholding treatment on the health of others and the military medical system.

*(f)* Evidence that the Soldier was given the opportunity to appear before the committee in person and submit a written statement. If circumstances do not permit the Soldier to appear in person or submit a written statement (or both), or the Soldier declines to appear in person or submit a written statement then the board will include this information in the report. Any written statement submitted will be attached to the report as an enclosure.

*(g)* A recommendation as to whether the medical treatment should be given over the Soldier's objection to protect the Soldier's health, enable the Soldier to perform his or her duties properly, and/or protect the health of others; or, in the case of a mentally incompetent Soldier, a statement as to whether compulsory treatment is medically necessary and warranted by the circumstances. Generally, refusal of medical care is considered unreasonable unless there is substantial evidence that the treatment is medically inadvisable. However, in deciding whether refusal of medical treatment, including surgery, is reasonable or unreasonable, the board should consider among other things—

1. Existing medical research and evidence that the physical or mental treatment is medically inadvisable.

2. Previous unsuccessful operations and procedures.

3. Any special risks involved in the proposed medical treatment.

(3)  Soldiers may have a representative. A representative will be appointed for Soldiers believed to be incompetent. The representative need not be legally qualified. The report will include the rationale for any determination of incompetency. The commander will coordinate with the MTF and legal advisor to determine an appropriate representative, such as a Family member or patient advocate.

*j.  Results of medical board proceedings.*

(1)  The results of the board proceedings will be provided to the Soldier through the Soldier's immediate commander. The Soldier will be offered an opportunity to accept the recommended medical care.

(2)  If the Soldier still refuses, the Medical Corps officer serving as the medical board chair will forward the medical board proceedings to the Office of the Surgeon General (DASG–HS–AS), 7700 Arlington Blvd, Falls Church, VA 22042–5041 for review.

(3)  The Surgeon General (TSG) will either approve or disapprove the medical board proceedings and return them to the Medical Corps officer serving as the medical board chair.

(4)  If TSG approves the medical board proceedings, the Soldier will again be given the chance to accept treatment. If the Soldier persists in refusing the medical care, the matter will be referred to the Soldier's SPCMCA. Copies of the medical board proceedings will be provided. If the SPCMCA orders the Soldier to submit to treatment and the Soldier refuses to obey, the commander may take—

*(a)*  Disciplinary action according to MCM.

*(b)*  Administrative action to separate the Soldier from service through retirement, discharge, or other legal means.

## 5–5.  Breastfeeding and lactation support policy

*a.*  Extensive medical research has documented that breastfeeding has significant health, nutritional, immunologic, developmental, emotional, social, and economic benefits for both mother and child. In light of these benefits, commanders are responsible for notifying all Soldiers of this breastfeeding and lactation support policy during initial pregnancy counseling. Commanders will counsel all pregnant Soldiers as required by AR 600–8–24 or AR 635–200.

*b.*  Soldiers who want to breastfeed upon return to duty will notify their chain of command as soon as possible. This notification allows commanders to determine how to best support the Soldier and ensure a workplace with appropriate space for expressing milk. Lactation support, including counseling and equipment, is available through MTFs and Tri-Service Medical Care (TRICARE).

*c.*  Commanders will designate a private space, other than a restroom, with locking capabilities for a Soldier to breastfeed or express milk. This space must include a place to sit, a flat surface (other than the floor) to place the pump on, an electrical outlet, and access to a safe water source within reasonable distance from the lactation space.

*d.*  Commanders will ensure that Soldiers have adequate time to express milk but must be aware that each Soldier's situation is unique. The time required to express breast milk varies and depends on several factors, including the age of the infant, amount of milk produced, quality of the pump, and distance the pumping location is from the workplace, as well as how conveniently located the water source is from the pump location. For example, new mothers commonly express milk every 2 to 3 hours for 15 to 30 minutes, but this timeframe may change as the child ages. When a child is 6 months old and begins eating solid foods, the number of breaks a Soldier needs to breastfeed or express milk may decrease. Lactation support personnel at military treatment facilities or through TRICARE are available to help Soldiers develop individualized plans. Commanders will provide reasonable lactation breaks for Soldiers for at least 1 year after the child's birth.

*e.*  Soldiers who are breastfeeding or expressing milk remain eligible for field training, mobility exercises, and deployment (after completing their postpartum deployment deferment period). During field training and mobility exercises, commanders will provide private space for Soldiers to express milk. If the Soldier (or designated personnel) cannot transport expressed milk to garrison, the Soldier's commander will permit her the same time and space to express and discard her breast milk with the intent to maintain physiological capability for lactation. Commanders should work with the supporting medical officer to determine whether milk storage and/or transportation will be feasible during the exercise. Commanders will counsel Soldiers to discuss the potential risks/benefits of storing milk during field training and mobility exercises with their medical provider.

## 5–6.  Accommodating religious practices

*a.  Policy.*

(1)  The Army places a high value on the rights of its Soldiers to observe tenets of their respective religions or to observe no religion at all; while protecting the civil liberties of its personnel to the greatest extent possible, consistent with its military requirements.

(2)  Pursuant to Section 2000bb of Title 42, United States Code and DoDI 1300.17, requests for religious accommodations from a military policy, practice, or duty that substantially burdens a Soldier's (to include military prisoner's) exercise of religion may be denied only when the military policy, practice, or duty furthers a compelling government interest and is the least restrictive means of furthering that compelling government interest. It is the Soldier's responsibility to demonstrate he or she has a sincerely held religious belief and that the government policy, practice, or duty substantially burdens their religious exercise. If the Soldier demonstrates a sincerely held religious belief and a substantial burden to their religious exercise, the commander must then demonstrate how/why the government action furthers a compelling government interest and is the least restrictive means of furthering that interest.

(3)  Requests for religious accommodations from a military policy, practice, or duty that are not sincerely based on a religious belief or that do not substantially burden a Soldier's exercise of religion should not be evaluated using the compelling government interest standard prescribed in *a*(2). Under these circumstances, commanders are only required to balance the needs of the Soldier against the needs of mission accomplishment.

(4)  A religious exercise includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief. Compelling government interests could potentially include: safety, health, good order, discipline, uniformity, National Security, and mission accomplishment. All requests for accommodation of religious practices will be assessed on a case-by-case basis. Each request must be considered based on its unique facts; the nature of the requested religious accommodation; the effect of approval or denial on the Soldier's exercise of religion; and the effect of approval or denial on military necessity. Accommodation of a Soldier's religious practices must be examined against military necessity and cannot be guaranteed at all times. Some religious practices, such as dietary and worship practices, do not need a request for a waiver of policy and can be accommodated by immediate commanders.

*b.  Responsibilities.*

(1)  The ASA (M&RA) will oversee the implementation and execution of this paragraph to ensure compliance with DoD and Army policy.

(2)  The DCS, G–1 will develop policy on the accommodation of religious practices within the Army.

(3)  The following will ensure that every prospective enlisted Soldier (to include reenlistment),  cadet, and commissioned officer is informed of the Army's religious accommodation policy as set forth in this regulation and, furthermore, that recruits and candidates for officer producing programs acknowledge in writing that they have been so informed:

*(a)*  The CG, U.S. Army Recruiting Command (for enlisted Soldier and AMEDD officer accessions).

*(b)*  The CG, TRADOC (for ROTC cadets, WOCs, and OCs).

*(c)*  The Judge Advocate General (for judge advocate officer accessions).

*(d)*  The Chief of Chaplains (for chaplain officer accessions).

*(e)*  Superintendent, USMA (for USMA cadets).

(4)  The Chief of Chaplains will serve as advisor to the DCS, G–1 on matters pertaining to religious accommodation. The Office of the Chief of Chaplains will develop and publish training on the process for requesting and receiving religious accommodations. The training will be reviewed by the Office of The Judge Advocate General prior to publication.

(5)  The CG, TRADOC will ensure that training on the provisions of this chapter is incorporated in pre-command training provided to brigade commanders.

*c.  Pre-Accession requests.*  Individuals intending to enter service may submit a pre-accession request for religious accommodation related to uniform and grooming and initial immunizations required at MEPS, using the procedures in appendix P.

(1)  A pre-accession request is defined as a request before any of the following occur: contracting for enlistment, contracting in a Senior ROTC program, accepting appointment to the United States Military Academy (USMA), or accepting appointment through direct commission.

(2)  The chain of command routing for pre-accessions requests will be established by each accessions agency and command up through the GCMCA level. See appendix P.

(3)  For pre-accession requests requiring HQDA action, the procedures for requesting a waiver related to uniform and grooming policy or medical policy, as outlined in appendix P, apply.

*d.  Types of Requests.*  Requests for religious accommodation generally fall into five major areas: worship practices, dietary practices, medical care (including immunizations), wear and appearance of the uniform, and personal appearance and grooming practices. Procedures and approval authorities vary depending on the type of accommodation. See appendix P for additional processing information for each category of request.

(1)  *Worship practices.*  Some religious groups have worship practices that conflict with the Soldier's normal availability for duty; for example worship on days other than Saturday or Sunday, a 25-hour Sabbath, or special holy days

or periods. While many worship practices can be accommodated informally, others may require a formal accommodation request. Worship practices involving the use of prohibited substances require a waiver of Army policy and can only be approved by the SECARMY or designee.

(2) *Dietary practices.* Some religious groups have beliefs that prohibit the eating of specific foods, or prescribe a certain manner in which food must be prepared. Many dietary requirements can be accommodated using existing authorized resources. A Soldier with a conflict between the diet provided by the Army and that required by religious practice may also request an exception to policy to ration separately.

(3) *Medical care.* Some religious practices conflict with normal Army medical procedures. These practices include beliefs in self-care, and prohibitions against immunizations, blood transfusions, or surgery. Accommodations concerning medical care always require coordination between unit commander and appropriate healthcare provider.

(4) *Wear and appearance of the uniform.*

(a) *Religious items.* Many Soldiers wear or carry jewelry, apparel, or articles with religious significance (hereafter referred to as religious items). Some discreet religious items, such as a yarmulke, necklace, or metal bracelet, are authorized for wear in uniform, or in civilian clothes on duty, without submitting a religious accommodation request. Other religious items, such as a hijab or turban, require a religious accommodation request using procedures in appendix P.

(b) *Modesty.* Some Soldiers have religious or cultural practices which encourage greater body coverage than is provided by certain uniform variations (for example, summer Army Physical Fitness Uniform (APFU)). Commanders may informally authorize wear of additional or alternative uniform items. Requests to wear apparel that is not authorized by AR 670–1 or DA Pam 670–1 require a religious accommodation request using the waiver request procedures in appendix P. (For example, commanders may authorize a Soldier to wear the pants or long sleeve shirt of the Army Physical Fitness Uniform (APFU), but a request to wear unauthorized apparel to cover arms and legs would require action by the SECARMY or designee).

(c) *Appearance and Grooming.* The Army's appearance and grooming standards are contained in AR 670–1. Soldiers must request a religious accommodation to engage in religious appearance and grooming practices, regardless of whether the practice is addressed in AR 670–1.

e. *Request procedures and approval authorities.*

(1) Requests for religious accommodation are processed under distinct approval channels depending on the type of accommodation requested.

(a) *Worship, modesty, and dietary practices.* Unit commanders are the designated decision authority for most worship and dietary practices as outlined below, including procedures for appeal.

(b) *Medical practices.* Unit commanders, in consultation with MTF commanders and/or their assigned medical advisor (that is, brigade surgeon), are the designated decision authority for medical practices which do not involve exemption from immunization. TSG is the decision authority for immunization exemptions and appeals concerning disapproved religious accommodations for other medical practices.

(c) *Uniform and grooming practices.* Some uniform and grooming requests may be approved or disapproved by the GCMCA. Any request which requires a waiver of Army policy may only be approved or disapproved by the SECARMY or designee.

(2) Unless otherwise stated, commanders should consider the following factors when considering a request for the purposes of a decision or recommendation:

(a) The importance of military requirements in terms of mission accomplishment, including military readiness, unit cohesion, good order, discipline, health, and safety.

(b) The religious importance of the accommodation to the requestor.

(c) The cumulative impact of repeated accommodations of a similar nature.

(d) The measurable effect, if any, of granting the single accommodation requested, to include whether it results in the sanctioned discrimination of other Soldiers.

(e) Alternative means available to meet the requested accommodation.

(f) Previous treatment of the same or similar requests, including treatment of similar requests if made for other than religious reasons.

f. *Continuation of accommodation.*

(1) Approved accommodations pertaining to worship practices, dietary practices, medical care, and modesty concerns are temporary and subject to modification or revocation by immediate commanders in accordance with the provisions of para 5–6a(4).

(2) Approved accommodations pertaining to the following faith practices continue throughout a Soldier's career: wear of a hijab, wear of a beard, and the wear of a turban or under-turban/patka with uncut beard and uncut hair.

Although subject to the suspension procedures below, these accommodations may not be permanently revoked or modified unless authorized by the SECARMY or designee.

*(a)* Once approved, religious accommodations are subject to GCMCA review at any time for health and safety considerations.

*(b)* The GCMCA of the gaining command will review an approved religious accommodation upon the Soldier's permanent change of station.

*(c)* The GCMCA will review an approved religious accommodation when a Soldier reclassifies into a new or secondary MOS.

(3) Suspension of non-temporary accommodations.

*(a)* When an accommodated Soldier's GCMCA identifies a specific and concrete threat to health and safety based on the accommodation (such as threat of exposure to toxic chemical, biological, radiological, nuclear (CBRN) agents that may merit a heightened protective posture), the GCMCA, after consultation with the Staff Judge Advocate, will notify the Soldier of the need to suspend the religious accommodation, the basis for the suspension, the date the suspension will likely go into effect, and the Soldier's right to appeal. If the Soldier requests an appeal, the Soldier will have 10 days to submit matters to the Office of the DCS, G–1 Command Policy Division at usarmy.penta-gon.hqda-dcs-g-1.mbx.command-policy@mail.mil. The accommodation will not be suspended before the SECARMY or designee takes action on the appeal.

*(b)* In exigent circumstances involving an imminent threat to health and safety, the GCMCA may shorten the time for appeal and, in urgent circumstances, may require immediate suspension of the accommodation. The GCMCA will notify the Office of the DCS, G–1 Command Policy Division of the decision and its basis as soon as possible at usarmy.pentagon.hqda-dcs-g-1.mbx.command-policy@mail.mil.

*(c)* The GCMCA will reinstate the suspended accommodation when the specific and concrete threat to health and safety as a result of the accommodation no longer exists. See appendix P for suspension procedures.

*Note:* An accommodation for a beard may be temporarily suspended when a specific and concrete threat of exposure to toxic CBRN agents exists that requires all Soldiers to be clean-shaven, including those with medical profiles. Following the suspension procedures of this paragraph, commanders may require a Soldier to shave if the unit is in, or about to enter, a real tactical situation where use of protective mask is actually required and where the inability to safely use the mask could endanger the Soldier and the unit. A Soldier may wear a beard while participating in training or tactical simulations designed to ensure that the Soldier is fully familiar with use of the protective mask.

*g. Separation Procedures.* An enlisted Soldier whose religious practices cannot be accommodated consistent with military necessity may request separation from the Army under the provisions of AR 635–200. Commissioned or WOs who request separation for reasons of religious accommodation will follow the application for release from active duty as prescribed in AR 600–8–24 (for other than RA), or apply for an unqualified resignation as outlined in AR 600–8–24 (for RA). All personnel separated or discharged from the U.S. Army because of conflict between their religious practices and military requirements will be subject to recoupment of Federal funds as outlined in referenced regulations.

*Note:* Nothing in this regulation will be construed to limit the authority of commanders to enforce standards by means of all applicable provisions of the UCMJ while requests and appeals are being processed. Soldiers are obligated to adhere to orders and standards set by their immediate commanders.

## 5–7. Unit memorial ceremonies and services policy
Unit memorial ceremonies and services show respect to the service of Soldiers who have died, and offer support to unit survivors. These memorial events assist surviving Soldiers in dealing with the realities of death and honor the military service and the contribution the Soldier made while in uniform. The unit memorial event allows surviving Soldiers a means for expressing their grief and assists in the healing process.

*a. Command responsibilities.* Except as prescribed in paragraph 5–7b, commanders will conduct a memorial event (memorial ceremony or memorial service) for every Soldier who dies while assigned to their unit, regardless of the manner of death, to include suicides. Commanders will also notify their supporting Casualty Assistance Center of the time and place of unit memorial events.

*b. Command exceptions.* Unit commanders may request an exception to policy not to conduct a memorial event through their command channels.

(1) The first GO in the chain of command may approve the exception only when—

(2) The deceased Soldier has been convicted of a capital offense under Federal or State law for which the person was sentenced to death or life imprisonment without parole; or

(3)  The deceased Soldier has been convicted of a serious offense, which is defined as a military or civilian offense, which if prosecuted under the UCMJ, could be punished by confinement of 6 months or more and/or a punitive discharge; or

(4)  The deceased Soldier is found by the GO to have committed an offense as described in paragraph 5–7*b*(1) and has not been convicted of such offense after referral to a court-martial by reason of such Soldier not being available for trial due to death or flight to avoid prosecution; or

(5)  When the circumstances surrounding the Soldier's death or other circumstances surrounding the Soldier's service, are found by the GO to be such that to provide a memorial event would bring discredit upon the Army.

*c.  Elements of the memorial events.*  Recognizing the military service of the Soldier provides healing and renewal for the living. The opportunity to provide closure for members of the unit is offered during a memorial event. Commanders have discretion to scale down a memorial event to offer closure to unit members while not glamorizing the manner of death when a Soldier dies by suicide. The commander's decision regarding when to conduct a memorial ceremony or a memorial service is dependent upon many factors, to include the unit mission, tactical situation, and the wishes of Family members in the local area.

(1)  *Memorial ceremony.*  A memorial ceremony is a command program with a ceremonial orientation. As a command program, attendance of Soldiers at a memorial ceremony may be made mandatory. Although there are religious aspects to the memorial ceremony, such as an invocation and benediction, the major focus will be on military tributes and honors. A memorial ceremony may include the following: prelude, posting of the colors, national anthem, invocation, memorial tribute, readings, address, memorial prayers, silent tribute or roll call, music, benediction, firing of volleys, and sounding of taps. The Soldier's remains are not present for this ceremony.

(2)  *Memorial service.*  A memorial service is a command program with a religious orientation. A memorial service should be sensitive to the deceased Soldier's faith group and the needs of the Soldiers who voluntarily attend. Attendance of units and Soldiers may be encouraged and supported by command, but will not be made mandatory. A memorial service may include the following: prelude, invocation, scripture reading, meditation, prayer, silent tribute or roll call, and benediction. The Soldier's remains are not present for this service.

*d.  Combat theater memorial events.*  Commanders of units deployed to combat theaters or other contingency operations may conduct a memorial event in the theater as the tactical situation permits and another event upon return to home station.

*e.  Family member attendance.*  As part of Total Army Strong, unit commanders are charged with ensuring the Families of their fallen Soldiers are made to feel a part of the Army for as long as they desire. To that end, unit commanders will inform Family members of the deceased Soldier about any unit memorial event that is conducted in a deployed environment and will invite the Soldier's Family to attend unit memorial events at the home station.

(1)  Family members will not be invited to unit memorial events in a deployed environment due to operational considerations.

(2)  Memorial event locations are limited to CONUS, Alaska, Hawaii, U.S. territories, and the last permanent duty station of the deceased Soldier.

(3)  Eligible relatives, as defined in the Joint Travel regulation (JTR), are authorized Government funded travel and transportation allowances for one round-trip to the installation or unit memorial service at a location other than the burial ceremony location. This is in addition to any travel and transportation allowances provided for attendance at the burial ceremony. Commanders have the discretion to invite eligible Family members to an additional unit memorial event if more than one event is conducted. However, travel and transportation allowances may be provided under the JTR for travel of eligible relatives to only one memorial service for the deceased member. This travel must be completed within 2 years of the Soldier's death, unless the Service Secretary waives the time limitation.

(4)  In extending this invitation, commanders should factor in the Family's particular circumstances so that the unit memorial event to which Families are invited does not conflict with other key events, such as the Dignified Transfer of Remains at Dover Air Force Base or the deceased Soldier's funeral service. Overseas commanders and commanders who invited Family members who do not reside at the overseas location should plan for sufficient lead time in extending the invitation to enable Families to obtain or update passport documents prior to traveling to the event.

(5)  Commanders will coordinate through their supporting Casualty Assistance Center for aid in de-conflicting the scheduling of unit memorial events that may coincide with key Family events, such as the Dignified Transfer of Remains or the deceased Soldiers funeral service. Casualty Assistance Centers will assist in identifying all eligible Family members who should be invited, obtaining the last known contact information available in the Defense Casualty Information Processing System for each eligible Family member, and preparing invitational travel authorizations under the Open Allotment fund site, a centrally managed fund cite maintained by the Casualty and Mortuary Affairs Operations Division for those eligible relatives, as defined in the JTR, who accept an invitation to unit memorial events.

(6) Invitational travel authorizations will not exceed authorization for 2 days of per diem and the time necessary to travel to and from the event. Use of a rental car for in-and-around transportation while at the memorial event is not a reimbursable expense.

(7) Commanders will ensure the provision of any in-and-around transportation required for Family member attendance at the memorial event, assist Families with making all travel and hotel arrangements, provide unit escorts as needed, and ensure all eligible relatives receive assistance in filing a travel claim for reimbursement of authorized expenditures upon completion of the travel.

*f. Nonmilitary memorial events.* Commanders may also conduct nonmilitary memorial events for deceased immediate Family members of Soldiers assigned to their units to recognize the Family member's contribution to the unit and military community when appropriate. "Immediate Family members" are defined as the Soldier's spouse, children (to include stepchildren), and parents (to include stepparents).

*g. Memorial event support.* Commanders at all levels must ensure unit memorial events are conducted in recognition of the deceased Soldier's military service and on behalf of a grateful Nation.

## 5–8. Better Opportunities for Single Soldiers

*a.* Better Opportunities for Single Soldiers (BOSS) is a commander's program. The BOSS Program provides the environment for leaders to affect the single Soldier's well-being, safety, education, recreation, and overall resiliency. It is paramount that commanders and leaders realize that their support of the BOSS Program indirectly promotes positive behavior, while deterring undesirable activities, within the single Soldier population. Commanders must also understand that, although local BOSS programs and BOSS representatives are responsible for identifying quality of life issues, it is the commander and leadership who are solely responsible for ensuring that the single Soldier population is represented, supported, and integrated within all efforts/priorities at their respective level of command. Command engagement, management, and monitoring of single Soldiers' program(s) are an associated task and responsibility of Soldiers and leaders alike.

*b.* Regardless of geographic location or status, the BOSS Program receives fiscal guidance from IMCOM Family and MWR services (IMCOM, G–9). Local garrison command teams will ensure that their BOSS Program develops and executes an annual budget. Supplemental funding, when available, can be requested from IMCOM G–9. Garrisons will provide aid and support to programs for recreation, leisure and opportunities for community service through on and off-installation partnerships. Command teams will ensure and enable single Soldiers' ability to participate in garrison hosted life-skill trainings when the opportunities are present. Command teams will also encourage command designated single Soldier/BOSS representatives to participate in the Army Family Action Plan process.

## 5–9. Soldier for Life–Transition Assistance Program

*a.* The Transition Soldier Life Cycle is focused on the following four goals:

(1) Teach Soldiers to be Soldiers first;

(2) Retain quality Soldiers in the total force and support the all-volunteer force;

(3) Develop career readiness skills, while introducing Soldiers to the many benefits the Army has to offer; and

(4) Prepare leaders to mentor eligible Soldiers to achieve career readiness prior to transition from active duty.

*b.* Commanders are responsible for the Soldier for Life–Transition Assistance Program (SFL–TAP) within their units, and will integrate transition preparedness in their professional development and counseling programs and ensure all eligible Soldiers accomplish Transition Soldier Life Cycle and SFL–TAP related tasks as outlined in AR 600–81.

(1) Commanders will ensure all Soldiers are counseled on their professional and personal development goals within the Army and establish relevant military and civilian career goals. Commanders should encourage Soldiers, throughout their careers, to work toward their educational or occupational goals through traditional education, technical training, MOS credentialing, and military experience.

(2) Commanders will ensure all leaders fulfill their critical responsibility to develop future leaders who are prepared to meet tomorrow's challenges. Mentoring is an essential component of this development. Mentoring requires taking advantage of any opportunity to teach, counsel, or coach to build skills and confidence in the mentored. To aid in the mentorship (and career management) process, the Army has developed and implemented the Army Career Tracker, an Army leadership development tool that uses the professional development model and provides a common picture of training and experience. Used properly, this tool facilitates structured mentorship and can be used and revised by successive mentors as officers and Soldiers progress in experience.

*c.* The final phase of the Transition Soldier Life Cycle is the transition phase. During the transition phase, the SFL–TAP provides services designed to deliver a world-class transition assistance program that will "prepare" Soldiers, DA Civilians, retirees, and Soldiers' Family members for a new career, and "connect" Soldiers with employers primed to hire veterans. The SFL–TAP ensures all eligible transitioning Soldiers have the knowledge, skills, and self-

confidence necessary to be competitive and successful in the global workforce and to achieve their post military service goals. The SFL–TAP helps affected Soldiers, DA Civilians, retirees, and Soldiers' Family members to make informed career decisions, through benefits counseling and employment assistance, for a successful transition.

(1)  SFL–TAP is a commander's program. By encouraging and supporting eligible Soldiers to start SFL–TAP services early, commanders, CSMs, 1SGs, and first line supervisors ensure eligible Soldiers are able to make informed decisions regarding their career transitions.

(2)  Commanders are essential members of the installation transition council, led by the SC to assure resources, policies, guidance and processes are in place to support access and services for transitioning personnel. The installation transition council represents the command's interest and collaboration with internal and external partners and sets a "command climate" that sends the message "transitioning Soldiers are valued".

## 5–10.  Federal Parent Locator Service

42 USC 653 requires that current addresses of Soldiers be available to the Federal Parent Locator Service. The Defense Enrollment Eligibility Reporting System (DEERS) serves as DoD's centralized personal locator service. Commanders will ensure that all Soldiers update new residential addresses on the DEERS within 30 days after the new address is established. Soldiers assigned overseas, or whose residential address should not be disclosed in the commander's judgment because of security or safety concerns, will provide a duty address to DEERS.

## 5–11.  Complaints or accusations against military personnel

*a.  Guidelines for implementation.*  The policies outlined in this paragraph are intended to provide broad and general guidance. Complaints to the Army IG are governed by AR 20–1. Accusations of a criminal nature are reported and investigated according to AR 195–2 or AR 190–30. Complaints by Soldiers involving harassment (hazing, bullying, discriminatory harassment) follow the procedures set forth in paragraph 4–19 and chapter 6. Complaints by Soldiers and Family members involving discrimination based upon race, color, sex (including gender identity), national origin, religion, and sexual orientation follow the procedures set forth in chapter 6. Complaints by Soldiers and Family members involving sexual harassment follow the procedures set forth in chapter 7. Complaints of wrongdoing made by Soldiers against their commander pursuant to UCMJ, Art. 138 should be prepared, submitted, and resolved following the guidance in AR 27–10. Complaints or accusations that fall within the 10 USC 1034 pertaining to military whistle-blower reprisal, are addressed in DoDD 7050.06 and AR 20–1.

*b.  Command responsibilities.*  When commanders are apprised of complaints or accusations against military personnel, they are expected to inquire into the matter and attempt a resolution. When a written complaint or accusation is received against military personnel, COs of units or installations will take action as noted below. All complaints will be acknowledged and/or documented, in writing.

(1)  *Complaints against a senior official.*  Any allegations of impropriety or misconduct (including criminal allegations) against a GO, a promotable COL, a member of the Senior Executive Service, and any other DA Civilian employee of comparable grade or position will be reported to the DAIG's Investigations Division within 2 days of receipt, in accordance with AR 20–1.

(2)  *Complaints forwarded from higher headquarters.*

*(a)*  When final action on a complaint received from higher headquarters for investigation and a report of findings is completed, the complaint will be returned to that headquarters. It will be accompanied by the report of investigation. Unless a higher headquarters reserved decision on the disposition of the complaint or accusation pending receipt of investigation, the case will be disposed of at the lowest level having authority consistent with the gravity of the case. When higher headquarters has reserved the right to approve disposition of the case, the report of investigation will be returned and final action withheld pending disposition instructions. Higher headquarters normally will reserve the right of final disposition only in cases involving complex issues or cases the commander desires in the interest of justice to ensure uniform handling throughout the command.

*(b)*  Complaints received after a Soldier is transferred will be forwarded to the Soldier's gaining organization. The headquarters sending the complaint will be advised of the results of the commander's investigation.

(3)  *Complaints received by units or installations.*  When warranted, the complaint will be investigated. If the commander believes the complaint does not warrant an investigation, the statement "does not warrant investigation" will be recorded on the complaint, along with an explanation of the commander's rationale for not initiating an investigation, followed by the initials of the commander or an officer designated by the commander. The complainant will be advised a decision was made that further action on the complaint is not warranted. Such complaints will be maintained and disposed of per AR 25–400–2.

(4) *Complaints concerning retired personnel.* Commanders should seek advice from their servicing legal advisor when they receive complaints or accusations against retired military personnel not on active duty. Normally, such complaints should be forwarded to the Commander, HRC.

*c. Protected communication.* Commanders and supervisors are prohibited from initiating any type of disciplinary or adverse action against any Soldier because the individual made a protected communication to any recipient identified in 10 USC 1034, to include providing testimony at a court-martial. For definitions of protected communications and recipients, see paragraph 5–13.

*d. False statements.* Knowingly false statements are excepted from the prohibition in paragraph 5–12*c*. Persons who make such knowingly false statements are potentially subject to court-martial or other disciplinary measures (Soldiers), to prosecution by civil authorities or to administrative or disciplinary action under applicable civilian personnel regulations.

*e. Unfavorable information.* Unfavorable information concerning a Soldier will not be filed in their record except as provided in AR 600–37.

## 5–12. Military Whistleblower Protection Act

DA personnel are prohibited from restricting a Soldier's lawful communication with a Member of Congress or an IG, and from taking acts of reprisal against a Soldier for making, preparing to make, or being perceived as making a protected communication (see 10 USC 1034 and DoDD 7050.06). The provisions of paragraph 5–12 are punitive, and violations may be punished under UCMJ, Art. 92.

*a.* No person will restrict a member of the Armed Services from lawfully communicating with a Member of Congress or an IG.

*b.* No person will take an unfavorable personnel action, or withhold or threaten to withhold a favorable personnel action, as a reprisal against a member of the Armed Forces for making or preparing or being perceived as making or preparing to make a protected communication. A protected communication includes:

(1) Any lawful communication with a Member of Congress or an IG.

(2) A communication described in paragraph 5–12*b*(4) that is made (prepared or perceived to be made) to a Member of Congress; an IG; a member of a DoD audit, inspection, investigation, or law-enforcement organization; any person or organization in the chain of command; a court-martial proceeding; or any other person or organization designated pursuant to regulations or other established administrative procedures for such communications or:

(3) Testimony, or otherwise participating in or assisting in an investigation or proceeding related to a protected communication, or filing, causing to be filed, participating in, or otherwise assisting in an action brought under the Military Whistleblower Reprisal Act or:

(4) A communication in which a member of the Armed Forces complains of or discloses information that the member reasonably believes constitutes evidence of any of the following:

*(a)* A violation of law or regulation, including a law or regulation prohibiting rape, sexual assault, or certain other sexual misconduct, sexual harassment, or unlawful discrimination.

*(b)* Gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or

*(c)* A threat by another member of the Armed Forces  or employee of the Federal Government that indicates a determination or intent to kill or cause serious bodily injury to members of the Armed Forces or civilians or damage to military, Federal, or civilian property.

*c.* A communication under paragraph 5–12 b (4) does not lose protected status because—

(1) The communication is made to a person who participated in an activity that the member reasonably believes to be covered in paragraph 5–12*b*(4);

(2) The communication revealed information that had previously been disclosed;

(3) Of the member's motive for making the communication;

(4) The communication was not made in writing;

(5) The communication was made while the member was off duty; or

(6) The communication was made during the normal course of duties of the member.

*d.* For the definition of personnel action see DoDD 7050.06 and 10 USC 1034.

*e.* If the allegation of reprisal is made known to any agency authorized in this regulation to receive complaints, the agency will refer the complainant to an IG.

*f.* The Soldier subject to reprisal (the complainant) must make a first person complaint to an IG within 1 year of becoming aware of the personnel action taken or threatened that they believe to have been in reprisal, or the complaint may be dismissed as untimely. Soldiers should file the complaint with their supporting IG; however, the complainant may submit the complaint directly to Assistance Division, U.S. Army IG Agency, or to DoD IG. While the Military

Whistleblower Protection Act provides Soldiers protection from acts of reprisal by the chain of command; it does not relieve Soldiers of responsibility for their own performance, conduct, and behavior.

*g.* The chain of command will ensure Soldiers are protected from reprisal or retaliation for protected communications. If a complainant brings his or her complaint to the commander, the commander should refer the complaint to the supporting IG. The chain of command retains the authority and responsibility to take actions appropriate for the circumstances, even though those actions may be subject to review by an IG in a whistleblower reprisal investigation. Should an allegation of whistleblower reprisal be substantiated, the complainant may submit the results of the investigation to the Army Board for Correction of Military Records to correct the record. Additionally, the appropriate command will be provided the results of the investigation and must report actions taken against the reprising officials as required by DoDD 7050.06 and AR 20–1.

**5–13. Retaliation**

*a.* No Soldier may retaliate against a victim, an alleged victim, or another member of the Armed Forces based on that individual's reporting or planning to report a criminal offense or discourage the individual from reporting a criminal offense.

*b.* The provisions of paragraph 5–13 are punitive, and violations may be punished under the UCMJ.

*c.* Definitions—

(1) Subject to more specific guidance from the DoD, for the purposes of this paragraph 5–13, "retaliation" is defined as:

*(a)* Any person subject to the UCMJ who wrongfully takes or threatens to take an adverse personnel action, or wrongfully withholds or threatens to withhold a favorable personnel action with the intent to discourage or retaliate against any person for reporting or planning to report a criminal offense, or making, or planning to make a protected communication. (See Article 132, UCMJ (2019).)

*(b)* Acts of cruelty, oppression or maltreatment (as these terms are described in UCMJ, Art. 93) committed against a victim, an alleged victim or another member of the Armed Forces by peers or other persons, because the individual reported a criminal offense or was believed to have reported a criminal offense.

(2) Personnel action is defined in DoDD 7050.06 as any action taken against a member of the Armed Forces that affects, or has the potential to affect, that member's current position or career. Such actions include a promotion; a disciplinary or other corrective action; a transfer or reassignment; a performance evaluation; a decision on pay, benefits, awards or training, relief or removal: separation: discharge; referral for mental health evaluations under DoDI 6490.04; and any other significant change in duties or responsibilities inconsistent with the member's grade.

*d.* Allegations of retaliation described in paragraph 5–13*c*(1)(*a*) will be referred to, and investigated by, the appropriate IG in accordance with references DoDD 7050.06 and AR 20–1.

*e.* Allegations of reprisal described in paragraphs 5–13*c*(1)(*a*) and fall within the provisions addressed in paragraph 5–12, should be referred to an IG. When the complaint is presented to an IG by a first person complainant, the allegation will be investigated by an appropriate IG in accordance with DoDD 7050.06 and AR 20–1. An IG will not accept a third person complaint of reprisal.

*f.* When the USACIDC initiates a sexual assault investigation, it will also initiate and conduct subsequent investigations related to suspected criminal acts related to retaliation against the sexual assault victim, such as physical assaults, threats and damage to property. Complainants and/or their commander should immediately notify USACIDC whenever the victim of an unrestricted sexual assault is threatened, assaulted, or suffers property damage subsequent to their complaint of a sexual assault. Should a Soldier desire to file a whistleblower reprisal complaint under 10 USC 1034/DoDD 7050.06 as described in paragraph 5–12, the Soldier must present the complaint to an IG.

*g.* All reports of retaliatory behavior (including retaliatory personnel actions, ostracism, and offenses arising under the UCMJ) must be investigated, including actions against other individuals (for example, Family members) intended to harm or influence a Soldier.

(1) Reports of retaliatory personnel actions presented to an IG under 10 USC 1034by the individual subject to the retaliatory personnel action will be investigated by the appropriate IG in accordance with DoDD 7050.06 and AR 20–1.

(2) Reports of retaliatory behavior falling outside the definitions in this directive that include offenses under the UCMJ (such as stalking, damage of property, communicating a threat, obstruction of justice, assault, and so on) will be referred to USACIDC for initiation of a criminal investigation.

(3) Reports of retaliatory behavior that an IG or USACIDC do not accept for investigation will be referred to and investigated by the complainant's chain of command or supervisor, or by any other appropriate investigative agency, organization, or entity.

(4) Appropriated fund civilian employees may generally present whistleblower reprisal allegations to either the Office of Special Counsel or DoDIG. Nonappropriated fund employees and appropriated fund employees  in the intelligence community may submit reprisal complaints to DoDIG. See AR 20–1.

*h.* Commanders should consult with their servicing legal advisor and/or IG for guidance on implementation of this policy at the command level.

## 5–14.  Appearance before congressional committees

The functional proponent for policy on appearances before congressional committees is the HQDA Chief of Legislative Liaison. The DA will provide maximum information about its operation and activities to congressional committees. This information is subject to AR 380–5. When asked to appear before a congressional committee, Army military personnel will coordinate with the Chief of Legislative Liaison, Office of the SECARMY for guidance or assistance. Coordination will be accomplished with the ASA (FM&C) on matters pertaining to the budget. See AR 1–20 for additional guidance.

## 5–15.  Political activities

The DCS, G–1 is responsible for policy on Soldier participation in political activities, as contained in 10 USC 973 and DoDD 1344.10 as follows:

*a. Obligations as a citizen.* Soldiers are expected to carry out their obligations as citizens. However, while on active duty, Soldiers (including full-time ARNG) are prohibited in certain cases from engaging in certain political activities. The following principles apply:

(1) A Soldier on active duty may—

*(a)* Register, vote, and express their personal opinion on political candidates and issues, but not as a representative of the Army.

*(b)* Make monetary contributions to a political organization.

*(c)* Attend partisan and nonpartisan political meetings or rallies as a spectator when not in uniform.

(2) A Soldier on active duty will not—

*(a)* Use their official authority or influence for interfering with an election; affecting the course or outcome of an election; soliciting votes for a particular candidate or issue; or requiring or soliciting political contributions from others.

*(b)* Be a candidate for, or hold, civil office except under the conditions set forth in this regulation and DoDD 1344.10.

*(c)* Participate in partisan political management, campaigns, or conventions, except as authorized by appendix B and DoDD 1344.10.

*(d)* Make campaign contributions to another member of the Armed Forces serving on active duty.

(3) Appendix B provides guidelines and examples of permissible and prohibited political activities.

*b. Participation in local nonpartisan political activities.*  See paragraph B–5.

*c. Candidate for elective office.*  A member on active duty or under a call or order to active duty for more than 270 days may not—

(1) Campaign as a nominee, or as a candidate for nomination for civil office, except as authorized in this regulation. When circumstances warrant, the SECARMY may permit the Soldier to file such evidence of nomination or candidacy for nomination, as may be required by law. Such permission will not authorize activity while on active duty that is otherwise prohibited by this regulation, DoDD 1344.10, or Federal statutes. Any request for permission to file or run as a candidate must be submitted as a memorandum through the chain of command to the SECARMY. Such permission is granted sparingly because it runs counter to the traditional concept that Soldiers on active duty should not engage in partisan political activity. Requests should be submitted at least 6 months prior to any filing deadline, and conform to DoDD 1344.10. Any filing deadline should be explained in the request memorandum. Requests should be submitted to the SECARMY through the chain of command, with each level of command providing a recommendation to the SECARMY.

(2) Become a candidate for any civil office while serving an initial tour of active duty or a tour of active duty that the member agreed to perform as a condition of receiving schooling or other training wholly or partly at U.S. Government expense.

*d. Election or appointment to civil office.*

(1) Except as authorized by this regulation, or otherwise provided for by law or DoD policy—

(2) No member on active duty or under a call or order to active duty for more than 270 days may hold or exercise the function of civil offices in the U.S. Government that is an elective office, requires an appointment by the President with the advice and consent of the Senate, or is a position on the executive schedule under 5 USC 5312 through 5

USC 5317. A retired regular member, or a USAR member on active duty under a call or order to active duty for 270 days or fewer, may hold and exercise the functions of a civil office provided there is no interference with the performance of military duty.

(3) A member may hold and exercise the function of a civil office in the U.S. Government that is described in paragraph 5–3*d*(2) when assigned or detailed to such office to perform such functions, provided the assignment or detail does not interfere with military duties.

(4) No member on active duty may hold or exercise the function of civil offices in the government of a State; the District of Columbia; a territory, possession, or commonwealth of the United States; or in any political subdivision thereof, unless otherwise authorized by DoDD 1344.10 or by law. A retired regular or USAR member on active duty under a call or order to active duty for more than 270 days may hold, but will not exercise the functions of, a civil office as set out in DoDD 1344.10, as long as the holding of such office is not prohibited under the laws of the State; the District of Columbia; a territory, possession, or commonwealth of the United States; or any political subdivision thereof and the SECARMY grants permission after determining that holding such office does not interfere with the performance of military duties. Requests for permission to hold, but not exercise the functions of, an office should be submitted to the SECARMY through the chain of command, with each level of command providing a recommendation to the SECARMY, and should be submitted immediately upon notice of mobilization or orders.

(5) A Soldier on active duty may serve as a regular or reserve civilian law-enforcement officer or as a member of a civilian fire or rescue squad. Such service will be in a private capacity, will not involve the exercise of military authority, and will not interfere with the performance of military duties.

(6) As long as they are not under a call or order to active duty for more than 270 days, Reserve enlisted members and officers may hold partisan and nonpartisan civil office if such office is held in a private capacity and does not interfere with the performance of military duties. Additionally, enlisted members on active duty may seek and hold nonpartisan civil office as a notary public or member of a school board, neighborhood planning commission, or similar local agent, as long as such office is held in a private capacity and does not interfere with the performance of military duties. Any warrant or commissioned officer on active duty may seek, hold, and exercise the functions of a nonpartisan civil office on an independent school board that is located exclusively on a military reservation, provided the office is held in a nonmilitary capacity and there is no interference with the performance of military duties.

(7) A Soldier elected or appointed to a prohibited civil office may request retirement and will be retired if eligible for retirement. If the Soldier does not request or is not eligible for retirement, the Soldier will be discharged or released from active duty, as determined by the SECARMY.

(8) The separation and retirement requirements above, do not apply if the member declines to serve in the prohibited office; if the SECARMY determines that the member should not be released from active duty based on the needs of the Army; or if the member is—

*(a)* Obligated to fulfill an active duty service commitment.

*(b)* Serving or has been issued orders to serve in an area that is overseas, remote, a combat zone, or a hostile-fire pay area.

*(c)* Ordered to remain on active duty while the subject of an investigation or inquiry.

*(d)* Accused of an offense under the UCMJ, 10 USC Chapter 47, or serving a sentence or punishment for such offense.

*(e)* Pending an administrative separation action or proceedings.

*(f)* Indebted to the United States.

*(g)* In the USAR and serving involuntarily under a call or order to active duty that specifies a period of active duty of more than 270 days during a period of declared war or national emergency; or other period when a unit or individual of the ARNG or USAR has been involuntarily called or ordered to active duty as authorized by law.

*(h)* In violation of this regulation or an order or other regulation prohibiting the Soldier from assuming or exercising the function of civil office.

(9) A Soldier who refuses to decline to serve in a prohibited civil office after being denied separation or retirement under this chapter, may be subject to disciplinary or adverse administrative action.

(10) No actions undertaken by a Soldier in carrying out assigned military duties will be invalidated solely by virtue of the Soldier having violated the provisions of this chapter.

## 5–16. Prohibition of military labor unions

*a. Incompatibility with military service.*

(1) Soldiers must be prepared to fight and, if necessary, place their own personal safety in jeopardy in order to defend the Constitution of the United States and their fellow citizens. Therefore, discipline and prompt obedience to the lawful orders of seniors are essential and time-honored elements of the American military tradition. From the

earliest Articles of War, laws and regulations have prohibited conduct detrimental to the military chain of command and lawful military authority.

(2) Unionization of Soldiers is incompatible with the military chain of command. It would undermine the role, authority, and position of the commander. It would impair the morale and readiness of the Army. Therefore, Soldiers will not participate in labor-management negotiation or collective bargaining unless part of their official duties with respect to civilian employees in recognized bargaining units. Nor will they take part in strikes, slowdown, picketing, or other traditional forms of job actions.

*b. Responsibilities.* SCs will report activities prohibited by this regulation immediately to DCS, G–1 (DAPE–MPC), Washington, DC 20310–0300. Reports will be made by priority message and information copies will be sent to intermediate commanders.

*c. Prohibited activities.*

(1) *Enrollment and membership.*

*(a)* A member of the Army, knowing of the activities of a particular military labor organization, may not—

1. Join or maintain membership in such an organization.

2. Attempt to enroll another member of the Armed Forces as a member of such an organization.

*(b)* No person on a military installation, and no member of the Armed Forces, may enroll in a military labor organization or solicit or accept dues or fees for such an organization from any member of the Armed Forces.

(2) *Negotiation or bargaining.*

*(a)* No person on a military installation, and no member of the Armed Forces, may negotiate or bargain, or attempt through any coercive act to negotiate or bargain with any civilian officer, or employee, or any member of the Armed Forces on behalf of members of the Armed Forces concerning the terms or conditions of service of such members.

*(b)* No member of the Armed Forces and no civilian officer, or employee, may negotiate or bargain on behalf of the U.S. Government concerning the terms or conditions of military service of members of the Armed Forces with any person who represents or purports to represent members of the Armed Forces.

(3) *Strikes or other concerted labor actions.*

*(a)* No person on a military installation, and no member of the Armed Forces may organize or attempt to organize, or participate in, any strike, picketing, march, demonstration, or other similar form of concerted action involving members of the Armed Forces that is directed against the government of the United States, and that is intended to induce any DA Civilian officer or employee, or any member of the Armed Forces, to—

1. Negotiate or bargain with any person about the terms or conditions of service of any member of the Armed Forces.

2. Recognize any military labor organization as a representative of individual members of the Armed Forces in connection with any complaint or grievance of any such member arising out of the terms or conditions of service of such member in the Armed Forces.

3. Make changes in the terms or conditions of military service in the Armed Forces of individual members of the Armed Forces.

*(b)* No person may use any military installation for any meeting, march, picketing, demonstration, or other similar activity for the purpose of engaging in any activity prohibited by this paragraph.

*(c)* No member of the Armed Forces, and no civilian officer or employee, may permit or authorize the use of any military installation for any meeting, march, picketing, demonstration, or other similar activity that is for the purpose of engaging in any activity prohibited by this paragraph.

(4) *Representation.* A military labor organization may not represent, or attempt to represent any member of the Armed Forces before any civilian officer or employee, or any member of the Army, in connection with any grievance or complaint of any such member arising out of the terms or conditions of service of any member of the Army.

(5) *Violations of policy.* Violations of this policy provide a basis for disciplinary action under UCMJ in addition to appropriate administrative sanctions.

*d. Permitted activities.*

(1) This regulation will not limit the rights of Soldiers to—

*(a)* Belong to lawful organizations, other than military labor organizations.

*(b)* Present complaints through established military channels.

*(c)* Seek or receive information or counseling from authorized sources.

*(d)* Be represented by authorized counsel in any legal or quasi-legal proceeding, according to applicable laws and regulations.

*(e)* Petition the Congress for redress of grievances.

*(f)* Take other administrative action for administrative or judicial relief as is authorized by applicable laws and regulations.

(2)  This regulation does not prevent eligible DA Civilians from belonging to or being represented by labor unions.

*e.  Making determinations.*

(1)  To determine if an organization is a military labor organization and violates this regulation, the following will be evaluated:

*(a)*  Its history and operation.

*(b)*  Its constitution and bylaws.

*(c)*  The evidence gathered for any suspected prohibited act.

(2)  To determine if a person belongs to a military labor organization and is in violation of this regulation, the following will be evaluated:

*(a)*  Their history and conduct.

*(b)*  The evidence gathered for any suspected prohibited act.

(3)  To determine if a person acted for a military labor organization when they committed a prohibited act, the following will be considered:

*(a)*  The frequency of such acts.

*(b)*  The position of the person in the organization.

*(c)*  If the acts were known and condemned or disavowed by the organization's leadership.

*f.  Gathering information.*  Personnel gathering information about persons and organizations to make the determinations required by this chapter must strictly comply with AR 380–13. Counterintelligence or security investigation personnel may not gather such information. The organization itself should be considered the primary source of information.

## 5–17.  On-post distribution of non-government printed materials

*a.  The functional proponent for policy regarding on-post distribution of non-government printed materials is the Office of the Chief of Public Affairs (SAPA–ZDA).*

*b.  Access to news and publications.*  The maintenance of loyalty, discipline, and morale among Soldiers is essential if the Army is to provide a reliable and effective military force responsive to the national security missions assigned pursuant to lawful authority. At the same time, Soldiers are generally entitled to free access to news and publications.

*c.  Policy.*  SCs will encourage and promote the availability of books, periodicals, and other printed materials that present a wide range of viewpoints on public issues to Soldiers. Such media should include those emphasizing the standards of loyalty, patriotism, and discipline that are common to the Armed Forces. However, SCs will not, except as provided in this paragraph and in AR 360–1, take action to control or restrict dissemination of printed materials, even if they are believed to be in poor taste or unfairly critical of government policies or officials. The SC will be guided by the principle that, except in cases in which a publication constitutes a clear danger to military loyalty, discipline, or morale, or specifically violates the law or regulatory authority, military personnel are entitled to the same free access to publications, as are other citizens.

*d.  Distribution outlets.*  A SC may impose a requirement that distribution of printed materials may not be made except through regularly established and approved distribution outlets, unless prior approval is obtained from the commander or authorized representative. AR 210–7 and AR 360–1 provide further explanation and guidance. The SC may, without informing higher headquarters or DA in advance, take appropriate action to prevent the distribution of non-DoD commercial publications by persons who have not obtained the required approval or have not complied with this regulation, AR 210–7, and AR 360–1. Except when the publication in question is published primarily for advertising or promotional purposes, a denial of a request for distribution will be reported, as required in paragraph 5–17*e*.

*e.  Restrictions on dissemination.*  If it appears that a publication presents a clear danger to the loyalty, discipline, or morale of Soldiers, the SC may, without prior approval of higher headquarters, delay distribution on property subject to the SC's control. The SC will consider whether the act of restriction will in itself result in the publication in question achieving notoriety d increased circulation to military personnel through off-post sources.

(1)  The SC's directive to delay distribution will be in writing.

(2)  Concurrently with imposing a delay authorized above, the SC will inform, by telephone, the next major commander and Chief of Public Affairs (SAPA–ZDA), Washington, DC 20310–0300.

(3)  When a delay in dissemination of a publication through either official or unofficial outlets is imposed by the SC, the SC will, within 5 working days thereafter—

*(a)*  Review the publication in question.

*(b)*  Prepare a written recommendation to HQDA that provides the basic facts for the determination that distribution of the subject publication would present a clear danger to the loyalty, discipline, or morale of the Soldiers on his or her installation.

(c) Send the recommendation, together with a copy of the subject publication, to Chief of Public Affairs (SAPA–ZDA) Washington, DC 20310–0300. Appropriate information copies should also be provided to intermediate headquarters.

(4) Reports required in paragraph 5–17*e*(2) and (3), are "exempt reports."

(5) The delay in distribution will remain in force until a determination to approve or disapprove the request is made by HQDA.

*f. Distribution of commercial publications.* On-post distribution of commercial publications will be restricted as defined in AR 360–1. All commercial publications distributed free of charge will not carry any advertisement that implies discrimination with regard to the race, color, sex (including gender identity), national origin, religion, or sexual orientation of the purchaser, user or patron. The publication will place its readers and advertisers on notice of this requirement by including in a prominent location the following: "Everything advertised in this publication must be made available for purchase, use, or patronage without regard to the race, color, sex (including gender identity), national origin, religion, or sexual orientation of the purchaser, user, or patron."

*g. Distribution of command information newspapers.* The distribution of command information newspapers (either Army-funded or civilian enterprise) will be governed by AR 360–1. Distribution through official channels will be authorized.

## 5–18. Insider Threat Program

Commanders have an obligation to support the Army Insider Threat Program.

*a. Purpose.*

(1) The Army Insider Threat Program, managed by the ASA (M&RA) and the DCS, G–3/5/7, and executed by the Army Protection Directorate (DAMO–AP) in accordance with DoDD 5205.16 and AR 525–2, is an integrated Departmental effort to enhance the Army's ability to prevent, detect, deter, and mitigate risk posed by insiders who may represent a threat to national security.

(2) To enable this effort, the Army Insider Threat Program coordinates enterprise-wide efforts to screen and clear personnel, protect Army networks, secure Army installations, share insider threat information, establish a centralized insider threat analytical capability, and train, report and respond to potential insider threats.

*b. Definitions.*

(1) An "insider threat" is defined as the threat that an "insider" will use his or her authorized access, wittingly or unwittingly, to do harm to the security of the United States. This threat can include damage through espionage, terrorism, unauthorized disclosure of national security information, or through the loss or degradation of an Army resource or capability.

(2) An "indicator" is an action, event, or behavior that points out or shows a sign, symptom, or implication of a potential risk, and which reflects intent or capability that may constitute a witting or unwitting insider threat.

*c. Coordination.* Commanders of ACOMs, ASCCs, and HQDA DRUs will coordinate and synchronize their insider threat effort through existing protection forums such as the Protection Executive Committee in accordance with AR 525–2.

*d. Insider Threat Hub.* The Army maintains a centralized insider threat analysis and reporting capability, known as the Army Insider Threat "Hub". The Insider Threat Hub provides a commander an assessment of insider threat risk based on observable indicators to inform command decisions. The assessment, correlated from available Government information, takes a holistic approach, giving context to the indicators and any pattern of behavior. In preparing the assessment, the Insider Threat Hub methodically gathers, integrates, and analyzes information from a variety of approved Government information sources. Further, the Insider Threat Hub coordinates subject matter expert analysis for its assessments in areas including law enforcement, counterintelligence, security, behavioral sciences, and legal.

*e. Responsibilities.*

(1) Commanders will—

(a) Remain vigilant and encourage vigilance in their commands for potential threats and other risks from insiders.

(b) Act to mitigate risk from insiders.

(c) Develop and enforce policies that deter threats and mitigate risk, protecting Army resources, information, personnel, and capabilities. Commanders will regularly assess the effectiveness of policies and activities during regular command inspections, Army Protection Program Assessments, or similar activities.

(d) Ensure compliance with reporting requirements for information related to insider threats as found in AR 380–67, AR 190–45, and AR 25–2.

(e) Reduce vulnerabilities through increasing awareness of threat indicators and reporting procedures by ensuring compliance with required threat awareness training in accordance with AR 381–12, information assurance training in accordance with AR 25–2, and antiterrorism awareness training in accordance with AR 525–13.

*(f)* As appropriate, request assessment support from the Insider Threat Hub through their designated command representative. A commander may submit a request for assistance to the Army Insider Threat Hub when they reasonably conclude based on observable indicators that an insider might wittingly or unwittingly commit—

1. An act in contravention of law or policy that resulted in, or might result in, harm through the loss or degradation of government or company information, resources, or capabilities; or

2. A destructive act, which may include physical harm to another in the workplace. ACOM, ASCC, DRU, and field operating agency approved representatives may submit requests for assistance via NIPRNET at usarmy.pentagon.hqda-dcs-g-3-5–7.mbx.g-34-int-hub-reports-cell@mail.mil or SIPRNET at usarmy.pentagon.hqda-dcs-g-3–5–7.mbx.g-34-int-hub-reports-cell@mail.smil.mil. The Insider Threat Hub will not accept requests for support to inform an unrelated process (such as an administrative separation proceeding), to unreasonably target a Soldier, or for any other unlawful purpose. Further, a request for assistance should not be made if the matter has been otherwise reported to Army counterintelligence.

(2) To enable commanders, the Army Insider Threat Hub will—

*(a)* Provide commanders ready access to Army Insider Threat Hub capabilities through their commands including providing subject matter expertise, advice, and recommendations relating to a potential insider threat.

*(b)* Take a proactive approach to aid commanders in countering insider threats before they become active or operationalized. If the Army identifies a potential insider threat, the Army Insider Threat Hub will provide commanders or their DA Civilian equivalents with holistic risk assessments to enable more timely and informed investigative and command responses. With their assessments, the Army Insider Threat Hub will include recommended command actions and may include additional relevant information, as authorized by law or policy.

*f. Point of contact.* The proponent for the Army Insider Threat Program and the associated Hub is the DCS, G–3/5/7, G–34, Army Protection (DAMO–AP), 3200 Army Pentagon, Washington, DC 20310–3200.

## 5–19. Risk management

*a.* The functional proponent for risk management is the Director of The Army Staff. Commanders at all levels are responsible and accountable for risk management training in accordance with AR 385–10 and DA Pam 385–30. Risk management addresses the full spectrum of Army training and operations, individual and collective day-today activities and events, and base operations functions to identify and assess hazards/risks, develop and implement controls, make decisions, and evaluate outcomes. It blends tactical, threat-based risks with accidental, hazard-based risks.

*b.* Leaders and managers are responsible for integrating risk management into all Army processes and operations. Safety and occupational health staffs will provide risk management training, tools, and other related assistance. Risk reduction through application of controls by training, procedures, cautions, and warnings help reduce accident probability.

*c.* Commanders will ensure that the risk management process is incorporated into training plans.

## 5–20. Operations security

Commanders at all levels are responsible for maintaining an active operations security (OPSEC) program in accordance with AR 530–1. For OPSEC to be effective, all Army personnel must be aware of OPSEC and understand how OPSEC complements traditional security programs. All personnel must know how to apply and practice OPSEC in the performance of their daily tasks. OPSEC must become a mindset within all Army personnel and be performed as second nature. To accomplish this level of OPSEC vigilance, OPSEC programs must be action and job-oriented, enabling the workforce to put into practice the knowledge and tactics, techniques, and procedures, and maximize the use of lessons learned to illustrate OPSEC objectives and requirements. AR 530–1 addresses three levels of certification requirements.

## 5–21. Adoption Reimbursement Program

*a.* Unit commanders will serve as reviewing officials to evaluate and approve submission of payment claims for reimbursement by Soldiers. Unit commanders will assist Soldiers with DD Form 2675 (Reimbursement Request for Adoption Expenses), review the required documents, and verify and sign the DD Form 2675.

*b.* Applications for reimbursement must include documents as outlined in DoDI 1341.09 and documentation to substantiate reasonable and necessary expenses.

*c.* Commanders will forward the DD Form 2675 and claim application package with original signatures of both the member and the verifying official to the Defense Finance and Accounting Service (DFAS). Digital signatures are preferred and completed packets may be submitted electronically to DFAS–CL Center: dfas.cleveland-oh.jfl.mbx.adoption-reimbursesment-cle@mail.mil. Manually signed DD Form 2675 and claims application packets may be mailed to: Defense Finance and Accounting Service, Cleveland Center (Code JFLADA), 1240 East Ninth

Street, Cleveland, OH 44199. Soldiers should retain a copy of the claim application package and completed DD Form 2675.

*d.* The designated HQDA point of contact is DCS, G–1, Directorate of Military Personnel Management (DMPM–MPC), Command Policy Division (usarmy.pentagon.hqda-dcs-g-1.mbx.command-policy@mail.mil, 703–695–7370). Command policy will act as a conduit for directing Soldiers and/or commanders to the appropriate agencies for assistance—

(1) Commanders needing assistance with verifying the claim application packet and DD Form 2675 should contact DCS, G–1 (DAPE–MPC) Command Policy Division for assistance (usarmy.pentagon.hqda-dcs-g-1.mbx.command-policy@mail.mil, 703–695–7370).

(2) Soldiers needing assistance with facilitating adoptions will be referred to Military OneSource (http://www.militaryonesource.mil/family-and-relationships/parenting, 800–342–9647), legal assistance, and their local Army Community Service Center. These agencies will refer Soldiers to appropriate agencies for assistance.

(3) Soldiers needing assistance with questions concerning leave procedures in conjunction with adopting a child, in accordance with DoDI 1327.06 and AR 600–8–10 will be referred to the HRC, (AHRC–PDF–I) Leave and Pass Policy section (usarmy.knox.hrc.mbx.tagd-leave-and-pass-policy@mail.mil, 502–613–8484).

(4) Soldiers needing assistance with claim application packets that have been submitted to DFAS for payment will be referred to the DFAS–CL Center (dfas.cleveland-oh.jfl.mbx.adoption-reimbursesment-cle@mail.mil).

## Chapter 6
## Military Equal Opportunity Policy and Program

### 6–1. Purpose

*a.* The MEO Program formulates, directs, and sustains a comprehensive effort to maximize human potential and to ensure fair treatment for all Soldiers based solely on merit, performance, and potential in support of readiness. MEO philosophy is based on fairness, justice, and equity. Commanders are responsible for sustaining a positive EO climate within their units. Specifically, the goals of the MEO Program are to—

(1) Build and maintain a cohesive, combat ready Army which is focused and determined to accomplish its mission.

(2) Provide support to Soldiers, both on and off-post, and within the limits of the laws of localities, states, and host nations.

(3) Ensure MEO exists for all Soldiers.

(4) Ensure every Soldier is treated with dignity and respect.

(5) Support commanders at all levels and MEO professionals (EO PMs, EO SGMs, EO advisors; and EO specialists (RA/USAR)) and EO Leaders (EOLs) who are responsible for the execution of MEO policies in their units organizations, and agencies.

*b.* Commanders are also responsible for the DA Civilian Equal Employment Opportunity (EEO) Program which provides equal opportunity in employment for all DA Civilians and prohibits discrimination in employment because of race, color, religion, sex, national origin, age, disability, genetic information, or reprisal. Commanders are responsible for sustaining a positive EEO climate within their workplace in accordance with applicable law and Federal regulations; specific responsibilities and complaint procedures are outlined in AR 690–12 and AR 690–600.

### 6–2. Military equal opportunity policies

*a.* Commanders and organizational leaders will foster and maintain positive command climates. A positive command climate is an environment free from personal, social, or institutional barriers that prevent Soldiers from rising to the highest level of responsibility for which they are qualified. Soldiers are evaluated on individual merit, performance, and potential. The evaluations of commanders will include an assessment of their compliance with MEO policy.

*b.* The Army will provide an environment that is free of unlawful discrimination. Discrimination occurs when someone, or a group of people, is harassed, intimidated, insulted, humiliated, or is treated less favorably than another person or group, because of their race, color, sex (to include gender identity), national origin, religion, or sexual orientation. It includes use of disparaging terms with respect to a person's race, color, sex (to include gender identity), national origin, religion, or sexual orientation which contributes to a hostile work environment.

*c.* When discrimination is alleged, commanders will take immediate and appropriate action to investigate the allegations and correct any unlawful discriminatory practices. In substantiated cases, commanders will consider appropriate disciplinary action.

*d.* The chain of command will promote, support, and enforce MEO and Harassment Prevention and Response policy and programs. The chain of command has primary responsibility for identifying and correcting discriminatory harassment.

*e.* The operational language of the Army is English. Commanders may require Army personnel to use English when performing official duties but may not require the use of English for personal communications which are unrelated to official duties.

*f.* Violations of MEO and Harassment Prevention and Response policies may result in disciplinary action under the UCMJ, Arts. 92, 133, or 134.

*g.* Soldiers are required to follow policies both on and off-post, during duty and non-duty hours.

*h.* Policies apply to work, living, and recreational environments (including both on and off-post housing).

*i.* Members of the Army will not—

(1) Retaliate against a member who files a discrimination or harassment complaint.

(2) Knowingly make a false accusation of discrimination.

(3) While in a supervisory or command position, condone or ignore discrimination, harassment, disparaging terms, or hostile work environment.

## 6–3.  Military equal opportunity professional staffing
See appendix C.

## 6–4.  Military equal opportunity training and education
See appendix D.

## 6–5.  Command climate assessment
See appendix E.

## 6–6.  Military Equal Opportunity and Harassment Complaint Processing System
*a. Attempts should be made to resolve concerns at the lowest possible level within an organization.* If low-level resolution fails, the situation escalates, or is too malicious to resolve at a low-level, the complaint processing system defines a process for resolution. Soldiers (including DEP), cadets, and Family members (in accordance with DoDD 1350.2) may utilize the complaint processing system. Complaints from DA Civilians (to include those against Soldiers) alleging discrimination and/or harassment will be handled in accordance with the policies and procedures contained in AR 690–12 and AR 690–600, or as described in separate DoD and DA policy, or as provided for in any applicable collective bargaining agreement.

*b. Entering the complaints processing system.* The complaint processing system addresses complaints that allege unlawful discrimination on the basis of race, color, sex (to include gender identity), national origin, religion, or sexual orientation and harassment which includes hazing, bullying, and other discriminatory harassment. Concerns raised and/or resolved outside of the complaint processing system are considered problem resolution or leadership actions; and are not considered MEO or harassment complaints. Incidents involving allegations of criminal behavior (that is, violations of UCMJ) will be reported or referred to law enforcement.

(1) *Anonymous complaint.*

*(a)* Complaints where the complainant remains unidentified may be handled as either an informal or a formal complaint and entered in MEO database, as such. The commander will determine if sufficient information is provided to proceed as either an informal or formal complaint. The commander will be identified as the complainant on the DA Form 7279 (Equal Opportunity and Harassment Complaint Form) and in MEO database. If the complaint is processed as an informal complaint, the commander will determine if informing the entire command or part of the organization of the actions taken is appropriate. If during the informal or formal process of an anonymous complaint the identity of the actual complainant is revealed, the complainant will be edited in MEO database, and the actual complainant will be provided the requisite follow-up actions (DA Form 7279–1 (Equal Opportunity and Harassment Complaint Resolution Assessment Form)).

*(b)* Actions taken regarding anonymous complaints will depend upon the extent of information provided in the anonymous complaint. If an anonymous complaint contains sufficient information to permit the initiation of an investigation, the investigation will be initiated by the commanding officer or supervisor in accordance with this instruction. If an anonymous complaint does not contain sufficient information to permit the initiation of an investigation, the information should be documented in a Memorandum for Record and maintained on file in accordance with disposition instructions and the central point of contact responsible for processing discrimination and harassment complaints. The Memorandum for Record should contain the following information, if available: date and time the information

  
was received; a detailed description of the facts and circumstances included in the complaint; date and time the complaint was resolved and by whom; and any other pertinent information.

(2) *Informal complaint.*

(a)  An informal complaint is one that a Soldier, cadet, or Family member does not wish to file in writing on a DA Form 7279. Informal complaints may be resolved directly by the complainant addressing the offending party, a peer, or another person in or outside the complainant's chain of command or NCO chain of command, or the MEO professional. Those issues that can be taken care of informally might be resolved through problem identification and clarification of issues, discussion, recognition of inappropriate or misleading behavior, and a willingness to change. Actions and resolutions taken with others before involving commanders or MEO professionals are not tracked in the MEO database nor reviewed by the MEO professional. When practical, an informal complaint should be resolved within 60 calendar days.

(b)  Upon receipt of a written or oral informal complaint, the commander or MEO professional will—

1. Listen to the complainant and find out as much as possible concerning the complaint.

2. Advise the complainant of—

a) Their rights and responsibilities in accordance with DoDI 6400.07.

b)  Support services that are available to help resolve the issues, as appropriate, both on and off-post (health care, counseling, MPOs and CPOs, chaplains, legal assistance, and unit or installation trained mediators for alternative dispute resolution).

c)  The protected nature of the communication, which will only be shared with those who have a legitimate need-to-know.

d)  Both the informal and formal complaint processes.

e)  That the complainant may choose to resolve the complaint through facilitation, intervention, counseling, and/or training.

(c)  Within 3 calendar days of complaint receipt (at the next MUTA–4 or other regularly scheduled training for Army Reserve TPU Soldiers), members of the chain of command assisting with informal complaint resolution will inform their MEO professional of the initiation of informal complaint assistance efforts.

(d)  If the commander receives the complaint and chooses to resolve the situation through commander's inquiry and/or AR 15–6 investigation without the assistance of the MEO professional, the commander will also inform the MEO professional within three calendar days of the receipt of the informal complaint and the subsequent resolution efforts.

(e)  Commanders or MEO professionals will prepare an MFR, which will include information indicating the nature of the complaint and identifying pertinent information to assist in the identification of the organization's command climate.

(f)  The MEO professional will input informal complaint information into MEO database no later than 3 calendar days (RA), or next MUTA–4 (USAR) from date of receipt.

(g)  Upon completion of the resolution efforts, the complainant may—

1. Accept informal resolution or continued efforts at resolution.

2. Render a formal complaint.

3. Decline to pursue complaint.

(h)  The MEO professional will retain the informal complaint records for 15 years from the date of complaint receipt.

(3) *Formal complaint.*

(a)  A formal complaint is one that a complainant files in writing using a DA Form 7279 and swears to the accuracy of the information. Formal complaints require specific actions, are subject to timelines, and require documentation of the actions taken. If a complaint is filed against a promotable COL, an active or retired GO, inspectors general of any component, members of the SES, or executive schedule personnel, the allegation will be transferred directly to the Investigations Division, U.S. Army Inspector General Agency (SAIG–IN), Pentagon, Washington, DC 20310–1700 by rapid but confidential means within 2 working days of receipt when practical. The complaint will be emailed to the DAIG's investigations mailbox at usarmy.pentagon.hqda-otig.mbx.saig-in-office@mail.mil in order to provide timely submission.

(b)  MEO and harassment complaints are received by MEO professionals (MEO PM, MEO SGM, MEO advisor, MEO specialist) or (RA/USAR) commanders. Complaints cannot be received by EOLs.

(c)  Within 3 calendar days of complaint receipt (same for USAR) MEO professionals will refer complaint to the subject's commander.

*(d)* Inform ACOM, ASCC, DRU MEO PM of any complaints, to include those that may potentially leave the Army chain of command for processing. Upon receipt of a formal complaint, the MEO professional or commander assisting the complainant will—

1. Listen to the complainant and find out as much as possible concerning the complaint.

2. Advise the complainant of—

a) Support services that are available to help resolve the issues as appropriate, both on and off-post (health care, counseling, MPOs and CPOs, chaplains, legal assistance, and unit or installation trained mediators for alternative dispute resolution).

b) The protected nature of the communication, which will only be shared with those who have a legitimate need-to-know (for example, the MEO professional, commander).

c) Both the informal and formal complaint processes.

d) The necessity to resolve the complaint in 60 days or less, when practical.

e) The importance of describing the incident(s) in as much detail as possible to assist in the investigative process.

f) That the complainant may choose to resolve the complaint through facilitation, intervention, counseling, and/or training.

g) Knowingly submitting a false complaint (a complaint containing information or allegations that the complaint knew to be false) may be punishable under the UCMJ.

h) In DA Form 7279, the complainant will—

(1) Specify the alleged concern.

(2) Provide the names of the parties involved and witnesses.

(3) Describe the incident(s)/behavior(s).

(4) Indicate the date(s) of the occurrence(s).

(5) The complainant will also state the EO basis of the complaint (that is, discrimination based upon race, color, sex (including gender identity), national origin, religion, sexual orientation, or harassment (hazing, bullying, or other discriminatory harassment)).

i) In DA Form 7279, "Requested Remedy," the complainant will enter the requested resolution, which the commander may take into consideration upon completion of the inquiry or investigation, and when considering resolution actions. The information in this block can vary in terms of the complainant's expectations of the investigative process. If expectations that are not likely to be met come to the surface, they should be dispelled by the MEO professional or commander (during receipt of the complaint) through an explanation of the potential and the possible outcomes.

(3) *Time limit to file formal complaint.* Complainants Soldiers have 60 calendar days (same for USAR) from the date of the alleged incident in which to file a formal complaint. This time limit is established to set reasonable parameters for the inquiry or investigation and resolution of complaints, to include ensuring the availability of witnesses, accurate recollection of events, and timely resolution or remedial action. If a complaint is received after 60 calendar days, the commander may conduct an investigation into the allegations or appoint an investigating officer. In deciding whether to conduct an investigation, the commander should consider the reason for the delay, the availability of witnesses, and whether a complete and fair inquiry or investigation can be conducted.

*(a)* A complaint should be filed at the lowest echelon of command (Battalion, Company, or equivalent command) to ensure the complainant receives a thorough, expeditious, and unbiased investigation of the allegations. Depending on the various aspects of the complaint and individuals involved, that lowest level commander may not be the immediate company or even battalion level commander of the subject.

*(b)* MEO professional taking the complaint will notify the commander at their level (for example, brigade MEO professional will notify the brigade commander for all complaints filed at the battalion or company level or equivalent).

*(c)* The commander must work to resolve underlying causes of all complaints.

*(d)* The commander or a commissioned officer will have the complainant swear to the contents of statement(s) contained in the formal complaint and associated documents by administering, or having a person authorized to administer oaths in accordance with UCMJ, Art. 136 administer such an oath to the complainant.

*(e)* The MEO professional will assemble the complaint documentation for provision and briefing (an explanation of the complaint concerns, applicable regulatory and policy guidance, and proposed timeline) to the commander. The MEO professional will prepare the reprisal plan for the commander to issue to the complainant, the alleged subject, chain of command/supervisory chain, and witnesses. The MEO professional will keep a copy of the commander-acknowledged DA Form 7279 on file and suspense the complaint for follow-up with the commander, complainant, and subject in 14 days (next MUTA–4 for USAR), every 14 days (next MUTA–4 for USAR) thereafter until the complaint is resolved, and 30 days (two MUTA (60 days)–4 for USAR) after the commander's final decision on the complaint. Follow-up activities will be annotated on DA Form 7279–1, and provided to the commander no later than

5 days (next MUTA–4 for USAR) after completion of follow assessment, not to exceed 30 days (two MUTA (60 days)–4 for USAR) after the commander's final decision on the complaint.

*(f)* The MEO professional will draft recommended questions for the investigating officer to obtain answers to during their investigation.

*(g)* The MEO professional will enter the initial complaint information into the MEO database, no later than 3 calendar days (RA) and next MUTA–4 (USAR) from date of receipt from the commander.

*(h)* Army Reserve Soldiers on active duty are subject to the active duty complaint timeline.

(4) *Actions of the commander upon receipt of complaint.*

*(a)* Upon receipt of a complaint, the commander will—

1. Ensure that the complainant has been sworn to the complaint (DA Form 7279). If not, the commander will administer the oath and annotate it on DA Form 7279.

2. Complete acknowledging receipt of DA Form 7279.

3. Commence, or cause the commencement of, an investigation of the complaint within 5 calendar days of receipt.

4. Inform the complainant and subject of the commencement of the investigation.

5. Forward within 5 calendar days (5 calendar days for USAR, as well) the complaint or a detailed description of the allegation(s) to the first SPCMCA in the chain of command when the complaint is processed at the battalion or company level, or the first GCMCA when the complaint is processed at the brigade level. The description will include acknowledgment of receipt of the formal complaint and the commencement of a commander's inquiry or appointment of an investigating officer, to conduct the investigation within 30 days (three MUTA (90 days)–for USAR), from acknowledgment in DA Form 7279, when mission permits. The legal sufficiency review will be conducted within 14 calendar days from the date the investigation is completed.

*(b)* The commander will either conduct an investigation personally or immediately appoint an investigating officer according to the provisions of AR 15–6. Investigations will follow the complaint timeline prescribed in paragraph 6–6. Depending on the magnitude of the complaint, the commander may deem it necessary to ask the next higher-level commander in the chain of command to appoint the investigating officer.

*(c)* The commander will establish and implement a reprisal plan to protect the complainants, any named witnesses, and the subjects from acts of reprisal. The reprisal plan of actions will include, as a minimum, specified meetings and discussions by appropriate personnel with the complainants, subjects, named witnesses, and selected members of the chain of command and third-party individuals. The commander will provide a copy of the executed plan to the investigating officer and the MEO professional.

1. Content of the discussions with the above named individuals will include—

a) The definition of retaliation and reprisal with examples of such behavior.

b) The Army's policy prohibiting retaliation and reprisal.

c) The complainant's rights and extent of whistleblower protection afforded complainants, witnesses, and the subjects under DoDD 7050.06.

d) Encouragement to all the aforementioned individuals to report incidents and/or threats of retaliation and reprisal.

e) The procedures to report acts and/or threats of retaliation and reprisal; the consequences retaliation and of reprisal.

f) Possible sanctions against violators.

g) A reminder of the roles and responsibilities of the leadership in the prevention of retaliation and reprisal and protection of all parties involved.

h) The command's support of a thorough, expeditious, and unbiased investigation and good faith in attempting to resolve the complaint.

i) The need to treat all parties in a professional manner both during and following the conduct of the investigation.

2. Discretion will be used to determine the extent of information provided and the numbers of personnel addressed in the discussions with the chain of command and coworkers. Investigating officers will treat all those they interview professionally and courteously and will limit their discussion to only those issues relating to the specific complaint.

*(d)* The commander will provide a progress report to the SPCMCA or GCMCA commander every 14 days (next MUTA–4 and every MUTA–4 thereafter for USAR) thereafter until the investigation is complete. The entire complaint process will be complete within 60 days (three MUTA (90 days)–for USAR).

*(e)* If, due to extenuating circumstances, it becomes impossible to conduct a complete investigation with in the 30 calendar days allowed (three MUTA (90 days)- for USAR), that commander may obtain an extension in writing from the next higher commander for usually not more than 30 calendar days (three MUTA (90 days) for USAR). Under extreme circumstances a commander may obtain an additional extension in writing from the GCMCA not to exceed 30 calendar days (three MUTA (90 days) - for USAR). Commanders of ACOM's, ASCC's, or DRU's (only) may

delegate extension approval authority to ACOM, ASCC, DRU Deputy Commanding General, Chief of Staff, or sub-ordinate general officer. Upon receipt of an approved extension, the commander must inform the complainant and subject of the extension, its duration, and the reasons for which it was requested. Failure to adhere to prescribed timelines will result in automatic referral of the complaint to the next higher echelon commander for investigation and resolution.

*c. Conduct of the investigation.*

(1) *Investigation.*  The purpose of any investigation of unlawful discrimination and harassment is to determine to the maximum extent possible what actually occurred, to assess the validity of allegations made by the complainant, to advise the commander of any leadership or management concerns that might contribute to perceptions of unlawful discrimination, and harassment, poor command climate, and to recommend appropriate corrective actions. The appointing authority is responsible for ensuring the investigation is complete, thorough, and unbiased.

(2) *Initial actions.*  The commander who acts as the appointing authority will provide the investigating officer a copy of orders assigning them as the investigating officer and the initiated DA Form 7279, which identifies the complainants, subjects and lists the allegations to be investigated. The investigating officer will review AR 15–6 and AR 600–20 to review procedures applicable to the conduct of the investigation. The commander may alternatively elect to conduct a commander's inquiry.

(3) *Legal advice.* The investigating officer will meet with the servicing SJA or legal advisor to review how the conduct of the investigation should be conducted under AR 15–6 and AR 600–20. The discussion should include the specific requirements of both regulations, advice on how investigations are conducted, and advice on how to question an interviewee who is suspected of committing a violation of the UCMJ.

(4) *Equal opportunity professional assistance.*  The investigating officer will meet with the MEO professional prior to conducting the investigation. The MEO professional will provide the investigating officer with suggested investigation questions. The investigating officer will address these questions to the complainants, subjects, witnesses, chain of command, and third-party personnel. The MEO professional will ensure the focus of the investigation is placed squarely on assessing the validity of the allegations. The MEO professional will remain available to the investigating officer for consultation and assistance throughout the conduct of the investigation.

(5) *Conduct of interviews.*  The investigating officer will conduct a comprehensive investigation and must attempt to interview every individual who may have firsthand knowledge of the facts surrounding the validity of the allegations. The investigating officer, on the advice of their legal advisor, may seek to interview everyone who may have relevant information concerning the relationship between the complainant and the subject. The investigating officer will interview the subject after interviewing witnesses, so that they will have a complete understanding of the alleged incident. If needed prior to the conclusion of the investigation, the investigating officer should conduct a second interview of the complainant and the subject. The investigating officer may choose to re-interview certain witnesses for clarification of conflicting statements. Should unit policies or procedures be called into question as contributing factors to perceptions of unlawful discrimination or harassment, the investigating officer will interview responsible members of the chain of command.

(6) *Identification of criminal act.*  If, when interviewing any Soldier, including the subject, the investigating officer reasonably suspects that the individual has committed an offense in violation of the UCMJ, the investigating officer must advise the Soldier of their rights under UCMJ, Art. 31. Investigating officers must consult with their servicing judge advocate or legal advisor before giving UCMJ, Art. 31 rights warnings, and must record the suspect's election on DA Form 3881 (Rights Warning Procedure/Waiver Certificate).

(7) *Supporting documents.*  The investigating officer will secure copies of any documents that might substantiate or refute the testimony of the complainant, subject, or named witnesses, chain of command, or third-party personnel. These documents may include copies of unit and personnel records, to include records and rosters of MEO training conducted and attended by the alleged subject. The investigating officer will also procure a copy of the commander's reprisal plan for inclusion in the final report of investigation.

(8) *Unit climate , policies and procedures.* During the course of the investigation, the investigating officer will note concerns or observations of unit policy, procedures, and individual leadership or management techniques that may have a negative effect upon unit climate and contribute to discriminatory or harassing behaviors.

(9) *Investigative findings and recommendations.*  When the investigation is completed, the investigating officer must review the evidence, determine if the investigation adequately addresses allegations, make factual findings about what occurred, and provide recommendations consistent with the findings.

(10) *Equal opportunity review.*  Prior to submission of the report to the legal advisor, the investigating officer and MEO professional will meet and conduct an administrative review the report. The MEO professional will provide the investigating officer a memorandum documenting the review.

(11) *Investigative report.*  Assemble the packet in the following chronological order:

*(a)* DA Form 1574–1 (Report of Proceedings by Investigating Officer).

*(b)* Appointing order.

*(c)* Copy of the DA Form 7279 with attached continuation sheets.

*(d)* List of questions developed with MEO professional.

*(e)* Copy of the completed/initialed commander's reprisal plan.

*(f)* Exhibits (with an index) of statements/synopses of interviews with complainant, subject, named witnesses (with DA Form 3881, if necessary), chain of command, and third-party personnel.

*(g)* Description/assessment of unit policies.

*(h)* Written approval from the appointing authority for any approved extensions.

*(i)* Written explanation of extenuating circumstances that prevented the investigating officer from interviewing any complaints, subjects, named witnesses, chain of command, or third-party personnel.

*(j)* Written review by the MEO professional.

(12) *Standard of proof.* Findings of substantiated complaints will meet the standard of proof of the "preponderance of the evidence" standard. This means that the findings must be supported by a greater weight of evidence than supports a contrary conclusion, that is, evidence that, after considering everything that is presented, points to one particular conclusion as being more credible and probable than any other conclusion. The "weight of the evidence" is not determined by the number of witnesses or volume of exhibits, but by considering all the evidence and evaluating such factors as the witness's demeanor, opportunity for knowledge, information possessed, ability to recall and relate events, and other indications of veracity.

(13) *Legal review.* The investigating officer will submit the completed investigation to the servicing SJA or legal advisor for a determination of legal sufficiency. Once the legal review is complete, the investigating officer will submit the final investigation to the command for final disposition.

*d. Actions by the commander upon receipt of the report of the investigation.* Once the legal review is completed, the commander will decide whether further investigation is necessary or whether to approve all or part of the findings and recommendations.

(1) *Actions to resolve complaints.* A complaint is resolved by action to restore benefits and privileges lost because of unlawful discrimination or harassment. Punitive or administrative actions against a subject do not necessarily change offending behaviors or rectify the situation for the individual complainant or unit. Commanders will take corrective action to preclude recurrence of discriminatory or harassing conduct and address any management deficiencies or other contributing factors that caused the allegations to be raised. Commanders will also look at the causes of why complainants rendered complaints that were not substantiated by the investigating officer and /or commander. Actions taken (or to be taken) by the commander and the chain of command will be annotated on DA Form 7279. Specific actions taken against the subject will not be annotated on the form. This information will be discussed orally with the complainant. The commander will also inform the complainant and the subject of the complaint of their right to appeal and make them aware of timelines and procedures to file that appeal (see para 6–6). The complainant and subject will sign and date the DA Form 7279, Part III, to acknowledge receiving this information. This acknowledgment does not necessarily signify the complainant's or subject's agreement with the findings or actions taken to resolve the complaint. Consistent with the limitations of the Privacy Act and other applicable statutes, the commander will provide both the complainant and subject with a memorandum that summaries the results of the investigation including whether the allegations were substantiated. Information about specific adverse actions taken against an individual is generally not disclosed unless such information is a matter of public record or when otherwise required to be released by statute. Upon request, the complainant should be provided a copy of the investigating officer's report, redacted as necessary to comply with the Privacy Act and other applicable laws and regulations.

*(a) Actions upon substantiated complaint.* A substantiated discrimination or harassment complaint is a complaint that, after the completion of an inquiry or investigation, provides evidence to indicate that the complainant was more likely than not treated differently because of their race, color, sex (including gender identity), national origin, religion, or sexual orientation, hazed, bullied, or other discriminatory harassment. The finding is annotated on the DA Form 7279, the commander must decide what corrective action to take. Corrective action may be administrative or punitive.

1. *Administrative action.* Subjects of substantiated complaint will, as a minimum, undergo counseling by a member of the chain of command. Commanders have the full range of administrative actions available to them to deal with violators of the Army MEO and harassment policies, to include discharge from the Service, bar to reenlistment, adverse performance evaluations and/or specific comments concerning nonsupport of MEO/EEO Programs on evaluation reports, relief for cause, administrative reduction, admonition, reprimand, administrative withholding of privileges, and rehabilitative transfer to another unit. Commanders should determine whether the complainant desires to be transferred to another unit, but they should not cause the complainant to be revictimized by requiring that they be transferred to another unit while leaving the subject in the unit.

2. *Uniform Code of Military Justice.* Violators of Army policies on MEO and harassment, whose conduct violates a punitive article of the UCMJ, may be charged and prosecuted. Nonjudicial punishments (for example, UCMJ, Art. 15) will be handled in accordance with AR 27–10.

*(b) Actions upon an unsubstantiated complaint.* An unsubstantiated complaint is one for which the preponderance of evidence (that is, the greater weight of evidence) does not support and verify that the alleged discrimination or harassment (hazing, bullying, discriminatory harassment) occurred. In this situation, the commander should determine whether the allegations, though unsubstantiated, might be indicative of problems in the unit that require resolution through training, initiatives, or other leadership actions. Should the complaint be found unsubstantiated, the commander will notify the complainant and subject in writing (DA Form 7279). The complainant and subject will sign and date the DA Form 7279 to acknowledge receiving this information. This acknowledgment does not necessarily signify the complainant's or subject's agreement with the actions taken. Commanders will inform complainants and subjects of the availability of a final investigative report and their right to request a copy of the final investigative report, redacted as necessary to comply with the Privacy Act and any other applicable laws and regulations. Freedom of Information Act requests will be processed in accordance with DoDM 5400.07.

*(c) Actions to resolve complaints.* Actions to resolve complaints should focus on changing inappropriate behavior of offending personnel and avoid targeting the complainant. The complainant's assignment, job, and/or status should not be affected unless they request such a remedy. The chain of command will administer such a remedy only after weighing the impact on readiness on the Soldier and unit. Ultimately, the commander will eliminate underlying causes of all complaints. More members of the unit, other than complainant and subject, are affected by complaints, especially those that go unresolved.

(2) *Feedback.* The commander will provide written feedback to the complainant and the subject on the status of the investigation. Feedback will be provided every 14 calendar days (next MUTA–4 and every MUTA–4 thereafter for USAR) until actions to resolve the complaint are taken (DA Form 7279). This responsibility will not be delegated. Feedback should be consistent with the limitations of the Privacy Act and the FOIA. Commanders will inform the servicing MEO professional of the provisions of feedback so it can be entered in MEO database.

*e. Appeals process.* If the complainant or subject perceives the investigation failed to reveal all relevant facts to substantiate the allegations, or that the actions taken by the command on their behalf were insufficient to resolve the complaint both the complainant and the subject have the right to submit an appeal. The complainant may not appeal the actions taken against the subject if any were taken. The first appeal level is the first commander in the chain of command with SPCMCA. When complaint is processed at the SPCMCA (brigade level) the appeal will be processed with the first commander in the chain of command with GCMCA. The second and final appeal will be forwarded to the ACOM, ASCC, or DRU commander with GCMCA. If the first level appeal was processed at the ACOM, ASCC, DRU level then the second and final appeal will be forwarded to the Department of the Army, Assistant Secretary of the Army (ASA), Manpower and Reserves Affairs (M&RA) by the ACOM, ASCC, or DRU commander. The ASA M&RA or other designated official will decide the final appeal based on the written record and any written arguments submitted with the appeal. The final appeal authority may sustain or overrule the finding(s) or remand the matter for further fact finding. Geographically remote units, field operating agencies, and various other organizations (including tenant units on the installation) will promulgate MOUs between the Senior Commander and their units. These documents will serve to provide the necessary guidance to unit personnel for the courses of action to be taken with appeals. MEO and harassment appeals that may leave the Army chain of command (for other Services) will be forwarded to the DCS, G–1 with appellate authority to ASA M&RA with coordination HQDA MEO Policy Branch.

(1) The first and second appeal request must be presented within 7 calendar days (next MUTA–4 for USAR) following notification of the results of investigation and acknowledgment of the actions of the command to resolve the complaint or the results of the first appeal. The complainant or subject must provide a brief statement that identifies the basis of the appeal. This will be done in writing on the DA Form 7279 and will be returned to the commander in the chain of command who either conducted the investigation or appointed the investigating officer or the commander who conducted the first appeal.

(2) Once the first or second appeal is initiated by the complainant /or and subject, the commander has 3 calendar days (same for USAR) to refer the appeal to the appellate authority.

(3) The first and second appellate authorities have 14 calendar days (two MUTA (60 days)–4 for USAR) to review the case, act on the appeal and provide written feedback, consistent with Privacy Act and FOIA limitations, to the complainant or subject on the results of the appeal. The final appellate authority decision is final.

(4) If a Soldier PCSs and files a complaint, the gaining unit will intake the complaint and transfer the complaint to the losing unit for processing. MEO professionals from both commands will work closely to ensure a complaint is handled in accordance with Army policy.

*f. Follow-up assessment.* The MEO professional will conduct a follow-up assessment of all formal discrimination complaints. The follow-up assessment will be completed for both substantiated and unsubstantiated complaints, within 30 calendar days (next MUTA–4 for USAR) following the final decision rendered on the complaint. The purpose of the assessment is to measure the effectiveness of the actions taken and to detect and deter any acts or threats of reprisal. The MEO professional will also assess the complainant's satisfaction with the procedures followed in the complaint process to include timeliness, staff responsiveness and helpfulness, resolution of the complaint, and ensure reprisal did not occur. The findings of this assessment will be annotated on DA Form 7279–1 and maintained by the MEO professional. The MEO professional will present findings and recommendations to the commander for further consideration/action within 5 calendar days (next MUTA–for USAR). After the commander reviews the MEO professional findings and recommendations, the commander will determine within 5 calendar days (next MUTA–for USAR) whether any further actions are required. The DA Form 7279–1 is attached to the original complaint file and entered into MEO database.

*g. Documentation/reporting of formal complaints.*

(1)  After the complainant's case is closed, the MEO professional will file the entire complaint packet by the MEO database case number. The MEO professional will update and close out the complaint in MEO database.

(2)  The MEO professional will retains the complaint file for 15 years from the date of the commander signing the DA Form 7279–1, using the Army Record Information Management System.

(3)  In addition to the completed DA Form 7279 and DA Form 7279–1, the MEO professional will retain the following information (using the MFR format) for each case:

*(a)*  Complete report of investigation to include written review by MEO professional and servicing legal advisor.

*(b)*  The status or results of any judicial action, nonjudicial punishment, or other action taken to resolve the case.

(4)  The commander processing the complaint involving Reserve and/or ARNG Soldiers will send an information copy of the information in paragraph 6–6*i*, to the Army Reserve Headquarters' MEO Directorate and/or the NGB's MEO within 30 days of the final action taken by the commander.

*h. Actions against Soldiers submitting false complaints.* Soldiers who knowingly submit a false MEO complaint (a complaint containing information or allegations that the complainant knew to be false) may be punished under the UCMJ.

*i. Complaint procedures for Army Reserve Soldiers serving in the Individual Ready Reserve.*

(1)  *Complaint filed during active duty tour.* Complaint procedures will remain the same as for active duty personnel. RA and USAR commanders, upon receiving a complaint from members of the IRR or individual mobilization augmentee, from Soldiers performing active duty for special work or temporary tour of active duty, or from any USAR Soldier who is not a member of a TPU, will make every attempt to resolve the complaint prior to the completion of the Soldier's active duty tour. Commanders will notify their command MEO professional for assistance and documentation into MEO database.

*(a) Timelines.* Should the complaint be filed but not resolved prior to the Soldier's release from active duty, the timelines will be modified. The RA or USAR commander will have 30 calendar days from the filing of the complaint to notify the complainant of the results of the investigation/actions taken to resolve the complaint.

*(b) Appeals.* The complainant and subject of the complaint will have 30 calendar days from notification of the results of the investigation to file a first level appeal. The complainant and subject of the complaint will have 30 calendar days from notification of the results for the first level appeal to file a second and final appeal. Appeals filed more than 30 calendar days after notifications must be accompanied by a written explanation of the reasons for delay. The commander has the discretion to consider an appeal based on its merits.

*(c) Final notification.* The first and second final appeal notifications of the commander's decision will be provided to the complainant and subject of the complaint with information copies provided to the next higher headquarters and the Army Reserve Headquarters MEO Directorate within 30 calendar days of the receipt of the appeals. The final appeal GCMCA may sustain or overrule the finding(s) or remand the matter for further fact finding.

(2)  *Complaint filed subsequent to release from active duty.* In the event the complaint is filed after the active duty tour has ended, the complainant and subjects will file a sworn complaint on DA Form 7279 to the active duty tour commander. Upon the receipt of DA Form 7279, the active duty tour commander will forward the complaint to the appropriate commander of the subject of the complaint active duty unit for investigation.

*(a) Timelines.* That commander will have 30 calendar days from date of receipt of the complaint to conduct an investigation and to provide feedback to the complainant and subject. (Extensions, not to exceed an additional 45 calendar days (two MUTA (60 days)–4 for USAR), may be granted by higher echelon commander.)

*(b) Appeals.* Complainant and subject of the complaint will have 30 calendar days from notification of the results of investigation/to appeal/decline appeal. Appeals filed more than 30 calendar days after notification must be accompanied by a written explanation of the reasons for delay. The commander has the discretion to consider an appeal based on its merits.

*(c) Final decision.* Within 30 calendar days of receipt of appeal, the commander will provide notification of final decision to the complainant and subject of the complaint, next higher headquarters, and Army Reserve Headquarters' MEO Directorate.

*j. Military Equal Opportunity and Harassment 24 Hour Hotline.*

(1) *Purpose.* To define roles and responsibilities of the MEO and Harassment local hotlines. The MEO and Harassment local hotlines provides 24/7 information on MEO and Harassment policies and procedures on how and where to file complaints, the behaviors that constitute discrimination and harassment, and information about the DoD Safe Helpline for sexual assault and the SHARP ACOM, ASCC, DRU and Senior Commander hotline phone numbers. The hotline is an additional avenue for Soldiers to   anonymously report incidents of MEO and Harassment.

(2) *Policy.*

*(a) Requirements for 24/7 Military Equal Opportunity and Harassment local hotlines, per DoDI 1020.03 and DoDD 13502.*

1. Senior Commanders will have an installation 24/7 MEO and harassment (hazing, bullying, discriminatory harassment) hotline.

2. Each Senior Commander will have a local 24/7 MEO and Harassment response hotline phone number posted on installation and commander's websites and bulletin boards to ensure immediate MEO and Harassment assistance.

3. ACOM, ASCC, DRU, and USAR commands will contact the ASA M&RA EIA MEO Program office for revisions required to the ACOM, ASCC, DRU and USAR command or installation 24/7 hotline phone information posted on the HQDA MEO website.

4. All commanders will coordinate with their appropriate website administrators to ensure that their official Army websites comply. Commands and installations are responsible for updating their command pages through coordination with Chief Information Officer/G–6 or appropriate website administrator.

*(b) ACOM, ASCC, DRU, USAR, and Senior Commander will—*

1. Publish policy governing procedures required to ensure accuracy of installation and subordinate websites and maintaining accurate subordinate 24/7 hotline phone numbers.

2. Ensure ACOM. ASCC, DRU, USAR MEO Program Manager (PMs) advises the DASA M&RA EIA MEO Program office within 1 business day when revisions are required to the command and installation 24/7 MEO and Harassment hotline phone numbers.

3. Commanders and MEO professionals will include maintaining accurate MEO and Harassment hotline phone number information as an agenda item for annual SAVs.

*(c) Roles and responsibilities for answering Military Equal Opportunity and Harassment hotlines.*

1. The installation 24/7 MEO and Harassment hotline response phone calls must only be answered by MEO Professionals (not EOLs) who are currently serving in authorized MEO tour of duty billets; when calls cannot be answered immediately the MEO professional will respond within 24 hours. The senior commander will be responsible for ensuring that 24/7 MEO and Harassment hotline responders have the current listing of subordinate unit information so that they can coordinate as required. Subordinate level 24/7 phone information will not, under any circumstances, be posted on official Army websites.

2. Commands will ensure written procedures are in place for 24/7 MEO and Harassment hotlines; and ensure MEO professionals are trained on procedures.

3. The installation 24/7 MEO and Harassment hotline telephone number must have at least the minimum voicemail greeting required. The greeting must also advises callers the live crisis support is available by calling the DoD Safe Helpline at 1–877–995–5247 for sexual assault and the SHARP hotline for sexual harassment. For example, "Hello, this is (name) (MEO professional) at (organization identified). Please leave me a message with your name and phone number and I will return your call within 24 hours. For immediate help, for sexual assault contact the DoD Safe Helpline at 1–877– 995–5247 or for sexual harassment contact the SHARP hotline at (local number)."

4. When responding to MEO and Harassment phone calls, the responder will identify themselves, their role, and location such as, "Hello, this is (name) (MEO professional) at (organization identified). How may I help you?"

5. Describe the quality control requirements.

a) ACOM, ASCC, DRU, and USAR commanders will conduct quarterly QC test calls to a minimum of 20 percent of the total inventory of 24/7 MEO and Harassment hotline phone numbers within their respective commands.

b) ACOM, ASCC, DRU, and USAR commanders will submit a quarterly report of command/installation test calls made to the MEO and Harassment 24/7 hotline, to include installation, organization and telephone numbers to ASA

M&RA EIA MEO Program office no later than the 15th day following the end of the quarter. This includes making test calls and ensuring accuracy of all MEO and Harassment hotline phone numbers with the ACOM, ASCC, DRU, and USAR footprint.

c) The HQDA MEO Program Staff will provide a QC report template to ACOMs, ASCCs, DRUs, and USARs. Information received from ACOMs, ASCCs, or DRUs not using the template, or that are incomplete, will be sent back to the command for corrections. Test call population will be established and documented on each quarter's report.

d) The DA MEO Program will compile information submitted by the ACOMs, ASCCs, DRUs, and USARs into a memorandum report with support enclosures and provide the report to the DASA, M&RA, EIA no later than the 25th day following the end of the quarter. If the 25th is a holiday or weekend, the report and support enclosures are due the next business day.

6. Responsibility. The DASA M&RA EIA MEO Program office will—

a) Independently conduct quarterly QC checks of the command and installation 24/7 MEO and Harassment hotline response phone numbers posted on the HQDA MEO website and coordinate findings with ACOMs, ASCCs, DRUs, and USAR PMs. Changes to the installation 24/7 MEO and Harassment hotline phone numbers will only be made upon concurrence from the ACOM, ASCC, or DRU, or USAR.

b) Notify the DASA M&RA EIA under any of the following conditions for 2 consecutive quarters: 1) an MEO and Harassment incorrect hotline phone number has not been reconciled by the command/installation, or 2) the command does not submit a quarterly QC report as prescribed in this policy. The DASA M&RA EIA will contact the senior responsible GO directly.

c) Consolidate the results of the HQDA MEO Program, ACOMs, ASCCs, DRUs, and USARs' QC testing of MEO and Harassment hotline phone numbers and report the results to the ASA M&RA quarterly, with negative findings, only. If the hotlines are answered or calls returned within the appropriate time frame, the DASA M&RA EIA and ASA M&RA will not be notified.

*k. Victim Support Program.*

(1) MEO professionals must ensure complainants are provided adequate protection and care, and informed about available support resources, including—

*(a)* Ensure complainants are provided adequate protection and care, and informed about available support resources, including Emergency medical and support services.

*(b)* Public and private programs that are available to provide counseling, treatment, and other support.

*(c)* Organizations and entities on and off base that provide victim and witness services and support.

(2) Complaints in a Joint Service environment.

*(a)* MEO professionals must ensure that discrimination and harassment complaints are processed through the command or Service that has administrative control, or disciplinary authority, or a combination thereof, over the alleged offender.

*(b)* Ensure that Joint commanders forward the complaint, with a detailed description of the facts and circumstances, to the next superior officer in the alleged offender's chain of command who is authorized to convene a general court-martial.

*(c)* Require the alleged offender's commander or supervisor to provide updates, as appropriate, to the complainant's commander or supervisor, upon receipt of complaint through final disposition.

*(d)* Ensure, upon completion and final disposition of the complaint, that the complainant's commander and the offender's commander are informed of the final disposition for proper tracking, documentation, file maintenance, and records management purposes.

*(e)* Respond to incidents of harassment and comply with investigation timelines and notification requirements established in this issuance.

*l.  Complaints in a Joint Service environment.*

(1) MEO professionals must ensure that discrimination and harassment complaints are processed through the command or Service that has administrative control, or disciplinary authority, or a combination thereof, over the subject offender.

(2) Ensure that Joint commanders forward the complaint, with a detailed description of the facts and circumstances, to the next superior officer in the alleged subject chain of command who is authorized to convene a general court-martial.

(3) Require the alleged subject commander or supervisor to provide updates, as appropriate, to the complainant's commander or supervisor, upon receipt of complaint through final disposition.

(4) Ensure, upon completion and final disposition of the complaint, that the complainant's commander and the subject commander are informed of the final disposition for proper tracking, documentation, file maintenance, and records management purposes.

(5)  Respond to incidents of discrimination and harassment and comply with investigation timelines and notification requirements established in this issuance.

## 6–7.  Retaliation Prevention and Response

*a.*  The MEO professional, will inform the commander if the Soldier wishes to pursue action relating to reported conduct that does not fall under the jurisdiction of the IG or Military Criminal Investigation Organization (MCIO). Allegations of retaliation or reprisal fall within the jurisdiction of the IG in accordance with 10 USC 1034, and as such, an investigative determination will be made by the IG. Depending on the facts of the case, ostracism, maltreatment or other retaliatory behavior may fall within the jurisdiction of the IG if, for example, it is determined that they are inextricably linked to restriction or reprisal.

*b.*  The commander will then decide whether to refer the report for investigation by law enforcement or seek whether to resolve it through other appropriate investigative means (for example, AR 15–6 investigation or through coordination with a Special Victims' Counsel (SVC) or a military legal assistance attorney, if the victim is represented by one).

*c.*  When referred to a command for investigation, an individual independent of the originating unit or organization of the reported retaliation will investigate the retaliation reports referred to the command.

*d.*  The chain of command will ensure that the MEO professional and Soldier remain informed throughout the process.

*e.*  The MEO professional will work with the Soldier, making available alternative means for the Soldier to resolve the retaliation.

*f.*  Legal assistance personnel are available to help the Soldier in a variety of ways, such as communicating with the reported retaliator verbally or in writing to address the Soldiers concerns, requesting intervention from a coworker, utilizing the Soldier's chain of command, or other means of action.

*g.*  Wherever appropriate and desired, MEO professional may assist with coordinating resolution at the lowest appropriate level.

*h.*  The MEO professional may serve as a resource and coordinate with command, legal assistance attorneys or SJA to address Soldiers questions.

*i.*  The MEO professional will notify the appropriate level of command of the retaliation report as soon as possible. If the retaliation report is against the immediate commander or first-line supervisor, then the next level of command will be notified and assume responsibility for the case.

*j.*  The MEO professional will make every effort to provide updates to commanders whose personnel are involved in a retaliation report and/or retaliation investigation.

*k.*  The commander(s) of the Soldier(s) or other Soldiers who is a subject of a retaliation report, will provide in writing a case status and all disposition data, to include any administrative or judicial action taken, stemming from a retaliation investigation to the MEO professional. If the MEO professional has concerns about violating privileged communications, the MEO professional will consult with the servicing SJA office prior to notifying command.

*l.*  Soldiers who report retaliation associated with filing a harassment complaint, or being a uniformed witness, bystander, or first responder related to the harassment complaint, will be afforded the opportunity to communicate with a GO in their chain of command regarding career-related impacts and administrative separation actions they perceive to be associated with the complaint or involvement in the incident. MEO professionals will notify Soldier complainants of harassment as well as uniformed witnesses, bystanders, and first responders, of this policy provision.

## 6–8.  Military equal opportunity definitions
See glossary, section II (terms).

## 6–9.  Racial and ethnic categories
Refer to DoDD 1350.2 for race or population group and ethnic group reporting codes.

## 6–10.  Military Equal Opportunity Program and Harassment Prevention and Response Program responsibilities
Commanders, supervisors, and managers at all levels are responsible for preventing and appropriately responding to incidents of discrimination. Commanders are responsible for the execution of the MEO Program, The Army's Harassment Prevention and Response Program, and the climate in their organizations.

*a.*  The ASA (M&RA) will—

(1)  Develop and execute Army MEO and harassment prevention and response policies and act on behalf of the Secretary in all MEO and Harassment Prevention and response policies and compliance matters.

(2) Ensure all personnel have MEO participate in occupational specialties and duty locations in accordance with applicable law and DoD policy.

(3) Provide leadership opportunities and equitable assignment processes for all personnel.

*b.* The Deputy Assistant Secretary of the Army (DASA), Equity and Inclusion Agency (E&IA) will—

(1) Manage the Army's MEO Program and The Army's Harassment Prevention and Response Program.

(2) Ensure adequate resources and training are available to effectively execute the Army MEO Program and The Army's Harassment Prevention and Response Program.

(3) Develop Army wide policies, plans, and initiatives pertaining to the Army MEO Program and The Army's Harassment Prevention and Response Program.

(4) Establish selection criteria, in coordination with the DCS, G–1 and CG, HRC for Army and Army Reserve personnel to attend the Defense Equal Opportunity Management Institute (DEOMI).

(5) Serve as the Army's member of the DEOMI Board of Advisors.

*c.* The Inspector General (TIG) will process and investigate all MEO and harassment complaints filed against a promotable COL, an active or retired GO, IGs of any component, members of the SES, or executive schedule personnel. Commanders and field IGs receiving such complaints will report them to the IG within 2 working days of receipt when practical.

*d.* The Deputy Assistant Secretary of the Army (DASA), Equity and Inclusion Agency (E&IA), through the Chief, MEO Policy will—

(1) Assist the DASA (E&IA) in executing SECARMY and ASA (M&RA) MEO Program and The Army's Harassment Prevention and Response Program responsibilities.

(2) Develop and disseminate Armywide policies for MEO Program and The Army's Harassment Prevention and Response Program and compliance requirements.

(3) Provide functional expertise and policy guidance, clarification, and direction to ACOM, ASCC, and DRU MEO professionals.

(4) Serve as the subject matter expert and liaison regarding Army MEO Program and The Army's Harassment Prevention and Response Program.

(5) Respond to MEO and harassment-related congressional and high-level inquiries.

(6) Ensure all MEO professionals maintain and update the MEO database.

(7) Ensure MEO data is complete, accurate, and up-to-date in support of headquarters Army reporting requirements.

(8) Analyze trend data and identify areas of concern with respect to command climate for Army senior leadership.

(9) Assess the Army MEO Program and The Army's Harassment Prevention and Response Program by reviewing input from ACOM, ASCC, or DRU as recorded in the MEO database. Provide oversight of the MEO and harassment complaint process, evaluate its effectiveness, and take corrective action or initiate program improvements, as needed.

(10) Manage programming and implementation of the Army's MEO Program and The Army's Harassment Prevention and Response Program budget.

(11) Communicate with Army, DoD, and other Federal agencies.

(12) Serve as the Army's MEO Program and The Army's Harassment Prevention and Response Program functional representative to the DEOMI.

(13) Update and maintain forms for documenting formal complaint process, to include pre-decision updates and post-decision follow-ups in accordance with the Privacy Act of 1974.

*e.* The Chief of the Army Reserves (CAR) will—

(1) Develop, monitor, and evaluate the implementation of Army Reserve's MEO Program and The Army's Harassment Prevention and Response Program policies and programs.

(2) Establish staff positions with the Army Reserve and make resources available to adequately carry out MEO Program and The Army's Harassment Prevention and Response Program   requirements.

(3) Select Reserve personnel to attend the DEOMI.

(4) Establish the Army's MEO Program and The Army's Harassment Prevention and Response Program training for units, organization, and agencies and PME courses consistent with HQDA policy and command needs.

*f.* The CG, U.S. Army Forces Command (FORSCOM) and CG, U.S. Army Pacific are responsible for the oversight and evaluation of subordinate direct reporting command MEO Program and The Army's Harassment Prevention and Response Program.

*g.* The CG, Training and Doctrine Command (TRADOC) will—

(1) Be responsible for the MEO and Harassment Prevention and Response Program Training Proponent office.

(2) Develop MEO and Harassment Prevention and Response doctrine and training materials.

(3)  Develop MEO and Harassment Prevention and Response instruction and associated training materials for use in the accession/initial entry training base, in PME courses, and throughout the Army. Training will be developed in accordance with AR 350–1, will be interactive, discussion based, and evaluated via tests or examinations.

(4)  Conduct required MEO and Harassment Prevention and Response education and training in TRADOC Service schools and training courses.

(5)  Evaluate the effectiveness of required MEO and Harassment Prevention and Response education and training in TRADOC Service schools and training courses.

(6)  Provide MEO and Harassment Prevention and Response instructional materials to schools not under the jurisdiction of TRADOC. These schools include, but are not limited to: The Judge Advocate General's Legal Center and School, AMEDD Center and School, IG Course, the USMA, and the U.S. Army War College.

(7)  Develop the program of instruction, evaluate, and validate the Army Service specific training for Army personnel attending the MEO Advisors Course at DEOMI.

(8)  Maintain an official Army MEO training website with training materials, resources, and tools.

(9)  Act as the proponent for TC 26–6.

*h.*  The CG, Human Resources Command (HRC) will—

(1)  Maintain statistical data concerning racial and ethnic designation category and sex for the management of personnel systems.

(2)  Determine training seats at DEOMI for the annual Structure Manning and Decision Review for the POM years.

(3)  Control DEOMI military student training allocations for the Army.

(4)  Assign active duty and AGR military personnel to meet Army MEO professional requirements. Selection for MEO duty represents an investment in these Soldiers that will continue to benefit the Army long after their EO duty is complete.

*i.*  Commanders (or equivalent) at all levels will—

(1)  Promote a positive command climate through personal example and command emphasis.

(2)  Establish effective MEO and Harassment Prevention and Response objectives and ensure applied in every command policy, action, and program at all levels of command.

(3)  Publish and enforce MEO and Harassment Prevention and Response policy letters which addresses the following: prevention of discrimination and harassment, resolution of complaints, prohibited reprisal, retaliation, and harassment (in accordance with para 4–19).

(4)  Ensure that MEO and harassment complaints are promptly investigated in a fair, impartial manner, and are appropriately resolved without fear of reprisal, intimidation, or retaliation. See paragraph 6–6 for procedures and timelines for processing MEO and harassment complaints.

(5)  Conduct complaint resolution assessments, using DA Form 7279–1, with the complainant(s). Make discrimination and harassment prevention a special interest item in the command's inspection program. Ensure complainants and subjects are provided feedback information about the status and outcome of the complaint (for example, who is investigating, projected completion date, whether the allegations were substantiated, and any commander's actions taken). Inform complainants and subjects of the availability of a final investigative report and their right to request a copy of the final investigative report, redacted as necessary to comply with the Privacy Act and any other applicable laws and regulations. Freedom of Information Act requests will be processed in accordance with DoDM 5400.07.

(6)  Assess the organizational climate and at the outset and periodically during command tenure (see app E).

(7)  Ensure appropriate confidentiality measures are in place for climate assessment.

(8)  Prevent discrimination in administrative and disciplinary proceedings.

(9)  Provide consistent and fair career actions across all grades.

(10)  Assign jobs, education opportunities, and special programs based on merit, performance, and potential. Provide awards and recognition based on the same criteria.

(11)  Enter mandatory performance evaluation data in accordance with AR 623–3 and DA Pam 623–3.

(12)  Provide adequate facilities, logistical support, and resources to effectively manage and operate the MEO Program effectively. EO facilities must be easily accessible, present a welcoming atmosphere, and ensure privacy.

(13)  Provide annual MEO and Harassment Prevention and Response training in accordance with appendix D and AR 350–1 using the MEO training support package (TSP) published by the MEO training proponent.

(14)  Assign MEO professionals and EOLs to deploy with the unit.

(15)  Report all formal, informal, and anonymous MEO and harassment complaints alleged on discrimination based on race, color, sex (to include gender identity), national origin, religion or sexual orientation and harassment involving hazing, bullying, and other discriminatory harassment  to MEO professionals to be entered into MEO database.

*j.*  Commanders of ACOMs, ASCCs, and DRUs, corps, divisions, and brigades (or equivalent), will—

(1)  Assign MEO professionals to the commander's special staff.

(2)  Rate or senior rate the MEO professional and ensure evaluations and record briefs will reflect the principal MEO duty title.

(3)  Ensure manning documents accurately reflect the correct duty position title and skill requirements.

(4)  Ensure all MEO professionals (at all levels) are in direct support of the MEO Program. They will not be assigned duties that may subsequently disqualify them from making or assisting in impartial inquiries or investigations within their sphere of activity, such as but not limited to: SHARP PMs, sexual assault response coordinators (SARCs), Victim Advocates (VAs), or acting CSM/1SG/Platoon SGTs. The restrictions listed are intended to preclude conflicts of interest, prevent the prejudice of impartiality, and protect the integrity of the MEO Program. MEO professionals do not do anything that may jeopardize the distinction between being the extension of the commander and a fair and impartial fact-finder. The restrictions in this section are not intended to exclude MEO professionals from Performing management functions normal for officers and noncommissioned officers, such as participating in the budget process and contributing to goal setting for the command.

(5)  Allocate and provide personnel and funding to resource MEO Program and The Army's Harassment Prevention and Response Program requirements, Army Heritage Month activities, continuing education of command MEO professionals, local training for EOLs, and staff assistance visits (SAVs).

(6)  Ensure MEO and EEO Programs complement each other.

(7)  Execute senior leader MEO and Harassment Prevention and Response training for command selectees, GOs, and SES members.

(8)  Monitor and assess the execution of MEO Program and The Army's Harassment Prevention and Response Program policies at all levels within their commands/areas of responsibility through annual SAVs.

(9)  Involve public affairs personnel at every level of command in planning and sharing command information on MEO Program and The Army's Harassment Prevention and Response Program initiatives.

(10)  Ensure MEO database is updated no less than on a quarterly basis (prior to 30 days after each fiscal quarter) in preparation for HQDA data pull.

(11)  ASCC, ACOM, and DRU commanders will allocate adequate records holding area space for long-term storage of their respective units' closed MEO and harassment complaint record files. Maintain files for 15 years from case closure date.

(12)  Conduct Army Heritage Month activities in accordance with appendix D (Commanders of ACOMs, ASCCs, DRUs, and senior commanders (or equivalent) only).

*(a)*  Army Heritage Month activities are conducted to recognize diversity, promote cohesion, teamwork, and Esprit de Corps with in the total Army force. These activities foster a culture of equity and inclusion, and enhance heritage awareness and understanding. These activities should also promote understanding, teamwork, harmony, pride, and esprit.

*(b)*  Commanders will incorporate a statement in their MEO policy that states all personnel desiring to participate in the Army Heritage Month Activities will be given a reasonable opportunity to do so.

(13)  Execute and resource (funds, MEO professionals and facilities) the EO Leader Course.

*k.*  Battalion and company (or equivalent) commanders, will—

(1)  Appoint two EOLs (primary and alternate) in their units in the rank of SGT (P) through CPT.

(2)  Ensure the EOLs attend the Equal Opportunity Leaders Course (EOLC) prior to performing their duties.

*l.*  MEO professionals (EO PMs, EO SGMs, EO advisors and EO specialists (RA/USAR)) at all levels will—

(1)  Provide senior leaders with information and guidance on MEO Program and Harassment Prevention and Response Program, policies, areas of concern, and processes. Serve as command's subject matter expert for policies and procedures relating to both.

(2)  Ensure both MEO Programs and Harassment Prevention and Response Program comply with Army and DoD policies, and applicable law.

(3)  Receive, process, and/or respond to complaints.

(4)  Develop, execute, and manage a budget to ensure that the command's MEO Program and The Army's Harassment Prevention and Response Program are properly resourced.

(5)  Coordinate with HQDA MEO office on high visibility (national news worthy) complaints (ACOM, ASCC, or DRU PM's only). Subordinate commands will coordinate these types of complaints with ACOM, ASCC, or DRU MEO PM's.

(6)  Provide advice to subordinate command MEO offices upon resolution of the complaints or other issues.

(7)  Communicate with other agencies having collateral responsibilities and interests, in an effort to maximize limited fiscal and personnel resources while providing the best possible service. These offices may include, but not limited to, EEO; Public Affairs Office (PAO); MP; USACIDC; SJA; Chaplain; IG; and off-base local organizations.

(8)  Maintain, where appropriate, informal liaison with community organizations fostering civil rights. If the MEO professional considers becoming a member of such organizations in their private capacity, they must coordinate with the servicing legal advisor to preclude possible conflicts of interest.

(9)  Participate as a member of the Community Health Promotion Council.

(10)  Assist commanders with the following MEO and Harassment Prevention and Response training and briefings, at a minimum:

*(a)* Unit level common mandatory training.

*(b)* Pre-command course.

*(c)* Plan and assist with conducting executive seminars for senior leadership.

*(d)* In-processing of Soldiers.

(11)  Evaluate the effectiveness of training.

(12)  Register in the MEO database within the first 14 days (RA), or two multiple unit training assemblies (MU-TAs)–4 (USAR) of arrival to the unit.

(13)  Manage and maintain MEO data for their respective command levels and prepare, input, and review MEO data in preparation for quarterly HQDA data pull.

(14)  Continually assess the climate through CCAs, using surveys, interviews, focus groups, records reviews, observations, and SAVs.

(15)  Conduct quarterly MEO professional development training for all MEO professionals and EOLs assigned to their command/area of responsibility.

(16)  Establish and maintain effective channels of communication with MEO professionals, EOLs, and EEO professionals.

(17)  Analyze trend data, identify problem areas, and recommend solutions for command senior leadership at a minimum on a quarterly basis.

(18)  Assist commanders with Army Heritage Month activities (ACOM, ASCC, DRU, and senior commander MEO Professionals only).

(19)  Assess and evaluate the program compliance in accordance with this regulation by conducting onsite SAVs.

(20)  Assist commanders with the CCAs, and development of responsive action plans which mitigate or eliminate areas of concern identified with the CCAs.

(21)  Manage and monitor MEO manning structure and project fill for all subordinate commands (ACOM, ASCC, and DRU MEO PMs only).

(22)  Act as the appellate authority action office for MEO and harassment complaints; and provide complaint processing guidance to subordinate MEO professional, as required.

(23)  Develop MEO and Harassment Prevention and Response command policy and guidance in accordance with this regulation. .

(24)  Coordinate command participation in HQDA Diversity Outreach Awards Program.

(25)  Ensure all assigned MEO professionals are registered and inputting data into the MEO database (ACOM, ASCC, and DRU MEO PMs only).

(26)  Conduct commander's in-brief within the first 30 days after arrival.

(27)  Inform and continue to provide updates through EO PM to HQDA MEO policy office of MEO and harassment-related incidents that may result in media coverage or have a congressional interest.

(28)  Include in the responses to the M&RA, Equity and Inclusion, MEO Program Office, all data requests.

*m.* EOL (battalion and company level, or equivalent), will—

(1)  Maintain a unit level MEO and Harassment Prevention and Response bulletin board.

(2)  Establish and maintain liaison with other EOLs and supporting MEO professional.

(3)  Assist MEO professionals with planning and executing the Army Heritage Month activities.

(4)  Refer all informal and formal complainants to an MEO professional.

# Chapter 7
# Sexual Harassment/Assault Response and Prevention Program

## 7–1.  Scope

The Deputy Chief of Staff, G–1 (DAPE–AR) Army Resilience Directorate (ARD) executes the Army Sexual Harassment/Assault Response and Prevention (SHARP) program under the supervision of the Assistant Secretary of the Army, Manpower and Reserve Affairs (ASA M&RA), 300 Army Pentagon, Washington, DC 20310–0300.

**7–2.  Policy**
The SHARP Program implements DoD and Army policy regarding sexual harassment and sexual assault. The Army does not tolerate or condone sexual harassment, sexual assault, or associated retaliatory behaviors. The SHARP Program enhances Army readiness by fostering a culture free of sexual harassment and sexual assault through prevention, education and training, response capability, victim support, reporting procedures, and appropriate accountability that enhances the safety, well-being, readiness. This regulation implements DoDD 1350.2, DoDD 6495.01, DoDI 1020.03, DoDI 5505.18, DoDI 6400.07, DoDI 6495.02, and DoDI 6495.03.

**7–3.  Purpose**
Commanders are responsible for the success of the SHARP Program, including prevention, annual training activities, compliance with required response actions when acts of sexual harassment or sexual assault are reported, and victim support. Commanders are responsible for creating climates that encourage individuals to intervene to correct misconduct and behavior that could lead to sexual harassment and sexual assault at the earliest opportunity and to trust their chain of command to take appropriate action when reports of sexual harassment and sexual assault are made. The SHARP Program assists commanders at all levels in executing their SHARP responsibilities to prevent and respond to sexual harassment, sexual assault, and associated retaliatory behaviors. SHARP PMs, SARCs, SHARP victim advocates (SHARP VAs), victim representatives (VRs), and SHARP Training Instructors support the commander with training and tracking requirements, program management, sexual assault, sexual harassment, and associated retaliatory behavior response, and case coordination. .

**7–4.  Program eligibility**
  *a.*  The SHARP Program provides assistance to—
  (1)  Soldiers and their dependent Family members who are 18 years and older.
  *(a)*  A Family member does not lose their right to file a restricted report if they are also a DA Civilian.
  *(b)*  A Soldier may file a sexual harassment complaint on behalf of a Family member.
  (2)  Soldiers who report being sexually assaulted prior to entry into the Army. Reports of prior-to-military service sexual assault will be handled in accordance with the procedures for restricted and unrestricted reports outlined in this regulation and applicable DoD policy, as appropriate, based on the type of report made (restricted or unrestricted).
  (3)  ARNG and USAR Soldiers who are sexually assaulted when performing active service, as defined in 10 USC 101(d) and inactive duty training. If reporting a sexual assault that occurred prior to or while not performing active service or inactive training, ARNG and USAR members will be eligible to receive timely access to SHARP advocacy services from a SARC and SHARP VA or VR, and the appropriate nonmedical referrals. ARNG and USAR members also have access to a Special Victims' Counsel and are eligible to file a restricted or unrestricted report. USAR members can report at any time, and do not have to wait to start active service or be in inactive status to file their report.
  (4)  The following nonmilitary individuals who experience sexual assault are only eligible for limited emergency medical care services at a MTF and to make an unrestricted report. The listed nonmilitary individuals will also be offered limited SHARP services, defined as assistance from the SARC and a SHARP VA or VR while undergoing emergency care.
  *(a)*  DA Civilians and their Family members 18 years of age and older when they are stationed or performing duties OCONUS and eligible for treatment in the MTF at military installations or facilities OCONUS. However, SHARP professionals can assist all DA Civilians with identifying appropriate civilian sexual assault resources.
  *(b)*  U.S. citizen DoD contractor personnel when they are authorized to accompany the Armed Forces in OCONUS contingency operations and their U.S. citizen employees.
  *(c)*  All victims who contact SHARP professionals for assistance, regardless of their military status, will be given all necessary assistance, support, and access to resources permitted by law and policy.
  *b.*  This policy does not apply to victims of sexual assault perpetrated by a spouse or intimate partner as defined in DoDI 6400.06 or Family members under the age of 18 who are sexually assaulted. The Family Advocacy Program, as described in DoDM 6400.01 Volumes 1–4 and AR 608–18, provides the full range of services to those individuals. When sexual assault or sexual harassment occurs as a result of domestic abuse or involves child abuse, SHARP professionals will refer the victim to the Family Advocacy Program.

**7–5.  Responsibilities**
Commanders, supervisors, and managers at all levels are responsible for the effective implementation of SHARP Policy and execution of the SHARP Program. Military and DA Civilian officials at each management level will advocate a strong SHARP Program, and provide education and annual training that will enable them to prevent and appropriately respond to sexual harassment and sexual assault. Commanders are the center of gravity for execution of

the SHARP Program. Commanders and leaders are responsible for the climate in their organizations. Other agencies and individuals, including IG, MEO, provost marshal officer, SJA, or chaplain, will refer Soldiers to a servicing full-time brigade SARC to file a formal complaint.

*a.* The ASA (M&RA) will—

(1)  Provide oversight for policies, doctrine, plans, and initiatives pertaining to the SHARP Program Armywide.

(2)  Serve as the tasking authority for ARSTAF coordination and integration of all SHARP Program initiatives and staffing actions.

(3)  Support DoD-level requirement meetings with Army representation.

*b.* The DCS, G–1 will, in conjunction with G–3/5/7 (DAMO- FMZ) Force Management, establish and assign personnel to the staff organization of the DCS, G–1 ARD and the SHARP Program Armywide.

*c.* The DCS, G–1 ARD Director will —

(1)  Be responsible for Armywide policies, doctrine, plans, initiatives, overall implementation, evaluation, and assessment pertaining to the SHARP Program.

(2)  Coordinate with ARSTAF offices and agencies in developing policies that reduce sexual harassment and sexual assault, streamline reporting, establish cohesive procedures to support victims, establish investigative procedures, and all other aspects of the SHARP Program.

(3)  Implement and maintain policies to ensure the completion of requisite SHARP training, background screening, D–SAACP certification (to include revocation of certification), and proper appointment of all SHARP professionals.

(4)  Establish and maintain a SHARP Program Campaign Plan fully aligned with the DoD strategy for the Sexual Assault Prevention and Response (SAPR) Program and the Harassment Prevention and Response in the Armed Forces.

(5)  Support the Army Campaign Plan objectives and initiatives related to the SHARP Program.

(6)  Review SHARP Program training materials, including videos, brochures, and any other marketing materials.

(7)  Exercise authority for the Army's SHARP Program management functions.

(8)  Maintain and evaluate SHARP reporting database systems and all case-level data.

(9)  Maintain and update policy for selection criteria in accordance with background screenings requirements for all SHARP professionals (see app G).

(10)  Manage and maintain the SHARP Organizational Inspection Program.

(11)  Manage and budget the annual SHARP awards.

(12)  Implement requirements and establish selection criteria for SHARP professionals at all levels.

(13)  Provide oversight for coordination of SHARP Program training requirements with the CG, TRADOC for all Soldiers and DA Civilians throughout the Army.

(14)  Coordinate with DCS, G–3/5/7 and TRADOC to ensure SHARP training requirements are incorporated into AR 350–1.

(15)  Establish and maintain oversight of all SHARP budget actions for RA, ARNG, and USAR. Coordinate with the Army Budget Office and DCS, G–8 to ensure adequate SHARP funding and integration of all SHARP Program-related activities through coordination with SHARP ARSTAF proponents.

(16)  Identify the fiscal and personnel resources necessary to implement, monitor, and evaluate the SHARP Program, and report these resource totals annually, as required, to the office of the Under Secretary of Defense for Personnel and Readiness.

(17)  Prepare and submit SHARP Program reports through the ASA (M&RA) office, to the DoD SAPR office as required by DoDD 6495.01, DoDI 6495.02, and DoDI 1020.03.

(18)  Monitor sexual harassment, sexual assault, and associated retaliatory behavior data, trends, and SHARP performance. Identify and report emerging trends and performance to Army leadership, as required.

(19)  Prepare and communicate annual guidance, as required, for the collection of input from designated Army organizations to support the preparation of annual reports and assessments.

(20)  Approve and monitor Sexual Harassment Integrated Case Reporting System (ICRS) and DSAID access.

(21)  Prepare monthly ICRS reports.

(22)  Prepare monthly DSAID command reports (without personally identifiable information (PII)) and distribute to ACOM, ASCC, DRU, and USAR SHARP PMs.

(23)  Prepare monthly DSAID QC reports and command data quality metrics reports. Distribute reports to lead SARCs and ACOM, ASCC, DRU and USAR SHARP PMs.

(24)  Maintain the HQDA SHARP DSAID Help Desk and assist Army DSAID users.

(25)  Coordinate DSAID change requests with the DoD SAPR office to improve DSAID utility.

(26)  Maintain the HQDA SHARP ICRS Help Desk to assist Army ICRS users.

(27)  Analyze and identify trends related to SHARP questions contained in the CCA.

(28) Provide strategic communications, marketing, awareness, outreach, and leadership support to the ARSTAF, the Army leadership, and ACOMs.

(29) Publicize the DoD Safe Helpline through marketing materials and other communications and outreach products.

*d.* The CG, AMC through the CG, IMCOM will —

(1) Ensure MOUs/MOAs exist with civilian law enforcement agencies establishing relationships and allowing for open lines of communication between installation law enforcement and civilian law enforcement for information sharing regarding sexual assault subjects and victims.

(2) In conjunction with the garrison commander, ensure availability of resources required to support military protective orders (MPOs) and advise on civilian temporary restraining orders (TROs) and civilian protection orders (CPOs), and enter MPOs into the National Crime Information Center.

(3) Support requirements related to background screenings for SHARP professional positions.

(4) Ensure the Family Advocacy Program coordinates with the SARC regarding adult victims of sexual assault not committed by an intimate partner (see AR 608–18 for definition of intimate partner).

(5) Ensure that the DES personnel receive SHARP first responder training for responding to victims of sexual assault, as well as training on victim assistance and resources, in accordance with DoDI 6495.02.

*e.* The Provost Marshal General will—

(1) Develop law-enforcement policy for the investigation of reports of sexual assault.

(2) Develop law enforcement policy for the investigation of reports of violations of the UCMJ that meet the definition of sexual harassment.

(3) Establish procedures for ensuring policy compliance in all sexual assault investigations throughout the Army.

*f.* The CG, USACIDC will—

(1) Develop and implement criminal investigation procedures for the immediate investigation of all reports of sexual assault.

(2) Establish procedures for USACIDC special agents to support the SHARP Program.

(3) Ensure adequate staffing of the sexual assault investigator and the special victim capability throughout the Army.

(4) Ensure installation USACIDC offices, through the U.S. Army Crime Records Center, support the completion of background checks, for SHARP professionals.

(5) Supervise activities at the U.S. Army Criminal Investigation Laboratory to efficiently and effectively process evidence from sexual assault cases.

(6) Establish criminal investigation processes and procedures for investigating sexual assaults that are within USACIDC investigative authority and jurisdiction in accordance with AR 195–2 and DoDI 5505.18.

(7) Ensure USACIDC provides input to the commander's Sexual Assault Incident Response Oversight (SAIRO) report.

(8) Ensure when USACIDC initiates a sexual assault investigation, it also initiates and conducts subsequent investigations related to suspected retaliation against the sexual assault victim, witnesses, and bystanders who intervened, in accordance with DoDI 5505.18, including physical assaults threats and damage to property.

(9) Ensure USACIDC provides support to Sexual Assault Review Board (SARB) throughout the Army.

(10) Ensure at least one USACIDC agent at each office is designated as the USACIDC sexual assault liaison, responsible for coordinating with the SARC for all sexual assault cases investigated by or involving USACIDC. The sexual assault liaison will—

*(a)* Immediately notify the SARC of all reports of adult sexual assault.

*(b)* At a minimum, provide the SARC with the data necessary for the SARC to open the case in DSAID, if it is being investigated by USACIDC (a law enforcement report with assigned or to be assigned crime records center number): USACIDC investigation number, date of report to USACIDC, victim's full name and SSN.

*(c)* Coordinate with the lead SARC at least monthly to reconcile the ALERTS data regarding sexual assault investigations with unrestricted report case data in DSAID. Large installations may need to meet more frequently.

*(d)* Assist the lead SARC with reconciling discrepancies involving investigations identified in the monthly DSAID QC report provided by the DCS, G–1 ARD and assist with capturing retaliation data if applicable.

*(e)* Assist the lead SARC in obtaining the civilian law-enforcement agency case number for sexual assaults that USACIDC will not investigate via an assigned crime records center numbered case (for example, a non-DoD affiliated civilian sexually assaults a Soldier off the installation). In these cases, USACIDC will not provide a case number and will advise the lead SARC that the investigative agency is civilian law enforcement agency and not USACIDC.

(11) Identify and provide USACIDC agents to attend the advanced sexual assault training, through the United States Army Military Police School.

(12)  Request changes to curriculum through the critical task selection board for the advanced sexual assault training to ensure all training reflects current policy and legal requirements.

(13)  Conduct periodic evaluations of law-enforcement and investigative services related to sexual assault cases.

(14)  Ensure USACIDC provides sexual assault case data to SARCs for entry into DSAID, within 36 hours of the initial report.

(15)  Provide the data listed below to the DCS, G–1 ARD. Each report will be prepared as prescribed in DoDI 6495.02—

*(a)* Quarterly Army sexual assault data.

*(b)* Annual Army sexual assault data.

(16)  Submit annual reports in accordance with DA guidance to the DCS, G–1 ARD.

(17)  Provide sexual assault investigative data to the DCS, G–1 ARD, as needed.

(18)  Provide the DCS, G–1 ARD weekly updates of newly opened sexual assault investigations, a list of law enforcement report numbers on all sexual assault investigations opened in each quarter, a list of law enforcement report numbers on all sexual assault investigations closed in each quarter, and quarterly data matrices.

*g.*  The Surgeon General (TSG) will—

(1)  Establish and implement medical policy, procedures, and protocols that are culturally and gender sensitive for the treatment and care of sexual assault victims.

(2)  Establish and maintain regulatory guidance and protocols for sexual assault medical forensic examiners (SAM-FEs) that include consideration of State, local, and host nation requirements.

(3)  Provide guidance to MTF commanders on what medical treatment information may be provided to the SARC or VA to assist in the coordination of services.

(4)  Conduct behavioral health screenings for Soldiers selected for full-time SHARP professional positions.

(5)  Coordinate the overall evaluation and assessment of sexual assault support services provided by MTFs with DHA.

(6)  Ensure, where appropriate, MOUs/MOAs with nonmilitary agencies provide an adequate sexual assault response.

(7)  In coordination with DHA, provide guidance to MTF commanders on what procedures to have in place whereby Soldiers, Family members age 18 or older, and DA Civilians eligible for treatment in an MTF who report they were sexually assaulted are able to receive confidential care and treatment.

(8)  Coordinate with DHA to establish and support medical personnel requirements for response to sexual assaults, in accordance with DoDI 6310.09, and recognized SAMFE standards throughout the Army.

(9)  Ensure Army medical personnel receive training for responding to victims of sexual assault, as well as training on victim assistance and resources, and related medical requirements in accordance with DoDI 6495.02.

(10)  Ensure the Army Medical Department (AMEDD) Center and School SAMFE training curriculum reflects best practices and standards of care.

(11)  Conduct periodic evaluations of medical services provided to sexual assault victims.

(12)  Submit annual reports, in accordance with DA guidance to the DCS, G–1 ARD.

*h.*  The Chief of Chaplains will—

(1)  Provide policy and guidance explaining that while Chaplain Corps personnel do not serve as SHARP professionals, they provide critical support to the SHARP program providing pastoral care and counseling to victims and in regard to SHARP referrals.

(2)  Advise DCS G–1 and TRADOC on baseline first responder training properly explaining—

*(a)* Chaplain Corps roles and responsibilities and privileged communications supporting victims of sexual harassment and assault, and

*(b)* Chaplain service on a SARB.

*i.*  The Judge Advocate General will—

(1)  In coordination with the DCS, G–1, ARD, support the development and implementation of policy, procedures, and protocols that support victims of sexual assault, sexual harassment, and associated retaliatory behavior.

(2)  Support the DCS, G–1 ARD with legal reviews, input, and advice related to the execution of the SHARP Program.

(3)  Provide guidance on the fair and competent investigation, counsel, and prosecution of sexual assaults.

(4)  Implement the SVC Program in support of sexual assault victims. Ensure competent counsel are assigned to represent eligible sexual assault victims.

(5)  Be responsible for establishing personnel requirements and manning the following critical legal positions: SVC, special victim prosecutors, special victim NCOs, and special victim witness liaisons.

(6) Appoint legal personnel, as TJAG deems necessary, authorized to enter sexual assault disposition information into DSAID.

(7) Be responsible for establishing personnel requirements and manning the following critical legal positions: SVC, special victim prosecutor, special victim NCO, special victim witness liaisons, and paralegals.

(8) Appoint legal personnel, as TJAG deems necessary, authorized to enter sexual assault information into DSAID.

(9) Submit input for annual report in accordance with DA guidance to the DCS, G–1 ARD.

(10) Ensure the timely entry and validation of OTJAG case dispositions and case synopsis data into DSAID.

(11) Ensure Judge Advocate General's Corps members receive appropriate training, as required by DoDI 6495.02; supervise TJAG's Legal Center and School curriculum development to ensure sexual harassment and sexual assault training reflects current policy and legal requirements.

(12) Conduct periodic evaluations of legal services related to sexual harassment and sexual assault cases.

*j.* The Inspector General will—

(1) Periodically inspect sexual harassment and sexual assault prevention, response, and reporting procedures as directed by the appropriate authority.

(2) Identify noncompliance, analyze significant indicators of deficiencies, and identify responsibility for corrective action.

(3) Provide support in establishing standards for the SHARP Program SAV and Organization Inspection Program (OIP) checklist.

(4) Support requirements related to background screenings for SHARP professionals.

(5) Conduct periodic assessments of metrics to determine if services are being provided to victims of sexual assault and sexual harassment and complainants of sexual harassment in accordance with DA and DoD policy and law.

(6) Submit input for annual reports to the DCS, G–1, ARD.

(7) Submit input for quarterly retaliation data call.

(8) Provide SHARP inspection reports upon request to the DCS, G–1.

*k.* The Chief, National Guard Bureau will —

(1) Develop, monitor, and evaluate the implementation of the SHARP Program and policies within the National Guard Bureau and be prepared to modify approaches, if necessary, to ensure compliance with the SHARP Program and policies.

(2) Provide SHARP services for ARNG members who are sexually assaulted when performing active service, as defined in 10 USC 101, and inactive duty training.

(3) Standardize policy and procedural guidelines that comply with all RA policies on sexual harassment and sexual assault.

(4) Ensure policies and procedures are in place to ensure that all first responders contact the SARC immediately when a victim comes forward.

(5) Ensure procedures are in place for ARNG units to process rapid line of duty (LOD) determinations for ARNG Soldiers eligible to make sexual assault reports.

(6) Ensure the servicing legal office assists the SARC for LOD determinations. The SARC will exercise care to protect covered communications by disclosing only non-identifying information.

(7) Direct that commanders of ARNG Soldiers who are sexually assaulted while on Title 10 orders and who file unrestricted reports must, to the extent allowed by law and regulation, update the victim's home-state Title 32 commander on all ongoing investigative, medical, and legal proceedings and any actions taken by the RA against subjects who remain on Title 10 orders.

(8) Monitor the execution of the SHARP Program in all commands, agencies, and activities under the commanders' jurisdiction.

(9) Ensure Soldiers have access to a well-coordinated and highly-responsive SHARP Program.

(10) Ensure that all commands use the DoD Safe Helpline as the sole DoD hotline to provide crisis intervention, facilitate victim reporting through connection to the nearest SARC, and provide other resources as warranted. The DoD Safe Helpline does not replace local base and installation SARC, SHARP VA, or VR contact information.

(11) Prepare and submit by the 15th of the month the QC audit report for sexual harassment and sexual assault responder information posted on the DoD Safe Helpline and QC audit reports for the subordinate installation 24/7 sexual assault responder information. Maintain, monitor, and report incorrect information and SARC and SHARP VA non-response calls not returned within 60 minutes.

(12) Submit expedited transfer reports to the DCS, G–1 ARD by the 15th of the close of each fiscal year quarter.

(13) Ensure full-time and collateral duty SHARP professionals are appointed in writing, trained, certified, and prepared to perform their duties in garrison and deployed environments.

(14) Establish annual SHARP training in units and PME consistent with HQDA policy.

(15)  Ensure Soldiers receive annual, pre-deployment and post-deployment SHARP training.

(16)  Ensure SHARP training is conducted within the first 14 days of accession.

(17)  Provide the DCS, G–1 ARD Director with the POM and a mid-year and annual report for the year of execution budget information for the SHARP Program.

(18)  Budget for SHARP education, outreach and awareness activities, and materials (that is, Sexual Assault Awareness and Prevention Month (SAAPM)). Outreach and awareness materials authorized for procurement include, but are not limited to pens, magnets, key fobs, and so forth. Purchase agents will consult with their servicing legal office to ensure proper use of appropriated funds when making such purchases.

(19)  Provide guidance and resources for SAAPM activities.

(20)  Enforce the entry of sexual assault data into DSAID and the entry of sexual harassment data into ICRS within required timelines.

(21)  Include the SHARP Program as part of the inspection program and conduct periodic evaluations of the SHARP Program.

*l.*  The Chief of the Army Reserves will —

(1)  Develop, implement, and monitor the SHARP Program and applicable policies. The USAR may be required to modify approaches to ensure compliance with the SHARP Program and policies in this regulation.

(2)  Provide SHARP services for Army Reserve members who are sexually assaulted when performing active service, as defined in 10 USC 101and inactive duty training.

(3)  Standardize policy and procedural guidelines that comply with all RA policies on sexual harassment and sexual assault.

(4)  Ensure policies and procedures are in place for all first responders to contact the SARC when a victim comes forward.

(5)  Ensure procedures are in place for USAR units to process rapid LOD determinations for USAR Soldiers eligible to make sexual assault reports.

*(a)*  The SARC will brief these individuals on restricted reporting policies and the limitations of disclosure of covered communications.

*(b)*  The SARC should consult with their servicing legal office for assistance, exercising care to protect covered and privileged communications by disclosing only non-identifying information.

(6)  Monitor the execution of the SHARP Program in all commands, agencies, and activities under the CAR's area of responsibility.

(7)  Ensure Soldiers have access to a well-coordinated and highly-responsive SHARP Program.

(8)  Ensure that all commands use the DoD Safe Helpline as the DoD resource to provide crisis intervention, facilitate victim reporting through connection to the nearest SARC, and other resources as warranted. The DoD Safe Helpline does not replace local base and installation SARC or SHARP VA or VR contact information.

(9)  Prepare and submit to the DCS, G–1 ARD Director by the 15th of the month the QC audit reports for sexual harassment and sexual assault responder information posted on the DoD Safe Helpline (https://safehelpline.org) and installation QC audit reports for 24/7 responder information.

(10)  Maintain, monitor, and report incorrect information and SARC and SHARP VA non-response calls not returned within 60 minutes. Phone number changes will be reported to the RC SHARP PM and DCS, G–1 ARD within 1 business day.

(11)  Submit expedited transfer reports to the DCS, G–1 ARD office by the 15th of the close of each fiscal year quarter.

(12)  Ensure full-time and collateral duty SHARP professionals are appointed in writing, trained, certified, and prepared to perform their duties both in garrison and deployed environments.

(13)  Establish SHARP training in units and PME consistent with HQDA policy.

(14)  Ensure Soldiers receive annual, pre-deployment, and post-deployment SHARP training.

(15)  Provide the DCS, G–1 ARD with the POM and a mid-year and annual report for the year of execution budget information for the SHARP Program.

(16)  Budget for SHARP education, outreach and awareness activities, and materials (that is, SAAPM). Outreach and awareness materials authorized for procurement include, but are not limited to pens, magnets, key fobs, and so forth. Purchase agents will consult with their servicing legal office to ensure proper use of appropriated funds when making such purchases.

(17)  Provide guidance and resources for SAAPM activities.

(18)  Enforce the entry of sexual assault data into DSAID and the entry of sexual harassment data into ICRS within required timelines.

(19)  Include the SHARP Program as part of the inspection program and conduct periodic evaluations of SHARP Program implementation and compliance.

(20)  Ensure the SHARP PM reviews the monthly DSAID QC reports provided by the DCS, G–1 ARD and enforces error correction and reconciliation of missing USACIDC sexual assault case investigation data. Note. In order for errors to be cleared from the QC report, corrections must be made no later than the 14th of the month.

(21)  Submit annual reports in accordance with DA guidance to the DCS, G–1 ARD.

*m.*  The CG, U.S. Army TRADOC will—

(1)  Develop, manage, and execute the functions of the U.S. Army SHARP Academy in coordination with DCS, G–1, ARD and OTJAG.

(2)  Develop and manage the SHARP professional training courses.

(3)  Develop and manage all SHARP Training Support Packages.

(4)  Train USACIDC agents to investigate sexual assault through the advanced sexual assault training, at the United States Army Military Police School.

(5)  Supervise curriculum development of the special victims course taught at the U.S. Army Military Police School.

(6)  Develop and provide oversight for military law-enforcement advanced sexual assault investigation and sensitivity training during basic courses, annual training, and subsequent professional development courses taught at the U.S. Army Military Police School.

(7)  Develop and provide oversight for initial SHARP training, pre-entry training, and professional education for recruiters, and drill sergeants.

(8)  Ensure SHARP training conducted during initial military training (IMT) is conducted within the first 14 days of each training cycle.

*(a)*  Ensure IMT Soldiers are instructed on and have access to 24/7 sexual assault reporting, to include the DoD Safe Helpline and installation 24/7 SHARP hotline.

*(b)*  In environments where IMT training is conducted, evaluate processes to address sexual harassment and sexual assault.

(9)  Ensure that drill sergeants are not appointed as SHARP professionals outside of trainee units. Drill Sergeants will not provide advocacy services outside of trainee units.

(10)  Coordinate designation of the appropriate additional skill identifier (ASI) with HRC.

(11)  Ensure staffing required to manage and operate the U.S Army SHARP training academy.

(12)  Implement and track SHARP training for all Soldiers, DA Civilians, and Family members throughout the Army's lifecycle of training (institutional, operational, and self-study).

(13)  Conduct and evaluate the effectiveness of required SHARP education and training in TRADOC Service schools and training centers.

(14)  Conduct SHARP training at all levels of IMT and PME to include ROTC, brigade and battalion pre-command courses, the U.S. Army War College, and at all levels of the DA Civilian Education System.

(15)  Ensure that all SHARP training and education courses are reviewed and approved by DCS, G–1, ARD and OTJAG. All training containing sexual harassment must also be reviewed by DEOMI.

*n.*  The CG, Human Resources Command will—

(1)  Support and conduct suitability centralized screenings for SHARP positions. At the request of DCS, G–1, ARD or U.S. Army SHARP training academy will provide results of background screenings.

(2)  Process 2-year tour stabilization actions for Soldiers filling full-time SARC and SHARP VA positions.

(3)  Execute PCS expedited transfer requests in accordance with AR 614–100 and AR 614–200.

*(a)*  Provide a quarterly report to the DCS, G–1 ARD on the number of PCS expedited transfer requests and non-PCS expedited transfer requests that cross ACOMs, ASCCs, and DRUs that have approved and denied.

*(b)*  Process expedited transfers, safety moves, and compassionate reassignments as per commanders' requests to provide for victims' safety and recovery.

(4)  Apply and maintain records for the SHARP ASI "1B" and "1H" based on successful completion of SHARP training.

*(a)*  Process ASI revocations, as necessary.

*(b)*  Provide annual ASI report to the DCS, G–1, ARD.

(5)  For Soldiers who are victims of sexual assault who have requested review by a GCMCA of a separation action initiated within 1 year of the final disposition of their sexual assault case, ensure a GO with GCMCA authority reviews the case.

*o.*  All commanders will—

(1) Immediately notify the SARC and USACIDC upon receipt of information of a sexual assault from any source, including a third party. A commander will not conduct any internal, inquiries or investigations of sexual assaults or delay immediately contacting USACIDC while attempting to assess the credibility of the report.

(2) Ensure all eligible victims and complainants have access to a well-coordinated and highly-responsive SHARP Program.

(3) Meet with the SARC within 30 days of taking command for one-on-one SHARP briefing. The training will include a trends brief for the unit and area of responsibility, the confidentiality and "official need-to-know" requirements for both unrestricted and restricted reporting, and the requirements of the SAIRO report.

*(a)* Ensure the chaplain and senior enlisted (1SG/CSM) advisor participate in the briefing with the commander.

*(b)* The commander will contact the servicing legal advisor for training on legal responsibilities related to reports of sexual assault and harassment.

(4) Publish a command policy for SHARP for each unit and agency down to company, troop, or battery level. Units will ensure the command policy for SHARP is in accordance with brigade or equivalent command policies.

*(a)* Ensure that SHARP policy memorandums and a list of victim service resources are posted on the unit bulletin boards.

*(b)* Policy memorandums will include an overview of the command's commitment to the SHARP Program; victims' rights; the definitions of sexual assault and sexual harassment; available resources to support victims and complainants; specific statements that sexual assault is a criminal offense that is punishable under the UCMJ and other Federal and local civilian laws; that sexual harassment and retaliatory behavior may be punishable under the UCMJ; and that sexual harassment, sexual assault, and retaliatory behavior are incompatible with Army values.

*(c)* Ensure the victim services resources include the DoD Safe Helpline number, installation 24/7 SHARP hotline, and the names and contact information of the responsible SARC and VA.

(5) Ensure that assigned personnel, to include RC personnel under their command, are trained on SHARP policy.

(6) Incorporate unit-level SHARP annual training into the overall training for the unit and document the training on unit training schedules.

*(a)* Annual SHARP training will be conducted face-to-face using the approved Department of the Army SHARP Annual Training Support Package available on the Army Training Network. Commanders will determine the duration, location, and means for conducting training. Unit leaders will lead the training with the assistance of certified SHARP professionals.

*(b)* Commanders will retain records of Soldiers' SHARP training.

(7) Ensure Soldiers receive SHARP pre-deployment and post-deployment training.

(8) Conduct annual SHARP training for military and DA Civilians and offer SHARP annual training to Family members age 18 and over. Ensure deployed DA Civilians receive pre-deployment and post-deployment SHARP training.

(9) Conduct periodic assessments of the command's SHARP Program for program improvement.

(10) Ensure comprehensive and accurate sexual assault data is provided to SARCs for entry into DSAID.

(11) Continually monitor the unit and assess SHARP policy implementation at all levels within the area of responsibility. Identify problems or potential problems for commander's update.

(12) Ensure that command climate surveys are conducted and that their questions and results are coordinated with the SARC.

(13) Continually assess the command climate through various methods (for example, focus groups, surveys, talking with Soldiers).

(14) Publish contact information of SARCs, SHARP VAs, and VRs, and provide take-away information such as telephone numbers for unit and installation points of contact, booklets, and information on available victim services.

(15) Emphasize SHARP in all holiday safety memos and briefings.

(16) Participate in SAAPM.

(17) Ensure that all units have a SHARP response capability 24 hours a day/7 days a week.

(18) Ensure SHARP professionals have the communication (that is, cell phone shared between on-call SHARP professionals) and authorized transportation (that is, TMP) resources needed to accomplish assigned tasks.

(19) Use good judgment and discretion in providing facilities to ensure privacy and confidentiality for SARCs and other SHARP professionals to respond to and support complainants and victims.

(20) Reinforce support for MPOs, TROs, and CPOs.

(21) Ensure awareness of the SHARP Program and publicize on- and off-post crisis response resources available to assist complainants and victims.

(22) Establish and enforce procedures to protect SARCs, SHARP VAs, and VRs from retaliation, reprisal, ostracism, intimidation, or maltreatment related to the execution of their duties and responsibilities. Unit commanders

and/or supervisors will not interfere with or otherwise attempt to negatively influence SHARP professionals in the performance of their duties.

(23)  Establish and enforce procedures to protect witnesses and bystanders who intervene to prevent or report sexual assault or sexual harassment, from retaliation, reprisal, ostracism, intimidation, or maltreatment. Immediately notify USACIDC whenever the victim of a sexual assault, witnesses, or bystander who intervenes is threatened, assaulted, or suffers property damage.

(24)  Notify the DCS, G–1 ARD in writing of any change in a SHARP professional position.

(25)  Ensure that an appointment of a Soldier or DA Civilian to a SHARP professional position does not create a conflict of interest, or the appearance of a conflict of interest, with other duty assignments; Commanders will not appoint Soldiers performing the following duties to any position within the SHARP Program: military equal opportunity professional/EOL/EEO, chaplain, chaplain's assistant, legal officer, or paralegal.

(26)  Ensure, servicing SARCs have reasonably direct and unimpeded access to the immediate commander of the victim of a sexual assault with regard to response.

(27)  Upon learning of a sexual assault, from a victim or a third party, follow the list of actions in paragraph 7–9.

(28)  Upon learning of an act of sexual harassment within the commander's purview to investigate from the complainant, victim, or a third party, all commanders will ensure an investigation is completed in accordance with DoDI 1020.03 and this regulation.

(29)  Ensure all SHARP professionals under their command are appropriately screened, trained, and certified before being appointed to their positions.

(30)  Provide information to the lead SARC regarding command actions and dispositions in response to reports of retaliatory behavior targeting victims of sexual assault, complainants of sexual harassment, SARCs, SHARP VAs, VRs, first responders, witnesses and bystanders who intervened, upon request.

(31)  Officials authorized to approve the use of appropriated funds, may occasionally use appropriated funds, when it is necessary to advance legitimate agency goals and policies as opposed to simply attracting attention to the agency and its programs. Prior to the expenditure, it should be reviewed by appropriate officials to determine the particular factual circumstances in which the command can demonstrate that the item will directly advance SHARP's statutory mission and objective. Authorizing official will consult with their servicing legal office to ensure proper use of appropriated funds when making purchases consistent with this paragraph.

(32)  Support investigations by providing access to information, as appropriate, to ensure that investigations are impartial and timely.

(33)  Enter mandatory performance evaluation data in accordance with AR 623–3 and DA Pam 623–3.

*p.*  In addition to the responsibilities listed above, all battalion commanders will —

(1)  Ensure the appointment of one trained and certified collateral duty SARC and one trained and certified collateral duty SHARP VA.

(2)  Prepare the SAIRO (see app K) for all unrestricted reports of sexual assault, with input from USACIDC and the SARC, in accordance with DoDI 6495.02.

*q.*  In addition to the responsibilities listed in paragraph 7–5*o* all brigade and brigade-equivalent commanders will ensure the appointment of one full-time SARC and one full-time SHARP VA.

*r.*  In addition to the responsibilities listed in paragraph 7–5*o*, all commanders for echelons above brigade will ensure the appointment of one trained and certified collateral duty SARC.

*s.*  In addition to the responsibilities listed in paragraph 7–5*o*, all garrison commanders will—

(1)  Ensure the appointment of one full-time SARC and one full-time SHARP VA.

(2)  Ensure availability of logistical support for SHARP professionals and activities as appropriate.

(3)  Develop a post-wide community education program to—

*(a)*  Inform all personnel about the seriousness of sexual assault and sexual harassment, including the causes, effects, and remedies.

*(b)*  Publicize procedures for reporting sexual assault and sexual harassment and available services.

*(c)*  Emphasize the importance of total community involvement in the SHARP Program.

*(d)*  Publicize the installation 24/7 SHARP Hotline and information on the availability of installation and community sexual harassment and sexual assault resources.

*(e)*  Publicize, the DoD Safe Helpline.

*(f)*  Participate in and provide logistical support for SAAPM.

*t.*  In addition to the responsibilities listed in paragraph 7–4, all SCs will—

(1)  Appoint a lead SARC, in writing.

(2)  Require the lead SARC to review the HQDA monthly QC reports and coordinate with brigade SARCs and USACIDC to ensure errors are resolved, and missing/correct data are entered into DSAID upon receipt of the monthly QC report. Require lead SARCs to immediately inform DCS, G1 ,ARD of any unresolved errors.

*Note.* In order for errors to be cleared from the QC report, corrections will be made no later than the 14th of the month.

(3)  Ensure that a safety assessment is conducted for all victims who report a sexual assault.

(4)  Chair the monthly installation SARB (may be delegated to a deputy commander); implement procedures and standards of operations and actions for reports of retaliation, reprisal, ostracism, or maltreatment to protect the victim.

(5)  Ensure servicing SARCs have reasonably direct and unimpeded access to him or her.

(6)  Ensure that information maintained on the DoD Safe Helpline is accurate and revisions are reported to the ACOM, ASCC, and DRU within 1 business day. Revisions not reflected within 2 business days are re-addressed to the ACOM, ASCC, or DRU SHARP PM.

(7)  Have an installation 24/7 SHARP hotline. Calls to the installation 24/7 SHARP hotline number not immediately answered must be returned within 60 minutes.

(8)  The installation 24/7 SHARP hotline number will be published on the DoD Safe Helpline website and will be accessible through the Safe Helpline.

(9)  Require the lead SARC to be present during each SARB, to co-chair each SARB, and to address actions taken to resolve all DSAID data errors and reconciliation of USACIDC sexual assault case investigations reported as missing from DSAID on the monthly QC report.

(10)  Designate personnel who are responsible for conducting a safety assessment for each reported sexual assault victim. The SC will ensure that these personnel are trained to perform a safety assessment; codify this designation in the installation SHARP standard operating procedure.

(11)  Ensure a victim's immediate commander provides monthly updates to victims of a sexual assault who filed an unrestricted report regarding the current status of any ongoing investigative, medical, legal, or any other request made by the victim, or command proceedings regarding the sexual assault until the final disposition of the reported assault. This is a non-delegable commander duty. The monthly update will occur within 72 hours after the SARB.

(12)  Ensure coordinated execution of the SHARP Program across all commands and organizations, to include all subordinate and tenant units on installations and in deployed areas, with a primary focus on delivering a seamless, timely, and efficient process for complainants and victims.

(13)  Consider locating the SHARP office in an area near the chaplain's office, if feasible, to ensure easier access for victims and complainants in an environment that is less compromising or restrictive for reporting.

*u.*  All ACOM, ASCC, and DRU commanders will—

(1)  Develop and issue command policy guidance on SHARP Program requirements, prevention of sexual harassment, sexual assault, and retaliatory behavior, response standards for reports and complaints as well as the standards of care for treatment of victims and complainants.

(2)  Issue command policy that, in a deployed environment, units will conduct SARBs at the appropriate level, though no lower than brigade level.

(3)  Ensure a commander's critical information requirement (CCIR) is prepared when required (see format in app J). The CCIR will be completed and forwarded to the Army Operations Center (AOC) and DCS, G–1 (DAPE–MPE–PC) Personnel Contingency Cell (PCC), within 24 hours of command notification of the triggering event.

(4)  Ensure the assignment of full-time SARCs and SHARP VAs at the brigade (or equivalent) level.

(5)  Ensure the assignment of trained and certified collateral duty SARCs, SHARP VAs, and VRs at the battalion (or equivalent) level.

(6)  Act as approval authority for the assignment of company-level trained and certified collateral duty SHARP VAs for exceptional situations, such as geographical dispersion or large units.

(7)  Monitor the execution of the SHARP Program in all commands, agencies, and activities (including USAR and ARNG units when mobilized) under their jurisdiction.

(8)  Ensure all eligible victims and complainants have access to a well-coordinated and highly-responsive SHARP Program.

(9)  Ensure that all commands promote and maintain accurate information on the DoD Safe Helpline and the installation 24/7 SHARP hotline to provide crisis intervention, facilitate victim reporting through connection to the nearest SARC, and other first responder resources.

(10)  Prepare and submit by the 15th of each month to the DCS, G–1 ARD test call reports for sexual harassment and sexual assault responder information posted on the DoD Safe Helpline https://safehelpline.org and QC audit reports submitted by ACOMs, ASCCs, and DRUs for installation 24/7 sexual assault responder information. Maintain,

monitor, and report incorrect information and calls to SARCs, SHARP VAs, and VR that are not immediately answered or returned within 60 minutes. Phone number changes will be reported within 1 business day.

(11) Ensure that MOUs/MOAs are in place where civilian agencies or military services are used as support services.

(12) Ensure compliance with AR 600–8– 8. Engaged sponsorship and mentorship programs can be effective prevention measures.

(13) Ensure sexual assault response services are provided to sister Service units that are stationed within the area of responsibility.

(14) Develop program policy, guidance and other information for commanders and supervisors, SHARP professionals, and first responders. Provide program direction and guidance to all concerning reporting procedures, confidentiality, training, safety tips, and resources.

(15) Track the disposition of all sexual harassment and sexual assault cases and ensure commanders provide the disposition of sexual assault investigations to USACIDC in a timely manner in accordance with AR 190–45.

(16) Use the Organization Inspection Program (OIP) checklist to ensure SHARP Program compliance and effectiveness.

(17) Ensure all SHARP professionals are on a command appointment memo. The SARC, PM, and Training Instructor appointment memos will be signed by the first GO/SES in their chain of command; the appointment memo for a SHARP VA or VR will be signed by their brigade commander (O–6). The memo will acknowledge the SHARP professional has a current D–SAACP certification, a cleared background screening, and is authorized to provide victim advocacy services.

(18) Appoint a full-time SHARP PM to oversee the ACOM, ASCC, and DRU SHARP Program, to include reporting, data collection, assessments, statistics, trend analyses, and coordination of staff proponents, as well as other requirements as necessary.

(19) Ensure the SHARP PM has a record of every SHARP professional in the command. These records will include copies of the nomination, screening checklist (for Soldiers), cleared screening (for DA Civilians), training certificate, ASI (for Soldiers), D–SAACP certification, and appointment memo.

(20) Ensure SHARP annual, pre-deployment, and post deployment training is conducted and tracked.

(21) Ensure commanders and senior enlisted (CSMs, SGMs, 1SG) receive a SHARP briefing within 30 days of assuming command or change of responsibility.

(22) Integrate sexual harassment and sexual assault awareness into newcomer orientation briefings and provide contact information for all SHARP Program response agencies.

(23) Ensure SHARP First Responder annual training is conducted and tracked.

(24) Ensure SHARP Foundation Course mobile training teams coordinate with the installation lead SARC to schedule and resource the 80-hour SHARP mobile training courses.

(25) Ensure Army Training Requirements and Resource System (ATRRS) entry for SHARP professionals required to attend training at the SHARP Academy.

(26) Provide and monitor resources to enable subordinate commands to achieve compliance with SHARP Program policy.

(27) Budget for SHARP education, outreach and awareness activities, and materials (that is, SAAPM). Outreach and awareness materials authorized for procurement include, but are not limited to pens, magnets, key fobs, and so forth.

(28) Provide DCS, G–1 ARD with the POM and a mid-year and annual report for the year of execution budget information for the SHARP Program.

(29) Ensure all SHARP professionals in subordinate units have access to the communication (that is, cell phone shared between on-call SHARP professionals) and authorized transportation (that is, the TMP) resources needed to accomplish and to respond to sexual harassment and sexual assault cases.

(30) Provide guidance and resources for all SAAPM activities.

(31) Ensure sexual assault data is entered into DSAID and sexual harassment data is entered into ICRS.

(32) Include the SHARP Program as part of the OIP in non-deployed and deployed environments.

(33) Submit annual reports in accordance with DA guidance to the DCS, G–1 ARD.

(34) Ensure ACOM, ASCC, and DRU SHARP PMs review monthly DSAID QC reports provided by the DCS, G–1 ARD and enforce error correction and reconciliation of missing USACIDC sexual assault case investigation data.

*Note.* In order for errors to be cleared from the QC report, corrections will be made no later than the 14th of the month.

(35) Ensure ACOM, ASCC, and DRU SHARP PMs submit quarterly retaliatory behavior reports to the DCS, G–1, ARD.

(36)  Ensure SCs at each Army installation appoint, on orders, a lead SARC.

(37)  Ensure SCs review, during each SARB, actions taken to resolve all DSAID data errors and the reconciliation of USACIDC sexual assault case investigations reported as missing from DSAID on the monthly DSAID QC report provided to lead SARCs by the DCS, G–1 ARD.

*v.*  All SHARP professionals (PMs, SARCs, SHARP VAs, VRs, and Training Instructors), full-time, part-time, and collateral duty, must have a cleared background screening, have attended the appropriate training, have an active D–SAACP certification, and an appropriately signed appointment memo. In the event that an individual's certification expires or is revoked, they are no longer authorized to serve in any SHARP position or perform any SHARP duties until their D–SAACP certification is re-authorized. PMs and Training instructors are not ordinarily authorized to carry a caseload but are directed to refer a victim to a SARC for SHARP services. Any SHARP position not included in this regulation requires the approval of the DCS, G–1 ARD Director. All SHARP professionals will—

(1)  Perform their duties in accordance with the ethical standards in DoDI 6400.07 and DoDI 6495.03, at all times. These standards apply to all interactions with and intercessions for victims of sexual assault, complainants of sexual harassment, and those who report retaliation.

(2)  Assist with SHARP annual, pre-deployment, and post deployment training.

*w.*  Sexual Harassment/Assault Response and Prevention program managers. ACOMs, ASCCs, and DRUs will designate a PM to oversee the program by providing report, assessments, statistics, and trend analysis and coordinating with staff proponents. Primary functions are assessment and ensuring compliance with DoD and Army policy. Serves as principle advisor to the commander for all matters relating to the implementation of the SHARP Program. Responsible for the oversight and coordination of the SHARP Program throughout the area of responsibility. Updates the CG and major subordinate commands on changes to guidance, policy, and procedures. All SHARP PMs will—

(1)  Obtain and maintain expertise in procedures and issues related to prevention, response, victim advocacy, reporting/investigative procedures, and decision points related to sexual harassment and sexual assault.

(2)  Be thoroughly familiar with SHARP and SHARP-related policies, Army and DoD regulations, and applicable local, State, Federal, and host nation laws.

(3)  Implement commander's guidance on the execution of the SHARP Program, under the cognizance of the DCS, G–1, ARD.

(4)  Ensure HRC background screening and confirm SHARP training authorization with the SHARP Academy for all SHARP professionals within their command.

(5)  Ensure re-screening and recertification, at applicable intervals, of all SHARP professionals within their command.

(6)  Maintain records for all SHARP professionals in their command. These records will include copies of the nomination, screening checklist (for Soldiers), cleared screening (for DA Civilians), training certificate, ASI (for Soldiers), D–SAACP certification, and appointment memo.

(7)  Conduct ongoing assessment to ensure consistency and effectiveness of the SHARP Program, complainant services, and victim care throughout the command.

(8)  Refer Soldiers reporting sexual harassment to a full-time brigade SARC.

(9)  Ensure the DCS, G–1 ARD receives the information and documentation necessary to grant access to DSAID and ICRS to SARCs within their command.

(10)  Ensure collaboration of all key SHARP stakeholders.

(11)  Develop mechanisms to ensure compliance with DoD and Army policy and for accountability throughout the command.

(12)  Serve as a liaison and conduit for information flow to and from DCS, G–1, ARD.

(13)  Provide guidance on program implementation within area of responsibility.

(14)  Monitor and evaluate compliance with policy.

(15)  Monitor and assess training requirements throughout their command.

(16)  Personally ensure that all SHARP training conducted correctly states the law.

(17)  Maintain cognizance of day-to-day operation and reporting requirements for the command. Prepare POM submissions, spending plans, and manning requirements submissions as required by DCS, G–1 ARD.

(18)  Submit quarterly and mid-year review budget execution and deviation reports to the DCS, G1 ARD.

(19)  Conduct SHARP Program assessments; monitor trends; identify systemic issues and best practices; develop appropriate corrective actions, as necessary.

(20)  Conduct routine assessments of 24/7 SHARP hotlines and command websites; assist in facilitating corrective actions.

(21)  Facilitate development and collaboration of SHARP public awareness campaigns.

(22)  Assume the duties of a SARC or SHARP VA, if needed.

*(a)* Ensure program continuity in the event of a position vacancy.

*(b)* Coordinate and participate in the SARB, as a lead SARC, SARC, or SHARP VA, if needed.

(23) Track and report expedited transfer requests and ensure compliance with appendix I.

(24) If the area of responsibility includes a SHARP resource center—

*(a)* Oversee SHARP resource center compliance with applicable policy, regulations, and guidance.

*(b)* Coordinate the resourcing and sustainment of the SHARP resource center.

*x.* The SARC is a DA Civilian or Soldier who reports directly to the SC for matters concerning sexual harassment sexual assault. SARCs will be an NCO (SFC or higher) or DA Civilian (general schedule (GS)-11 or higher). The appointing authority for SARCs is the first GO or SES in the nominated SARC's chain of command.

(1) All SARCs are authorized to perform victim advocate duties. It is advantageous that SARCs have experience as a VA.

(2) For SARCs that operate within deployable commands that are not attached to an installation, they must have access to the SC for the deployable command.

(3) All SARCs will—

*(a)* Serve as the point of contact for coordinating care to ensure that sexual harassment and sexual assault victims receive appropriate and responsive care.

*(b)* Ensure advocacy services are available 24 hours a day/7 days a week for all victims eligible for SHARP services.

1. SARCs will respond, or direct a SHARP VA or VR to respond, to every restricted and unrestricted report of sexual assault. The response will be in person, unless otherwise requested by the victim.

2. In some situations, a sexual assault victim may receive medical care and a SAFE outside of a military installation under an MOU or MOA with local private or public sector entities. In these cases, pursuant to the MOU or MOA, the SARC will be notified and a SARC, SHARP VA, or VR will respond.

*(c)* Coordinate and establish relationships with civilian resources off-post in order to refer victims to nonmilitary affiliated resources should the victim choose to use them.

*(d)* Ensure victim services are in place to provide information and emotional support during administrative, medical, investigative, and legal procedures, that victims understand the processes involved, and that data will be collected, reported, and maintained on cases.

*(e)* Ensure sexual assault victims are properly advised of the role and availability of a victim advocate and victims' rights.

*(f)* Ensure sexual assault victims are properly advised of their potential eligibility for an SVC by coordinating with the servicing legal office regarding SVC services, assistance provided by a SARC, and assistance provided by a SHARP VA or VR, as soon as they seek assistance from a SARC, SHARP VA or VR, USACIDC, VWL, or trial counsel.

1. Legal assistance and SHARP services are optional and may be declined, in whole or in part, at any time.

2. Information regarding the availability of an SVC will be provided to a victim before USACIDC or trial counsel interviews or requests any statement from the victim.

3. Assistance from an SVC, SARC, SHARP VA, or VR are available whether a victim has made a restricted or unrestricted report.

*(g)* Maintain liaisons with the provost marshal officer, USACIDC, medical and legal services, and commanders to facilitate immediate response to and accurate reporting of sexual assaults.

*(h)* Assist commanders in developing, establishing, and implementing prevention strategies, activities, programs, and efforts.

*(i)* Ensure all unrestricted reports of sexual assault, documented with a signed DD Form 2910 (Victim Reporting Preference Statement) are reported to USACIDC immediately. The SARC will also inform the SC and the first LTC/O–5 in the victim's chain of command of an unrestricted report within 24 hours of receipt.

*(j)* Track services provided to victims of sexual assault from initial report of sexual assault through disposition and resolution or until the victim no longer wishes to receive SHARP services. If a SARC is not authorized to have access to DSAID, they will coordinate with the first full-time brigade-level SARC in their chain of command to ensure services are properly tracked.

1. Enter information into DSAID within 48 hours of the report of sexual assault. In deployed locations that have internet connectivity issues, the time frame is extended to 96 hours.

2. Maintain in DSAID an account of the services referred to and requested by the victim for all reported sexual assaults, from the time of the initial report through the final case disposition or until the victim no longer desires services. If the victim requests SHARP services from the SARC or SHARP VA after their SHARP case has been closed, the case is reopened and addressed at the SARB.

*(k)*  Safeguard confidential communications pertaining to victims. It is imperative for the integrity of the SHARP Program that steps be taken to prevent unauthorized reading, printing, retaining, copying, or dissemination of information, messages, or correspondence revealing personally identifiable information in accordance with existing rules and regulations.

*(l)*  Maintain the signed DD Form 2910 in a secure file cabinet under double lock and key.

*(m)*  Ensure all SHARP Program records are maintained under double lock and key.

*(n)*  Maintain a copy their appointment memo.

*(o)*  Maintain records showing certification as SARC and completion of all required training.

*(p)*  Ensure the SHARP PM receives a copy of the appointment memo, D–SAACP certification, DD Form 2950 (Department of Defense Sexual Assault Advocate Certification Program (D–SAACP) Application Packet for New Applicants) packet, and all evidence of completing the required initial training and continuing education.

*(q)*  Maintain a roster of certified VAs within the command.

*(r)*  Ensure that no SHARP case is converted from restricted to unrestricted without signed permission from the victim, documented on a DD Form 2910. If USACIDC opens an investigation based on a third-party report, that investigation will be included in DSAID as a case in "Open with Limited Information" status, even if it is a duplicate of a restricted report. If the victim decides at a later date to convert the restricted report to an unrestricted report, the SARC will make appropriate changes to the restricted report in DSAID and contact the DCS, G–1 ARD help desk to remove the duplicate report in DSAID.

*(s)*  Serve as a VA, if requested.

*(t)*  Coordinate all communication with the DCS, G–1, ARD through their ACOM, ASCC, and DRU PM.

*(u)*  Attend the monthly SARB, regardless if they have an open case.

*(v)*  Collateral duty SARCs assigned to military police units must not provide SARC or VA services outside of military police units. If a victim who is not an MP discloses a sexual assault or act of sexual harassment to a SHARP professional within an MP unit, that SHARP professional must refer the victim to a SHARP professional who can provide services to that victim.

*y.*  In addition to all the SARC duties listed in paragraph 7–5*v*, brigade and brigade-equivalent SARCs will—

(1)  Accept and process informal, formal, and anonymous sexual harassment complaints. This responsibility cannot be delegated to a VA.

(2)  Assist and support sexual harassment complainants and victims in accordance with DoDD 1350.2, DoDI 1030.2, and DoDI 6400.07. Complainants and victims will be provided adequate protection and care, and informed about available support resources, including:

*(a)*  Military and civilian emergency medical and support services.

*(b)*  Public and private programs that are available to provide counseling, treatment, and other support.

*(c)*  Organizations and entities on- and off-base that provide victim and witness services and support.

(3)  Ensure formal and anonymous sexual harassment complaints are properly documented on DA Form 7746 (Sexual Harassment Complaint) and entered into ICRS.

(4)  Track, at a minimum, what subordinate units require SHARP professionals, the  roster of trained and certified SHARP professionals, the status of their D–SAACP certification, the continuing education they have completed, and their rotation dates (PCS and expiration term of service), using DSAID.

(5)  Ensure entry of case data into DSAID within 48 hours of the victim signing a DD Form 2910. For deployed locations, data should be entered within 96 hours of victim response.

(6)  Maintain in DSAID an account of the services referred to and requested by the victim, from medical treatment through counseling, and from the time of the initial report through the final case disposition, or until the victim no longer desires services. Update each victim's case in DSAID within 48 hours of receipt of new information, client contact, and SARB, until the SHARP case is closed.

*z.*  On installations with more than one SARC the SC will appoint a lead SARC. It is not required to hire or appoint an individual specifically to fill the role of lead SARC; any existing SARC on the installation can be appointed as the lead SARC. The SC should select a Full-Time SARC assigned to their command as the lead SARC. The lead SARC is supported by and works in collaboration with the supporting SHARP PM, as appropriate. In addition to all the SARC duties listed in paragraphs 7–5*x*, the lead SARC will—

(1)  Serve as the co-chair of the SARB; compile SARB agenda; and ensure all retaliation cases are tracked until resolved.

(2)  Review the HQDA monthly QC reports and coordinate with brigade SARCs and USACIDC to ensure errors are resolved, and missing/corrected data is entered into DSAID upon receipt of the monthly QC report. Lead SARCs will immediately inform the DCS, G–1 ARD of any unresolved errors.

*Note.* In order for errors to be cleared from the QC report, corrections will be made no later than the 14th of the month.

(3)  At each SARB, address actions taken to resolve all DSAID data errors and reconciliation of USACIDC sexual assault case investigations reported as missing from DSAID on the monthly QC report.

(4)  Collect and report retaliation data to the SHARP PM.

(5)  Support the SC, tenant commanders, and other SARCs to ensure an integrated and transparent response capability and system accountability.

(6)  Support SARCs in their efforts to provide quality victim care.

(7)  Establish a standard operating procedure for collecting the required information for DSAID.

(8)  In consultation and coordination with the SJA for the SC and other concerned parties (for example, USACIDC, healthcare personnel) ensure MOUs are established with off-post non-military facilities or agencies as appropriate for victim care and compliance with the restricted reporting option.

(9)  In the absence of a PM, prepares POM submissions, spend plans, and manning requirements submissions as required by DCS, G–1 ARD.

*aa.*  In addition to the SARC duties listed in paragraph 7–4, collateral duty SARCs will—

(1)  Refer Soldiers reporting sexual harassment to the full-time brigade-level SARC.

(2)  Provide the brigade SARC with SHARP related data and case information, as requested.

(3)  Collaborate with the full-time brigade-level SARCs and the lead SARC to expedite the flow of information to and from the field and to ensure quality victim care.

*bb.*  SHARP VAs are DA Civilians or Soldiers trained to provide advocacy services to victims of sexual assault and complainants and victims of sexual harassment. The SHARP VA will be an NCO (SSG or higher), or DA Civilian (GS–9 or higher). The SHARP VA reports directly to their SARC for sexual assault and sexual harassment cases. The SHARP VA will—

(1)  Establish contact with each victim who reports that an act of sexual assault or sexual harassment occurred, if the victim is receptive to such contact. Advise each victim of the role and availability of a victim advocate, victim rights, and his or her potential right to an SVC by coordinating with the servicing legal office regarding SVC services. The victim alone will decide whether to accept the offer of victim advocacy services and/ or an SVC.

(2)  Advise victims on their options for restricted and unrestricted reporting when assigned a sexual assault and case by the SARC; ensure victim acknowledges in writing their preference for restricted or unrestricted reporting using DD Form 2910.

*(a)*  If the victim chooses the restricted reporting option, the SHARP VA will ensure the victim with their consent is taken to a healthcare provider in lieu of reporting the sexual assault to law enforcement or command.

*(b)*  If the victim chooses the unrestricted reporting option, the SHARP VA will immediately notify the SARC who will immediately notify USACIDC.

*(c)*  If the victim chooses the restricted reporting option, the SHARP VA will provide information to the SARC, who will in turn for the purposes of public safety and command responsibility report the sexual assault, without information that could reasonably lead to personal identification of the victim, to the SC within 24 hours from the time the victim signed the DD Form 2910. No other notification to any other commander will take place.

(3)  Be informed about services available to sexual assault victims on the installation as well as in the surrounding community. The SHARP VA will maintain awareness of agencies that provide such services, being knowledgeable of the location, telephone number, confidentiality policies, and procedures for accessing service at these agencies.

(4)  Provide crisis intervention, referrals, and ongoing emotional support to sexual assault and sexual harassment victims. Services must be non-clinical in nature. The victim has the right to independently determine whether to accept the offer of VA services. The SHARP VA must be sensitive to the needs of each victim and tailor services to meet those needs.

(5)  Provide initial information to victims on their rights, to include the right to refuse services, and explain the scope and limitations of the SHARP VA's role as an advocate.

(6)  Immediately inform the SARC upon receiving a report of sexual assault or sexual harassment; the SARC will provide support and assistance to the SHARP VA, including liaising with commanders, USACIDC, and other First Responders.

(7)  Accompany the victim during investigative interviews and medical examinations, unless the victim chooses not to use the SHARP VA's services. The SHARP VA will not make decisions for the victim, provide legal advice, or interfere with the legitimate operations of medical, investigative and judicial processes.

(8)  Coordinate activities with the SARC to ensure the best services are provided to victims and to avoid duplication of services.

(9)  Provide updates regarding victims' concerns and status to the SARC at an interval determined by the SARC or more frequently if the situation warrants.

(10)  Provide on-call services after normal duty hours to victims of sexual assault as needed. Fully inform the SARC of all activities that occurred during the on-call duty period within the first 2 hours of the next duty day.

(11)  Provide education and training on the subject of sexual assault to VRs, SHARP VAs and others as required.

(12)  Safeguard documents in their possession and always being mindful of the victims' right to confidentiality, until the documents can be turned over to the SARC.

(13)  Attend ongoing training as required or recommended by the SARC.

(14)  Assist other SHARP VAs in the performance of their duties, as directed by the SARC.

(15)  Refer Soldiers reporting sexual harassment to the full-time brigade level SARC.

(16)  Coordinate all communication with the DCS, G–1, ARD through their SARC and PM.

(17)  Collateral duty SHARP VAs assigned to military police units and must not provide SHARP VA services outside of military police units; if a victim who is not an MP discloses a sexual assault or act of sexual harassment to a SHARP professional within an MP unit, that SHARP professional must refer the victim to a SHARP professional who can provide services to that victim.

*cc.* VRs are DA Civilians (GS–9 and above) who have volunteered for and are appointed to perform collateral SHARP VA duties. VRs provide assistance and referrals to victims of sexual assault and sexual harassment, under the guidance and oversight of the parent organization's assigned full-time level VA. They also receive guidance and assistance from the parent organization's SARC. VRs are subject to the same screening and certification requirements as SHARP VAs. VRs will—

(1)  In coordination with the SHARP VA, assess the urgency of cases, develops a proposed plan for assistance, and implements the plan after the SHARP VA's approval.

(2)  Perform victim advocacy duties as required and requested.

(3)  Refer Soldiers reporting sexual harassment to the full-time brigade SARC.

(4)  Prioritize SHARP duties, when required to be performed, over the VR's full-time duties.

*dd.* Training Instructors are DA Civilians GS–11 or higher. Trainers must complete the SARC/VA Career Course and the SHARP Trainer Course. An approved exception to policy signed by the Director, DCS, G–1, ARD is required for Soldiers to attend the SHARP Trainer Course. Training Instructors will—

(1)  Train SHARP professionals through the SHARP Foundation Course.

(2)  Provide input to the modification of current SHARP training materials, to meet new and revised mission objectives.

(3)  Support SHARP annual, pre-deployment, and post-deployment training as required.

(4)  Maintain current, expert knowledge of the SHARP Program and related policy, processes, and procedures.

(5)  Prepare student records.

(6)  Coordinate all communication with the DCS, G–1 ARD through their PM.


## 7–6.  Program fundamentals

*a.*  Commanders and supervisors at each management level must champion a strong SHARP Program and provide effective education and SHARP annual training for all Soldiers and DA Civilians. Commanders are responsible for ensuring all supervisors and leaders understand their SHARP responsibilities.

*b.*  Commanders who receive or become aware of a formal or informal complaint of sexual harassment will initiate a commander's inquiry or AR 15–6 investigation. If the complaint of sexual harassment describes a sex-based offense punishable under the UCMJ, the commander will refer the complaint to USACIDC for investigation immediately.

*c.*  Commanders who become aware of reported or suspected sexual assault, including reports from a third party, will immediately contact the SARC and USACIDC. Commanders will not initiate any AR 15–6 investigation into reports of sexual assault and will contact their servicing legal office for consultation if it is unclear whether a reported act is sexual harassment or sexual assault.

*d.*  Commanders will not make credibility assessments as a precursor to forwarding reports of sexual assault to USACIDC or initiating authorized command investigations into complaints of sexual harassment.

*e.*  Commanders will enforce privacy protections. All complaints of sexual harassment and reports of sexual assault will be handled with discretion to maintain confidentiality.

*f.*  The SARB is addressed in appendix F.

*g.*  D–SAACP certification requirements are addressed in appendix G.

*h.*  Confidentiality guidelines for restricted/unrestricted reporting are addressed in appendix L.

**7–7. Sexual harassment**

*a.* Title 10 USC 1561 defines the term "sexual harassment" to mean any of the following:

(1) Conduct that involves unwelcome sexual advances, requests for sexual favors, and deliberate or repeated offensive comments or gestures of a sexual nature when—

*(a)* Submission to such conduct is made either explicitly or implicitly a term or condition of a person's job, pay, or career; or

*(b)* Submission to or rejection of such conduct by a person is used as a basis for career or employment decisions affecting that person; or

*(c)* Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creates an intimidating, hostile, or offensive working environment; and

*(d)* Is so severe or pervasive that a reasonable person would perceive, and the victim does perceive, the environment as hostile or offensive.

(2) Any use or condonation, by any person in a supervisory or command position, of any form of sexual behavior to control, influence, or affect the career, pay, or job of a member of the Armed Forces or a Civilian employee of the DoD.

(3) Any deliberate or repeated unwelcome verbal comment or gesture of a sexual nature by any member of the Armed Forces or Civilian employee of the DoD.

*b.* There is no requirement for concrete psychological harm to the complainant for behavior to constitute sexual harassment. Behavior is sufficient to constitute sexual harassment if it is so severe or pervasive that a reasonable person would perceive, and the complainant does perceive, the environment as hostile or offensive.

*c.* Sexual harassment can occur through electronic communications, including social media, other forms of communication, and in person.

*d.* The use of disparaging and/or sexualized terms may contribute to an unlawful hostile environment and thus will not be tolerated. Leaders at all levels will protect their teams against sexual harassment and proactively ensure that their environments are free from all forms of sexual harassment.

*e.* This paragraph is punitive, and violations may be punished under UCMJ, Art. 92. Leaders who fail to address complaints or document sexual harassment may also be subject to punitive and/or adverse administrative action.

*f.* Categories of sexual harassment—

(1) *Verbal.* Examples of verbal sexual harassment may include telling sexual jokes; using sexually explicit profanity, threats, sexually oriented cadences, or sexual comments; whistling in a sexually suggestive manner; and describing certain attributes of one's physical appearance in a sexual manner. Verbal sexual harassment may also include using terms of endearment such as "honey," "babe," "sweetheart," "dear," "stud," or "hunk" in referring to Soldiers, DA Civilian coworkers, or Family members.

(2) *Nonverbal.* Examples of nonverbal sexual harassment may include: cornering or blocking a passageway; inappropriately or excessively staring at someone; blowing kisses; winking; or licking one's lips in a suggestive manner. Nonverbal sexual harassment also includes offensive printed material (for example, displaying sexually oriented pictures or cartoons); using electronic communications as defined in paragraph 4–19; or sending sexually-oriented faxes, notes, or letters.

(3) *Physical contact.* Examples of physical sexual harassment may include: touching, patting, pinching, bumping, grabbing, kissing; or providing unsolicited back or neck rubs. There is significant overlap between that physical contact which constitutes sexual assault and that physical contact which constitutes sexual harassment. If the SARC receiving the sexual harassment complaint determines that the victim  describes sexual assault and not sexual harassment, the  SARC will advise the victim that the unwanted physical contact will be handled as a sexual assault; advise each victim of the role availability of a victim advocate; their victim rights; their potential right to an SVC, with SVC eligibility determined by coordinating with the servicing legal office regarding SVC services; explain the victim's options for restricted and unrestricted reporting; and clearly describe the required response protocol for each type of reporting option. Unwanted physical touching that does not meet the legal definition of sexual assault may still be addressed using the sexual harassment complaint process.

*g.* Types of sexual harassment—

(1) *Quid pro quo.* "Quid pro quo" is a Latin term meaning "this for that." This term refers to conditions placed on a person's career or terms of employment in return for favors. Examples include demanding sexual favors in exchange for a promotion, award, or favorable assignment. An example would be a Soldier who is not recommended for promotion and who believes that his or her squad leader recommended another Soldier in his or her squad for promotion on the basis of provided or promised sexual favors, not upon merit or ability.

(2) *Hostile environment.* A hostile environment, to include the work environment, can occur when Soldiers or DA Civilians are subjected to offensive, unwanted and unsolicited comments, or conduct of a sexual nature. An abusive

or hostile environment need not result in concrete psychological harm to the victim, but rather need only be so severe or pervasive that a reasonable person would perceive, and the victim does perceive, the environment as hostile or offensive. A hostile environment brings the topic of sex or gender into the environment in any one of a number of forms. Conduct considered under the hostile environment definition generally includes nonviolent, gender-biased sexual behaviors (for example, the use of derogatory gender-biased terms, comments about body parts, suggestive pictures, and explicit jokes).

### 7–8.  Sexual Harassment Complaint Processing System

*a.*  Soldiers (including DEP), cadets, and Family members aged 18 and over may file a sexual harassment complaint with the BDE SARC. Complaints from DA Civilian personnel (to include those against Soldiers) reporting sexual harassment will be handled in accordance with the procedures contained in AR 690–600, AR 690–12, or as described in separate DoD and DA policy, or as provided for in any applicable collective bargaining agreement.

*b.*  Although the processing of sexual harassment complaints through the chain of command and SARC is strongly encouraged, it will not serve as the only channel available to Soldiers/Family members to resolve, or seek guidance on how to address sexual harassment. SARCs are only responsible for processing and tracking in ICRS those complaints they have been made aware of. Actions and resolutions external to the commander or full-time brigade SARC will not be tracked or documented by the SARC, or entered into ICRS. Commanders will not preclude Soldiers from using alternative agencies to provide guidance regarding how to address sexual harassment directly.

*c.*  Concerns raised and/or resolved outside of the SHARP program by the complainant or another organization/individual are considered problem resolution or leadership actions; and are not considered sexual harassment complaints. Complaints involving reports of criminal behavior (that is, violations of UCMJ) will be reported or referred to law enforcement.

*d.*  The person or agency assisting the Soldier may be able to resolve the issue while maintaining confidentiality. While confidentiality should be attempted, it will neither be guaranteed nor promised to the complainant by agencies other than the chaplain or a lawyer. If the complainant discusses a complaint of sexual harassment involving criminal sexual offenses with SARC, SHARP VA, or VR, medical personnel, or chaplains, the complainant has not lost their ability to file a restricted sexual assault report. Unless discussed with personnel otherwise able to preserve the restricted reporting option, reports of sexual offenses will be referred to USACIDC as such conduct may violate the UCMJ. If any complaints of sexual harassment describe sexual assault, leaders will provide the Soldier an immediate opportunity to speak with a SARC.

*e.*  There are three ways Soldiers can submit a sexual harassment complaint—

(1)  Formally in writing on DA Form 7746.

(2)  Informally to a full-time brigade-level SARC.

(3)  Anonymously by any means from an unidentified complainant.

*f.*  There are three complaint processing types—

(1)  Anonymous complaints, made from an unknown or unidentified source, when referred to the subject's BDE commander for evaluation, and entered into ICRS.

(2)  Informally, when the complainant and/or the full-time brigade SARC address resolution at the lowest level with documentation in ICRS and on a locally-filed memorandum of record.

(3)  Formally, when the BDE commander initiates an investigation, disposition and resolution are addressed at the command level, and complaint processing is documented in ICRS.

*g.*  All sexual harassment complaints will be addressed regardless of the level at which they are reported. SHARP professionals, including SHARP VAs, trained and certified collateral duty SARCs, Training Instructors and PMs, will refer sexual harassment complainants to their servicing full-time brigade or equivalent SARC.

*h.*  DA Civilians, former employees, applicants for employment, and some contract employees may file their complaints of sexual harassment under the EEO complaint process. The DA Civilian EEO complaint process is contained in AR 690–600. SHARP professionals approached by DA Civilians concerning a sexual harassment complaint should assist them in finding the appropriate servicing EEO office.

(1)  DA Civilian complainants may make a complaint directly to the commander who will then initiate an investigation.

(2)  The SARC will not provide SHARP services in these cases, ask the complainant to fill out a DA Form 7746, or enter the complaint into ICRS.

(3)  The SHARP professionals should provide information to DA Civilians and refer them to the EEO Office.

*i.*  Family members aged 18 and over are eligible for SHARP services when they are victims of sexual harassment.

(1)  Family members may file complaints with a SARC.

(2)  These cases will be entered into ICRS and processed accordingly.

*j.* Sexual harassment complaints in a Joint Service environment will follow instructions contained in DoDI 1020.03.

*k.* Complaints involving online misconduct of a sexual nature will be addressed by law enforcement, IG, or the commander.

*l. Anonymous complaints.*

(1) An anonymous complaint is defined as a report of sexual harassment, regardless of the means of transmission, from an unknown or unidentified source. The individual reporting the information is not required to divulge any PII. Commanders will publicize and enable anonymous reporting through organizational hotlines, email, or official telephone lines. Anonymous reports of sexual harassment occurring in confinement facilities involving military inmates will adhere to requirements of the Prison Rape Elimination Act of 2003 (PREA).

(2) All anonymous complaints, even those that cannot be investigated, will be referred to the subject's BDE commander for evaluation, and entered into ICRS.

(3) Actions taken regarding anonymous complaints will depend upon the extent of information provided in the anonymous complaint. If an anonymous complaint contains sufficient information to permit the initiation of an investigation (such as, who committed the act(s), what the aggrieving behavior is, when the act(s) occurred, where the act(s) occurred, unit(s) of assignment for the complainant and the subject), the commander will initiate an inquiry or investigation in accordance with this instruction. If an anonymous complaint does not contain sufficient information to permit the initiation of an investigation, the complaint will be documented in a Memorandum for Record and maintained by the brigade SARC under double lock and key. The Memorandum for Record should contain the following information, if available: date and time the information was received; a detailed description of the facts and circumstances included in the complaint; date and time the complaint was resolved and by whom; any other pertinent information; and signed by the commander.

(4) Full-time brigade SARCs will process the DA Form 7746 for anonymous complaints for which the commander directs a formal investigation. The commander's information utilized in the Complainant section of the form when processing an anonymous complaint.

*m. Informal complaints.*

(1) An informal sexual harassment complaint is a complaint that a complainant does not wish to file in writing on a DA Form 7746. Typically, those issues that can be taken care of informally can be resolved through discussion, problem identification, and clarification of the issues. The SARC will provide information regarding support services that are available to help resolve the complaint, as appropriate, both on and off-post (health care, counseling, chaplains, legal assistance, and unit or installation trained mediators for alternative dispute resolution). The SARC receiving the complaint will not provide mediation themselves but can refer the complainant or victim to another mediator. SARCs who receive or discuss informal resolution of sexual harassment complaints will maintain a memorandum of record regarding the complaint and resolution actions taken. The SARC will ensure that the complainant understands that if a commander is informed of a complaint of sexual harassment, by the complainant or another party, the commander will inquire into the matter.

(2) If the commander investigates an informal complaint, the SARC will inform the complainant. The complainant may then decide not to pursue the complaint or complete a DA Form 7746. If the complainant does not fill out a DA Form 7746, an MFR, without PII, will be filed by the SARC locally, detailing the complaint and the response to that complaint. The SARC will also enter the relevant information into ICRS.

(3) SARCs are only responsible for processing and tracking in ICRS those informal complaints they have been made aware of. Actions and resolutions external to the commander or full-time brigade-level SARC, including requests for direct resolution will not be tracked or documented by the SARC, or entered into ICRS. If the complainant is not satisfied by the resolution provided by an informal complaint or a request for direct resolution, the complainant may file a formal complaint.

(4) An informal complaint is not subject to regulatory timeliness standards, but should be resolved within 14 calendar days of the complaint receipt. When involved, SARCs will update named complainants and victims, within the limitations of the Privacy Act and the FOIA, on the progress of the complaint status every 14 days from complaint receipt until it is closed. Within 14 days of being informed of the resolution, the complainant will accept informal resolution actions, submit a formal complaint, or decline to pursue the complaint further.

(5) Soldiers may make a request for direct resolution if their desired remedy for the aggrieving behavior can be achieved through leadership actions, peer intervention, counseling, or training. Requests for direct resolution can be made to anyone in a supervisory position, including NCOs and officers who are not in command. Requests for direct resolution are not required to be coordinated with the SARC or entered into ICRS.

(6) Upon receipt of a written or oral informal complaint, the brigade SARC will find out as much as possible concerning the complaint.

*(a)* SARCs will invite the complainant to provide as much information as the complainant is able to without asking detailed questions or pressuring the complainant for responses.

*(b)* SARCs will use crisis intervention and active listening skills to gather information in a manner that will not re-traumatize the complainant.

*(c)* Inform the complainant of—

1. Their rights in accordance with DoDI 6400.07.

2. Support services that are available to help resolve the issues, as appropriate, both on and off-post (health care, counseling, MPOs, TROs, and CPOs, chaplains, legal assistance, and unit or installation trained mediators for alternative dispute resolution).

3. The protected nature of the communication.

4. Both the informal and formal complaint processes.

5. That the complainant may choose to resolve the complaint through facilitation, intervention, counseling, and/or training.

6. SARCs can, at the victim's request, assign a SHARP VA who can provide crisis intervention, referrals, safety planning, and accompaniment to interviews and appointments.

(7) If the commander receives the complaint and chooses to resolve the situation through commander's inquiry and/or AR 15–6 investigation without the assistance of the SARC, the commander will inform the SARC within three calendar days of the receipt of the complaint and the subsequent resolution efforts.

(8) SARCs will prepare an MFR, which will include information indicating the nature of the complaint and identifying pertinent information to assist in the identification of the organization's command climate. SARCs will maintain the MFR under double lock and key.

(9) The SARC will enter informal complaint information into ICRS no later than 3 calendar days (RA) and next MUTA–4 (USAR) from the date of receipt.

(10) Upon completion of the resolution efforts, the complainant may–

*(a)* Accept informal resolution or continued efforts at resolution.

*(b)* Render a formal complaint.

*(c)* Decline to pursue complaint.

(11) The SARC will retain the informal complaint records for 15 years from the date of complaint receipt.

*n. Formal sexual harassment complaints.*

(1) Soldiers are encouraged to file formal complaints within 60 calendar days from the date of the aggrieving behavior. This will facilitate the investigation and resolution of these complaints.

(2) In cases where the complainant and subject are in different units, complaints may have to be elevated to the first commander in the chain of command at brigade level or above who has command authority over both the complainant and the subject. Complainant confidentiality will be protected to the maximum extent possible.

(3) There are two mechanisms by which complaints of sexual harassment are recorded by the servicing full-time brigade SARC as formal complaints.

*(a)* DA Form 7746. Soldiers can file formal sexual harassment complaints on the DA Form 7746, documenting the nature of the complaint and the requested remedies. Additionally, when an anonymous complaint is elevated to the commander and the commander determines that the complaint contains enough information to conduct an investigation, these anonymous complaints will be processed formally and will be documented on the DA Form 7746.

*(b)* Entry in ICRS. Any informal complaint investigated by the commander will, unless the complainant files a formal complaint on the DA Form 7746, be entered into ICRS as a formal complaint with the commander entered as the complainant.

(4) The full-time brigade SARC will refer all formal complaints to the BDE commander immediately. The commander will have the complainant swear to the contents of the statement(s) contained in the formal complaint by administering an oath to the complainant, in accordance with this regulation. At that time, the commander will inform the complainant of the potential adverse consequences to knowingly submitting a false complaint; that is, a complaint containing information that the complainant knew to be false. False complaints may be punishable under the UCMJ.

(5) Upon receipt of a complaint, commanders will commence or cause the commencement of an investigation or inquiry within 72 hours and will forward the complaint to the first commander in the chain of command with GCMCA within 72 hours of receipt. The investigation will be conducted at the level which a thorough examination of the facts can be achieved. To the extent practicable, investigations should be completed no later than 14 calendar days after the date on which the investigation is initiated. Within 20 calendar days of initiation of an investigation or inquiry, commanders will forward a progress report or final report of the investigation to the GCMCA. Progress reports will be submitted to the commander every 14-calendar days until completion. Complaints involving an investigation require a review for legal sufficiency before they are complete. Final reports will include the results of the investigation as

well as the appointing authority's actions taken on the findings and recommendations of the investigation. Commanders will forward final investigative reports to the GCMCA.

(6)  The servicing brigade SARC will provide complainants and victims with information about the investigative process and victim support resources available. The BDE Commander will update named complainants and victims on the progress of the investigation every 14 days from the date of complaint receipt until the case is closed. BDE Commanders will provide information about the status and outcomes of the complaint; for example, who is investigating, projected completion date, inquiry/investigation findings, and, upon command decision, a substantiated or unsubstantiated determination. When properly requested, and upon proper legal review and approval from the appointing authority, the complainant may be provided a redacted copy of the results of the investigation. Information about specific adverse actions taken against an individual is generally not disclosed unless such information is a matter of public record or when otherwise required to be released by statute. Upon completion of the final report, complainants will be informed whether the complaint was substantiated or not. The complainant may accept or appeal the findings or decline to pursue the complaint further. The servicing full-time brigade-level SARC will follow-up on the resolution status with the complainant between 30 to 45 days after case closure. Follow-up issues include any retaliation/reprisal the complainant was subjected to as well as whether the unwanted behavior stopped. Follow-up actions will be documented on DA Form 7746–1 (Sexual Harassment Complaint Resolution Assessment).

(7)  Full-time brigade SARCs are required to enter all formal sexual harassment complaints in ICRS. SARCs will ensure that all required data elements are collected and accurately documented. Substantiated complaints will be accompanied by a written report of investigation or other document detailing the evidence and findings as well as the commander's determination and signature. Commanders will comply with AR 15–6 when reports of investigation are to be used as the basis for administrative action. Commanders will consult legal counsel prior to initiating any administrative action.

(8)  Upon receipt of a formal complaint—

(a)  The SARC will invite the complainant to provide as much information as the complainant is able to without asking detailed questions or pressuring the complainant for responses.

(b)  SARCs will use their crisis intervention and active listening skills to gather information in a manner that will not re-traumatize the complainant. SARCs are not investigators and only need a limited amount of information to inform the BDE commander of the complaint and enter a case into ICRS.

(c)  SARCs must not swear the complainant to their statement.

(d)  SARCs will ask questions regarding the complainant's account of events as necessary to swear/affirm a complainant to their complaint, ascertain enough information to brief the GCMCA and IO on the nature of the complaint, and ensure the complainant is emotionally and physically safe as well as informed of resources available to support them through the investigation process. Commanders are reminded that the complainant will be asked these questions, perhaps several times, by the IO.

(e)  Inform the complainant of—

1.  Support services that are available to help resolve the issues as appropriate, both on and off-post (health care, counseling, MPOs and CPOs, chaplains, legal assistance, and unit or installation trained mediators for alternative dispute resolution).

2.  The protected nature of the communication, which will only be shared with those who have a legitimate need-to-know (for example, SARC, commander).

3.  The formal complaint process.

4.  SARCs can, at the victim's request, assign a SHARP VA who can provide crisis intervention, referrals, safety planning, and accompaniment to interviews and appointments.

5.  The importance of understanding the complainant's desired resolution or remedy.

6.  In DA Form 7746, the complainant will—

a)  Specify the concern.

b)  Provide the names of the parties involved and witnesses.

c)  Describe the aggrieving act(s)/behavior(s).

d)  Indicate the date(s) of the aggrieving act(s)/behavior(s).

7.  On DA Form 7746, the complainant will enter the requested resolution, which the commander may take into consideration upon completion of the inquiry or investigation, and when considering resolution actions. The information in this block can vary in terms of the complainant's expectations of the investigative process. If expectations that are not likely to be met come to the surface, they should be dispelled by the SARC or commander (during receipt of the complaint) through an explanation of the potential and the possible outcomes.

(f)  The BDE commander will establish and implement a plan to protect the complainant, any named witnesses, and the subject from acts of retaliation and reprisal. The retaliation and reprisal prevention plan will include, at a minimum,

a command meeting with the subject. The plan will also include separate meetings and discussions with the full-time SARC, the complainant, named witnesses, and necessary members of the chain of command and coworkers. Discretion will be used to determine the extent of information provided and the numbers of personnel addressed in the discussions with the chain of command and coworkers.

1. Content of the discussions with the above named individuals will include—

a) The definitions of retaliation and reprisal with examples of such behavior.

b) The Army's policy prohibiting retaliation and reprisal; the complainant's rights and extent of whistleblower protection afforded complainants, witnesses, and the subject under DoDD 7050.06.

c) Encouragement to all the aforementioned individuals to report incidents and/or threats of retaliation and reprisal.

d) The procedures to report acts and/or threats of retaliation and reprisal.

e) The consequences of retaliation and reprisal.

f) Possible sanctions against violators.

g) A reminder of the roles and responsibilities of the leadership in the prevention of retaliation and reprisal and protection of all parties involved.

h) The command's support of a thorough, expeditious, and unbiased investigation and good faith in attempting to resolve the complaint.

i) The need to treat all parties in a professional manner both during and following the conduct of the investigation.

2. Content of the written plan will include actions to be accomplished and annotation of names of personnel addressed. The commander will initial and date actions as completed, and provide a copy of the plan to the investigating officer and brigade SARC.

a) The investigating officer will include the commander's plan to prevent reprisal as an exhibit in the investigative findings.

b) The SARC will retain a copy of the commander's plan to prevent retaliation and reprisal with the completed case file and use the plan to conduct follow-up assessment of the complaint.

(9) *Conducting the investigation.*

*(a)* The commander will determine whether the investigation will be an investigation with appointment of an investigating officer or an informal inquiry directed by the commander. Commanders at all levels should consult their servicing legal office on inquiry and investigation procedures and standards.

*(b)* All commanders who receive a complaint of sexual harassment that includes unwanted physical contact that is not clearly sexual assault will coordinate with their servicing legal office concerning the determination as to whether the physical contact will be reported to USACIDC. Any doubts will be resolved in favor of reporting the physical contact to USACIDC. Every victim report of sexual assault to the chain of command will be reported to USACIDC.

*(c)* Commanders who act as the appointing authority will provide the investigating officer a copy of orders assigning him or her as the investigating officer and the initiated DA Form 7746 which identifies the complainant and lists the complaints to be investigated. The investigating officer will review AR 15–6 and AR 600–20 to review procedures applicable to the conduct of the investigation. .

*(d)* The investigating officer will meet with the servicing SJA or legal advisor to review how the investigation should be conducted under AR 15–6 and AR 600–20. The discussion should include the specific requirements of both regulations, advice on how investigations are conducted, and advice on how to question an interviewee who is suspected of committing a violation of the UCMJ.

*(e)* The investigating officer (the commander or appointed investigating officer) will meet with the SARC prior to conducting the investigation. The investigation officer must not consult with the same SARC who took the initial complaint or is providing assistance to the complainant. The SARC will assist the investigating officer in the development of questions to be addressed to the complainant, the subject and any witnesses or third parties. The SARC will remain available to the investigating officer for consultation and assistance throughout the conduct of the investigation.

*(f)* The investigating officer should interview every individual who may have firsthand knowledge of the facts surrounding the validity of the complaint. The investigating officer should also interview everyone who can substantiate the relationship or corroborate the relationship between the complainant and the subject. The investigating officer should interview the person who initially received the formal complaint, the complainant(s), any named witnesses, and the subject.

*(g)* The investigating officer should normally interview the subject after interviewing other witnesses, so that he or she will have a complete understanding of the reported incident. If needed prior to the conclusion of the investigation, the investigating officer should conduct a second interview of the complainant and the subject.

*(h)* The investigating officer may choose to re-interview certain witnesses for clarification of conflicting statements. Should unit policies or procedures be called into question as contributing factors to perceptions of unlawful discrimination or hostile environment, the investigating officer will interview responsible members of the chain of

command. It may be advisable to interview coworkers of the complainant and the subject for knowledge they may have about the reported incidents or the relationship that exists between the complainant and subject.

*(i)* If, when interviewing any Soldier, including the subject, the investigating officer reasonably suspects that the individual has committed an offense in violation of the UCMJ, the investigating officer must advise the Soldier of his/her rights under UCMJ, Art. 31. Investigating officers should consult with their servicing judge advocate or legal advisor before giving UCMJ, Art. 31 rights warnings, and should record the suspect's election on DA Form 3881. If the Soldier being questioned asks for a lawyer (that is, asserts his or her right to counsel), questioning must stop immediately and the interview must be terminated. Questioning may resume only in the presence of a lawyer, if the Soldier initiates further discussion or if the Soldier has consulted with a lawyer and thereafter waives his/her rights pursuant to a proper rights advisement. Similarly, questioning of a Soldier must stop immediately if a Soldier indicates the desire to remain silent. Once this right is asserted, questioning may resume only if the Soldier initiates further questioning or if after an appropriate interval, the Soldier waives his or her rights pursuant to a proper rights advisement. (See UCMJ, Art. 31, MRE 304 and 305, MCM).

*(j)* The investigating officer should secure copies of any documents that might substantiate or refute the testimony of the complainant, subject, or named witnesses. These documents may include copies of unit and personnel records and the complainant's personal documents.

*(k)* When the investigation is completed, the investigating officer should review the evidence, determine if the investigation adequately addresses the complaint, make factual findings about what occurred, and provide recommendations consistent with the findings. During the course of the investigation, the investigative officer should note concerns or observations of unit policy, procedures, and individual leadership or management techniques that may have a dysfunctional effect upon unit climate and foster discriminatory behavior and/or a hostile environment.

*(l)* If the subject of the complaint is a promotable colonel or an SES, the commander will refer the complaint to the IG for investigation, per AR 20–1. The IG is not subject to the timelines set for in DoDI 1020.03 or 10 USC 1561. These cases will not be entered into the Integrated Case Reporting System by the SARC but complainants are still eligible for victim advocacy services.

*(m)* The commander who initially received the complaint must notify complainants when an investigation begins, provide them information about the investigation process and victim support resources available, on- and off-base, and any appeal rights. When the investigation is complete, the commander must notify the complainant whether the complaint was substantiated or unsubstantiated.

*(n)* The investigation must be completed within 14 calendar days of receipt. If the investigation is not completed within 14 days, the commander must submit a report on the progress made in completing the investigation to the GCMCA, and every 14 calendar days after that until the investigation is completed.

*(o)* Upon completion of the investigation, a final report of the investigation must be submitted, including any action taken, to the GCMCA. All reports of investigations of sexual harassment must have a legal review before they are submitted to the GCMCA. The following items are required enclosures to the report presented to the appointing authority:

1. Orders of appointment as investigating officer.
2. Copy of the DA Form 7279 with attached continuation sheets.
3. Copy of the completed/initialed commander's plan to prevent reprisal.
4. List of questions developed with the MEO professional.
5. Statements/synopses of interviews with complainant(s), named witnesses, and subject(s) and relevant members of the chain(s) of command.
6. Copies of supporting documents.
7. Description/assessment of unit policies, procedures that may have contributed to sexual harassment within the unit.
8. Written approval of next higher echelon commander for any approved extensions.
9. Written explanation of extenuating circumstances that prevented the investigating officer from interviewing any named witnesses, complainants, or subjects.

*(p) Actions by the commander upon receipt of the report of the investigation.* Once the legal review is completed, the commander will decide whether further investigation is necessary or whether to approve or disapprove all or part of the findings and recommendations.

*o. Actions to resolve complaints.* A complaint is resolved by action to restore benefits and privileges lost because of sexual harassment. Punitive or administrative actions against a subject do not necessarily change offending behaviors or rectify the situation for the individual complainant or unit. Commanders will take corrective action to preclude recurrence of sexual harassment and address any management deficiencies or other contributing factors that caused the complaint to be filed. Commanders should review the investigation to assess factors or perceptions that may have

contributed to the reporting of an unsubstantiated complaint. The commander will also inform the complainant and the subject of the complaint of their right to appeal and make them aware of timelines and procedures to file that appeal. Consistent with the limitations of the Privacy Act and the FOIA, the commander will provide the complainant and subject with a memorandum that summaries the results of the investigation.

*p. Feedback.* The commander will provide written feedback to the complainant and the subject on the status of the investigation. Feedback will be provided every 14 calendar days (next MUTA–4 and every MUTA–4 thereafter for USAR) until actions to resolve the complaint are taken. This responsibility will not be delegated. Feedback should be consistent with the limitations of the Privacy Act and the FOIA. Commanders will inform the servicing SARC/SARC who received the initial complaint of the provisions of feedback so it can be entered into ICRS.

*q. Acts of sexual harassment that violate other provisions of the UCMJ.*

(1) Certain reported acts of sexual misconduct are investigated by USACIDC or other Military Criminal Investigation Organization (MCIO) rather than a commander. If an investigation reveals that an act initially reported as sexual harassment is an act of sexual misconduct, the commander will halt the investigation and refer the case to USACIDC or other MCIO.

(2) Any act of sexual harassment, as defined in paragraph 7–7, may result in punitive action. DA Civilians who commit an act of sexual harassment may be subject to disciplinary and/or administrative action according to appropriate civilian personnel regulations.

*(a)* Victims of stalking and sexual misconduct may be eligible for expedited transfers.

*(b)* Victims of wrongful broadcast or distribution of intimate visual images may not be eligible for expedited transfers but are eligible for other transfers (for example, compassionate reassignment or a safety move) to ensure their safety and protect their well-being.

(3) SARCs can assist the victim by coordinating with the servicing legal office regarding SVC services and provide assistance to the victim in obtaining an MPO, TROs and/or CPO.

(4) If a UCMJ offense that also meets the definition of sexual harassment is committed by a current or former intimate partner of the victim, SHARP professionals will coordinate with the Family Advocacy Program.

*r. Appeal process.*

(1) Both the complainant and the subject(s) may submit an appeal to the GCMCA; however this appeal process is not applicable to command action under UCMJ.

(2) If the complainant perceives the investigation failed to reveal all relevant facts to substantiate the complaint, or that the actions taken by the command on their behalf were insufficient to resolve the complaint, the complainant has the right to appeal to the next higher commander in their chain of command with GCMCA. The complainant may not appeal the action taken against the perpetrator, if any is taken. If subject(s) of the complaint perceive that the investigation has failed to reveal all relevant facts to prove their innocence, they have the right to appeal to the next higher commander in their chain of command with GCMCA. These documents will serve to provide the necessary guidance to unit personnel for the courses of action to be taken with appeals. Appeals that may potentially leave the Army chain of command will be forwarded to the DCS, G–1 (DAPE –A R) for resolution. The complainant may accept the command determination, submit an appeal, or decline to pursue the complaint further. The subject may accept the command determination or submit an appeal. Complainant appeals of unsubstantiated complaints will be made through the servicing full-time brigade-level SARC. This communication will clearly state, in writing, the basis of the appeal and will be made within 14 days of notification of the findings. Appeals made after 7 days from notification may be rejected as untimely. Appeals will be elevated to the next higher commander of the decision authority in the original complaint. Appeals will follow the formal complaint process wherein the next higher commander with GCMCA evaluates the complaint for legal sufficiency and may choose to conduct another investigation or commanders inquiry.

(3) The appeal will be submitted within 7 calendar days (at the next MUTA–4 drill period for USAR) following notification of the results of investigation and acknowledgement of the actions of the command to resolve the complaint. The complainant will provide a brief statement that identifies the basis of the appeal. This will be done in writing on DA Form 7746, Part VI. The DA Form 7746 will be returned to the commander in the chain of command who either conducted the investigation or appointed the investigating officer.

(4) Once the appeal is initiated by the complainant, the commander has three calendar days (or one MUTA–4 drill period for USARs) to refer the appeal to the next higher commander with GCMCA (or SC for those tenant units with a MOU that designate an appellate authority).

(5) The commander to which the appeal is made has 14 calendar days (or three MUTA–4 periods for USARs) to review the case and act on the appeal (that is, approve it, deny it, or conduct an additional investigation). No later than the 14th calendar day following receipt of the appeal (or appropriate RC timelines), this commander will provide written feedback, consistent with Privacy Act and Freedom of Information Act (FOIA) limitations, to the complainant on the results of the appeal.

(6) Sexual harassment complaints in a Joint Service environment will follow instructions contained in DoDI 1020.03.

**7–9. Sexual assault**

Sexual assault is a crime. Sexual assault is intentional sexual contact characterized by use of force, threats, intimidation, or abuse of authority or when the victim does not or cannot consent. The term includes a broad category of sexual offenses consisting of the following UCMJ offenses: rape, sexual assault, aggravated sexual contact, abusive sexual contact, or attempts to commit these acts. There are two reporting options for sexual assault: restricted reporting and unrestricted reporting.

  *a. Unrestricted reporting.*

  (1) This reporting option triggers an investigation, command notification, and allows a person who reports sexual assault to access healthcare treatment and the assignment of a SARC and a SHARP VA or VR. When a sexual assault is reported through unrestricted reporting, a SARC will be notified and respond or direct a SHARP VA or VR to respond, offer the victim emergency healthcare and an optional forensic exam, explain the contents of the DD Form 2910, and request that the victim elect a reporting option on the form. If the victim elects the unrestricted reporting option, a victim may not change from an unrestricted to a restricted report once it is reported to USACIDC. If the unrestricted option is elected, the completed DD Form 2701 (Initial Information for Victims and Witnesses of Crime), which sets out victims' rights and points of contact, will be distributed to the victim in unrestricted reporting cases by DoD law-enforcement agents.

  (2) A victim can disclose that they are the victim of a sexual assault to a SARC, SHARP VA, VR, HCP, command authorities, or others. The victim will have access to medical treatment and counseling, support, and consideration for protection orders and expedited transfers. If the victim chooses to file an unrestricted report, the SARC, SHARP VA or VR, HCP, chain of command, and law enforcement, will be notified that the crime was reported. An official investigation will be triggered and the subject may be prosecuted. All unrestricted reports will be referred to USACIDC, regardless of severity. Once a victim files an unrestricted report, it cannot be converted to a restricted report. If at any time a victim declines to participate in an investigation or prosecution, that decision should be honored by commanders, investigators, and all other personnel involved in the case.

  (3) A commander who receives an unrestricted report of a sexual assault will immediately refer the matter to USACIDC. A commander cannot investigate any report of sexual assault or delay immediately contacting USACIDC.

  (4) If a supervisor of a Soldier becomes aware of a sexual assault involving a Soldier, the supervisor is required to inform the Soldier's commander immediately.

  (5) Commanders will provide final disposition of sexual assault cases in accordance with AR 190–45.

  *b. Restricted reporting.*

  (1) This reporting option does not trigger an investigation. The SC is notified a sexual assault has been reported, but is not given the victim's name or other PII. Restricted reporting allows Soldiers and Family members age 18 and older who are sexual assault victims to confidentially disclose the assault to specified individuals (SARC, SHARP VA, or VR,) and receive healthcare treatment and the assignment of a SARC and SHARP VA or VR. A sexual assault victim can report directly to a SARC, who will respond or direct a SHARP VA or VR to respond, offer the victim healthcare treatment and a sexual assault forensic examination (SAFE), and explain to the victim the resources available through the DD Form 2910, where the reporting option is elected. The restricted reporting option is only available to Soldiers and Family members aged 18 and older. DA Civilians wishing to file a restricted report should consult with a SARC, SHARP VA, or SHARP VR. If a victim elects this reporting option, a victim may convert a restricted report to an unrestricted report at any time. The conversion to an unrestricted report will be documented with a signature by the victim and the signature of the SARC or SHARP VA or VR in the appropriate block on the DD Form 2910.

  (2) The victim can confidentially disclose and report a sexual assault to a SARC, SHARP VA, VR, or HCP. The victim will have access to medical treatment, including emergency care, counseling, and the assignment of a SARC and SHARP VA or VR, without triggering an official investigation or prosecution of the subject. If the victim chooses to file a restricted report, the SC will receive non-identifying information indicating a sexual assault has been reported.

  (3) If the victim tells someone outside of the restricted reporting chain (for example, a friend, Family member, roommate, or others), then they can still elect to submit a restricted report; however, if the person to whom the victim confided the information is in the victim's chain of command or military law enforcement, the report cannot be restricted. If the friend, Family member, roommate or other person to whom the victim confided the information reports the sexual assault to the chain of command or law enforcement, an official investigation will be initiated.

  (4) For restricted and unrestricted reporting purposes, a report can be made to healthcare personnel, but healthcare personnel will then immediately contact the SARC or SHARP VA to explain and complete the DD Form 2910.

Healthcare personnel can preserve the restricted reporting option; disclosures to them do not trigger an investigation. Healthcare personnel may not assist with the DD Form 2910.

(5)  Unless a DD Form 2910 is filed with a SARC, a report to a Chaplain or SVC will not result in the rendering of SHARP services or investigative action because of the privileges associated with speaking to these individuals. A Chaplain or SVC should advise the victim to consult with a SARC to understand the full scope of services available and facilitate, with the victim's consent, contact with a SARC.

### 7–10.  Retaliation in response to reports of sexual assault and sexual harassment

*a.*  SARCs, SHARP VAs, and VRs will inform victims of the resources available to report instances of retaliation, reprisal, ostracism, maltreatment, sexual harassment, or to request a transfer, or seek an MPO. If the retaliatory behavior is criminal in nature and the victim filed an unrestricted report, the crime should be immediately reported to USACIDC, even if the crime is not something normally reported to USACIDC (for example, victim's personal vehicle was defaced). Victims can seek assistance on how to report retaliatory behavior by requesting assistance from—

(1)  A SARC, SHARP VA, or VR, to report a sexual assault or sexual harassment.

(2)  A SARC on a different installation, which can be facilitated by the DoD Safe Helpline.

(3)  Immediate commander.

(4)  A commander outside their chain of command.

(5)  EO professional.

(6)  A GO if the retaliation, reprisal, ostracism, or maltreatment involves the administrative separation of victims within 1 year of the final disposition of their sexual assault case.

(7)  A GO if the victim believes that there has been an impact on their military career because they reported a sexual assault or sought mental health treatment for trauma that the victim believes is associated with the sexual assault. The victim may discuss the impact with the GO.

(8)  Trial counsel, Victim Witness Assistance Program, SVC if the victim is eligible for one pursuant to 10 USC 1044e, or a legal assistance attorney.

(9)  IG, invoking whistleblower protections.

(10)  Commander or SARC to request a safety transfer, or an MPO, TRO and/or CPO, if the victim is in fear for their safety.

(11)  USACIDC, if the retaliation takes the form of an act that is criminal in nature and the victim filed an unrestricted report.

*(a)*  SARCs, SHARP VAs, and VRs will provide support to victims of sexual assault and complainants of sexual harassment who are targets of retaliatory behavior until the response to the retaliatory behavior has reached final disposition.

*(b)*  SHARP professionals will assist commanders with retaliation prevention efforts.

*b.*  When USACIDC initiates a sexual assault investigation, it will also initiate and conduct subsequent investigations related to suspected retaliation against the sexual assault victim, to include physical assaults, threats and damage to property. Victims and/or their commander should immediately notify USACIDC whenever the victim of sexual assault is threatened, assaulted, or suffers property damage subsequent to their unrestricted report of a sexual assault.

*c.*  Commanders will establish procedures to protect all first responders, both civilians and Soldiers, as well as witnesses and bystanders who intervened to prevent a sexual assault or act of sexual harassment from retaliation, reprisal, ostracism, or maltreatment related to the execution of their duties and responsibilities.

*d.*  Commanders should consult with their servicing legal advisor and/or IG for guidance on implementation of policy regarding reports of retaliatory behaviors.

### 7–11.  Commander actions upon notification of a sexual assault

Commanders have significant leadership responsibility for actions after a report of sexual assault. The victim's commander will ensure the following actions are taken in response to an unrestricted report of sexual assault—

*a.*  Ensure the physical safety of the victim—determine if the subject is still nearby and if the victim needs protection.

*b.*  Determine if the victim needs or desires emergency medical care.

*c.*  Notify the SARC and USACIDC as soon as the victim's immediate safety is ensured.

*d.*  Advise the victim of the need to preserve evidence (for example, by not bathing, showering, or washing clothing).

*e.*  Make appropriate administrative and logistical coordination for movement of victim to receive care. (Involve the minimum number of personnel possible and only on a need-to-know basis.) If needed, assist with or provide immediate military transportation for the victim to the hospital or other appropriate treatment facility.

*f.* Ask if the victim needs a support person (for example, a personal friend or Family member, SHARP VA, chaplain) to immediately join the victim. Ensure the victim understands the availability of victim advocacy and the benefits of accepting advocacy and support.

*g.* Notify the chaplain if the victim requests pastoral counseling or assistance.

*h.* Advise the victim that he or she may be eligible for an SVC.

*i.* Notify military police, installation provost marshal (see AR 195–2), the servicing legal office, and commanders in the chain of command (as appropriate) within 24 hours (as soon as the victim's safety is established and victim's medical treatment procedures are in motion) and—

(1) Strictly limit the details regarding the sexual assault to only those personnel who have a legitimate need-to-know, specifically those who are involved in the investigation or in ensuring the victim's safety and care.

(2) Take action to safeguard the victim from any formal or informal investigative interviews or inquiries, except by those personnel who may have a "need-to-know," including but not limited to, the USACIDC investigator(s) and trial counsel.

(3) Collect only the necessary information (for example, victim's identity, location and time of the sexual assault, name and/or description of offender(s)). Do not ask detailed questions and/or pressure the victim for responses.

(4) Do not conduct AR 15–6 investigations or similar inquiries to determine if a sexual assault occurred.

(5) Collaborate closely with the SARC, legal, medical, and chaplain offices, and other service providers to ensure timely, coordinated, and appropriate responses to sexual assault issues and concerns.

*j.* Ensure the victim is made aware of, and encouraged to exercise, their options during each phase of the medical, investigative, and legal processes.

*k.* Ensure USACIDC notifies victims and witnesses of their rights through a completed DD Form 2701. (See AR 27–10).

*l.* Provide emotional support to the victim, including—

(1) Throughout the investigation, consult with the victim and, to the extent practicable, accommodate the victim's wishes regarding safety, health, and security, as long as neither a critical mission nor a full and complete investigation is compromised.

(2) Listen/engage in quiet support of the victim, as needed. Be available in the weeks and months following the sexual assault, and ensure the victim that they can rely on the commander's support.

(3) Emphasize to the victim the availability of additional avenues of support; refer to available counseling resources and other victim services.

(4) Ensure that victims of sexual assault receive sensitive care and support and do not experience secondary victimization as a result of making a report.

(5) As appropriate, refer the victim's Family to available resources (that is, counseling, resources, information, and medical care).

(6) Continue to monitor the victim's well-being, particularly if there are any indications of suicidal ideation, and ensure appropriate intervention occurs as needed.

*m.* Ensure the physical safety of the victim.

(1) If needed, confer with victim's HCP(s) and, based on their recommendation, determine the need for or other administrative or convalescent leave options in accordance with AR 600–8–10.

(2) Determine if the victim desires or needs a "no contact" order or an MPO to be issued, particularly if the victim and the subject are assigned to the same command, unit, duty location, or living quarters. Coordination with other commanders may be necessary if the subject is assigned to a different commander. MPOs are an effective tool for commanders to maintain the safety of victims and witnesses. Copies of the DD Form 2873 (Military Protective Order (MPO)) will be provided to the victim, subject, and to the military police for entry into federal databases.

*(a)* Ensure that when an MPO has been issued that the protected victim is informed, in a timely manner, of their option to request transfer from the command to which he or she is assigned (see app I for expedited transfer procedures). In addition, the person seeking the MPO will be advised that the MPO is not enforceable by civilian authorities off post. Victims desiring protection off base should be advised to seek a CPO.

*(b)* Ensure that appropriate civilian authorities are notified of the issuance of a protective order and the individuals involved in that order in the event an MPO has been issued against a member of the Armed Forces and any individual involved in the order does not reside on a military installation at any time during the duration of the MPO.

(3) Determine the need for temporary reassignment to another unit, duty location, or living quarters on the installation of the victim or the subject being investigated, working with the subject commander if different than the victim's commander, until there is a final legal disposition of the sexual assault report, and/or the victim is no longer in danger.

(4) Coordinate with sexual assault response agencies and the chain of command (involve as few people as possible and only on a need-to-know basis, protecting the victim's privacy) to determine if the victim's condition warrants

redeployment or reassignment until final legal disposition of the sexual assault case and/or the victim is no longer in danger.

*n.* Protect the victim's legal rights.

(1) Inform the victim of their right to request an expedited transfer.

(2) Inform the victim of the resources in theater that are available through the Victim Witness Assistance Program (see AR 27–10).

(3) Ensure the victim understands the availability of other referral organizations staffed with personnel who can explain the medical, investigative, and legal processes and advise the victim of his or her victim support rights.

(4) Consult with servicing legal office, as needed, to determine when and how best to dispose of the victim's collateral misconduct, if any.

*(a)* Absent extenuating or overriding considerations, which in the commander's judgment make it inappropriate to delay taking action, the commander should consider deferring discipline for such victim misconduct until all investigations are completed and the sexual assault report has been resolved. Commanders should take into account the trauma to a victim and dispose of collateral misconduct in a manner that encourages reporting of sexual assaults and the continued cooperation of the victim. Keep in mind the implications of this decision on speedy trial and/or statute of limitations.

*(b)* Consult with the servicing legal office and notify the assigned SARC before taking any administrative or disciplinary action affecting the victim.

(5) Avoid automatic suspension or revocation of a security clearance and/or Army Suitability Program access, understanding that the victim may be satisfactorily treated for his/her related trauma without compromising his/her security clearance or PRP. Consider the negative impact that suspension of a victim's security clearance or may have on building a climate of trust and confidence in the Army's sexual assault reporting system, but make final determination based on established national security standards (see AR 50–5 and DoD 5210.42–R).

(6) Remind personnel that discussion of a sexual assault might compromise an investigation.

(7) Do not allow Soldiers to be retaliated against for reporting sexual assault.

(8) Discourage members from participating in gossip or grapevine speculation about the case or investigation. Instruct unit members to wait until all the facts are known and final disposition of the report has occurred before reaching conclusions.

(9) Advise those who may have knowledge of the events leading up to or surrounding the sexual assault to fully cooperate with any investigation involved.

(10) May consider some form of unit training; or have an outside expert address the unit regarding preventive measures, as well as some of the emotional or psychological feelings that may manifest themselves, affect the unit, and require the unit's response during the course of the investigation.

(11) Continuously monitor the unit's overall climate to ensure neither the victim nor the subject is being ostracized. Take actions to prevent organizational splintering.

*o.* Commanders of subjects of sexual assault investigations will ensure the following actions are taken in response to an unrestricted report of sexual assault—

(1) Notify the SARC and USACIDC immediately after receiving a report of a sexual assault incident. Do not conduct any independent investigations of sexual assault reports.

(2) Avoid questioning the subject about the sexual assault, to the extent possible, because doing so may jeopardize the criminal investigation. However, if questioning does occur, advise the Soldier reported for committing a UCMJ offense of his or her rights under Article 31 of 10 USC Chapter 47.

(3) Any contact with a Soldier suspected of a sexual assault may involve rules and procedures that ensure due process of law and are unique to the military criminal justice system. Commanders and other command representatives should contact the servicing legal office for guidance.

(4) Safeguard the subject's rights and preserve the integrity of a full and complete investigation, including limitations on any formal or informal investigative interviews or inquiries by personnel other than those by personnel with a legitimate need-to-know.

(5) Strictly limit information pertinent to an investigation to those who have a legitimate need-to-know.

(6) Ensure procedures are in place to inform the subject, as appropriate, about the investigative and legal processes that may be involved.

(7) Consult with the servicing legal office for guidance on consulting with victim regarding jurisdictional preference, pretrial, disposition and other military justice actions.

(8) Ensure procedures are in place to inform the subject about available counseling support. As appropriate, refer the subject to available counseling resources and other services.

(9)  With the benefit of the SARC, servicing legal office legal, and/or investigative advice, determine the need for a MPO Copies of the DD Form 2873 will be provided to the victim and subject.

(10)  Monitor the well-being of the subject, particularly for any indications of suicidal ideation and homicidal tendencies, and to ensure appropriate intervention occurs if indicated.

(11)  Flag (suspend favorable personnel actions) any Soldier under charges, restraint, or investigation for sexual assault in accordance with AR 600–8–2 and suspend the Soldier's security clearance in accordance with AR 380–67.

(12)  If the subject is a foreign national or from a coalition force, confer with servicing legal office on responsibilities, options, and victims' rights.

(13)  Take appropriate action to prevent retaliation against Soldiers who file complaints or report acts of sexual harassment and sexual assault.

(14)  Discourage members from participating in gossip or grapevine speculation about the case or investigation. Instruct unit members to wait until all the facts are known and final disposition of the report has occurred before reaching conclusions.

(15)  Remind members that discussion of a sexual assault might compromise an ensuing investigation.

(16)  Emphasize that the subject is presumed innocent until proven guilty.

(17)  Advise those who may have knowledge of the events leading up to or surrounding the sexual assault to fully cooperate with any investigation involved.

(18)  Consider some form of unit training; or have an outside expert address the unit regarding preventive measures, as well as some of the emotional or psychological feelings that may manifest themselves, affect the unit, and require the unit's response during the course of the investigation.

(19)  Continuously monitor the unit's overall climate to ensure neither the victim nor the subject is being ostracized. Take actions to prevent organizational splintering.

## Appendix A

## References

### Section I
### Required Publications

**AR 15–6**
Procedures for Administrative Investigations and Boards of Officers (Cited in para 2–18*c*.)

**AR 25–2**
Army Cybersecurity (Cited in para 5–18*e*(1)(*d*).)

**AR 27–10**
Military Justice (Cited in para 2–5*b*(3)(*a*)14.)

**AR 30–22**
Army Food Program (cited in para P–1*b*.)

**AR 40–562**
Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases (Cited in para 5–4*g*(2).)

**AR 190–30**
Military Police Investigations (Cited in para 5–11*a*.)

**AR 195–2**
Criminal Investigation Activities (Cited in para 4–7*d*.)

**AR 195–5**
Evidence Procedures (Cited in para L–4*a*(5).)

**AR 380–67**
Personnel Security Program (Cited in para 4–7*d*(2).)

**AR 381–12**
Threat Awareness and Reporting Program (Cited in para 4–12*f*.)

**AR 525–2**
The Army Protection Program (Cited in para 5–18*a*(1).)

**AR 525–13**
Antiterrorism (Cited in para 5–18*e*(1)(*e*).)

**AR 600–8–24**
Officer Transfers and Discharges (Cited in para 4–22*d*(7).)

**AR 600–78**
Army Suitability Program (Cited in para G–2*a*.)

**AR 600–81**
Soldier for Life–Transition Assistance Program (Cited in para 5–9*b*.)

**AR 600–291**
Foreign Government Employment (Cited in para 4–9*d*.)

**AR 623–3**
Evaluation Reporting System (Cited in para 2–3*a*.)

**AR 670–1**
Wear and Appearance of Army Uniforms and Insignia (Cited in para 2–19*a*(4).)

**Department of Defense Foreign Clearance Guide**
(Available at https://www.fcg.pentagon.mil/fcg.cfm.) (Cited in para 5–3*k*(3)(*b*).)

**DoD 5500.07–R**
Joint Ethics Regulation (JER) (Available at https://www.esd.whs.mil.) (Cited in para 4–9*c*.)

**DoDD 1350.2**
Department of Defense Military Equal Opportunity (MEO) Program (Available at https://www.esd.whs.mil.) (Cited in title page.)

**DoDD 5205.16**
The DoD Insider Threat Program (Available at https://www.esd.whs.mil.) (Cited in title page.)

**DoDD 6495.01**
Sexual Assault Prevention and Response (SAPR) Program (Available at https://www.esd.whs.mil.) (Cited in title page.)

**DoDD 7050.06**
Military Whistleblower Protection ((Available at https://www.esd.whs.mil.) (Cited in title page.)

**DoDI 1000.15**
Procedures and Support for Non-Federal Entities Authorized to Operate on DoD Installations (Available at https://www.esd.whs.mil.) (Cited in para 4–11.)

**DoDI 1020.03**
Harassment Prevention and Response in the Armed Forces (Available at https://www.esd.whs.mil.) (Cited in title page.)

**DoDI 1300.17**
Accommodation of Religious Practices Within the Military Services (Available at https://www.esd.whs.mil.) (Cited in title page.)

**DoDI 1325.06**
Handling Dissident and Protest Activities Among Members of the Armed Forces (Available at https://www.esd.whs.mil.) (Cited in title page.)

**DoDI 5154.31, Volume 4,**
Commercial Travel Management: DoD Government Travel Charge Card (GTCC) Program (Available at https://www.esd.whs.mil.) (Cited in para 4–21*b.*)

**DoDI 6490.04**
Mental Health Evaluations of Members of the Military Services (Available at https://www.esd.whs.mil.) (Cited in para 5–4*f.*)

**DoDI 6495.02**
Sexual Assault Prevention and Response (SAPR) Program Procedures (Available at https://www.esd.whs.mil.) (Cited in title page.)

**DoDI 6495.03**
Defense Sexual Assault Advocate Certification Program (D–SAACP) (Available at https://www.esd.whs.mil.) (Cited in title page.)

**DoD Government Travel Charge Card Regulations**
(Available at https://www.defensetravel.dod.mil.) (Cited in para 4–21*b.*)

**Joint Travel Regulation**
(Available at http://www.defensetravel.dod.mil.) (Cited in para 5–3*k*(3)(*b*).)

**Manual for Courts–Martial (MCM)**
2016 edition (Available at https://jsc.defense.gov.) (Cited in para 2–5*j*(2).)

### Section II

### Related Publications

A related publication is a source of additional information. The user does not have to read it to understand this regulation. DoD publications can be found at https://www.esd.whs.mil. USCs can be found at http://uscode.house.gov. CFRs can be found at https://www.govinfo.gov.)

**AD 2018–23**
Improving the Effectiveness of Essential and Important Army Programs: Sexual Harassment/Assault Response and Prevention, Equal Opportunity, Suicide Prevention, Alcohol and Drug Abuse Prevention, and Resilience

**ADP 1**
The Army

**ADP 6–22**
Army Leadership

**ADRP 5–0**
The Operations Process

**AR 1–20**
Legislative Liaison

**AR 5–9**
Installation Agreements

**AR 10–87**
Army Commands, Army Service Component Commands, and Direct Reporting Units

**AR 11–2**
Managers' Internal Control Program

**AR 15–1**
Department of the Army Federal Advisory Committee Management Program

**AR 15–39**
Department of the Army Intergovernmental and Intragovernmental Committee Management Program

**AR 20–1**
Inspector General Activities and Procedures

**AR 25–22**
The Army Privacy Program

**AR 25–30**
Army Publishing Program

**AR 25–50**
Preparing and Managing Correspondence

**AR 25–400–2**
The Army Records Information Management System (ARIMS)

**AR 27–40**
Litigation

**AR 40–1**
Composition, Mission, and Functions of the Army Medical Department

**AR 40–3**
Medical, Dental, and Veterinary Care

**AR 40–5**
Army Public Health Program

**AR 40–66**
Medical Record Administration and Health Care Documentation

**AR 40–400**
Patient Administration

**AR 50–5**
Nuclear Surety

**AR 50–6**
Chemical Surety

**AR 135–18**
The Active Guard Reserve Program

**AR 135–91**
Service Obligations, Methods of Fulfillment, Participation Requirements, and Enforcement Procedures

**AR 135–100**
Appointment of Commissioned and Warrant Officers of the Army

**AR 135–155**
Promotion of Commissioned Officers and Warrant Officers Other than General Officers

**AR 135–175**
Separation of Officers

**AR 135–178**
Enlisted Administrative Separations

**AR 140–10**
Assignments, Attachments, Details, and Transfers

**AR 140–111**
U.S. Army Reserve Reenlistment Program

**AR 140–483**
Army Reserve Land and Facilities Management

**AR 165–1**
Army Chaplain Corps Activities

**AR 190–9**
Absentee Deserter Apprehension Program and Surrender of Military Personnel to Civilian Law Enforcement Agencies

**AR 190–17**
Biological Select Agents and Toxins Security Program

**AR 190–24/OPNAVINST 1620.2A/AFI 31–213/MCO 1620.2D/COMDTINST 1620.1E**
Armed Forces Disciplinary Control Boards and Off-Installation Liaison and Operations

**AR 190–45**
Law Enforcement Reporting

**AR 190–47**
The Army Corrections System

**AR 200–1**
Environmental Protection and Enhancement

**AR 210–7**
Personal Commercial Solicitation on Army Installations

**AR 215–1**
Military Morale, Welfare, and Recreation Programs and Nonappropriated Fund Instrumentalities

**AR 220–1**
Army Unit Status Reporting and Force Registration - Consolidated Policies

**AR 350–1**
Army Training and Leader Development

**AR 350–100**
Officer Active Duty Service Obligations

**AR 360–1**
The Army Public Affairs Program

**AR 380–5**
Army Information Security Program

**AR 380–13**
Acquisition and Storage of Information Concerning Nonaffiliated Persons and Organizations

**AR 385–10**
The Army Safety Program

**AR 420–1**
Army Facilities Management

**AR 525–28**
Personnel Recovery

**AR 530–1**
Operations Security

**AR 600–3**
The Army Personnel Development System

**AR 600–8–2**
Suspension of Favorable Personnel Actions (Flag)

**AR 600–8–6**
Personnel Accounting and Strength Reporting

**AR 600–8–8**
The Total Army Sponsorship Program

**AR 600–8–10**
Leaves and Passes

**AR 600–8–11**
Reassignment

**AR 600– 8–14**
Identification Cards for Members of the Uniformed Services, Their Family Members, and Other Eligible Personnel

**AR 600–8–19**
Enlisted Promotions and Reductions

**AR 600–8–29**
Officer Promotions

**AR 600–8–104**
Army Military Human Resource Records Management

**AR 600–9**
The Army Body Composition Program

**AR 600–25**
Salutes, Honors, and Courtesy

**AR 600–29**
Fund-raising within the Department of the Army

**AR 600–37**
Unfavorable Information

**AR 600–63**
Army Health Promotion

**AR 601–210**
Regular Army and Reserve Components Enlistment Program

**AR 601–280**
Army Retention Program

**AR 608–1**
Army Community Service

**AR 608–10**
Child Development Services

**AR 608–18**
The Army Family Advocacy Program

**AR 608–75**
Exceptional Family Member Program

**AR 614–30**
Overseas Service

**AR 614–100**
Officer Assignment Policies, Details, and Transfers

**AR 614–200**
Enlisted Assignments and Utilization Management

**AR 621–1**
Advanced Education Programs and Requirements for Military Personnel

**AR 635–40**
Disability Evaluation for Retention, Retirement, or Separation

**AR 635–200**
Active Duty Enlisted Administrative Separations

**AR 638–8**
Army Casualty Program

**AR 690–11**
Department of the Army Expeditionary Civilian Workforce and Civilian Deployments, in Support of Military Contingency and Emergency Operations

**AR 690–12**
Equal Employment Opportunity and Diversity

**AR 690–600**
Equal Employment Opportunity Discrimination Complaints

**AR 690–700**
Personnel Relations and Services (General)

**AR 700–90**
Army Industrial Base Process

**ATP 6–22.1**
The Counseling Process

**CNGBI 9601.01**
National Guard Discrimination Complaint Program (Available at https://www.ngbpdc.army.mil.)

**CTA 50–900**
Clothing and Individual Equipment

**CTA 50–909**
Field and Garrison Furnishings and Equipment (Available at https://fmsweb.army.mil.)

**DA Pam 25–403**
Guide to Recordkeeping in the Army

**DA Pam 40–11**
Army Public Health Program

**DA Pam 220–1**
Defense Readiness Reporting System-Army Procedures

**DA Pam 385–30**
Risk Management

**DA Pam 600–3**
Officer Professional Development and Career Management

**DA Pam 600–8**
Military Human Resources Management Administrative Procedures

**DA Pam 600–26**
The Department of the Army Affirmative Action Plan

**DA Pam 611–21**
Military Occupational Classification and Structure

**DA Pam 623–3**
Evaluation Reporting System

**DA Pam 670–1**
Guide to the Wear and Appearance of Army Uniforms and Insignia

**DoD Retaliation Prevention and Response Strategy Implementation Plan**
Available http://www.sapr.mil/.

**DoDM 6025.18**
Implementation of the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule in DoD Health Care Programs

**DoDD 1344.10**
Political Activities by Members of the Armed Forces

**DoDD 1440.1**
DoD Civilian Equal Employment Opportunity (EEO) Program

**DoDD 2311.01E**
DoD Law of War Program

**DoDD 5158.04**
United States Transportation Command (USTRANSCOM)

**DoDI 1030.2**
Victim and Witness Assistance Procedures

**DoDI 1304.33**
Protecting Against Inappropriate Relations During Recruiting and Entry Level Training

**DoDI 1320.14**
Commissioned Officer Promotion Program Procedures

**DoDI 1325.02**
Desertion and Unauthorized Absence (UA)

**DoDI 1332.14**
Enlisted Administrative Separations

**DoDI 1332.30**
Commissioned Officer Administrative Separations

**DoDI 1341.09**
DoD Adoption Reimbursement Policy

**DoDI 1342.19**
Family Care Plans

**DoDI 1400.25**
DoD Civilian Personnel Management System

**DoDI 2200.01**
Combating Trafficking in Persons (CTIP)

**DoDI 3025.21**
Defense Support of Civilian Law Enforcement Agencies

**DoDI 5200.02**
DoD Personnel Security Program (PSP)

**DoDI 5240.22**
Counterintelligence Support to Force Protection

**DoDI 5240.26**
Countering Espionage, International Terrorism, and the Counterintelligence (CI) Insider Threat

**DoDI 5505.18**
Investigation of Adult Sexual Assault in the Department of Defense

**DoDI 5505.19**
Establishment of Special Victim Investigation and Prosecution (SVIP) Capability within the Military Criminal Investigative Organizations (MCIOS)

**DoDI 6400.07**
Standards for Victim Assistance Services in the Military Community

**DoDM 5200.02**
Procedures for the DoD Personnel Security Program (PSP)

**DoDM 6400.01 Vol 1**
Family Advocacy Program (FAP): FAP Standards

**DoDM 6400.01 Vol 2**
Family Advocacy Program (FAP): Child Abuse and Domestic Abuse Incident Reporting System

**DoDM 6400.01 Vol 3**
Family Advocacy Program (FAP): Clinical Case Staff Meeting (CCSM) And Incident Determination Committee (IDC)

**DoDM 6400.01 Vol 4**
Family Advocacy Program (FAP): Guidelines for Clinical Intervention for Persons Reported As Domestic Abusers

**DoDM 7730.47–M, Volume 1**
Defense Incident-Based Reporting System (DIBRS): Data Segments and Elements

**Handbooks**
(Available at https://www.opm.gov)

**Joint Resolution of Congress, 1971**
Women's Equality Day (Available at https://www.govinfo.gov.)

**MRE 304**
Confessions and admissions (Available at https://jsc.defense.gov.)

**MRE 502**
Lawyer-client privilege (Available at https://jsc.defense.gov.)

**MRE 503**
Communications to clergy (Available at https://jsc.defense.gov.)

**MRE 513**
Psychotherapist-patient privilege (Available at https://jsc.defense.gov.)

**MRE 514**
Victim advocate-victim privilege (Available at https://jsc.defense.gov.)

**NGR 600–21**
Equal Opportunity Program in the Army National Guard (Available at http://www.ngbpdc.ngb.army.mil/publications.htm.)

**NGR 635–101**
Efficiency and Physical Fitness Boards (Available at http://www.ngbpdc.ngb.army.mil/publications.htm.)

**PL 88–352**
Civil Rights Act of 1964 (Available at https://www.ssa.gov.)

**PL 99–244**
National Black/African-American History Month (Available at https://www.ssa.gov.)

**PL 104–191**
Health Insurance Portability and Accountability Act of 1996 (Available at http://www.ssa.gov.)

**PL 105–277**
Federal Vacancies Reform Act of 1998 (Available at https://www.ssa.gov.)

**PL 108–79**
Prison Rape Elimination Act of 2003 (PREA) (Available at https://www.ssa.gov.)

**TC 7–22.7**
Noncommissioned Officer Guide

**TC 26–6**
Commander's Equal Opportunity Handbook

**5 CFR 2635.301 through 304**
Gifts Between Employees

**29 CFR 1614**
Federal Sector Equal Employment Opportunity

**32 CFR Part 105**
Sexual Assault Prevention and Response Program Procedures

**5 USC 552a**
Records maintained on individuals

**5 USC 5312**
Positions at level I

**5 USC 5317**
Presidential authority to place positions at level IV and V

**5 USC 6323**
Military leave; Reserves and National Guardsmen

**10 USC**
Armed Forces

**10 USC Chapter 13**
Insurrection

**10 USC Chapter 47**
Uniform Code of Military Justice

**10 USC Chapter 1211**
National Guard Members in Federal Service

**10 USC 580a**
Enhanced authority for selective early discharges

**10 USC 637**
Selection of regular officers for continuation on active duty

**10 USC 741**
Rank: commissioned officers of the Armed Forces

**10 USC 747**
Command: when different commands of Army, Navy, Air Force, Marine Corps, and Coast Guard join

**10 USC 888**
Art. 88. Contempt toward officials

**10 USC 922**
Art. 122. Robbery

**10 USC 973**
Duties: officers on active duty; performance of civil functions restricted

**10 USC 1034**
Protected communications; prohibition of retaliatory personnel actions

**10 USC 1044e**
Special Victims' Counsel for victims of sex-related offenses

**10 USC 1176**
Enlisted members: retention after completion of 18 or more, but less than 20, years of service

**10 USC 1211**
Members on temporary disability retired list: return to active duty; promotion

**10 USC 1561**
Complaints of sexual harassment: investigation by commanding officers

**10 USC 7233**
Requirement of exemplary conduct

**10 USC 10505**
Vice Chief of the National Guard Bureau

**10 USC 12301**
Reserve components generally

**10 USC 12302**
Ready Reserve

**10 USC 12303**
Ready Reserve: members not assigned to, or participating satisfactorily in, units

**10 USC 12304**
Selected Reserve and certain Individual Ready Reserve members; order to active duty other than during war or national emergency

**10 USC 12686**
Reserves on active duty within two years of retirement eligibility: limitation on release from active duty

**18 USC 205**
Activities of officers and employees in claims against and other matters affecting the Government

**18 USC 207**
Restrictions on former officers, employees, and elected officials of the executive and legislative branches

**18 USC 208**
Acts affecting a personal financial interest

**18 USC 607**
Place of solicitation

**18 USC 922**
Unlawful acts

**18 USC 1385**
Use of Army and Air Force as posse comitatus (Posse Comitatus Act)

**29 USC 630**
Definitions

**29 USC 631**
Age limits

**29 USC 633**
Federal-State relationship

**29 USC 634**
Authorization of appropriations

**32 USC**
National Guard

**32 USC 110**
Regulations

**32 USC 317**
Command during joint exercises with Federal troops

**36 USC 102**
Asian/Pacific American Heritage Month

**42 USC 653**
Federal Parent Locator Service

**42 USC 2000bb**
Congressional findings and declaration of purposes

**42 USC 2000bb–1**
Free exercise of religion protected

**42 USC 2000bb–2**
Definitions

**42 USC 2000bb–3**
Applicability

**42 USC 2000bb–4**
Establishment clause unaffected

**52 USC 30116**
Limitations on contributions and expenditures

## Section III

**Prescribed Forms**

Unless otherwise indicated, DA Forms are available on the Army Publishing Directorate website (https://armypubs.army.mil); DD Forms are available on the Office of the Secretary of Defense website (https://www.esd.whs.mil/directives/forms).

**DA Form 5304**
Family Care Plan Counseling Checklist (Prescribed in para 5–3*a*(3)(*e*).)

**DA Form 5305**
Family Care Plan (Prescribed in para 5–3*a*(2).)

**DA Form 5840**
Certificate of Acceptance as Guardian or Escort (Prescribed in para 5–3*a*(3)(*b*).)

**DA Form 5841**
Power of Attorney (Prescribed in para 5–3*a*(3)(*a*).)

**DA Form 7279**
Equal Opportunity and Harassment Complaint Form (Prescribed in para 6–6*b*(1)(*a*).)

**DA Form 7279–1**
Equal Opportunity and Harassment Complaint Resolution Assessment Form (Prescribed in para 6–6*b*(1)(*a*).)

**DA Form 7666**
Parental Consent (Prescribed in para 5–3*a*(3)(*f*).)

**DA Form 7667**
Family Care Plan Preliminary Screening (Prescribed in para 5–3*g*(1).)

**DA Form 7746**
Sexual Harassment Complaint (Prescribed in para 7–5*y*(3).)

**DA Form 7746–1**
Sexual Harassment Complaint Resolution Assessment (Prescribed in para 7–8*n*(6).)

## Section IV

## Referenced Forms

Unless otherwise indicated, DA Forms are available on the Army Publishing Directorate website (https://armypubs.army.mil); DD Forms are available on the Office of the Secretary of Defense website (https://www.esd.whs.mil/directives/forms).

**DA Form 11–2**
Internal Control Evaluation Certification

**DA Form 67–10–1**
Company Grade Plate (O1 - O3; WO1 - CW2) Officer Evaluation Report

**DA Form 67–10–2**
Field Grade Plate (O4 - O5; CW3 - CW5) Officer Evaluation Report

**DA Form 67–10–3**
Strategic Grade Plate (O6) Officer Evaluation Report

**DA Form 67–10–4**
Strategic Grade Plate General Officer Evaluation Report

**DA Form 1059**
Service School Academic Evaluation Report

**DA Form 1059–1**
Civilian Institution Academic Evaluation Report

**DA Form 1574–1**
Report of Proceedings by Investigating Officer

**DA Form 2028**
Recommended Changes to Publications and Blank Forms

**DA Form 2166–9–1**
NCO Evaluation Report (SGT)

**DA Form 2166–9–2**
NCO Evaluation Report (SSG–1SG/MSG)

**DA Form 2166–9–3**
NCO Evaluation Report (CSM/SGM)

**DA Form 2627**
Record of Proceedings under Article 15, UCMJ

**DA Form 3881**
Rights Warning Procedure/Waiver Certificate

**DA Form 4187**
Personnel Action

**DA Form 4833**
Commander's Report of Disciplinary or Administrative Action

**DA Form 5248–R**
Report of Unfavorable Information for Security Determination

**DD Form 553**
Deserter/Absentee Wanted by the Armed Forces

**DD Form 1172–2**
Application for Identification Card/DEERS Enrollment

**DD Form 2558**
Authorization to Start, Stop, or Change an Allotment

**DD Form 2675**
Reimbursement Request for Adoption Expenses

**DD Form 2701**
Initial Information for Victims and Witnesses of Crime

**DD Form 2760**
Qualification to Possess Firearms or Ammunition

**DD Form 2791**
Notice of Release/Acknowledgement of Convicted Sex Offender Registration Requirements

**DD Form 2873**
Military Protective Order (MPO)

**DD Form 2910**
Victim Reporting Preference Statement

**DD Form 2950**
Department of Defense Sexual Assault Advocate Certification Program (D–SAACP) Application Packet for New Applicants

**DD Form 2950–1**
Department of Defense Sexual Assault Advocate Certification Program (D–SAACP) Application Packet for Renewal Applicants

**DD Form 2982**
Recruiter/Trainer Prohibited Activities Acknowledgment

**DD Form 2983**
Recruit/Trainee Prohibited Activities Acknowledgment

## Appendix B

## Political Activities

### B–1. Purpose
This appendix gives specific guidance on those political activities that are permitted or prohibited.

### B–2. Examples of permissible political activity
A Soldier on active duty may—

*a.* Register, vote, and express a personal opinion on political candidates and issues, as a private citizen, but not as a representative of the Armed Forces.

*b.* Promote and encourage other Soldiers to exercise their voting franchise, if such promotion does not constitute an attempt to influence or interfere with the outcome of an election.

*c.* Join a partisan or nonpartisan political club and attend its meetings when not in uniform, subject to the restrictions in paragraph B–3*d*.

*d.* Serve as an election official, if such service is not as a representative of a partisan political party, does not interfere with military duties, is performed when not in uniform, and has the prior approval of the SECARMY.

*e.* Sign a petition for specific legislative action or a petition to place a candidate's name on an official election ballot, if the signing does not obligate the Soldier to engage in partisan political activity and is done as a private citizen and not as a representative of the Armed Forces.

*f.* Write a letter to the editor of a newspaper expressing the Soldier's personal views on public issues or political candidates, if such action is not part of an organized letter-writing campaign or a solicitation of votes for or against a political party or partisan political cause or candidate. If the letter identifies the member as on active duty (or if the member is otherwise reasonably identified as a member of the Armed Forces), the letter should clearly state that the views expressed are those of the individual only and not those of the Department of Defense.

*g.* Make monetary contributions to a political organization, party, or committee favoring a particular candidate or slate of candidates, subject to the limitations under 18 USC 607 and 52 USC 30116.

*h.* Display a political sticker on the Soldier's private vehicle.

*i.* Attend partisan and nonpartisan political fundraising activities, meetings, rallies, debates, conventions, or activities as a spectator when not in uniform and when no inference or appearance of official sponsorship, approval, or endorsement can reasonably be drawn.

*j.* Participate fully in the Federal Voting Assistance Program.

*k.* Follow, friend, or like a political party or candidate running for partisan office.

### B–3. Examples of prohibited political activities
According to the statutory restrictions in 10 USC 973and the policies established in section d of DoDD 1344.10 and implemented in chapter 5, of this regulation, a Soldier on active duty will not—

*a.* Participate in partisan political fundraising activities (except as permitted in para B–2*g*), rallies, conventions (including making speeches in the course thereof), management of campaigns, or debates, either on one's own behalf or on that of another, without respect to uniform or inference or appearance of official sponsorship, approval, or endorsement. Participation includes more than mere attendance as a spectator (see para B–2*i*).

*b.* Use official authority or influence to interfere with an election, affect the course or outcome of an election, solicit votes for a particular candidate or issue, or require or solicit political contributions from others.

*c.* Allow or cause to be published partisan political articles signed or written by the Soldier that solicit votes for or against a partisan political party or candidate. This is distinguished from a letter to the editor as permitted under the conditions noted in paragraph B–2*f*.

*d.* Serve in any official capacity or be listed as a sponsor of a partisan political club.

*e.* Speak before a partisan political gathering, including any gathering that promotes a partisan political party, candidate, or cause.

*f.* Participate in any radio, television, or other program or group discussion as an advocate for or against a partisan political party, candidate, or cause.

*g.* Conduct a political opinion survey under the auspices of a partisan political club or group or distribute partisan political literature.

*h.* Perform clerical or other duties for a partisan political committee during a campaign, on an election day, or after an election day during the process of closing out a campaign.

*i.* Solicit or otherwise engage in fundraising activities in Federal offices or facilities, including military reservations, for any political cause or candidate.

*j.* March or ride in a partisan political parade.

*k.* Display a large political sign, banner, or poster (as distinguished from a bumper sticker) on the top or side of a private vehicle.

*l.* Display a partisan political sign, poster, banner, or similar device visible to the public at one's residence on a military installation, even if that residence is part of a privatized housing development.

*m.* Participate in any organized effort to provide voters with transportation to the polls if the effort is organized by, or associated with, a partisan political party, candidate, or cause.

*n.* Sell tickets for, or otherwise actively promote, partisan political dinners and similar fundraising events.

*o.* Attend partisan political events as an official representative of the Armed Forces, except as a member of a joint Armed Forces color guard at the opening ceremonies of the national conventions of the Republican, Democratic, or other political parties recognized by the Federal Elections Committee or as otherwise authorized by the SECARMY.

*p.* Be a nominee or candidate for civil office in Federal, State, or local government, except as authorized in this regulation or DoDD 1344.10, or engage in public or organized soliciting of others to become partisan candidates for nomination or election to civil office.

*q.* Hold or exercise the functions of a Federal, State, or local government office attained by election or appointment, except as authorized by this regulation or DoDD 1344.10.

*r.* Make a campaign contribution to, or receive or solicit (on one's own behalf) a campaign contribution from, any other member of the Armed Forces on active duty. Any contributions not prohibited by this subparagraph remain subject to the gift provisions of Section 301, Part 2635, Title 5, Code of Federal Regulations (5 CFR 2635.301) through 5 CFR 2635.304. See paragraph B–2*a* for general prohibitions on partisan fundraising activity.

*s.* Use contemptuous words against the officeholders described in 10 USC 888 or participate in activities prescribed by DoDI 5200.02 and DoDD 1325.6.

*t.* Post links to, share or re-tweet comments or tweets from the Facebook page or twitter account of a political party of candidate running for partisan office.

*u.* Comment, post, or link to material that could be deemed contempt for public officials or unprofessional material that is prejudicial to good order and discipline or Service discrediting.

## B–4. Political activities not expressly permitted or prohibited

Some activities not expressly prohibited may be contrary to the spirit and intent of this regulation. Any activity may be reasonably viewed directly or indirectly associating DoD or DA with a partisan political activity or is otherwise contrary to the spirit and intention of this regulation or DoDD 1344.10 will be avoided.

## B–5. Local nonpartisan political activities

This regulation does not preclude participation in local nonpartisan political campaigns, initiatives, or referendums. A Soldier taking part in local nonpartisan political activity, however, will not—

*a.* Wear a uniform or use any government property or facilities while participating.

*b.* Allow participation to interfere with, or prejudice, the Soldier's performance of military duties.

*c.* Engage in conduct that in any way may reasonably imply that the DA has taken an official position on, or is otherwise involved in, the local political campaign or issue.

## B–6. Additional requirements

All Soldiers on active duty engaging in permissible political activity will—

*a.* Give full time and attention to the performance of military duties during prescribed duty hours.

*b.* Avoid any outside activities that may be prejudicial to the performance of military duties or are likely to bring discredit upon the U.S. Army.

*c.* Refrain from participating in any political activity while in military uniform, as proscribed by AR 670–1, or using government facilities or resources for furthering political activities.

**Appendix C**

**Military Equal Opportunity Professional Staffing**

The functional proponent for MEO Policy and the MEO Program is the Deputy Assistant Secretary of the Army, Equity and Inclusion Agency (SAMR), 5825 21st Street, Fort Belvoir, Virginia 22060–5921

**C–1.  Staffing**

Minimum military staffing requirements.

*a.  MEO professionals.* EO PMs, EO SGMs, EO advisors and EO specialists (RA/USAR) will be assigned to the special staff of commanders at ACOM, ASCC, and DRU, Senior Commander, organizations, and agencies that are brigade level (or equivalent) and higher. Assignments will not be a collateral or part-time duty. Primary duty position authorizations and requirements that comply with this guidance are to be documented in applicable personnel management authorization documents. Authorized positions will not be changed without prior coordination with HQDA, Deputy Assistant Secretary for the Army (Equity and Inclusion Agency).

*b.  Command staffing.*

(1)  Each Brigade (or equivalent unit) will have, as a minimum, one full-time MEO professional in the rank of SFC or higher. Each division will have, as a minimum four MEO professionals: one officer (LTC) and three NCOs (one MSG and two SFC). Corps staff will have, as a minimum four MEO professionals: one officer (LTC) and three NCOs (one SGM, one MSG and one SFC). All ACOMs/ASCCs/DRUs will have, as a minimum three MEO professionals: one officer (LTC) and two NCOs (one SGM and one MSG or SFC). U.S. Army Central Command, U.S. Army Special Operations Command, and U.S. Army Pacific Command will have an additional NCO in the grade of SFC. The Eighth United States Army will have an additional two NCOs in the grade of SFC. TRADOC and FORSCOM will have four additional NCOs: (one MSG and three SFCs). The MEO training proponent will have as a minimum of three MEO professionals: one officer (LTC) and two NCOs (one SGM and one MSG) for all MEO training. HQDA MEO Policy Branch will have, as a minimum three MEO professionals: one officer (LTC) and two DA Civilians.

(2)  In addition to the unit staffing requirements listed above, small installations (fewer than 10,000 Soldiers) or base support battalions (or equivalent) are authorized two enlisted MEO professionals (MSG and SFC). Large installations (more than 10,000) and area support groups (or equivalent) are authorized four enlisted MEO professionals (SGM, MSG, and two SFCs).

(3)  Senior command MEO professionals will provide geographic support for units without a dedicated MEO professional in their specific area of responsibility. Specific areas of responsibility for MEO support are identical to the military justice areas of support responsibility established in AR 27–10 (to include all activated USAR units in accordance with AR 27–10). Senior commanders will establish an MOA with tenant units without MEO support to ensure that those tenant units receive MEO support from the Senior Commanders MEO office. Senior MEO professionals will also support non-deploying Soldiers whose unit MEO professional deployed with their unit.

(4)  To substitute civilian staffing in place of military staffing requirements above. Civilian substitutions will be DEOMI graduates with a minimum 2 years of previous MEO experience. Assignment of MEO duties to DA Civilians will be in strict accordance with applicable position classification standards and guidelines. At the commander's discretion, DA Civilians may perform duties as the PMs.

(5)  In addition to the above staffing requirements, the USAR staffing will have, as a minimum—

*(a)*  One officer (LTC) for HQDA, M&RA Equity and Inclusion Agency, MEO Policy Branch.

*(b)*  One officer (LTC), two NCOs (SGM and MSG), and two DA Civilians (GS–13 and GS–11) for Headquarters, USARC (three-star command).

*(c)*  One officer EO PM (LTC), one NCO (MSG), and one DA Civilian (GS–11) for each one-star and two-star level commands.

*(d)*  One NCO (SFC) at each brigade and battalion command (due to the unique structure of the USARC).

**C–2.  Military equal opportunity professional selection and assignment policy**

*a.  Selection policy.*  The CG, HRC and CG, USARC for USAR MEO professionals will select qualified officers and NCOs for duty as MEO professional in accordance with the following selection requirements:

(1)  Record of outstanding duty performance as demonstrated by last five evaluation reports.

(2)  Favorable behavioral health screen for purposes of assignment to MEO duties, performed by a licensed behavioral health provider. This applies to both RA and USAR Soldiers and officers.

(3)  Commander (LTC or higher) interview and recommendation. The commander will personally interview the Soldier or officer (this will not be delegated) and ensure that the Soldier/officer meets prerequisites. Commanders will

consider the "whole Soldier" when making their recommendation. Input should include, but is not limited to, demonstrated leadership ability and potential; physical fitness, character and/or integrity; the Soldiers/officers ability to perform in stressful situations; no incidents of abuse of which the chain of command is aware; and demonstrated commitment to principles of MEO. All negative evaluations will include a full explanation.

(4) Personal readiness. Soldier will not have a history of unresolved personal distractions, chronic indebtedness, excessive use of alcohol, or any use of illegal drugs during the 5 years preceding the nomination.

(5) Will not have been punished under the provisions of the UCMJ during the 5 years preceding the nomination.

(6) Will have a minimum of 3 years of service remaining upon completion of the DEOMI.

(7) Will meet Army fitness and body fat composition standards (military).

(8) Will meet the minimum qualifications for promotion.

(9) Will not have been previously declined or been disenrolled (academic or disciplinary) from an Officer or Noncommissioned Officer Education System course.

(10) Have a general technical score of 110 for all MEO professionals (waiverable by the HRC or USARC for troop program unit (TPU) applicants) and 100 with minimum 12 credit hours from an accredited college; 12 credit hours will include at minimum either an English, math, science, or history courses.

(11) Maintain a minimum physical, upper, lower, hearing, eyes, psychiatric profile of 222221.

(12) Will possess a favorable national agency check with local records and credit check or higher prior to submission of MEO packet.

(13) Will not have Type 1 (see AR 614–200) reports of unfavorable information disqualifiers (automatic rejection) involving—

(a) Any credible evidence of criminal activity involving sexual harassment; sexual assault (UCMJ, Arts. 80, 120, and 125); Family member or child abuse; pandering prostitution; any criminal offense related to pornography (except UCMJ, Art. 92 violations), incest, bestiality, adultery, sexual activity with a subordinate or fraternization, and/or stalking.

(b) Credible evidence of criminal activity involving drug abuse (use, possession, distribution, manufacturing), to include prescription medication and synthetic drugs.

(c) Conduct in violation of the Army's policy regarding participation in extremist organizations or activities.

(d) Any court-martial conviction in the Soldier's career.

(e) Any repeat, or combination of, Type 2 offenses.

(f) Pending medical/physical evaluation board/MOS Administrative Retention Review.

(g) Any "relief for cause" NCOER or OER.

(14) Will not have Type 2 reports of unfavorable information or offenses that have occurred in the last 5 years, or other disqualifying conditions. Such offenses may be waived by the responsible appointment authority. If a waiver is approved, the waiver authority will prepare and sign a MFR. The MFR will articulate the rationale for the waiver and why the individual is still the best suited to serve in that position.

(15) Type 2 unfavorable information or offenses involve—

(a) Any substantiated alcohol related incident to include, but not limited to, operating a motor vehicle under the influence or while ability is impaired.

(b) Minor assault not listed as Type 1 above.

(c) Singular drug use offense beyond 5 years.

(d) Larceny and/or theft below $100 level.

(e) Misdemeanor level traffic offenses (for example, reckless driving).

(f) Initial enlistment waivers for derogatory information (not related to an offense listed in Type 1).

(g) Letters or memoranda of reprimand for offenses listed above in Type 1.

(h) Good conduct medal disqualification memorandums.

(i) Previous reduction in rank or removal from promotion list.

(j) A "no" for any Army Values block on an NCOER or OER.

(k) LOD or misconduct reports of investigation for offenses other than those offenses listed above in Type 1.

(l) Revoked, denied, or suspended security clearances.

(m) Other unfavorable information: Any record of unfavorable information other than the above in the past 3 years.

(16) Will not have any other disqualifiers or any record of unfavorable information other than listed above in the past 3 years.

(17) The Director of Enlisted Personnel, HRC is the appointing waiver authority for Type 2 offenses and will make the final decision on all potentially disqualifying cases. HRC will screen and/or coordinate the following records for all potential MEO candidates based on the criteria listed above.

(18) The following records will be screened prior to favorable consideration:

*(a)* Personnel security and criminal records indexed in the Defense Clearance Investigations Index as present in the U.S. Army Investigative Records Repository, the U.S. Army Crime Records Center, Defense Security Service, DAIG records, and other Federal agencies and military departments.

*(b)* Official military personnel file restricted files-HRC Army Personnel Records Division (HRC–PDR–R).

(19) Soldiers who are disqualified for MEO duty based on background screening will be notified via Enterprise email. The email will include the name of the agency that reported the potentially disqualifying information. The Soldier will be informed that they may request an appeal of the decision by submitting a written appeal to the Commanding General, U.S. Human Resources Command, Special Actions Branch (HRC–EPO–A), 1600 Spearhead Division Avenue, Fort Knox, KY 40122–5303. The appeal request will be endorsed by the first GO in the chain of command. The Director, Enlisted Personnel Management Directorate is the approval authority for all waivers and may request a decision from the CG, HRC or the DCS, G–1, when warranted.

(20) Will maintain qualification standards throughout tour; units will notify HRC through the chain of command when an MEO professional fails to meet minimum qualification standards.

(21) In addition to the above requirements, officers will—

*(a)* Have a bachelor's degree.

*(b)* Be an officer in the grade of LTC or above.

*(c)* Officers will be graduates of, or have received military education level four credits for Command and General Staff Officer Course.

(22) In addition to requirements above, active duty and Army Reserve enlisted Soldiers will—

*(a)* Be a high school graduate (or equivalent) and possess the potential to complete college-level courses.

*(b)* Be a SSG (P) or above, with less than 17 years' time (except USAR Soldiers) in service upon completion of DEOMI.

*(c)* Have served in a leadership position.

*(d)* May be assigned to back-to-back special duty assignments (for example, IG to MEO professional or multiple MEO professional tours), if assignments support career progression and approved HRC assignment manager.

*b. Volunteers.* Any active duty or AGR officer and NCO who meet the selection criteria in paragraph C–2*a* may volunteer for duty as an MEO professional by submitting a written request to their branch manager or through appropriate announcement for USAR. Enlisted and officer requests will be submitted through the first COL in the chain of command, and forwarded through the ACOM, ASCC, and DRU MEO PM for endorsement.

*c. Tour lengths for military equal opportunity professionals.*

(1) *Active duty and Active Guard Reserve enlisted and officers.* Tours for personnel assigned to CONUS units will be 36 months (exclusive of training time) with the possibility for additional year extensions. Tours for personnel assigned OCONUS will be the prescribed tour length of that assignment based on status (accompanied/unaccompanied). Those personnel assigned to a 1–year OCONUS tour will be further assigned to another MEO assignment for the remaining 2 years of utilization in CONUS.

(2) *Army Reserve troop program unit Soldiers.* Upon completion of DEOMI MEO professionals will complete a 3–year tour with an option of a second 3–year tour. The USARC will obtain school quotas through the ATRRS for course attendance in the 11–week resident course at the DEOMI within 6 months of assignment as an MEO professional. TPU Soldiers will be required to attend a two phase course: Phase 1 is distance learning and Phase 2 is a 4 week resident course at DEOMI, unless there are available training seats in the long course and local command funding has been approved. Requests to exceed the 6–month completion requirement will be forwarded through the chain of command to headquarters, USARC. Each request will be handled on a case-by-case basis and requires justification of the Soldier's inability to attend the course within the allotted time. Failure to complete the course will result in removal from the MEO professional position.

## C–3. Attendance at the Defense Equal Opportunity Management Institute

*a. Military personnel attendance.* Officer and enlisted personnel selected for MEO duty will attend the MEO Advisor Course at DEOMI.

(1) Certification. Upon successful completion of the MEO Advisor Course, DEOMI recommends awarding of skill qualifications identifier (SQI) Q (enlisted) and ASI 5T (officers). The CG, HRC will award the appropriate designator to MEO professionals.

(2) Scheduling of training. The CG, HRC schedules qualified active duty/AGR officers and NCOs for training and duty as MEO professionals. CG, HRC controls DEOMI training seats for active duty/AGR; the CG, USARC controls DEOMI training seats for USAR MEO professionals. Commands will use the following procedures to acquire these allocations:

*(a)* Commanders desiring to send officers and NCOs on TDY to DEOMI and then return to their units as MEO professionals will send their requests through their ACOMs, ASCCs, or DRUs. The ACOMs, ASCCs, or DRUs will forward applications for officers to Commander, U.S. Army Human Resources Command (HRC–OPC–A), 1600 Spearhead Division Avenue, Fort Knox, KY, 40122–5303. For NCOs, forward applications to Commander, U.S. Army Human Resources Command (AHRC–EPD–D), 1600 Spearhead Division Avenue Fort Knox, KY 40122–5303.

*(b)* Commanders and ACOM, ASCC, and DRU MEO PMs will request training seat allocations in writing and requests will arrive at HRC/USARC no later than 12 months prior to the start date of a requested class.

*(c)* USAR personnel will have an ATRRS allocation and a valid MEO TDA position (USAR Soldiers) to be considered for attendance at DEOMI. This is applicable to USAR MEO professionals assigned to a major Army Reserve command.

*b. Department of the Army Civilian personnel attendance.* DA Civilian personnel selected for MEO duty will attend the MEO Advisor Resident Course at DEOMI.

(1) *Resident courses.* The DEOMI curriculum currently consists of the 11-week MEO Advisor Course. The MEO Advisor Course is designated to train personnel for assignment as full-time MEO professional.

(2) *Allocations.* DA Civilian allocations for the DEOMI are controlled by the CG, HRC. The CG, USARC controls allocations for their respective Reserve elements and prescribes the way in which DA Civilian requests are submitted.

(3) *Application.* Commanders desiring to send DA Civilians who are officially assigned to duties in the Army MEO Program to DEOMI will send an application to the appropriate ACOM, ASCC, or DRU. If approved, the ACOM, ASCC, or DRU will request a training seat through the ATRRS. If all training seats are filled, the request will be considered for a later class. Requests for allocations will be submitted in writing to be received by the approving official no later than 12 months before the start date of the requested class.

(4) *Defense Equal Opportunity Management Institute notification.* Upon approval, the applicant will be notified through a DEOMI welcome letter.

(5) *Department of the Army Civilian personnel selection requirements and prerequisites for attendance at the Defense Equal Opportunity Management Institute are as follows:*

*(a)* Be in grade GS–11 or above or be slated for promotion to GS–11 upon completion of the course.

*(b)* Occupy or be scheduled to occupy an officially assigned position in the military EO Program in accordance with applicable position classification standards and guidelines for Career Program-28 (CP–28) Office of Personnel Management's Classification Unique Requirements.

*(c)* Be considered suitable for MEO duties as determined in an interview conducted by the commander on whose staff the person will be assigned.

(6) *Request procedures.* The ACOMs, ASCCs, or DRUs, when requesting allocations, will send the following information to the CG, HRC:

*(a)* Class desired to attend.

*(b)* Willingness to accept an allocation in a subsequent class if the requested class is filled.

(7) *Funding.* Attendee's current unit of assignment will provide funding for "TDY and return".

## C–4.  Secretary of the Army, Diversity and Leadership Award for Military Equal Opportunity Professionals

The SECARMY recognizes and celebrates MEO professionals responsible for managing the commander's MEO Program, policies, practices, and compliance.

*a. Eligibility.* Any MEO professional (MEO PMs, SGMs, advisors and MEO specialists (RA/USAR)), who has performed the duties of an MEO for at least 12 months, may be nominated.

*b. Criteria for selection.* Eligible MEO professionals will be nominated according to the criteria below. The DASA –EL EEL may revise these criteria as necessary to support the Army's MEO Program.

(1) Significantly contributes to the overall organizational readiness by mobilizing and/or sustaining an environment that maximizes human potential resulting in cohesion and accomplishment of the commander's mission through the management and implementation of MEO Programs, climate assessments, MEO training, and policy enforcement with the goal of ensuring fair treatment of all Soldiers and based solely on individual merit, performance, and potential.

(2) Exemplifies leadership qualities that have made significant contributions to human relations, MEO, diversity and leadership programs, thereby, assisting the command in overcoming discrimination and eliminating barriers.

(3) Promotes and conducts training that support and contribute to understanding and valuing diversity's impact on readiness, and fostering a climate that promotes successful military and DA Civilian communication and collaboration.

*c. Procedure for selection.* The ACOM, ASCC, and DRU will nominate the most outstanding MEO professional of their respective command. Forward nominations to DASA–EL Directorate in accordance with annual guidance.

**C–5.  Early release or relief for cause**

*a.* The CG, HRC is approval authority for early release.

*b.* The MEO professional's commander will notify HRC, MEO assignment branch in writing (DA Form 4187 and supporting documentation), no later than 12 months prior to the MEO professionals requested departure, through the ACOM, ASCC, and DRU MEO PM, requesting the MEO professional's reassignment. This will allow HRC ample time to select, train, and assign a replacement for the outgoing MEO professional, to eliminate a gap in coverage.

(1) Early release is authorized for MEO professional from the MEO Program when—

*(a)* The MEO professional is a U.S. Sergeants Major Academy selectee or a CSM designee.

*(b)* The MEO professional is being considered for a valid 1SG position. The MEO professional will complete 2 years of their MEO tour prior to release from the MEO program.

(2) Early release for MEO PMs from the MEO Program when—

*(a)* The MEO PM has been selected for promotion and the current unit of assignment cannot place him or her.

*(b)* The MEO PM has been selected for a command selection list assignment or resident schooling.

*c.* Relief for cause.

(1) The CG, HRC will be immediately notified when an MEO professional has been selected for relief for cause.

(2) The commander will submit relief for cause packet (DA Form 4187, "Relief for Cause" evaluation) to HRC MEO Assignment Branch through the ACOM, ASCC, and DRU MEO PM. HRC MEO Assignment Branch will work with the command to select, train, and assign a replacement for the relieved MEO professional.

(3) At a minimum MEO professional relieved for cause will—

(4) Receive a relief for cause evaluation report.

(5) HRC will remove the MEO SQI or ASI.

**C–6.  Military Equal Opportunity and Equal Employment Opportunity Program relationship**

The MEO Program for military personnel and the EEO Program for DA Civilian personnel share the same foundations in similar goals and objectives. Both are Commander's programs. There are areas in which MEO and EEO Programs can and should be integrated when doing so promotes understanding, efficiency, economy, and common interests of both programs. These areas include CCAs, diversity initiatives, some aspects of training, and coordination of administrative support. Commanders may choose to consolidate MEO and EEO offices under the direction of one or the other program principals. If consolidated, MEO/EEO complaint processing will remain a separate function. Military EO professionals may not intake EEO complaints.

## Appendix D

## Military Equal Opportunity and Harassment Training and Education

### D–1. General

There is an indisputable link between how Soldiers are treated and how they perform their duties. Training commanders and Soldiers to treat one another with dignity and respect achieves better morale, greater commitment, increased trust and cohesion and better performance. MEO and Harassment Prevention and Response training directly affects individual and unit readiness.

### D–2. U.S. Army

**Training and Doctrine Command military equal opportunity training proponent responsibilities**

  *a.* Develop and maintain training for specific levels of PME and unit level MEO and Harassment Prevention and Response common mandatory training (which will include harassment).

  *b.* Develop and maintain the EOLC.

  *c.* Develop and maintain the extremist organizations and activities instructional material.

  *d.* Develop the program of instruction, evaluate, and validate the Army Service specific training for Army personnel attending the MEO Advisor Course at DEOMI.

  *e.* MEO and Harassment Prevention and Response training is an HQDA common mandatory training subject in accordance with AR 350–1. As such, the standardized MEO and Harassment Prevention and Response TSP in support of HQDA MEO common mandatory training will be maintained in the Army Training Management System (ATMS) in order to allow for a single point of accessibility for training. MEO and Harassment Prevention and Response TSP will only be accessible to MEO professionals currently serving in an authorized EO billet.

  *f.* Maintain TC 26–6.

  *g.* Maintain the MEO and Harassment Prevention and Response network. The network provides one-stop access for relevant information and training materials for the U.S. Army.

### D–3. Equal opportunity and harassment common mandatory training requirements

Company (or equivalent) level common mandatory training requirements.

  *a.* Company commanders (or equivalent) will utilize the MEO and Harassment Prevention and Response command mandatory training (TSPs) prepared by the MEO training proponent maintained on ATMS in accordance with AR 350–1. MEO TSP will include EO mandatory topics (which will include harassment) and additional MEO topics for consideration.

  *b.* MEO professionals currently serving in an authorized MEO billet will facilitate MEO and Harassment Prevention and Response training. EOLs on appointment orders may assist in conducting MEO and Harassment Prevention and Response training; additional training products will be vetted and approved by the MEO professional and unit commander prior to executing the training.

  *c.* Commanders and unit leaders will personally attend and be involved during unit training.

  *d.* Based on the organizations CCA the commanders will determine which additional MEO topics will be trained during annual MEO and Harassment Prevention and Response training.

  *e.* The commander will incorporate MEO and Harassment Prevention and Response training into the overall training plan for the organization.

  *f.* Commanders will conduct mandatory MEO and Harassment Prevention and Response training annually and document training on the training schedules and in the Digital Training Management System in accordance with AR 350–1.

  *g.* MEO and Harassment Prevention and Response training will be interactive and discussion based.

  *h.* Headquarter elements of brigades or brigade combat teams (or equivalent meaning units commanded by COL/O–6) and higher will conduct senior leader/executive-level seminars on MEO and Harassment Prevention and Response topics annually (which will include harassment).

  *i.* Commanders should use CCA results to determine the focus areas for MEO and Harassment Prevention and Response training.

### D–4. Professional military education training requirements

The Army includes the principles of MEO, cultural awareness, CCAs and the harassment in the officer and NCO PME courses. PME schools will include lesson blocks on the importance of these topics as a foundation of effective leadership. Instruction will enforce the importance of MEO as a leadership imperative to maximize the performance of

and demonstrate care and concern for Soldiers. Instructors at PME schools will utilize the TRADOC MEO training proponent TSPs maintained on ATMS in accordance with AR 350–1. Progressive MEO and Harassment Prevention and Response training commensurate with rank will enable Soldiers in supervisory positions to recognize and resolve potential discriminatory and harassment practices at the lowest level.

### D–5. Equal Opportunity Leaders Course
The EOLC is designed to train students to become EOLs. It provides the minimum training required for EOLs to fulfill their duties and responsibilities. This course is also designed to ensure individuals selected to perform EOL duties are trained to the same level and standard, regardless of location. It will be conducted quarterly (or as needed) at installation level with help from unit MEO professionals. Soldiers identified to serve as EOLs will complete this course prior to being assigned as an EOL. Course materials are controlled by the TRADOC MEO training proponent and maintained on the TRADOC ATMS and can only be requested by ACOM, ASCC, or DRU MEO offices.

### D–6. Army Heritage Month
*a.* The purpose of the Army Heritage Month is to—
(1) Promote the Army Values.
(2) Foster a culture of equity and inclusion in the Army.
(3) Recognize diversity within the Army total force as a strength and Force Multiplier.
(4) Promote unit cohesion, teamwork and Esprit de Corps.
(5) Recognize and celebrate Army's Heritage and Birthday.
*b.* The Department of the Army Public Affairs Office will provide strategic communication for the Army Heritage Month annually during the month of June.
*c.* Commanders of ACOMs, ASCCs, and DRUs, and senior commanders (or equivalent) will conduct Army Heritage Month during the month of June annually.
*d.* Army Heritage Month must accomplish the following objectives:
(1) Promote the Army Values.
(2) Recognize the achievements and contributions of Army organizations while enhancing a sense of inclusion and unit cohesiveness among diverse attendees.
(3) Enhance heritage awareness and understanding.
(4) Focus on interaction, not just recognition, to preserve the memories of Soldiers, DA Civilians and their families, honor their service and help educate American public about the Army and the Army Families contributions to the Nation.
(5) Utilize the Army Heritage Month recognition to include local community and community influencers to promote the Army as a model employer of civilians and a way of life for potential military service in defense of our great Nation.

### D–7. Army Heritage Month responsibilities
*a.* Commanders of ACOMs, ASCCs, and DRUs, and senior commanders (or equivalent) will consider the following, unless otherwise directed—
(1) Develop, plan, and conduct Army Heritage Month activities annually during the month of June.
(2) Invite members of the military community to participate in the planning, implementation, and conduct of Army Heritage Month activities.
(3) Involve members of the staff elements and subordinate units in the development and conduct of Army Heritage Month activities.
(4) Promote the Army Heritage Month activities consistent with the Army's strategic communications plan.
(5) Allocate funds for installation Army Heritage Month activities.
*b.* Commanders are encouraged to announce the Army Heritage Month activities through command information channels to include print and social media, ensuring widest dissemination.
*c.* Commanders may form a standing committee to plan Army Heritage Month activities.
*d.* Commanders are encourage to use of recreational facilities to include the post library, recreation center, theater, and so forth for use during Army Heritage Month activities.
*e.* Activities should be scheduled to allow for maximum attendance by all Soldiers, Family members, and DA Civilians within the command.

## Appendix E

## Command Climate Assessment

### E–1. General

*a. Purpose.* The purpose of the CCA is to assist commanders and senior responsible officials (SROs) at all levels in assessing their organizational climate and to make recommendations for improvements.

*b. Objective.* The objective of the CCA is to provide commanders/SROs insight into positive and negative factors that may impact organizational effectiveness and readiness.

*c. Confidentiality.* CCA information will be treated as confidential. Exceptions to confidentiality will be consistent with the Privacy Act Statement (that is, respondent statements about being a threat to themselves or others, allegations of criminal behavior, and/or operationally sensitive information). When paper and pencil surveys are used, the organization will ensure that respondents can submit their survey in an inconspicuous location. Survey results will never be reported so that an individual's responses can be identified. CCA results will be briefed to the next higher-level commander/SROs and commanders/SROs will provide timely feedback to the organization.

*d. Compliance.* The MEO professional will note completion of the CCA in MEO database after commander/SRO has completed the following: briefed their supervisor and provided feedback to the organizations workforce. Completion of the CCA is an item that is checked under the CIP and the Managers' Internal Control Program.

*e. Role of the equal opportunity professional.* The MEO professional will serve as the Organization Climate Assessment Survey administrator and will discuss assessment results with the commander/SRO to aid in developing a CCA Action Plans. The MEO professional will secure copies of all CCA executive summaries, action plans and results will be stored in a controlled container for 5 years.

*f. Role of the equal opportunity leader.* The EOL may assist the MEO professional with the management of a CCA (for example, issuing survey numbers, coordinating facilities for interviews or focus groups and so forth). EOLs will not serve as CCA survey administrators nor assist with analyzing or assessing CCA results, aiding commander/SRO with developing CCA Action Plans, storing CCA documentations, or tracking commander timelines.

*g. Conducting the Command Climate Assessment.* Commanders/SROs may use the following tools, individually or in combination, to conduct the CCA: survey distribution and analysis, SAVs, individual interviews, observations, focus groups, organization trend data and reports. The MEO professional will assist the commander/SRO and obtain the commander's/SRO's approval of the methods to be used to assess the organization effectiveness prior to conducting the CCA.

(1) *Anonymity.* The anonymity of individuals submitting a survey will always be protected. MEO professionals administering the survey and collecting the data will ensure procedures are in place to protect the anonymity of respondents and the confidentiality of the results. The CCA survey is designed to protect respondent anonymity. Organization results will not be broken out by demographic groups (such as race, sex, or rank) if a subgroup (for example male or female) has fewer than five respondents. However, the answers provided to free-response questions may reveal the respondent's identity. Therefore Soldiers and DA Civilians will be notified of exceptions to anonymity before the survey is administered. They will also be notified if their verbatim comments will be provided to their commander/SRO, chain of command or others. Specifically, respondent statements about being a threat to themselves or others, the comments involving criminal and operationally sensitive information may be released and, if necessary, reported to the proper authorities. Any allegations or reports of sexual assault will be immediately reported to USACIDC. If an MEO professional is named in the assessment, another MEO professional will administer the survey and collect the data.

(2) *Release of information for Regular Army and U.S. Army Reserve.* The following guidance applies to special inquiries from IG investigating officers requesting copies of CCA records. Local command IG investigating officers will submit a written request on official letterhead to their ACOM, ASCC, and DRU MEO professional. HQDA level IG's investigating officers will submit a written request to the HQDA MEO Policy Branch. Request will include justification and organizations name, survey report number and/or survey window, requesting officer's rank, first and last name. Investigating officers will also include appointment orders. Investigating representatives external to the Army will submit a request through the HRC, FOIA office.

*h. Collaboration.* To the extent privacy laws and regulations and confidentiality requirements allow, commanders/SROs and MEO professionals may collaborate with other offices that are an integral part of the organization's climate. These agencies include, but are not limited to SJA, EEO, IG, nonappropriated fund instrumentalities, Army Community Services, chaplain, DHA MTFs, PAO, MP/USACIDC, SARC, and so forth.

*i. Higher headquarters Command Climate Assessment.* When a higher-level commander/SRO (for instance, at the ACOM, ASCC, DRU or Senior Commander level) wishes to assess the climate of all sub-organizations, they may

request roll up reports from Data Retrieval System (DRS) database to obtain subordinate roll up reports. Commanders will not resurvey subordinate commands in order to reduce survey fatigue.

## E–2.  Requirements and explanation of terms
See table E–1.

**Table E–1**
**Command Climate Assessment guidance**

| Command level | Frequency (days) | Requirements |
|---|---|---|
| Company or equivalent | RA:<br>60 days and annually thereafter<br><br>USAR:<br>120 days and annually thereafter | 1) Inform the members of the organization of the upcoming assessment<br>2) Survey for entire organization (minus leadership team)<br>3) Use other assessment tools, as needed<br>4) Prepare CCA summary and action plan<br>5) Brief to commander or supervisor at next higher level (no later than 30 days (two MUTA (60 days)–4 for USAR) after receipt of survey results)<br>6) Conduct formal feedback session(s) with organization (same as requirement 5)<br>7) MEO professional enters data into MEO database (no later than 35 days (three MUTA (90 days)–4 for USAR) after requirements 5 and 6) |
| Battalion or equivalent | RA:<br>60 days and annually thereafter<br><br>USAR:<br>120 days and annually thereafter | 1) Inform the members of the organization of the upcoming assessment<br>2) Survey for battalion staff element and company command teams<br>3) DRS roll-up of subordinate organization (companies or equivalent) survey responses and comparison of historical data<br>4) Use other assessment tools, as needed<br>5) Prepare CCA summary and action plan<br>6) Brief to commander or supervisor at next higher level (no later than 30 days (two MUTA (60 days)–4 for USAR) days after receipt of survey results)<br>7) Conduct formal feedback session(s) with organization (same as requirement 6)<br>8) MEO professional enters data into MEO database (no later than 35 days (three MUTA (90 days)–4 for USAR) after requirements 6 and 7)<br>9) Monitor compliance of subordinate organizations |
| Brigade or equivalent | RA:<br>60 days and annually thereafter<br><br>USAR:<br>120 days and annually thereafter | 1) Inform the members of the organization of the upcoming assessment<br>2) Survey for brigade staff element and subordinate command teams one level below<br>3) DRS roll-up of subordinate organizations (battalions/companies or equivalent) survey responses and comparison of historical data<br>4) Use other assessment tools, as needed<br>5) Prepare CCA summary and action plan<br>6) Brief to commander or supervisor at next higher level (no later than 30 days (two MUTA (60 days)–4 for USAR) after receipt of survey results)<br>7) Conduct formal feedback session(s) with organization (same as requirement 6)<br>8) MEO professional enters data into MEO database (no later than 35 days (three MUTA (90 days)–4 for USAR) after requirements 6 and 7)<br>9) Monitor compliance of subordinate organizations |

**Table E–1**
**Command Climate Assessment guidance—Continued**

| Command level | Frequency (days) | Requirements |
|---|---|---|
| Division or above | RA:<br>60 days and annually thereafter<br><br>USAR:<br>120 days and annually thereafter | 1) Inform the members of the organization of the upcoming assessment<br>2) Survey for headquarters staff element and subordinate organization teams one level below<br>3) DRS roll-up of subordinate organizations (all levels or equivalent) survey responses and comparison of historical data<br>4) Use other assessment tools, as needed<br>5) Prepare CCA summary and action plan<br>6) Brief to commander or supervisor at next higher level (no later than 30 days (two MUTA (60 days)–4 for USAR) after receipt of survey results)<br>7) Conduct formal feedback session(s) with organization (same as requirement 6)<br>8) MEO professional enters data into MEO database (no later than 35 days (three MUTA (90 days)–4 for USAR) after requirements 6 and 7)<br>9) Monitor compliance of subordinate organizations |
| Non-command type organizations<br>SRO, O–5 LTC / GS–14 or equivalent<br><br>**Organizations/agencies such as: Army Review Board Agency, Army Audit Agency, DCS, G–1. SROs are not applicable for ACOM/ASCC/ DRU headquarters staff elements. | RA:<br>120 days/annually and bi-annually thereafter | 1) Inform the members of the organization of the upcoming assessment<br>2) Survey for entire organization (minus the leadership team)<br>3) Utilize other assessment tools, as needed<br>4) Prepare CCA summary and action plan<br>5) Brief next higher-level supervisor (no later than 30 days (two MUTA (60 days)–4 for USAR) after receipt of survey results)<br>6) Conduct formal feedback session(s) with organization (same as requirement 5)<br>7) MEO professional enters into MEO database (no later than 35 days (three MUTA (90 days)–4 for USAR) after requirements 5 and 6) |
| Non-command type organizations<br>SRO, COL/O–6, GS–15 or equivalent<br><br>**Organizations/agencies such as: Army Review Board Agency, Army Audit Agency, DCS, G–1. SROs are not applicable for ACOM, ASCC, and DRU headquarters staff elements. | RA:<br>120 days/annually and bi-annually thereafter | 1) Inform the staff members and subordinate level leadership team(s) of the organization of the upcoming assessment<br>2) Survey the staff members and subordinate level leadership team(s)<br>3) DRS or roll-up of subordinate organization(s) survey responses and historical comparison data<br>4) Utilize other assessment tools, as needed<br>5) Prepare CCA summary and action plan<br>6) Brief next higher-level supervisor (no later than 30 days (two MUTA (60 days)–4 for USAR) after receipt of survey results)<br>7) Conduct formal feedback session(s) with organization (same as requirement 6)<br>8) MEO professional enters into MEO database (no later than 35 days (three MUTA (90 days)–4 for USAR) after requirements 6 and 7)<br>9) Monitor subordinate organization compliance |

**Table E–1**
**Command Climate Assessment guidance—Continued**

| Command level | Frequency (days) | Requirements |
|---|---|---|
| Non-command type organizations SRO, GO/SES or equivalent. | RA: 120 days/annually and bi-annually thereafter | 1) Inform the staff members and subordinate level leadership team(s) of the organization of the upcoming assessment<br>2) Survey staff members and subordinate level leadership team(s) of the organization of the upcoming assessment one level below<br>3) DRS or roll-up of subordinate unit (LTC/O–5/GS–14 and COL/O–6/GS–15) survey responses and historical comparison data<br>4) Utilize other assessment tools, as needed<br>5) Prepare CCA summary and action plan<br>6) Brief to next higher-level supervisor (no later than 30 days (two MUTA (60 days)–4 for USAR) after receipt of survey results)<br>7) Conduct formal feedback session(s) with organization (same as requirement 6)<br>8) MEO professional enters into MEO database (no later than 35 days (three MUTA (90 days)–4 for USAR) after requirements 6 and 7)<br>9) Monitor subordinate organization compliance |

## E–3. Explanation of terms

*a. Survey.* Surveys provide the commander/SRO insight into unit perceptions and serve as the starting point for assessing the overall climate of the organization. They are an important tool because they provide for standardization and anonymity. When administering surveys, commanders/SROs will utilize the Department of Defense Command Climate Assessment Survey and the Data Retrieval System.

*b. Data Retrieval System/Command Climate Assessment Survey roll-up.* The roll-up and survey trend data will provide subordinate organizations' survey results without requiring re-administration of duplicate surveys to their subordinate organizations. MEO professionals will coordinate with their ACOM, ASCC, and DRU MEO office to obtain these reports. Only the following organizations and/or individuals are authorized to request DRS or survey reports:

(1) Individuals may request a copy of their organizations report through the FOIA office (short answer question responses are not provided).

(2) Unit level commanders or command MEO professionals may request a copy for their organizational report (complete report).

(3) ACOM, ASCC, DRU, Corps, and division-level commanders or their command MEO professional may request copies of subordinate command reports (complete report).

(4) IG personnel serving as investigating officers and on official appointment orders (complete report). IG offices looking into individual organizations command climate are not authorized copies of DRS nor survey reports.

*c. Other assessment tools.* The survey is only one component of a CCA. Commanders/SROs will consider use of other tools to provide depth and clarification on concerns raised in the survey results. Other tools include: interviews, focus groups, SAVs, or trend analysis. Commanders/SROs should consult their MEO professional to determine the best methods for their organization.

*d. Command Climate Survey executive summary and Command Climate Assessment action plan.* Upon receipt of survey results, the commanders/SROs and the MEO professional will analyze survey results. Survey responses will be systematically collated and analyzed, and used to create an executive summary of the data. The CCA executive summary will include significant findings, organizational strengths, and areas of concerns. The CCA Action Plan describes the commander's/SRO's planned corrective actions. The requesting commander/SRO will brief the next higher-level commander/SRO on CCA results, to include CCA Action Plan, no later than 30 days (two MUTA (60 days)–4 for USAR) after receipt of survey results.

*e. Sample size.* All organization members will be afforded the opportunity to participate in the command climate surveys. The surveyed audience will include a sufficient number of participants to preserve anonymity to obtain a genuine representation of the organization and provide the commander/SRO with actionable information.

*f. Response rate.* The survey will produce results for any organization that achieves at least 16 responses; however, results under 30 percent may not provide an accurate picture of the organization's climate. Units should strive for 50 percent or better. MEO professionals can provide commanders/SROs the response rate and can extend the survey window to allow for increased response rate if needed.

*g. Equal opportunity professionals.* MEO professionals will serve as the brigade-and-above-level commander's/SRO's special staff officer for organizational climate effectiveness. Only MEO professionals on a current tour of duty can request and administer the survey, administer other assessment tools and prepare assessment analysis for commanders/SROs. Unit EOLs are not MEO professionals.

*h. Participation in command climate surveys and assessments is optional for Soldiers and Department of the Army Civilians.* Management will ensure all applicable collective bargaining obligations are fulfilled prior to initiating a command climate survey or assessment covering bargaining unit employees. Commanders/SROs will ensure contractors statement of work authorizes contractor employees to participate in the survey.

## E–4.  Assessment tools

*a. Surveys.*  Command climate surveys are one avenue available to assist leaders in assessing the climate of their organization. Surveys provide the commander/SRO insight into organization perceptions and serves as the starting point for developing focus groups and/or personal interviews. When conducting surveys commanders/SROs will utilize the Department of Defense Command Climate Assessment Survey and the DRS.

(1) Survey responses will be systematically collected.

(2) All organization members will be afforded the opportunity to participate in the command climate surveys. The surveyed audience will include a sufficient number of participants in order to obtain a genuine representation of the organization, and to provide the commander/SRO with actionable information.

(3) The MEO professional will request the survey report once the survey window has been closed. Department of Defense staff does not automatically generate and release the report to the commander/SRO.

(4) The MEO professional will analyze data and assist commander/SRO to create an executive summary and plan of action. The analysis will assess and report organizational strengths, weakness (areas to improve), opportunities, and potential threats to organizational effectiveness.

(5) Upon receipt of survey results, the commanders/SROs and the MEO professional will analyze survey results.

(6) Commanders/SROs will provide their supervisor with an analysis of survey responses from the respondents. The analysis will identify factors that may impact organization effectiveness and cohesion.

*b. Staff assistance visits.*  The SAVs provide commanders/SROs an overall assessment of their command climate. Commanders/SROs and MEO professionals will conduct SAV's at every command/organization level, on an annual basis.

*c. Interviews.*  Conducting interviews is an integral part of CCAs. Commanders/SROs and MEO professionals will consider the best interview method when gathering data, such as individual interviews, focus groups, or group interviews.

(1) Selection of personnel. The number of personnel to be interviewed is based on the size of the organization and the capability of the team.

(2) Select a representative mix of personnel in the organizations based on sex, race, national origin, grade, and operational function, MOS/branch specialty, and career program.

(3) Allow interviewees to elaborate on certain subjects may uncover new subjects of interest for the organization. Also, the commander/SRO may conduct interviews only when they have specific needs, issues, and concerns requiring clarification.

(4) When survey responses reveal concerns specific to a group (for example, group members perceive inequity in disciplinary actions or women perceive sex discrimination to be a problem), it may be important to schedule more individuals from that group to clarify the concern.

(5) Commander/SROs or MEO professional will inform organization members of the schedule and requirement for conducting interviews. Conduct interview(s) at a neutral location and offices or rooms will be private and dedicated to CCA team. It is recommended to schedule "walk in" times in order to allow for members who want to provide input may do so.

(6) The survey, survey analysis, and specific commander/SRO concerns are the key sources for developing interview questions. When required, trend data review (for example, complaints, personnel actions, or legal actions) will also be a source for follow-up questions. In all cases, commanders/SROs will approval interview questions developed by MEO professionals.

*d. Observations.*  Personal observation by the organizational leader gathers additional climate information that may impact personnel and the unit.

(1) It is the MEO professional's responsibility to schedule an "out and about walk around" with the commander/SRO or other staff/leadership. The MEO professional will ensure unit leadership receives a summary of observations following the walk around. Off-base out and about walk arounds will first be approved by commander/SRO

prior to conducting walk around. The commander/SRO or MEO professional determines the number of walk arounds that will be conducted.

(2) Observations and discussions will focus on command climate and organizational effectiveness factors that impact morale and mission readiness to include but not limited to—

(a) Interpersonal communication, interaction, or polarization (break rooms, work areas, recreation/entertainment facilities, and so forth).

(b) Accessibility to organization leadership.

(c) Bulletin boards and public display items (individual/group recognition, policy letters/posters, and so forth).

(d) Workplace conditions and environments for graffiti and displays of pictures, posters, and artifacts.

(3) Such walk arounds will be performed on no less than three of the above effectiveness factors.

(4) Information gathered during the walk arounds will be used as part of the overall CCA.

e. *Focus groups.* A focus group is a form of qualitative research in which groups of people are asked about their perceptions, beliefs, and attitudes toward leadership and organization. Questions are asked in an interactive group setting where participants are free to talk with other group members. Focus groups also provide an opportunity for disclosure among others in a setting where participants are validated (for example, in the context of workplace bullying, discriminating behaviors and so forth).

f. *Trends and analysis reports.*

(1) Recognize trends and potential problem areas that may affect organizational effectiveness.

(2) Gather unit historical trend data, such as military/DA Civilian complaint and incident data, personnel date (performance reports, promotions, and awards), and legal data (Article 15 and Courts-Martial). The key is the availability of relevant data and the selection, compilation, analysis, and presentation of the material.

(3) If trends are identified there are several agencies from which data may be gathered. The commander/SRO and MEO will review information gathered from MEO, SHARP, IG, SJA, G–1/S–1 to determine trends that may impact unit effectiveness. If additional investigation is warranted, the commander/SRO may initiate an inquiry.

g. *Other items must all be reviewed.*

(1) Formal and informal complaint summary reports.

(2) Previous CCA reports.

h. *Command Climate Assessment summary.* Executive summaries will include significant findings, organizational strengths, areas of concerns, and recommended corrective actions (CCA Action Plan).

## E–5. Reporting

a. Types of reporting.

(1) MEO database.

(a) All ACOM, ASCC, and DRU commanders and SROs will submit CCA data, no later than 35 days (three MUTA (90 days)–4 for USAR) upon receipt of survey results by completing the MEO database CCA screen.

(b) ACOM, ASCC, and DRU commanders/SROs will establish internal reporting suspense's for subordinate commands.

(c) Deployed organizations will submit their data under their parent ACOM, ASCC, and DRU.

(2) CCA executive summary.

b. All commanders (or equivalent)/SROs will brief their supervisor or next higher commander in person no later than 30 days calendar days (two MUTA (60 days)–2 for USAR) upon receipt of survey results. CCA summary and CCA Action Plan information will be reported in MEO database.

(1) Executive summaries will include significant findings, organizational strengths, areas of concern, and recommend corrective action plans.

(2) SCs/SROs will utilize these opportunities as a mentoring tool to coach and teach subordinates. Commanders/SROs may use this knowledge to advance their confidence, skills, and capabilities; maximizing their potential; and grow beyond their expectations.

(3) SAV summary.

(a) MEO professionals will brief commander/SRO in person no later than 5 calendar days (next MUTA–4 for USAR) upon completion of a SAV. SAV summary and action plan information will be reported in MEO database.

(b) Summary will include a synopsis of the SAV analysis report, comments gathered from the SAV, relevant trends date, anecdotal comment made by interviewees, and proposed action plan.

(c) Commander/SRO will provide the subordinate commander a copy of the final SAV summary.

**E–6.  Interview techniques for commanders, senior responsible officials, and leaders**

  *a.*  Explain to the interviewee the purpose and objective of the personal interview, focus group interview, or group interview.

  *b.*  Explain to the interviewee that the CCA team members do not have confidentiality, and if a legal issue or UCMJ violation surfaces, the CCA team will terminate the interview and inform the proper authorities.

  *c.*  Emphasize to the interviewee that participation is voluntary. The interviewee will concur with being interviewed and can terminate the interview at any time.

  *d.*  Do not use coercion or pressure.

  *e.*  Explain the purpose of taking notes.

  *f.*  Ask all questions on your list in an identical fashion.

  *g.*  Limit questions to a single idea per question.

  *h.*  Use open-ended questions, those facilitating open dialogue concerning positive and negative issues affecting the organization.

  *i.*  Phrase questions so as not to suggest an appropriate response.

  *j.*  Move from the general to specific information in order to capture useful data.

  *k.*  Use language that interviewee will understand.

  *l.*  Use transition statements to move from one question to another and to orient the respondent to new areas of discussion.

  *m.*  Do not be judgmental or express your own views about interviewee responses.

  *n.*  Pace the interview so all questions are covered, as a rule, individual interviews will not exceed 15 to 30 minutes. If interviewee desires to continue beyond their allotted time, provide them the option to visit your office at a later time.

  *o.*  Take short concise interview notes and attempt to quantify response where possible.

  *p.*  If during the interview, a military/DA Civilian interviewee makes a request to file an MEO/EEO complaint, the CCA team member will terminate the interview and immediately refer the interviewee to the MEO/EEO office.

## Appendix F

## Sexual Assault Review Board for Unrestricted Reports of Sexual Assault

### F–1. Purpose

This section prescribes mission, responsibilities, procedures, and policies pertaining to installation level SARB at installations and in deployed environments. In a deployed environment, the SARB will be convened by the brigade commander or higher-level commander as appropriate and follow the same format as the installation SARB. The Army SARB fulfills DoDI 6495.02 Case Management Group requirements and is considered equivalent for policy and execution purposes. The Army identifies the SAPR DoDI 6495.02 Case Management Group as the SARB and considers it the equivalent for policy and execution purposes.

### F–2. Mission

The primary purpose of the SARB is to ensure victims' physical, emotional, and spiritual needs are provided for, their rights are protected, and their recovery is facilitated. The SARB provides executive oversight, procedural guidance, and feedback concerning the installation's SHARP Program. This board reviews the installation's prevention program and the response to any unrestricted report of sexual assault involving the installation. This includes reviewing cases and procedures to improve processes, system accountability, and victim access to quality services. In order to ensure the SARB remains victim-centric and to avoid potential interference with the administration of justice, the subject will not be discussed at the SARB, except when retaliatory behavior is being reported or the safety of the victim is being discussed.

### F–3. Sexual Assault Review Board composition

*a.* The SC or deputy commander is responsible for the SARB and will convene this multi-disciplinary board on a monthly basis. This responsibility cannot be delegated.

*b.* The SARB will consist of the following professionals:

(1) Lead SARC (co-chair).

(2) Victim's immediate commander.

(3) All SARCs assigned to an installation, regardless of whether they have a case being discussed.

(4) SHARP VA or VR, if assigned to a case being discussed.

(5) USACIDC (or other Service military criminal investigative organization, if required) who has detailed knowledge of the case.

(6) SJA (or representative).

(7) SVC.

(8) Provost Marshal or representative, law enforcement (military or civilian police services).

(9) Chaplain.

(10) Sexual assault clinical provider.

(11) Chief, Behavioral Health.

(12) Other members may be appointed by nature of their responsibilities as they pertain to sexual assault (for example, special victim witness liaisons, SHARP PMs, and Alcohol and Substance Abuse Program representatives).

*c.* All members of the SARB will be appropriately trained and on appointment orders before attending.

*d.* If the installation is a joint base or if the installation has tenant commands, the commander of the tenant organization and the designated lead SARC will be invited to SARB meetings. The commander of the tenant organization will provide appropriate information to the host commander, to enable the host commander to provide the necessary supporting services.

*e.* If all members of the special victim investigation and prosecution (SVIP) are present at the SARB, the SARB will satisfy the minimum requirement of a once a month meeting to assess progress in the investigation or prosecution of a sexual assault and to help ensure all victim's needs are being met, in accordance with DoDI 5505.19.

### F–4. Cases discussed at the Sexual Assault Review Board

*a.* The SC (or deputy commander) will chair the SARB on a monthly basis to review individual cases of unrestricted reporting of sexual assault; facilitate monthly victim updates; and direct system coordination, accountability, training of commanders, and victim access to quality services. The SC will work closely with the servicing Judge Advocate in advance of the SARB and during the SARB to ensure that the review of sexual assault cases does not interfere with the administration of justice.

*b.* SARB oversight for unrestricted reports of adult sexual assault is limited to open cases in DSAID that were initiated by a DD Form 2910 or an investigation initiated by USACIDC or another MCIO. For cases under investigation by CID when there is no corresponding unrestricted DD Form 2910—

(1)  The SARC will have no information for the SARB members. During the SARB, USACIDC will provide case management information to the SARB.

(2)  The SARC will open a case in DSAID indicating the case status as "Open with Limited Information." The SARC will only use information from the MCIO to initiate an "Open with Limited Information" case in DSAID. In the event that there was a restricted report filed prior to the independent investigation, the SARC will not use any information provided by the victim, since that information is confidential.

(3)  Cases arising from restricted reports will not be reviewed at the SARB.

(4)  Family Advocacy Program cases, those involving the sexual assault of children, and cases not under investigation by USACIDC or other MCIO, will not be reviewed at the SARB in the absence of a signed DD Form 2910 indicating an unrestricted report.

(5)  Each case will be reviewed independently; the victim's immediate commander and VA will be present only when the case they are associated with is discussed.

## F–5. Responsibilities

*a.*  All SARB members will—

(1)  Carefully consider and implement immediate, short-term, and long-term measures to help facilitate and assure the victim's emotional and physical safety and their recovery. They will monitor each victim's case while ensuring the victim's privacy.

(2)  Perform required functional tasks as designated by applicable regulations and as directed by the SC.

(3)  Participate in training as required.

(4)  Determine SHARP training needs of each agency by monitoring each unrestricted report of sexual assault. Identify training requirements to the SARB.

(5)  Work to ensure that victims' services are provided in an appropriately coordinated manner.

*b.*  The SC or deputy commander only will chair the SARB and will —

(1)  Convene SARB meetings at least monthly to review cases arising from unrestricted reports of sexual assault. If there are no cases to review in a given month, the SARB will still meet to ensure training, processes, and procedures are complete for system coordination.

(2)  Provide SARB findings through the appropriate command channels, noting deficiencies in processes and procedures for preventing or responding to sexual assault.

(3)  Implement process improvements to ensure system accountability and an effective victim services program.

(4)  Ensure that the SHARP service providers and first responders are receiving appropriate training and have the necessary resources to provide an effective response to victims.

(5)  Facilitate monthly victim updates.

(6)  Ensure the SARCs and VAs actively participate in each SARB by presenting updates orally. This will be done without violating victim confidentiality or disclosing protected communications.

(7)  Ensure the brigade equivalent commander(s) (O–6) of Soldier subjects of sexual assault investigations provide all disposition information, in writing, to include any administrative or judicial action taken, stemming from the sexual assault investigation, to USACIDC.

*(a)*  Ensure that the appropriate paperwork is submitted for each case disposition within 24 hours. This information will then be entered into DSAID by the victim's assigned SARC.

*(b)*  Ensure that the victim is informed of all case dispositions, including those disposed of by nonjudicial punishment, within 2 business days of the final disposition decision.

(8)  Inquire if any victim, member of the victim's Family, witnesses, bystanders (who intervened), first responders, or other parties has experienced any form of retaliation, reprisal, ostracism, or maltreatment for working with a specific victim or on a particular case.

*(a)*  If any retaliatory behavior is reported, the LTC (O–5)-level or higher commander of the victim of the retaliatory behavior will develop a plan to immediately address the retaliatory behavior and forward the plan to the SARB chair.

*(b)*  Retaliation, reprisal, ostracism, and maltreatment involving the victim, SARCs, VAs, VRs, first responders, or other parties will remain on the agenda for status updates, until the victim's case is closed or until the retaliatory behavior has been appropriately addressed.

*(c)*  Commanders are responsible for ensuring that retaliation and reprisal are appropriately addressed even when they are no longer tracked by the SARB because a victim's sexual assault case has been closed.

(9)  Confirm that each victim receives a safety assessment as soon as possible.

(10)  Ensure effective and timely coordination among SARB members.

*(a)*  Confirm that the USACIDC agent assigned to the sexual assault investigation has notified the SARC as soon as possible, after the investigation is initiated.

*(b)*  Confirm that all unrestricted reports, initiated by a DD Form 2910 or an investigation initiated by an MCIO, are entered into DSAID within 48 hours of the DD Form 2910 being signed or the investigation being initiated.

*(c)*  Confirm that commanders are providing the final disposition of sexual assault cases to USACIDC.

*(d)*  Confirm that members of the SVIP, that is USACIDC special agents, special victim prosecutors, victim witness liaisons, and administrative paralegal support personnel, are working with SARCs, VAs, and VRs during all stages of the investigative and military justice process, to the greatest extent possible.

*(e)*  Confirm that SARCs, VAs, VRs, and SVCs have everything they need to provide an effective response to victims.

(11)  Ensure the immediate transfer of a case from one SARC or VA to another, in the event of a SARC's or VA's change of duty station, to ensure continuity of care.

(12)  Ensure that each SARB member involved with a specific case provides oral updates without disclosing protected communications or violating victim confidentiality.

(13)  Provide recommendations and assistance to SARCs and VAs to ensure a victim's continued recovery, well-being, and safety.

(14)  Monitor the status of each expedited transfer request and MPO.

(15)  If the victim has informed the SARC of an existing CPO, require the SARC to inform the SARB of the CPO and its requirements.

(16)  Ensure the accuracy of all contact information for the SARCs, USACIDC, MP desk, MTF, servicing legal office, SVC, and chaplain for the installation posted on the DoD Safe Helpline website (https://safehelpline.org). Inaccurate information will be reported by the lead SARC to the appropriate ACOM, ASCC, or DRU PM within 24 hours of the SARB.

*c.*  The lead SARC will—

(1)  Serve as the co-chair of the SARB. This responsibility will not be delegated.

(2)  Inform other SARB members of cases to be discussed prior to the SARB to allow SARB members to review services provided and ongoing needs of the victims, areas for improvement in their organization's response, and related issues under their cognizance for presentation at the SARB.

(3)  Request reports of command action and case dispositions arising from reports of retaliatory behavior on the SARB's agenda.

(4)  Create any slides displayed at the SARB, ensuring they do not contain any confidential or privileged information and contain all required information, in the format provided by the DCS, G–1 ARD. The content of a victim's slide will be provided and presented by their assigned SARC.

(5)  Confirm that all reported sexual assaults are entered into DSAID within 48 hours of the report of sexual assault. This deadline is extended to 96 hours if in a deployed location.

(6)  Confirm that only a trained, certified, full-time brigade-level SARC is entering information into DSAID.

(7)  Present actions taken to resolve all DSAID data errors and reconciliation of USACIDC sexual assault investigations reported as missing on the monthly QC report.

(8)  Keep minutes of the SARB to include those in attendance and issues discussed, not providing any PII or violating victim confidentiality of the victims. Once the minutes have been signed by the Chair, the lead SARC will send the minutes, via encrypted email, to their ACOM/ASCC/DRU level PM.

*d.*  The USACIDC agent will—

(1)  Provide any applicable information related to case progression as long as it does not hinder an investigation.

(2)  Document information regarding protective orders (CPO, TRO, and MPO) that is presented in the investigative case file, to include documentation for RC personnel in Title 10 status.

(3)  Document the SARB in the investigative file as an SVIP meeting, if all required members of the SVIP are present at the SARB.

*e.*  The victim's immediate commander will—

(1)  Attend all SARB meetings where cases involving victims under their command will be discussed.

(2)  Ensure they are present only during the discussion of cases regarding victims under their command.

(3)  Update their Soldier on the status of their case, using information received during the SARB, within 72 hours of the SARB. This responsibility will not be further delegated.

(4)  When the victim is a civilian, either a DoD employee who is eligible for services or a Family member, the SARB Chair will serve as the victim's immediate commander, ensuring all updates are completed within 72 hours.

*f.*  SARCs will—

(1) Provide an updated SARB slide, in the official format provided by the DCS, G–1 ARD, to the lead SARC for each of their assigned cases.

(2) Provide limited, pertinent details of the assault only the first time the case is heard at the SARB. This information will be shared in a manner that maintains the victim's dignity and privacy.

(3) Provide a verbal update of the victim's case, with assistance from the assigned victim advocate. Answer questions regarding the case and victim from other SARB members without violating victim confidentiality or disclosing privileged communications.

(4) Confirm that the victim has been informed of available services, to include counseling, medical, and legal resources, without violating victim confidentiality.

(5) Update DSAID entry for each case discussed at the SARB within 48 hours.

*g.* SHARP VAs and VRs will—

(1) Provide their SARC with updated case information prior to the SARB.

(2) Provide a verbal update of the victim's case, with assistance from the SARC. Answer questions regarding the case and victim from other SARB members without violating victim confidentiality or disclosing privileged communications.

(3) Confirm that the victim has been informed of available services, to include counseling, medical, and legal resources, without violating victim confidentiality.

(4) Ensure they are present only when those cases to which they are assigned are discussed.

*h.* All other SARB members will—

(1) Perform required functional tasks as designated by the applicable regulations and as directed by the SC.

(2) Conduct ongoing reviews of current procedures for each case for compliance with regulations and local policies in keeping with the accepted high standards of victim care.

(3) Meet at least monthly to review the handling and disposition of all cases. Provide recommendations to the SARB on ways to improve the processing of sexual assault cases.

(4) Participate in training as required. Determine SHARP training needs of each agency by monitoring each unrestricted report of sexual assault. Identify training requirements to the SARB.

(5) Conduct reviews of MOAs with other Services and civilian agencies regarding SHARP support. Provide updates to the SARB and recommendations for improvements, as necessary.

*i.* On a joint base or if the installation has tenant commands, the SARB will—

(1) Explore the feasibility of joint use of existing SHARP resources, to include rotating on-call status of SARCs, SHARP VAs, and VRs.

(2) Evaluate the effectiveness of communication among SARCs, SHARP VAs, VRs, and other first responders.

## F–6.  High risk response team

For unrestricted reports, the SARB Chair will form a high risk response team (HRRT) if the victim is assessed by the SARC or through a safety assessment to be at a high risk of harm from the subject, people associated with the subject, or harm to themselves.

*a.* The SARB chair will immediately stand up a multi-disciplinary HRRT if a victim is assessed to be in a high-risk situation. The purpose and the responsibility of the HRRT is to continually monitor the victim's safety by assessing danger and developing a plan to manage the situation and implement a response, as needed.

*b.* The HRRT will be chaired by the victim's immediate commander and, at a minimum, include the subject's immediate commander; the victim's SARC and assigned SHARP VA or VR; USACIDC and the VWL assigned to the case; victim's SACP or mental health and counseling services provider; and the personnel who conducted the safety assessment. The responsibility of the HRRT members to attend the HRRT meetings and actively participate in them will not be delegated. The HRRT chair's servicing legal advisor, or a representative, will be available to advise the chair.

*c.* The HRRT will make their first report to the SC, SARB chair, and SARB co-chair within 24 hours of being activated. A briefing schedule for the SARB chair and co-chair will be determined, but briefings will occur at least once a week while the victim is on high-risk status.

*d.* The HRRT assessment of the victim will include, but is not limited to evaluating—

(1) Victim's safety concerns.

(2) Subject's access to the victim or whether the subject is stalking or has stalked the victim.

(3) Previous or existing relationship or friendship between the victim and the subject, or the subject and the victim's spouse, or victim's dependents. The existence of children in common. The sharing (or prior sharing) of a common domicile if the subject and the victim have children in common, or are/were intimate partners who share or have ever

shared a domicile, the HRRT will refer the case to Family Advocacy Program, in accordance with AR 608–18. These cases are not managed by the SARC or discussed at the SARB.

(4)  Whether the subject (or the subject's friends or Family members) has destroyed victim's property; threatened or attacked the victim; or threatened, attempted, or has a plan to harm or kill the victim or the victim's Family members; or intimidated the victim to withdraw participation in the investigation or prosecution.

(5)  Whether the subject has threatened, attempted, or has a plan to commit suicide.

(6)  Whether the subject has used a weapon, threatened to use a weapon, or has access to a weapon that may be used against the victim.

(7)  Whether the victim has sustained serious injury during the sexual assault incident.

(8)  Whether the subject has a history of law enforcement involvement regarding domestic abuse, assault, or other criminal behavior.

(9)  Whether the victim has a CPO or command has an MPO against the subject, or the subject has violated a CPO or MPO.

(10)  History of drug or alcohol abuse by either the victim or the subject.

(11)  Whether the subject exhibits erratic or obsessive behavior, rage, agitation, or instability.

(12)  Whether the subject is a flight risk.

## Appendix G

## Department of Defense Sexual Assault Advocate Certification Program Requirements, Training, and Additional Skill Identifier Assignment

### G–1. Purpose

To ensure SHARP professionals are properly background screened, SHARP trained, D–SAACP certified, and have received an appropriately signed appointment memo authorizing them to provide victim advocacy services, prior to providing SHARP services to victims of sexual assault.

### G–2. General

*a.* Soldiers who serve in SHARP positions and interact with victims of sexual assault serve in positions of significant trust and authority and must meet the Army's suitability requirements (see AR 600–78). DA Civilians who serve in SHARP positions and interact with victims of sexual assault serve in public trust positions with a moderate risk level.

*b.* All SHARP professionals (PMs, SARCs, SHARP VAs, VRs, and trainers) will be  appointed by commanders or the appropriate appointing authority and will be D–SAACP certified in accordance with DoDI 6495.03 and ASA (M&RA) guidance for DA Civilian SHARP Program positions ; will be trained and qualified to receive formal complaints of sexual harassment in accordance with DoDD 1350.2; have undergone the required background investigation within the past 3 years; and not have any disqualifying conditions.

*c.* Applicants will complete and submit the DD Form 2950 application packet for new applicants or DD Form 2950–1 (Department of Defense Sexual Assault Advocate Certification Program (D–SAACP) Application Packet for Renewal Applicants) for re-certification and a certificate of completion of the SHARP Course required for their position. Instructions on how to complete the form and where to submit them are provided on the DD Form 2950. The DD Form 2950 is located at the DoD Forms Management Program website at http://www.esd.whs.mil/.

(1)  PMs will apply/identify themselves as SARCs using the DD Form 2950.

(2)  Training Instructors will apply/identify themselves as VAs using the DD Form 2950.

(3)  VRs will apply/identify themselves as VAs using the DD Form 2950.

*d.* Soldiers who are subjects of an open criminal, IG investigation, or command directed investigation relating to a violation of victim rights or with a nexus to their SHARP duties will not submit requests for D–SAACP certification.

*e.* Any actions involving DA Civilians related to background screening and D–SAACP suspension, revocation, or removal actions will be closely coordinated with the servicing civilian personnel office (CPAC).

*f.* Table G–1 is a list of requirements that will be met prior to any Soldier or DA Civilian serving in a SHARP position.

**Table G–1**
**Qualifications·**

| Pre-requisites to serve in SHARP professional position | Minimum rank/grade:<br>SARC: SFC, CW3, MAJ, or GS–11<br>SHARP VA/VR: SSG, CW2, 1LT, or GS–9<br>Training Instructor: Based on position description<br>PM: Based on position description<br>*Rank and grade requirements can be waived only after an exception to policy request has been approved and signed by the first GO/SES in the SARC or SHARP VA candidate's chain of command and coordinated and approved by the ACOM, ASCC, or DRU SHARP PM and DCS, G–1 ARD |
|---|---|
| | Command interview prior to nomination to a SHARP position |
| | Behavioral health care check—for military full time only |
| Screening | Every 3 years |
| Certification | D–SAACP (must be renewed every 2 years, 32 hours of continuing education required per renewal) |
| Training | Full time SARC or SHARP VA–SARC/SHARP VA Career Course<br>Collateral duty SARC, SHARP VA, VR–SHARP Foundation Course<br>Training Instructor–SARC/SHARP VA Career Course  and SHARP Trainer Course<br>PM–SHARP Foundation Course and SHARP PM Course |

| Table G–1<br>Qualifications—Continued | |
|---|---|
| Appointment memo | Appointment memo appropriately signed which acknowledges nominee has met all conditions for the SHARP position and is authorized to serve as a VA or SARC |
| DA Form 4187 | DA Form 4187 for SHARP full time positions |

### G–3. Commanders' responsibilities

*a. D–SAACP certification.*

(1)  Commanders will ensure Soldiers (RA, Reserve, and ARNG) and DA Civilians who are SHARP professionals possess an active D–SAACP certification and favorable background screening. Commanders will ensure Soldiers or DA Civilians with an unfavorable or expired background screening or expired or revoked D–SAACP certification are not serving in SHARP professional positions. Commanders will provide information to SARCs, SAPR VAs, and SAPR PMs regarding the security classification of their position. Upon notification that a Soldier has an unfavorable background screening, the removal authority will issue a memo and notify them in writing of the revocation, the requirement to immediately cease contact with victims of sexual assault, and the right to appeal. If a Soldier chooses to appeal, the command will issue a suspension memorandum until final disposition of the appeal. Soldiers who have an unfavorable background screening or revoked D–SAACP certification are not authorized to retain the SHARP ASI 1B or 1H.

(2)  Upon notification that a DA Civilian has an unfavorable background screening, the removal authority will issue a memo and notify them in writing of the revocation, the requirement to immediately cease contact with victims of sexual assault, and the right to appeal. If a DA Civilian chooses to appeal, the command will issue a suspension memorandum until final disposition of the appeal. The appointing/waiver/removal authority will process D–SAACP revocations and position removals in close coordination with the servicing CPAC and legal advisor, and in compliance with applicable guidance.

*b. Soldier appointment.*

(1)  The appointing authority for Soldiers will conduct professional selection interviews with Soldiers intended to fill SHARP professional positions (see D–SAACP Commanders Guide at http://sapr.mil/public/docs/d-saacp/d-saacp_commanders_guide_20140514.pdf). Suggested topics of discussion may include reasons for wanting to work in the SHARP Program, trust and responsibility, financial well-being, the prioritization of SHARP responsibilities, the Professional Code of Ethics codified in the D–SAACP application packet (DD Form 2950 and DD Form 2950–1, pages 4 and 5), and anything in their past or present that would preclude them from serving in a positions of significant trust and authority or being on-call. Upon a cleared local screening, the commander will nominate the Soldier to the ACOM, ASCC, DRU, ARNG or USAR SHARP PM for HRC background screening.

(2)  The SHARP PM will confirm the Soldier has a favorably adjudicated local screening and favorably adjudicated HRC broadened screening, is approved to attend the SHARP course, and will enter this information into Army Training Requirements and Resources System (ATRRS). Upon successful completion of the required SHARP course (s), the SHARP PM will oversee the D–SAACP certification process.

(3)  Only Soldiers selected to serve as SHARP professionals are authorized to attend SHARP courses. Upon completion of the command interview, favorably adjudicated screening, successful completion of training, and D–SAACP certification, the appropriate appointing authority will prepare appointment orders for full-time and trained and certified collateral duty SARCs and SHARP VAs. The appointment memo will confirm the Soldier a favorably adjudicated background screenings not more than 3 years old, has successfully completed the relevant SHARP course, and possesses an active D–SAACP certification. Commanders will prepare a DA Form 4187 and submit it to the HRC for Soldiers filling full-time SARC and SHARP VA positions.

*c. Department of the Army Civilian appointment to SHARP positions.* DA Civilians are hired (on-boarded) into full-time SHARP positions, not nominated. Commanders and SESs will work with their servicing CPAC to announce, recruit, and fill full-time DA Civilian SHARP professional positions. Appointing authorities will fill DA Civilian positions following normal personnel processes and background screenings. DA Civilian selectees may be on-boarded after an interim basic suitability determination is made based on results of an FBI Fingerprint files check and examination of application documents. The local CA is responsible to make these interim basic suitability determinations. DA Civilians will possesses a favorably adjudicated, complete background screening, and D–SAACP certification prior to any contact with victims of sexual assault.

(1)  Only the DCS, G–1 ARD Director is authorized to approve revisions to SHARP position descriptions.

(2)  A DA Civilian who is hired into a SHARP position is not appointed until the appropriate appointing authority has signed an appointment memo, authorizing them to act as a SARC or VA. Without this appointment memo, a DA Civilian cannot offer Victim-Victim Advocate Privilege and is not authorized to have contact with victims.

## G–4.  Department of Defense Sexual Assault Advocate Certification Program

*a.*  All SHARP professionals, both Military and DA Civilian, will obtain and maintain D–SAACP certification.

*b.*  To be eligible for the D–SAACP certification, the SHARP course will have been successfully completed within the 2 years immediately prior to the date of the D–SAACP application and the candidate will possess a completed and cleared background screening.

*c.*  SHARP PMs are responsible for validating and submitting D–SAACP certification packets to the National Organization for Victim Assistance. A completed and cleared background screening is required in order to submit D–SAACP certification requests. Personnel serving in SHARP positions who are determined to be in non-compliance with screening requirements will have their D–SAACP certification and ASI (Soldiers only) revoked.

## G–5.  Recertification

*a.*  Recertification is required every 2 years after the initial certification.

*b.*  Re-certification requires 32-hours of continuing education (1 hour = 1 continuing education unit (CEU)). No more than 12 hours can be Army specific information (that is, policies and procedures); 2 hours must be victim advocacy ethics. Topics should be related to victim advocacy and care, but do not need to be directly related to the military or sexual assault. Applicants must take 2 hours of victim advocacy ethics training and must complete the Safe Helpline 101 training; both count towards the 32 hour requirement.

*c.*  The DCS, G–1 ARD periodically offers webinars and most are approved for continuing education credits. In most cases, participants will be able to earn 1.5 CEUs. The CEUs are sanctioned by DoD Sexual Assault Program Office. The webinar topics fall in the following categories for CEUs: ethics, response, advocacy, and/or prevention.

(1)  Activities that are not educational in nature do not count towards the D–SAACP continuing education training course requirements (for example, participating in a run/walk event, reading information online, reviewing SAPR program or policy updates, volunteering at a sexual assault awareness table or  booth, or serving as an instructor in a SAPR training).

(2)  All SHARP professionals will apply for renewal of their D–SAACP certification using DD Form 2950–1, coordinating through their PM, before the expiration of their initial 2 year certification SHARP professionals who fail to obtain renewal approval prior to the expiration of their current certification will have their certification revoked by National Organization for Victim Assistance and must reapply as a new applicant.

*(a)*  SHARP professionals will maintain all training certificates to verify training completion.

*(b)*  SARCs will retain this documentation for each SHARP VA and VR in their area of responsibility and enter the information into DSAID.

## G–6.  Department of Defense Sexual Assault Advocate Certification Program suspension

*a.*  A D–SAACP certified individual must notify the commander, supervisor or other appropriate authority immediately if he or she is charged, arrested, or convicted of any criminal activity, or he or she experiences any event that, pursuant to DoD Manual 5200.02, must be reported by individuals eligible for a sensitive position. Upon notification, the suspension authority will immediately, in writing, suspend and temporarily reassign the D–SAACP certified individual. The suspension authority and D–SAACP certified individual will follow the DoD D–SAACP suspension and revocation guidelines (see DoDI 6495.03).

*b.  Soldier suspension.*

(1)  In addition to the requirements of the DoD D–SAACP guidelines, the command will flag Soldiers under investigation in accordance with AR 600–8–2 and monitor the investigation until it is complete.

(2)  If the investigation does not result in disqualifying information, the command will notify the suspension authority, who will lift the suspension and reinstate the Soldier to the SHARP position.

(3)  If the investigation results in disqualifying information, or if the command receives credible evidence that the Soldier has committed an offense, the command will notify the removal authority who processes revocation/removal actions.

*c.  Department of the Army Civilian suspension.*  Upon notification that a DA Civilian is under investigation for an offense that would disqualify them from serving in a SHARP position, the suspension authority will ensure the suspension is processed in close coordination with the servicing CPAC and legal advisor, and in compliance with applicable policy and procedures.

**G–7.  Department of Defense Sexual Assault Advocate Certification Program revocation and removal**

*a.*  Soldier revocation/removal.

(1)  The revocation/removal authority will notify a Soldier who is disqualified from serving in a SHARP professional position, in writing, of the basis for the proposed removal; the Soldier's right to consult with legal counsel; the Soldier's right to request a waiver, if authorized; and the Soldier's right to submit matters in defense, extenuation, or mitigation. The waiver/removal authority will also provide the Soldier with a copy of the disqualifying information.

(2)  At any time a commander becomes aware a Soldier with D–SAACP certification is in their area of operations and has an unfavorable background screening, the current commander with removal authority is responsible for issuing a memo and notifying the Soldier of D–SAACP certification revocation, and, if applicable, removal from the SHARP assignment, the requirement to immediately cease providing SHARP services to victims of sexual assault, and the Soldiers right to appeal.

(3)  The revocation//removal review authority will document the decision in writing to remove a Soldier from a SHARP position, and provide that documentation to HRC, which will apply the appropriate personnel management codes and remove the ASI of the Soldier's file.

(4)  AR 190–45 addresses amendment of inaccurate or irrelevant records.

(5)  DA Civilian revocation/removal: The revocation/removal authority for DA Civilians, in close coordination with the servicing CPAC and legal advisor, and in compliance with applicable guidance will revoke D–SAACP certification for DA Civilians who have unfavorable screening.

*b.*  Upon receipt of an allegation, the first GO/SES in the SHARP professional's chain of command will—

(1)  Ensure a timely and comprehensive inquiry is conducted.

(2)  Notify the SHARP professional, in writing, that an allegation has been received, an inquiry has been initiated, and their authority to perform SHARP duties is suspended pending the outcome of the investigation by the responsible commander.

(3)  If a SHARP professional is reported to have committed a sexual assault, the commander will immediately report any and all unrestricted reports of sexual assault to USACIDC and ensure a SAIRO is completed.

*c.*  Refer to DoDI 6495.03 for the inquiry process for adverse action, administrative inquiry, or investigative procedures pertaining to the D–SAACP certified SHARP professional.

*d.*  If the first GO in the chain of command determines in consultation with the assigned SARC, SJA and human resources office there is preponderance of evidence to support the complaint based on the nexus of the reported misconduct to the SHARP professional's duties, he or she will determine whether to suspend or revoke the D–SAACP certification.

*e.*  The first GO in the chain of command will notify the SHARP professional in writing if a decision has been made to suspend or revoke a D–SAACP certification and will provide a copy of the notification letter to DCS, G–1 ARD. This notification letter will include—

(1)  The effective date of the suspension or revocation of certification.

(2)  The grounds for the suspension or revocation, including the specific misconduct, ethical violation, substandard performance, professional or personal impairment, or the reason the commander lost faith and confidence in the SHARP professional to perform assigned duties.

(3)  The direction for the SHARP professional to surrender their D–SAACP certificate and wallet identification card to the first person in the chain of command or supervisor within 24 hours of receipt of the letter.

(4)  Notification of the SHARP professional's right to appeal the decision and description of the appeals procedures.

*f.*  The commander will provide a report to DCS, G–1 ARD, within 3 business days of concluding an inquiry. The report will document information specified by DoDI 6495.03.

*g.*  The DCS, G–1 ARD will provide the DoD SAPR office with written notification within 5 business days of receiving the commander's notification to suspend or revoke the SHARP professional's D–SAACP certification.

*h.*  Should the complaint prove unfounded, the commander may reinstate the SHARP professional.

*i.*  DA Civilian revocation will be processed per procedures in *Guidance for Civilian Sexual Harassment/Assault Response Program Positions* published by ASA (M&RA), in close coordination with the servicing CPAC and legal advisor, and in compliance with applicable guidance. DA Civilians have the right to appeal D–SAACP suspension and revocation, in writing, within 7 business days of notification of the suspension or revocation.

**G–8.  Department of Defense Sexual Assault Advocate Certification Program reinstatement guidelines**

*a.*  If a SHARP professional's certification has been suspended or revoked due to an administrative error, the first GO in the chain of command or first SES in the supervisory chain must issue a reinstatement letter to the D–SAACP

administrator to reinstate the individual. A copy of this letter will be forwarded to DCS, G–1 ARD within 3 business days. The report will document the administrative error and the reinstatement.

*b.* The standard for reinstatement to this sensitive and trusted position extends beyond whether there was a conviction or founded claim. All allegations will be considered by the commander or appropriate appointing authority who will determine if they are inconsistent with SHARP core duties.

*c.* The D–SAACP Review Committee staff will determine the steps necessary to reinstate the certification (that is, if a new or renewal application and committee review is required due to the original certification expiration date). The D–SAACP Review Committee staff will communicate directly with the applicant about these requirements.

## G–9. Army Staff, Army commands, Army service component commands, and direct reporting units SHARP program managers

*a.* SHARP PMs are responsible for requesting HRC background screening for Soldiers once commanders have verified a cleared local screening. Soldiers will have SHARP PM approval and verification of cleared screening to attend SHARP training. SHARP PMs will ensure Soldiers who attend SHARP training will be appointed to SHARP positions. SHARP PMs will ensure Soldiers meet the requirements to serve in a SHARP professional position. SHARP PMs may approve Soldiers to attend training with a cleared local screening and a cleared broadened HRC background screening. Soldiers who do not have a favorable screening will not possess D–SAACP certification, the ASI 1B or 1H, and cannot serve in SHARP positions. Should unfavorable screening results be discovered while the student is in class, the student will be removed from class and returned to their command.

*b.* SHARP PMs will maintain documentation required for personnel to hold SHARP professional positions. The documentation will include, at a minimum, copies of the nomination for Soldiers, documentation indicating cleared local and broadened screening for Soldiers, CPAC confirmation that DA Civilians have cleared or adjudicated screening, training certificate, ASI (for Soldiers), and D–SAACP certification. Only Soldiers and DA Civilians with D–SAACP certification are authorized to provide SHARP services.

*c.* The SHARP PM with oversight for the installation hosting the SHARP Foundation Course, will coordinate with the SHARP Academy to enter courses into ATRRS. Prior to the beginning of the SHARP course, the SHARP PM will ensure that all Soldiers approved to attend training have a cleared local background screening, a cleared HRC screening, and will serve in a SHARP professional position.

## G–10. Screening and additional skill identifier

*a.* Soldiers who have cleared background screening and successfully complete the SARC/VA Career Course qualify for the ASI 1H. Upon completion of the course, the SHARP Academy will forward the Soldier's name and SSN to HRC for award of the ASI 1H. O6-level commanders or above will ensure the ASI 1H is removed for Soldiers with an unfavorable screening.

*b.* Soldiers who have cleared background screening and successfully complete the SHARP Foundation Course qualify for the SHARP ASI 1B. Upon successful completion of training, SHARP PMs who hosted the training will forward the training certificates, Soldier's name, and SSN to HRC for award of the ASI 1B. Commanders will ensure the ASI 1B is removed for Soldiers with an unfavorable screening.

*c.* Soldiers who have an unfavorable screening or have their D–SAACP certification revoked will have their ASI removed.

**Appendix H**

**Retaliation Prevention and Response**

### H–1. Sexual Assault

*a.* The following procedures outline what a SARC will do to respond to a report of retaliatory behavior from a uniformed victim of sexual assault or a uniformed witness, bystander, or first responder to a sexual assault. A brief explanation of the types of retaliation is provided to the victim when signing the DD Form 2910 with a SARC, SHARP VA, or VR reviewing the types of retaliatory behavior.

(1) If a victim comes to a SARC to speak about retaliatory behavior, the SARC will —

*(a)* Discuss what the individual is experiencing in regard to retaliatory behavior.

*(b)* Explain the different types of retaliatory behavior and the investigative entities (IG, law enforcement, USACIDC, and commanders) by providing an informational sheet.

*(c)* Explain that the victim can go to an IG at any time during the process. Visits to the IG may range from consultation to filing a complaint.

*(d)* Offer support throughout the process, to include providing referrals (for example, SVC or legal assistance for legal advice) and accompanying the victim to meetings with command, investigators, and other first responder personnel, if requested.

*(e)* Write a MFR to record date of discussion, any referrals given, and the point of contact associated with the referrals. These referrals will be documented in DSAID.

*(f)* Prior to engaging an investigative entity or seeking alternative means for resolving the retaliatory behavior, discuss with the victim the options to consult with an IG, SVC, or a legal assistance attorney concerning retaliatory behavior, reporting options, and the investigative and military justice processes, as appropriate.

*(g)* Follow-up with the victim  to ask if the individual proceeded with making a retaliation report after speaking with the SVC or legal assistance attorney (if the individual elected to speak with an SVC or legal assistance attorney) or if the victim wants the retaliatory behavior to be discussed at SARB instead of going directly to an investigative entity.

*(h)* Receive notification of the report from an investigative entity or command and record the report in the retaliation data calls or open a case in the retaliation module in DSAID, once developed.

*(i)* If the victim made a restricted report, the SARC or SHARP VA will inform the victim that formal action regarding the perceived retaliation is limited and will require conversion to an unrestricted report, if the intent is to link the retaliation to a report of sexual assault or have the allegations investigated. Sexual assault victims who made a Restricted Report do not have to convert to an Unrestricted Report to file a complaint with an IG or the DoD Safe Helpline.

(2) SARB discussion of retaliation.

*(a)* The lead SARC will confirm with the SARCs and SAPR VAs if there is a retaliation report to discuss at the SARB.

*(b)* The lead SARC will provide the servicing SJA office with information on retaliation reports to be presented at the SARB if the lead SARC has concerns regarding privileged communications.

*(c)* SARB attendees will discuss the retaliation report, including whether the victim is represented (except for cases under the jurisdiction of the IG or the discussion will compromise the integrity of an investigation by USACIDC, other MCIO, or other law enforcement agency).

*(d)* After disclosure of the retaliation report at the SARB, the SARB Chair will provide referrals to USACIDC, IG, MEO, or a subordinate commander or some other follow-on action if action or an investigation is not already underway.

*(e)* If the retaliation reporter is a sexual assault victim, their commander will provide an update on the status of the case to the victim. Commanders will provide updates to witnesses, bystanders, or first responders to a sexual assault.

(3) Resolving a retaliation report.

*(a)* The lead SARC will inform the retaliation reporter's commander if the reporter wishes to pursue action relating to retaliatory behavior that does not fall under the jurisdiction of the IG or USACIDC. Reports of restriction or reprisal fall within the jurisdiction of the IG in accordance with 10 USC 1034 and as such, an investigative determination will be made by the IG. Depending on the facts of the case, reports of ostracism, maltreatment, or other retaliatory behavior may fall within the jurisdiction of the IG if, for example, it is determined that they are inextricably linked to restriction or reprisal.

1. The commander will then decide whether to refer the report for investigation by law enforcement or seek resolution through other appropriate means (for example, command-directed Investigation or through coordination with an SVC).

2. An individual independent of the originating unit or organization of the alleged retaliation will investigate the retaliation reports referred to command.

3. The reporter and the SARC and SHARP VA will remain informed of the investigation through the chain of command, if desired.

*(b)* The SARC and SHARP VA will work with the reporter, making available alternative means for the reporter to resolve the retaliation allegations.

1. Under 10 USC 1044e, a retaliation reporter may be eligible for an SVC.

2. Wherever appropriate and desired, the SARC and SHARP VA may assist with coordinating resolution at the lowest appropriate level.

3. SARCs and SHARP VAs may request the assistance of the lead SARC, when needed, to serve as a resource and coordinate with command and SVC or SJA to address legal questions from SARCs.

*(c)* If a sexual assault victim reports retaliation through the DoD Hotline or the Army IG, the report will be sent to the DoD IG. The DoD IG will then review the case to determine if it will be the investigative entity. If the DoD IG decides to conduct the investigation, it will notify the retaliation reporter and the Army IG of the investigation.

*(d)* The lead SARC will notify the appropriate level of command of the retaliation report as soon as possible (if the retaliation report is against the immediate commander or first-line supervisor, the next level of command will be notified). If the SARC has concerns about violating privileged communications, the SARC will consult with the servicing SJA office prior to notifying command.

*(e)* The lead SARC will make every effort to provide updates to commanders whose personnel are involved in a retaliation report.

*(f)* The commander(s) of the Soldier, who is a subject of a retaliation report, will provide, in writing, a case status and all disposition data, to include any administrative or judicial action taken, stemming from a retaliation investigation to the lead SARC.

*b.* If the sexual assault victim (or uniformed witnesses, bystanders, and first responders involved in a sexual assault report) reports a retaliatory action, because they are (were) being processed for administrative separation within 1 year of the final disposition of the victim's sexual assault case, then that Soldier who is being processed (or has been processed) for administrative separation may request that the appropriate GO in their chain of command review the separation. SARCs and SHARP VAs will notify these personnel of this policy provision.

*c.* Sexual assault victims, uniformed witnesses, bystanders, and first responders involved in a sexual assault report have the right to discuss the career impacts with a GO if they believe there were other impacts to their military career because they reported retaliation.

## H–2. Sexual harassment

The following procedures outline what SHARP professionals will do to respond to a report of retaliatory behavior from a uniformed sexual harassment complainant or a uniformed witness, bystander, or first responder to a sexual harassment:

*a.* If the individual comes to a SHARP professional to speak about retaliation, the SHARP professional will coordinate with a brigade SARC. The brigade SARC will—

(1) Discuss what the individual is experiencing concerning perceived retaliation.

(2) Explain the types of retaliation and investigative entities (for example, IG, law enforcement, USACIDC, and command) and provide an informational sheet.

(3) Explain that the individual can go to an IG at any time during the process. Visits to the IG may range from consultation to filing a complaint.

(4) Offer support throughout the process, to include providing referrals (for example, legal assistance for legal advice; behavioral health) and accompanying the individual to meetings with command, investigators, and other first responder personnel, if requested.

(5) Write a Memorandum for Record to record date of discussion, any referrals given, and the point of contact associated with the referral (this procedure is optional).

(6) Explain that the lead SARC will be informed when the individual files a retaliation report and/or if the command or the investigative entity discusses the report at the SARB.

(7) Discuss with the individual the options to consult with an IG or a legal assistance attorney concerning retaliatory behavior, reporting options, and the investigative and military justice processes, as appropriate, and prior to engaging an investigative entity or seeking alternative means for resolving the retaliatory behavior report.

(8)  Follow-up with the individual to ask if the individual proceeded to file a retaliation report after speaking with a legal assistance attorney (if the individual elected to speak with a legal assistance attorney) or if the individual wants the allegation  to be discussed at SARB instead of going directly to an investigative entity.

*b.*  Receive notification of the report from the lead SARC and record the report in the retaliation data calls or open a report in ICRS.

(1)  SARB discussion of retaliation reports—

(2)  The lead SARC will coordinate with the brigade SARC the individual is seeking legal assistance and/or if there is a retaliation report to discuss at the SARB.

(3)  The lead SARC will provide the servicing SJA office with information on retaliation reports to be discussed at the SARB to review any concerns regarding privileged communications.

(4)  Attendees will discuss the retaliation reports unless the discussion will compromise the integrity of the investigation by USACIDC or other law enforcement agency, or compromise privileged communications, per SJA determination.

(5)  Cases under the jurisdiction of IG will not be presented, discussed, or tracked at the SARB.

(6)  After discussion of the retaliation report at the SARB, the chair will provide referrals to the appropriate investigative entities for action including law enforcement agency, Army IG, DoD IG, DoD Hotline, or a subordinate commander as appropriate.

(7)  The brigade SARC, in coordination with the lead SARC and/or servicing legal assistance personnel, will provide updates to the reporting individual.

*c.*  Resolving a retaliation report—

(1)  The lead SARC, upon being informed by the brigade SARC, will inform the retaliation reporter's commander if the reporter wishes to pursue action relating to reported conduct that does not fall under the jurisdiction of the IG or MCIO. Allegations of restriction or reprisal fall within the jurisdiction of the IG in accordance with 10 USC 1034, and as such, an investigative determination will be made by the IG. Depending on the facts of the case, ostracism, maltreatment or other retaliatory behavior may fall within the jurisdiction of the IG if, for example, it is determined that they are inextricably linked to restriction or reprisal.

*(a)*  The commander will then decide whether to refer the report for investigation by law enforcement or seek resolution through other appropriate investigative means (for example, AR 15–6 investigation).

*(b)*  When referred to command for investigation, an individual independent of the originating unit or organization of the reported retaliation will investigate the retaliation reports referred to the command.

(2)  The chain of command will ensure that the lead SARC and the brigade SARC all remain informed throughout the process.

(3)  The brigade SARC will work with the reporter, making available alternative means for the reporter to resolve the retaliation.

*(a)*  Legal assistance personnel are available to help the retaliation reporter in a variety of ways, such as communicating with the reported retaliator verbally or in writing to address reporter concerns, requesting intervention from a coworker, utilizing the reporter's chain of command, or other means of action.

*(b)*  Wherever appropriate and desired, the brigade SARC may assist with coordinating resolution at the lowest appropriate level.

(4)  Brigade SARCs may request the assistance of the lead SARC to serve as a resource and coordinate with command and legal assistance attorneys or SJA to address legal questions from SARCs.

(5)  The lead SARC will notify the appropriate level of command of the retaliation report as soon as possible. If the retaliation report is against the immediate commander or first-line supervisor, then the next level of command will be notified and assume responsibility for the case.

(6)  The lead SARC, in coordination with the brigade SARC, will make every effort to provide updates to commanders whose personnel are involved in a retaliation report and/or retaliation investigation.

(7)  The commander of the Soldier who is a subject of a retaliation report, will provide in writing a case status and all disposition data, to include any administrative or judicial action taken, stemming from a retaliation investigation to the lead SARC. If the SARC has concerns about violating privileged communications, the SARC will consult with the servicing SJA office prior to notifying command.

(8)  If a sexual assault victim reports retaliation through the DoD Safe Helpline or the Army IG, the report will be sent to the DoD IG. The DoD IG will then review the case to determine if it will be the investigative entity. If the DoD IG decides to conduct the investigation, it will notify the retaliation reporter and the Army IG of the investigation.

(9)  Soldiers who report retaliation associated with filing a sexual harassment complaint, or being a uniformed witness, bystander, or first responder related to the sexual harassment complaint, will be afforded the opportunity to communicate with a GO in their chain of command regarding career-related impacts and administrative separation

actions they perceive to be associated with the complaint or involvement in the incident. SARCs and SHARP VAs will notify Soldier complainants of sexual harassment as well as uniformed witnesses, bystanders, and first responders, of this policy provision.

### H–3. Training and data collection

*a.* Training for personnel involved with retaliation reports and reporters on procedures as set forth in appendices E, C, and F, "Retaliation Response Procedures" of the DoD Retaliation Prevention and Response Strategy Implementation Plan will be incorporated into existing training, as practicable.

*b.* Retaliation data will be included in the responses to the DCS, G–1 ARD and the M&RA, Equity and Inclusion Agency, MEO Program office, data request until the DSAID/ICRS/EORS module(s) becomes operational, at which point, the DSAID/ICRS/EORS retaliation module(s) will be utilized.

*c.* Metrics will be assessed to evaluate Army efforts to prevent and respond to retaliation. The ACOMs, ASCCs, or DRUs may be asked to provide information to support these metrics. The account of these metrics will appear in the Army's submission of the Annual Report to Congress. Metrics are included in appendix D of the DoD Retaliation Prevention and Response Strategy Implementation Plan.

## Appendix I

## Expedited Transfer Victim Requests

### I–1. General

Soldiers who file unrestricted sexual assault reports may request an expedited transfer. The intent behind the Expedited Transfer policy is to address situations where a victim feels safe, but uncomfortable. An example of where a victim feels uncomfortable is where a victim may be experiencing ostracism and/or retaliation. The intent behind the Expedited Transfer policy is to assist in the victim's recovery by moving the victim to a new location, where no one knows of the sexual assault.

### I–2. Guidelines

*a.* It is Army policy that there is a presumption in favor of transferring or reassigning a sexual assault victim, at his or her request, following that victim's credible report of sexual assault. Commanders and DA Civilian leaders will consider requests for transfer or reassignment in an expedited manner.

*b.* Soldiers who file an unrestricted report of sexual assault will be informed by the SARC, SHARP VA, VR, or the commander or DA Civilian supervisor equivalent (if applicable), at the time of making the report, or as soon as practicable, of the option to request an expedited transfer from their assigned command or installation, or to a different location within their assigned command or installation. The Soldier may also request an assignment deletion when the reported offender is assigned or inbound to the Soldier's gaining location.

*c.* For any number of reasons, victims may not wish to remain in their current units or organizations after a sexual assault. Requiring them to remain when they have a desire to leave the unit or organization can negatively affect their safety and emotional well-being, as well as the functioning of the unit or organization. Expediting review and action on a victim's request for transfer or reassignment is an important component of a leader's response to a credible report of sexual assault.

*d.* For the purposes of this policy, a report of sexual assault is credible when the battalion commander or above, after considering all available evidence from USACIDC or other investigative agency and the advice of the servicing legal office, concludes that there are reasonable grounds to believe that an offense constituting sexual assault has been committed against the person requesting the transfer or reassignment. For purposes of this policy, a credible report is limited to reports of crimes being investigated by USACIDC, other MCIO, or other investigative agencies.

*e.* Requests for a transfer or reassignment will be submitted in writing on a DA Form 4187 and processed using the procedure in AR 614–100 and AR 614–200.

*f.* In making a decision on a victim's request, the commander will start with a presumption in favor of transferring or reassigning the victim. A transfer or reassignment includes, but is not limited to, the victim's temporary or permanent movement to a unit within the same battalion or brigade, to a unit within the same division, to a unit on the same installation or to a unit at a different geographic location. For RC members, a transfer or reassignment might include provisions to perform inactive duty training on different weekends or at different times from the subject or with a different unit in the home drilling location.

*g.* Soldiers requesting the transfer will be informed that they may have to return for the prosecution of the case, if the determination is made that prosecution is the appropriate action.

*h.* When an expedited transfer is approved, notification from the losing commander (that is, no lower than a brigade commander (at a minimum an O–6)) to the gaining commander (that is, no lower than a brigade commander (at a minimum an O–6)) will depend on whether there is an open case and the continuation of services. If there is neither an open case nor a continuation of services requirement, no other action is needed. If there is an open case or services are requested, then notification to the gaining commander (that is, no lower than a brigade commander (at a minimum an O–6)) will occur to facilitate the investigation and/or access to services, as applicable. This procedure applies to any sexual assault victim move (for example, PCS either on or before the Soldier's normal rotation date, TDY inside or out of local area, compassionate reassignment).

(1) When an expedited transfer is approved, the losing commander will inform the gaining commander of the sexual assault when one of the following applies:

*(a)* Active criminal investigation.

*(b)* Active legal proceeding.

*(c)* Ongoing victim healthcare (medical or mental health) needs that are directly related to the sexual assault.

*(d)* Ongoing monthly SARB oversight involving the victim.

*(e)* Active SHARP victim support services.

(2) When an expedited transfer is approved, the losing commander (that is, no lower than a brigade commander (at a minimum an O–6)) will inform the gaining commander of the inbound expedited transfer if any of the aforementioned circumstances are occurring. The losing commander will limit the information given to objective facts about victim care provided, status of open investigations, and the status of ongoing legal proceedings in order to provide the gaining commander with some context for victim behavior and to facilitate the victim's access to advocacy, healthcare, USACIDC, and legal counsel.

(3) SHARP case documents will not be transferred to the gaining SARC without the victim's consent.

(4) The receiving commander will adopt processes to assure strict confidentiality. Only the immediate commander of the victim will be notified. The immediate commander may share the notification with the senior enlisted (1SG/CSM) advisor, if deemed necessary to support the victim. All information will be kept confidential to the extent authorized by law. Additional personnel will be notified by the commander only if they have direct input to the monthly SARB meeting. Every attempt will be made to limit access to the information related to expedited transfers.

(5) Expedited transfer procedures for USAR may allow for separate training on different weekends or times from the subject or with a different unit in the home drilling location to ensure undue burden is not placed on the Soldier or their Family by the transfer. Potential transfer of the reported offender instead of the Soldier should also be considered. At a minimum, the reported offender's access to the Soldier who made the unrestricted report will be controlled, as appropriate.

(6) Even in those court-martial cases in which the subject has been acquitted, the standard for approving an expedited transfer still remains whether a credible report has been filed. The commander will consider all the facts and circumstances surrounding the case and the basis for the transfer request.

(7) If a victim transfers then processes in table I–1 apply.

**Table I–1**
**Victim transfer processes**

| If | Then |
|---|---|
| —The victim does not seek continued services of a SARC or SHARP VA/VR at the new location, and<br>—The investigation or legal proceeding is ongoing at the original installation: | —The SARB responsibility remains with the original installation's SARB chair.<br>—The victim will be asked if they would like to receive the monthly update from the SARB meetings.<br>—If the victim wants the SARB updates, then the victim's new commander will participate in person or call in to the SARB meetings and this call-in will be documented in the minutes of the SARB.<br>—The new commander will provide the victim a monthly update of her or his case within 72 hours of the last SARB. |
| —The victim does seek SHARP VA/VR services at the new location: | —The advocacy responsibility transfers to the receiving SARC at the victim's new installation (if the victim consents to seek SHARP services at new location), and then the SARB responsibility may transfer to the new location.<br>—If the SARB does transfer to the location of the victim, then USACIDC at the original installation (if there is an ongoing investigation) and the legal officer at the original installation (if there are ongoing legal proceedings) are required to call in to the SARB. This USACIDC and legal officer call-in will be documented in the SARB notes. |
| —The victim seeks SHARP VA/VR services at the new location, and<br>—The commander determines that the SARB should stay at the original installation: | —The SARC at the new location will call in to the SARB meeting at the original location to report on victim services and any safety or retaliation-related issues. This SARC call-in will be documented in the SARB notes.<br>—The victim's new commander will also call in to the SARB meeting and will provide the victim a monthly update of her or his case within 72 hours of the last SARB. |

## Appendix J

## Sexual Harassment/Assault Response and Prevention Commander's Critical Information Requirement(s)

Standardized process for CCIRs regarding complaints of sexual harassment and reports of sexual assault.

### J–1.  Reporting categories

ACOM, ASCC, and DRU organizations will report formal sexual harassment complaints and unrestricted reports of sexual assault involving the following incident categories to the AOC and DCS, G–1 (DAPE–MPE–PC) PCC within 24 hours of notification.

*a.*  Category 1: Subject is a commander/O–5 (P) and above, E– 9/CSM, or senior DA Civilian supervisor (GS–15 or SES).

*b.*  Category 2: Subject falls within one of the following categories:

(1)  SHARP professional currently serving or with an active D–SAACP certification (regardless if currently serving in the position).

(2)  Staff member of the DCS, G–1 ARD or command SHARP offices or anyone who has an active D–SAACP certification (regardless if they are still serving in the position).

(3)  Special Victims' Counsel, Special Victims' Prosecutor, USACIDC Sexual Assault Investigator, or Special Victim Witness Liaison.

(4)  Drill Sergeant, Advanced Individual Training Platoon Sergeant,*included in the memo but position no longer recognized* or Recruiter.

(5)  Chaplain.

(6)  Sexual Assault Nurse Examiners and Sexual Assault Medical Forensic Examiners.

*c.*  Category 3: Curious cases, including, but not limited to the following:

(1)  Multiple reports originating from a single unit or organization within a time period defined by a lead SARC or PM that would warrant informing the Army G–1 and/or Army Senior Leaders.

(2)  A pattern of reports recognized by a lead SARC or PM that suggests a serial offender and would warrant informing the Army G–1 and/or Army Senior Leaders.

(3)  Extreme violence (victim requires hospitalization, robbery, murder).

(4)  Other abnormal situations that may warrant informing the DCS, G–1 and/or Army senior leaders.

*d.*  Category 4: Cases expected to attract high media or Congressional attention.

### J–2.  Submission of commander's critical information requirement(s)

Submit CCIRs in the following format:

*a.*  Incident type: Category 1 through 4.

*b.*  Who: Subject(s) name, grade or rank, gender, unit of assignment, and position. Victim(s) grade or rank and gender. Omit other PII of the victim, even if it is public knowledge or has been reported in the media. If the victim's grade, rank, or gender could possibly identify them, omit that information.

*c.*  What: Description of the incident. For sexual assault, what crime USACIDC is investigating; do not include specific details of the assault. For sexual harassment, what type of sexual harassment (quid pro quo, hostile environment, and so forth.), do not include specific details of the harassment.

*d.*  When: Date and time of incident and/or report.

*e.*  Where: Location of incident, to include e reporting installation and whether the incident occurred on or off post.

*f.*  Actions taken: Response to date (example, USACIDC investigation initiated with case number, appointment of an investigating officer, suspension of a commander, revocation of a SHARP professional's appointment orders).

*g.*  Other factors: Known or expected media or international interest, safety of victim, or any other pertinent information regarding the victim's well-being.

### J–3.  Notification process

*a.*  ACOM, ASCC, and DRUs submit initial CCIRs to the AOC and POC. The AOC forwards the CCIR to the PCC if it meets one of the four categories listed in paragraph K–1. Occasionally, the PCC may receive the initial USACIDC report, initiating the CCIR process and the SHARP CCIR OPT consisting of XO, DAS; XO, ASA (M&RA); XO, DCS, G1; XO, DCS, G–3/5/7; XO, OCPA; XO, OCLL; SHARP Director; XO, OTJAG; Chief, Criminal Law Division; OTJAG; Army Provost Marshal; and PCC Chief. ACOM/ASCC/DRU SHARP PMs will immediately notify the DCS, G–1 ARD of forthcoming CCIRs.

*b.*  The PCC then notifies the DCS, G–1 ARD Director.

(1) For category 2 incidents involving SHARP professionals, the DCS, G–1 ARD Director will—

*(a)* Validate the individual's certification in the D–SAACP. Validation will occur same day if notification occurs during the duty day or the next business day if after duty hours. If the individual is not D–SAACP certified, verify if they are currently serving as a SHARP professional.

*(b)* Inform the subject's PM if not already notified. Advise the PM of the requirement to submit a D–SAACP suspension or revocation memo to the DCS, G–1 ARD Director within 96 hours. Commanders can suspend a SHARP professional's D–SAACP certification immediately via verbal order of the commander. The PM will confirm that the individual's D–SAACP card is seized immediately.

*(c)* Immediately suspend access for subjects with DSAID and ICRS accounts.

(2) For all sexual assault incidents involving O6 commanders and above, a SHARP professional staff member and all Category 3 and 4 sexual assault incidents—

*(a)* The PCC submits the CCIR to the National Military Command Center (NMCC) / National Joint Operations and Intelligence Center (NJOIC).

*(b)-* The NMCC / NJOIC then notifies SAPRO, the Joint Staff, The Undersecretary of Defense for Personnel and Readiness, and the Office of the Secretary of Defense Public Affairs.

(3) The DCS, G–1 ARD Director notifies the DASA–DL for all sexual assault and sexual harassment CCIR incidents.

(4) The DCS, G–1 ARD Director notifies the DoD SAPRO director of all incidents that meet the DoD SAPR CCIR reporting guidelines. This includes all sexual assault incidents involving O–6 commanders and above, a SHARP professional or SHARP staff member, and all category 3 and 4 sexual assault incidents.

*c.* Follow-up reporting for CCIRs will be reported through ACOMs, ASCCs, and DRUs to the AOC and PCC. Reports will indicate actions conducted, a summary of the findings from USACIDC and /or AR 15–6 investigations (if available and releasable), and steps taken to assist the complainant / victim (if applicable).

*d.* If a written extract from local police intelligence files is provided to an authorized agency or individual, the following will be included on the transmittal documents: "This document is provided for information and use. Copies of this document, enclosures thereto, and information there from, will not be further released without the prior approval of the victim and Office of the Provost Marshal General."

## J–4. Crisis action team

The Director of the Army Staff may convene a crisis action team for category 4 CCIRs expected to receive Congressional or high media attention. The Army DCS, G–1 ARD Director will work with the command PAO, the DCS, G–1 PAO, and the Office of the Chief, Public Affairs to draft public affairs guidance, as needed.

## Appendix K

## Sexual Assault Incident Response Oversight Report

### K–1. Purpose

The SAIRO report details the actions taken or in progress to provide care and support to the victim, ensures that reports are referred to the appropriate investigatory agencies, and to provide initial notification to appropriate commanders. The SAIRO report will not delay a commander's immediate reporting to USACIDC or operational reporting through appropriate channels.

### K–2. Report requirements

*a. SAIRO report requirements.*

(1) *Preparation.* The battalion-level commander will prepare the SAIRO report in accordance with the guidance in this appendix, with input from the SARC and USACIDC. The SAIRO report will follow these standards:

(a) The assigned commander will submit the SAIRO report within 8 calendar days of an unrestricted report of sexual assault. An unrestricted report can be either 1) an unrestricted report of sexual assault made to a SARC, SHARP VA, or VR that is documented by a signed DD Form 2910; or 2) an investigation initiated by USACIDC or other MCIO. The 8-day timeframe begins once the DD Form 2910 is signed or the assigned commander receives a notification of an investigation from USACIDC.

(b) The SAIRO does not replace the SARC's requirement to contact the SC.

(c) If the victim files a restricted report and then converts to an unrestricted report, the 8-day timeframe begins when the victim revises the DD Form 2910 to an unrestricted report.

(2) *When required.* A SAIRO report is required when the victim or subject is a Soldier at the time of reporting, even if the sexual assault occurred before the enlistment or commissioning of the Soldier victim. This requirement only applies to unrestricted reports and independent investigations and does not apply to Family Advocacy Program cases.

(3) *Format.* The SAIRO report will follow the written format laid out in subparagraph K–2*b* below.

(4) *Reporting responsibilities.* See table K–1.

(a) Within 8 calendar days of the unrestricted report or notification to the commander that an independent investigation is underway of an adult sexual assault involving a victim and subject who are Soldiers , the immediate commander will submit a written SAIRO report.

(b) If the victim and subject are Soldiers in the same unit, the immediate commander will prepare and submit the report.

(c) If the victim and subject are Soldiers in different units, the victim's immediate commander will prepare and submit the report.

(d) If the immediate commander is the subject, the next higher commander in the chain of command will prepare and submit the report.

(e) If the sexual assault victim is a Soldiers and the subject is a civilian, the victim's immediate commander will prepare and submit the SAIRO report within 8 calendar days of the unrestricted report.

(f) If the sexual assault victim is a civilian who is eligible for SHARP services and the subject is a Soldier, the immediate commander of the subject will submit an abbreviated SAIRO report, with the understanding that some victim or subject information may not be accessible. The abbreviated SAIRO will include "Incident Data" and "Investigation."

(g) If the sexual assault victim is a civilian who is not eligible for SHARP services and the subject is a Soldier, the immediate commander of the subject will submit an abbreviated SAIRO report, with the understanding that some victim or subject information may not be accessible. The abbreviated SAIRO will include "Incident Data" and "Investigation."

(h) If the subject is the victim's immediate commander, the first O–6 in the victim's chain of command will submit the SAIRO report. However, if the subject is the victim's immediate commander and the O–6 in the chain, then the first GO in the victim's chain of command will submit the report.

**Table K–1**
**Sexual Assault Incident Response Oversight report reporting responsibilities**

| Victim | Subject | Unit | Responsibility for preparing and submitting SAIRO | Report length | Trigger for 8-day timeframe |
|---|---|---|---|---|---|
| Soldier | Soldier | Both in same unit | Victim's immediate commander | Full report | Signed DD Form 2910 or USACIDC or other MCIO notifies immediate commander |
| Soldier | Soldier | In different units | Victim's immediate commander | Full report | Signed DD Form 2910 or USACIDC or other MCIO notifies immediate commander |
| Soldier | Civilian | N/A | Victim's immediate commander | Full report | Signed DD Form 2910 or USACIDC or other MCIO notifies immediate commander |
| Civilian who is eligible for SHARP services | Soldier | N/A | Subject's immediate commander | Abbreviated report containing "Incident Data" and "Investigation" information outlined in this enclosure | Signed DD Form 2910 or USACIDC or other MCIO notifies immediate commander |
| Civilian who is not eligible for SHARP services | Soldier | N/A | Subject's immediate commander | Abbreviated report containing "Incident Data" and "Investigation" information outlined in this enclosure | USACIDC or other MCIO notifies immediate commander |

  *b. Required information.*

  (1) *Required.* The information required will be obtained from the SARC and USACIDC. Information will not be acquired through a command directed preliminary investigation. (DoDI 6495.02 prohibits command directed investigations for sexual assaults.) Provide preliminary information about the sexual assault that includes, at a minimum—

  *(a)* Victim gender, duty status, Service affiliation, assigned unit, rank or grade, and current geographic area where the victim is stationed and lives. If not a Soldier or DA Civilian employee, indicate whether the victim is a Family member, DoD contractor, foreign national or non-government civilian. Do not include PII. The SARC will report non-PII concerning sexual assault incidents (without information that could reasonably lead to identification of the victim or subject). For example, depending on the size of the location or the gender makeup of the unit, the SARC may not be able to include victim gender, rank, or grade.

  1. For SAIRO reports triggered by unrestricted reports, the SARC is responsible for providing all victim information and USACIDC will provide the incident data and investigation information.

  2. For SAIRO reports triggered by an independent investigation, USACIDC is responsible for providing the available information and no information will be requested from the SARC.

  *(b)* Subject gender, duty status, Service affiliation, assigned unit, rank or grade and current geographic area where the subject is stationed and lives. If the subject is not a Soldier or DoD Civilian employee, indicate whether the subject is a military dependent, DoD contractor, foreign national or non-government civilian. Do not include PII.

  *(c)* The most serious sexual assault offense reported in the investigation.

  *(d)* Location where the reported sexual assault offense occurred (for example, indicate if on an installation). Provide additional details if available (for example, in barracks, off-base housing, showers, and so forth).

  *(e)* Date and time of the reported sexual assault.

  *(f)* Date the victim was referred to the SARC, SHARP VA, or VR.

  *(g)* If an unrestricted report was made to a SARC, SHARP VA, or VR, date when the DD Form 2910 was completed by the SARC, SHARP VA, or VR.

  *(h)* Date the sexual assault was reported to USACIDC or other MCIO, including the organization notified.

  *(i)* If the subject is a Soldier, indicate whether the subject has been temporarily transferred or removed from an assigned billet, ordered to pretrial confinement or otherwise restricted, if applicable.

  *(j)* Any other relevant information related to the subject excluding victim photographs or additional incident information that could reasonably lead to personal identification of the victim or subject.

(2)  *Advocacy services offered.*  SHARP advocacy services of a SARC and SHARP VA or VR will be offered if the victim is a Soldier or adult military dependent or otherwise eligible for SHARP services. The SARC will provide the immediate commander who is preparing the SAIRO report—

*(a)*  Confirmation that the SARC entered information into DSAID within 48 hours (96 hours if in a deployed environment with connectivity issues).

*(b)*  If the victim accepted advocacy services, a description of any circumstances in the response that adversely affected the command's ability to address the victim's needs if the victim accepted advocacy services (for example, timeliness; sensitivity; obstacles to care; and coercion, retaliation and/or reprisal, if any). The SARC will include any victim input provided with documented victim consent for disclosure of privileged communications. The SARC will also inform the victim if he or she may be eligible to speak with a military legal assistances attorney or an SVC before providing consent for release of privileged communications.

*(c)*  A summary of the SHARP services offered.

*(d)*  The date when the next SARB meeting is scheduled to provide oversight for this case. Confirm that the SC of deputy commander will chair the SARB. The victim's immediate commander is a mandatory member of the SARB in accordance with DoDI 6495.02.

(3)  *Input of victim's commander.*  (For Soldier victims only.) Include additional comments by the victim's commander, if any.

(4)  *Healthcare.*  When providing healthcare information, do not include PII or individually identifiable health information protected under DoDM 6025.18 or the Health Insurance Portability and Accountability Act of 1996. If the victim is a Soldier or otherwise eligible for healthcare at a MTF, provide the date when the victim was offered—

*(a)*  Medical care.

*(b)*  Mental health care.

*(c)*  A SAFE at the appropriate location based on eligibility requirements. If a SAFE was not offered, explain why.

(5)  *Investigation.*  The USACIDC will provide the immediate commander assigned to prepare the SAIRO report with—

*(a)*  The USACIDC case file number. If no USACIDC case number is available, explain why and include the investigating jurisdiction notified and the date of the notification. Information from civilian law enforcement may not be available.

*(b)*  Confirmation that the victim has a copy of the DD Form 2701.

(6)  *Safety.*  If the victim is a Soldier or an adult military dependent, the SARC will provide the immediate commander preparing and submitting the SAIRO report—

*(a)*  Date the safety assessment of the victim was conducted.

*(b)*  Whether it was necessary to assemble a HRRT.

*(c)*  Date the victim was given information regarding MPOs and CPOs.

*(d)*  Report on whether the MPO or CPO were issued.

*(e)*  Description of the safety measures taken for the victim (for Soldiers and other Servicemembers, foreign service members, or local national subjects) if the event(s) happened OCONUS, including deployed environments.

(7)  *Expedited transfers.*  The SARC will provide the immediate commander preparing and submitting the SAIRO report—

*(a)*  Date the victim was given information regarding expedited transfers.

*(b)*  Report on whether or not the victim requested an expedited transfer and, if so, the processing status (including date received).

(8)  *Legal services.*  If the victim is eligible for SHARP services the SARC will provide the immediate commander preparing and submitting the SAIRO report the date when the victim was informed of the SVC Program.

(9)  *Need-to-know.*  The information in the SAIRO report will be limited to personnel with an official need-to-know.

(10)  *Procedure.*  The SAIRO report will be provided to—

*(a)*  The SC if the sexual assault occurred on or in the vicinity of a military installation.

*(b)*  The first O–6 and first GO in the victim's chain of command.

*(c)*  The first O–6 and first GO in the subject's chain of command.

*(d)*  The next higher commander, if the first officer in the grade of O–6 and first GO in the chain of command designated to receive the report is the subject.

*(e)*  The SAIRO report will not be sent to any other personnel.

**Appendix L**

**Confidentiality Guidelines for Restricted/Unrestricted Reporting**

**L–1.  Purpose**

This appendix establishes the Army's guidelines for restricted and unrestricted reporting by victims of sexual assault.

**L–2.  Mission**

The Army is committed to ensuring victims of sexual assault are protected, treated with dignity and respect, and provided support, advocacy, and care. Army policy strongly supports effective command awareness and prevention programs, and law enforcement and criminal justice activities that will maximize accountability and prosecution of sexual assault perpetrators. To achieve these dual objectives, the Army prefers unrestricted reporting of sexual assaults to activate both victims' services and accountability actions. However, recognizing that a mandate of unrestricted reporting may represent a barrier for victims to be able to access services when the victim desires no command or law-enforcement involvement, a need exists to provide an option for restricted reporting.

**L–3.  Commander's responsibility**

Assuring privacy and providing a confidential disclosure option for sexual assault victims is critical to discharging our commitment. Sexual assault is the most under reported violent crime in both our society and the military. Although the victim's decision to report is a crucial step following a sexual assault, reporting is often precluded by the victim's desire for no one to know what happened. Commanders have a responsibility to ensure community safety and due process of law, but they will also recognize the importance of protecting the privacy of victims under their command. Subject matter experts agree that a system that promotes privacy/confidentiality can have a positive impact in bringing victims forward to provide information about being assaulted.

**L–4.  Confidentiality and reporting**

Confidentiality for victims is a fundamental principle at the core of victims' services and one of the cornerstones of the SHARP Program. Having control over the release of information regarding their victimization preserves a victim's dignity, empowers victims, and establishes trust between victims and the SHARP Program. Regardless of a victim's choice in how they report, either restricted or unrestricted, victims' communication will be confidential, released only on an official need-to-know basis.

 *a. Restricted reporting.* A Soldier or Family member 18 years of age and older who is sexually assaulted and desires medical care, counseling, and victim advocacy without initiating the investigative process should use the re-stricted reporting option. Restricted reporting allows a sexual assault victim to confidentially disclose the details of their assault to specifically identified individuals and receive medical treatment and counseling, without triggering the official investigative process. Restricted reporting is intended to give victims additional time and increased control over the release and management of their personal information, and to empower them to seek relevant information and support to make more informed decisions about participating in the criminal investigation. A victim who receives appropriate care and treatment, and is provided an opportunity to make an informed decision about a criminal inves-tigation is more likely to develop increased trust that their needs are of primary concern to the command and may eventually decide to pursue an investigation. Even if the victim chooses not to pursue a criminal investigation, this additional reporting avenue gives commanders a clearer picture of the sexual violence within their command, and enhances a commander's ability to provide an environment that is safe and contributes to the well-being and mission readiness of all of its members. Restricted reporting procedures are as follows:

 (1)  Soldiers or Family members 18 years of age or older who are sexually assaulted and desire restricted reporting under this policy should report the assault to the SARC, a SHARP VA, VR, or a healthcare provider.

 *(a)*  Healthcare personnel, including behavioral health, cannot complete a DD Form 2910 with a victim in order to take a restricted report. Healthcare personnel who receive a report of sexual assault will immediately contact a SARC, SHARP VA, or VR to ensure that a victim is offered SHARP services and that a victim can complete a DD Form 2910.

 *(b)*  Healthcare personnel can preserve the restricted reporting option; unless and until a DD Form 2910 is com-pleted documenting a restricted report, the victim cannot invoke a restricted report's protections.

 *(c)*  Victims may also discuss their sexual assault with a chaplain, legal assistance attorney, or SVC. Discussing a sexual assault with these personnel is not a restricted report but is protected under MRE 502 and MRE 503. The restricted reporting process does not affect any privilege recognized under MRE. Protections provided by DoD and Army policies on restricted reporting are in additional to the protections afforded by privileged communications with

a chaplain, legal assistance attorney, or SVC, and does not alter or affect those protections. During a privileged communication with a chaplain or SVC, if a victim indicates that they want to file a restricted report, the chaplain, legal assistance attorney, or SVC will, with the victim's consent, facilitate contact with a SARC, SHARP VA, or VR to ensure that the victim is offered SHARP services and so that a DD Form 2910 can be completed.

*(d)* If a victim chooses not to complete a DD Form 2910 and file a restricted report after disclosing a sexual assault during a privileged communication, the disclosure remains privileged.

(2) Upon notification of a reported sexual assault, the SARC will immediately assign a SHARP VA or VR, with the victim's consent.

(3) The assigned SHARP VA, or VR will provide the victim accurate information on the reporting process to include the differences between restricted and unrestricted reporting.

(4) The SARC, SHARP VA, or VR will ensure the victim acknowledges in writing on a DD Form 2910 their understanding that restricted reporting may limit the ability of the government to prosecute the subject, restrict the Army's ability to provide adequate measures to limit contact between the victim and the subject, and an understanding of the reasons Army policy favors unrestricted reporting.

(5) Healthcare providers will, with the consent of the victim, initiate the appropriate care and treatment. Healthcare providers will report the sexual assault to the SARC in lieu of reporting the assault to law enforcement or the chain of command. Additionally, at the victim's discretion/request, the SAMFE will conduct a forensic medical examination, which may include the collection of evidence. Disposition instructions for such evidence are provided in AR 195–5.

(6) If a DoD healthcare provider is not available, the victim will be appropriately referred to a civilian provider for the forensic examination, if the victim requests such a forensic examination.

*(a)* Commanders, with their SARCs, will develop protocols to protect the restricted reporting option while providing transportation to have a SAFE completed.

1. State or host nation laws may impact the ability to make a restricted report.

2. Health care and a forensic examination many be performed in a civilian medical facility in a jurisdiction bound by laws that require healthcare personnel to report the sexual assault to civilian agencies or law enforcement. Civilian law enforcement may take jurisdiction of the case or inform USACIDC that a sexual assault was reported. In such instances, filing a restricted report may not be possible.

*(b)* SHARP professionals will not use their own vehicles to provide transportation for a victim.

(7) Victims may disclose that they were sexually assaulted to another person and maintain their ability to file a restricted report.

*(a)* If the person to whom the victim disclosed their sexual assault is in the victim's chain of command or DoD law enforcement, the victim cannot file a restricted report.

*(b)* If the SARC is informed of an investigation into a victim's sexual assault, the victim cannot file a restricted report.

*(c)* If an investigation into a victim's sexual assault begins after the victim has signed a DD Form 2910 selecting the restricted reporting option, the investigation has no impact on the victim's restricted report and the victim's communications and SAFE Kit remain confidential, to the extent provided by law.

*b. Unrestricted reporting.* A Soldier or DA Civilian who is sexually assaulted and desires medical treatment, counseling, and an official investigation of their sexual assault should use current reporting channels, for example, chain of command, law enforcement or report the incident to the SARC. Healthcare providers will contact the SARC if a patient discloses that they are a victim of sexual assault. Details regarding the sexual assault will be limited to only those personnel who have a legitimate need-to-know; specifically, those involved in the investigation or in ensuring the victim's care.

*c. Victim reporting preference statement.* The SARC will ensure that victims receive a copy of their signed DD Form 2910 and that they or the SHARP VA or VR who has completed the DD Form 2910 with the victim has emphasized the importance of safeguarding the document.

*d. A victim is not required to sign a DD Form 2910.* A victim may make a report of sexual assault to USACIDC or access any medical and behavioral health services to which they are entitled without working with the SHARP Program or making a restricted or unrestricted report on a DD Form 2910. If a victim approaches a SARC, SHARP VA, or VR and begins to make a report, but then changes their mind and does not sign the DD Form 2910 documenting their chosen reporting option, the SARC, SHARP VA, or VR will not inform investigators or commanders about the attempted report or disclose the communication surrounding the report. If commanders or law enforcement ask about the report, disclosures can only be made in accordance with exceptions to the MRE 514 privilege.

*e. Non-participating victim.* For victims who make either a restricted or unrestricted report, the following guidelines apply:

(1)  Details regarding the sexual assault will be limited to only those personnel who have an official need-to-know. The victim's decision to decline to participate in an investigation or prosecution will be honored by all personnel charged with the investigation and prosecution of sexual assault cases, including, but not limited to, commanders, USACIDC agents, and personnel in the victim's chain of command. If at any time a victim who originally chose unrestricted reporting declines to participate in an investigation or prosecution, that decision should be honored in accordance with this subparagraph. However, the victim cannot change from an unrestricted to a restricted report. The victim will be informed by the SARC, SHARP VA, or VR that the investigation may continue regardless of whether the victim participates.

(2)  The victim's decision not to participate in an investigation or prosecution does not affect access to SARC, SHARP VA, and VR services, medical and psychological care, or services from an SVC. These services will be made available to all eligible sexual assault victims.

(3)  If a victim approaches a SARC, SHARP VA, VR, or healthcare provider and begins to make a report, but then changes their mind and leaves without signing the DD Form 2910, the SHARP professional or healthcare provider is not under any obligation or duty to inform investigators or commanders about this report and will not produce the report or disclose the communications surrounding the report. If commanders or law enforcement ask about the report, disclosures can only be made in accordance with exceptions to the MRE 514 privilege, as applicable.

## L–5.  Confidential communication

*a.*  Regardless of whether the Soldier elects restricted or unrestricted reporting, confidentiality of medical information will be maintained in accordance with current guidelines on the Health Insurance Portability and Accountability Act.

*b.*  Covered communications are oral, written, or electronic communications made by a victim to the SARC, assigned SHARP VA, or VR or to a healthcare provider related to their sexual assault.

*c.*  In cases where a victim elects restricted reporting, the SARC, assigned SHARP VA, or VR and healthcare providers will not disclose covered communications or the SAFE and the accompanying kit to law enforcement or command authorities, either within or outside the Army or DoD, except as provided in this regulation or DoDI 6495.02.

*d.*  For purposes of public safety and command responsibility, when a restricted report is made, the SARC is responsible for reporting information concerning sexual assault without information that could reasonably lead to the identification of the victim or the reported offender, to the SC within 24 hours of the report.

(1)  This notification may be extended to 48 hours after the restricted report is made, in the presence of extenuating circumstances in deployed environments.

(2)  The SARC will confirm in their report to the SC that the victim has been offered SHARP advocacy services, an explanation of the notifications in DD Form 2910, medical and mental healthcare, and informed of their eligibility for an SVC.

(3)  A victim has the right to refuse to disclose, and to prevent any other person from disclosing, a confidential communication made between the victim and a victim advocate, in a case arising under the UCMJ, if such communication is made for the purpose of facilitating advice or supportive assistance to the victim. Within the SHARP Program, this privilege applies to any SHARP professional (PM, SARC, SHARP VA, VR, or trainer) with an active D–SAACP certification and an appropriately signed appointment memo authorizing them to perform duties as a VA.

*(a)*  This privilege applies to all stages of a UCMJ proceeding, from an initial investigation of the crime by law enforcement to a court martial.

*(b)*  With this privilege, statements between a victim and a VA are given similar protection as statements between a patient and a mental health professional.

*e.*  In the event that information about a sexual assault is disclosed to the commander from a source independent of the restricted reporting avenues, or to law enforcement from other sources, the commander will report the information to  USACIDC and USACIDC is authorized to initiate its own independent investigation of the sexual assault. In these cases, SHARP professionals and healthcare personnel are prevented from disclosing confidential communications under restricted reporting, unless an exception applies.

*f.*  A victim's disclosure of their sexual assault to persons outside the protective sphere of the persons covered by this policy may result in an investigation of the sexual assault. SHARP professionals, and healthcare personnel will not disclose covered communications, including the existence of a restricted report, or prior contact with the victim, unless and until the victim authorizes the disclosure in writing or another exception applies.

(1)  An independent investigation does not in and of itself change a restricted report to unrestricted.

(2)  Once a victim signs a DD Form 2910 documenting a restricted report, it remains restricted unless that victim changes their reporting option, in writing.

(3)  A victim's communication with another person (for example, roommate, friend, Family member) does not, in and of itself, prevent the victim from later electing to make a restricted report. Restricted reporting is confidential, not anonymous, reporting. However, if the person to whom the victim confided the information (for example, roommate, friend, Family member) is in the victim's chain of command or DoD law enforcement, there can be no restricted report.

(4)  Communications between the victim and a person other than the SARC, SHARP VA, VR, healthcare personnel, and assigned SVC are not confidential and do not receive the protections of restricted reporting. Improper disclosure of covered communications, improper release of medical information, and other violations of this policy are prohibited and may result in discipline under the UCMJ, loss of certification, or other adverse personnel or administrative actions.

*(a)*  If a SHARP VA or VR makes an inadvertent, unauthorized disclosure of a confidential communication, they and the other party to the communication will immediately notify the SARC.

*(b)*  SARCs will immediately notify the SC of any inadvertent unauthorized disclosure of a confidential communication.

*(c)*  The SARC will notify the victim of the inadvertent disclosure and review the process or circumstance that led to the unauthorized disclosure as soon as the SC has been notified.

### L–6.  Independent investigations

Independent investigations are not initiated by the victim. If information about a sexual assault comes to a commander's attention from a source other than a victim (victim may have elected restricted reporting or where no report has been made by the victim), that commander will immediately report the matter to an MCIO and an official (independent) investigation may be initiated based on that independently acquired information.

*a.*  If there is an ongoing independent investigation, the sexual assault victim will no longer have the option of restricted reporting when—

(1)  DoD law enforcement informs the SARC of the investigation, and

(2)  The victim has not already elected restricted reporting.

*b.*  The timing of filing a restricted report is crucial. In order to take advantage of the restricted reporting option, the victim will file a restricted report by signing a DD Form 2910 before the SARC is informed of an ongoing independent investigation of the sexual assault.

(1)  If a SARC is notified of an ongoing independent investigation and the victim has not signed a DD Form 2910 electing restricted report, the SARC will inform the victim that the option to file a restricted report is no longer available. However, all communications between the victim and SHARP professionals will remain privileged.

(2)  If an independent investigation begins after the victim has formally elected restricted reporting (by signing the DD Form 2910), the independent investigation has no impact on the victim's restricted.

(3)  If information about a restricted report of sexual assault comes to the commander's attention as a result of a disclosure that is required for fitness of duty or disability determination, the commander will not report the matter to USACIDC and the restricted nature of the report will remain.

### L–7.  Exceptions to confidentiality

*a.*  The SARC will evaluate the confidential information provided under the restricted report to determine whether an exception applies.

(1)  The SARC will disclose the otherwise protected confidential information only after consultation with the SJA of the SC, supporting judge advocate or other legal advisor concerned, who will advise the SARC whether an exception to restricted reporting applies. In addition, the SJA, supporting judge advocate, or other legal advisor concerned will analyze the impact on the communications.

(2)  When there is uncertainty or disagreement on whether an exception to restricted reporting applies, the matter will be brought to the attention of the SC for final decision without identifying the victim (using non-PII information). Improper disclosure of confidential communications under restricted and unrestricted reporting, improper release of medical information, and other violations of this guidance are prohibited and may result in discipline pursuant to the UCMJ or State statute, loss of privileges, loss of certification or credentialing, or other adverse personnel or administrative actions.

*b.*  The following exceptions to the prohibition against disclosures of restricted reports authorize a disclosure of a restricted report only when an SJA consultation has occurred and only if one or more of the following conditions apply:

(1)  An authorization by the victim in writing.

(2)  Necessary to prevent or mitigate a serious and imminent threat to the health or safety of the victim or another person; for example, multiple reports involving the same subject (repeat offender) could meet this criterion.

(3) Required for fitness for duty or disability determinations. This disclosure is limited to only the information necessary to process duty or disability determinations for Soldiers. Disclosure of a restricted report under these circumstances does not change the nature of the victim's restricted report, nor does it create an obligation for reporting to law enforcement or command for investigation.

(4) Required for the supervision of coordination of direct victim healthcare or services. The SARC, SHARP VA, or healthcare personnel can disclose specifically requested information to those individuals with an official need-to-know, or as required by law or regulation.

(5) Ordered by a military official (for example, a duly authorized subpoena in a UCMJ case), Federal or State judge, or as required by a Federal or State statute or applicable U.S. international agreement. SARCs, SHARP VAs, VRs, and healthcare providers will consult with the servicing legal office in the same manner as other recipients of privileged information to determine if the criteria apply and they have a duty to obey. The SJA will also address any release of information that is protected. Until those determinations are made, only non-identifying information should be disclosed.

*c.* Healthcare providers may convey to the command any possible adverse duty impact related to the victim's medical condition and prognosis in accordance with DoDM 6025.18. Such circumstances however, do not otherwise warrant an exception to policy, and therefore neither the specific details of the sexual assault nor confidential communications may be disclosed.

*d.* A sexual assault victim certified under the Army Suitability Program is eligible for both the restricted and unrestricted reporting options. If electing restricted reporting, the victim is required to advise the competent medical authority of any factors that could have an adverse impact on the victim's performance, reliability, or safety while performing Army Suitability Program duties. If necessary, the competent medical authority will inform the certifying official that the person in question should be temporarily suspended or temporarily decertified from Army Suitability Program status, as appropriate, without revealing that the person is a victim of sexual assault, thus preserving the restricted report.

*e.* The SARC or SHARP will inform the victim when a disclosure is made. Whenever possible, the victim should be notified in advance of the disclosure.

*f.* Unauthorized disclosure has no impact on the status of the restricted report. All restricted reporting information is still confidential and protected. However, unauthorized or inadvertent disclosures made to a commander or law enforcement will result in notification to USACIDC.

## L–8.  Covered communication

*a.* Improper disclosure of covered communications, improper release of medical information, and other violations of this policy are prohibited and may result in discipline under the UCMJ, loss of certification, or other adverse personnel or administrative actions.

*b.* In the event that information about a sexual assault is disclosed to the commander from a source independent of the restricted reporting avenues, or to law enforcement from other sources, the commander will report the matter to law enforcement and law enforcement remains authorized to initiate its own independent investigation of the matter presented. Additionally, a victim's disclosure of their sexual assault to persons outside the protective sphere of the persons covered by this policy may result in an investigation of the disclosure.

*c.* This policy does not create any actionable rights for the subject or the victim, nor constitute a grant of immunity for any actionable conduct by the offender or the victim. Covered communications that have been disclosed may be used in disciplinary proceedings against the offender or the victim, even if such communications were improperly disclosed.

*d.* The Army recognizes the potential impact of restricted reporting on investigations and the commander's ability to hold perpetrators accountable, and this policy decision represents the judgment that such risks have been carefully considered but were outweighed by the overall interest in providing sexual assault victims this form of support. This policy supersedes all regulatory and policy guidance within the Department of Army not expressly mandated by law that is inconsistent with its provisions, or would preclude execution.

## L–9.  Confidentiality when making a sexual harassment complaint

*a.* Communications between a sexual harassment complainant or victim and a SHARP professional, not intended to be disclosed to third persons, are confidential when made in furtherance of the rendition of advice or assistance to the complainant or victim. Information regarding sexual harassment complaints should only be shared on a need-to-know basis in order to successfully process the complaint, complete an investigation, and provide services to complainants and victims.

*b.* Any questions regarding the release of information will be coordinated with the servicing legal office.

## Appendix M

## 24/7 Sexual Harassment/Assault Response and Prevention Hotline

### M–1. Purpose

To define roles and responsibilities of the SHARP Program use of the DoD 24/7 Safe Helpline (SHL) and local installation SHARP hotlines. The DoD Safe Helpline provides 24/7 worldwide, anonymous and confidential assistance and additional avenues for Soldier sexual assault victims to receive crisis support and information about secure and anonymous reporting. Soldiers wishing to file a sexual harassment complaint may also use the SHL and installation SHARP hotline to contact a SARC or VA for additional information or a SARC to file a sexual harassment complaint.

### M–2. Answering SHARP Hotlines

*a.* Installation 24/7 SHARP hotline phone calls will be answered by D–SAACP certified SHARP professionals capable of taking a restricted or unrestricted report of sexual assault and information regarding filing a sexual harassment complaint. The SC will ensure that 24/7 SHARP hotline responders have the current listing of subordinate unit information so that they can coordinate as required. Subordinate level 24/7 phone information will not, under any circumstances, be posted on the SHL website or official Army websites.

*b.* The SC will ensure written procedures are in place for 24/7 SHARP hotline responders and all responders are trained in the procedures.

*c.* When the installation 24/7 SHARP hotline responder cannot immediately answer the phone call, the responder will contact the caller within 60 minutes. The installation 24/7 SHARP hotline telephone number will have a voicemail greeting that advises callers that live crisis support is available by calling the SHL at 1–877–995–5247 and that if the caller provides contact information, their call will be returned within 60 minutes. For example, "Hello, this is (NAME) (Sexual Assault Response Coordinator or Victim Advocate) at (Organization Identified); if this is an emergency, please call 911. I'm sorry I cannot take your call right now. Please leave me a message with your name and phone number, and I will return your call within 60 minutes. For immediate help, live crisis support is available by calling the SHL at 1–877–995–5247."

*d.* When responding to calls, the responder will identify themselves, their role, and location such as, "Hello, this is (NAME) (TITLE, for example, Sexual Assault Response Coordinator or Victim Advocate) at (Organization Identified). How may I help you?"

### M–3. Quality control requirements

*a. Daily checks.* The Army Operations Center (AOC) will conduct daily, after duty-hour checks for Army installation 24/7 SHARP hotlines. The AOC will call one installation each day and report the result of the call to the DCS, G–1 ARD daily.

*b. Quality control checks.* DCS, G–1 ARD will independently conduct quality control checks of all Army installation responder phone numbers posted on the SHL website. The DCS, G–1 ARD will coordinate unsuccessful calls with ACOM, ASCC, DRU, and Army Reserve Program Managers. DCS, G–1 ARD will notify the Deputy Chief of Staff, G–1 if any of the following conditions occur for two consecutive months: 1) A sexual assault phone number that is incorrect and has not been reconciled by the command/installation, or 2) The command does not submit a SHL report as prescribed in this policy.

*c. Consolidation.* The DCS, G–1 ARD will consolidate the results of its quality control calls along with those of the AOC, ACOMs, ASCCs, and DRUs and report the results to the Army SHARP Director in a monthly memorandum for record.

*d. Correct numbers.* The ACOM, ASCC, DRU and USAR PM will ensure that the SARC, Chaplain, SVC, MTF, and MP numbers are correct and that required updates are submitted to the DCS, G–1 ARD within one business day.

*e. Sexual assault review board.* SCs and lead SARCs will include maintaining accurate SHL phone number information as an agenda item for the SARB. The SARB will also address accurate installation website information and the previous month's quality control test call results of the 24/7 SHARP hotline. All SARB due outs, updates, and/or systems corrections will be addressed within one business day of the SARB and will be included as an update at the next SARB.

*f. Requirements for 24/7 sexual assault response hotlines and website information.*

(1) Sexual assault victims can contact the DoD Safe Helpline by calling 877–995–5247; texting their location or zip code to 55–247 within CONUS or 202–470–5546 OCONUS; or chat online with a counselor at https://safehelpline.org 24 hours a day.

(2)  The following responder's phone numbers will be provided to the DoD Safe Helpline: SARCs, chaplains, SVC, medical personnel, and military police. DCS, G–1 ARD is required to provide DoD Safe Helpline administrators any changes to these phone numbers.

(3)  Each installation will have a local 24/7 sexual assault response phone number that will be posted on the DoD Safe Helpline website or list.

(4)  ACOM, ASCC, DRU, and RC commands will contact the DCS, G–1 ARD for revisions required to the primary command or installation 24/7 and duty hour's phone information posted on the DoD Safe Helpline. The DoD Safe Helpline will only reflect the primary/main sexual assault phone numbers of Army garrisons/installations.

(5)  Commanders will ensure the DoD Safe Helpline phone number and website is posted on their garrison websites and media to ensure immediate sexual assault victim assistance.

(6)  All Army activity websites, to include RC websites, will only reflect two 24/7 sexual assault response phone numbers on its homepage: 1) the DoD Safe Helpline and 2) the primary 24/7 SHARP hotline number for the installation that is posted on the DoD Safe Helpline. The DoD Safe Helpline will only reflect the primary or main sexual assault phone numbers for Army garrisons and installations.

(7)  All commanders will coordinate with their appropriate website administrators to ensure that their official Army websites comply. Any future changes to installation 24/7 SHARP hotline numbers will require immediate changes to websites. Commands and installations are responsible for updating their command pages through coordination with Chief Information Officer/G–6 or appropriate website administrator.

(8)  The DCS, G–1 ARD will coordinate with office of the Chief Information Officer/G–6 who will be responsible for updating official Army webpages and media that are managed and/or used for HQDA and the ARSTAF. (For example, https://www.army.mil, AKO, U.S. Army Facebook, and so forth.)

(9)  ACOM, ASCC, DRU, and RC commands will—

*(a)* Publish policy governing procedures required to ensure accuracy of installation and subordinate websites and maintaining accurate subordinate 24/7 phone numbers.

*(b)* Ensure SHARP PMs or lead SARCs advise the DCS, G–1 ARD within 1 business day when revisions are required to the installation 24/7 SHARP hotline phone numbers published on the DoD Safe Helpline.

(10)  ACOM, ASCC, DRU, and RC SHARP PMs or lead SARCs and AOC monitor 24/7 sexual assault phone numbers at least monthly. Report changes within 1 business day to ACOM, ASCC, or DRU SHARP PM. Ensure all phone responders are aware of applicable policies.

(11)  The ACOM, ASCC, DRU, and RC SHARP PM is responsible to ensure that the SARCs, chaplains, SVC, medical personnel, and military police numbers are correct and that required updates are submitted to DCS, G–1 ARD within 1 business day.

(12)  Commanders and lead SARCs will include maintaining accurate DoD Safe Helpline sexual assault phone number information as an agenda item for the monthly SARB. The SARB will also address accurate installation website information and the previous month's QC test call results of all 24/7 sexual assault phone numbers within the garrison.

*g.  Describe the quality control requirements.*

(1)  ACOM, ASCC, DRU, and RC commanders will conduct monthly QC test calls to a minimum of 20 percent of the total inventory of brigade 24/7 sexual assault phone numbers within their respective commands.

(2)  ACOM, ASCC, DRU, and RC commanders will submit a monthly report of command/installation test calls made to the sexual assault 24/7 and duty hours response telephone numbers to DCS, G–1 ARD no later than the 15th of each month. This includes making test calls and ensuring accuracy of all sexual assault phone numbers with the ACOM, ASCC, and DRU brigade footprint. Commanders will ensure sexual assault phone numbers posted on the DoD Safe Helpline are accurate. Revisions required will be reported within 1 business day to the DCS, G–1 ARD.

(3)  The HQDA Program Staff will provide a QC report template to ACOMs, ASCCs, DRUs, and RCs. Information received from ACOMs, ASCCs, or DRUs not using the template, or that are incomplete, will be sent back to the command for corrections. Test call population will be established and documented on each month's report.

(4)  The DA SHARP Program will compile information submitted by the ACOMs, ASCCs, DRUs, and RCs into a memorandum report with support enclosures and provide the report to the Director of the DA SHARP Program no later than the 25th of each month. If the 25th is a holiday or weekend, the report and support enclosures are due the next business day.

(5)  Commands that don't submit their monthly test call data to the DA SHARP Program in accordance with guidance will be recorded as unsuccessful for all of the entries for that month.

(6)  For any activity using a separate service, such as the Fort Family Hotline for the RC, to connect victims with a sexual response coordinator or VA, will incorporate verifying the accuracy of the phone numbers listed with the separate service as a part of its 20-percent monthly test calls.

*h. Responsibility.* Office of the DCS, G–1/HQDA Program Oversight of the monthly QC. The DCS, G–1 ARD will—

(1)  Independently conduct monthly QC checks of the installation 24/7 SHARP hotline response phone numbers posted on the DoD Safe Helpline and coordinate findings with ACOMs, ASCCs, DRUs, and RC PMs. Changes to the installation 24/7 SHARP hotline phone numbers will only be made upon concurrence from the ACOM, ASCC, or DRU, or RC.

(2)  Notify the DCS, G–1 under any of the following conditions for 2 consecutive months: 1) a sexual assault phone number that is incorrect and has not been reconciled by the command/installation, or 2) the command does not submit a DoD Safe Helpline report as prescribed in this policy. The DCS, G–1 will contact the senior responsible GO directly.

(3)  Consolidate the results of the HQDA SHARP AOC, ACOMs, ASCCs, DRUs, and RCs' QC testing of primary sexual assault response phone numbers posted on the DoD Safe Helpline and report the results to the SECARMY quarterly, with negative findings, only. If the hotline is answered or call returned within the appropriate time frame, the DCS, G–1 and SECARMY will not be notified.

## Appendix N

## Sexual Harassment/Assault Response and Prevention Program Organization Inspection Program

This guidance prescribes the method to maintain accountability and oversight of sexual assault and sexual harassment processes and services.

### N–1. General requirements

*a.* The Army SHARP Program OIP checklist is the standard document for all official inspections and will be used when—

(1) A PM transitions in/out of the position; or

(2) Once per calendar year when no transitions occur.

*b.* When initiating/conducting the inspection, obtain the most current OIP checklist from HQDA. Commands may also add command specific questions or concerns to their program inspection.

*c.* Each PM-level inspection, will include the inspection of at least one immediate subordinate command.

*d.* Division-level organizations will request an inspection of its SHARP Program from its immediate higher command whenever the PM, or lead SARC as applicable, transitions in/out of the position.

*e.* Brigade-level organizations will request an inspection of its SHARP Program from its immediate higher command whenever the SARC transitions in/out of the position.

*f.* The OIP checklist may also be used during staff assistance visits, for random program spot-checks, and any other means the command sees fit for evaluating, coaching and mentoring personnel on SHARP requirements.

### N–2. Usage

*a.* All organization will have all references and supporting documents available at the time of the inspection. Either hard copy or electronic documents will be organized, easily accessible and appropriately protected.

*b.* Inspectors will report all discrepancies at the time of inspection, including those that were correctable prior to the conclusion of the inspection. Inspectors will annotate the on-site corrections in the remarks sections for each discrepancy found.

### N–3. Considerations by Army Component

*a.* Each ACOM, ASCC, and DRU will conduct an organizational inspection of its program office every 2 years.

*b.* USAR organizational and functional commands, support commands, and training commands will perform inspections when conducting annual training or mobilized for contingency operations within the calendar year.

*c.* ARNG brigade-sized units from each state will conduct inspections when conducting annual training or mobilizing while under Title 10 USC status.

### N–4. Mobilizing and deploying units

This applies to all units that deploy or mobilize for more than 30 days within the calendar year.

*a.* Brigade-sized organizations and larger will use the full inspection checklist for all components within their responsibility prior to deployment. This includes using the ARNG portions of the checklist for ARNG units that are co-located and attached, OPCON, or ADCON when mobilized.

*b.* The unit-level portion of the checklist should also be used for battalion-sized units, organizational headquarters, or equivalently sized organizations.

*c.* All pre-deployment inspections will be finalized within 30 days of deployment in order to give the unit time to correct deficiencies. All other mobilization inspections will be complete within 30 days after mobilization or within 10 days of the demobilization date, whichever comes first.

*d.* RA and USAR commands/units will conduct a reset inspection within 6 months of redeployment or demobilization.

### N–5. Reporting and accountability

*a.* ACOMs, ASCC, and DRUs will provide an annual report of their OIPs and SAVs to the DCS, G–1 ARD.

*b.* These reports should include the overall assessment of how well the command is meeting the requirements in the checklist, specifically highlighting those items that were not compliant, the unit's assessment of subordinate organizations if applicable, and how the unit has addressed, or plans to address, deficiencies in compliance.

*c.* Any plan should include the anticipated timeline and reconciliation methods.

**N–6. Exceptions**

  *a.* Commands, units, and organizations deployed for more than 1 year or that have completed an inspection less than 90 days from the deployment/mobilization notification date are not required to conduct inspections. Rear detachment personnel will maintain memorandums for record on behalf of their forward elements that identify them in a deployed status.

  *b.* ARNG commands, units, and organizations are permitted to submit a MFR along with a copy of the inspection results instead of conducting an inspection if the command, the state JFHQ, or another organization designed by the state JFHQ or NGB conducts and inspection of their SHARP Program during the calendar year while under Title 32 USC status.

  *c.* USAR and ARNG commands, units, and organizations are also exempt from inspection of they conducted an inspection while under Title 10 USC status within 180 days of any mission or activity that requires an inspection of the SHARP Program. The command/unit/organization will provide these results to the inspecting organization as proof of the inspection and a MFR that outlines its corrective action since the inspection as needed.

  *d.* Any other exceptions will be directed to the DCS, G–1 ARD for approval by the SECARMY.

## Appendix O

## Inspector General Activities in Support of the Commander

### O–1. The inspector general system

*a. Dual responsibilities.* The Army IG system is unique in both its scope and its implementation. IGs work only for the commander or head of an agency--the directing authority for IG inspections, investigations, assistance, and teaching and training standards. However, IGs respond to the SECARMY and CSA requirements through TIG, who serves as the IG system's proponent. The system complements and supports commands while providing the SECARMY and CSA visibility on systemic issues across the force. This dual window allows the SECARMY and CSA to address critical Armywide issues that could adversely affect the Army's readiness.

*b. Assignment of inspectors general.* IGs are assigned to commands, agencies, activities, centers, communities, installations, and States in accordance with established authorization documents (the modified table of organization and equipment and the TDA). GOs who are commanders and SES DA Civilians in lead director positions will have an assigned command IG on their personal staffs complete with an IG staff section. The first command echelon that normally has an assigned command IG is the division headquarters. As a result, the division IG staff section is the basic building block of the Army IG system's force structure.

*c. Inspector general attributes.* The Army IG system is comprised of officers, NCOs, and DA Civilians who embrace and exemplify Army Values, the Warrior Ethos, and the DA Civilian Corps Creed. The IG holds a position of public trust, so broad experience, strong communication skills, and impeccable ethics are key attributes that strengthen and continually build upon the viability and effectiveness of the Army IG system.

*d. The four inspector general functions.* All IGs serve their commanders and their commands by performing the four IG functions—inspections, assistance, investigations, and teaching and training—for the specific purpose of enhancing the command's readiness and warfighting capability. The IGs use these functions to seek out systemic issues that adversely affect the command and the Army and then inspect those systemic issues to identify problem areas and make recommendations that directly address the causes of these problem areas. The two main concepts that bear directly upon and often characterize the execution of these four functions are the IG tenet of confidentiality and the restrictions placed on the distribution and use of IG records.

(1) All IGs function within a system of Armywide IGs who cooperate and assist each other in executing these functions on behalf of their respective commands—even though they serve other commands and commanders. The effective functioning of the IG system depends on the mutual cooperation of all IGs through IG technical channels, not simply within each particular command or State but throughout the Army as a whole.

(2) All IGs operate within an environment consisting of the commander; the commander's staff; the commander's Soldiers, Family members, DA Civilian employees, retirees, and contract employees; and other civilians. These individuals represent the IG's constituency, and all IGs bolster the chain of command by performing the four IG functions in support of this constituency.

(3) All IGs are confidential advisors and fact-finders to the commander. Selfless service is the cardinal attribute of successful IGs, and all IGs will adhere to—and be advocates of—the Army Values, the Warrior Ethos, and the Army Civilian Corps Creed. Everyone within a command will respect IGs for their level of expertise, candor, credibility, reliability, and trustworthiness.

(4) The IG selects uniformed Army IGs using a nominative process, and command IGs select civilian IGs through normal personnel recruitment procedures. The best IGs are those nominated by the commander/directing authority in coordination with HRC, NGB, and USARC. Commanders should identify and locally nominate officers, NCOs, and DA Civilians with impeccable reputations of honesty, integrity, adherence to Army Values, and knowledge of how the Army runs to TIG for detailed assignment as IGs. The nomination process is outlined in appendix B of AR 20–1.

### O–2. The inspector general and commander relationship

*a. The inspector general system's foundation.* The relationship between the command IG and the commander represents the foundation of the Army IG system. The command IG must become the commander's confidant—one of the individuals with whom the commander can discuss, with complete trust, any aspect of the command in times of both war and peace. IGs extend the eyes, ears, voice, and conscience of their commanders by providing IG observations, findings, and impressions on all aspects of the command that might hinder the organization's readiness and warfighting capability. The commander has a responsibility to learn and understand the IG concept and system and to advise the command IG on how the IG staff section can serve the command effectively.

*b. The command inspector general.* Most GOs serving in a command position will have a command IG and an accompanying IG staff section. The command IG is a commissioned officer or DA Civilian (only RA commissioned

officers may serve as State commands IGs). The command IG leads the IG staff section and works directly for the commander or, in the case of the States, the State adjutant general. Commanders should not alter their command's IG staff structure prior to consulting with TIG and DAIG's force managers.

(1) The trust and confidence shared between all IGs and their commanders extend beyond other confidential relationships between commanders and their staffs.

(2) To protect this relationship, the command IG is a member of the commander's personal staff, and only the commander rates the IG (see AR 623–3). In addition, the commander should senior rate those IGs within the IG staff section whom the command IG rates. The commander should publically issue the IG oath to all new IGs when assigned (see AR 20–1).

(3) Command IGs and the IG staff sections will remain solely under the command and control of the commander to avoid any possibility or perception of external influence on the staff section's personnel, budget, and operations. This requirement is designed to protect the triangle of confidentiality between the commander, the IG, and the source of any information. Protecting this relationship is essential.

(4) Commanders and IGs must develop a relationship of trust and confidence for the system to work properly. As such, the commander will afford the command IG (and all IGs within the IG staff section) a high degree of independence as well as unlimited access to information necessary to perform IG duties.

*c. The inspector general's sphere of activity.* The IG's sphere of activity includes everything for which the commander is responsible and over which the commander or State adjutant general has Federal authority. The IG must be fully aware of this sphere of activity when determining jurisdiction of Inspector General Action Requests (IGARs) and IG issues within the IG system. The IG is responsible for IGARs from within the IG's sphere of activity. Generally, if the IG's commander is responsible for resolving the issues or allegations because they reside in the commander's area of responsibility, then that commander's IG is responsible for the IGAR.

## O–3. Assistance as a commander and inspector general function

*a. Importance to the commander and the unit.* Of the four IG functions, IGs probably spend the most time providing assistance to Soldiers, Family members, DA Civilians, retirees, contract employees, and civilians. Seeking help from an IG on matters affecting health, welfare, and personal readiness is critical to morale and operational readiness and helps resolve systemic issues. Commanders at all levels must ensure that all personnel within their command have access to IGs and know how to contact the IG when needed.

*b. The inspector general's role as the commander's representative.* The IG does not replace the chain of command, but augments unit leaders to help resolve issues.

*c. Commander requirements.* Commanders will produce memorandums for Soldiers and DA Civilians as to their right to present complaints and seek assistance from the IG in accordance with AR 20–1.

(1) The memorandums should be reproduced on command letterhead using the language at figure O–1 and figure O–2.

(2) All commanders and directors within the command must post these memorandums on bulletin boards prominently and permanently. These memorandums should also be provided as a link on the commander's or unit's homepage.

(3) Incoming commanders will update the memorandums after each change of command.

## O–4. Inspector general office space

*a. Location.* The IG section's office space should not be located in or next to the headquarters or in a remote location that is not readily accessible to non-IGs. The ideal location is in a heavily trafficked area where Soldiers, DA Civilians, and others can blend in and not appear conspicuous when entering the IG office, which reinforces confidentiality and reduces the potential for reprisal.

*b. Co-location with other staff elements.* IGs cannot share open office space with non-IGs. This requirement stems from the potential breach of confidentiality when complainants visit the staff section's office and because of the potential for non-IGs to overhear confidential IG telephone conversations, view IG information on desks and computer screens, and overhear conversations between and among IGs.

*c. Office space resources.* Commands must accommodate these IG office space requirements within resource constraints.

## O–5. Inspector general duty restrictions

Officers, WOs, NCOs, and DA Civilians serving as IGs must not perform duties that might interfere with their status as fair, impartial fact-finders and confidants within the command. Inspectors general are never off the record, IGs do not establish command policy, and IGs do not recommend adverse personnel action. The restrictions set forth in this

paragraph are intended to preclude conflicts of interest, prevent the prejudice of impartiality, and protect the integrity of the IG system but not to exclude IGs from performing management functions normal for staff sections such as budgeting and contributing to goal-setting for the command. Commanders must gain TIG approval to use their IGs for non-IG duties due to operational requirements, taskings, and other demands—even if the tasking or requirement is only for 1 day in duration. See AR 20–1 for a list of specific duty restrictions.



**DEPARTMENT OF THE ARMY**
ORGANIZATION
STREET ADDRESS
CITY STATE ZIP

Date

MEMORANDUM FOR ALL SOLDIERS AT (INSTALLATION OR ORGANIZATION)

SUBJECT: The Right of Soldiers to Present Complaints or Request Assistance from the Inspector General

1. All Soldiers have the right to present complaints, grievances, or requests for assistance to the Inspector General (IG). These complaints or grievances may include what Soldiers reasonably believe to be evidence of fraud, waste, and abuse.

2. Before visiting the IG, you should consider whether your chain of command can address your concerns in a more prompt manner. However, you are not required to present your concerns to your chain of command before contacting the IG. Remember to obtain permission to be absent from your duties if you wish to visit the IG during duty hours. You are not required to tell anyone why you want to speak to an IG.

3. You may visit, call, or write your local IG using the following contact information:

(Name)
(Office hours)
(Building / Room)
(Address)
(Telephone)

4. If you believe that your local IG's response to your concerns is not fair, complete, or in accordance with law or regulation—or if you believe that contacting your local IG may jeopardize your interests—you may write to (*give address of the IG at the appropriate headquarters*). You may also call the Department of the Army Inspector General (DAIG) or the IG, Department of Defense (DOD) Hotline. Their telephone numbers are as follows:

DAIG Assistance Line:  1–800–752–9747 (toll free)
IG DOD Hotline:  1–800–424–9098 (toll free)

5. Department of the Army personnel are prohibited from taking any action that restricts you from filing a complaint, seeking assistance, or cooperating with the IG or a Member of Congress. These same individuals are prohibited from taking any disciplinary or adverse action against you for filing a complaint, seeking assistance, or cooperating with the IG, a Member of Congress, or any agency established to receive such complaints. However, if you lie or knowingly make false accusations to the IG, you will be subject to disciplinary action.

**Figure O–1.  Right of Soldiers to present complaints to the inspector general**

6. In accordance with AR 20–1, paragraph 1–12, the IG has a duty to protect confidentiality to the maximum extent possible. This requirement to protect confidentiality is true for all persons who ask the IG for help, make a complaint, contact or assist an IG during an inspection or investigation, or otherwise interact with an IG.

//signature//
JOHN S. JONES MG
USA
Commanding

**Figure O–1.  Right of Soldiers to present complaints to the inspector general—Continued**



**DEPARTMENT OF THE ARMY**
ORGANIZATION
STREET ADDRESS
CITY STATE ZIP

Date

MEMORANDUM FOR CIVILIAN EMPLOYEES AT (INSTALLATION OR ORGANIZATION)

SUBJECT: The Right of Civilian Employees to Present Complaints or Request Assistance from the Inspector General

1. All Civilian employees have the right to present complaints or requests for assistance to the Inspector General (IG). These complaints or grievances may include what the Civilian employee reasonably believes to be evidence of fraud, waste, and abuse.

2. Before visiting the IG, you should consider whether your immediate supervisor can address your concerns in a more prompt manner or follow one of the procedures outlined in paragraph 3, below. Remember to obtain permission to be absent from your duties if you wish to visit the IG during duty hours. You are not required to tell anyone why you want to speak to an IG.

3. Civilian personnel laws and regulations prescribe procedures for Civilian employees to use in submitting complaints related to employment. If you are a bargaining-unit employee, your complaint may be covered by a negotiated grievance procedure. Your servicing Civilian Personnel Advisory Center can provide you with further information. If you want to submit a complaint about employment discrimination due to race, color, religion, sex, age, national origin, or disability, contact (*name and address of Equal Employment Opportunity officer*). Appropriated fund employees' complaints regarding whistleblower reprisal or prohibited personnel practices may also be addressed to the Office of Special Counsel; nonappropriated fund employees should address such complaints to the office of the IG, Department of Defense.

4. If you have a complaint about matters other than Civilian employment, or a complaint about possible regulatory or procedural violations concerning personnel actions that you feel your supervisor has failed to (or cannot) resolve, you may visit, call, or write your local IG using the following contact information:

(Name)
(Office hours)
(Building / Room)
(Address)
(Telephone)

**Figure O–2. Right of Department of the Army Civilian employees to present complaints to the inspector general**

5. If you believe that your local IG's response to your concerns is not fair, complete, or in accordance with law or regulation—or if you believe that contacting your local IG may jeopardize your interests—you may write to (give address of the IG at the appropriate headquarters). You may also call the Department of the Army Inspector General (DAIG) or the Inspector General, Department of Defense (DOD) Hotline. Their telephone numbers are as follows:

DAIG Assistance Line: 1–800–752–9747 (toll free)

IG DOD Hotline: 1–800–424–9098 (toll free)

6. You may report complaints about hazardous work conditions (unsafe or unhealthy) by following the procedures outlined in DA Pam 385-10, paragraph 8–4.

7. In accordance with AR 20–1, paragraph 1–12, the IG has a duty to protect confidentiality to the maximum extent possible. This requirement to protect confidentiality is true for all persons who ask the IG for help, make a complaint, contact or assist an IG during an inspection or investigation, or otherwise interact with an IG.

8. Department of the Army personnel are prohibited from taking any action that restricts you from filing a complaint, seeking assistance, or cooperating with the IG. These same individuals are prohibited from taking any disciplinary or adverse action against you for filing a complaint, seeking assistance, or cooperating with the IG, Special Counsel, or another employee designated by the head of the agency to receive such disclosures. However, if you lie or knowingly make false accusations to the IG, you may be subject to disciplinary action.

//signature//
JOHN S. JONES MG
USA
Commanding

**Figure O–2. Right of Department of the Army Civilian employees to present complaints to the inspector general—Continued**

**Appendix P**

**Religious Accommodation**

**P–1. Processing requests related to worship and dietary practices**

Any commander may approve or disapprove requests for accommodation that concern worship practices and dietary practices, unless the request would require a waiver of Army policy. (For example, requests to use, possess, or transport Peyote, or other substance prohibited by law or policy, for religious use must be forwarded to the SECARMY or designee using the waiver procedures in para P–3*b*.) Disapprovals by a commander may be appealed to the next higher commander, up to the SECARMY. Disapprovals by the SECARMY or SECARMY designee are final.

*a. Worship practices.*  Worship services, holy days, Sabbath and similar religious observance requests will be accommodated to the extent possible, consistent with mission accomplishment. If the time required for religious worship falls within normal duty hours or duty rosters, the Soldier may request exception from those hours and rosters. The Soldier, however, must be prepared to perform alternative duty or duty hours. Commanders have the option of granting to Soldiers ordinary leave or a special pass for religious observances when such observances would interfere with the performance of normal duties.

*b. Dietary practices.*  In accordance with AR 30–22, commanders will ensure adequate menu planning and operational rations for Soldiers with religious dietary requirements. The Soldier may also request permission to take personal supplemental rations when in a field or combat environment. Commanders will consider religious practices when acting on requests for separate rations.

*c. Request procedures.*  A Soldier may make a request orally or in writing. The commander may approve the request either informally or formally (in writing) or formally disapprove it (in writing). Commanders will respond to requests for religious accommodation within 10 working days of receipt of the request.

(1) If the commander approves a request informally the issue is closed, except that the commander will assist the Soldier in completing those actions necessary to the accommodation (for example, obtaining permission to ration separately or adjusting the unit duty roster).

(2) If the commander approves a request formally, the commander will provide the Soldier with written notice of the accommodation and maintain a copy in unit files. The accommodation will then remain in effect unless revoked, in writing, by the commander who originally granted it (due to changed conditions); by a subsequent commander of that unit; by a commander of a gaining unit if the Soldier is transferred; or by a higher commander. Commanders should review all approved religious accommodations to determine whether conditions under which the accommodation was granted still apply. Revocation must be based upon one or more of the criteria discussed in paragraph 5–6*a*. If the accommodation is revoked, the Soldier may appeal the revocation to the next higher commander using the procedures in paragraph d.

(3) If the commander disapproves the request, the commander will provide the Soldier with written notice and maintain a copy in unit files. Disapproval must be based upon one or more of the criteria discussed in paragraph 5–6*a*. The Soldier may appeal a disapproval to the next higher commander using the procedures in paragraph d below.

*d. Appeal procedures.*

(1) A Soldier may appeal a disapproval or revocation to the next higher commander. Appeals must be in writing and explain the type of accommodation requested and the religious basis for the request. Other documentation, such as letters from a religious leader or copies of religious texts, is optional but may assist commanders evaluating the request.

(2) The commander will arrange an in-person or telephonic interview between the requestor and the assigned unit chaplain or other chaplain determined by the senior chaplain present. The chaplain must provide a memorandum that summarizes the interview and addresses the religious basis and sincerity of the Soldier's request. The chaplain is not required to recommend approval or disapproval, but may do so. Memorandums from other chaplains or religious leaders may accompany the request as optional attachments, but do not meet the requirement for interview by the assigned unit chaplain or one determined by the senior chaplain present.

(3) If a commander at any level approves the request for accommodation, written approval will be returned to the Soldier through channels. If the commander disapproves it, the appeal packet will be so endorsed and forwarded to the next higher level of command.

(4) If all levels of command disapprove the request for accommodation, the appeal packet will be forwarded to the DCS, G–1 (DAPE–MPC) for final decision by the SECARMY or designee.

(5) A legal review is required at the GCMCA prior to forwarding to the DCS, G–1. A legal advisor will review the request packet for legal sufficiency and may make a recommendation for disposition of the request. The review will also state whether the request and enclosures are complete.

(6)  Appeals will reach the DCS, G–1 within 30 days after the Soldier submits the appeal (60 days for ARNG, and USAR) for decision by the SECARMY or designee. The decision of the SECARMY or designee will be transmitted through channels to the Soldier requesting accommodation within 60 days after receipt of the request by DCS, G–1. Disapprovals by the SECARMY or their designee are final. Subsequent requests will only be considered if based on substantially different grounds or supported by substantially new evidence.

## P–2.  Processing requests related to medical care

*a. Self-care or refusal of treatment.*  A Soldier may request to have medical treatment withheld for non-emergency or nonlife-threatening illnesses and injuries. Accommodations for medical care are fact specific. Blanket requests covering unspecified future medical care will not be approved. Unit commanders may consult with MTF personnel about medical treatment options, including temporarily deferring medical treatment to accommodate a Soldier's religious practices while a request is pending. Commanders will follow DHA or DoD policies and procedures. If DHA or DoD procedures are not prescribed, an MTF commander will engage in the following procedures (see Memorandum of Agreement between Defense Health Agency and the Army Office of the Surgeon General and the U.S. Army Medical Command for the Direct Support to the Defense Health Agency for Medical Treatment Facility Administration and Management, 19 September 2019):

(1)  The MTF commander will convene an ad hoc committee to assess any request to withhold recommended medical treatment because of religious objections. The committee will be chaired by a Medical Corps officer and must include a chaplain. All committee members must be officers or full-time employees of the Federal Government.

(2)  The committee will prepare a report which includes the following information:

*(a)*  Proposed treatment to relieve incapacity and aid the Soldier's return to duty status.

*(b)*  The need for the treatment.

*(c)*  An assessment of the likely medical outcome and potential risks to the Soldier's health of withholding treatment based on the Soldier's age and general physical condition.

*(d)*  An assessment of the possible effects on the health of others and the military medical system.

*(e)*  Evidence that the Soldier was given the opportunity to appear before the board in person; submit a written statement; or submit written statements from a member of their faith group. If circumstances do not permit the Soldier to appear in person or submit a written statement (or both), or the Soldier declines to appear in person or submit a written statement; then the board will include this information in the report.

(3)  Soldiers may have a representative. A representative will be appointed for Soldiers believed to be incompetent. The representative need not be legally qualified. The report will include the rationale for any determination of incompetency.

(4)  Unit and MTF commanders will review the committee report and any matters submitted by the Soldier and consider the effects of accommodation on military necessity in accordance with paragraph 5–6*a*.

(5)  If, after consulting with the MTF commander and conducting the requisite analysis in accordance with paragraph 5–6*a*, the unit commander determines that military necessity requires that medical care be provided to a Soldier, the unit commander will inform the Soldier by written memorandum. If the Soldier requests an appeal or refuses care, the MTF commander will forward the committee report and the unit commander's decision memorandum through command channels to TSG for final action.

(6)  TSG will provide a copy of the final determination to the Office of the Deputy Chief of Staff, G–1 (DAPE–MPC), Washington, DC 20310–0300.

(7)  If TSG disapproves the request for accommodation, the Soldier will be given the opportunity to accept the treatment. If the Soldier refuses, the MTF commander will refer the matter to the Soldier's SPCMCA for appropriate action.

(8)  In emergency situations, the MTF commander may order, or the attending healthcare provider may take, immediate steps in accordance with local MTF policy to save a Soldier's life regardless of religious practices or objections.

*b.  Immunizations.*  Immunization requirements for Soldiers are described in AR 40–562. Soldiers whose religious practices conflict with immunization requirements may request an exemption through command channels, from company or immediate commander through battalion, brigade, division, and GCMCA commanders to TSG. TSG is the only approval or disapproval authority for immunization accommodation requests.

*Note.* Accession agencies and commands are authorized to establish routing chains for pre-accession requests which may not include all levels of intermediate command, but must be routed through a GCMCA.

(1)  Requests for religious exemption must include name, rank, MOS/branch, and a description of the religious tenet or belief contrary to immunization. Other documentation, such as letters from a religious leader, is optional but may assist commanders evaluating the request.

(2)  The commander will arrange an in-person or telephonic interview between the requestor and the assigned unit chaplain or other chaplain determined by the senior chaplain present. The chaplain must provide a memorandum that summarizes this interview and addresses the religious basis and sincerity of the Soldier's request. The chaplain is not required to recommend approval or disapproval, but may do so. Memorandums from other chaplains or religious leaders may accompany the request as optional attachments, but do not meet the requirement for interview by the assigned unit chaplain or one determined by the senior chaplain present.

(3)  A licensed healthcare provider must counsel the applicant. The healthcare provider should ensure that the applicant is making an informed decision and should address, at a minimum, the following:

*(a)* Specific information about the diseases concerned;

*(b)* Specific vaccine information including benefits and risks; and

*(c)* Potential risks of infection incurred by unimmunized individuals.

(4)  The applicant's immediate commander must counsel the applicant and recommend approval or denial of the exemption request. The commander must counsel that noncompliance with immunization requirements may adversely impact deployability, assignment, or international travel, and that the exemption may be revoked under imminent risk conditions. The commander's recommendation will address the factors of military necessity described in paragraph 5–6*a*.

(5)  Commanders will forward exemption requests through command channels to TSG. TSG will approve or disapprove the requested exemption, and return the decision to the Soldier's commander through command channels.

(6)  TSG may authorize exemptions for the career of a Soldier (subject to revocation), or issue a single, specific exemption, or may disapprove the request. If TSG disapproves a requested exemption and the Soldier still refuses the immunization, paragraph 5–4*g*(2) applies.

(7)  TSG will provide a copy of the determination to the Office of the Deputy Chief of Staff, G–1 (DAPE–MPC), Washington, DC 20310–0300.

(8)  Religious exemptions may be revoked in the case of an imminent risk of exposure to a disease for which an immunization is available.

## P–3.  Processing requests related to uniform and grooming

*a.  Beards, hijabs, and turbans.*  Commanders at the GCMCA or the first general officer in the chain of command, and above may approve, disapprove, or elevate religious accommodation requests for beards, hijabs, and turbans worn in accordance with the standards provided in AR 670–1 (see table P–1). Requests must be approved or forwarded to the DCS, G–1 with a recommendation for disapproval within 30 calendar days of initial submission for pre-accession requests and RA requests within 60 calendar days of initial submission for ARNG and USAR requests. Only the DCS, G–1 or designee may grant a request for extension of these timelines.

*Note.* Accession agencies and commands may designate an officer in the grade of BG/O–7 or higher who is not a commander to serve as the GCMCA approval authority for purposes of evaluating and approving requests for religious accommodation described in this paragraph. All roles and responsibilities assigned to GCMCA commanders also apply to designated GCMCA approval authorities for pre-accession requests.

(1)  All requests must be in writing and must explain the type of accommodation requested and the religious basis for the request. Other documentation, such as photos of the requested accommodation, copies of religious texts or letters from a religious leader, is optional but may assist commanders evaluating the request.

*Note.* Requestors (other than pre-accession requests) must continue to comply with AR 670–1 standards for non-accommodated Soldiers while the request is pending.

(2)  Commanders receiving an initial accommodation request (immediate commander) will immediately notify the Office of the DCS, G–1 (DAPE–MPC) Command Policy Division at usarmy.pentagon.hqda-dcs-g-1.mbx.command-policy@mail.mil. Notification will include the requestor's name, rank (if applicable), unit, MOS (or prospective MOS if known), and a copy of the request documents.

(3)  The commander will arrange an in-person or telephonic interview between the requestor and the assigned unit chaplain or other chaplain determined by the senior chaplain present. The chaplain must provide a memorandum which summarizes this interview and addresses the religious basis and sincerity of the Soldier's request. The chaplain is not required to recommend approval or disapproval, but may do so. Memorandums from other chaplains or religious

leaders may accompany the request as optional attachments, but do not meet the requirement for interview by the assigned unit chaplain or one determined by the senior chaplain present.

(4)  The immediate commander will review the chaplain memorandum and complete a recommendation memorandum. An explanation is required if the commander recommends disapproval of the request. The immediate commander will forward the request packet through intermediate commanders to the brigade level commander.

*Note.* Accession agencies and commands are authorized to establish routing chains for pre-accession requests which may not include all levels of intermediate commanders.

(5)  The GCMCA will consider every religious accommodation request on a case-by-case basis.

(6)  When evaluating sincerity, commanders may consider the credibility and demeanor of the applicant and the circumstances of the request. Although a religious practice does not have to be compelled by, or central to, a system of religious belief, commanders may evaluate the Soldier's ability to articulate the religious basis and religious importance of the request.

(7)  Before acting on a request, the GCMCA will direct his or her staff to—

*(a)*  Obtain a legal review conducted in consultation with the Office of the Judge Advocate General (OTJAG), which may be contacted at usarmy.pentagon.hqda-otjag.mbx.g-law@mail.mil.

*(b)*  Consult the DCS, G–1 Command Policy Division to ask for a review of the preliminary request materials and approval or disapproval memorandum to ensure consistent standards in processing requests for religious accommodations. The division may be contacted at 703–695–7370 and usarmy.pentagon.hqda-dcs-g-1.mbx.command-policy@mail.mil.

*(c)*  Consult with the Office of the Chief of Chaplains to evaluate the religious basis and sincerity of the request, and to ensure consistency and fairness across the force. Chaplain Operations may be contacted at 703–545–6629, 703–695–0295, or usarmy.pentagon.hqda-occh.mbx.chaplain-corps-operations @mail.mil.

*(d)*  Consult with U.S. Army Corrections Command when the requestor is a prisoner confined in an Army correctional facility. Army Corrections Command Operations may be contacted at usarmy.pentagon.corrections-cmd.list.admin-operations-npe-mgt@mail.mil.

(8)  The commander will notify the Soldier and forward a copy of the request packet and approval or disapproval memorandum to the DCS, G–1. The DCS, G–1 will web upload the approval memo to the interactive Personnel Electronic Records Management System (iPERMS) for filing in the Soldier's Army Military Human Resource Record (AMHRR), per AR 600–8–14. Soldiers are not initiated to a copy of the packet provided to the GCMCA, except as authorized through a request under the Freedom of Information Act (FOIA).

(9)  If the GCMCA elevates the request, the GCMCA will forward the request to the DCS, G–1 with a recommendation for approval or denial and the reason(s) for the approval or denial. The GCMCA will notify the Soldier Once the packet is received by the DCS, G–1, a legal advisor will review the request packet for legal sufficiency. The review will also state whether the request and enclosures are complete within the provisions of this regulation. Only the SECARMY or their designee may take final action to approve or disapprove the elevated request.

(10)  The decision of the SECARMY or their designee will be transmitted through command channels to the Soldier requesting accommodation within 60 days after receipt of the final request packet by DCS, G–1. Upon the SECARMY or their designee's decision, a copy of the decision documents will be web uploaded to iPERMS by the DCS, G–1 for filing in the Soldier's AMHRR, per AR 600–8–104. For individuals without an established AMHRR, the Office of the DCS, G–1 will maintain copies and the unit personnel file until upload to the AMHRR is possible. Soldiers are not entitled to a copy of the packet provided to the SECARMY, his designee, or the DCS, G–1, except as authorized through a FOIA request.

(11)  The DCS, G–1 will track approved religious accommodations to ensure that individuals and commanders are notified of any changes in equipment or policies which may affect accommodations.

(12)  Disapprovals by the SECARMY or their designee are final. Subsequent requests will only be considered if based on substantially different grounds or supported by substantially new evidence.

*b. Waiver requests.*  A religious accommodation request which requires a waiver of AR 670–1 or any other Army policy may only be approved or disapproved by the SECARMY or designee. If commanders have any questions about whether a request requires a waiver, they should contact the Office of the DCS, G–1 (DAPE–MPC) Command Policy Division at usarmy.pentagon.hqda-dcs-g-1.mbx.command-policy@mail.mil. Waiver request packets must be forwarded to the DCS, G–1 within 30 days of the initial request for RA requests and pre-accession requests from all components and within 60 days for USAR and ARNG requests. Only the DCS, G–1 or designee may grant a request for extension of these timelines.

(1)  All requests must be in writing and must explain the type of accommodation requested and the religious basis for the request. Other documentation, such as photos of the requested accommodation, copies of religious texts or letters from a religious leader, is optional but may assist commanders evaluating the request.

*Note.* Requestors (other than pre-accession requests) must continue to comply with AR 670–1 standards for non-accommodated Soldiers while the request is pending.

(2)  Unit commanders receiving an initial accommodation request (immediate commander) will immediately notify the Office of the DCS, G–1 (DAPE–MPC) Command Policy Division at usarmy.pentagon.hqda-dcs-g-1.mbx.command-policy@mail.mil. Notification will include the requestor's name, rank (if applicable), unit, MOS (or prospective MOS if known), and a copy of the request documents.

(3)  The commander will arrange an in-person or telephonic interview between the requestor and the assigned unit chaplain or other chaplain determined by the senior chaplain present. The chaplain must provide a memorandum that summarizes this interview and addresses the religious basis and sincerity of the Soldier's request. The chaplain is not required to recommend approval or disapproval, but may do so. Memorandums from other chaplains or religious leaders may accompany the request as optional attachments, but do not meet the requirement for interview by the assigned unit chaplain or one determined by the senior chaplain present.

(4)  The immediate commander will review the chaplain memorandum and complete a recommendation memorandum. An explanation is required if the commander recommends disapproval of the request. The immediate commander will forward the request packet through intermediate commanders to the GCMCA.

*Note.* Accession agencies and commands are authorized to establish routing chains for pre-accession requests which may not include all levels of intermediate command.

(5)  A legal review is required by the GCMCA's SJA prior to forwarding a request to the DCS, G–1. A legal advisor will review the request packet for legal sufficiency and may make a recommendation for disposition of the request. The review will also state whether the request and enclosures are complete within the provisions of this regulation.

(6)  The GCMCA will forward the request with recommendations directly to the DCS, G–1 (DAPE–MPC) Command Policy Division and provide concurrent notification through command channels. Senior commanders may provide concurring comments or objections to the DCS, G–1 if desired, but additional processing time will not be provided.

(7)  The decision of the SECARMY or their designee will be transmitted through channels to the Soldier requesting accommodation within 60 days after receipt of the request by DCS, G–1. Upon the SECARMY or their designee's decision, a copy of the decision documents will be web uploaded to iPERMS by the DCS, G–1 for filing in the Soldier's AMHRR. For individuals without an established AMHRR, the Office of the DCS, G–1 will maintain copies and the unit personnel file until upload to the AMHRR is possible.

(8)  The DCS, G–1 will track approved religious accommodation waivers to ensure that individuals and commanders are notified of any changes in equipment or policies which may affect accommodations.

(9)  Disapprovals by the SECARMY or their designee are final. Subsequent requests will only be considered if based on substantially different grounds or supported by substantially new evidence.

*c.  Duty considerations.*

(1)  A religious accommodation consistent with the uniform wear and grooming standards in AR 670–1 will not affect a Soldier's assignment of MOS or branch, duty location, or attendance at military schools, except as described in paragraph 5*b* for Soldiers with beards or for units with specific uniform requirements that supersede AR 670–1. If a GCMCA, a higher level commander, or an MOS proponent identifies additional specific hazards an accommodation created that cannot be reasonably mitigated, they must immediately inform the Office of the DCS, G–1 Command Policy Division at usarmy.pentagon.hqda-dcs-g-1.mbx.command-policy@mail.mil.

(2)  Study results show that beard growth consistently degrades the protection factor provided by the protective masks currently in the Army inventory to an unacceptable degree. Until the Army can field such protective gear that meets safety standards in conjunction with beard growth, these restrictions apply:

*(a)* Soldiers with a religious accommodation allowing a beard may not attend military schools requiring toxic chemical agent training and may not be assigned to positions requiring compliance with biological, chemical, or nuclear surety requirements in accordance with AR 50–5, and AR 50–6. For example, they may not serve as 74A, Chemical, Biological, Radiological, Nuclear (CBRN) Officers; 740A, CBRN Technicians; or 74D, CBRN Specialists.

*(b)* An accommodation for a beard may be temporarily suspended when a threat of exposure to toxic CBRN agents exists that requires all Soldiers to be clean-shaven, including those with medical profiles. Following the procedures in paragraph P–3*d*, commanders may require a Soldier to shave if the unit is in, or about to enter, a tactical situation where use of a protective mask will likely be required and where the inability to safely use the mask could endanger

the Soldier and the unit. A Soldier may wear a beard while participating in training or tactical simulations designed to ensure that the Soldier is fully familiar with use of the protective mask.

*d. Suspension procedures.*

(1)  When an accommodated Soldier's GCMCA identifies a specific threat to health and safety based on the accommodation (such as threat of exposure to toxic CBRN agents that may merit a heightened protective posture) or the GCMCA identifies an issue of sincerity, the GCMCA, after consultation with the Staff Judge Advocate, will notify the Soldier of the need to suspend the religious accommodation, the basis for the suspension, the date the suspension will likely go into effect, and the Soldier's right to appeal. If the Soldier requests an appeal, the Soldier will have 10 days to submit matters to the Office of the DCS, G–1 Command Policy Division at usarmy.pentagon.hqda-dcs-g-1.mbx.command-policy@mail.mil. The accommodation will not be suspended before I or my designee take action on the appeal.

(2)  In exigent circumstances involving imminent threat to health and safety, the GCMCA may shorten the time for appeal and may require immediate suspension of the accommodation. The GCMCA will notify the DCS G–1 Command Policy Division of the decision and its basis as soon as possible at us.army.pentagon.hqda-dcs-g-1.mbx.command-policy@mail.mil.

(3)  The GCMCA will reinstate the suspended accommodation when the specific and concrete threat to health and safety as a result of the accommodation no longer exists.

---

**Table P–1**
**Process for General Court-Martial Convening Authority uniform and grooming requests and all waiver requests**

Requestor
1. Submits accommodation request to immediate commander
1. In writing
2. Explain type of accommodation requested and religious basis for the request
3. Additional documentation (photos, letters, and so forth) is optional
4. Currently serving Soldiers must continue to comply with all Army standards for non-accommodated Soldiers unless the request is approved

Immediate commander
5. Reviews request
6. Emails the requester's name, rank (if applicable), unit, MOS (or prospective MOS if known), and a copy of the request documents to the DCS, G–1 (DAPE–MPC) Command Policy Division at usarmy.pentagon.hqda-dcs-g-1.mbx.command-policy@mail.mil
7. Schedules an in-person or telephonic interview between the requestor and the assigned unit chaplain or other chaplain determined by the senior chaplain present

Chaplain [1]
8. Interviews requestor
9. Completes a memo with date of interview and addresses the religious basis and sincerity of the request
10. Recommendation on approval/disapproval is optional

Immediate commander
11. Reviews chaplain memo
12. Completes recommendation memo (explanation required if recommending disapproval)
13. Forwards request packet with recommendation and chaplain memo

Intermediate commander(s) (if applicable)
14. Reviews chaplain memo
15. Completes recommendation memo (explanation required if recommending disapproval)
16. Forwards request packet with recommendation

**If the request is—**

| For one or more of the following:<br>17. Beard<br>18. Turban (with uncut hair) or<br>19. Hijab<br>20. Worn in accordance with AR 670–1 standards | For a waiver of Army policy |
|---|---|
| Forward to GCMCA | Forward to GCMCA |
| Legal review | Legal review |
| GCMCA | GCMCA |

**Table P–1**
**Process for General Court-Martial Convening Authority uniform and grooming requests and all waiver requests—Continued**

| | |
|---|---|
| 21. Reviews packet | 39. Reviews packet |
| 22. Consult with OTJAG | 40. Completes recommendation memo (explanation required if recommending disapproval) |
| 23. Consult with DCS, G–1, Command Policy | 41. Forward packet directly to DCS, G–1 for decision by the SECARMY or designee [3] |
| 24. Consult with Office of the Chief of Chaplains | |
| 25. Consult with Army Corrections Command (for prisoner requests) | |
| 26. Approves request | |
| 27. Complete approval memo | |
| 28. Notify requestor with copy of approval | |
| 29. Forwards approval and packet to DCS, G–1; DCS, G–1 uploads approval memo to iPERMS for filing in requestor's AMHRR | |
| or | |
| 30. Disapproves request | |
| 31. Explanation required [2] | |
| 32. Complete disapproval memo | |
| 33. Notify requestor with copy of disapproval | |
| 34. Forward packet directly to DCS, G–1; DCS, G–1 uploads disapproval memo to iPERMS for filing in requestor's AMHRR | |
| or | |
| 35. Elevates request | |
| 36. Complete recommendation memo | |
| 37. Notify requestor with copy of recommendation memo | |
| 38. Forward packet directly to DCS, G–1 for decision by the SECARMY or designee [3] | |

**Timelines**

| | |
|---|---|
| Requests must be approved or forwarded to HQDA (if recommending disapproval) within— | Request packets must be forwarded to HQDA within— |
| 30 days–Pre-accession (all components) and RA | 30 days–Pre-accession (all components) and RA |
| 60 days–USAR and ARNG | 60 days–USAR and ARNG |

Notes:

[1] Memorandums from other chaplains or religious leaders may accompany the request as optional attachments, but do not meet the requirement for interview by the assigned unit chaplain or one determined by the senior chaplain.

[2] Requests for accommodations consistent with published standards will be approved, unless the commander determines the request is not based on a sincerely held religious belief or the commander identifies a specific hazard resulting from the accommodation not otherwise addressed in policy.

[3] SCs may provide concurring comments or objections to the DCS, G–1, but additional processing time is not authorized.

**Appendix Q**

**Internal Control Evaluation**

**Q–1. Function**
This internal evaluation checklist provides internal controls for the evaluation of ACOMs and commanders.

**Q–2. Purpose**
The purpose of this evaluation is to assist commanders and other Army leaders in evaluating the key internal controls listed. It is intended as a guide and does not cover all controls.

**Q–3. Instructions**
Answers must be based on the actual testing of key internal controls (for example, document analysis, direct observation, sampling, simulation, other). Answers that indicate deficiencies must be explained and the corrective action identified in supporting documentation. These internal controls must be evaluated at least once every five years. Certification that the evaluation has been conducted must be accomplished on DA Form 11–2 (Internal Control Evaluation Certification).

**Q–4. Test questions**
  *a.* Does the commander have posted command policies on—
  (1) Open door policy (para 2–2)?
  (2) Harassment (para 4–19b(3))?
  (3) MEO (para-8i(3))?
  (4) Prevention of sexual harassment (para 7–5*o*)?
  (5) MEO complaint procedures (see chap 6)?
  *b.* Do Soldiers receive regular performance counseling (para 2–3)?
  *c.* In case of a relief for cause, did a GO direct the relief for cause (para 2–17)?
  *d.* Did the commander submit DA Form 4833 within 60 days of offense notification (para 4–7)?
  *e.* Are membership campaigns for voluntary organizations truly voluntary (para 4–11)?
  *f.* Does the commander alert for signs of extremist, terrorist, or criminal gang organizations or activities (para 4–12)?
  *g.* Does the commander enforce Army policy on fraternization (paras 4–14 through 4–16)?
  *h.* Does the commander enforce the Domestic Violence Amendment to the Gun Control Act of 1968 (Lautenberg Amendment (para 4–23))?
  *i.* Does the commander enforce the policy that officers, WOs, and enlisted members above the grade of E–6 self-report criminal convictions (para 4–24)?
  *j.* Does the commander require appropriate Soldiers to file and regularly update Family care plans (para 5–3)?
  *k.* If the commander denies a religious accommodation, does the commander afford the Soldier the opportunity to appeal the disapproval (para 5–6*f*(3)(*a*))?
  *l.* Does the commander prohibit acts of reprisal for filing a complaint of unlawful discrimination or sexual harassment, communicating with a Member of Congress, the IG, or any other authorized agency (para 5–12)?

**Q–5. Supersession**
Not applicable.

**Q–6. Comments**
Help make this a better tool for evaluating internal controls. Submit comments to Deputy Staff of Staff, G–1 (DAPE–MP), 300 Army Pentagon, Washington, DC 20310–0300.

**Glossary**

**Section I**

**Abbreviations**

**AC**
Active Component

**ACOM**
Army command

**ADRP**
Army doctrine reference publication

**AGR**
Active Guard Reserve

**AKO**
Army Knowledge Online

**ALERTS**
Army Law Enforcement Reporting and Tracking System

**AMC**
U.S. Army Materiel Command

**AMEDD**
Army Medical Department

**AMHRR**
Army Military Human Resource Record

**AOC**
Army Operations Center

**AR**
Army Regulation

**ARIMS**
Army Records Information Management System

**ARNG**
Army National Guard

**ARNGUS**
Army National Guard of the United States

**ARSTAF**
Army Staff

**Art.**
Articles

**ASA**
Assistant Secretary of the Army

**ASA (FM&C)**
Assistant Secretary of the Army (Financial Management and Comptroller)

**ASA (IE&E)**
Assistant Secretary of the Army (Installations, Energy and Environment)

**ASA (M&RA)**
Assistant Secretary of the Army (Manpower and Reserve Affairs)

**ASCC**
Army service component command

**ASI**
Additional skill identifier

**ATMS**
Army Training Management System

**ATRRS**
Army Training Requirements and Resource System

**BDE**
Brigade

**BG**
Brigadier General

**BOSS**
Better Opportunities for Single Soldiers

**CAR**
Chief, Army Reserve

**CCA**
Command Climate Assessment

**CCIR**
Commander's Critical Information Requirement

**CDT**
Cadet

**CEU**
Continuing Education Unit

**CFR**
Code of Federal Regulations

**CG**
Commanding General

**CIP**
Command Inspection Program

**CNGBI**
Chief of National Guard Bureau Instruction

**COL**
Colonel

**CONUS**
Continental United States

**CPL**
Corporal

**CPO**
Civilian Protection Order

**CPT**
Captain

**CR2C**
Commander's Ready and Resilient Council

**CSA**
Chief of Staff, Army

**CSM**
Command Sergeant Major

**CW2**
Chief Warrant Officer Two

**CW3**
Chief Warrant Officer Three

**CW4**
Chief Warrant Officer Four

**CW5**
Chief Warrant Officer Five

**DA**
Department of the Army

**DAIG**
Department of the Army Inspector General

**DASA–E&IA**
Deputy Assistant Secretary of the Army, Equity and Inclusion Agency

**DCS**
Deputy Chief of Staff

**DD**
Department of Defense (forms)

**DEERS**
Defense Enrollment Eligibility Reporting System

**DEOMI**
Defense Equal Opportunity Management Institute

**DEP**
Delayed Entry Program

**DES**
Director of Emergency Services

**DFAS**
Defense Finance and Accounting Service

**DHA**
Defense Health Agency

**DoD**
Department of Defense

**DoD CAF**
Department of Defense Central Adjudication Facility

**DoDD**
Department of Defense directive

**DoD–EC Workforce**
DoD Expeditionary Civilian Workforce

**DoDI**
Department of Defense instruction

**DOR**
Date of Rank

**DRS**
Data Retrieval System

**DRU**
Direct Reporting Unit

**D–SAACP**
Department of Defense Sexual Assault Advocate Certification Program

**DSAID**
Defense Sexual Assault Incident Database

**DSN**
Defense Switched Network

**EEO**
Equal Employment Opportunity

**EO**
Equal Opportunity

**EOL**
Equal Opportunity Leader

**EOLC**
Equal Opportunity Leaders Course

**FM**
Field Manual

**FOIA**
Freedom of Information Act

**FORSCOM**
Forces Command

**FP**
Force Protection

**FTNGD**
Full-time National Guard Duty

**GC**
Garrison Commander

**GCMCA**
General Court-Martial Convening Authority

**GEN**
General

**GO**
General Officer

**GS**
General Schedule

**HCP**
Health care provider

**HQDA**
Headquarters, Department of the Army

**HRC**
Human Resources Command

**HRRT**
High Risk Response Team

**ICRS**
Integrated Case Reporting System

**IG**
Inspector General

**IGAR**
Inspector General Action Request

**IMCOM**
U.S. Army Installation Management Command

**IMT**
Initial Military Training

**iPERMS**
interactive Personnel Electronic Records Management System

**IRR**
Individual Ready Reserve

**IT**
Information Technology

**JBC**
Joint Base Commander

**JFHQ**
Joint Forces Headquarters

**JMOS**
Joint Management Oversight Structure

**JPAS**
Joint Personnel Adjudication System

**JTR**
Joint Travel regulation

**LOD**
Line of Duty

**LTC**
Lieutenant Colonel

**LTG**
Lieutenant General

**MAJ**
Major

**MCIO**
Military Criminal Investigation Organization

**MCM**
Manual for Courts-Martial

**MEO**
Military Equal Opportunity

**MFR**
Memorandum for Record

**MG**
Major General

**MOA**
Memorandum of Agreement

**MOS**
Military Occupational Specialty

**MOU**
Memorandum of Understanding

**MP**
Military Police

**MPO**
Military Protective Order

**MRE**
Military Rules of Evidence

**MSG**
Master Sergeant

**MTF**
Military Treatment Facility

**MUTA**
Multiple Unit Training Assembly

**MWR**
Morale, Welfare and Recreation

**N/A**
Not applicable

**NCO**
Noncommissioned Officer

**NCOER**
Noncommissioned Officer Evaluation Report

**NGB**
National Guard Bureau

**NGR**
National Guard regulation

**NIPRNET**
Non-secure Internet Protocol Router Network

**NLT**
No later than

**OC**
Officer Candidate

**OCONUS**
Outside the Continental United States

**OER**
Officer Evaluation Report

**OIP**
Organization Inspection Program

**OPSEC**
Operations Security

**OTJAG**
Office of The Judge Advocate General

**OTSG**
Office of The Surgeon General

**PAO**
Public Affairs Office

**PCC**
Personnel Contingency Cell

**PCS**
Permanent Change of Station

**PFC**
Private First Class

**PII**
Personally Identifiable Information

**PM**
Program Manager

**PME**
Professional Military Education

**PMO**
Provost Marshal Office

**POM**
Program Objective Memorandum

**PT**
Physical Training

**PV1**
Private

**PV2**
Private Enlisted Two

**QC**
Quality Control

**R2**
Ready and Resilient

**RA**
Regular Army

**RC**
Reserve Component

**RCM**
Rule for Court-Martial

**ROTC**
Reserve Officers' Training Corps

**RRS–A**
Army Records Retention Schedule-Army

**RSC**
Regional Support Command

**SAAPM**
Sexual Assault Awareness and Prevention Month

**SAEC**
Senior Army Element Commander

**SAFE**
Sexual Assault Forensic Examination

**SAIRO**
Sexual Assault Incident Response Oversight

**SAMFE**
Sexual Assault Medical Forensic Examiner

**SAPR**
Sexual Assault Prevention and Response

**SARB**
Sexual Assault Review Board

**SARC**
Sexual assault response coordinator

**SAV**
staff assistance visit

**SC**
senior commander

**SECARMY**
Secretary of the Army

**SES**
Senior Executive Service

**SFC**
sergeant first class

**SFRG**
Soldier and Family Readiness Group

**SGM**
Sergeant Major

**SGT**
sergeant

**SHARP**
Sexual Harassment/Assault Response and Prevention

**SHL**
Safe Helpline

**SIPRNET**
secure internet protocol router network

**SJA**
staff judge advocate

**SMA**
Sergeant Major of the Army

**SPC**
specialist

**SPCMCA**
special court-martial convening authority

**SQI**
skill qualifications identifier

**SRO**
senior responsible official

**SSG**
staff sergeant

**SSN**
social security number

**SVC**
special victims' counsel

**SVIP**
special victim investigation and prosecution

**TDA**
table of distribution and allowances

**TDY**
temporary duty

**TIG**
The Inspector General

**TJAG**
The Judge Advocate General

**TMP**
transportation motor pool

**TPU**
troop program unit

**TRADOC**
U.S. Army Training and Doctrine Command

**TRICARE**
Tri-Service Medical Care

**TSG**
The Surgeon General

**TSP**
training support package

**UCMJ**
Uniform Code of Military Justice

**USACIDC**
U.S. Army Criminal Investigation Command

**USAR**
U.S. Army Reserve

**USARC**
U.S. Army Reserve Command

**USC**
United States Code

**USMA**
United States Military Academy

**VA**
victim advocate

**VCSA**
Vice Chief of Staff, Army

**VR**
victim representative

**WO**
warrant officer

**WO1**
warrant officer one

**WOC**
warrant officer candidate

**1LT**
first lieutenant

**1SG**
first sergeant

**2LT**
second lieutenant

## Section II

## Terms

**Active duty**
Full-time duty in the active military Service of the United States, including full-time training duty; annual training duty; attendance while in the active military Service, at a school designated as a Service school by law or by secretary of the military department concerned. This term does not include FTNGD.

**Active status**
The status of a member of a RC not in the inactive ARNG, on inactive status list, or in the Retired Reserve.

**Anonymous complaint**
Anonymous reporting is defined as an allegation report of sexual harassment, regardless of the means of transmission, from an unknown/unidentified source. The individual reporting the information is not required to divulge any PII. Commanders will publicize and enable anonymous reporting through organizational hotlines, email, and official telephone lines. Anonymous reports of sexual harassment occurring in confinement facilities involving military inmates will adhere to the Prison Rape Elimination Act.

**Army National Guard**
The Army portion of the recognized militia of the several states, Commonwealth of Puerto Rico and District of Columbia whose units and members are federally recognized.

**Army National Guard of the United States**
A RC of the Army, all of whose members are members of the ARNG.

**Army recruit**
An Army recruit is an individual who has joined the Army, including U.S. Army Military Academy cadets, ROTC cadets who are under contract, and individuals in the DEP (Future Soldiers Program), Delayed Training Program, Recruit Sustainment Program, or similar programs.

**Beliefs**
Judgments or expectancies which one may hold.

**Category**
A specifically defined division in a system of classification.

**Chain of command**
The succession of COs from a superior to a subordinate through which command is exercised.

**Civil office**
A nonmilitary office involving the exercise of the powers of authority of civil government, to include elective or an appointed office in the government, a U.S. territory or possession, State, county, municipality, or official subdivision thereof.

**Command Climate Assessment**
A determination of the health and functioning effectiveness of an organization by examining such factors as leadership, unit cohesion, morale, teamwork and communication. This accomplished through some or all of the following: group and/or individual interviews, observations, surveys or questionnaires, and review of records and reports.

**Common levels of support**
Common levels of support are the IMCOM determined levels for the common services that are provided by a garrison. Common levels of support refers to the method by which IMCOM directs all garrisons to deliver specific elements of installation support services (Service Support Programs) at a IMCOM approved pre-determined level of service. This

strategy is aimed at achieving standardization of installation services across the Army through equitable distribution of resources and garrison accountability for service delivery performance.

**Complainant**
A Soldier, military Family member, or DA civilian employee who submits a complaint.

**Complaint (equal opportunity)**
An allegation of discrimination based on race, color, sex (including gender identity), national origin, religion, or sexual orientation or allegation of harassment (hazing, bullying, or discriminatory harassment).

**Complaint (equal opportunity), formal**
An allegation of discrimination or harassment (hazing, bullying, or discriminatory harassment) submitted in writing on a DA Form 7279 to a commander, supervisor, or military equal opportunity professional; or an allegation identified by the commander to be investigated through the formal complaint process.

**Complaint (equal opportunity), informal**
An allegation of discrimination or harassment (hazing, bullying, or discriminatory harassment) made either verbally or in writing that is not submitted as a formal complaint to an MEO professional (not an EOL).

**Consent**
As used in the context of sexual assault, consent is a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress of the person involved with the accused in the conduct at issue does not constitute consent. A sleeping, unconscious, or incompetent person cannot consent.

**Cultural diversity**
A condition in a group of people or organization brought about by the sex, religion, racial, cultural, and social differences that the individuals naturally bring to the group or organization.

**Culture**
The learned and shared behaviors and perceptions of a group which have been transmitted from generation to generation through a shared symbol system.

**Date of rank**
The date on which an officer or enlisted Soldier actually or constructively was appointed in a particular grade. The date will be calculated on the basis of criteria established in this regulation and is the first rule for determining relative seniority for officers and enlisted holding the same grade.

**Delayed Entry Program**
(Future Soldier Program), Delayed Training Program, and the Recruit Sustainment Program. Under these programs, an individual may enlist in a RC of the Army or other military Service and specify a future reporting date for entry on active duty that would coincide with the availability of training spaces and personal plans, such as high school graduation. This policy also covers any similar program.

**Department of Defense Military Equal Opportunity Program**
The DoD-wide military program of MEO that is accomplished through efforts by the DoD components. It provides an environment in which Soldiers are ensured an opportunity to rise to the highest level of responsibility possible in the military profession, dependent only on merit, performance, and potential.

**Direct support**
A support relationship requiring a force to support another specific forces and authorizing it to answer directly to the supported force's request for assistance.

**Discrimination**
The act, policy, or procedure that arbitrarily denies EO or EEO because of race, color, sex (including gender identity), national origin, religion, or sexual orientation to an individual or group of individuals.

**Discrimination types**
The following definition of discrimination types apply to the Military Equal Opportunity program:

*a. Color discrimination.* Occurs when an individual is treated differently based on the lightness, darkness or toner color characteristics of the person. This type of discrimination can occur with race discrimination. Color discrimination can occur between persons of different races or ethnicities. It can also occur when members of the same race treat each other differently because of lightness or darkness of their skin.

*b. Sex discrimination.* Occurs when an individual is deprived of an opportunity because of their sex (including gender identity and pregnancy) or when decisions are made based on stereotypes and assumptions about abilities, traits, or the performance of individuals on the basis of sex.

*c. Racial discrimination.* Occurs when an individual is treated differently because of their racial group, racial characteristics (for example, hair texture, color, facial features), or because of their relationship or association with someone of a particular race.

*d. Religious discrimination.* Occurs when an individual is treated more or less favorably because of their religious beliefs or practices—except to the extent a religious accommodation is warranted. For example, imposing stricter promotion requirements for a person of a certain religious or imposing more or different work requirements on an individual because of their religious beliefs or practices, or forcing an individual to participate—or not participate— in a religious activity.

*e. National origin discrimination.* Occurs when an individual is treated less favorably because of their origin, ethnicity or accent, or because it is believed they are a particular nationality.

*f. Sexual orientation discrimination.* One's emotional or physical attraction to the same and/or opposite sex (homosexuality, bisexuality, or heterosexuality). Complaints may be based on actual or perceived sexual orientation, as well as association with an individual or affinity group associated with a particular sexual orientation.

**Disparaging terms**
Terms used to degrade, belittle, insult, or negative statements pertaining to race, color, sex (including gender identity), national origin, or religion. These terms include insults, printed material, visual material, signs, symbols, posters, or insignia. The determining factor whether a term is disparaging is not the intent but the impact it has on the recipient or a reasonable person. The use of these terms may contribute to an unlawful hostile work environment if it occurs with respect to a person's race, color, sex (including gender identity), national origin, or religion and must not be tolerated.

**Disparaging treatment**
Treatment that is different and unequal because of race, color, sex (including gender identity), national origin, or religion, or sexual orientation.

**Diversity**
Diversity in the Army is defined as the different attributes, experiences and backgrounds of our Soldiers, DA Civilians, and Family members that further enhance our global capabilities and contribute to an adaptive, culturally astute Army. It is the composite of individual characteristics, experiences, and abilities consistent with the Army Core Values and the Army Mission. Army diversity includes, but is not limited to, personal life experiences, geographic background, socioeconomic background, cultural knowledge, educational background, work background, language abilities, physical abilities, philosophical/spiritual perspectives, age, race, ethnicity, and gender.

**Dual-military couple**
A Soldier (RA or USAR) married to another Soldier (RA or USAR) of the Army, Air Force, Navy, Marines, or Coast Guard. A dual-military parent is one who shares with their military spouse all parental responsibilities for Family members acquired through birth or legal decree who are in physical custody of the Soldier and who are under the age of 18 years or who are beyond 18 years but are mentally or physically incapable of self-care.

**Emergency medical care**
Immediate intervention to prevent the loss of life, limb, sight, or body tissue, or to prevent undue suffering.

**Entry-level training**
Entry-level training includes, but is not limited to, recruit and initial skill training, including enlisted basic combat training, advanced individual training, and one station unit training; officer acquisition training, such as the Basic Officer Leader Course, Officer Candidate School, WO Basic Course, and WOC School; and Military Academy- and Cadet Command- conducted training (including ROTC courses). It includes students in training and holding status.

**Equal Employment Opportunity Program**
The comprehensive program through which the Army implements its policy to provide EO in employment for all qualified current and former DA Civilians and applicants for employment (AR 690–12).

**Equal opportunity**
The right of all persons to participate in, and benefit from, programs and activities for which they are qualified. These programs and activities will be free from social, personal, or institutional barriers that prevent people from rising to the highest level of accountability possible. Persons will be evaluated only on individual merit, performance, and potential, regardless of race, color, sex (including gender identity), national origin, religion, or sexual orientation except as prescribed by statute, or other Service policy.

**Equal opportunity complaint review**
Prior to submission of the MEO complaint report to the legal advisor, the investigating officer and MEO professional will meet and review the report. The MEO professional will provide the investigating officer a memorandum documenting the review.

**Equal opportunity leader**
A military member who is collaterally appointed to serve at the company and battalion (or equivalent) to assist commanders in carrying out the MEO Program within their unit, as an additional duty.

**Equal opportunity professional (equal opportunity program manager, sergeant major, GM, equal opportunity advisor or specialist (Active Component/Reserve Component))**
A military member or DA Civilian employee who performs MEO duties on a full-time basis and who have completed required DEOMI MEO Advisor Course.

**Establishment**
An entity that either recognizes itself or is recognized as such by the community at large. Specifically, any corporation, partnership, school, training center, or educational institution, club, fraternal, social, or political group.

**Ethnic group**
A segment of the population that possesses common characteristics and a cultural heritage based to some degree on: faith or faiths; shared traditions, values or symbols; literature, folklore, or music; an internal sense of distinctiveness; and/or an external perception of distinctiveness.

**Ethnic origin**
The quality of being distinguishable from the general population on the basis of actual or perceived cultural criteria such as language, religion, and more. For purposes of this regulation, ethnic origin is included within the meaning of national origin.

**Ethnicity**
That which sets off a group by race (defined as genetic), religion (preferred denomination), national origin (country of one's ancestors), or some combination of these categories.

**Extended active duty**
Active duty under a call or order performed by a member of ARNGUS or USAR when end strength accountability passes from the ARNG or USAR to the RA.

**Family member**
A child under the age of 18 or any other member who depends upon the sponsor for total support and or care.

**Family readiness liaison**
An official command-sponsored individual who provides liaison between Soldiers and their Families and the command, promoting a culture of mutual support and communication

**Formal complaint**
Allegation of unlawful discrimination and/or harassment that is submitted in writing to proper authority and processed through official complaint channels.

**Garrison**
An IMCOM unit that provides appropriate and equitable services in accordance with HQDA-directed common levels of support to tenants, Soldiers, other Servicemembers, Families, DA Civilians, and civilians in the garrison area of responsibility.

**Gender identity**
The internal perception, experience, or sense of being male or female. Includes how a person labels themselves based on how much they align or do not align with what they understand their options for gender to be. Common identity

labels include man, woman, trans or transsexual, and gender fluid, among others. Gender identity may or may not align with one's physical anatomy.

**Goals**
An objective based on realistic, measurable prospects of attainment.

**Grade**
A step or degree in a graduated scale of office or rank that is established and designated as a grade by law or regulation. For example, 2LT, CPT, SFC, CW2 are grades.

**Hostile work environment**
A hostile work environment is a series of acts that are so severe and pervasive as to alter an individual's work conditions. The acts may be discreet acts which are offensive, intimidating, or abusive to another person using the reasonable person standard. They need not result in concrete psychological harm, but need only be perceived by a reasonable person as hostile or offensive.

**Housing discrimination**
Denying or attempting to deny housing to Army personnel because of race, color, sex (including gender identity), national origin, religion, or sexual orientation. Housing of unmarried personnel on the basis of gender (for example, female-only or male-only barracks) is not considered discriminatory within the interest of this regulation.

**Human relations**
The social relations between human beings; a course, study, or program designed to develop better interpersonal and intergroup adjustments.

**Informal complaint**
Allegations of unlawful discrimination, harassment (hazing, bullying, or discriminatory harassment), or sexual harassment that do not require written documentation. These complaints may be voiced to the offending party, to someone in a position of authority, or both. The intention is that the offending behavior will cease with no further action required.

**Installation**
An aggregation of contiguous or near contiguous, real property holding commanded by a centrally selected commander. Installations represent management organizations. An installation may be made of one or more sites.

**Investigation**
An examination into allegations of wrongdoing or misconduct.

**Joint Service environment**
A locality from which operations of two or more of the Military Departments are projected or supported and which is manned by significant elements of two or more Military Departments or in which significant elements of two or more Military Departments are located. Includes joint commands, joint bases, Defense agencies, and joint field activities that involve more than one branch of Military Service.

**Legal sufficiency review**
The review of an investigation into a formal complaint of discrimination or harassment (hazing, bullying, or discriminatory harassment) to determine whether:
*a.* Whether the proceedings complied with legal requirements, including the requirements established in the appointing memorandum.
*b.* Whether there are errors and, if so, whether the errors are substantial or harmless; the effect, if any, that the errors had on the proceedings; and, what action, if any, is recommended to remediate the errors.
*c.* Whether the findings of the investigation or board, or those substituted or added by the approval authority, are supported by a greater weight of the evidence than supports a contrary conclusion.
*d.* Whether the recommendations are consistent with the findings.

**Military criminal investigative organizations**
The U.S. Army Criminal Investigation Command, Naval Criminal Investigative Service, and Air Force Office of Special Investigations.

**Military Equal Opportunity Program**
The DoD MEO Program that provides an environment in which Soldiers are ensured an opportunity to rise to the highest level or responsibility possible in the military profession, dependent only on merit, performance, and potential.

**National origin**
An individual's or ancestor's place of origin. Also applies to a person who has the physical, cultural, or linguistic characteristics of a national group.

**Nonpartisan political activity**
Activity supporting or relating to candidates not representing, or issues not specifically identified with, national or State political parties and associated or ancillary organizations. Issues relating to Constitutional amendments, referendums, approval of municipal ordinances, and others of similar character and are not considered under this regulation as specifically being identified with national or State political parties.

**Objective**
Defines the basic results desired.

**Original appointment**
Any appointment in a Reserve or regular component of the Armed Forces that is neither a promotion nor a demotion. Officers may receive more than one "original appointment."

**Other sex-related offenses**
All other sexual acts or acts in violation of the UCMJ that do not meet the definition of sexual assault, or the definition of sexual harassment as promulgated in DoDD 1350.2. Examples of other sex-related offenses could include indecent acts with another and adultery. (For the specific articles of sexual assault offenses under the UCMJ, see the MCM).

**Partisan political activity**
Activity supporting or relating to candidates representing, or issues specifically identified with, national or State political parties and associated or ancillary organization.

**Permanent party personnel**
Any Soldier assigned to an installation via PCS orders.

**Placement on the active duty list**
The date on which a commissioned officer entered on active duty on their current tour of service on the active duty list.

**Prejudice**
An attitude, judgment or opinion, without regard to pertinent fact, that is typically expressed in suspicion, fear, hostility, or intolerance of certain people, customs, and ideas.

**Preponderance of evidence**
Evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not. Preponderance of the evidence may not be determined by the number of witnesses, but by the greater weight of all evidence.

**Proposed corrective action**
Plan of action developed to resolve identified areas of concern.

**Prospect**
Any person who has expressed an interest to recruiting personnel in enlisting or receiving an appointment in the Army or any other military Service and who appears to possess, or who may in the future possess, the potential and qualifications for enlistment or appointment in the Army or other military Service. For the purpose of the policy, an individual who expresses a loss of interest in enlistment or appointment will continue to be a prospect for a period of 1 year from the date they express their loss of interest to recruiting personnel. Individuals who possess the potential or qualifications for enlistment or appointment at some point in the future may include, but are not limited to, individuals who do not meet minimum age requirements, who scored too low on the qualification testing but will be eligible to retest, or who have not completed their education. An individual who expresses an interest in enlistment or appointment but is permanently barred under existing regulations is not a prospect.

**Protected communication (Military Whistleblower Protection Act)**
A lawful communication to any member of the chain of command, a Member of Congress, an IG or any member of a DoD audit, inspection, or law-enforcement organization, including any office or command official designated to receive MEO complaints from Soldiers in which a military member makes a complaint or discloses information that he or she reasonably believes evidences a violation of law or regulation, gross mismanagement, a gross waste of funds, a gross abuse of authority, or a substantial and specific danger to public health or safety.

**Race**

A division of humans identified by the possession of traits that are transmissible by descent and that are sufficient to characterize persons possessing these traits as a distinctive human genotype.

**Race/ethnic groups**

The race/ethnic groups for Army reporting are the same as listed under ethnic and racial categories.

**Rank**

The order of precedence among members of the Armed Forces. Military rank among officers of the same grade or of equivalent grade is determined by comparing dates of rank. An officer whose DOR is earlier that the DOR of another officer of the same or equivalent grade is senior to that officer.

**Reasonable person standard**

An objective test used to determine if behavior constitutes discrimination or harassment (hazing, bullying, or discriminatory harassment). This standard considers what a reasonable person's reaction would have been under similar circumstances and in a similar environment. The reasonable person standard considers the recipient's perspective and not stereotyped notions of acceptable behavior. For example, a work environment in which racial slurs, the display of racial material or other offensive racial behavior abound can constitute discrimination even if other people might deem it to be harmless or insignificant.

**Recipient**

Any person subjected to discrimination or harassment (hazing, bullying, or discriminatory harassment) (also referred to as complainant).

**Recruit's Family**

The near relatives of an Army recruit, including the guardian, parent, mother, father, siblings, and spouse of the recruit.

**Religion**

A personal set or institutionalized system of attitudes, moral or ethical beliefs and practices held with the strength of traditional views, characterized by ardor and faith, and generally evidenced through specific observances.

**Reprisal**

Taking or threatening to take an unfavorable personnel action, or withholding or threatening to withhold a favorable personnel action, or any other act of retaliation, against a Soldier or Family member, for making or preparing a formal MEO complaint, a DA Civilian for engaging in activity in opposition to perceived discrimination; or against an alleged subject under investigation.

**Restricted reporting**

Restricted reporting allows a Soldier and/or and adult Family member 18 years or older who is a sexual assault victim, on a confidential basis, to disclose the details of his/her assault to specifically identified individuals and receive medical treatment and counseling, without triggering the official investigative process. Soldiers and qualified Family members who are sexually assaulted and desire restricted reporting under this policy should report the assault to the SARC, VA, or a healthcare provider. (See app G for a detailed explanation of restricted and unrestricted reporting.)

**Retaliation**

Any person subject to the UCMJ who wrongfully takes or threatens to take an adverse personnel action, or wrongfully withholds or threatens to withhold a favorable personnel action with the intent to discourage or retaliate against any person for reporting or planning to report a criminal offense, or making, or planning to make a protected communication. (See Article 132, UCMJ (2019))

**Senior commander**

An officer designated on orders from HQDA as the SC of an installation. Normally the senior GO at the installation. The SC's mission is the care of Soldiers, Families, and DA Civilians, and to enable unit readiness. While the delegation of senior command authority is direct from HQDA, the SC will routinely resolve installation issues with IMCOM and, as needed, the associated ACOM, ASCC, or DRU.

**Senior regularly assigned Army officer**

The officer whose appointed place of duty is the company, battalion, or brigade to which assigned. If the company commander is absent, the executive officer, if they are the senior officer who performs duty in the company, will assume command. Likewise, if the battalion commander is absent, the senior officer assigned to the battalion (normally the executive officer) will assume command. If an officer is senior to the executive officer and is assigned to

the company or battalion, but who works in the division headquarters or a maintenance unit, the executive officer would still assume command.

**Senior responsible officials**
Leaders of non-command type organizations that supervise military and/or DA Civilian personnel (for example, the DCS, G–1, or a director under the U.S. Army Materiel Command).

**Servicemember**
A Regular or Reserve Component officer (commissioned or warrant) or enlisted member of the Army, Navy, Air Force, Marine Corps, and the Coast Guard (when it is operating as a Service in the Navy) on active duty.

**Sexual assault**
Intentional sexual contact, characterized by use of force, threats, intimidation, or abuse of authority or when the victim does not or cannot consent. The term includes a broad range of sexual offenses including the following specific UCMJ offenses: rape, sexual assault, aggravated sexual contact, abusive sexual contact, forcible sodomy (forced oral or anal sex), and attempts to commit these acts.

**Sexual harassment**
Conduct that involves unwelcome sexual advances, requests for sexual favors, and deliberate or repeated offensive comments of a general nature when: Submission to such conduct is either explicitly or implicitly a term or condition of a person's job, pay or career; or submission to or rejection of such conduct by a person is used as a basis for career or employment decisions affecting that person; or such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creates an intimidating, hostile, or offensive working environment and is so severe or pervasive that a reasonable person would perceive and the victim does perceive, the environment as hostile or offensive. Any use or condonation, by any person in a supervisory or command position, of any form of sexual behavior to control, influence or affect the career, pay, or job of a member of the armed forces or a DA Civilian employee. Any deliberate or repeated unwelcome verbal comment or gesture of a sexual nature related to the work environment by any member of the Armed Forces or DA Civilian employee.

**Sexual orientation**
The type of sexual, romantic, and/or physical attraction an individual feels toward others of the same or opposite sex.

**Single parent**
A Soldier who is the responsible adult who by reason of birth or legal decree, has physical custody of and the legal and moral responsibility to provide for the care and well-being of a child under the age of 18 years or for a person beyond 19 years of age who is mentally or physically incapable of self-care. Persons who fit this category are generally regarded as parents with full or joint custody of children, and who are unmarried, divorced, widowed, or residing apart from their spouse.

**Site**
A physically defined location which can be supported by a legal boundary survey which closes a polygon. It can be owned, leased, or otherwise possessed or used. A site may exist in one of three forms: land only; facility or facilities only; or land and all facilities on it. A site is a sum of all real property at a specific location.

**Social media**
Web-based tools, websites, applications, and media that connect users and allow them to engage in dialogue, share information, collaborate, and interact.

**Spouse**
The husband or wife of a Soldier. If such person is also in the military, see the term "dual-military couple."

**Strategic Support Area**
The area of cross-combatant command coordination to include the strategic sea and air lines of communications and the homeland. Joint sustainment functions required to support Multi-Domain Operations campaigning throughout the competition continuum emanate from the Strategic Support Area.

**Subject**
A person or a group of people who are alleged to have committed the action or offense that is the basis for a formal or informal complaint or investigation.

**Substantiated equal opportunity complaint**
A substantiated finding occurs when a preponderance of the evidence supports (more likely to have occurred than not occurred) the complainant's allegation of a violation of law, regulation or Army policy or standards. The documented facts indicate that a violation occurred.

**Substantiated violation**
A violation will be treated as substantiated if a violation of the policy results in a court-martial conviction, but the adjudged sentence does not include discharge or dismissal; or if a nonjudicial punishment authority under 10 USC 815 (reference a) has determined that a Soldier has committed an offense in violation of the policy and imposed nonjudicial punishment upon that Soldier. For contractor recruiters and trainers providing entry-level training, a violation will be treated as substantiated if the charge is supported by a preponderance of the evidence.

**Supervisor**
A commissioned officer, noncommissioned officer or DoD Civilian employee in a supervisory position.

**Supported commander**
In the context of the support command relationship, the commander who receives assistance from another commander's force or capabilities, and who is responsible for ensuring that the supporting commander understands the assistance required.

**Supporting commander**
In the context of a support command relationship, the commander who aids, protects, complements, or sustains another commander's force, and who is responsible for providing the assistance required by the supported commander.

**Third party**
A person or organization that attempts to present allegations on behalf of another individual.

**Transgender**
A person who lives as a member of a gender other than that expected based on their sex assigned at birth. May also be used as an umbrella term to cover and describe a range of identities that transgress socially defined gender norms.

**Uniformed Service**
The Army, Navy, Air Force, Marine Corps, Coast Guard, the Commissioned Corps of the Public Health Service, and the Commissioned Corps of the National Oceanic and Atmospheric Administration.

**Unrestricted reporting**
Unrestricted reporting allows a Soldier or eligible DA Civilian who is sexually assaulted and desires medical treatment, counseling, and an official investigation of their allegation to use current reporting channels (for example, the chain of command or law enforcement), or they may report the incident to the SARC or SHARP VA. Upon notification of a reported sexual assault, the SARC will immediately notify a SHARP VA. Additionally, with the victim's consent, the healthcare provider will conduct a forensic examination, which may include the collection of evidence. Details regarding the incident will be limited to only those personnel who have a legitimate need-to-know. (See app G for a detailed explanation of restricted and unrestricted reporting.)

**Unwelcome**
Conduct that is not solicited and which is considered objectionable by the person to whom it is directed and which is found to be undesirable or offensive using a reasonable person standard.

**Values**
Those things, people, and ideas that are important to an individual.

**Verbatim comments**
Comments made by a survey respondent that are recorded exactly as they appear in the survey and are transferred to the analysis report. Verbatim comments retain all the spelling and grammatical content of the original along with as much stylistic or emphatic markings as is possible.

**Victim**
In the SHARP context, a person who asserts direct physical, emotional, or pecuniary harm as a result of the commission of a sexual assault or an act of sexual harassment. The term encompasses all persons 18 and over eligible to receive treatment in military medical treatment facilities.



**SECRETARY OF THE ARMY**
**WASHINGTON**

2 4 SEP 2021

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT: Army Directive 2021-33 (Approval and Appeal Authorities for Military Medical and Administrative Immunization Exemptions)

1. References.

    a. Department of Defense Instruction 1300.17 (Religious Liberty in the Military Services), 1 September 2020

    b. Army Regulation (AR) 40–562 (Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases), 7 October 2013

    c. AR 600–20 (Army Command Policy), 24 July 2020

2. Purpose. To establish approval and appeal authorities for requests for medical exemptions (temporary or permanent) and administrative exemptions (including religious accommodations) from mandatory immunizations submitted pursuant to references 1b and 1c.

3. Applicability. This policy applies to the Regular Army, Army National Guard/Army National Guard of the United States, and U.S. Army Reserve.

4. Policy.

    a. Medical Exemption Requests.

        (1) Temporary Medical Exemption Requests (up to 365 days). Healthcare providers are the approval and denial authorities for all temporary medical exemption requests. The term "healthcare providers" refers to physicians, physician assistants, and nurse practitioners.

        (2) Permanent Medical Exemption Requests.

        (a) The initial approval and denial authority for COVID-19 vaccine permanent medical exemption requests is the commanding general of the regional health command where the Soldier is assigned.

        (b) The appeal authority for COVID-19 vaccine permanent medical exemption requests is The Surgeon General, whose decisions are final.

SUBJECT: Army Directive 2021-33 (Approval and Appeal Authorities for Military Medical and Administrative Immunization Exemptions)

(c)  Healthcare providers (as defined in paragraph 4a(1)) are the approval and denial authority for all other required vaccines.

b.  Administrative Exemptions.

(1)  Religious Accommodation Requests.

(a)  Pursuant to AR 600–20, The Surgeon General is the initial approval and denial authority for religious accommodation requests for all immunization exemptions.

(b)  The appeal authority is the Assistant Secretary of the Army for Manpower and Reserve Affairs, whose decision is final.

(2)  Other Administrative Exemption Requests (other than a religious accommodation request). The approval and denial authority for an administrative exemption request as enumerated in reference 1b, table C–2, is the Soldier's commander at O-6 level or above unless withheld by other law, policy, or regulation. For units without a commander at that level, the first general officer in the chain of command will serve as the approval authority. This decision is final.

5.  Supplemental Procedures. Follow the procedures outlined in references 1b and 1c for immunization exemption requests. As necessary, The Surgeon General will facilitate publication of supplemental procedures implementing this guidance within 30 days of its issuance.

6.  Proponent. The Surgeon General is the proponent for this policy, responsible for coordinating with the Deputy Chief of Staff, G-1 to ensure its provisions are incorporated in AR 40–562 and AR 600–20 within 2 years from the date of this directive.

7.  Duration. This directive is rescinded on publication of the revised regulations.

Christine E. Wormuth

DISTRIBUTION:
Principal Officials of Headquarters, Department of the Army
Commander
    U.S. Army Forces Command
(CONT)

2

SUBJECT: Army Directive 2021-33 (Approval and Appeal Authorities for Military Medical and Administrative Immunization Exemptions)

DISTRIBUTION: (CONT)
    U.S. Army Training and Doctrine Command
    U.S. Army Materiel Command
    U.S. Army Futures Command
    U.S. Army Pacific
    U.S. Army Europe and Africa
    U.S. Army Central
    U.S. Army North
    U.S. Army South
    U.S. Army Special Operations Command
    Military Surface Deployment and Distribution Command
    U.S. Army Space and Missile Defense Command/Army Strategic Command
    U.S. Army Cyber Command
    U.S. Army Medical Command
    U.S. Army Intelligence and Security Command
    U.S. Army Criminal Investigation Command
    U.S. Army Corps of Engineers
    U.S. Army Military District of Washington
    U.S. Army Test and Evaluation Command
    U.S. Army Human Resources Command
Superintendent, U.S. Military Academy
Director, U.S. Army Acquisition Support Center
Superintendent, Arlington National Cemetery
Commandant, U.S. Army War College
Director, U.S. Army Civilian Human Resources Agency

CF:
Director of Business Transformation
Commander, Eighth Army



# ANNEX XX Refusals and Medical/Religious Exemptions Process

## Mandatory Vaccination Declination

Soldier Declines Immunization

Commander counsels Soldier using Annex NN or OO to HQDA EXORD 225-21, FRAGO 5

Soldier views mandatory educational video

Following the mandatory video, the Soldier's immediate commander directs Soldier to comply with the order to receive the vaccination

Soldier Declines Immunization

Immediate commander directs Soldier to meet with designated medical professional (Physician, Physician Assistant, or Nurse Practitioner) to discuss vaccine and concerns

Immediate commander orders Soldier to receive vaccination

Soldier Declines Immunization

Commander contacts SJA regarding steps to issue GOMOR

## Medical Exemption

Soldier Declines Immunization

Commander counsels Soldier using Annex NN or OO to HQDA EXORD 225-21, FRAGO 5

PCM (or equivalent) assess the Soldier

If temporary exemption (up to 365 days) indicated, PCM will document in MEDPROS
**Approved**

If temporary exemption is denied, PCM administers vaccine if Soldier agrees and documents in MEDPROS; if Soldier declines, PCM refers Soldier back to Commander
**Disapproved**

PCM recommendation for approval or disapproval of permanent exemption is forwarded to RHC-CG for action
**Recommended**

RHC-CG approves permanent exemption (document in MEDPROS)
**Approved**

RHC-CG disapproves permanent exemption
**Disapproved**

Soldier elects to appeal to TSG

TSG approves appeal (document in MEDPROS)
**Approved**

TSG disapproves appeal
**Disapproved**

Commander is notified, orders Soldier to take vaccine, and if Soldier refuses, contacts SJA regarding steps to issue GOMOR

## Religious Exemption
### (subset of Administrative Exemptions)

Soldier Declines Immunization

Commander counsels Soldier using Annex NN or OO to HQDA EXORD 225-21, FRAGO 5

Chaplain interviews Soldier; assess the basis and sincerity of belief; provides input (memo) for CoC

PCM (or equivalent) counsels Soldier to ensure that they are making an informed decision on risk

Commanders (CO/BN/BDE) provide CoC recommendations of approval or disapproval to GCMCA

OSJA conducts legal review, drafts recommendations for GCMCA

GCMCA recommends approval or disapproval and upload the request into TMT to TSG

TSG approves exemption (document in MEDPROS)
**Approved**

TSG disapproves exemption
**Disapproved**

Soldier elects to appeal to ASA(M&RA)

ASA(M&RA) approves appeal (document in MEDPROS)
**Approved**

ASA(M&RA) disapproves appeal
**Disapproved**

Commander is notified, orders Soldier to take vaccine, and if Soldier refuses, contacts SJA regarding steps to issue GOMOR

*ARNG see paragraph 3.D.8.B.8

## DEVELOPMENTAL COUNSELING FORM
For use of this form, see ATP 6-22.1; the proponent agency is TRADOC.

### DATA REQUIRED BY THE PRIVACY ACT OF 1974

| | |
|---|---|
| **AUTHORITY:** | 5 USC 301, Departmental Regulations; 10 USC 3013, Secretary of the Army. |
| **PRINCIPAL PURPOSE:** | To assist leaders in conducting and recording counseling data pertaining to subordinates. |
| **ROUTINE USES:** | The DoD Blanket Routine Uses set forth at the beginning of the Army's compilation of systems or records notices also apply to this system. |
| **DISCLOSURE:** | Disclosure is voluntary. |

### PART I - ADMINISTRATIVE DATA

| Name *(Last, First, MI)* | | Rank/Grade | Date of Counseling |
|---|---|---|---|
| Organization | | Name and Title of Counselor | |

### PART II - BACKGROUND INFORMATION

**Purpose of Counseling:** *(Leader states the reason for the counseling, e.g. Performance/Professional or Event-Oriented counseling, and includes the leader's facts and observations prior to the counseling.)*

***TEMPLATE COUNSELING STATEMENT FOR ENLISTED SOLDIERS DECLINING IMMUNIZATION***

On 24 August 2021, the Secretary of Defense directed the Secretary of the Army to begin full vaccination of the U.S. Army against the COVID-19 disease.

On _____, you declined to receive the COVID-19 vaccine.

### PART III - SUMMARY OF COUNSELING
Complete this section during or immediately subsequent to counseling.

**Key Points of Discussion:**

[The following is sample language for the counseling required by AR 600-20, paragraph 5-4g(2). Please note that this counseling must be tailored to the specific facts of the case. Prior to issuing this counseling, Commanders will consult with their servicing Judge Advocate].

1. The purpose of the COVID-19 vaccines is to prevent the spread of the COVID-19 disease.

2. The COVID-19 disease may be present in a possible area of operation.

3. The COVID-19 vaccines are safe and effective at preventing the COVID-19 disease and reducing the risk of severe illness and death. COVID-19 vaccines reduce the risk of people spreading the virus that causes COVID-19. While you may have side effects after your vaccination, these are normal and should go away within a few days. It typically takes 2 weeks after vaccination for the body to build protection (immunity) against the virus that causes COVID-19. You are not fully vaccinated until 2 weeks after the second dose of a 2-dose vaccine or 2 weeks after a single dose vaccine. You can learn more about the COVID-19 vaccines at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/index.html. Additionally, you may discuss any concerns you have about receiving the vaccine with medical professionals.

4. You are hereby ordered to become fully vaccinated with a COVID-19 vaccine that has received full licensure from the Food and Drug Administration (FDA), in accordance with FDA-approved labeling and guidance NLT _____, subject to the availability of vaccines. This is a lawful order. Failure to obey this order may result in punitive or adverse administrative action. Voluntary immunization with a COVID-19 vaccine under FDA Emergency Use Authorization or World Health Organization Emergency Use Listing in accordance with applicable dose requirements prior to, or after receiving this order, constitutes compliance with this order.

5. If you believe you should be granted a medical exemption, then discuss this with your health care provider. If you have already been vaccinated, you must provide valid proof of vaccination for inclusion in your medical records. If you wish to submit an administrative exemption request under AR 40-562, including a request for a religious accommodation, you must request it through your chain-of-command. Soldiers with active pending immunization exemption requests will not be immunized or subjected to adverse action for refusal to receive the vaccine, pending the outcome of their request or any appeal of a denied request. If you continue to refuse to be immunized after final denial of your exemption request/appeal, you will be in violation of my order in paragraph 4 above. You are further advised IAW AR 600-20, Appendix P-2b(4) that noncompliance with immunization requirements may adversely impact deployability, assignment, or international travel and that exemptions may be revoked under imminent risk conditions.

I am counseling you for the conduct noted above. Continued conduct of this nature may result in initiation of a bar to reenlistment, administrative action to include your separation from the service, and/or punitive action under the UCMJ. If this conduct continues, action may be initiated to involuntarily separate you from the service under AR 635-200. If you are involuntarily separated, you could receive an Honorable, General Under Honorable Conditions, or Other Than Honorable discharge. If you receive an Honorable Discharge, you will be qualified for most benefits resulting from your military service. If you receive a General Under Honorable Conditions Discharge or an Other Than Honorable Discharge, you may be disqualified from reenlisting in the service for some period and you may be ineligible for many, if not all, veterans benefits to include but not limited to the Montgomery G.I. Bill and post-9/11 G.I. Bill. If you receive a General Under Honorable Conditions or Other Than Honorable Discharge, you may face difficulty obtaining civilian employment as employers may have low regard for less than Honorable discharges.

### OTHER INSTRUCTIONS

This form will be destroyed upon: reassignment *(other than rehabilitative transfers)*, separation at ETS, or upon retirement. For separation requirements and notification of loss of benefits/consequences see local directives and AR 635-200.

**DA FORM 4856, JUL 2014**     PREVIOUS EDITIONS ARE OBSOLETE.

**Plan of Action** *(Outlines actions that the subordinate will do after the counseling session to reach the agreed upon goal(s). The actions must be specific enough to modify or maintain the subordinate's behavior and include a specified time line for implementation and assessment (Part IV below)*

MANDATORY VACCINATION DECLINATION:

(1) NLT 3 duty days after receipt of this counseling, the Service member will watch an educational video on the benefits of vaccination. The video is available at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html. _____ (SM initial when complete) _____ (CDR initial when complete)

(2) NLT 3 duty days after the Service member watches the mandatory video, the immediate commander directs the Service member to comply with the order on page 1, paragraph 4. _____ (SM initial when complete) _____ (CDR initial when complete)

(3) If the SM continues to refuse immunization, the commander directs the Soldier to meet with a medical professional (physician, physician assistant, or nurse practitioner) to discuss the vaccine and any concerns. _____ (SM initial when complete) _____ (CDR initial when complete)

(4) NLT 3 duty days after the Service member consults with a medical professional, the immediate commander directs the Service member to comply with the order on page 1, paragraph 4. _____ (SM initial when complete) _____ (CDR initial when complete)

TEMPORARY OR PERMANENT MEDICAL EXEMPTION REQUESTS:

(1) If requesting a temporary or permanent medical exemption, the Service member will contact the Service member's Primary Care Manager (PCM) or equivalent (physician, physician assistant, or nurse practitioner) NLT 3 duty days after receipt of this counseling. The Service member will schedule the next available appointment with the PCM or equivalent. _____ (SM initial when complete) _____ (CDR initial when complete) The appointment is _____

(2) If the request for a temporary medical exemption is denied, the Service member may request a second opinion NLT 3 duty days after notification of the denial. The denial authority will provide information on requesting a second opinion. _____ (SM initial when complete) _____ (CDR initial when complete)

(3) If the Commanding General, Regional Health Command (TSG) through command channels NLT 3 duty days after notification of the denial. _____ (SM initial when complete) _____ (CDR initial when complete)

RELIGIOUS EXEMPTION REQUESTS:

(1) If requesting a religious exemption, the Service member will submit a written request for a religious exemption IAW AR 600-20, Appendix P-2b(1) to the immediate commander NLT 3 duty days after receipt of this counseling. _____ (SM initial when complete) _____ (CDR initial when complete)

(2) The commander will arrange for an interview with the assigned unit Chaplain or other Chaplain determined by the senior Chaplain present, NLT 3 duty days after the commander receives the Service member's request for a religious exemption. _____ (SM initial when complete) _____ (CDR initial when complete)

(3) The commander will arrange for a PCM or equivalent to counsel the Service member to ensure the Service member is making an informed decision IAW AR 600-20, Appendix P-2b(3) _____ (SM initial when complete) _____ (CDR initial when complete)

(4) If TSG denies the request, the Service member may appeal to the Assistant Secretary of the Army (Manpower and Reserve Affairs) through command channels NLT 3 duty days after notification of the denial. _____ (SM initial when complete) _____ (CDR initial when complete)

**Session Closing:** *(The leader summarizes the key points of the session and checks if the subordinate understands the plan of action. The subordinate agrees/disagrees and provides remarks if appropriate.)*

Individual counseled: ☐ I agree    ☐ disagree with the information above.

Individual counseled remarks:




Signature of Individual Counseled: _____     Date: _____

**Leader Responsibilities:** *(Leader's responsibilities in implementing the plan of action.)*

Leaders will ensure Service member has the opportunity to discuss any request for an administrative or medical exemption with the chain-of-command, medical, Chaplain, and/or legal professionals, as appropriate.



Signature of Counselor: _____     Date: _____

### PART IV - ASSESSMENT OF THE PLAN OF ACTION

**Assessment:** *(Did the plan of action achieve the desired results? This section is completed by both the leader and the individual counseled and provides useful information for follow-up counseling.)*




Counselor: _____    Individual Counseled: _____    Date of Assessment: _____

## Note:  Both the counselor and the individual counseled should retain a record of the counseling.

# DEVELOPMENTAL COUNSELING FORM
For use of this form, see ATP 6-22.1; the proponent agency is TRADOC.

## DATA REQUIRED BY THE PRIVACY ACT OF 1974

**AUTHORITY:** 5 USC 301, Departmental Regulations; 10 USC 3013, Secretary of the Army.

**PRINCIPAL PURPOSE:** To assist leaders in conducting and recording counseling data pertaining to subordinates.

**ROUTINE USES:** The DoD Blanket Routine Uses set forth at the beginning of the Army's compilation of systems or records notices also apply to this system.

**DISCLOSURE:** Disclosure is voluntary.

## PART I - ADMINISTRATIVE DATA

| Name *(Last, First, MI)* | | Rank/Grade | Date of Counseling |
|---|---|---|---|
| Organization | | Name and Title of Counselor | |

## PART II - BACKGROUND INFORMATION

**Purpose of Counseling:** *(Leader states the reason for the counseling, e.g. Performance/Professional or Event-Oriented counseling, and includes the leader's facts and observations prior to the counseling.)*

***TEMPLATE COUNSELING STATEMENT FOR OFFICERS DECLINING IMMUNIZATION***

On 24 August 2021, the Secretary of Defense directed the Secretary of the Army to begin full vaccination of the U.S. Army against the COVID-19 disease.

On _____, you declined to receive the COVID-19 vaccine.

## PART III - SUMMARY OF COUNSELING
### Complete this section during or immediately subsequent to counseling.

**Key Points of Discussion:**

[The following is sample language for the counseling required by AR 600-20, paragraph 5-4g(2). Please note that this counseling must be tailored to the specific facts of the case. Prior to issuing this counseling, Commanders will consult with their servicing Judge Advocate].

1. The purpose of the COVID-19 vaccines is to prevent the spread of the COVID-19 disease.

2. The COVID-19 disease may be present in a possible area of operation.

3. The COVID-19 vaccines are safe and effective at preventing the COVID-19 disease and reducing the risk of severe illness and death. COVID-19 vaccines reduce the risk of people spreading the virus that causes COVID-19. While you may have side effects after your vaccination, these are normal and should go away within a few days. It typically takes 2 weeks after vaccination for the body to build protection (immunity) against the virus that causes COVID-19. You are not fully vaccinated until 2 weeks after the second dose of a 2-dose vaccine or 2 weeks after a single dose vaccine. You can learn more about the COVID-19 vaccines at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/index.html. Additionally, you may discuss any concerns you have about receiving the vaccine with medical professionals.

4. You are hereby ordered to become fully vaccinated with a COVID-19 vaccine that has received full licensure from the Food and Drug Administration (FDA), in accordance with FDA-approved labeling and guidance NLT _____, subject to the availability of vaccines. This is a lawful order. Failure to obey this order may result in punitive or adverse administrative action. Voluntary immunization with a COVID-19 vaccine under FDA Emergency Use Authorization or World Health Organization Emergency Use Listing in accordance with applicable dose requirements prior to, or after receiving this order, constitutes compliance with this order.

5. If you believe you should be granted a medical exemption, then discuss this with your health care provider. If you have already been vaccinated, you must provide valid proof of vaccination for inclusion in your medical records. If you wish to submit an administrative exemption request under AR 40-562, including a request for a religious accommodation, you must request it through your chain-of-command. Soldiers with active pending immunization exemption requests will not be immunized or subjected to adverse action for refusal to receive the vaccine, pending the outcome of their request or any appeal of a denied request. If you continue to refuse to be immunized after final denial of your exemption request/appeal, you will be in violation of my order in paragraph 4 above. You are further advised IAW AR 600-20, Appendix P-2b(4) that noncompliance with immunization requirements may adversely impact deployability, assignment, or international travel and that exemptions may be revoked under imminent risk conditions.

I am counseling you for the conduct noted above. Be advised that continued conduct of this nature may result in administrative action to include your separation from the service, and/or punitive action under the UCMJ. If this conduct continues, action may be initiated to involuntarily separate you from the service under AR 600-8-24. If you are involuntarily separated, you could receive an Honorable, General Under Honorable Conditions, or Other Than Honorable discharge.  If you receive an Honorable discharge, you will be qualified for most benefits resulting from your military service. If you receive a General Under Honorable Conditions discharge or an Other Than Honorable discharge, you may be ineligible for many, if not all, veterans benefits. If you receive a General Under Honorable Conditions or Other Than Honorable Discharge, you may face difficulty in obtaining civilian employment as employers may have a low regard for less than Honorable discharges.

## OTHER INSTRUCTIONS

This form will be destroyed upon: reassignment *(other than rehabilitative transfers)*, separation at ETS, or upon retirement. For separation requirements and notification of loss of benefits/consequences see local directives and AR 635-200.

**DA FORM 4856, JUL 2014**            PREVIOUS EDITIONS ARE OBSOLETE.

**Plan of Action** *(Outlines actions that the subordinate will do after the counseling session to reach the agreed upon goal(s). The actions must be specific enough to modify or maintain the subordinate's behavior and include a specified time line for implementation and assessment (Part IV below)*

MANDATORY VACCINATION DECLINATION:
(1) NLT 3 duty days after receipt of this counseling, the Service member will watch an educational video on the benefits of vaccination. The video is available at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html. _____ (SM initial when complete) _____ (CDR initial when complete)
(2) NLT 3 duty days after the Service member watches the mandatory video, the immediate commander directs the Service member to comply with the order on page 1, paragraph 4. _____ (SM initial when complete) _____ (CDR initial when complete)
(3) If the SM continues to refuse immunization, the commander directs the Soldier to meet with a medical professional (physician, physician assistant, or nurse practitioner) to discuss the vaccine and any concerns. _____ (SM initial when complete) _____ (CDR initial when complete)
(4) NLT 3 duty days after the Service member consults with a medical professional, the immediate commander directs the Service member to comply with the order on page 1, paragraph 4. _____ (SM initial when complete) _____ (CDR initial when complete)
TEMPORARY OR PERMANENT MEDICAL EXEMPTION REQUESTS:
(1) If requesting a temporary or permanent medical exemption, the Service member will contact the Service member's Primary Care Manager (PCM) or equivalent (physician, physician assistant, or nurse practitioner) NLT 3 duty days after receipt of this counseling. The Service member will schedule the next available appointment with the PCM or equivalent. _____ (SM initial when complete) _____ (CDR initial when complete) The appointment is _____
(2) If the request for a temporary medical exemption is denied, the Service member may request a second opinion NLT 3 duty days after notification of the denial. The denial authority will provide information on requesting a second opinion. _____ (SM initial when complete) _____ (CDR initial when complete)
(3) If the Commanding General, Regional Health Command denies the permanent medical exemption request, the Service member may appeal to The Surgeon General (TSG) through command channels NLT 3 duty days after notification of the denial. _____ (SM initial when complete) _____ (CDR initial when complete)
RELIGIOUS EXEMPTION REQUESTS:
(1) If requesting a religious exemption, the Service member will submit a written request for a religious exemption IAW AR 600-20, Appendix P-2b(1) to the immediate commander NLT 3 duty days after receipt of this counseling. _____ (SM initial when complete) _____ (CDR initial when complete)
(2) The commander will arrange an interview with the assigned unit Chaplain or other Chaplain determined by the senior Chaplain present, NLT 3 duty days after the commander receives the Service member's request for a religious exemption. _____ (SM initial when complete) _____ (CDR initial when complete)
(3) The commander will arrange for a PCM or equivalent to counsel the Service member to ensure the Service member is making an informed decision IAW AR 600-20, Appendix P-2b(3) _____ (SM initial when complete) _____ (CDR initial when complete)
(4) If TSG denies the request, the Service member may appeal to the Assistant Secretary of the Army (Manpower and Reserve Affairs) through command channels NLT 3 duty days after notification of the denial. _____ (SM initial when complete) _____ (CDR initial when complete)

**Session Closing:** *(The leader summarizes the key points of the session and checks if the subordinate understands the plan of action. The subordinate agrees/disagrees and provides remarks if appropriate.)*

Individual counseled:  ☐ I agree  ☐ disagree with the information above.

Individual counseled remarks:

Signature of Individual Counseled: _____  Date: _____

**Leader Responsibilities:** *(Leader's responsibilities in implementing the plan of action.)*

Leaders will ensure Service member has the opportunity to discuss any request for an administrative or medical exemption with the chain-of-command, medical, Chaplain, and/or legal professionals, as appropriate.

Signature of Counselor: _____  Date: _____

## PART IV - ASSESSMENT OF THE PLAN OF ACTION

**Assessment:** *(Did the plan of action achieve the desired results? This section is completed by both the leader and the individual counseled and provides useful information for follow-up counseling.)*

Counselor: _____  Individual Counseled: _____  Date of Assessment: _____

## Note:  Both the counselor and the individual counseled should retain a record of the counseling.

**Army Regulation 600–37**

**Personnel–General**

# Unfavorable Information

**Headquarters**
**Department of the Army**
**Washington, DC**
**2 October 2020**

# UNCLASSIFIED

# *SUMMARY of CHANGE*

AR 600–37
Unfavorable Information

This regulation is certified current on 2 October 2020. Aside from the following administrative changes, no other changes were made to certify the currency of this regulation—

o    Updates Department of the Army signature authority and history statement (title page).

o    Updates Uniform Code of Military Justice article number (para 3–4*b*(2)).

o    Updates Uniform Code of Military Justice nomenclature (para 3–4*b*(5)).

o    Updates titles of references and associated websites (app A).

o    Adds "United States Code" to the glossary.

**Headquarters**
**Department of the Army**
**Washington, DC**
**2 October 2020**

**\*Army Regulation 600–37**

**Effective 10 May 2018**

Personnel–General

## Unfavorable Information

By Order of the Secretary of the Army:

**JAMES C. MCCONVILLE**
*General, United States Army*
*Chief of Staff*

Official:

**KATHLEEN S. MILLER**
*Administrative Assistant*
*    to the Secretary of the Army*

**History.**  This regulation is certified current on 2 October 2020. Aside from the administrative changes listed in the summary of change, no other changes were made to certify the currency of this regulation.

**Summary.**  This regulation implements policies regarding unfavorable information considered for inclusion in official personnel files.

**Applicability.**  This regulation applies to the Regular Army, the Army National Guard/Army National Guard of the United States and the U.S. Army Reserve, unless otherwise stated.

**Proponent and exception authority.** The proponent of this regulation is the Deputy Chief of Staff, G–1. The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or its direct reporting unit or field operating agency, in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include a formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25–30 for specific guidance.

**Army internal control process.** This regulation contains internal control provisions in accordance with AR 11–2 and identifies key internal controls that must be evaluated (see app B).

**Supplementation.**  Supplementation of this regulation is prohibited without prior approval from the Deputy Chief of Staff, G–1 (DAPE–MPS), 300 Army Pentagon, Washington DC 20310–0300.

**Suggested    improvements.**  Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) direct to the Deputy Chief of Staff, G–1 (DAPE–MPS), 300 Army Pentagon, Washington DC 20310–0300.

**Distribution.**  This publication is available in electronic media only and is intended for the Regular Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve.

---

## Contents (Listed by paragraph and page number)

**Chapter 1**
**Introduction,** *page 1*
Purpose • 1–1, *page 1*
References and forms • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Responsibilities • 1–4, *page 1*
Records management (recordkeeping) requirements • 1–5, *page 1*
Objectives • 1–6, *page 1*

**Chapter 2**
**Responsibilities,** *page 1*
Headquarters, Department of the Army Principal Officials • 2–1, *page 1*
Assistant Secretary of the Army (Manpower and Reserve Affairs) • 2–2, *page 1*
Deputy Chief of Staff, G–1 • 2–3, *page 2*
Deputy Chief of Staff, G–2 • 2–4, *page 2*
Commanders, Army commands, Army service component commands, direct reporting units, and other commanders • 2–5, *page 2*

---

*\*This regulation supersedes AR 600–37, 10 April 2018.*

# UNCLASSIFIED

Contents—Continued

**Chapter 3**
**Unfavorable Information in Army Military Human Resources Record,** *page 3*
General • 3–1, *page 3*
Policies • 3–2, *page 3*
Filing of information exempt from the referral procedure • 3–3, *page 3*
Filing of information on sex-related offenses • 3–4, *page 4*
Filing of nonpunitive administrative memoranda of reprimand, admonition, or censure • 3–5, *page 5*
Anonymous communications • 3–6, *page 7*
Referral of information • 3–7, *page 7*

**Chapter 4**
**Unfavorable Information in Counterintelligence and Investigative Files,** *page 7*
General • 4–1, *page 7*
Security clearance • 4–2, *page 7*
Resolution of unfavorable information in counterintelligence and investigative files • 4–3, *page 7*
Use of counterintelligence and investigative files in personnel actions • 4–4, *page 8*

**Chapter 5**
**Unfavorable Information in Army Law Enforcement Files,** *page 8*
Authorities for filing and using unfavorable information • 5–1, *page 8*
Disposition of information in law enforcement files • 5–2, *page 8*
Access to law enforcement investigative files • 5–3, *page 9*

**Chapter 6**
**Organization and Procedures of the Department of the Army Suitability Evaluation Board,** *page 9*
Board membership and voting procedures • 6–1, *page 9*
Department of the Army Suitability Evaluation Board Filing Determinations • 6–2, *page 9*
Department of the Army Suitability Evaluation Board process • 6–3, *page 10*

**Chapter 7**
**Appeals,** *page 12*
Appeal authority • 7–1, *page 12*
Policies and Standards • 7–2, *page 12*
Processing appeals–Army Military Human Resource Record • 7–3, *page 13*
Processing appeals–locally filed • 7–4, *page 13*
Amendment rights • 7–5, *page 14*
Appeal review priorities • 7–6, *page 14*
Correction of military records–Army Board for Correction of Military Records • 7–7, *page 14*

**Appendixes**

**A.**   References, *page 15*

**B.**   Internal Control Evaluation, *page 18*

**Glossary**

# Chapter 1
# Introduction

## 1–1. Purpose
This regulation sets forth policies and procedures to ensure the best interests of both the Army and Soldiers are served by authorizing unfavorable information to be placed in, transferred within, or removed from an individual's Army Military Human Resource Record (AMHRR).

## 1–2. References and forms
See appendix A.

## 1–3. Explanation of abbreviations and terms
See glossary.

## 1–4. Responsibilities
See chapter 2.

## 1–5. Records management (recordkeeping) requirements
The records management requirement for all record numbers, associated forms, and reports required by this regulation are addressed in the Army Records Retention Schedule–Army (RRS–A). Detailed information for all related record numbers, forms, and reports are located in ARIMS/RRS–A at https://www.arims.army.mil. If any record numbers, forms, and reports are not current, addressed, and/or published correctly in ARIMS/RRS–A, see DA Pam 25–403 for guidance.

## 1–6. Objectives
Objectives of this regulation are to—
   *a.* Apply fair and just standards to all Soldiers.
   *b.* Protect the rights of individual Soldiers, and at the same time, permit the Army to consider all available relevant information when choosing Soldiers for positions of significant trust and authority (POSTA) or positions or appointments screened for suitability (PASS) in accordance with Secretary of the Army (SECARMY) Memorandum, dated 12 February 2014.
   *c.* Prevent adverse personnel actions based on unsubstantiated derogatory information, irrelevant or untimely information, or mistaken identity.
   *d.* Provide a means of correcting injustices if they occur.
   *e.* Ensure that Soldiers of poor moral character are not continued in the Army or selected for POSTA or PASS.

# Chapter 2
# Responsibilities

## 2–1. Headquarters, Department of the Army Principal Officials
HQDA Principal Officials will—
   *a.* Ensure continuous screening of official records for suitability information, and refer unresolvable cases to the Department of the Army Suitability Evaluation Board (DASEB).
   *b.* Take necessary action(s) for carrying out the DASEB or Deputy Assistant Secretary of the Army (Review Boards) (DASA (RB)) decisions on cases that have been reviewed or referred to them by higher authority.

## 2–2. Assistant Secretary of the Army (Manpower and Reserve Affairs)
The ASA (M&RA) will—
   *a.* Oversee administration of the DASEB (a continuing board within the Army Review Boards Agency (ARBA)) as the initial appeal authority for unfavorable information entered in the AMHRR under this regulation.
   *b.* Ensure the DASA (RB)—
   (1) Monitors DASEB membership and appoints a president, as required.
   (2) Prescribes policies governing operations of the DASEB.

(3)  Approves, disapproves, or refers to higher authority for proper action(s) on all adverse DASEB determinations concerning the filing of unfavorable information in a Soldier's AMHRR.

(4)  Directs actions on all other DASEB determinations as deemed proper (ensuring compliance with chap 6).

(5)  Monitors and oversees all DASEB activities not otherwise prescribed.

(6)  Delegates authority for responsibilities in paragraphs 2–2*b*(1) through 2–2*b*(5) to the Director, MRB, as appropriate.

*c.*  Also, on behalf of the ASA (M&RA), DASEB will—

(1)  Determine whether unfavorable information should be filed in the performance portion of the AMHRR when cases or actions are referred. The DASEB may also recommend potential separation or elimination action(s) to the U.S. Army Human Resources Command (HRC).

(2)  Recommend the filing of unfavorable information to the DASA (RB). The DASEB will not recommend filing of unfavorable information that has not been referred to the recipient, even if such filing would be otherwise permissible under this regulation.

(3)  Review and evaluate evidence presented to support appeals for removing or transferring unfavorable information from the performance portion of the AMHRR.

(4)  Revise, alter, or remove unfavorable information covered by this regulation from the AMHRR that is determined upon appeal to be untrue or unjust, in whole or in part (see chap 7).

(5)  Transfer those administrative memoranda of reprimand, admonition, or censure that are determined upon appeal to have served their intended purpose from the performance to the restricted portion of the AMHRR, when such transfer would be in the best interest of the Army. Transfer of such memoranda is subject to stipulations noted in paragraphs 7–2*d*(3).

(6)  Transfer records of non-judicial punishment (proceedings pursuant to Article 15, Uniform Code of Military Justice (UCMJ, Art. 15)) that are determined upon appeal to have served their intended purpose from the performance to the restricted portion of the AMHRR, when such transfer would be in the best interest of the Army. Transfer of such records is subject to stipulations noted in paragraph 7–2*d*(3).

## 2–3.  Deputy Chief of Staff, G–1

The DCS, G–1 will establish policy pertaining to—

*a.*  The filing of unfavorable information in the AMHRR (see chap 3).

*b.*  Removing information under appeal procedures in chapter 7.

*c.*  Transferring information from the performance portion of a Soldier's AMHRR to the restricted portion of the AMHRR (listed under appeal procedures in chap 7).

*d.*  Ensuring that the Commanding General, HRC initiates flagging actions under AR 600–8–2, pending a final decision on the proposed filing of unfavorable information in a Soldier's AMHRR.

## 2–4.  Deputy Chief of Staff, G–2

The DCS, G–2 will—

*a.*  Ensure the U.S. Army Intelligence and Security Command provides assistance to the DASEB by making necessary records available, as required.

*b.*  Set forth procedures to release information from counterintelligence and personnel security records to commanders and the DASEB, as required.

## 2–5.  Commanders, Army commands, Army service component commands, direct reporting units, and other commanders

Commanders, ACOMs, ASCCs, DRUs, and other commanders will—

*a.*  Ensure that subordinate commanders are properly informed, and take appropriate action(s) with reference to unfavorable information concerning members of their commands (prescribed in chaps 3 and 5).

*b.*  Refer cases to the DASEB, when, because of unusual circumstances or complexities, unfavorable information of a serious nature concerning members or former members of their commands cannot properly be acted upon in accordance with their authority.

*c.*  Commanders of law enforcement and Army intelligence agencies responsible for maintaining law enforcement and counterintelligence records may release such records as specified in this regulation, and those outlined in AR 20–1, AR 40–66, AR 40–400, AR 190–45, and AR 381–45.

*d.*  Law enforcement agencies will (in accordance with AR 190–45, AR 195–2, and chap 5 of this regulation)—

(1)  Advise the DASEB (or other proper Headquarters, Department of the Army (HQDA) adjudicating agencies) upon request, when unfavorable information is provided for criminal justice action on an individual.

(2)  Provide file copies (or extracts thereof) to these requestors, as appropriate.

(3)  Ensure that the decisions of adjudicating agencies, relative to information provided, are attached to the file report.

## Chapter 3
## Unfavorable Information in Army Military Human Resources Record

### 3–1.  General
Personnel management decisions will be based on the following:

*a.*  Review of a Soldier's AMHRR when selecting Soldiers for POSTA or PASS.

*b.*  The knowledge and best judgment of the commander, board (based on direction given in the applicable memorandum of instruction), or other responsible authority. Both favorable and unfavorable information regarding the Soldier will be considered.

### 3–2.  Policies
*a.*  Except as indicated in paragraph 3–3, unfavorable information will not be filed in the AMHRR unless the recipient has been given:

(1)  The opportunity to review the documentation that serves as the basis for the proposed filing—

*(a)*  The documentation will be reviewed by the release authority prior to forwarding to the recipient to ensure personally identifying information and other sensitive information, such as social security numbers and home addresses, has been redacted.

*(b)*  Redactions should be minimal; however, to ensure the recipient is afforded full due process rights in providing a meaningful rebuttal.

*(c)*  The privileged and confidential nature of information in inspector general (IG) records requires special attention. Provisions for requesting access and use of IG reports are addressed in AR 20–1.

(2)  A reasonable amount of time to make a written statement in response—

*(a)*  This statement may include evidence that rebuts, explains, or mitigates the unfavorable information (see para 3–7).

*(b)*  The recipient may also elect to decline, in writing, the opportunity to provide a written response.

*b.*  The issuing authority should fully affirm and document unfavorable information to be considered for inclusion in the AMHRR.

*c.*  Unfavorable information filed in the AMHRR must meet Title 5, United States Code, Section 552a (5 USC 552a), standards of accuracy, relevance, timeliness, and completeness. Access to the AMHRR is governed by AR 600–8–104.

*d.*  Unfavorable information filed in the AMHRR that indicates sub-standard leadership ability, and a lack of promotion potential, morals, or integrity must be identified early, and shown in those permanent official personnel records that are available to personnel managers and selection board members for use in making POSTA or PASS personnel decisions. Other unfavorable character traits of a permanent nature should be similarly recorded.

*e.*  Unfavorable information that has been directed for filing in the restricted portion of the AMHRR may be considered for making determinations under this regulation.

*f.*  Information reflecting a Soldier's refusal to consent to a polygraph examination will not be recorded in the AMHRR.

### 3–3.  Filing of information exempt from the referral procedure
The following information may be filed in the performance portion of the AMHRR without further referral to the recipient:

*a.  Records.*  Records of courts-martial and court-martial orders and records of proceedings pursuant to UCMJ, Art. 15 (see AR 600–8–104).

*b.  Proceedings of boards of officers.*  It must be clear the recipient has been given the opportunity to present evidence and cross-examine witnesses on his or her own behalf.

*c.  Completed criminal investigative reports.*  These include criminal reports (or authenticated extracts) that have resulted in adverse administrative or disciplinary action against the person concerned. The investigative report will be referenced when it is not practical to include the entire report (or an extract).

*d.  Certified judgments of civilian criminal convictions (to include the record of arrest) or extracts thereof may be included in the Army Military Human Resource Record.*  The certified judgment of conviction may include the record

of arrest. Records consisting solely of minor traffic violations (as outlined in AR 190–45) are not to be filed in the AMHRR.

*e. Officer and enlisted evaluation reports.*  Administrative processing, and the appeal of evaluation instruments are governed by AR 623–3.

*f. General.*  Other unfavorable information of which the recipient had prior official knowledge and an adequate opportunity to refute (as prescribed by para 3–7).

*Note.* The notation "AR 600–37 complied with" will be entered below the filing authority on unfavorable information.

## 3–4. Filing of information on sex-related offenses

*a. Filing in the Army Military Human Resource Record.*  Commanders will ensure that a Soldier's performance-disciplinary folder is annotated when a court-martial conviction, non-judicial punishment, or punitive administrative action for a sex-related offense is received. Punitive administrative action means any adverse administrative action initiated as a result of the sex-related offenses identified below and includes, but is not limited to, memoranda of reprimand, admonishment, or censure, from all levels of command.

*b. Applicability.*  This requirement applies to Soldiers in all components, regardless of grade. Commanders do not have the authority to designate any of the following documents be filed in the restricted folder of the AMHRR or locally (see para 3–5). Sex-related offenses include a violation of the following sections of 10 USC and equivalent articles of the UCMJ:

(1)  Section 920—Art. 120: Rape and sexual assault generally. This includes rape, sexual assault, aggravated sexual contact, and abusive sexual contact.

(2)  Section 930—Art. 130: Stalking.

(3)  Section 920b—Art. 120b: Rape and sexual assault of a child. This includes rape, sexual assault, and sexual abuse of a child.

(4)  Section 920c—Art. 120c: Other sexual misconduct. This includes indecent viewing, visual recording, or broad-casting.

(5)  Section 925—Art. 125: Kidnapping.

(6)  Section 880—Art. 80: Attempt (to commit any of the offenses listed in this paragraph).

*c. Action taken against a Soldier.*  If an action is taken against a Soldier resulting in an Army Law Enforcement Report in a civilian court, the disposition will be recorded on a DA Form 4833 (Commander's Report of Disciplinary or Administrative Action) in accordance with AR 190–45. Possible action(s) taken against a Soldier may include military action, civilian action, or both.

(1)  The appropriate Army Criminal Investigation Division (CID) office will enter the law enforcement report into CID's reporting system (The Army and state requirements to register as a sex offender contributes to this reporting, if applicable).

(2)  Cases where an Army Law Enforcement Report does not exist for a conviction in civilian court. Once the Army is made aware of the incident/conviction (that is, sexual offense), the appropriate CID office will generate a DA Form 4833, and enter the report into CID's reporting system (the Army and state requirements to register as a sex offender contributes to this reporting, if applicable).

(3)  Records of civil convictions for sexual offenses separate from military action/reports must be recorded in National Crime Information Center in accordance with AR 195–5, and accessible by all agencies performing a criminal justice junction.

*d. Due process guarantee.*  Unless exempt from referral (see para 3–3), the Soldier will be given notice of the requirement to file the information in the AMHRR, and will be given the opportunity to respond before adverse administrative action is included in the Soldier's performance-disciplinary folder. The Soldier's response will be filed with the adverse administrative action.

*e. Mandatory filing in the performance folder.*  Documents will be filed in the performance-disciplinary folder of the AMHRR.

*f. Processing sex-related offenses.*

(1)  Commanders will coordinate with his or her servicing Judge Advocate to ensure the offense meets the criteria for a sex-related offense (as stated in para 3–4*b*(1)). Offenses determined not to meet the criteria for a sex-related offense will be processed by the unit in accordance with AR 600–8–104.

(2)  Commanders will forward packets including a sex-related offense to: Commander, Army Human Resources Command (AHRC–PLB (G3)), 1600 Spearhead Division Avenue, Fort Knox, KY 40122–5120, or encrypted email to usarmy.knox.hrc.mbx.sex-offenses@mail.mil with subject line "Documented Sex-Related Offense for (Rank/Full Name)". Packets must include Soldier's full name, last four of social security number, and grade. Packets must include

supporting documents for the offense (Article 15/General Officer Memorandum of Reprimand, Court-Martial Conviction) for filing in the AMHRR.

(3) HRC–G3 will forward packets and supporting documents to the appropriate records custodian, as defined in AR 600–8–104, for web uploading to the AMHRR in the interactive Personnel Electronic Records Management System.

*g. Coding record.* The Commander, HRC, will designate and implement an appropriate assignment consideration code (ASCO) for use on Soldiers' record briefs to identify those Soldiers with a court-martial conviction, non-judicial punishment, or punitive administrative action, for a sex-related offense. U.S. Army Reserve (USAR) Command and The Adjutant General for state/territory National Guard will enter the ASCO for Soldiers in their component (RCMS–R/SIDPERS).

*h. Command review.* Lieutenant colonel-level commanders, or higher authority, will review the history of sex-related offenses documented in the AMHRR for any Soldier permanently assigned to their unit. Commanders will screen the record brief of current and incoming Soldiers for the ASCO indicating that the Soldier has received a court-martial conviction, non-judicial punishment, or punitive administrative action, for the sex-related offense. The purpose of this review is to ensure that commanders are aware of the history of sex-related offenses of Soldiers within their organizations.

*i. Appeal of filing.* A Soldier may appeal the placement of the information in their AMHRR to the Army Board for Correction of Military Records (ABCMR).

## 3–5. Filing of nonpunitive administrative memoranda of reprimand, admonition, or censure

*a. Authority for filing in the local file.* There are only two filing options: filing in the performance portion of the AMHRR, or local filing. Commanders do not have the option to file memoranda in the restricted portion of the AMHRR. If local filing is intended, the memorandum does not need to be referred to a higher authority for review.

(1) Authority to issue and direct the filing of a memorandum of reprimand, admonition, and/or censure in the local file (after referral to the person concerned pursuant to para 3–7) of enlisted personnel is restricted to the recipient's immediate commander (or a higher commander in his or her chain of command), school commandants, any general officer (GO) (to include those frocked to the rank of brigadier general), or an officer exercising general court-martial jurisdiction over the recipient. Immediate supervisors of enlisted personnel also have authority to issue memoranda of reprimand, and may also direct filing in the local file, but only if serving in one of the capacities listed above.

(2) Authority to issue and direct the filing of such memoranda in an officer's local file is restricted to—

*(a)* The recipient's immediate commander or a higher-level commander in the chain of command (if such commander is senior in grade or date of rank to the recipient).

*(b)* The designated rater, intermediate rater, or senior rater, under the officer evaluation reporting system (see AR 623–3).

*(c)* A GO (to include one frocked to the rank of brigadier general) who is senior to the recipient, or an officer who exercises general court-martial convening authority (GCMCA) jurisdiction over the recipient, or the designee of the GCMCA.

(3) Statements furnished by the recipient following referral will be attached to the memorandum for filing in the local file (see para 3–7).

*b. Filing in Army Military Human Resource Records.* A memorandum, regardless of the issuing authority, may be filed in the AMHRR, and managed by HRC or the proper State Adjutant General (for Army National Guard personnel) upon the order of a GO (to include one frocked to the rank of brigadier general). The GO directing filing must: exercise GCMCA over the recipient, or be the GCMCA's designee or delegate; be a GO commander over the recipient; been a filing authority from the recipient's losing command pursuant to paragraph 3–5*f*(1); be the Commander of HRC; be any HQDA staff principal, to include the Chief of Staff of the Army, Vice Chief of Staff of the Army (VCSA), or the DAS; be a State Adjutant General or designee; or be the chief, or his or her designee, of any designated special branch pursuant to 10 USC 3064–acting pursuant to their statutory authority over members of their respective special branches. Memoranda filed in the AMHRR will be filed in the performance folder. Directions for filing in the AMHRR will be contained in an endorsement or addendum to the memorandum.

*Note.* All administrative actions for GOs are withheld to the VCSA.

*c. A memorandum containing unfavorable information, to be included in a Soldier's Army Military Human Resource Record will* —

(1) Be referred to the recipient concerned for comment (see para 3–7).

*(a)* The referral will include reference to the intended filing of the memorandum.

*(b)* This referral will also include and list applicable portions of investigations, reports, and other documents that serve, in part or in whole, as the basis for the memorandum, provided the recipient was not previously provided an opportunity to respond to information reflected in that documentation.

*(c)* Documents that require the approval from officials or agencies, other than the official issuing the memorandum, will be coordinated with the release authority prior to releasing to the recipient.

*(d)* Statements and other evidence furnished by the recipient will be reviewed and considered by the officer authorized to direct filing in the AMHRR. The statements and evidence, and/or any applicable written correspondence thereof, will be attached as enclosures to the memorandum.

*Note.* This will be done before a final determination is made to file the memorandum. Referral acknowledgment must be included with any unfavorable information directed for filing in the AMHRR (see para 3–7).

*(e)* If the filing authority desires to file allied documents with the memorandum, these documents must also be referred to the recipient for comment. This includes statements, previous reprimands, admonitions, or censure. Allied documents must also be specifically referenced in the memorandum or referral document. Care must be exercised to ensure additional unfavorable information is not included in the transmittal documentation, unless it has been properly referred for comment.

(2) Contain a statement that indicates the memorandum has been imposed as an administrative measure, and not as a punishment under UCMJ, Art. 15.

(3) Be signed by (or sent under the cover or signature of) an officer authorized to direct such filing.

(4) Include a statement indicating the imposing authority's intent for filing. This statement will provide the Soldier direction on how to correct his or her behavior, and will assist the DASEB in its deliberations in the event the Soldier appeals to have the document transferred to the restricted portion of the AMHRR.

(5) Be forwarded for inclusion in the performance portion of the AMHRR, only after considering the circumstances and alternative non-punitive measures. Minor behavior infractions or developmental mistakes will not normally be recorded in a Soldier's AMHRR. Once placed in the AMHRR; however, such information will be permanently filed, unless removed through the appeal process (see chap 7).

(6) Names of victims and third party social security numbers will be redacted from all documents prior to filing locally or in the AMHRR.

*d.  Decisions against filing memoranda in the Army Military Human Resource Record.*  If the GO (or GCMCA) elects not to place the memorandum in the AMHRR, the correspondence will be returned to the issuing authority who will advise the recipient of the decision not to file the memorandum in the AMHRR.

*e.  Filing memoranda designated for local files.*  Local filing may only be filed for up to 18 months, or until reassignment of the recipient to another general court-martial jurisdiction, whichever is sooner. Such a letter will state the length of time the letter is to remain in the local file, and provide a point of contact for the Soldier to contact after the expiration date to ensure removal. Both the Soldier and his or her unit are equally responsible for removing the letter from the local file after18 months.

*f.  Circumstances affecting the imposition or processing of administrative memoranda of reprimand.*

(1) If/when a Soldier leaves the chain of command or supervision after a commander or supervisor has stated, in writing, the intent to impose a reprimand, but before the reprimand has been imposed, the action may be processed to completion by the losing command. In such cases, the losing command must coordinate reprimanding action(s) with the gaining command prior to imposition.

(2) If/when the reprimanding official leaves the chain of command or supervision after stating in writing the intent to impose a reprimand, his or her successor may complete appropriate action on the reprimand. In such cases, the successor must be familiar with relevant information about the proposed reprimand.

(3) If/when a former commander or supervisor discovers misconduct warranting a reprimand, an admonition, or censure without having previously stated in writing the intent to impose a reprimand, he or she may—

*(a)* Send pertinent information to the Soldier's current commander for action.

*(b)* Personally initiate and process a memorandum of reprimand, admonition, or censure, as if the former command or supervisory relationship continued. In such cases, the current commander must be familiar with relevant information about the proposed reprimand.

*Note.* Officials should consider the timeliness and relevance of the adverse information before taking administrative action at a later date.

*g.  Reprimands and admonitions.*  Reprimands and admonitions imposed as non-judicial punishment (see UCMJ, Art. 15) are governed by AR 27–10.

*h. Change from enlisted to officer status.* If a status change from enlisted to officer was approved on or after 16 December 1980, memoranda of reprimand, admonition, or censure, received while in an enlisted status and filed in the performance portion of the AMHRR, will be moved to the restricted portion of the AMHRR.

## 3–6. Anonymous communications

Anonymous communications will not be filed in a Soldier's AMHRR or filed locally. If, after investigation or inquiry, unfavorable information is found to be true, relevant, proven, or supported, and not exempted under paragraph 3–3, the information must be referred to the Soldier before such information is filed in the AMHRR or filed locally (see para 3–7).

## 3–7. Referral of information

*a.* Except as provided in paragraph 3–3, unfavorable information will be shared with the recipient for acknowledgment of his or her rebuttal opportunity, prior to filing.

*b.* Recipients will be provided 7 calendar days (active duty Soldiers (all components) or USAR Soldiers in Troop Program Units (TPUs)), or 30 calendar days (Army National Guard/Reserve Soldiers not on active duty) to make a statement, or to decline, in writing, to make such a statement. The notice will state the date by which the statement must be provided. The statement may include evidence that rebuts, explains, or mitigates the unfavorable information. Acknowledgment and rebuttal comments or documents will be submitted generally in the following form:

(1) "I have read and understand the unfavorable information presented against me, and submit the following statement or document(s) on my behalf."

(2) "I have read and understand the unfavorable information presented against me, and elect not to make a statement."

*c.* If a recipient refuses to acknowledge the referral of unfavorable information, the reprimanding official will prepare the following statement: "On (insert date in YYYY/MM/DD format), (insert name in first, middle, last sequence) has been presented with the unfavorable information and refuses to acknowledge by signature." The memorandum can then be directed for filing (see para 3–5).

# Chapter 4
# Unfavorable Information in Counterintelligence and Investigative Files

## 4–1. General

This chapter sets forth provisions for the disposition of unresolved unfavorable information in counterintelligence and investigative files.

## 4–2. Security clearance

Commanders will ensure that security clearance eligibility is not suspended in lieu of punishment under the UCMJ or other disciplinary measures. Recommendations to deny or revoke a security clearance will not be used as a punishment or disciplinary measure. Action to deny or revoke a security clearance will be taken only by the Department of Defense (DOD) Consolidated Adjudications Facility (see AR 380–67).

## 4–3. Resolution of unfavorable information in counterintelligence and investigative files

*a. Commander's responsibility.* When commanders receive information that may cast doubt on the suitability of a person to hold a security clearance, he or she will follow the procedures in AR 380–67 for reporting the information. When a commander receives information that may be reportable under the provisions of AR 381–12, he or she will notify the supporting counterintelligence office. In addition, the commander will—

(1) Follow incident procedures in accordance with AR 380–67.

(2) Initiate investigation under AR 15–6, AR 380–67, or AR 600–8–104, and forward the results through the chain of command.

(3) Consider the appropriate action under AR 135–175, AR 135–178, AR 600–8–24, AR 635–200, or the UCMJ.

(4) Reassign the person to a non-sensitive position.

(5) Commanders may use additional investigative resources available, such as military police, IG, U.S. Army Criminal Investigation Command (USACIDC), and/or investigating officers or a board of officers who may investigate matters within their assigned area of responsibility. This authority does not include the conduct of counterintelligence investigations.

*b. Suspension of favorable personnel actions.*  Suspension of favorable personnel actions (under AR 600–8–2) will be considered. The suspension of favorable personnel actions on a Soldier is mandatory when military or civilian authorities initiate any investigation or inquiry that may potentially result in disciplinary or adverse administrative action.

### 4–4.  Use of counterintelligence and investigative files in personnel actions

*a.*  Counterintelligence and investigative files are not a part of the military personnel records system, as prescribed by AR 600–8–104. However, to ensure that the Army's interests are protected when selecting a Soldier for a POSTA or PASS, commanders should (in accordance with all Army activities188/2014)—

(1)  Correlate significant verified information with information in personnel files.

(2)  Make all information available to personnel decision-makers.

*b.*  Current counterintelligence and investigative files may have unevaluated or dormant information which was not furnished to the Soldier for comment. These records may have sensitive information that may not be releasable either to the subject, or the board. If disclosed prematurely, the information could jeopardize current investigations or sources of information. For these reasons, counterintelligence and investigative files are not furnished to promotion selection boards or other personnel decision-makers except—

(1)  The DASEB, as outlined in chapters 2 and 6. This board merely determines what information will be considered for possible filing in the AMHRR, but does not make personnel decisions.

(2)  Personnel managers in highly intensified personnel management areas, as designated by the SECARMY, the Chief of Staff of the Army, or the DCS, G–1.

(3)  As the SECARMY may direct.

## Chapter 5
## Unfavorable Information in Army Law Enforcement Files

### 5–1.  Authorities for filing and using unfavorable information

Statutory or regulatory authorities govern the filing and use of unfavorable material in military police or USACIDC crime records (see AR 190–45, AR 195–5, and AR 195–6; and paras 2–2 and 2–5). This chapter prescribes procedures for the disposition and referral of, and access to, information in Army law enforcement files.

### 5–2.  Disposition of information in law enforcement files

*a. Criminal justice action.*  Copies of criminal investigative case files, military police reports, or information from these files or reports are provided to commanders by law enforcement agencies for criminal justice disposition and ancillary actions.

(1)  *Criminal justice disposition.*  As a result of command consideration, criminal justice disposition proceeds to one of the categories listed below. To this end, the proper authority may—

*(a)*  Start court-martial action.

*(b)*  Start action under the UCMJ, Art. 15.

*(c)*  Decline to consider further criminal justice proceedings.

(2)  *Ancillary action.*  The actions described below do not replace criminal justice disposition, but are independent of criminal justice disposition.

*(a)*  Action to suspend favorable personnel actions reported according to AR 600–8–2.

*(b)*  Elimination action under AR 135–175, AR 135–178, AR 600–8–24, or AR 635–200.

*(c)*  Action to suspend or deny access to classified information under AR 380–67 and, if needed, investigation under AR 381–20 to obtain more facts in the case.

*(d)*  Other administrative action, as appropriate.

*b. Non-criminal justice action.*  Independent of completing a criminal justice disposition (as listed in para 5–2*a*(1)), Army review of criminal investigative or military police cases about subject personnel, for suitability consideration, may result in action under one or more of the categories listed below.

(1)  Elimination action under AR 135–175, AR 135–178, AR 600–8–24, or AR 635–200.

(2)  Action to suspend or deny access to classified information under AR 380–67 and, if needed, investigation under AR 381–20 to develop the facts of the case.

(3)  Favorable closing of the case.

**5–3.  Access to law enforcement investigative files**

*a.*  AR 25–55, AR 190–45, AR 195–2, and AR 195–6 set forth procedures for gaining access to law enforcement investigative files.

*b.*  Law enforcement records and reports are not a part of the military personnel records system as prescribed by AR 380–67.

(1)  To ensure that commanders and supervisors take proper action (see para 5–2), information from criminal investigative and military police files is exchanged between USACIDC, or military police elements, and the commanders whom they support.

(2)  AR 190–45, AR 195–2, and AR 195–6 set forth procedures to preclude the release of unfavorable information for purposes other than those described in paragraph 5–2.

(3)  Safeguards will be established to preclude unauthorized released of information in accordance with AR 195–2.

*c.*  Criminal record data related to uses described by paragraph 5–2 are not provided to Army selection boards or other personnel decision-makers before an initial determination of guilt (based on criminal justice disposition). Exceptions are as follows:

(1)  DASEB as outlined in chapters 2 and 6, subject to restrictions that may be imposed concerning secondary release.

(2)  Personnel managers of intensified personnel management areas, specifically designated by the SECARMY, the Chief of Staff of the Army, or the DCS, G–1.

(3)  As the SECARMY may direct.

# Chapter 6
# Organization and Procedures of the Department of the Army Suitability Evaluation Board

**6–1.  Board membership and voting procedures**

*a.*  The DASEB is a standing, continuous board within ARBA. The DASEB typically consists of officers in the grade of colonel; however, voting members on any case will be senior in grade to the recipient. The board membership will include at least one enlisted member in the grade of sergeant major when considering cases involving enlisted personnel. If the recipient is senior to the enlisted member(s) of the Board, three colonels will vote the case. The DASEB is authorized direct communication with all commanders, agencies, and individuals.

*b.*  A quorum of three members will be actively involved in every step of the case's adjudication. Determination recommendations will be by majority vote. The DASEB may find that adverse suitability information can best be resolved by returning the case to the Soldier's chain of command.

*c.*  No DASEB member will vote on a case in which he or she was personally involved, or in which he or she knowingly has any bias. In any event where a DASEB member is/was personally involved in a case, he or she will be removed from said case, and replaced with another suitable board member.

*d.*  The Director, Military Review Boards, will make the final decision regarding the DASEB's recommendation to transfer unfavorable information from the performance to the restricted file in the AMHRR.

*e.*  The DASA (RB) will make the final decision regarding the DASEB's recommendation to remove unfavorable information from the AMHRR.

**6–2.  Department of the Army Suitability Evaluation Board Filing Determinations**

*a.*  The DASEB will deliberate to determine whether unfavorable information requested by a commander or agency without filing authority should be filed in the AMHRR and, if so, whether to be placed in the performance or restricted portion.

*b.*  The DASEB will only consider and recommend the filing of unfavorable information for cases in which the recipient has been afforded an opportunity to explain or rebut the unfavorable information, and has not provided a satisfactory explanation or rebuttal.

*c.*  The DASEB may edit unfavorable information for cases in which the recipient has satisfactorily explained a portion of the unfavorable information in the rebuttal. The DASEB will then recommend the filing of the edited unfavorable information.

*d.*  The DASEB may determine that the unfavorable information should not be included in either the performance or restricted portion of the AMHRR. In such cases, the DASA (RB) will make the final determination, as they are the approval authority for DASEB determinations not to file unfavorable information in the AMHRR. This authority will not be further delegated. The DASEB will close such cases and notify the commander or agency of the outcome.

*e.* The DASEB makes determinations upon appeal of unfavorable information filed in a Soldier's AMHRR. The DASEB may determine to revise, alter, or remove such unfavorable information if it is determined to be untrue or unjust, in whole or in part (see chap 7).

*f.* The DASEB makes determinations, upon appeal, on requests to transfer unfavorable information from the performance to the restricted portion of the AMHRR (see chap 7). The DASEB may recommend the transfer of those administrative memoranda of reprimand when such transfer would be in the best interest of the Army. Transfer of such memoranda is further subject to the stipulations stated in paragraph 6–1*d*, paragraph 6–1*e*, and chapter 7.

## 6–3. Department of the Army Suitability Evaluation Board process

*a. The Department of the Army Suitability Evaluation Board will review and consider the recipient's response or rebuttal to the proposed filing of a case summary of unfavorable information in his or her Army Military Human Resource Record.* The DASEB will adequately document its findings, conclusions, and recommendations. The DASEB will adjudicate cases under the following circumstances:

(1) Commanders who do not have filing authority for unfavorable information may submit requests for a filing determination. This normally is any commander below the rank of brigadier general who does not have GCMA.

(2) Agencies who possess, or are aware of, unfavorable information about a Soldier may submit a request for a filing determination when the information cannot be filed under the provisions of other regulatory policies or procedures.

(3) Filing authorities who directed the filing in the AMHRR of an administrative memorandum of reprimand, admonition, or censure, may request its revision, alteration, or removal if later investigation determines it was untrue or unjust, in whole or in part.

(4) Soldiers who believe unfavorable information filed in their AMHRR is untrue or unjust may submit an appeal to request the removal of that information on the basis that it is untrue or unjust. Such appeals must include sufficient clear and convincing evidence that shows the unfavorable information is either untrue or unjust in whole or in part.

(5) Soldiers who believe that unfavorable information filed in their AMHRR, in the form of a memorandum of reprimand, admonition, or censure, or records or proceedings pursuant to UCMJ, Art. 15, have served their intended purpose, may submit an appeal in the case of an UCMJ, Art. 15, to request its transfer to the restricted portion of the AMHRR in accordance with paragraph 7–2*d*(3). Such appeals must include evidence that—

*(a)* The intended purpose has been served.

*(b)* The Soldier has received at least one evaluation report (not academic) since its imposition.

*(c)* The transfer is in the best interest of the Army.

*(d)* The Soldier's chain of command at the time of the imposition and/or imposing authority support the transfer in the form of a memorandum.

*Note.* In cases where an imposing authority/unit no longer exists, the Soldier's next higher command/unit may support the transfer.

(6) Soldiers who have had an appeal denied under paragraphs 6–3*a* may submit a request for reconsideration no earlier than 1 year from the date of notification of denial. The request for reconsideration must include evidence not previously considered.

*b. Case analysis.*

(1) The DASEB will review and evaluate the records of each case referred to the board to determine if—

*(a)* Documents that contain unfavorable information submitted for filing considerations have sufficient credible evidence to support a finding, by preponderance of the evidence, that the unfavorable information is valid.

*(b)* Unfavorable information is of such a serious nature that it should be made a part of the AMHRR. In doing so, the DASEB will consider serious individual incidents, as well as a pattern of lesser incidents, that may reflect unfavorably on the Soldier's character, integrity, trustworthiness, or reliability.

(2) The DASEB will presume that once an official document has been properly filed in the AMHRR, it is administratively correct and was filed pursuant to an objective decision made by a competent authority. Thereafter, the burden of proof rests with the recipient responsible for providing clear and convincing evidence to support the document is either untrue or unjust, in whole or in part, thereby warranting its alteration or removal from the AMHRR; or has served its intended purpose, and it is in the best interest of the Army to transfer it to the restricted portion of the AMHRR.

(3) The DASEB will review all cases, regardless of prior decisions made by commanders, courts-martial, elimination boards, or other authorities.

*Note.* AR 15–6 does not apply to DASEB proceedings.

(4)  The DASEB will not consider appeals that merely allege an injustice or error without supporting evidence.

(5)  The DASEB will consider appeals for the transfer of unfavorable information to the restricted portion of the AMHRR when the recipient has submitted proof that the intended purpose has been served and the transfer is in the best interest of the Army. Requests for consideration include the following criteria:

*(a)*  (Required) Time elapsed since the filing.

*(b)*  (Required) The Soldier has indicated remorse for the actions which caused the unfavorable information to be filed.

*(c)*  (Required) At least one positive evaluation report, other than an academic evaluation, has been received since the filing.

*(d)*  (Required) There is no evidence or indication of a repeat of the offense.

*(e)*  (Recommended) Memorandum from the original imposing authority supporting the transfer.

*(f)*  (Optional) Memorandum of support from the current chain of command and the chain of command at the time of imposition.

(6)  The DASEB may obtain information from the recipient, Soldiers in the chain of command, or anyone thought to have firsthand knowledge relevant to the case. The DASEB is authorized direct communication with commanders, agencies, and individuals regarding matters before the board. The DASEB may request and consider any files, records, and reports believed to have relevance to a case under consideration. These include criminal records, official personnel files, counterintelligence and investigative files, law enforcement, and other investigative files. Except as set forth in 10 USC 1556, a recipient will be provided copies of all correspondence and communications (including summaries of verbal communications) between DASEB and any entity or person outside ARBA pertaining to the recipient's case or potentially having a material effect on the recipient's case. The recipient will be given a reasonable opportunity to respond to such information before the DASEB renders a decision or recommendation.

(7)  The DASEB does not permit recipients or those on their behalf, to appear in person before the board.

(8)  The DASEB will document its findings and conclusions, and will state its recommendations in their record of proceedings. The recipient will receive a copy of the record of proceedings with the final decision.

*c.  Case decisions.*

(1)  The DASEB makes determinations and recommendations based on a majority vote of the board members, following the process outlined above.

(2)  The DASEB makes initial filing decisions based on its case review and analysis, and will determine one of the following:

*(a)*  The unfavorable information is already adequately reflected in the AMHRR so as to be meaningful to personnel managers and selection boards. Therefore, the case may be closed without further action except to properly notify the sender of this determination.

*(b)*  The unfavorable information is either not of such a serious nature or is not of the type that should be filed in the AMHRR. Therefore, the case may be closed without further action, except to properly notify the sender of the DASEB determination that the information will not be filed.

*(c)*  The unfavorable information is of such a serious nature as to warrant filing in the AMHRR. In such cases, a notification memorandum will be sent to the individual involved, in which his or her rights are explained.

*Note.* The memorandum will include the unfavorable information proposed for filing in the AMHRR.

*(d)*  The recipient must be given an opportunity to review the evidence against them, and to submit a written rebuttal or explanation for the board's consideration before any adverse finding or recommendation is made. Once the DASEB reviews the response, it will make a filing recommendation to the DASA (RB) for final filing decision action.

*(e)*  The adverse suitability information can best be resolved by returning the case to the current chain of command.

(3)  The DASEB makes removal decisions based on its case review and analysis, and will determine one of the following:

*(a)*  The unfavorable information is determined to be untrue or unjust, in whole or in part; therefore, there is sufficient reason to remove the document from the recipient's AMHRR.

*(b)*  The unfavorable information is determined to be untrue or unjust, in whole or in part; therefore there is sufficient reason to require alteration of the unfavorable information as determined by the DASEB.

*(c)*  The unfavorable information is determined to be true and just, and will remain in the recipient's AMHRR.

*(d)*  The DASEB determines the case does not meet the criteria for consideration by the board, and returns the appeal without action.

## Chapter 7
## Appeals

### 7–1.  Appeal authority
The DASEB is the initial appeal authority and makes recommendations for removal, alteration, or transfer of unfavorable information entered in the AMHRR. This chapter sets forth the policies and procedures whereby a person may seek removal of unfavorable information from his or her AMHRR, or transfer of unfavorable information from the performance file to the restricted file of his or her AMHRR.

### 7–2.  Policies and Standards
An officer who directed the filing in the AMHRR of an administrative memorandum of reprimand, admonition, or censure, may request its revision, alteration, or removal if later investigation determines such information is untrue/unjust in whole or in part. The basis for such determination must be provided to the DASEB in sufficient detail so as to justify the request. The officer who directed the filing of such a letter in the AMHRR may not initiate an appeal on the basis that the memorandum has served its intended purpose. However, a memorandum of support may be submitted with the recipient's appeal.

*a. Applicability.*

(1) *Appeals for removal.*  This regulation applies to appeals for the removal of memoranda of reprimand, admonition, or censure, already filed in the recipient's AMHRR.

(2) *Appeals for transfer.*  This regulation applies to appeals for the transfer of memoranda of reprimand, admonition, or censure for the transfer of records of proceedings under UCMJ, Art. 15, from the performance file to the restricted file of the recipient's AMHRR.

(3) *Appeals involving documents with regulatory appeal authority.*  This regulation does not apply to documents that have their own regulatory appeal authority, such as evaluation reports or records of courts-martial.

(4) *Appeals for Article 15 removal*  (see AR 27–10). The DASEB will not consider appeals to remove a records of proceedings under UCMJ, Art. 15, from the AMHRR. The authority to adjudicate such claims rests with the ABCMR, under AR 15–185.

*b. Who may appeal?*  The DASEB will consider all appeals from Soldiers in the Regular Army, the Army National Guard of the United States/Army National Guard (in grades E–6 and above), officers, and warrant officers. The DASEB will consider appeals from Soldiers in grades below E–6 only as an exception to policy granted by the DCS, G–1.

*c. Veterans and retirees.*  The DASEB will not accept or consider appeals from individuals no longer in the military or members of the Inactive Ready Reserve. Those individuals must submit their requests to the ABCMR using DD Form 149 (Application for Correction of Military Record) (see para 7–7).

*d. Burden of proof and level of evidence required.*

(1) *General.*  Once an official document has been properly filed in the AMHRR, it is presumed to be administratively correct, and to have been filed pursuant to an objective decision by a competent authority.

(2) *Removals.*

*(a)* There is no time restriction for submitting an appeal for removal of unfavorable information from the AMHRR.

*(b)* The recipient has the burden of proof to show, by clear and convincing evidence, to support assertion that the document is either untrue or unjust, in whole or in part.

*(c)* Evidence submitted in support of the appeal may include, but is not limited to: an official investigation showing the initial investigation was untrue or unjust; decisions made by an authority above the imposing authority overturning the basis for the adverse documents; notarized witness statements; historical records; official documents; and/or legal opinions.

*(d)* The DASEB will not consider appeals that merely allege an injustice or error without supporting evidence or a compelling argument. Appeals such as these will be returned without action.

*(e)* The DASA (RB) is the final decision authority for removal of unfavorable information from the AMHRR. This authority will not be further delegated.

(3) *Transfers.*

*(a)* Soldiers must have received at least one evaluation (other than academic) since imposition.

*(b)* The recipient bears the burden of providing substantial evidence that the intended purpose of the document has been served in support of a request for the transfer of any official memoranda of reprimand, admonition, censure, or records of proceedings pursuant to UCMJ, Art. 15 from the performance file to the restricted file of the recipient's AMHRR.

*(c)* The recipient must indicate how the transfer of the unfavorable information would be in the best interest of the Army, thereby warranting transfer of the document to the restricted file of the AMHRR. Such evidence may include, but is not limited to: statements of support from the imposing authority, the Soldier's current chain of command, the Soldier's chain of command at the time of imposition, and/or other memoranda of support; subsequent evaluation reports (other than academic); notarized witness statements; official documents; court documents; statements of remorse; documents demonstrating rehabilitation; other documents proving the intended purpose of the document has been served; and legal documents.

*(d)* The DASEB will not consider appeals that merely allege that the intent of the document has been served without supporting evidence. Appeals such as these will be returned without action.

*(e)* The transfer of an unfavorable document to the restricted portion of the AMHRR will not normally serve as the sole basis for promotion reconsideration by a special selection board, unless approved as an exception to policy granted by the DCS, G–1 (based on the DASEB's recommendation, and the DASA (RB)'s concurrence).

*(f)* If the DASEB denies an appeal, a copy of the memorandum of notification regarding the denial will be placed in the commendatory and disciplinary portion of the performance record. The appeal itself and the record of the proceedings will be placed in the restricted portion of the AMHRR.

### 7–3. Processing appeals–Army Military Human Resource Record

*a. Preparation and submission.*

(1) All appeals must be submitted by, or on behalf of, the recipient in writing.

*Note.* A sample Department of the Army Suitability Evaluation Board Appeal memorandum can be found at ARBA's website: https://arba.army.pentagon.mil/unfavorable.html /.

(2) All appeals must be accompanied by relevant, substantive evidence (see para 7–2*d*).

(3) For active duty Soldiers (all components) and USAR Soldiers in TPU, appeals must be submitted to the DASEB at Army Review Boards Agency. The DASEB mailing address is: 251 18th Street South, Suite 385, Arlington, VA 22202–3531.

(4) For Army National Guard Soldiers not on active duty, appeals must be submitted through the applicable state Adjutant General and the Chief, National Guard Bureau, to the DASEB.

(5) Retired, Separated, or Soldiers in the Individual Ready Reserve do not appeal to the DASEB; they must appeal to the ABCMR to remove from or move unfavorable information within their AMHRR (see para 7–7).

(6) The appeal process is administrative and non-adversarial in nature.

*Note.* The provisions of AR 15–6 do not apply.

(7) Recipients, or those acting on their behalf, are not authorized to appear in person before the DASEB.

*b. Recipient awareness of the Department of the Army Suitability Evaluation Board process.*

(1) The DASEB may request and consider any files, records, and reports believed to have relevance to a case under consideration.

(2) The DASEB may obtain corroboration from Soldiers in the chain of command, or anyone thought to have first-hand knowledge relevant to a case.

(3) The DASEB may contact a recipient by official correspondence for specific information as necessary.

(4) The DASEB may contact (whenever practical) the imposing authority for input regarding an appeal.

(5) The DASEB will adhere to the notice requirements to recipients (see para 6–3).

*c. Filing authority to redress actions.*

(1) An officer who directed the filing in the AMHRR of an administrative memorandum of reprimand, admonition, or censure, may request its revision, alteration, or removal, if evidence or information indicates the basis for the adverse action was untrue or unjust, in whole or in part.

(2) An officer who directed such a filing must provide the DASEB a copy of the new evidence or information to justify the request.

### 7–4. Processing appeals–locally filed

Procedures for requesting removal of such locally filed unfavorable documents.

*a.* All appeals must be submitted by the recipient, in writing.

*b.* All appeals must be accompanied by relevant, substantive evidence, justifying why the document should be removed prior to its specified removal date.

*c.* Appeals to remove a locally filed memorandum of reprimand, admonition, or censure involving unfavorable information from the Soldier's local file, prior to the designated removal date, should be directed to the individual

who initially directed the filing of the memorandum, or a higher-level commander in the chain of command for action on the request.

## 7–5. Amendment rights

This regulation does not limit or restrict a Soldier's right to request amendment of his or her records under the Privacy Act. Nor does it limit or restrict the authority of the DASEB to act as an Access and Amendment Authority.

## 7–6. Appeal review priorities

Appeals are processed in the order of priority established by the DASEB.

*a. For officers appealing.*

(1) First-priority are appeals pertaining to officers who have been:

*(a)* Twice non-selected for promotion and given a directed discharge, release, or mandatory retirement date within 6 months.

*(b)* Selected for release within 6 months by an HQDA elimination board or an Active Guard Reserve continuation board.

*(c)* Recommended for elimination within 6 months. (*Note.* This also applies to officers who have applied for, and have been denied, voluntary indefinite category.)

(2) Second-priority is all other officers.

*b. For noncommissioned officers appealing.*

(1) First-priority are appeals pertaining to noncommissioned officers (NCOs) who have been:

*(a)* Twice non-selected for promotion in the primary zone of consideration and are within 6 months of discharge release from service (expiration term of service) or mandatory retirement date.

*(b)* Selected for release under the HQDA or Army National Guard Qualitative Management Program, or the USAR Qualitative Retention Program.

*(c)* Selected for release from Active Guard Reserve by an Active Guard Reserve continuation board.

*(d)* Identified for referral within 6 months to an Active Guard Reserve continuation board.

(2) Second-priority are appeals pertaining to NCOs who have been non-selected for promotion in the primary zone of consideration at least once, but who do not have a mandatory release date within 6 months.

(3) Third-priority is all other NCOs.

## 7–7. Correction of military records–Army Board for Correction of Military Records

*a.* AR 15–185 contains policy and procedures for applying to the ABCMR for the purpose of correcting military records. Applications should be sent to the ABCMR to correct an error or remove an injustice only after all other means of administrative appeal have been exhausted, including available appeal actions provided in this regulation.

*b.* Soldiers, Veterans, or their authorized representatives, may appeal adverse DASEB decisions to the ABCMR.

*c.* If the Soldier or veteran is deceased or incompetent, the surviving spouse, next of kin, or a legal representative may apply. The application must include documentation to prove this relationship, such as a certified copy of a marriage license, death certificate, or power of attorney, as appropriate.

## Appendix A

## References

### Section I
### Required Publications

**AR 15–6**
Procedures for Administrative Investigations and Boards of Officers (Cited in para 4–3*a*(2).)

**AR 15–185**
Army Board for Correction of Military Records (Cited in para 7–2*a*(4).)

**AR 20–1**
Inspector General Activities and Procedures (Cited in para 2–5*c*.)

**AR 25–55**
The Department of the Army Freedom of Information Act Program (Cited in para 5–3*a*.)

**AR 27–10**
Military Justice (Cited in para 3–5*g*.)

**AR 40–66**
Medical Record Administration and Heath Care Documentation (Cited in para 2–5*c*.)

**AR 40–400**
Patient Administration (Cited in para 2–5*c*.)

**AR 135–175**
Separation of Officers (Cited in para 4–3*a*(3).)

**AR 135–178**
Enlisted Administrative Separations (Cited in para 4–3*a*(3).)

**AR 190–45**
Law Enforcement Reporting (Cited in para 2–5*c*.)

**AR 195–2**
Criminal Investigation Activities (Cited in para 2–5*d*.)

**AR 195–5**
Evidence Procedures (Cited in para 3–4*c*(3).)

**AR 195–6**
Department of the Army Polygraph Activities (Cited in para 5–1.)

**AR 380–67**
Personnel Security Program (Cited in para 4–2.)

**AR 381–12**
Threat Awareness and Reporting Program (Cited in para 4–3*a*.)

**AR 381–20**
Army Counterintelligence Program (Cited in para 5–2*a*(2)(*c*).)

**AR 381–45**
Investigative Records Repository (Cited in para 2–5*c*.)

**AR 600–8–2**
Suspension of Favorable Personnel Actions (Flag) (Cited in para 2–3*d*.)

**AR 600–8–24**
Officer Transfers and Discharges (Cited in para 4–3*a*(3).)

**AR 600–8–104**
Army Military Human Resource Records Management (Cited in para 3–2*c*.)

**AR 623–3**
Evaluation Reporting System (Cited in para 3–3*e*.)

**AR 635–200**
Active Duty Enlisted Administrative Separations (Cited in para 4–3*a*(3).)

## Section II

## Related Publications

Unless otherwise indicated, DA forms are available on the Army Publishing Directorate website (https://armypubs.army.mil/). A related publication is a source of additional information. The user does not have to read it to understand this regulation. Code of Federal Regulations (CFR) material is available at https://www.ecfr.gov/ and USC material is available at https://uscode.house.gov/. UCMJ Articles are available at https://jsc.defense.gov/.

**AR 11–2**
Managers' Internal Control Program

**AR 25–30**
Army Publishing Program

**DA Pam 25–403**
Guide to Recordkeeping in the Army

**Homeland Security Presidential Directive–12**
Policy for a Common Identification Standard for Federal Employees and Contractors (Available at https://www.dhs.gov/homeland-security-presidential-directive-12.)

**SECARMY Memorandum, dated 12 February 2014**
Ensuring the Quality of Sexual Response Coordinators, Sexual Assault Prevention and Response Victim Advocates and Others in Identified Positions of Significant Trust and Authority (Available at https://www.sexualassault.army.mil/policy_orders.aspx.)

**UCMJ, Art. 15**
Commanding officer's non-judicial punishment

**UCMJ, Art. 80**
Attempts

**UCMJ, Art. 120**
Rape and sexual assault generally

**UCMJ, Art. 120b**
Rape and sexual assault of a child

**UCMJ, Art. 120c**
Other sexual misconduct

**UCMJ, Art. 125**
Kidnapping

**UCMJ, Art. 130**
Stalking

**10 CFR**
Energy

**32 CFR**
National Defense

**5 USC 552a**
Records maintained on individuals (popularly known as the Privacy Act)

**10 USC**
Armed Forces

**10 USC 1556**
Ex parte communications prohibited

**32 USC**
National Guard

## Section III

**Prescribed Forms**
This section contains no entries.

## Section IV

**Referenced Forms**
Unless otherwise indicated, DA forms are available on the Army Publishing Directorate website (https://armypubs.army.mil/). DD forms are available on the Executive Services Directorate website (https://www.esd.whs.mil/directives/forms/).

**DA Form 11–2**
Internal Control Evaluation Certification

**DA Form 2028**
Recommended Changes to Publications and Blank Forms

**DA Form 4833**
Commander's Report of Disciplinary or Administrative Action

**DD Form 149**
Application for Correction of Military Record

**Appendix B**

**Internal Control Evaluation**

**B–1. Function**
This function covered by this evaluation is the administration of the Manager's Internal Control Program.

**B–2. Purpose**
The purpose of this evaluation is to assist commanders, security managers, and those involved with unfavorable information to accurately understand procedures outlined in this regulation. It is not intended to cover all controls.

**B–3. Instructions**
These key internal controls must be formally evaluated at least once every 5 years or whenever the internal control administrator changes. Certification that this evaluation has been conducted must be accomplished on DA Form 11–2 (Internal Control Evaluation Certification). Evaluation test questions are outlined in paragraph B–2, and are intended as a starting point for each applicable level of internal control evaluation. Answers must be based on the actual testing of key controls (for example, document, analysis, direct observation, sampling, simulation, or other). Answers that indicate deficiencies must be explained and corrective action indicated in supporting documentation.

**B–4. Test questions**
 *a.* Who determines if unfavorable information should be filed in the performance portion of the AMHRR once cases / actions are referred?
 *b.* Unfavorable information will not be filed in the AMHRR unless what individual has been given an opportunity to review the documentation?
 *c.* When can anonymous communications be filed in a Soldier's AMHRR?
 *d.* The DASEB is a board within what and consists of officers of what rank?
 *e.* Who is the initial appeal authority for entering unfavorable information in the AMHRR?

**B–5. Supersession**
This evaluation replaces the management control evaluation checklist previously published in AR 11–2, dated 1 August 1994.

**B–6. Comments**
Help to make this a better tool for evaluating internal controls. Submit comments to Deputy Chief of Staff, G–1 (DAPE–MPS), 300 Army Pentagon, Washington DC 20310–0300.

## Glossary

**Section I**

**Abbreviations**

**ABCMR**
Army Board for Correction of Military Records

**ACOM**
Army command

**AMHRR**
Army Military Human Resource Record

**AR**
Army regulation

**ARBA**
Army Review Boards Agency

**ASA (M&RA)**
Assistant Secretary of the Army (Manpower and Reserve Affairs)

**ASCC**
Army service component command

**ASCO**
assignment consideration code

**CID**
Criminal Investigation Division

**DA Form**
Department of the Army form

**DA Pam**
Department of the Army pamphlet

**DASA (RB)**
Deputy Assistant Secretary of the Army (Review Boards)

**DASEB**
Department of the Army Suitability Evaluation Board

**DCS**
Deputy Chief of Staff

**DD Form**
Department of Defense form

**DOD**
Department of Defense

**DRU**
direct reporting unit

**GCMCA**
general court-martial convening authority

**GO**
general officer

**HQDA**
Headquarters, Department of the Army

**HRC**
U.S. Army Human Resources Command

**IG**
Inspector General

**NCO**
noncommissioned officer

**PASS**
positions or appointments screened for suitability

**POSTA**
positions of significant trust and authority

**SECARMY**
Secretary of the Army

**TPU**
Troop Program Unit

**UCMJ**
Uniform Code of Military Justice

**USACIDC**
U.S. Army Criminal Investigation Command

**USAR**
U.S. Army Reserve

**USC**
United States Code

**VCSA**
Vice Chief of Staff of the Army

**Section II**

**Terms**

**Ancillary action**
Action attendant to or subsequent to criminal justice action.

**Army Military Human Resource Record**
Reports, forms, and records (in documents or data banks) maintained by the Army pursuant to AR 600–8–104 for consideration when making personnel management decisions affecting the person concerned.

**Clear and convincing evidence**
Evidence of the measure or degree of proof which will produce in the mind a firm belief or conviction as to the facts sought to be established. The requirement of clear and convincing evidence does not call for unanswerable or conclusive evidence. Whether the evidence is clear and convincing requires weighing, comparing, testing, and judging its worth when considered in connection with all the facts and circumstances in evidence.

**Counterintelligence and personnel security, law enforcement, and other investigative files**
Reports, dossiers, and case materials (in documents or data banks) that belong to intelligence, law enforcement, or other investigative agencies. (Examples: files of the U.S. Army Investigative Records Repository, the USACIDC Crime Records Center, those pertaining to investigations conducted by General Court-Martial Convening authorities, and IG files at all IG files at all echelons.)

**Crime records**
Criminal Investigation Command reports of investigation, military police reports, and other reports maintained by (or belonging to) USACIDC. (Example: Criminal Investigation Command and military policy reports kept at the USACIDC Crime Records Center.)

**Favorable personnel action**
Any personnel or career management decision that enhances a Soldier's status or position. Included are as follows:
*a.* Promotions.
*b.* Regular Army appointments.
*c.* Selection for schooling.

*d.* Entry or continuation on active duty.
*e.* Awards, decorations, and commendations.
*f.* Voluntary reassignment.
*g.* Voluntary retirement.
*h.* Voluntary separation or release from active duty.
*i.* Reenlistment.
*Note.* Although the granting of a security clearance is a "favorable personnel action," it is not governed by this regulation.

**Major commands**
In addition to the designated ACOMs, separate Department of the Army agencies and activities, continental United States armies, the U.S. Army Recruiting Command, the U.S. Military Entrance Processing Command, and Army General and Special Staff agencies are considered major commands for the purpose of processing cases under this regulation.

**Non–sensitive position**
Any position so designated within the DOD, the occupant of which could not bring about, by virtue of the nature of the position, a materially adverse effect on the national security.

**Personally identifiable information**
Any information about an individual which can be used to distinguish or trace an individual's identity such as name, social security number, date, and place of birth, mother's maiden name, and biometric records.

**Preponderance of the evidence**
Evidence which is of greater weight or more convincing than the evidence offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not. Preponderance of the evidence may not be determined by the number of witnesses, but by the greater weight of all evidence.

**Punitive administrative action**
Any adverse administrative action initiated as a result of identified sex-related offenses including, but not limited to, memoranda of reprimand, admonishment, or censure from all levels of command.

**Recipient**
A Soldier who has had unfavorable information referred to them for refusal, explanation, or comment; who has received a memorandum of reprimand, admonition, or censure in accordance with this regulation; or who has otherwise been the subject of an adverse action, the resolution of which may implicate the provisions of this regulation.

**Sensitive position**
Any position so designated within the DOD, the occupant of which could bring about, by virtue of the nature of the position, a materially adverse effect on the national security.

**Substantial evidence**
Evidence which is sufficient for a reasonable, prudent fact finder to accept as adequate to support a conclusion. It is more than a mere scintilla of evidence but less that a preponderance of evidence.

**Suitability**
All vetting functions to include fitness, Homeland Security Presidential Directive–12 common access card credentialing functions, the Personnel Reliability Program, information technology vetting of privileged users, health care personnel, Army civilian police and security guards, continued reliability of positions having duties and responsibilities associated with law enforcement and security, unescorted access to arms, ammunition, and explosives and other access to credentials.

**Unfavorable information**
Any credible derogatory information that may reflect on a Soldier's character, integrity, trustworthiness, or reliability and includes letters of reprimand and UCMJ, Art. 15.

**Unresolvable cases**
Cases where, because of unusual circumstances or complexities, unfavorable information of a serious nature concerning members or former members of a command cannot properly be acted upon in accordance with the commander's authority.

Army Regulation 15–185

Boards, Commissions, and Committees

# Army Board for Correction of Military Records

Headquarters
Department of the Army
Washington, DC
31 March 2006

## UNCLASSIFIED

# *SUMMARY of CHANGE*

AR 15-185
Army Board for Correction of Military Records

This rapid action revision dated 31 March 2006--

o  Updates policies and procedures in the reconsideration of Army Board for
   Correction of Military Records decision in order to comply with the United
   States District Court for the District of Columbia decision (Lipsman v.
   Secretary of the Army--Civil Action No. 02-0251, 2004 U.S. Dist. Lexis 17866)
   (para 2-15).

o  Updates appendix A.

This revision--

o  Updates information on the policy and procedures for the operation of the Army
   Board for Correction of Military Records.

o  Implements Department of Defense (DOD) Instruction 1336.6, Correction of
   Military Records (para 2-2a).

o  Implements that portion of section 1034 of title 10 of the U.S. Code and that
   portion of DOD Directive 7050.6, Military Whistleblower Protection, that
   pertain to actions by the Army Board for Correction of Military Records (para
   2-2b).

o  Prescribes DD Form 149 (Application for Correction of Military Record Under
   the Provisions of title 10, U.S. Code, section 1552) (para 2-3b).

**Headquarters**
**Department of the Army**
Washington, DC
31 March 2006

*****Army Regulation 15–185**

**Effective 1 May 2006**

Boards, Commissions, and Committees

## Army Board for Correction of Military Records

By Order of the Secretary of the Army:

PETER J. SCHOOMAKER
*General, United States Army*
*Chief of Staff*

Official:

*JOYCE E. MORROW*
JOYCE E. MORROW
*Administrative Assistant to the*
*Secretary of the Army*

**History.** This publication is a rapid action revision. The portions affected by this rapid action revision are listed in the summary of change.

**Summary.** This regulation provides Department of the Army policy, criteria, and administrative instructions regarding an applicant's request for the correction of a military record.

**Applicability.** This regulation applies to the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve unless otherwise stated. Also, it applies to former soldiers of these organizations and their heirs or legal representatives and other individuals, military or civilian, who are affected by a military record. Further, it applies to the Defense Finance and Accounting Service in settling claims as a result of correction of an Army military record. This regulation remains in full effect during mobilization.

**Proponent and exception authority.** The proponent of this regulation is the Assistant Secretary of the Army (Manpower and Reserve Affairs). The proponent has the authority to approve exceptions or waivers to this regulation that are consistent with controlling law and regulations. The proponent may delegate this approval authority, in writing, to a division chief within the proponent agency or its direct reporting unit or field operating agency, in the grade of colonel or the civilian equivalent. Activities may request a waiver to this regulation by providing justification that includes a full analysis of the expected benefits and must include formal review by the activity's senior legal officer. All waiver requests will be endorsed by the commander or senior leader of the requesting activity and forwarded through their higher headquarters to the policy proponent. Refer to AR 25–30 for specific guidance.

**Army management control process.** This regulation contains management control provisions in accordance with AR 11–2, but does not identify key management controls that must be evaluated.

**Supplementation.** Supplementation of this regulation and establishment of command and local forms are prohibited without prior approval from HQDA, Assistant Secretary of the Army (Manpower and Reserve Affairs) (SAMR–ZA), Army Pentagon, Washington, DC 20310–0111.

**Suggested improvements.** Users are invited to send comments and suggested improvements on DA Form 2028 (Recommended Changes to Publications and Blank Forms) directly to the Department of the Army Review Boards Agency, ATTN: SAMR–ARBA, 1941 Jefferson Davis Highway, Arlington, VA 22202–4508.

**Distribution.** This publication is available in electronic media only and is intended for command levels C, D, and E for the Active Army, Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve.

**Contents** (Listed by paragraph and page number)

**Chapter 1**
**Introduction,** *page 1*

*Section I*
*General, page 1*
Purpose • 1–1, *page 1*
References • 1–2, *page 1*
Explanation of abbreviations and terms • 1–3, *page 1*
Statutory authority • 1–4, *page 1*

*Section II*
*Responsibilities, page 1*

*This regulation supersedes AR 15–185, dated 29 February 2000.

**UNCLASSIFIED**

**Contents—Continued**

The Secretary of the Army • 1–5, *page 1*
The Director, Army Board for Correction of Military Records • 1–6, *page 1*
The chair of an Army Board for Correction of Military Records panel • 1–7, *page 1*
The Army Board for Correction of Military Records members • 1–8, *page 1*
The Director, Army Records Holding Agency • 1–9, *page 1*
The commanders of Army Staff agencies and commands • 1–10, *page 2*
The Director, Defense Finance and Accounting Service • 1–11, *page 2*

**Chapter 2**
**General,** *page 2*

*Section I*
*Army Board for Correction of Military Records Establishment and Functions, page 2*
Army Board for Correction of Military Records establishment • 2–1, *page 2*
Army Board for Correction of Military Records functions • 2–2, *page 2*

*Section II*
*Application Procedures, page 2*
Who may apply • 2–3, *page 2*
Time limits • 2–4, *page 2*
Administrative remedies • 2–5, *page 3*
Stay of other proceedings • 2–6, *page 3*
Counsel • 2–7, *page 3*

*Section III*
*Actions by the Army Board for Correction of Military Records Director and Staff, page 3*
Criteria • 2–8, *page 3*
Burden of proof • 2–9, *page 3*
Army Board for Correction of Military Records consideration • 2–10, *page 3*

*Section IV*
*Hearings and Disposition of Applications, page 3*
Army Board for Correction of Military Records hearings • 2–11, *page 3*
Army Board for Correction of Military Records decisions • 2–12, *page 3*
Army Board for Correction of Military Records final action • 2–13, *page 3*
Decision of the Secretary of the Army • 2–14, *page 4*
Reconsideration of Army Board for Correction of Military Records decision • 2–15, *page 4*

**Chapter 3**
**Claims/Expenses,** *page 4*
Authority • 3–1, *page 4*
Settlement of claims • 3–2, *page 4*
Payment of expenses • 3–3, *page 4*

**Chapter 4**
**Miscellaneous Provisions,** *page 5*
Special standards • 4–1, *page 5*
Public access to decisions • 4–2, *page 5*

**Appendix A.**   References, *page 6*

**Glossary**

**Index**

## Chapter 1
## Introduction

**Section I**
**General**

### 1–1. Purpose
This regulation prescribes the policies and procedures for correction of military records by the Secretary of the Army, acting through the Army Board for Correction of Military Records (ABCMR).

### 1–2. References
Required and related publications and prescribed and referenced forms are listed in appendix A.

### 1–3. Explanation of abbreviations and terms
Abbreviations and special terms used in this regulation are explained in the glossary.

### 1–4. Statutory authority
Section 1552, Title 10, United States Code (10 USC 1552) is the statutory authority for this regulation.

**Section II**
**Responsibilities**

### 1–5. The Secretary of the Army
The Secretary of the Army will oversee the operations of the ABCMR. The Secretary will take final action on applications, as appropriate.

### 1–6. The Director, Army Board for Correction of Military Records
The Director, ABCMR will manage the ABCMR day–to–day operations.

### 1–7. The chair of an Army Board for Correction of Military Records panel
The chair of a given ABCMR panel will—
  *a.* Preside over the panel.
  *b.* Conduct a hearing.
  *c.* Maintain order.
  *d.* Ensure the applicant receives a full and fair opportunity to be heard.
  *e.* Certify the written record of proceedings in pro forma and formal hearings as being true and correct.

### 1–8. The Army Board for Correction of Military Records members
The ABCMR members will—
  *a.* Review all applications that are properly before them to determine the existence of error or injustice.
  *b.* Direct or recommend changes in military records to correct the error or injustice, if persuaded that material error or injustice exists and that sufficient evidence exists on the record.
  *c.* Recommend a hearing when appropriate in the interest of justice.
  *d.* Deny applications when the alleged error or injustice is not adequately supported by the evidence and when a hearing is not deemed proper.
  *e.* Deny applications when the application is not filed within prescribed time limits and when it is not in the interest of justice to excuse the failure to file in a timely manner.

### 1–9. The Director, Army Records Holding Agency
The director of an Army records holding agency will—
  *a.* Take appropriate action on routine issues that may be administratively corrected under authority inherent in the custodian of the records and that do not require ABCMR action.
  *b.* Furnish all requested Army military records to the ABCMR.
  *c.* Request additional information from the applicant, if needed, to assist the ABCMR in conducting a full and fair review of the matter.
  *d.* Take corrective action directed by the ABCMR or the Secretary of the Army.
  *e.* Inform the Defense Finance and Accounting Service (DFAS), when appropriate; the applicant; the applicant's counsel, if any; and the interested Members of Congress, if any, after a correction is complete.
  *f.* Return original records of the soldier or former soldier obtained from the Department of Veterans Affairs.

## 1–10. The commanders of Army Staff agencies and commands

The commanders of Army Staff agencies and commands will—

*a.* Furnish advisory opinions on matters within their areas of expertise upon request of the ABCMR and in a timely manner.

*b.* Obtain additional information or documentation as needed before providing the opinions to the ABCMR.

*c.* Provide records, investigations, information, and documentation upon request of the ABCMR.

*d.* Provide additional assistance upon request of the ABCMR.

*e.* Take corrective action directed by the ABCMR or the Secretary of the Army.

## 1–11. The Director, Defense Finance and Accounting Service

At the request of the ABCMR staff, the Director, DFAS, will—

*a.* Furnish advisory opinions on matters within the DFAS area of expertise upon request.

*b.* Obtain additional information or documentation as needed before providing the opinions.

*c.* Provide financial records upon request.

*d.* Settle claims that are based on ABCMR final actions, on behalf of the Army.

*e.* Report quarterly to the ABCMR Director on the monies expended as a result of ABCMR action and the names of the payees.


# Chapter 2
# General

## Section I
## Army Board for Correction of Military Records Establishment and Functions

### 2–1. Army Board for Correction of Military Records establishment

The ABCMR operates pursuant to law (10 USC 1552) within the Office of the Secretary of the Army. The ABCMR consists of civilians regularly employed in the executive part of the Department of the Army (DA) who are appointed by the Secretary of the Army and serve on the ABCMR as an additional duty. Three members constitute a quorum.

### 2–2. Army Board for Correction of Military Records functions

*a.* The ABCMR considers individual applications that are properly brought before it. In appropriate cases, it directs or recommends correction of military records to remove an error or injustice.

*b.* When an applicant has suffered reprisal under 10 USC 1034 and DODD 7050.6, the ABCMR may recommend to the Secretary of the Army that disciplinary or administrative action be taken against any Army official who committed an act of reprisal against the applicant.

*c.* The ABCMR will decide cases on the evidence of record. It is not an investigative body. The ABCMR may, in its discretion, hold a hearing (sometimes referred to as an evidentiary hearing or an administrative hearing in 10 USC 1034 and DODD 7050.6) or request additional evidence or opinions.

## Section II
## Application Procedures

### 2–3. Who may apply

*a.* The ABCMR's jurisdiction under 10 USC 1552 extends to any military record of the DA. It is the nature of the record and the status of the applicant that define the ABCMR's jurisdiction.

*b.* Usually applicants are soldiers or former soldiers of the Active Army, the U.S. Army Reserve (USAR), and in certain cases, the Army National Guard of the United States (ARNGUS) and other military and civilian individuals affected by an Army military record. Requests are personal to the applicant and relate to military records. Requests are submitted on DD Form 149 (Application for Correction of Military Record Under the Provisions of Title 10, U.S. Code, Section 1552). Soldiers need not submit applications through their chain of command.

*c.* An applicant with a proper interest may request correction of another person's military records when that person is incapable of acting on his or her own behalf, missing, or deceased. Depending on the circumstances, a child, spouse, parent, or other close relative, heir, or legal representative (such as a guardian or executor) of the soldier or former soldier may be able to demonstrate a proper interest. Applicants must send proof of proper interest with the application when requesting correction of another person's military records.

### 2–4. Time limits

Applicants must file an application within 3 years after an alleged error or injustice is discovered or reasonably should

have been discovered. The ABCMR may deny an untimely application. The ABCMR may excuse untimely filing in the interest of justice.

## 2–5. Administrative remedies
The ABCMR will not consider an application until the applicant has exhausted all administrative remedies to correct the alleged error or injustice.

## 2–6. Stay of other proceedings
Applying to the ABCMR does not stay other proceedings.

## 2–7. Counsel
*a.* Applicants may be represented by counsel, at their own expense.
*b.* See DODD 7050.6 for provisions for counsel in cases processed under 10 USC 1034.

## Section III
## Actions by the Army Board for Correction of Military Records Director and Staff

## 2–8. Criteria
The ABCMR staff will review each application to determine if it meets the criteria for consideration by the ABCMR. The application may be returned without action if—
*a.* The applicant fails to complete and sign the application.
*b.* The applicant has not exhausted all other administrative remedies.
*c.* The ABCMR does not have jurisdiction to grant the requested relief.
*d.* No new evidence was submitted with a request for reconsideration.

## 2–9. Burden of proof
The ABCMR begins its consideration of each case with the presumption of administrative regularity. The applicant has the burden of proving an error or injustice by a preponderance of the evidence.

## 2–10. Army Board for Correction of Military Records consideration
*a.* A panel consisting of at least three ABCMR members will consider each application that is properly brought before it. One panel member will serve as the chair.
*b.* The panel members may consider a case on the merits in executive session or may authorize a hearing.
*c.* Each application will be reviewed to determine—
(1) Whether the preponderance of the evidence shows that an error or injustice exists and—
(a) If so, what relief is appropriate.
(b) If not, deny relief.
(2) Whether to authorize a hearing.
(3) If the application is filed outside the statute of limitations and whether to deny based on untimeliness or to waive the statute in the interest of justice.

## Section IV
## Hearings and Disposition of Applications

## 2–11. Army Board for Correction of Military Records hearings
Applicants do not have a right to a hearing before the ABCMR. The Director or the ABCMR may grant a formal hearing whenever justice requires.

## 2–12. Army Board for Correction of Military Records decisions
The panel members' majority vote constitutes the action of the ABCMR. The ABCMR's findings, recommendations, and in the case of a denial, the rationale will be in writing.

## 2–13. Army Board for Correction of Military Records final action
The panel members' majority vote constitutes the action of the ABCMR. The ABCMR's findings, recommendations, and in the case of a denial, the rationale will be in writing.
*a.* Except as otherwise provided, the ABCMR acts for the Secretary of the Army, and an ABCMR decision is final when it—
(1) Denies any application (except for actions based on reprisals investigated under 10 USC 1034).
(2) Grants any application in whole or in part without a hearing when—
(a) The relief is as recommended by the proper staff agency in an advisory opinion.

*(b)* Is unanimously agreed to by the ABCMR panel.

*(c)* Does not involve an appointment or promotion requiring confirmation by the Senate.

*b.* The ABCMR will forward the decisional document to the Secretary of the Army for final decision in any case in which—

(1) A hearing was held.

(2) The facts involve reprisals under the Military Whistleblower Protection Act, confirmed by the DOD Inspector General (DODIG) under 10 USC 1034 and DODD 7050.6.

(3) The ABCMR recommends relief but is not authorized to act for the Secretary of the Army on the application.

## 2–14. Decision of the Secretary of the Army

*a.* The Secretary of the Army may direct such action as he or she deems proper on each case. Cases returned to the Board for further consideration will be accompanied by a brief statement of the reasons for such action. If the Secretary does not accept the ABCMR's recommendation, adopts a minority position, or fashions an action that he or she deems proper and supported by the record, that decision will be in writing and will include a brief statement of the grounds for denial or revision.

*b.* The Secretary of the Army will issue decisions on cases covered by the Military Whistleblower Protection Act (10 USC 1034 and DODD 7050.6). In cases where the DODIG concluded that there was reprisal, these decisions will be made within 180 days after receipt of the application and the investigative report by the DODIG, the DA Inspector General (DAIG), or other Inspector General offices. Unless the full relief requested is granted, these applicants will be informed of their right to request review of the decision by the Secretary of Defense.

## 2–15. Reconsideration of Army Board for Correction of Military Records decision

An applicant may request the reconsideration of an ABCMR decision under the following circumstances:

*a.* If the ABCMR receives the request for reconsideration within 1 year of the ABCMR's original decision and if the ABCMR has not previously reconsidered the matter, the ABCMR staff will review the request to determine if it contains evidence (including, but not limited to, any facts or arguments as to why relief should be granted) that was not in the record at the time of the ABCMR's prior consideration. If new evidence has been submitted, the request will be submitted to the ABCMR for its determination of whether the new evidence is sufficient to demonstrate material error or injustice. If no new evidence is found, the ABCMR staff will return the application to the applicant without action.

*b.* If the ABCMR receives a request for reconsideration more than 1 year after the ABCMR's original decision or after the ABCMR has already considered one request for reconsideration, then the case will be returned without action and the applicant will be advised the next remedy is appeal to a court of appropriate jurisdiction.

# Chapter 3
# Claims/Expenses

## 3–1. Authority

*a.* The Army, by law, may pay claims for amounts due to applicants as a result of correction of military records.

*b.* The Army may not pay any claim previously compensated by Congress through enactment of a private law.

*c.* The Army may not pay for any benefit to which the applicant might later become entitled under the laws and regulations managed by the Department of Veterans Affairs.

## 3–2. Settlement of claims

*a.* The ABCMR will furnish DFAS copies of decisions potentially affecting monetary entitlement or benefits. The DFAS will treat such decisions as claims for payment by or on behalf of the applicant.

*b.* The DFAS will settle claims on the basis of the corrected military record. The DFAS will compute the amount due, if any. The DFAS may require applicants to furnish additional information to establish their status as proper parties to the claim and to aid in deciding amounts due. Earnings received from civilian employment during any period for which active duty pay and allowances are payable will be deducted. The applicant's acceptance of a settlement fully satisfies the claim concerned.

## 3–3. Payment of expenses

The Army may not pay attorney's fees or other expenses incurred by or on behalf of an applicant in connection with an application for correction of military records under 10 USC 1552.

## Chapter 4
## Miscellaneous Provisions

### 4–1. Special standards

*a.* Pursuant to the 27 November 1979 order of the United States District Court for the District of Columbia in *Giles v. Secretary of the Army* (Civil Action No. 77–0904), a former Army soldier is entitled to an honorable discharge if a less than honorable discharge was issued to the soldier on or before 27 November 1979 in an administrative proceeding in which the Army introduced evidence developed by or as a direct or indirect result of compelled urinalysis testing administered for the purpose of identifying drug abusers (either for the purposes of entry into a treatment program or to monitor progress through rehabilitation or follow-up).

*b.* Applicants who believe that they fall within the scope of paragraph *a,* above, should place the term "CATEGORY G" in block 11b of DD Form 149. Such applications should be expeditiously reviewed by a designated official, who will either send the individual an honorable discharge certificate if the individual falls within the scope of paragraph *a,* above, or forward the application to the Discharge Review Board if the individual does not fall within the scope of paragraph *a,* above. The action of the designated official will not constitute an action or decision by the ABCMR.

### 4–2. Public access to decisions

*a.* After deletion of personal information, a redacted copy of each decision will be indexed by subject and made available for review and copying at a public reading room at Crystal Mall 4, 1941 Jefferson Davis Highway, Arlington, VA. The index will be in a usable and concise form so as to indicate the topic considered and the reasons for the decision. Under the Freedom of Information Act, records created on or after 1 November 1996 will be available by electronic means.

*b.* Under the Freedom of Information Act and the Privacy Act of 1974, the ABCMR will not furnish to third parties information submitted with or about an application unless specific written authorization is received from the applicant or unless the Board is otherwise authorized by law.

**Appendix A**
**References**

**Section I**
**Required Publications**
This section contains no entries.

**Section II**
**Related Publications**
A related publication is a source of additional information. The user does not have to read a related reference to understand this publication.

**AR 15–130**
Army Clemency and Parole Board

**AR 25–55**
The Department of the Army Freedom of Information Act Program

**AR 340–21**
The Army Privacy Program

**AR 600–8–104**
Military Personnel Information Management/Records

**DODD 7050.6**
Military Whistleblower Protection

**5 USC 552**
Public information; agency rules, opinions, orders, records, and proceedings

**10 USC 1034**
Protected communications; prohibition of retaliatory personnel actions

**10 USC 1552**
Correction of military records: claims incident thereto

**38 USC 5902**
Recognition of representatives of organizations

**Section III**
**Prescribed Forms**
This prescribed form is available through the normal supply channels and the APD Web site http://www.apd.army.mil.

**DD Form 149**
Application for Correction of Military Record Under the Provisions of Title 10, U.S. Code, Section 1552 (prescribed in para 2–3*b*).

**Section IV**
**Referenced Forms**
This section contains no entries.

## Glossary

**Section I**
**Abbreviations**

**ABCMR**
Army Board for Correction of Military Records

**AR**
Army regulation

**ARNGUS**
Army National Guard of the United States

**ATTN**
Attention

**DA**
Department of the Army

**DAIG**
Department of the Army Inspector General

**DFAS**
Defense Finance and Accounting Service

**DOD**
Department of Defense

**DODD**
Department of Defense Directive

**DODIG**
Department of Defense Inspector General

**HQDA**
Headquarters, Department of the Army

**IG**
Inspector General

**U.S.**
United States (of America)

**USAR**
U.S. Army Reserve

**USC**
United States Code

**Section II**
**Terms**

**Applicant**
A person who applies to the ABCMR for correction of an Army military record.

**Counsel**
Includes individuals in good standing of the Federal bar or the bar of any state, territory or the District of Columbia; accredited representatives of veterans' organizations recognized under 38 USC 5902; and other individuals determined by the ABCMR to be competent to represent the interests of the applicant. Army Judge Advocate General's Corps officers may assist in the preparation and submission of an application to the ABCMR. However, they may not

represent an applicant at a hearing, if one is granted, without written approval of The Judge Advocate General of the Army.

**Official military personnel file**
The permanent, historical, and official record of a soldier's military service.

**Records Holding Agency**
The agency responsible for the safe storage, maintenance, and control of records.

**Secretary of the Army**
Includes the Secretary's designee to act on ABCMR matters.

**Section III**
**Special Abbreviations and Terms**
This section contains no entries.

## Index

This index is organized alphabetically by topic and subtopic. Topics and subtopics are identified by paragraph number.

**ABCMR decisions**
Action of the ABCMR, 1–8, 2–2, 2–8
Decisional documents, 2–13
Determinations, 1–8, 2–12
\Military Whistleblower Protection Act provisions, 2–12, 2–14

**ABCMR deliberations**
ABCMR determinations, 2–14, 2–15
Advisory opinions, 1–10, 1–11
Denial of applications, 1–8, 2–12, 2–13
Evidence considered, 2–10

**ABCMR hearings**
Evidence considered, 2–10
Executive session, 2–10
Hearings, 2–10, 2–11
Military Whistleblower Protection Act provisions, 2–2, 2–14
No right to hearing, 2–11

**ABCMR information sources**
Advisory opinions, 1–10, 1–11, 2–13
Information from other Government sources, 1–9, 1–10
Presumption of administrative regularity, 2–9
Reports from IG, 2–14

**Access to records**
Records access, 4–2
Request for official records, 4–2

**Action after final decision**
Filing of documentation, 1–9
Notification to applicant, 1–9
Notification to Army/Defense officials , 1–9, 3–2
Notification to counsel/Members of Congress, 1–9

**Actions by the ABCMR staff**
Administrative denial, 2–8
Notification to applicant, 2–8
Preview of applications, 2–8

**Application forms**
Completion of forms, 2–3, 2–8

**Claims/expenses**
Authority for payment, 3–1
Payments not authorized, 3–1, 3–3

**Consideration by the ABCMR**
Composition of ABCMR panel, 2–10
Evidence considered, 2–10

**Counsel representation**
Counsel at applicant's own expense, 2–7
Definition of counsel, 2–7
Representation by Army Judge Advocate General Corps officer, 2–7

**Decision of the Secretary of the Army**
Military Whistleblower Protection Act provisions, 2–13, 2–14
Review by the Secretary of Defense, 2–14
Secretary of the Army's actions, 1–5, 2–13, 2–14

**Decisional documents**
Evidence considered, 2–13

**Explanation of abbreviations and terms, Glossary**

**Final action by the ABCMR**
   Actions of the ABCMR, 2–12, 2–13
   Decisional documents, 2–13
**Form prescribed**
   Completion of form, 2–8, 4–1
   Minority reports, 2–14

**Payment of expenses**
   Payments not authorized, 3–1, 3–3
**Preparation before applying**
   Applicant's actions before applying, 2–5
**Public access to decision**
   Documents available to review, 4–2
   Index of decisions, 4–2
   Prohibitions on furnishing information, 4–2
   Purpose paragraph, 1–1

**Reconsideration of applications**
   Actions on requests for reconsideration, 2–15
   Basis for reconsideration, 2–15
   Notification to applicant, 2–15
**References**
   Prescribed and referenced forms, appendix A
   Related publications, appendix A
**Report of settlement**
   The Army section of the DFAS action, 1–11
**Responsibilities**
   ABCMR members, 1–8, 2–14
   Applicant, 2–3, 2–4, 2–5, 2–6, 2–10, 2–11, 2–12, 2–13, 3–2
   Army records holding agency, 1–9, 4–2
   DFAS, 1–11, 3–1, 3–2, 3–3
   Army Staff agencies and/or commands, 1–10
   Chair, 1–7
   Director of the ABCMR, 1–6
   Secretary of the Army, 1–1, 1–5, 1–9, 2–1, 2–13, 4–2

**Separate communications**
   Comments/Recommendations to the Secretary of the Army, 2–14
**Settlement of claims**
   Army section of the DFAS actions, 1–11, 3–1, 3–2, 3–3
   Settlement report, 1–11
**Setup of the ABCMR**
   Authority for ABCMR, 2–1
   Composition of ABCMR, 2–1
   Special Standards, 4–1
**Staff assistance**
   Advisory opinions, 1–10, 1–11
   Compliance with requests, 1–10, 1–11, 1–14
   Information from other Government sources, 2–13, 4–2
   Statutory authority, 1–4
   Stay on other proceedings, 2–6

**Time limits**
   Excusing a failure to timely file, 2–4, 2–10
   Failure to timely apply, 2–4, 2–10

**Who may apply**
   Applicants, 2–3
   ABCMR jurisdiction, 2–3

**UNCLASSIFIED**

PIN 000431−000