## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| NAVY SEAL 1, *et al.*, for themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>JOSEPH R. BIDEN, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 8:21-cv-2429-SDM-TGW |

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### LEGAL ARGUMENT

### I.  PLAINTIFFS FACE IMMEDIATE, IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.

Defendants contend that Plaintiffs face no irreparable harm because post-disciplinary measures can correct any injuries they suffer. (Dkt. 23, Opposition, at 30–31.) But, while generally true in the employment context, Defendants' contention ignores the seminal First Amendment questions before the Court. And there can be no dispute that Defendants' substantial burden on Plaintiffs' religious exercise constitutes irreparable harm as a matter of law. As the Supreme Court has held time and again, Plaintiffs "are irreparably harmed by the loss of free exercise rights for even minimal periods of time." *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021). "There can be no question that the challenged [mandate], if enforced, will cause irreparable harm." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). Contrary to

Defendants' assertions, Plaintiffs' constitutional injuries in the instant matter are presumed to be irreparable harm. *See, e.g.*, *Ne. Fla. Chap. of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Indeed, suffering consequences for failure to violate their sincerely held religious belief represents "direct penalization" of First Amendment rights, which "constitutes irreparable injury." *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983).

Defendants' false reduction, that Plaintiffs face only the loss of a job and the potential discharge of their commissions rather than the loss of First Amendment rights, must be rejected. "The harm [Plaintiffs] would suffer is not only, as [Defendants] argue[], the loss of [their] job[s] *per se,* but also the penalty for exercising [their First Amendment] rights. The chilling effect of that penalty cannot be adequately redressed after the fact." *Romero Feliciano v. Torres Gaztambide*, 836 F.2d 1, 4 (1st Cir. 1987). As the "chief function" of a preliminary injunction is "to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated," *Robinson v. Attorney General*, 957 F.3d 1171, 1178 (11th Cir. 2020), Defendants' contentions that lost First Amendment freedoms can be made whole after the status quo has been altered is incorrect as a matter of law.

The testimony before this Court demonstrates the immediate and irreparable harm that Plaintiffs and other members of the Class are facing right now. As the sworn testimony of Lieutenant Colonel, United States Marine Corp, demonstrates, **Defendants are already taking action against military servicemembers for failure to**

2

**violate their sincerely held religious convictions**. (**EXHIBIT A**, Declaration of Lieutenant Colonel, USMC, ¶¶8-9 (testifying that Lieutenant Colonel's request for religious accommodation was denied and that "**based upon the command's presumption that my appeal would be denied, I was preemptively removed from my Executive Office leadership position on 1 November 2021** (emphasis original)).) In order to comply with his sincerely held religious convictions, Lieutenant Colonel requested that the USMC permit him to accept early retirement, but his request for even that consideration – a benefit to which his nearly 19 years of service entitles him – has been stalled and denied. (Ex. A, Lieutenant Colonel Decl. ¶11.) Lieutenant Colonel faces termination and disciplinary measures, even though he has sought other alternative mechanisms "as a means of avoiding the conflict between the COVID shot order and [his] faith." (*Id.*, ¶13) And, even that imminently reasonable request has not been approved.

Federal contractors subject to Defendants mandates are likewise suffering irreparable harm that cannot wait for final resolution of Defendants' purported administrative process. As Federal Contractor Employee witness puts it, **the process for even obtaining a religious exemption is a sham because every one of the requests has been denied by his employer**. (**EXHIBIT B**, Declaration of Federal Contractor Employee, ¶36.) Federal Employee Contractor was denied a religious exemption **explicitly because of Defendant Biden's executive order mandating that contractors ensure their employees are vaccinated**. (Ex. B, Federal Contractor Employee Decl.

¶25.) Thus, Defendants' contentions that Plaintiffs need only let the process play out is belied by the facts before this Court. There is no process to play out, Plaintiffs and the members of the Class are merely waiting for the consequence of termination to occur. The testimony of federal contractor Field Test Technician similarly bears this out. (**EXHIBIT C**, Declaration of Federal Contractor Employee Field Test Technician, ¶20.) Indeed, the blanket denial of religious exemptions mirrored the exact language denying other federal contractors' denials. (*Compare id. with* Ex. B at 25.) As is readily apparent, federal contractors subject to Defendant Biden's mandate are plainly denying all requested religious exemptions and failing to provide any process for religious accommodations.

Moreover, Defendants' contentions that Plaintiffs and other members of the Class should just allow the process to play out is completely undermined by the situations faced by numerous federal contractors. (*See* **EXHIBIT D**, Declaration of Network Services Level 3 Federal Contractor Employee.) Not only has Network Services Level 3 witness been denied his requested religious accommodation, **he has been informed that – absent intervention by this Court – his employment will terminate as of Monday, November 15 at 2:00 p.m**. (Ex. D ¶9.)

Plaintiffs and other members of the Class are also being subjected to unconscionable actions and pressure to violate their sincerely held religious beliefs by accepting a COVID-19 vaccine. (*See* **EXHIBIT E**, Declaration of Air Force Civilian Registered Nurse). On October 21, Air Force Civilian Registered Nurse was subjected,

along with her colleagues, to an active shooter drill wherein the scenario was based upon an active shooter being an individual "forced to take a Covid injection against their will," who "became violent," and "enter[ed] the clinic shooting and killing many staff." (Ex. E ¶23.) Subjecting individuals to exercises portraying them as unhinged and dangerous unquestionably represents substantial pressure on the sincerely held religious beliefs of those holding religious objections to COVID-19 vaccines. And, the Free Exercise Clause was intended to prevent this precise type of coercion. *See, e.g.*, *Sch. Dist. of Abington Tp. v. Schempp*, 374 U.S. 203, 222 (1963) (noting that the Free Exercise Clause was intended to protect "the right of every person to freely choose his or her own course . . . **free from compulsion from the state**." (emphasis added)). Indeed, "the Free Exercise Clause protects against **indirect coercion** or penalties on the free exercise of religion." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022 (2017) (emphasis added).

## II. DEFENDANTS' JURISDICTIONAL ARGUMENTS ARE ERRONEOUS ATTEMPTS TO EVADE SCRUTINY OF THEIR UNCONSTITUTIONAL MANDATES.

### A. Defendants' Jurisdictional Contentions Fail to Recognize That Facial Challenges to Military Regulations Are Permissible and Justiciable Under the First Amendment.

Defendants attempt to escape this Court's review by claiming that Plaintiffs are not permitted to bring as-applied challenges under *Speigner v. Alexander*, 248 F.3d 1292 (11th Cir. 2001). (Opp'n 13–16.) *Speigner*, however, recognized its "holding in no way bars facial challenges to military regulations." 248 F.3d at 1298. The reason is simple:

Plaintiffs and other military members did not forego their constitutional rights upon enlistment or commission. *See, e.g.*, *Chappell v. Wallace*, 462 U.S. 296, 304 (1983) ("This Court has never held, nor do we now hold, that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service."). *Speigner* specifically recognized a host of Supreme Court precedents permitting constitutional challenges to military regulations, such as the COVID-19 vaccine mandates at issue in the instant litigation. *See* 248 F.3d at 1297–98 (collecting cases); *see also Goldman v. Weinberger*, 475 U.S. 503, 507 1986) (considering a First Amendment challenge to dress code violations and holding the distinctives of military service "do not, of course, render entirely nugatory in the military context the guarantees of the First Amendment"); *Brown v. Glines*, 444 U.S. 348 (1980) (considering First Amendment facial challenge to speech restrictions on members United States Air Force). Defendants' efforts to evade this Court's review of their unconstitutional mandates fails.

### 1.    Plaintiffs' First Amendment challenges need not wait for the Government's unlawful application.

Finding no refuge in their assertion of nonjusticiability, Defendants retreat to the equally unavailing position that Plaintiffs' facial challenges are not ripe because they have not exhausted administrative remedies. (Opp'n 14.) Defendants fail to recognize, however, that Plaintiffs have brought a First Amendment challenge to their unconstitutional mandates. (V. Compl. ¶¶ 194–211.) As the Supreme Court has held, "we have not required that all of those subject to overbroad regulations risk

prosecution to test their rights." *Dombrowski v. Pfister* 380 U.S. 479, 486 (1965). As the Eleventh Circuit, too, has held: "We will not force a plaintiff to choose between intentionally violating a law to gain access to judicial review and foregoing what he or she believes to be constitutionally protected activity in order to avoid criminal prosecution." *White's Place, Inc. v. Glover*, 222 F.3d 1327, 1329 (11th Cir. 2000). Put simply, "one does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (cleaned up); *see also Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."); *ACLU v. The Florida Bar*, 999 F.2d 1486, 1492 (11th Cir. 1993) ("When a plaintiff has stated that he intends to engage in a specific course of conduct 'arguably affected with a constitutional interest,' however, he does not have to expose himself to enforcement to be able to challenge the law." (quoting *Babbitt*, 442 U.S. at 298)).

 "If the rule were otherwise, the contours of regulation would have to be hammered out case by case—and tested only by those hardy enough to risk criminal prosecution to determine the proper scope of the regulation." *Drombrowski*, 380 U.S. at 486.  Under that scenario, the First Amendment—"of transcendent value to all society, and not merely those exercising their rights—might be the loser." *Id.*

The Government has no answer to the above. Ignoring First Amendment precedent, Defendants claim that Plaintiffs have not been subjected to any

consequences of the COVID-19 vaccine mandates, so there is no claim *yet*. (Opp'n 14.)

But pre-enforcement challenges are permissible in the First Amendment context.

> We are not troubled by the pre-enforcement nature of this suit. The State
> has not suggested that the newly enacted law will not be enforced, and
> we see no reason to assume otherwise. We conclude that plaintiffs have
> alleged an actual and well-founded fear that the law will be enforced
> against them. Further, the alleged danger of this statute is, in large
> measure, one of self-censorship; a harm that can be realized even without
> an actual prosecution.

*Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988); *see also Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1993) (recognizing the availability of pre-enforcement challenges to government restrictions on First Amendment activity); *Int'l Soc'y for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 817 (5th Cir. 1979) (same).[1]

Defendants' contention that Plaintiffs must await actual enforcement, which for Plaintiffs includes the threat of dishonorable discharge (V. Compl. ¶ 134), is incorrect. The threat of Defendants' enforcement of the COVID-19 Vaccine Mandate is "latent in the existence of the [order]," *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003), and thus confers standing on Plaintiffs to challenge it before it is enforced against them.

### 2. Plaintiffs' RFRA claims need not wait for the Government's unlawful application.

Plaintiffs may also seek injunctive relief on their RFRA claims. Numerous courts have found that RFRA challenges are ripe for review prior to the government's

---

[1]      Fifth Circuit cases prior to October 1, 1981 are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

enforcement. *See, e.g.*, *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126 (10th Cir. 2013) (en banc) (holding plaintiffs had standing to bring RFRA challenge to government restrictions before deadline for compliance); *Adam v. Barr*, No. 18-cv-2106(AJN), 2019 WL 1426991, at *3 (S.D.N.Y. Mar. 29, 2019) (pre-enforcement challenges to government regulations are permissible under RFRA); *Oklevueha Native American Church of Hawaii, Inc. v. Holder*, No. 09–00336 SOM/BMK, 2012 WL 6738532, at *4 (D. Hi. Dec. 31, 2012) (allowing pre-enforcement challenge under RFRA).

Plaintiffs have alleged that the various COVID-19 Vaccine Mandates against the United States Military Servicemembers, Federal Employees, and Federal Contractors violate RFRA by substantially burdening the exercise of their religious beliefs and that the mandates fail strict scrutiny. (V. Compl. ¶¶ 212–234.) As the en banc Tenth Circuit stated, Plaintiffs "face an imminent [injury], traceable to the requirement." *Hobby Lobby*, 723 F.3d at 1126. Imminent threat of injury is enough for a pre-enforcement challenge to the mandates.

### 3. Even in the military context, Plaintiffs are not required to exhaust administrative remedies to assert First Amendment and RFRA claims in this Court.

In addition to being settled law outside of the military context, Defendants' contention (Opp'n 28) that Military Servicemembers must exhaust administrative remedies before bringing their RFRA and First Amendment claims in this Court is incorrect. A military plaintiff need not exhaust administrative remedies in order to bring a First Amendment or RFRA challenge to a military policy. *See, e.g.*, *Adair v.*

*England*, 183 F. Supp. 2d 31, 55 (D.D.C. 2002) (military plaintiff need not exhaust administrative remedies to bring First Amendment Free Exercise challenge to military regulations); *Singh v. Carter*, 168 F. Supp. 3d 216, 226 (D.D.C. 2016) (military plaintiff not required to exhaust administrative remedies to bring RFRA challenge to military policies substantially burdening his religious exercise). As *Singh* noted, "RFRA certainly provides no textual support for the defendants' position that the plaintiff is required to exhaust administrative remedies in a court-martial proceeding before bringing his constitutional and RFRA claims before this Court." 168 F. Supp. 3d at 226; *see also Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 838 (9th Cir. 2012) ("We decline, however, to read an exhaustion requirement into RFRA where the statute contains no such condition and the Supreme Court has not imposed one.").

"Resolving a claim founded solely upon a constitutional right is singularly suited to a judicial forum and clearly inappropriate to an administrative board." *Downey v. Warner*, 481 F.2d 642, 643 (9th Cir. 1973). In *Downey*, the Ninth Circuit held that a military servicemember need not exhaust administrative remedies to bring a constitutional challenge. *Id.* There, as here (V. Compl. ¶¶ 194–234), Plaintiffs' "complaint rests solely upon the resolution of her constitutional claim." 481 F.2d at 643. Accordingly, the plaintiff "was not barred from the district court through her failure to exhaust administrative remedies." *Id.*

In *Dilley v. Alexander*, the court explained why military plaintiffs may bring their claims directly in federal court. 603 F.2d 914, 920 (D.C. Cir. 1979). The court reasoned that deference to the military is

> wholly inappropriate, however, when a case presents an issue that is amenable to judicial resolution. Specifically, courts have shown no hesitation to review cases in which a violation of the Constitution, statutes, or regulations is alleged. It is a basic tenet of our legal system that a government agency is not at liberty to ignore its own laws and that agency action in contravention of applicable statutes and regulations is unlawful. The military departments enjoy no immunity from this proscription.

*Id.* (citations omitted).

As the district court said in *Adair*, Defendants' contention that Plaintiffs must exhaust all administrative remedies before bringing a First Amendment or RFRA challenge in federal court "falls flat." 183 F. Supp. 2d at 55.

### B. Defendants' Contentions That No Plaintiff Has Standing to Challenge the Executive Order Mandating COVID-19 Vaccines for Federal Employees Is Incorrect.

Defendants' claim (Opp'n 17) that no Plaintiff has standing to challenge the Executive Order mandate that federal employees receive a COVID-19 vaccine is incorrect. Plaintiffs have made class allegations concerning the unconstitutionality and unlawfulness of Defendants' Executive Orders as pertaining to "military servicemembers, civilian federal employees, and civilian federal contractors." (V. Compl. ¶ 157.) Plaintiffs allege that the other members of the requested class "are all members of the United States Armed Forces, civilian federal employees, or civilian federal contractors." (V. Compl. ¶ 158.) Thus, Plaintiffs, on behalf of themselves and the

11

other federal employees in the Class, have standing to challenge Defendants' COVID-19 vaccine mandates as to federal employees.

**C.   This Court Has Jurisdiction Under the First Amendment and RFRA to Review the Constitutionality and Enjoin Enforcement of Defendant Biden's Orders.**

The Government contends that this Court cannot issue an injunction against the President in his official capacity. (Opp'n 17.) But Defendants' argument proves too little. As the Supreme Court noted in *Franklin v. Massachusetts*, although ordinary injunctive relief is inappropriate against the President, "the President's actions may still be reviewed for constitutionality." 505 U.S. 788, 801 (1992). And the Supreme Court has upheld an injunction against enforcement, by a subordinate official, of an executive order deemed an unconstitutional abuse of executive power. *See Youngstown Sheet Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

Moreover, even if the Supreme Court had not recognized that presidential actions may be reviewed for constitutional infirmity, which it has, RFRA explicitly provides that Plaintiffs may seek injunctive relief against Defendant Biden. *See* 42 U.S.C. §2000bb-2(1) ("the term 'government' includes a *branch*, department, agency, instrumentality, and *official* (or other persons acting under color of law) of the United States" (emphasis added)). *See also Tanzin v. Tanvir*, 141 S. Ct. 486 (2020) (holding that RFRA's definition of "government" includes "all government officials"); *id.* ("A 'government,' under RFRA, extends beyond the term's plain meaning to include officials. And the term 'official' does not refer solely to an office, but rather to the actual person 'who is invested with an office.'"). And, as Congress's explicit findings

make clear, the "purpose" of RFRA was "to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. §2000bb(b)(1).

## III.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT AND RFRA CLAIMS BECAUSE DEFENDANTS' UNLAWFUL REQUIREMENT THAT PLAINTIFFS ACCEPT OR RECEIVE A COVID-19 VACCINE SUBSTANTIALLY BURDENS THEIR RELIGIOUS EXERCISE AND FAILS STRICT SCRUTINY.

### A.   Plaintiffs Have Raised a Facial Challenge to Defendants' Mandate.

Defendants wrongfully assert that Plaintiffs have not raised a facial challenge to Defendants' COVID-19 vaccine mandates. (Opp'n 27.) On the contrary, Plaintiffs allege that they are bringing a facial challenge to Defendants' mandates at least 20 times in Plaintiffs' Verified Complaint. (V. Compl. ¶¶ 198–207, 222–228, 230, 233.) Plaintiffs allege, "The Federal COVID-19 Vaccine Mandate, on its face and as applied, targets Plaintiffs' sincerely held religious beliefs by prohibiting Plaintiffs from seeking and receiving exemption and accommodation for their sincerely held religious beliefs." (V. Compl. ¶ 222.) Moreover, Plaintiffs allege, "The Federal COVID-19 Vaccine Mandate, on its face and as applied, constitutes a substantial burden on Plaintiffs' exercise of their sincerely held religious beliefs." (V. Compl. ¶ 228.)

### B.   Plaintiffs' Facial Challenges to Defendants' COVID-19 Vaccine Mandate on Military Plaintiffs Are Likely to Succeed Under RFRA.

Defendants erroneously contend that Military Plaintiffs are not likely to succeed on the merits of their RFRA claims because this Court should wait until adverse action has been taken against them. (Opp'n 27–28.) But Plaintiffs are not required to exhaust administrative remedies before bringing their RFRA claims for relief in this Court.

Forcing Plaintiffs to live under the daily threat of court martial and/or termination is itself a substantial burden on religious exercise. The DOD mandate was issued August 24, and the mandate for civilian federal employees and contractors was announced on September 9—more than two months ago. Yet not one religious accommodation has been granted. Military Servicemembers have instead been threatened with discipline and told there will be no religious exemptions. And civilian contractors have received no guidance as to the procedures for submitting a religious exemption/accommodation request.

### 1.   RFRA plainly protects Military Plaintiffs' religious exercise.

RFRA applies to the United States Armed Forces. RFRA defines "government" to include "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." 42 U.S.C. §2000bb-2(1). As all Defendants represent branches, departments, agencies, or officials of the United States, Plaintiffs claims against them are justiciable under RFRA.

The explicit text of the statute is recognized by numerous federal courts that have considered RFRA challenges from military members. *See, e.g.*, *Singh v. McHugh*, 185 F. Supp. 3d 201, 218 (D.D.C. 2016) ("on its face, the statute plainly applies to the U.S. Army. Defendants acknowledge that Congress specifically intended RFRA to apply to the military."); *Singh v. Carter*, 168 F. Supp. 3d 216, 226 (2016) ("Congress nowhere inserted any exception for the U.S. Armed Forces from RFRA's application or any exhaustion requirement"); *Rigdon v. Perry*, 962 F. Supp. 150 (D.D.C. 1997)

(applying RFRA against a military regulation restricting the speech of certain military chaplains).

> **2.    Plaintiffs need not await administrative exhaustion or rejection of their requested exemptions to bring claims in this Court.**

Plaintiffs need not await administrative adjudication before bringing claims in this Court. (*See supra* Section II.A.)

> **3.    Forcing Plaintiffs to choose between their sincere religious beliefs and compliance with Defendants' Mandates is a substantial burden on religious exercise.**

> **a.    Defendants' attempts to probe the truth of Plaintiffs' religious beliefs is impermissible as a matter of law.**

Defendants contend that Plaintiffs cannot show a substantial burden on their religious exercise because they have proceeded in this case under pseudonyms, and thus Defendants cannot prod the sincerity of Plaintiffs' religious beliefs. (Opp'n 28.) This is wrong. First, Defendants' knowledge of Plaintiffs' identities is irrelevant to the inquiry of whether these Plaintiffs have alleged violation of their sincerely held religious beliefs.[2] Defendants' contention "dodges the question that RFRA presents,"

---

[2]    Plaintiffs' identity is not critical to the determinations of whether they have alleged in the Verified Complaint and asserted to Defendants their sincerely held religious beliefs. In fact, as many courts have recognized, plaintiffs are often permitted to proceed using a pseudonym when the underlying claims involve religious beliefs. "[R]eligion is perhaps the quintessentially private matter." *Doe v. Stegall*, 653 F.2d 180, 186 (5th Cir. 1981); *see also, e.g.*, *Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004) (affirming district court's order allowing pseudonymous plaintiffs where the "suit—challenging a government activity—forces Plaintiffs to reveal their beliefs about a particularly sensitive topic that could subject them to considerable harassment"); *Doe v. Franklin Bank, SSB*, No. A-08-CA-293 LY, 2008 WL 11334179, * (W.D. Tex. Sept. 3, 2008) (same); *Doe v. Barrow Cnty.*, 219 F.R.D. 189, 193 (N.D. Ga. 2003) (same); *id.* (noting involvement of "religious beliefs" and "the proper interaction

namely, "whether the [government's] mandate imposes a substantial burden on the ability of the objecting parties to conduct business in accordance with *their religious beliefs*." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014). Contrary to Defendants' contentions, "it is not for us to say that their religious beliefs are mistaken or insubstantial." *Id.* at 725. Defendants' understanding of RFRA claims would turn the courts into roving seminary professors and adjudicators of religious doctrine. Plaintiffs have plainly alleged sincerely held religious beliefs against Defendants' COVID-19 vaccine mandates. (V. Compl. ¶¶ 58-–88.) Plaintiffs have plainly alleged that they requested exemptions and accommodations from the COVID-19 vaccine mandates because of their sincerely held religious beliefs. (V. Compl. ¶¶ 17–41, 98–115.) Those allegations, which have been verified by each of Plaintiffs in this action, are sufficient to demonstrate Plaintiffs' sincerely held religious beliefs.

The resolution of the question of whether Plaintiffs' have sincerely held religious beliefs "is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible in order to merit First Amendment protection." *Thomas v. Rev. Bd. of Ind. Empl. Sec. Div.*, 450 U.S. 707, (1981). As the Supreme Court has held numerous times, "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigant interpretations of those creeds." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989).

---

between government and religion" are sufficiently private to warrant a plaintiff's proceeding anonymously). And, Plaintiffs will demonstrate this to the Court in their forthcoming Motion.

Contrary to this established precedent, however, Defendants raise the novel contention that this Court cannot make a decision before Plaintiffs identify themselves and provide proof of their religious beliefs that have already been asserted. (Opp'n 28.) But, this would turn the Court into the arbiter of religious doctrine. That is plainly forbidden. Since time immemorial,

> Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others. Yet, the fact that they may be beyond the ken of mortals does not mean they can be made suspect before the law.

*United States v. Ballard*, 322 U.S. 78, 87 (1944). Defendants' attempts to suggest relief cannot be had without a deep dive into the veracity of Plaintiffs' religious beliefs is plainly incorrect. What matters, for purposes of RFRA, is that Plaintiffs "sincerely believe that [compliance with the mandate] lies on the forbidden side of the line," *Hobby Lobby*, 573 U.S. at 725, and this Court's "narrow function" is to determine whether Plaintiffs' line represents "an honest conviction [and] there is no dispute that it does." *Id.*

### b. Defendants' mandates impose a substantial burden on Plaintiffs' religious beliefs.

Defendants' only response to Plaintiffs' assertion of a substantial burden is that Plaintiffs' anonymity precludes an ability to find a substantial burden. (Opp'n 27.) This is also incorrect. Defendants' mandates put Plaintiffs to the choice: receive a COVID-19 vaccine or face disciplinary consequences. (V. Compl. ¶¶ 50–56.) Defendants, for their part, concede that a failure to receive a COVID-19 vaccine under

the mandates will result in "adverse action" and "discipline." (Opp'n 6, 8.) Moreover, Plaintiffs have alleged that they face dishonorable discharge, court martial, other life-altering disciplinary procedures, and termination for failure to comply with a mandate that violates their sincerely held religious beliefs. (V. Compl. ¶¶ 1, 134.)

As the Court said in *Singh v. Carter*, making out a case for a substantial burden under RFRA is "easily satisfied since, absent an accommodation, the plaintiff would face serious disciplinary action" for conforming his behavior to his sincere religious beliefs. 168 F. Supp. 3d 216, 228 (D.D.C. 2016). As in *Holt v. Hobbs*,

> The Department's grooming policy requires petitioner to shave his beard and thus to "engage in conduct that seriously violates [his] religious beliefs." . . . If petitioner contravenes that policy and grows his beard, he will face serious disciplinary action. Because the grooming policy puts petitioner to this choice, it substantially burdens his religious exercise.

574 U.S. 352, 361 (2015) (quoting *Hobby Lobby*, 573 U.S. at 720).

Here, Defendants' mandates put Plaintiffs to the choice: comply with the mandates or face serious disciplinary action. In fact, Defendants' COVID-19 vaccine mandates impose a substantial burden as a matter of binding law because they require Plaintiffs to engage in activity contrary to their sincerely held religious beliefs. *See, e.g.*, *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) ("We have held that an individual's exercise of religion is 'substantially burdened' if a regulation completely prevents the individual from engaging in religiously mandated activity, or if the regulation requires participation in an activity prohibited by religion."); *see also Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004) ("[A] government action or regulation creates a 'substantial burden' on a religious exercise

if it truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs.").

**C.**  **Plaintiffs' Facial Challenges to the Mandates' Singling Out Religious Exercise for Especially Harsh Treatment Are Likely to Succeed Under the First Amendment.**

Aside from their contention that Plaintiffs have not brought a facial challenge to the mandates (Opp'n 27), which is belied by the Verified Complaint (*see supra* Section III.A), Defendants ignore Plaintiffs' First Amendment claims. Defendants fail to contest, and therefore concede, that Defendants have virtually unfettered discretion to deny religious exemption requests yet readily grant medical exemption requests. And that failure is fatal to Defendants' COVID-19 vaccine mandates. Indeed, "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). By failing to even grapple with the disparate treatment of religious exemption requests, which are being universally denied (V. Compl. ¶¶ 17–41), and the permanently available, nonreligious medical exemptions (V. Compl. ¶ 96), which are being granted (V. Compl. ¶ 30), Defendants have failed to demonstrate that the mandates are neutral and generally applicable.

**D.**  **Defendants Cannot Satisfy Strict Scrutiny Under RFRA or the First Amendment.**

Because Defendants' COVID-19 Vaccine Mandates substantially burden Plaintiffs' religious exercise, and are neither neutral nor generally applicable, they are

subject to strict scrutiny under RFRA and the First Amendment. And, under strict scrutiny, it is Defendants' burden to demonstrate that the mandates are supported by a compelling interest and are the least restrictive means. *Tandon*, 141 S. Ct. at 1296 ("the government bears the burden to establish that the challenged law satisfies strict scrutiny"). Defendants' fail that test.

> **1.** **Defendants have not satisfied their burden to demonstrate that the refusal to grant religious exemptions is supported by a compelling interest where other exemptions are available.**

Defendants just assert that stemming the spread of COVID-19 is a compelling government interest. (Opp'n 28.) No one, including Plaintiffs, doubts that the government has an interest in protecting health and preventing disease. But, as Defendants admit, the Nation has been dealing with COVID-19 since January 31, 2020 and had its first declaration of emergency on March 13, 2020. (Opp'n 2.) The Nation has thus been dealing with emergency proclamations *for 23 months*. As Justice Gorsuch noted recently, while stemming the spread of COVID-19 may be a compelling interest, it "cannot qualify as such forever. . . . If human nature and history teach anything, it is that civil liberties face grave risks when governments proclaim indefinite states of emergency." *Does 1-3 v. Mills*, No. 21A90, 2021 WL 5027177, at *4 (Oct. 29, 2021) (Gorsuch, J., dissenting).

Under strict scrutiny, this Court must "look beyond broadly formulated interests and . . . scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Hobby Lobby*, 573 U.S. at 726–27 (cleaned up). And, as in *Gonzales*, the government's "mere invocation" of a compelling interest "cannot carry

the day." 546 U.S. at 432. Where the government permits exceptions to the policy that it claims a compelling interest in advancing, those exceptions undermine any claims of a compelling interest. *Id.* at 433. Here, Defendants permit a host of nonreligious, medical exemptions (V. Compl. ¶ 96.) To permit a broad swath of medical exemptions without demonstrating that "the denied exemptions could not be accommodated" fails the compelling interest test. *Gonzalez*, 546 U.S. at 435. "Slice it how you will, medical exemptions and religious exemptions are on comparable footing when it comes to the State's asserted interest," *Does*, 2021 WL 5027177, at *4 (Gorsuch, J., dissenting), and yet Defendants permit medical exemptions while precluding religious exemptions. (*See, e.g.*, V. Compl. ¶ 32.) That double standard, "leav[ing] appreciable damage to that supposedly vital interest unprohibited," *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002), undermines Defendants' ostensibly compelling interest.

### 2. Defendants have not satisfied their burden to demonstrate that denying all religious exemptions is the least restrictive means.

Defendants' final and probably most egregious error is their failure to even attempt to justify their mandates as the least restrictive means. Defendants merely state that "preventing infectious disease through vaccines [is] the least restrictive means." (Opp'n 29.) But this fails to understand the requirements of narrow tailoring. As the Supreme Court said in *Tandon*,

> narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest in reducing the spread of COVID. Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the

same precautions are applied. Otherwise, precautions that suffice for other activities suffice for religious exercise too.

141 S. Ct. at 1296–97 (emphasis added).

Here, Defendants make only one assertion: "that the military is best situated to assess whether . . . less restrictive alternatives are available." (Opp'n 30.) But this simply begs the question. Under strict scrutiny, the government must show it "seriously undertook to address the problem with less intrusive tools readily available to it," meaning that it "considered different methods that other jurisdictions have found effective." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014); *see also Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 633 (2d Cir. 2020) (same). And Defendants must "show either that substantially less-restrictive alternatives were *tried and failed*, or that the alternatives were *closely examined and ruled out for good reason*," *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2016) (emphasis added), and that "imposing lesser burdens on religious liberty 'would fail to achieve the government's interest, not simply that the chosen route was easier.'" *Agudath Israel*, 983 F.3d at 633 (quoting *McCullen*, 573 U.S. at 495). Put simply, "[g]iven the vital First Amendment interests at stake it is not enough for [Defendants] to simply say" that they are best suited to make the least restrictive means determination. *McCullen*, 573 U.S. at 496. Defendants' failure to even attempt to demonstrate that other methods would not achieve its interest is fatal, and the mandates are not the least restrictive means.

IV.   **PLAINTIFFS' CLAIMS UNDER THE EUA ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE DEFENDANTS CANNOT OVERCOME THE RECORD EVIDENCE THAT THERE ARE NO FULLY APPROVED COVID-19 VACCINES AVAILABLE.**

Defendants contend that the interchangeability of Comirnaty and the EUA vaccines renders Plaintiffs' EUA claims unlikely to succeed. (Opp'n 22–26.) The sworn testimony before this Court, the allegations of the Verified Complaint, and statements from the FDA, CDC, and others confirm that Defendants' contentions are meritless. Although the FDA has stated that the two vaccines have the "same formulation . . . and can be used interchangeably to provide the vaccination series without presenting any safety or effectiveness concerns," that does not mean they are the same vaccine. (**EXHIBIT F**, Declaration of Robert Malone, ¶21.) In fact, the FDA has explained that the two "products are legally distinct" but "with certain differences that do not impact safety or effectiveness." (*Id.*) Indeed, the Pfizer-BioNTech vaccine and BioNTech COMIRNATY vaccine are legally distinct products, as described by the FDA documents available at https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-COVID-19/comirnaty-and-pfizer-biontech-COVID-19-vaccine. (*Id.* ¶ 22) These vaccines and any other FDA regulated medicinal products consists of the entirety of the data supporting the safe and effective use of the product, as well as the quality systems, production methods and processes, laboratory assays (including in-process and release assays), materials, facilities & equipment, and packaging & labeling of the product. (*Id.*) Packaging and labeling specifically includes a package insert summarizing the data supporting the intended safe and effective use,

and also describing the risks associated with the medical product. (*Id.*) Indeed, "[t]hese packaging and labeling aspects for the Pfizer-BioNTech vaccine and BioNTech's COMIRNATY, which are intrinsic aspects of the regulated product, are explicitly not identical between these two legally distinct products." (*Id.* ¶ 23.) For example, BioNTech's COMIRNATY includes FDA approved labeling and a package insert designed to inform the recipient of the (incomplete, as recognized by the FDA) list of risks and benefits of the product, whereas the Pfizer-BioNTech vaccine does not. (*Id.*) Therefore, the Pfizer-BioNTech vaccine and BioNTech's COMIRNATY are neither identical legally nor functionally. (*Id.*)

Defendants claim that, despite the unequivocal statements of the FDA, they do indeed have a supply of "BLA-compliant vaccine." (Opp'n 24.) But that cannot be true. As Dr. Malone testifies, based on the statements from the National Institutes of Health, the Centers for Disease Control, and the FDA letters concerning the vaccines, the "FDA regulated product labeled COMIRNATY is the only FDA licensed SARS-CoV-2 vaccine . . . but it is not yet available for use in the United States." (Malone Decl. ¶ 26.) As stated in the CDC COVID-19 Vaccine Related Codes document (Malone Decl., Ex. E), COMINARTY products are not orderable at this time. NDCs are listed per FDA Structured Product Label (SPL) document for the BLA licensed product. (*Id.* ¶ 27.) These codes are not included in CDC Vaccine Code Set files at this time. (*Id.*)

Pfizer has provided the following statement regarding the COMINARTY branded NDCs and labels: 'Pfizer received FDA BLA license on

8/23/2021 for its COVID-19 vaccine for use in individuals 16 and older (COMIRNATY). At that time, the FDA published a BLA package insert that included the approved new COVID-19 vaccine tradename COMIRNATY and listed 2 new NDCs (0069-1000-03, 0069-1000-02) and images of labels with the new tradename. (*Id.*) At present, Pfizer does not plan to produce any product with these new NDCs and labels over the next few months while EUA authorized product is still available and being made available for U.S. distribution.  (*Id.*) As such, the CDC, AMA, and drug compendia may not publish these new codes until Pfizer has determined when the product will be produced with the BLA labels.'" (*Id.* and Ex. E.)

On September 13, 2021, the NIH published the identical Pfizer statement: "At present, Pfizer does not plan to produce any product with these new NDCs and labels over the next few months while EUA authorized product is still available and being made available for U.S. distribution.  As such, the CDC, AMA, and drug compendia may not publish these new codes until Pfizer has determined when the product will be produced with the BLA labels." (*See* Malone Decl. ¶ 28 and Ex. 28.)

As Dr. Malone's declaration, the statements of the FDA, CDC, and NIH, and Pfizer itself establish, Defendants' assertion that they have the FDA-approved COVID-19 vaccines available for Plaintiffs to accept is false.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be granted.

Respectfully submitted,

/s/ Roger K. Gannam
Mathew D. Staver
Horatio G. Mihet
Roger K. Gannam
Daniel J. Schmid*
Richard L. Mast*
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Facsimile: (407) 875-0770
Email: court@lc.org
hmihet@lc.org
rgannam@lc.org
dschmid@lc.org*
rmast@lc.org*
*Applications for Admission pro hac vice pending

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of November, 2021, I caused a true and correct copy of the foregoing to be electronically filed with this Court. Service will be effectuated on all counsel of record via this Court's ECF/electronic notification system.

/s/ Roger K. Gannam
Roger K. Gannam