## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

**NAVY SEAL # 1,** et al.,

                Plaintiffs,

   v.

**JOSEPH R. BIDEN, JR.,** in his official
capacity as President of the United States, et al.,

                Defendants.

Case No. 8:21-cv-02429-SDM-TGW

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION
## FOR A TEMPORARY RESTRAINING ORDER

Plaintiffs have filed an emergency motion asking the Court to prevent the U.S. Navy from removing purported Plaintiff Command Surface Warfare Officer from his command of a guided missile destroyer and the U.S. Marine Corps from withdrawing Plaintiff Lieutenant Colonel 2's command selection. Plaintiffs' motion fails to satisfy any of the requirements under law for such emergency relief. Most significantly, the Court should decline Plaintiffs' invitation to take command of armed services assignment decisions, which is a core constitutional responsibility entrusted to the President as Commander in Chief. Plaintiffs literally ask the Court to determine who is fit to command a U.S. Navy warship. And they also ask the Court to decide whether a Marine Corps officer should retain a command position. Such relief is well beyond the proper sphere of the courts. Plaintiffs' motion must be denied on this basis alone.

As explained in the attached declaration from the Vice Chief of Naval Operations, the second highest uniformed officer in the United States Navy, an order interfering with the military's ability to make judgments about officer assignments

would pose immediate and severe threats to both the success of the Navy's missions and the health of its service members. *See* Ex. 3 (Decl. of Admiral William Lescher).[1] Such an order would also be an extraordinary and unprecedented intrusion into the inner workings of the military, directly superintending senior military officials' operational judgments about service members' fitness to serve as commanding officers on some of the Nation's most sensitive and challenging military missions.

Plaintiffs' other claimed injuries relate to the outcome of future officer separation processes, which take, at a minimum, several months to complete, and are therefore neither imminent nor irreparable. Contrary to Plaintiffs' assertions that this matter presents an extraordinary emergency, justifying their failure to confer adequately and their astonishing suggestion that the military not even be allowed to respond to the motion,[2] nothing about the pending motion is proper or remotely justifies the entry of a temporary restraining order.

For these reasons, set forth further below, Plaintiffs' motion should be denied.

## BACKGROUND

### I.   Procedural History

On October 15, 2021, eighteen service members, four government contractors, and one employer of federal contractors, all proceeding anonymously, filed their

---

[1] The Lescher Declaration was prepared and submitted in connection with separate litigation. Here, it provides essential background on the importance of vaccination for military readiness.

[2] Plaintiffs had five days' notice to get vaccinated or face adverse action, and they knew that subsequent disciplinary proceedings would take months to complete, and yet waited until the eve of their vaccination deadline to confer with Defendants' counsel and filed their motion on just one day's notice.

complaint challenging what they refer to as the "Federal COVID-19 vaccine mandate," which includes the two EOs governing federal employees and federal contractors and the DoD directive governing members of the Armed Forces.  Compl. ¶¶ 50–57, ECF No. 1.  Plaintiffs purported to bring a class action of "military servicemembers, civilian federal employees, and civilian federal contractors who have been denied religious exemption from the Federal COVID-19 Vaccine Mandate."  *Id.* ¶ 157.  Plaintiffs allege that the "Federal COVID-19 vaccine mandate" violates: (1) the FDCA, 21 U.S.C. § 360bbb-3, *id.* ¶¶ 166–193; (2) the First Amendment, *id.* ¶¶ 194–211; and (3) RFRA, 42 U.S.C. § 2000bb-1, *id.* ¶¶ 212–234.  Plaintiffs seek a nationwide injunction against the President and the military that would prevent implementation of the EOs and the DoD directive, require the government to grant all religious exemption requests, and prevent the government from taking any adverse action or discipline against service members, Federal employees, and Federal contractors.  *Id.* at 93–96; Plaintiffs filed an emergency motion for a temporary restraining order and preliminary injunction that same day.  *See* ECF No. 2.

On October 18, 2021, the Court stated that Plaintiffs' motion for a temporary restraining order remains under advisement but "will likely not issue," and directed Plaintiffs' counsel to confer with defense counsel "in good faith" prior to seeking temporary injunctive relief for any individual Plaintiff.  Order, ECF No. 9.

Defendants filed their opposition to Plaintiffs' motion for a temporary restraining order and preliminary injunction on November 3, 2021.  ECF No. 23. Defendants incorporate by reference all arguments made in that opposition brief to

this brief.

Plaintiffs filed a motion to for class certification on November 15, 2021.  ECF No. 35.  Defendants opposed class certification, ECF No. 42, and that motion remains pending.

On January 20, 2022, Plaintiffs filed a motion for leave to amend their complaint, seeking, among other things, to add plaintiffs, including purported Plaintiff Command Surface Warfare Officer.  *See* ECF No. 49.  Defendants opposed that motion, ECF No. 57, and the motion remains pending.

On January 26, 2022, Plaintiffs, who had been proceeding anonymously for months without seeking leave to do so, filed a motion for leave to proceed via pseudonym.  ECF No. 55.  Defendants anticipate opposing that motion within the time provided by Local Rule 3.01(c).  Plaintiffs have not provided all of their names to Defendants to allow Defendants to investigate the allegations in their complaint and motion for a preliminary injunction.

At 1:25 PM on Tuesday, February 1, Plaintiffs' counsel contacted defense counsel via email to seek defense counsel's position on an emergency motion for a temporary restraining order they planned to file that afternoon.  Plaintiffs' counsel informed defense counsel that purported Plaintiff Command Surface Warfare Officer's religious accommodation appeal was denied on January 28, 2022, and that he had been ordered to get vaccinated by February 3 or he would be relieved of his command of a guided missile destroyer.  Plaintiffs' counsel further informed defense counsel that named Plaintiff Lieutenant Colonel 2's religious accommodation appeal was denied

4

on January 26, 2022, and that she had been ordered to get vaccinated or would be placed on the Officer Disciplinary Notebook and her selection for command would be withdrawn on the next day, February 2. Plaintiffs' counsel asked for the Government's position on their motion to enjoin any adverse action, and defense counsel informed Plaintiffs that it would be difficult to provide a position without knowing the names of the Plaintiffs. Plaintiffs' counsel provided the names of the two Plaintiffs at 2:45 PM. At 5:21 PM defense counsel informed Plaintiffs' counsel that Defendants were still discussing Plaintiffs' request, but that they currently opposed the requested relief. Defense counsel further informed Plaintiffs' counsel that separating officers from the military usually took many months, so there was no need for an emergency motion, and that any individual assignment or command decision is non-justiciable. Plaintiffs' counsel did not respond and instead filed the emergency motion and, remarkably, urged that the military not even be allowed to respond – despite the fact they ask the Court to decide who may hold command positions in the United States military, including command of a warship. ECF No. 60.

That same evening, Defendants filed a notice of intent to respond, ECF No. 61, and the Court ordered Defendants to respond by 5:00 PM on February 2, ECF No. 62. On the afternoon of February 2, Plaintiffs filed a response to Defendants' notice with additional substantive arguments. ECF No. 64.

## II.     Plaintiffs' Background

### A. Plaintiff Command Surface Warfare Officer

As the commanding officer of a guided-missile destroyer, Plaintiff commands a

crew of more than 300 sailors aboard a 510-foot long ship. Guided-missile destroyers are warships that provide multi-mission offensive and defensive capabilities.[3] They are equipped with missiles, torpedoes, and guns, and they carry helicopters that are also equipped with missiles and torpedoes. Because a destroyer can fill several mission sets and deploy independently, it is one of the most dynamic and versatile assets within the Navy. Onboard, the crew of the ship and others, who may include helicopter aircrews or embarked special operations forces, sleep in confined berthing spaces, are in close proximity in passageways, and eat meals in a communal galley. Lescher Decl. ¶ 19; Decl. of Mery-Angela Sanabria Katson ¶ 15, ECF No. 42-4. There is no ability on a destroyer to care adequately or effectively for a service member with severe COVID symptoms. Lescher Decl. ¶ 13; Katson Decl. ¶ 13, ECF No. 42-4. Accordingly, if a service member were to develop severe symptoms on a destroyer, it would require the ship to return to port (and abandon its present mission) or arrange for an emergency medical evacuation using a helicopter. Lescher Decl. ¶¶ 13, 20; Katson Decl. ¶ 13, ECF No. 42-4. But a medical evacuation may not be a viable option due to the ship's location and the limited range of the ship's helicopter. Lescher Decl. ¶ 13; Katson Decl. ¶ 13, ECF No. 42-4. And even where a medical evacuation is an option, it may involve the long-term loss of the ship's helicopter and members of the ship's crew to accompany the sick service member. Lescher Decl. ¶ 21; Katson Decl. ¶ 13, ECF No. 42-4. Such a loss would have an adverse impact on employment of the

---

[3] *See* U.S. Navy, *Destroyers (DDG 51)* (Sept. 29, 2021), https://www.navy.mil/Resources/Fact-Files/Display-FactFiles/Article/2169871/destroyers-ddg-51/.

ship and the ability of the ship to execute its assigned missions.  Lescher Decl. ¶ 21; Katson Decl. ¶ 13, ECF No. 42-4.

### B. Plaintiff Lieutenant Colonel 2

As a logistics officer and material readiness officer assigned to United States Marine Forces Special Operations Command (MARSOC), Plaintiff Lieutenant Colonel 2 directly supports missions of special operations forces (i.e., the Marine Corps' version of Navy SEALs or Army Rangers).  Logistics officers plan, coordinate, and execute and/or supervise the execution of all logistics functions to include functional areas of tactical logistics: supply, maintenance, transportation, general engineering, health services, and services.  As a member of a deployable special operations unit, she must maintain her military readiness at all times; including medical readiness. *See* Ex. 2 (Assistant Commandant Appeal Mem.).  Additionally, Plaintiff was due to permanently assume duties in Bahrain, but has been unable to do so because, while unvaccinated, she is not worldwide-deployable.  *Id.*  Her current duties require her to work indoors and in close proximity to others.  *Id.*  She is also required to stand Officer of the Deck duty, an in-person watch at the command.

### LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008).  To justify this "drastic remedy," the movants must "clearly establish[] the burden of persuasion" on the following four elements: (1) Plaintiffs have a substantial likelihood of success on the merits; (2) there is a substantial threat that Plaintiffs will suffer irreparable injury absent an injunction;

(3) the threatened injury to Plaintiffs outweighs the damage an injunction would cause to Defendants; and (4) the injunction would not be adverse to the public interest. *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001); *Ga. Advoc. Off. v. Jackson*, 4 F.4th 1200, 1208 (11th Cir. 2021); *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225 (11th Cir. 2005) (same standard for a temporary restraining order). "Failure to show any of the four factors is fatal[.]" *ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

Aside from these traditional standards for any preliminary injunction, an injunction against the military involves an additional set of considerations and significant hurdles. Judicial review of claims involving the "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force," *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973), is highly constrained. *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981) (Because of the "healthy deference to legislative and executive judgments in the area of military affairs," courts employ a relaxed scrutiny in reviewing military policy.); *Aktepe v. United States,* 105 F.3d 1400, 1403 (11th Cir. 1997) ("[T]he political branches of government are accorded a particularly high degree of deference in the area of military affairs."); *see also Winck v. England*, 327 F.3d 1296, 1302–04 (11th Cir. 2003), *abrogated in part on other grounds by Santiago-Lugo v. Warden*, 785 F.3d 467, 471 (11th Cir. 2015). Such deference extends to constitutional claims and military decisions about the health and welfare of the troops. *E.g.*, *Solorio v. United States*, 483 U.S. 435, 448 (1987); *Mazares v. Dep't of Navy*, 302 F.3d 1382, 1385 (Fed.

Cir. 2002).

Moreover, and especially pertinent here, the Supreme Court and multiple Circuits have confirmed that courts should not interfere with military assignment decisions, even when they involve a constitutional challenge.  *See, e.g.*, *Orloff v. Willoughby*, 345 U.S. 83 (1953) (declining to review service member challenge to a military assignment decision that was allegedly discriminatory punishment for his invocation of the constitutional right against self-incrimination)*; see also infra* pp. 16–17 (citing cases).

## ARGUMENT

**I.   An Order Requiring The Department Of The Navy To Disregard Plaintiffs' Unvaccinated Status In Making Assignment And Reassignment Decisions Would Inflict Irreparable Damage On The Navy And The Public.**

Plaintiffs invite this Court to begin judicial oversight of individual assignment, reassignment, and command decisions, asking this Court to enjoin the Navy from removing the commander of a warship and to stop withdrawal of another's command selection.  Such unprecedented judicial action would damage the military's interests in readiness, health of service members, and good order and discipline, and the public interest in the national security of the United States.

The public has an exceptionally strong interest in national defense, *see Winter*, 555 U.S. at 7, and the military has a compelling interest in requiring its fighting forces to be vaccinated, healthy, and ready to deploy.  An injunction that allows Plaintiffs to serve in a military setting without being vaccinated against COVID-19 would threaten harm to Plaintiffs and other service members serving alongside them.

The Stanley and Katson Declarations previously submitted in this case explained the severe and far-reaching impact that COVID-19 has had on the Navy. *See* ECF No. 23-19, ¶ 8; ECF No. 42-4 ¶¶ 13–16.  Updated declarations of Major Scott Stanley and Colonel Tanya Rans and a declaration of Colonel James Poel, all recently prepared for another action, describe the continued threat from COVID-19 and the importance of vaccination as a defense.  *See* Ex. 4 (Decl. of Colonel Tanya Rans) ¶¶ 5–39; Ex. 5 (Decl. of Major Scott Stanley) ¶¶ 3–20; Ex. 6 (Decl. of Colonel James Poel) ¶¶ 6, 10–36, 38.   As Admiral Lescher further explains in his declaration, "[u]nvaccinated or partially vaccinated service members are at higher risk to contract COVID-19, and to develop severe symptoms requiring hospitalizations that remove them from their units and impact mission execution." Lescher Decl. ¶ 2.  Indeed, the vast majority of active duty personnel whose COVID-19 symptoms required hospitalization were unvaccinated; only 12% had received a primary COVID-19 vaccine without a booster, and only 0.8% had received a booster.  *Id*. ¶ 11; *see also* Stanley Decl. ¶ 18; Rans Decl. ¶ 39.  The heightened risk that an unvaccinated service member will contract COVID-19 necessarily heightens the risk that others in his unit will contract COVID-19. *See* Lescher Decl. ¶ 17.

The Navy's highest leaders have therefore made the judgment that "[f]ully vaccinated naval forces are required to ensure readiness to carry out Navy missions throughout the world and, if required, to engage in combat operations." *Id*.; *see id*. ¶ 11 ("The judgment of each of the Military Services is that vaccines are the most effective tool the Armed Forces have to keep our personnel safe, fully mission capable and

prepared to execute the Commander-in-Chief's orders to protect vital United States[] national interests.").  And in particular, "[r]estriction of the Navy's ability to reassign unvaccinated personnel in order to mitigate COVID-19 related risks to units preparing to deploy, or that are deployed, will cause direct and immediate impact to mission execution," as well as to "[t]he health, readiness, and mission execution of broader conventional Navy units and personnel who support these personnel." *Id*. ¶ 2.

In the context of warship operations, the dangers are unique and the ability to mitigate the dangers limited.  Katson Decl. ¶¶ 13–16, ECF No. 42-4; Lescher Decl. ¶¶ 13, 20, 21; Stanley Decl. ¶ 8; *see Garland v. N.Y.C. Fire Dep't*, 2021 WL 5771687, at *9 (E.D.N.Y. Dec. 6, 2021) (noting the city's "significant interest" in preventing the spread of COVID-19 among firefighters who work in "close proximity" with each other "while on duty [and] in their fire stations"); *Mass. Correction Officers Federated Union v. Baker*, No. 21-11599-TSH, 2021 WL 4822154, at *8 (D. Mass. Oct. 15, 2021) (noting the public interest in preventing the spread of COVID-19 in "congregate facilities").  "Navy ships have limited health care facilities," and if a sailor developed severe COVID-19 symptoms, his ship would be required to abandon its mission and "pull into port."  Lescher Decl. ¶ 20; *see also* Katson Decl. ¶¶ 13–15, ECF No. 42-4.

Military leaders, in their professional judgment, have concluded that the risks of these potentially catastrophic outcomes are significantly higher when unvaccinated service members are deployed.  *See, e.g.*, Lescher Decl. ¶ 25 (expressing "the Navy's judgment" "that COVID-19 vaccines are a critical defense against COVID-19 and mitigate risk both to our force and to our mission," "tak[ing] into account the

environments our service members operate in, the operations the Navy conducts, and the absence of other effective COVID-19 mitigation measures in the environments in which we operate").   An order precluding the military from considering Plaintiffs' vaccination status in making assignments would therefore threaten "[t]he health, readiness, and mission execution" both of Plaintiffs' units and "of broader conventional Navy units and personnel who support these personnel." *Id.* ¶ 2.

The requested injunction would also undercut the maintenance of military good order and discipline.   Lescher Decl. ¶ 16; Decl. of Vice Admiral William Merz ¶ 23, ECF No. 23-18; Decl. of Lieutenant General David Furness ¶ 23, ECF No. 23-19; *see also Miller v. United States*, 42 F.3d 297, 303 (5th Cir. 1995) (stating that the concern for preserving military discipline is "the most important consideration in any single case" (quoting *Scales v. United States*, 685 F.2d 970, 973 (5th Cir. 1982)).   No military can successfully function where service members feel free to define the terms of their own military service, including which orders they will choose to follow. *See Chappell v. Wallace*, 462 U.S. 296, 300 (1983) ("The inescapable demands of military discipline and obedience to orders cannot be taught on battlefields; the habit of immediate compliance with military procedures and orders must be virtually reflex with no time for debate or reflection.").   The injunction Plaintiffs now demand here would encourage other members to attempt to bypass the military's process and ask courts to enter similar injunctive relief, which "in the aggregate present the possibility of substantial disruption and diversion of military resources" and is contrary to the public interest.   *Parrish v. Brownlee*, 335 F. Supp. 2d 661, 669 (E.D.N.C. 2004); *see Chilcott v.*

*Orr*, 747 F.2d 29, 33 (1st Cir. 1984) (noting the "strong judicial policy against interfering with the internal affairs of the armed forces"); *Shaw v. Austin*, 539 F. Supp. 3d 169, 184 (D.D.C. 2021) ("the public interest supports . . . limited intrusion in military affairs from civilian courts"); *Reinhard v. Johnson*, 209 F. Supp. 3d 207, 221 (D.D.C. 2016) (same). This is especially true here where both Plaintiffs are or would be in command positions, expected to set an example of obedience to orders and are charged with maintaining good order and discipline within the ranks.

The Court should decline Plaintiffs' invitation to take command of the U.S. Navy and Marine Corps both as a general matter and with respect to these two Plaintiffs. As another court found, "the public interest in the nation's military readiness may well be served by allowing military officials who are familiar with the unique challenges posed by the COVID-19 pandemic in a military setting to manage those challenges without this Court's intervention." Order at 6, *Robert v. Austin*, No. 1:21-cv-02228 (D. Colo. Sept. 1, 2021), ECF No. 12.

## II.  Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims.

### A. Plaintiffs Have Failed to Exhaust Administrative Remedies.

The Eleventh Circuit has made clear "time and again" that exhaustion of administrative remedies is "require[d]" in military cases. *Winck*, 327 F.3d at 1302 (citing *Linfors v. United States*, 673 F.2d 332, 334 (11th Cir. 1982) (per curiam); *Von Hoffburg v. Alexander*, 615 F.2d 633, 637–38 (5th Cir.1980); *Hodges v. Callaway*, 499 F.2d 417, 420 (5th Cir. 1974); *Mindes v. Seaman*, 453 F.2d 197, 201 (5th Cir. 1971); *U.S. ex rel. Berry v. Commanding Gen., Third Corps, Fort Hood, Tex.*, 411 F.2d 822, 825 (5th Cir.

1969); *see, e.g., Layman v. Harvey*, No. 8:05-CV-2208-T24EAJ, 2007 WL 430678, at *5 (M.D. Fla. Feb. 5, 2007); *cf. Chappell*, 462 U.S. at 303 (service member complaints of a deprivation of constitutional rights can be addressed "within the framework of [] intramilitary administrative procedure").

Plaintiffs have not exhausted their military remedies.  Even though the two Plaintiffs' religious exemption requests have been denied, internal military procedures are available to them and should be completed before judicial review here.  The Navy and Marine Corps have further administrative procedures that offer many opportunities for them to present their arguments and for the Navy to respond.  *See* Merz Decl. ¶¶ 15–23, ECF No. 23-18; Furness Decl. ¶¶ 13–23, ECF No. 23-19.  Service members subject to discipline can challenge the lawfulness of the vaccination requirement in those proceedings.  *See United States v. Kisala*, 64 M.J. 50 (C.A.A.F. 2006).  Should Plaintiffs face discharge for non-compliance with the directive, they may present their arguments before the discharge authority.  *See* Merz Decl. ¶¶ 17–19, ECF No. 23-18; Furness Decl. ¶¶ 16–20, ECF No. 23-19.  For officers, this process takes several months, and service members with more than six years of military service receive a formal administrative hearing over which a panel of no fewer than three senior service members preside in order to make findings with respect to the bases for separation, and recommendations with respect to retention or separation and character of service.  Merz Decl. ¶¶ 17–19, ECF No. 23-18; Furness Decl. ¶¶ 17–18, ECF No. 23-19.  If a service member is discharged, he or she can appeal to the Navy Discharge Review Board and Board for Correction of Naval Records ("BCNR").  Merz Decl. ¶

22, ECF No. 23-18; Furness Decl. ¶ 22, ECF No. 23-19.  For adverse action less than discharge, the Navy has additional procedures that can provide relief.  Merz Decl. ¶ 22, ECF No. 23-18; Furness Decl. ¶ 22, ECF No. 23-19.[4]

Courts have found that service members have failed to exhaust administrative remedies when even fewer steps in the administrative process remained.  *See, e.g., Leicht v. McHugh*, No. 13-60015-CIV, 2013 WL 11971266, at *3 (S.D. Fla. May 24, 2013) (finding plaintiff failed to exhaust his administrative remedies before the Board of Correction for Military Records); *Layman v. Harvey*, No. 8:05-CV-2208-T24EAJ, 2007 WL 430678, at *6 (M.D. Fla. Feb. 5, 2007) (same); *Bickel v. Del. Air Nat'l Guard*, 2018 WL 2183296, at *6 (S.D. Ohio May 11, 2018) (concluding that "[g]iven all of the remaining steps in the military process, it is clear that [the plaintiff] has not yet exhausted his administrative remedies" as a board had not yet convened to determine whether plaintiff would be discharged, discharge would have to be approved by the Secretary of the Air Force, and plaintiff could appeal that decision); *Montgomery v. Sanders*, 2008 WL 4546262, at *5 (S.D. Ohio Aug. 18, 2008) (dismissing plaintiff's claims concerning an investigation and reassignment when he failed to exhaust internal military review processes); *Shuman v. Celeste*, 1989 WL 182617, at *1 (N.D. Ohio Apr. 2, 1989) ("A review of plaintiff's case in this instance would thrust the Court

---

[4] Plaintiff Commander Surface Warfare Officer in theory could be relieved of command due to loss of confidence, as he speculates may be the case.  *See* ECF No. 60-1.  That relief will only be characterized as "detachment for cause" (DFC) and entered into his record following a formal request from his leadership and Plaintiff will be afforded the opportunity to respond and submit matters to the DFC approval authority.  *See generally* MILPERSMAN 1611-020, *available at* https://www.mynavyhr.navy.mil/Portals/55/ Reference/MILPERSMAN/1000/1600Performance/1611-020.pdf.

deep into the internal decisionmaking of the military which is precisely what the doctrine of non-justiciability was formulated to prevent."); *Diraffael v. Cal. Mil. Dep't*, 2011 WL 13274364, at *3 (C.D. Cal. Mar. 21, 2011).

The exhaustion requirement is especially important in the military context because it serves the important purpose of allowing the military to apply its "specialized expertise" in the first instance. *Lawrence v. McCarthy*, 344 F.3d 467, 470 (5th Cir. 2003). If the service member is dissatisfied with the military's decision, that service member may seek judicial review only after exhausting military appeals, allowing the military to make its decision and fully articulate its interests. *Orloff*, 345 U.S. at 94 ("Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters."); *Winck*, 327 F.3d at 1302–04 ("[W]e reaffirm the unflagging strength of the principles of comity and judicial noninterference with, and respect for, military operations."); *Seepe v. Dep't of Navy*, 518 F.2d 761, 764 (6th Cir. 1975) (recognizing that when the facts are "service-oriented" and the case involves a "mixed question of fact and law," "the service's development of a factual record and its interpretation of the law as applied to the facts may well prove of value to the reviewing court"); *Heidman v. United States*, 414 F. Supp. 47, 49 (N.D. Ohio 1976) (military's development of a record will avoid interruption of the administrative process and afford the court with a final application of the law and facts). As another court recently found in a similar context, review of service members' claims without first allowing the military's internal process to conclude "would undermine the

purpose of exhaustion and infringe on the military's expertise and interest in handling its own personnel matters." *Church*, 2021 WL 5179215, at *11 (citing *Orloff*, 345 U.S. at 94; *Hidalgo v. FBI*, 344 F.3d 1256, 1259 (D.C. Cir. 2003)); *see also Shaw*, 539 F. Supp. 3d at 183 ("Despite Plaintiff's skepticism about the show-cause process, the Court cannot so easily dismiss the possibility that he will have a fair opportunity to make his case to a Board of Inquiry.").

In sum, exhaustion procedures is the adequate remedy provided by law such that an exercise of the court's equity powers is premature. Because Plaintiffs have not exhausted their intra-military remedies, they thus fail to show a likelihood of success on the merits.

## B. The Court Should Not Make Military Assignment Decisions Through Injunctive Relief.

Even if Plaintiffs' claims about their individual exemption denials were subject to judicial review, the relief sought with respect to their individual assignments should not be granted. Decisions about how to assign and deploy service members are for the military to make, under the supervision of the President as Commander in Chief, not civilian courts. For that reason, the Supreme Court and multiple Circuits have confirmed that courts should not review challenges to such assignment decisions, even when they involve a constitutional challenge. *See, e.g.*, *Orloff*, 345 U.S. at 83. Indeed, the Eleventh Circuit has observed that courts "have traditionally deferred to the superior experience of the military in matters of duty orders, promotions, demotions, and retentions." *Speigner v. Alexander*, 248 F.3d 1292, 1298 (11th Cir. 2001). In

*Speigner,* the Court found that a claim regarding injury from such orders was non-justiciable, despite the existence of constitutional claims, reasoning that "it is imperative to the military that only those officers determined to be competent to serve are retained" and that "[t]o dictate to the military which officers should be considered competent would be to interfere in just the way that *Feres* and its progeny preclude." *Id*. Courts in other circuits have reached the same conclusion. *See Harkness v. Secretary of Navy*, 858 F.3d 437, 443 (6th Cir. 2017) (noting in a case involving a First Amendment challenge to military assignment decisions that "courts are generally reluctant to review claims involving military duty assignments"); *Cargill v. Marsh*, 902 F.2d 1006, 1007 (D.C. Cir. 1990) (holding mandamus claim for reassignment is nonjusticiable); *Schlanger v. United States*, 586 F.2d 667, 671 (9th Cir. 1978) ("[C]ourts should not review internal military decisions such as duty order or duty assignments."); *Sebra v. Neville*, 801 F.2d 1135, 1141 (9th Cir. 1986) (same); *Wilson v. Walker*, 777 F.2d 427, 429 (8th Cir. 1985) (same); *Cortright v. Resor*, 447 F.2d 245, 254 (2d Cir. 1971) (same); *Antonellis v. United States*, 723 F.3d 1328, 1332 (Fed. Cir. 2013) ("Courts are in no position to determine the 'best qualified Officer' or the 'best match' for a particular billet.").

Plaintiffs argue that the Government's position is that their underlying RFRA and First Amendment claims are non-justiciable. *See generally* Pls.' Resp., ECF No. 64. But Plaintiffs misstate Defendants position. Defendants have not argued that Plaintiffs' underlying RFRA and First Amendment claims or subsequent military discharge claims are non-justiciable. Indeed, in many circumstances such claims are

reviewable. However, as far as the Court's review of Plaintiffs' claims extend to a review of military assignment decisions and specifically Plaintiffs' fitness for command, or Plaintiffs' requested relief pertaining to such claims, judicial review would impermissibly intrude into the Constitutional purview of the Executive and Legislative Branches. *Gilligan*, 413 U.S. at 10 ("The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches."); *Orloff*, 345 U.S. at 94–95; *Chappell*, 462 U.S. at 301 ("[J]udges are not given the task of running the [military].").

The ultimate relief sought in the proposed amended complaint is an injunction against enforcement of the vaccinate mandate across the armed services, including a prohibition on related discipline. *See* ECF No. 49-1. That is extraordinary in itself, but the relief sought in this emergency motion is even more extraordinary – ongoing judicial oversight of assignment and duty decisions, as a preliminary matter. Plaintiffs, through a purported "emergency" motion, invite the Court to take command of the armed services assignment decisions. But these are core constitutional responsibilities entrusted to the President as Commander in Chief and, through him, to military commanders. However the Court may rule on the underlying merits of this case, it should not purport to determine who may presently be assigned to command a U.S. Navy warship—today, tomorrow, next week, or at any point, nor should the Court determine who may hold a command position in the United States Marine Corps. This is especially so where the military has judged that doing so would

risk harm to the health and readiness of the military force and, thus, harm to the national security of the United States as the Navy and the Marine Corps carry out their vital missions.

### C. Plaintiffs' RFRA and First Amendment Claims Are Unlikely To Succeed.

"Under RFRA, the Federal Government may not . . . substantially burden a person's exercise of religion, 'even if the burden results from a rule of general applicability.'" *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006) (quoting 42 U.S.C. § 2000bb–1(a)). "The only exception recognized by the statute requires the Government to satisfy the compelling interest test—to 'demonstrat[e] that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Id.* (quoting 42 U.S.C. § 2000bb–1(b)).

Here, senior military commanders have reasonably assessed the Government's compelling interest in vaccinating both Plaintiffs and the lack of less restrictive alternatives, taking into consideration current military needs, and Plaintiffs' unique circumstances. Without the benefit of a full administrative record, the Court should not, on emergency briefing, conclude that Plaintiffs have a strong likelihood of success on the merits of their RFRA and First Amendment claims such that a temporary restraining order is warranted.[5]  Even the limited record before the Court

---

[5] There is no reason to address Plaintiffs' First Amendment claim separately.  If Plaintiffs prevail on their RFRA claim there is no need to reach their separate First Amendment theory, as the Court would

shows they do not.

### 1. The COVID-19 Vaccination Requirement Furthers the Government's Compelling Interest in Military Readiness.

The Supreme Court has recognized that "[s]temming the spread of COVID–19 is unquestionably a compelling interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).  In addition, "when evaluating whether military needs justify a particular restriction on religiously motivated conduct, courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest."[6] *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986).  After consulting with "medical experts and military leadership," ECF No. 23-3, including the "Chairman of the Joint Chiefs of Staff, the Secretaries of the Military Departments, [and] the Service Chiefs," and considering the rise in infection rates due to the Delta variant, ECF No. 23-2, the Secretary of Defense "determined that mandatory vaccination against [COVID-19] is necessary to protect the Force and defend the American people," ECF No. 23-3 ("To defend this Nation, we need a healthy and ready Force").  The Secretary of the Navy likewise found that COVID-19 vaccination is necessary to ensure military readiness and the health and safety of

---

already have concluded that Plaintiffs are likely to succeed on their challenge to the vaccination requirement.  Conversely, if the Government prevails under RFRA, it would necessarily prevail under Plaintiffs' First Amendment theory as well.

[6] Congress intended for courts to continue to apply principles of military deference in RFRA cases. *See* S. REP. 103-111, 12, *reprinted in* 1993 U.S.C.C.A.N. 1892, 1901 ("The courts have always recognized the compelling nature of the military's interest in [good order, discipline, and security] in the regulations of our armed services.  Likewise, the courts have always extended to military authorities significant deference in effectuating these interests.  The committee intends and expects that such deference will continue under this bill.").

sailors and marines.  ECF No. 23-8.  The Court must "give great deference" to the "professional military judgments" of these leaders when it comes to what is needed to ensure military readiness and the welfare of service members.[7]  *See Winter*, 555 U.S. at 24–25; *Goldman*, 475 U.S. at 507.

These professional military judgments are supported by the evidence showing COVID-19's harmful impact on the military.  *See Church*, 2021 WL 5179215, at *18 (requiring vaccination is "supported by a lengthy record replete with data demonstrating the necessity of a general vaccine mandate").  COVID-19 has "impacted exercises, deployments, redeployments, and other global force management activities," Stanley Decl. ¶ 6; caused the cancellation of "19 major training events, many of which involved preparedness and readiness training with our foreign partners," *id.* ¶ 9; and "required significant operational oversight" by the most senior military leaders, *id.* ¶ 4.  Further, vaccination requirements of other nations restrict the ability of unvaccinated service members to participate in joint training exercises, which are "vital to the preservation of national security and the protection of our foreign interests."  *Id.* ¶¶ 10–11.  And because health care providers have had to care for COVID-19 patients, certain service members have not been able to "address non-emergency conditions and undergo routine medical and health assessments that

---

[7]  In finding that the Navy had no compelling interest in vaccinating the 35 Navy SEALs and members of the Navy's Special Warfare Community, the court in *Navy SEALs 1–26* ignored Supreme Court precedent such as *Goldman*, 475 U.S. at 507, and *Winter*, 555 U.S. at 24–25, and failed to consider either the Secretary of Defense's or the Secretary of the Navy's determinations that vaccination is necessary for military readiness, or the declarations from military leaders concerning the military's interest in vaccination.  *See Navy SEALs 1–26 v. Biden*, 2022 WL 34443, at *9–11 (N.D. Tex. Jan. 3, 2022).

are required under military directives to maintain medical readiness." *Id.* ¶¶ 12–13.

Vaccinations have promoted readiness by reducing the risk of infections, hospitalizations, and deaths of service members. *Id.* ¶ 20. Since the onset of the COVID-19 pandemic, hundreds of thousands of service members have been infected, thousands have been hospitalized, and 92 have died. *Id.* ¶ 3. None of the service members who died had both doses of an mRNA vaccine. *See id.* In addition, "[b]etween July and November of 2021, non-fully-vaccinated active-duty service members had a 14.6-fold increased risk of being hospitalized when compared to fully vaccinated active-duty service members," "[i]n December 2021 unvaccinated adults were 16-times more likely to be hospitalized than vaccinated adults," *id.* ¶ 18, and "the hospitalization rate during Omicron dominance in the unvaccinated active duty population was 65 times higher than the hospitalization rate in those fully vaccinated," Rans Decl. ¶ 39. "Given the tangible protection the vaccines afford service members against infection, serious illness, hospitalization, and death, it is clear that COVID-19 vaccines improve readiness and preserve the DoD's ability to accomplish its mission." Stanley Decl. ¶ 20. Not only have vaccinations reduced the risk of infections, hospitalizations, and deaths of service members, they have reduced the number of service members required to quarantine, permitted the military to return to higher levels of occupancy in DoD facilities and hold in-person training, and allowed service members to participate in joint training exercises with countries that have vaccine requirements. *Id.* ¶ 14.

Upon review of Plaintiffs' religious exemption request packages, the appeal

authorities concluded that the Navy and the Marine Corps have compelling interests in vaccinating Plaintiffs.  With regard to Plaintiff Command Surface Warfare Officer, the Chief of Naval Operations (CNO) took into account that Plaintiff is the "command[er] [of] an operational warship," and found that the Navy had a compelling interest in "preventing the spread of disease" on that ship to ensure "military readiness and [the] health of the force."  Ex. 1 (CNO Appeal Mem.).  The Navy further concluded that waiving the vaccine requirement "would have a predictable and detrimental effect on the readiness of [Plaintiff] and the Sailors who serve alongside [Plaintiff]."  *Id.*  Indeed, "[s]pread of communicable diseases among Sailors who live and work in confined quarters aboard ships . . . has the potential to cause mission failure if one or more personnel become too sick to perform their jobs."  Katson Decl. ¶ 13, ECF No. 42-4.  This is because

> [l]ogistical challenges inherent in moving personnel to and from deployed ships and other deployed environments makes it difficult, if not impossible, to quickly evacuate sick personnel and replace them with healthy personnel. Navy ships have limited medical and long-term placement capabilities. If even one Sailor infected with a communicable disease requires treatment beyond the capabilities of a ship's medical department, or if multiple Sailors must be placed in critical care, a decision will have to be made whether the ship may have to abandon its mission and transit to a location that offers more adequate treatment. Transit time is not instantaneous and depends on factors such as ship location, current mission requirements, and port access or availability. That time variable creates additional health risk for infected Sailors and the potential for disease transmission to the remaining crew.

*Id.*  In sum, "[t]here is little ability on ship to care for a service member with severe COVID symptoms" and severe illness "would require a return to port or an emergency medical evacuation by helicopter," which is "not always viable due to the location of

24

the ship and the limited range of helicopters." Lescher Decl. ¶ 13.

With regard to Plaintiff Lieutenant Colonel 2, the appeal authority was skeptical that a sincere belief was substantially burdened in light of her past practice of taking vaccines, but found that even if it was, vaccination served the Marine Corps' compelling "interests in military readiness and in the health and safety of the force." Ex. 2. The Assistant Commandant of the Marine Corps found that personnel who have gotten ill from COVID-19 have "undermine[d] a unit's effective functioning and negatively impact[ed] their unit's ability to accomplish the mission." *Id.* The Assistant Commandant further found that the Delta and Omicron variants were "highly transmissible," that the "greatest risk of transmission is from and among unvaccinated people," and that while fully vaccinated people can have breakthrough infections, "they appear to spread the virus for shorter periods of time." *Id.* Accordingly, "personnel who are unvaccinated do not just put themselves at risk, they also risk the health and medical readiness of other persons within their unit, which in turn decreases the military readiness of the unit and the Marine Corps as a whole." *Id.* The Assistant Commandant determined that waiving immunization for Plaintiff Lieutenant Colonel 2 would harm readiness because she "work[s] primarily indoors and cannot perform all of [her] duties remotely." *Id.* Indeed, the Assistant Commandant found that Plaintiff Lieutenant Colonel's failure to get vaccinated had already harmed the Marine Corps' interest in readiness, as she had been unable to travel to Bahrain to complete her duty assignment. *Id.* ("[Y]our orders to Bahrain have been delayed several times due to your failure to be fully medically ready to travel overseas as a result of your

25

vaccination status."). Finally, the Assistant Commandant found that Plaintiff Lieutenant Colonel 2 is "attached to a deployable unit, and [she] must be prepared to deploy at a moment's notice." *Id.*

2. **Vaccination is the Least Restrictive Means of Furthering the Government's Compelling Interest in Military Readiness.**

As other courts have found, in non-military settings, vaccination is the least restrictive means in fully accomplishing the government's interest in preventing the spread of infectious diseases in the workforce. *See, e.g.*, *Does 1-6 v. Mills*, No. 1:21-CV-00242-JDL, 2021 WL 4783626, at *14 (D. Me. Oct. 13, 2021), *aff'd*, 16 F.4th 20 (1st Cir. 2021); *see also F.F. ex rel. Y.F. v. New York*, 65 Misc. 3d 616, 634 (N.Y. Sup. Ct. 2019) (concluding same in schools); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014) ("Other coverage requirements, such as immunizations, may be supported by different interests (for example, the need to combat the spread of infectious diseases) and may involve different arguments about the least restrictive means of providing them."). This reasoning has even greater force in the military setting, where health of service members is paramount to military readiness.

After careful consideration of Plaintiffs' requests for a religious exemption and their appeals, the Navy and Marine Corps concluded that there are no lesser restrictive means than vaccination to further the military's compelling interests in readiness and ensuring the health and safety of service members. The Chief of Naval Operations found that vaccination "reduce[s] an individual's risk of contracting the disease and generally reduce[s] the severity of disease for those who do contract the illness" and

that other mitigation measures, such as "personal hygiene, mask wearing, and social distancing," "are not as effective as vaccination in maintaining military readiness and the health of the force." Ex. 1. This is especially true on ships, such as the destroyer Plaintiff Command Surface Warfare Officer currently commands. *See id.* As Admiral Lescher states, "The environment in which Navy personnel operate -- in close quarters for extended periods of time -- make them particularly susceptible to contagious respiratory diseases such as COVID-19 and renders mitigation measures such as social distancing unrealistic." Lescher Decl. ¶ 12; *see also* Katson Decl. ¶ 13, ECF No. 42-4.

The Assistant Commandant of the Marine Corps likewise found that mitigation measures such as "masking, social distancing, hygiene, teleworking, and other similar measures, individually or in combination," are "not as effective as vaccination" and "are often incompatible with the demands of military life, where Marines and Sailors must live, work, realistically train, and, if necessary, fight in close quarters." Ex. 2. The Assistant Commandant further rejected Plaintiff Lieutenant Colonel 2's claim that "natural immunity" was as effective as vaccination. *See id.*

Although Plaintiffs argue that the mitigation measures the Navy and Marine Corps utilized from the start of the pandemic worked equally well as vaccination, *see* Pl. Decl. ¶¶ 12–14, ECF No. 60-1, Pl. Decl. ¶¶ 19–21, ECF No. 60-2, the record shows otherwise. The effectiveness of mitigation measures such as sanitizing workspaces, hand washing, mask wearing, and maintaining 6-foot social distancing "is extremely limited on ships, where Sailors must live, work, eat, and sleep in close proximity to other Sailors." Katson Decl. ¶¶ 14–15, ECF No. 42-4; *see also* Lescher Decl. ¶ 12; Rans

Decl. ¶ 10; Stanley Decl. ¶ 8.  Indeed, as Captain Katson, a Surface Warfare Officer

like Plaintiff, states,

> On board a ship, Sailors must navigate narrow passageways that do not
> permit sufficient social distancing.  Ships have almost no windows, and
> fresh air circulation is intentionally limited, as ships are designed to be
> able to seal off compartments to protect against water intrusion or
> chemical, biological, or radiological weapons attacks.  Though Sailors
> work to keep their ships clean, safe transit up and down ladders and
> through watertight doors requires everyone to touch all of the same
> handrails and handles frequently.  Ships typically have limited space to
> quarantine Sailors from the rest of the crew, if such facilities exist at all.
> Frequent handwashing is not generally feasible because Sailors have to
> transit up and down ladders, using those shared handrails, to get between
> their workspaces and the restrooms ("heads") in which they can wash
> their hands. Almost all enlisted berthing compartments feature three-foot
> by six-foot bunks ("racks") that are generally stacked three high with
> narrow passages between rows.  Enlisted berthing compartments have as
> few as 12 and as many 210 personnel sleeping in the same space. Sailors
> in larger berthing compartments are typically never alone in the head
> when they use the facilities, shower, or brush their teeth, because the head
> is a shared space used by 200 or more personnel.

Katson Decl. ¶ 15, ECF No. 42-4.  Because in these circumstances, many mitigation

measures, such as social distancing, are "unrealistic," Lescher Decl. ¶ 12, they cannot

possibly be equally as effective as vaccination in serving the military's interest in

readiness, *see Burwell*, 573 U.S. at 731 (examining whether alternative served interest

"equally well").

The same is true even outside of the ship environment.  Many mitigation

measures, such as masks, temperature checks, testing, social distancing, isolating,

handwashing, and sanitizing workspaces, are limited to controlling the spread of the

virus; they provide no protection from severe illness, hospitalization, or death if a

service member contracts the disease.  *See* Poel Decl. ¶¶ 15, 21, 26, 36.

Plaintiff Command Surface Warfare Officer argues that because 93% of sailors on his ship are vaccinated (leaving 24 out of 294 sailors unvaccinated), he has a reduced risk of infection and there is a reduced risk the disease will spread through the ship. Pl. Decl. ¶ 15, ECF No. 60-1. As in initial matter, the premise of this "herd immunity" argument is flawed. "Even with approximately 97% of the Navy vaccinated, the COVID-19 virus can degrade units and impact mission[s]." Lescher Decl. ¶ 13. Indeed, even with a fully vaccinated crew, the USS Milwaukee, a 100-person ship, had to remain in port one week beyond its schedule because several members tested positive for COVID-19." *Id.* However, "[b]ecause the full crew was vaccinated, infected personnel were asymptomatic or had mild symptoms and the impact to mission accomplishment was substantially mitigated compared to the [aircraft carrier] USS THEODORE ROOSEVELT's experience of more than 4,000 crew removed from the ship and a 51-day loss of mission." *Id.* "Given the hospitalizations and death statistics" for unvaccinated individuals, "the MILWAUKEE's minor deployment delay would likely have been far worse with unvaccinated personnel." *Id.* The Navy's experience with the USS Milwaukee as compared to the USS Theodore Roosevelt underscores that the Navy's interest in vaccination is not just limited to mitigating the spread of disease, but also in mitigating the severity of illness for those who do contract the virus.

Even if herd immunity had been achieved, it is not as effective as vaccination at protecting a member from infection, spreading the disease, or combatting the disease. Poel Decl. ¶¶ 28, 32; Rans Decl. ¶ 23. Unvaccinated service members are at an

increased risk of infection and may spread the virus (particularly new variants) to other service members, and thus still pose a risk of significant harm to maintaining a healthy force. Poel Decl. ¶¶ 31–32. For these reasons, the military has not set any benchmark to cease any of its immunization requirements based on herd immunity. *See* Rans Decl. ¶¶ 23–27. The military has determined that maximum vaccination for all of the mandatory ten vaccines minimizes the risk to service members of illness and outbreaks. *See id.*; *see also* Lescher Decl. ¶ 11 ("[O]rdering unvaccinated personnel into an environment in which they endanger their lives, the lives of others and compromise accomplishment of essential missions" would not "maximiz[e] the crew's odds of success."). The Court should defer to the military regarding its assessment of the acceptable level of risk. *See Gilligan*, 413 U.S. at 10.

Next, although Plaintiff Lieutenant Colonel 2 asserted that her prior COVID-19 infection was a lesser restrictive means to vaccination, *see* Ex. 2, "there is no 'recognized, long standing, natural immunity' against COVID-19," Poel Decl. ¶ 22; *see also* Rans Decl. ¶ 28 (noting that "[t]he body of evidence for infection-induced immunity is more limited than that for vaccine-induced immunity in terms of the quality of evidence . . . and types of studies"). Individuals who have been infected with the virus have had "diverse or varying immune responses which, when compared to the subsequent response of those receiving the COVID-19 vaccine, are not as reliable or consistent." Rans Decl. ¶ 20; Poel Decl. ¶ 23. "Conversely, the immune response following COVID-19 vaccination is more reliable, consistent, and predictable." Rans Decl. ¶ 20. Furthermore, "[n]umerous immunologic studies have

consistently shown that vaccination of individuals who were previously infected enhances their immune response, and growing epidemiologic evidence indicates that vaccination following infection further reduces the risk of subsequent infection, including in the setting of increased circulation of more infectious variants." *Id.* For these reasons, Plaintiff Lieutenant Colonel 2's assertion that she previously had COVID-19 is irrelevant.

In sum, the military's vaccine policy is narrowly tailored to serve compelling military interests.   The military is best situated to assess whether a specific unvaccinated individual puts the military mission at risk, or whether feasible, less restrictive alternatives are available. *See Orloff*, 345 U.S. at 94; *Bryant v. Gates*, 532 F.3d 888, 899 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ("[T]he Supreme Court has indicated" that "military decisions and assessments of morale, discipline, and unit cohesion . . . are well beyond the competence of judges.").   The Navy and Marine Corps have considered whether there are any lesser restrictive means of achieving their interest in military readiness and concluded that there are none.   RFRA does not compel the military to adopt a measure that is inferior in the military context to requiring the use of safe and effective vaccines.   Therefore, Plaintiffs has not shown a likelihood of success on their RFRA claims to warrant the extraordinary injunctive relief they seek.

## III.   Plaintiffs Do Not Face Irreparable Harm.

"[E]ven if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make

preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citations omitted).   Irreparable harm "must be neither remote nor speculative, but actual and imminent." *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990).  "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson*, 415 U.S. at 90.  "In cases involving claims related to military personnel decisions, moreover, courts have held that the showing of irreparable harm must be *especially strong* before an injunction is warranted, given the national security interests weighing against judicial intervention in military affairs." *Shaw*, 539 F. Supp. 3d at 183; *Spadone v. McHugh*, 842 F. Supp. 2d 295, 301 (D.D.C. 2012) ("When plaintiffs have requested an injunction preventing a military discharge, some courts have determined that plaintiffs must make a 'much stronger showing of irreparable harm than [must be made under] the ordinary standard for injunctive relief,' due to the "magnitude of the interests weighing against judicial interference with the internal affairs of the armed forces.'" (quoting *Veitch v. Danzig*, 135 F.Supp.2d 32, 37 (D.D.C. 2001)).

Plaintiffs make no such showing.  No service member is subject to forcible or involuntary vaccination.  *See* ECF No. 23, at 34 (collecting regulation cites).  Nor do they allege otherwise.  Separation or discharge procedures could begin, but nothing

indicates that the process has even been initiated.  If a process is initiated soon, such processes would take months for officers, like Plaintiffs, who are entitled to a Board if they request a hearing.  *See* ECF No. 23-18, ¶ 17, 19 (Navy); ECF No. 23-19, ¶¶ 17–18 (Marines).  Even if these plaintiffs are ultimately separated based on their refusal of the vaccine, such a separation is neither imminent nor irreparable.  Military administrative and disciplinary actions, including separation, are not *irreparable* injuries because the service member could later be reinstated and provided back pay if he prevailed on his claim. *See, e.g.*, *Hartikka v. United States*, 754 F.2d 1516, 1518 (9th Cir. 1985); *Chilcott*, 747 F.2d at 34; *Guitard v. Sec'y of Navy*, 967 F.2d 737, 742 (2d Cir. 1992); *Church*, 2021 WL 5179215, at *17.  Placement on the Officer Disciplinary Notebook, as Plaintiff Lieutenant Colonel claims will happen to her, likewise does not constitute irreparable harm; it is not even a disciplinary measure.[8]  Even a court martial, unlikely here, would not constitute irreparable injury.  *See Schlesinger v. Councilman*, 420 U.S. 738, 755 (1975).  If even the most severe and unlikely penalty available is not irreparable harm, then assignment to other job duties in which their

---

[8] Plaintiff Lieutenant Colonel 2's declaration misunderstands the next steps and likely outcomes of the process available to her.  For example, placement on the Officer Disciplinary Notebook, "a database used to track officer misconduct and substandard performance in the Marine Corps," is not itself a disciplinary measure, and ODN entries are not included in an officer's personnel file.  *See* MCO 5800.016.104.  If she did proceed to a Board of Inquiry, the Board has a range of options available. *See generally* Secretary of the Navy Instruction (SECNAVINST) 1920.6D, encl. (11), ¶ 13. It could find that she had not committed the misconduct alleged, *see* SECNAVINST 1920.6D, encl. (11), ¶ 13a (providing that only court-martial findings of guilty or civilian criminal convictions are binding on Board), or if it finds misconduct, the Board could nevertheless recommend her retention, which would be binding on the Secretary, *see* 10 U.S.C. § 1182(d)(1); SECNAVINST 1920.6D, encl. (11), ¶ 13a(2)–(3); *id.* ¶ 17b.  Even if she is involuntarily retired, there is no reason to think she would be retired in a lesser grade. *See* SECNAVINST 1920.6D, encl. (9), ¶ 2a–b; *id.*, encl. (11), ¶¶ 13b, 17b(3).  And it is unlikely that her service would be characterized as anything but honorable. *Id.* encl. (7), ¶ 4c.

vaccination status will pose less of a threat to their units is certainly not irreparable harm.  For this reason alone, there is no basis for emergency injunctive relief, let alone relief directing the military's command assignment decisions, where Plaintiffs' alleged injuries are fully reparable.

## IV.   The Court Should Not Grant Relief For a Non-Party.

Finally, Plaintiffs cannot seek relief for an individual who has not yet been added as a party to the case.  *See Piambino v. Bailey*, 757 F.2d 1112, 1137 n.62 (11th Cir. 1985) (stating that a non-party could not seek an injunction); *Jones v. Arnold*, No. 3:09-CV-1170-J-34JRK, 2010 WL 11507773, at *1 (M.D. Fla. May 7, 2010) ("An unnamed 'class member' in an uncertified class, Haddad is not a party to this case and lacks standing here to seek the relief requested in the Motion for Preliminary Injunction").  Plaintiffs filed their motion for leave to amend their complaint on January 20, 2022, in which they sought to, among other things, add Commander Surface Warfare Officer as a party.  *See* ECF Nos. 49, 49-1.  Because the motion is still pending, that individual is not a party to the case.  Nor has the Court certified as class. Accordingly, the Court should not grant any relief whatsoever, but especially not to Commander Surface Warfare Officer.

## CONCLUSION

The religious accommodation requests of the two plaintiffs seeking emergency relief have been denied based on the Navy's and Marine Corps' considered military judgment that vaccination is the only way to meet the Navy's and Marine Corps' needs with respect to these two individuals.  The Court should defer to that judgment, which

is amply supported in the record. While the Court evaluates this matter, these plaintiffs face no imminent irreparable harm that this court can redress, but they do pose an ongoing threat to their units and the Navy as a whole.  The Court in no event should purport to determine where officers may serve in the military, nor dictate to the military that these two plaintiffs must remain in their command positions, including command of a U.S. Navy warship, contrary to the judgement of military officials.  For all of these reasons, Plaintiffs' motion for a temporary restraining order should be denied.

Dated:  February 2, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

/s/  *Amy E. Powell*
ANDREW E. CARMICHAEL
AMY E. POWELL
Senior Trial Counsel
ZACHARY A. AVALLONE
COURTNEY D. ENLOW
R. CHARLIE MERRITT
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (919) 856-4013
Email: amy.powell@usdoj.gov
*Counsel for Defendants*