IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| **NAVY SEAL #1**, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>**JOSEPH R. BIDEN**, in his official capacity as President of the United States, *et al.*<br><br>Defendants. | Case No. 8:21-cv-02429-SDM-TGW |

## DECLARATION OF FRANK BRANDON

## [WITH REGARD TO PLAINTIFF NAVY COMMANDER]

I, Captain Frank Brandon, United States Navy, hereby state and declare as follows:

1. I am a Captain in the United States Navy, currently serving as Commodore of Destroyer Squadron TWO SIX, located in Norfolk, Virginia. I make this declaration in my official capacity, based upon my personal knowledge and upon information that has been provided to me in the course of my official duties.

2. I have been assigned to my current position since June 2021. Prior to my current assignment, I served as the Deputy Commodore of Destroyer Squadron TWO SIX from June of 2020 to June of 2021.

3. I am the immediate superior officer in command (ISIC) to Plaintiff Navy Commander.

4.  In early November 2021, I embarked on Plaintiff Navy Commander's ship. The ship was scheduled to get underway the following day. In order to get underway, I and my staff needed to attend a navigation brief and certify the navigation team.

5.  Once onboard, I chatted with Plaintiff Navy Commander in his cabin. I noticed that his voice was softer than usual. We departed the cabin for the mess decks and attended the navigation brief. Roughly 50-60 personnel were present for the navigation brief, in shoulder-to-shoulder proximity with one another. The Commanding Officer of the ship typically makes comments to close out the brief. I could hardly hear Plaintiff Navy Commander's voice, though I was sitting just across from him. His voice was not just muffled by the mask he was wearing, it was distinctly quiet. He could barely speak. I asked to speak with him privately following the brief.

6.  After the brief, I spoke with Plaintiff Navy Commander again in his cabin. I asked him why he seemed to struggle to speak. He told me that he had gone for a run and it was the cold air. I asked him if he had a sore throat. He replied that he did, but that it was improving. I immediately ordered that he be tested for COVID-19. Plaintiff Navy Commander tested positive for COVID-19. I learned later that he had discussed that morning with his Independent Duty Corpsman the need to get tested for COVID-19. USFFC/NAVNORTH EXORD 20-032.011 clearly states: "Personnel exhibiting influenza or COVID like symptoms in the past 48 hours, have had known close contact with COVID positive personnel in the last 14 days and/or have traveled without a completed risk assessment within the past 10 days should avoid entering the workplace until consultation with a supervisor and medical personnel." I discussed with Plaintiff Navy Commander that the Commanding Officer needs to set the example for his crew. If there was any question on the need to get tested, then he should have

2

taken the test to remove any doubt and protect his crew from the spread of COVID-19. In this case, he should have contacted the IDC prior to reporting to the workplace removing the risk to his crew altogether.

7. Following the incident, on December 3rd, 2021, I issued Plaintiff Navy Commander a Letter of Instruction (LOI). An LOI is an administrative measure intended to document deficiencies and prescribe corrective action. In the letter, I explained that Plaintiff Navy Commander reported to work on November 9th and 10th while experiencing symptoms of COVID-19, when he should not have done so. I advised that per USFFC/NAVNORTH EXORD 20-032.011 and CDC guidelines, he should have tested for COVID-19 as soon as he began experiencing symptoms. I further advised that by reporting to work for at least two days while experiencing COVID-19 symptoms put his crew at unnecessary risk. Finally, I told him that I expected him to adhere strictly to COVID-19 protocols and mitigation measures in the future. Exhibit 1 to this declaration is a copy of that LOI.

8. As Plaintiff Navy Commander's ISIC, I am his leave approval authority. As a practical matter, I have delegated the authority to sign the leave requests by direction to the executive officer (XO) of the ship after my verbal approval with the Plaintiff Navy Commander. There is a special trust and confidence that the Plaintiff Navy Commander will be forthright with his intentions for his leave, so that I can properly assess the operational impact to his ship while he is absent. During the COVID-19 pandemic, in accordance with USFFC/NAVNORTH EXORD 20-032.009, there is an additional requirement to conduct a risk assessment of his travel while on leave. One of the critical assessments that has to be made is the availability of a Commanding Officer in the event of an emergency. For example if Commanding Officer is on leave in the local area in the event of a major fire, emergency weather sortie or emergent

operational tasking, I could cancel their leave and order them to return to the ship. I need to understand the availability of my Commanding Officers at all times, they are critical to the security of our nation. This is what we refer to as the "burden of Command," and if a Commanding Officer is not readily available then I have to be aware of that in order to ensure my ships meet any and all operational requirements when tasked.

9. On 3 February, Plaintiff Navy Commander discussed with me his desire to take some leave in the near future to spend with his family. I strongly supported that leave, expressing my understanding that Plaintiff Navy Commander was under an extraordinary amount of stress and that the time off would be a worthwhile opportunity to reconnect with his family. Following verbal discussions with myself and my Deputy Commodore (DCDRE), Plaintiff Navy Commander sent me an e-mail on Monday, February 7th at roughly 1000 (10 a.m.). He stated that he intended to take leave this week. The email did not disclose that he would be traveling out of area. Exhibit 2.

10. In the evening on Monday, February 7th, I called Plaintiff Navy Commander to discuss his ongoing ship inspections and to verify that he was staying local for his leave. To my recollection, he stated that he was going to spend some time with his family and that he would be available. Even though I asked him directly if he was leaving the local area, he did not tell me that he was flying to ███████

4

12. I learned on 8 February, from the Navy's litigation team that Plaintiff Navy Commander was traveling to ▌ in order to testify in this litigation. But for the Navy's participation in preparing for the lawsuit, I might not have known that Plaintiff Navy Commander was traveling out of area. Also on February 8th, the day his leave started, he submitted his formal leave paperwork to the Executive Officer for approval signature by direction with a leave address in ▌ This was the first time his Executive Officer became aware the Plaintiff Navy Commander was traveling outside the local area.

13. Regardless of the current public health crisis and the dramatic effect it has had on military operations, I consider Plaintiff Navy Commander's failure to notify me that he was traveling out of area to be an egregious breach of trust. Plaintiff Navy Commander has served in the military for roughly seventeen years. He should understand the responsibility of Command and that his ISIC needs to be notified, if he plans to travel of the local area. Even when on leave, the Navy expects all Sailors to inform their chain of command of their location, if it were to change during their leave. Based on that fact, and the three opportunities Plaintiff Navy Commander had to notify me that he was traveling out of area, I believe that Plaintiff Navy Commander intentionally misled me. This is cause alone for removal of Command. If I cannot trust the Commanding Officer of a guided-missile destroyer to honestly apprise me of his whereabouts, I cannot trust him with command of the ship or her crew.

14. As it happens, the current public health crisis has placed limitations on the movements of sailors, both for official and unofficial travel. In most cases, travel by unvaccinated servicemembers requires restriction of movement upon their return. In order to protect the force, United States Fleet Forces Command has implemented a risk assessment

matrix that must be completed and approved prior to *any* travel.[1] Contrary to Navy policies, Plaintiff Navy Commander did not complete the required risk assessment worksheet prior to beginning his leave.

15. Upon learning that he would be traveling out of area, I contacted Plaintiff Navy Commander on the evening of 8 February (after he started his leave at 1600, i.e. 4 p.m.) with the Deputy Commodore listening over speaker phone. When asked why he did not tell me he was leaving the local area during our conversation the night before, Plaintiff Navy Commander stated that he did tell me and also stated he told me he would be unavailable. I then asked him if he understood the requirements that I have as a Commander when approving his leave as it pertains to COVID mitigation policy. He acknowledged that I was required to do a risk assessment of his travel prior to approving his leave. I asked Plaintiff Navy Commander why he had failed to complete the required notifications and travel risk assessment, Plaintiff Navy Commander only responded that he failed to do so. I then conducted the risk assessment over the phone. Given the area of travel, the mode of travel and his activities, Plaintiff Navy Commander will require a 5 day restriction of movement (quarantine period) before he can return to work, assuming he remains symptom free. I reiterated that he had already received an LOI outlining that he needed to maintain strict adherence to the COVID policy direction and that his actions as a Commanding Officer needed to be beyond reproach.

---

[1] The DOD Force Protection Guidance (Supplement 20, Revision 1), provides that "for Service members" a risk assessment is required before all travel. For unofficial travel (i.e., leave), servicemembers will comply with the component-specific guidance for screening, ROM and testing (Exhibit 4). The Navy implemented that guidance via NAVADMIN 073/21, which provides that commanders will conduct a risk assessment when approving leave travel and comply with Echelon 2 (United States Fleet Forces Command) delegation of authority. (Exhibit 5). United States Fleet Forces Command, implemented that guidance in FRAGO 20-032.009. That order requires that commanders and supervisors use a risk assessment worksheet for all travel requests. "This Risk Assessment Management Worksheet is meant to provide a repeatable, risk-based assessment framework that Commanders and Supervisors can use in their decision making process." (Exhibits 6 and 7).

6

16. Plaintiff Navy Commander provided a written risk assessment thirty minutes after this phone conversation and after his leave period had already begun. Exhibit 8. He was clearly aware of the requirement and had the worksheet readily available to him, but failed to complete and submit the assessment before he began his leave.

17. Additionally, the operational impact of losing a Commanding Officer from a ship for over a week during the basic phase is significant and a very rare occurrence across the waterfront. The significance can be mitigated by proper planning and coordination with me and my staff to ensure the ship is properly supported during his absence. In this case, the Executive Officer found out Plaintiff Navy Commander was leaving the area only hours before he departed on leave. In discussions the day before he started leave, Plaintiff Navy Commander told his Executive Officer that he would be gone for two and a half days returning to the ship on Friday afternoon to be available to support ship operations. Plaintiff Navy Commander never discussed the COVID risk assessment required with the Executive Officer and the ship had no plan to be without the Commanding Officer for over a week due to ROM requirements. Even after my discussion with the Plaintiff Navy Commander and determining the ROM requirements, he did not contact his Executive Officer to inform him that he would need to stay away from the ship for an extended period of time, much less provide his Commander's intentions to mitigate his absence until after I had already spoken with his executive officer the next morning. This is negligent behavior by Plaintiff Navy Commander in performance of his duties as a Commanding Officer.

18. In sum, I believe Plaintiff Navy Commander intentionally deceived me when it came to his leave request. Despite multiple opportunities and direct questions about his intention for leave, he never stated he was going to travel on a commercial aircraft out of the state of

7

Virginia. I believe, he clearly understood that he was required to do so. I do not understand why he would have done this, as I have been very clear that I would approve his leave in any event— even for the purposes of attending this hearing. If I had not intervened after learning about his travel plans, I believe that the Plaintiff Navy Commander intended to *again* risk the welfare of his crew and ship by reporting back to work without adhering to the COVID ROM policies of the Navy.

19. In light of the foregoing, I do not trust Plaintiff Navy Commander with the lives of our Sailors. In my professional judgment, I cannot leave him in Command of a Navy warship, regardless of his vaccination status or religious exemption request. Plaintiff Commanding Officer put his crew at risk due to his personal actions and failed to comply with the Navy's COVID-19 policies. He was intentionally evasive about whether he was going to remain in the local area, despite being asked a direct question by me about his leave. I am responsible for the well-being of my Squadron, including welfare of my ships and the health of my sailors. My loss of confidence in Plaintiff Navy Commander is not based on his vaccination status or his denied request for a religious exemption. It is based on the fact that I cannot trust his judgment, I cannot trust him to look after the welfare of his sailors, and I cannot trust him to be honest with me. In my judgment, allowing him to remain in command of Navy warship would be reckless.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of February, 2022.

FRANK BRANDON