UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NAVY SEAL 1, et al.,

     Plaintiffs,

v.                               CASE NO. 8:21-cv-2429-SDM-TGW

LLOYD AUSTIN, et al.,

     Defendants.

_____/

## PRELIMINARY INJUNCTION AND ORDER

     Here is the short version:  Expressly applicable to each branch of the federal government, the Religious Freedom Restoration Act (RFRA) commands the military to grant to a service member harboring a sincerely held religious objection to COVID-19 vaccination a religious exemption from the vaccination (1) unless a compelling governmental interest requires the vaccination and (2) unless a good faith evaluation, directed specifically to the singular circumstances of the service member — that is, directed "to the person" requesting the exemption — demonstrates that no less restrictive means is available to the military reasonably to protect the compelling governmental interest.  Under the command of RFRA, the military bears the burden of showing both the existence of a compelling governmental interest and the absence of a less restrictive means of reasonably protecting that interest.  In the instance of Navy Commander and Lieutenant Colonel 2, the Navy and the Marine Corps have failed manifestly to offer the statutorily required demonstration that no less restrictive

means is available, and each of the two service members is entitled to preliminary injunctive relief that (1) permits them, pending a final determination on a complete record, to continue to serve without the vaccination and (2) forbids any punitive or retaliatory measure against either by the military pending a final judgment in this action. The long version follows.

## BACKGROUND

Harboring a sincere religious objection to COVID-19 vaccination and denied a religious exemption, Navy Commander Surface Warfare Officer and Lieutenant Colonel 2 (each appearing pseudonymously) move (Doc. 60) for injunctive relief against the military. The defendants oppose (Docs. 23 and 74) the motion. Two orders (Docs. 67 and 85) preserve the status quo for Navy Commander and Lieutenant Colonel 2 pending resolution of a motion for preliminary injunction on behalf of Navy Commander, Lieutenant Colonel 2, the service members appearing in this action, and a putative class comprising service members in each branch of the military.

## I. PROCEDURAL POSTURE

On October 15, 2021, several service members in each branch of the military sued on behalf of a putative class and promptly moved to preliminarily enjoin and to temporarily restrain military directives and executive orders requiring COVID-19 vaccination.[1] An October 18, 2021 scheduling order (Doc. 9) states that the plaintiffs

---

[1] The original complaint includes as plaintiffs federal employees, federal contractors, and the employees of federal contractors, but a February 12, 2022 order (Doc. 89) severs the non-service members.

may move in an exigent circumstance for relief on behalf of an individual member of the putative class.

After a hearing on the motion for a preliminary injunction, a November 22, 2021 order (Doc. 40) defers resolution of the service members' claims under RFRA and the First Amendment because each service-member plaintiff remained temporarily exempt from the COVID-19 vaccination requirement pending resolution of a request for a religious exemption and the resolution of any appeal.[2] The order (Doc. 40) requires, among other things, that the defendants submit every fourteen days beginning January 7, 2022, a notice containing information about, among other things, the number of requests for religious and other exemptions and the number of requests denied after appeal (this reporting requirement was terminated recently). According to the February 4, 2022 notice (Doc. 73), the Navy has denied 81 appeals and granted none, the Marine Corps has denied 119 appeals and granted 3, and the Air Force has denied 443 appeals and granted 1 appeal (and granted 8 initial requests).

On January 20, 2022, the plaintiffs moved (Doc. 49) to amend the complaint to remove President Biden as a defendant, to add as a defendant the head of each branch of the military, to add claims under the APA, and to add plaintiffs. On January 21, 2022, the plaintiffs submitted (Doc. 51) a supplemental memorandum in support of a preliminary injunction on behalf of the putative class of service members.

---

[2] The order (Doc. 40) denies the motion on the service members' "informed consent" claim under 10 U.S.C. § 1107a.

On February 1, 2022, the plaintiffs moved (Doc. 60) for emergency injunctive relief on behalf of Navy Commander and Lieutenant Colonel 2, each denied a religious exemption after a final appeal and each ordered to accept COVID-19 vaccination within five days.  A February 2, 2022 order (Doc. 67) schedules for February 10, 2022, a hearing on further preliminary relief resulting from the emergency motion and enjoins through February 11, 2022, the military's diminishing or altering the current status of these two service members.  At the February 10, 2022 hearing, the service members testified, and the defendants filed (Doc. S-91) additional items from the administrative record.  To permit review of the administrative record; to preserve the status quo; to permit a reasonable time to evaluate the issues presented during the February 10, 2022 hearing; and for other good cause shown, a February 11, 2022 order (Doc. 85) extends the February 2, 2022 order's injunctive relief through February 18, 2022.  Also, a February 13, 2022 order (Doc. 90) requires the defendants to submit for each of the Navy, Marines, and Air Force (1) each letter or memorandum granting a religious exemption (whether granted initially or after appeal), (2) the twenty-five most recent denials after appeal and the underlying denial of the initial request, (3) for each grant or denial the service member's initial request and the service member's written submission beginning the appeal, and (4) anything else the defendants elect to submit in an effort to meet their statutory burden of proof.

## II.  THE RECORD

On August 23, 2021, the FDA licensed Pfizer's COVID-19 vaccine.  The next day, the Secretary of the Department of Defense directed each branch to require of

every service member "full vaccination" against COVID-19.  (Doc. 1-4 at 1)  The secretary's memorandum states that "the Military Departments should use existing policies and procedures to manage mandatory vaccination of [s]ervice members to the extent practicable" and that the vaccination requirement "will be subject to any identified contraindications and any administrative or other exemptions established in Military Department policy."  (Doc. 1-4 at 1)

A.    <u>Religious exemptions in the Navy and the Marine Corps</u>

Each branch of the military has promulgated a process for a service member to request a religious, medical, or administrative exemption from COVID-19 vaccination.  In general, each branch temporarily exempts a service member from the COVID-19 vaccination requirement pending resolution of a request and of any appeal.  If the appeal results in denial, each branch requires the service member — within only five days — to decide the life-altering question whether to accept COVID-19 vaccination or face discharge for disobeying an order.  Specifically, if the service member fails to accept COVID-19 vaccination within the allotted five days, the branch considers the service member in violation of a lawful order and the commander reports the service member for discharge or other punishment based on the charge of misconduct, moral or professional dereliction, and substandard performance.  (Of course, the typical service member cannot as a practical matter obtain judicial relief on only five days' notice.)

1.   Religious exemption in the Navy

Under BUPERINST 1730.11A, a sailor requesting a religious exemption from COVID-19 vaccination must interview with a Navy chaplain, who decides whether to recommend the service member's religious objection as sincere.  (Doc. 23-18 ¶ 14)  Next, the sailor submits an exemption request to the service member's commander.  (Doc. 23-18 ¶ 14)  Within seven days after receiving an exemption request, the commander must prepare in accord with MILSPERMAN 1730-020 an endorsement identifying "(1) the negative effect (if any) of the requested accommodation on the unit's military readiness, health, or safety; (2) the number of service members in the command that have been granted a similar exemption; and (3) when recommending a denial, a determination that the denial furthers a compelling government interest and there is no less restrictive means of accommodating the request."  (Doc. 23-18 ¶ 14.b)  After receiving the commander's endorsement, the Chief of Naval Personnel resolves the request within sixty days.  (Doc. 23-18 ¶ 14.b)

If the request is denied, the sailor can appeal to the Chief of Naval Operations.  (Doc. 23-18 ¶ 14.b)  Under NAVADMIN 256/21, if the Chief of Naval Operations (or other adjudicating authority) denies the appeal, the sailor must accept COVID-19 vaccination within five days.  (Doc. 23-18 ¶ 15)  Under NAVADMIN 225, if the sailor fails to accept COVID-19 vaccination within five days, the sailor is "refusing the vaccine" and must "be processed for administrative separation" under the Navy's Covid Consolidated Disposition Authority.  (Doc. 23-18 ¶ 15)  Under NAVADMIN 225/21, an officer refusing the vaccine "is processed for separation on the bases of

Misconduct, Moral or Professional Dereliction, and substandard Performance." A non-probationary officer refusing the vaccine is entitled to a Board of Inquiry hearing, during which three or more senior officers recommend retention or separation. (Doc. 23-18 ¶ 17.b)

In the February 4, 2022 notice (Doc. 73), the Navy reports receiving 4,095 requests for a religious exemption from COVID-19 vaccination. (Doc. 73-3 at 3) The Navy has denied 3,728 initial requests — 93% of all pending requests — and granted no initial request. Of these 3,728 denials, 1,303 sailors have appealed. The Navy has denied 81 appeals and granted none. The Navy has reportedly separated 240 sailors who requested a religious exemption from COVID-19 vaccination.

Although the defendants report an inability to quantify the number of requests for, or denials of, a temporary or permanent medical exemption (Doc. 34-2 at 3–4), the Navy reports 252 active temporary medical exemptions, which require renewal every thirty days (Doc. 34-2 at 4), and 11 permanent medical exemptions. (Doc. 73-2 at 3) The number of active temporary medical exemptions has fallen since November 10, 2021, when the Navy reported 698 active temporary medical exemptions. (Doc. 34-2 at 4)

2. Religious exemption in the Marine Corps

Under Marine Corps Order 1730.9, a Marine requesting a religious exemption from COVID-19 vaccination must complete a religious exemption form, NAVMC 10274 AA. (Doc. 23-19 Ex. A ¶ 4.a) Next, the Marine interviews with a chaplain, "who assesses whether the [applicant's] beliefs appear sincerely held." (Doc. 23-19

¶ 12.a)  The chaplain routes the assessment to the applicant's commander, who routes the application through the chain of command to the Deputy Commandant, Manpower and Reserve Affairs.  (Doc. 23-19 ¶ 12.a)

The Deputy Commandant reviews the application and consults with a staff judge advocate and the Religious Accommodation Board.  (Doc. 23-19 ¶ 12.c)  Under Marine Corps Order 1730.9, the Religious Accommodation Board, comprising at least three voting members and a recorder, a legal advisor, and a chaplain advisor, reviews each request for a religious exemption, writes an assessment of the request, and recommends granting, granting-in-part, or denying the request.  Marine Corps Order 1730.9 requires the Deputy Commandant to resolve each request "on a case-by-case basis" and to "articulate the factual basis underlying their decision."  Under the regulations, the reviewing authority can deny the request only if "there is no lesser restrictive means to furthering" a "compelling government interest." (Doc. 23-19 ¶ 12.a–b)

The Deputy Commandant resolves the request within sixty days.  (Doc. 23-19 Ex. A ¶ 4.b)  The Marine receives written notice of the decision and, if applicable, "any conditions or limitations placed on the approval to meet the compelling governmental interest in mission accomplishment."  (Doc. 23-19 Ex. A ¶ 4.b.4)  If the request is denied, the Marine can appeal to the Commandant of the Marine Corps, who issues a final decision.  (Doc. 23-19 Ex. A ¶ 4.c)

If the Commandant denies the appeal (or if the Marine declines to appeal), the Marine receives an order to begin COVID-19 vaccination within five days.  Under

MARADMIN 612/21, if the Marine fails to timely begin COVID-19 vaccination, the Marine has "refused the vaccine" and is reported for administrative separation based on misconduct, moral or professional dereliction, and substandard Performance.

As of February 3, 2022, the Marine Corps reports receiving 3,539 initial requests for a religious exemption.  (Doc. 73-4 at 3)  The Marine Corps has denied 3,458 initial requests — 98% of all pending requests — and granted none.  In 1,272 denials, the requestor appealed.  The Marine Corps has adjudicated 122 appeals and granted 3 exemptions on appeal.

Like the Navy, the Marine Corps has begun the administrative separation of a Marine who, after denial of the appeal, fails to accept COVID-19 vaccination. As of February 3, 2022, the Marine Corps has reportedly separated two Marines who were denied a religious exemption to COVID-19 vaccination and has reportedly initiated the separation of seven more Marines who were denied a religious exemption to COVID-19 vaccination.

The Marine Corps, like the Navy, reports an inability to present the number of requests for, or denials of, a temporary or permanent medical exemption from a vaccine.  (Doc. 47-4 at 2)  The Marine Corps reports 232 active temporary and 21 active permanent medical exemptions from COVID-19 vaccination.  (Doc. 73-4 at 3)  The number of active temporary medical exemptions has decreased since January 7, 2022, when the Marine Corps reported 419 active temporary medical exemptions. (Doc. 47-4 at 6)

B.  Findings of fact from the evidentiary hearing

The following findings of fact result from my assessment of Navy Commander and Lieutenant Colonel 2's credibility during an evidentiary hearing and from my review of the declarations, exhibits, and other items in the record.

1.  Navy Commander

Navy Commander serves as the commanding officer of a guided missile destroyer.  (Doc. 60-1 ¶ 2)  Navy Commander joined the Navy in 2004 and has served for more than seventeen years.  (Doc. 60-1 ¶ 4)  Over the course of those seventeen years, the Navy entrusted Navy Commander with increasing levels of responsibility. After completing several tours of duty and graduating nuclear power school, Navy Commander commands a surface warfare vessel with a crew of 320.  Because of the required nuclear education and experience, few service members are as qualified as Navy Commander to direct a surface vessel.  From January 2020 to March 2021, from the onset of COVID-19, through the height of the pandemic, and without a vaccine (and certainly before the FDA fully authorized a COVID-19 vaccine), Navy Commander conducted successful operations, including a voyage exceeding 300 days, while adhering to COVID-19 safety protocols, including masking, sanitizing, physical distancing, COVID-19 testing, and quarantining.  (Doc. 60-1 ¶¶ 12-13) More than 93% of the sailors under his command have completed a COVID-19 vaccination series.  (Doc. 60-1 ¶ 15)  In sum, his present regime has proven successful including while "underway" on the oceans of the world.

On September 13, 2021, Navy Commander submitted a "Religious Accommodation Request." (Doc. 60-1 ¶ 8)  A devout Christian, Navy Commander harbors a sincere belief, which during his testimony he convincingly articulated with scriptural citations, that acceptance of the vaccine introduces an unclean substance into his body, which he understands is a gift from God and a temple of the Holy Spirit. Navy Commander abhors the use of fetal cell tissue in the development of the vaccines and believes that production of the available vaccines was and is achieved by immoral means.  As required by his faith, Navy Commander refuses to accept any COVID-19 vaccine.

On October 22, 2021, the Chief of Naval Personnel denied Navy Commander's Religious Accommodation Request.  Navy Commander appealed on November 3, 2021.  (Doc. 60-1 ¶¶ 9, 10)  Navy Commander testifies — consistent with the balance of the record in this action — that the denial letter "is identical to the denial letter received" by the sixteen sailors under his command on the guided missile destroyer.  (Doc. 60-1 ¶ 19)  Although Navy Commander endorsed the exemption request of each sailor under his command and affirmed the ability on the destroyer he commands to accommodate each sailor's request, the reviewing authority deemed Navy Commander's endorsement insufficient for each member of his crew. (Doc. 60-1 ¶ 22)

On January 28, 2022, the Chief of Naval Operations, the Navy's final appellate authority for religious exemptions, denied Navy Commander's appeal. (Doc. 60-1 at 8–9)  The appellate denial letter assumes that Navy Commander's

"religious beliefs are sincere and would be substantially burdened." (Doc. 60-1 at 8) However, the letter states that "[a] waiver of immunizations would have a predictable and detrimental effect on the readiness of you and the Sailors who serve along side you" and that the other preventative measures, which for the last two years Navy Commander has required of sailors under his command, "are not 100 percent effective and must be implemented in conjunction with immunization to reduce the risk of mission failure." (Doc. 60-1 at 8) The appellate denial letter orders Navy Commander to begin a COVID-19 vaccination series at a Navy immunization clinic not later than February 3, 2022. (Doc. 60-1 at 9) Also, another order directed Navy Commander to meet with a squadron commander the evening of February 3, 2022, at which time Navy Commander "fully expect[ed]" — absent preliminary injunctive relief — "to be relieved as a commander of the ship, due to a 'loss of confidence.'" (Doc. 60-1 ¶¶ 24–25)[3]

---

[3] Within minutes of the conclusion of the February 10, 2022 hearing on Navy Commander's and Lieutenant Colonel 2's motion for injunctive relief, counsel for the defendants announced the essentially simultaneous filing of, among other things, the affidavit (Doc. 81-1) of Navy Commander's commanding officer and the affidavit (Doc. 83-1) of the Executive Officer serving immediately under Navy Commander on the destroyer. Although introduced after the close of evidence, the affidavits purport to contradict a part of Navy Commander's testimony that is unrelated to his request for, and the Navy's denial of, a religious exemption from the COVID-19 vaccination requirement. The plaintiffs object to consideration of the declaration.

Because I heard the testimony of Navy Commander and carefully observed his demeanor and listened attentively to the content of his testimony, I fully credit his testimony, even the parts inconsistent with the un-cross-examined, last-minute affidavits. A determination of the credibility of the statements in the affidavits must await live testimony and further exploration (these two witnesses are at the disposal of, and under the command of, the defendants, who neither offered their live testimony nor notified the plaintiffs of the fact of, or the content of, their affidavits). Cross-examination is necessary in this circumstance to permit assessment of, among other things, the extent to which "command influence" might have affected the presence or content of the affidavits.

- 12 -

2.  Lieutenant Colonel 2

Lieutenant Colonel 2 serves as a logistics officer at Marine Forces Special Operations Command at Camp Lejeune, North Carolina.  (Doc. 60-2 ¶ 2)  In 1997, Lieutenant Colonel 2 enlisted in the Marine Corps.  (Doc. 60-2 ¶ 3)  Originally a reservist, Lieutenant Colonel 2 voluntarily transferred to active duty after the attacks of September 11, 2001.  In 2003, Lieutenant Colonel 2 completed officer candidate school and basic school.  After becoming an officer, Lieutenant Colonel 2 performed several duties for the Marine Corps, which duties included serving as a congressional fellow for the Department of Defense and as a legislative assistant for the Marine Forces Integration Office.  Lieutenant Colonel 2 was selected in a class of ten service members to receive a master's degree from the Command and Staff College at the University of the Marine Corps.

Currently, Lieutenant Colonel 2 serves as a Logistics Officer and a Diversity and Inclusion Officer.  (Doc. 60-2 ¶ 6)  Since the beginning of COVID-19, Lieutenant Colonel 2 has completed eight temporary duty assignments, which required travel across the United States.  (Doc. 60-2 ¶ 19)  In January 2021, Lieutenant  Colonel 2 received orders to transfer to Bahrain to serve in the Marine Corps' "naval integration program" during the summer of 2022.[4]  In August 2021, Lieutenant Colonel 2 was selected to command a combat logistics battalion stationed at Camp Lejeune.  She was scheduled to assume command in the fall of 2022.

---

[4]  After objecting to COVID-19 vaccination, Lieutenant Colonel 2's transfer to Bahrain was delayed.

On September 7, 2021, Lieutenant Colonel 2 requested a religious exemption from COVID-19 vaccination.  (Doc. 60-2 ¶ 8; Doc. 60-2 at 13)  A devout follower of Christ, Lieutenant Colonel 2 testified that she and her husband live their lives according to the word of God.  Lieutenant Colonel 2 harbors a sincere religious belief that her body is temple of God and that the compulsory introduction of a foreign substance into the body violates the word of God.  Also, before joining the military, Lieutenant Colonel 2 received an abortion after she became pregnant because of a rape.  (Doc. 60-2 ¶ 18)  This experience caused Lieutenant Colonel 2 to develop a profound religious opposition to abortion and to any vaccine developed with cell lines derived from fetal cells.  (Doc. 60-2 ¶ 18)

On October 13, 2021, the Deputy Commandant, Manpower & Reserve Affairs denied Lieutenant Colonel 2's request for a religious exemption.  (Doc. 60-2 ¶ 10)  On November 3, 2021, Lieutenant Colonel 2 appealed, which on January 26, 2022, the Assistant Commandant of the Marine Corps denied. (Doc. 60-2 at 7)  In the appellate denial letter (Doc. 66-3), the Assistant Commandant determines — without explanation or citation of sources — that the COVID-19 vaccination requirement "does not substantially burden" Lieutenant Colonel 2's religious belief because "fetal stem cells are neither used in the manufacture of the Pfizer COVID-19 vaccine nor are they present in the vaccine itself."  (Doc. 66-3 at 3)  (The Assistant Commandant says nothing about the development of the vaccine or the religious concepts of, for example, accepting a personal benefit from evil, assisting someone in profiting from evil, cooperating in evil, appropriation of evil, de-sensitization to evil, moral

- 14 -

contamination by intimacy with evil, ratification of evil, complicity with evil, or other considerations undoubtedly familiar to a theologian and likely familiar to a thoughtful religious lay person.)

Further, "assuming that COVID-19 vaccination substantially burdens" Lieutenant Colonel 2's religious exercise, the Assistant Commandant concludes that "the government's compelling interests in military readiness and in the health and safety of the force" justify denying Lieutenant Colonel 2's request.  (Doc. 66-3 at 3)  Again, in conclusory fashion, without citation of sources and without analyzing the specific demands of Lieutenant Colonel 2's particular assignment, the Assistant Commandant states that "[w]hile masking, social distancing, hygiene, teleworking, and other similar measures, individually or in combination, have been shown to help slow the spread of the virus, they are simply not as effective as vaccination."  (Doc. 66-3 at 4) The Assistant Commandant finds that these lesser-restrictive measures "are often incompatible with the demands of military life, where Marines and Sailors must live, work, realistically train, and, if necessary fight in close quarters."  (Doc. 66-3 at 4) (The Assistant Commandant's use of "often" exemplifies the difference between an insufficient global dismissal and the required evaluation directed "to the person.")

On January 26, 2022, the commanding officer directed Lieutenant Colonel 2 to begin a vaccination series not later than February 2, 2022.  (Doc. 60-2 at 7)  If Lieutenant Colonel 2 failed to timely begin the vaccination series, "the process will immediately begin to place [Lieutenant Colonel 2] on the Officer Disciplinary Notebook," which strips Lieutenant Colonel 2 of her scheduled command and her

- 15 -

eligibility for deployment, promotion, schooling, and other career progression, including retirement. (Doc. 60-2 ¶ 13) Further, placement on the Officer Disciplinary Notebook begins the "Board of Inquiry Process," that is, the process of administrative separation from the Marines. (Doc. 60-2 ¶ 14)

## DISCUSSION[5]

This action questions the effect of RFRA's resurrection of the Free Exercise Clause, the "prohibiting" clause of the First Amendment.[6] The meaning of the Free Exercise Clause, which understandably leaves "Free Exercise" undefined, has confused, confounded, and vexed studious and well-meaning citizens and, especially, beleaguered jurists for many decades. (For a vivid example, see *McGowan v. Maryland*, 366 U.S. 420 (1961) (separate opinions appear at 366 U.S. 459, 561, 583, 599, and 617).

Thomas Jefferson in his often-remarked letter (his "wall of separation" letter) to the Danbury Baptists in 1802 seems confidently to declare that "the legitimate

_____

[5] The following observations in a substantially similar form appear in an earlier order (Doc. 40) and appear here because understanding the provenance of RFRA informs a faithful application of Congress's command.

[6] The First Amendment, a spare but dense forty-five words, preserves against legislative intrusion by Congress an array of rights irreplaceable to the civil and peaceful preservation of a constitutional republic. After the central prohibition "Congress shall make no law," the First Amendment deploys three participles to identify the laws the amendment forbids. The three participles—respective, prohibiting, and abridging—are not identical and not synonymous but suggest a hierarchical ordering. Akin to the encompassing but amorphous phrase "relating to," "respecting" connotes the proscription of any law touching the pertinent rights. A more focused and more targeted phrase, "prohibiting" connotes a bar against any law that disallows, proscribes, or precludes the pertinent rights. "Abridging" connotes a bar of any law that compacts, constricts, confines, or otherwise impedes the pertinent rights. But the Supreme Court seldom, if ever, mentions the presence of these three distinct terms and attributes little, if any, importance to the apparent hierarchy of protections embedded in the First Amendment.

- 16 -

powers of government reach actions only, and not opinions" and that a person "has no natural rights in opposition to his social duties."  James Madison, often but not always in agreement with Jefferson, held that the constitutional meaning of "religion" extends to "the means of discharging" religious faith.  And, among others, William Penn held that "liberty of conscience," which during the time of the Founders meant religious liberty, included "not only a mere liberty of the mind, in believing or disbelieving . . . but the exercise of ourselves in a visible way of worship."  Of course, the statements and the writings of this or that person, however prominent in the politics of the founding years or of another time, might influence — but cannot in isolation resolve — the meaning of a founding document (or any other document) that was drafted by one or more persons, first approved by a larger group of persons, and finally approved after further and more encompassing deliberation, for example, in the several states.  Although famously inconstant and sometimes even self-contradictory on the subject, the Supreme Court's interpretation governs the content and effect of the First Amendment (the Supreme Court's exclusive power to interpret the Constitution is one of the rare doctrines on which the Supreme Court is tirelessly constant).

Remarkably, from 1789 to 1878 the Supreme Court had no occasion to expound the meaning of the Free Exercise Clause (perhaps the meaning was agreed and accepted, and the lawmakers, mindful of the Constitution and the tradition of deference to religious beliefs and tolerance of religious difference, prudentially chose tolerance and diversity over aggression and enforced homogeneity).  But a territorial

legislature's response to polygamy among the Mormons resulted in *Reynolds v. United States*, 98 U.S. 145 (1878), in which Chief Justice Waite for a unanimous court evaluated whether at Reynolds's trial the judge should have instructed the jury that if Reynolds, a Mormon criminally charged under the law of the Territory of Utah with bigamy, was married simultaneously to two women "in pursuance of and in conformity with what he believed at the time to be a religious duty, th[en] the verdict must be not guilty."  98 U.S. at 161.

*Reynolds* sounds strongly the theme that bigamy "has always been odious among the northern and western nations of Europe," in England and Wales was punishable by death, and was at all times in the states of the United States "an offence against society."  Fortified by a recitation of some pertinent history, by a survey of the states, and by the force of public opinion, *Reynolds* finds that by force of the Free Exercise Clause:

> Congress was deprived of all legislative powers over mere opinion, but was left free to reach actions which were in violation of social duties or subversive of good order.
>
> . . .
>
> Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.

98 U.S. at 145.  *Reynolds* reaches a Jeffersonian result, entirely consistent with his reassurances to the Danbury Baptists, a small and uneasy assembly at the time, that "the legislative powers of the government reach action only, and not opinions."

After *Reynolds*, the Free Exercise Clause received little attention in the Supreme Court until *Cantwell v. Connecticut*, 310 U.S. 296 (1940), discovered that the Fourteenth Amendment had incorporated the Free Exercise Clause and subjected the state's law to the First Amendment's admonition that "Congress shall make no law." With the addition of challenges to state laws affecting religion, the frequency of Supreme Court decisions on the Free Exercise Clause accelerated.  In *Cantwell*, three Jehovah's Witnesses were convicted of soliciting house-to-house for contributions to the church without first procuring a permit from "the secretary of the public welfare council of the state."  Soliciting for a religious contribution in Connecticut was fine, but soliciting without a permit from the public welfare secretary was, according to Connecticut, an illegal incitement of a breach of the peace.

*Cantwell* finds that the public-welfare secretary's capacity to accomplish the "censorship of religion" by an exercise of governmental permitting discretion imposed a "prior restraint" — a "denial of liberty protected by the First Amendment" as incorporated into the Fourteenth Amendment and applied to Connecticut.  Although casually mingling concepts of freedom of religion with concepts of freedom of speech (and perhaps freedom of assembly), *Cantwell* resolves:

> [T]o condition the solicitation of aid for the perpetuation of religious views or systems upon a license, the grant of which rests in the exercise of a determination by state authority as to what is a religious cause, is to lay a forbidden burden upon the exercise of liberty protected by the Constitution.

310 U.S. at 307.

Legal developments from the fraternal disagreement between Jefferson and Madison to the present dispute are too lengthy to detail precisely. But a distinct and troublesome thread of tension between religion and legislation appears, and the main decisions are worth briefly recalling. For example, the availability of the Fourteenth Amendment to support a claim against a state law yielded *Sherbert v. Verner*, 374 U.S. 398 (1963), in which a Seventh-Day Adventist lost her job when she declined to work on Saturday, the Sabbath Day of her faith. The state denied her application for unemployment compensation because she "failed without good cause . . . to accept available suitable work," which her employer offered if she would work on Saturday, which she would not. *Sherbert*, 374 U.S. at 401.

Explicitly confirming a distinction between regulation to "compel affirmation of a repugnant belief" and "regulation of certain overt acts prompted by religious beliefs or principles," *Sherbert* addresses "whether the disqualification for benefits imposes any burden on the free exercise of appellant's religion." *Sherbert*, 374 U.S. at 402–03. Acknowledging that the disqualification required by the unemployment compensation law "derives solely from the practice of her religion" and that the law applies "pressure upon her to forego that practice," *Sherbert* equates the effect of the law to a monetary penalty for "Saturday worship" and invalidates the law as a violation of the Free Exercise Clause because the law "penalizes the free exercise of her constitutional liberties" by inducing her to avoid the penalty by violating a "cardinal principle of her religious faith." *Sherbert*, 374 U.S. at 404–06. *Sherbert* considers

whether a "compelling state interest" might counterbalance the identified infringement of religious liberty and concludes:

> It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, "[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation.

*Sherbert*, 374 U.S. at 406 (citing *Thomas v. Collins*, 323 U.S. 516, 530 (1945)). *Sherbert* was a much more Madisonian result.

Similarly, *Wisconsin v. Yoder*, 406 U.S. 205 (1972), invalidates the state's law requiring compulsory school attendance for those under sixteen. Yoder and other Amish declined on religious grounds to send their children to school after the eighth grade. Writing for the court, Chief Justice Burger finds the state's interest in education ("a high responsibility") is "not totally free from a balancing process when it impinges . . . the Free Exercise Clause . . . and the traditional interests of parents with respect to the religious upbringing of their children." *Yoder*, 406 U.S. at 213–14. After an extensive review of the provenance and practice of Amish beliefs and after finding the beliefs sincere, enduring, and elemental to the Amish faith, the Chief Justice observes that — for the Amish — limiting a child's education to the eighth grade, to "the three Rs," "is not merely a matter of personal preference, but one of deep religious conviction." *Yoder*, 406 U.S. at 216. As a result, the Chief Justice finds "a very real threat of undermining the Amish community and religious practice as they exist today" and concludes:

> The impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under

> threat of criminal sanction, to perform acts undeniably at odds
> with fundamental tenets of their religious beliefs.

*Yoder*, 406 U.S. at 218.

*Yoder* balances two strong but, in Yoder's circumstance, competing and irre-solvable interests — universal education and Free Exercise.  Because examination identified only a marginal harm to the state's interest if Free Exercise rights were pre-served, Yoder prevailed.  *Yoder* is avowedly an example of the court's "recognizing the need for a sensible and realistic application of the Religion Clauses."  *Yoder*, 406 U.S. at 221.  The extended discussion in *Yoder* includes this summary:

> The essence of all that has been said and written on the subject
> is that only those interests of the highest order and those not
> otherwise served can overbalance legitimate claims to the free
> exercise of religion. We can accept it as settled, therefore, that,
> however strong the State's interest in universal compulsory edu-
> cation, it is by no means absolute to the exclusion or subordina-
> tion of all other interests.

*Yoder*, 406 U.S. at 215.  *Sherbert* and *Yoder* governed for a several years.

Somewhat similar to this dispute is *Goldman v. Weinberger*, 475 U.S. 503 (1986), in which the Air Force enforced a dress regulation that prohibited the wear-ing of a non-regulation attire, including a yarmulke worn by an Air Force psycholo-gist who was an Orthodox Jew, an ordained rabbi, and a PhD in psychology; who was practicing in a clinic at March Air Force Base in California; and whose sincerely held religious belief required his wearing a yarmulke.

Although the rabbi argued for the application of *Sherbert* and *Yoder*, then-Jus-tice Rehnquist in his opinion for the court cited the military's "specialized society separate from civilian society" and the military's "respect for duty and a discipline

- 22 -

without counterpart in civilian life" and determined to apply a standard (unstated) "far more deferential" than for a challenge by a civilian to a similar restriction "for civilian society." *Goldman*, 475 U.S. at 506–07. *Goldman* offers assurances that the consequences of military discipline "do not, of course, render entirely nugatory in the military context the guarantees of the First Amendment" and that:

> [W]hen evaluating whether military needs justify a particular restriction on religiously motivated conduct, courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.

*Goldman*, 475 U.S. at 507.

Remarking the claimed need for a "sense of hierarchical unity," advanced in the military "by tending to eliminate outward individual distinctions except for those of rank," Justice Rehnquist identifies regulations providing that only "authorized headgear" is worn outdoors and that, except for on-duty law enforcement and in "designated living quarters," no headgear is worn indoors. *Goldman*, 475 U.S. at 508–09. Without a lucid expression of the applicable standard of scrutiny and an explanation of how the result in *Goldman* follows reasonably from the facts of *Goldman*, the opinion leaves the reader mystified about how a mere yarmulke, worn under a regulation Air Force cap outdoors on the base and in the confines of a psychologist's consulting rooms and clinic on the base, erodes "hierarchical unity"; how the yarmulke was even noticed (except perhaps in retaliation by Goldman's litigation adversary, who filed the complaint); and how this prospective erosion of military discipline, hierarchy, or the like — not specified, not quantified, and not even exemplified

— outweighed a constitutionally fundamental right guaranteed by the Free Exercise Clause.  The *Goldman* dissenters complained tellingly that the military's "lack of any reasoned basis for prohibiting yarmulkes" was "striking" and that the majority seemed to forsake the more demanding inquiry featured in *Sherbert* and *Yoder*.  *Goldman*, 475 U.S. at 520 (Brennan, J., dissenting).

Soon after *Goldman* came *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), in which Justice Scalia, writing for the majority, determines that Oregon — without unconstitutionally contravening the Free Exercise rights of church members — can criminalize consumption of the hallucinogen peyote, although members of the Native American Church use peyote in religious rites.  While surveying the precedent in which a state law of general application competes with the Free Exercise Clause, Justice Scalia first attempts to confine the precedent to instances raising "not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional freedoms, such as freedom of speech and of the press," *Smith*, 494 U.S. at 881, and next attempts to confine the balance of the precedent to instances involving unemployment compensation.  Further minimizing *Sherbert* and *Yoder*, Justice Scalia cites instances, including *Goldman*, that evade *Sherbert*.  In a decisive dismissal of *Sherbert*, Justice Scalia mentions his view of the limitations that *Sherbert* would encounter "even if we were inclined to breathe into *Sherbert* some life beyond the unemployment compensation field."  *Smith*, 494 U.S. at 884.

- 24 -

In precisely describing (or, at least, in trying to precisely describe) the controlling distinction, Justice Scalia in *Smith* distinguishes between (1) a circumstance in which "the state has in place a system of individual exemptions," in which case "the state may not refuse to extend that system to cases of 'religious hardship' without compelling reason" and (2) a circumstance in which a state adopts "an across-the-board criminal prohibition on a particular form of conduct."  494 U.S. at 884.  Justice Scalia's coda to *Smith* presents both his recognition that several states had enacted statutory exemptions from the criminal law to permit sacramental use of peyote and his reconciliation of those exemptions to *Smith*:

> Values that are protected against government interference through enshrinement in the Bill of Rights are not thereby banished from the political process.
>
> . . .
>
> But to say that a nondiscriminatory religious-practice exemption is permitted, or even that it is desirable, is not to say that it is constitutionally required, and that the appropriate occasions for its creation can be discerned by the courts. It may fairly be said that leaving accommodation to the political process will place at a relative disadvantage those religious practices that are not widely engaged in; but that unavoidable consequence of democratic government must be preferred to a system in which each conscience is a law unto itself or in which judges weigh the social importance of all laws against the centrality of all religious beliefs.

*Smith*, 494 U.S. at 890.

A search for a general rule emerging from *Smith* reveals this paragraph, written by Justice O'Connor in a concurrence, which recapitulates *Smith*'s formal retirement of *Sherbert*:

> The Court today extracts from our long history of free exercise precedents the single categorical rule that "if prohibiting the exercise of religion . . . is . . . merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended." [citation omitted] Indeed, the Court holds that where the law is a generally applicable criminal prohibition, our usual free exercise jurisprudence does not even apply. [citation omitted] To reach this sweeping result, however, the Court must not only give a strained reading of the First Amendment but must also disregard our consistent application of free exercise doctrine to cases involving generally applicable regulations that burden religious conduct.

*Smith*, 494 U.S. at 892 (O'Connor, J., concurring).

*Smith* left much uncertainty about the breadth and vigor of the Free Exercise Clause, an uncertainty fortified by an assay of the Supreme Court's decisions, to and including *Smith*, which reveals a variety of distinctions, each offering utility in the facts of a particular case and used by the Supreme Court to resolve challenges to governmental intrusion on Free Exercise: whether the governmental action affects belief or conduct; if conduct is affected, whether the conduct is active or passive; whether the governmental action affects a religious practice that is otherwise legal or otherwise illegal; whether application or enforcement of the law is mandatory, strictly or loosely guided, or discretionary; whether governmental action enforces a law that is generally applicable or aimed toward religious activity; whether the governmental action is generally applicable or permits exceptions; if exceptions are permitted, whether the exceptions are religious, secular, or both; if exceptions are permitted, whether the exceptions favor religious activity to an extent that affronts the Establishment Clause; whether the law affects a religious belief or a conviction of secular moral conscience; whether an affected belief is sincere and, if so, whether the

affected belief or conviction is implausible, irrational, or bizarre (but not whether the belief is true or untrue); whether the belief or conviction amounts to principled opposition to a category of morally offensive events or is limited to ad hoc opposition to a particular event (such as the difference between opposition to all wars and opposition to a particular war); whether the law affects only the government's conduct of its own internal affairs; and whether the law affects only Free Exercise or also affects other constitutional rights; and sundry other distinctions from time to time deployed by the Supreme Court "as meet and convenient."

Perceiving unhappily the result in *Smith* and the shifting grounds for the Supreme Court's other Free Exercise Clause decisions, Congress enacted RFRA, which emphatically rejects *Smith* and explicitly restores *Sherbert* and *Yoder*. In RFRA's statement of purpose section, 42 U.S.C. § 2000bb, Congress states that RFRA serves "(1) to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where Free Exercise is substantially burdened; and (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government."

For a unanimous court in *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418 (2006), the Chief Justice confirms the congressional rejection of *Smith* in favor of *Sherbert* and *Yoder* and outlines more expressly the statutory purpose:

> [T]he Federal Government may not, as a statutory matter, sub
> stantially burden a person's exercise of religion, "even if the bur
> den results from a rule of general applicability." [42 U.S.C.] §
> 2000bb-1(a). The only exception recognized by the statute re
> quires the Government to satisfy the compelling interest test—to
> "demonstrat[e] that application of the burden to the person—
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling
> governmental interest." [42 U.S.C.] § 2000bb-1(b). A person
> whose religious practices are burdened in violation of RFRA
> "may assert that violation as a claim or defense in a judicial pro
> ceeding and obtain appropriate relief." [42 U.S.C] § 2000bb-1(c).

*O Centro*, 546 U.S. at 424.

Further, the Chief Justice in his unanimous opinion details that, assuming a

plaintiff presents prima facie evidence of a substantial burden on a sincerely held reli

gious exercise, the government bears the burden to prove that the law in question fur

thers a compelling governmental interest by the least restrictive means available.

Confirming the reasoning in *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656

(2004), and summarizing, the Chief Justice explains:

> RFRA requires the Government to demonstrate that the com
> pelling interest test is satisfied through application of the chal
> lenged law "to the person"—the particular claimant whose sin
> cere exercise of religion is being substantially burdened.

*O Centro*, 546 U.S. at 430.

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), conceives RFRA's stat

utory protection for religious liberty as more comprehensive and more accessible

than the constitutional protection, at least if the federal government is the alleged in

fringer.  Specifically, *Hobby Lobby* confirms that "RFRA did more than merely re

store the balancing test used in the *Sherbert* line of cases; it provided even broader

protection for religious liberty than was available under those decisions." *Hobby Lobby*, 573 U.S. at 695 n.3; *Holt v. Hobbs*, 574 U.S. 352, 859–60 (2015) (finding that RFRA "provide[s] greater protection for religious exercise than is available under the First Amendment.")

The service members in Count II challenge the military's vaccination requirement under the First Amendment and in Count III challenge the military's vaccination requirement under RFRA.  Because for a service member RFRA "provides greater protection . . . than is available under the First Amendment," the RFRA claim demands primary consideration (after all, if a service member's RFRA claim fails, the service member's First Amendment claim necessarily fails).

## I. JUSTICIABILITY

RFRA secures for a service member a claim against the military for violation of Free Exercise.  Article I, Section 8, Clause 14 of the Constitution vests Congress with the plenary authority "[t]o make Rules for the Government and Regulation of the land and naval Forces[.]"  By enacting RFRA, Congress exercised this plenary authority to guarantee the "broad protection for religious liberty."  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014).  To ensure comprehensive protection of Free Exercise, Congress under 42 U.S.C. § 2000bb-2(1) extends RFRA to govern any substantial burden imposed by a "branch, department, agency, instrumentality, and

official (or other person acting under color of law) of the United States." No exemption, whether express or implied, relieves the military of RFRA's command.[7]

Further, RFRA expressly creates a remedy in district court. Entitled "Judicial Relief," 42 U.S.C. § 2000bb-1(c), affords "[a] person whose religious exercise has been burdened in violation of this section" to "assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." RFRA includes no administrative exhaustion requirement and imposes no jurisdictional threshold. No exemption, whether or express or implied, insulates the military from review in the district court.

Explaining RFRA's application to the military, *Singh v. McHugh*, 185 F. Supp. 3d 201, 217–18 (D.D.C. 2016) persuasively observes:

> RFRA applies to the "government," which is defined to include a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." 42 U.S.C. § 2000bb–2(1). So, on its face, the statute plainly applies to the U.S. Army. And defendants acknowledge that Congress specifically intended RFRA to apply to the military. Hr'g Tr. at 35; see also S. Rep. No. 103–111, at 12 (1993) ("Under

---

[7]   "[C]ourts must — at least initially —indulge the optimistic presumption that the military will afford its members the protections vouchsafed by the Constitution, by the statutes, and by its own regulations." *Hodges v. Callaway*, 499 F.2d 417, 424 (5th Cir. 1984). But that deference "does not justify the abdication of the responsibility, conferred by Congress, to apply [a statute's] rigorous standard." *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). *Holt* charges that the Religious Land Use and Institutionalized Persons Act—RFRA's "sister statute"—"does not permit such unquestioning deference" to a decision by a prison official even if that decision affects health, safety, good order, and discipline. *Holt*, 574 U.S. at 364. The defendants cite no authority—governing or persuasive—to suggest that a military personnel decision allegedly violative of RFRA enjoys immunity from judicial review. To the contrary, determining whether a government official's action contravenes a statutory directive is singularly within the expertise of a district court. *See Holt*, 574 U.S. at 866 (emphasizing that RLUIPA "demands much more" than deferring to an officials "mere say-so that they could not accommodate petitioner's request"); *Harmon v. Brucker*, 355 U.S. 579, 582 (1958); *Emory v. Sec'y of Navy*, 819 F.2d 291, 294 (D.C. Cir. 1987); *Dilley v. Alexander*, 603 F.2d 914, 920 (D.C. Cir. 1979) ("It is the duty of the federal courts to inquire whether an action of a military agency conforms to the law[.]"); *Singh v. McHugh*, 185 F. Supp. 3d 201, 218–22 (D.D.C. 2016); *Heap v. Carter*, 112 F. Supp. 402 (E.D. Va. 2015).

the unitary standard set forth in [RFRA], courts will review the free exercise claims of military personnel under the compelling governmental interest test."); H.R. Rep. No. 103–88 (1993) ("Pursuant to the Religious Freedom Restoration Act, the courts must review the claims of prisoners and military personnel under the compelling governmental interest test.").

A service member can sue in a district court to enjoin a military department or military official from violating the service member's civil right to Free Exercise.[8]  Although RFRA imposes no requirement of administrative exhaustion and both this record and other decisions explain the likely futility within the military of a religious exemption, *Air Force Officer v. Austin*, 5:22-cv-0009-TES (M.D. Ga. Feb. 15, 2022), and *U.S. Navy SEALs 1–26 v. Biden*, --- F. Supp. 3d ---, 2022 WL 34443 (N.D. Tex. Jan. 3, 2022), Navy Commander and Lieutenant Colonel 2 have nonetheless exhausted the mechanisms available within the military.

## II. PRELIMINARY INJUNCTION

A preliminary injunction issues only if the movant shows (1) a substantial likelihood of success on the merits, (2) a substantial likelihood of irreparable injury absent an injunction, (3) an imbalance of equities favoring the movant, and (4) an

---

[8] According to *Speigner v. Alexander*, 248 F.3d 1292, 1295 n.5 (11th Cir. 2001), the test in *Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971), no longer determines justiciability in actions by service members against the military for a claim "based on an injury incident to service." *See also Doe v. Garrett*, 903 F.2d 1455, 1463 n.15 (11th Cir. 1990) ("[I]t appears well established that *Mindes* need not be applied before reaching the merits of a statutory claim against the military."). *But see Stinson v. Hornsby,* 821 F.2d 1537, 1540 (11th Cir. 1987) (remanding case against the military to district court to apply *Mindes* factors). In the alternative that the *Mindes* factors govern justiciability, I find the *Mindes* test thoroughly and convincingly satisfied for the reasons stated in *Air Force Officer v. Austin*, 5:22-cv-00009-TES (M.D. Ga. Feb. 15, 2022) and *U.S. Navy SEALs 1–26 v. Biden*, --- F. Supp. 3d ---, 2022 WL 34443 (N.D. Tex. Jan. 3, 2022).

unlikelihood of the injunction's materially injuring the public interest.  *Siegel v. Le-*

*Pore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

A.     <u>Substantial likelihood of success</u>

As explained earlier, to prevail on a claim under RFRA, the plaintiff must

show that the challenged government action substantially burdens a sincere religious

belief.  If the plaintiff establishes a substantial burden and sincerity, the government

must demonstrate "that application of the burden to the person" both "is in further-

ance of a compelling governmental interest" and "is the least restrictive means of fur-

thering that interest."

1.  A substantial burden on a sincere religious belief

A substantial burden exists if the challenged action "'prevents the plaintiff

from participating in an activity motivated by a sincerely held religious belief,'"

*Davila v. Gladden*, 777 F.3d 1198, 1204 (11th Cir. 2015) (quoting *Yellowbear v. Lam-*

*pert*, 741 F.3d 48, 55 (10th Cir. 2014)), or if the action "'truly pressures the [plaintiff]

to significantly modify his religious behavior,'" *Christian Missionary All. Found., Inc. v.*

*Burwell*, No. 2:14-cv-580, 2015 WL 437631, at *5 (M.D. Fla. 2015) (quoting *Adkins v.*

*Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004)).  Governmental action coercing a direct

violation of a religious belief imposes a substantial burden.  *Wisconsin v. Yoder*, 406

U.S. 205, 218 (1972) (finding the existence of a substantial burden "inescapable, for

the Wisconsin law affirmatively compels them, under threat of criminal sanction, to

perform acts undeniably at odds with fundamental tenets of their religious beliefs.");

*Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069–70 (9th Cir. 2008) (defining

"substantial burden" to mean a person "coerced to act contrary to their religious beliefs by threat of civil or criminal sanctions").

Judged under the governing legal standard, both Navy Commander and Lieutenant Colonel 2 suffer a substantial burden on a sincere religious belief. Navy Commander refuses vaccination to remain true to his faith, which requires the preservation of his body as a temple of the Holy Spirit. Similarly situated and believing that each COVID-19 vaccination is "religiously unclean according to [Lieutenant Colonel 2's] personal faith," Lieutenant Colonel 2 refuses vaccination. (Doc. 60-2 at 9) Lieutenant Colonel 2 voices a sincere objection to "any substance . . . connected with [] aborted fetal cell lines." In practicing her religious belief, Lieutenant Colonel 2 finds her opposition to abortion irreconcilable with accepting any COVID-19 vaccine.

On January 28, 2022, Navy Commander received notice that the Chief of Naval Operations disapproved Navy Commander's appeal. (Doc. 60-1 at 8) The notice of denial ordered Navy Commander to receive a vaccine within five calendar days. (Doc. 66-2 at 2) On January 26, 2022, Lieutenant Colonel 2 received the denial of her appeal, accompanied with an order to vaccinate within five business days. (Doc. 60-2 at 3) The fact of, and the consequences of, disobeying a direct order doubtlessly pressure Navy Commander and Lieutenant Colonel 2 to alter their religious practice. Because the COVID-19 vaccination requirement "puts [Navy Commander and Lieutenant Colonel 2] to this choice," the requirement to vaccinate substantially burdens religious exercise. *Holt v. Hobbs*, 574 U.S. 352, 361 (2015).

2.  The defendants fail to discharge RFRA's burden.

If a plaintiff demonstrates that the government's action substantially burdens the person's Free Exercise, the government must "demonstrate" under 42 U.S.C. § 2000bb-1(b), that is, the government must bear the burden of going forward with the evidence and satisfying the burden of persuasion, that application of the burden to the person (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering that compelling governmental interest.  RFRA's focus on "the burden to the person" demands more than dismissive, encompassing, and inflexible generalizations about the government's interest and about the absence of a less restrictive alternative.  *Davila*, 777 F.3d at 1206 ("[B]roadly formulated interests" and "generalized statement[s]" will not suffice).  Instead, the government must proffer "specific and reliable evidence" (not formulaic commands, policies, and conclusions) demonstrating that the marginal benefit flowing from a specific denial — discounted by any detriment as a consequence of dismissing highly trained, successful, and patriotic service members — furthers a compelling governmental interest. The government must discharge both of RFRA's burdens "through application of the challenged law 'to the person' — the particular claimant whose sincere exercise of religion is being substantially burdened."  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006); *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 727–28 (emphasizing that a court must "'loo[k] beyond broadly formulated interests' and to 'scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants'") (alterations in original) (quoting *O Centro*, 546 U.S.

at 431).  In sum, a district court must not defer to an official's "mere say-so that [the official] could not accommodate" a request.  *Holt*, 574 U.S. at 369.  RFRA demands a "more focused" inquiry and requires scrutiny of the "'marginal interest in enforcing' the challenged government action in that particular context."  *Holt*, 574 U.S. at 363 (citing *Hobby Lobby*, 573 U.S. at 726–27); *U.S. Navy Seals 1-26 v. Biden*, --- F. Supp. 3d ---, 2022 WL 34443, at *10 (N.D. Tex. Jan. 3, 2022) ("The defendants must provide more than a broadly formulated interest in 'national security.'  They must articulate a compelling interest in vaccinating the thirty-five religious servicemembers currently before the Court.").[9]

Further, the government's burden at the preliminary injunction stage tracks the government's burden at trial.  *O Centro*, 546 U.S. at 429.  RFRA "squarely" places the burden on the government to demonstrate a compelling interest achieved through the least restrictive means.  *O Centro*, 546 at 429–30 (citing *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 666 (2004) (affirming the grant of a preliminary injunction because the government failed to satisfy the burden of proof)).  Accordingly, the plaintiffs "must be deemed likely to prevail unless the Government has shown that [the plaintiffs'] proposed less restrictive alternatives are less effective" than the burden imposed by the government.  *Ashcroft*, 542 U.S. at 666.  Showing

---

[9] Accordingly, RFRA likely exceeds the pre-*Smith* protection of Free Exercise. *City of Boerne v. Flores*, 521 U.S. 507, 535 (1997) (holding that RFRA "imposes in every case a least restrictive means requirement—a requirement that was not used in the pre-*Smith* jurisprudence RFRA purported to codify"); *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 475 (5th Cir. 2014) (holding that RFRA's requiring the least-restrictive means "is a severe form of the 'narrowly tailored' test.")

that the challenged action has "some effect" on achieving a governmental interest is insufficient. *Ashcroft*, 542 U.S. at 666; *O Centro*, 546 U.S. at 418 ("The point remains that the burdens at the preliminary injunction stage [of a RFRA action] track the burdens at trial.").

      a.  The denial of Navy Commander's and Lieutenant Colonel 2's request for a religious exemption.

The Navy denies Navy Commander's appeal "due to the Navy's compelling governmental interest in preventing spread of diseases to support mission accomplishment, including military readiness, unit cohesion, good order and discipline, and health and safety, at the individual, unit, and organizational levels." (Doc. 60-1 at 8) The denial letter asserts that granting Navy Commander's appeal "will have a direct and foreseeable negative impact on the compelling government interest in military readiness and health of the force." In support of this assertion, the letter states that COVID-19 vaccination "reduces the risk to the individual for disease-related performance impairment and [] reduces the risk to the unit for disease outbreaks" and states that "non-pharmacologic measures [of mitigating COVID-19] . . . are not 100 percent effective and must be implemented in conjunction with immunization." (The denial letter fails, as the denial letter must fail, to identify any "100 percent" effective method to defeat COVID-19.) Except for noting that Navy Commander is "a Surface Warfare Officer commanding an operational warship[,]" the letter fails to explain how the denial of Navy Commander's religious accommodation satisfies the requirements of RFRA.

The Marine Corps denies Lieutenant Colonel 2's appeal because of "the government's compelling interests in military readiness and in the health and safety of the force."  Citing the increased transmission and severity of the Delta variant among unvaccinated people, the letter states that "an exemption from the COVID-19 vaccination poses a significant risk to military readiness[] and the health and safety of the force," particularly because Lieutenant Colonel 2 "work[s] primarily indoors" and because Lieutenant Colonel 2 is "currently attached to a deployable unit."  Further, the letter asserts — again reaching disputed medical conclusions without evaluation or citation of medical or legal authority — that "natural immunity" and mitigation measures other than vaccination "are simply not as effective as vaccination" and that "[t]he demands of military life" render ineffective these less restrictive means of protecting the health and safety of the force.[10]

---

[10] The comparative effectiveness—and the quantification of that comparative effectiveness—for several combinations of vaccines, for natural immunity resulting from an earlier infection, and for several combinations of vaccines plus natural immunity remains, especially as to the current Omicron variant, remain under careful study and constant "evolution." For example, the CDC Morbidity and Mortality Weekly Report for January 28, 2022, finds in the summary that "[b]y early October [2021], persons who survived a previous infection had lower case rates than persons who were vaccinated alone." The report later finds:

> [A]fter emergence of the Delta variant and over the course of time, incidence increased sharply in this group, but only slightly among both vaccinated and unvaccinated persons with previously diagnosed COVID-19. Across the entire study period, persons with vaccine- and infection-derived immunity had much lower rates of hospitalization compared with those in unvaccinated persons. These results suggest that vaccination protects against COVID-19 and related hospitalization and that surviving a previous infection protects against a reinfection. Importantly, infection-derived protection was greater after the highly transmissible Delta variant became predominant, coinciding with early declining of vaccine-induced immunity in many persons. Similar data accounting for booster doses and as new variants, including Omicron, circulate will need to be assessed.

(continued…)

Thus, each letter predicates Navy Commander's and Lieutenant Colonel 2's denial on a broadly articulated interest in "the health and safety of the force" and on the assertion that broadly articulated "demands of military life" render ineffective any less restrictive means that either service member identified to mitigate COVID-19.  RFRA demands more.

b.  The defendants discharge neither of RFRA's burdens.

Identifying only the broadly articulated governmental interests and broadly articulated demands of military life, neither denial letter engages in any individualized assessment of Navy Commander's or Lieutenant Colonel 2's request. As the November 22, 2021 order (Doc. 40 at 32) explains:

> To accomplish the consideration required by RFRA, the military certainly must consider, perhaps above all else, not whether COVID adversely affects the force (or course it does) but whether the readiness and fitness of the force is more adversely affected (1) by granting exemptions and accommodations to a stated number of sincere objectors or (2) by punishing, separating, and discharging that same stated number of skilled and experienced personnel, notwithstanding the time, energy, and money expended to train those service members and necessarily spent again to locate, recruit, and train a successor, including the cost

---

The understanding and epidemiology of COVID-19 has shifted substantially over time with the emergence and circulation of new SARS-CoV-2 variants, introduction of vaccines, and changing immunity as a result. Similar to the early period of this study, two previous U.S. studies found more protection from vaccination than from previous infection during periods before Delta predominance (3,7). As was observed in the present study after July, recent international studies have also demonstrated increased protection in persons with previous infection, with or without vaccination, relative to vaccination alone.

Tomás M. León, et al., Ctrs. for Disease Control & Prevention, *COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis—California and New York, May–November 2021*, 71 MMWR 125, 130 (Jan. 28, 2022), https://www.cdc.gov/mmwr/volumes/71/wr/pdfs/mm7104e1-H.pdf (internal citations and footnotes omitted).

> of the successors' acquiring similar experience and the deficit in
> fitness and readiness experienced in the interim.

These factors might not present the best evaluation available or the only evaluation available or the most complete evaluation available, but these and other individualized factors seem pertinent and in all events seem better than dismissive generalization and recitation of policies and aspirations.  Regardless, the Navy and the Marine Corps fail to "demonstrate" the individualized "to the person" analysis required when reviewing Navy Commander's or Lieutenant Colonel 2's request for a religious exemption.  The defendants' justifications for denying a religious accommodation to Navy Commander and Lieutenant Colonel 2 are elementally inadequate under RFRA.

   *i.*   The defendants rely on a generalized assessment of the compelling
         interest.

To justify the denial of Navy Commander's and Lieutenant Colonel 2's request for a religious exemption, the Navy and Marine Corps assert that each denial supports the military's compelling interest in "military readiness and health of the force."  But *Davila*, 777 F.3d at 1206, explains that "[military] officials cannot simply utter the magic words ['military readiness and health of the force'] and as a result receive unlimited deference from those of us charged with resolving the dispute."  The denial of these two religious exemptions removes from the service (1) a surface warfare officer with seventeen years of experience, with several deployments, and with specialized training on nuclear engineering and whom the Navy entrusted to command a destroyer with 320 personnel and (2) a Marine with twenty-four years

(eighteen of which as an officer) of experience in field operations and legislative affairs, in whom the Corps has invested substantial time and money (including a master's degree from the Command and Staff College at the Marine Corps University), and whom the Corps selected to lead a combat logistics battalion.  Absent record material demonstrating that the military considered both the marginal increase, if any, in the risk of contagion incurred by granting the requested exemption and the marginal detrimental effect, if any, on military readiness and the health of the force flowing from the specific denial of Navy Commander's and Lieutenant Colonel 2's request for religious exemption from COVID-19 vaccination, the government fails to demonstrate that either denial results from an individualized "to the person" evaluation required by RFRA.  In other words, the government has not shown that the stated interest cannot be reasonably preserved without subjecting Navy Commander and Lieutenant Colonel 2 to vaccination contrary to a sincerely held religious belief protected by RFRA or, given a refusal to vaccinate, separating each from service.

    *ii*. The defendants rely on a generalized assessment of a less restrictive means.

In each application, Navy Commander and Lieutenant Colonel 2 identify several alternative measures to mitigate the spread of COVID-19.  For example, each applicant demonstrates the natural presence of COVID-19 antibodies following an infection.  These antibodies, each applicant argues, provide similar if not equal (or better, according to the recent CDC report cited above) protection against infection with, and serious symptoms from, COVID-19.  Further, each applicant describes the

COVID-19 mitigation protocol — masking, social distancing, and isolation — that the Navy and the Marine Corps successfully implemented for more than a year before the development of vaccines and have continued to implement in conjunction with vaccines.

In response, the Navy and Marine Corps assert that the proposed alternatives "are less effective than vaccination" and "must be implemented in conjunction with immunization."  As with a compelling governmental interest, however, the defendants cannot rely on "magic words."  The defendants must demonstrate, with specific and reliable evidence, that the proposed alternative measures are insufficient to further — to an extent reasonably similar to vaccination — the military's compelling governmental interest.

Also, the military fails to consider other alternatives, such as altering the applicant's practice in a manner that might further the military's compelling interest without burdening the plaintiff's religious exercise.  For more than a year before the COVID-19 vaccination requirement, Navy Commander and Lieutenant Colonel 2 performed their duties under altered conditions including remote work and isolation protocol.  Further, after the defendants initiated the vaccination requirement, both plaintiffs have continued to work under an administrative exemption and under altered duties.

In sum, the defendants fail to articulate why Navy Commander's and Lieutenant Colonel 2's sincerely held religious practice must yield to the requirement to accept COVID-19 vaccination.  The administrative record documenting the denial of

- 41 -

both Navy Commander's and Lieutenant Colonel 2's request for religious exemption fails to evidence the required "to the person" evaluation of whether a less restrictive means is available to further the compelling governmental interest. Accordingly, on this record, Navy Commander and Lieutenant Colonel 2 enjoy a substantial likelihood of success on the merits.

In accord with a February 13, 2022 order (Doc. 90), the Navy, the Marine Corps, and the Air Force submit (Docs. S-106, S-108, and S-109) the twenty-five most recent letters denying an appeal and submit every letter granting a religious exemption. The submission reveals a process of "rubber stamp" adjudication by form letter, a process incompatible with RFRA's command to assess each request "to the person."

Although the form letter varies slightly by branch, each form letter contains the same general recitation of the military's "compelling interest in . . . mission accomplishment, military readiness, unit cohesion, good order, and discipline, and . . . health and safety." (Doc. S-106) For example, each denial letter authored by the Navy announces that granting the exemption request "will have a direct and foreseeable negative impact on the compelling governmental interest in military readiness and health of the force," which each letter invariable supports with the conclusion:

> Vaccination of Navy personnel can impact both individual and unit mission accomplishment. It reduces the risk to the individual for disease-related performance impairment, and it reduces the risk to the unit for disease outbreaks of contagious diseases such as COVID-19.

(Doc. S-106)  Next, each form denial letter identifies certain general characteristics of military life (such as the need to interact in close proximity) and of the specific applicant (most notably whether the applicant is attached to a deployable unit) that render impossible the continued implementation of COVID-19 mitigation measures.  Finally, each letter asserts generally that no lesser restrictive means exists because other COVID-19 mitigation efforts, such as masking and social distancing, "are not 100 percent effective," a statement equally true of vaccination.[11]  (Doc. S-106)

The letters granting an exemption yield nothing more.  For example, in the Marine Corps, each grant letter contains the same boilerplate discussion of the Marine Corps' compelling interest in military readiness and the health and safety of the force and of the insufficiency of "masking, social distancing, hygiene, teleworking, and other similar measures."  But each grant concludes:

> However, in your case, because you [either have begun terminal leave, are currently participating in a Skill Bridge Program, or otherwise will have no interaction with Marines before leaving the Corps] I find the compelling interest of the government and the likelihood of your vaccination status impacting readiness, and the health of the force, remote.  Therefore, I approve your request until the date of the end of your active duty service

---

[11] For example, Department of Defense data discussed at the hearing and available on the department's website show that between November 24, 2021, and December 22, 2021, the month during which vaccines became mandator, the "military total of new COVID-19 cases rose by 7,515 cases but between December 22, 2021 and February 9, 2021, after vaccination was mandatory and after each branch reported greater than 90% vaccination rates, cases rose by 114,292 cases. *Coronavirus: DOD Response*, U.S. Dept. of Def., https://www.defense.gov/Spotlights/Coronavirus-DOD-Response/ (data as of Nov. 24, 2021, Dec. 22, 2021, and Feb. 9, 2022); *see* Oren Lieberman, *US military has vaccinated more than 97% of service members*, CNN Politics, Dec. 16, 2021, https://www.cnn.com/2021/12/16/politics/military-vaccine-numbers/index.html.

> obligation, which is [the day on which the applicant's service ends].

(Doc. S-109-1)  Thus, each grant letter differs only by the description of the applicant's future service and by the day upon which the applicant's service ends.

As the defendants note, the fact that all "decision memoranda [are] simple form letters" does not automatically justify granting each request for a religious exemption.  A blanket or categorical grant no more satisfies RFRA's individualized assessment than does a blanket or categorical denial.  Although only a sample of the hundreds of denial letters issued by the military, the documents considered in conjunction with the administrative record supporting Navy Commander's and Lieutenant Colonel 2's denial, strongly illustrates that the military fails to afford an applicant an actual "case-by-case assessment" as required by RFRA.

B.   Irreparable harm

"The loss of First Amendment freedoms, even for minimal periods of time unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) ("This principle applies with equal force to the violation of RLUIPA rights because RLUIPA enforces First Amendment freedoms[.]").  As *Air Force Officer v. Austin*, 5:22-cv-0009-TES (M.D. Ga. Feb. 15, 2022), and *U.S. Navy SEALs 1–26 v. Biden*, --- F. Supp. 3d ---, 2022 WL 34443, at *1 (N.D. Tex. Jan. 3, 2022) correctly recognize, the "substantial pressure" on a religiously objecting service member to obey the COVID-19 vaccination order and violate a sincerely held

- 44 -

religious belief constitutes an irreparable injury redressable by a preliminary injunction.  *See also BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).  Requiring a service member either to follow a direct order contrary to a sincerely held religious belief or to face immediate processing for separation or other punishment undoubtedly causes irreparable harm.  *Sambrano v. United Airlines, Inc.*, 19 F.4th 839, 842 (5th Cir. 2021) (Ho, J., dissenting) ("To hypothesize that the earthly reward of monetary damages could compensate for these profound challenges of faith is to misunderstand the entire nature of religious conviction at its most foundational level.")

C.    <u>Balance of the equities and the public interest</u>

Because Navy Commander and Lieutenant Colonel 2 request preliminary relief against officials of the federal government, the analysis on the balance of equities and the analysis on the public interest merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  As the plaintiffs correctly argue, the public has no interest in tolerating even a minimal infringement on Free Exercise.  *See Hobby Lobby*, 723 F.3d at 1147; *Beckwith Elec. Co. v. Sebelius*, 960 F. Supp. 2d 1328, 1350 (M.D. Fla. 2013).  "The vindication or constitutional rights and the enforcement of a federal statute serve the public interest almost by definition."  *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012).

In opposition, the defendants claim that preliminary relief "would encourage other members to attempt to bypass the military's process and ask courts to enter similar injunctive relief, which 'in the aggregate present the possibility of substantial disruption and diversion of military resources[.]'"  (Doc. 74 at 36) (citing *Parrish v.*

- 45 -

*Brownlee*, 335 F. Supp. 2d 661, 669 (E.D.N.C. 2004)).  But no injury to the public results from recognizing a person's constitutional or statutory right or from "encouraging" a person to vindicate that right in federal court, especially when the statute creating the right expressly authorizes such judicial vindication. Further, to the extent a "substantial disruption" results from the defendants' systemic failure to assess a religious exemption request "to the person," the "harm" suffered by defendants results only from the defendants' own failure to comply with RFRA.  By enacting RFRA, Congress guaranteed each service member "appropriate relief " from an infringement on the service member's Free Exercise.  To say the least, an attempted evasion of judicial review strongly disserves the public interest. *See* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2947 (3d ed. Apr. 2021 update) ("Although the fundamental fairness of preventing irremediable harm to a party is an important factor on a preliminary-injunction application, the most compelling reason in favor of entering a Rule 65(a) order is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act.").

For the past two years, Navy Commander and Lieutenant Colonel 2 ably discharged their duties.  Each served at the onset of the pandemic and successfully during peak jeopardy in the pandemic and before any vaccination against COVID-19 existed, each served during the height of the Delta variant surge, and each served (with the benefit of a temporary exemption from the vaccination requirement) during the Omicron variant.  Nothing in the record establishes — on balance — that

- 46 -

preliminary injunctive relief for these officers harms the public interest.  Extending the status quo protects the fundamental right to Free Exercise and ensures judicial review of allegedly wrongful government action.  The record fails to demonstrate any meaningful increment of harm to national defense likely to result because Navy Commander and Lieutenant Colonel 2's continue to serve unvaccinated but in accord with other, proven, rigorous, and successful safety protocols.

## CONCLUSION

The record in this civil rights action reveals a substantial likelihood that the Navy and the Marine Corps has failed to discharge RFRA's burden of demonstrating the required RFRA evaluation individualized "to the person" of Navy Commander and "to the person" of Lieutenant Colonel 2, each of whom harbor a sincere religious belief substantially burdened by the military's COVID-19 vaccination requirement.  The motion (Doc. 60) for preliminary injunctive relief by Navy Commander and Lieutenant Colonel 2 is **GRANTED**, and the defendants are **PRELIMINARILY ENJOINED** (1) from enforcing against Navy Commander and Lieutenant Colonel 2 any order or regulation requiring COVID-19 vaccination and (2) from any adverse or retaliatory action against Navy Commander or Lieutenant Colonel 2 as a result of, arising from, or in conjunction with Navy Commander's or Lieutenant Colonel 2's requesting a religious exemption, appealing the denial of a request for a religious exemption, requesting reconsideration of the denial of a religious

exemption, or pursuing this action or any other action for relief under RFRA or the First Amendment.

ORDERED in Tampa, Florida, on February 18, 2022.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE