IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

**NAVY SEAL # 1,** et al.,

        Plaintiffs,

v.

**JOSEPH R. BIDEN, JR.**, in his official capacity as President of the United States, et al.,

        Defendants.

Case No. 8:21-cv-02429-SDM-TGW

## DEFENDANTS' EMERGENCY MOTION FOR STAY PENDING APPEAL AND FOR IMMEDIATE ADMINISTRATIVE STAY

Defendants respectfully request a stay pending appeal of this Court's February 18, 2022, Preliminary Injunction and Order ("Order") ECF No. 111, which granted Plaintiffs' motion for a preliminary injunction. The Court's Order prevents the Navy and Marine Corps from removing an officer from — and requires the Marine Corps to place an officer in — commanding officer billets who the military has deemed unfit for command. Moreover, the Order prohibits the military from requiring these service members to receive the COVID-19 vaccine at all, even as a condition of deployment and assignment to command an operational unit. The Order is an extraordinary intrusion upon the inner workings of the military that presents a direct and imminent threat to national security during a global military crisis, and it indefinitely sidelines a Navy warship. Because a stay of the Court's Order is of the utmost urgency, Defendants also seek an immediate administrative stay of that Order while the Court

considers Defendants' stay motion, and to allow the Eleventh Circuit time to consider an emergency stay motion if this Court does not issue one.

Defendants respectfully request a ruling on the administrative stay by the end of the day March 2, 2022. After that date, if relief has not been granted, Defendants will seek relief from the U.S. Court of Appeals for the Eleventh Circuit.

## ARGUMENT

The factors governing a request for a stay pending appeal are "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceedings; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). "[W]here the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020).

While "[l]ikelihood of success [is] a prerequisite in the usual case[, . . . ] it is not an invariable requirement." *Ruiz v. Estelle*, 666 F.2d 854, 857 (5th Cir. 1982). Rather, a motion can still be "granted upon a lesser showing of a substantial case on the merits when the balance of the equities . . . weighs heavily in favor of granting the stay." *LabMD, Inc. v. Fed. Trade Comm'n*, 678 F. App'x 816, 819 (11th Cir. 2016); *see also Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005) ("Where the 'balance of the equities weighs heavily in favor of granting the [injunction],' the movant need only show a 'substantial case on the merits.'"). Moreover, the loss of

discretion vested under the Constitution and federal law to determine assignment and resource decisions is *per se* irreparable harm. *See Swain v. Junior*, 958 F.3d 1081, 1090 (11th Cir. 2020).

## I. The Preliminary Injunction Exceeds the Court's Authority.

The "Constitution vests '[t]he complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force' exclusively in the legislative and executive branches," *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1511, (D.C. Cir. 1989) (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)). It is "difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible—as the Judicial Branch is not—to the electoral process," *Gilligan*, 413 U.S. at 10. Accordingly, courts have consistently held that decisions as to who is placed in command of our troops are beyond the judiciary's competence and constitutionally entrusted to the military and political branches. *See, e.g., Orloff v. Willoughby*, 345 U.S. 83, 93–94 (1953); *Speigner v. Alexander*, 248 F.3d 1292, 1298 (11th Cir. 2001) ("To dictate to the military which officers should be considered competent would be to interfere in just the way that *Feres* and its progeny preclude."); *Antonellis v. United States*, 723 F.3d 1328, 1336 (Fed. Cir. 2013) ("Courts are in no position to determine the 'best qualified Officer' or the 'best match' for a particular billet"); *Bryant v. Gates*, 532 F.3d 888, 899 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ("[T]he Supreme Court has indicated" that "military decisions and assessments of morale, discipline, and unit cohesion . . . are

well beyond the competence of judges."). For that reason, courts routinely find challenges to military assignment decisions to be non-justiciable even when they involve a constitutional challenge. *See, e.g., Harkness v. Sec'y of Navy*, 858 F.3d 437, 443–45 (6th Cir. 2017) (collecting cases). Here, the Court's order enjoins any "enforcement" of the vaccine mandate with respect to these two individuals and any related adverse action. By ordering that these two Plaintiffs be kept in command (in the case of Navy Commander) or be placed in command (in the case of Lieutenant Colonel 2), the Court improperly took control of the Navy's and the Marine Corps' command assignments, stepping beyond its constitutional limits and improperly stepping into the role of those officers entrusted to run the military.

Moreover, this Court's Order is broad enough to prevent the military from imposing discipline or convening a court martial with respect to either Plaintiff, even for potential violations of the Uniform Code of Military Justice, and is therefore contrary to longstanding principles of comity for coordinate judicial systems. *See Schlesinger v. Councilman*, 420 U.S. 738, 756-57 (1975); *see also* Ex. 1 (Email from Plaintiffs' Counsel) (threatening contempt motion if any disciplinary action is taken with respect to misconduct identified at the hearing).

## II.  Defendants Are Likely To Prevail On The Merits Of Their Appeal and, at the Least, Present a Substantial Case on the Merits.

The Court need not determine that its prior decision was in error in order to grant a stay of its preliminary injunction pending appeal. While Defendants respectfully submit that they are also likely to prevail on the merits of their appeal, the

Court need only determine that Defendants have, at a minimum, presented a substantial question on the merits. *See Schiavo*, 403 F.3d at 1232. In addition to its jurisdictional arguments, Defendants have presented a substantial case on the merits in response to Plaintiffs' claims under RFRA and the First Amendment.

As an initial matter, Defendants have presented a substantial case that the Court erred in substituting its "own evaluation of evidence for a reasonable evaluation" by the military regarding the necessity of full COVID-19 vaccination among service members. *Rostker v. Goldberg*, 453 U.S. 57, 68 (1981). The Court overstepped its expertise by, for example, ruling on the "comparative effectiveness" of vaccines *vis-à-vis* so-called natural immunity in maintaining a ready military force, Order, at 37 n.10, by discounting the effect of refusers on good order and discipline in the military, *id*. at 43, by not addressing the specific declarations regarding the compelling interest in vaccinating these officers, ECF. Nos. 74-11, 74-12, and by second-guessing the scientific and military evidence that vaccination is the most effective means to protect the health and safety of the force, *see, e.g.*, ECF Nos. 66-4 through 66-7; ECF Nos. 74-3 through 74-9. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2421-22 (2018) (declining in matters of national security to "substitute" the Court's own "predictive judgments," or its own "evaluation of the underlying facts," for those of the President); *Goldman v. Weinberger,* 475 U.S. 503, 507 (1986); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 9 (2008). The Services have determined that vaccination is the most effective means of mitigating the risk to their missions, units, and personnel from COVID-19, and even if the Court views this risk is "marginal," the assessment

5

of such operational risks is the specific purview of the military and not the judiciary. *Goldman,* 475 U.S. at 512 (Stevens, J. concurring) ("Because professionals in the military service attach great importance to that plausible interest, it is one that we must recognize as legitimate and rational even though personal experience or admiration for the performance of the 'rag-tag band of soldiers' that won us our freedom in the Revolutionary War might persuade us that the Government has exaggerated the importance of that interest.").

Moreover, Defendants are likely to prevail on their (easily substantial) argument that the military has a compelling interest in mitigating the impact of COVID-19 on its missions, units, and personnel, and that vaccination of these particular service members is the least restrictive means to advance that interest. For example, the Court's conclusion that the record "strongly illustrates that the military fails to afford an applicant an actual 'case-by-case' assessment as required by RFRA," Order at 44, is contradicted by substantial arguments presented by Defendants. The Court's findings rely on similarities between the final letters received by Navy Commander and Lieutenant Colonel 2 and other similarly situated individuals, Order at 37–44, and ignores the fact that there are substantial concerns about unvaccinated individuals that apply broadly, such as their inability to deploy worldwide, and the increased danger from COVID-19 on board ships. The Court also failed to consider the individual-specific analysis in the letters, as well as the voluminous records filed under seal that provide additional descriptions of each individual's role, their responsibilities, the requirements for deployment, and the specific descriptions of how less restrictive

means are not available for those particular individuals, including because of the requirements of foreign countries. *See* ECF Nos. 81, 87, 90, and 103.

The Court's conclusion also runs contrary to declarations provided by the two high-ranking military officers who decided Navy Commander's and Lieutenant Colonel 2's appeals. Admiral Michael M. Gilday, the highest-ranking uniformed officer in the Navy and a member of the Joint Chiefs of Staff, personally decided to deny Navy Commander's appeal. Ex. 3, Gilday Decl. ¶¶ 1-2, 10; ECF No. 66-2. He explained that he "carefully review[s] each appeal, to include the service member's initial request and appeal, all enclosed matters submitted by the service member, command endorsement, and the requester's specific duties." *Id.* ¶ 2; *see* ECF No. 66-2. General Eric M. Smith, the second-highest ranking uniformed officer in the Marine Corps, explained that he "personally consider[s] every appeal" including the requester's submissions, "the command endorsements, the recommendation of the Religious Accommodation Review Board (RARB), the input of the Director [of] Health Services, . . . and the nature of the requester's current duties, living conditions, deployment status and a variety of other information specific to the individual requester." Ex. 4, Smith Decl. ¶ 2; *id.* ¶ 11 (explaining consideration of details specific to Lieutenant Colonel 2, including requirements of foreign countries that would apply to her); ECF No. 66-3.

The Court may disagree with the readiness conclusions of these declarants, but senior military leaders, exercising their professional military judgment, have determined that "[i]mmunizations are a vital component of individual and unit

medical readiness, as Marines operate in environments and under conditions that increase their exposure and susceptibility to illness," especially when deployed. Smith Decl. ¶ 8; *id.* ¶ 10 (explaining that every Marine must be deployable). For the Navy, "[s]pecific duty assignments and the requirement for Sailors to be immediately available to deploy in the event of military exigencies will result in less restrictive means not being feasible in many circumstances." Gilday Decl. ¶¶ 6-8. As explained above, the reasons for requiring vaccination are compelling—unvaccinated service members are at heightened risk of contracting and spreading COVID-19, and the consequences of infection in even one deployed service member are severe. *See supra* 5-7; *see also* Gilday Decl.¶ 7.[1]  At the very least, the military has clearly substantial arguments in support of its position on the merits, warranting a stay pending appeal.

The military has also presented a compelling case that there are no less restrictive means available to protect the force, because measures like masking, social distancing, and teleworking are unavailable or ineffective or need to be layered with vaccination to achieve mitigation in the context of deployable units. There is copious evidence in the record that vaccination is most effective means of protecting the health

---

[1] The Court relied in part on individual Plaintiffs' testimony that they personally had previously conducted some successful missions during the pandemic. *See, e.g.,* Order, at 10. Plaintiffs' assessment of military readiness is, of course, "quite beside the point." *See Goldman*, 475 U.S. at 509 (dismissing "expert testimony" from military official); *Rostker*, 453 U.S. at 63 (similar); *Trump*, 138 S. Ct. at 2421-22 (giving no weight to the views of former military officials). But even if Plaintiffs' testimony had some relevance, the Government does not need to prove a 100% failure rate of all missions in the face of COVID-19. Defendants have submitted copious evidence that maintaining both these particular Plaintiffs and unvaccinated service members in general undermines military readiness. And Plaintiffs' own testimony supports a conclusion that COVID-19 adversely impacted Plaintiffs' military missions. *See* Ex. 5, Decl. of Vice Admiral Daniel Dwyer ¶ 15 n.5 (explaining that types of COVID response measures described by Navy Commander in his testimony affect the Navy broadly).

and safety of service members in general, and these individuals in particular (and thus, the readiness of the force). *See generally* Declaration of Admiral William Lescher, ECF No. 66-4; Declaration of Joon Yun, ECF No. 74-9; Declaration of Col. Tonya Rans, ECF No. 74-4. Admiral Daryl Caudle, Commander of the United States Fleet Force Command and third-ranking admiral in the Navy, further explains that "[i]n the confined and enclosed working environments in which Navy personnel perform their duties, the COVID- 19 vaccination in addition to other mitigation measures is the best way to keep the Navy underway and deployed and prevent the COVID-19 virus from interfering with mission accomplishment." Ex. 1, Decl. of Adm. Daryl Caudle ¶ 2.[2] And the Navy and Marine Corps made a particularized finding based on the individual records and working situation of these particular Plaintiffs that no less restrictive means are available. *See* ECF Nos. 66-2, 66-3, 66-11, 74-11, 74-12; Gilday Decl. ¶¶ 2, 9; Smith Decl. ¶¶ 10-11.

Accordingly, Defendants have presented a detailed and substantial case that Plaintiffs' claims are unlikely to succeed on the merits.

### III. An Order Enjoining the Navy and Marines from Making Assignment And Reassignment Decisions Would Inflict Irreparable Damage On The Navy And The Public Interest, and the Balance of Interests Favors a Stay.

The Court's preliminary injunction will cause irreparable harm to the military and the public in at least two ways: first, it will keep unvaccinated individuals in places where they and their units are at risk and thus degrade the overall readiness of the

---

[2] This declaration was prepared in connection with other litigation and is submitted here because it addresses many of the considerations for granting a stay pending appeal in this case as well.

9

units; and it will undermine good order and discipline. *See generally* Ex. 5, Declaration of Vice Admiral Daniel Dwyer; Ex. 6, Declaration of Lieutenant General William Jurney. In contrast, staying the order will result in Plaintiffs being reassigned to non-command roles. If the military initiates separation proceedings against Plaintiffs, those proceedings will take place over many months, during which time Plaintiffs will not have to undergo vaccination and will have further opportunity to make their case for being retained in their respective Services. The threat to military readiness and national security outweighs the impact on these Plaintiffs of additional military proceedings, while an appeal is pending in this matter. *See, e.g., Councilman*, 420 U.S. at 758.

### A. The Order Creates an Unacceptable Risk to the Force.

The Order causes irreparable harm because these unvaccinated individuals place themselves and their units at higher risk of illness, hospitalization and death, and thus create a greater risk of mission failure. *See* Lescher Decl. ¶¶ 2, 11-13; Declaration of Joon Yun ¶ 5, ECF No. 74-10; Rans Decl. ¶¶ 14-30, ECF No. 74-4. As Admiral Lescher explained, "[u]nvaccinated or partially vaccinated service members are at higher risk to contract COVID-19, and to develop severe symptoms requiring hospitalizations that remove them from their units and impact mission execution." Lescher Decl. ¶ 2. The Navy's highest leaders have therefore made the judgment that "[f]ully vaccinated naval forces are required to ensure readiness to carry out Navy missions throughout the world and, if required, to engage in combat operations." *Id.*; *see id.* ¶ 11. And in particular, "[r]estriction of the Navy's ability to reassign

10

unvaccinated personnel in order to mitigate COVID-19 related risks to units preparing to deploy, or that are deployed, will cause direct and immediate impact to mission execution," as well as to "[t]he health, readiness, and mission execution of broader conventional Navy units and personnel who support these personnel." *Id.* ¶ 2. Admiral Caudle concurs, explaining that "serious illness resulting from the COVID-19 virus remains a threat to the unvaccinated and, therefore, the mission if unvaccinated Sailors remain in deployable units," and "fully vaccinated units withstand COVID outbreaks with significantly less impact to the mission." Caudle Decl. ¶¶ 14-16.

Accordingly, the Navy has determined that having an unvaccinated commander of a destroyer poses an unacceptable risk to the mission. *See* ECF Nos. 66-2; Dwyer Decl. ¶¶ 15-16 (describing risks Commander poses to destroyer, including potential for incapacitation of Commander, potential need for medical evacuations, quarantine requirements); Gilday Decl. ¶ 7 (describing risks posed by unvaccinated personnel in general, including dangers of mission failure, medical evacuation, and the sensitivity of foreign host country requirements); 1st Brandon Decl. ¶¶ 12-13 (describing risks Commander poses to a destroyer).[3] Admiral Dwyer elaborates that the risks of an unvaccinated Commander "reverberate throughout the force" because

---

[3] These declarations emphasize that COVID-19 is particularly likely to spread aboard a destroyer in light of close quarters and congregate living situations. *See, e.g.,* Gilday Decl. ¶¶ 7-8; 1st Brandon Decl. ¶ 12. In case a visual aid is helpful, this url includes a photo of sleeping berths in a guided missile destroyer: https://www.dvidshub.net/image/5285051/us-sailor-checks-deck-berthing-during-gq-drill-aboard-uss-spruance.

11

"complex operational plans are impacted when ships are unavailable to deploy as planned or when a ship is taken off mission for reasons such as a COVID-19 outbreak." Dwyer Decl. ¶ 16.  Vaccination status also affects "pre-deployment quarantine requirements" and "port entry requirements," and in the event of an outbreak, "the unavailability of a vessel can have negative implications at the strategic level by removing U.S. naval presence from key areas." *Id*.

Similarly, the Marine Corps has determined that Lieutenant Colonel 2 poses an unacceptable risk to her unit. *See* ECF No. 66-3; Jurney Decl. ¶¶ 9-11; Smith Decl. ¶¶ 10-11 (describing how concerns about unvaccinated Marines in general apply to Lieutenant Colonel 2); Thompson Decl. ¶¶ 8-9 (describing risks an unvaccinated battalion commander will pose to the Marine unit).  As explained by Lieutenant General Jurney, "it is imperative that a CLB commander be worldwide deployable and ready to lead Marines at all times." Jurney Decl. ¶ 6; *see also* Tr. 190:24 –191:4; 191:19 –22 (agreeing that Marines deploy into inhospitable environments).

The "fundamental goal" of the Marine Corps "is the maintenance of a force that is ready, responsive, and capable of fighting whenever and wherever called upon," which requires the Corps "to maintain a high degree of readiness to deploy responsively, engage quickly, and sustain itself in combat for whatever period is required." Decl. of Col. Eric N. Thompson ¶ 4, ECF No. 74-11. As a result, "every Marine is a rifleman," Smith Decl. ¶ 10, and Marine Expeditionary Units in particular are organized and equipped to be "capable of responding rapidly to a broad range of crises and conflict situations." Jurney Decl. ¶ 12. As an unvaccinated officer whose

exemption request was denied, Lieutenant Colonel 2 cannot meet those standards and should be unable to deploy with the Combat Logistics Battalion of the Marine Expeditionary Unit to which she is assigned. Jurney Decl. ¶¶ 6, 9-13; Thompson Decl. ¶¶ 7-10. She is at increased risk of infection, severe illness and death, and she would be unable to disembark with her battalion in many countries, which would undermine operations. Jurney Decl. ¶¶ 9-10.[4] For example, if she were to fall "seriously ill before or during the deployment," the loss of a battalion commander would "necessitat[e] a change of command at an inopportune moment" and compromise the effectiveness of the unit. *Id*. ¶ 10. For another example, the commands within the MEU are often tasked for disaggregated or independent operations, and her unit would be unable to do so and would hinder the effectiveness of the unit. *Id.* ¶ 9; Thompson Decl. ¶¶ 9-10 (explaining need for commander to disembark); Smith Decl. ¶ 11; Tr. 191:23-25 (agreeing that commander needs to deploy). The record reflects that a battalion commander needs to deploy with her unit, but Lieutenant Colonel 2's deployment and effectiveness will be limited by COVID-19 mitigation measures imposed by foreign countries, as well as by DoD, to protect the force.[5]

---

[4] Even when not deployed, she is regularly interacting with "at least 20, 30 people a day." Tr. 188:1–6, and being unvaccinated poses an increased risk to herself and to those around her. *See* supra pp. 5-7; ECF No. 74-11; Smith Decl. ¶¶ 8, 11; Jurney Decl. ¶ 10.

[5] Although Lieutenant Colonel 2's unit is not expected to deploy until the fall of 2022, it is necessary to select, train and prepare a battalion commander now. Battalion commanders are selected months ahead of any deployment to permit time for adequate training and preparation. Jurney Decl. ¶¶ 5, 7.

13

Senior military officers have thus determined that these particular unvaccinated service members pose an unacceptable risk and degrade the readiness of their units. Even if the Court ultimately disagrees, it should not enjoin the exercise of that quintessential military judgment as a preliminary matter.

### B. The Order Undermines Good Order and Discipline.

The Court's order will also undermine military good order and discipline and cause irreparable harm to the military's effectiveness (and potentially, our nation's security) by forcing the military to keep or to place persons who the military finds unfit to lead in command positions. *Speigner*, 248 F.3d at 1297 ("[C]ourts should not interfere with military discipline and management.") (quoting *Meister v. Texas Adjutant Gen. Dep't*, 233 F.3d 332 (5th Cir. 2002). As Admiral Caudle explained, the life and death work of the military demands obedience to lawful orders. Caudle Decl. ¶¶ 14, 17. As the Supreme Court has explained, "[t]he inescapable demands of military discipline and obedience to orders cannot be taught on battlefields; the habit of immediate compliance with military procedures and orders must be virtually reflex with no time for debate or reflection." *Chappell v. Wallace*, 462 U.S. 296, 300 (1983). "Our success, our national security, and the safety of our people depends on instinctive compliance with orders, and unless an order is 'patently illegal,' the Sailor should robustly follow the order." Caudle Decl. ¶ 14. Admiral Dwyer confirms that insubordination like that here "is corrosive to good order and discipline, and ultimately degrades mission effectiveness and the ability of the strike group to perform its mission in the interest of U.S. national security." Dwyer Decl. ¶ 14.

The Order allows two officers who have refused a lawful order to continue to serve in assignments over the Navy's objection. As explained by Admiral Dwyer, "enjoining the service from taking 'any adverse action' with respect to Plaintiff Navy Commander, creates a manifest good order and discipline concern because it shields Navy Commander from the responsibility and accountability upon which his command authority rests, and leaves him in charge of enforcing policies from which he is immunized." Dwyer Decl ¶ 17; 1st Brandon Decl. ¶¶ 11, 15 (explaining that the lack of uniformity and disparate treatment necessitated by" the Order "significantly corrodes good order and discipline beyond this officer's destroyer").

With respect to Navy Commander, the Navy has lost confidence in his ability to lead and will not deploy the warship with him in command. Dwyer Decl. ¶¶ 14, 17; First Decl. of Frank Brandon ¶ 6, ECF No. 74-12. The record shows that he disobeyed an order that he is also expected to enforce, Dwyer Decl. ¶¶ 13-14; 1st Brandon Decl. ¶ 15, and that he further compromised his trustworthiness by misleading his commander regarding taking leave out of the area, Second Decl. of Frank Brandon, ECF No. 81-1, ¶¶ 8–18, and by making misleading statements about communications with his Executive Officer, Executive Officer Decl. ECF No. 83-1. This conduct occurred after he had already disregarded Navy regulations and, as a result, exposed dozens of his crew to COVID-19 when he decided not to test himself after experiencing symptoms, 2d Brandon Decl. ¶¶ 4–7; ECF No. 81-2 (Letter of

15

Instruction).[6] Even if the Court found him credible despite these lapses in judgment, Navy Commander cannot lead a crew and command a warship, particularly given the breach of the relationships with both his commanding officer and his subordinates.

As explained by Admiral Dwyer, the Commander of the Second Fleet, "the prospect of a subordinate commander in charge of other Service members or military assets disregarding the orders of his or her superior for personal reasons, whatever they may be, is itself a manifest national security concern" and "it appears Plaintiff Navy Commander may be precisely such a concern—one who would disregard simple orders pertaining to risk mitigation on travel, while still expected to enforce the order as it pertains to his 320 sailors." Dwyer Decl. ¶ 14. By forcing the Navy to keep in place a commander of a destroyer who has lost the trust of his superior officers and the Navy at large, this Order effectively places a multi-billion dollar guided missile destroyer out of commission. *Id*. ¶ 17; 1st Brandon Decl. ¶¶ 6; 2d Brandon Decl. For example, if it becomes necessary to deploy an East Coast-based surface ship in response to global events in Ukraine (or elsewhere), the Navy will not deploy the Commander's vessel. In this way, the Court's order will have a wide-ranging impact on Navy operations and national security.

---

[6] Navy Commander's insistence on the witness stand that "loss of voice" is not a symptom of COVID-19 and that his throat was not at all sore despite his inability to speak is implausible, but these excuses are also rather beside the point. *See* Tr. 68-73, 108-29. In the face of possible symptoms, he came into work, interacted with dozens of crew members and chose not to get tested until ordered, and in doing so, he objectively made the wrong decision and exposed others to COVID-19. He continued to fail to meet expectations by failing to inform his commanding officer he was going on leave out of town, failing to inform his executive officer, and failing to submit a mitigation plan until confronted on the evening he left. *See* Brandon Decls., ECF Nos. 74-12, 81-1; Executive Officer Declaration, ECF No. 83-1.

Similarly, Lieutenant Colonel 2's "failure to follow the lawful policies and standards of her superiors undermines her ability to require her subordinates to follow her policies and standards" because "a commander who cannot follow lawful orders loses the moral authority to require others to follow their own lawful orders." Jurney Decl. ¶ 14. Among other problems, she will be tasked with enforcing the vaccination order and convening administrative separation processing for vaccine refusers. *Id*. Thompson Decl. ¶¶ 7, 10 (explaining that the TRO "will irreparably harm good order and discipline in the unit and will ripple across the Marine Corps"). In addition, her inability to deploy or disembark with her unit "is antithetical to her ability to command." Jurney Decl. ¶ 13. No military can successfully function where courts allow service members to define the terms of their own military service, including which orders they will choose to follow.

Given the deference due to the military in this area, the harms to the military and the public interest vastly outweigh Plaintiffs' employment interests and interests in evading military administrative processes.

## CONCLUSION

Accordingly, for the foregoing reasons, Defendants respectfully request that this Court grant a stay of its order pending appeal, or an immediate administrative stay of that Order while the Court considers Defendants' stay motion, and to allow the Eleventh Circuit time to consider an emergency stay motion if this Court does not issue one.

## Local Rule 3.01(g) Certification

Defense counsel conferred with Plaintiffs' counsel by email on February 28, 2022. Plaintiffs oppose the relief requested in this motion.

Dated: February 28, 2022        Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

*/s/ Amy E. Powell*
ANDREW E. CARMICHAEL
AMY E. POWELL
Senior Trial Counsel
ZACHARY A. AVALLONE
COURTNEY D. ENLOW
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (919) 856-4013
Fax: (202) 616-8470
Email: amy.powell@usdoj.gov

*Counsel for Defendants*