# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

U.S. NAVY SEALs 1-26;
U.S. NAVY SPECIAL WARFARE
COMBATANT CRAFT CREWMEN 1-5;
U.S. NAVY EXPLOSIVE ORDNANCE
DISPOSAL TECHNICIAN 1; and
U.S. NAVY DIVERS 1-3,
                Plaintiffs,

v.

LLOYD J. AUSTIN, III, in his official capacity as United States Secretary of Defense; UNITED STATES DEPARTMENT OF DEFENSE; CARLOS DEL TORO, in his official capacity as United States Secretary of the Navy,
                Defendants.

Case No. 4:21-CV-01236-O

## DECLARATION OF DARYL CAUDLE

I, Daryl L. Caudle, hereby state and declare as follows:

1.     I am an admiral[1] in the United States Navy, currently serving as the Commander, United States Fleet Forces Command (USFFC), located in Norfolk, Virginia. Commander, USFFC is appointed by the President, by and with the advice and consent of the Senate. I have served in this position since December 7, 2021. I make this declaration in support of the Government's motion in opposition to Plaintiffs' motion for a preliminary injunction for putative class members in this lawsuit.[2] The statements made in this declaration are based upon my personal knowledge, my military judgment and experience, and upon information that has been provided to me in the course of my official duties.

---

[1] The rank of "admiral" is the highest military rank in the Navy. The term "admirals" is also frequently referred to as "flag officers." Flag officers include the ranks of rear admiral (lower half), rear admiral (upper half), vice admiral and admiral. Flag officers comprise the most senior levels of uniformed leadership in the Navy.
[2] ECF 104, filed Feb. 7, 2022.

1

## Preliminary Statement

2. I have reviewed the preliminary injunction order issued by this Court on January 3, 2022, Admiral Lescher's declaration previously filed in this case and the motion for a preliminary injunction for putative class members filed on February 7, 2022. I agree with Admiral Lescher's assessment regarding the importance of a fully vaccinated force to blunt the impact of the COVID-19 virus in the fleet and the significant harm that would come from allowing a subset of the force to remain unvaccinated, putting themselves, their fellow service members, and the mission at unacceptable risk. As Admiral Lescher stated, unvaccinated or partially vaccinated service members are at higher risk to contract COVID-19, and to develop severe symptoms requiring hospitalizations that remove them from their units and impact mission execution. The medical data clearly shows that vaccination against COVID-19 is essential to keeping Navy units on mission by mitigating the impact of COVID-19. Plaintiffs now seek to expand the current injunction, which is already causing risk to military operational readiness, from 35 personnel to potentially 2,500 to 4,000 personnel across various ranks, occupational specialties, and unit assignments. Accordingly, the harm to military readiness and interference in the Navy's ability to fight and win the nation's wars would be exponentially greater if this Court were to grant Plaintiffs' pending motion for a class-wide preliminary injunction. At this time, 88 ships are underway and tens of thousands of personnel are deployed to deter conflict and, if required, win conflicts decisively. In the confined and enclosed working environments in which Navy personnel perform their duties, the COVID-19 vaccination *in addition to* other mitigation measures is the best way to keep the Navy underway and deployed and prevent the COVID-19 virus from interfering with mission accomplishment. Having fully vaccinated Navy forces is essential to ensure maximum health and readiness of forces to carry

out the Navy's mission throughout the world and, if required, engage in combat operations. Having thousands of unvaccinated personnel assigned across the Fleet, especially within operational units, degrades the effectiveness of the units and seriously endangers the Navy's ability to fully accomplish assigned missions.

## Navy Background and Experience

3.     The Chief of Naval Operations (CNO)[3] delegates to USFFC authorities and responsibilities under Title 10, U.S. Code, to train, certify and provide combat-ready Navy forces to combatant commanders that are capable of conducting prompt, sustained naval, joint and combined operations in support of U.S. national interests. USFFC is the budget submitting office with financial management authority and responsibility for assigned forces, shore activities, military and civilian personnel, infrastructure, and budget. CNO delegates to USFFC the authority to generate and communicate Navy global force management solutions to the Joint Staff concerning general purpose forces and ad hoc forces, whether assigned, unassigned, allocated, or service retained. The Secretary of the Navy designates USFFC as U.S. Naval Forces Northern Command (NAVNORTH), the Navy Component to U.S. Northern Command (USNORTHCOM).[4] USNORTHCOM designates NAVNORTH as the standing Joint Force Maritime Component Commander (JFMCC). NAVNORTH and JFMCC exercise operational

---

[3] The CNO is the most senior uniformed officer in the United States Navy.

[4] USNORTHCOM is one of many geographical and functional combatant commands. The combatant commanders exercise authority, direction and control over the commands and forces assigned to them and employ those forces to accomplish missions assigned to the combatant commander. Department of Defense Directive (DoDD) 5100.01, Change 1, 09/17/2020, Encl. 1, ¶1.a through d. USNORTHCOM is the combatant commander defends the homeland; deters, detects, and defeats threats to the United States; conducts security cooperation activities with allies and partners and supports civil authorities. USNORTHCOM's AOR includes air, land and sea approaches and encompasses the continental United States, Alaska, Canada, Mexico and the surrounding water out to approximately 500 nautical miles. It also includes the Gulf of Mexico, the Straits of Florida, and portions of the Caribbean region to include The Bahamas, Puerto Rico, and the U.S. Virgin Islands.

control over allocated forces as delegated by USNORTHCOM. CNO delegates USFFC authority to deploy and attach to USNORTHCOM service-retained Navy forces for execution of maritime homeland defense, maritime homeland security, and defense support to civil authority's operations. Commander, U.S. Strategic Command (USSTRATCOM)[5] designates USFFC as U.S. Naval Forces Strategic Command (NAVSTRAT) and USSTRATCOM JFMCC. As directed, NAVSTRAT and USSTRATCOM JFMCC coordinate and synchronize operations with combatant commanders and other USSTRATCOM components.

4. I have served in the United States Navy for over 37 years. I graduated from North Carolina State University (magna cum laude) with a degree in chemical engineering in 1985 and served in several assignments throughout my career. I hold advanced degrees from the Naval Postgraduate School, Master of Science (distinction) in Physics; from Old Dominion University, Master of Science in Engineering Management; and the School of Advanced Studies, University of Phoenix, Doctor of Management in Organizational Leadership with a specialization in Information Systems and Technology. As a flag officer, I most recently served as Commander, Submarine Force Atlantic; Commander, Task Force (CTF) 114, CTF 88, and CTF 46; and Commander, Allied Submarine Command. My other flag assignments include Deputy Chief for Security Cooperation, Office of the Defense Representative, Pakistan; Deputy Commander, Joint Functional Component Command-Global Strike; Deputy Commander, U.S. 6th Fleet; Director of Operations, U.S. Naval Forces Europe-Africa; Commander, Submarine Group Eight;

---

[5] The mission of USSTRATCOM is to deter strategic attack and employ forces, as directed, to guarantee the security of our Nation and our Allies. The command enables Joint Force operations and is the combatant command responsible for strategic deterrence, nuclear operations, nuclear command, control, and communications (NC3) enterprise operations, joint electromagnetic spectrum operations, global strike, missile defense, analysis and targeting, and missile threat assessment.

Commander, Submarine Force, U.S. Pacific Fleet; and Vice Director for Strategy, Plans, and Policy on the Joint Staff (J-5) in Washington, D.C.

## **Major Components and Functions of the Navy**

5. The United States is a maritime nation, and the U.S. Navy protects America at sea. The Navy defends freedom, preserves economic prosperity, and keeps the sea lanes open and free. America's maritime forces preserve peace, deter aggression and, when directed by the President and Secretary of Defense, engage in combat operations and win decisively. The Navy projects power above, on, and below the surface of the world's oceans, which cover 70% of the surface of the Earth. Our nation is engaged in strategic competition with The People's Republic of China and Russia, and we, along with our partners and allies, face grave threats from rogue nations and non-state actors. To defend American interests around the globe, the Navy must be in a constant state of readiness to execute the missions the President directs. As of February 10, 2022, the Navy is composed of approximately 350,000 active duty personnel, approximately 3,700 operational aircraft, and 296 deployable ships, 88 of which are currently underway at sea.

6. Whether they serve at sea, overseas, or ashore, every Sailor is important to mission accomplishment and must be available to perform their duties globally when called upon. Because the stakes in war can be so high - both for the success and survival of individual units at sea and for the success of the mission - it is imperative that all Sailors are medically and physically ready to execute their duties and responsibilities without fail, even while exposed to extreme danger, emotional stress and harsh environments. The loss of personnel due to illness, disease, injury, or bad health diminishes military effectiveness. The Navy's medical standards are therefore designed to minimize the odds that any given Sailor will be unable to perform his or her duties because of illness, disease, or injury. These standards are particularly vital in the

deployed or at sea environments where a Sailor may not have access to robust medical care and may require medical evacuation. Those who seek to enter military service must be free of contagious diseases; free of medical conditions or physical defects that could require treatment, hospitalization, or eventual separation from service for medical unfitness; medically capable of satisfactorily completing required training; medically adaptable to the military environment; and medically capable of performing duties without aggravation of existing physical defects or medical conditions.[6] Further, each service member must receive (or show that they have previously received) nine vaccinations—now ten with the inclusion of the COVID-19 vaccination—upon entry into Navy service.[7] Because COVID-19 presents a severe risk to the mission of Navy units, and the COVID-19 vaccination is the most effective means of mitigating that risk, the Navy requires every person assigned to operational units to be vaccinated against COVID-19. Any request to waive this requirement or any other medical standard introduces potential additional risk to the mission. Accordingly, such a waiver request requires a case by case military operational risk assessment regardless of the basis of the waiver request. As explained in detail below, Plaintiffs' requested injunction would take that risk assessment away from the military, exposing the Navy's mission, units, and personnel to unacceptable and unmanaged risk.

7.  <u>Surface Operations</u>. The surface fleet is composed of 296 ships consisting of aircraft carriers, amphibious assault ships, cruisers, destroyers, littoral combat ships, minesweepers, and patrol craft. The objective of surface operations is to achieve and sustain sea control at the time and place of the Nation's choosing to protect the homeland from afar; build and maintain global security; project the national power of the United States; and win decisively.

---

[6] *See* DOD Instruction 6130.03, Vol 1 ¶1.2.c.
[7] AR 40–562/BUMEDINST 6230.15B/AFI 48–110_IP/CG COMDTINST M6230.4G, Appx D.

6

It is essential to security and prosperity that the Navy maintain the ability to maneuver globally on the seas and to prevent others from using the sea against the interests of the United States, our allies and partners, or any other nation. Additionally, sea control is the pre-requisite to achieving the objectives of all domain[8] access, deterrence, power projection, and maritime security.

8. Personnel on surface ships work in close proximity in confined spaces almost exclusively in the interior of the ship with no exterior ventilation. While masking and frequent cleaning assist in mitigating the spread of the COVID-19 virus, Sailors sleep in confined berthing often stacked three "racks" (beds) high with as many as 60 enlisted personnel sharing these quarters. These are ideal conditions for the spread of a respiratory virus, as evidenced by the COVID-19 outbreak on USS THEODORE ROOSEVELT (CVN 71).[9] Personnel cannot distance themselves from other personnel in berthing or in confined workspaces. Sailors who operate surface ships cannot telework. While aircraft carriers (11 total) and large amphibious assault ships (nine total) have over a dozen medical personnel and advanced equipment, including ICU beds, to treat injuries sustained in combat, some personnel have experienced such severe COVID-19 symptoms that they have had to be evacuated from even aircraft carriers. The remaining ships in the Fleet have much more limited medical capabilities and personnel. Those ships may have one or possibly two independent duty Navy Hospital Corpsman (HM), who are enlisted personnel with specialized medical training. HMs are well trained but are not physicians

---

[8] Domains are distinct operating areas that cross political and geographic boundaries. Simply put, they are areas in which military forces operate and, if necessary, fight. The five commonly accepted domains of warfare are land, maritime, air, space and cyberspace.

[9] By April 1, 2020, USS THEODORE ROOSEVELT (CVN 71) had approximately 1,000 crew removed from the ship with a small skeleton crew remaining to maintain the nuclear reactor and other essential systems. At this time, this ship was off mission in port in Guam. By April 20, 2020, 4,069 Sailors had been removed from the ship out of a crew of approximately 4,800. The ship was unavailable for 51 days to partner with allies, maintain presence in the maritime commons, which include the world's busiest sea lanes, and, if required, engage in combat operations, creating a national security vulnerability in an area vital to the United States' national interests. The extended absence and unavailability of the aircraft carrier could likely have emboldened potential adversaries and set the conditions for instability in an area essential to global commerce.

or nurses and the ships to which they are assigned as independent duty HMs lack sophisticated medical equipment. Unlike doctors and nurses, formal civilian medical licenses and formal medical education are not required for HMs. They do not generally have the capability, capacity, or training to intubate a patient or use a ventilator. Personnel with severe COVID-19 symptoms would need to be medically evacuated from these ships. Prior to the availability of the vaccine and requirement for deployable units to be fully vaccinated, ships with unvaccinated personnel needed to remain within 72-hours of higher-level medical care, placing an undesirable restraint on where they could transit.

9. <u>Undersea Operations</u>. All U.S. Navy submarines are nuclear-powered, as only nuclear propulsion allows for the combination of persistent stealth, long duration, high-speed, and sustained underwater movement that makes modern nuclear submarines vital to a modern blue-water navy. Today's submarine force, consisting of 71 submarines, is the most capable force in the history of the U.S. Navy and the world. Our existing fleet of ballistic submarines currently carries 54 percent of our nation's nuclear deterrent arsenal, and their replacements under development and eventual construction will carry an even greater percentage of strategic warheads. The U.S. Navy operates three types of submarines: ballistic missile submarines, guided missile submarines, and attack submarines. U.S. Navy (nuclear) ballistic missile submarines carry the most survivable leg of the U.S. strategic triad; the other legs are the land-based U.S. strategic missile force and the air-based U.S. strategic bomber force. These submarines have only one mission: to carry and, if called upon, launch the Trident D5 strategic missile. The primary missions of attack and guided missile submarines in the U.S. Navy are peacetime engagement, surveillance and intelligence, special operations, precision strikes, and control of the seas. To these, attack submarines also add support to the battlegroup operations

8

mission. Attack and guided missile submarines have several tactical missions, including sinking ships and adversary submarines, launching cruise missiles, gathering intelligence, and supporting special operations missions.

10. Submarines can remain submerged for extended periods of time and the primary limitation for the duration of a submerged patrol is the amount of food on the submarine. Submarines have limited medical capabilities similar to small surface ships. Berthing is even more confined than on surface ships, making the spread of a respiratory disease highly likely. Space is so limited and confined that frequently the most junior Sailors on the boat are required to "hot rack" (i.e., crew members take turns sleeping in the same rack). Like smaller surface ships, submarines have one independent duty Navy HM. If a member of the crew were to become seriously ill with the COVID-19 virus, the submarine would be required to evacuate the ill crew member, requiring it to navigate to a location suitable for evacuation and forcing it to rise to the surface of the ocean. This would very likely result in the compromise, disruption, or even termination of critical missions for which the avoidance of detection is vital. Additionally, depending on where the submarine is located, the rapid evacuation of an ill crew member may be nearly impossible, jeopardizing the crew member's safety.

11. <u>Air operations</u>. There are ground-based Navy aviation units for larger patrol aircraft and other platforms, but projecting air power from the sea is the core function of naval aviation. The Navy has approximately 3,700 operational aircraft. Many surface ships have rotary wing aircraft (i.e., helicopters) onboard. There are 11 aircraft carriers in the Fleet, and each aircraft carrier has a carrier air wing (CVW) made up of nine squadrons of fixed wing and rotary wing aircraft with a combined total of more than 70 aircraft when the carrier is at full strength. Each CVW is composed of approximately 1,500 personnel. The personnel in the

9

CVW live and work in the same conditions as the other 3,000 personnel assigned to the carrier. They live in confined spaces and almost always share berthing, eat meals together in close quarters, and participate in frequent briefings or meetings in small spaces referred to as "ready rooms." If members of the squadron succumb to illness, the squadron's readiness is diminished. If aviators fall ill and cannot operate their aircraft, the aircraft carrier cannot serve its purpose to project air power from the sea. Without the CVW, the aircraft carrier goes from being the centerpiece of a multi-vessel strike group from which to project force and take the fight to the adversary, to being a vulnerability that must be protected by other assets.

12. <u>Naval Special Warfare</u>. Admiral Lescher's declaration provides extensive background on the training and operating environments in which Navy special operations personnel perform their duties and the associated risks from being unvaccinated.

13. <u>Cyber and other functions</u>. The Navy performs a variety of other missions and support functions through its vast array of shore installations and organizations. While it would take considerable time to explain the myriad functions and missions ashore, cyberspace operations represents one particular function of increasing strategic importance and an example of vital work frequently performed outside of ships, submarines, and aircraft. Every operational plan and every mission across the Navy builds from the assumption that we will be able to assure that the bandwidth and data that our forces require will be accessible and trustworthy. Since its establishment on January 29, 2010, U.S. Fleet Cyber Command/U.S. TENTH Fleet has grown into an operational force composed of more than 14,000 Sailors and civilians organized into 28 active commands, 40 Cyber Mission Force units, and 27 reserve commands around the globe. U.S. Fleet Cyber Command is responsible for Navy information network operations, offensive and defensive cyberspace operations, space operations, and signals intelligence. As such, U.S.

Fleet Cyber Command serves as the Navy component command to U.S. Cyber Command, the Navy space component to U.S. Space Command, and the Navy's Service Cryptologic Component Commander under the National Security Agency/Central Security Service. U.S. TENTH Fleet is the operational arm of Fleet Cyber Command and executes its mission through a task force structure similar to other warfare commanders. Personnel assigned to cyber units almost exclusively perform their work in a secured compartmentalized information facility (SCIF). These are enclosed, windowless spaces in which the most highly classified work of the U.S. government is performed. Personnel assigned to these units cannot do their jobs remotely in a telework environment. The confined nature of a SCIF creates a significant risk for the spread of a highly contagious respiratory virus. Having unvaccinated personnel in such an environment creates significant risk for the unvaccinated person and potentially others, in addition to the critical mission performed by our cyberspace operators.

### The Necessity of Vaccinations in Response to COVID-19 Pandemic

14. The Supreme Court has acknowledged that the life and death work of the military demands a level of obedience without counterpart in civilian life.[10] The Uniform Code of Military Justice, a commander's principal tool to enforce that obedience, states that orders are inferred to be lawful and are "disobeyed at the peril of the subordinate." Moreover, "the dictates of a person's conscience, religion, or personal philosophy cannot justify or excuse the disobedience of an otherwise lawful order."

But the Navy has made room for personal religious values to be considered, when time permits, by establishing a process for those with religious objections to the COVID-19 vaccine to request an exemption from the requirement to take the vaccine. Each exemption request is

---

[10] Parker v. Levy, 417 U.S. 733, 758-59 (1974).

11

reviewed and a determination is made based upon the merits of that case. If initially denied an exemption, a Sailor may appeal the decision. If the appeal is denied, the Sailor must comply with the order to take the vaccine.

In the Navy, we champion self-sufficiency and the ability to operate effectively with limited external guidance. This is known as "mission command" and is an operational imperative for our Navy to be ready to deploy worldwide at a moment's notice to execute the commander's intent without persistent supervision or additional orders. Trust is the cornerstone of mission command and a commander cannot trust those who choose to disobey lawful orders. Although we train Sailors to be thoughtful and inquisitive, compliance with lawful orders must be instinctive and expeditious.

In the deadly business of protecting our national security, we cannot have a Sailor who disobeys a lawful order to receive a vaccine because they harbor a personal objection any more than we can have a Sailor who disobeys the technical manual for operating a nuclear reactor because he or she believes they know better. Our success, our national security, and the safety of our people depends on instinctive compliance with orders, and unless an order is "patently illegal," the Sailor should robustly follow the order.

The judgment of the Military Services is that the direction to take the vaccine is a lawful order and are the most effective and readily available tool the Armed Forces has to keep Sailors safe, fully mission capable, and prepared to execute the Commander-in-Chief's orders to protect vital United States' national interests.[11] Simply put, the less people who are vaccinated, the less ready the Navy is to deter aggression and, if required, fight and win in combat. As of February 16, 2022, there have been 17 deaths among uniformed personnel - 16 were unvaccinated and one

---

[11] Memorandum for the Joint Force from General Mark A. Milley, Chariman of the Joint Cheifs of Staff, CM-0141-21 (Aug. 9, 2021).

was partially vaccinated. There have been 84,924 Navy uniformed personnel infected with the COVID-19 virus. There have been 623 hospitalizations - 546 unvaccinated, 32 partially vaccinated, 44 fully vaccinated, and one fully vaccinated with a booster shot. Readiness is not just measured by deaths and hospitalizations. Taking the 84,924 cases of infection multiplied by the previous 14 days[12] of restriction of movement (i.e., a period in which the member is isolated and unavailable to perform normal duties), the result is a rough estimate of 1,188,936 lost days in the Navy since the inception of the COVID-19 pandemic. In addition to the irreplaceable loss of 17 Sailors, the lost opportunities resulting from this massive loss of time and readiness cannot be replaced.

## Harm to Readiness if Preliminary Injunction Issued

15. A preliminary injunction requiring unvaccinated members be assigned to deployable units or critical shore assignments will create an unacceptable risk to personnel. It is well-established and understood that commanders have absolute responsibility to maintain a safe working environment, protect Sailors, and soundly assess and balance risk. Commanders are given the authority to ensure that Sailors are safe. If commanders fail in this responsibility or exercise poor judgment in balancing risk, they will be subject to the absolute accountability of being relieved of command and perhaps other more severe consequences. In following the direction and guidance of the Secretary of Defense, the Navy determined that there is a compelling interest in ensuring Sailors remain healthy and ready to fight. The survival rate of

---

[12] Recent CDC guidance issued several weeks ago has lowered the isolation period to as little as five days, but noting that fully vaccinated, boosted and asymptomatic persons *exposed* to a COVID positive person do not need to isolate for five days, but do need to wear a mask for up to 10 days. On the other hand, unvaccinated or non-boosted persons *exposed* to a COVID positive person need to isolate for five days regardless if they have no symptoms. CDC Updates and Shortens Recommended Isolation and Quarantine Period for General Population | CDC Online Newsroom | CDC

vaccinated people is significantly higher than unvaccinated people.[13] The Department of Defense and Navy have determined that COVID-19 is a risk that can be best managed by vaccination *in addition to* other mitigation measures and *is* the least intrusive means to maintain maximum readiness while creating the lowest risk the Navy is willing to accept to the force. Having 4,000 unvaccinated Sailors deployed across the Fleet will create an unacceptable risk to readiness and could result in unnecessary deaths.

16.  A preliminary injunction will result in irreparable harm to readiness and mission accomplishment by prohibiting several necessary actions to ensure the health and readiness of naval forces. Plaintiffs ask the Court to maintain the status quo, which effectively is a request for the Court to order the Navy to leave unvaccinated personnel in their units, performing their same duties and deploying regardless of the substantial risk to personnel and mission that will result. By obliging the Plaintiffs' request, an injunction would seriously degrade the military readiness, and unnecessarily limit the Navy's ability to respond to the most challenging crises, and may result in the failure of critical military missions and irreparable harm to our national security. Contrary to the Court's and Plaintiffs' understanding, serious illness resulting from the COVID-19 virus remains a threat *to the unvaccinated and, therefore, the mission if unvaccinated Sailors remain in deployable units.* For example, the USS MILWAUKEE (LCS-5) outbreak during deployment in late 2021 and early 2022 demonstrated the risk COVID-19 still poses *and* the success of the vaccine. Approximately, one-third (i.e., about 30 of a crew of approximately 100) of the 100% vaccinated crew tested positive in January 2022, but all positive personnel

---

[13] "During October–November [2021], unvaccinated persons had 13.9 and 53.2 times the risks for infection and COVID-19–associated death, respectively, compared with fully vaccinated persons who received booster doses, and 4.0 and 12.7 times the risks compared with fully vaccinated persons without booster doses." Available at COVID-19 Incidence and Death Rates Among Unvaccinated and Fully Vaccinated Adults with and Without Booster Doses During Periods of Delta and Omicron Variant Emergence — 25 U.S. Jurisdictions, April 4–December 25, 2021 | MMWR (cdc.gov)

experienced mild symptoms or were asymptomatic. While the ship remained in port for 14 days due to the outbreak, had they been at sea, they would have been able to continue normal operations. Contrast that situation to the one on USS THEODORE ROOSEVELT (CVN 71) before the vaccine existed, or even the early days of vaccine availability when USS PHILIPPINE SEA (CG-58) had 20 Sailors of a crew of approximately 330 test positive, yet spent an entire month in port in Bahrain - off mission in the strategically important Arabian Gulf and adjacent areas - due to the outbreak. Bottom line: fully vaccinated units withstand COVID outbreaks with significantly less impact to the mission. The Court's order of January 3, 2022, takes the position that the incremental impact of adding one unvaccinated member, then another, then another and so on will have a minimal impact on the unit and operations. This is incorrect and dangerous logic. With each unvaccinated member added to a unit, the risk to personnel and risk to mission increases exponentially and unacceptably in the professional judgment and experience of the Military Services.

17. A preliminary injunction would essentially prohibit discipline, adverse administrative action, and non-adverse, routine personnel actions and, therefore, irreparably harm good order and discipline in the Navy. Such an order creates two different sets of rules applied to Plaintiffs and non-Plaintiffs. If issued, the order will set the conditions for Plaintiff Sailors to judicially challenge every order or assignment a commander directs. Irrespective of the nature of the government interest or how compelling it is, Sailors will be invited to challenge a commander's professional military judgment, whether it concerns training, assignment of duties, or other everyday orders essential to the Navy's mission that they might find to be objectionable. The Navy's protection of its people and preservation of our national security demands a force that complies with the lawful orders of superiors, and Navy leadership must be

15

empowered to equitably enforce strict adherence with those orders. A preliminary injunction will result in decreased morale and a breakdown of discipline across the organization and the Navy. The order would create a bifurcated system for leading, assigning, disciplining, and employing Sailors in a unit. The lack of uniformity and disparate treatment necessitated by the order would significantly corrode good order and discipline to the point in which unit effectiveness would very likely suffer.

## Conclusion

18. The professional military judgment of United States Navy military and civilian leadership is that the working conditions and operations that Navy personnel are engaging in or need to be immediately prepared to engage in require a fully protected and medically ready force. The least constrictive manner to accomplish this compelling and vital imperative is the COVID-19 vaccine *in addition to* other mitigation measures. The vaccine is to be viewed as the same as any other protective equipment that Sailors need to accomplish the mission safely and return home. Extending the preliminary injunction to potentially 4,000 personnel and requiring the Navy to deploy unvaccinated service members who are not medically fit for deployment will severely undermine military readiness through the spread of disease and cause irreparable harm to military operations by allowing unvaccinated service members to remain in their current status. Furthermore, having 4,000 unvaccinated personnel who refuse the lawful order to be vaccinated in such units will further undermine mission accomplishment by subverting good order and discipline.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of February, 2022.

*[signature]*

D. L. CAUDLE