UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

NAVY SEAL 1, et al.,

     Plaintiffs,

v.                            CASE NO. 8:21-cv-2429-SDM-TGW

LLOYD AUSTIN, et al.,

     Defendants.

_____/

## **ORDER**

     The defendants move (Doc. 118) on an emergency basis (1) for a stay pending

appeal from a February 18, 2022 preliminary injunction (Doc. 111) and (2) for an

"immediate administrative stay" pending resolution of the motion (Doc. 118) to stay.

The preliminary injunction order enjoins the defendants:

> (1) from enforcing against Navy Commander and Lieutenant Colonel 2 any order or regulation requiring COVID-19 vaccination and
>
> (2) from any adverse or retaliatory action against Navy Commander or Lieutenant Colonel 2 as a result of, arising from, or in conjunction with Navy Commander's or Lieutenant Colonel 2's requesting a religious exemption, appealing the denial of a request for a religious exemption, requesting reconsideration of the denial of a religious exemption, or pursuing this action or any other action for relief under RFRA or the First Amendment.

(Doc. 111 at 47–48)

     The defendants contend that, among other things, the preliminary injunction

"allows two officers who have refused a lawful order to continue to serve in

assignments over the Navy's objection." (Doc. 118 at 15)  The defendants report that "the Navy has lost confidence in [Navy Commander's] ability to lead" because Navy Commander "disobeyed an order that he is also expected to enforce" and because Navy Commander "further compromised his trustworthiness" by allegedly "misleading his commander regarding taking leave out of the area," by allegedly making misleading statements about communications with his Executive Officer," and by allegedly "expos[ing] dozens of his crew to COVID-19 when he decided not to test himself after experiencing symptoms." (Doc. 118 at 15–16)

In other words, the defendants contend that the sudden eagerness to remove Navy Commander from command of a destroyer results from "other neutral factors," *U.S. Navy Seals 1–26 v. Biden*, No. 22-10077, 2022 WL 594375 at *12 (5th Cir. Feb. 28, 2022), and not from a retaliatory animus toward Navy Commander's legally protected pursuit of the relief that Congress through RFRA secures in federal court for every service member.  Presented at the preliminary injunction hearing with declarations endeavoring to establish Navy Commander's untrustworthiness (and consequently his unsuitability for command), the preliminary injunction order (Doc. 111) states:

> Because I heard the testimony of Navy Commander and carefully observed his demeanor and listened attentively to the content of his testimony, I fully credit his testimony, even the parts inconsistent with the un-cross-examined, last-minute affidavits. A determination of the credibility of the statements in the [defendants'] affidavits must await live testimony and further exploration (these two witnesses are at the disposal of, and under the command of, the defendants, who neither offered their live testimony nor notified the plaintiffs of the fact of, or the content of, their affidavits). Cross-examination is necessary in this

> circumstance to permit assessment of, among other things, the
> extent to which "command influence" might have affected the
> presence or content of the affidavits.

(Doc. 111 at 12 n.3)  Accordingly, the defendants' proffered basis to stay the injunction to permit the re-assignment of Navy Commander and Lieutenant Colonel 2 (despite the likely unlawful denial of their religious exemptions) warrants a prompt evidentiary hearing.[1]

## A Necessary Preface About RFRA

In Article I, Section 8, the Constitution empowers (but does not compel) the Congress to "raise and support" the armed forces of the United States and "to make rules for the government and regulation of the . . . forces."  These constitutional clauses were informed preeminently by the unfortunate English experience, fresh in the minds of the Constitution's authors, with James II and his royal army, which was raised without the consent of Parliament, which led to the Glorious Revolution of 1688, and which ended with the Bill of Rights of 1689, which stated that "raising or keeping a standing army within the kingdom in time of peace, unless it be with the consent of Parliament, is against the law."

Fortunately, Congress raised and has maintained the armed forces (at some times more generously than at others) throughout the ensuing years, and these forces have preserved and defended the Constitution of the United States by defeating

---

[1] The defendants contend that Lieutenant Colonel 2, among other things, allegedly cannot reliably enforce the vaccination order against subordinates, convene administrative separation proceedings for service members refusing COVID-19 vaccination, or deploy worldwide in foreign countries requiring that foreign service members accept COVID-19 vaccination. (Doc. 118 at 17)

aggression and tyranny whenever and wherever necessary; under whatever circum-
stance, no matter how brutal and merciless; and at whatever cost proved necessary
(for one historic example, read the riveting and unforgettable *With the Old Breed* by E.
B. Sledge).

 A signal feature of the Constitution that the armed forces have vigilantly pre-
served and defended is the Free Exercise Clause of the First Amendment.  One of the
"rules for the government and regulation of the . . . forces" that the Congress has en-
acted and that the President (who is, of course, also the Commander-in-Chief of the
armed forces) has signed into law is the Religious Freedom Restoration Act of 1993,
Public Law 103-141, which creates for the free exercise of religion a renewed protec-
tion against impingement by the government, including the armed forces.  RFRA
was a bi-partisan enactment (although in 1993 the President, the Speaker of the
House, and the Majority Leader in the Senate were Democrats).  Specifically, two
months after then-Representative Chuck Schumer (and more than one-hundred other
representatives, both Republicans and Democrats) introduced RFRA, H.R. 1308,
103d Cong. (1993), the House of Representatives passed the bill by a two-thirds voice
vote. 139 Cong. Rec. 9,687 (1993).  The Senate amended the bill and passed the
amended version by a vote of 97 yeas to 3 nays.  139 Cong. Rec. 26,416.  After unan-
imously consenting to the Senate's amendment, 139 Cong. Rec. 27,241, the House
presented RFRA to President Clinton on November 5, 1993. 139 Cong. Rec. 32,215.
President Clinton promptly signed RFRA.

The statutorily stated purpose of RFRA is "to restore the compelling interest test . . . in all cases where free exercise of religion is substantially burdened and to provide a claim or defense to persons whose religious exercise is substantially burdened by government."  To enable those, including service members, whose free exercise rights are improperly restricted to pursue RFRA's statutory remedy, RFRA amends 42 U.S.C. § 1988, the Civil Rights Attorney's Fees Awards Act of 1976, Public Law 94–559, to allow in a RFRA action an award to the prevailing party, other than the United States, of a reasonable attorney's fee and costs, including expert witness fees.

RFRA includes specific and unequivocal commands to the government, defined to include every "branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States."  Obviously, RFRA includes everyone from the President to a park ranger, from the Chief Justice of the United States to a probation officer, from the Speaker of the House to a member's district office staffer, from the Chairman of the Joint Chiefs of Staff to a military recruiter — even if they don't like it and even if they don't agree with it.  The Free Exercise Clause and RFRA are the law of the land.

Among RFRA's express and explicit findings are that the government "should not substantially burden religious exercise without a compelling justification" and that the "compelling interest test" that RFRA restores is a "workable test" that demands "striking a sensible balance between religious liberty and competing prior governmental interests."  With the notions of a "workable test" and a "sensible balance"

- 5 -

featured conspicuously, the statute proscribes any substantial burden on Free Exercise unless the government "demonstrates" (a statutorily defined term) that the substantial burden (1) "is in furtherance of a compelling governmental interest" and (2) "is the least restrictive means of furthering that compelling governmental interest." Explaining that the government must meet a "burden of proof," RFRA defines "demonstrates" as "meets the burdens of going forward with the evidence and of persuasion." That burden is the same for preliminary or permanent injunctive relief.

The unanimous decision in *Gonzalez v. O Centro Espirita Beneficente Uniao Do Vegetal*, 126 S. Ct. 1211 (2006), authored by the Chief Justice, exemplifies the proper method for applying RFRA. In *O Centro*, a Christian "religious sect" used a "sacramental tea," *hoasca*, containing dimethyltryptamine, a Schedule 1 controlled substance under the Controlled Substances Act, 21 U.S.C. §§ 801–971, which imposes on the hallucinogen in *hoasca* "an outright ban on all importation and use, except pursuant to strictly regulated research projects." The religious sect sued in the district court under RFRA for preliminary and permanent injunctive relief against both the government's seizure of shipments of *hoasca* and the government's threatened prosecution for continued use of *hoasca*. In sum, a statute containing a prohibition against the acquisition and use of a dangerous controlled substance and providing for the necessary enforcement mechanism, including prosecution — a statute fundamental to the well-being and security of the United States — conflicted directly with the sacramental observations, using *hoasca*, of the sectarian plaintiffs, who relied on RFRA to resolve the conflict.

- 6 -

After finding the evidence introduced at the preliminary injunction hearing to stand "in equipoise," the district court determined that the government failed to satisfy RFRA's statutory burden of "demonstrating" that seizure and prosecution were the "least restrictive means" to preserve the compelling governmental interests expressed in the Controlled Substances Act and issued a preliminary injunction against the government.  The Tenth Circuit affirmed, and the Supreme Court granted certiorari.

After confirming that the lower courts properly assigned the burden of proof to the government in accord with RFRA, the Chief Justice explained a fundamental flaw in the government's approach:

> RFRA, and the strict scrutiny test it adopted, contemplate an inquiry more focused than the Government's categorical approach. RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law "to the person" — the particular claimant whose sincere exercise of religion is being substantially burdened.

126 S. Ct. at 1220.  Similarly, responding to the government's argument that granting an exception to the Controlled Substances Act was not within the proper domain of the judiciary, the Chief Justice responded authoritatively:

> RFRA, however, plainly contemplates that *courts* would recognize exceptions — that is how the law works. See 42 U.S.C. § 2000bb–1(c) ("A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."). . . . RFRA makes clear that it is the obligation of the courts to consider whether exceptions are required under the test set forth by Congress.

- 7 -

126 S. Ct. at 1222. (Supreme Court's emphasis). The message from *O Centro* and later decisions is unmistakable.

Despite the unmistakable message of the Free Exercise Clause, RFRA, and *O Centro*, the defendants argue as if none of the three exists (or, at least, as if none of the three affects the command discretion of the armed forces). The defendants begin their present motion by declaring, "The Supreme Court has made clear: 'Judges are not given the task of running the Army,'" a quote from *Orloff v. Willoughby*, 345 U.S. 83, 93 (1953), a dispute resolved forty years before enactment of RFRA. Although certainly not "given the task of running the Army," the courts in the narrow instance of RFRA are given the task of ensuring that those who are given the task of running the Army (and the armed forces in general and every other component of the federal government) conform their actions to the governing law, to RFRA, to which the admirals and the generals and commandants are unquestionably subordinate — just like the President, the Speaker of the House, the Chief Justice, and every other person in the federal government. This order and this action will proceed accordingly.

### Discussion

The defendants move (Doc. 118) for a stay pending appeal and for an "immediate administrative stay." The defendants announce menacingly in the opening sentences of the motion, filed at 6:27 p.m. EST on February 28, 2022, that "by the end of the day March 2, 2022 . . . if relief has not been granted, Defendants will seek relief from the U.S. Court of Appeals for the Eleventh Circuit." The opening sentences of the motion, along with much of the remainder of the motion, attempt to evoke the

- 8 -

frightening prospect of a dire national emergency resulting from allegedly reckless and unlawful overreaching by the district judge, an exigency sufficient to warrant depriving the plaintiffs of a fair opportunity to respond to the motion, depriving the district court of a fair opportunity to consider and resolve the motion, and finally and effectively depriving the two immediately affected service-member plaintiffs of a right explicitly secured by RFRA.

A review of the defendants' motion reveals that the defendants persistently and resolutely cling to the belief that their accustomed and unfettered command discretion need not yield — on the narrow and specific question of the free exercise of religion — to the statutory command of RFRA or to an order under RFRA from a district court (actually, at this moment, orders from several district courts and a circuit court of appeals), the forum selected by Congress and enacted in RFRA to resolve a dispute under RFRA (in other words, Congress and the President, not the district court, chose the district court as the proper forum for service members to assert the RFRA claim asserted in this action).

In the motion, filed in response to the preliminary injunction granted to one Navy officer and one Marine officer, the defendants first feature a series of alarums, including the specter of "a direct and imminent threat to the national security" and "an indefinitely sideline[d]" Navy warship," which putatively create a circumstance of "utmost urgency," the severity of which compels the defendants to demand an immediate ruling from the district court, failing which the defendants promise an emergency motion in the court of appeals.  In contrast, this order prescribes an accelerated

but reasonable time for the plaintiffs to respond and schedules a hearing at which the parties can offer evidence, including live testimony, and both legal and factual argument on the merits of the defendants' motion.  Also, because the defendants, if dissatisfied with the stated schedule, promise to move in the court of appeals, this order responds in general terms (all that time permits) to the defendants' characterization of the preliminary relief granted to Navy Commander and Lieutenant Colonel 2.

The first heading of the defendants' motion suggests that the preliminary injunction "exceeds the court's authority"; mentions that the executive branch and the legislative branch, not the court, properly direct "the composition, training, equipping, and control" of the armed forces; insists that "who is placed in command" is "beyond the judiciary's competence"; and recalls that "challenges to military assignment decisions" are "routinely" found non-justiciable.  Although those claims are largely correct, none takes cognizance of RFRA; none mentions the narrow and specific instruction in RFRA to the district court to provide an "appropriate remedy" for violation of RFRA by any component of the federal government, including the military.  The defendants argue as if RFRA does not exist or has no application to the military or is a matter subject to the command discretion of the military.  Stated plainly: Yes, the Congress and the President, not the courts, govern the military.  But the Congress and the President in governing the military and by enacting RFRA have established — for the narrow category of free exercise of religion — an action and a remedy in the district court, have specified and placed the burden of proof on the military, and have allowed for an "appropriate remedy" to ensure a service

- 10 -

member's right to free exercise.  That is not a fairly contestable proposition, and the military must acquiesce to the command of the Congress and the President in that respect.

Further the preliminary injunction includes no instructions to the military about composing, training, equipping, or otherwise controlling the military or about assigning, promoting, or demoting anyone.  On the contrary and in accord with RFRA, the preliminary injunction — as an "appropriate remedy" pending a final order — merely preserves the status quo, that is, preserves for Navy Commander and Lieutenant Colonel 2 the assignments granted by the military, not by the court.  The preliminary injunction preserves the state of affairs established by the military before Navy Commander and Lieutenant Colonel 2 sought under RFRA a religious exemption from vaccination.  As an interim "appropriate remedy," the preliminary injunction prevents an adverse action by the military against Navy Commander and Lieutenant Colonel 2 based on their resort to the court in an effort to acquit their statutory rights under RFRA.

If the military has a non-retaliatory reason for some adverse action against Navy Commander and Lieutenant Colonel 2, the military can move for a modification of the injunction, which is always an option for a party subject to a preliminary, or even a permanent, injunction.  In this instance, Navy Commander and Lieutenant Colonel 2 testified most credibly in person at the hearing.  Before the hearing, the Navy submitted affidavits that claim the Navy has "lost confidence" in Navy Commander.  This peculiarly subjective determination of "lost confidence," arriving

- 11 -

suddenly after seventeen stellar years of service by Navy Commander and after, to say the least, tense exchanges with his superior officer about vaccination and about his RFRA claim does not warrant immediate deference but, rather, demands a closer examination, which is readily and reasonably promptly available.  Surely the free exercise rights restored by RFRA are not subject to evisceration or circumnavigation by a notion as subjective and illusory — and, according to the defendants, unreviewable by the judiciary — as a sudden "loss of confidence" by a superior officer who sends a declaration to the court.  The same reasoning applies to Lieutenant Colonel 2 and any non-retaliatory basis the military might have with respect to her assignments.

The defendants conclude the first heading with the startling accusation that the preliminary injunction "is broad enough to prevent the military from imposing discipline or convening a court martial with respect to either plaintiff, even for potential violations of the Uniform Code of Military Justice."  This novel formulation is wholly unwarranted, except that admittedly the preliminary injunction likely prohibits, because RFRA prohibits, the military's disciplining or court martialing either plaintiff in retaliation for their requesting a religious exemption under RFRA.

This odd inclusion in the defendants' argument of the prospect of a court martial for the plaintiffs perhaps originates in the defendants' frequently repeated idea that the plaintiffs are subject to discipline and separation because they have "disobeyed a lawful order" to accept vaccination.  Admittedly, the order to accept vaccination is lawful.  But, owing to RFRA, the order to accept vaccination is a lawful order with respect to which the plaintiffs, based on the present record, are likely

- 12 -

entitled to an exemption.  In other words, what we have here is a failure to com-municate.  The military sees the plaintiffs' request for a lawful exemption from a law-ful order as a refusal to obey a lawful order and as a basis for discipline.  But, alt-hough the matter remains momentarily unresolved, the plaintiffs might enjoy — likely enjoy — a lawful exemption from compliance with a lawful order.  Thus far, the defendants seem to comprehend, or at least to acknowledge, only half — the "lawful order" half — of the governing legal reality and seem studiously and pur-posefully to ignore the other half, the religious exemption half, ensured by RFRA.

The second portion of the defendants' motion advances the "judicial overstep-ping" claim.  In particular, the second portion claims that two footnotes in the pre-liminary injunction (Doc. 111 at 37, n.10 and at 43, n. 11) somehow "discount[] the effect of refusers on good order and discipline in the military" and "by second-guess-ing the scientific and military evidence that vaccination is the most effective means to protect the health and safety of the force."  (The term "refusers" is a tellingly offen-sive term that the defendants must employ no further in this court.  A RFRA claim-ant is not a "refuser," not an outcast subject to shunning.)

First, the footnote on page 37 of the preliminary injunction order notes — with a lengthy quote from, and citation to, a January 28, 2022 CDC publication — that the matter of natural immunity and vaccination in several combinations "remain under careful study and constant evolution," which is not surprising, is not news, and is not an adjudication or a "second guessing" of any kind.  The footnote on page 43 of the order notes then-current Department of Defense data that shows a

remarkable surge in COVID-19 (Omicron) cases in the military immediately after the vaccination deadline and despite about a 97% vaccination rate among service members. The footnote draws no conclusion from the Department of Defense's data, adjudicates nothing, and second-guesses nothing.

Second, no dispute exists in the action (not even the plaintiffs suggest otherwise) that the military must combat COVID-19 (and other diseases) and that vaccination helps maximize the health and safety of the force. Of course it does. And in excess of 99% of the armed forces is fully vaccinated today. Neither this action nor the plaintiffs' claims nor the preliminary injunction raises any question about that. The defendants might prefer to argue that question, but the plaintiffs and the court address only the question presented in this RFRA claim. The plaintiffs concede that the military has a compelling governmental interest in the "health and safety of the force" and consequently in vaccinating the force. The question presented in this action and presented by the explicit language of RFRA is whether vaccinating Navy Commander or Lieutenant Colonel 2 over their religious objection, that is, athwart the right of each to the free exercise of religion, is "the least restrictive means of furthering that compelling governmental interest." RFRA establishes that explicit test and places the burden of proof on the government.

Proving the obvious, that vaccination is best for "the force" and necessary for "the force," fails to satisfy the "to the person" test required by RFRA. The military designs to avoid the "to the person" test, but the statute is unflinching.

- 14 -

Earlier orders discuss — without any limitations and for suggestive, not directional, purposes — what sort of evidence might gravitate favorably for the defendants.  For example, reason suggests that the defendants might show why the Navy cannot — in the facts of his actual performance — accommodate Navy Commander's service on his surface missile destroyer now, when 99% of the force is vaccinated and the relatively weak and transient Omicron variant is dominant, even though Navy Commander served in the same command on the same destroyer, including on a 300-day mission with his 320-member crew, entirely without vaccination during the many months of the height of the pandemic and without any unmanageable consequence.  Navy Commander's unrebutted testimony about the feasibility of that accommodation was compelling (history is difficult to rebut).  Perhaps the defendants have a good response — directed "to the person" of Navy Commander — but, because they fail to acknowledge the correct issue (or, at least, the correct focus of the issue), the defendants' presentation was largely unresponsive to the issue governing the preliminary injunction.

Also, as stated in a November 22, 2021 order (Doc. 40), the defendants might consider offering evidence probative of:

> not whether COVID adversely affects the force (or course it does) but whether the readiness and fitness of the force is more adversely affected (1) by granting exemptions and accommodations to a stated number of sincere objectors or (2) by punishing, separating, and discharging that same stated number of skilled and experienced personnel, notwithstanding the time, energy, and money expended to train those service members and necessarily spent again to locate, recruit, and train a successor, including the cost of the successors' acquiring similar

experience and the deficit in fitness and readiness experienced
in the interim.

To illustrate the deeply entrenched failure of the defendants to respond effec-
tively to the requirements of RFRA, Part A of Section III (Doc. 118 at 10–14) of the
defendants' motion offers a graphic exemplar.  The defendants claim that the prelim-
inary injunction "causes irreparable harm because these unvaccinated individuals
place themselves and their units at higher risk of illness, hospitalization and death,
and this creates a grater risk of mission failure."  To support this dramatic and broad
claim, the defendants cite declarations submitted by Lescher, Yun, and Rans.  A de-
finitive review of the probative value of these declarations and others requires a hear-
ing and an opportunity for cross-examination.  And a detailed discussion of these
declarations is beyond the scope of, and the time available for, this order.  But the af-
fidavits fail, consistent with the balance of the defendants' presentation, to focus on
the assignment, duty, and performance of Navy Commander and Lieutenant Colo-
nel 2.  Further, for the most part, the declarations contain generalizations and con-
clusions about "the force" as a whole or aggregated portions of the whole force.  The
declarations fail, at a minimum, to disaggregate by age, by medical characteristics
(for example, BMI, diabetes, high blood pressure, etc.), by assignment, and the like.
The declarations evidence mostly historical data from the 2020 and 2021 pre-Omi-
cron, pre-vaccine phase of the pandemic.  In sum, the declarations, both bulky and
full of numbers, say little or nothing about, for example, the marginal risk, if any,
that Navy Commander, who is triumphantly fit and slim and strong, who is robustly

- 16 -

healthy, who is young, who has already caught and recovered from COVID-19 with only trivial symptoms, who has commanded the same destroyer "underway" on a 300-day mission with a 320-sailor crew, and who has designed and implemented successfully an anti-COVID protocol customized to the needs of his vessel cannot serve — consistent with his sincerely held religious beliefs — without vaccination as a reasonable accommodation that both preserves the compelling governmental interest and reasonably accommodates the free exercise of religion.  That is the question, as to Navy Commander, the defendants scrupulously avoid.  But that is the question that RFRA burdens the defendants to answer.  They have not.

As well stated in *U.S. Navy Seals 1–26 v. Biden*, No. 22-10077, 2022 WL 594375 at *9–10 (5th Cir. Feb. 28, 2022), in denying a stay in a strikingly similar circumstance:

> The Navy has been extraordinarily successful in vaccinating service members, as at least 99.4% of whom are vaccinated. But that general interest is nevertheless insufficient under RFRA. The Navy must instead "scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants." *O Centro*, 546 U.S. at 431, 126 S. Ct. at 1220. "The question, then, is not whether [the Navy has] a compelling interest in enforcing its [vaccination] policies generally, but whether it has such an interest in denying an exception to [each Plaintiff]." *Fulton*, 141 S. Ct. at 1881. And RFRA "demands much more[]" than deferring to "officials' mere say-so that they could not accommodate [a plaintiff's religious accommodation] request." *Holt*, 574 U.S. at 369, 135 S. Ct. at 866 (RLUIPA context). That is because "only the gravest abuses, endangering paramount interests, give occasion for permissible limitation[ ]" on the free exercise of religion. *Sherbert v. Verner*, 374 U.S. 398, 406, 83 S. Ct. 1790, 1795, 10 L.Ed.2d 965 (1963).

(Because the defendants in this action assert in the Fifth Circuit action many arguments and theories rejected by the Fifth Circuit, the quoted opinion is immensely instructive and endorsed entirely.)

Time will not permit further comment about the defendants' motion for a stay. However, a comment on the progress of the action is required.  The complaint (Doc. 1) and a motion (Doc. 2) for injunctive relief were filed on October 15, 2021. The defendants responded (Doc. 23) to the motion on November 3, 2021.  The first hearing on the motion occurred on November 15, 2021.  A November 22, 2021 order (Doc. 40) denied the motion for a temporary restraining order and denied the motion for a preliminary injunction as to the civilian plaintiffs, some defendants, and some counts but deferred ruling on the preliminary injunction as to the First Amendment and RFRA counts pending.  Also, the order directed certain reporting by the defendants and permitted another hearing, which occurred on February 10, 2022, after additional briefing and supplemental material.  Navy Commander and Lieutenant Colonel 2 were the only witnesses testifying at the hearing.

The amended complaint (Doc. 75) had arrived on February 7, 2022.  Later, an order (Doc. 89) severed misjoined parties and opened separate actions (assigned to the same district and magistrate judge) in an effort to manage this abundance of parties and claims more effectively.  The order (Doc. 111) granting preliminary relief was entered on February 18, 2022.

In sum, this difficult and unprecedent action, along with similar actions pending in this court and elsewhere, presents not only a somewhat novel legal problem

- 18 -

(the application of RFRA to the armed forces) but a daunting management problem (hundreds or more of disappointed RFRA applicants asserting claims in different districts in different circuits, some including class allegations, as in this action, and some not, and some with plaintiffs serving on one branch or two branches of the armed forces and this action, with plaintiffs in each branch of the service).  To further illustrate the management problem, at 1:56 p.m. today, during the hurried composition of this order, the plaintiffs filed another motion (Doc. 121) for preliminary relief on behalf of another plaintiff who is ordered to receive vaccination and offered only two days to either accept vaccination or face discipline.  The military, despite several adverse orders, continues on the path determined months ago.  A more organized and encompassing approach must attach soon.

     In finalizing a plan, the district judge must consider the full array of options available for conditional and final class certification, along with an array of other formidable issues.  Mindful of these and other considerations and mindful both of the public interest and the interest of the litigants (not necessarily divergent in many or most respects), this action has proceeded expeditiously but carefully (with simultaneous mediation underway before the magistrate judge).  Unless ordered otherwise, the district judge will continue to proceed apace to resolve the organizational, legal, and remedial complexities (assuming some successful claims) in accord with governing law.

## Conclusion

The motion for an "immediate administrative stay" is **DENIED**.  Not later than **MARCH 8, 2022**, (1) the plaintiffs must respond to the motion (Doc. 118) to stay and (2) the parties must submit a witness and exhibit list.  An evidentiary hearing on the motion to stay is scheduled for **MARCH 10, 2022, at 10:00 A.M.** in Courtroom 15A, United States Courthouse, 801 N. Florida Avenue, Tampa, Florida, 33602.

ORDERED in Tampa, Florida, on March 2, 2022.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE