IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

NAVY SEAL 1, United States Navy, )
NAVY SEAL 2, United States Navy, )
SENIOR CHIEF PETTY OFFICER, United )
States Navy, CHAPLAIN, United )
States Navy, NAVY EOD OFFICER, )
United States Navy, COMMANDER )
SURFACE WARFARE OFFICER, United )
States Navy, NAVY CHIEF WARRANT )  Civil Docket
OFFICER, United States Navy )
Reserve, COLONEL FINANCIAL )  8:21-cv-02429-SDM-TGW
MANAGEMENT OFFICER, United States )
Marine Corps, LIEUTENANT COLONEL 1, )
United States Marine Corps, )
LIEUTENANT COLONEL 2, United States )
Marine Corps, RESERVE LIEUTENANT )
COLONEL, United States Marine )
Corps, MAJOR, United States Marine )
Corps, CAPTAIN, United States )
Marine Corps, CAPTAIN 2, United )
States Marine Corps, CAPTAIN 3, )
United States Marine Corps, FIRST )
LIEUTENANT, United States Marine )
Corps, SECOND LIEUTENANT, United )
States Marine Corps, CHIEF WARRANT )
OFFICER 3, United States Marine )
Corps, LANCE CORPORAL 1, United )
States Marine Corps, LANCE CORPORAL )
2, United States Marine Corps, )
MAJOR, United States Air Force, )
CHAPLAIN, United States Air Force, )
RESERVE LIEUTENANT COLONEL 1, )
United States Air Force, RESERVE )
LIEUTENANT COLONEL 2, United States )
Air Force, MASTER SERGEANT SERE )
SPECIALIST, United States Air )
Force, TECHNICAL SERGEANT, United )
States Air Force, CADET, United )
States Air Force Academy, COLONEL, )
United States Army, ARMY RANGER, )
United States Army, NATIONAL )
GUARDSMAN, Virginia Army National )
Guard, PILOT, United States Coast )

Guard, LCDR PILOT, United States
Coast Guard, LIEUTENANT, United
States Coast Guard, MANAGEMENT AND
PROGRAM ANALYST, Citizenship and
Immigration Services, Department
of Homeland Security, STATE
DEPARTMENT EMPLOYEE 1, and FEDERAL
CIVILIAN CONTRACTOR EMPLOYER, for
themselves and all others similarly
situated,

                    Plaintiffs,

    vs.

LLOYD AUSTIN, in his official
capacity as Secretary of the United
States Department of Defense,
CHRISTINE WORMUTH, in her official
capacity as Secretary of the United
States Army, CARLOS DEL TORO, in
his official capacity as Secretary
of the United States Navy, GEN.
DAVID H. BERGER, in his official
capacity as Commandant of the
United States Marine Corps,
FRANK KENDALL, in his official
capacity as Secretary of the United
States Air Force, ALEJANDRO
MAYORKAS, in his official
capacity as Secretary of the
Department of Homeland Security,
ROBIN CARNAHAN, in her official
capacity as Administrator of the
United States General Services
Administration, KIRAN AHUJA, in her
official capacity as Director of
the United States Office of
Personnel Management, LESLEY A.
FIELD, in her official capacity as
Acting Administrator for Federal
Procurement Policy, Office of
Management and Budget, and
MATHEW C. BLUM, in his official
capacity as Chair of the Federal
Acquisition Regulatory Council,

                    Defendants.

_____

Transcript of Evidentiary Hearing

Heard in Courtroom 15A
Sam M. Gibbons United States Courthouse
801 North Florida Avenue
Tampa, Florida 33602
Thursday - March 10, 2022
10:22 a.m. - 11:25 a.m.

BEFORE THE HONORABLE STEVEN D. MERRYDAY

UNITED STATES DISTRICT JUDGE

REBECCA M. SABO, RMR, CRR
Federal Official Court Reporter
Sam M. Gibbons United States Courthouse
801 North Florida Avenue, Room 1221
Tampa, Florida 33602
Rebecca_Sabo@flmd.uscourts.gov
(406) 855-6410

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

APPEARANCES

PRESENT ON BEHALF OF THE PLAINTIFFS:

**Mathew D. Staver**
**Daniel Joseph Schmid**
**Horatio G. Mihet**
**Roger K. Gannam**
LIBERTY COUNSEL
P.O. Box 540774
Orlando, Florida 32854-0774


PRESENT ON BEHALF OF THE DEFENDANTS:

**Amy Powell**
DEPARTMENT OF JUSTICE - CIVIL
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601

**Catherine Yang**
DEPARTMENT OF JUSTICE - CIVIL
1100 L St. NW
Washington, DC 20005

# I N D E X

**WITNESSES CALLED BY THE PLAINTIFF:**                              **PAGE**


**COMMANDER SURFACE WARFARE OFFICER
UNITED STATES NAVY**
Direct Examination By Mr. Gannam                                    7
Cross-Examination By Ms. Powell                                    33
Redirect Examination By Mr. Gannam                                 50

Reporter's Certificate                                             53

|    | PROCEEDINGS |
|----|-------------|
| 1  | |
| 2  | (Open court.) |
| 3  | MR. STAVER:  Okay.  Very good. |
| 4  | With that in mind, we would like to just proceed with |
| 5  | the first witness -- |
| 6  | THE COURT:  You may. |
| 7  | MR. STAVER:  -- which would be the Commander. |
| 8  | THE COURT:  You may. |
| 9  | Good morning, sir.  Let me ask you to pause and raise |
| 10 | your right hand. |
| 11 | COMMANDER SURFACE WARFARE OFFICER, UNITED STATES NAVY, |
| 12 | having been sworn or affirmed under oath, was examined and |
| 13 | testified as follows: |
| 14 | THE COURT:  State your name, please. |
| 15 | Are you the Lieutenant Commander who is referred to |
| 16 | in the complaint in this action? |
| 17 | THE WITNESS:  Yes, sir. |
| 18 | THE COURT:  Please have a seat in the witness stand, |
| 19 | make yourself comfortable.  We need to attach that microphone |
| 20 | with which I think you're familiar. |
| 21 | And I'll recognize Mr. Gannam for his direct |
| 22 | examination. |
| 23 | MR. GANNAM:  Thank you, Your Honor. |
| 24 | May it please the Court. |
| 25 | /// |

Timestamps:
10:22:06AM (line 3)
10:22:07AM (line 4)
10:22:12AM (line 5)
10:22:12AM (line 6)
10:22:14AM (line 7)
10:22:15AM (line 8)
10:22:29AM (line 9)
10:22:29AM (line 10)
10:22:29AM (line 11)
10:22:29AM (line 12)
10:22:36AM (line 13)
10:22:36AM (line 14)
10:22:38AM (line 15)
10:22:42AM (line 16)
10:22:45AM (line 17)
10:22:45AM (line 18)
10:22:48AM (line 19)
10:22:55AM (line 20)
10:23:01AM (line 21)
10:23:06AM (line 22)
10:23:07AM (line 23)
10:23:07AM (line 24)
10:23:07AM (line 25)

10:23:11AM 1 ///

10:23:11AM 2                      DIRECT EXAMINATION

10:23:11AM 3 BY MR. GANNAM:

10:23:16AM 4 Q.   Commander, will you please just state again for the record

10:23:21AM 5 that you are in fact the Navy Commander Surface Warfare Officer

10:23:27AM 6 proceeding under pseudonym in this case?

10:23:30AM 7 A.   I am the Navy Commander.

10:23:34AM 8 Q.   And, Commander, are you aware of a preliminary injunction

10:23:37AM 9 order that was entered by this Court on February 18 essentially

10:23:42AM 10 prohibiting the Navy from taking any adverse action against you

10:23:45AM 11 as a result of your unvaccinated status?

10:23:48AM 12 A.   Yes, sir.

10:23:49AM 13 Q.   And are you aware that also on February 28th the

10:23:53AM 14 defendants filed an emergency motion in this court to stay that

10:23:58AM 15 preliminary injunction order?

10:23:59AM 16 A.   Yes, I am.

10:24:00AM 17 Q.   Have you read that motion to stay?

10:24:02AM 18 A.   I have.

10:24:04AM 19 Q.   I'm going to refer to a few portions of it.

10:24:08AM 20       On page 1, and this is, for the record, Document 118,

10:24:13AM 21 page 1, about three-quarters of the way down, it reads, "The

10:24:18AM 22 Order is an extraordinary intrusion upon the inner workings of

10:24:22AM 23 the military that presents a direct and imminent threat to

10:24:25AM 24 national security during a global military crisis, and it

10:24:29AM 25 indefinitely sidelines a Navy warship."

10:24:31AM 1       Had you read that statement in the motion?

10:24:34AM 2  A.   Yes, sir, I did.

10:24:35AM 3  Q.   And did you understand that warship to be referring to the

10:24:38AM 4  destroyer that you command?

10:24:40AM 5  A.   Yes, sir.

10:24:42AM 6  Q.   I also want to refer to page 16 of the same document,

10:24:46AM 7  Document 118, about halfway down it reads, "By forcing the Navy

10:24:50AM 8  to keep in place a commander of a destroyer who has lost the

10:24:55AM 9  trust of his superior officers and the Navy at large, this

10:24:58AM 10  Order effectively places a multi-billion dollar guided missile

10:25:02AM 11  destroyer out of commission."

10:25:03AM 12       Do you remember reading that statement in the motion?

10:25:06AM 13  A.   Yes, sir, I do.

10:25:08AM 14  Q.   On February 28th, when the defendants filed this motion

10:25:12AM 15  stating that your destroyer was indefinitely sidelined and

10:25:16AM 16  effectively out of commission, where were you?

10:25:19AM 17  A.   I was out at sea.

10:25:22AM 18  Q.   How were you out at sea, Commander?

10:25:24AM 19  A.   I was commanding my warship on a two-week underway period

10:25:28AM 20  conducting training exercises.

10:25:31AM 21  Q.   And can you explain what kind of training exercises you

10:25:35AM 22  were performing?

10:25:36AM 23  A.   Yes, sir.  Specifically my ship is in our training cycle,

10:25:43AM 24  and we have basic mission areas that we need to conduct

10:25:47AM 25  training, assessments, and certifications on to get us ready.

|            |    |                                                              |
|------------|----|--------------------------------------------------------------|
| 10:25:53AM | 1  | Most recently, my ship came out of a maintenance             |
| 10:25:56AM | 2  | availability last year, we came out of a shipyard.  When you |
| 10:25:58AM | 3  | come out of a shipyard, you also have to do some engineering |
| 10:26:01AM | 4  | light-off assessments, dock trials, crew certification.  We  |
| 10:26:05AM | 5  | fast cruise to make sure the ship is qualified, watch bills, |
| 10:26:08AM | 6  | and ready to conduct sea trials, which was generally the first |
| 10:26:12AM | 7  | underway period that the ship has since preceding the shipyard |
| 10:26:16AM | 8  | availability window.  We conducted that in December.          |
| 10:26:19AM | 9  | We closed out our maintenance phase window in that time       |
| 10:26:23AM | 10 | frame and started our basic phase training cycle; it's        |
| 10:26:27AM | 11 | generally about six months.  We started that in January and it |
| 10:26:30AM | 12 | will go into July.                                           |
| 10:26:32AM | 13 | Once our ship finishes that basic phase training cycle, we    |
| 10:26:36AM | 14 | start moving into integrative and advanced phases where we    |
| 10:26:41AM | 15 | integrate with other assets, working with, you know, a strike |
| 10:26:43AM | 16 | group so we can, you know, certify to go on deployment.       |
| 10:26:47AM | 17 | My ship right now is in that basic window where we're         |
| 10:26:52AM | 18 | working on our basic certifications.  Basic certifications are |
| 10:26:55AM | 19 | not warfare specific.  They include basic things that a warship |
| 10:26:59AM | 20 | needs to do, like seamanship, navigation, damage control,     |
| 10:27:02AM | 21 | engineering, aviation, and communications.  This past two-week |
| 10:27:08AM | 22 | underway, we were specifically doing engineering training and |
| 10:27:11AM | 23 | certifications to make sure we knew how to do engineering     |
| 10:27:15AM | 24 | evolutions, drills, and combat main space fire.               |
| 10:27:20AM | 25 | We did that all successfully.  We finished that actually a    |

10:27:24AM  1   day early over that two-week period, and we were moving very

10:27:28AM  2   well in accordance of the assessment team that was onboard to

10:27:31AM  3   evaluate us.  Most ships, and this is from the assessor's point

10:27:35AM  4   of view that I got, don't always finish that on time.  They

10:27:37AM  5   have to, you know, continue, you know, doing these evolutions

10:27:42AM  6   and drills, you know, later underways which kind of prolong

10:27:45AM  7   their training time.

10:27:46AM  8        My ship was able to do that a day early.  I try to move

10:27:50AM  9   forward and ask for to finish our certification altogether, we

10:27:54AM 10   didn't get approval to do that due to the inspection team's

10:27:57AM 11   shore leadership management, but that's okay.  My ship

10:28:01AM 12   celebrated that victory for getting through our engineering

10:28:03AM 13   drills and certifications that we were required to complete in

10:28:04AM 14   that window.

10:28:06AM 15   Q.   And were you in command of the ship throughout this

10:28:09AM 16   training exercise?

10:28:10AM 17   A.   Yes, sir, I was.

10:28:11AM 18   Q.   And were you in command of the ship -- or strike that.

10:28:14AM 19        The completion of the training exercise successfully was

10:28:21AM 20   all under your command, correct?

10:28:23AM 21   A.   That is correct.

10:28:25AM 22   Q.   Has the training schedule of your ship continued on the

10:28:32AM 23   same schedule as was in place prior to this Court entering its

10:28:36AM 24   preliminary injunction?

10:28:38AM 25   A.   Yes, sir, for the most part.  You know, if things do

10:28:42AM  1  change by, you know, training teams or schedule changes or

10:28:45AM  2  whatnot, you know, as long as we do it within our windows, we

10:28:47AM  3  are fine.  And I say that under the auspices of, you know, last

10:28:51AM  4  time I testified in our January underway, our schedule was

10:28:55AM  5  impacted slightly by the weather and so we had to pull into

10:28:59AM  6  port and adjust our schedule for what training and

10:29:01AM  7  certifications we did, but we still completed them within our

10:29:05AM  8  allotted time.

10:29:06AM  9  Q.   Has any aspect of your ship's training qualifications

10:29:09AM 10  schedule been impacted by your vaccine status?

10:29:12AM 11  A.   No, sir, it has not.

10:29:15AM 12  Q.   So is the work that you're doing for these training

10:29:19AM 13  qualifications, is it different from if your -- for example,

10:29:23AM 14  your ship was tasked with a combat mission?

10:29:27AM 15  A.   Yes.  So while we're in the basic phase training cycle,

10:29:32AM 16  it's kind of divided in half.  You have Tier 1 certifications,

10:29:35AM 17  which are the non-warfare specific ones as previously

10:29:39AM 18  mentioned, and you have Tier 2 certifications, which go into

10:29:42AM 19  warfare specific areas, things like air warfare, surface

10:29:49AM 20  warfare, anti-submarine warfare, electronic warfare, so on and

10:29:51AM 21  so forth.

10:29:53AM 22       As a result of the USS Fitzgerald and John S. McCain

10:29:56AM 23  collisions back in 2017, the surface fleet and/or the Navy

10:30:00AM 24  adjusted the training cycle to make sure that, hey, we will not

10:30:04AM 25  task ships with missions unless they have met their basic

10:30:09AM 1  program certifications, and those are those Tier 1

10:30:12AM 2  certifications that I mentioned earlier, the seamanship,

10:30:14AM 3  navigation, damage control, engineering, aviation, and

10:30:17AM 4  communications.

10:30:18AM 5       My ship is still moving through those between now and the

10:30:21AM 6  end of April, so I would not be tasked to do any missions until

10:30:25AM 7  after we have met those minimum training requirements to

10:30:28AM 8  proceed forward.  We have to get through our training

10:30:31AM 9  certifications right now to be able to do that.  We don't take

10:30:34AM 10 ships that are, you know, in a shipyard or don't have the

10:30:38AM 11 proficiency or haven't been trained right to go out and do

10:30:41AM 12 missions that they're not properly certified to do.  And my

10:30:43AM 13 ship is in that window right now while we're doing those things

10:30:47AM 14 as we speak.

10:30:47AM 15 Q.   And is your ship on schedule to complete its necessary

10:30:51AM 16 training qualifications, that is, the schedule established by

10:30:55AM 17 the Navy prior to the Court entering its preliminary

10:30:58AM 18 injunction?

10:30:58AM 19 A.   Yes, sir, we are.

10:31:00AM 20 Q.   Now, when you go underway, or go out to sea on your ship,

10:31:05AM 21 do you -- are there certain COVID protocols that impact, you

10:31:09AM 22 know, what you have to do, for example, before you leave for a

10:31:12AM 23 trip?

10:31:16AM 24 A.   Not necessarily before I leave anymore.  And the COVID

10:31:19AM 25 policy seems to be changing, you know, every month in terms of

10:31:23AM  1  how we adapt and overcome.

10:31:25AM  2      I will tell you, you know, last -- or excuse me, in

10:31:28AM  3  January, the standard operational guidance for COVID policy was

10:31:33AM  4  released by the Navy, and it established conditions, for

10:31:37AM  5  example, for mask wear underway, in which, for the first ten

10:31:41AM  6  days underway, everyone has to wear masks in the conduct of our

10:31:45AM  7  duties as long as it doesn't impact the operations, and there

10:31:48AM  8  are some exceptions out there that I can make for, you know,

10:31:50AM  9  during flight operations, for example.  They make exceptions

10:31:54AM  10 that, you know, if 75 percent of the eligible population that

10:32:02AM  11 has been boosted, has their booster shot, then the crew can

10:32:05AM  12 relax mask and you won't have to wear your mask underway.

10:32:09AM  13     That is an example of, you know, COVID protocols that we

10:32:12AM  14 still have in place.  And most recently, last week, I think,

10:32:18AM  15 the indoor mask policy changed based on community level of

10:32:21AM  16 transmission.

10:32:23AM  17         THE COURT:  I'm sorry.  It changed based on?

10:32:25AM  18         THE WITNESS:  (No oral response.)

10:32:26AM  19         THE COURT:  I didn't hear what you said --

10:32:27AM  20         THE WITNESS:  Yes, sir.

10:32:28AM  21         THE COURT:  -- because your voice was a little soft.

10:32:30AM  22 Based on what?

10:32:32AM  23         THE WITNESS:  Community level of transmission.

10:32:35AM  24         THE COURT:  Got it.  Thank you.

10:32:37AM  25         THE WITNESS:  So there's a website on the CDC that

10:32:40AM 1   lists certain areas by county and gives their level of

10:32:44AM 2   transmission, low, medium, or high.

10:32:46AM 3         THE COURT:  Yes.

10:32:48AM 4         THE WITNESS:  And the DoD policy is for -- if you're

10:32:51AM 5   in areas of a low or medium level of transmission, indoor masks

10:32:55AM 6   are not required at indoor facilities.  If it is high, then you

10:32:59AM 7   are required to wear that indoors.  So right now, certainly in

10:33:01AM 8   Norfolk, indoor mask policy for my ship is relaxed because

10:33:06AM 9   Norfolk's level of transmission is low.

10:33:09AM 10  **Q.**  (By Mr. Gannam)  Have any COVID-related policies specific

10:33:15AM 11  to you because of your vaccination status impacted the ability

10:33:19AM 12  of your ship to complete its training qualifications or any

10:33:23AM 13  other tasks assigned to it?

10:33:25AM 14  **A.**  No, sir.

10:33:26AM 15  **Q.**  I'm going to refer again to the motion filed by the

10:33:31AM 16  defendants, specifically the attached declarations.  So at

10:33:38AM 17  Document 118-4, which is the Admiral Gilday declaration.  On

10:33:45AM 18  page 5, at the bottom, in paragraph 8, it reads, "The

10:33:50AM 19  effectiveness of mitigation measures is extremely limited on

10:33:54AM 20  ships where Sailors must live, work, eat, and sleep in close

10:33:58AM 21  proximity to other Sailors."

10:34:01AM 22         Had you seen that statement?

10:34:02AM 23  **A.**  Yes, sir.

10:34:02AM 24  **Q.**  Do you agree that's generally true?

10:34:04AM 25  **A.**  Yes, sir.

**Q.** When you are underway for a training qualification mission, do sailors have to live, work, eat, and sleep in close proximity to other sailors?

**A.** Yes, they do.

**Q.** Is that close proximity any different when you're doing a training qualification as opposed to when you're underway for a combat mission?

**A.** No, sir, it does not.

**Q.** The second sentence of that paragraph reads, "Ships typically have limited space to quarantine Sailors from the rest of the crew, if such facilities exist at all."

You already testified that you have a specific berthing area that you've established for quarantining anyone who tests positive, correct?

**A.** That is correct. So all ships are supposed to have what's called a quarantine or isolation instruction. And this actually predated COVID, but it's obviously adapted for COVID, such that if we do have somebody who develops symptoms underway and gets tested and it comes up positive that we would put them in isolation. The SOG 5.0, the standard operating guidance for COVID that was released in January, even allows ships to execute that ROM isolation period afloat, which is good, it makes us more adaptable. We're moving with the policy, and we can do that, we can execute that with our isolation protocols that we have onboard our Navy vessels.

**Q.**   And is there any -- is the limited space available to quarantine sailors on your ship any more limited when you are doing a training qualification exercise as opposed to being on a combat mission?

**A.**   The ability to isolate people I don't think is more limited due to training.  We are able to execute that now, we did execute it last month when I had a three-week scheduled underway period, had to pull in for the weather and then get back underway again.  I had folks that did test positive during that period coming back from the holidays, you know, that were delayed.  We were able to ROM COVID-positive cases onboard the ship with permission of my commodore, with the permission that is laid out in that SOG guidance.  We had about eight males and two females in those isolation areas and were able to execute this under Navy guidance effectively.

     So to answer your question, does it, you know, change right now?  No, we're still able to execute that even while we're doing our training missions.

**Q.**   I'm going to refer now to Document 118-6, which is Admiral Dwyer's declaration attached to the stay motion.  On page 3 of that document, in paragraph 6, it reads, "The environment in which the Navy -- in which Navy personnel operate at sea - in close quarters for extended periods of time in spaces without the availability of exterior ventilation (for example, inside surface ships, submarines and aircraft) - renders our Sailors

10:36:57AM 1  susceptible to contagious respiratory diseases such as

10:37:02AM 2  COVID-19."

10:37:02AM 3        Have you seen that statement before?

10:37:04AM 4  **A.**    I believe I did read that.

10:37:05AM 5  **Q.**    And do you generally agree with that statement?

10:37:11AM 6  **A.**    Yes.  I mean, I think on a warship, yes, we are confined

10:37:14AM 7  with all those limitations.  I would say that also it doesn't

10:37:17AM 8  matter whether we're doing a training certification or, you

10:37:20AM 9  know, underway deployment either.

10:37:23AM 10  **Q.**    So are the quarters any closer on an underway deployment

10:37:28AM 11  as compared to doing training qualifications?

10:37:31AM 12  **A.**    No, sir.  It's the same.

10:37:33AM 13  **Q.**    When the government said on February 28th that your

10:37:39AM 14  destroyer was indefinitely sidelined, do you believe that's an

10:37:43AM 15  accurate statement?

10:37:44AM 16  **A.**    No, sir, I do not.

10:37:45AM 17  **Q.**    And when the government said on February 28th that your

10:37:48AM 18  destroyer was effectively out of commission, do you believe

10:37:52AM 19  that's an accurate statement?

10:37:54AM 20  **A.**    No, sir, I do not.

10:38:03AM 21  **Q.**    Several -- there have been several allusions in the

10:38:08AM 22  various declarations and the motion to the concept of good

10:38:09AM 23  order and discipline.  Can you sort of explain for the Court

10:38:13AM 24  what is good order and discipline and why is that important in

10:38:16AM 25  the Navy?

**A.**   So good order and discipline is, you know, our requirement under Navy regulations that, you know, I am to maintain both as a commanding officer and as a service to ensure the proper operations for what we do.  It does talk about, you know, following orders and the importance of that.  It also talks about the moral integrity that we're supposed to establish in the profession of arms.

It is a good thing to have good order and discipline, and I agree with that.  The problem that I have with, you know, throwing out good order and discipline, even in this case, is it becomes a catchall for anything where -- goes against, you know, an established or initial policy.

We are historically repeating bad patterns in our history for discriminatory acts.  For example, if you go back into history and look at the integration of people of color into the military service, and whether they were segregated or integrated, the push of not doing that was because it was contrary to good order and discipline.

It's the same thing that was repeated when, you know, gender was an issue and trying to integrate women with men in military service, whether your troops are on the ground or on the ship or submarine or whatever the case may be, you don't want to do this because it's contrary to good order and discipline.

The same thing was repeated again in like the '80s and

```
10:39:39AM   1    '90s when sexual orientation of the people in the military
10:39:43AM   2    became an issue and they the established policies like "don't
10:39:45AM   3    ask, don't tell."  If you do, your sexual orientation now is
10:39:50AM   4    going to be contrary to good order and discipline because we
10:39:52AM   5    can't have folks serving together with contrary points of view
10:39:56AM   6    on that.  Even most recently, today, in the past five years,
10:40:00AM   7    the topic of, you know, transgender or your gender identity is
10:40:04AM   8    a topic of, you know, hey, how are we going to implement this
10:40:07AM   9    or execute this to not affect good order and discipline?
10:40:11AM  10         The Navy has undergone, and I assume the military at
10:40:17AM  11    large, this, you know, idea of, how do we get better at
10:40:20AM  12    diversity and inclusion, and we do training on, like, things
10:40:23AM  13    that you're not supposed to discriminate against.  You're not
10:40:26AM  14    supposed to discriminate against race, ethnicity, gender,
10:40:30AM  15    sexual orientation, so on and so forth, but one of those is
10:40:33AM  16    also religion.  It's founded in our Constitution.
10:40:37AM  17         I'm here today because the military is not executing this
10:40:44AM  18    policy while respecting the constitutional freedoms laid out in
10:40:49AM  19    the First Amendment or RFRA.  I should not be the one standing
10:40:54AM  20    here to say that today; generals and admirals, the executives
10:40:59AM  21    in our service, should be here to say that to the politics, to
10:41:03AM  22    the bureaucracy, to their decision-making.  It should also not
10:41:06AM  23    be my junior sailors or the hundreds of thousands of military
10:41:10AM  24    servicemen out there to say, "Hey, I have a religious objection
10:41:14AM  25    to this.  Why is no one not speaking out that we can do this
```

10:41:17AM   1   and still do the job, the mission?"  That's for me to do when

10:41:22AM   2   my superiors will not.

10:41:24AM   3       I understand that I took an oath to the Constitution, that

10:41:28AM   4   is what my oath is, and it's different than the enlisted oath,

10:41:31AM   5   which is to follow orders.  Every general on flag takes the

10:41:35AM   6   same oath as me, to uphold the Constitution, to bear true faith

10:41:39AM   7   and allegiance to the Constitution and the country whose course

10:41:40AM   8   it directs.  That requires that I know the Constitution.

10:41:44AM   9       Our religious freedoms are being attacked.  And when I

10:41:47AM  10   read the declaration that talks about, you know, there are no

10:41:51AM  11   less restrictive means other than vaccination, and they use

10:41:55AM  12   examples in there such as, you know, the port entry

10:41:59AM  13   requirements such as the pre-ROM deployment sequester.  Those

10:42:04AM  14   are less restrictive means in and of themselves.

10:42:08AM  15       Your Honor, I did that last year when we did a deployment.

10:42:11AM  16   My ship, regardless of vaccination status, is that was a

10:42:14AM  17   policy, and we did a pre-deployment ROM.  We all, the day after

10:42:18AM  18   Christmas, had to report to a hotel and test in prior to going

10:42:23AM  19   there.  And when we tested out, we were allowed to go back in a

10:42:27AM  20   bubble transport back to the ship deemed clean.  And that

10:42:31AM  21   policy has shifted obviously over the past year and a half, and

10:42:35AM  22   it's, you know, somewhere in the degree of vaccinated personnel

10:42:37AM  23   do not have to execute that ROM sequester.  At one period of

10:42:41AM  24   time unvaccinated did.  If the ability for me to go on

10:42:46AM  25   deployment is dependent upon whether or not I have to do a

10:42:48AM  1  pre-deployment ROM sequester that is a less restrictive means

10:42:52AM  2  than me getting a vaccine that I have a religious objection to,

10:42:57AM  3  then I would execute that.

10:42:58AM  4      The port of entry requirements, it's also laid out there,

10:43:01AM  5  that says my vaccination is going to affect that is confusing

10:43:04AM  6  to me, and I don't understand how they're saying that.  Other

10:43:08AM  7  nations cannot tell our ship what to do as a sovereign-immune

10:43:14AM  8  vessel in terms of the interworkings of our ship.  They can't

10:43:17AM  9  tell what our sailors can do onboard the ship or what we have

10:43:19AM 10  to do.  They don't review or medical records; we don't give

10:43:22AM 11  that stuff up.

10:43:24AM 12      They can put restrictions on if people go out in town on

10:43:28AM 13  liberty or official business, that is true.  But if I'm an

10:43:32AM 14  unvaccinated sailor and the choice is, hey, when you pull into

10:43:34AM 15  a port, if you're unvaccinated, you can't go out in town

10:43:39AM 16  because that's what the host country requirements are, right

10:43:41AM 17  when I step off that vessel, okay, I can stay on the ship.

10:43:44AM 18  That is my home, that's where I live, that is a less

10:43:47AM 19  restrictive means, and I would do that.  We have done that over

10:43:50AM 20  the past two years.

10:43:52AM 21      I did a seven-month deployment in 2020 during the COVID

10:43:56AM 22  pandemic, we were not allowed to pull in anywhere.  I did

10:43:59AM 23  another deployment in 2021 for 60 days, we pulled in seven

10:44:02AM 24  places -- around seven places in the Caribbean and we were not

10:44:06AM 25  allowed to leave the pier, and this was regardless of

| | | |
|---|---|---|
| 10:44:09AM | 1 | vaccination status.  The one time we were able to go on the |
| 10:44:12AM | 2 | pier was in Guantanamo, and that's a U.S. base so we could do |
| 10:44:16AM | 3 | that.  The point is that is a less restrictive means to taking |
| 10:44:20AM | 4 | the vaccine if you have a religious objection to it.  We have |
| 10:44:24AM | 5 | demonstrated resiliency and adaptability during the COVID |
| 10:44:25AM | 6 | pandemic to execute our mission, and we can do that. |
| 10:44:29AM | 7 | The Navy has policies right now in place where we set |
| 10:44:32AM | 8 | accommodations in place just by policy.  The standard operating |
| 10:44:37AM | 9 | guidance that was just released in January did that when it |
| 10:44:40AM | 10 | talked about the mask wear guidance underway.  So if 25 percent |
| 10:44:48AM | 11 | of the eligible population is not boosted, 75 percent are, like |
| 10:44:53AM | 12 | that's an accommodation.  The whole ship can now relax mask if |
| 10:44:57AM | 13 | 75 percent of the boosted population has met that requirement, |
| 10:44:59AM | 14 | and it's not based on your medical or religious exemptions for |
| 10:45:03AM | 15 | that other 25 percent, that's an accommodation. |
| 10:45:07AM | 16 | The recent indoor mask guidance, that's an accommodation. |
| 10:45:11AM | 17 | The fact that I can isolate people who are COVID-positive |
| 10:45:17AM | 18 | regardless of their vaccination status underway and still |
| 10:45:21AM | 19 | execute my mission is an accommodation.  It isn't based on |
| 10:45:25AM | 20 | religious objection, it's based on the fact that you are |
| 10:45:29AM | 21 | COVID-positive.  And for me to be able to execute my mission, |
| 10:45:31AM | 22 | if you are only isolated for five days and I'm out at sea for |
| 10:45:34AM | 23 | longer than that, I can still do that with minimum impact. |
| 10:45:38AM | 24 | That's a good thing.  But I accommodated vaccinated sailors in |
| 10:45:44AM | 25 | that process as well, and I did.  Every person that I ROM'd on |

| | |
|---|---|
| 10:45:49AM | 1 |
| 10:45:50AM | 2 |
| 10:45:54AM | 3 |
| 10:45:55AM | 4 |
| 10:45:58AM | 5 |
| 10:46:01AM | 6 |
| 10:46:05AM | 7 |
| 10:46:08AM | 8 |
| 10:46:10AM | 9 |
| 10:46:15AM | 10 |
| 10:46:18AM | 11 |
| 10:46:21AM | 12 |
| 10:46:24AM | 13 |
| 10:46:28AM | 14 |
| 10:46:31AM | 15 |
| 10:46:37AM | 16 |
| 10:46:41AM | 17 |
| 10:46:43AM | 18 |
| 10:46:49AM | 19 |
| 10:46:52AM | 20 |
| 10:46:55AM | 21 |
| 10:46:59AM | 22 |
| 10:47:02AM | 23 |
| 10:47:05AM | 24 |
| 10:47:09AM | 25 |

onboard my ship underway in January, it was about ten sailors, they were all vaccinated sailors that were COVID-positive. That's okay.

There are other examples out there where we make accommodations.  I mean the flu shot, I think I testified last month, is another example of that.  The flu shot policy that we release every October-November time frame says, hey, everyone is supposed to go do that, get evaluated by your medical provider.  The minimum requirement is 90 percent.  What is that 10 percent delta based off of?  I don't know that it's based off of religion or anything else, it's by policy.

So if I have people that don't get the flu shot but the rest of my ship is 90 percent or higher, we move forward.  We don't go after to separate them, we don't kick them off the ship.  Whether the people come and go or my flu shot inventory expires and I have people that come and go, as long as I'm above 90 percent, there is no question.  That's okay.

The same should be true with the COVID policy.  And we are going out after people and separating people and removing them from their job and making blanket policy statements to say they can't execute their mission without respect to their religious objections, which is required by law and enshrined in our Constitution, and that is wrong.

Q.   Let me ask you this, Commander.  Has your vaccination status in any way undermined the good order and discipline on

10:47:12AM 1  your destroyer?

10:47:13AM 2  A.   I do not think so.  I would say no.

10:47:17AM 3  Q.   And how do you know?

10:47:19AM 4  A.   My ship is performing everything that they need to do.

10:47:22AM 5  They are doing extremely well.  As we go through our basic

10:47:27AM 6  phase training cycle, in terms of meeting our mission

10:47:30AM 7  objectives, we are doing that.

10:47:32AM 8       Just this week, I talked about engineering when we were

10:47:35AM 9  underway, we're finishing out our damage control

10:47:37AM 10 certifications.  I was there for the first two days, we were --

10:47:40AM 11 it's a five-day event, we were on track to finish it on

10:47:43AM 12 Wednesday.  My ship didn't need me there on Wednesday to

10:47:46AM 13 execute that, and they did, and they completed it, so now we

10:47:49AM 14 are damage control certified as we move out of the basic phase,

10:47:52AM 15 and that's a good thing.

10:47:53AM 16      The things that my ship are supposed to be doing, they are

10:47:56AM 17 doing well.  I'm not saying we're perfect, because there are

10:47:59AM 18 obviously personnel, equipment issues, maintenance issues, and

10:48:01AM 19 training things that every ship does differently, but in terms

10:48:05AM 20 of meeting our mission objectives, we are doing well.

10:48:09AM 21 Q.   And in your last training exercise that you just returned

10:48:13AM 22 from, were there any superior officers along the way with you

10:48:17AM 23 who gave you feedback about that particular mission?

10:48:19AM 24 A.   Yes, there was.

10:48:21AM 25 Q.   And who was that?

**A.**    So my deputy commodore was sent to observe our two-week underway period.  He and another member of his staff, who is an engineering readiness assessor, which is the purpose of our underway, was there, and the deputy commodore was there, purportedly, to observe me and make sure that the ship was doing all right.

A welcoming to the crew, he observed our training, he observed our evolutions, talked to me, gave me daily updates, provided recommendations on how we can do better, which I welcome.  I always want to know how we can be better.  And as a post commanding guy, he has a good perspective how we can do that.  That's a part of his job.

So after the end of those two weeks, he sat down with me and my executive officer the night before we pulled in and gave us the download for his observations, and he did say we had a very successful underway.  He was very pleased that the ship did more than just the engineering assessments that we were required to do.  We obviously did other things along the way; we did electronic warfare training, combat systems training.  We had a very successful refueling at sea, which is a high risk evolution.  It was our second one of the year.

And so the focus of, hey, you're not solely focused on engineering, but the rest of the ship is still doing stuff in operations, which you need to do to train to go into battle and/or deploy, the ship was doing that and he was pleased with

10:49:47AM  1   that.

10:49:48AM  2          So in addition to some other recommendations for

10:49:50AM  3   improvement, at the end of that brief, to me and XO, he said,

10:49:54AM  4   "I am going to go back and report that your ship is safe and

10:49:56AM  5   ready to execute the basic phase.  There was nothing that

10:50:00AM  6   happened where I needed to intervene or had concerns on your

10:50:04AM  7   ability to command."

10:50:09AM  8   Q.   Let me ask you about your appearance here today.  How did

10:50:15AM  9   you obtain permission this time to come down and testify?

10:50:21AM 10   A.   Yes, sir.  So I got back from our underway period on late

10:50:27AM 11   Friday afternoon, didn't get home until Friday night, was

10:50:31AM 12   informed by the legal team that -- of the subpoena desiring my

10:50:35AM 13   presence here.

10:50:37AM 14          I -- first thing Monday morning coming into work, I let my

10:50:41AM 15   chain of command know, "Hey, these are my intentions."  Based

10:50:44AM 16   on the discussions with my JAG or whatnot, he said, "Hey,

10:50:47AM 17   because you have a subpoena, this might be permissive TAD."  I

10:50:47AM 18   let my supervisor know that I intend to do permissive TAD.

10:50:55AM 19   Q.   What is permissive TAD?  What does that mean?

10:50:57AM 20   A.   So instead of taking leave where I use my entitled leave

10:51:02AM 21   days, it would be, you know, effectively like a no-cost orders

10:51:05AM 22   to come down and execute this legal matter.

10:51:09AM 23          I provided a travel risk assessment and a recommended ROM

10:51:14AM 24   for my return.  I let my supervisor know, based on all the

10:51:18AM 25   change in guidance, this COVID risk assessment or travel risk

10:51:23AM 1 assessment is not a requirement, it is discretionary at the

10:51:28AM 2 commander.  I presume, obviously, from last month, that he

10:51:31AM 3 wanted to see that, so I gave it.  I recommended a three-day

10:51:34AM 4 ROM on my return based on the conditions, and then sent that

10:51:40AM 5 off.

10:51:40AM 6      Over the course of those two days, I got a lot of

10:51:45AM 7 questions or pushback on, you know, why permissive leave?  Is

10:51:49AM 8 this required to be funded?  Why are you taking leave?  Your

10:51:54AM 9 leave is starting -- or your absence from the ship is starting

10:51:58AM 10 to impact readiness.  Why are you subpoenaed?  When I sent the

10:52:03AM 11 subpoena, it was, your lawyer sent the subpoena, not the judge.

10:52:06AM 12 I don't know if there's a difference to that, I don't know why.

10:52:09AM 13 There was a lot of push back and forth to be able to do that.

10:52:13AM 14      The frustrating part is, you know, after sending all that

10:52:16AM 15 stuff off, to include my, you know, leave chit request, which

10:52:21AM 16 is abnormal, all of our COs only email him, but he wanted to

10:52:25AM 17 see that, what exact location I was staying, the exact fly

10:52:30AM 18 times.  So probably, like, after 15 emails of doing all this

10:52:35AM 19 stuff, he finally said, "Leave is approved."

10:52:37AM 20      However, I'm still here today and I don't know what my ROM

10:52:40AM 21 requirements will be upon my return.  I will assume, in

10:52:43AM 22 discussion with him, that if he hasn't decided that I will do

10:52:46AM 23 the five-day ROM.  By Navy policy, five days is only required

10:52:51AM 24 if you test positive for COVID.  I tested prior to executing my

10:52:55AM 25 travel and it was negative, and I will test when I get back as

10:52:59AM  1  well.

10:52:59AM  2  **Q.**   So your commander has not yet given you an answer on what

10:53:04AM  3  your ROM requirement will be when you return from this trip?

10:53:09AM  4  **A.**   Correct.  There is no final answer.  He said it will be

10:53:12AM  5  five days unless I -- after reviewing my recommendation, which

10:53:15AM  6  he wants to pass along with the medical community to make sure

10:53:19AM  7  it's in line, to go earlier, but he has not deemed the official

10:53:23AM  8  five, three, or zero for ROM days.

10:53:26AM  9  **Q.**   And is it also true, then, that you are unable to tell

10:53:29AM 10  your XO, for example, or other department heads when you'll be

10:53:33AM 11  back because you're waiting on this decision from your

10:53:35AM 12  commander?

10:53:36AM 13  **A.**   That's correct.

10:53:40AM 14  **Q.**   Argument was made a few minutes ago about what happened on

10:53:43AM 15  your last trip, this dispute over when you let your XO know

10:53:49AM 16  that you were traveling out of area.  Do you recall that

10:53:52AM 17  argument earlier today?

10:53:54AM 18  **A.**   Yes, sir, I do.

10:53:54AM 19  **Q.**   And you recall discussing that at the last hearing on this

10:53:57AM 20  matter?

10:53:57AM 21  **A.**   I do.

10:53:59AM 22  **Q.**   Let me ask you to just remind the Court, when did you

10:54:03AM 23  first communicate that you were traveling out of area, or

10:54:08AM 24  taking leave out of area, to your crew?

10:54:12AM 25  **A.**   To my crew or to my XO?

10:54:15AM  1  **Q.**  To your crew.

10:54:16AM  2  **A.**  Okay.

10:54:16AM  3  **Q.**  Well, to your XO, if there's a difference.

10:54:19AM  4  **A.**  Okay.  So some of that confusion comes into play based on

10:54:23AM  5  the preceding Thursday, where I had to report in to my

10:54:26AM  6  supervisor because I did not get the vaccine when I went to

10:54:32AM  7  Navy Medical Center Portsmouth, and I reported back to my

10:54:36AM  8  commodore.  It was also around the time that the injunction was

10:54:36AM  9  placed.

10:54:38AM  10      I asked then that, you know, "Hey, it's been a very

10:54:41AM  11  emotional, stressful time, I do need to take leave the

10:54:43AM  12  following week.  I would like, you know, a day or two to spend

10:54:45AM  13  time with the family."  He said, "Of course.  You know, policy,

10:54:50AM  14  send me an email, we'll work on it from there."  And at that

10:54:52AM  15  time I was going to take local leave the following week to

10:54:56AM  16  spend time with my family.  There's -- that was conveyed.

10:54:59AM  17      Over the weekend is when I, you know, had the

10:55:02AM  18  correspondence with the legal team that said, "Hey, there's a

10:55:05AM  19  hearing.  Are you in port, and are you available to come?"  I

10:55:09AM  20  said, "I am in port, I could conceivably come.  I need to

10:55:13AM  21  figure this out with my family," which my wife was supportive

10:55:16AM  22  of, and so we decided that, hey, let's do this.

10:55:19AM  23      So that Monday morning I made the preparations to, you

10:55:25AM  24  know, come down here for that hearing, submitted my request in

10:55:30AM  25  NSIPS.  At the department head meeting that I had that

10:55:32AM  1    afternoon, which is -- we normally do on Monday afternoon, we

10:55:36AM  2    generally have an hour, hour and a half department head

10:55:39AM  3    meeting.  I had six department heads, and my executive officer

10:55:42AM  4    and command master chief usually attend those.  We talk about

10:55:46AM  5    various things, each department provides updates, talk about

10:55:49AM  6    the ship, what's coming up next, taskers that need to go out or

10:55:53AM  7    whatnot.

10:55:56AM  8        So over that hour-, hour-and-a-half-long meeting, I did

10:55:56AM  9    mention that, "Hey, for my leave this week, I will be out of

10:55:59AM 10    area, I will not be available, get the CO leave message ready,"

10:56:03AM 11    and then I continued on with, you know, multiple other things.

10:56:05AM 12    I cannot attest, because I did not specifically look at my

10:56:08AM 13    executive officer or specifically tasked him, I just said it

10:56:12AM 14    openly, passing in the group in that hour-and-a-half-long

10:56:13AM 15    conversation.

10:56:13AM 16        It is true that I did not make it a point to talk about

10:56:17AM 17    Tampa or the legal case.  I did not want to, and frankly I

10:56:21AM 18    think that's, you know, contrary to good order and discipline,

10:56:24AM 19    because I don't want my subordinates to be privy to the

10:56:27AM 20    personal legal cases I'm involved that would also detract from

10:56:31AM 21    their mission, or what's my boss involved in, what's going to

10:56:34AM 22    happen to him.  So I did feel that was necessary to protect

10:56:37AM 23    them from that, that does not mean that I didn't say I was

10:56:41AM 24    going out of the area.

10:56:42AM 25        The next morning -- or the next day, you know, at some

| | |
|---|---|
| 10:56:46AM | 1 |
| 10:56:50AM | 2 |
| 10:56:55AM | 3 |
| 10:56:58AM | 4 |
| 10:57:02AM | 5 |
| 10:57:04AM | 6 |
| 10:57:07AM | 7 |
| 10:57:12AM | 8 |
| 10:57:12AM | 9 |
| 10:57:14AM | 10 |
| 10:57:17AM | 11 |
| 10:57:20AM | 12 |
| 10:57:22AM | 13 |
| 10:57:27AM | 14 |
| 10:57:31AM | 15 |
| 10:57:35AM | 16 |
| 10:57:35AM | 17 |
| 10:57:40AM | 18 |
| 10:57:43AM | 19 |
| 10:57:46AM | 20 |
| 10:57:50AM | 21 |
| 10:57:53AM | 22 |
| 10:57:57AM | 23 |
| 10:58:01AM | 24 |
| 10:58:04AM | 25 |

point the XO came in when we were having updates, and I pulled him in and shut the door and I told my XO, "Hey, when you go in and look at my leave chit, you're going to see that it's in Tampa, Florida.  I am going to go handle legal matters.  I don't want to share this with the rest of the crew, I don't want that to be a distraction, but you need to know that."  He acknowledged.  His declaration does say that he didn't know about out of area going to Tampa for the purpose of that case; that is true for Tuesday.  Whether or not he heard me say out of area or not on Monday, I don't know the relevance of that. It's not misleading in my opinion.

But the point that I would make also to the Court and others is there is no negative feeling that I have towards my XO.  I do not have a loss of trust with my XO.  He's a very good naval officer and he should be the one to relieve me next when it comes time.  We have a fleet-up policy where the XO relieves the CO when their time comes.

If you were to bring him in or make a declaration and/or make a statement to the Court, he would attest to the integrity or the character or the success of our ship, I have no doubt about that.  I do think it was some undue influence on him or partial information given to him to make that declaration that doesn't have the full scope of the details, and I don't fault him for that.  He is a good officer.

Q.    You mentioned a CO's leave message.  Can you explain what

10:58:09AM 1    that is?

10:58:11AM 2    A.    A CO's leave message is generally something that you send

10:58:16AM 3    out the day before a CO goes on leave, it generally lets the

10:58:20AM 4    chain of command and the other commands out there know that the

10:58:24AM 5    CO is not going to be available generally due to, you know,

10:58:29AM 6    being on leave out of area.  If I were to go on leave and be

10:58:33AM 7    local, I wouldn't need to send that message, because if

10:58:36AM 8    something came up and I needed to cancel my leave, I would just

10:58:39AM 9    drive into the ship.  Obviously I can't do that when I am out

10:58:43AM 10   of the area.

10:58:45AM 11   Q.    So would there be any reason to issue a CO's leave message

10:58:48AM 12   if you were to be in the area and available?

10:58:51AM 13   A.    No, sir, there's no requirement to do that.

10:58:54AM 14   Q.    And you testified a moment ago that you directed that a

10:58:58AM 15   CO's leave message be prepared at the Monday briefing with your

10:59:03AM 16   department heads, correct?

10:59:03AM 17   A.    I did.

10:59:04AM 18   Q.    Was a CO's leave message prepared?

10:59:08AM 19   A.    There was.  It was routed to me the next morning, maybe

10:59:12AM 20   around lunchtime or so, I initialed it and it went out sometime

10:59:15AM 21   after lunch that day.

10:59:16AM 22   Q.    And can you think of any reason why a CO's leave message

10:59:20AM 23   would have been issued if you hadn't asked for one to be issued

10:59:24AM 24   in that briefing?

10:59:29AM 25   A.    I think generally me or the XO would have that done.  So

10:59:32AM 1    if it had not already been done, when I talked to my XO the

10:59:35AM 2    next morning, he would have made sure, "Hey, are we tracking

10:59:39AM 3    this message?  It needs to go out today," so he's my back-up as

10:59:40AM 4    the second in command.  But, no, otherwise for them to be able

10:59:44AM 5    to release that, they would have to know that I'm going out of

10:59:47AM 6    area.

10:59:51AM 7              MR. GANNAM:  No further questions, Your Honor.

10:59:53AM 8              THE COURT:  All right.  Thank you, sir.

10:59:54AM 9              Ms. Powell, have you cross-examination for this

10:59:58AM 10   witness?

10:59:58AM 11             MS. POWELL:  I do.

11:00:00AM 12             THE COURT:  You're recognized for that purpose.

11:00:10AM 13                        CROSS-EXAMINATION

11:00:10AM 14   BY MS. POWELL:

11:01:11AM 15   Q.   Commander, you testified the ship was underway in just the

11:01:14AM 16   past few weeks, correct?

11:01:16AM 17   A.   Yes.

11:01:17AM 18   Q.   And when was that approximately?  Do you recall the dates?

11:01:22AM 19   A.   I think it was the 22nd of February, and we returned this

11:01:25AM 20   past Friday on the 4th of March.  I believe those are the

11:01:30AM 21   dates.  Roughly about 11 or 12 days.

11:01:33AM 22   Q.   So that was the first underway period since the issuance

11:01:36AM 23   of the injunction in this case?

11:01:42AM 24   A.   Yes, I think so.

11:01:45AM 25   Q.   Sorry, I didn't mean to make that complicated.  I think

11:01:48AM 1   that's adequate in the record.

11:01:49AM 2       And the purpose of the underway was to complete the

11:01:51AM 3   certification, correct?

11:01:53AM 4   A.   Not complete the certification, but there are

11:01:55AM 5   certifications we get before the entire certification.  So next

11:01:59AM 6   week we'll actually close out our last portion of the

11:02:02AM 7   engineering certifications.  But we are doing a training in

11:02:05AM 8   certification of Events 3 and 4, which have certain milestones,

11:02:08AM 9   in those were certifications for evolutions -- engineering

11:02:12AM 10  evolutions, certification for engineering drills, and

11:02:15AM 11  certification for fighting and main space fire drill for the

11:02:19AM 12  ship.

11:02:20AM 13  Q.   You have read two -- or have you read the two previous

11:02:26AM 14  declarations that Captain Brandon submitted in this matter?

11:02:31AM 15  A.   The last time I read any of the declarations provided by

11:02:33AM 16  him, I think was the court hearing last time.  I vaguely

11:02:37AM 17  remember the first one, I do not remember the second one.

11:02:40AM 18  Q.   Okay.  Do you recall him discussing a loss of trust and

11:02:43AM 19  confidence in you?

11:02:46AM 20  A.   If that was in the declaration, then yes.

11:02:50AM 21  Q.   Do you recall him stating that he was already mitigating

11:02:54AM 22  the risk of having you in command of the ship at sea?

11:02:58AM 23  A.   I'd have to read that again.

11:02:59AM 24  Q.   By placing extra supervision onboard?

11:03:03AM 25  A.   Okay.

11:03:05AM  1    **Q.**   Normally the Navy can trust commanders to command their

11:03:08AM  2    open ships, right?  They're expected to operate with a certain

11:03:11AM  3    amount of independence?

11:03:13AM  4    **A.**   Should, yes.

11:03:15AM  5    **Q.**   But on your recent underway, Captain Aldridge was onboard,

11:03:19AM  6    correct?

11:03:19AM  7    **A.**   That is correct.  He was the deputy commodore that I was

11:03:22AM  8    referring to earlier that did come underway with us, yes.

11:03:24AM  9    **Q.**   He is senior in rank to you?

11:03:26AM 10    **A.**   Yes, ma'am.

11:03:27AM 11    **Q.**   And senior in position as well?

11:03:29AM 12    **A.**   Yes, ma'am.

11:03:31AM 13    **Q.**   And he was on the ship for the entire underway period?

11:03:34AM 14    **A.**   That is correct.

11:03:37AM 15    **Q.**   You previously mentioned that -- or I'm sorry.  You as the

11:03:42AM 16    commanding officer need to stay current on Navy policy and

11:03:46AM 17    regulations in general, correct?

11:03:50AM 18    **A.**   To stay current on policy?  I mean, yes, every time a

11:03:54AM 19    policy comes out, you know, we're supposed to read it and make

11:03:57AM 20    sure we understand it, yes.

11:03:58AM 21    **Q.**   Sure.

11:04:00AM 22          So you know what the Navy regulations are?

11:04:04AM 23    **A.**   As a general statement, yes.

11:04:08AM 24    **Q.**   Are you familiar with the concept of a senior officer

11:04:15AM 25    present?  Is that a phrase you have heard before?

11:04:17AM 1  **A.** Senior officer present?  I think so.  Like SOPA, Senior

11:04:22AM 2  Officer Present Afloat.

11:04:22AM 3  **Q.** Yes.

11:04:23AM 4  **A.** Is that what you're referring to?

11:04:25AM 5  **Q.** Yes.

11:04:26AM 6  **A.** Okay.

11:04:27AM 7  **Q.** And what does that mean in your words?

11:04:30AM 8  **A.** So, for example, my commodore is the commander of our

11:04:37AM 9  destroyer squadron, and we have four ships out of Norfolk based

11:04:42AM 10 in that squadron, two other ships in Florida that are under his

11:04:45AM 11 operational control, if not administrative.

11:04:47AM 12     So if he, for example, were to embark on our ship, we

11:04:52AM 13 would have a pennant for him as a Senior Officer Present Afloat

11:04:56AM 14 when we're pulled into port on the pier.  Right?  The senior,

11:04:59AM 15 you know, ship on that pier would deem the pier

11:05:02AM 16 responsibilities, watch-standing requirements, et cetera.  And

11:05:05AM 17 if you're underway and embarked with other ships, the

11:05:08AM 18 commanding control would generally go with the senior officer

11:05:12AM 19 present.

11:05:12AM 20 **Q.** Okay.  So they have responsibilities as senior officer

11:05:17AM 21 present?

11:05:17AM 22 **A.** So if -- I don't want to misconstrue that.  If they are in

11:05:23AM 23 command, yes.

11:05:24AM 24 **Q.** And if they're not in command?

11:05:26AM 25 **A.** So you can have riders that are on your ship that are

11:05:29AM 1    senior officers to you but they're not in command.

11:05:32AM 2    Q.   Understood.

11:05:32AM 3         In that situation, are you aware that the senior officer

11:05:35AM 4    is required to assume command if in his or her judgment the

11:05:41AM 5    exercise of authority is otherwise necessary?

11:05:47AM 6    A.   I think so.

11:05:47AM 7    Q.   Okay.

11:05:48AM 8    A.   So I will tell you, when I was told that the deputy was

11:05:51AM 9    coming to get underway, it was not disclosed to me the

11:05:54AM 10   purposes.  In fact, I just got an email that said, "Please

11:05:57AM 11   confirm that you know that the deputy commodore and my

11:05:59AM 12   engineering senior chief petty officer are getting underway

11:06:04AM 13   next week."

11:06:04AM 14        "Roger, sir.  I understand they're coming to get underway

11:06:06AM 15   with us."

11:06:07AM 16        I have no problem with people coming to get underway.  I

11:06:08AM 17   did ask the deputy, when he came aboard my ship that day, "Hey,

11:06:11AM 18   is your purpose here to relieve me?" and he said, "No."

11:06:13AM 19        "What is your purpose here?" and he did say that he was

11:06:16AM 20   here to observe me and make sure the ship was safe for

11:06:19AM 21   operations.  I understand that my commodore wants to have that

11:06:22AM 22   backup.

11:06:24AM 23   Q.   Understood.

11:06:24AM 24   A.   Yes.

11:06:24AM 25   Q.   So you would agree with the statement that in that

11:06:26AM  1  position he could intervene if there was reason to do so in his

11:06:29AM  2  judgment and it was necessary?

11:06:31AM  3  **A.**   Sure.

11:06:32AM  4  **Q.**   And you understood that was why he was there?

11:06:35AM  5  **A.**   Yes.

11:06:46AM  6  **Q.**   At your last hearing, you testified that you informed your

11:06:50AM  7  XO and department heads at a meeting on Monday the 9th that you

11:06:54AM  8  were leaving the area.  And that is your testimony again today?

11:06:59AM  9  **A.**    In that meeting, that hour and a half meeting that we had,

11:07:03AM 10  I did make that as a passing statement, that for my leave I'll

11:07:06AM 11  be out of area and unavailable, get the CO leave message ready.

11:07:12AM 12  I did not look at my XO and specifically task him.  I did not

11:07:15AM 13  have an individual conversation with my XO.  It was general

11:07:17AM 14  words I put out to him.

11:07:19AM 15  **Q.**   Well, is it -- well, I don't want you to speculate.

11:07:21AM 16       You have read the declaration that your XO signed as well,

11:07:25AM 17  correct?

11:07:25AM 18  **A.**   Yes.  I remember reading it the day of that it was brought

11:07:29AM 19  in.

11:07:30AM 20  **Q.**   Right.  And he says he was not told you were leaving the

11:07:33AM 21  area at that meeting?

11:07:35AM 22  **A.**   If you could bring the declaration, I would rather read it

11:07:37AM 23  with you so I make sure that I don't misunderstand.

11:07:41AM 24  **Q.**   Sure.

11:07:41AM 25            MS. POWELL:  I think I've got the redacted version

11:07:44AM  1   with me.  Is that okay?

11:07:46AM  2           MR. STAVER:  Sure.

11:08:18AM  3           MS. POWELL:  May I approach?

11:08:19AM  4           THE COURT:  You may.

11:08:23AM  5           MS. POWELL:  Would you like a copy?

11:08:27AM  6           THE COURT:  No, that's fine.

11:08:38AM  7   **Q.**  (By Ms. Powell)  Paragraph 3, the third sentence.

11:08:49AM  8   **A.**  "Monday" -- do you want me to read that?

11:08:51AM  9   **Q.**  Sure.

11:08:51AM 10   **A.**  "Monday, February 7th, 2022, Plaintiff Navy Commander did

11:08:55AM 11   not tell me he was going -- leaving the local area on leave."

11:09:01AM 12   **Q.**  So at the very least, your XO does not recall the

11:09:03AM 13   statement that you made at that meeting?

11:09:05AM 14   **A.**  I don't know if he means that I did not look at him one on

11:09:09AM 15   one and have a conversation, "Hey, XO, I'm going out of area on

11:09:12AM 16   leave."  As I previously stated, I said it in the meeting in

11:09:15AM 17   the group.  I don't know, if you were to ask him, "Hey, what

11:09:18AM 18   else did your commanding officer say at that meeting?" if he

11:09:21AM 19   would also be able to attest to all of those things.  I don't

11:09:25AM 20   know.  But whether or not he heard specifically that I was

11:09:28AM 21   going out of area on leave or not, I do not fault him for

11:09:31AM 22   remembering everything, nor am I going to, you know, say that,

11:09:35AM 23   you know, he is out of line.  I said it to a group.  This reads

11:09:39AM 24   as if I had a conversation with him, and I did not have a

11:09:44AM 25   conversation specifically with him.  I said it to a group.

| | | |
|---|---|---|
| 11:09:48AM | 1 | **Q.**   Well, it doesn't say a conversation specifically with him. |
| 11:09:50AM | 2 | It says he did not tell me he was leaving the local area on |
| 11:09:54AM | 3 | leave in a group or otherwise, correct? |
| 11:09:56AM | 4 | **A.**   I agree that he did not tell me he was leaving the local |
| 11:09:59AM | 5 | area to be there. |
| 11:10:02AM | 6 | **Q.**   Okay.  And yet paragraph 4 goes on to say that he spoke |
| 11:10:04AM | 7 | with the other department heads about that meeting as well, |
| 11:10:06AM | 8 | correct? |
| 11:10:08AM | 9 | **A.**   Paragraph 4.  Okay.  Are you asking me to read that, |
| 11:10:16AM | 10 | ma'am? |
| 11:10:17AM | 11 | **Q.**   I'll read it.  The second sentence begins -- well, no, |
| 11:10:20AM | 12 | I'll read all of it; how's that. |
| 11:10:22AM | 13 | "I asked today" -- so the day this was signed.  "I asked |
| 11:10:26AM | 14 | all the department heads who are other officers supervising |
| 11:10:31AM | 15 | personnel responsible for different functions on the ship when |
| 11:10:33AM | 16 | they became aware that Plaintiff Navy Commander was leaving the |
| 11:10:37AM | 17 | local area on leave.  The combat systems officer became aware |
| 11:10:40AM | 18 | that Plaintiff was leaving the local area on midday Tuesday, |
| 11:10:43AM | 19 | February 8th, 2022, when Plaintiff Navy Commander asked him for |
| 11:10:47AM | 20 | a COVID mitigation worksheet.  No other department heads were |
| 11:10:50AM | 21 | aware that Plaintiff was leaving the local area before midday |
| 11:10:53AM | 22 | on Tuesday." |
| 11:10:57AM | 23 | Now, is that -- that suggests that he believes that none |
| 11:11:04AM | 24 | of the other department heads remembered this conversation you |
| 11:11:07AM | 25 | supposedly had with them. |

11:11:09AM 1       MR. GANNAM:  Your Honor, I object to the requirement

11:11:11AM 2  for speculation.  On its face, there's no possible way that the

11:11:16AM 3  commander could know what happened in this conversation that

11:11:20AM 4  apparently occurred the day that he was testifying.  We further

11:11:23AM 5  object to the admissibility of anything in paragraph 4 as

11:11:29AM 6  hearsay or on top of hearsay.

11:11:32AM 7       We have no objection to the government asking the

11:11:33AM 8  commander questions about this or if he agrees to any of these

11:11:37AM 9  statements or knows about them, but we object to the

11:11:39AM 10  admissibility as the truth of anything in paragraph 4.

11:11:43AM 11       MS. POWELL:  Rules of evidence are somewhat relaxed

11:11:45AM 12  at these preliminary proceedings.  I certainly acknowledge this

11:11:48AM 13  is hearsay, Your Honor, and I'm interested in what the

11:11:51AM 14  commander's explanation is at this point.

11:11:53AM 15       THE COURT:  Overruled.  Go ahead, Ms. Powell.

11:11:56AM 16  **Q.**   (By Ms. Powell)  Does it change your testimony that

11:12:06AM 17  apparently the other department heads also don't remember that

11:12:08AM 18  conversation the way you do?

11:12:10AM 19  **A.**   No, it doesn't.

11:12:10AM 20  **Q.**   Do you think they're mistaken as well?

11:12:13AM 21  **A.**   I don't know.

11:12:14AM 22  **Q.**   Do you think your XO is lying about the conversation he

11:12:18AM 23  had?

11:12:18AM 24  **A.**   I do not think my XO is a liar.  I do not know if he heard

11:12:22AM 25  it when I said it on Monday.  The point of me talking to him

11:12:25AM  1    about Tampa is correct; it did not occur until Tuesday.  I did

11:12:31AM  2    not tell any of my department heads where I was going or what I

11:12:35AM  3    was doing.  It is my job to protect them from that and

11:12:39AM  4    establish good order and discipline on my ship.  I do not think

11:12:42AM  5    it a good practice to share my personal legal matters to my

11:12:45AM  6    ship that impact my ability to carry on my service or conduct

11:12:50AM  7    my ability to command.  That, in and of itself, is contrary to

11:12:54AM  8    good order and discipline and it would be a distraction.  All

11:12:57AM  9    they needed to know was that I was going out of area.

11:12:58AM  10        The tasker to get a CO leave message did come out of that

11:13:02AM  11   conversation.  Whether or not they remember this or the other

11:13:05AM  12   things that I said that day over the context or the course of

11:13:09AM  13   all the meetings and stuff that we have, I don't know.  You

11:13:11AM  14   would have to call each one of them up here and state that.  If

11:13:14AM  15   there's a question as to my integrity, you would have to call

11:13:17AM  16   them up here and say that, and I have no problem with that.

11:13:22AM  17   Q.   Commander, you previously expressed a concern that the

11:13:22AM  18   declaration might have been the result of undue influence.  Do

11:13:25AM  19   you have any specific reason to believe that there was undue

11:13:29AM  20   influence on your executive officer?

11:13:33AM  21   A.   I don't think it is appropriate for my case here to speak

11:13:37AM  22   on the religious freedoms as associated with this case and the

11:13:42AM  23   vaccine mandate, is appropriate to go under me to my

11:13:47AM  24   subordinates and speak to my integrity or, you know, misleading

11:13:50AM  25   of information, as it's saying here, specifically as in terms

11:13:53AM  1    to when I was going out of leave and what they know or didn't

11:13:57AM  2    know.

11:13:57AM  3    **Q.**    Do you have any reason to think that someone asked him to

11:13:59AM  4    lie or mislead?

11:14:02AM  5    **A.**    I don't think my XO is lying.

11:14:06AM  6    **Q.**    Or you speculated that there might have been undue

11:14:09AM  7    influence.  I'm just asking whether you have any -- anyone told

11:14:11AM  8    you that was the case or if you have other specific evidence of

11:14:15AM  9    it.

11:14:15AM  10   **A.**    I think the act of going to my XO to provide a declaration

11:14:20AM  11   on one particular subject matter that is in question and

11:14:24AM  12   doesn't provide a recourse for what else you knew or the full

11:14:28AM  13   context of that is -- in my opinion, that is undue command

11:14:32AM  14   influence.  If you wanted him to provide a full statement on

11:14:35AM  15   everything that he knew, or my integrity, or character, or the

11:14:37AM  16   good order and discipline on my ship, that's not provided here.

11:14:41AM  17   It's one specific question that they went after.

11:14:44AM  18   **Q.**    Correct.

11:14:45AM  19   **A.**    I don't think he had the full context of this either.

11:14:50AM  20   **Q.**    Okay.

11:14:50AM  21   **A.**    Does that answer your question, ma'am?

11:14:52AM  22   **Q.**    Yes, I think it does.

11:14:53AM  23          Prior to the last hearing, you did -- you testified that

11:15:04AM  24   you did eventually submit the travel risk assessment that's

11:15:08AM  25   required, correct?

11:15:09AM 1   **A.**   Ma'am, are you referring to this week or the last one?

11:15:12AM 2   **Q.**   The last one.

11:15:12AM 3   **A.**   The last one, yes.  The commodore had called me, because

11:15:16AM 4   he saw the leave message.  I can't remember if it was late on

11:15:21AM 5   the ship and I was still there, you know, working through

11:15:23AM 6   things, somewhere around 5 or 6 o'clock, he called and had that

11:15:27AM 7   conversation, yes, ma'am.

11:15:28AM 8   **Q.**   So it was submitted after he confronted you about it?

11:15:30AM 9   **A.**   I submitted it after having the conversation, walking

11:15:33AM 10   through the worksheet with him on it, yes.

11:15:36AM 11   **Q.**   This particular county you were traveling to was

11:15:40AM 12   considered a high risk COVID area at the time, correct?

11:15:43AM 13   **A.**   I believe so, but I don't know --

11:15:44AM 14   **Q.**   It is currently, correct?

11:15:46AM 15   **A.**   Yes.  Yes, ma'am.

11:15:48AM 16   **Q.**   And I think at the last hearing, and please correct me if

11:15:52AM 17   I'm wrong, I think you conceded that you probably should have

11:15:54AM 18   done the risk mitigation plan sooner?

11:15:57AM 19   **A.**   Yes, I conceded that I probably should have said to him on

11:16:01AM 20   Monday --

11:16:01AM 21   **Q.**   Because it needed his approval?

11:16:06AM 22   **A.**   Yes.  The COVID travel risk assessment in and of itself is

11:16:10AM 23   not directive.  It's not required by Navy policy, it's at

11:16:14AM 24   commander's discretion.  My point in speaking to the commodore,

11:16:18AM 25   is like, "Yes, sir, I realize me being unvaccinated and high

11:16:21AM  1  risk, I should have provided to you more time to make that

11:16:24AM  2  determination."  To say that I didn't meet a requirement, I

11:16:27AM  3  don't know if I agree with that or where that's written that

11:16:30AM  4  that is required, unless my commodore said, "I want to see that

11:16:36AM  5  so I can make a determination for your ROM."  Yes.

11:16:38AM  6  **Q.**    The policy applicable to sailors aboard your ship requires

11:16:41AM  7  it to be done prior to requesting leave, correct?

11:16:44AM  8  **A.**    If they are going out-of-area leave, yes, ma'am.

11:17:00AM  9  **Q.**    For this hearing, you submitted your leave request and

11:17:03AM  10 travel mitigation plan ahead of time, correct, before taking

11:17:07AM  11 leave?

11:17:07AM  12 **A.**    Yes, ma'am.

11:17:08AM  13 **Q.**    And in that you proposed a three-day restriction of

11:17:12AM  14 movement?

11:17:13AM  15 **A.**    I did.

11:17:13AM  16 **Q.**    Despite the fact this county is a high risk area and

11:17:17AM  17 you're attending indoor gatherings?

11:17:19AM  18 **A.**    I did.  In consult with my IDC, my independent duty

11:17:23AM  19 corpsman, and the Navy policy for executing a ROM is not

11:17:29AM  20 specific to the community level of transmission.  It actually

11:17:32AM  21 says the ROM is required if you are COVID-positive.  One, I am

11:17:36AM  22 not COVID-positive and I tested negative, and, two, the ROM is

11:17:40AM  23 at the discretion of the commander based on all the facts.  You

11:17:44AM  24 can implement mitigations and not do a ROM, such as no ROM is

11:17:48AM  25 required after the return of your travel, wear an N95 mask.  If

11:17:52AM 1 you develop symptoms, get a test, et cetera.  We decided three

11:17:56AM 2 days --

11:17:56AM 3 **Q.**  So --

11:17:56AM 4 **A.**  -- because -- if I can continue.  My IDC, based on the CDC

11:18:02AM 5 guidance that, you know, symptoms -- if you were to be exposed,

11:18:05AM 6 symptoms generally develop within 48 to 72 hours following

11:18:08AM 7 that.  So if I did this travel, based on the interactions that

11:18:12AM 8 I had with people, and I returned to Norfolk, after 48 to

11:18:16AM 9 72 hours, if you don't have any symptoms, that would be a

11:18:19AM 10 sufficient ROM and you could come back and we could do the test

11:18:22AM 11 and clear.

11:18:23AM 12 **Q.**  But the CDC guidance applicable to unvaccinated travelers

11:18:26AM 13 specifically recommends a five-day quarantine, correct?

11:18:31AM 14 **A.**  I don't know if that's what the CDC says.  I know what the

11:18:34AM 15 CDC puts out before the Navy can execute, and the Navy has to

11:18:38AM 16 evaluate that and apply it to the Navy based on, you know,

11:18:41AM 17 operational guidance, ships, buildings, et cetera.

11:18:43AM 18 **Q.**  The guidance you provided to your own sailors provides for

11:18:46AM 19 a five-day quarantine, does it not?

11:18:49AM 20 **A.**  That guidance was written in May of 2021, and the policy

11:18:54AM 21 for COVID and the CDC has changed multiple times over since

11:18:58AM 22 May of 2021.  It was actually signed by my predecessor.  I

11:19:02AM 23 would say that it's somewhat out-of-date.  But, yes, we did

11:19:05AM 24 that five a-day ROM also based on medical guidelines then, and

11:19:10AM 25 I can't remember what the five days was for, but that --

11:19:14AM 1  **Q.**   But it still does apply to the sailors under your command?

11:19:17AM 2  **A.**   It does.

11:19:17AM 3  **Q.**   And it is consistent with the current CDC guidance for

11:19:19AM 4  travel of unvaccinated persons, correct?

11:19:21AM 5  **A.**   I can't attest to that.  I'd have to read what the CDC

11:19:25AM 6  says for travel of unvaccinated sailors.

11:19:28AM 7  **Q.**   But in any event, you thought you were entitled to special

11:19:29AM 8  treatment that your crew was not?

11:19:33AM 9  **A.**   No.  Why is it special treatment?

11:19:35AM 10 **Q.**   Because your crew would be required to undergo a five-day

11:19:40AM 11 quarantine?

11:19:40AM 12 **A.**   No.  I can change and establish that based on the travel

11:19:42AM 13 risk assessments that I got.  Most of my crew doesn't get a ROM

11:19:44AM 14 at all because most of the crew is vaccinated.

11:19:47AM 15 **Q.**   Correct.

11:19:48AM 16       But if they were not, the current policy would provide for

11:19:51AM 17 a five-day quarantine, would it not?

11:19:53AM 18 **A.**   It's at my discretion for their ROM.

11:19:58AM 19 **Q.**   Okay.

11:19:59AM 20 **A.**   For my crew.  The whole travel risk assessment is based on

11:20:04AM 21 commander's evaluation whether the travel is at risk or not.

11:20:09AM 22 The only requirement is if I had someone who tested positive

11:20:13AM 23 for COVID, they would be mandated a five-day ROM.  I think the

11:20:17AM 24 Navy policy also says that for foreign travel, so if somebody

11:20:20AM 25 traveled overseas, whether it's for vacation or to go see

11:20:23AM 1   family living somewhere, they would also be mandated a five-day

11:20:26AM 2   ROM.

11:20:26AM 3   Q.   You testified briefly, and I'm honestly not entirely sure

11:20:31AM 4   I understand the ins and outs here, that you had requested for

11:20:35AM 5   temporary duty status for this hearing.

11:20:38AM 6   A.   Mm-hmm.

11:20:39AM 7   Q.   If that were the case, you would not be taking leave,

11:20:43AM 8   right?  If that would were the case, you would be getting paid

11:20:46AM 9   by the Navy to pursue your private lawsuit against the Navy?

11:20:49AM 10  A.   That's a negative.  No, ma'am.

11:20:52AM 11  Q.   Why?

11:20:52AM 12  A.   Because the joint travel regulations do allow permissive

11:20:57AM 13  TAD.  There are provisions for funded government travel and

11:21:01AM 14  there are provisions that say that this is not government

11:21:03AM 15  funded travel.  At no point -- and the commodore asked me that

11:21:07AM 16  multiple times if I was asking for funded travel.  I very

11:21:10AM 17  clearly said, at least three times, I am not asking for funded

11:21:13AM 18  travel.

11:21:13AM 19  Q.   You are asking to not to take leave.

11:21:15AM 20  A.   Yes.  Because there are provisions that allow you to do

11:21:19AM 21  something under the obligation of duties that are allowed by

11:21:22AM 22  Navy policy or DoD policy that you don't have to take leave

11:21:26AM 23  for.

11:21:26AM 24  Q.   And if you were not taking leave, you'd be receiving your

11:21:29AM 25  regular salary for pursuing your private lawsuit against the

11:21:32AM 1  Navy.

11:21:32AM 2  A.   Yes.  And in conversation with my JAG, you can do

11:21:35AM 3  permissive TAD when you are a witness -- when you are

11:21:39AM 4  subpoenaed to witness in court.  We have permissive travel all

11:21:42AM 5  the time for, you know, local TAD stuff, for example, for

11:21:45AM 6  schools.  You have permissive TAD -- and I'm speaking no-cost

11:21:49AM 7  options here -- for house hunting, for example.  Somebody has

11:21:54AM 8  orders to go somewhere else, they can take no-cost orders to go

11:21:57AM 9  out and, you know, pursue a future home, where they're going to

11:22:01AM 10  live if they are moving out of the area.  And I did not request

11:22:05AM 11  funded travel.  I said my intentions are to do permissive TAD

11:22:09AM 12  because I thought there was that provision for me.

11:22:11AM 13  Q.   And typically when your TAD -- is that what you called

11:22:14AM 14  that?

11:22:15AM 15  A.   Temporary assigned duty --

11:22:15AM 16  Q.   Okay.

11:22:16AM 17  A.   -- or temporary duty, TAD, TDY.

11:22:19AM 18  Q.   You're in some sort of official status when you're on

11:22:21AM 19  that, correct?  Sort of acting in an official capacity?

11:22:26AM 20  A.   I guess you can say that.

11:22:28AM 21  Q.   And this is a personal legal matter; no?

11:22:30AM 22  A.   So when you do house hunting, you are not acting in an

11:22:34AM 23  official capacity, you are executing duties that the Navy or

11:22:37AM 24  government allows you to do for that purpose.

11:22:39AM 25  Q.   Right.  But if you're searching for a house in a new

11:22:42AM   1   location, it's typically one that the Navy has ordered you to

11:22:45AM   2   go to.

11:22:45AM   3   A.   For house hunting leave, yes.  You have to have orders

11:22:49AM   4   outside of the area to be able to travel there and execute

11:22:51AM   5   that.

11:22:52AM   6   Q.   Got it.

11:23:00AM   7        MS. POWELL:  Can I have just a moment?

11:23:02AM   8        THE COURT:  You may.

11:23:13AM   9        (Off-the-record discussion between Ms. Powell and

11:23:16AM  10         Commander Osterhues.)

11:23:19AM  11        MS. POWELL:  That's all I have, Your Honor.

11:23:20AM  12        THE COURT:  All right.  Thank you, Ms. Powell.

11:23:23AM  13        Mr. Gannam, if you have redirect for this witness,

11:23:27AM  14   you are recognized for that purpose.

11:23:30AM  15        MR. GANNAM:  Thank you, Your Honor.

11:23:32AM  16        May it please the Court.

11:23:33AM  17                    REDIRECT EXAMINATION

11:23:33AM  18   BY MR. GANNAM:

11:23:34AM  19   Q.   Did you or the government file the motion that led to the

11:23:38AM  20   hearing here today?

11:23:40AM  21   A.   I'm sorry, can you say that again?

11:23:41AM  22   Q.   Did you file the motion seeking the stay of the Court's

11:23:45AM  23   order that led to the hearing today?

11:23:47AM  24   A.   No, sir.

11:23:47AM  25   Q.   Is it your understanding that the defendants, the U.S.

| | | |
|---|---|---|
| 11:23:50AM | 1 | government, filed that motion? |
| 11:23:53AM | 2 | **A.**   I'm not -- can you say that again? |
| 11:23:55AM | 3 | **Q.**   Is it your understanding that the defendants in this |
| 11:23:58AM | 4 | case -- |
| 11:23:58AM | 5 |         THE COURT:  I think we can take notice of who filed |
| 11:24:00AM | 6 | the motion, Mr. Gannam. |
| 11:24:04AM | 7 | **Q.**   (By Mr. Gannam)  At least you didn't ask for the motion to |
| 11:24:07AM | 8 | be filed that led to you being here? |
| 11:24:09AM | 9 | **A.**   No, sir, I did not. |
| 11:24:10AM | 10 | **Q.**   When you submitted your request for TAD, did you disclose |
| 11:24:15AM | 11 | to your commander the reason why you wanted to take that TAD? |
| 11:24:19AM | 12 | **A.**   I did. |
| 11:24:19AM | 13 | **Q.** |
| 11:24:21AM | 14 | **A.**   It was approved Tuesday evening, yes, sir.  After multiple |
| 11:24:28AM | 15 | RFIs, which is request for information, of the type of travel |
| 11:24:32AM | 16 | and the type of leave, what am I doing on leave, where am I |
| 11:24:36AM | 17 | staying, my travel risk, whether it's going to be funded or |
| 11:24:40AM | 18 | not, there are multiple RFIs after requesting that, yes, sir. |
| 11:24:44AM | 19 | **Q.**   When you submitted your recommendation for the ROM |
| 11:24:48AM | 20 | requirement when you returned from this hearing, did you demand |
| 11:24:54AM | 21 | that it only be three days, or merely recommend that? |
| 11:24:59AM | 22 | **A.**   It was a recommendation, sir. |
| 11:25:01AM | 23 | **Q.**   And will you comply with whatever ROM requirement is |
| 11:25:04AM | 24 | imposed by your commander whenever that's done? |
| 11:25:06AM | 25 | **A.**   Yes, sir, I will. |

Line 13 (11:24:19AM): **Q.**   And was it approved?

11:25:07AM   1   **Q.**   And is that any different from how a sailor under your

11:25:11AM   2   command would be treated when submitting a recommended ROM

11:25:15AM   3   requirement for travelling out of area?

11:25:17AM   4   **A.**   No, it is not.

11:25:20AM   5   **Q.**   When the deputy commodore came on board your ship to

11:25:25AM   6   travel with you on your last exercise, at any point did he

11:25:30AM   7   assume command of your ship?

11:25:31AM   8   **A.**   No, sir, he did not.

11:25:37AM   9          MR. GANNAM:  I've no further questions, Your Honor.

11:25:38AM   10          THE COURT:  All right.  Thank you very much.  In that

11:25:40AM   11   case, Navy Commander, if you'll remember to let us detach that

11:25:43AM   12   microphone, you may step down, and you're excused with our

11:25:47AM   13   thanks.

11:25:48AM   14          THE WITNESS:  Thank you.

11:25:48AM   15                    --ooOoo--

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

I, REBECCA M. SABO, a Registered Professional Reporter and Certified Realtime Reporter, certify that the foregoing transcript is a true and correct record of the proceedings given at the time and place hereinbefore mentioned; that the proceedings were reported by me in machine shorthand and thereafter reduced to typewriting using computer-assisted transcription; that after being reduced to typewriting, a certified copy of the transcript will be filed electronically with the Court.

I further certify that I am not attorney for, nor employed by, nor related to any of the parties or attorneys to this action, nor financially interested in this action.

IN WITNESS WHEREOF, I have set my hand at Billings, Montana, this 13th day of March, 2022.


/s/ Rebecca M. Sabo

Rebecca M. Sabo, RPR, CRR
United States Court Reporter