Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## RAMIREZ *v.* COLLIER, EXECUTIVE DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 21–5592.   Argued November 9, 2021—Decided March 24, 2022

A Texas jury sentenced John Ramirez to death after he brutally murdered Pablo Castro in 2004.  On February 5, 2021, after years of direct and collateral proceedings concerning Ramirez's conviction, sentence, and aspects of his execution, Texas informed Ramirez that his execution date would be September 8, 2021.  Ramirez then filed a prison grievance requesting that the State allow his long-time pastor to be present in the execution chamber, which Texas initially denied.  Texas later changed course and amended its execution protocol to allow a prisoner's spiritual advisor to enter the execution chamber.  On June 11, 2021, Ramirez filed another prison grievance asking that his pastor be permitted to "lay hands" on him and "pray over" him during his execution, acts Ramirez's grievance explains are part of his faith.  Texas denied Ramirez's request on July 2, 2021, stating that spiritual advisors are not allowed to touch an inmate in the execution chamber.  Texas pointed to no provision of its execution protocol requiring this result, and the State had a history of allowing prison chaplains to engage in such activities during executions.  Ramirez appealed within the prison system by filing a Step 2 grievance on July 8, 2021.  With less than a month until his execution date, and no ruling on his Step 2 grievance, Ramirez filed suit in Federal District Court on August 10, 2021.  Ramirez alleged that the refusal of prison officials to allow his pastor to lay hands on him in the execution chamber violated his rights under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) and the First Amendment.  Ramirez sought preliminary and permanent injunctive relief barring state officials from executing him unless they granted the requested religious accommodation.  On August 16, 2021, Ramirez's attorney inquired whether

2                    RAMIREZ *v.* COLLIER

Syllabus

Ramirez's pastor would be allowed to pray audibly with him during the execution. After prison officials said no, Ramirez filed an amended complaint seeking an injunction that would allow his pastor to lay hands on him and pray with him during the execution. Ramirez also sought a stay of execution while the District Court considered his claims. The District Court denied the request, as did the Fifth Circuit. This Court then stayed Ramirez's execution, granted certiorari, and heard argument on an expedited basis.

*Held*: Ramirez is likely to succeed on his RLUIPA claims because Texas's restrictions on religious touch and audible prayer in the execution chamber burden religious exercise and are not the least restrictive means of furthering the State's compelling interests. Pp. 6–22.

(a) The question before the Court is whether Ramirez's execution without the requested participation of his pastor should be halted pending full consideration of his claims on a complete record. To obtain the relief Ramirez seeks—relief that the parties agree is properly characterized as a preliminary injunction—Ramirez "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 20. The Court rejects the prison officials' threshold contention that Ramirez cannot succeed on his claims because he failed to exhaust all available remedies before filing suit as mandated by the Prison Litigation Reform Act of 1995, 42 U. S. C. §1997e(a). In the context of Texas's grievance system, the Court finds Ramirez properly exhausted administrative remedies. Ramirez tried (unsuccessfully) to resolve the issue informally with a prison chaplain. He then filed a Step 1 grievance requesting that his pastor be allowed to " 'lay hands on me' & pray over me while I am being executed." Prison officials denied that grievance, and Ramirez timely appealed. His Step 2 grievance reiterated the same requests. Ramirez's grievances thus "clearly stated" that he wished to have his pastor touch him and pray with him during his execution.

Respondents' various arguments to the contrary lack merit. Respondents maintain that Ramirez failed to exhaust Texas's grievance process because he filed suit six days before prison officials ruled on his Step 2 grievance, but any defect was arguably cured by Ramirez's filing of an amended complaint the same day the State denied his Step 2 grievance, and the Court need not definitively resolve the issue as respondents failed to raise it below. See *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7. While respondents correctly note that Ramirez's grievance did not explicitly request "audible" prayer in the execution chamber, the most natural understanding of Ramirez's request to permit

his pastor to "pray over" him during the execution is one that conveys a request for "audible" prayer. Finally, the Court rejects respondents' argument that Ramirez should have filed his grievance earlier. Ramirez filed the grievance that sparked this litigation just three days after he learned of the prohibition on religious touch, and the Court finds his grievance timely. Pp. 6–9.

(b) Turning to the merits of Ramirez's RLUIPA claims, RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the government demonstrates that the burden imposed on that person is the least restrictive means of furthering a compelling governmental interest. 42 U. S. C. §2000cc–1(a). A plaintiff bears the initial burden of proving that a prison policy "implicates his religious exercise." *Holt* v. *Hobbs*, 574 U. S. 352, 360. A prisoner's requested religious accommodation "must be sincerely based on a religious belief and not some other motivation." *Id.*, at 360–361. The burden on the prisoner's religious exercise must also be "substantial[ ]." *Id.*, at 361. Pp. 9–18.

(1) Ramirez is likely to succeed in proving that his religious requests are "sincerely based on a religious belief." *Id.*, at 360–361. Both the laying on of hands and prayer are traditional forms of religious exercise, and Ramirez's pastor confirmed that prayer accompanied by touch is a significant part of their shared faith tradition. Neither the District Court nor the Court of Appeals doubted that Ramirez had a sincere religious basis for his requests. Texas's argument to the contrary—which stems from a complaint Ramirez filed in 2020 in which he sought his pastor's presence and prayer in the chamber, but disclaimed any need for touch—does not outweigh ample evidence of the sincerity of Ramirez's beliefs. Respondents do not dispute that any burden their policy imposes on Ramirez's religious exercise is substantial. Pp. 9–12.

(2) Given the current record, the State has not shown that it is likely to carry the burden of demonstrating that its refusal to accommodate Ramirez's religious exercise is the least restrictive means of furthering the government's compelling interests. Pp. 12–18.

(i) Despite a historical tradition of clerical prayer at the time of a prisoner's execution that stretches back well before the founding and continues today, prison officials insist that a categorical ban on audible prayer is the least restrictive means of furthering two compelling governmental interests. First, they assert that absolute silence is necessary to monitor the inmate's condition during the delicate process of lethal injection without the potential interference of audible prayer. Respondents fail to show that a categorical ban on audible prayer is the least restrictive means of furthering this compelling interest, and

Syllabus

they do not explain why other jurisdictions can accommodate audible prayer but Texas cannot feasibly do so. Texas asks the Court to defer to its execution chamber policy determinations, but RLUIPA requires more when a policy imposes a substantial burden on sincere religious exercise. Further, no basis for deference exists given the State's history of allowing prison chaplains to audibly pray with the condemned during executions.

Second, prison officials say that if they allow spiritual advisors to pray aloud during executions, the opportunity "could be exploited to make a statement to the witnesses or officials, rather than the inmate." Texas has a compelling interest in preventing disruptions of any sort and maintaining solemnity and decorum in the execution chamber. But the record here provides no indication that Ramirez's pastor would cause the sorts of disruptions that respondents fear. Conjecture alone fails to satisfy the sort of case-by-case analysis that RLUIPA requires. See *Holt*, 574 U. S., at 363. Further, prison officials have less restrictive ways to handle any concerns. Pp. 12–16.

(ii) Ramirez is also likely to prevail on his claim that Texas's categorical ban on religious touch in the execution chamber is inconsistent with his rights under RLUIPA. Respondents point to three compelling governmental interests it says the ban on touch furthers: security in the execution chamber, preventing unnecessary suffering of the prisoner, and avoiding further emotional trauma to the victim's family members. But respondents fail to show that a categorical ban on touch is the least restrictive means of accomplishing any of these commendable goals. Indeed, Texas does nothing to rebut obvious alternatives, and its suggestion that Ramirez must identify other less restrictive means that would accomplish the government's interests gets RLUIPA's burden shifting backward. Texas may eventually face more problematic requests than those made by Ramirez here, but RLUIPA requires that courts consider only "the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt*, 574 U. S., at 363. Pp. 16–18.

(c) Having found that Ramirez is likely to prevail on the merits of his RLUIPA claims, the Court concludes other factors justify preliminary relief. See *Winter*, 555 U. S., at 20. Ramirez is likely to suffer irreparable harm absent injunctive relief because he will be unable to engage in protected religious exercise in the final moments of his life. This is a spiritual harm that compensation paid to his estate would not remedy. Additionally, the balance of equities and public interest tilt in Ramirez's favor. RLUIPA recognizes that prisoners like Ramirez have a strong interest in avoiding substantial burdens on their religious exercise. At the same time, "[b]oth the State and the victims of crime have an important interest in the timely enforcement

Cite as: 595 U. S. ____ (2022)          5

Syllabus

of a sentence." *Hill* v. *McDonough*, 547 U. S. 573, 584. Because it is possible to accommodate Ramirez's sincere religious beliefs without delaying or impeding his execution, the Court concludes the balance of equities and the public interest favor his tailored request for injunctive relief. The record does not support respondents' assertion that Ramirez has engaged in litigation misconduct that should preclude equitable relief here. Pp. 18–20.

(d) Timely resolution of RLUIPA claims in the prisoner context could be facilitated if States were to adopt policies anticipating likely issues and streamlined procedures for resolving requests. It should be the rare RLUIPA capital case that requires last-minute resort to the federal courts. The proper remedy in such a case is an injunction ordering the accommodation, not a stay of the execution. This approach balances the State's interest in carrying out capital sentences without delay and the prisoner's interest in religious exercise. Texas must decide on remand here where its interest lies, as further proceedings defending its policies may delay carrying out Ramirez's sentence. If Texas reschedules Ramirez's execution and declines to permit audible prayer or religious touch, the District Court should enter appropriate preliminary relief. Pp. 21–22.

10 F. 4th 561, reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which BREYER, ALITO, SOTOMAYOR, KAGAN, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. SOTOMAYOR, J., and KAVANAUGH, J., filed concurring opinions. THOMAS, J., filed a dissenting opinion.

Cite as: 595 U. S. ____ (2022)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order that
corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 21–5592

————

## JOHN H. RAMIREZ, PETITIONER *v.* BRYAN COLLIER, EXECUTIVE DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[March 24, 2022]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

A Texas jury sentenced John Ramirez to death for the brutal murder of Pablo Castro. In this litigation, Ramirez does not challenge his conviction. Nor does he challenge his sentence. He asks instead that his long-time pastor be allowed to pray with him and lay hands on him while he is being executed. He says that the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 803, 42 U. S. C. §2000cc *et seq.*, requires this accommodation. Ramirez sought a preliminary injunction ordering Texas to permit his religious exercise if the State went forward with his execution. The District Court and Court of Appeals declined to grant such relief. We then stayed the execution and granted certiorari.

### I

#### A

Pablo Castro worked the night shift at the Times Market convenience store in Corpus Christi, Texas. On July 19, 2004, Castro was outside closing up when Ramirez and an

accomplice approached him with a knife.  Ramirez stabbed Castro 29 times, searched his pockets, and made off with $1.25.  Castro died on the pavement, leaving behind 9 children and 14 grandchildren.

Ramirez fled to Mexico, where he evaded authorities for more than three years.  In 2008, he was finally apprehended near the Mexican border.  Texas charged Ramirez with murdering Castro in the course of committing or attempting to commit robbery—a capital offense.  See Tex. Penal Code Ann. §19.03(a)(2) (West 2019).  Ramirez admitted to killing Castro, but denied the robbery that made the murder a capital crime.  A jury disagreed, found Ramirez guilty, and sentenced him to death.  The Texas Court of Criminal Appeals affirmed Ramirez's conviction and sentence on direct appeal.  See *Ramirez* v. *State*, No. AP–76100 (Mar. 16, 2011).  Ramirez's attempts to collaterally attack his conviction in state and federal court also proved unsuccessful.  See *Ramirez* v. *Davis*, 780 Fed. Appx. 110, 112–114 (CA5 2019) (discussing Ramirez's past habeas filings), cert. denied, 589 U. S. ___ (2020).

B

Texas scheduled Ramirez's execution for February 2, 2017.  Less than a week before that date, Ramirez moved to stay the execution, arguing that his habeas counsel had rendered constitutionally ineffective assistance.  The District Court granted a stay, but later rejected Ramirez's claim.  The Fifth Circuit then declined to issue a certificate of appealability.  See *Ramirez*, 780 Fed. Appx. 110.  Still, this last-minute litigation had the effect of delaying Ramirez's execution for several years.

Texas rescheduled Ramirez's execution for September 9, 2020.  Ramirez then asked to have his pastor accompany him into the execution chamber.  Prison officials denied the request.  They did so because, at the time, Texas's execution protocol barred all spiritual advisors from entering the

Opinion of the Court

chamber. App. 60. A prior version of the protocol had allowed access for prison chaplains. *Ibid.* But Texas employed only Christian and Muslim chaplains. In 2019, when a Buddhist inmate sought to have his spiritual advisor join him in the execution chamber, Texas declined to grant the accommodation. We stayed that execution pending certiorari, unless the State allowed a Buddhist spiritual advisor into the execution chamber. *Murphy* v. *Collier*, 587 U. S. ___ (2019). In response, Texas amended its execution protocol to bar *all* chaplains from entering the execution chamber, so as not to discriminate among religions. See Brief for Respondents 4–5; App. 111.

Ramirez filed suit, arguing that Texas's new execution protocol violated his rights under the First Amendment and RLUIPA. Ramirez's complaint said that he was a Christian and had received religious guidance from Pastor Dana Moore since 2016. *Id.*, at 61. Pastor Moore serves the Second Baptist Church in Corpus Christi, of which Ramirez is a member. Ramirez explained that he wanted his pastor "to be present at the time of his execution to pray with him and provide spiritual comfort and guidance in his final moments." *Ibid.* Ramirez's complaint focused on prayer and explained that his pastor "need not touch [him] at any time in the execution chamber." *Ibid.*

Texas withdrew Ramirez's death warrant before there were any further filings. As a result, the parties jointly agreed to dismiss the litigation without prejudice.

C

On February 5, 2021, Texas informed Ramirez that his new execution date would be September 8, 2021. Ramirez then filed a Step 1 prison grievance requesting that he "be allowed to have [his] spiritual advisor present in the death chamber." *Id.*, at 50–51. Texas again denied the request, but later changed course, amending its execution protocol to permit a prisoner's spiritual advisor to be present in the

execution chamber.  See *id.*, at 133–152.

Our decisions in *Gutierrez* v. *Saenz*, 590 U. S. ___ (2020), and *Dunn* v. *Smith*, 592 U. S. ___ (2021), seem to have precipitated the change.  Both cases concerned prisoner requests to have a spiritual advisor present in the execution chamber.  And in both cases, we declined to allow the executions to proceed unless the inmate was granted that accommodation.  JUSTICE KAVANAUGH, dissenting in *Dunn*, explained that States wishing to avoid such stays "should figure out a way to allow spiritual advisors into the execution room, as other States and the Federal Government have done." *Id.*, at ___ (slip op., at 1).

Texas's 2021 Execution Protocol did just that.  It allows a prisoner's spiritual advisor to enter the execution chamber, accompanied by a prison security escort.  This accommodation is subject to various procedural requirements.  See App. 133–137.  For instance, the prisoner must notify the warden of his choice of spiritual advisor within 30 days of learning his execution date.  *Id.*, at 134.  Additionally, the spiritual advisor must pass a background check and undergo training.  *Id.*, at 136.  And if the spiritual advisor is "disruptive," he is subject to "immediate removal."  *Id.*, at 149.  The protocol says nothing about whether a spiritual advisor may pray aloud or touch an inmate for comfort.  But Texas had long allowed its own prison chaplains to engage in such activities during executions, and it was against this backdrop that Texas enacted the new policy.  See Brief for Petitioner 29–33; Brief for Former Prison Officials as *Amici Curiae* 2–11.

### D

On June 11, 2021, Ramirez filed the grievance that is at the center of this case.  Having successfully petitioned the State to allow his pastor into the execution chamber, he requested that his pastor be permitted to "lay hands" on him and "pray over" him while the execution was taking place.

Opinion of the Court

App. 52–53. Ramirez's grievance explains that it is "part of my faith to have my spiritual advisor lay hands on me anytime I am sick or dying." *Id.*, at 52. Texas denied the grievance on July 2, 2021. It said that spiritual advisors are "not allowed to touch an inmate while inside the execution chamber," though it did not point to any provision of its execution protocol requiring this result. *Id.*, at 53.

Ramirez appealed within the prison system by filing a Step 2 grievance on July 8, 2021. *Id.*, at 155–156. But with less than a month to go until his September 8 execution date, prison officials had still not ruled on that appeal. So on August 10 he filed suit in Federal District Court. Ramirez alleged that the refusal of prison officials to allow Pastor Moore to lay hands on him in the execution chamber violated his rights under RLUIPA and the First Amendment. Ramirez sought preliminary and permanent injunctive relief barring state officials from executing him unless they granted the religious accommodation.

On August 16, 2021, Ramirez's attorney inquired whether Pastor Moore would be allowed to pray audibly with Ramirez during the execution. Prison officials responded three days later that the pastor would not. *Id.*, at 85–86. So on August 22 Ramirez filed an amended complaint seeking an injunction that would allow Pastor Moore to lay hands on him *and* pray with him during the execution. *Id.*, at 95–102.

Ramirez also sought a stay of execution while the District Court considered his claims. The District Court denied the request, as did the Fifth Circuit. See 10 F. 4th 561 (CA5 2021) (*per curiam*). Judge Dennis dissented. In his view, Ramirez's RLUIPA claims were likely to succeed because the prison's policies burdened religious exercise and were not the least restrictive means of furthering the State's compelling interest in the security of the execution. *Id.*, at 566–568.

We then stayed Ramirez's execution, granted certiorari,

and heard argument on an expedited basis. See 594 U. S.
___ (2021). Ramirez's certiorari petition asked us to deter-
mine whether Texas's restrictions on religious touch and
audible prayer violate either RLUIPA or the Free Exercise
Clause. Ramirez's merits brief addresses only RLUIPA,
however, so we do not consider any standalone argument
under the Free Exercise Clause.

We are also mindful that, while we have had full briefing
and oral argument in this Court, the case comes to us in a
preliminary posture: The question is whether Ramirez's ex-
ecution without the requested participation of his pastor
should be halted, pending full consideration of his claims on
a complete record. The parties agree that the relief sought
is properly characterized as a preliminary injunction. Un-
der such circumstances, the party seeking relief "must es-
tablish that he is likely to succeed on the merits, that he is
likely to suffer irreparable harm in the absence of prelimi-
nary relief, that the balance of equities tips in his favor, and
that an injunction is in the public interest." *Winter* v. *Nat-
ural Resources Defense Council, Inc.*, 555 U. S. 7, 20 (2008).

## II

The prison officials begin by arguing that Ramirez cannot
hope to succeed on his claims, because he failed to exhaust
all available remedies before filing suit. Such exhaustion is
mandatory under the Prison Litigation Reform Act of 1995
(PLRA), 42 U. S. C. §1997e(a), even in the execution con-
text. See *Woodford* v. *Ngo*, 548 U. S. 81, 85 (2006); *Porter*
v. *Nussle*, 534 U. S. 516, 520 (2002). The Act requires com-
pliance with "deadlines and other critical procedural rules,"
*Woodford*, 548 U. S., at 90–91, with no exceptions for "spe-
cial circumstances," *Ross* v. *Blake*, 578 U. S. 632, 635
(2016). Thus, if Ramirez failed to exhaust all available ad-
ministrative remedies, his suit may not proceed. Respond-
ents argue that is the case here. We disagree.

The Texas prison grievance process is straightforward.

Opinion of the Court

See Texas Dept. of Criminal Justice, Offender Orientation Handbook 73–75 (Feb. 2017) (Prison Handbook). Prior to filing a grievance, an inmate must try to resolve the issue informally. If that does not work, the prisoner must file a Step 1 grievance within 15 days of the "alleged incident or occurrence." *Id.*, at 74. When filing a grievance, an inmate must "clearly state[ ]" "[t]he specific action required to resolve the complaint." *Id.*, at 75. Prison officials then have 40 days to decide the grievance. If the prisoner remains dissatisfied, he may appeal by filing a Step 2 grievance within 15 days. Prison officials have another 40 days to issue a decision on the appeal. *Id.*, at 74. Only after exhausting both steps of that grievance process may a prisoner file suit. See 42 U. S. C. §1997e(a).

We are persuaded—at least in the current posture of the case—that Ramirez properly exhausted these administrative remedies. The record indicates that Ramirez tried to resolve the issue informally with a prison chaplain. App. 52.* When that did not work, he filed a Step 1 grievance requesting that his pastor be allowed to "'lay hands on me' & pray over me while I am being executed." *Id.*, at 52–53. Prison officials denied that grievance, and Ramirez timely appealed. *Id.*, at 53, 155–156. His Step 2 grievance reiterated, "I wish to have my Spiritual Advisor 'lay hands on me' to pray over me during my upcoming execution." *Id.*, at 155. Ramirez's grievances thus "clearly stated" that he wished to have his pastor touch him and pray with him during his execution. Prison Handbook 75. In the context of Texas's grievance system, that is enough.

———————

*The dissent argues that Ramirez's effort at informal resolution was either insufficient or insufficiently documented. *Post*, at 18–19 (opinion of THOMAS, J.). Ramirez specified on the grievance form the date he raised the issue with the prison chaplain and attempted to resolve it. In a one-sentence description of the chaplain's response, Ramirez mentioned only the touching claim. Texas does not argue that this constituted failure to exhaust, and therefore forfeited any such argument.

Respondents briefly argue that Ramirez failed to exhaust Texas's grievance process because he filed suit before prison officials ruled on his Step 2 grievance. See Brief for Respondents 28. It is true that prison officials did not decide that grievance until six days after Ramirez sued. Compare App. 1 with *id.*, at 155–156. But Ramirez filed an amended complaint that same day, and he also filed a second amended complaint after that. *Id.*, at 2–3. The original defect was arguably cured by those subsequent filings. See *Rhodes* v. *Robinson*, 621 F. 3d 1002, 1005 (CA9 2010) ("As a general rule, when a plaintiff files an amended complaint, the amended complaint supercedes the original, the latter being treated thereafter as non-existent." (internal quotation marks and brackets omitted)) (PLRA case). In any event, we need not definitively resolve the issue as respondents failed to raise it below. See *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005) ("we are a court of review, not of first view").

Respondents also argue that Ramirez failed to properly exhaust his request for audible prayer in the execution chamber. The gist of their argument is that while his grievances clearly requested prayer, they did not clearly request *audible* prayer. See Brief for Respondents 25–30. We disagree. Ramirez asked that prison officials permit his pastor to "lay hands" on him and "pray over" him during the execution. App. 53. While it is true that this language did not explicitly reference "audible" prayer, the language adequately conveyed such a request for several reasons. First, if Ramirez had merely wanted silent prayer, his grievance need not have mentioned prayer at all. He and his pastor could have prayed silently and no one would have been the wiser. Second, praying aloud is a common type of Christian prayer that people engage in together. See Brief for Petitioner 21–22. Even respondents concede that such prayer is "not uncommon." Brief for Respondents 30. Finally, Texas's historic practice of allowing prison chaplains to

pray audibly with inmates inside the execution chamber further suggests that Ramirez intended to invoke this practice. See Brief for Petitioner 32–33. A request for audible prayer is thus the most natural understanding of Ramirez's grievances.

Nor are we persuaded by respondents' argument that Ramirez should have filed his grievance sooner. In Texas, prisoners must raise a grievance within "15 days from the date of the alleged incident or occurrence." Prison Handbook 74. Respondents contend that Ramirez should have filed his grievance within 15 days of when Texas issued its revised execution protocol (April 21, 2021), or within 15 days of when he learned that his pastor would be allowed inside the chamber (May 4, 2021). See Brief for Respondents 26–27. Both suggestions are untenable. Neither the revised execution protocol nor the State's decision to admit Pastor Moore put Ramirez on notice that religious touch and audible prayer would be banned inside the execution chamber. To the contrary, Texas had long permitted such activities. See Brief for Petitioner 29–33; Brief for Former Prison Officials as *Amici Curiae* 6–11. Ramirez says—and respondents do not dispute—that he first learned of the prohibition on religious touch on June 8, 2021. Reply Brief 4. Ramirez filed the grievance that sparked this litigation just three days later, on June 11. App. 53. We thus have little trouble concluding that the grievance was timely, and that we may proceed to the merits.

### III

Congress enacted RLUIPA, and its sister statute the Religious Freedom Restoration Act of 1993, 107 Stat. 1488, 42 U. S. C. §2000bb *et seq.*, in the aftermath of our decisions in *Employment Division, Department of Human Resources of Oregon* v. *Smith*, 494 U. S. 872 (1990), and *City of Boerne* v. *Flores*, 521 U. S. 507 (1997). See *Holt* v. *Hobbs*, 574 U. S. 352, 356–358 (2015) (discussing this history). Both statutes

aim to ensure "greater protection for religious exercise than is available under the First Amendment." *Id.*, at 357.

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution"—including state prisoners—"even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U. S. C. §2000cc–1(a). A plaintiff bears the initial burden of proving that a prison policy "implicates his religious exercise." *Holt*, 574 U. S., at 360. Although RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," §2000cc–5(7)(A), a prisoner's requested accommodation "must be sincerely based on a religious belief and not some other motivation," *id.*, at 360–361. The burden on the prisoner's religious exercise must also be "substantial[ ]." *Id.*, at 361. Once a plaintiff makes such a showing, the burden flips and the government must "demonstrate[ ] that imposition of the burden on that person" is the least restrictive means of furthering a compelling governmental interest. §2000cc–1(a); see also *id.*, at 362. This allocation of respective burdens applies in the preliminary injunction context. *Gonzales* v. *O Centro Espírita Beneficente União do Vegetal*, 546 U. S. 418, 429–430 (2006).

## A

To begin, we think Ramirez is likely to succeed in proving that his religious requests are "sincerely based on a religious belief." *Holt*, 574 U. S., at 360–361. Ramirez seeks to have his pastor lay hands on him and pray over him during the execution. Both are traditional forms of religious exercise. See Brief for Becket Fund for Religious Liberty as

*Amicus Curiae* 3–19. As Ramirez's grievance states, "it is part of my faith to have my spiritual advisor lay hands on me anytime I am sick or dying." App. 52. Pastor Moore, who has ministered to Ramirez for four years, agrees that prayer accompanied by touch is "a significant part of our faith tradition as Baptists." *Id.*, at 47. And neither the District Court nor the Court of Appeals doubted that Ramirez had a sincere religious basis for his requested accommodations.

Respondents' argument to the contrary turns in large part on a complaint Ramirez filed in 2020. See Brief for Respondents 35–37. Ramirez filed the complaint while Texas's prior execution protocol, which banned all spiritual advisors from the execution chamber, was in place. See App. 56–70, 111. The complaint sought Pastor Moore's presence and prayer in the chamber, but disclaimed any need for touch. *Id.*, at 61 ("When Plaintiff Ramirez is executed, Pastor Moore will pray with him. Pastor Moore need not touch Mr. Ramirez at any time in the execution chamber."). As respondents see things, this shows that Ramirez's current request for touch is insincere.

Ramirez responds that the 2020 complaint was inaccurate, and that he would have amended it had the litigation continued. Brief for Petitioner 11, n. 3; Reply Brief 7, n. 5. The litigation, however, did not proceed, because the parties jointly agreed to dismiss the suit without prejudice less than a week after it was filed. See Notice of Nonsuit Without Prejudice in No. 2:20–cv–205 (SD Tex. 2020). Ramirez's specific statement in his prior complaint is certainly probative on the issue of sincerity; evolving litigation positions may suggest a prisoner's goal is delay rather than sincere religious exercise. See *Rhines* v. *Weber*, 544 U. S. 269, 278 (2005). Under the facts of this case, however, we do not think the prior complaint—dismissed without prejudice and by agreement one week after it was filed—outweighs

the ample evidence that Ramirez's beliefs are sincere.  Respondents do not dispute that any burden their policy imposes on Ramirez's religious exercise is substantial.  See *Holt*, 574 U. S., at 361.

## B

Because Ramirez is likely to succeed in showing that Texas's policy substantially burdens his exercise of religion, respondents must prove that their refusal to accommodate the exercise both (1) furthers "a compelling governmental interest," and (2) is the "least restrictive means of furthering that compelling governmental interest."  42 U. S. C. §2000cc–1(a).  Under RLUIPA, the government cannot discharge this burden by pointing to "broadly formulated interests." *Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U. S. 682, 726 (2014).  It must instead "demonstrate that the compelling interest test is satisfied through application of the challenged law [to] the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt*, 574 U. S., at 363.

Here, the government has not shown that it is likely to carry that burden.

## 1

As for audible prayer, there is a rich history of clerical prayer at the time of a prisoner's execution, dating back well before the founding of our Nation.  See Brief for Becket Fund for Religious Liberty as *Amicus Curiae* 3–15.  For example, at Newgate Prison—one of London's most notorious jails—an Anglican priest would stand and pray with the condemned in their final moments.  A. McKenzie, Tyburn's Martyrs 9–14 (2007).  By the early 1700s, that practice had evolved to permit prisoners to be "attended by a minister, or even a priest, of their own communion." *Id.*, at 176; see also *id.*, at 176–182.  Prayer at the time of execution was also commonplace in the American Colonies.  See, *e.g.*, W.

Smith, New London Gazette, Sept. 11, 1772, reprinted in W. DeLoss Love, Samsom Occom and the Christian Indians of New England 173–174 (1899) ("The Rev. Mr. Occom . . . attended the Criminal to the Place of Execution, where he made a short but well adapted Prayer to the Occasion."); see also W. Smith, The Convict's Visitor 85 (1791) (containing model prayers for clergy attending to the condemned, including at the "[g]iving [of] the signal").  And during the Revolutionary War, General George Washington ordered that "prisoners under sentence of death" "be attended with such Chaplains, as they choose"—including at the time of their execution.  G. Washington, General Orders (June 9, 1777); see also *ibid.* (May 1, 1780).  These chaplains often spoke and prayed with the condemned during their final moments.  See Pennsylvania Evening Post, June 6, 1780, vol. 4, p. 62, col. 2 ("Upon the arrival of the criminals at the place of execution, the attending chaplain . . . prayed and recommended them severally to God.").

A tradition of such prayer continued throughout our Nation's history.  See S. Banner, The Death Penalty 35–36 (2002).  When, for example, the Federal Government executed four members of the conspiracy that led to the assassination of President Abraham Lincoln, the prisoners were accompanied by clergy of various denominations.  See End of the Assassins, N. Y. Times, July 8, 1865, p. 1, col. 1. These "spiritual advisers" ministered to the condemned, and three spoke public prayers shortly before the prisoners were hanged.  *Id.*, at col. 5–6.  And in the aftermath of World War II, the United States Army even permitted Nazi war criminals facing execution to be accompanied by a chaplain, who "spoke" prayers on the gallows in the moments before death.  See H. Gerecke, I Walked to the Gallows With the Nazi Chiefs, Saturday Evening Post, Sept. 1, 1951, p. 58.

The practice continues today.  In 2020 and 2021, the Federal Bureau of Prisons allowed religious advisors to speak

Opinion of the Court

or pray audibly with inmates during at least six federal executions. See Brief for United States as *Amicus Curiae* 24–25. What's more, Texas itself appears to have long allowed prison chaplains to pray with inmates in the execution chamber, deciding to prohibit such prayer only in the last several years. *Id.*, at 2–3.

Despite this long history, prison officials now insist that a categorical ban on audible prayer in the execution chamber is the least restrictive means of furthering two compelling governmental interests.

*First*, prison officials say that absolute silence is necessary in the execution chamber so they can monitor the inmate's condition through a microphone suspended overhead. They say that audible prayer might impede their ability to hear subtle signs of trouble or prove distracting during an emergency. See Brief for Respondents 46. We do not doubt that prison officials have a compelling interest in monitoring an execution and responding effectively during any potential emergency. And we recognize that audible prayer could present a more serious risk of interference during the delicate process of lethal injection than during the method of execution (hanging) that was used in most of the historical examples we have cited. But respondents fail to show that a categorical ban on all audible prayer is the least restrictive means of furthering their compelling interests.

Indeed, respondents offer only a conclusory defense of the policy's tailoring. They acknowledge that both the Federal Government and Alabama have recently permitted audible prayer or speech in the execution chamber, but then assert that, "under the circumstances in Texas's chamber, allowing speech during the execution is not feasible." *Id.*, at 47. Respondents do not explain why. Nor do they explore any relevant differences between Texas's execution chamber or process and those of other jurisdictions. Instead, they ask that we simply defer to their determination. That is not

enough under RLUIPA.  Nor is there a basis for deference, given that Texas has "historically and routinely allowed prison chaplains to audibly pray" with the condemned during executions, a fact Texas does not dispute.  Brief for Petitioner 29; see also *id.*, at 32–33.

*Second*, prison officials say that if they allow spiritual advisors to pray aloud during executions, the opportunity "could be exploited to make a statement to the witnesses or officials, rather than the inmate."  Brief for Respondents 46.  They note that such statements might cause further trauma to the victim's family or otherwise interfere with the execution.  *Ibid.*  We agree that the government has a compelling interest in preventing disruptions of any sort and maintaining solemnity and decorum in the execution chamber.  But there is no indication in the record that Pastor Moore would cause the sorts of disruptions that respondents fear.  Respondents' argument thus comes down to conjecture regarding what a hypothetical spiritual advisor might do in some future case.  "Such speculation is insufficient to satisfy" respondents' burden, see *Fulton* v. *Philadelphia*, 593 U. S. ___, ___ (2021) (slip op., at 14), and fails to engage in the sort of case-by-case analysis that RLUIPA requires, see *Holt*, 574 U. S., at 363.

What's more, there appear to be less restrictive ways to handle any concerns.  Prison officials could impose reasonable restrictions on audible prayer in the execution chamber—such as limiting the volume of any prayer so that medical officials can monitor an inmate's condition, requiring silence during critical points in the execution process (including when an execution warrant is read or officials must communicate with one another), allowing a spiritual advisor to speak only with the inmate, and subjecting advisors to immediate removal for failure to comply with any rule.  Prison officials could also require spiritual advisors to sign penalty-backed pledges agreeing to abide by all such limitations.

Given the current record, respondents have not shown that a total ban on audible prayer is the least restrictive means of furthering their asserted interests.

### 2

Respondents' categorical ban on religious touch in the execution chamber fares no better. They point to three governmental interests they say are compelling: security in the execution chamber, preventing unnecessary suffering, and avoiding further emotional trauma to the victim's family members. All three goals are commendable. But again, respondents fail to show that a categorical ban on touch is the least restrictive means of accomplishing any of them.

Respondents say that allowing a spiritual advisor to touch an inmate would place the advisor in harm's way because the inmate might escape his restraints, smuggle in a weapon, or become violent. Brief for Respondents 37–38. They also contend that if a spiritual advisor were close enough to touch an inmate, he might tamper with the prisoner's restraints or yank out an IV line. *Id.*, at 38–39. We agree that prisons have compelling interests in both protecting those attending an execution and preventing them from interfering with it (though if an inmate smuggling a weapon into the execution chamber is a serious prospect, the prison has broader issues than those considered here). Even so, Texas's categorical ban on religious touch is not the least restrictive means of furthering such interests.

Under Texas's current protocol, spiritual advisors stand just three feet from the gurney in the execution chamber. *Id.*, at 38. A security escort is posted nearby, ready to intervene if anything goes awry. *Ibid.* We do not see how letting the spiritual advisor stand slightly closer, reach out his arm, and touch a part of the prisoner's body well away from the site of any IV line would meaningfully increase risk. And that is all Ramirez requests here. See Tr. of Oral Arg. 9–10 (Ramirez's counsel stating, "Pastor Moore can

touch Mr. Ramirez's foot, an extremity on the complete far end of the body from the point at which the IV line will be inserted into his arm. . . . [T]hat would satisfy the religious exercise.").

Respondents next argue that allowing the pastor to touch Ramirez in the execution chamber might lead to preventable suffering. The theory is that Pastor Moore might accidentally jostle, pinch, or otherwise interfere with an IV line, and that this in turn might affect the administration of the execution drugs in a way that results in greater pain or suffering. See Brief for Respondents 38–39. We think that preventing accidental interference with the prison's IV lines is a compelling governmental interest. But we also think it is one reasonably addressed by means short of banning *all* touch in the execution chamber.

For example, Texas could allow touch on a part of the body away from IV lines, such as a prisoner's lower leg. That seems to have been the practice of many prison chaplains during past Texas executions. Brief for Petitioner 29–33. Additionally, Texas could require Ramirez's pastor to stand in a location that gives the medical team an unobstructed view of the IV lines, allowing them to watch for problems and quickly respond. Texas could also restrict the time period during which touching is permitted to minimize risk during critical points in the execution process, such as the insertion of the IV line. Finally, Texas could require that the pastor undergo training so that he understands the importance of staying away from IV lines and taking whatever other precautions are necessary to avoid problems in the chamber.

Texas does nothing to rebut these obvious alternatives, instead suggesting that it is Ramirez's burden to "identify any less restrictive means." Brief for Respondents 41. That gets things backward. Once a plaintiff has made out his initial case under RLUIPA, it is the government that must show its policy "is the least restrictive means of furthering

Opinion of the Court

[a] compelling governmental interest." 42 U. S. C. §2000cc–1(a)(2).

Finally, respondents say that allowing certain forms of religious touch might further traumatize a victim's family members who are present as witnesses, reminding them that their loved one received no such solace. Brief for Respondents 39–40. As we have already noted, maintaining solemnity and decorum in the execution chamber is a compelling governmental interest. But here what is at issue is allowing Pastor Moore to respectfully touch Ramirez's foot or lower leg inside the execution chamber. Respondents do not contend that this particular act will result in trauma. See *ibid.* Instead, their real concern seems to be with other, potentially more problematic requests down the line. RLUIPA, however, requires that courts take cases one at a time, considering only "the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt,* 574 U. S., at 363. As a result, respondents' final argument is unavailing.

We conclude that Ramirez is likely to prevail on his claim that Texas's categorical ban on religious touch in the execution chamber is inconsistent with his rights under RLUIPA.

## IV

### A

Our conclusion that Ramirez is likely to prevail on the merits of his RLUIPA claims does not end the matter. As noted earlier, he must also show "that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter,* 555 U. S., at 20.

We think these factors also favor an injunction. Ramirez is likely to suffer irreparable harm in the absence of injunctive relief because he will be unable to engage in protected religious exercise in the final moments of his life. Compensation paid to his estate would not remedy this harm, which

is spiritual rather than pecuniary.

Additionally, the balance of equities and public interest tilt in Ramirez's favor. Ramirez "does not seek an open-ended stay of execution." Brief for Petitioner 44. Rather, he requests a tailored injunction requiring that Texas permit audible prayer and religious touch during his execution. By passing RLUIPA, Congress determined that prisoners like Ramirez have a strong interest in avoiding substantial burdens on their religious exercise, even while confined. At the same time, "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Hill* v. *McDonough*, 547 U. S. 573, 584 (2006). Given these respective interests, a tailored injunction of the sort Ramirez seeks—rather than a stay of execution—will be the proper form of equitable relief when a prisoner raises a RLUIPA claim in the execution context. Cf. 18 U. S. C. §3626(a)(2) ("Preliminary injunctive relief [in a prison conditions suit] must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm."). Because it is possible to accommodate Ramirez's sincere religious beliefs without delaying or impeding his execution, we conclude that the balance of equities and the public interest favor his requested relief.

## B

Respondents argue that Ramirez has engaged in inequitable conduct. As they see it, this should bar the equitable relief that Ramirez seeks.

We agree that a party's inequitable conduct can make equitable relief inappropriate. When a party seeking equitable relief "has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him." *Keystone Driller Co.* v. *General Excavator Co.*, 290 U. S. 240, 245 (1933) (quoting

J. Pomeroy, Equity Jurisprudence §397 (4th ed. 1918)). These well-worn principles of equity apply in capital cases just as in all others. Thus, late-breaking changes in position, last-minute claims arising from long-known facts, and other "attempt[s] at manipulation" can provide a sound basis for denying equitable relief in capital cases. *Gomez* v. *United States Dist. Court for Northern Dist. of Cal.*, 503 U. S. 653, 654 (1992) (*per curiam*); see also *Hill*, 547 U. S., at 584 ("A court considering a stay must also apply a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." (internal quotation marks omitted)).

Here, however, the record does not support the conclusion that Ramirez engaged in such misconduct. Respondents argue that Ramirez inequitably delayed this litigation by filing suit just four weeks before his scheduled execution. But this is not a case in which a litigant "slept upon his rights." *Gildersleeve* v. *New Mexico Mining Co.*, 161 U. S. 573, 578 (1896) (quoting *Speidel* v. *Henrici*, 120 U. S. 377, 387 (1887)). To the contrary, Ramirez had sought to vindicate his rights for months. He first learned that prison officials would not allow his pastor to lay hands on him in the execution chamber on June 8, 2021. See Part II, *supra.* That was a break from Texas's longstanding practice. Ramirez filed a Step 1 grievance requesting both prayer and religious touch just three days later. App. 52–53. When that grievance was rejected, he quickly filed a Step 2 grievance. *Id.*, at 155–156. Yet respondents failed to issue a final decision until August 16, 2021—39 days after Ramirez had filed his Step 2 grievance, and just a few weeks before the scheduled execution. To be sure, prison officials issued their decision within the 40 days allowed by Texas's grievance policy. See Prison Handbook 74. But respondents can hardly complain about the inequities of delay when their own actions were a significant contributing factor.

Opinion of the Court

### C

As we have explained, the resolution of RLUIPA claims in the prisoner context requires a case-specific consideration of the particular circumstances and claims.  At the same time, timely resolution of such claims could be facilitated if States were to adopt policies anticipating and addressing issues likely to arise.  Doing so would assist both prison officials responsible for carrying out executions and prisoners preparing to confront the end of life according to their religious beliefs.

The first step would be to specify reasonable rules on the time for prisoners to request religious accommodations, and for prison officials to respond.  Cf. *Woodford*, 548 U. S., at 87–96.  States could also adopt streamlined procedures for claims involving requests like those at issue in this case, so that these potentially complicated matters can be litigated at all levels well in advance of any scheduled execution.  If spiritual advisors are to be admitted into the execution chamber, it would also seem reasonable to require some training on procedures, including any restrictions on their movements or conduct.  When a spiritual advisor would enter and must leave could be spelled out.  If the advisor is to touch the prisoner, the State might also specify where and for how long.  And, as noted, if audible prayer is to occur, a variety of considerations might be set forth in advance to avoid disruption.  See *supra*, at 15.  It may also be reasonable to document the advisor's advance agreement to comply with any restrictions.

If States adopt clear rules in advance, it should be the rare case that requires last-minute resort to the federal courts.  If such cases do arise and a court determines that relief is appropriate under RLUIPA, the proper remedy is an injunction ordering the accommodation, not a stay of the execution.  This approach balances the State's interest in carrying out capital sentences without delay and the prisoner's interest in religious exercise.

22                          RAMIREZ *v.* COLLIER

                          Opinion of the Court

   One final point bears mentioning.  Our holding today
arises in the context of a preliminary injunction.  And our
analysis turns on Texas's specific execution protocol, cham-
ber, and historical practices.  Further proceedings on re-
mand, if necessary, might shed additional light on Texas's
interests, and on whether its policies are narrowly tailored.
But such proceedings might also contribute to further delay
in carrying out the sentence.  The State will have to deter-
mine where its interest lies in going forward.

                    *        *        *

   We hold that Ramirez is likely to prevail on the merits of
his RLUIPA claims, and that the other preliminary injunc-
tion factors justify relief.  If Texas reschedules Ramirez's
execution and declines to permit audible prayer or religious
touch, the District Court should therefore enter appropriate
preliminary relief.  The judgment of the United States
Court of Appeals for the Fifth Circuit is reversed, and the
case is remanded for further proceedings consistent with
this opinion.

                                        *It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–5592

_____

JOHN H. RAMIREZ, PETITIONER *v.* BRYAN COLLIER,
EXECUTIVE DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[March 24, 2022]

JUSTICE SOTOMAYOR, concurring.

The opinion of the Court, which I join in full, explains why clear rules governing the presence of spiritual advisors at executions are necessary to ensure that any disputes are resolved in a timely fashion before a scheduled execution date. I write separately to underscore the interaction between prison officials' obligations to set such rules and the exhaustion requirement of the Prison Litigation Reform Act (PLRA).

Under the PLRA, prison officials and incarcerated individuals share an obligation to act in good faith in resolving disputes: Incarcerated individuals must timely raise their claims through the prison grievance system, and prison officials must ensure that the system is a functioning one. To that end, the PLRA requires incarcerated individuals to exhaust the prison's administrative grievance process before turning to the courts only where that process is actually "available." 42 U. S. C. §1997e(a). An administrative process is not available if it is not "'capable of use' to obtain 'some relief for the action complained of.'" *Ross* v. *Blake*, 578 U. S. 632, 642 (2016). Availability is a practical determination that requires considering both whether the administrative system is accessible as designed and whether

prison administrators and officers ensure meaningful access to it in practice.  See *id.,* at 643–644.

A scheduled execution date may impose unique time constraints on grievance procedures, but it does not alter either party's responsibilities under the PLRA.  Just as incarcerated individuals still bear the burden of timely raising execution-related claims, prisons still must ensure that administrative remedies are available, which may require modifying procedures to account for the time constraints of a scheduled execution as the Court describes, *ante,* at 21.  Where an administrative process does not facilitate addressing execution-related claims within the timeframe of a scheduled execution, it is likely not an "available" remedy that must be exhausted under the PLRA.

To ensure that administrative remedies are available in the execution context, prison officials bear a twofold responsibility.  First, they must ensure that rules clearly and timely inform an individual facing execution of any relevant protocols, so that the individual in turn may timely raise concerns.  Second, the officials must ensure that the administrative process proceeds swiftly enough to permit exhaustion with sufficient time for the individual to seek judicial review, if necessary, prior to a scheduled execution.  Finally, to act in good faith means that neither incarcerated individuals nor prison officials should unnecessarily wait to act until the end of time available to them.

Because I agree with the Court that Ramirez exhausted his administrative remedies, it is unnecessary to address whether they qualified as available such that exhaustion was actually a prerequisite to suit.\*  It raises questions,

---

\*The dissent both contends that Ramirez did not exhaust administrative remedies and that Ramirez cannot claim that administrative remedies were unavailable to him because he filed grievances and received responses.  *Post,* at 17–21 (opinion of Thomas, J.).  As the dissent recounts at length, however, many prison grievance systems require additional steps after filing a complaint and receiving a response in order to

Cite as: 595 U. S. ____ (2022)             3

SOTOMAYOR, J., concurring

however, that the record indicates that the prison failed to
provide Ramirez with notice of its restrictions on a spiritual
advisor's actions in the execution room.  Timely notice of
policies is essential to ensure the ability to timely raise, or
seek informal resolution of, any claims related to those pol-
icies.  It also raises questions that the prison took 39 days
to deny Ramirez's Step 2 grievance, even though the prison
had considered and rejected his request previously and
maintains that its established policies foreclosed it.  Such
delay creates an impression, whether valid or not, that the
prison is trying to "thwart inmates from taking advantage
of [the] grievance process" and cut short their opportunity
to obtain judicial review.  *Ross*, 578 U. S., at 644.

At its heart, the Religious Land Use and Institutionalized
Persons Act requires commitment on both sides to achieve
a timely resolution of disputes, as does the PLRA's exhaus-
tion requirement.  Consistent with these principles, incar-
cerated individuals should know that delays in raising their
requests can result in denial.  They should not, however, be
penalized for delays attributable to prison administrators.

––––––––––

"exhaust."  Ramirez received a response to his second grievance in early
July, yet his grievance remained pending in the prison's Step 2 process
through August despite his pending September execution date.  If an ad-
ministrative system does not permit complete exhaustion of execution-
related claims in a timely manner before a scheduled execution, it may
be unavailable for the purposes of those claims even if it would be avail-
able for other types of claims.  See *Ross* v. *Blake*, 578 U. S. 632, 642 (2016)
(evaluating administrative remedies in terms of their ability to grant re-
lief for "'the action complained of'").

Cite as: 595 U. S. ____ (2022)          1

KAVANAUGH, J., concurring

# SUPREME COURT OF THE UNITED STATES

————

No. 21–5592

————

JOHN H. RAMIREZ, PETITIONER *v.* BRYAN COLLIER, EXECUTIVE DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[March 24, 2022]

JUSTICE KAVANAUGH, concurring.

I join the Court's opinion in full, and I write separately to add three points: one about the recent history of litigation involving religious advisors in execution rooms; a second about the difficulty of applying RLUIPA's compelling interest and least restrictive means standards; and a third about state execution procedures going forward.

*First*, the recent history. The question of religious advisors in the execution room came to this Court three years ago as a question of religious *equality*. Some States had long permitted state-employed chaplains in the execution room. But those state-employed chaplains were mostly Christian. Those States did not allow inmates to have their own religious advisors in the room. Therefore, a Christian inmate could have the state-employed Christian chaplain in the room, but a Buddhist inmate, for example, could not have a Buddhist religious advisor in the room. The Court correctly determined that this practice constituted unlawful religious discrimination because it treated inmates of different religions differently. See *Murphy* v. *Collier*, 587 U. S. ___ (2019).

At the same time, the Court stressed that an inmate had to timely raise such a claim so that the execution would not be unreasonably delayed to the detriment of the victims'

2                          RAMIREZ *v.* COLLIER

families, among others.  For timeliness reasons, the Court
denied relief in the first such claim to reach this Court.  See
*Dunn* v. *Ray*, 586 U. S. ___ (2019).  But the Court then
granted relief in the second such claim, which was timely
raised.  *Murphy*, 587 U. S. ___.

The bedrock religious equality principle was easy for
States to apply: States could either (i) always allow a reli-
gious advisor into the execution room or (ii) always exclude
a religious advisor, including any state-employed chaplain.
But States could not allow religious advisors of some reli-
gions while excluding religious advisors of other religions.

Then, however, a different kind of claim emerged.  In
States that equally barred all advisors from the execution
room, some inmates brought a religious *liberty* claim—a
claim seeking a religious exemption from an otherwise neu-
tral and generally applicable rule excluding all advisors.
The Religious Land Use and Institutionalized Persons Act
of 2000, known as RLUIPA, proscribes the State from sub-
stantially burdening an inmate's religious exercise except
when the State has a compelling interest and employs the
least restrictive means to achieve that interest.  See 114
Stat. 803, 42 U. S. C. §2000cc *et seq.*  Suing under RLUIPA,
some inmates argued that the State did not have a suffi-
ciently "compelling" interest to exclude religious advisors
from the execution room—or at least that the State could
satisfy its asserted safety, security, and solemnity interests
by means less restrictive than excluding all religious advi-
sors from the room.

And then, in this case, still another kind of claim
emerged.  Ramirez not only wants a religious advisor in the
execution room.  He also wants the advisor to be able to en-
gage in audible prayer and even to be able to physically
touch him during the execution process.  Ramirez argues
that the State does not have a sufficiently "compelling" in-
terest to prevent such activities by religious advisors, or at
least could satisfy its compelling interests by less restrictive

KAVANAUGH, J., concurring

means. For example, security officers in the room could prevent or promptly respond to any disruption or interference.

As to those RLUIPA claims, the Court previously indicated that a State may not completely exclude religious advisors from the execution room, even if the State equally excludes all advisors on a neutral and generally applicable basis. See *ante,* at 4; *Gutierrez* v. *Saenz*, 590 U. S. ___ (2020); *Dunn* v. *Smith*, 592 U. S. ___ (2021). And the Court today further holds that the State may not prevent a religious advisor from engaging in at least some audible prayer and physical touching of the inmate while in the execution room. Although the Court concludes that the State has a compelling interest in ensuring the safety, security, and solemnity of the execution room, the Court decides that the State can satisfy those interests by means less restrictive than excluding religious advisors altogether or restricting religious advisors from audible prayer and touching.

*Second*, the Court's holding implicates significant issues about how the Court decides whether a State's asserted interest is sufficiently "compelling" and how the Court assesses whether less restrictive means could satisfy that compelling interest. This case illustrates both the difficulty of those inquiries and the important role that history and state practice often play in the analysis.

The compelling interest standard of RLUIPA—like the compelling interest standard that the Court employs when applying strict scrutiny to examine state limitations on certain constitutional rights—necessarily operates as a balancing test. See generally B. Kavanaugh, Two Challenges for the Judge as Umpire: Statutory Ambiguity and Constitutional Exceptions, 92 Notre Dame L. Rev. 1907, 1914–1919 (2017). The Court starts with a heavy presumption against a state law that infringes the constitutional or statutory right in question. The Court allows state infringement on that right only when the State has a sufficiently

4                    RAMIREZ *v.* COLLIER

KAVANAUGH, J., concurring

"compelling" interest.  See *Williams-Yulee* v. *Florida Bar*, 575 U. S. 433, 444 (2015).

But what does "compelling" mean, and how does the Court determine when the State's interest rises to that level?  And how does the Court then determine whether less restrictive means would still satisfy that interest?  Good questions, for which there are no great answers.  Sometimes, the Court looks to a State's policy-based or commonsense arguments.  Often, the Court also examines history and contemporary state practice to inform the inquiries.  Cf. *Republican Party of Minn.* v. *White*, 536 U. S. 765, 785–787 (2002) (Scalia, J., for the Court).[1]

Here, the State asserts that it has a compelling interest in ensuring the safety, security, and solemnity of the execution room.  To further those interests, the State has sought to restrict the number of people in the room, as well as their activities.  As the United States pointed out at oral argument, any disruption or interference could be "catastrophic."  Tr. of Oral Arg. 69.  And a religious advisor would not ordinarily be allowed in a public hospital's operating room during a major life-or-death surgical procedure, so why should one be allowed into the execution room?

The Court has no difficulty reaching the commonsense

_____

[1] The strict scrutiny test requires the government to demonstrate a "compelling interest" in order to justify imposing a burden on certain constitutional rights.  That test was first applied by this Court in certain First Amendment cases in the late 1950s and early 1960s.  See R. Fallon, Strict Judicial Scrutiny, 54 UCLA L. Rev. 1267, 1270–1271 (2007); S. Siegel, The Origin of the Compelling State Interest Test and Strict Scrutiny, 48 Am. J. Legal Hist. 355, 356–357 (2006).  The test can be difficult to apply because it arguably "permits and even requires judges to engage recurrently in only minimally structured appraisals of the significance of competing values or interests in many cases."  R. Fallon, The Nature of Constitutional Rights: The Invention and Logic of Strict Judicial Scrutiny 66–67 (2019).  In RLUIPA, Congress used the term "compelling" interest without further defining it.

KAVANAUGH, J., concurring

conclusion that the State has a compelling interest in en-
suring safety, security, and solemnity in the execution
room. The more difficult question is: How much risk of dis-
ruption or interference must the State tolerate in order to
accommodate the inmate's religious liberty claim under
RLUIPA?

The Court concludes that, even if audible prayer and
physical touching are allowed, the State can still suffi-
ciently ensure safety, security, and solemnity in the execu-
tion room. The Court suggests that the risk of disruption
or interference is conjecture and can be addressed in other
ways. For example, security officers in the room could im-
mediately intervene if the religious advisor accidentally or
intentionally disrupts or interferes with the execution.

Even so, it is undeniable that allowing an outside indi-
vidual in an execution room and allowing touching would
*increase the risk* of a problem occurring, such as accidental
or intentional disruption of or interference with the execu-
tion. So why can't the State choose to avoid any additional
risk of disruption or interference, especially given the po-
tentially catastrophic harm if the risked disruption or in-
terference actually ensues?

That is a difficult question to answer, in my view. The
core problem is that a State's understandable goal of avoid-
ing a higher risk of great harm does not easily map onto the
compelling interest/least restrictive means standards. In
particular, it is difficult for a court applying those stand-
ards to know where to draw the line—that is, how much
additional risk of great harm is too much for a court to order
the State to bear.

Here, if the Court's own intuitive policy assessment that
the State can reasonably tolerate the additional risk were
all that the Court could muster in response to the State's
argument, I might have concluded that the State could ex-
clude religious advisors from the execution room, or at least
could restrict their activities in the room and not allow

6                    RAMIREZ *v.* COLLIER

KAVANAUGH, J., concurring

physical touching, for example.

Importantly, however, the Court does not merely point to its own policy assessment of how much risk the State must tolerate in the execution room.  The Court also relies in part on the history of religious advisors at executions.  To be sure, the Court acknowledges that some of the history is not precisely on point because many executions historically were outdoor public hangings where the presence of religious advisors did not raise the same risks to safety, security, and solemnity that their presence in a small execution room does.  And some of the other history involved state-employed chaplains, who arguably do not raise the same risks to safety, security, and solemnity as outsiders in the execution room.  Still, the history generally demonstrates that religious advisors have often been present at executions.  And perhaps even more relevant, the Federal Government and some States have recently allowed inmates' religious advisors into the execution room.  Those religious advisors have been allowed to engage in audible prayer and limited touching of the inmate without apparent problems. See *ante,* at 13–14.  As the Court explains, experience matters in assessing whether less restrictive alternatives could still satisfy the State's compelling interest.  Cf. *Holt* v. *Hobbs*, 574 U. S. 352, 368–369 (2015).[2]

---

[2] Of course, in assessing risk, a government need not wait for the flood before building the levee.  But as the Court explains, the recent experience in other States can nonetheless be somewhat informative in analyzing whether the State has a sufficiently compelling interest and has employed the least restrictive means of avoiding the risk of disruption or interference from the presence of religious advisors.  Courts must be discerning, however, when relying on state practice.  States are not necessarily required to follow the less restrictive practices of other States in a kind of race to the top (or bottom).  Moreover, state practice can fluctuate as States change their approach to an issue over time.  In any event, other States' practices nonetheless have sometimes informed judicial evaluation of whether a State's interest rises to the level of "compelling,"

KAVANAUGH, J., concurring

In short, as this case demonstrates, the compelling interest and least restrictive means standards require this Court to make difficult judgments about the strength of the State's interests and whether those interests can be satisfied in other ways that are less restrictive of religious exercise.  Although the compelling interest and least restrictive means standards are necessarily imprecise, history and state practice can at least help structure the inquiry and focus the Court's assessment of the State's arguments.

*Third*, turning from the doctrinal to the practical, States seek clarity going forward.  States understandably want to know what they may and may not do to regulate the time and manner of audible prayer and touching in the execution room.  In its opinion today, the Court supplies some guidance.

Because the Court's guidance does not purport to answer every question, however, a dose of caution for the States is probably in order, especially given the Court's recent case law on this issue and the extraordinary micromanagement of the execution room that RLUIPA has ushered in.  The States of course may ensure the safety, security, and solemnity of the execution room.  But to avoid persistent future litigation and the accompanying delays, it may behoove States to try to accommodate an inmate's timely and reasonable requests about a religious advisor's presence and activities in the execution room if the States can do so without meaningfully sacrificing their compelling interests in safety, security, and solemnity.  Doing so not only would help States avoid future litigation delays but also would serve the exceptionally powerful interests of victims' families in finally obtaining closure.

With those comments, I join the Court's opinion in full.

––––––––––

and whether a State has employed the least restrictive means of achieving that interest.

Cite as: 595 U. S. ____ (2022)          1

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–5592

_____

JOHN H. RAMIREZ, PETITIONER *v.* BRYAN COLLIER, EXECUTIVE DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[March 24, 2022]

JUSTICE THOMAS, dissenting.

Petitioner John Henry Ramirez stabbed Pablo Castro 29 times during a robbery that netted $1.25. Castro bled to death in a parking lot. Since that day, Ramirez has manufactured more than a decade of delay to evade the capital sentence lawfully imposed by the State of Texas. This Court now affords yet another chance for him to delay his execution. Because I think Ramirez's claims either do not warrant equitable relief or are procedurally barred, I respectfully dissent.

## I

The saga of Ramirez's crimes and the ensuing litigation warrants a fuller retelling than the majority provides.

### A

On the night of July 19, 2004, John Henry Ramirez, Christina Chavez, and Angela Rodriguez ran out of drug money. Wanting more, they drove through Corpus Christi, Texas, in search of victims to rob. *Ramirez* v. *Stephens*, 641 Fed. Appx. 312, 314 (CA5 2016).

Pablo Castro, a father of nine, was working the night shift at the Times Market convenience store, as he had for years. With midnight approaching, he and another employee pre-

THOMAS, J., dissenting

pared to close up. Castro collected the trash and went outside to put it in the dumpster. *Ramirez* v. *State*, 2011 WL 1196886, *1–*5 (Tex. Crim. App., Mar. 16, 2011).

Ramirez and his confederates found Castro in the convenience store's parking lot. Wielding a serrated knife, Ramirez slashed and stabbed Castro 29 times. Castro suffered eight wounds on his forearm and hands as he struggled to defend himself. He suffered many more wounds to the head, neck, shoulders, and back. After Castro fell to the ground, the attackers rifled through his pockets, collected $1.25, and drove away. *Ibid.*

Two employees at a nearby store witnessed the attack. When they reached Castro, he was still conscious. He had suffered a deep gash across his throat and was spitting up blood. Castro eventually lost consciousness and, by the time first responders arrived, he had stopped breathing. He died in the parking lot. *Ibid.*

Having netted only $1.25 from Castro, Ramirez and the others pursued new targets. Within minutes of murdering Castro, they found April Metting waiting in the drivethrough of a Whataburger, with her 2-year-old son in the back seat. While Chavez distracted Metting, Ramirez crept up to the driver's side window, grabbed Metting by the back of her neck, and held the now blood-stained serrated knife to her throat. Metting implored the assailants not to harm her in front of her child. Ramirez ordered: "'Shut up, bitch.'" Metting surrendered her purse, and Ramirez let her go. The assailants again fled in their van. *Id.,* at *3–*4.

They next targeted Ruby Pena Hinojosa, who was sitting in the drive-through line of a different Whataburger. As before, one of the women distracted Hinojosa while Ramirez approached her driver-side window to put the knife to her neck. But Hinojosa was able to dodge the knife, roll up the window, and back her car away from the assailants, who then departed in their van. *Ibid.*

Thomas, J., dissenting

Not long after, responding officers spotted the van and pulled it over.  When the officers exited their patrol cruiser, the van sped off.  The police pursued, only to lose sight of it. Ramirez, Rodriguez, and Chavez then abandoned the van in an overgrown lot and continued on foot.  *Id.,* at *5.  Police soon found and arrested Rodriguez and Chavez, but they did not find Ramirez.  He fled to Mexico and hid there for over three years before law enforcement apprehended him near the U. S.-Mexican border.  *Id.,* at *6, n. 3.

## B

In 2008, A Texas jury convicted Ramirez of capital murder and sentenced him to death.  The Texas courts upheld the conviction on direct and state postconviction review.  In October 2013, Ramirez filed a federal habeas petition in the U. S. District Court for the Southern District of Texas. Seven years of habeas litigation followed, during which the District Court intervened at the last minute to stay a 2017 execution.  See Part II–A–1, *infra*.  Ultimately, the District Court, the Court of Appeals, and this Court denied relief. See *Ramirez* v. *Davis*, 580 U. S. 833 (2016) (denying certiorari); *Ramirez* v. *Davis*, 589 U. S. ___ (2020) (same).

After the federal habeas proceedings had run their course, Texas set a new execution date for September 9, 2020.  But, in August 2020, Ramirez sued under Rev. Stat. §1979, 42 U. S. C. §1983, to stop the execution, arguing that Texas' then-operative ban on outside spiritual advisors in the execution chamber violated the First Amendment and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U. S. C. §2000cc *et seq*.  Ramirez demanded that his pastor, Dana Moore, be present with him during his execution.  But Ramirez also pleaded in his complaint that "Pastor Moore need not touch [him] at any time in the execution chamber."  App. 61.  Ultimately, Ramirez and Texas agreed to recall the death warrant, withdraw the execution date, and dismiss the complaint.  Texas then

4                 RAMIREZ *v.* COLLIER

THOMAS, J., dissenting

changed its execution protocols to permit vetted spiritual advisors into the chamber.

On February 5, 2021, a Texas state court set Ramirez's execution date for September 8, 2021. Two months passed before Ramirez submitted an administrative grievance requesting that the prison allow his pastor into the execution chamber. *Id.,* at 50–51. Texas acquiesced on May 4. *Id.,* at 55. Another month passed. Then, on June 11, Ramirez submitted a new grievance requesting what his 2020 complaint specifically disclaimed: that his spiritual advisor be allowed to "'lay hands on [him]' during [his] upcoming execution." *Id.,* at 52. In the part of the grievance instructing him to describe the "[a]ction [r]equested to resolve [his] [c]omplaint," Ramirez asked that Texas permit Moore to lay hands on him and "pray over" him during the execution. *Id.,* at 53.

Texas denied that request on July 2. *Ibid.* Ramirez sought administrative review of the decision on July 8. *Id.,* at 155–156. On August 10, before the prison decided the appeal, Ramirez again sued under §1983, this time claiming that the State's refusal to allow his pastor to lay hands on him violated the First Amendment and RLUIPA.

On August 22—just 17 days before his execution date—Ramirez amended his complaint. He still demanded that the State allow his pastor to lay hands on him. But he now specified that he also wanted Moore to engage in "*audible* praying" during the execution. *Id.,* at 96 (emphasis added).

In light of his belated §1983 suit, Ramirez moved the District Court on August 18 to stay his execution. The State responded that Ramirez's claims did not warrant equitable relief and were not properly exhausted under the Prison Litigation Reform Act of 1995 (PLRA), 42 U. S. C. §1997e(a). The District Court denied Ramirez's motion on September 2. ___ F. Supp. 3d ___ (SD Tex. 2021). A divided panel of the Court of Appeals likewise denied relief. Concurring, Chief Judge Owen observed: "[T]he shifting of

THOMAS, J., dissenting

Ramirez's litigation posture indicates that the change in position is strategic, and that delay is the goal." 10 F. 4th 561, 562 (CA5 2021). Nevertheless, just a few hours before Ramirez's execution was scheduled to take place on September 8, this Court stayed the proceeding and granted his petition for a writ of certiorari. See 594 U. S. ___ (2021).

## II

This Court granted equitable relief in September, and today it grants further relief pending proceedings below. Ramirez presses two reasons why he merited—and continues to merit—our intervention in Texas' enforcement of his capital sentence. First, he argues that the State would violate RLUIPA by prohibiting his pastor from "laying hands" on him during his execution. Second, he argues that the State would violate the same statute by prohibiting his pastor from audibly praying during the execution. I do not think either claim warranted relief on September 8. Nor do I think either claim warrants further relief now.

## A

First, I disagree with the majority that Ramirez's demand for in-chambers touching merits relief.

An "equitable remedy," such as a stay of execution or a preliminary injunction, is "not available as a matter of right" to a death-row inmate who has sued the State under §1983. *Hill* v. *McDonough*, 547 U. S. 573, 584 (2006). The parties agree that Ramirez seeks a particular type of equitable relief: a preliminary injunction. See *ante,* at 6. A federal court may issue this "extraordinary remedy" only if the prisoner shows that he is likely to succeed on the merits, that he will be irreparably injured absent the injunction, and that the equities, taking the public interest into account, balance in his favor. *Nken* v. *Holder*, 556 U. S. 418, 432, 434 (2009) (internal quotation marks omitted).

Two components of the equitable balance are especially

relevant here. First, federal courts "should police carefully" against abusive litigation designed "to interpose unjustified delay" and deny relief if they detect gamesmanship. *Bucklew* v. *Precythe*, 587 U. S. ___, ___ (2019) (slip op., at 30). Second, federal courts "must take into consideration" the weighty interest that States and victims have in carrying out capital sentences in a timely manner. See *id.,* at ___ (slip op., at 29); *Gomez* v. *United States Dist. Court for Northern Dist. of Cal.*, 503 U. S. 653, 654 (1992) (*per curiam*). These equitable factors foreclose Ramirez's request for extraordinary relief.

1

This Court has long recognized the "equitable princip[e]" that "a suitor's conduct in relation to the matter at hand may disentitle him to the relief he seeks." *Sanders* v. *United States*, 373 U. S. 1, 17 (1963); see also, *e.g., Deweese* v. *Reinhard*, 165 U. S. 386, 390 (1897) ("[I]f the conduct of the plaintiff be offensive to the dictates of natural justice, . . . he will be held remediless in a court of equity"); *Bein* v. *Heath*, 6 How. 228, 247 (1848); 1 Pomeroy's Equity Jurisprudence §397 (4th ed. 1918). Or, as the majority puts it, if a prisoner acts inequitably, "'the doors of the court will be shut against him.'" *Ante,* at 19 (quoting *Keystone Driller Co.* v. *General Excavator Co.*, 290 U. S. 240, 245 (1933)).

This equitable rule is especially important in the death penalty context. Unsurprisingly, death-row inmates generally employ any means available to stave off their sentences and therefore often engage in abusive litigation. See *Woodard* v. *Hutchins*, 464 U. S. 377, 380 (1984) (Powell, J., concurring) (noting a "pattern"). And this Court has warned that, while zealous "counsel for the condemned in a capital case" understandably "lay hold of every ground which, in their judgment, might tend to the advantage of their client," they should not "interfer[e] with "the admin-

istration of justice . . . on mere pretexts." *Lambert* v. *Barrett*, 159 U. S. 660, 662 (1895).

Prisoners engage in abusive litigation in several different ways. For instance, some prisoners hold off bringing new claims until the last minute in order to force courts to stay or enjoin an execution simply to afford themselves more time to consider the merits of the claims. See, *e.g.*, *Woodard*, 464 U. S., at 377–380 (Powell, J., concurring); *Bucklew*, 587 U. S., at ___ (slip op., at 30); *Price* v. *Dunn*, 587 U. S. ___, ___ (2019) (THOMAS, J., concurring in denial of certiorari) (slip op., at 13); *Dunn* v. *Ray*, 586 U. S. ___ (2019) (slip op., at 1). Other prisoners bring any "meritless" claim available, no matter how frivolous, in hopes a sympathetic court will grant relief. *Ibid.*; see also *Hill*, 547 U. S., at 584–585; *Lambert*, 159 U. S., at 662. Still others litigate their claims "piecemeal[,] . . . challenging one aspect" of their execution "after another" in order to buy time. *Hill,* 547 U. S., at 581; see also *Woodard*, 464 U. S., at 380 (Powell, J., concurring); *Williams* v. *Kelley*, 854 F. 3d 998, 1002 (CA8 2017) (*per curiam*); cf. *Sanders*, 373 U. S., at 18 (noting that federal courts should not "tolerate needless piecemeal litigation, or . . . entertain collateral proceedings whose only purpose is to vex, harass, or delay"). And, in many other ways, yet more prisoners "deliberately engage in dilatory tactics" designed to drag execution-delaying claims out "indefinitely." *Rhines* v. *Weber*, 544 U. S. 269, 277–278 (2005); see also *Ryan* v. *Valencia Gonzales*, 568 U. S. 57, 76–77 (2013). These tactics all too often succeed. See, *e.g., Bucklew,* 587 U. S., at ___ (slip op., at 29) (describing two decades of delay).

Because of the prevalence of vexatious death penalty litigation, a court sitting in equity "must" consider whether a condemned criminal has made an "attempt at manipulation" that would disqualify him from equitable relief. *Gomez*, 503 U. S., at 654. Federal courts faced with abusive litigation "can and should" use their "equitable powers" to

protect state judgments and sentences. *Bucklew*, 587 U. S.,
at ___ (slip op., at 30) (internal quotation marks omitted);
see also *Barr* v. *Lee*, 591 U. S. ___, ___ (2020) (*per curiam*)
(slip op., at 3) (describing "our responsibility" to ensure that
lawful sentences are carried out "'fairly and expedi-
tiously'"); 1 Pomeroy's Equity Jurisprudence §397.

   Today, this Court should have denied equitable relief to
a prisoner who has acted inequitably—as both the District
Court and Court of Appeals did before us. Ramirez's shift-
ing litigation position lays bare what he really wants: "to
manipulate the judicial process" to win further delay.
*Gomez*, 503 U. S., at 654. The record all but speaks for it-
self. In August 2020, when Ramirez first demanded that
Texas allow his pastor into the chamber, he explicitly
avowed that his pastor "need not touch" him "at any time in
the execution chamber." App. 61. Taking Ramirez at his
word, Texas eventually acquiesced. But then Ramirez
flipped his position and filed another administrative griev-
ance and §1983 complaint demanding what he had earlier
disclaimed: touching in the execution chamber. See *id.,* at
19, 52. This is a textbook example of dilatory and abusive
"piecemeal litigation" against which we have warned courts
in equity to guard. See *Hill*, 547 U. S., at 585. Like Chief
Judge Owen, I think that the shift in Ramirez's litigation
posture alone justifies denying equitable relief because it
"indicates that the change in position is strategic and that
delay is the goal." 10 F. 4th, at 562 (Owen, C. J., concur-
ring).

   But if any doubt remained on that score, the history of
this case dispels it. Ramirez's current RLUIPA suit is but
the latest iteration in an 18-year pattern of evasion.

   First, consider the night of the murder. Rather than sur-
render and face justice, Ramirez sped away from police be-
fore abandoning his confederates and fleeing on foot.
*Ramirez*, 2011 WL 1196886, *3. He even went so far as to
abscond to a foreign country, delaying justice for another

Cite as: 595 U. S. ____ (2022)          9

THOMAS, J., dissenting

3 ½ years.  His evasion ended only after state and federal law enforcement captured him on the southern border.  See *id.*, at *6, n. 3.

Ramirez continued to engineer delay in state court.  After a jury convicted him, his case moved to the sentencing phase.  Ramirez's lawyer intended to put on mitigation witnesses.  But after one witness, Ramirez instructed his lawyer to call no more.  The state court found Ramirez competent and honored his decision.  Predictably, he was sentenced to death.  Yet, during state habeas proceedings, Ramirez nonetheless brought a claim (among several others) accusing his state trial counsel of ineffective assistance for failing to provide an adequate mitigation defense.  *Ramirez*, 641 Fed. Appx., at 315, 326–327.  The state courts had to take the time to adjudicate this patently meritless claim, arising from Ramirez's own sentencing-phase decision and subsequent about-face.  *Ibid.*

The pattern continued in federal habeas proceedings.  Ramirez brought several claims.  Among them, he again claimed that his trial counsel provided ineffective assistance for failing to call more mitigation witnesses.  The District Court proceedings alone bought Ramirez another 20 months, at the end of which the District Court ruled that all of his claims were procedurally barred, lacked merit, or both.  The court also declined to issue a certificate of appealability on any claim, see *Ramirez* v. *Stephens*, 2015 WL 3629639, *26 (SD Tex., June 10, 2015), meaning that it thought no "reasonable jurists" would believe its decision to deny relief was even "debatable," *Slack* v. *McDaniel*, 529 U. S. 473, 484 (2000).

Undeterred, Ramirez sought a certificate of appealability in the Court of Appeals.  The Court of Appeals denied Ramirez's request, but only after those proceedings bought him another seven months of delay.  See *Ramirez*, 641 Fed. Appx., at 314.  Ramirez then sought our review.  We did not deny his petition for a writ of certiorari until October 3,

2016—three years after he first filed his federal habeas petition.  See *Ramirez* v. *Davis*, 580 U. S. 833.

Reasonably thinking the litigation finished, Texas set Ramirez's execution for February 2, 2017.  Yet Ramirez squeezed more time out of his federal petition with a "[l]ast-minute" motion to stay his execution, *Bucklew*, 587 U. S., at ___ (slip op., at 30), filed less than a week before the execution date.  Through new counsel, Ramirez argued that his prior federal habeas counsel suffered from a conflict of interest and had abandoned him during clemency proceedings.  Ramirez suggested that he needed a stay because he might try to reopen his habeas judgment under Federal Rule of Civil Procedure 60(b).  Citing the "short time remaining before Ramirez's execution" and the "immediacy" of the situation, the District Court granted the stay two days before the scheduled execution, *Ramirez* v. *Davis*, No. 2:12–CV–410, ECF Doc. 48, pp. 1, 9 (SD Tex., Jan. 31, 2017), which the Court of Appeals affirmed the next day, see *Ramirez* v. *Davis*, 675 Fed. Appx. 478 (CA5 2017) (*per curiam*).

This extraordinary equitable relief did not inspire Ramirez to make any extraordinary effort—or, frankly, any effort—to resolve the proceedings expeditiously.  Instead, Ramirez filed his Rule 60(b) motion on August 20, 2018—over 18 months after alerting the District Court of his intent to do so.  See ECF Doc. 74 (SD Tex., Aug. 20, 2018).  The District Court admonished Ramirez for his "unreasonably delayed" motion before dismissing it on procedural and jurisdictional grounds.  ECF Doc. 80, p. 11 (SD Tex., Jan. 3, 2019).  And, as before, the District Court denied him a certificate of appealability.  *Id.,* at 17.  So, too, did the Court of Appeals after another six months had passed, see *Ramirez* v. *Davis*, 780 Fed. Appx. 110, 120 (CA5 2019), and this Court took several more months to deny his petition for a writ of certiorari, see *Ramirez* v. *Davis*, 589 U. S. ___ (2020).  All told, Ramirez's 11th-hour gambit in January 2017

THOMAS, J., dissenting

bought him more than three years of delay.

In the end, none of Ramirez's federal habeas claims merited even a single certificate of appealability, let alone relief. Yet, through ceaseless litigation, strategic delay, and a "[l]ast-minute" blitz on the District Court, *Bucklew*, 587 U. S., at ___ (slip op., at 30), Ramirez parlayed his federal habeas petition into a 7-year deferral of his lawfully imposed sentence. We should interpret Ramirez's actions in the instant litigation in light of that history, recognize that his shifting in-chambers-touching claim is just another chapter in that history, and reject his most recent attempt to delay his execution.

### 2

Second, a court balancing the equities must consider that "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a sentence." *Hill*, 547 U. S., at 584; see also *Gomez*, 503 U. S., at 654. The State's interest inheres in our form of government, given that "our federal system" protects a State from "repeated frustration" of its imposition of a capital sentence. *Wainwright* v. *Spenkelink*, 442 U. S. 901, 903–904 (1979) (Rehnquist, J., dissenting). "[T]he question of capital punishment belongs to the people and their representatives . . . to resolve," and the people are entitled to see their chosen sentence carried out. *Bucklew*, 587 U. S., at ___ (slip op., at 29).

Meanwhile, victims share the State's interest in the timely execution of a lawful sentence. "Only with real finality can the victims of crime move forward knowing the moral judgment" of the State "will be carried out." *Calderon* v. *Thompson*, 523 U. S. 538, 556 (1998). Endless delay harms "the 'powerful and legitimate interest in punishing the guilty,' an interest shared by the State and the victims of crime alike." *Ibid.* (citation omitted). "Th[is] interes[t is] magnified" when the offense is of a "heinous nature." *In re Federal Bureau of Prisons' Execution Protocol Cases*, 955

F. 3d 106, 127 (CADC 2020) (Katsas, J., concurring).

The equitable balance here tilts decisively in favor of the State and Ramirez's victims. Texans, acting through their elected representatives, have decided that certain crimes range so far beyond what a civilized society will accept that only a death sentence will suffice. Ramirez long has denied Texas its sovereign interest in seeing that sentence carried out "fairly and expeditiously." *Bucklew*, 587 U. S., at ___ (slip op., at 30). Moreover, the legal uncertainty surrounding Texas' death penalty protocols that his litigation engendered has led to further delays in at least four other Texas cases. See Texas Coalition to Abolish the Death Penalty, Texas Death Penalty Developments in 2021: The Year in Review 8 (Dec. 16, 2021). Each of these delays "work[s] a miscarriage of justice on the State." *Price* v. *Dunn*, 587 U. S. ___, ___ (opinion of Thomas, J.) (slip op., at 13) (internal quotation marks omitted).

Moreover, by evading his sentence, Ramirez has inflicted recurrent emotional injuries on the victims of his crime. When Ramirez killed Pablo Castro, he stole more than a life and $1.25. He stole a father from nine children. Four of them filed a brief in this case to explain how Ramirez's machinations have "'frustrated'" their interest in seeing what they believe to be a just execution carried out. Brief for Pablo Castro's Children as *Amici Curiae* 13 (quoting *Bucklew*, 587 U. S., at ___ (slip op., at 29)).

Fernando Castro has watched as Ramirez repeatedly "'used loopholes to delay [his] execution,'" leaving Fernando with a "'lack of closure for many years, ever since [he] was merely a child.'" Brief for Pablo Castro's Children as *Amici Curiae* 12. Roberto Castro likewise wants "'to close this chapter so that the healing process can continue without being reopened every couple of years to entertain Ramirez's appeals.'" *Id.* at 15. Maria Chauvon Aguilar, who remembers her father as "'a great man,'" also must endure "'all this pain and suffering'" each time the courts

THOMAS, J., dissenting

"'put a hold on'" Ramirez's execution. *Ibid.* Her indignity and frustration grow particularly acute when Ramirez receives "'all this publicity'" from sympathetic media outlets for his efforts to delay his lawful sentence, as if "'he just won a gold medal.'" *Ibid.* Finally, Pablo Castro, Jr., must live every day with the fact that his father "'was not able to witness [him] graduate school, basic training, advance individual training, or see his grandchildren.'" *Id.*, at 16. He wants "'justice and [to] be able to close this horrible chapter'" in his life and the lives of his family members. *Ibid.*

These four siblings ask that their father "'finally have his justice'" so that "'this nightmare [can] be over.'" *Ibid.* As their words show, delays like the kind Ramirez has pursued here "inflict further emotional trauma on the family . . . of the murder victim." *Murphy* v. *Collier*, 587 U. S. ___, ___ (2019) (ALITO, J., dissenting from grant of application for stay) (slip op., at 7).

3

The majority does not adequately account for either Ramirez's inequitable conduct or the State's and his victims' interest in the timely execution of his capital sentence.

Consider first Ramirez's inequitable conduct. The majority acknowledges that "'the doors of the court will be shut against'" a prisoner who engages in abusive litigation. *Ante,* at 19 (quoting *Keystone Driller*, 290 U. S., at 245). But it proceeds as though the abusive-litigation inquiry asks only whether "a litigant 'slept upon his rights.'" *Ante*, at 20 (quoting *Gildersleeve* v. *New Mexico Mining Co.*, 161 U. S. 573, 578 (1896)). As described above, last-minute litigation is but one of several types of abusive and manipulative litigation that death-row inmates employ to delay their executions. See *supra*, at 7; see also, *e.g., Hill*, 547 U. S., at 584–585 (separately listing abusive claims that are "speculative," "filed too late in the day," "[r]epetitive," or "piece-

meal").  Here, Ramirez not only brought his claims piece-meal; he executed a bait and switch.  He first demanded his pastor's presence without touching, but then shifted and de-manded touching when requesting Moore's presence alone no longer gave him an excuse for delay.  The majority's analysis simply fails to factor in Ramirez's inequitable con-duct.

In any event, the timing of Ramirez's claims still cuts against granting equitable relief.  True, this was not an 11th-hour blitz of the sort that Ramirez carried out in 2017.  But Ramirez should have communicated his touching claim no later than September 2020, when he expressly dis-claimed any need for it.  Instead, he parceled out his claims tactically to drag out the time before his sentence, finally asking for in-chambers touching in June 2021, mere months before the September 2021 execution date.

Worse, the majority bypasses the "'important interest'" that both the State and Ramirez's victims have in the exe-cution.  *Ante,* at 19 (quoting *Hill*, 547 U. S., at 584).  It does not mention that "the question of capital punishment be-longs to the people and their representatives, not the courts, to resolve."  *Bucklew*, 587 U. S., at ___ (slip op., at 29).  It does not discuss the pain that every delay has in-flicted on Castro's family.  See *supra,* at ___–___.  And it does not acknowledge that the "heinous nature" of the of-fense—the brutal slaying of a working father during a rob-bery spree to supply a drug habit—"magnified" the State's and the victims' shared interest in the prompt execution of Ramirez's capital sentence.  *In re Federal Bureau of Pris-ons' Execution Protocol Cases*, 955 F. 3d, at 127 (Katsas, J., concurring).  Texas' citizens and Castro's family deserve more consideration and better treatment than the majority gives them.

Instead, the majority discounts these considerations be-cause it thinks it can resolve the case "without delaying or impeding [Ramirez's] execution."  *Ante,* at 19.  Of course,

that is self-evidently wrong. We are now many months past what was Ramirez's third execution date. And, in the mine run of cases, the majority's approach will not do all that it promises. The majority proposes that when a federal court "determines that relief is appropriate under RLUIPA, the proper remedy is an injunction ordering the accommodation, not a stay of the execution." *Ante,* at 21. According to the majority, "[t]his approach balances the State's interest in carrying out capital sentences without delay and the prisoner's interest in religious exercise." *Ibid.* But if the State has the temerity to challenge a federal court's assessment of its execution-chamber protocols under RLUIPA, the State must necessarily pursue "[f]urther proceedings." *Ante,* at 22. Doing so "might also contribute to further delay in carrying out the sentence," *ibid.*, for which the State will now be at fault. Thus, "[t]he State will have to determine where its interest lies in going forward." *Ibid.*

Here is how the majority's test will likely play out in practice: Prisoners, ably represented by the death penalty defense bar, will propose new accommodations tailored to elicit an objection from the State. They will then have three levels of federal-court review in which to litigate whether the State has complied with RLUIPA. From the outset, many district courts will find that RLUIPA demands an accommodation. They will then put the State to a stark choice: capitulate to the court-ordered accommodation that it thinks is dangerous, or litigate and delay the execution, knowing that the delay will count against it in the equitable balance. Now seen as the blameworthy party, the State that chooses to litigate will "hardly" be able to "complain about the inequities of delay" caused by a prisoner's last-minute filings, because the court will hold that the State's "own actions were a significant contributing factor." *Ante,* at 20. Thereafter, the district court and court of appeals will be less likely to dismiss a prisoner's abusive lawsuit because, after all, both sides will have been liable for the

16          RAMIREZ *v.* COLLIER

delay. And, like here, the result will be months or years of federally imposed stasis. The State, its citizens, and the victims will pay the price of that delay.

4

Equities aside, I also doubt Ramirez is likely to succeed on the merits of his touching claim. To prevail, Ramirez will have to show that his request is "sincerely based on a religious belief." *Holt* v. *Hobbs*, 574 U. S. 352, 360–361 (2015). "[T]he propensity of some prisoners to assert claims of dubious sincerity [is] well documented." *Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U. S. 682, 718 (2014). So, just as federal courts have a duty to deny equitable relief to prisoners engaged in vexatious litigation, they likewise have a duty under RLUIPA to deny religious liberty claims when prisoners are insincere. See *ibid.* (Congress passed RLUIPA "confident of the ability of the federal courts to weed out insincere claims"); *Holt*, 574 U. S., at 369 (noting that prison officials may question the authenticity of a prisoner's religious belief); *Cutter* v. *Wilkinson*, 544 U. S. 709, 725, n. 13 (2005) (same). The evidence that demonstrates Ramirez is bringing abusive litigation to delay his execution also strongly suggests that he does not sincerely believe that his pastor needs to touch him in the execution chamber.

The majority concedes that Ramirez's "evolving litigation positio[n]" is evidence of insincerity, but concludes that "ample" evidence cuts the other way. *Ante,* at 11–12. The majority's countervailing evidence, however, falls short of showing any sincerity, let alone "a clear showing that [Ramirez] is entitled to . . . relief." *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 22 (2008) (citing *Mazurek* v. *Armstrong*, 520 U. S. 968, 972 (1997) (*per curiam*)). The majority's primary support is that the laying of hands is a "traditional for[m] of religious exercise" and that Moore engages in the practice. *Ante,* at 10. But whether

Thomas, J., dissenting

Ramirez's supposed belief is "traditional" is irrelevant. RLUIPA's protection, like "[t]he protection of the First Amendment[,] is not restricted to orthodox religious practices." *Follett* v. *Town of McCormick*, 321 U. S. 573, 577 (1944); see also N. Chapman, Adjudicating Religious Sincerity, 92 Wash. L. Rev. 1185, 1197–1202 (2017). The relevant issue is whether Ramirez himself *actually believes* that it is "part of [his] faith to have [his] spiritual advisor lay hands on [him]." App. 52. To that point, the majority cites nothing other than Ramirez's bare grievance—precisely the same evidence that shows the "evolving litigation positio[n]" that the majority concedes is evidence of insincerity. Thus, the only relevant evidence in this case cuts strongly in favor of finding that Ramirez is insincere.

B

Ramirez also asks us to intervene in his long-delayed execution because Texas will not allow his pastor to pray audibly in the execution chamber. Given Ramirez's history, I suspect that his goal in raising this claim is also to secure delay. But his audible-prayer claim suffers from an antecedent defect: Ramirez did not comply with the PLRA by exhausting the administrative remedies available to him before bringing his claim to federal court. Because he failed to carry out this mandatory, congressionally imposed threshold requirement, I would dismiss his claim.

1

Congress passed the PLRA "to eliminate unwarranted federal-court interference with the administration of prisons" and to allow state prisons the opportunity to address problems before they become federal cases. *Woodford* v. *Ngo*, 548 U. S. 81, 89, 93 (2006). To that end, the PLRA requires prisoners to exhaust available administrative remedies before suing. See 42 U. S. C. §1997e(a). Those remedies include "prison grievance procedures." *Jones* v. *Bock*,

THOMAS, J., dissenting

549 U. S. 199, 217–218 (2007).  Further, any exhaustion must be "proper"—that is, "a prisoner must complete the [prison] review process in accordance with the applicable procedural rules."  *Woodford*, 548 U. S., at 88; see also *Jones*, 549 U. S., at 211.  Ultimately, a federal court may not hear a prisoner's claim if he has failed to comply with those "critical procedural rules" that "impos[e] some orderly structure on the course of . . . proceedings."  *Woodford*, 548 U. S., at 90–91.

Ramirez failed to exhaust his audible-prayer claim properly under the PLRA because he did not comply with the administrative procedures prescribed by the Texas Department of Criminal Justice.  Two sets of procedural requirements set forth in the department's prisoner handbook and on its grievance forms are most salient.  See Tex. Dept. of Criminal Justice, Offender Orientation Handbook (Feb. 2017) (Prison Handbook); App. 52–53 (Step 1 form). First, a prisoner must "attempt to informally resolve [his] problem . . . before filing a grievance," and he must "not[e]" the informal resolution attempt "in the space provided" on a "Step 1 grievance form."  Prison Handbook 73–75.  Second, when filing a Step 1 form, the prisoner must "[s]tate [his] grievance" in the designated section, describing the "who, what, when, [and] where" applicable to the grievance. App. 52; see also Prison Handbook 73–75 (prisoners must make their grievance by "completely filling out" a "Step 1 grievance form (I–127)").

Ramirez failed to comply with either requirement.

First, Ramirez did not attempt informal resolution of his audible-prayer claim in accordance with Texas' procedures. His grievance form described the informal effort he made to resolve his touching request, but it did not mention any informal attempt to resolve any grievance related to audible prayer.  See App. 52.  Whether Ramirez made no effort to resolve this grievance, or he simply failed to document his efforts to do so, makes no difference under the PLRA; he did

not comply either way. And that failure is not trivial. Several prisons have imposed a threshold requirement that prisoners attempt to resolve their issues informally and then document that attempt. See *Woodford*, 548 U. S., at 85–86 (describing California's informal resolution requirement); see also, *e.g.*, *Little* v. *Jones*, 607 F. 3d 1245, 1249 (CA10 2010) (describing Oklahoma's informal first step). This "step 0" is critical—it reduces the administrative burden on prison adjudicatory authorities and avoids turning minor misunderstandings into formal adversarial proceedings. Ramirez's failure to comply with this "critical procedural rul[e]" means that he failed to exhaust his audible-prayer claim "properly." *Woodford*, 548 U. S., at 90.

Second, in the section of the Step 1 form where the prisoner is supposed to "[s]tate [his] grievance," Ramirez said nothing about audible prayer. App. 52. Ramirez mentioned only that he wanted his pastor to "lay hands" on him in the chamber. *Ibid.* It was that laying of hands, alone, that Ramirez identified as "part of [his] faith." *Ibid.* Ramirez thus denied Texas "a fair and full opportunity to adjudicate" his new audible-prayer claim. *Woodford*, 548 U. S., at 90. That failure, like his failure to seek informal resolution, is no small matter. Absent proper presentation of a grievance pursuant to procedures that "impos[e] some orderly structure on the course of . . . proceedings," "no adjudicative system can function effectively." *Id.*, at 90–91. To avoid that breakdown, States like Texas must be able to rely on federal courts to decline entertaining lawsuits that do not comply with the PLRA. Otherwise, because prisoners "do not want to exhaust" and have no "incentive" to do so, they will stop following prison procedures, and the benefit of administrative adjudication will be lost. *Id.*, at 90.

## 2

The majority does not dispute these procedural shortcom-

ings. Regarding Ramirez's failure to seek informal resolu-
tion, it says nothing. And, on Ramirez's failure to state a
grievance, the majority itself ignores Texas' procedural
rules. The majority notes that, in the section of Ramirez's
grievance where he was required to state the "[a]ction
[r]equested to resolve [his] [c]omplaint," Ramirez wrote:
"That I be ALLOWED to have my Spiritual Advisor 'lay
hands on me' & pray over me while I am being executed."
App. 53. That is not enough. For one, the statement ap-
pears in the wrong part of the grievance form. There would
be a substantial loss in administrative efficiency if prison
officials had to rummage through different parts of a griev-
ance form to discern what the grievance actually is. For
another, that single statement is woefully imprecise. The
State is free to decide the "level of detail necessary in a
grievance to comply with the grievance procedures." *Jones*,
549 U. S., at 218. Texas defined one here—the handbook
instructs that "[t]he *specific action* required to resolve the
complaint *shall be clearly stated* in the space provided on
the I–127 form." Prison Handbook 75 (emphasis added).
Ramirez did not "clearly" describe the relief he now says he
wants. His fleeting, general reference to prayer, lodged in
the wrong section of a form with a request for in-chambers
touching, did not put Texas officials on notice of what he
was demanding. That Ramirez felt the need to amend his
August 2021 §1983 complaint explicitly to include "audible
prayers" proves the point. App. 91 (Second Amended Com-
plaint).

But even if he had, Ramirez would have failed to satisfy
the PLRA for yet another reason. If the grievance had, in
fact, presented two claims, *neither* of them would have been
properly exhausted because Texas prisoners may "[p]resent
only one issue per grievance." Prison Handbook 74. An "is-
sue" is a "point in dispute between two or more parties."
Black's Law Dictionary 995 (11th ed. 2019). The touching

claim and the audible-prayer claim present two independent issues, each of which (as this litigation demonstrates) represents a different "point of dispute" calling for independent analysis. See *Ramirez* v. *Collier*, 594 U. S. ___ (2021) (ordering briefing on whether Texas rules restricting "either audible prayer or physical contact" burdened Ramirez); compare *ante,* at 7–8 (first addressing the audible-prayer claim), with *ante,* at 8–9 (then addressing the touching claim); *ante,* at 18 (acknowledging multiple "claims"). If Ramirez had raised his audible-prayer claim on the June 11 grievance form, he would have violated Texas procedures by doing so, meaning he would not have properly exhausted *either* claim at issue here. See *Woodford*, 548 U. S., at 88, 93.

Finally, for his part, Ramirez raises one additional argument on which the majority does not rely. He argues that the State's changing position over what it would permit in the execution chamber rendered the administrative grievance process "unavailable" to him, and therefore he was under no obligation to exhaust administrative remedies. *Ross* v. *Blake*, 578 U. S. 632, 643 (2016). But Ramirez's own conduct belies that claim. He used the grievance process twice in the lead up to the execution date. See, *e.g.*, App. 50–55. The State responded to his concerns. The first time, the State acquiesced, allowing his pastor into the chamber. *Id.,* at 55. The second time, the State did not, denying his request to allow his pastor to lay hands on him. *Id.,* at 53. So, each time, the administrative review process was available to him. He cannot now blame a system that his own experience shows he was "'capable of us[ing].'" *Ross*, 578 U. S., at 642 (quoting *Booth* v. *Churner*, 532 U. S. 731, 738 (2001)).

\*     \*     \*

This case well demonstrates why a prisoner's failure to exhaust under the PLRA should not be excused. If Ramirez

had pursued administrative remedies properly, the State would have had a "fair opportunity to consider [his] grievance." *Woodford*, 548 U. S., at 95. For example, an attempt at informal resolution might have allowed the prison chaplain or other officials to resolve his request at an earlier juncture. Or, if Ramirez had given prison officials any notice of his request in a formal grievance, he and the State might have been able to come up with a compromise before federal litigation turned them into adversaries. *Id.*, at 89 (noting the value of settling claims at the "administrative level"). At the very least, we might have had a more robust administrative record with which to assess the burdens, interests, and state rules on which his RLUIPA claims hinge. See *id.*, at 95 (noting that proper exhaustion "often results in the creation of an administrative record that is helpful to the court"). Such a record might have obviated the need to wait for the "[f]urther proceedings on remand" that the majority now thinks are necessary to illuminate the State's interests. *Ante,* at 22.

### III

In RLUIPA, Congress created a potent tool with which prisoners can protect their sincerely held religious beliefs. But, like any tool, it can be wielded abusively. And few have a greater incentive to do so than death-row inmates. To counter such abuse, federal courts sitting in equity have a duty to dismiss piecemeal, late-breaking, dilatory, specious, speculative, or manipulative litigation. RLUIPA itself complements that process by requiring a prisoner to demonstrate sincerity.

Meanwhile, Congress passed the PLRA to force prisoners to exhaust their complaints through state prisons' administrative review processes so that prison officials might resolve, or at least build a record to help shed light on, an alleged problem before it escalates to litigation. Federal

THOMAS, J., dissenting

courts have a duty under the PLRA to dismiss these unex-
hausted claims.

Today, the Court shrugs off both of these duties.  It grants
equitable relief for a demonstrably abusive and insincere
claim filed by a prisoner with an established history of seek-
ing unjustified delay, harming the State and Ramirez's vic-
tims in the process.  The Court also forgives the same pris-
oner's complete failure to exhaust another claim.  Because
I would deny equitable relief for the first claim and dismiss
the second under the PLRA, I respectfully dissent.