IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

NAVY SEAL 1, United States Navy,         )
NAVY SEAL 2, United States Navy,         )
SENIOR CHIEF PETTY OFFICER, United       )
States Navy, CHAPLAIN, United            )
States Navy, NAVY EOD OFFICER,           )
United States Navy, COMMANDER            )
SURFACE WARFARE OFFICER, United          )
States Navy, NAVY CHIEF WARRANT          )   Civil Docket
OFFICER, United States Navy              )
Reserve, COLONEL FINANCIAL               )   8:21-cv-02429-SDM-TGW
MANAGEMENT OFFICER, United States        )
Marine Corps, LIEUTENANT COLONEL 1,      )
United States Marine Corps,              )
LIEUTENANT COLONEL 2, United States      )
Marine Corps, RESERVE LIEUTENANT         )
COLONEL, United States Marine            )
Corps, MAJOR, United States Marine       )
Corps, CAPTAIN, United States            )
Marine Corps, CAPTAIN 2, United          )
States Marine Corps, CAPTAIN 3,          )
United States Marine Corps, FIRST        )
LIEUTENANT, United States Marine         )
Corps, SECOND LIEUTENANT, United         )
States Marine Corps, CHIEF WARRANT       )
OFFICER 3, United States Marine          )
Corps, LANCE CORPORAL 1, United          )
States Marine Corps, LANCE CORPORAL      )
2, United States Marine Corps,           )
MAJOR, United States Air Force,          )
CHAPLAIN, United States Air Force,       )
RESERVE LIEUTENANT COLONEL 1,            )
United States Air Force, RESERVE         )
LIEUTENANT COLONEL 2, United States      )
Air Force, MASTER SERGEANT SERE          )
SPECIALIST, United States Air            )
Force, TECHNICAL SERGEANT, United        )
States Air Force, CADET, United          )
States Air Force Academy, COLONEL,       )
United States Army, ARMY RANGER,         )
United States Army, NATIONAL             )
GUARDSMAN, Virginia Army National        )
Guard, PILOT, United States Coast        )

Guard, LCDR PILOT, United States
Coast Guard, LIEUTENANT, United
States Coast Guard, MANAGEMENT AND
PROGRAM ANALYST, Citizenship and
Immigration Services, Department
of Homeland Security, STATE
DEPARTMENT EMPLOYEE 1, and FEDERAL
CIVILIAN CONTRACTOR EMPLOYER, for
themselves and all others similarly
situated,

    Plaintiffs,

  vs.

LLOYD AUSTIN, in his official
capacity as Secretary of the United
States Department of Defense,
CHRISTINE WORMUTH, in her official
capacity as Secretary of the United
States Army, CARLOS DEL TORO, in
his official capacity as Secretary
of the United States Navy, GEN.
DAVID H. BERGER, in his official
capacity as Commandant of the
United States Marine Corps,
FRANK KENDALL, in his official
capacity as Secretary of the United
States Air Force, ALEJANDRO
MAYORKAS, in his official
capacity as Secretary of the
Department of Homeland Security,
ROBIN CARNAHAN, in her official
capacity as Administrator of the
United States General Services
Administration, KIRAN AHUJA, in her
official capacity as Director of
the United States Office of
Personnel Management, LESLEY A.
FIELD, in her official capacity as
Acting Administrator for Federal
Procurement Policy, Office of
Management and Budget, and
MATHEW C. BLUM, in his official
capacity as Chair of the Federal
Acquisition Regulatory Council,

    Defendants.

_____

Transcript of Preliminary Injunction Hearing

Heard in Courtroom 15A
Sam M. Gibbons United States Courthouse
801 North Florida Avenue
Tampa, Florida 33602
Thursday - March 10, 2022
10:03 a.m. - 6:25 p.m.

BEFORE THE HONORABLE STEVEN D. MERRYDAY

UNITED STATES DISTRICT JUDGE

REBECCA M. SABO, RMR, CRR
Federal Official Court Reporter
Sam M. Gibbons United States Courthouse
801 North Florida Avenue, Room 1221
Tampa, Florida 33602
Rebecca_Sabo@flmd.uscourts.gov
(406) 855-6410

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

APPEARANCES

PRESENT ON BEHALF OF THE PLAINTIFFS:

**Mathew D. Staver**
**Daniel Joseph Schmid**
**Horatio G. Mihet**
**Roger K. Gannam**
LIBERTY COUNSEL
P.O. Box 540774
Orlando, Florida 32854-0774


PRESENT ON BEHALF OF THE DEFENDANTS:

**Amy Powell**
DEPARTMENT OF JUSTICE - CIVIL
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601

**Catherine Yang**
DEPARTMENT OF JUSTICE - CIVIL
1100 L St. NW
Washington, DC 20005

# I N D E X

**WITNESSES CALLED BY THE PLAINTIFF:**                    **PAGE**


**COMMANDER SURFACE WARFARE OFFICER,**
**UNITED STATES NAVY**
Direct Examination By Mr. Gannam                          20
Cross-Examination By Ms. Powell                          46
Redirect Examination By Mr. Gannam                       63
**PETER CONSTANTINE CHAMBERS**
Direct Examination By Mr. Staver                         69
Cross-Examination By Ms. Yang                            116
Continued Cross-Examination By Ms. Yang                  130
Redirect Examination By Mr. Staver                       138
**THERESA MARIE LONG**
Direct Examination By Mr. Staver                         141
Cross-Examination By Ms. Yang                            193
Redirect Examination By Mr. Staver                       211
**STEWART HILL TANKERSLEY**
Direct Examination By Mr. Staver                         214
Cross-Examination By Ms. Powell                          241
Redirect Examination By Mr. Staver                       247


Opening Statements by Ms. Powell                          8
Opening Statements by Mr. Staver                         16
Closing Arguments by Ms. Powell                          248
Closing Arguments by Mr. Gannam                          253
Closing Arguments by Mr. Staver                          266
Closing Arguments by Ms. Powell                          271
Reporter's Certificate                                   273


**EXHIBITS**


**PLAINTIFFS'**                                          **ADMITTED**
Exhibit 1                                                87
Exhibit 2                                                94
Exhibit 3                                                97
Exhibit 5                                                100
Exhibit 6                                                102
Exhibit 7                                                103
Exhibit 8                                                115
Exhibit 9                                                222
Exhibit 11                                               189
Exhibit 18                                               233
Exhibit 19                                               237


**DEFENDANTS'**                                          **ADMITTED**
Exhibit 1                                                135

1                        PROCEEDINGS

10:03:25AM    2        (Open court.)

10:03:25AM    3             THE COURT:  Please be seated, one and all.

10:03:28AM    4             And the chief judge on Monday dissolved the mask

10:03:37AM    5    mandate, and it was discretionary in my courtroom anyway.  I

10:03:42AM    6    will say that for the benefit of those who might not have been

10:03:45AM    7    here before.

10:03:47AM    8             We are together this morning once again in case

10:03:54AM    9    21-civil-2429, Navy SEAL 1, et al., versus Biden, et al.,

10:04:01AM   10    although I don't think he's any longer a party.

10:04:07AM   11             Who will speak for the plaintiff this morning?

10:04:11AM   12             MR. STAVER:  I will, Your Honor.  Mat Staver and

10:04:15AM   13    Roger Gannam.

10:04:16AM   14             THE COURT:  Good morning, Mr. Staver, and good

10:04:19AM   15    morning, Mr. Gannam.

10:04:21AM   16             MR. GANNAM:  Good morning.

10:04:22AM   17             THE COURT:  And who will speak for the defendants

10:04:22AM   18    this morning?

10:04:23AM   19             MS. POWELL:  Amy Powell for DOJ for the defendants.

10:04:24AM   20    With me at counsel table also presenting today is Catherine

10:04:28AM   21    Yang.  With me today, not presenting, is Commander Osterhues

10:04:33AM   22    from the Navy.

10:04:34AM   23             THE COURT:  Good morning, and welcome.

10:04:38AM   24             COMMANDER OSTERHUES:  Good morning, sir.

10:04:39AM   25             THE COURT:  All right.  We are here on the -- I think

10:04:44AM 1  Document 118 -- is that right? -- the defendants' emergency

10:04:48AM 2  motion for stay pending appeal, I think the part of it having

10:04:53AM 3  to do with the immediate administrative stay has been resolved,

10:04:56AM 4  but we still have the question of a stay pending appeal.

10:05:00AM 5       So, Ms. Powell, did you want to be heard further on

10:05:05AM 6  the motion?

10:05:08AM 7       MS. POWELL:  I'm happy to do that now, Your Honor, or

10:05:12AM 8  hold it until after we've dealt with witnesses.  Defer to the

10:05:15AM 9  Court on your preferences.

10:05:16AM 10       THE COURT:  Yes.  Did you and Mr. Staver talk and

10:05:18AM 11  agree to -- probably not --

10:05:20AM 12       MS. POWELL:  No.

10:05:20AM 13       THE COURT:  -- agree to some method of presentation?

10:05:24AM 14       Do you have witnesses?

10:05:25AM 15       MS. POWELL:  We did not bring witnesses, Your Honor,

10:05:28AM 16  no.

10:05:28AM 17       THE COURT:  That's right.

10:05:30AM 18       Well, I will leave that in your discretion.  If you

10:05:33AM 19  would like to speak now, you're welcome to do so.  If you'd

10:05:36AM 20  like to defer any presentation, given the fact that you're not

10:05:40AM 21  going to offer evidence, you can do that as well.

10:05:43AM 22       MS. POWELL:  I'm happy to begin speaking.

10:05:45AM 23       THE COURT:  You can do part now and part later, I'm

10:05:47AM 24  not trying to exclude you from doing anything you want to do.

10:05:50AM 25       MS. POWELL:  Sure, sure.  I'm happy to begin talking

**OPENING STATEMENTS   BY MS. POWELL**

10:05:52AM   1   now.  Of course if the Court has particular questions, I'd

10:05:55AM   2   welcome the Court's direction.

10:05:57AM   3        THE COURT:  All right.  Thank you.

10:05:57AM   4        MS. POWELL:  The military defendants here have shown

10:05:59AM   5   at least, we think, a substantial case on the merits.  And

10:06:02AM   6   given the traditional deference due to the military in this

10:06:05AM   7   area, we think that the balance of harms tip sharply in the

10:06:09AM   8   military's favor.

10:06:10AM   9        The Court's order against enforcing the vaccine

10:06:13AM   10  mandate and against any adverse action arising out of their

10:06:16AM   11  requests substantially interferes with military judgment as

10:06:19AM   12  laid out in the multiple declarations submitted in this matter

10:06:24AM   13  and has the deleterious affect of sidelining a guided-missile

10:06:27AM   14  destroyer and interfering with the potential deployment of 300

10:06:31AM   15  Marines as well.

10:06:33AM   16       The declarations lay out a number of harms related

10:06:36AM   17  both to the additional risks from COVID as well as to good

10:06:40AM   18  order and discipline.  To summarize briefly, realizing this was

10:06:46AM   19  all quite laid out in the briefing and the declarations --

10:06:49AM   20       THE COURT:  Yes.

10:06:49AM   21       MS. POWELL:  -- with respect to Navy Commander and

10:06:53AM   22  particular vaccination status creates a risk of serious illness

10:06:57AM   23  to him, some additional risks to his crew and effects on the

10:07:00AM   24  operations of the ship, including his inability to enter

10:07:03AM   25  certain ports.

**OPENING STATEMENTS  BY MS. POWELL**

10:07:05AM  1        Similarly, with respect to Lieutenant Colonel 2, many

10:07:11AM  2   of the Navy declarations, like Caudle and Merz and Dwyer, apply

10:07:17AM  3   to her as well, because she is scheduled to be on a deployed

10:07:21AM  4   ship.  But the declarations specific to her indicate that she

10:07:24AM  5   as an unvaccinated person has an increased risk of illness or

10:07:28AM  6   serious infection and, thus, is a risk to herself and her crew,

10:07:33AM  7   and it is particularly important that the commanding officer

10:07:35AM  8   not become ill, and that it also limits the utility of her

10:07:41AM  9   battalion because she will not be able to enter certain ports

10:07:44AM  10  or certain countries.

10:07:46AM  11       The good order and discipline harms are similarly

10:07:51AM  12  laid out with respect to both plaintiffs here.  The military's

10:07:55AM  13  mission demands a culture of immediate and unquestioned

10:07:58AM  14  compliance with orders.  Here, plaintiffs went through the

10:08:01AM  15  exemption process.  The original vaccine mandate gave them the

10:08:05AM  16  option of pursuing an exemption process, and they certainly

10:08:08AM  17  were not considered to be out of compliance with order while

10:08:10AM  18  they pursued that process.

10:08:12AM  19       That process is now complete, they were given an

10:08:15AM  20  order and declined to follow it.  Under those circumstances,

10:08:18AM  21  even if they had good reason to do so, leaving them in command

10:08:21AM  22  when they cannot -- even if the reasons are strong and powerful

10:08:25AM  23  to them, if they cannot follow lawful orders, it creates a good

10:08:28AM  24  order and discipline problem that reverberates across the

10:08:33AM  25  Department of the Navy.

**OPENING STATEMENTS  BY MS. POWELL**

10:08:33AM 1          With respect to Navy Commander, there are additional
10:08:37AM 2    concerns as well laid out in further detail in the declarations
10:08:42AM 3    that not only has he disobeyed an order he is expected to
10:08:45AM 4    enforce, he has compromised his trustworthiness in other ways.
10:08:51AM 5    His commanding officer believes he was misled about the leave
10:08:54AM 6    request for the last hearing.  Commander testified to the
10:08:57AM 7    contrary to be sure that he told his commanding officer he was
10:09:01AM 8    leaving town, but he also testified that he told his executive
10:09:05AM 9    officer he was leaving town, and the executive officer says
10:09:08AM 10   otherwise.

10:09:10AM 11         Recognizing that all that is disputed, there are a
10:09:12AM 12   few things that are not disputed.  He did disobey orders
10:09:16AM 13   regarding getting approval for a COVID-19 mitigation plan
10:09:20AM 14   before he was scheduled to go out on leave.  He's required to
10:09:24AM 15   do that before requesting leave, much less before he is already
10:09:26AM 16   out on leave, it was after he had already received a letter of
10:09:30AM 17   instruction last fall for exercising poor judgment with regard
10:09:36AM 18   to COVID-19 mitigation measures and potentially exposing his
10:09:40AM 19   crew to COVID.

10:09:41AM 20         Also undisputed is the fact that, whether he agrees
10:09:45AM 21   or not, his commanding officer does not trust him, and his
10:09:50AM 22   subordinate officer contradicted his testimony given in this
10:09:52AM 23   court.  Under these circumstances, where he does not trust the
10:09:56AM 24   officers above and below him, and they do not trust him, he
10:09:59AM 25   cannot command a warship.

## OPENING STATEMENTS  BY MS. POWELL

10:10:01AM  1   The harm to plaintiffs on the other hand is that if

10:10:06AM  2   the injunction is stayed or modified such that they can be

10:10:10AM  3   reassigned, they will be reassigned to non-command roles and be

10:10:14AM  4   processed for potential separation.  That separation process is

10:10:17AM  5   not automatic.  They have the opportunity to make RFRA

10:10:21AM  6   arguments again to the Board of Inquiry.  Both of these

10:10:23AM  7   plaintiffs are entitled to a Board of Inquiry where they can

10:10:28AM  8   make the case that they should not be separated, that they

10:10:30AM  9   still have sufficient value to the Navy, even as unvaccinated

10:10:33AM 10   individuals that they should be retained in service or even

10:10:35AM 11   placed in different positions.  If the board disagrees with the

10:10:38AM 12   decision to date, they can be retained in service, and that

10:10:41AM 13   decision is binding on the Secretary.  That process is expected

10:10:46AM 14   to take months, possibly a year.  It is not in and of itself an

10:10:51AM 15   irreparable harm to the plaintiffs.

10:10:54AM 16   On the merits, bearing in mind that we need only make

10:11:01AM 17   a substantial case on the merits at this stage for the motion

10:11:04AM 18   to stay, we certainly believe that we have made a substantial

10:11:08AM 19   case both with respect to justiciability as well as the

10:11:12AM 20   standards for RFRA, that typically courts should not elect the

10:11:19AM 21   authority to enter injunctions that could intrude on military

10:11:24AM 22   judgments in this area.  With respect to compelling interest

10:11:26AM 23   and the availability of less restrictive alternatives, we have

10:11:30AM 24   put in personal declarations from the actual decisionmakers,

10:11:34AM 25   some of the most senior military officers in the country to

OPENING STATEMENTS  BY MS. POWELL

10:11:37AM   1   explain that they personally consider each individual exemption

10:11:40AM   2   request and make a decision based on the individualized

10:11:43AM   3   circumstances before them, including the submissions of the

10:11:45AM   4   requester, their service records, the chaplains' interviews and

10:11:50AM   5   the other material that is properly before them.

10:11:52AM   6            Not only are unvaccinated service members at higher

10:11:57AM   7   risk of contracting and spreading COVID-19, the consequences of

10:12:01AM   8   infection in even one infected service member can be severe.

10:12:07AM   9   Several of the declarations make this point, including the Merz

10:12:10AM  10   declaration recently submitted.  And there are collateral

10:12:15AM  11   consequences, like the inability to deploy such people to

10:12:19AM  12   certain countries, an ability for them to disembark in certain

10:12:22AM  13   countries, and less restrictive measures cannot solve problems

10:12:28AM  14   like that.  Not only is vaccination superior to measures like

10:12:32AM  15   masking or social distancing that might not be available

10:12:36AM  16   onboard ship in any case, it's the only way to ensure that they

10:12:40AM  17   can enter a country with the COVID-19 vaccine requirement.

10:12:44AM  18            The Court previously suggested that they had served

10:12:47AM  19   successfully unvaccinated without unmanageable consequences.

10:12:51AM  20   But there were consequences, there are always consequences, and

10:12:54AM  21   those are laid out in some of the declarations, like Caudle and

10:12:58AM  22   Dwyer.  And indeed in their testimony, both plaintiffs

10:13:02AM  23   testified about COVID outbreaks onboard ship or in units that

10:13:07AM  24   they observed which led to quarantine, the unavailability of

10:13:10AM  25   service members, people being transferred off ship, all of

**OPENING STATEMENTS  BY MS. POWELL**

10:13:15AM  1  those things have an impact on the mission of the Navy and the

10:13:18AM  2  Marine Corps.

10:13:18AM  3       Ultimately, the fundamental mission of the military

10:13:23AM  4  is to be ready at any given time to fight and win wars.  They

10:13:27AM  5  cannot do that if they are sick.  Resources get tied up in

10:13:32AM  6  quarantine, the Navy's loss -- millions of service days have

10:13:39AM  7  been lost to COVID-19.  And I think these plaintiffs' own

10:13:42AM  8  testimony at the hearing last time actually tended to confirm

10:13:45AM  9  that, that there are consequences, that resources have to be

10:13:47AM 10  shuffled around when there are outbreaks.

10:13:50AM 11       That doesn't mean that every mission fails, but some

10:13:53AM 12  will, and it is particularly severe of course when that person

10:13:56AM 13  could be the commanding officer in the midst of a mission.

10:13:59AM 14  There is also the problem -- it's laid out in I think the

10:14:05AM 15  Caudle declaration -- that while unvaccinated members were

10:14:08AM 16  onboard ship, they were required to be within 72 hours of

10:14:11AM 17  higher level medical care at any given time, because a ship

10:14:14AM 18  like a destroyer does not have higher level medical care or

10:14:16AM 19  even a physician onboard.

10:14:19AM 20       The Court observed that there's no specific data in

10:14:30AM 21  the record with respect to these individuals' sort of

10:14:35AM 22  particular health conditions, and I think that's true.  The

10:14:40AM 23  Rans declaration points out that even young and healthy people

10:14:43AM 24  are at risk of severe COVID and long COVID, that even people

10:14:48AM 25  who have mild cases or even asymptomatic cases sometimes seem

**OPENING STATEMENTS   BY MS. POWELL**

10:14:50AM  1    to have long-term consequences.

10:14:52AM  2           One of the studies she cites in her declaration

10:14:55AM  3    points to a study of -- I forget how many, but more than a

10:15:00AM  4    hundred international athletes who contracted COVID, and

10:15:03AM  5    somewhere over 85 percent of them had significant symptoms

10:15:07AM  6    persisting longer than 28 days, with 14 percent of them I think

10:15:11AM  7    having symptoms persisting even longer than that.

10:15:17AM  8           Now, if these particular plaintiffs had been in poor

10:15:21AM  9    condition, that certainly would have been taken note of in

10:15:25AM 10    considering their request.  But them being in good condition is

10:15:29AM 11    expected to be the norm of course across the Navy and the

10:15:32AM 12    Marine Corps.  The expectation is that others -- that anyone

10:15:35AM 13    who is on duty in the Navy or Marine Corps is in good physical

10:15:40AM 14    condition.  And the Rans declaration, like Young and Lescher

10:15:45AM 15    and others who have proffered declarations in this case take

10:15:48AM 16    that into account when they assess the risk of COVID to the

10:15:52AM 17    force.

10:15:52AM 18           In any case, I guess to sum up, a lack of finding

10:16:02AM 19    about, you know, the commander's body mass index or something

10:16:05AM 20    like that, we don't think undercuts in any way the finding --

10:16:08AM 21    or the military judgment that a vaccine requirement in this

10:16:11AM 22    instance is the best way to protect the force.

10:16:14AM 23           I'm happy to answer any questions the Court has.

10:16:19AM 24    There are -- I'd like at some point to address the Court about

10:16:23AM 25    some of the plaintiffs' proffered witnesses, but -- does the

OPENING STATEMENTS  BY MS. POWELL

10:16:26AM  1   Court have further questions right now?

10:16:27AM  2         THE COURT:  I would think that you would -- is it

10:16:30AM  3   satisfactory just to do that as they're called in the normal

10:16:34AM  4   order?  Did you have some sort of global --

10:16:37AM  5         MS. POWELL:  I had a global point --

10:16:39AM  6         THE COURT:  Okay.

10:16:40AM  7         MS. POWELL:  -- that we would like the Court to

10:16:41AM  8   exclude the testimony of Drs. Long, Chambers, and Tankersley.

10:16:45AM  9   I don't know if all of them are here.  But the plaintiffs

10:16:48AM  10  appear to have proffered them according to their opposition as

10:16:52AM  11  potential experts on the safety and efficacy of the vaccine.

10:16:56AM  12        We are here of course on a motion to stay a

10:17:02AM  13  preliminary injunction with respect to these two individuals.

10:17:03AM  14  I don't view the plaintiffs' original motion with respect to

10:17:06AM  15  these two individuals, or anything in the Court's order, or

10:17:08AM  16  anything in our motion to stay as having previously addressed

10:17:13AM  17  this issue at all, and it seems improper to raise it at this

10:17:17AM  18  late stage in opposition to a stay motion.  It's certainly

10:17:21AM  19  unhelpful to the Court at this point to proffer this new expert

10:17:24AM  20  testimony from new experts that have not previously been

10:17:27AM  21  involved in this case.

10:17:28AM  22        Second, we think the inclusion or the acceptance of

10:17:32AM  23  their testimony at this point would be -- recognizing that the

10:17:36AM  24  rules of evidence at preliminary proceedings are somewhat

10:17:39AM  25  looser, it would unfair and unreasonable to accept them now on

OPENING STATEMENTS BY MR. STAVER

10:17:43AM  1   two days' notice of new people who have not previously been

10:17:45AM  2   involved in this case.

10:17:46AM  3          We haven't seen a declaration related to this case,

10:17:49AM  4   much less an expert report or expert discovery, nor even a

10:17:52AM  5   summary of what they're going to testify about other than it

10:17:55AM  6   has to do with the safety and efficacy of the vaccines.  We

10:17:59AM  7   think it is unlikely, that if we had that opportunity, that

10:18:01AM  8   they could be qualified as experts or that their submission

10:18:05AM  9   would comply with the federal rules or the *Daubert* standards of

10:18:09AM 10   evidence in this area, and they just don't speak to any issues

10:18:13AM 11   that the Court needs to decide today in any case, nor do they

10:18:16AM 12   seem to properly be fact witnesses as far as we're aware as to

10:18:19AM 13   any issue that is before the Court in the motion to stay.

10:18:24AM 14          THE COURT:  All right.  Thank you, Ms. Powell.

10:18:27AM 15          And I know a couple of times before when you've

10:18:30AM 16   argued, I've promised to let you argue without interrupting,

10:18:34AM 17   and I never did it, but I did this morning.

10:18:38AM 18          All right.  Mr. Staver.

10:18:41AM 19          MR. STAVER:  Good morning, Your Honor.

10:18:43AM 20          THE COURT:  Good morning.

10:18:44AM 21          MR. STAVER:  You had -- before we briefly address

10:18:48AM 22   this, and then we're going to actually wait till the end to

10:18:51AM 23   rebut the argument that was just presented by and large after

10:18:55AM 24   we present the witnesses, but you also asked us to address the

10:19:00AM 25   handling of the case --

**OPENING STATEMENTS BY MR. STAVER**

10:19:01AM  1      THE COURT:  Mm-hmm.

10:19:02AM  2      MR. STAVER:  -- and there's now three cases:  there's

10:19:04AM  3  this case, there are two outstanding motions in this case, the

10:19:08AM  4  motion on preliminary injunction for the rest of the

10:19:11AM  5  plaintiffs, and then the class certification or conditional

10:19:14AM  6  certification.

10:19:15AM  7      THE COURT:  And there are other cases in other

10:19:17AM  8  places.

10:19:18AM  9      MR. STAVER:  Right, right.  And in fact -- so the

10:19:20AM 10  other --

10:19:21AM 11      THE COURT:  And more all the time.

10:19:25AM 12      MR. STAVER:  There's more all the time.  In fact, as

10:19:27AM 13  you know, seven judges have reviewed RFRA, and all of them have

10:19:32AM 14  come to the same conclusion that Your Honor has come to.  Three

10:19:34AM 15  on the Fifth Circuit Court of Appeals and four other district

10:19:37AM 16  court decisions, all of which have concluded that the

10:19:40AM 17  Department of Defense and the various military branches are

10:19:43AM 18  blatantly violating the Religious Freedom Restoration Act.

10:19:47AM 19      Clearly, that is a serious issue.  If there is a

10:19:51AM 20  violation of an order, it's not a violation from our plaintiffs

10:19:56AM 21  as it relates to "get the shot," it's a preceding violation of

10:20:02AM 22  the federal Religious Freedom Restoration Act and even the

10:20:05AM 23  First Amendment.  That's where the violation actually begins,

10:20:08AM 24  and it is rampant, and it is frankly abusive, and it is

10:20:11AM 25  widespread, and we can address that more as we come to the

OPENING STATEMENTS BY MR. STAVER

10:20:15AM   1   conclusion of our hearing today.

10:20:17AM   2          But in looking at the process of the case, those two

10:20:22AM   3   motions are still outstanding as this Court knows.  The other

10:20:25AM   4   two cases that were severed, the employer -- the federal

10:20:28AM   5   employer and the federal civil contractors, we propose that

10:20:32AM   6   this Court stay those at this point because there is no

10:20:37AM   7   immediacy for us to proceed on that at this stage and take some

10:20:42AM   8   of the burden away from the Court.

10:20:44AM   9          THE COURT:  Mr. Staver, let me interrupt you just a

10:20:46AM  10   second.

10:20:46AM  11          MR. STAVER:  Yes.

10:20:47AM  12          THE COURT:  I was going to suggest at the conclusion

10:20:48AM  13   of this hearing that I would meet with counsel and we can

10:20:52AM  14   discuss this maybe in a little bit more relaxed format.

10:20:57AM  15          MR. STAVER:  Sure, we can do that.

10:21:00AM  16          THE COURT:  And before you went to -- I understand

10:21:03AM  17   you're going to talk to Judge Porcelli today, or whenever, and

10:21:08AM  18   so we could talk about these procedural matters at that point.

10:21:13AM  19          MR. STAVER:  Okay.

10:21:13AM  20          THE COURT:  I do feel as -- I don't know this,

10:21:16AM  21   because I haven't talked to either of you about it, but I'm

10:21:19AM  22   sure both counsel do as well, we need to -- a decision must be

10:21:25AM  23   made soon as to how to manage these cases.

10:21:28AM  24          MR. STAVER:  Yes.

10:21:29AM  25          THE COURT:  And I certainly would appreciate any

**OPENING STATEMENTS BY MR. STAVER**

10:21:31AM   1   assistance that I can get in making that decision.  I know

10:21:35AM   2   there are some other factors that bear on both sides'

10:21:38AM   3   objectives that may not be consistent with that, legitimate

10:21:45AM   4   factors that come to bear, but I thought we would talk about

10:21:49AM   5   this --

10:21:49AM   6            MR. STAVER:  Very good.

10:21:50AM   7            THE COURT:  -- immediately after the hearing,

10:21:52AM   8   depending on when it ends, perhaps after lunch after the

10:21:56AM   9   hearing or something, but depending on how long it goes.  But

10:22:00AM  10   we'll get to that, and then we can see where that leads us.

10:22:06AM  11            MR. STAVER:  Okay.  Very good.

10:22:07AM  12            With that in mind, we would like to just proceed with

10:22:12AM  13   the first witness --

10:22:12AM  14            THE COURT:  You may.

10:22:14AM  15            MR. STAVER:  -- which would be the Commander.

10:22:15AM  16            THE COURT:  You may.

10:22:29AM  17            Good morning, sir.  Let me ask you to pause and raise

10:22:29AM  18   your right hand.

10:22:29AM  19       COMMANDER SURFACE WARFARE OFFICER, UNITED STATES NAVY,

10:22:29AM  20        having been sworn or affirmed under oath, was examined and

10:22:36AM  21   testified as follows:

10:22:36AM  22            THE COURT:  State your name, please.

10:22:38AM  23            Are you the Lieutenant Commander who is referred to

10:22:42AM  24   in the complaint in this action?

10:22:45AM  25            THE WITNESS:  Yes, sir.

## NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM

10:22:45AM  1     THE COURT:  Please have a seat in the witness stand,

10:22:48AM  2  make yourself comfortable.  We need to attach that microphone

10:22:55AM  3  with which I think you're familiar.

10:23:01AM  4     And I'll recognize Mr. Gannam for his direct

10:23:06AM  5  examination.

10:23:07AM  6     MR. GANNAM:  Thank you, Your Honor.

10:23:11AM  7     May it please the Court.

10:23:11AM  8            DIRECT EXAMINATION

10:23:11AM  9  BY MR. GANNAM:

10:23:16AM 10  **Q.**   Commander, will you please just state again for the record

10:23:21AM 11  that you are in fact the Navy Commander Surface Warfare Officer

10:23:27AM 12  proceeding under pseudonym in this case?

10:23:30AM 13  **A.**   I am the Navy Commander.

10:23:34AM 14  **Q.**   And, Commander, are you aware of a preliminary injunction

10:23:37AM 15  order that was entered by this Court on February 18 essentially

10:23:42AM 16  prohibiting the Navy from taking any adverse action against you

10:23:45AM 17  as a result of your unvaccinated status?

10:23:48AM 18  **A.**   Yes, sir.

10:23:49AM 19  **Q.**   And are you aware that also on February 28th the

10:23:53AM 20  defendants filed an emergency motion in this court to stay that

10:23:58AM 21  preliminary injunction order?

10:23:59AM 22  **A.**   Yes, I am.

10:24:00AM 23  **Q.**   Have you read that motion to stay?

10:24:02AM 24  **A.**   I have.

10:24:04AM 25  **Q.**   I'm going to refer to a few portions of it.

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:24:08AM 1   On page 1, and this is, for the record, Document 118,

10:24:13AM 2 page 1, about three-quarters of the way down, it reads, "The

10:24:18AM 3 Order is an extraordinary intrusion upon the inner workings of

10:24:22AM 4 the military that presents a direct and imminent threat to

10:24:25AM 5 national security during a global military crisis, and it

10:24:29AM 6 indefinitely sidelines a Navy warship."

10:24:31AM 7   Had you read that statement in the motion?

10:24:34AM 8 **A.** Yes, sir, I did.

10:24:35AM 9 **Q.** And did you understand that warship to be referring to the

10:24:38AM 10 destroyer that you command?

10:24:40AM 11 **A.** Yes, sir.

10:24:42AM 12 **Q.** I also want to refer to page 16 of the same document,

10:24:46AM 13 Document 118, about halfway down it reads, "By forcing the Navy

10:24:50AM 14 to keep in place a commander of a destroyer who has lost the

10:24:55AM 15 trust of his superior officers and the Navy at large, this

10:24:58AM 16 Order effectively places a multi-billion dollar guided missile

10:25:02AM 17 destroyer out of commission."

10:25:03AM 18   Do you remember reading that statement in the motion?

10:25:06AM 19 **A.** Yes, sir, I do.

10:25:08AM 20 **Q.** On February 28th, when the defendants filed this motion

10:25:12AM 21 stating that your destroyer was indefinitely sidelined and

10:25:16AM 22 effectively out of commission, where were you?

10:25:19AM 23 **A.** I was out at sea.

10:25:22AM 24 **Q.** How were you out at sea, Commander?

10:25:24AM 25 **A.** I was commanding my warship on a two-week underway period

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:25:28AM 1    conducting training exercises.

10:25:31AM 2    **Q.**    And can you explain what kind of training exercises you

10:25:35AM 3    were performing?

10:25:36AM 4    **A.**    Yes, sir.  Specifically my ship is in our training cycle,

10:25:43AM 5    and we have basic mission areas that we need to conduct

10:25:47AM 6    training, assessments, and certifications on to get us ready.

10:25:53AM 7         Most recently, my ship came out of a maintenance

10:25:56AM 8    availability last year, we came out of a shipyard.  When you

10:25:58AM 9    come out of a shipyard, you also have to do some engineering

10:26:01AM 10   light-off assessments, dock trials, crew certification.  We

10:26:05AM 11   fast cruise to make sure the ship is qualified, watch bills,

10:26:08AM 12   and ready to conduct sea trials, which was generally the first

10:26:12AM 13   underway period that the ship has since preceding the shipyard

10:26:16AM 14   availability window.  We conducted that in December.

10:26:19AM 15        We closed out our maintenance phase window in that time

10:26:23AM 16   frame and started our basic phase training cycle; it's

10:26:27AM 17   generally about six months.  We started that in January and it

10:26:30AM 18   will go into July.

10:26:32AM 19        Once our ship finishes that basic phase training cycle, we

10:26:36AM 20   start moving into integrative and advanced phases where we

10:26:41AM 21   integrate with other assets, working with, you know, a strike

10:26:43AM 22   group so we can, you know, certify to go on deployment.

10:26:47AM 23        My ship right now is in that basic window where we're

10:26:52AM 24   working on our basic certifications.  Basic certifications are

10:26:55AM 25   not warfare specific.  They include basic things that a warship

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:26:59AM 1    needs to do, like seamanship, navigation, damage control,

10:27:02AM 2    engineering, aviation, and communications.  This past two-week

10:27:08AM 3    underway, we were specifically doing engineering training and

10:27:11AM 4    certifications to make sure we knew how to do engineering

10:27:15AM 5    evolutions, drills, and combat main space fire.

10:27:20AM 6        We did that all successfully.  We finished that actually a

10:27:24AM 7    day early over that two-week period, and we were moving very

10:27:28AM 8    well in accordance of the assessment team that was onboard to

10:27:31AM 9    evaluate us.  Most ships, and this is from the assessor's point

10:27:35AM 10   of view that I got, don't always finish that on time.  They

10:27:37AM 11   have to, you know, continue, you know, doing these evolutions

10:27:42AM 12   and drills, you know, later underways which kind of prolong

10:27:45AM 13   their training time.

10:27:46AM 14       My ship was able to do that a day early.  I try to move

10:27:50AM 15   forward and ask for to finish our certification altogether, we

10:27:54AM 16   didn't get approval to do that due to the inspection team's

10:27:57AM 17   shore leadership management, but that's okay.  My ship

10:28:01AM 18   celebrated that victory for getting through our engineering

10:28:03AM 19   drills and certifications that we were required to complete in

10:28:04AM 20   that window.

10:28:06AM 21   **Q.**   And were you in command of the ship throughout this

10:28:09AM 22   training exercise?

10:28:10AM 23   **A.**   Yes, sir, I was.

10:28:11AM 24   **Q.**   And were you in command of the ship -- or strike that.

10:28:14AM 25       The completion of the training exercise successfully was

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:28:21AM 1   all under your command, correct?

10:28:23AM 2   A.   That is correct.

10:28:25AM 3   Q.   Has the training schedule of your ship continued on the

10:28:32AM 4   same schedule as was in place prior to this Court entering its

10:28:36AM 5   preliminary injunction?

10:28:38AM 6   A.   Yes, sir, for the most part.  You know, if things do

10:28:42AM 7   change by, you know, training teams or schedule changes or

10:28:45AM 8   whatnot, you know, as long as we do it within our windows, we

10:28:47AM 9   are fine.  And I say that under the auspices of, you know, last

10:28:51AM 10  time I testified in our January underway, our schedule was

10:28:55AM 11  impacted slightly by the weather and so we had to pull into

10:28:59AM 12  port and adjust our schedule for what training and

10:29:01AM 13  certifications we did, but we still completed them within our

10:29:05AM 14  allotted time.

10:29:06AM 15  Q.   Has any aspect of your ship's training qualifications

10:29:09AM 16  schedule been impacted by your vaccine status?

10:29:12AM 17  A.   No, sir, it has not.

10:29:15AM 18  Q.   So is the work that you're doing for these training

10:29:19AM 19  qualifications, is it different from if your -- for example,

10:29:23AM 20  your ship was tasked with a combat mission?

10:29:27AM 21  A.   Yes.  So while we're in the basic phase training cycle,

10:29:32AM 22  it's kind of divided in half.  You have Tier 1 certifications,

10:29:35AM 23  which are the non-warfare specific ones as previously

10:29:39AM 24  mentioned, and you have Tier 2 certifications, which go into

10:29:42AM 25  warfare specific areas, things like air warfare, surface

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:29:49AM 1 warfare, anti-submarine warfare, electronic warfare, so on and

10:29:51AM 2 so forth.

10:29:53AM 3   As a result of the USS Fitzgerald and John S. McCain

10:29:56AM 4 collisions back in 2017, the surface fleet and/or the Navy

10:30:00AM 5 adjusted the training cycle to make sure that, hey, we will not

10:30:04AM 6 task ships with missions unless they have met their basic

10:30:09AM 7 program certifications, and those are those Tier 1

10:30:12AM 8 certifications that I mentioned earlier, the seamanship,

10:30:14AM 9 navigation, damage control, engineering, aviation, and

10:30:17AM 10 communications.

10:30:18AM 11   My ship is still moving through those between now and the

10:30:21AM 12 end of April, so I would not be tasked to do any missions until

10:30:25AM 13 after we have met those minimum training requirements to

10:30:28AM 14 proceed forward.  We have to get through our training

10:30:31AM 15 certifications right now to be able to do that.  We don't take

10:30:34AM 16 ships that are, you know, in a shipyard or don't have the

10:30:38AM 17 proficiency or haven't been trained right to go out and do

10:30:41AM 18 missions that they're not properly certified to do.  And my

10:30:43AM 19 ship is in that window right now while we're doing those things

10:30:47AM 20 as we speak.

10:30:47AM 21 Q. And is your ship on schedule to complete its necessary

10:30:51AM 22 training qualifications, that is, the schedule established by

10:30:55AM 23 the Navy prior to the Court entering its preliminary

10:30:58AM 24 injunction?

10:30:58AM 25 A. Yes, sir, we are.

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:31:00AM  1   **Q.**   Now, when you go underway, or go out to sea on your ship,

10:31:05AM  2   do you -- are there certain COVID protocols that impact, you

10:31:09AM  3   know, what you have to do, for example, before you leave for a

10:31:12AM  4   trip?

10:31:16AM  5   **A.**   Not necessarily before I leave anymore.  And the COVID

10:31:19AM  6   policy seems to be changing, you know, every month in terms of

10:31:23AM  7   how we adapt and overcome.

10:31:25AM  8        I will tell you, you know, last -- or excuse me, in

10:31:28AM  9   January, the standard operational guidance for COVID policy was

10:31:33AM 10   released by the Navy, and it established conditions, for

10:31:37AM 11   example, for mask wear underway, in which, for the first ten

10:31:41AM 12   days underway, everyone has to wear masks in the conduct of our

10:31:45AM 13   duties as long as it doesn't impact the operations, and there

10:31:48AM 14   are some exceptions out there that I can make for, you know,

10:31:50AM 15   during flight operations, for example.  They make exceptions

10:31:54AM 16   that, you know, if 75 percent of the eligible population that

10:32:02AM 17   has been boosted, has their booster shot, then the crew can

10:32:05AM 18   relax mask and you won't have to wear your mask underway.

10:32:09AM 19        That is an example of, you know, COVID protocols that we

10:32:12AM 20   still have in place.  And most recently, last week, I think,

10:32:18AM 21   the indoor mask policy changed based on community level of

10:32:21AM 22   transmission.

10:32:23AM 23             THE COURT:  I'm sorry.  It changed based on?

10:32:25AM 24             THE WITNESS:  (No oral response.)

10:32:26AM 25             THE COURT:  I didn't hear what you said --

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:32:27AM  1          THE WITNESS:  Yes, sir.

10:32:28AM  2          THE COURT:  -- because your voice was a little soft.

10:32:30AM  3  Based on what?

10:32:32AM  4          THE WITNESS:  Community level of transmission.

10:32:35AM  5          THE COURT:  Got it.  Thank you.

10:32:37AM  6          THE WITNESS:  So there's a website on the CDC that

10:32:40AM  7  lists certain areas by county and gives their level of

10:32:44AM  8  transmission, low, medium, or high.

10:32:46AM  9          THE COURT:  Yes.

10:32:48AM 10          THE WITNESS:  And the DoD policy is for -- if you're

10:32:51AM 11  in areas of a low or medium level of transmission, indoor masks

10:32:55AM 12  are not required at indoor facilities.  If it is high, then you

10:32:59AM 13  are required to wear that indoors.  So right now, certainly in

10:33:01AM 14  Norfolk, indoor mask policy for my ship is relaxed because

10:33:06AM 15  Norfolk's level of transmission is low.

10:33:09AM 16  Q.   (By Mr. Gannam)  Have any COVID-related policies specific

10:33:15AM 17  to you because of your vaccination status impacted the ability

10:33:19AM 18  of your ship to complete its training qualifications or any

10:33:23AM 19  other tasks assigned to it?

10:33:25AM 20  A.   No, sir.

10:33:26AM 21  Q.   I'm going to refer again to the motion filed by the

10:33:31AM 22  defendants, specifically the attached declarations.  So at

10:33:38AM 23  Document 118-4, which is the Admiral Gilday declaration.  On

10:33:45AM 24  page 5, at the bottom, in paragraph 8, it reads, "The

10:33:50AM 25  effectiveness of mitigation measures is extremely limited on

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:33:54AM  1   ships where Sailors must live, work, eat, and sleep in close

10:33:58AM  2   proximity to other Sailors."

10:34:01AM  3        Had you seen that statement?

10:34:02AM  4   **A.**   Yes, sir.

10:34:02AM  5   **Q.**   Do you agree that's generally true?

10:34:04AM  6   **A.**   Yes, sir.

10:34:05AM  7   **Q.**   When you are underway for a training qualification

10:34:10AM  8   mission, do sailors have to live, work, eat, and sleep in close

10:34:14AM  9   proximity to other sailors?

10:34:16AM 10   **A.**   Yes, they do.

10:34:16AM 11   **Q.**   Is that close proximity any different when you're doing a

10:34:20AM 12   training qualification as opposed to when you're underway for a

10:34:23AM 13   combat mission?

10:34:24AM 14   **A.**   No, sir, it does not.

10:34:25AM 15   **Q.**   The second sentence of that paragraph reads, "Ships

10:34:27AM 16   typically have limited space to quarantine Sailors from the

10:34:31AM 17   rest of the crew, if such facilities exist at all."

10:34:35AM 18        You already testified that you have a specific berthing

10:34:38AM 19   area that you've established for quarantining anyone who tests

10:34:42AM 20   positive, correct?

10:34:42AM 21   **A.**   That is correct.  So all ships are supposed to have what's

10:34:45AM 22   called a quarantine or isolation instruction.  And this

10:34:49AM 23   actually predated COVID, but it's obviously adapted for COVID,

10:34:54AM 24   such that if we do have somebody who develops symptoms underway

10:34:57AM 25   and gets tested and it comes up positive that we would put them

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:35:01AM 1  in isolation.  The SOG 5.0, the standard operating guidance for

10:35:08AM 2  COVID that was released in January, even allows ships to

10:35:11AM 3  execute that ROM isolation period afloat, which is good, it

10:35:15AM 4  makes us more adaptable.  We're moving with the policy, and we

10:35:19AM 5  can do that, we can execute that with our isolation protocols

10:35:22AM 6  that we have onboard our Navy vessels.

10:35:25AM 7  Q.   And is there any -- is the limited space available to

10:35:30AM 8  quarantine sailors on your ship any more limited when you are

10:35:34AM 9  doing a training qualification exercise as opposed to being on

10:35:39AM 10  a combat mission?

10:35:40AM 11  A.   The ability to isolate people I don't think is more

10:35:43AM 12  limited due to training.  We are able to execute that now, we

10:35:50AM 13  did execute it last month when I had a three-week scheduled

10:35:54AM 14  underway period, had to pull in for the weather and then get

10:35:58AM 15  back underway again.  I had folks that did test positive during

10:36:03AM 16  that period coming back from the holidays, you know, that were

10:36:04AM 17  delayed.  We were able to ROM COVID-positive cases onboard the

10:36:07AM 18  ship with permission of my commodore, with the permission that

10:36:10AM 19  is laid out in that SOG guidance.  We had about eight males and

10:36:14AM 20  two females in those isolation areas and were able to execute

10:36:18AM 21  this under Navy guidance effectively.

10:36:21AM 22       So to answer your question, does it, you know, change

10:36:23AM 23  right now?  No, we're still able to execute that even while

10:36:26AM 24  we're doing our training missions.

10:36:27AM 25  Q.   I'm going to refer now to Document 118-6, which is Admiral

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:36:34AM  1    Dwyer's declaration attached to the stay motion.  On page 3 of

10:36:37AM  2    that document, in paragraph 6, it reads, "The environment in

10:36:41AM  3    which the Navy -- in which Navy personnel operate at sea - in

10:36:45AM  4    close quarters for extended periods of time in spaces without

10:36:48AM  5    the availability of exterior ventilation (for example, inside

10:36:52AM  6    surface ships, submarines and aircraft) - renders our Sailors

10:36:57AM  7    susceptible to contagious respiratory diseases such as

10:37:02AM  8    COVID-19."

10:37:02AM  9         Have you seen that statement before?

10:37:04AM 10    **A.**   I believe I did read that.

10:37:05AM 11    **Q.**   And do you generally agree with that statement?

10:37:11AM 12    **A.**   Yes.  I mean, I think on a warship, yes, we are confined

10:37:14AM 13    with all those limitations.  I would say that also it doesn't

10:37:17AM 14    matter whether we're doing a training certification or, you

10:37:20AM 15    know, underway deployment either.

10:37:23AM 16    **Q.**   So are the quarters any closer on an underway deployment

10:37:28AM 17    as compared to doing training qualifications?

10:37:31AM 18    **A.**   No, sir.  It's the same.

10:37:33AM 19    **Q.**   When the government said on February 28th that your

10:37:39AM 20    destroyer was indefinitely sidelined, do you believe that's an

10:37:43AM 21    accurate statement?

10:37:44AM 22    **A.**   No, sir, I do not.

10:37:45AM 23    **Q.**   And when the government said on February 28th that your

10:37:48AM 24    destroyer was effectively out of commission, do you believe

10:37:52AM 25    that's an accurate statement?

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:37:54AM  1    **A.**   No, sir, I do not.

10:38:03AM  2    **Q.**   Several -- there have been several allusions in the

10:38:08AM  3    various declarations and the motion to the concept of good

10:38:09AM  4    order and discipline.  Can you sort of explain for the Court

10:38:13AM  5    what is good order and discipline and why is that important in

10:38:16AM  6    the Navy?

10:38:16AM  7    **A.**   So good order and discipline is, you know, our requirement

10:38:20AM  8    under Navy regulations that, you know, I am to maintain both as

10:38:23AM  9    a commanding officer and as a service to ensure the proper

10:38:27AM  10   operations for what we do.  It does talk about, you know,

10:38:31AM  11   following orders and the importance of that.  It also talks

10:38:34AM  12   about the moral integrity that we're supposed to establish in

10:38:38AM  13   the profession of arms.

10:38:39AM  14       It is a good thing to have good order and discipline, and

10:38:42AM  15   I agree with that.  The problem that I have with, you know,

10:38:46AM  16   throwing out good order and discipline, even in this case, is

10:38:49AM  17   it becomes a catchall for anything where -- goes against, you

10:38:54AM  18   know, an established or initial policy.

10:38:58AM  19       We are historically repeating bad patterns in our history

10:39:03AM  20   for discriminatory acts.  For example, if you go back into

10:39:07AM  21   history and look at the integration of people of color into the

10:39:10AM  22   military service, and whether they were segregated or

10:39:13AM  23   integrated, the push of not doing that was because it was

10:39:16AM  24   contrary to good order and discipline.

10:39:19AM  25       It's the same thing that was repeated when, you know,

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:39:22AM 1   gender was an issue and trying to integrate women with men in

10:39:26AM 2   military service, whether your troops are on the ground or on

10:39:29AM 3   the ship or submarine or whatever the case may be, you don't

10:39:32AM 4   want to do this because it's contrary to good order and

10:39:34AM 5   discipline.

10:39:35AM 6       The same thing was repeated again in like the '80s and

10:39:39AM 7   '90s when sexual orientation of the people in the military

10:39:43AM 8   became an issue and they the established policies like "don't

10:39:45AM 9   ask, don't tell."  If you do, your sexual orientation now is

10:39:50AM 10  going to be contrary to good order and discipline because we

10:39:52AM 11  can't have folks serving together with contrary points of view

10:39:56AM 12  on that.  Even most recently, today, in the past five years,

10:40:00AM 13  the topic of, you know, transgender or your gender identity is

10:40:04AM 14  a topic of, you know, hey, how are we going to implement this

10:40:07AM 15  or execute this to not affect good order and discipline?

10:40:11AM 16      The Navy has undergone, and I assume the military at

10:40:17AM 17  large, this, you know, idea of, how do we get better at

10:40:20AM 18  diversity and inclusion, and we do training on, like, things

10:40:23AM 19  that you're not supposed to discriminate against.  You're not

10:40:26AM 20  supposed to discriminate against race, ethnicity, gender,

10:40:30AM 21  sexual orientation, so on and so forth, but one of those is

10:40:33AM 22  also religion.  It's founded in our Constitution.

10:40:37AM 23      I'm here today because the military is not executing this

10:40:44AM 24  policy while respecting the constitutional freedoms laid out in

10:40:49AM 25  the First Amendment or RFRA.  I should not be the one standing

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:40:54AM 1    here to say that today; generals and admirals, the executives

10:40:59AM 2    in our service, should be here to say that to the politics, to

10:41:03AM 3    the bureaucracy, to their decision-making.  It should also not

10:41:06AM 4    be my junior sailors or the hundreds of thousands of military

10:41:10AM 5    servicemen out there to say, "Hey, I have a religious objection

10:41:14AM 6    to this.  Why is no one not speaking out that we can do this

10:41:17AM 7    and still do the job, the mission?"  That's for me to do when

10:41:22AM 8    my superiors will not.

10:41:24AM 9         I understand that I took an oath to the Constitution, that

10:41:28AM 10   is what my oath is, and it's different than the enlisted oath,

10:41:31AM 11   which is to follow orders.  Every general on flag takes the

10:41:35AM 12   same oath as me, to uphold the Constitution, to bear true faith

10:41:39AM 13   and allegiance to the Constitution and the country whose course

10:41:40AM 14   it directs.  That requires that I know the Constitution.

10:41:44AM 15        Our religious freedoms are being attacked.  And when I

10:41:47AM 16   read the declaration that talks about, you know, there are no

10:41:51AM 17   less restrictive means other than vaccination, and they use

10:41:55AM 18   examples in there such as, you know, the port entry

10:41:59AM 19   requirements such as the pre-ROM deployment sequester.  Those

10:42:04AM 20   are less restrictive means in and of themselves.

10:42:08AM 21        Your Honor, I did that last year when we did a deployment.

10:42:11AM 22   My ship, regardless of vaccination status, is that was a

10:42:14AM 23   policy, and we did a pre-deployment ROM.  We all, the day after

10:42:18AM 24   Christmas, had to report to a hotel and test in prior to going

10:42:23AM 25   there.  And when we tested out, we were allowed to go back in a

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:42:27AM  1    bubble transport back to the ship deemed clean.  And that
10:42:31AM  2    policy has shifted obviously over the past year and a half, and
10:42:35AM  3    it's, you know, somewhere in the degree of vaccinated personnel
10:42:37AM  4    do not have to execute that ROM sequester.  At one period of
10:42:41AM  5    time unvaccinated did.  If the ability for me to go on
10:42:46AM  6    deployment is dependent upon whether or not I have to do a
10:42:48AM  7    pre-deployment ROM sequester that is a less restrictive means
10:42:52AM  8    than me getting a vaccine that I have a religious objection to,
10:42:57AM  9    then I would execute that.
10:42:58AM 10        The port of entry requirements, it's also laid out there,
10:43:01AM 11    that says my vaccination is going to affect that is confusing
10:43:04AM 12    to me, and I don't understand how they're saying that.  Other
10:43:08AM 13    nations cannot tell our ship what to do as a sovereign-immune
10:43:14AM 14    vessel in terms of the interworkings of our ship.  They can't
10:43:17AM 15    tell what our sailors can do onboard the ship or what we have
10:43:19AM 16    to do.  They don't review or medical records; we don't give
10:43:22AM 17    that stuff up.
10:43:24AM 18        They can put restrictions on if people go out in town on
10:43:28AM 19    liberty or official business, that is true.  But if I'm an
10:43:32AM 20    unvaccinated sailor and the choice is, hey, when you pull into
10:43:34AM 21    a port, if you're unvaccinated, you can't go out in town
10:43:39AM 22    because that's what the host country requirements are, right
10:43:41AM 23    when I step off that vessel, okay, I can stay on the ship.
10:43:44AM 24    That is my home, that's where I live, that is a less
10:43:47AM 25    restrictive means, and I would do that.  We have done that over

NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM

10:43:50AM  1   the past two years.

10:43:52AM  2        I did a seven-month deployment in 2020 during the COVID

10:43:56AM  3   pandemic, we were not allowed to pull in anywhere.  I did

10:43:59AM  4   another deployment in 2021 for 60 days, we pulled in seven

10:44:02AM  5   places -- around seven places in the Caribbean and we were not

10:44:06AM  6   allowed to leave the pier, and this was regardless of

10:44:09AM  7   vaccination status.  The one time we were able to go on the

10:44:12AM  8   pier was in Guantanamo, and that's a U.S. base so we could do

10:44:16AM  9   that.  The point is that is a less restrictive means to taking

10:44:20AM 10   the vaccine if you have a religious objection to it.  We have

10:44:24AM 11   demonstrated resiliency and adaptability during the COVID

10:44:25AM 12   pandemic to execute our mission, and we can do that.

10:44:29AM 13        The Navy has policies right now in place where we set

10:44:32AM 14   accommodations in place just by policy.  The standard operating

10:44:37AM 15   guidance that was just released in January did that when it

10:44:40AM 16   talked about the mask wear guidance underway.  So if 25 percent

10:44:48AM 17   of the eligible population is not boosted, 75 percent are, like

10:44:53AM 18   that's an accommodation.  The whole ship can now relax mask if

10:44:57AM 19   75 percent of the boosted population has met that requirement,

10:44:59AM 20   and it's not based on your medical or religious exemptions for

10:45:03AM 21   that other 25 percent, that's an accommodation.

10:45:07AM 22        The recent indoor mask guidance, that's an accommodation.

10:45:11AM 23   The fact that I can isolate people who are COVID-positive

10:45:17AM 24   regardless of their vaccination status underway and still

10:45:21AM 25   execute my mission is an accommodation.  It isn't based on

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:45:25AM 1   religious objection, it's based on the fact that you are

10:45:29AM 2   COVID-positive.  And for me to be able to execute my mission,

10:45:31AM 3   if you are only isolated for five days and I'm out at sea for

10:45:34AM 4   longer than that, I can still do that with minimum impact.

10:45:38AM 5   That's a good thing.  But I accommodated vaccinated sailors in

10:45:44AM 6   that process as well, and I did.  Every person that I ROM'd on

10:45:49AM 7   onboard my ship underway in January, it was about ten sailors,

10:45:50AM 8   they were all vaccinated sailors that were COVID-positive.

10:45:54AM 9   That's okay.

10:45:55AM 10       There are other examples out there where we make

10:45:58AM 11  accommodations.  I mean the flu shot, I think I testified last

10:46:01AM 12  month, is another example of that.  The flu shot policy that we

10:46:05AM 13  release every October-November time frame says, hey, everyone

10:46:08AM 14  is supposed to go do that, get evaluated by your medical

10:46:10AM 15  provider.  The minimum requirement is 90 percent.  What is that

10:46:15AM 16  10 percent Delta based off of?  I don't know that it's based

10:46:18AM 17  off of religion or anything else, it's by policy.

10:46:21AM 18       So if I have people that don't get the flu shot but the

10:46:24AM 19  rest of my ship is 90 percent or higher, we move forward.  We

10:46:28AM 20  don't go after to separate them, we don't kick them off the

10:46:31AM 21  ship.  Whether the people come and go or my flu shot inventory

10:46:37AM 22  expires and I have people that come and go, as long as I'm

10:46:41AM 23  above 90 percent, there is no question.  That's okay.

10:46:43AM 24       The same should be true with the COVID policy.  And we are

10:46:49AM 25  going out after people and separating people and removing them

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:46:52AM 1  from their job and making blanket policy statements to say they

10:46:55AM 2  can't execute their mission without respect to their religious

10:46:59AM 3  objections, which is required by law and enshrined in our

10:47:02AM 4  Constitution, and that is wrong.

10:47:05AM 5  **Q.**   Let me ask you this, Commander.  Has your vaccination

10:47:09AM 6  status in any way undermined the good order and discipline on

10:47:12AM 7  your destroyer?

10:47:13AM 8  **A.**   I do not think so.  I would say no.

10:47:17AM 9  **Q.**   And how do you know?

10:47:19AM 10  **A.**   My ship is performing everything that they need to do.

10:47:22AM 11  They are doing extremely well.  As we go through our basic

10:47:27AM 12  phase training cycle, in terms of meeting our mission

10:47:30AM 13  objectives, we are doing that.

10:47:32AM 14       Just this week, I talked about engineering when we were

10:47:35AM 15  underway, we're finishing out our damage control

10:47:37AM 16  certifications.  I was there for the first two days, we were --

10:47:40AM 17  it's a five-day event, we were on track to finish it on

10:47:43AM 18  Wednesday.  My ship didn't need me there on Wednesday to

10:47:46AM 19  execute that, and they did, and they completed it, so now we

10:47:49AM 20  are damage control certified as we move out of the basic phase,

10:47:52AM 21  and that's a good thing.

10:47:53AM 22       The things that my ship are supposed to be doing, they are

10:47:56AM 23  doing well.  I'm not saying we're perfect, because there are

10:47:59AM 24  obviously personnel, equipment issues, maintenance issues, and

10:48:01AM 25  training things that every ship does differently, but in terms

NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM

10:48:05AM  1   of meeting our mission objectives, we are doing well.

10:48:09AM  2   **Q.**   And in your last training exercise that you just returned

10:48:13AM  3   from, were there any superior officers along the way with you

10:48:17AM  4   who gave you feedback about that particular mission?

10:48:19AM  5   **A.**   Yes, there was.

10:48:21AM  6   **Q.**   And who was that?

10:48:23AM  7   **A.**   So my deputy commodore was sent to observe our two-week

10:48:28AM  8   underway period.  He and another member of his staff, who is an

10:48:32AM  9   engineering readiness assessor, which is the purpose of our

10:48:36AM 10   underway, was there, and the deputy commodore was there,

10:48:41AM 11   purportedly, to observe me and make sure that the ship was

10:48:42AM 12   doing all right.

10:48:45AM 13       A welcoming to the crew, he observed our training, he

10:48:47AM 14   observed our evolutions, talked to me, gave me daily updates,

10:48:52AM 15   provided recommendations on how we can do better, which I

10:48:56AM 16   welcome.  I always want to know how we can be better.  And as a

10:49:00AM 17   post commanding guy, he has a good perspective how we can do

10:49:04AM 18   that.  That's a part of his job.

10:49:04AM 19       So after the end of those two weeks, he sat down with me

10:49:07AM 20   and my executive officer the night before we pulled in and gave

10:49:11AM 21   us the download for his observations, and he did say we had a

10:49:15AM 22   very successful underway.  He was very pleased that the ship

10:49:17AM 23   did more than just the engineering assessments that we were

10:49:20AM 24   required to do.  We obviously did other things along the way;

10:49:24AM 25   we did electronic warfare training, combat systems training.

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:49:27AM  1   We had a very successful refueling at sea, which is a high risk

10:49:31AM  2   evolution.  It was our second one of the year.

10:49:35AM  3       And so the focus of, hey, you're not solely focused on

10:49:38AM  4   engineering, but the rest of the ship is still doing stuff in

10:49:41AM  5   operations, which you need to do to train to go into battle

10:49:45AM  6   and/or deploy, the ship was doing that and he was pleased with

10:49:47AM  7   that.

10:49:48AM  8       So in addition to some other recommendations for

10:49:50AM  9   improvement, at the end of that brief, to me and XO, he said,

10:49:54AM  10  "I am going to go back and report that your ship is safe and

10:49:56AM  11  ready to execute the basic phase.  There was nothing that

10:50:00AM  12  happened where I needed to intervene or had concerns on your

10:50:04AM  13  ability to command."

10:50:09AM  14  **Q.**   Let me ask you about your appearance here today.  How did

10:50:15AM  15  you obtain permission this time to come down and testify?

10:50:21AM  16  **A.**   Yes, sir.  So I got back from our underway period on late

10:50:27AM  17  Friday afternoon, didn't get home until Friday night, was

10:50:31AM  18  informed by the legal team that -- of the subpoena desiring my

10:50:35AM  19  presence here.

10:50:37AM  20      I -- first thing Monday morning coming into work, I let my

10:50:41AM  21  chain of command know, "Hey, these are my intentions."  Based

10:50:44AM  22  on the discussions with my JAG or whatnot, he said, "Hey,

10:50:47AM  23  because you have a subpoena, this might be permissive TAD."  I

10:50:47AM  24  let my supervisor know that I intend to do permissive TAD.

10:50:55AM  25  **Q.**   What is permissive TAD?  What does that mean?

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:50:57AM 1   **A.**   So instead of taking leave where I use my entitled leave

10:51:02AM 2 days, it would be, you know, effectively like a no-cost orders

10:51:05AM 3 to come down and execute this legal matter.

10:51:09AM 4     I provided a travel risk assessment and a recommended ROM

10:51:14AM 5 for my return. I let my supervisor know, based on all the

10:51:18AM 6 change in guidance, this COVID risk assessment or travel risk

10:51:23AM 7 assessment is not a requirement, it is discretionary at the

10:51:28AM 8 commander. I presume, obviously, from last month, that he

10:51:31AM 9 wanted to see that, so I gave it. I recommended a three-day

10:51:34AM 10 ROM on my return based on the conditions, and then sent that

10:51:40AM 11 off.

10:51:40AM 12     Over the course of those two days, I got a lot of

10:51:45AM 13 questions or pushback on, you know, why permissive leave? Is

10:51:49AM 14 this required to be funded? Why are you taking leave? Your

10:51:54AM 15 leave is starting -- or your absence from the ship is starting

10:51:58AM 16 to impact readiness. Why are you subpoenaed? When I sent the

10:52:03AM 17 subpoena, it was, your lawyer sent the subpoena, not the judge.

10:52:06AM 18 I don't know if there's a difference to that, I don't know why.

10:52:09AM 19 There was a lot of push back and forth to be able to do that.

10:52:13AM 20     The frustrating part is, you know, after sending all that

10:52:16AM 21 stuff off, to include my, you know, leave chit request, which

10:52:21AM 22 is abnormal, all of our COs only email him, but he wanted to

10:52:25AM 23 see that, what exact location I was staying, the exact fly

10:52:30AM 24 times. So probably, like, after 15 emails of doing all this

10:52:35AM 25 stuff, he finally said, "Leave is approved."

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:52:37AM  1      However, I'm still here today and I don't know what my ROM

10:52:40AM  2  requirements will be upon my return.  I will assume, in

10:52:43AM  3  discussion with him, that if he hasn't decided that I will do

10:52:46AM  4  the five-day ROM.  By Navy policy, five days is only required

10:52:51AM  5  if you test positive for COVID.  I tested prior to executing my

10:52:55AM  6  travel and it was negative, and I will test when I get back as

10:52:59AM  7  well.

10:52:59AM  8  **Q.**   So your commander has not yet given you an answer on what

10:53:04AM  9  your ROM requirement will be when you return from this trip?

10:53:09AM  10  **A.**   Correct.  There is no final answer.  He said it will be

10:53:12AM  11  five days unless I -- after reviewing my recommendation, which

10:53:15AM  12  he wants to pass along with the medical community to make sure

10:53:19AM  13  it's in line, to go earlier, but he has not deemed the official

10:53:23AM  14  five, three, or zero for ROM days.

10:53:26AM  15  **Q.**   And is it also true, then, that you are unable to tell

10:53:29AM  16  your XO, for example, or other department heads when you'll be

10:53:33AM  17  back because you're waiting on this decision from your

10:53:35AM  18  commander?

10:53:36AM  19  **A.**   That's correct.

10:53:40AM  20  **Q.**   Argument was made a few minutes ago about what happened on

10:53:43AM  21  your last trip, this dispute over when you let your XO know

10:53:49AM  22  that you were traveling out of area.  Do you recall that

10:53:52AM  23  argument earlier today?

10:53:54AM  24  **A.**   Yes, sir, I do.

10:53:54AM  25  **Q.**   And you recall discussing that at the last hearing on this

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:53:57AM  1  matter?

10:53:57AM  2  **A.**   I do.

10:53:59AM  3  **Q.**   Let me ask you to just remind the Court, when did you

10:54:03AM  4  first communicate that you were traveling out of area, or

10:54:08AM  5  taking leave out of area, to your crew?

10:54:12AM  6  **A.**   To my crew or to my XO?

10:54:15AM  7  **Q.**   To your crew.

10:54:16AM  8  **A.**   Okay.

10:54:16AM  9  **Q.**   Well, to your XO, if there's a difference.

10:54:19AM 10  **A.**   Okay.  So some of that confusion comes into play based on

10:54:23AM 11  the preceding Thursday, where I had to report in to my

10:54:26AM 12  supervisor because I did not get the vaccine when I went to

10:54:32AM 13  Navy Medical Center Portsmouth, and I reported back to my

10:54:36AM 14  commodore.  It was also around the time that the injunction was

10:54:36AM 15  placed.

10:54:38AM 16      I asked then that, you know, "Hey, it's been a very

10:54:41AM 17  emotional, stressful time, I do need to take leave the

10:54:43AM 18  following week.  I would like, you know, a day or two to spend

10:54:45AM 19  time with the family."  He said, "Of course.  You know, policy,

10:54:50AM 20  send me an email, we'll work on it from there."  And at that

10:54:52AM 21  time I was going to take local leave the following week to

10:54:56AM 22  spend time with my family.  There's -- that was conveyed.

10:54:59AM 23      Over the weekend is when I, you know, had the

10:55:02AM 24  correspondence with the legal team that said, "Hey, there's a

10:55:05AM 25  hearing.  Are you in port, and are you available to come?"  I

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:55:09AM  1    said, "I am in port, I could conceivably come.  I need to

10:55:13AM  2    figure this out with my family," which my wife was supportive

10:55:16AM  3    of, and so we decided that, hey, let's do this.

10:55:19AM  4        So that Monday morning I made the preparations to, you

10:55:25AM  5    know, come down here for that hearing, submitted my request in

10:55:30AM  6    NSIPS.  At the department head meeting that I had that

10:55:32AM  7    afternoon, which is -- we normally do on Monday afternoon, we

10:55:36AM  8    generally have an hour, hour and a half department head

10:55:39AM  9    meeting.  I had six department heads, and my executive officer

10:55:42AM  10   and command master chief usually attend those.  We talk about

10:55:46AM  11   various things, each department provides updates, talk about

10:55:49AM  12   the ship, what's coming up next, taskers that need to go out or

10:55:53AM  13   whatnot.

10:55:56AM  14       So over that hour-, hour-and-a-half-long meeting, I did

10:55:56AM  15   mention that, "Hey, for my leave this week, I will be out of

10:55:59AM  16   area, I will not be available, get the CO leave message ready,"

10:56:03AM  17   and then I continued on with, you know, multiple other things.

10:56:05AM  18   I cannot attest, because I did not specifically look at my

10:56:08AM  19   executive officer or specifically tasked him, I just said it

10:56:12AM  20   openly, passing in the group in that hour-and-a-half-long

10:56:13AM  21   conversation.

10:56:13AM  22       It is true that I did not make it a point to talk about

10:56:17AM  23   Tampa or the legal case.  I did not want to, and frankly I

10:56:21AM  24   think that's, you know, contrary to good order and discipline,

10:56:24AM  25   because I don't want my subordinates to be privy to the

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:56:27AM  1   personal legal cases I'm involved that would also detract from

10:56:31AM  2   their mission, or what's my boss involved in, what's going to

10:56:34AM  3   happen to him.  So I did feel that was necessary to protect

10:56:37AM  4   them from that, that does not mean that I didn't say I was

10:56:41AM  5   going out of the area.

10:56:42AM  6       The next morning -- or the next day, you know, at some

10:56:46AM  7   point the XO came in when we were having updates, and I pulled

10:56:50AM  8   him in and shut the door and I told my XO, "Hey, when you go in

10:56:55AM  9   and look at my leave chit, you're going to see that it's in

10:56:58AM 10   Tampa, Florida.  I am going to go handle legal matters.  I

10:57:02AM 11   don't want to share this with the rest of the crew, I don't

10:57:04AM 12   want that to be a distraction, but you need to know that."  He

10:57:07AM 13   acknowledged.  His declaration does say that he didn't know

10:57:12AM 14   about out of area going to Tampa for the purpose of that case;

10:57:12AM 15   that is true for Tuesday.  Whether or not he heard me say out

10:57:14AM 16   of area or not on Monday, I don't know the relevance of that.

10:57:17AM 17   It's not misleading in my opinion.

10:57:20AM 18       But the point that I would make also to the Court and

10:57:22AM 19   others is there is no negative feeling that I have towards my

10:57:27AM 20   XO.  I do not have a loss of trust with my XO.  He's a very

10:57:31AM 21   good naval officer and he should be the one to relieve me next

10:57:35AM 22   when it comes time.  We have a fleet-up policy where the XO

10:57:35AM 23   relieves the CO when their time comes.

10:57:40AM 24       If you were to bring him in or make a declaration and/or

10:57:43AM 25   make a statement to the Court, he would attest to the integrity

**NAVY COMMANDER - DIRECT EXAM BY MR. GANNAM**

10:57:46AM  1   or the character or the success of our ship, I have no doubt

10:57:50AM  2   about that.  I do think it was some undue influence on him or

10:57:53AM  3   partial information given to him to make that declaration that

10:57:57AM  4   doesn't have the full scope of the details, and I don't fault

10:58:01AM  5   him for that.  He is a good officer.

10:58:04AM  6   **Q.**    You mentioned a CO's leave message.  Can you explain what

10:58:09AM  7   that is?

10:58:11AM  8   **A.**    A CO's leave message is generally something that you send

10:58:16AM  9   out the day before a CO goes on leave, it generally lets the

10:58:20AM  10  chain of command and the other commands out there know that the

10:58:24AM  11  CO is not going to be available generally due to, you know,

10:58:29AM  12  being on leave out of area.  If I were to go on leave and be

10:58:33AM  13  local, I wouldn't need to send that message, because if

10:58:36AM  14  something came up and I needed to cancel my leave, I would just

10:58:39AM  15  drive into the ship.  Obviously I can't do that when I am out

10:58:43AM  16  of the area.

10:58:45AM  17  **Q.**    So would there be any reason to issue a CO's leave message

10:58:48AM  18  if you were to be in the area and available?

10:58:51AM  19  **A.**    No, sir, there's no requirement to do that.

10:58:54AM  20  **Q.**    And you testified a moment ago that you directed that a

10:58:58AM  21  CO's leave message be prepared at the Monday briefing with your

10:59:03AM  22  department heads, correct?

10:59:03AM  23  **A.**    I did.

10:59:04AM  24  **Q.**    Was a CO's leave message prepared?

10:59:08AM  25  **A.**    There was.  It was routed to me the next morning, maybe

**NAVY COMMANDER - CROSS-EXAM BY MS. POWELL**

10:59:12AM 1    around lunchtime or so, I initialed it and it went out sometime

10:59:15AM 2    after lunch that day.

10:59:16AM 3    Q.   And can you think of any reason why a CO's leave message

10:59:20AM 4    would have been issued if you hadn't asked for one to be issued

10:59:24AM 5    in that briefing?

10:59:29AM 6    A.   I think generally me or the XO would have that done.  So

10:59:32AM 7    if it had not already been done, when I talked to my XO the

10:59:35AM 8    next morning, he would have made sure, "Hey, are we tracking

10:59:39AM 9    this message?  It needs to go out today," so he's my back-up as

10:59:40AM 10   the second in command.  But, no, otherwise for them to be able

10:59:44AM 11   to release that, they would have to know that I'm going out of

10:59:47AM 12   area.

10:59:51AM 13          MR. GANNAM:  No further questions, Your Honor.

10:59:53AM 14          THE COURT:  All right.  Thank you, sir.

10:59:54AM 15          Ms. Powell, have you cross-examination for this

10:59:58AM 16   witness?

10:59:58AM 17          MS. POWELL:  I do.

11:00:00AM 18          THE COURT:  You're recognized for that purpose.

11:00:10AM 19                     CROSS-EXAMINATION

11:00:10AM 20   BY MS. POWELL:

11:01:11AM 21   Q.   Commander, you testified the ship was underway in just the

11:01:14AM 22   past few weeks, correct?

11:01:16AM 23   A.   Yes.

11:01:17AM 24   Q.   And when was that approximately?  Do you recall the dates?

11:01:22AM 25   A.   I think it was the 22nd of February, and we returned this

NAVY COMMANDER - CROSS-EXAM BY MS. POWELL

11:01:25AM 1   past Friday on the 4th of March.  I believe those are the

11:01:30AM 2   dates.  Roughly about 11 or 12 days.

11:01:33AM 3   Q.   So that was the first underway period since the issuance

11:01:36AM 4   of the injunction in this case?

11:01:42AM 5   A.   Yes, I think so.

11:01:45AM 6   Q.   Sorry, I didn't mean to make that complicated.  I think

11:01:48AM 7   that's adequate in the record.

11:01:49AM 8        And the purpose of the underway was to complete the

11:01:51AM 9   certification, correct?

11:01:53AM 10  A.   Not complete the certification, but there are

11:01:55AM 11  certifications we get before the entire certification.  So next

11:01:59AM 12  week we'll actually close out our last portion of the

11:02:02AM 13  engineering certifications.  But we are doing a training in

11:02:05AM 14  certification of Events 3 and 4, which have certain milestones,

11:02:08AM 15  in those were certifications for evolutions -- engineering

11:02:12AM 16  evolutions, certification for engineering drills, and

11:02:15AM 17  certification for fighting and main space fire drill for the

11:02:19AM 18  ship.

11:02:20AM 19  Q.   You have read two -- or have you read the two previous

11:02:26AM 20  declarations that Captain Brandon submitted in this matter?

11:02:31AM 21  A.   The last time I read any of the declarations provided by

11:02:33AM 22  him, I think was the court hearing last time.  I vaguely

11:02:37AM 23  remember the first one, I do not remember the second one.

11:02:40AM 24  Q.   Okay.  Do you recall him discussing a loss of trust and

11:02:43AM 25  confidence in you?

**NAVY COMMANDER - CROSS-EXAM BY MS. POWELL**

11:02:46AM  1  **A.**   If that was in the declaration, then yes.

11:02:50AM  2  **Q.**   Do you recall him stating that he was already mitigating

11:02:54AM  3  the risk of having you in command of the ship at sea?

11:02:58AM  4  **A.**   I'd have to read that again.

11:02:59AM  5  **Q.**   By placing extra supervision onboard?

11:03:03AM  6  **A.**   Okay.

11:03:05AM  7  **Q.**   Normally the Navy can trust commanders to command their

11:03:08AM  8  open ships, right?  They're expected to operate with a certain

11:03:11AM  9  amount of independence?

11:03:13AM  10  **A.**   Should, yes.

11:03:15AM  11  **Q.**   But on your recent underway, Captain Aldridge was onboard,

11:03:19AM  12  correct?

11:03:19AM  13  **A.**   That is correct.  He was the deputy commodore that I was

11:03:22AM  14  referring to earlier that did come underway with us, yes.

11:03:24AM  15  **Q.**   He is senior in rank to you?

11:03:26AM  16  **A.**   Yes, ma'am.

11:03:27AM  17  **Q.**   And senior in position as well?

11:03:29AM  18  **A.**   Yes, ma'am.

11:03:31AM  19  **Q.**   And he was on the ship for the entire underway period?

11:03:34AM  20  **A.**   That is correct.

11:03:37AM  21  **Q.**   You previously mentioned that -- or I'm sorry.  You as the

11:03:42AM  22  commanding officer need to stay current on Navy policy and

11:03:46AM  23  regulations in general, correct?

11:03:50AM  24  **A.**   To stay current on policy?  I mean, yes, every time a

11:03:54AM  25  policy comes out, you know, we're supposed to read it and make

**NAVY COMMANDER - CROSS-EXAM BY MS. POWELL**

11:03:57AM 1  sure we understand it, yes.

11:03:58AM 2  **Q.**   Sure.

11:04:00AM 3        So you know what the Navy regulations are?

11:04:04AM 4  **A.**   As a general statement, yes.

11:04:08AM 5  **Q.**   Are you familiar with the concept of a senior officer

11:04:15AM 6  present?  Is that a phrase you have heard before?

11:04:17AM 7  **A.**   Senior officer present?  I think so.  Like SOPA, Senior

11:04:22AM 8  Officer Present Afloat.

11:04:22AM 9  **Q.**   Yes.

11:04:23AM 10 **A.**   Is that what you're referring to?

11:04:25AM 11 **Q.**   Yes.

11:04:26AM 12 **A.**   Okay.

11:04:27AM 13 **Q.**   And what does that mean in your words?

11:04:30AM 14 **A.**   So, for example, my commodore is the commander of our

11:04:37AM 15 destroyer squadron, and we have four ships out of Norfolk based

11:04:42AM 16 in that squadron, two other ships in Florida that are under his

11:04:45AM 17 operational control, if not administrative.

11:04:47AM 18       So if he, for example, were to embark on our ship, we

11:04:52AM 19 would have a pennant for him as a Senior Officer Present Afloat

11:04:56AM 20 when we're pulled into port on the pier.  Right?  The senior,

11:04:59AM 21 you know, ship on that pier would deem the pier

11:05:02AM 22 responsibilities, watch-standing requirements, et cetera.  And

11:05:05AM 23 if you're underway and embarked with other ships, the

11:05:08AM 24 commanding control would generally go with the senior officer

11:05:12AM 25 present.

## NAVY COMMANDER - CROSS-EXAM BY MS. POWELL

11:05:12AM  1  **Q.**   Okay.  So they have responsibilities as senior officer
11:05:17AM  2  present?
11:05:17AM  3  **A.**   So if -- I don't want to misconstrue that.  If they are in
11:05:23AM  4  command, yes.
11:05:24AM  5  **Q.**   And if they're not in command?
11:05:26AM  6  **A.**   So you can have riders that are on your ship that are
11:05:29AM  7  senior officers to you but they're not in command.
11:05:32AM  8  **Q.**   Understood.
11:05:32AM  9      In that situation, are you aware that the senior officer
11:05:35AM  10  is required to assume command if in his or her judgment the
11:05:41AM  11  exercise of authority is otherwise necessary?
11:05:47AM  12  **A.**   I think so.
11:05:47AM  13  **Q.**   Okay.
11:05:48AM  14  **A.**   So I will tell you, when I was told that the deputy was
11:05:51AM  15  coming to get underway, it was not disclosed to me the
11:05:54AM  16  purposes.  In fact, I just got an email that said, "Please
11:05:57AM  17  confirm that you know that the deputy commodore and my
11:05:59AM  18  engineering senior chief petty officer are getting underway
11:06:04AM  19  next week."
11:06:04AM  20      "Roger, sir.  I understand they're coming to get underway
11:06:06AM  21  with us."
11:06:07AM  22      I have no problem with people coming to get underway.  I
11:06:08AM  23  did ask the deputy, when he came aboard my ship that day, "Hey,
11:06:11AM  24  is your purpose here to relieve me?" and he said, "No."
11:06:13AM  25      "What is your purpose here?" and he did say that he was

**NAVY COMMANDER - CROSS-EXAM BY MS. POWELL**

11:06:16AM 1 here to observe me and make sure the ship was safe for

11:06:19AM 2 operations. I understand that my commodore wants to have that

11:06:22AM 3 backup.

11:06:24AM 4 Q. Understood.

11:06:24AM 5 A. Yes.

11:06:24AM 6 Q. So you would agree with the statement that in that

11:06:26AM 7 position he could intervene if there was reason to do so in his

11:06:29AM 8 judgment and it was necessary?

11:06:31AM 9 A. Sure.

11:06:32AM 10 Q. And you understood that was why he was there?

11:06:35AM 11 A. Yes.

11:06:46AM 12 Q. At your last hearing, you testified that you informed your

11:06:50AM 13 XO and department heads at a meeting on Monday the 9th that you

11:06:54AM 14 were leaving the area. And that is your testimony again today?

11:06:59AM 15 A. In that meeting, that hour and a half meeting that we had,

11:07:03AM 16 I did make that as a passing statement, that for my leave I'll

11:07:06AM 17 be out of area and unavailable, get the CO leave message ready.

11:07:12AM 18 I did not look at my XO and specifically task him. I did not

11:07:15AM 19 have an individual conversation with my XO. It was general

11:07:17AM 20 words I put out to him.

11:07:19AM 21 Q. Well, is it -- well, I don't want you to speculate.

11:07:21AM 22 You have read the declaration that your XO signed as well,

11:07:25AM 23 correct?

11:07:25AM 24 A. Yes. I remember reading it the day of that it was brought

11:07:29AM 25 in.

**NAVY COMMANDER - CROSS-EXAM BY MS. POWELL**

11:07:30AM  1  **Q.**   Right.  And he says he was not told you were leaving the

11:07:33AM  2  area at that meeting?

11:07:35AM  3  **A.**   If you could bring the declaration, I would rather read it

11:07:37AM  4  with you so I make sure that I don't misunderstand.

11:07:41AM  5  **Q.**   Sure.

11:07:41AM  6       MS. POWELL:  I think I've got the redacted version

11:07:44AM  7  with me.  Is that okay?

11:07:46AM  8       MR. STAVER:  Sure.

11:08:18AM  9       MS. POWELL:  May I approach?

11:08:19AM 10       THE COURT:  You may.

11:08:23AM 11       MS. POWELL:  Would you like a copy?

11:08:27AM 12       THE COURT:  No, that's fine.

11:08:38AM 13  **Q.**   (By Ms. Powell)  Paragraph 3, the third sentence.

11:08:49AM 14  **A.**   "Monday" -- do you want me to read that?

11:08:51AM 15  **Q.**   Sure.

11:08:51AM 16  **A.**   "Monday, February 7th, 2022, Plaintiff Navy Commander did

11:08:55AM 17  not tell me he was going -- leaving the local area on leave."

11:09:01AM 18  **Q.**   So at the very least, your XO does not recall the

11:09:03AM 19  statement that you made at that meeting?

11:09:05AM 20  **A.**   I don't know if he means that I did not look at him one on

11:09:09AM 21  one and have a conversation, "Hey, XO, I'm going out of area on

11:09:12AM 22  leave."  As I previously stated, I said it in the meeting in

11:09:15AM 23  the group.  I don't know, if you were to ask him, "Hey, what

11:09:18AM 24  else did your commanding officer say at that meeting?" if he

11:09:21AM 25  would also be able to attest to all of those things.  I don't

**NAVY COMMANDER - CROSS-EXAM BY MS. POWELL**

11:09:25AM  1   know.  But whether or not he heard specifically that I was

11:09:28AM  2   going out of area on leave or not, I do not fault him for

11:09:31AM  3   remembering everything, nor am I going to, you know, say that,

11:09:35AM  4   you know, he is out of line.  I said it to a group.  This reads

11:09:39AM  5   as if I had a conversation with him, and I did not have a

11:09:44AM  6   conversation specifically with him.  I said it to a group.

11:09:48AM  7   Q.   Well, it doesn't say a conversation specifically with him.

11:09:50AM  8   It says he did not tell me he was leaving the local area on

11:09:54AM  9   leave in a group or otherwise, correct?

11:09:56AM 10   A.   I agree that he did not tell me he was leaving the local

11:09:59AM 11   area to be there.

11:10:02AM 12   Q.   Okay.  And yet paragraph 4 goes on to say that he spoke

11:10:04AM 13   with the other department heads about that meeting as well,

11:10:06AM 14   correct?

11:10:08AM 15   A.   Paragraph 4.  Okay.  Are you asking me to read that,

11:10:16AM 16   ma'am?

11:10:17AM 17   Q.   I'll read it.  The second sentence begins -- well, no,

11:10:20AM 18   I'll read all of it; how's that.

11:10:22AM 19        "I asked today" -- so the day this was signed.  "I asked

11:10:26AM 20   all the department heads who are other officers supervising

11:10:31AM 21   personnel responsible for different functions on the ship when

11:10:33AM 22   they became aware that Plaintiff Navy Commander was leaving the

11:10:37AM 23   local area on leave.  The combat systems officer became aware

11:10:40AM 24   that Plaintiff was leaving the local area on midday Tuesday,

11:10:43AM 25   February 8th, 2022, when Plaintiff Navy Commander asked him for

**NAVY COMMANDER - CROSS-EXAM BY MS. POWELL**

11:10:47AM  1    a COVID mitigation worksheet.  No other department heads were

11:10:50AM  2    aware that Plaintiff was leaving the local area before midday

11:10:53AM  3    on Tuesday."

11:10:57AM  4        Now, is that -- that suggests that he believes that none

11:11:04AM  5    of the other department heads remembered this conversation you

11:11:07AM  6    supposedly had with them.

11:11:09AM  7        MR. GANNAM:  Your Honor, I object to the requirement

11:11:11AM  8    for speculation.  On its face, there's no possible way that the

11:11:16AM  9    commander could know what happened in this conversation that

11:11:20AM 10    apparently occurred the day that he was testifying.  We further

11:11:23AM 11    object to the admissibility of anything in paragraph 4 as

11:11:29AM 12    hearsay or on top of hearsay.

11:11:32AM 13        We have no objection to the government asking the

11:11:33AM 14    commander questions about this or if he agrees to any of these

11:11:37AM 15    statements or knows about them, but we object to the

11:11:39AM 16    admissibility as the truth of anything in paragraph 4.

11:11:43AM 17        MS. POWELL:  Rules of evidence are somewhat relaxed

11:11:45AM 18    at these preliminary proceedings.  I certainly acknowledge this

11:11:48AM 19    is hearsay, Your Honor, and I'm interested in what the

11:11:51AM 20    commander's explanation is at this point.

11:11:53AM 21        THE COURT:  Overruled.  Go ahead, Ms. Powell.

11:11:56AM 22    Q.   (By Ms. Powell)  Does it change your testimony that

11:12:06AM 23    apparently the other department heads also don't remember that

11:12:08AM 24    conversation the way you do?

11:12:10AM 25    A.   No, it doesn't.

**NAVY COMMANDER - CROSS-EXAM BY MS. POWELL**

11:12:10AM 1 **Q.** Do you think they're mistaken as well?

11:12:13AM 2 **A.** I don't know.

11:12:14AM 3 **Q.** Do you think your XO is lying about the conversation he

11:12:18AM 4 had?

11:12:18AM 5 **A.** I do not think my XO is a liar. I do not know if he heard

11:12:22AM 6 it when I said it on Monday. The point of me talking to him

11:12:25AM 7 about Tampa is correct; it did not occur until Tuesday. I did

11:12:31AM 8 not tell any of my department heads where I was going or what I

11:12:35AM 9 was doing. It is my job to protect them from that and

11:12:39AM 10 establish good order and discipline on my ship. I do not think

11:12:42AM 11 it a good practice to share my personal legal matters to my

11:12:45AM 12 ship that impact my ability to carry on my service or conduct

11:12:50AM 13 my ability to command. That, in and of itself, is contrary to

11:12:54AM 14 good order and discipline and it would be a distraction. All

11:12:57AM 15 they needed to know was that I was going out of area.

11:12:58AM 16 The tasker to get a CO leave message did come out of that

11:13:02AM 17 conversation. Whether or not they remember this or the other

11:13:05AM 18 things that I said that day over the context or the course of

11:13:09AM 19 all the meetings and stuff that we have, I don't know. You

11:13:11AM 20 would have to call each one of them up here and state that. If

11:13:14AM 21 there's a question as to my integrity, you would have to call

11:13:17AM 22 them up here and say that, and I have no problem with that.

11:13:22AM 23 **Q.** Commander, you previously expressed a concern that the

11:13:22AM 24 declaration might have been the result of undue influence. Do

11:13:25AM 25 you have any specific reason to believe that there was undue

## NAVY COMMANDER - CROSS-EXAM BY MS. POWELL

11:13:29AM 1   influence on your executive officer?

11:13:33AM 2   A.   I don't think it is appropriate for my case here to speak

11:13:37AM 3   on the religious freedoms as associated with this case and the

11:13:42AM 4   vaccine mandate, is appropriate to go under me to my

11:13:47AM 5   subordinates and speak to my integrity or, you know, misleading

11:13:50AM 6   of information, as it's saying here, specifically as in terms

11:13:53AM 7   to when I was going out of leave and what they know or didn't

11:13:57AM 8   know.

11:13:57AM 9   Q.   Do you have any reason to think that someone asked him to

11:13:59AM 10  lie or mislead?

11:14:02AM 11  A.   I don't think my XO is lying.

11:14:06AM 12  Q.   Or you speculated that there might have been undue

11:14:09AM 13  influence.  I'm just asking whether you have any -- anyone told

11:14:11AM 14  you that was the case or if you have other specific evidence of

11:14:15AM 15  it.

11:14:15AM 16  A.   I think the act of going to my XO to provide a declaration

11:14:20AM 17  on one particular subject matter that is in question and

11:14:24AM 18  doesn't provide a recourse for what else you knew or the full

11:14:28AM 19  context of that is -- in my opinion, that is undue command

11:14:32AM 20  influence.  If you wanted him to provide a full statement on

11:14:35AM 21  everything that he knew, or my integrity, or character, or the

11:14:37AM 22  good order and discipline on my ship, that's not provided here.

11:14:41AM 23  It's one specific question that they went after.

11:14:44AM 24  Q.   Correct.

11:14:45AM 25  A.   I don't think he had the full context of this either.

NAVY COMMANDER - CROSS-EXAM BY MS. POWELL

11:14:50AM  1   Q.   Okay.

11:14:50AM  2   A.   Does that answer your question, ma'am?

11:14:52AM  3   Q.   Yes, I think it does.

11:14:53AM  4        Prior to the last hearing, you did -- you testified that

11:15:04AM  5   you did eventually submit the travel risk assessment that's

11:15:08AM  6   required, correct?

11:15:09AM  7   A.   Ma'am, are you referring to this week or the last one?

11:15:12AM  8   Q.   The last one.

11:15:12AM  9   A.   The last one, yes.  The commodore had called me, because

11:15:16AM 10   he saw the leave message.  I can't remember if it was late on

11:15:21AM 11   the ship and I was still there, you know, working through

11:15:23AM 12   things, somewhere around 5 or 6 o'clock, he called and had that

11:15:27AM 13   conversation, yes, ma'am.

11:15:28AM 14   Q.   So it was submitted after he confronted you about it?

11:15:30AM 15   A.   I submitted it after having the conversation, walking

11:15:33AM 16   through the worksheet with him on it, yes.

11:15:36AM 17   Q.   This particular county you were traveling to was

11:15:40AM 18   considered a high risk COVID area at the time, correct?

11:15:43AM 19   A.   I believe so, but I don't know --

11:15:44AM 20   Q.   It is currently, correct?

11:15:46AM 21   A.   Yes.  Yes, ma'am.

11:15:48AM 22   Q.   And I think at the last hearing, and please correct me if

11:15:52AM 23   I'm wrong, I think you conceded that you probably should have

11:15:54AM 24   done the risk mitigation plan sooner?

11:15:57AM 25   A.   Yes, I conceded that I probably should have said to him on

**NAVY COMMANDER - CROSS-EXAM BY MS. POWELL**

| | | |
|---|---|---|
| 11:16:01AM | 1 | Monday -- |
| 11:16:01AM | 2 | Q.   Because it needed his approval? |
| 11:16:06AM | 3 | A.   Yes.  The COVID travel risk assessment in and of itself is |
| 11:16:10AM | 4 | not directive.  It's not required by Navy policy, it's at |
| 11:16:14AM | 5 | commander's discretion.  My point in speaking to the commodore, |
| 11:16:18AM | 6 | is like, "Yes, sir, I realize me being unvaccinated and high |
| 11:16:21AM | 7 | risk, I should have provided to you more time to make that |
| 11:16:24AM | 8 | determination."  To say that I didn't meet a requirement, I |
| 11:16:27AM | 9 | don't know if I agree with that or where that's written that |
| 11:16:30AM | 10 | that is required, unless my commodore said, "I want to see that |
| 11:16:36AM | 11 | so I can make a determination for your ROM."  Yes. |
| 11:16:38AM | 12 | Q.   The policy applicable to sailors aboard your ship requires |
| 11:16:41AM | 13 | it to be done prior to requesting leave, correct? |
| 11:16:44AM | 14 | A.   If they are going out-of-area leave, yes, ma'am. |
| 11:17:00AM | 15 | Q.   For this hearing, you submitted your leave request and |
| 11:17:03AM | 16 | travel mitigation plan ahead of time, correct, before taking |
| 11:17:07AM | 17 | leave? |
| 11:17:07AM | 18 | A.   Yes, ma'am. |
| 11:17:08AM | 19 | Q.   And in that you proposed a three-day restriction of |
| 11:17:12AM | 20 | movement? |
| 11:17:13AM | 21 | A.   I did. |
| 11:17:13AM | 22 | Q.   Despite the fact this county is a high risk area and |
| 11:17:17AM | 23 | you're attending indoor gatherings? |
| 11:17:19AM | 24 | A.   I did.  In consult with my IDC, my independent duty |
| 11:17:23AM | 25 | corpsman, and the Navy policy for executing a ROM is not |

**NAVY COMMANDER - CROSS-EXAM BY MS. POWELL**

11:17:29AM  1  specific to the community level of transmission.  It actually

11:17:32AM  2  says the ROM is required if you are COVID-positive.  One, I am

11:17:36AM  3  not COVID-positive and I tested negative, and, two, the ROM is

11:17:40AM  4  at the discretion of the commander based on all the facts.  You

11:17:44AM  5  can implement mitigations and not do a ROM, such as no ROM is

11:17:48AM  6  required after the return of your travel, wear an N95 mask.  If

11:17:52AM  7  you develop symptoms, get a test, et cetera.  We decided three

11:17:56AM  8  days --

11:17:56AM  9  Q.   So --

11:17:56AM 10  A.   -- because -- if I can continue.  My IDC, based on the CDC

11:18:02AM 11  guidance that, you know, symptoms -- if you were to be exposed,

11:18:05AM 12  symptoms generally develop within 48 to 72 hours following

11:18:08AM 13  that.  So if I did this travel, based on the interactions that

11:18:12AM 14  I had with people, and I returned to Norfolk, after 48 to

11:18:16AM 15  72 hours, if you don't have any symptoms, that would be a

11:18:19AM 16  sufficient ROM and you could come back and we could do the test

11:18:22AM 17  and clear.

11:18:23AM 18  Q.   But the CDC guidance applicable to unvaccinated travelers

11:18:26AM 19  specifically recommends a five-day quarantine, correct?

11:18:31AM 20  A.   I don't know if that's what the CDC says.  I know what the

11:18:34AM 21  CDC puts out before the Navy can execute, and the Navy has to

11:18:38AM 22  evaluate that and apply it to the Navy based on, you know,

11:18:41AM 23  operational guidance, ships, buildings, et cetera.

11:18:43AM 24  Q.   The guidance you provided to your own sailors provides for

11:18:46AM 25  a five-day quarantine, does it not?

NAVY COMMANDER - CROSS-EXAM BY MS. POWELL

11:18:49AM 1  **A.**   That guidance was written in May of 2021, and the policy

11:18:54AM 2  for COVID and the CDC has changed multiple times over since

11:18:58AM 3  May of 2021.  It was actually signed by my predecessor.  I

11:19:02AM 4  would say that it's somewhat out-of-date.  But, yes, we did

11:19:05AM 5  that five a-day ROM also based on medical guidelines then, and

11:19:10AM 6  I can't remember what the five days was for, but that --

11:19:14AM 7  **Q.**   But it still does apply to the sailors under your command?

11:19:17AM 8  **A.**   It does.

11:19:17AM 9  **Q.**   And it is consistent with the current CDC guidance for

11:19:19AM 10 travel of unvaccinated persons, correct?

11:19:21AM 11 **A.**   I can't attest to that.  I'd have to read what the CDC

11:19:25AM 12 says for travel of unvaccinated sailors.

11:19:28AM 13 **Q.**   But in any event, you thought you were entitled to special

11:19:29AM 14 treatment that your crew was not?

11:19:33AM 15 **A.**   No.  Why is it special treatment?

11:19:35AM 16 **Q.**   Because your crew would be required to undergo a five-day

11:19:40AM 17 quarantine?

11:19:40AM 18 **A.**   No.  I can change and establish that based on the travel

11:19:42AM 19 risk assessments that I got.  Most of my crew doesn't get a ROM

11:19:44AM 20 at all because most of the crew is vaccinated.

11:19:47AM 21 **Q.**   Correct.

11:19:48AM 22     But if they were not, the current policy would provide for

11:19:51AM 23 a five-day quarantine, would it not?

11:19:53AM 24 **A.**   It's at my discretion for their ROM.

11:19:58AM 25 **Q.**   Okay.

## NAVY COMMANDER - CROSS-EXAM BY MS. POWELL

11:19:59AM 1   A.   For my crew.  The whole travel risk assessment is based on

11:20:04AM 2   commander's evaluation whether the travel is at risk or not.

11:20:09AM 3   The only requirement is if I had someone who tested positive

11:20:13AM 4   for COVID, they would be mandated a five-day ROM.  I think the

11:20:17AM 5   Navy policy also says that for foreign travel, so if somebody

11:20:20AM 6   traveled overseas, whether it's for vacation or to go see

11:20:23AM 7   family living somewhere, they would also be mandated a five-day

11:20:26AM 8   ROM.

11:20:26AM 9   Q.   You testified briefly, and I'm honestly not entirely sure

11:20:31AM 10  I understand the ins and outs here, that you had requested for

11:20:35AM 11  temporary duty status for this hearing.

11:20:38AM 12  A.   Mm-hmm.

11:20:39AM 13  Q.   If that were the case, you would not be taking leave,

11:20:43AM 14  right?  If that would were the case, you would be getting paid

11:20:46AM 15  by the Navy to pursue your private lawsuit against the Navy?

11:20:49AM 16  A.   That's a negative.  No, ma'am.

11:20:52AM 17  Q.   Why?

11:20:52AM 18  A.   Because the joint travel regulations do allow permissive

11:20:57AM 19  TAD.  There are provisions for funded government travel and

11:21:01AM 20  there are provisions that say that this is not government

11:21:03AM 21  funded travel.  At no point -- and the commodore asked me that

11:21:07AM 22  multiple times if I was asking for funded travel.  I very

11:21:10AM 23  clearly said, at least three times, I am not asking for funded

11:21:13AM 24  travel.

11:21:13AM 25  Q.   You are asking to not to take leave.

**NAVY COMMANDER - CROSS-EXAM BY MS. POWELL**

11:21:15AM  1   **A.**   Yes.  Because there are provisions that allow you to do
11:21:19AM  2   something under the obligation of duties that are allowed by
11:21:22AM  3   Navy policy or DoD policy that you don't have to take leave
11:21:26AM  4   for.
11:21:26AM  5   **Q.**   And if you were not taking leave, you'd be receiving your
11:21:29AM  6   regular salary for pursuing your private lawsuit against the
11:21:32AM  7   Navy.
11:21:32AM  8   **A.**   Yes.  And in conversation with my JAG, you can do
11:21:35AM  9   permissive TAD when you are a witness -- when you are
11:21:39AM 10   subpoenaed to witness in court.  We have permissive travel all
11:21:42AM 11   the time for, you know, local TAD stuff, for example, for
11:21:45AM 12   schools.  You have permissive TAD -- and I'm speaking no-cost
11:21:49AM 13   options here -- for house hunting, for example.  Somebody has
11:21:54AM 14   orders to go somewhere else, they can take no-cost orders to go
11:21:57AM 15   out and, you know, pursue a future home, where they're going to
11:22:01AM 16   live if they are moving out of the area.  And I did not request
11:22:05AM 17   funded travel.  I said my intentions are to do permissive TAD
11:22:09AM 18   because I thought there was that provision for me.
11:22:11AM 19   **Q.**   And typically when your TAD -- is that what you called
11:22:14AM 20   that?
11:22:15AM 21   **A.**   Temporary assigned duty --
11:22:15AM 22   **Q.**   Okay.
11:22:16AM 23   **A.**   -- or temporary duty, TAD, TDY.
11:22:19AM 24   **Q.**   You're in some sort of official status when you're on
11:22:21AM 25   that, correct?  Sort of acting in an official capacity?

**NAVY COMMANDER - REDIRECT EXAM BY MR. GANNAM**

11:22:26AM  1   **A.**   I guess you can say that.

11:22:28AM  2   **Q.**   And this is a personal legal matter; no?

11:22:30AM  3   **A.**   So when you do house hunting, you are not acting in an

11:22:34AM  4   official capacity, you are executing duties that the Navy or

11:22:37AM  5   government allows you to do for that purpose.

11:22:39AM  6   **Q.**   Right.  But if you're searching for a house in a new

11:22:42AM  7   location, it's typically one that the Navy has ordered you to

11:22:45AM  8   go to.

11:22:45AM  9   **A.**   For house hunting leave, yes.  You have to have orders

11:22:49AM 10   outside of the area to be able to travel there and execute

11:22:51AM 11   that.

11:22:52AM 12   **Q.**   Got it.

11:23:00AM 13           MS. POWELL:  Can I have just a moment?

11:23:02AM 14           THE COURT:  You may.

11:23:13AM 15      (Off-the-record discussion between Ms. Powell and

11:23:16AM 16       Commander Osterhues.)

11:23:19AM 17           MS. POWELL:  That's all I have, Your Honor.

11:23:20AM 18           THE COURT:  All right.  Thank you, Ms. Powell.

11:23:23AM 19           Mr. Gannam, if you have redirect for this witness,

11:23:27AM 20   you are recognized for that purpose.

11:23:30AM 21           MR. GANNAM:  Thank you, Your Honor.

11:23:32AM 22           May it please the Court.

11:23:33AM 23                        REDIRECT EXAMINATION

11:23:33AM 24   BY MR. GANNAM:

11:23:34AM 25   **Q.**   Did you or the government file the motion that led to the

NAVY COMMANDER - REDIRECT EXAM BY MR. GANNAM

11:23:38AM 1  hearing here today?

11:23:40AM 2  A.   I'm sorry, can you say that again?

11:23:41AM 3  Q.   Did you file the motion seeking the stay of the Court's

11:23:45AM 4  order that led to the hearing today?

11:23:47AM 5  A.   No, sir.

11:23:47AM 6  Q.   Is it your understanding that the defendants, the U.S.

11:23:50AM 7  government, filed that motion?

11:23:53AM 8  A.   I'm not -- can you say that again?

11:23:55AM 9  Q.   Is it your understanding that the defendants in this

11:23:58AM 10 case --

11:23:58AM 11       THE COURT:  I think we can take notice of who filed

11:24:00AM 12 the motion, Mr. Gannam.

11:24:04AM 13 Q.   (By Mr. Gannam)  At least you didn't ask for the motion to

11:24:07AM 14 be filed that led to you being here?

11:24:09AM 15 A.   No, sir, I did not.

11:24:10AM 16 Q.   When you submitted your request for TAD, did you disclose

11:24:15AM 17 to your commander the reason why you wanted to take that TAD?

11:24:19AM 18 A.   I did.

11:24:19AM 19 Q.   And was it approved?

11:24:21AM 20 A.   It was approved Tuesday evening, yes, sir.  After multiple

11:24:28AM 21 RFIs, which is request for information, of the type of travel

11:24:32AM 22 and the type of leave, what am I doing on leave, where am I

11:24:36AM 23 staying, my travel risk, whether it's going to be funded or

11:24:40AM 24 not, there are multiple RFIs after requesting that, yes, sir.

11:24:44AM 25 Q.   When you submitted your recommendation for the ROM

11:24:48AM 1  requirement when you returned from this hearing, did you demand

11:24:54AM 2  that it only be three days, or merely recommend that?

11:24:59AM 3  **A.**   It was a recommendation, sir.

11:25:01AM 4  **Q.**   And will you comply with whatever ROM requirement is

11:25:04AM 5  imposed by your commander whenever that's done?

11:25:06AM 6  **A.**   Yes, sir, I will.

11:25:07AM 7  **Q.**   And is that any different from how a sailor under your

11:25:11AM 8  command would be treated when submitting a recommended ROM

11:25:15AM 9  requirement for travelling out of area?

11:25:17AM 10 **A.**   No, it is not.

11:25:20AM 11 **Q.**   When the deputy commodore came on board your ship to

11:25:25AM 12 travel with you on your last exercise, at any point did he

11:25:30AM 13 assume command of your ship?

11:25:31AM 14 **A.**   No, sir, he did not.

11:25:37AM 15          MR. GANNAM:  I've no further questions, Your Honor.

11:25:38AM 16          THE COURT:  All right.  Thank you very much.  In that

11:25:40AM 17 case, Navy Commander, if you'll remember to let us detach that

11:25:43AM 18 microphone, you may step down, and you're excused with our

11:25:47AM 19 thanks.

11:25:48AM 20          THE WITNESS:  Thank you.

11:25:58AM 21          THE COURT:  It is just at 11:30.  Would this be a

11:26:01AM 22 good time to take a brief recess?

11:26:03AM 23          MR. STAVER:  That's fine.

11:26:05AM 24          THE COURT:  You're about to call a witness.  Do you

11:26:07AM 25 have an idea what the duration of that witness might be on

11:26:10AM 1 direct?

11:26:10AM 2          MR. STAVER:  I would say 45 minutes to an hour.

11:26:13AM 3          THE COURT:  All right.  Well, why don't we take a

11:26:15AM 4 brief recess, then we'll come back here, hear that witness and

11:26:19AM 5 any cross-examination, and then we'll break for lunch.

11:26:21AM 6          MR. STAVER:  Thank you.

11:26:22AM 7          THE COURT:  Does that sound all right, Ms. Powell?

11:26:24AM 8          MS. POWELL:  I'm sorry, I missed what you said.

11:26:29AM 9          THE COURT:  I asked Mr. Staver -- I said we've been

11:26:32AM 10 in session about an hour and a half, and it's also 30 minutes

11:26:40AM 11 before noon.  So I said, "Well, are you going to call a

11:26:44AM 12 witness?  How long will the witness be on direct?" and I think

11:26:47AM 13 he said 45 minutes.  I said, "Okay.  Well, let's take a break,"

11:26:51AM 14 just the morning recess, in other words, "and come back in 15

11:26:54AM 15 or 20 minutes, maybe at a quarter to 12, we'll hear that

11:26:58AM 16 witness and any cross-examination, and then break for the lunch

11:27:01AM 17 hour."  Is that all right?

11:27:02AM 18          MS. POWELL:  Yes.

11:27:03AM 19          THE COURT:  Does that sound good?

11:27:04AM 20          MR. STAVER:  Thank you.

11:27:05AM 21          THE COURT:  Then we are in recess for about 15 or

11:27:11AM 22 20 minutes.  We'll say 20.  All right.  Thank you.

11:27:15AM 23      (Proceedings in recess from 11:27 a.m. until 11:50 a.m.)

11:50:34AM 24          THE COURT:  All right.  Please be seated.

11:50:39AM 25          Mr. Staver, you're recognized to call your next

11:50:54AM  1   witness.

11:50:54AM  2              MR. STAVER:  Yes, Your Honor.

11:50:55AM  3              I call Lieutenant Colonel Peter Chambers --

11:50:58AM  4   Dr. Chambers to the stand.

11:50:59AM  5              MS. POWELL:  Your Honor, this is one of the witnesses

11:51:09AM  6   I previously objected to.  I don't know how you'd like to

11:51:12AM  7   handle that.

11:51:12AM  8              THE COURT:  Well, here's what I'm going to do.  This

11:51:21AM  9   is -- there's no jury in this circumstance, so the witness is

11:51:25AM  10  here for the purpose of testifying, and, like everyone else,

11:51:30AM  11  has, I'm sure, traveled here.  I cannot determine at this

11:51:35AM  12  moment anything about qualifications or -- I don't know his

11:51:39AM  13  opinions or the like.

11:51:43AM  14             But the way I normally handle this for experts when

11:51:48AM  15  their credentials are not stipulated as qualifying the witness

11:51:59AM  16  to testify in the form of an opinion on some stated topic, I

11:52:06AM  17  allow the proffering party to state the -- through question and

11:52:15AM  18  answer, to develop their credentials and state the subject

11:52:19AM  19  matter on which the party tenders the witness to the Court as

11:52:22AM  20  an expert, and then would recognize you to voir dire that

11:52:26AM  21  witness for that purpose, and then assuming that the witness

11:52:34AM  22  qualifies, allow the testimony to proceed.  At your option, you

11:52:40AM  23  could let the testimony go forward and voir dire the witness on

11:52:43AM  24  cross-examination, either way.  For the purposes of this

11:52:51AM  25  hearing, initially, I will permit the witness to testify over

11:52:55AM 1 the objection.  And obviously the plaintiffs would be entitled

11:53:01AM 2 to proffer the testimony in any event.

11:53:05AM 3          MS. POWELL:  Okay.

11:53:05AM 4          THE COURT:  So it's not a material difference one way

11:53:08AM 5 or the other.  So that's how I sort of intended to handle that,

11:53:14AM 6 which I think is about the most expeditious way to do it.

11:53:18AM 7          Yes, sir.  If you'll step forward.  Let me ask you to

11:53:22AM 8 raise your right hand.

11:53:23AM 9               PETER CONSTANTINE CHAMBERS,

11:53:23AM 10     having been sworn or affirmed under oath, was examined and

11:53:31AM 11 testified as follows:

11:53:31AM 12          THE COURT:  State your name, please.

11:53:32AM 13          THE WITNESS:  Peter Constantine Chambers.

11:53:35AM 14          THE COURT:  Peter Constantine Chambers.

11:53:39AM 15          THE WITNESS:  Yes, sir.

11:53:40AM 16          THE COURT:  Sir, if you will have a seat in the

11:53:44AM 17 witness stand.  We'll need to attach the microphone to

11:53:47AM 18 something, lapel, the tie, or something of the like.

11:54:10AM 19          MR. STAVER:  May we approach the witness with the

11:54:12AM 20 exhibits, and we'll distribute those so we can address those as

11:54:15AM 21 we proceed?

11:54:16AM 22          THE COURT:  You may do so freely as long as you don't

11:54:21AM 23 camp out.

11:54:21AM 24          MR. STAVER:  Certainly.  We're just going to present

11:54:24AM 25 one notebook and leave it there for the different ones.

## PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

11:54:25AM 1            THE COURT:  Great.  Thank you.

11:54:26AM 2            MR. STAVER:  And this is not -- we're not introducing

11:54:28AM 3    all of this, but will pare it down to streamline our hearing

11:54:33AM 4    today.

11:54:40AM 5                        DIRECT EXAMINATION

11:54:40AM 6    BY MR. STAVER:

11:54:43AM 7    Q.   Can you state your name again for the record.

11:54:45AM 8    A.   Peter Constantine Chambers.

11:54:47AM 9    Q.   Can you tell the Court the background about your education

11:54:51AM 10   and training particularly in the medical field and in the

11:54:54AM 11   military?

11:54:56AM 12   A.   Yes, sir.  I came into the Army in 1983 as an enlisted

11:55:00AM 13   man, infantryman.  Did my time, got an honorable discharge.

11:55:05AM 14   Upon completion of that, I attended College of Medical School,

11:55:08AM 15   University of New England.  College of Osteopathic Medicine is

11:55:11AM 16   where I graduated from in 1995.  At that time, I went to the

11:55:15AM 17   Reserves in order to do my residency program, the Inactive

11:55:20AM 18   Ready Reserves.  I did a primary care residency with the

11:55:23AM 19   intention of being an operational position in the Army's

11:55:26AM 20   Special Forces, of which I did.

11:55:27AM 21        I went back in after 9/11 and I attended the Special

11:55:31AM 22   Forces Q Course, became qualified as a Green Beret and also as

11:55:36AM 23   a battalion surgeon for a particular unit at Fort Bragg.

11:55:40AM 24        That would bring me up to 2015, when I left that position

11:55:45AM 25   and then I went to the Texas National Guard --

PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

11:55:47AM  1          THE COURT:  Mr. Chambers.

11:55:48AM  2          THE WITNESS:  Yes, sir.

11:55:48AM  3          THE COURT:  Could I ask you to speak just a step or

11:55:50AM  4   two more slowly.

11:55:51AM  5          THE WITNESS:  Yes.

11:55:52AM  6          THE COURT:  I'm trying to follow you --

11:55:52AM  7          THE WITNESS:  Okay.

11:55:53AM  8          THE COURT:  -- and take a few notes here as I go.

11:55:53AM  9          THE WITNESS:  Okay.  Absolutely.

11:55:56AM 10          THE COURT:  -- and it'll ease the pressure on the

11:55:59AM 11   court reporter as well.

11:55:59AM 12          THE WITNESS:  So after 2015, I came off active duty

11:56:02AM 13   from Fort Bragg and went to the Texas National Guard.  At that

11:56:06AM 14   time, I took a position as a surgeon -- physician and surgeon

11:56:11AM 15   with the task force also in the Texas Guard that is a Special

11:56:18AM 16   Operations Tac Unit.

11:56:19AM 17          After that, we get to last year of 2020, I was the

11:56:27AM 18   governor's task force liaison, so the Governor Abbott, for the

11:56:32AM 19   COVID response, and I did that for eight months during the

11:56:35AM 20   COVID response, from March -- for eight months on.

11:56:39AM 21          The border mission then came on, it was Operation

11:56:44AM 22   Lone Star, and it -- let's see, February -- February of 2021.

11:56:49AM 23   I went on to that mission as a task force surgeon under a

11:56:55AM 24   502(f) type orders.  And a 502(f) is for COVID response, it's

11:57:00AM 25   Title 10.  And I was taken off those orders in November of 2021

PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

11:57:06AM 1   at which time -- unfortunately I have to get out for a medical

11:57:11AM 2   discharge, sir -- Your Honor.

11:57:15AM 3   Q.   (By Mr. Staver)  We'll talk about that in a few moments.

11:57:17AM 4        So do have -- in addition to your medical training, do you

11:57:20AM 5   have individual training in COVID response with regards to the

11:57:23AM 6   governor's task force of Texas?

11:57:28AM 7   A.   Well, that's more of an on-the-job type training.  I

11:57:30AM 8   wasn't trained specifically in epidemiology or virology.  I'm a

11:57:34AM 9   primary care doctor.  But I was able to help advise on

11:57:39AM 10  procurement of PPE, testing and tracing for the state of Texas,

11:57:45AM 11  to include the northern half of the state of Texas.  Put me on

11:57:48AM 12  the road a lot, sir.  So there's no real particular training

11:57:52AM 13  other than on-the-job, like I said, observation and beliefs.

11:57:57AM 14  Q.   Can I assume that you were selected for that position

11:58:00AM 15  because of your abilities to address COVID response?

11:58:04AM 16  A.   Okay.  Yes, sir.  I believe that the selection for that

11:58:09AM 17  was because of my training as a Special Forces position, where

11:58:13AM 18  we do training for weapons of mass destruction and bio-warfare,

11:58:17AM 19  yes, sir.

11:58:17AM 20  Q.   And you mentioned that you're also a Green Beret and that

11:58:21AM 21  you're a medical doctor.  Are there very many other people like

11:58:24AM 22  you that are medical doctors within the Green Beret?

11:58:27AM 23  A.   There are five in the inventory, sir, in the Department of

11:58:30AM 24  Defense.

11:58:30AM 25  Q.   Are you saying that there's five medical doctors that are

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

11:58:34AM  1  in the Green Beret in the entire Department of Defense or in

11:58:38AM  2  the U.S. Army?

11:58:39AM  3  **A.**   To my last knowledge, sir, there are five.

11:58:42AM  4  **Q.**   In the entire Department of Defense?

11:58:44AM  5  **A.**   18 series/61 November, there are five, sir.

11:58:48AM  6  **Q.**   Okay.  And you're one of those five?

11:58:50AM  7  **A.**   Yes, sir.

11:58:52AM  8  **Q.**   You also were apparently tasked for the COVID response

11:58:55AM  9  with regards to your military.

11:58:57AM 10  **A.**   I believe so, sir.

11:59:00AM 11  **Q.**   Prior to talking about what you're seeing on the border,

11:59:04AM 12  and we'll talk more about that, and your COVID response, you

11:59:08AM 13  also have received a number of honors and medals, including a

11:59:13AM 14  Purple Heart?

11:59:14AM 15  **A.**   Yes, sir.  I didn't move out of the way fast enough.

11:59:17AM 16  **Q.**   Can you explain that?

11:59:18AM 17  **A.**   Yes, sir.  At 12 May, 2004, my vehicle was struck by an

11:59:22AM 18  IED.  There was a one-five-five howitzer shell buried in the

11:59:26AM 19  road in Iraq.  Other gentlemen in the vehicle lost their lives;

11:59:32AM 20  I was able to get out of it.

11:59:33AM 21  **Q.**   And you were injured?

11:59:35AM 22  **A.**   Yes, sir.

11:59:36AM 23  **Q.**   How were you injured?

11:59:37AM 24  **A.**   I was injured by initial blast overpressure injury and a

11:59:42AM 25  high velocity round that went through my left arm and ended up

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

11:59:47AM  1  lodged into the left side of my chest.

11:59:49AM  2  **Q.**   Did the other individuals in the vehicle survive?

11:59:52AM  3  **A.**   One did, and he passed away en route back to the States,

11:59:55AM  4  yes, sir.

11:59:55AM  5  **Q.**   And did you assist him?

11:59:57AM  6  **A.**   Yes, sir.

11:59:59AM  7  **Q.**   So in your work with regards to the military, you also

12:00:04PM  8  were assigned a bomb-sniffing dog; is that correct?

12:00:10PM  9  **A.**   Yes, sir.   The dog was -- because we lost the handler, we

12:00:14PM 10  have a military working dog, he's airborne qualified, he goes

12:00:18PM 11  on missions with us.   It's not typically the job of the

12:00:20PM 12  surgeon, but as a Green Beret, I'm generally closer to the tip

12:00:25PM 13  of the spear, and so we have these working dogs that go with us

12:00:28PM 14  down range.   The handler was killed, I got a hold of him, I had

12:00:31PM 15  him for six months, he retired, and then I ended up adopting

12:00:35PM 16  him, yes, sir.

12:00:35PM 17  **Q.**   Now, I understand this dog has taken 41 jumps.   Are most

12:00:39PM 18  of them or many of them with you?

12:00:40PM 19  **A.**   Just one with me, sir.

12:00:41PM 20  **Q.**   One with you, but 41 total?

12:00:43PM 21  **A.**   Yes.

12:00:43PM 22  **Q.**   And you have your dog here, not in the courtroom but in

12:00:46PM 23  the hotel room?

12:00:47PM 24  **A.**   Next door.

12:00:48PM 25  **Q.**   Are you with him 24/7?

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:00:50PM 1  **A.**   Yes, sir.

12:00:51PM 2  **Q.**   And you still use that dog?

12:00:52PM 3  **A.**   Yes, sir.

12:00:52PM 4  **Q.**   Can you tell us --

12:00:53PM 5  **A.**   He's now a service dog for me.

12:00:55PM 6  **Q.**   Can you tell us what you're doing in Texas?  What is your

12:00:59PM 7  duty with the military?

12:01:00PM 8  **A.**   My duty with the military is I'm a Special Operations

12:01:03PM 9  Detachment-Alpha, that's for Africa, that's our area of

12:01:06PM 10  operations, I am the surgeon for that.  I also serve as a dual

12:01:09PM 11  capacity as an 18 Alpha, which is a commander for Special

12:01:14PM 12  Forces, however my primary position is as a flight surgeon, 61

12:01:19PM 13  November.

12:01:20PM 14  **Q.**   And your dog is with you on the border?

12:01:23PM 15  **A.**   He was with me for the past several months, since March,

12:01:26PM 16  and I came off in November this last year.

12:01:28PM 17  **Q.**   What do you do on the border?

12:01:30PM 18  **A.**   So my job on the border is -- primarily because I'm under

12:01:32PM 19  502(f) orders, that is Title 10, even though to stay active

12:01:38PM 20  duty mission, my primary focus was to mitigate COVID as we

12:01:42PM 21  operated in an austere environment on the border, where 10,000

12:01:46PM 22  to 20,000 people a week that are unvaccinated walk across that

12:01:50PM 23  border, and it is our soldiers who have to meet them, and

12:01:53PM 24  apprehend many times, and my dog and I have done that as well

12:01:56PM 25  because I spent every third night on the border.

## PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:01:57PM  1  **Q.**   Is this potentially life-and-death-threatening situations

12:02:01PM  2  for you and your team?

12:02:02PM  3  **A.**   Absolutely, sir.

12:02:03PM  4  **Q.**   Why is that?

12:02:05PM  5  **A.**   Well, on occasion we get indirect fire, sometimes we get

12:02:08PM  6  direct fire, not indirect in the form of mortars, but they --

12:02:09PM  7  plunging fire, so sometimes you can take a 50-caliber, which is

12:02:12PM  8  a large round, it's happened.  We've had people not in my unit

12:02:15PM  9  hit, but civilians in town that's probably not talked about in

12:02:19PM  10  the news, and it comes across from what we call the Mike side,

12:02:23PM  11  or the Mexican side.  Cartels are always having exchanges of

12:02:29PM  12  gunfire.  There are exchanges of gunfire that take place

12:02:33PM  13  between factions down there, particularly in the Roma region,

12:02:36PM  14  that is one of our hottest areas.  We will have 900 migrants

12:02:41PM  15  walk across that point every night who are unvaccinated and who

12:02:47PM  16  are sick, and it has been my job to keep our soldiers safe, and

12:02:52PM  17  I did a good job of it, sir.

12:02:54PM  18  **Q.**   Before we get to that, I want to ask, you are nearly 40

12:02:58PM  19  years in the military, correct?

12:03:00PM  20  **A.**   My career spans 38 years; came in in 1983, sir.  I had a

12:03:04PM  21  break in service.  So on my leave-and-earning statement, it

12:03:08PM  22  says 38 years.  I'm over 20 years and have a letter that I can

12:03:11PM  23  retire.

12:03:12PM  24  **Q.**   Was it your goal to reach 40 years cumulatively?

12:03:15PM  25  **A.**   I wanted to reach 40 years, yes, sir.

PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:03:17PM 1  **Q.**   And why are you not going -- let me back up.

12:03:19PM 2       Are you planning to retire prior to 40 years cumulative,

12:03:23PM 3  sir?

12:03:23PM 4  **A.**   Yes, sir.  My plan was to retire at 40 years and hopefully

12:03:28PM 5  make the next rank so it would be a better retirement.

12:03:31PM 6  **Q.**   And that would be 2023 sometime?

12:03:34PM 7  **A.**   Yes, sir.

12:03:34PM 8  **Q.**   But are you retiring in 2022?

12:03:37PM 9  **A.**   Yes, sir.  I'll be retiring probably in 60 days.

12:03:41PM 10 **Q.**   Why are you retiring?

12:03:44PM 11 **A.**   I had an adverse reaction to a Moderna shot.

12:03:48PM 12 **Q.**   What kind of adverse reaction?

12:03:50PM 13 **A.**   It was a neurologic deficit.

12:03:51PM 14 **Q.**   Can you explain what that is?

12:03:53PM 15 **A.**   Yes, sir.  What my MRI shows is demyelination.  And I've

12:03:59PM 16 had several soldiers on the border have the same type situation

12:04:02PM 17 all within the same time frame as myself.  This is what brought

12:04:06PM 18 me to meet with my colleague -- can I say her name?

12:04:09PM 19 **Q.**   You can.

12:04:10PM 20 **A.**   Lieutenant Colonel Theresa Long.  She's sitting in this

12:04:14PM 21 courtroom right now.  I met her over the phone.  She's a master

12:04:18PM 22 of public health and she's also an epidemiology trained

12:04:23PM 23 physician.  I work, like I said, sir, at the tip of the spear.

12:04:26PM 24 I don't have access to those things typically; she pointed me

12:04:29PM 25 in the right direction.  I called her and asked her, "How do I

PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:04:32PM  1   find out how many soldiers in general?"  She said, "The DMED

12:04:37PM  2   system," defense medical epidemiologic database.

12:04:40PM  3   **Q.**   Is that abbreviation D-M-E-D?

12:04:42PM  4   **A.**   Delta, Echo -- Well, D-M-E-D.

12:04:45PM  5   **Q.**   And what is the DMED?

12:04:47PM  6   **A.**   It's a database -- and she can explain it more eloquently

12:04:52PM  7   than I -- that is created to be a sentinel watch for physicians

12:04:58PM  8   to know when there's a pandemic, an epidemic, or too many of

12:05:03PM  9   one type of disease process that would typically break the

12:05:09PM 10   normal patterns, and it lets us know every year based upon ICD

12:05:13PM 11   Ten Codes, so this is a very objective database.

12:05:16PM 12        This is not like the VAERS system that we've been hearing

12:05:19PM 13   about, where in the VAERS system it can be somewhat subjective.

12:05:23PM 14   This one is objective; it is by each individual visit.

12:05:27PM 15        So perhaps if a soldier comes in and says, "I have chest

12:05:31PM 16   pain, shortness of breath," and they're diagnosed with

12:05:34PM 17   pericarditis, you would then have three ICD Ten Codes that

12:05:38PM 18   would be brought up for that.  Then we look at that and see

12:05:41PM 19   what are the norms, what are the changes, and whether the Delta

12:05:44PM 20   would cause the changes.

12:05:46PM 21   **Q.**   And when you say VAERS, that's capital VAERS?

12:05:48PM 22   **A.**   VAERS.  That's the civilian side.

12:05:51PM 23   **Q.**   Right.

12:05:52PM 24        And so the DMED is the military side?

12:05:53PM 25   **A.**   It's DoD.

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:05:55PM 1   **Q.**   Okay.

12:05:56PM 2   **A.**   Covers, I believe -- and this is my belief -- 1.4 million

12:06:01PM 3   active duty, and then I believe it takes over to 2.4 total with

12:06:05PM 4   Reserves and National Guard.

12:06:08PM 5   **Q.**   So you're retiring one year shy of 40 cumulative years

12:06:12PM 6   because you have a medical condition?

12:06:15PM 7   **A.**   Yes, sir.  It makes it difficult for me to jump out of a

12:06:18PM 8   plane, which is one the tasks that's required for me to do

12:06:21PM 9   that.  I get vertigo occasionally and sometimes some brain fog,

12:06:25PM 10  which is more of just a vision thing.  I just kind of -- you

12:06:29PM 11  know, foggy.  It's changed vision, and it's secondary to what's

12:06:33PM 12  called demyelination, which is evident on my MRI.

12:06:38PM 13  **Q.**   What is demyelinization as far as you know?

12:06:39PM 14  **A.**   Demyelination is -- there's a myelin sheath that covers

12:06:42PM 15  much like a wire, it's rubber on the outside.  The myelin is

12:06:46PM 16  what protects the neurons, the nerves, from crisscrossing or

12:06:52PM 17  being damaged, inflammatory responses, et cetera.

12:06:55PM 18       When you have demyelination, it is concomitant with

12:07:00PM 19  typically multiple sclerosis is the concern.  I didn't expect

12:07:05PM 20  to see anything on my MRI; I did.  I went through a military

12:07:09PM 21  physician, he diagnosed it, and then -- now I'm going with

12:07:13PM 22  neurology specialty care to continue it, because it's something

12:07:17PM 23  I want to get rid of if I can.

12:07:18PM 24  **Q.**   Prior to taking Moderna vaccine, did you have any of these

12:07:18PM 25  conditions?

## PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:07:18PM 1  **A.**   Negative, sir.  I've taken every vaccine the Army has

12:07:24PM 2  given me since 1983 on and never had a problem.

12:07:26PM 3  **Q.**   Why did you take the Moderna vaccine?

12:07:28PM 4  **A.**   Because I trusted my government.

12:07:29PM 5  **Q.**   What did they tell you?

12:07:31PM 6  **A.**   It was safe and effective.  There was no informed consent,

12:07:35PM 7  but it was safe and effective.

12:07:37PM 8  **Q.**   And you relied upon that?

12:07:39PM 9  **A.**   Yes, sir.

12:07:39PM 10 **Q.**   And do you believe -- or do your physicians believe that

12:07:41PM 11 this is related to your Moderna shot?

12:07:46PM 12 **A.**   It would be hard for me to speculate.  I know that my

12:07:48PM 13 personal -- other physicians, I can't say, but for mine he does

12:07:51PM 14 believe that after going through what's called a differential

12:07:54PM 15 diagnosis of ruling out other things.

12:07:56PM 16 **Q.**   And was this in close proximity to your Moderna

12:08:00PM 17 vaccination?

12:08:01PM 18 **A.**   It was approximately two to three weeks afterwards I

12:08:07PM 19 noticed the vertigo starting, and then the headaches was the

12:08:12PM 20 next thing.  And this is not just me, numerous soldiers on the

12:08:16PM 21 border received this.  As we grew from a certain size, and

12:08:19PM 22 that's an operational security I can't give out the numbers on

12:08:22PM 23 the border, but I can say in the thousands now.  But we started

12:08:24PM 24 with a lot less, and as we progressed in the -- I'll explain it

12:08:32PM 25 real quickly.

## PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:08:37PM  1      So 28 percent of the people, when I got on the border, of

12:08:39PM  2   soldiers, 28 percent, were vaccinated.  As more and more came

12:08:45PM  3   on, it was my job to do informed consent, and I did.  When I

12:08:48PM  4   did informed consents, I was told by the command not to do

12:08:51PM  5   informed consents.  I have a letter that I provided from our

12:08:56PM  6   state surgeon that said do not.  Either wise, if you cannot

12:08:59PM  7   convince soldiers to take it, you must recuse yourself.  I'm

12:09:03PM  8   paraphrasing.  The letter is available.  It's a direct email

12:09:07PM  9   from state surgeon -- from surgeon -- command surgeon -- sorry,

12:09:10PM 10   task force surgeon.

12:09:11PM 11      THE COURT:  Of the state of Texas.

12:09:13PM 12      THE WITNESS:  Of the state of Texas, yes, sir.

12:09:15PM 13      So we did the informed consents and we did them

12:09:21PM 14   efficiently.  We gave fair data, this is the way we do it as

12:09:24PM 15   physicians; we say the positives, we say the negatives.  It's

12:09:27PM 16   harder for me, as I'm going along, knowing what I could

12:09:29PM 17   possibly have, corroborating with the VAERS data and seeing

12:09:35PM 18   that our DMED data is virtually the same.  And I know that, you

12:09:39PM 19   know, you'll probably have questions about that, but...

12:09:41PM 20   **Q.**   (By Mr. Staver)  We'll talk about that in a few moments.

12:09:43PM 21   **A.**   Yes, sir.

12:09:44PM 22   **Q.**   The letter that you're referring to, is that -- I want to

12:09:46PM 23   point you to tab 1.

12:09:49PM 24   **A.**   Yes, sir.

12:09:50PM 25      MR. STAVER:  Your Honor, as far as -- I'd like to --

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:09:54PM 1   we weren't planning -- because of the military regulations,

12:10:00PM 2   Dr. Chambers is not testifying as a spokesperson for the

12:10:03PM 3   military as an individual.

12:10:05PM 4           THE WITNESS:  Yes.

12:10:06PM 5           MR. STAVER:  And there are certain military

12:10:08PM 6   regulations as to whether they can testify based upon

12:10:11PM 7   reasonable medical certainty and represent the military.  We're

12:10:15PM 8   presenting him primarily in his expertise as a witness of what

12:10:19PM 9   he knows, and we're not going to get into necessarily causal

12:10:24PM 10  relationship with regards to this, but he will present facts or

12:10:29PM 11  fact witness information.

12:10:33PM 12          THE COURT:  All right.  Go ahead.

12:10:34PM 13  **Q.**   (By Mr. Staver)  All right.  I turn your attention to tab

12:10:38PM 14  1.  Can you identify what is listed as tab 1 in the notebook

12:10:42PM 15  that you have before you?

12:10:43PM 16  **A.**   Yes, sir, I have it before me.

12:10:45PM 17  **Q.**   What is this?

12:10:47PM 18  **A.**   This is a copy of the email that all providers in the

12:10:51PM 19  state of Texas got as a mass email.  The only thing missing

12:10:55PM 20  from it is the email addresses.

12:10:55PM 21  **Q.**   Now, this is from Jeffrey Powell, lieutenant colonel,

12:11:00PM 22  deputy joint surgeon?

12:11:02PM 23  **A.**   Yes, sir, it is.

12:11:03PM 24  **Q.**   So when you said it's from Texas, it's not from the state

12:11:06PM 25  of Texas, it's from the Texas Military Department, or the

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:11:10PM  1   Office of the Joint Surgeon, correct?

12:11:12PM  2   A.   Yes, correct.

12:11:13PM  3   Q.   So that's the military branch?

12:11:14PM  4   A.   Yes, sir.

12:11:16PM  5   Q.   So what did this letter address to you?  What did it say?

12:11:20PM  6   I want to point your attention to paragraph 4, in following up,

12:11:27PM  7   that you said that you were not supposed to give informed

12:11:29PM  8   consent.

12:11:30PM  9   A.   Would you like me to read it, sir?

12:11:31PM  10  Q.   Yes, sir.

12:11:32PM  11  A.   It kind of bothers me every time I do, but I'll read it,

12:11:32PM  12  sir.

12:11:34PM  13       "As a reminder, it is our job to convince Soldiers to

12:11:38PM  14  receive the vaccine.  If you, personally are not able to

12:11:41PM  15  fulfill this role, please, privately message the State Surgeon,

12:11:47PM  16  Colonel Peter Coldwell at..." his email address.  "Do not reply

12:11:50PM  17  all," with five stars at the end of it.

12:11:53PM  18  Q.   Is Colonel Peter Coldwell you?

12:11:57PM  19  A.   Negative.

12:11:58PM  20  Q.   That's a different person --

12:11:58PM  21  A.   The command surgeon --

12:12:00PM  22  Q.   That's a different person that you would also give your

12:12:03PM  23  email to, correct?

12:12:05PM  24  A.   Yes, sir.

12:12:07PM  25  Q.   Now, I want you to go down to the medical exemptions

PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:12:13PM  1   sections, and it's actually highlighted.

12:12:16PM  2   A.   Mm-hmm.

12:12:17PM  3   Q.   Can you read the section that is the first highlight under

12:12:19PM  4   "Medical Exemptions"?

12:12:21PM  5   A.   The 2-6 Alpha?  Is that what you're talking about, sir?

12:12:21PM  6   Q.   Yes.

12:12:26PM  7   A.   "Temporary medical exemptions are outlined in the

12:12:29PM  8   regulation (As we do annually with the flu vaccine) those who

12:12:34PM  9   are pregnant or breastfeeding, undergoing chemotherapy --"

12:12:38PM 10   Q.   Just read the yellow highlight --

12:12:38PM 11   A.   Oh, yellow --

12:12:40PM 12   Q.   -- instead of the whole thing.

12:12:42PM 13   A.   "Don't apply science to the regulation.  It will hurt your

12:12:46PM 14   head."

12:12:46PM 15   Q.   As a physician, how do you address that?

12:12:53PM 16   A.   As a physician, I did address it, sir.  I wrote a letter

12:12:57PM 17   back explaining that we do kind of operate in the realm of

12:13:01PM 18   science and that this was inappropriate.

12:13:04PM 19   Q.   On the next page, page 2, can you read the section called

12:13:08PM 20   "Religious Exemptions"?

12:13:14PM 21   A.   "Religion Exemptions.  Read the regulation."  This is him

12:13:17PM 22   speaking to all of us providers.  See AR 600-20.  And he's

12:13:22PM 23   quoting here, tongue-in-cheek.  "Ever seen a religious

12:13:27PM 24   exemption for vaccines?  No," exclamation point.  You haven't.

12:13:30PM 25   That kid was administratively separated during IET.  Soldiers

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:13:33PM  1  will try.  Soldiers will fail."

12:13:37PM  2  **Q.**   How do you interpret that?

12:13:40PM  3  **A.**   Well, that's exactly what prompted me, sir, to respond

12:13:44PM  4  back to an email directly back, and then I was told just to

12:13:48PM  5  find somebody else to do the informed consents.  But I also

12:13:52PM  6  conferred with other physicians throughout the force, to

12:13:54PM  7  include the Marine Corps, to include the Navy, which Navy docs

12:13:58PM  8  cover Marine Corps, but Air Force that were working with us in

12:14:02PM  9  the state as well, active duty and with Guards, and they all

12:14:06PM 10  felt that there was the same shadow regulation that takes

12:14:08PM 11  place.  And this is my belief, this is what I'm hearing.

12:14:12PM 12  **Q.**   When you say "shadow regulation," what do you mean?

12:14:15PM 13  **A.**   It's not to go exactly by the regs, but if I go by Army

12:14:19PM 14  regulation 40-562, Chapter 8, which covers vaccines, there are

12:14:26PM 15  certain pieces in there that are being used, but not the whole

12:14:30PM 16  regulation, and I can't -- I haven't done that in my many years

12:14:33PM 17  as an officer or enlisted, only picked and choosed a

12:14:38PM 18  regulation.  Maybe been out of grooming regulation with a

12:14:41PM 19  mustache in the past, but that's about it.

12:14:43PM 20  **Q.**   So according to this directive that you got, you were, as

12:14:47PM 21  your duty, to convince soldiers to get the vaccine, not to give

12:14:52PM 22  them informed consent?

12:14:53PM 23  **A.**   Based upon this directive, yes, sir.

12:14:55PM 24  **Q.**   You were also told that there are no religious exemptions?

12:15:01PM 25  **A.**   I was told, based on this -- but then I did get in their

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:15:07PM   1   chili a little bit and went up and talked to them face to face,

12:15:10PM   2   and verbally, he said, "Well, we're going to look at them, but,

12:15:14PM   3   you know, between you and I, this isn't going to go anywhere."

12:15:17PM   4   Yes, sir, that was a conversation.

12:15:18PM   5          MR. STAVER:  I'd like to introduce what is tab 1 as

12:15:23PM   6   Plaintiffs' Exhibit 1.

12:15:30PM   7          MS. YANG:  We would object, Your Honor.  The document

12:15:31PM   8   has no relevance to the issues in this case and in particular

12:15:34PM   9   to this motion that's before the Court.  On its face, it is

12:15:37PM  10   issued by the Texas Military Department.  The forces that are

12:15:43PM  11   at issue today are the U.S. Navy, the U.S. Marine Corps.  This

12:15:47PM  12   simply has no bearing on the issues.

12:15:51PM  13          MR. STAVER:  Your Honor, in their motion, they put

12:15:54PM  14   back into issue compelling interest, safety, efficacy, they did

12:16:00PM  15   that on page 5 of the motion and is why we're here.  They cite

12:16:04PM  16   to the declarants that they have put in their side of medical

12:16:13PM  17   information generally for all of the different branches,

12:16:16PM  18   including the Navy and the Marines.

12:16:18PM  19          This Court stated specifically in its order last

12:16:22PM  20   Wednesday that some of that data may need to be subject to

12:16:27PM  21   cross-examination.  It's outdated, or could be outdated.  We

12:16:32PM  22   asked them to bring those individuals, because we assumed that

12:16:35PM  23   they were going to comply and have an evidentiary hearing; they

12:16:39PM  24   refused to do so.  We asked if they were going to bring

12:16:43PM  25   Commodore Brandon; they refused to do so.  When we asked

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:16:46PM  1  whether they would accept a subpoena; they refused to accept a

12:16:50PM  2  subpoena.  So they are here without any live testimony.  You

12:16:53PM  3  invited them to be here to present live testimony and subject

12:16:57PM  4  that to cross-examination, which they're not wanting to do.

12:17:01PM  5      In fact, today they have said again they have a

12:17:05PM  6  compelling interest, everybody needs to be vaxxed because of

12:17:10PM  7  safety and efficacy, otherwise you'll have a deterioration of

12:17:15PM  8  military readiness, so they put it in again today.  They also

12:17:18PM  9  have said that the rules of evidence are relaxed, twice, and we

12:17:21PM 10  agree with them.  And so based upon all of those reasons, we

12:17:24PM 11  believe that this information is relevant, and we will continue

12:17:27PM 12  to build through this to show its continued connection to this

12:17:30PM 13  case.

12:17:31PM 14      MS. YANG:  Your Honor, if I may, very quickly.

12:17:33PM 15  Nothing that my colleague has just said rebuts the lack of

12:17:38PM 16  relevance of this document.  Yes, the rules of evidence may be

12:17:41PM 17  relaxed for purposes of this preliminary hearing, but that

12:17:42PM 18  doesn't mean that they go out the window completely.  Relevance

12:17:45PM 19  is still very much at issue for this Court as well as the

12:17:49PM 20  Court's time.

12:17:50PM 21      THE COURT:  All right.  Thank you.

12:17:55PM 22      I cannot determine at this moment that the testimony

12:18:00PM 23  is without probative value.  Immaterial for the moment.

12:18:11PM 24  Without determining that, I'll receive the proffered document

12:18:18PM 25  into evidence.

PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:18:21PM  1     MR. STAVER:  Thank you, Your Honor.

12:18:22PM  2     THE COURT:  That implies no weighing of the matter,

12:18:26PM  3  so overruled.

11:04:37AM  4     (Plaintiffs' Exhibit 1 admitted.)

12:18:30PM  5  Q.   (By Mr. Staver)  I'd like to point you to what is tab

12:18:34PM  6  No. 2 in the notebook.

12:18:38PM  7  A.   Yes, sir, I'm there.

12:18:39PM  8  Q.   Can you identify that document?

12:18:42PM  9  A.   Yes, sir.  This is updated masking guidance from the

12:18:46PM  10  SPACECOM, General Jim Dickinson.

12:18:50PM  11  Q.   Does paragraph 2 say, "With the high levels of population

12:18:55PM  12  immunity in both vaccinations and infections, the risk of

12:18:57PM  13  medically significant disease, hospitalization, and death from

12:19:01PM  14  COVID-19 has been greatly reduced," therefore they're changing

12:19:05PM  15  the masking and testing requirement?

12:19:08PM  16  A.   Yes, sir, I recognize that, and I tend to agree that it is

12:19:12PM  17  greatly reduced.

12:19:14PM  18  Q.   And that came to you?

12:19:16PM  19  A.   Say again, sir.  I'm sorry, I missed that.

12:19:19PM  20  Q.   This is the general of the United States Navy -- or Army?

12:19:25PM  21  A.   It didn't come to me, but, yeah, I recognize that.

12:19:28PM  22  Q.   Yeah.  Okay.

12:19:28PM  23     And you're aware of it?

12:19:30PM  24  A.   Yes, sir.

12:19:30PM  25  Q.   And has the masking been changed this week?

## PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:19:34PM 1  **A.**   On the active duty side?

12:19:36PM 2  **Q.**   Yes.

12:19:36PM 3  **A.**   Yes, it has.

12:19:37PM 4  **Q.**   And it has been relaxed?

12:19:39PM 5  **A.**   It has been relaxed.  But, sir, if I might add, on the

12:19:42PM 6  border of Texas, because I understand that there is some

12:19:46PM 7  concern that the Texas Military Department is not a part of the

12:19:51PM 8  Department of Defense.  But when somebody is on 502(f) orders,

12:19:53PM 9  I am under Title 10, and that is Department of Defense.  And

12:19:57PM 10  those are straight up Department of Defense atmospherics that

12:20:03PM 11  I'm receiving when I get a letter like this.  I just wanted to

12:20:05PM 12  clear that up.

12:20:06PM 13      But regarding masking, it was released earlier -- on the

12:20:09PM 14  border earlier for us, because the EXORD that the -- summer of

12:20:14PM 15  last year, the governor of Texas lifted that earlier than the

12:20:20PM 16  active duty side.

12:20:21PM 17  **Q.**   Now, in January of vice admiral of the Navy has indicated

12:20:26PM 18  that -- it was quoted in the *Navy Times* that Omicron has not

12:20:30PM 19  interfered with the Navy operations.  Are you familiar with

12:20:33PM 20  that article?

12:20:34PM 21      MS. YANG:  Objection, Your Honor.

12:20:39PM 22      THE COURT:  I don't think there's a predicate for

12:20:41PM 23  that, Mr. Staver.

12:20:42PM 24  **Q.**   (By Mr. Staver)  Are you --

12:20:44PM 25      THE COURT:  Sustained.

## PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:20:45PM 1  **Q.**   (By Mr. Staver)  Are you familiar with an article that

12:20:48PM 2  quotes the vice admiral of the Navy with regards to Omicron and

12:20:53PM 3  the Navy particularly?

12:20:54PM 4  **A.**   Yes, I'm aware of that.  I just read it two days ago.

12:20:58PM 5  **Q.**   And what is your understanding that the vice admiral

12:21:01PM 6  indicated in his quotation in January of 2022?

12:21:05PM 7  **A.**   Much like this previous one, the space command, that

12:21:08PM 8  Omicron was less virulent, or that -- and I'm -- I know I'm

12:21:11PM 9  generalizing, but it's my belief that it's also indicating

12:21:14PM 10 that same --

12:21:17PM 11 **Q.**   So is it consistent in terms of this with the Army, that

12:21:21PM 12 there's a downgrading of the risk or the restrictions such as

12:21:28PM 13 masking?

12:21:29PM 14 **A.**   Yes.  And it has been, in my opinion -- or my belief,

12:21:34PM 15 based upon observation on the border, that the mortality -- the

12:21:40PM 16 morbidity is much decreased, so much so that it really don't

12:21:46PM 17 put anybody in the hospital in uniform, and we've been in the

12:21:50PM 18 worst of it, the thick of it regarding migrants coming in that

12:21:52PM 19 do not have any vaccination status who come in sick.

12:21:56PM 20 **Q.**   With regards to those that do have vaccination status and

12:21:59PM 21 they have whatever vaccination levels that each one of these

12:22:02PM 22 vaccines require, is that preventing the transmission of COVID

12:22:08PM 23 in your unit?

12:22:11PM 24 **A.**   With the soldiers that are vaccinated?

12:22:13PM 25 **Q.**   Correct.

## PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:22:14PM  1    **A.**    Okay.  As of this Omicron variant and time frame, I'm

12:22:19PM  2    going to say late summer going into fall, the vaccinated,

12:22:23PM  3    especially double vaccinated, sat at 71 to 78 upwards -- up

12:22:29PM  4    some weeks, 82 percent of the positive cases; whereas, my

12:22:35PM  5    unvaccinated personnel remained steady state, almost a flat

12:22:40PM  6    curve, they were still in the mix, but typically around

12:22:43PM  7    15 percent.  Those are unvaccinated.  That's just the numbers.

12:22:47PM  8    **Q.**    Unvaccinated were getting Omicron or some version about

12:22:52PM  9    15 percent?

12:22:52PM  10   **A.**    15 to 16 percent typically, but that wave -- that never

12:22:57PM  11   really had any increase in the Delta.  It was pretty much

12:23:01PM  12   consistent across the board.

12:23:03PM  13   **Q.**    And those that had the double vaccine, at least two

12:23:07PM  14   doses --

12:23:07PM  15   **A.**    That shot up -- as soon as we got -- incrementally, with

12:23:11PM  16   the amount of soldiers that showed up on the borders, we went

12:23:14PM  17   from 28 percent unvaxxed when we began.  Then more soldiers

12:23:19PM  18   came on, and as they came on, they were going through the

12:23:22PM  19   in-processing stations, they were giving them vaxxes there.  I

12:23:24PM  20   couldn't -- I didn't have any control over their informed

12:23:27PM  21   consents.

12:23:28PM  22        As we went to 48 percent of the soldiers on the border

12:23:31PM  23   vaxxed, that's when that number went to 86 percent of the

12:23:36PM  24   double vaxxed, or vaccinated positive rate on, we can say,

12:23:41PM  25   Omicron, but it was just during that time frame.

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:23:43PM  1   **Q.**   Now, are you saying the more people that got vaccinated,

12:23:46PM  2   the higher percentage of those that got COVID?

12:23:49PM  3   **A.**   Without a shadow of a doubt, yes, sir.

12:23:54PM  4   **Q.**   Were you finding, then, that the vaccination was not

12:23:57PM  5   effective with regards to preventing infection in transmission?

12:24:02PM  6   **A.**   Well, sir, I got the vaccine, and two months later,

12:24:06PM  7   roughly during the Delta variant timeframe, I got extremely

12:24:10PM  8   sick.

12:24:10PM  9   **Q.**   I want to ask you about your vaccination.  You said that

12:24:12PM 10   you got the vaccination because you trusted that it was safe

12:24:15PM 11   and effective.  Were you aware of any aborted fetal cell, were

12:24:20PM 12   you aware of any other issues or safety or efficacy?

12:24:24PM 13   **A.**   No, sir.

12:24:24PM 14   **Q.**   And have you learned about them now?

12:24:25PM 15   **A.**   Yes, sir.

12:24:25PM 16   **Q.**   Would you do it again?  With the knowledge that you have,

12:24:28PM 17   what would your decision be?

12:24:31PM 18   **A.**   My decision would be based upon my faith, which I would

12:24:34PM 19   not be taking an aborted fetal cell, that's for sure.  Yes,

12:24:42PM 20   sir.

12:24:42PM 21   **Q.**   All right.  I want to point you to what is at tab 3.  Do

12:24:54PM 22   you recognize that document -- that page?

12:24:58PM 23   **A.**   I absolutely do.  This is the FDA document that was -- I

12:25:01PM 24   think it was in response to a court order to release the

12:25:07PM 25   adverse reactions or --

## PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:25:08PM  1   **Q.**   No.  I think that you may be -- let me back up.  This

12:25:13PM  2   is -- just take a look at what the document is --

12:25:13PM  3   **A.**   Okay.

12:25:15PM  4   **Q.**   -- without any court-order issues.

12:25:17PM  5   **A.**   Okay.  No.  This is -- this is -- oh, this is just the FDA

12:25:20PM  6   surveillance COVID-19 vaccines.

12:25:23PM  7   **Q.**   What date is it?

12:25:23PM  8   **A.**   The side effects and disease process, or possible --

12:25:26PM  9   **Q.**   At the bottom of the first page, what is the date?

12:25:29PM  10   **A.**   Bottom of the first page, looks like -- I don't have a

12:25:35PM  11   date on this -- oh, first page here.  Roger.  22 October, 2020.

12:25:39PM  12   **Q.**   And the second page is a slide from that presentation?

12:25:42PM  13   **A.**   Yes, sir.

12:25:43PM  14   **Q.**   And that was during the clinical trials before the first

12:25:46PM  15   emergency use authorization was granted in December 2020?

12:25:51PM  16   **A.**   Yes, sir.

12:25:51PM  17   **Q.**   Nearly two months before?

12:25:53PM  18   **A.**   Yes, sir.

12:25:53PM  19   **Q.**   What does that -- how did you and why did you come across

12:25:56PM  20   this document?

12:25:58PM  21   **A.**   Well, this document -- I didn't see it in this particular

12:26:01PM  22   way, but these data is what we saw coming out in the VAERS,

12:26:06PM  23   which made us go back and look, because we tried to marry these

12:26:10PM  24   up with the side effects that we were seeing.  That's how I ran

12:26:16PM  25   across it.

## PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:26:17PM 1  **Q.**   And was this relevant to your research with regards to --

12:26:21PM 2  or in your investigation regarding your own injury and the

12:26:28PM 3  DMED?

12:26:29PM 4  **A.**   The DMED data cleared it up for me, sir, and not just for

12:26:32PM 5  me.  I really was looking to be -- we had a rash of various

12:26:36PM 6  different entities, even -- you know, diagnoses that we see

12:26:40PM 7  here:  convulsions, seizures, transverse myelitis.

12:26:46PM 8  Questionable whether we had encephalomyelitis.  We had people

12:26:51PM 9  that passed out and they called them strokes.  But when they

12:26:54PM 10 went to emergency room, it came off my purview so I didn't have

12:26:57PM 11 the follow-up ability.  Because they didn't go to a military

12:27:00PM 12 treatment facility, they went to a civilian, so I can't tell

12:27:03PM 13 you specifically.

12:27:05PM 14 **Q.**   So some of the medical conditions that are listed on that

12:27:09PM 15 second page there, is that where you were seeing within your

12:27:12PM 16 soldiers and --

12:27:15PM 17 **A.**   Yes, sir.  Seeing within my soldiers, but also in

12:27:17PM 18 discussion with other physicians, with Dr. Long once again.

12:27:20PM 19 She had a much more complete list that she had seen in --

12:27:24PM 20 compared to this, because she sees a lot more patients in the

12:27:28PM 21 clinical setting.  So, yes, we do -- but we had those

12:27:32PM 22 discussions.

12:27:34PM 23 **Q.**   One of those conditions is myocarditis.  Do you see that?

12:27:38PM 24 **A.**   Yes, sir.

12:27:41PM 25          MR. STAVER:  I'd like to introduce that as

PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:27:45PM  1  Plaintiffs' No. 2.

12:27:46PM  2              THE COURT:  All right.  Plaintiffs' 2 is received.

11:04:37AM  3              (Plaintiffs' Exhibit 2 admitted.)

12:27:50PM  4  **Q.**   (By Mr. Staver)  And then the one right after that is an

12:27:54PM  5  article from the Journal of American Medical Association.  Are

12:27:58PM  6  you familiar with that article?

12:28:00PM  7  **A.**   I am familiar with this in reviewing before this case, but

12:28:03PM  8  I had not seen it in the past.  I've heard of it from other

12:28:08PM  9  colleagues.

12:28:09PM 10  **Q.**   That article addresses -- that's an article by military

12:28:14PM 11  doctors regarding military personnel, correct?

12:28:16PM 12  **A.**   Yes, sir.  I read it.

12:28:18PM 13  **Q.**   What does it conclude?

12:28:20PM 14  **A.**   That myocarditis occurs in previously healthy military

12:28:26PM 15  patients, is increased post-COVID-19 vaccine.  We've seen this,

12:28:35PM 16  it sort of -- within the past -- let me be straight up, within

12:28:37PM 17  the past three days, and people are texting me from the border,

12:28:42PM 18  I've had four chest pains in 28- to 40-year-olds.  This morning

12:28:48PM 19  I got texted again, and one of my friends -- I take care of

12:28:53PM 20  these soldiers, you become friends with them -- he had a

12:28:58PM 21  myocardial infarction at 30 -- thirty-something years old.

12:29:03PM 22  This is way more common.  I've never seen anything like this

12:29:06PM 23  since 2003 as a physician.

12:29:09PM 24  **Q.**   What was happening in 2003?

12:29:10PM 25  **A.**   Well, that's when I came on to actually getting deployed.

## PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:29:13PM  1    **Q.**   I see.

12:29:14PM  2        So in your history as a medical doctor in the military,

12:29:18PM  3    you've never seen any kind of spiking like this of these

12:29:21PM  4    adverse events?

12:29:22PM  5    **A.**   Not events like this, no, sir.

12:29:24PM  6    **Q.**   In otherwise healthy young men and woman?

12:29:28PM  7    **A.**   Absolutely.  In my whole time of deployment down range, if

12:29:32PM  8    we look at the border mission as a deployment -- it's a CONUS

12:29:36PM  9    deployment, but it is a deployment -- to have that many

12:29:40PM  10   hospitalized in the ICU, it's -- if I did that down range, I

12:29:46PM  11   would say, "Okay.  We're doing something wrong in Afghanistan."

12:29:49PM  12   I had one myocardial infarction with a 48-year-old first

12:29:54PM  13   sergeant down range, one, on a deployment that I can recall,

12:29:57PM  14   that I took care of firsthand, one in all of my deployments,

12:30:01PM  15   and I've got a few, sir -- Your Honor, and so now you can't say

12:30:06PM  16   that this is normal.  This is not normal.

12:30:09PM  17   **Q.**   And are you hearing the same thing from other doctors

12:30:12PM  18   outside of your unit that is very similar to this?

12:30:15PM  19          MS. YANG:  Objection, Your Honor.  That's hearsay.

12:30:19PM  20          MR. STAVER:  Your Honor --

12:30:19PM  21          THE COURT:  Excuse me.

12:30:21PM  22          MR. STAVER:  I'm sorry.

12:30:22PM  23          THE COURT:  Overruled.

12:30:35PM  24   **Q.**   (By Mr. Staver)  You can answer the question.  Are you

12:30:37PM  25   hearing similar reports?

PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:30:39PM   1          THE COURT:  The answer is -- "Are you hearing this?"

12:30:42PM   2  which is, respectfully, you either are or you aren't?

12:30:47PM   3          THE WITNESS:  I am, yes, sir.

12:30:48PM   4  **Q.**   (By Mr. Staver)  Does it confirm what you are seeing

12:30:51PM   5  yourself with your own soldiers?

12:30:54PM   6  **A.**   Sir, it's difficult to get other doctors that have been --

12:31:03PM   7  not coerced.  I don't know.  Their commands have been -- will

12:31:05PM   8  not let us talk sometimes.  In that particular email that

12:31:08PM   9  we have --

12:31:08PM  10          THE COURT:  The question here -- and I don't want you

12:31:10PM  11  to stray too far from it, was --

12:31:12PM  12          THE WITNESS:  Yes, sir.

12:31:13PM  13          THE COURT:  -- I believe whether -- without going

12:31:18PM  14  into what the doctors might have said, were their observations

12:31:26PM  15  to you consistent with your own observations?

12:31:28PM  16          THE WITNESS:  Yes, sir.

12:31:28PM  17          THE COURT:  Is that a fair rendering of your

12:31:29PM  18  question?

12:31:29PM  19          MR. STAVER:  Yes, that's correct.

12:31:31PM  20          THE WITNESS:  Yes, sir.  Absolutely consistent.

12:31:34PM  21          MR. STAVER:  I'd like to introduce that as

12:31:36PM  22  Plaintiffs' next exhibit, that'd be what's under tab 3, which

12:31:40PM  23  is the Journal of American Medical Association Cardiology

12:31:45PM  24  report -- or study.

12:31:46PM  25          THE COURT:  All right.  Plaintiffs' 3 is received.

## PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

| | | |
|---|---|---|
| 11:04:37AM | 1 | (Plaintiffs' Exhibit 3 admitted.) |
| 12:31:49PM | 2 | **Q.** (By Mr. Staver)  I'd like to direct your attention -- |
| 12:31:54PM | 3 | THE COURT:  I think that, fairly construed, the |
| 12:31:57PM | 4 | defendants have a standing objection to this material, and my |
| 12:32:02PM | 5 | ruling as to each one of them incorporates my ruling as to the |
| 12:32:05PM | 6 | first one. |
| 12:32:05PM | 7 | MS. YANG:  Thank you, Your Honor. |
| 12:32:07PM | 8 | MR. STAVER:  Thank you, Your Honor. |
| 12:32:08PM | 9 | **Q.** (By Mr. Staver)  I'd like to point your attention to what |
| 12:32:11PM | 10 | is tab 5 in that notebook before you.  Do you recognize that |
| 12:32:20PM | 11 | document? |
| 12:32:21PM | 12 | **A.** I originally heard of this actually in a news source, but, |
| 12:32:25PM | 13 | yes, I do recognize the document as what -- the first time I |
| 12:32:30PM | 14 | had seen it was the other day, yes, sir.  Two days ago. |
| 12:32:32PM | 15 | **Q.** And that document -- |
| 12:32:33PM | 16 | THE COURT:  I'm sorry, I could not understand you. |
| 12:32:35PM | 17 | THE WITNESS:  Yes, sir.  I do recognize the document. |
| 12:32:37PM | 18 | I had said I originally had seen it on the news.  It had come |
| 12:32:40PM | 19 | out on the news.  FDA was required to release -- |
| 12:32:44PM | 20 | THE COURT:  All right.  Understood. |
| 12:32:45PM | 21 | All right.  Mr. Staver. |
| 12:32:46PM | 22 | **Q.** (By Mr. Staver)  And have you reviewed the document? |
| 12:32:47PM | 23 | **A.** I have reviewed this document. |
| 12:32:49PM | 24 | **Q.** The document is entitled Cumulative Analysis of |
| 12:32:52PM | 25 | Post-Authorization Adverse Event Reports of PF-07302048 -- |

PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:32:59PM  1  **A.**   Mm-hmm.

12:33:02PM  2  **Q.**   -- (BNT162B2) Received through 28 February, 2021.  And it

12:33:11PM  3  is from Pfizer?

12:33:12PM  4  **A.**   Yes, sir.

12:33:14PM  5  **Q.**   To the FDA?

12:33:16PM  6  **A.**   I believe that this was court-ordered --

12:33:19PM  7          THE COURT:  The question is, did Mr. Staver properly

12:33:25PM  8  identify the document?

12:33:26PM  9          THE WITNESS:  Yes, sir.

12:33:27PM  10         THE COURT:  Mr. Staver?

12:33:27PM  11         MR. STAVER:  Yes.

12:33:28PM  12         THE WITNESS:  He did properly identify it.

12:33:29PM  13  **Q.**   (By Mr. Staver)  And this document was released by a court

12:33:33PM  14  order last March 1, just last week?

12:33:36PM  15  **A.**   Yes, sir.

12:33:37PM  16  **Q.**   And you've reviewed it since it has been released by a

12:33:41PM  17  FOIA request?

12:33:42PM  18  **A.**   Yes, sir, I have.

12:33:43PM  19  **Q.**   Is it your understanding that this document is in the

12:33:45PM  20  FDA's possession as it relates to Pfizer reporting adverse

12:33:49PM  21  events?

12:33:51PM  22  **A.**   That is my understanding.

12:33:58PM  23  **Q.**   I want you to go to the appendix, which is on -- it's at

12:34:04PM  24  the end of page 29.

12:34:08PM  25  **A.**   Yes, sir.  I am at page 29.

PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:34:10PM  1   **Q.**   What does that appendix do?  What is it for?

12:34:14PM  2   **A.**   It's a cumulative listing of adverse reactions based upon

12:34:21PM  3   their data that they obtained prior to releasing this.

12:34:25PM  4   **Q.**   Without going through and counting every one --

12:34:30PM  5   **A.**   I do know how many are there, sir.

12:34:33PM  6   **Q.**   How many?

12:34:33PM  7   **A.**   1291.

12:34:36PM  8   **Q.**   1291 adverse events.

12:34:37PM  9        Is your adverse reaction listed as one of those events?

12:34:41PM  10  **A.**   Yes, sir, it is.

12:34:42PM  11  **Q.**   Where is it?

12:34:44PM  12  **A.**   Page 32, it is there, demyelination.

12:34:50PM  13  **Q.**   It'll be page 3 of the appendix.

12:34:53PM  14  **A.**   Page -- oh, okay.  Yes, page 3 of the appendix, page 32.

12:34:57PM  15  **Q.**   So all of these adverse events are listed by alphabetical

12:35:01PM  16  order, and yours is just below the -- halfway down the section

12:35:06PM  17  of that page, demyelination?

12:35:08PM  18  **A.**   That is what I'm diagnosed with right now, sir.

12:35:13PM  19  **Q.**   And you didn't know that was a possible adverse event

12:35:16PM  20  before you took that shot, did you?

12:35:18PM  21  **A.**   No.

12:35:19PM  22  **Q.**   But Pfizer presented that information to the FDA as one of

12:35:21PM  23  the adverse reactions?

12:35:24PM  24  **A.**   Right.  Now, as of March 1st, yes.

12:35:28PM  25          MR. STAVER:  I'd like to introduce that as the next

PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:35:31PM  1   exhibit to plaintiffs.

12:35:32PM  2           THE COURT:  I believe that's 5.  Is that right?

12:35:33PM  3           MR. STAVER:  I believe so.

12:35:34PM  4           THE COURT:  All right.  Plaintiffs' 5 is received.

11:04:37AM  5           (Plaintiffs' Exhibit 5 admitted.)

12:35:37PM  6   Q.   (By Mr. Staver)  I'd like to take you to what is labeled

12:35:40PM  7   tab 6 in the notebook.

12:35:45PM  8   A.   Yes, sir.

12:35:46PM  9   Q.   What is that document?

12:35:49PM 10   A.   This reflects what appears to me to the web page at the

12:35:55PM 11   VAERS website, which was -- we call it the "dashboard" in our

12:36:00PM 12   vernacular.

12:36:02PM 13   Q.   Mm-hmm.

12:36:04PM 14        And that lists adverse events of the three COVID shots,

12:36:11PM 15   Moderna, Pfizer, and Johnson & Johnson, or Janssen?

12:36:15PM 16   A.   Yes, sir.

12:36:15PM 17   Q.   Okay.  And does it -- in terms of identifying the document

12:36:20PM 18   up through February 25, it has 1,151,448 reports of adverse

12:36:29PM 19   events.

12:36:29PM 20   A.   As of this date, yes, sir.

12:36:30PM 21   Q.   Some of those adverse events are listed and separated and

12:36:34PM 22   segregated below, including myocarditis, pericarditis at

12:36:40PM 23   35,303.  Do you see that?

12:36:40PM 24   A.   (No oral response.)

12:36:44PM 25   Q.   In the second page.

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:36:45PM  1  **A.**   There we are.  Yes, sir, I see it.

12:36:48PM  2  **Q.**   Thrombocytopenia, or low platelet?

12:36:53PM  3  **A.**   5,812.

12:36:54PM  4  **Q.**   Do you -- can you explain what that is?

12:36:56PM  5  **A.**   So the platelets are required for us to coagulate properly

12:37:02PM  6  your blood product.  And if you don't have enough platelets, or

12:37:08PM  7  low platelets, thrombocytes at the platelet cell, it can lead

12:37:13PM  8  to bleeding in the brain, or in anyplace, really, but -- if it

12:37:13PM  9  gets low enough.

12:37:21PM  10  **Q.**   And then it also says 45,615 permanent disabilities.

12:37:27PM  11  **A.**   Yes, sir.

12:37:27PM  12  **Q.**   Do you see that?

12:37:28PM  13  **A.**   I see that.

12:37:29PM  14  **Q.**   Go to the third page, if you will, and the first chart.

12:37:36PM  15  **A.**   Yes, sir.

12:37:37PM  16  **Q.**   What does that first chart, as a physician or someone who

12:37:41PM  17  is treating or working with people with COVID response -- what

12:37:44PM  18  does it tell you about with regards to the COVID vaccines

12:37:50PM  19  themselves?

12:37:51PM  20  **A.**   So this would be on the X axis, you're looking at time and

12:37:58PM  21  you're looking at -- that most recently corresponds with the

12:38:04PM  22  administration of the vaccines that the report of deaths have

12:38:08PM  23  increased exponentially.

12:38:11PM  24  **Q.**   So if you begin in June of 1990 when the CDC VAERS

12:38:18PM  25  database was instituted, and you take that all the way up to

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:38:22PM  1   the EUA approval, December of 2020, and particularly 2021,

12:38:28PM  2   before that spike, that other line that is fairly stable, is

12:38:33PM  3   that the cumulative of all vaccines combined?

12:38:39PM  4   A.   That's cumulative of all vaccines combined.

12:38:42PM  5   Q.   So in other words, from June of 1990 until these vaccines

12:38:45PM  6   were released on the public in the United States, particularly,

12:38:49PM  7   we're talking about, there was a cumulative number of all

12:38:54PM  8   vaccines from every kind of vaccine that was listed there, and

12:38:58PM  9   it was fairly stable in terms of its adverse reactions.

12:39:01PM 10   A.   Yes, sir.

12:39:02PM 11   Q.   And then what happened when the COVID vaccines were

12:39:05PM 12   release.

12:39:06PM 13   A.   Well, if you refer to it right there, you see that in 2020

12:39:11PM 14   and into 2021, it peaked out at exactly 2020-2021 mark.

12:39:22PM 15   Q.   Coinciding with the release of COVID vaccines?

12:39:28PM 16   A.   Yes, sir.

12:39:28PM 17             MR. STAVER:  I'd like to introduce that.

12:39:30PM 18             THE COURT:  Plaintiffs' 6 is received.

11:04:37AM 19             (Plaintiffs' Exhibit 6 admitted.)

12:39:35PM 20   Q.   (By Mr. Staver)  I would like to take you to tab 7 in your

12:39:38PM 21   notebook.

12:39:39PM 22   A.   Yes, sir.

12:39:39PM 23   Q.   Can you identify that?

12:39:43PM 24   A.   This is defense medical epidemiology database.  This is

12:39:48PM 25   the surveillance data that we spoke of before of onset.

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:39:54PM  1  **Q.**  So if I understand you correctly, you have the CDC VAERS

12:39:58PM  2  site, which is data we just looked at, correct?

12:39:58PM  3  **A.**  Yes, sir.

12:40:02PM  4  **Q.**  That's the civilian side?

12:40:03PM  5  **A.**  Mm-hmm.

12:40:04PM  6  **Q.**  Is that right?

12:40:04PM  7  **A.**  Yes, that's -- it also has -- it can -- when you enter

12:40:08PM  8  into a VAERS patient, I've done it before for the ones I've

12:40:12PM  9  had, you can -- there'll be a military way to pull up those as

12:40:18PM 10  well, and Dr. Long can speak to this.

12:40:21PM 11  **Q.**  And the next tab, the 7, the DMED, that's the DoD version

12:40:26PM 12  or -- so to speak, regarding military personnel specifically,

12:40:31PM 13  correct?

12:40:31PM 14  **A.**  Correct.  That is our own DoD internal.

12:40:37PM 15       MR. STAVER:  I would like to introduce that as the

12:40:39PM 16  next exhibit, Your Honor.

12:40:41PM 17       THE COURT:  Plaintiffs' 7 is received, again, subject

12:40:43PM 18  to the continuing objection and the ruling earlier.

11:04:37AM 19       (Plaintiffs' Exhibit 7 admitted.)

12:40:47PM 20  **Q.**  (By Mr. Staver)  Have you, as a physician who has seen an

12:40:52PM 21  adverse event, attempted to enter that data into VAERS?

12:40:57PM 22  **A.**  I have entered data into VAERS during the border mission

12:41:03PM 23  post-COVID-19 vaccines, yes, I have.

12:41:07PM 24  **Q.**  How easy or difficult is that process?

12:41:08PM 25  **A.**  It took me, on average, an hour and a half to enter the

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:41:11PM  1   data.

12:41:13PM  2   **Q.**   Are you aware that there's a Harvard study that says the

12:41:16PM  3   data entered into VAERS historically is less than one percent

12:41:20PM  4   of actual?

12:41:21PM  5   **A.**   Yes, sir, I'm aware of that information.

12:41:23PM  6   **Q.**   As someone who has attempted to enter into VAERS, do you

12:41:27PM  7   understand that it's very difficult to enter data into VAERS?

12:41:31PM  8   **A.**   There is a learning curve involved, so, yes, it is very

12:41:34PM  9   difficult.

12:41:34PM 10   **Q.**   So when you took about two hours to enter your first one,

12:41:39PM 11   what was happening when you attempted to populate VAERS with

12:41:41PM 12   your information regarding someone who had an adverse event?

12:41:44PM 13   **A.**   It kept popping off the system.  It's not very intuitive,

12:41:51PM 14   it's not something I use typically, but I felt the need to

12:41:54PM 15   catalogue these as these patients were increasing pretty

12:41:59PM 16   regularly.

12:42:00PM 17   **Q.**   Okay.  I want to take you to what is considered tab 8, and

12:42:05PM 18   I want to pass that chart that's there --

12:42:10PM 19   **A.**   Sure.

12:42:11PM 20   **Q.**   -- and go to the two letters from United States Senator

12:42:18PM 21   Ron Johnson, February 1, February 17.  It'll be at the end of

12:42:27PM 22   that chart.

12:42:27PM 23   **A.**   There it is.  I have it.

12:42:29PM 24          THE COURT:  And it's where again, Mr. Staver?

12:42:31PM 25          MR. STAVER:  It is at the end, Your Honor, of that

PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:42:33PM  1    tab 8.

12:42:34PM  2             THE COURT:  At the end of tab 8?

12:42:37PM  3             MR. STAVER:  Yes, sir.

12:42:38PM  4             THE COURT:  Thank you.  I've got it.

12:42:39PM  5             MR. STAVER:  And it starts with a February 1 letter

12:42:41PM  6    from the senator.

12:42:42PM  7             THE COURT:  I see it.

12:42:43PM  8             MR. STAVER:  All right.

12:42:44PM  9    Q.    (By Mr. Staver)  Do you recognize that letter and also the

12:42:47PM 10    February 17 letter, 2022, which is right behind it?

12:42:52PM 11    A.    I do recognize both letters, yes, sir.

12:42:54PM 12    Q.    Do you recognize Senator Ron Johnson?

12:42:57PM 13    A.    Yes, sir, I recognize the signature.

12:43:01PM 14    Q.    In paragraph one he says that an attorney is representing

12:43:06PM 15    three Department of Defense whistleblowers.  Do you see that in

12:43:09PM 16    the middle of that paragraph on the February 1 letter?

12:43:12PM 17    A.    Yes, sir, I do.

12:43:13PM 18    Q.    Do you see in the beginning of the second paragraph, he

12:43:17PM 19    refers to data from the Defense Medical Epidemiology Database,

12:43:22PM 20    DMED.

12:43:25PM 21    A.    Yes, sir, I see that part.

12:43:26PM 22    Q.    Is that what we were just talking about in terms of the

12:43:29PM 23    military version of the VAERS?

12:43:30PM 24    A.    Yes, sir.

12:43:33PM 25    Q.    Now, he also lists some summary of what was presented

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:43:39PM  1  before him in a hearing or a roundtable on January 24, 2022.

12:43:45PM  2  Do you see that summary that begins on the first page and goes

12:43:48PM  3  over to the second page?

12:43:50PM  4  **A.**   Yes, sir.

12:43:50PM  5  **Q.**   Can you read the summary?

12:43:51PM  6  **A.**   Yes, sir.  It begins with hypertension, 2,181 percent

12:43:56PM  7  increase.  Diseases of the nervous system --

12:43:58PM  8  **Q.**   Let me back up.  Let me back up.

12:44:01PM  9  **A.**   Okay.

12:44:03PM 10  **Q.**   The information that is -- that you're going to read is

12:44:07PM 11  regarding the military, particularly all branches of the

12:44:10PM 12  military; is that right?

12:44:12PM 13  **A.**   DoD-wide, sir.

12:44:14PM 14  **Q.**   And is that information, according to the letter,

12:44:18PM 15  beginning in 2021 as compared to the previous five years of

12:44:24PM 16  data?

12:44:25PM 17  **A.**   Yes, sir.  I'll explain that from my standpoint, and then

12:44:31PM 18  Dr. Long will be able to explain the details of how she came on

12:44:35PM 19  to it, and then brought some of it -- as we got the information

12:44:37PM 20  from her, how we found this -- how she found this.

12:44:45PM 21       2016 through 2020, it's the ICD Ten Code that's being

12:44:51PM 22  looked at.  This is the current system.  Prior to that, it was

12:44:55PM 23  the ICD Nine.  So she went back to those 2016 when we

12:45:00PM 24  originally discussed this.  And once I got a chance to get on

12:45:04PM 25  the system with some other colleagues of mine on the Texas

PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:45:08PM  1   side, I was able to concur.  What we found was -- and I'm going

12:45:13PM  2   to use neurologic, because it's the one I'm most aware of right

12:45:17PM  3   now having, through myself and taking care of soldiers with it,

12:45:20PM  4   neurologics in 2016 were roughly around 70- to 80,000, I

12:45:25PM  5   believe closer to 80,000.  2017, '18, '19, and '20, roughly

12:45:31PM  6   about the same.  And then it went up to 800,000 -- over 836,000

12:45:38PM  7   interactions -- or ICD 10 diagnoses that were entered into the

12:45:43PM  8   system.  That's over a thousand -- well, it is exactly a

12:45:47PM  9   1,048 percent increase.

12:45:49PM 10   Q.   Is that what the letter is referring to in that second

12:45:52PM 11   paragraph, that neurological issues increased ten times, from a

12:45:56PM 12   five-year average of 82,000 to 863,000 in 2021?

12:46:02PM 13   A.   Yes, sir.

12:46:03PM 14   Q.   And that's just for service members?

12:46:06PM 15   A.   Yes.

12:46:07PM 16   Q.   Not the general public?

12:46:09PM 17   A.   Yes, sir.

12:46:10PM 18   Q.   So with regards to that, can you read into the record the

12:46:17PM 19   percentages that compare 2021 to the previous five years of

12:46:22PM 20   several different listings?

12:46:24PM 21   A.   Okay.  We'll start with the hypertension, again, 2,181

12:46:29PM 22   percent increase.  Diseases of the nervous system, 1,048

12:46:33PM 23   percent increase.  Malignant neoplasms of the esophagus,

12:46:38PM 24   894 percent increase.  Multiple sclerosis, 680 percent

12:46:44PM 25   increase.  Neoplasms of digestive organs, 624 percent increase.

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:46:50PM 1   Guillain-Barré, 551 increase.  Breast cancers, 487 percent

12:46:50PM 2   increase.  Demyelinating diseases, 487 percent increase.

12:46:57PM 3   Neoplasms or cancers of the thyroid and other endocrine glands,

12:47:04PM 4   474 percent increase.  Female infertility, 472 percent

12:47:09PM 5   increase.  Pulmonary embolisms, that's a clot in the lung,

12:47:12PM 6   468 percent increase.  Migraines, 452 percent increase.

12:47:17PM 7   Ovarian dysfunction, 437 percent increase.  Testicular cancer,

12:47:23PM 8   369 percent increase.  And tachycardia -- final one -- 302

12:47:27PM 9   percent increase.

12:47:29PM 10  Q.   And that's military-wide, that's just not for your unit,

12:47:32PM 11  and it's not for just the United States Army.

12:47:35PM 12  A.   Military-wide.  That's the DoD.

12:47:37PM 13  Q.   The next paragraph -- actually, the second paragraph

12:47:44PM 14  there, your name is mentioned.  It says -- do you see that? --

12:47:48PM 15  "At the roundtable, Renz" -- the attorney -- do you see that?

12:47:51PM 16  A.   Yes, sir.

12:47:51PM 17  Q.   -- "revealed the names of the brave whistleblowers who

12:47:56PM 18  uncovered this information to DMED:  Drs. Samuel Sigoloff,

12:48:00PM 19  Peter Chambers, and Theresa Long."

12:48:02PM 20       Is the Peter Chambers referring in that letter to you?

12:48:05PM 21  A.   Yes, sir.

12:48:05PM 22  Q.   You're referred to as a whistleblower by this letter?

12:48:10PM 23  A.   Yes, sir.

12:48:10PM 24  Q.   And also Theresa Long is referred to as a whistleblower in

12:48:14PM 25  this letter?

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:48:15PM  1   **A.**   Yes, sir.

12:48:19PM  2   **Q.**   Is it your understanding that whistleblowers have certain

12:48:22PM  3   protection --

12:48:23PM  4   **A.**   Yes, sir.

12:48:24PM  5   **Q.**   -- from retaliation?

12:48:26PM  6   **A.**   Based upon the letter that's produced from the senator,

12:48:29PM  7   yes, sir, I believe that, and regulations.

12:48:30PM  8   **Q.**   Have you personally witness attempted retaliation or

12:48:34PM  9   attempt to influence a witness's testimony --

12:48:34PM 10   **A.**   Yes, sir --

12:48:36PM 11   **Q.**   -- in this hearing today?

12:48:37PM 12   **A.**   I did last night, sir.

12:48:38PM 13   **Q.**   Of who?

12:48:39PM 14   **A.**   Theresa Long.

12:48:41PM 15   **Q.**   We'll talk about that a little bit later.

12:48:45PM 16        The February 17 letter, that's a letter, again, to

12:48:49PM 17   Secretary of Defense Lloyd Austin, asking him to again produce

12:48:54PM 18   documents that he still has not produced to Senator Ron

12:48:59PM 19   Johnson; is that correct?

12:48:59PM 20   **A.**   Yes, sir.

12:48:59PM 21        Can I add something to that?

12:49:02PM 22   **Q.**   Sure.

12:49:02PM 23   **A.**   The only response that I believe I saw was on PolitiFacts

12:49:09PM 24   when it was released within the Pentagon --

12:49:15PM 25             THE COURT:  This seems to me not responsive to a

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:49:15PM  1   question.

12:49:18PM  2             THE WITNESS:  Okay.

12:49:19PM  3             THE COURT:  Mr. Staver.

12:49:19PM  4             MR. STAVER:  All right.

12:49:21PM  5   Q.   (By Mr. Staver)  The other letter that's there is the

12:49:24PM  6   February 17 letter also to Secretary of Defense Lloyd Austin --

12:49:28PM  7   A.   Yes, sir.

12:49:28PM  8   Q.   -- asking him to again produce documents that have

12:49:31PM  9   previously not been produced; is that correct?

12:49:33PM 10   A.   Yes, sir.

12:49:37PM 11   Q.   Okay.  So you were present last night, is that correct,

12:49:41PM 12   when Lieutenant Colonel Dr. Theresa Long received a -- pressure

12:49:51PM 13   to not do testimony today?

12:49:55PM 14   A.   Yes, sir, I was there.  And we had spoke about it between

12:49:58PM 15   she and I confidentially, but I was aware that she was

12:50:03PM 16   receiving pressure from her command as to her testifying under

12:50:10PM 17   her subpoena.

12:50:11PM 18   Q.   I only have a few more questions for you.  Just a moment.

12:50:20PM 19        Now, the defendants have indicated that universal

12:50:30PM 20   vaccination is necessary for military readiness.  You're aware

12:50:34PM 21   of that?

12:50:35PM 22   A.   Yes, sir.

12:50:36PM 23   Q.   They've indicated they have a compelling interest to

12:50:39PM 24   vaccinate every service member otherwise military readiness

12:50:44PM 25   would be undermined.  You're aware of that?

## PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:50:46PM  1    **A.**   Yes, sir.

12:50:46PM  2    **Q.**   Are you aware that they've also said there's no other

12:50:49PM  3  lesser restrictive means than to discharge an unvaccinated

12:50:56PM  4  religious-based individual.  You're aware of that?

12:51:02PM  5    **A.**   I'm aware of that.

12:51:05PM  6    **Q.**   In your experience, based upon not only your research

12:51:09PM  7  military-wide throughout the DoD with the DMED, but also

12:51:15PM  8  beginning from the very first FDA document pre-EUA, and the

12:51:22PM  9  material that was released last week, is this -- are these

12:51:30PM 10  vaccines safe for the men and women of the military?

12:51:33PM 11    **A.**   These are not safe for the men and women of the military,

12:51:37PM 12  not based on this data that we received or the soldiers that

12:51:40PM 13  I've seen in the hospital.  Not at all, sir.

12:51:42PM 14    **Q.**   Because the mantra has been they're always safe and

12:51:45PM 15  effective, and that's still the case, isn't -- that's what

12:51:47PM 16  you're hearing?

12:51:49PM 17    **A.**   Still hearing.  They're still doing informed consents to

12:51:51PM 18  the soldiers on the border when I left, and the new surgeon

12:51:54PM 19  that took over is telling them they are safe and effective.

12:51:58PM 20    **Q.**   And they're still telling them that their job is to get

12:52:01PM 21  every soldier vaccinated?

12:52:04PM 22    **A.**   Yes, sir.

12:52:06PM 23    **Q.**   So your personal experience and observation and research

12:52:10PM 24  do not support the fact that they have argued that these are

12:52:14PM 25  safe?

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:52:16PM  1    **A.**   No, sir.  There's alternate methods that we can use that

12:52:19PM  2    are a lot simpler and a lot more effective, because I was able

12:52:22PM  3    to do that.  I was able to prove it by the fact that with less

12:52:25PM  4    people vaccinated, we stayed in the field longer.  As soon as

12:52:28PM  5    the vaccinated increased, we were putting more people on

12:52:32PM  6    quarters for ten days.

12:52:34PM  7    **Q.**   In terms of the safety, you've addressed that, but what

12:52:38PM  8    about effectiveness?  You've already --

12:52:40PM  9    **A.**   Effectiveness?  As far as the vaccine, sir?

12:52:44PM 10    **Q.**   Correct.

12:52:44PM 11       Are they effective in preventing transmission,

12:52:48PM 12    particularly Omicron, or any other --

12:52:49PM 13    **A.**   There are research controlled trials that are out that

12:52:52PM 14    show that these shots don't last as long as they -- as natural

12:52:56PM 15    immunity does, by far outweighs -- natural immunity outweighs

12:53:02PM 16    the shots.  Sometimes -- it depends, really, on the individual,

12:53:03PM 17    but we've seen it where, two, three months, and then -- well,

12:53:06PM 18    now we're having to go to boosters, when a typical vaccine -- I

12:53:11PM 19    haven't seen that in the military --

12:53:13PM 20    **Q.**   And you yourself were vaccinated and got COVID after --

12:53:16PM 21          THE COURT:  Mr. Staver, I lost the last part of what

12:53:18PM 22    you were about to say.  You were finishing a sentence?

12:53:21PM 23          THE WITNESS:  Right, sir.

12:53:22PM 24          It's just -- I have not seen any of the vaccines I've

12:53:26PM 25    taken in the military where I had to take -- we have a series

PETER CHAMBERS - DIRECT EXAM BY MR. STAVER

12:53:27PM  1    that we have to take --

12:53:28PM  2              THE COURT:  Yes, I understand.

12:53:30PM  3              THE WITNESS:  -- but not a booster so frequently that

12:53:34PM  4    it's -- because it's waxed and waned so early.

12:53:38PM  5              THE COURT:  I see.  All right.

12:53:38PM  6              Mr. Staver.

12:53:39PM  7              THE WITNESS:  Yes, sir.

12:53:39PM  8    Q.   (By Mr. Staver)  So in your experience, it's neither safe

12:53:42PM  9    for everyone or effective for everyone?

12:53:44PM 10    A.   Correct.  In my experience.

12:53:46PM 11    Q.   Are there other lesser restrictive ways, based upon your

12:53:51PM 12    discussion with your soldiers and your operations and other

12:53:56PM 13    physicians, that the military could achieve its interest of

12:54:01PM 14    keeping a healthy military-ready force besides universal

12:54:08PM 15    vaccination?

12:54:08PM 16    A.   Yes, there are other ways.  And my situation would be

12:54:11PM 17    different than different theaters and different -- operating a

12:54:17PM 18    ship, for example.  But, yes, sir, there's many ways to do

12:54:20PM 19    that.

12:54:20PM 20    Q.   What are some of the other ways that you have implemented

12:54:23PM 21    with regards to preventing people from getting COVID, your

12:54:27PM 22    soldiers in particular?

12:54:28PM 23    A.   Okay.  So an example on the border would be when soldiers

12:54:32PM 24    are in tight quarters, they live in basically FEMA trailers,

12:54:35PM 25    and there's -- there could be up to 15 in a small trailer

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:54:39PM 1  packed in like sardines.  And so when they're in close

12:54:43PM 2  proximity, we tend to worry about those things when we have a

12:54:48PM 3  pandemic going on.

12:54:49PM 4      And so what we did was, based upon a study that I had seen

12:54:51PM 5  in April of -- I don't know if you want me to go into the

12:54:54PM 6  study, but basically says if you do nasal lavage with Betadine

12:54:59PM 7  and some salt solution -- that's how simple it is -- and -- or

12:55:03PM 8  you can using baking soda, as long as you did that every day

12:55:07PM 9  between the troops, and you -- the troops -- there was one

12:55:09PM 10  positive case in that group -- you don't have to do it every

12:55:15PM 11  day just because you're standing on the border, but in that

12:55:16PM 12  group, that we decreased it, and according to the studies,

12:55:20PM 13  between 70-, I've seen, -3 and 96 percent decrease within

12:55:25PM 14  hours, the amount that can be potentially growing a culture in

12:55:32PM 15  their nose.  So that's what we did.  We used that technique

12:55:36PM 16  pretty regularly.  It's in our medic packs.

12:55:37PM 17      If a SEAL is down range, a SEAL has that, if they're

12:55:40PM 18  worried about that versus bullets, then they can take Betadine

12:55:45PM 19  and make their own solution and do a nasal lavage.  We're doing

12:55:50PM 20  it to our guys when they're exposed on the border.

12:55:51PM 21  **Q.**  So that close proximity would be similar to what you heard

12:55:53PM 22  the testimony regarding close proximity on the ship?

12:55:57PM 23  **A.**  Yes, sir, that would then parlay over.

12:55:59PM 24  **Q.**  In addition to those kinds of preventative measures, did

12:56:02PM 25  you also use other medications besides the COVID injections?

**PETER CHAMBERS - DIRECT EXAM BY MR. STAVER**

12:56:07PM 1   **A.**   This is where -- where -- better situations for us as

12:56:10PM 2   physicians is that on a state active duty order for the

12:56:13PM 3   soldiers that were on state active duty orders, because I was

12:56:16PM 4   there -- as a Title 10, I could not physically write them a

12:56:20PM 5   prescription, and I did not.  But they could go to a local

12:56:24PM 6   economy, see a doctor, and they prescribed ivermectin, or they

12:56:27PM 7   were prescribed whatever, Budesonide if they had a breathing

12:56:31PM 8   problem.  Yes, that is available.  It was to us.

12:56:36PM 9          MR. STAVER:  And, Your Honor, I wanted to move those

12:56:38PM 10   two letters from Senator Ron Johnson as well as the next

12:56:42PM 11   plaintiffs' exhibit.

12:56:44PM 12          THE COURT:  So that would be 9 and -- that would be

12:56:50PM 13   Plaintiffs' 9.

12:56:51PM 14          MR. STAVER:  That would be 9 cumulatively, yeah.

12:56:53PM 15   Yeah, you can put them together.

12:56:53PM 16          THE COURT:  I mean, 8.  That would be Exhibit 8.

12:56:57PM 17          MR. STAVER:  8, yes.

12:56:58PM 18          THE COURT:  Exhibit 8 is received, again, subject to

12:57:01PM 19   the prevailing understanding.

12:57:04PM 20          (Whereupon, Plaintiffs' Exhibit 8 was admitted.)

12:57:04PM 21   **Q.**   (By Mr. Staver)  Do you have any other things that you

12:57:08PM 22   want to share with the Court that would be relevant for this

12:57:10PM 23   hearing?

12:57:11PM 24          THE COURT:  Now, there's a question that calls for a

12:57:13PM 25   narrative, but I'll let it go.

## PETER CHAMBERS - CROSS-EXAM BY MS. YANG

12:57:17PM  1      MR. STAVER:  That's a dangerous question too.

12:57:21PM  2  Q.  (By Mr. Staver)  You don't have to if you don't want to.

12:57:23PM  3  A.  No, I don't.

12:57:24PM  4      MR. STAVER:  I don't have any other questions.

12:57:25PM  5      THE COURT:  Thank you, Mr. Staver.

12:57:26PM  6      Ms. Yang, I'll leave it to your option to take the

12:57:30PM  7  lunch hour now, or cross-examine and then take the lunch hour.

12:57:34PM  8      MS. YANG:  I think I can be relatively quick.  About

12:57:38PM  9  15 minutes, if that's okay.

12:57:39PM 10      THE COURT:  You're recognized for your

12:57:41PM 11  cross-examination.

12:57:42PM 12                      CROSS-EXAMINATION

12:57:42PM 13  BY MS. YANG:

12:57:54PM 14  Q.  Good morning, sir -- I guess good afternoon at this point.

12:57:59PM 15  A.  Yes.

12:58:00PM 16  Q.  Doctor, you haven't actually offered any kind of expert

12:58:03PM 17  report in this case; is that correct?

12:58:06PM 18  A.  I've offered based upon belief and observation.

12:58:09PM 19  Q.  Right.  Just to be clear, I'm asking for a written -- you

12:58:12PM 20  haven't prepared anything written for this case, correct?

12:58:15PM 21  A.  Not for this case.

12:58:15PM 22  Q.  Okay.

12:58:16PM 23  A.  I have for other cases.

12:58:17PM 24  Q.  You haven't submitted a declaration in this case?

12:58:20PM 25  A.  I have not for this case.

**PETER CHAMBERS - CROSS-EXAM BY MS. YANG**

12:58:21PM 1  **Q.**  All right.  And your testimony today is the first time

12:58:24PM 2  that we're hearing from you; is that correct?

12:58:26PM 3  **A.**  Yes, it is.

12:58:28PM 4  **Q.**  Have you ever treated Plaintiff Navy Commander?

12:58:33PM 5  **A.**  No, I have not.

12:58:34PM 6  **Q.**  The man -- the individual who testified earlier --

12:58:37PM 7  **A.**  I can't understand.

12:58:39PM 8  **Q.**  The individual who testified earlier today --

12:58:39PM 9  **A.**  Mm-hmm.

12:58:41PM 10  **Q.**  -- have you ever treated him medically?

12:58:42PM 11  **A.**  No, I have not.

12:58:44PM 12  **Q.**  Have you ever treated, medically, Lieutenant Colonel 2,

12:58:48PM 13  who is the other plaintiff in this case?

12:58:49PM 14  **A.**  No, I have not.

12:58:51PM 15  **Q.**  They're in a different service, correct?

12:58:53PM 16  **A.**  Correct.

12:58:54PM 17  **Q.**  In a different location from you?

12:58:55PM 18  **A.**  Affirmative.

12:58:57PM 19  **Q.**  Several times today, I think I counted about five times,

12:59:01PM 20  that you referenced a Lieutenant Colonel Long; is that correct?

12:59:05PM 21  **A.**  Correct.

12:59:05PM 22  **Q.**  And I believe you referred to, you know, what she was

12:59:08PM 23  expected to testify about, something to that effect.  Do you

12:59:12PM 24  generally remember that?

12:59:12PM 25  **A.**  I do remember, yes.

**PETER CHAMBERS - CROSS-EXAM BY MS. YANG**

12:59:14PM 1   **Q.**   Are you offering any testimony today that's different from

12:59:18PM 2   Lieutenant Colonel Long's?

12:59:20PM 3   **A.**   Yes.   I mean, we have different expertise.

12:59:23PM 4   **Q.**   Okay.   And are you offering any testimony today that's in

12:59:27PM 5   addition to what Lieutenant Colonel Long is expected to testify

12:59:31PM 6   about?

12:59:34PM 7   **A.**   I don't really know what you're getting at.

12:59:35PM 8           MR. STAVER:   Your Honor, I don't know how he would

12:59:36PM 9   know what Lieutenant Colonel Long is planning to testify about.

12:59:39PM 10          MS. YANG:   During the direct examination, the witness

12:59:43PM 11  specifically referred to what he expected Lieutenant Colonel

12:59:45PM 12  Long would testify to.

12:59:47PM 13          THE COURT:   I must admit -- your question is what?

12:59:51PM 14          MS. YANG:   Whether the doctor's testimony today is

12:59:54PM 15  any different from or in addition to the expected testimony of

12:59:57PM 16  Lieutenant Colonel Long whose testimony --

12:59:59PM 17          THE COURT:   I think the question fairly construed, to

01:00:02PM 18  the best of your knowledge, as you sit there, is her testimony

01:00:05PM 19  different from or in addition to your own testimony?

01:00:09PM 20          THE WITNESS:   I didn't review all her testimony, so I

01:00:11PM 21  don't know what else she has to offer.   I know her expertise

01:00:14PM 22  level is much more -- at a different point specifically to the

01:00:20PM 23  DMED data, yes, sir, her expertise.   Yes, sir.   So I did not --

01:00:23PM 24  I was not able to complete that.

01:00:25PM 25          THE COURT:   Did I do your question justice?

PETER CHAMBERS - CROSS-EXAM BY MS. YANG

01:00:28PM  1      MS. YANG:  You did.  Thank you, Your Honor.

01:00:29PM  2      THE COURT:  All right.

01:00:30PM  3  Q.  (By Ms. Yang)  Doctor, you agreed, I believe, in the

01:00:33PM  4  direct examination that you have not been trained specifically

01:00:36PM  5  in epidemiology or virology; is that correct?

01:00:40PM  6  A.  Trained to the level of a typical DO or MD, I am.

01:00:44PM  7  Q.  You have not received specialized training, however, in

01:00:47PM  8  epidemiology or --

01:00:48PM  9  A.  No --

01:00:48PM 10  Q.  -- virology?

01:00:49PM 11  A.  -- I'm not an epidemiologist.

01:00:49PM 12  Q.  Right.

01:00:49PM 13      You don't have a board certification --

01:00:52PM 14  A.  I'm a --

01:00:52PM 15      THE COURT:  Just one at a time, please.  Q and

01:00:55PM 16  then A.

01:00:56PM 17  Q.  (By Ms. Yang)  So that's a "no," you do not have special

01:00:58PM 18  expertise in epidemiology or virology?

01:01:02PM 19  A.  I have more than all the nonphysicians in this room, yes,

01:01:06PM 20  but I do not have a degree in -- a Ph.D. in epidemiology, nor

01:01:13PM 21  am I an epidemiologist.

01:01:13PM 22  Q.  Nor are you board-certified in that specialty?

01:01:16PM 23  A.  Negative.

01:01:17PM 24  Q.  And the same goes for immunology?

01:01:20PM 25  A.  That's a subject matter, it's not -- there's no board

**PETER CHAMBERS - CROSS-EXAM BY MS. YANG**

01:01:24PM  1  certification in that.

01:01:24PM  2  Q.   Okay.  Have you received specialized medical training

01:01:24PM  3  in --

01:01:28PM  4  A.   Yes, I did --

01:01:28PM  5  Q.   -- immunology?

01:01:28PM  6  A.   -- in medical school.

01:01:30PM  7  Q.   And have you received specialized training in vaccine

01:01:32PM  8  efficacy?

01:01:33PM  9  A.   We did in medical school, yes.

01:01:35PM 10  Q.   And have you received specialized training in genetics?

01:01:40PM 11  A.   It was covered in medical school.

01:01:41PM 12  Q.   Okay.  Nothing beyond the basic courses in medical school,

01:01:44PM 13  however?

01:01:45PM 14  A.   Negative.

01:01:46PM 15  Q.   Earlier you testified that you were offering some of your

01:01:51PM 16  opinions based on your observations, correct?

01:01:54PM 17  A.   Yes, ma'am.

01:01:55PM 18  Q.   Are you claiming some kind of expertise in making

01:01:58PM 19  observations?

01:02:00PM 20  A.   I'm claiming, fact witness, that I observed operations on

01:02:06PM 21  the border that are of a medical nature.

01:02:08PM 22  Q.   So you're presenting those opinions as what you observed

01:02:10PM 23  with your eyes as opposed to drawing any medical or expert

01:02:14PM 24  conclusions from them?

01:02:15PM 25  A.   I try not to draw conclusions; it's not what I'm here for.

## PETER CHAMBERS - CROSS-EXAM BY MS. YANG

01:02:19PM 1   I'm here to be an expert witness -- not an expert witness, a

01:02:23PM 2   fact witness.

01:02:27PM 3   Q.   Earlier you testified that you've been involved in the

01:02:31PM 4   COVID response for Governor Abbott, correct, for Texas?

01:02:37PM 5   A.   I was a liaison to his task force.

01:02:39PM 6   Q.   And you haven't been charged with COVID response for the

01:02:42PM 7   U.S. Army, correct?

01:02:45PM 8   A.   Under Title 10, 502 Foxtrot orders, that's exactly what I

01:02:52PM 9   did.  That's -- that is the -- those are federal orders,

01:02:55PM 10  Title 10.

01:02:56PM 11  Q.   Your testimony is that you have been charged on behalf of

01:02:59PM 12  the entire U.S. Army to coordinate COVID response?

01:03:03PM 13  A.   Those orders are Title 10.  However you interpret that,

01:03:07PM 14  ma'am, that's exactly what they are.  It's not for the entire

01:03:10PM 15  United States Army, those are Title 10 orders.

01:03:10PM 16  Q.   Okay.  And similarly --

01:03:15PM 17  A.   I did not state active duty orders, which would be

01:03:15PM 18  specifically the Guard.

01:03:17PM 19  Q.   And similarly you have not been tasked with the COVID

01:03:22PM 20  response for any other branch of the U.S. military, correct?

01:03:27PM 21  A.   No, that's wrong.  We have a multi -- it's a task force,

01:03:31PM 22  so it's the Air Force, and the Army Title 10 active duty people

01:03:36PM 23  on the borders, as well as the Guard.  It's a combination.

01:03:40PM 24  It's a task force, a joint task force, a JTF, so, yes.

01:03:46PM 25  Q.   But that's a limited Title 10, in your words, not for --

**PETER CHAMBERS - CROSS-EXAM BY MS. YANG**

01:03:50PM 1   not on behalf of the entire U.S. Army, the U.S. Navy, the

01:03:55PM 2   U.S. Marine Corps, correct?

01:03:56PM 3   **A.**   Correct, not for the entire.

01:04:00PM 4   **Q.**   I gather, generally, that you've opined that the COVID

01:04:05PM 5   vaccine is unsafe and ineffective, you know, to paraphrase.  Is

01:04:10PM 6   it fair to say that you disagree with the CDC's conclusions

01:04:14PM 7   about the safety and efficacy of the COVID vaccines?

01:04:19PM 8   **A.**   Do I disagree with those?

01:04:21PM 9   **Q.**   Yes.

01:04:22PM 10   **A.**   I would say that I would have to disagree --

01:04:24PM 11   **Q.**   Okay.

01:04:26PM 12   **A.**   -- because of what I'm seeing, yes, ma'am.

01:04:28PM 13   **Q.**   Similarly, would you say that you are disagreeing with the

01:04:30PM 14   FDA's determinations about the safety and efficacy of the COVID

01:04:35PM 15   vaccines?

01:04:36PM 16   **A.**   Well, I really don't want to get argumentative at all, but

01:04:40PM 17   they just released something on the 1st of March that admits to

01:04:43PM 18   adverse reactions.  That was released -- the FDA had Pfizer

01:04:48PM 19   release that.  I don't understand how that's not clear.

01:04:51PM 20   **Q.**   Okay.  In your experience, does the fact of some adverse

01:04:57PM 21   events following the vaccine, let's just the flu vaccine, mean

01:05:02PM 22   that that vaccine is therefore unsafe and ineffective?

01:05:07PM 23   **A.**   It means that that vaccine is very unsafe and effective

01:05:09PM 24   for that particular person who could have that immunoglobulin E

01:05:13PM 25   response, which is anaphylaxis is what she's referring to.  So

**PETER CHAMBERS - CROSS-EXAM BY MS. YANG**

01:05:16PM  1  for that particular case, yes, that would be very dangerous for

01:05:18PM  2  that person.

01:05:19PM  3  Q.   And generally speaking, the answer, however, would be

01:05:22PM  4  "no"?

01:05:23PM  5  A.   Correct.  No, not regarding anaphylaxis or -- no, it would

01:05:28PM  6  not.

01:05:29PM  7  Q.   Have you reviewed all of the declarations of the military

01:05:31PM  8  doctors in this case?

01:05:35PM  9  A.   I've reviewed Dr. Long's.  I have not reviewed the other

01:05:40PM 10  physicians.

01:05:42PM 11  Q.   Okay.  Were you aware that the government has submitted

01:05:44PM 12  multiple declarations from various military doctors?

01:05:47PM 13  A.   Yes.

01:05:48PM 14  Q.   Did you review any of those?

01:05:51PM 15  A.   I went over them.  I had a lot of things to review, so I

01:05:54PM 16  categorized based upon my priorities.  So I just glanced

01:05:59PM 17  through them, yes.

01:05:59PM 18  Q.   Do you specifically remember which ones you reviewed?

01:06:02PM 19  A.   Is it epidemiologic -- would it -- Dr. Van -- is there a

01:06:11PM 20  Vans.  Rans.  Rans.  Dr. Rans.

01:06:14PM 21  Q.   Any others, or is that the only one you can recall?

01:06:16PM 22  A.   That's the only one I really looked at.

01:06:18PM 23  Q.   All right.  Could you turn, please, to that binder that

01:06:23PM 24  you have in front of you to tab 1.

01:06:26PM 25  A.   Mm-hmm.

PETER CHAMBERS - CROSS-EXAM BY MS. YANG

01:06:29PM  1   **Q.**   And this communication which you described earlier --

01:06:32PM  2   **A.**   Mm-hmm.

01:06:33PM  3   **Q.**   -- is issued by the State of Texas Military Department,

01:06:37PM  4   correct?

01:06:37PM  5   **A.**   Yes, it is.  Yes, ma'am.

01:06:39PM  6   **Q.**   Not the U.S. Navy?

01:06:42PM  7   **A.**   No.

01:06:43PM  8   **Q.**   Not the U.S. Marine Corps?

01:06:46PM  9   **A.**   Not the U.S. Marine Corps, no.

01:06:49PM  10  **Q.**   Could you turn to the same tab in that binder?

01:06:53PM  11  **A.**   Mm-hmm.

01:06:53PM  12  **Q.**   This is the October 2020 PowerPoint by the FDA, so that's

01:06:57PM  13  about a year and a half ago.  Are you aware that the FDA and

01:07:03PM  14  CDC have continued to update the data that they are receiving

01:07:08PM  15  about adverse health events since then?

01:07:11PM  16  **A.**   We do.  We do get updates.  Yes, ma'am, I'm aware.

01:07:17PM  17  **Q.**   On this second page of tab 3, there's a list of adverse

01:07:25PM  18  event outcomes.  You see that?

01:07:28PM  19  **A.**   Yes, ma'am.

01:07:29PM  20  **Q.**   Do you have any specialized medical training in any of

01:07:32PM  21  these areas beyond what you received in basic course work --

01:07:38PM  22  **A.**   I'll say empirically, 90 percent of these.

01:07:41PM  23  **Q.**   Okay.  Which ones specifically have you received

01:07:44PM  24  specialized medical training for?

01:07:48PM  25  **A.**   Encephalomyelitis, transverse myelitis, convulsions and

**PETER CHAMBERS - CROSS-EXAM BY MS. YANG**

01:07:53PM  1   seizures, stroke, anaphylaxis, acute myocardial infarction,

01:07:58PM  2   myocarditis, deaths -- I think all physicians receive training

01:08:03PM  3   for that -- and pronouncement.  Pregnancy and birth.

01:08:07PM  4   Demyelinating diseases, as far as the primary care initial

01:08:13PM  5   visits, yes.  Non-anaphylactic allergic reactions,

01:08:18PM  6   thrombocytopenia.  I worked in the emergency room for 20 years.

01:08:23PM  7   Arthritis, arthralgias, yes.  Kawasakis, no.  Multisystem

01:08:28PM  8   Inflammatory Syndromes in kids, yes.  I would be the gatekeeper

01:08:32PM  9   on that one.  Vaccine enhanced disease.  I've just got a lot of

01:08:38PM 10   experience with that.

01:08:38PM 11   Q.   All right.  You mentioned myocarditis a few times.

01:08:45PM 12   Myocarditis is a condition of the heart, correct?

01:08:51PM 13   A.   Yes, ma'am.

01:08:52PM 14   Q.   And the area of medicine that specializes in that, is it

01:08:55PM 15   fair to say is cardiovascular medicine?

01:08:58PM 16   A.   Negative.  It's a cardiologist.

01:08:58PM 17   Q.   Cardiologist.  Okay.  Excuse me.

01:09:01PM 18        Are you board-certified in cardiology?

01:09:03PM 19   A.   No, I'm not.

01:09:04PM 20   Q.   Do you have any specialized training in cardiology?

01:09:06PM 21   A.   Yes, I do.  I have 20 years of emergency room experience

01:09:10PM 22   taking care of myocardial infarctions.  That's more than

01:09:13PM 23   training; that's on the job.

01:09:14PM 24   Q.   Have you yourself performed any studies into myocarditis?

01:09:18PM 25   A.   No.  I've just most recently taken care of six soldiers on

## PETER CHAMBERS - CROSS-EXAM BY MS. YANG

01:09:23PM  1  the border with it.

01:09:24PM  2  Q.   Okay.  But separate from that direct patient care, have

01:09:28PM  3  you conducted any studies?

01:09:30PM  4  A.   Studies, no, no, I have not.  Not studies.

01:09:32PM  5  Q.   And those six cases that you just mentioned, I believe

01:09:39PM  6  earlier you described them as coming to you with complaints of

01:09:46PM  7  chest pain; is that correct?

01:09:48PM  8  A.   That is -- I never said that they came to me with chest

01:09:52PM  9  pain, but that's usually the presentation.

01:09:55PM 10  Q.   Oh, I see.  Okay.

01:09:56PM 11       So how many people have actually come to you with

01:10:01PM 12  complaints of chest pain that you believe --

01:10:05PM 13  A.   Out of those six?

01:10:07PM 14  Q.   Yes.

01:10:08PM 15  A.   Two.

01:10:09PM 16  Q.   Okay.  And is it your belief that those complaints were

01:10:17PM 17  related to the COVID vaccine?

01:10:21PM 18  A.   After discussion with physicians and specialists who did

01:10:25PM 19  take care of them, it is my belief, yes, that it is.

01:10:28PM 20  Q.   You didn't do any studies into it, though, however, right?

01:10:33PM 21  No studies into whether that was the case?

01:10:35PM 22  A.   No, I didn't do studies.  I don't have time for a study

01:10:39PM 23  when I'm on the border.  I have no time.

01:10:41PM 24  Q.   You didn't do any differential diagnosis --

01:10:45PM 25  A.   Absolutely, we did a differential diagnosis.  The

PETER CHAMBERS - CROSS-EXAM BY MS. YANG

01:10:45PM 1   specialist did.

01:10:46PM 2   Q.   You yourself did?

01:10:46PM 3   A.   No, I did not.  I'm a primary care doctor.  That's left to

01:10:50PM 4   the specialists.

01:11:05PM 5   Q.   Go ahead and turn to tab 6, and this is the VAERS

01:11:13PM 6   presentation that you were asked about earlier.

01:11:17PM 7   A.   Yes, ma'am.

01:11:20PM 8   Q.   VAERS data is self-reported, correct?

01:11:26PM 9   A.   It's not specifically self-reported, no.  Not correct.

01:11:29PM 10  Q.   So, for example, if I were to suffer an adverse event, I

01:11:36PM 11  couldn't go into VAERS and self-report my adverse event?

01:11:39PM 12  A.   You can do it, but it's not specifically self-reported.

01:11:44PM 13  That was the question, I believe.

01:11:45PM 14  Q.   In your view, what's the difference between my ability,

01:11:47PM 15  for example, to self-report --

01:11:49PM 16  A.   Mm-hmm.

01:11:50PM 17  Q.   -- and the distinction that you're drawing about VAERS

01:11:53PM 18  data not being self-reported?

01:11:56PM 19  A.   I'm not saying that it was not self-reported, I'm saying

01:11:59PM 20  it's not primarily or the only way.  That's the way I

01:12:03PM 21  understood the question.

01:12:04PM 22  Q.   I see.  Okay.

01:12:05PM 23       Okay.  So one component certainly of the data is

01:12:10PM 24  self-reporting?

01:12:10PM 25  A.   Yes, sir.

**PETER CHAMBERS - CROSS-EXAM BY MS. YANG**

01:12:10PM 1  Q.   You would agree with that?

01:12:12PM 2  A.   Absolutely.

01:12:12PM 3  Q.   Okay.  And another components would be the reports of

01:12:15PM 4  healthcare providers, correct?

01:12:17PM 5  A.   Correct.

01:12:17PM 6  Q.   There was a period, correct, when health providers were

01:12:22PM 7  required to report adverse events to VAERS, correct?

01:12:26PM 8  A.   Yes.

01:12:27PM 9  Q.   That was whether or not the healthcare provider had

01:12:30PM 10 determined there was actually any causal connection between the

01:12:33PM 11 two?

01:12:33PM 12 A.   Correct.

01:12:45PM 13 Q.   Okay.  As a healthcare provider, was there any similar

01:12:51PM 14 requirement for you to enter data into VAERS for something like

01:12:58PM 15 the flu vaccines?

01:13:00PM 16 A.   If the flu vaccine gave them a reaction, yes.

01:13:06PM 17 Q.   That's required as well?

01:13:06PM 18 A.   That's required by AR 40-562.

01:13:11PM 19 Q.   Are you aware that the CDC and FDA then take this data

01:13:14PM 20 from VAERS, investigate it and figure out whether there is

01:13:17PM 21 actually a causal connection between the adverse event that was

01:13:20PM 22 reported and the COVID vaccine?

01:13:23PM 23 A.   I'm not aware of that, but I am aware of the studies that

01:13:28PM 24 match up with the DMED data, almost exactly when you pull out

01:13:33PM 25 the VAERS military data and marry them up, they'll be able to

## PETER CHAMBERS - CROSS-EXAM BY MS. YANG

01:13:37PM  1  show that.

01:13:38PM  2  **Q.**  Specifically for the CDC and FDA --

01:13:41PM  3  **A.**  Okay.

01:13:41PM  4  **Q.**  -- do you know how many of these adverse events they

01:13:45PM  5  actually causally connected to the vaccine?

01:13:49PM  6  **A.**  I'm going based off what I see on VAERS.  But I use for

01:13:52PM  7  myself the DMED data because that's the population I'm taking

01:13:56PM  8  care of.

01:13:56PM  9  **Q.**  I understand.  I'm asking if you are aware --

01:13:56PM  10  **A.**  Okay.

01:13:58PM  11  **Q.**  -- one way or the other --

01:13:58PM  12  **A.**  Yes, yes.

01:13:59PM  13  **Q.**  -- of the number of these adverse events that CDC --

01:13:59PM  14  **A.**  I'm not aware of the numbers --

01:13:59PM  15  **Q.**  I'm sorry, just let me finish the question.

01:14:06PM  16      Are you aware of the number of adverse events that the CDC

01:14:12PM  17  and FDA actually causally connected to the COVID vaccine?

01:14:17PM  18  **A.**  I'm aware based upon the VAERS system, yes.  This is part

01:14:22PM  19  of the -- of that same CDC information and FDA.

01:14:36PM  20  **Q.**  You also talked about DMED --

01:14:44PM  21      THE COURT:  Ms. Yang, would this be a good time for

01:14:46PM  22  us to take the lunch break?  You're a bit over five or ten

01:14:50PM  23  minutes.

01:14:50PM  24      MS. YANG:  Oh, certainly.  Sorry about that.

01:14:50PM  25      THE COURT:  It's 1:15.  So it may be drizzling

PETER CHAMBERS - CONTINUED CROSS-EXAM BY MS. YANG

01:14:54PM 1    outside, but I couldn't tell.  Would an hour and 15 minutes be

01:14:57PM 2    all right for everybody?

01:14:57PM 3          MR. STAVER:  Yes, Your Honor.

01:14:58PM 4          THE COURT:  All right.  It's 1:15, so just to keep

01:15:01PM 5    the numbers even, we'll break now and we can come back at 2:30.

01:15:05PM 6          MS. YANG:  Okay.  Thank you.

01:15:06PM 7          THE COURT:  We are in recess at this time.  Enjoy

01:15:12PM 8    your lunch hour.

01:15:17PM 9          (Proceedings in recess from 1:15 p.m. until 2:28 p.m.)

02:28:56PM 10         THE COURT:  The witness may return to the witness

02:28:57PM 11   stand, assuming he remains available for that purpose.

02:28:57PM 12         THE WITNESS:  (Complies.)

02:29:25PM 13         THE COURT:  Let's get that clipped on with the

02:29:29PM 14   microphone pointing toward his face or mouth, whatever.  There

02:29:35PM 15   we go.

02:29:36PM 16         And, Ms. Yang, I believe that I interrupted your

02:29:39PM 17   cross-examination of this witness, so you are recognized to

02:29:42PM 18   resume that cross-examination uninterrupted.

02:29:45PM 19         MS. YANG:  Thank you, Your Honor.

02:29:47PM 20                 CONTINUED CROSS-EXAMINATION

02:29:47PM 21   BY MS. YANG:

02:29:49PM 22   Q.   Welcome back, sir.

02:29:51PM 23   A.   Thank you.

02:29:51PM 24   Q.   Let's talk about the DMED data that you referenced in your

02:29:57PM 25   direct examination.  Are you aware that the Defense Health

**PETER CHAMBERS - CONTINUED CROSS-EXAM BY MS. YANG**

02:30:02PM   1   Agency reviewed the data in DMED after you reported your

02:30:07PM   2   concerns?

02:30:09PM   3   **A.**   Yes.

02:30:10PM   4   **Q.**   And that the Defense Health Agency compared the data that

02:30:14PM   5   was in DMED to the underlying data source; are you aware of

02:30:19PM   6   that?

02:30:19PM   7   **A.**   I didn't look into that detail, because I came off the

02:30:23PM   8   mission at that point and was not taking care of soldiers at

02:30:28PM   9   that time.

02:30:28PM  10   **Q.**   Are you aware that the Defense Health Agency published an

02:30:31PM  11   information paper reflecting their findings from their

02:30:34PM  12   investigation?

02:30:35PM  13   **A.**   Yes.

02:30:36PM  14   **Q.**   And is this the February 2022 paper that you started to

02:30:43PM  15   discuss in your direct examination?

02:30:48PM  16   **A.**   February -- could you produce that for me?

02:30:51PM  17   **Q.**   Certainly.

02:31:02PM  18           MS. YANG:  Your Honor, may I approach?

02:31:04PM  19           THE COURT:  You may.  Yes, you may do so freely as

02:31:09PM  20   you want.

02:31:11PM  21           MS. YANG:  And I have a copy for the Court as well.

02:31:15PM  22           THE COURT:  Yes, please, if I don't have a copy of it

02:31:17PM  23   here.  Thank you.

02:31:20PM  24           MR. STAVER:  Your Honor, this was not something that

02:31:21PM  25   was discussed in direct, so I'm not quite sure what counsel may

PETER CHAMBERS - CONTINUED CROSS-EXAM BY MS. YANG

02:31:24PM  1  be referring to.

02:31:25PM  2          THE COURT:  Nor am I, but let's explore the matter.

02:31:31PM  3          MS. YANG:  Thank you, Your Honor.

02:31:32PM  4  Q.   (By Ms. Yang)  Sir, have you seen this information paper

02:31:38PM  5  before?

02:31:39PM  6  A.   No, I have not.

02:31:46PM  7          THE COURT:  And you say the source of this is what?

02:31:48PM  8          MS. YANG:  The Defense Health Agency.  And if the

02:31:51PM  9  Court would prefer, we are happy to submit an authenticating

02:31:55PM  10 declaration after our proceeding today.

02:31:57PM  11         THE COURT:  No, I just didn't hear what it is.  Is it

02:31:59PM  12 publicly available?

02:32:01PM  13         MS. YANG:  I believe it is, yes, sir.

02:32:02PM  14         MR. STAVER:  Your Honor, there is no foundation for

02:32:04PM  15 it.  And like last time, we had a declaration at the close of

02:32:08PM  16 evidence, and I don't -- hopefully we don't go down that same

02:32:13PM  17 road again today.  I've never seen this document.

02:32:22PM  18         MS. YANG:  Your Honor, may I proceed?

02:32:26PM  19         THE COURT:  "Yes" is the answer to your question.

02:32:34PM  20 But just for my benefit as the factfinder, what is this?

02:32:37PM  21         MS. YANG:  This is an information paper that was

02:32:39PM  22 published by the Defense Health Agency after they conducted a

02:32:43PM  23 review of the DMED data concerns that the witness testified

02:32:48PM  24 about earlier.

02:32:49PM  25         THE COURT:  And you say it's published.  Where is it

**PETER CHAMBERS - CONTINUED CROSS-EXAM BY MS. YANG**

02:32:53PM  1   published?

02:32:54PM  2          MS. YANG:  I am not certain of that.  I can certainly

02:32:59PM  3   double check on that.  But as I mentioned, we are very happy to

02:33:04PM  4   submit an authenticating declaration if authentication is a

02:33:08PM  5   concern to the Court.

02:33:10PM  6          THE COURT:  Well, I'm not sure if it's authentication

02:33:13PM  7   or identification, but I did want to know.  It has on its face

02:33:20PM  8   a date, but it doesn't have on its face -- at least at my

02:33:24PM  9   glance did not reveal a point of attribution.

02:33:31PM  10          MR. STAVER:  There's no identifying indicia of this,

02:33:33PM  11   and the witness says he's never seen it.

02:33:39PM  12          MS. POWELL:  Your Honor, do you mind if I'm heard?

02:33:42PM  13          THE COURT:  That's fine.

02:33:43PM  14          MS. POWELL:  Your Honor, obviously we only found out

02:33:49PM  15   these witnesses were testifying a couple of days ago.  This

02:33:52PM  16   paper was produced and released to media and Congress not long

02:33:56PM  17   before that.  In response to the allegations made by Lieutenant

02:34:01PM  18   Colonel Long and others in the media reporting about it, this

02:34:03PM  19   was created and released in response to that.  I don't know if

02:34:06PM  20   it's publish --

02:34:06PM  21          THE COURT:  It was released where or -- in other

02:34:09PM  22   words, I'm just trying to source it.  What is the --

02:34:13PM  23          MS. POWELL:  The Defense Health Agency is a subagency

02:34:16PM  24   within DoD that investigated the concerns raised by Lieutenant

02:34:20PM  25   Colonel Long and others, and sent this paper analyzing those

**PETER CHAMBERS - CONTINUED CROSS-EXAM BY MS. YANG**

02:34:24PM  1    concerns and using DMED paper to various members of the media

02:34:28PM  2    and various members of Congress who had inquired about it.

02:34:31PM  3           You're correct that we don't -- since the witness is

02:34:33PM  4    not familiar with it, we don't have authentication on the

02:34:36PM  5    record, but we would be happy to create that -- a document that

02:34:40PM  6    identifies it.  For now, as counsel, we're happy to represent

02:34:43PM  7    that we got it from DHA that has informed us that it has been

02:34:47PM  8    released to the public in general and that they created it

02:34:49PM  9    based on the DMED data and their review of the data that the

02:34:53PM  10   plaintiffs here have referred to.

02:34:55PM  11          THE COURT:  Are you going to offer this into

02:34:57PM  12   evidence?

02:34:58PM  13          MS. POWELL:  Yes.

02:35:01PM  14          THE COURT:  All right.  You didn't list it on your

02:35:02PM  15   evidence list.

02:35:03PM  16          MS. POWELL:  No.  We had no idea plaintiffs were

02:35:05PM  17   going to proffer witnesses on the safety and efficacy of the

02:35:09PM  18   vaccine or DMED.  This is purely in rebuttal and impeachment to

02:35:12PM  19   the witnesses plaintiffs identified on their list later.

02:35:16PM  20          MR. STAVER:  Your Honor, may I be heard?

02:35:17PM  21          THE COURT:  Briefly, yes.

02:35:19PM  22          MR. STAVER:  They had both doctors listed, and they

02:35:23PM  23   were going to do a global objection at the very beginning, as

02:35:27PM  24   this Court was informed, of all the witnesses with regard to

02:35:30PM  25   this issue, and on that witness list was information regarding

**PETER CHAMBERS - CONTINUED CROSS-EXAM BY MS. YANG**

02:35:34PM   1   DMED.  So if they want to rebut it, as of Tuesday when they got

02:35:38PM   2   our information, they could have done something in advance.

02:35:41PM   3   And, again, we're last minute, at the close of testimony -- or

02:35:44PM   4   at the end of testimony and wanting to do a post-hearing

02:35:48PM   5   declaration.

02:35:49PM   6          MS. POWELL:  I'm not aware of any rule or order that

02:35:52PM   7   would require us to disclose rebuttal evidence that we only

02:35:55PM   8   came up with in response to their witness list.  We had no

02:35:59PM   9   reason to think DMED data would be at issue before we got their

02:36:03PM   10  witness list.

02:36:04PM   11         THE COURT:  I'm not sure how you define rebuttal

02:36:07PM   12  evidence here.  I'm not sure that I know of any rule that

02:36:12PM   13  exempts you from including rebuttal evidence on an exhibit list

02:36:16PM   14  pretrial, but I know my standard order distinctly includes all

02:36:24PM   15  evidence that will be offered for any reason, although we

02:36:27PM   16  didn't issue such an order with respect to this hearing.

02:36:30PM   17         So you may mark it for identification, and you may

02:36:33PM   18  question the witness about it.  This is Defense Exhibit 1?

02:36:38PM   19  Defense Exhibit 1, is that what it is?

02:36:40PM   20         MS. YANG:  That's correct.  Okay.

02:36:41PM   21         THE COURT:  We'll identify it as Defense Exhibit 1,

02:36:44PM   22  and you may proceed.

11:12:37AM   23         (Defendants' Exhibit 1 admitted.)

02:36:47PM   24         THE COURT:  Defense Exhibit 1 for identification.

02:36:50PM   25  Q.   (By Ms. Yang)  Sir, I believe you said you have not

**PETER CHAMBERS - CONTINUED CROSS-EXAM BY MS. YANG**

02:36:52PM  1  reviewed this paper before today?

02:36:54PM  2  A.   Correct, I have not reviewed this paper.

02:36:56PM  3  Q.   Let me represent to you that this is a paper that was

02:37:02PM  4  created by the Defense Health Agency in which they correct the

02:37:08PM  5  data concerns that you and your colleagues had reported to

02:37:13PM  6  Congress and elsewhere, which you described in your direct

02:37:16PM  7  examination.  And if you would please turn to page 2 of this

02:37:21PM  8  paper.  Do you see the table on the bottom of that page?

02:37:26PM  9  A.   Yes, I do.

02:37:27PM  10  Q.   It goes on -- over to the top of the third page.

02:37:31PM  11  A.   Okay.  Yes.

02:37:32PM  12  Q.   And do you see the headings for each of these three

02:37:36PM  13  columns, the first heading, Medical Encounter Conditions?

02:37:40PM  14  A.   Yes, ma'am.

02:37:40PM  15  Q.   And that lists the various conditions you had

02:37:44PM  16  identified the increases in 2021 that you believe were

02:37:49PM  17  associated with the COVID vaccine; is that right?

02:37:53PM  18  A.   Correct.

02:37:53PM  19  Q.   And the second column is headed Reported Change to Number

02:37:57PM  20  of Healthcare Encounters (2021 Compared to Last Five Years)

02:38:04PM  21  Using Erroneous Data.  Do you see that?

02:38:08PM  22  A.   I see that.

02:38:09PM  23  Q.   And the numbers -- or the percentages in this column,

02:38:12PM  24  those are the same percentages that you had reported to

02:38:15PM  25  Congress and described earlier to the Court, correct?

**PETER CHAMBERS - CONTINUED CROSS-EXAM BY MS. YANG**

02:38:18PM   1  A.   They look similar.

02:38:19PM   2  Q.   The third column, the heading title is DMED Query Results

02:38:23PM   3  for Change to Number of Healthcare Encounters (2021 Compared to

02:38:28PM   4  Last Five Years) Following Data Correction.  Do you see that

02:38:32PM   5  heading?

02:38:33PM   6  A.   Yes, ma'am.

02:38:34PM   7  Q.   And do you see that the percentage numbers following that

02:38:38PM   8  heading are different from the percentages you had described

02:38:43PM   9  earlier?  Do you see that?

02:38:45PM  10  A.   I do see that.

02:38:47PM  11  Q.   So, for example, whereas before you had described a

02:38:52PM  12  1,048 percent increase in the diseases of the nervous system,

02:38:57PM  13  the corrected number is actually a 5.7 decrease.  Do you see

02:39:00PM  14  that?

02:39:01PM  15  A.   I do see that.

02:39:02PM  16  Q.   For hypertension, whereas you had reported a 2,181 percent

02:39:07PM  17  increase, the corrected number actually shows a 1.9 percent

02:39:12PM  18  increase?

02:39:13PM  19  A.   Yes, ma'am.  I didn't report that, that was DMED that

02:39:15PM  20  reported that.  I just read it.

02:39:18PM  21  Q.   And the 30 percent -- excuse me, the 302 percent increase

02:39:24PM  22  in tachycardia that you had described earlier, that was

02:39:28PM  23  corrected to an 8.3 percent decrease.  Do you see that?

02:39:32PM  24  A.   Yes.  I do see that on this paper, yes, ma'am.

02:39:34PM  25  Q.   And on the next page, there is a condition that's

**PETER CHAMBERS - REDIRECT EXAM BY MR. STAVER**

02:39:38PM   1  demyelinating -- I don't know if I'm pronouncing that right,

02:39:42PM   2  but is that the condition that you have, sir?

02:39:46PM   3  A.   That is the general descriptor.  It would be a larger

02:39:50PM   4  diagnosis picture, but yes.

02:39:52PM   5  Q.   Understood.

02:39:53PM   6       And whereas the concerns and the data that you had

02:39:57PM   7  reported showed 487 percent increase, do you see that the

02:40:01PM   8  corrected data actually accounts for a 17.7 percent decrease?

02:40:06PM   9  A.   I see that.

02:40:11PM  10       MS. YANG:  Thank you, Your Honor.  No further

02:40:12PM  11  questions for this witness at this time.

02:40:17PM  12       MR. STAVER:  Just a few, Your Honor.

02:40:18PM  13       THE COURT:  Mr. Staver, you're recognized for your

02:40:21PM  14  redirect examination.

02:40:22PM  15                    REDIRECT EXAMINATION

02:40:22PM  16  BY MR. STAVER:

02:40:26PM  17  Q.   Counsel asked you about the Tonya Rans declaration.  On

02:40:33PM  18  page 6 of her declaration, she says, "Just as it is

02:40:38PM  19  acknowledged that there are potential adverse events to

02:40:43PM  20  COVID-19 vaccines..."  Do you agree with her statement there,

02:40:47PM  21  that there are potential adverse events to COVID-19 vaccines?

02:40:51PM  22  A.   Yes, sir.

02:40:52PM  23  Q.   And you have personally seen those?

02:40:55PM  24  A.   Yes, sir.

02:40:56PM  25  Q.   On page 22, she stated in her declaration, "Available

PETER CHAMBERS - REDIRECT EXAM BY MR. STAVER

02:41:16PM   1   evidence shows that fully" -- I'm sorry.  On page 24 of her

02:41:21PM   2   declaration is what I'm looking at.  "As previously stated,

02:41:26PM   3   identified in multiple -- as previously identified in multiple

02:41:29PM   4   studies, vaccination with an mRNA vaccine like Pfizer-BioNTech

02:41:36PM   5   was associated with an elevated risk of myocarditis compared to

02:41:39PM   6   those unvaccinated (risk difference 2.7 events/100,000

02:41:45PM   7   people)."

02:41:45PM   8        Do you agree with that, there was an increased risk of

02:41:48PM   9   myocarditis?

02:41:49PM  10   A.   I agree that there was an increased risk, I could not

02:41:53PM  11   verify that percentage.

02:41:55PM  12   Q.   And have you seen that increased risk in the FDA report

02:41:59PM  13   that we discussed October 22, 2020?

02:42:03PM  14   A.   Yes, sir.

02:42:04PM  15   Q.   And have you seen that increased risk in VAERS?

02:42:07PM  16   A.   Yes, sir.

02:42:08PM  17   Q.   Have you seen that increased risk in DMED?

02:42:12PM  18   A.   Yes, sir.

02:42:13PM  19   Q.   Have you personally, in your experience as a medical

02:42:16PM  20   physician treating soldiers, seen that increased risk in the

02:42:20PM  21   soldiers after taking the vaccine?

02:42:23PM  22   A.   Yes, sir.  Absolutely.

02:42:23PM  23   Q.   In your discussion with other medical experts, have you

02:42:26PM  24   also discussed that increased risk with other medical experts

02:42:29PM  25   as well?

## PETER CHAMBERS - REDIRECT EXAM BY MR. STAVER

02:42:30PM 1   A.   Yes, sir.  Consultation, yes, sir.

02:42:38PM 2   Q.   Now, Rans goes on to say that, notwithstanding those

02:42:42PM 3   risks, that she continues to believe that vaccination --

02:42:47PM 4   universal vaccination is essentially the only way to protect

02:42:50PM 5   the military readiness of the force.  You understand that

02:42:54PM 6   that's what she's saying?

02:42:55PM 7   A.   I understand that.

02:42:55PM 8   Q.   And in your medical and other opinions, empirically, in

02:43:00PM 9   your research, do you agree or disagree with that opinion?

02:43:03PM 10  A.   I disagree with that opinion.

02:43:05PM 11          MR. STAVER:  I don't have any other questions.

02:43:06PM 12          THE COURT:  All right.  Thank you.

02:43:08PM 13          With that, Mr. Chambers, if you'll disconnect that

02:43:12PM 14  microphone -- or let the CSO do that.

02:43:15PM 15          THE WITNESS:  Yes, sir.

02:43:16PM 16          THE COURT:  And you may step down, and you're excused

02:43:19PM 17  with our thanks.

02:43:27PM 18          All right.  The plaintiffs are recognized to call

02:43:30PM 19  their next witness.

02:43:31PM 20          MR. STAVER:  Yes, Your Honor.

02:43:32PM 21          We call Lieutenant Colonel Dr. Theresa Long.

02:44:04PM 22          THE COURT:  Good afternoon.

02:44:06PM 23          THE WITNESS:  Good afternoon, sir.

02:44:07PM 24          THE COURT:  Let me ask you to pause a moment and

02:44:09PM 25  raise your right hand.

## THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

02:44:10PM  1          THERESA MARIE LONG,

02:44:10PM  2      having been sworn or affirmed under oath, was examined and

02:44:15PM  3  testified as follows:

02:44:15PM  4          THE COURT:  And state your name, please.

02:44:16PM  5          THE WITNESS:  Theresa Long.

02:44:19PM  6          THE COURT:  Please have a seat in the witness stand.

02:44:21PM  7  We'll need to connect that microphone.

02:44:46PM  8          With that, I'll recognize Mr. Staver for his direct

02:44:46PM  9  examination.

02:44:50PM 10          MR. STAVER:  Thank you, Your Honor.

02:44:50PM 11              DIRECT EXAMINATION

02:44:50PM 12  BY MR. STAVER:

02:44:50PM 13  Q.   Can you state your full name, please.

02:44:53PM 14  A.   Theresa Marie Long.

02:44:57PM 15  Q.   For the benefit of the Court, can you give us your

02:45:00PM 16  background and training and education from a medical doctor

02:45:05PM 17  perspective.

02:45:06PM 18  A.   Yes, sir.  I enlisted in the Army in 1991 as a combat

02:45:12PM 19  medic and did an assignment over in Germany, came back to

02:45:19PM 20  Washington, functioned as the trauma team leader at Madigan

02:45:23PM 21  Army Medical Center.  After receiving my bachelor's degree from

02:45:26PM 22  the University of Texas at Austin in neurobiology/neuroscience,

02:45:30PM 23  I completed my medical degree from the University of Texas

02:45:34PM 24  Health Science Center at Houston Medical School in 2008.

02:45:34PM 25  Q.   Okay.

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

02:45:40PM  1  **A.**    I served as a field surgeon for ten years in the Army out

02:45:45PM  2  of Fort Hood and completed a residency in aerospace and

02:45:50PM  3  occupational medicine at the United States Army School of

02:45:54PM  4  Aviation Medicine, Fort Rucker.

02:45:56PM  5      I hold a master's in public health.  I am trained by

02:46:02PM  6  Combat Readiness Center, Fort Rucker, as an aviation safety

02:46:06PM  7  officer and an aircraft mishap investigator.  Additionally, I

02:46:10PM  8  have been trained formally at Fort Detrick and USAMRIID in the

02:46:15PM  9  medical management of chemical and biological casualties, with

02:46:20PM  10  training in infectious disease from Army, Navy, and Air Force

02:46:24PM  11  at the Global Medicine Symposium, FEMA, the emergency

02:46:29PM  12  preparedness training, medical effects in ionizing radiation,

02:46:33PM  13  OSHA, Air Force toxicology, epidemiology, biostatistics, and

02:46:37PM  14  medical research, in addition to disaster planning.

02:46:45PM  15      I currently serve, sir, as a medical and scientific

02:46:49PM  16  advisor to the 1st Aviation Training Brigade at Fort Rucker,

02:46:55PM  17  with specific tasks to identify and mitigate -- create

02:47:01PM  18  mitigation strategies for COVID-19 infections, both in

02:47:07PM  19  vaccinated, unvaccinated soldiers, and to conduct

02:47:11PM  20  biostatistical analysis in the effort to mitigate lost training

02:47:19PM  21  time among pilots.

02:47:20PM  22  **Q.**    I may have missed this, but where did you get your medical

02:47:23PM  23  degree?

02:47:23PM  24  **A.**    From the United -- from Texas -- University of Texas

02:47:28PM  25  Health Science Center, Houston, Texas, sir.

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

02:47:31PM 1  **Q.**   And after that you got a master's in public health?

02:47:35PM 2  **A.**   Yes, sir, I did.

02:47:35PM 3  **Q.**   Can you explain what the difference would be and what

02:47:39PM 4  specialized training that equipped you to do.

02:47:43PM 5  **A.**   Yes, sir.  I got my master's in public health as part of

02:47:47PM 6  my aerospace medicine residency training.  In order to receive

02:47:52PM 7  a master's in public health, you have to be formally trained in

02:47:56PM 8  epidemiology, biostatistics, in addition to population health,

02:48:07PM 9  emergency preparedness, behavioral health, emerging infectious

02:48:15PM 10  diseases were kind of the basis of it.

02:48:19PM 11      As part of my master's in public health, I was required to

02:48:23PM 12  complete a one-year-long research project.  For that research

02:48:27PM 13  project, I was encouraged by senior medical leaders to use the

02:48:32PM 14  Defense Medical Epidemiology Database to conduct my research.

02:48:39PM 15  **Q.**   So that was part of your research of one year?

02:48:42PM 16  **A.**   Yes.

02:48:42PM 17  **Q.**   To conclude your master's in public health?

02:48:45PM 18  **A.**   Yes, sir.  I was trained how to use the database and used

02:48:48PM 19  it to create my research paper on intervertebral disk disease

02:48:55PM 20  among aviators.

02:48:56PM 21  **Q.**   You heard the testimony earlier of Dr. Chambers, correct?

02:48:59PM 22  **A.**   Yes, sir, I did.

02:49:00PM 23  **Q.**   He referred to you as "Lieutenant Theresa Long."  And

02:49:04PM 24  that's you?

02:49:05PM 25  **A.**   Lieutenant Colonel Theresa Long, yes, sir.

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

02:49:06PM  1   **Q.**   Lieutenant Colonel Theresa Long.

02:49:08PM  2       And he mentioned that you would be the one that has the

02:49:12PM  3   expertise in the DMED, particularly because of your background

02:49:18PM  4   and training.

02:49:18PM  5   **A.**   Yes, sir, I do.

02:49:18PM  6   **Q.**   So does your MPH particularly qualify you to analyze the

02:49:22PM  7   DMED data?

02:49:23PM  8   **A.**   Yes, sir, it does.

02:49:25PM  9   **Q.**   I'd like for you to look at --

02:49:26PM  10      MR. STAVER:  And I'm just going to go, Your Honor, by

02:49:29PM  11  tab since she has that tabbed.

02:49:30PM  12  **Q.**   (By Mr. Staver)  But it's in the notebook tab 7, and that

02:49:36PM  13  is the information about the DMED in terms of what it is.  Can

02:49:42PM  14  you read the purpose of what DMED is and how it is used by you

02:49:48PM  15  and other experts.

02:49:50PM  16  **A.**   Sir, can I preference that I am not here in my official

02:49:55PM  17  capacity?

02:49:55PM  18  **Q.**   Mm-hmm.

02:49:56PM  19  **A.**   I am not wearing my uniform today, and my views do not

02:49:59PM  20  represent that of the DoD, the United States Army, or the 1st

02:50:05PM  21  Aviation Brigade.

02:50:06PM  22  **Q.**   Okay.  With that, can you go ahead and read what the

02:50:08PM  23  purpose of the DMED is.

02:50:10PM  24  **A.**   Yes, sir.

02:50:12PM  25      It says, "DMED provides remote access to a subset of data

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

02:50:16PM   1   confined in the Defense Medical Surveillance System.  DMSS

02:50:21PM   2   contains up-to-date historical data on diseases and medical

02:50:25PM   3   events, hospitalizations, ambulatory visits, reportable

02:50:29PM   4   diseases, and longitudinal data relevant to personal

02:50:33PM   5   characteristics and deployment experience for all active duty

02:50:37PM   6   and reserve component personnel.  The DMED application provides

02:50:40PM   7   a user-friendly interface to perform queries regarding disease

02:50:45PM   8   and injury rates and relevant burdens of disease in active

02:50:49PM   9   component population.

02:50:50PM  10        "The purpose of DMED is to standardize the epidemiologic

02:50:55PM  11   method to collect, integrate, analyze active component service

02:51:00PM  12   member personnel medical event data and to provide authorized

02:51:04PM  13   users with remote access to the summarized data.  Using

02:51:08PM  14   client-server technologies and database optimization, DMED

02:51:12PM  15   users have unprecedented access to epidemiologic data on active

02:51:18PM  16   component service members and tailored queries that respond in

02:51:22PM  17   a timely and efficient manner."

02:51:25PM  18        It goes on to say that the --

02:51:28PM  19             THE COURT:  Well, let's not read it, because --

02:51:28PM  20             THE WITNESS:  Oh, sorry.

02:51:30PM  21             THE COURT:  -- I have it in front of me, so...

02:51:32PM  22             THE WITNESS:  Okay.

02:51:32PM  23   Q.   (By Mr. Staver)  So as -- in the military, after your

02:51:36PM  24   master's in public health, did you have opportunity to access

02:51:40PM  25   DMED before 2021?

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

02:51:42PM 1  **A.**   Yes, sir, I did.

02:51:43PM 2  **Q.**   For what purpose did you access it?

02:51:47PM 3  **A.**   Sir, I've been ordered not to answer.

02:51:51PM 4  **Q.**   Okay.  You also -- let me come back to -- in fact, let me

02:52:01PM 5  ask you this.  If there's anything that I ask you that you've

02:52:06PM 6  been ordered not to answer, just feel free to tell the Court as

02:52:09PM 7  you just did.

02:52:11PM 8  **A.**   (Nods head.)

02:52:12PM 9  **Q.**   With regards to what you are --

02:52:13PM 10          THE COURT:  Let me just inquire about this.  Ordered

02:52:15PM 11  by whom?

02:52:16PM 12          THE WITNESS:  Sir, last night, I received a phone

02:52:21PM 13  call from my command, followed by a written counseling

02:52:29PM 14  statement that -- do you have it?  I don't.

02:52:31PM 15          THE COURT:  Were you going to go into this,

02:52:33PM 16  Mr. Staver?

02:52:34PM 17          MR. STAVER:  I was going to go into it, yes.

02:52:35PM 18          THE COURT:  All right.  I will yield back to you.  I

02:52:38PM 19  just didn't want us to move on.  I wanted -- I did not --

02:52:38PM 20          MR. STAVER:  Okay.

02:52:40PM 21          THE COURT:  -- understand --

02:52:40PM 22          THE WITNESS:  So --

02:52:40PM 23          THE COURT:  -- who was exercising control of this

02:52:42PM 24  witness's testimony.

02:52:43PM 25          MR. STAVER:  Sure.  Thank you, Your Honor.  I will

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

02:52:44PM 1   get to that, and then we'll go through what we can with this
02:52:48PM 2   witness.
02:52:52PM 3             THE COURT:  Are there any -- if there are any other
02:52:54PM 4   restrictions on your testimony that are pertinent, I'd like to
02:52:57PM 5   know about them.
02:52:58PM 6             THE WITNESS:  Sir, I believe the information I have
02:53:04PM 7   is paramount to national security.  And --
02:53:07PM 8             THE COURT:  So --
02:53:07PM 9             THE WITNESS:  And I also believe it's consistent with
02:53:11PM 10  my faith.  In Leviticus 5:1 it says if you are called to
02:53:14PM 11  testify about something you have seen or that you know about,
02:53:19PM 12  it is sinful to refuse to testify and you will be punished for
02:53:23PM 13  your sin.
02:53:24PM 14            THE COURT:  You may proceed, Mr. Staver.
02:53:26PM 15            MR. STAVER:  Okay.
02:53:28PM 16  Q.   (By Mr. Staver)  You are here because you were subpoenaed
02:53:31PM 17  to be here, correct?
02:53:32PM 18  A.   Yes, sir.
02:53:34PM 19  Q.   Last night when we were going over your information, about
02:53:43PM 20  5 or 6 -- I think around 5 o'clock or so, did you receive a
02:53:47PM 21  telephone call?
02:53:48PM 22  A.   Yes, sir, I did.
02:53:49PM 23  Q.   Did you receive a telephone call just before that, perhaps
02:53:52PM 24  an hour earlier?
02:53:53PM 25  A.   Yes, sir.

## THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

02:53:53PM 1   **Q.**   And that was a phone call from who?

02:53:57PM 2   **A.**   Lieutenant Colonel Keith Haskins, who is the -- basically

02:54:07PM 3   the second command of the brigade.

02:54:08PM 4   **Q.**   And what did he inform you?

02:54:10PM 5   **A.**   That I would be receiving a counseling statement from the

02:54:13PM 6   brigade commander regarding coming down here and testifying.

02:54:19PM 7   **Q.**   And you would be getting a call from that brigade

02:54:23PM 8   commander at a certain time?

02:54:24PM 9   **A.**   Yes, sir.

02:54:24PM 10   **Q.**   And you did get a call from that brigade commander?

02:54:28PM 11   **A.**   Yes, sir, I did.

02:54:29PM 12   **Q.**   Did you leave our presence then and go out where you spoke

02:54:32PM 13   to that brigade commander?

02:54:34PM 14   **A.**   Yes, sir, I did.

02:54:35PM 15   **Q.**   What did that brigade commander tell you?

02:54:39PM 16   **A.**   The previous night he had -- he had called me and

02:54:45PM 17   questioned my integrity.  He said he had heard that my brother

02:54:49PM 18   had had a stroke and that I had plans to go -- take leave and

02:54:53PM 19   go see my brother, but then he had heard that I had, in fact,

02:54:57PM 20   sneaked away to go testify in a court case.  And he wanted to

02:55:00PM 21   know which is it, and I told him that both were true.  My

02:55:06PM 22   brother had had a stroke.  It was my intention to be up in

02:55:10PM 23   Minnesota seeing my brother this week, but I had received this

02:55:15PM 24   subpoena.  And as I've had many, many brothers in the service

02:55:18PM 25   now have strokes, I felt compelled to come here and comply with

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

02:55:25PM   1   the subpoena.

02:55:26PM   2        So last night when he spoke to me, he said he was ordered

02:55:32PM   3   to give me a counseling statement prepared for him, basically

02:55:39PM   4   advising me that I couldn't discuss anything about the DoD, any

02:55:44PM   5   information about the DoD that I had obtained while at work,

02:55:52PM   6   and if I did, there would be adverse action.

02:55:55PM   7        I informed my commander that I was here because I had been

02:56:02PM   8   a whistleblower and I had come forth with information regarding

02:56:08PM   9   the DMED database that was previously surrendered to

02:56:13PM  10   Senator Johnson and that I felt -- and that was under

02:56:17PM  11   whistleblower protection and that I felt him calling me and

02:56:22PM  12   threatening me with adverse action if I complied and testified

02:56:28PM  13   was witness tampering and in an attempt to intimidate me from

02:56:34PM  14   coming forward with really important information that is

02:56:38PM  15   pertinent to all service members of all branches.

02:56:42PM  16        And so they basically closed off and told me to sign the

02:56:52PM  17   counseling statement and return it to them.

02:56:56PM  18   Q.   And did you do that?

02:57:00PM  19   A.   No, sir.  I have not had my attorney review it.

02:57:04PM  20   Q.   Okay.  And you're not talking about us as your attorney;

02:57:07PM  21   you're talking about another attorney?

02:57:09PM  22   A.   Correct.  I have -- my attorney Dave Wilson is a JAG

02:57:14PM  23   officer and Todd Callender, in which I worked with for the

02:57:19PM  24   *Roberts v. Austin* case.

02:57:21PM  25        I would tell you, sir, that since discovering the DMED

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

02:57:25PM 1  data, it is not an embellishment to say I have feared for my

02:57:32PM 2  life.  I have feared for the safety of my children and my

02:57:43PM 3  family.

02:57:43PM 4  **Q.**   As you understand this instruction or order, however you

02:57:49PM 5  term it, this counseling, for which there would be consequences

02:57:52PM 6  if you violated it --

02:57:54PM 7          THE COURT:  I'm slightly confused.  Just let me ask

02:57:56PM 8  one question.

02:57:57PM 9          MR. STAVER:  Sure.

02:57:58PM 10         THE COURT:  Can you characterize that counseling

02:58:01PM 11  statement?  What is it?  What do you under- -- I take it you

02:58:05PM 12  read it.  What is the nature of a counseling statement?

02:58:09PM 13         THE WITNESS:  Basically, sir, they do not want me to

02:58:11PM 14  disclose or talk about anything going on, any of the harm I'm

02:58:11PM 15  being -- seen --

02:58:11PM 16         THE COURT:  Okay.

02:58:17PM 17         THE WITNESS:  -- per se.

02:58:17PM 18         THE COURT:  You're talking about --

02:58:17PM 19         THE WITNESS:  And --

02:58:17PM 20         THE COURT:  You're talking about some kind of

02:58:21PM 21  direction that's been given to you, not advice that you've

02:58:24PM 22  received?

02:58:25PM 23         THE WITNESS:  Yes, sir.

02:58:26PM 24         THE COURT:  I see.

02:58:26PM 25         THE WITNESS:  And if I -- and if I do that, that they

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

02:58:30PM   1   would take adverse action against me.

02:58:32PM   2         THE COURT:  All right.

02:58:33PM   3         Excuse me, Mr. Staver.  Go ahead.

02:58:35PM   4         MR. STAVER:  We have a counseling that was sent to

02:58:38PM   5   her last night.  It has not been signed by either party yet,

02:58:42PM   6   but I can indicate that what it says, it's called "a

02:58:47PM   7   counseling," but it's a directive.  If you violate it, there

02:58:50PM   8   are consequences to that.  And it's a counseling not to do

02:58:53PM   9   certain things.  The breach of that would be a certain kind of

02:58:58PM  10   punishment.  It doesn't list what that punishment would be, but

02:59:03PM  11   in paragraph 3 it says, "You will not disclose official

02:59:07PM  12   information.  Official information is all information of any

02:59:11PM  13   kind, however stored, that is in the custody and control of the

02:59:16PM  14   DoD, relates to information in the custody and control of the

02:59:19PM  15   DoD, or was acquired by DoD personnel as part of their official

02:59:24PM  16   duties or because of their official status within the

02:59:28PM  17   department while such personnel are employed by or on behalf of

02:59:31PM  18   the department or in active duty with the United States Armed

02:59:37PM  19   Forces.  You will not provide any expert or opinion testimony.

02:59:41PM  20   Additionally, you are not authorized to provide expert

02:59:45PM  21   testimony under the exception of AMEDD," A-M-E, double "D."

02:59:50PM  22   And it goes on and gives certain citations to that.

02:59:56PM  23         So it's unclear -- it's unclear how broad that is,

03:00:04PM  24   but it's quite broad.

03:00:06PM  25         THE COURT:  Understood.  All right.  You may proceed.

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

03:00:11PM  1   Q.   (By Mr. Staver)  Dr. Long, when you received that

03:00:21PM  2   communication from your commander, the commander said that he

03:00:25PM  3   was ordered to issue that counseling, correct?

03:00:31PM  4   A.   Yes.  He made it very clear to me that he was not the

03:00:35PM  5   originator of that document, that it was prepared for him to

03:00:39PM  6   give to me.

03:00:40PM  7   Q.   And did he say that in response to your statement that

03:00:43PM  8   this could be witness tampering or coercion of testimony of a

03:00:47PM  9   witness?

03:00:48PM 10   A.   Yes, sir.  I made it clear to him that I felt very

03:00:52PM 11   intimidated and threatened by that counseling statement.

03:00:58PM 12   Q.   After you received that conversation, did you feel

03:01:04PM 13   intimidated and threatened?

03:01:07PM 14   A.   Yes, sir.  I spent most of the night on the phone with

03:01:11PM 15   multiple attorneys, to include the ethics attorney from Fort

03:01:16PM 16   Rucker.

03:01:16PM 17   Q.   Did you come back into the room where we had been

03:01:18PM 18   preparing and break down?

03:01:22PM 19   A.   Yes, sir, I did.

03:01:23PM 20   Q.   Why?

03:01:31PM 21   A.   I have so many soldiers being absolutely destroyed by this

03:01:40PM 22   vaccine.  And I have done everything I possibly can to inform

03:01:52PM 23   my command, to inform everyone I can through an affidavit

03:02:01PM 24   published in the *Robert v. Austin* case testimony before

03:02:06PM 25   Senator Johnson, multiple conversations and emails to every

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:02:11PM   1   senior leader, including Colonel Rans and Colonel Margaret

03:02:18PM   2   Ryan, of my concerns.  And not a single member of my chain of

03:02:22PM   3   command, not a single senior medical leader, has investigated

03:02:28PM   4   or discussed with me these concerns.

03:02:33PM   5          People are getting hurt.  People are having strokes.

03:02:38PM   6   Young people are being permanently harmed, and no one will talk

03:02:46PM   7   about it.  And they don't want me to talk about it.  If you

03:02:53PM   8   want to talk about medical readiness, that's medical readiness.

03:02:59PM   9   You are talking about the health of our entire Armed Forces.

03:03:04PM  10          I have nothing to gain and everything to lose from coming

03:03:09PM  11   forward and testifying and talking to people about this.  I am

03:03:14PM  12   with a -- within a stone's throw of retirement.  I could lose

03:03:18PM  13   my pension.  I could lose my medical license.  I could lose

03:03:23PM  14   everything.  And I'm okay with that, because I'm watching

03:03:27PM  15   people get absolutely destroyed, and I am watching senior

03:03:31PM  16   leaders at the highest level have complete indifference to that

03:03:37PM  17   risk.

03:03:39PM  18          So, yes, I was incredibly upset.  They're more concerned

03:03:48PM  19   about covering and keeping the narrative protected --

03:03:53PM  20              THE COURT:  All right.  This sounds unresponsive.

03:03:53PM  21              MR. STAVER:  Okay.

03:03:55PM  22              THE COURT:  Let's bring it back to another question,

03:03:57PM  23   Mr. Staver.

03:03:57PM  24              MR. STAVER:  All right.  Sounds good.

03:03:59PM  25   Q.   (By Mr. Staver)  The -- does your -- obviously your

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

03:04:05PM  1   information goes against the narrative of safe and effective

03:04:10PM  2   for these vaccines?

03:04:11PM  3   A.   Absolutely.

03:04:12PM  4   Q.   When you said you saw people -- you see people that are

03:04:17PM  5   getting vaccine injuries, is it related -- are you saying that

03:04:22PM  6   these are injuries because of the vaccine?

03:04:25PM  7   A.   Yes, sir.

03:04:27PM  8   Q.   In fact, yesterday did you not get several phone calls

03:04:31PM  9   from soldiers who got their MRI back that was positive for

03:04:39PM 10   myocarditis?

03:04:40PM 11   A.   Yes, sir.

03:04:40PM 12   Q.   Do --

03:04:42PM 13   A.   Sir --

03:04:42PM 14   Q.   Go ahead.

03:04:44PM 15   A.   Ever since I filed an affidavit in September, anybody in

03:04:49PM 16   the Armed Forces can reach out to me via our global email

03:04:54PM 17   system.  So I literally have been inundated morning, noon, and

03:04:58PM 18   night with text messages, phone calls, emails of people telling

03:05:03PM 19   me about how they've been bullied, threatened, and intimidated

03:05:09PM 20   by command, how they have suffered some kind of adverse event,

03:05:13PM 21   how they've had a loved one die from these vaccines, asking for

03:05:16PM 22   help.  And so even outside of my duty day, I deal with service

03:05:24PM 23   members from every branch who have been injured by the vaccine.

03:05:30PM 24   Q.   So you were in the United States Army, but you're talking

03:05:34PM 25   with individual service members in all the branches?

## THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:05:37PM 1 **A.**   Yes, sir.   In fact, and predominantly pilots from all
03:05:43PM 2 branches but most notably the Navy.

03:05:47PM 3 **Q.**   The same branch that the commander serves in?

03:05:51PM 4 **A.**   Yes, sir.

03:05:52PM 5 **Q.**   With regards to pilots, are those individuals some of the
03:05:57PM 6 most -- should be generally some of the most healthy
03:06:01PM 7 individuals?

03:06:01PM 8 **A.**   Pilots have to meet one of the highest standards for
03:06:04PM 9 fitness in the Army, and logically so because the constrains of
03:06:11PM 10 aviation environment can place significant demand on them.   And
03:06:15PM 11 we have a long vested interest in them.   There are basically
03:06:21PM 12 two points at which aviators are most likely to crash an
03:06:25PM 13 aircraft; it's early on in their career and -- you know, at
03:06:27PM 14 around 200 hours, and then later again around 2,000 hours.   So
03:06:31PM 15 we expend a tremendous amount of resources and time training
03:06:36PM 16 pilots up.   And currently in the Army there's a ten-year ADSO,
03:06:40PM 17 so an active duty service obligation.   We -- so we need to know
03:06:45PM 18 that they're going to be able to stay in and be healthy for at
03:06:49PM 19 least ten years.

03:06:50PM 20         THE COURT:   So you said there was a ten-year -- what
03:06:52PM 21 was the word?

03:06:53PM 22         THE WITNESS:   Active duty service obligation.   So
03:06:56PM 23 once we put them through flight training --

03:06:58PM 24         THE COURT:   ADSO is what you said?

03:06:59PM 25         THE WITNESS:   Yes.

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

03:07:00PM   1        THE COURT:  ADSO.  Okay.

03:07:01PM   2        THE WITNESS:  Yes.  Once --

03:07:02PM   3        THE COURT:  Because we don't know all these terms.

03:07:04PM   4        All right, Mr. Staver.

03:07:06PM   5   **Q.**   (By Mr. Staver)  So once a pilot qualifies as a pilot,

03:07:09PM   6   there's a obligation to serve for ten years; is that what

03:07:09PM   7   you're saying?

03:07:12PM   8   **A.**   In the Army, yes, sir.

03:07:13PM   9   **Q.**   In the Army.  Okay.

03:07:15PM  10        Before 2021, have you seen the kind of increase in, say,

03:07:18PM  11   myocarditis or other health conditions in pilots, particularly,

03:07:23PM  12   compared to the other?  Is that exceptional?  Is it the same?

03:07:28PM  13   **A.**   Well, I can speak to the fact that most physicians have

03:07:34PM  14   never seen a case of myocarditis in their career.  Probably

03:07:39PM  15   most physicians could go their entire career and never see a

03:07:42PM  16   case of myocarditis.  It is historically a rare condition, and

03:07:50PM  17   of late, it has not been -- it has not been rare.

03:07:55PM  18        I had specifically significant concerns, as an aerospace

03:08:00PM  19   medicine specialist, about myocarditis, because early on in

03:08:07PM  20   COVID, before the vaccine came out, they had come up with the

03:08:48PM  21   big -- what they called "The Big Ten study," where they looked

03:08:14PM  22   at the prevalence of myocarditis after infection with COVID.

03:08:18PM  23   And what they found, having given a symptom survey to all of

03:08:24PM  24   these athletes and doing a regular EKG, was that -- was like

03:08:31PM  25   .1 -- .13 percent of them were positive for myocarditis by

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:08:37PM  1  symptom survey and a simple EKG alone.

03:08:40PM  2      But when they went back and did a cardiac MRI on a hundred

03:08:43PM  3  percent of them, 2.3 percent were positive for myocarditis.  So

03:08:47PM  4  this was the narrative used to say, "Hey, myocarditis is really

03:08:53PM  5  dangerous and potentially deadly, and we need to vaccinate all

03:08:57PM  6  these really young, healthy people to prevent myocarditis."

03:09:01PM  7      But my concern was, sir, that in June of 2021, the CDC

03:09:11PM  8  determined and had to come out with an emergency meeting about

03:09:15PM  9  the increased incidence of myocarditis in young, healthy males

03:09:21PM 10  that are age population from 16 to 30, I believe it was, and

03:09:28PM 11  that that was from the vaccine.  So my concern, being trained

03:09:33PM 12  in epidemiology and biostatistics, is that if you have an

03:09:40PM 13  independent risk of 2.3 percent for myocarditis and then you

03:09:46PM 14  add on two more or potentially three more independent risks in

03:09:52PM 15  the form of each shot that independently has been found to

03:09:57PM 16  carry a risk for myocarditis, there is no studies that tell us

03:10:02PM 17  if the effect is cumulative or -- or is it going to be

03:10:08PM 18  synergistic?  Are they going to end up with a 30 percent risk

03:10:13PM 19  of myocarditis when all of those things happen in succession?

03:10:16PM 20  There's no research on that.

03:10:20PM 21      And myocarditis, when you have the initial insult to the

03:10:24PM 22  heart -- and it can be bacterial, viral, toxins -- the person

03:10:29PM 23  may or may not have symptoms, but predominantly most people

03:10:33PM 24  don't have symptoms.  And as the heart starts to recover and

03:10:38PM 25  heal, it scars, and when it scars, that can take three to six

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:10:44PM  1   months.  And when it scars, you have an increased risk of

03:10:48PM  2   sudden cardiac death, arrhythmias, and heart failure.

03:10:54PM  3       None of those are acceptable in my patient population.

03:10:58PM  4   None of those are acceptable in young people.  And, in fact,

03:11:02PM  5   when I testified before Senator Johnson, Ernest Ramirez, who

03:11:08PM  6   sat next to me, I had reviewed his case and the autopsy of his

03:11:10PM  7   son who was 16 years old, who dropped dead of myocarditis three

03:11:14PM  8   days after vaccination with Moderna.

03:11:20PM  9   Q.   So the study that we discussed earlier with Dr. Chambers,

03:11:28PM  10  that came out in June of 2021.

03:11:31PM  11  A.   Yes, sir, it did.

03:11:32PM  12  Q.   You're familiar with that?

03:11:34PM  13  A.   Yes, sir, I am.

03:11:34PM  14  Q.   An increased risk of myocarditis in the military?

03:11:38PM  15  A.   Yes, sir.  In fact, I spoke to the authors of the paper.

03:11:45PM  16  I had communicated my concerns all the way up to Colonel

03:11:52PM  17  Margaret Ryan and Colonel Rans, and both of them were authors

03:11:59PM  18  on the paper.  And --

03:12:01PM  19  Q.   Colonel Rans was an author on that paper?

03:12:04PM  20  A.   Yes, sir.

03:12:04PM  21  Q.   The Colonel Rans that actually filed a declaration in this

03:12:08PM  22  court?

03:12:08PM  23  A.   Yes, sir.

03:12:09PM  24  Q.   So Colonel Rans is an author of a research paper that says

03:12:12PM  25  there's an increased risk of myocarditis in particularly males

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:12:16PM  1  in the military, 30 and under?

03:12:20PM  2  A.   Yes, sir, she did.

03:12:21PM  3  Q.   And have you brought these other concerns to her as well,

03:12:25PM  4  besides myocarditis, the other increase of adverse events?

03:12:29PM  5  A.   To Colonel Margaret Ryan, who is the director of

03:12:33PM  6  immunizations for the Defense Health Agency, yes, sir, I did.

03:12:37PM  7  I brought her my concerns on or around 9 September.  I

03:12:42PM  8  discussed a whole litany of research.

03:12:47PM  9       I had seen things that were concerning to me, and I had

03:12:52PM  10  been invited to be part of a group of over 450 scientists,

03:12:58PM  11  mathematicians, Nobel laureates, and doctors from around the

03:13:03PM  12  world who had worked in collaboration, in open discussion to

03:13:06PM  13  look at how to treat COVID in an outpatient setting and vaccine

03:13:11PM  14  safety.  As part of that group, what you got was information

03:13:19PM  15  globally, especially from Israel, that is about three months

03:13:23PM  16  ahead of us.  And the data coming out was incredibly

03:13:28PM  17  concerning, although not publicly available, because, one,

03:13:32PM  18  there's suppression of publication, scientific publications

03:13:36PM  19  that go against the narrative, and also the media does not

03:13:41PM  20  cover these things.

03:13:42PM  21       So I brought -- I reviewed literally thousands of pages of

03:13:48PM  22  scientific research and literature in this group, and we vetted

03:13:53PM  23  every paper that we covered and collectively determined whether

03:13:57PM  24  or not it was a valid scientific paper.  The mathematicians

03:14:01PM  25  would weigh in and say they used horrible bio stats.  And so

## THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:14:06PM  1   every specialist from every area would look at it, and we

03:14:09PM  2   picked only the best-quality research we could rely on and put

03:14:14PM  3   our names behind.

03:14:15PM  4       And I brought my concerns to Colonel --

03:14:25PM  5   Q.   Rans?

03:14:26PM  6   A.   -- Margaret Ryan.

03:14:26PM  7   Q.   All right.

03:14:28PM  8   A.   And what she said to me was, "Colonel Long, let's not

03:14:32PM  9   worry about everyone else.  Let's just get you a medical

03:14:37PM 10   exemption."  So I received from her a one-year temporary

03:14:42PM 11   medical exemption.

03:14:44PM 12   Q.   Let me pause here for a minute and talk about your medical

03:14:48PM 13   exemption.

03:14:49PM 14   A.   Yes, sir.

03:14:50PM 15   Q.   In the past, you have had a medical exemption; is that

03:14:55PM 16   correct?

03:14:55PM 17   A.   Yes.  After giving birth to my firstborn, I had heart

03:15:01PM 18   failure, and I have a pacemaker.  So --

03:15:04PM 19   Q.   And you still have those medical conditions?

03:15:08PM 20   A.   Yes, sir.  I've been nondeployable for the last ten years

03:15:12PM 21   because of them.

03:15:12PM 22   Q.   You say you've been nondeployable?

03:15:15PM 23   A.   Yes, sir, I have been.

03:15:17PM 24   Q.   But you're still in the military?

03:15:19PM 25   A.   Yes, sir, I am.

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

03:15:20PM  1  **Q.**   So when you gave your testimony or information to

03:15:24PM  2  Senator Ron Johnson, what happened to your medical exemption?

03:15:27PM  3  **A.**   It was revoked.  They shortened it down.  In fact, it

03:15:31PM  4  had -- I believe it expires on -- next week on 13 March 2022.

03:15:40PM  5  **Q.**   So let me understand.  During ten years you were, quote,

03:15:44PM  6  nondeployable but still not discharged from the military?

03:15:48PM  7  **A.**   That is correct.

03:15:49PM  8  **Q.**   But now if your religious exemption is denied and you're

03:15:55PM  9  considered nondeployable, the result is discharge?

03:16:01PM 10  **A.**   Yes, sir.

03:16:02PM 11  **Q.**   But for ten years, you were nondeployable.  You're still

03:16:06PM 12  nondeployable, and you're still operating as a medical

03:16:09PM 13  physician within the United States Army?

03:16:12PM 14  **A.**   And I served soldiers well.

03:16:14PM 15  **Q.**   So is there other ways to deal with this, besides just

03:16:14PM 16  complete discharging these individuals who have religious

03:16:18PM 17  exemptions?

03:16:18PM 18  **A.**   Well, I think I'm uniquely qualified to speak to that,

03:16:22PM 19  sir.  For almost three years, I functioned adjudicating

03:16:27PM 20  disability cases in the military in determining whether or not

03:16:31PM 21  soldiers met retention standards, whether they had a medical

03:16:35PM 22  condition which could preclude them from service, and

03:16:40PM 23  determination of fitness for duty.  So, for instance, if a

03:16:47PM 24  person with -- if someone was found to be HIV-positive, they

03:16:52PM 25  had to go through a medical evaluation board.  And as a matter

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:16:58PM 1   of regulation, they are found fit for duty and returned to duty

03:17:02PM 2   if they want to stay on active duty, and if they want to leave,

03:17:06PM 3   they are allowed to leave.

03:17:08PM 4   Q.   So, in other words, people with medical exemptions in

03:17:11PM 5   terms of your understanding and your service on this board --

03:17:16PM 6   is it a board?

03:17:18PM 7   A.   It's the Integrated Disability Evaluation System, sir.

03:17:22PM 8   Q.   And that's evaluating individuals that have medical issues

03:17:27PM 9   with regards to a potential disability or impairment?

03:17:30PM 10  A.   Yes, sir.  Although I would say I had never -- I have

03:17:35PM 11  never seen a policy in which -- say, like, we would have never

03:17:41PM 12  identified people that were at higher risk for getting HIV and

03:17:46PM 13  said, "Because you're higher risk, we're going to preemptively

03:17:51PM 14  put you out."

03:17:51PM 15  Q.   And that's how it's operated up until COVID?

03:17:55PM 16  A.   Yes, sir.

03:17:55PM 17  Q.   Is that how it still operates?

03:17:57PM 18  A.   Yes, sir.

03:17:58PM 19  Q.   But it operates differently regarding religious exemption

03:18:02PM 20  requests; is that your understanding?

03:18:06PM 21  A.   Well, sir, we're not really following our own regulations.

03:18:10PM 22  There are a number of exemptions given for medical that we're

03:18:17PM 23  not following.  And religious, I've always understood it to be

03:18:21PM 24  a deeply held religious belief.  Like, for example, sir, we've

03:18:26PM 25  had a number of individuals identify as Nordic paganism, and so

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

03:18:31PM  1  therefore they are given an exemption to have a beard.

03:18:35PM  2  **Q.**   Let me stop you for just a second.

03:18:38PM  3  **A.**   Mm-hmm.

03:18:39PM  4  **Q.**   Are the religious exemption requests being treated

03:18:43PM  5  differently than your understanding of the past ten years or

03:18:47PM  6  more for medical exemptions where they're not being discharged

03:18:51PM  7  from the military?

03:18:53PM  8  **A.**   Yes, sir.

03:18:53PM  9  **Q.**   So you haven't had a chance to examine the commander of

03:18:59PM  10  the Navy surface warship?

03:19:01PM  11  **A.**   No, sir, I have not.

03:19:02PM  12  **Q.**   But you have talked to him, correct?

03:19:04PM  13  **A.**   Yes, sir, I have.

03:19:04PM  14  **Q.**   You haven't had a chance to do a physical exam of the

03:19:07PM  15  Lieutenant Colonel 2 of the United States Marines, but you've

03:19:12PM  16  talked to her, correct?

03:19:13PM  17  **A.**   Yes, sir, I have.

03:19:14PM  18  **Q.**   Is the least restrictive means for a commander of that,

03:19:17PM  19  based upon your understanding of how the military has

03:19:20PM  20  accommodated disabilities, to discharge the commander

03:19:23PM  21  completely from the Navy?

03:19:26PM  22  **A.**   I find it highly irregular, sir.

03:19:30PM  23  **Q.**   Let me ask you this:  If he had a heart condition like you

03:19:35PM  24  have --

03:19:35PM  25  **A.**   Yes, sir.

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

03:19:37PM  1   **Q.**   -- based upon your experience on this group of looking at

03:19:41PM  2   disabilities, would your experience say that he would be

03:19:45PM  3   discharged automatically from the military, or would there be

03:19:49PM  4   some other lesser restrictive means to keep him in the Navy?

03:19:53PM  5   **A.**   Sir, he would have to meet certain criteria, but, yes, we

03:19:58PM  6   do have -- we would say, okay, he could not maybe perform the

03:20:03PM  7   job he's in here, but we could reassign him to a different type

03:20:07PM  8   of position.

03:20:08PM  9   **Q.**   But that's not what they're doing regarding religious

03:20:12PM  10  exemptions?

03:20:14PM  11  **A.**   No, sir.

03:20:14PM  12  **Q.**   And is that the same answer that you would give for

03:20:18PM  13  Lieutenant Colonel 2?

03:20:19PM  14  **A.**   Yes, sir.

03:20:19PM  15  **Q.**   With regards to the commander, is he a high-risk or

03:20:23PM  16  low-risk category for COVID?

03:20:23PM  17  **A.**   Well, sir, I -- he's very low-risk, as is most of our

03:20:29PM  18  healthy service members.  And so even Colonel Rans said in her

03:20:36PM  19  statement -- she admitted that on active duty, only 30 service

03:20:41PM  20  members -- her words, not mine -- 30 service members died of

03:20:45PM  21  COVID the first year of the pandemic on active duty.  And then

03:20:49PM  22  she went on to further say in her statement that 93 service

03:20:54PM  23  members, both active duty, Reserves, and National Guard, had

03:20:58PM  24  died total.  This is an incredibly low number, 30 service

03:21:04PM  25  members out of 1.4 million service members.

## THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:21:09PM 1    THE COURT:  Did you see anywhere that those were

03:21:13PM 2 identified by age and the like?

03:21:17PM 3    THE WITNESS:  Well, the reports that we have --

03:21:25PM 4    THE COURT:  I didn't ask you what they said.  I just

03:21:27PM 5 said, were they -- have you seen them identified by age and

03:21:31PM 6 otherwise disaggregated in some descriptive manner?

03:21:36PM 7    THE WITNESS:  Yes, sir, I have.

03:21:39PM 8 **Q.**  (By Mr. Staver)  Is that one of the areas that you've been

03:21:40PM 9 ordered not to address?

03:21:43PM 10 **A.**    Yes, sir.

03:21:43PM 11 **Q.**    So you can't speak that today, and if you do, you would be

03:21:48PM 12 disciplined; is that correct?

03:21:50PM 13 **A.**    Yes.

03:21:52PM 14 **Q.**    Is that relevant information that we should know?

03:21:55PM 15 **A.**    Yes, sir, it is very relevant.

03:22:02PM 16 **Q.**    So the commander is not at risk for COVID because of his

03:22:08PM 17 fit status, his age, his health, has no comorbidities.  But is

03:22:16PM 18 he at risk of these other conditions if he were to take the

03:22:19PM 19 COVID shot?

03:22:20PM 20 **A.**    Well, this is exactly what I do, sir.  In aviation

03:22:23PM 21 medicine, it's all about risk management, and in order to do

03:22:29PM 22 appropriate risk management, you have to know the risks and the

03:22:32PM 23 benefits to do an assessment.

03:22:34PM 24    THE COURT:  Let me just bring you back to the

03:22:36PM 25 question, which was -- Mr. Staver?

## THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:22:38PM 1   **Q.**   (By Mr. Staver)  If -- he's not at risk for COVID because

03:22:42PM 2   of his fitness, his health, lack of comorbidity, but is he at

03:22:49PM 3   risk if he were to take the COVID vaccines?

03:22:53PM 4   **A.**   Yes, sir.  So my point is, when I look at a young

03:22:56PM 5   gentleman like him, his age and his fitness level, we know that

03:23:04PM 6   young men in his age group are at an increased risk of

03:23:11PM 7   myocarditis compared to the rest of the population.  So asking

03:23:16PM 8   him to take the vaccination is actually asking him to take an

03:23:20PM 9   increased risk, more so than it would be for someone 80 years

03:23:28PM 10  old or for a female who is 54 years old, when it comes to the

03:23:33PM 11  risk of myocarditis.

03:23:36PM 12  **Q.**   Now, regarding Lieutenant Colonel 2, is she at low risk

03:23:41PM 13  for getting an infection --

03:23:41PM 14  **A.**   Excluding --

03:23:43PM 15  **Q.**   -- or having some serious adverse action subsequent to

03:23:46PM 16  infection?

03:23:48PM 17  **A.**   Again, she's a very -- she's a young, fit female, so she

03:23:54PM 18  has very, very low risk of dying from COVID.  And she, too, has

03:24:02PM 19  a unique risk with the vaccination: as a woman in her

03:24:08PM 20  childbearing potential, that that would place her at increased

03:24:14PM 21  risk for any kind of damage to her reproductive system and

03:24:20PM 22  potential damage to her offspring when you take medications

03:24:25PM 23  that can have an impact on that, especially when we have no

03:24:29PM 24  long-term data that can tell us what that looks like for her.

03:24:38PM 25  **Q.**   So in the October 22, 2020, FDA presentation before EUA

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:24:51PM  1   was granted, coming from the clinical trials, it says one of

03:24:54PM  2   the adverse event outcomes would be pregnancy and birth

03:24:58PM  3   outcomes.  Do you remember that when you reviewed it in the

03:25:02PM  4   past?

03:25:02PM  5   A.   Yes, sir, I do.

03:25:05PM  6   Q.   And you have reviewed VAERS as well, or --

03:25:08PM  7   A.   Yes, sir, I have.

03:25:10PM  8   Q.   That VAERS chart is listed in tab 6.  Can you look at

03:25:16PM  9   that.

03:25:16PM  10  A.   Yes, sir.

03:25:17PM  11  Q.   How are you familiar with VAERS?

03:25:21PM  12  A.   From the onset of COVID, I've started watching VAERS.

03:25:28PM  13  It's kind of a natural thing for epidemiologic-type people just

03:25:34PM  14  coming out of that to look at trends.  And so one thing -- the

03:25:40PM  15  FDA and the CDC had really touted that they had this great

03:25:44PM  16  system in place for monitoring adverse events.

03:25:48PM  17       And one of my coworkers and a good friend of mine suffered

03:25:53PM  18  an adverse event from the vaccine, and I first went in to the

03:25:59PM  19  VAERS to look and see if other similar events were being

03:26:02PM  20  reported.  And I was reading the narratives in VAERS.  You can

03:26:06PM  21  read, and it will say, you know, like, "25-year-old athlete

03:26:13PM  22  took the vaccination in the church parking lot vaccine rodeo

03:26:19PM  23  and dropped dead," and -- you know, and they'll kind of give

03:26:21PM  24  you a description of what happened.

03:26:22PM  25       It's pretty easy to pick out from there whether or not it

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:26:26PM 1    was reported by a layperson, a nonmedical person, or a doctor.

03:26:30PM 2    **Q.**    Let me ask you about that question.  Have you done

03:26:33PM 3    research or read anything with regards to the estimated

03:26:38PM 4    percentage that would be perhaps by experts such as yourself,

03:26:42PM 5    doctors, versus a layperson that has no medical training?

03:26:45PM 6    **A.**    Yes, I have.  And it's --

03:26:47PM 7    **Q.**    What did you conclude?

03:26:48PM 8    **A.**    It's my understanding that 85 percent of all VAERS reports

03:26:52PM 9    are submitted by medical professionals --

03:26:55PM 10    **Q.**    And how -- and when you read these reports, can you tell,

03:26:59PM 11    as an expert in your field, whether somebody has no medical

03:27:04PM 12    training that has entered in symptoms versus someone who has

03:27:08PM 13    medical training that enters in symptoms?

03:27:11PM 14    **A.**    Yes, sir.  The reports are made under the threat of

03:27:14PM 15    perjury.  So you can't just go in there and fake information.

03:27:17PM 16    It's very specific information they ask for, and they do ask

03:27:22PM 17    for your credentialing, so they can tell whether or not it was

03:27:25PM 18    a credentialed or -- I'm sorry -- a licensed medical provider.

03:27:31PM 19    **Q.**    And on the second page of that VAERS document that is

03:27:36PM 20    tab 6 -- it's a different exhibit number, but it's tab 6 in

03:27:40PM 21    your notebook -- it lists there at the top 4,209 miscarriages.

03:27:40PM 22    **A.**    Yes.

03:27:44PM 23    **Q.**    Do you see that?

03:27:45PM 24    **A.**    Yes, sir.

03:27:47PM 25    **Q.**    Is that consistency with an adverse event that the FDA

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

03:27:51PM 1   warned about prior to EUA, in October 2020?

03:27:51PM 2   A.   Yes --

03:27:55PM 3   Q.   In other words, it says "pregnancy and birth outcomes" in

03:27:58PM 4   that slide, and now you're seeing miscarriages in VAERS?

03:28:02PM 5   A.   Yes, sir.  It says "pregnancy outcomes" in that slide.  It

03:28:07PM 6   does say "miscarriages" here.  There is a famous paper in which

03:28:11PM 7   they discussed miscarriages, and they manipulated the

03:28:15PM 8   statistics to make it seem as though the outcome would be

03:28:19PM 9   normal.  They had -- I believe it was 827 reported pregnancies,

03:28:25PM 10  and they said that 104 miscarriages occurred out of the 827,

03:28:31PM 11  which we normally see a miscarriage is -- to the first 20 weeks

03:28:36PM 12  of pregnancy.  So we normally see a 10 to 15 percent

03:28:41PM 13  miscarriage rate.  But you had to look down in the research

03:28:45PM 14  paper to see that of the 827 pregnant women, 700 of them were

03:28:52PM 15  vaccinated in the second or third trimester that would not make

03:28:57PM 16  them eligible to have a miscarriage.  They could only have an

03:29:01PM 17  abortion.

03:29:02PM 18  Q.   So are you seeing --

03:29:02PM 19  A.   So --

03:29:04PM 20  Q.   -- miscarriages, or spontaneous abortions, if you will,

03:29:09PM 21  later in the pregnancy than you otherwise have in your history

03:29:12PM 22  of medical practice?

03:29:13PM 23  A.   Oh, yes, sir.  So that right there showed you that 104 out

03:29:18PM 24  of 127 first-trimester pregnancies ended in a dead baby.

03:29:27PM 25  Q.   And at the end of that chart, still on this -- go to the

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:29:36PM 1  third page.  I asked Dr. Chambers about this.  But that first

03:29:40PM 2  graph, going from the deployment of the VAERS in June of 1990

03:29:46PM 3  until 2020 -- 2021, so that graph before you get to the spike,

03:29:52PM 4  is it your understanding that that's the cumulative number of

03:29:57PM 5  all vaccine-related adverse events of every vaccine, not just

03:30:04PM 6  one?

03:30:04PM 7  A.   Yes, sir.  I tried to -- I tried to count them all up, and

03:30:08PM 8  I do believe that that accounts for at least 37 vaccinations

03:30:14PM 9  from cradle to grave that individuals would get.  And --

03:30:17PM 10  Q.   And the adverse events were pretty consistent over the

03:30:22PM 11  1990-to-2020,-2021 timeframe?

03:30:26PM 12  A.   Yes, sir.  And actually in each of those ten years

03:30:29PM 13  preceding COVID, it is my understanding from what I researched

03:30:35PM 14  that we never exceeded 2- to 300 deaths per year from all of

03:30:41PM 15  those vaccines combined.  Now, however, with COVID, just a few

03:30:47PM 16  months into it, we already had 5,000 deaths, and those deaths

03:30:54PM 17  are -- the majority of which are in the first three days after

03:31:00PM 18  vaccination currently.  And --

03:31:01PM 19  Q.   And on the VAERS document, page 1, as of February 25,

03:31:05PM 20  2022, it says 24,827 deaths have been recorded in VAERS?

03:31:13PM 21  A.   Yes, sir.

03:31:13PM 22  Q.   And that's in a year and a half, roughly, from essentially

03:31:18PM 23  January -- not even a year and a half, January of 2021 to early

03:31:25PM 24  March of 2022?

03:31:27PM 25  A.   Yes, sir.  And that would be the low end, given the

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

03:31:32PM  1  Harvard study showing that only 1 percent of adverse events are

03:31:32PM  2  reporting in the VAERS system.  And that makes sense, because,

03:31:35PM  3  sir, if I gave you your vaccine today in the court and then

03:31:41PM  4  tomorrow you drove to Atlanta on vacation and you had a heart

03:31:46PM  5  attack and died in Atlanta, that doctor there would have no

03:31:50PM  6  idea that you just got your vaccine here.  And so there's a lot

03:31:55PM  7  of reasons why they wouldn't --

03:31:58PM  8  Q.  So the numbers in the Harvard study shows that are

03:32:02PM  9  drastically underreported?

03:32:04PM 10  A.  So you can look at this number as -- yes, probably even if

03:32:10PM 11  you say that's 10 percent, but we know it's not even close to

03:32:15PM 12  the actual number.

03:32:18PM 13  Q.  So in your practice with regards to treating soldiers, is

03:32:29PM 14  your -- what you're seeing consistent with what's reported in

03:32:32PM 15  VAERS, in the sense that there's a drastic increase, beginning

03:32:37PM 16  in 2021, of a lot of adverse events that you haven't

03:32:41PM 17  historically seen at this level before?

03:32:44PM 18  A.  I can say that as a doctor who's been practicing since

03:32:50PM 19  2008, I've never filled out a VAERS report.  I have filled out

03:32:54PM 20  numerous VAERS reports, and I have 24 more VAERS reports to

03:32:57PM 21  fill out when I get back to work.

03:33:01PM 22  Q.  Are those all military?

03:33:05PM 23  A.  I'm sorry, sir.  I --

03:33:06PM 24  Q.  Oh, you can't answer that?  Okay.  Yeah, just tell me when

03:33:10PM 25  you can't.  I don't want to push you over --

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

03:33:16PM 1   A.   Yes.

03:33:17PM 2   Q.   -- the line that they have drawn for you because I don't

03:33:18PM 3   want to get you in any more situation than you're in with

03:33:23PM 4   regards to your religious exemption.  And we'll get to that in

03:33:28PM 5   just a minute.

03:33:28PM 6        On page 8 -- you didn't introduce this, but this was

03:33:32PM 7   introduced during the testimony of Dr. Chambers.  Is that your

03:33:39PM 8   name there at the end after the data that's listed there, the

03:33:48PM 9   chart, where it gets to Senator Ron Johnson's letter of

03:33:54PM 10  February 1?

03:33:54PM 11  A.   Yes, sir, I did.  I did.

03:33:56PM 12  Q.   Are you listed in that document on the next page as a

03:34:02PM 13  whistleblower that presented information to the Senator?

03:34:05PM 14  A.   Yes, I am.

03:34:06PM 15  Q.   That's your name there, Theresa Long?

03:34:08PM 16  A.   That is me.

03:34:11PM 17  Q.   And those figures that are there, are those based on your

03:34:15PM 18  personal research in the DMED system, the figures that are on

03:34:21PM 19  the bottom of page 1, going on to top of page 2, with regards

03:34:25PM 20  to the increases of adverse events, comparing 2021 to the

03:34:30PM 21  previous five years?

03:34:31PM 22  A.   Sir, I can confirm that as a whistleblower, I provided

03:34:37PM 23  Senator Johnson with all of this information.

03:34:41PM 24  Q.   Now, the chart that was -- that we're not going to

03:34:44PM 25  introduce into evidence is what the -- somebody higher up in

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:34:48PM 1   the command doesn't want you to talk about, correct?

03:34:51PM 2   A.   Yes, sir.

03:34:56PM 3   Q.   Now, you heard in the cross-examination of Dr. Chambers

03:35:01PM 4   that after the January 24, 2022, presentation/information to

03:35:09PM 5   Senator Ron Johnson in Washington, D.C., with this information,

03:35:13PM 6   submitted to Secretary of Defense Lloyd Austin, that the

03:35:18PM 7   numbers have been changed?

03:35:20PM 8   A.   Yes, I have heard that.

03:35:22PM 9   Q.   When this information hit the media, what happened to the

03:35:26PM 10  DMED?

03:35:28PM 11  A.   It was taken offline.

03:35:31PM 12  Q.   So nobody could research it at that point?

03:35:33PM 13  A.   No, sir.

03:35:34PM 14  Q.   Even you?

03:35:35PM 15  A.   No, sir -- yes --

03:35:36PM 16  Q.   Completely taken offline?

03:35:38PM 17  A.   Yes, sir.

03:35:38PM 18  Q.   And the reason it was taken offline, as you understand

03:35:41PM 19  that it was reported, it was why?

03:35:43PM 20  A.   Well, sir, I would say, in the military, normally if we

03:35:49PM 21  have a safety system failure -- and I consider the DMED a

03:35:54PM 22  safety system, as it's a warning system.  When we have a safety

03:35:59PM 23  system failure, there are normal lines of communication for

03:36:03PM 24  communicating such a failure.  I've never understood that

03:36:05PM 25  normal line of communication to include PolitiFact, but that is

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

03:36:10PM 1    the only way that the government communicated with anyone that

03:36:15PM 2    there was a glitch in the system.

03:36:22PM 3    **Q.**   Did you -- you did research on DMED before 2021?

03:36:26PM 4    **A.**   Yes, sir, I did.

03:36:27PM 5    **Q.**   In your role as a physician in the United States Army?

03:36:32PM 6    **A.**   As my role as a resident in training, yes.

03:36:37PM 7    **Q.**   In training.  Okay.

03:36:39PM 8         Were you able to rely upon the data before 2021?

03:36:43PM 9    **A.**   Numerous people rely on that data.  They do research

03:36:47PM 10   projects.  Most of the people who are getting their master's in

03:36:50PM 11   public health are encouraged to use the DMED database and

03:36:56PM 12   encouraged -- because epidemiology is all about noticing when

03:37:03PM 13   you are seeing things increase that aren't normal incidences,

03:37:09PM 14   are new cases of a disease in a population, prevalence is kind

03:37:13PM 15   of the consistent number of cases.

03:37:17PM 16        So for me as a physician, for example, if I take care of a

03:37:23PM 17   population for, let's say, 13 years like I have and I've never

03:37:29PM 18   seen a stroke in my population in a young 20- or a 30-year-old

03:37:34PM 19   and I've never seen weird clots in people's livers and spleens

03:37:40PM 20   and I've never seen a whole bunch of cases of myocarditis and

03:37:46PM 21   cancer springing up left and right; if I've never seen those

03:37:50PM 22   and then, all of a sudden, right, it's like every week I have

03:37:54PM 23   somebody coming in with a stroke or myocarditis and all these

03:38:01PM 24   things, then normally any physician paying attention, but most

03:38:05PM 25   certainly a good epidemiologist, will pick up there is --

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:38:09PM  1   something has changed, something is wrong and then start

03:38:12PM  2   looking for it.

03:38:13PM  3       I spoke before -- if you don't mind me saying, when we

03:38:17PM  4   look at these numbers -- I looked at the top ten -- top 18

03:38:23PM  5   drugs pulled off the market historically, before COVID, and I

03:38:29PM  6   found that eight out of ten drugs pulled off the market

03:38:33PM  7   disproportionately harmed females more than males.  Women have

03:38:33PM  8   this unique burden because, they have all the eggs they'll ever

03:38:39PM  9   have eggs from conception until menopause, and one of those

03:38:44PM 10   drugs was a synthetic estrogen called "DES."  We thought it was

03:38:49PM 11   a great drug, and how bad would it be?  It's a synthetic

03:38:53PM 12   estrogen.  Males and females both have estrogens in them, and

03:38:58PM 13   so a synthetic estrogen couldn't be that bad.

03:39:02PM 14       But what we found was that mothers had babies and the

03:39:04PM 15   babies were fine, but when the daughters of mothers who took

03:39:08PM 16   the drug grew up to be about 19, 20 years old, we started to

03:39:13PM 17   see this upswing in a cancer we had never seen before, and it

03:39:18PM 18   was a rare cancer, clear cell carcinoma of the vagina.  And so

03:39:24PM 19   intelligent doctors started saying, "What is going on?  What

03:39:29PM 20   has changed?  Why are we seeing this weird cancer popping up

03:39:29PM 21   and infertility in these young women?"

03:39:35PM 22       And they did a retrospective study and found that all of

03:39:38PM 23   their mothers had taken DES.  It took us 40 years to figure out

03:39:44PM 24   that DES was not the wonder drug.  It took us 40 years to

03:39:50PM 25   figure out that DES was causing infertility and cancer at 40 to

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

03:39:56PM 1   60 percent in the offspring of mothers who had taken it.

03:40:05PM 2   **Q.**   So in this document that they presented, which we don't

03:40:15PM 3   know where it is housed, but it redoes all the numbers to make

03:40:19PM 4   it look like 2021 is just a similar year to the previous five

03:40:27PM 5   years. Do you have that document in front of you?

03:40:35PM 6   **A.**   The one she introduced?

03:40:35PM 7   **Q.**   Yes.

03:40:37PM 8   **A.**   Oh, yes, sir. Okay.

03:40:40PM 9   **Q.**   I believe it's on page 2.

03:40:49PM 10   **A.**   Yes. It notes that there's -- but it still notes there's

03:40:53PM 11   a 25 percent increase in pulmonary embolisms and 20- -- almost

03:41:00PM 12   a 24 percent increase in ovarian dysfunction and a

03:41:14PM 13   17.7 percent -- let's see. It's saying a decrease in

03:41:18PM 14   demyelinating disease.

03:41:22PM 15   **Q.**   Now, in terms of those numbers that they say there was a

03:41:27PM 16   glitch because of the server and now they've went back and they

03:41:32PM 17   redid them to make them similar to the previous five years, are

03:41:36PM 18   the numbers that you're seeing on that document before you

03:41:41PM 19   consistent or inconsistent with what you're seeing in your

03:41:46PM 20   practice?

03:41:46PM 21   **A.**   Well, sir, I wouldn't just use a single point of reference

03:41:51PM 22   to make that evaluation. You have the VAERS system, which

03:41:58PM 23   covers vaccine adverse effects for the whole nation. You have

03:42:01PM 24   VAERS systems in other countries. You have the VAERS system

03:42:06PM 25   specific to service members. When you fill out the VAERS

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

03:42:09PM 1   report, there's a box you can check that says, "Is this person

03:42:12PM 2   a service member?"  You would check "yes."  If you pull the

03:42:15PM 3   numbers from the military vaccine adverse event reporting -- so

03:42:21PM 4   this is maintained by the CDC, not the DoD.  So when I emailed

03:42:28PM 5   the CDC and asked them for the numbers of service members that

03:42:35PM 6   they had reported in VAERS, they said that that there were

03:42:39PM 7   9,428 total reports.  Of the total adverse events, 2,000- --

03:42:47PM 8   there were -- 2,143 were deemed serious adverse events, with a

03:42:53PM 9   total of 119 deaths.  Remember, I quoted from Colonel Rans, who

03:43:02PM 10  cited that in the two years of the pandemic, we've had a total

03:43:07PM 11  of 93 active duty -- we've had a total of 93 deaths.  So we're

03:43:13PM 12  seeing in the military VAERS, provided by the CDC, not me, not

03:43:19PM 13  the DMED, that there was 119 deaths, that there was a total of

03:43:24PM 14  2,521 ER or hospitalizations, 300 total disabled people, 31

03:43:33PM 15  spontaneous abortions, 83 cancers, 120 anaphylactic adverse

03:43:40PM 16  events, seven cardiac arrests, 255 pulmonary embolisms, six

03:43:47PM 17  Guillain-Barre, one tuberculosis, 11 eczema, ten sepsis, and

03:43:54PM 18  three stillborns, and 155 cases of myocarditis, 213 cases of

03:44:01PM 19  female reproductive issues, 4,063 total neurologic adverse

03:44:08PM 20  events, 3,921 total cardiovascular events, 126 hepatological

03:44:17PM 21  events, 4,434 immunologic events, and 297 cases of depression

03:44:26PM 22  or anxiety.

03:44:32PM 23  Q.   So that's not DMED?

03:44:34PM 24  A.   No, sir, that's not DMED.

03:44:36PM 25  Q.   But that's military in the private -- or the civilian side

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:44:43PM 1  of the VAERS?

03:44:44PM 2  A.   These are reports submitted on service members, as

03:44:49PM 3  testified in the VAERS report that is submitted under the

03:44:53PM 4  penalty of perjury.  So I will say that I have submitted

03:44:58PM 5  numerous VAERS reports.  They're very difficult to report.

03:45:03PM 6  There's no, you know, financial incentive or anything.  There's

03:45:06PM 7  no encouragement to fill them out.

03:45:09PM 8          THE COURT:  Excuse me just a second.  Please silence

03:45:11PM 9  that phone.

03:45:13PM 10          MS. YANG:  I apologize, Your Honor.

03:45:15PM 11          THE COURT:  All right.

03:45:16PM 12          Excuse me.  Go ahead.

03:45:17PM 13          THE WITNESS:  But I will say, out of all the VAERS

03:45:20PM 14  reports -- and I've filed numerous of them -- I have only had

03:45:26PM 15  one correspondence from the CDC in which they followed back up.

03:45:32PM 16  So I think it is absurd to say that the CDC has investigated

03:45:39PM 17  one million adverse events and 24,000 deaths, and I know that

03:45:46PM 18  because I know people who have died and I know their records

03:45:50PM 19  have not been pulled; and nor have I seen any published

03:45:55PM 20  research whatsoever from the CDC or the FDA saying, "We

03:46:00PM 21  investigated a million adverse events, and we found that 10,000

03:46:04PM 22  of them were hospice patients who were going to die anyways.

03:46:08PM 23  And 20,000 were, like, fake reports."

03:46:11PM 24          We have heard nothing.  There has been no

03:46:15PM 25  transparency, no one coming back, even on the ones on service

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:46:20PM 1  members.  You would think that there would be a good analysis

03:46:25PM 2  of this and someone would come back and present a white paper

03:46:30PM 3  and do an investigation and say, "Of the 9,428 reported VAERS

03:46:36PM 4  events on service members, we found," you know, "that 3,000 of

03:46:42PM 5  them were falsified or" -- you know, whatever -- "and that ten

03:46:47PM 6  of them were validated," because we have an electronic medical

03:46:53PM 7  records system.

03:46:54PM 8  Q.   (By Mr. Staver)  But we don't have any of that

03:46:56PM 9  information?  We don't have any of that response from the CDC?

03:46:59PM 10 A.   No, we do not.

03:47:00PM 11 Q.   You mentioned that -- at the very end about depression --

03:47:04PM 12 A.   Yes.

03:47:05PM 13 Q.   -- subsequent to vaccination?

03:47:06PM 14 A.   Yes, sir.

03:47:08PM 15 Q.   With regards to the pressure -- well, let me back up.

03:47:13PM 16      You have filed a religious exemption; is that correct?

03:47:18PM 17 A.   Yes, sir, that is correct.

03:47:18PM 18 Q.   Is that pending?

03:47:19PM 19 A.   Yes, sir, that is.

03:47:20PM 20 Q.   At what level?

03:47:24PM 21 A.   I'm not aware of what level it's at.  It was, at one point

03:47:31PM 22 I was told, pushed beyond our base and then pulled back down to

03:47:34PM 23 our base.  But what I do know is that it's listed in the

03:47:38PM 24 computer system as an administrative exemption.

03:47:41PM 25 Q.   But you haven't gotten a religious exemption at this

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:47:45PM  1  point?

03:47:45PM  2  A.  No, sir, I have not.

03:47:47PM  3  Q.  With regards to the -- well, do you see pressure that's

03:47:53PM  4  being put on members of the military to get the COVID vaccine?

03:47:58PM  5  A.  I would tell you that I think the pressure that I have had

03:48:05PM  6  communicated to me is overwhelming.  I've received emails in my

03:48:10PM  7  personal capacity of -- just to give you an example, a very,

03:48:16PM  8  very high-ranking Navy officer whose daughter was five years

03:48:20PM  9  old, and she has a brain tumor.  And he is a single father of

03:48:24PM  10  this child, and he says, "If I get the vaccine and something

03:48:28PM  11  happens to me, she has no one.  And if I don't get the vaccine,

03:48:32PM  12  then I lose TRICARE.  I have no way of providing medical care

03:48:35PM  13  for her."

03:48:39PM  14      This is a terrible situation to put people in, and I have

03:48:43PM  15  had a lot of soldiers reach out to me in complete and utter

03:48:49PM  16  despair.

03:48:49PM  17  Q.  Do you have any instances where someone committed suicide

03:48:53PM  18  or has suicidal ideation as a result of the impending

03:48:57PM  19  discipline for failure to get a COVID vaccine?

03:49:01PM  20  A.  I'm aware of two such cases of people who have committed

03:49:06PM  21  suicide.

03:49:08PM  22  Q.  Because of the discipline that they would undergo if they

03:49:12PM  23  did not get the religious exemption granted?

03:49:16PM  24  A.  I think it's -- I think it's breaking faith in service

03:49:24PM  25  members, realizing they've deployed multiple times and they've

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:49:28PM  1  given everything for the military and then the military will

03:49:33PM  2  throw them out in a heartbeat because they won't bend the knee

03:49:38PM  3  to something that someone has a -- an ethical or a moral

03:49:46PM  4  obligation to -- or objection to.

03:49:48PM  5  Q.   Have you had others that had suicidal thoughts but did not

03:49:52PM  6  yet commit suicide?

03:49:54PM  7  A.   Yes.

03:49:54PM  8  Q.   About ending it all because of the pressure due to the

03:50:00PM  9  vax?

03:50:00PM  10  A.   Yes.

03:50:00PM  11  Q.   Is that why you feel that this is important for the Court

03:50:03PM  12  and the public to know?

03:50:11PM  13  A.   I have been in the military and basically come from a

03:50:16PM  14  position of being almost homeless and on welfare.  I'm a

03:50:22PM  15  Lieutenant Colonel in the Army, and I'm a doctor.  I've lived

03:50:25PM  16  the American dream.  Nobody has loved the opportunities and the

03:50:30PM  17  institution of the military, you know, as much as I have.  And

03:50:37PM  18  to see what is happening is going to be devastating on the

03:50:43PM  19  morale, on the readiness for a long time to come.

03:50:50PM  20  Q.   But they say that to maintain military readiness, that

03:50:56PM  21  there's only one solution with regards to COVID and that is

03:50:58PM  22  universal vaccination and absent that, you will be discharged.

03:51:04PM  23  Is the pressure that is being placed on them, in your

03:51:13PM  24  understanding and opinion, undermining military readiness

03:51:18PM  25  itself?

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

03:51:20PM 1    **A.**   I think it undermines good order and discipline.

03:51:25PM 2    **Q.**   Now, you've read Colonel Rans' affidavit -- or

03:51:30PM 3    declaration, correct?

03:51:31PM 4    **A.**   Yes, sir, I have.

03:51:32PM 5    **Q.**   Some of the things that she says I'm sure you would agree

03:51:34PM 6    with:  There's an increase in myocarditis, there's an increase

03:51:37PM 7    in other adverse events, that natural immunity prevent --

03:51:42PM 8    presents some kind of -- or infection presents some kind of

03:51:49PM 9    natural immunity.  You would agree with all those, correct?

03:51:52PM 10   **A.**   Yes, sir, I do.

03:51:53PM 11   **Q.**   But she concludes the same narrative that there's only one

03:51:55PM 12   solution, vaccines are safe and effective, everyone has to be

03:52:01PM 13   universally vaxxed, and absent that, you have to be discharged?

03:52:05PM 14   **A.**   Yes, sir.

03:52:06PM 15   **Q.**   Are there other -- you already addressed the safety.  Have

03:52:10PM 16   you had experience with the efficacy?  Is this, in fact, true

03:52:13PM 17   that getting the vaccine will protect you and be the magic

03:52:18PM 18   scenario to maintain military readiness?

03:52:23PM 19   **A.**   Well, sir, at the onset of COVID, my cardiologist called

03:52:28PM 20   me and said, you know, "You're, like, the highest risk for

03:52:34PM 21   getting COVID, and I am afraid that if you get COVID, you will

03:52:40PM 22   die."

03:52:41PM 23        And he attempted to order me some hydroxychloroquine that

03:52:45PM 24   I could take prophylactically before the vaccine had ever come

03:52:50PM 25   out onto market.  And the civilian pharmacy would not fill it.

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:53:01PM 1    And I ended up getting some ivermectin and taking ivermectin
03:53:06PM 2    and reading up on -- the literature on nasal washes, rinses.
03:53:11PM 3    Q.   Like Dr. Chambers spoke about?
03:53:13PM 4    A.   Yes, and also things like Listerine, chlorhexidine, oral
03:53:19PM 5    washes, because COVID takes hold in the back of the throat, so
03:53:24PM 6    they -- recommendations for gargling for 30 seconds three times
03:53:27PM 7    a day with, like, Listerine Cool Mint or chlorhexidine could
03:53:33PM 8    inactivate the virus.  And, actually, this is well known and
03:53:36PM 9    employed by the dentists throughout the military and across the
03:53:40PM 10   country, and they're -- and they report that there has not been
03:53:44PM 11   a single transmission from patient to dentist or vice versa,
03:53:50PM 12   even though they are in close proximity with aerosolized debris
03:53:55PM 13   coming out of the mouth.
03:53:58PM 14          And, also, with regard to least restrictive means, I had
03:54:07PM 15   the fortune of training at NASA.  NASA, the Air Force, and the
03:54:13PM 16   Army had funded research on something called "the kryptonite"
03:54:19PM 17   or "the far UV."  It's a light source that emits at
03:54:26PM 18   229 nanometers, that completely sanitizes the air, and it's the
03:54:32PM 19   equivalent of putting an N95 mask on everyone in the room.  It
03:54:38PM 20   sanitizes not only the air but surfaces, and it poses no risk
03:54:42PM 21   of skin cancer or damage to the eyes.  It -- so it was funded
03:54:47PM 22   by the military, and it's actually used in the Pentagon.
03:54:51PM 23   Q.   Are you aware that the Department of Defense entered into
03:54:54PM 24   a study with United Airlines regarding that very thing, in
03:54:58PM 25   terms of air filtration on aircraft?

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

03:55:01PM 1    A.    Yes, I am.

03:55:02PM 2    Q.    And that was the DoD?

03:55:03PM 3    A.    Yes, it was.

03:55:04PM 4    Q.    And based on that technology that you talked about, that

03:55:07PM 5    flying an aircraft has been presented as safe or near zero

03:55:12PM 6    chance of exposure to the virus?

03:55:15PM 7    A.    That is correct.  And I actually spoke to a retired Navy

03:55:21PM 8    commander who taught physics at the Naval Academy and discussed

03:55:24PM 9    these UV lights and how easily and effective it would be to be

03:55:31PM 10   put in every naval ship and on -- aboard aircrafts and small

03:55:36PM 11   vehicles, where people are in confined spaces, because it is

03:55:40PM 12   highly effective.

03:55:41PM 13   Q.    So instead of discharging a 17-, 18-year commander of a

03:55:47PM 14   Navy surface warship who is one the few that are

03:55:51PM 15   nuclear-trained, there are other ways, you're saying, that the

03:55:54PM 16   Navy warship could be fitted with this DoD technology?

03:55:58PM 17   A.    I understand it's good enough to the Pentagon.

03:56:03PM 18   Q.    And there's other ways to treat COVID besides the COVID

03:56:07PM 19   vaccines?

03:56:09PM 20   A.    Yes, sir, there is numerous ways.  There's nutraceuticals,

03:56:15PM 21   vitamin C, vitamin D, zinc, ivermectin.  I've taken ivermectin

03:56:22PM 22   prophylactically.  I've done CPR on COVID-positive patients.

03:56:25PM 23   I've interacted with COVID patients.  I am not vaccinated.  I

03:56:29PM 24   have never been vaccinated with a COVID vaccine, and I am

03:56:34PM 25   probably one of the few people I know that has never gotten

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

03:56:37PM 1  COVID.  I know a lot of people who are on their second bout of

03:56:42PM 2  COVID.

03:56:42PM 3  Q.   Now, before the August 24, 2021, directive from Secretary

03:56:48PM 4  Austin to have universal vaccine administered of the approved

03:56:54PM 5  FDA product, not the EUA but the approved one, you worked with

03:57:00PM 6  COVID patients before that, correct?

03:57:02PM 7  A.   Yes, sir, I did.

03:57:03PM 8  Q.   You were high-risk then as you're high-risk now?

03:57:06PM 9  A.   Yes, sir, I am.

03:57:06PM 10  Q.   Unvaccinated before, unvaccinated now?

03:57:09PM 11  A.   Yes, sir.

03:57:10PM 12  Q.   Where were you assigned to work?

03:57:12PM 13  A.   As part of my residency, I had several rotations.  One

03:57:17PM 14  included working at the civilian emergency room, Flowers

03:57:22PM 15  Hospital, Dothan, Alabama.

03:57:26PM 16  Q.   So they were so concerned about your health that they put

03:57:30PM 17  you, a high-risk patient -- or high-risk individual, in the

03:57:33PM 18  midst of treating COVID patients?

03:57:36PM 19  A.   Yes, sir.

03:57:37PM 20  Q.   But now something's changed, and it's the mandate.  Has

03:57:42PM 21  your health changed?

03:57:45PM 22  A.   No, sir.

03:57:45PM 23  Q.   Anything else change about the August 24 mandate?

03:57:48PM 24  A.   A few whistleblower complaints.

03:57:51PM 25  Q.   Other than that?

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

03:57:53PM  1  A.   No, sir.

03:57:53PM  2  Q.   Are there any other less restrictive means, besides total

03:57:57PM  3  discharge and separation from the military of these skilled,

03:58:01PM  4  experienced and otherwise qualified individuals, as it relates

03:58:06PM  5  to addressing COVID and military readiness, that you haven't

03:58:11PM  6  addressed?

03:58:12PM  7  A.   Well, I think in the general population, there are

03:58:17PM  8  numerous things, but we -- I think, as a matter of fact,

03:58:23PM  9  suicide is a permanent solution to, most of the time, temporary

03:58:27PM  10  problems, and to totally get rid of somebody permanently for an

03:58:36PM  11  illness that is temporary -- and I've never known of a pandemic

03:58:44PM  12  to just go on forever in an unlimited fashion.  That would be

03:58:52PM  13  pretty unheard of.

03:58:53PM  14  Q.   Just a couple of questions and I'll be done.  Are you

03:58:56PM  15  familiar with the bell curve of the wild version, the Delta

03:58:59PM  16  version, and now the Omicron version?

03:59:02PM  17  A.   Yes, sir.

03:59:02PM  18  Q.   And the bell curve would be that -- whatever version we're

03:59:05PM  19  in, it starts off, peaks -- sorry -- and then drops off?

03:59:08PM  20  A.   Yes, sir.

03:59:10PM  21  Q.   Comparing Florida, which has had no restrictions on houses

03:59:14PM  22  of worship, effective April 1, 2020, and was essentially open,

03:59:23PM  23  including in-person schools in September -- restaurants, bars,

03:59:29PM  24  gyms -- of 2020, with California, which is one the most

03:59:33PM  25  restrictive states in the nation, have you done some

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

03:59:36PM  1  comparisons with regards to the infection and mortality rate

03:59:40PM  2  between those two states?

03:59:42PM  3  A.   Generally speaking, there was no difference between the

03:59:44PM  4  two.

03:59:45PM  5  Q.   So no matter what happened, whether you did restrictions,

03:59:49PM  6  whether you got the shots, no shots, whether you were open, did

03:59:53PM  7  you still have the natural bell curve?

03:59:58PM  8  A.   Well, it didn't seem to matter what you implemented.  And

04:00:06PM  9  I think that nothing speaks better to that than when I did a

04:00:11PM  10  statistical analysis, at the beginning of this, of the

04:00:14PM  11  United States versus India.  The United States has a density

04:00:19PM  12  per square mile of 35 people per square mile.  India has a

04:00:23PM  13  density of like 545 people per square mile.  So typically in

04:00:30PM  14  public health, the more dense a population is, the more

04:00:34PM  15  communicable highly transmissible diseases would be, and yet

04:00:39PM  16  India had a fraction of both the total cases of COVID and the

04:00:46PM  17  deaths of COVID.

04:00:47PM  18        And so you can look across in the different strategies and

04:00:53PM  19  look at the different countries that implemented things and

04:00:57PM  20  find that it was not the countries that were the most

04:01:02PM  21  restrictive.  And if you look at Israel, the most vaccinated,

04:01:07PM  22  right, we're seeing the repercussions.  They're three months

04:01:12PM  23  ahead of us.  I've heard it's forthcoming that they have a

04:01:16PM  24  thousand percent increase in life insurance payouts, because of

04:01:21PM  25  non-COVID deaths.

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

04:01:21PM  1    Q.   I want you to look at tab 11.

04:01:29PM  2    A.   Yes.  Yes.  There it is.

04:01:30PM  3    Q.   Do you recognize that chart?

04:01:33PM  4    A.   Yes, sir.

04:01:33PM  5    Q.   And is that a chart of Israel at the top?

04:01:40PM  6    A.   Yes, sir.

04:01:41PM  7    Q.   Is that a chart of -- regarding infections and recovery,

04:01:45PM  8    as well as deaths?

04:01:47PM  9    A.   Yes, sir.

04:01:48PM  10   Q.   Now, Israel, you said, is one the most vaccinated nations

04:01:53PM  11   in the world, now on their fourth booster?

04:01:56PM  12   A.   Yes, sir, they are.

04:01:58PM  13   Q.   In the last few weeks, were they not also the highest

04:02:02PM  14   nation in the world per capita for COVID infections?

04:02:07PM  15   A.   Yes, sir.

04:02:09PM  16   Q.   And the vaccination that they used there is the Pfizer

04:02:13PM  17   two-dose, then three-dose, now four-dose shot?

04:02:17PM  18   A.   Yes, sir.

04:02:18PM  19   Q.   So what does this chart tell you?

04:02:21PM  20   A.   It's the wrong strategy, sir.

04:02:23PM  21   Q.   That despite the highest vaccinated -- or one of the

04:02:26PM  22   highest vaccinated nations in the world, they still have a

04:02:30PM  23   skyrocketing COVID infection rate?

04:02:35PM  24   A.   Yes, sir.

04:02:36PM  25            MR. STAVER:  I'd like to introduce that as

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

04:02:38PM 1  plaintiffs' next exhibit, Your Honor.

04:02:40PM 2      THE COURT:  I believe that's 11.

04:02:42PM 3      MR. STAVER:  I think so.

04:02:46PM 4      THE COURT:  So subject to the earlier ruling, 11 --

04:02:46PM 5      MR. STAVER:  The next --

04:02:52PM 6      THE COURT:  -- Plaintiffs' Exhibit 11 is received.

04:02:52PM 7  Excuse me.

04:02:52PM 8      (Plaintiffs' Exhibit 11 admitted.)

04:02:56PM 9      MR. STAVER:  Thank you.

04:02:56PM 10 Q.   (By Mr. Staver)  The next tab, if you'll look at that, is

04:02:59PM 11 the -- is Gibraltar, which I --

04:03:03PM 12 A.   Yes.

04:03:05PM 13 Q.   -- believe also uses Pfizer.

04:03:06PM 14 A.   Yes, sir.

04:03:07PM 15 Q.   And why is Gibraltar significant for doing your

04:03:10PM 16 epidemiological studies?

04:03:18PM 17 A.   Again, it's another case where you can see clearly the

04:03:27PM 18 case are rising and not decreasing.

04:03:30PM 19 Q.   Now, are you aware that Gibraltar claims that 100 percent

04:03:34PM 20 of the adult population --

04:03:35PM 21 A.   Yes, sir.

04:03:36PM 22 Q.   -- are vaccinated?

04:03:37PM 23 A.   Yes, sir.

04:03:37PM 24 Q.   And the vaccine they use is Pfizer?

04:03:41PM 25 A.   Yes, sir.

**THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER**

04:03:41PM  1    **Q.**   And despite that 100 percent vaccination, you still have

04:03:46PM  2    the same graph that exponentially skyrockets upwards.  So what

04:03:53PM  3    does that tell you as an expert in this area of epidemiology?

04:03:58PM  4    **A.**   The strategy is not working.

04:03:59PM  5    **Q.**   That the vaccine is working or not working?

04:04:02PM  6    **A.**   It -- this -- whatever strategy they're implementing, the

04:04:05PM  7    vaccine is not working.  In fact, these -- all of these charts

04:04:09PM  8    could be very indicative of a state in which the vaccine itself

04:04:19PM  9    is causing worse outcomes in patients who are vaccinated, and

04:04:27PM  10   so --

04:04:27PM  11   **Q.**   In the FDA document of October 22, 2020, the last

04:04:34PM  12   statement on the right side of that says --

04:04:40PM  13   **A.**   "Vaccine enhancements."

04:04:43PM  14   **Q.**   -- "vaccine enhancement disease."

04:04:45PM  15   **A.**   Yes, sir.

04:04:45PM  16   **Q.**   What is that?

04:04:46PM  17   **A.**   It's when essentially the vaccine has the opposite effect.

04:04:51PM  18   It actually makes you more vulnerable to bad outcomes from

04:04:57PM  19   getting the -- in a sense, your immune system does worse by

04:05:04PM  20   being vaccinated than it would if you just experienced the

04:05:09PM  21   infection by natural immunity.  It was one of the problems

04:05:14PM  22   identified very early on and concerns by people such as

04:05:18PM  23   Dr. Robert Malone, inventor of messenger RNA, that this

04:05:28PM  24   vaccine-induced enhancement could be a problem.  And --

04:05:31PM  25   **Q.**   And he's one of the doctors and experts that we've entered

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

04:05:37PM 1   into evidence here early on, in a declaration?

04:05:40PM 2   A.   Yes, sir.  He's one of the doctors I've worked with in

04:05:42PM 3   that group of 450,000.  So amazing opportunity to have someone

04:05:47PM 4   who actually created the delivery mechanism used for this

04:05:53PM 5   vaccine, and he is -- has continually sounded the alarm from

04:05:59PM 6   the beginning of his concerns about this effect.

04:06:02PM 7   Q.   The other expert that we had entered in last year when we

04:06:05PM 8   filed the case was Dr. Peter McCullough.  Are you familiar with

04:06:10PM 9   him?

04:06:10PM 10  A.   Yes, sir, I am.

04:06:11PM 11  Q.   He's a cardiologist, internal medicine specialist, most

04:06:11PM 12  published in his field in the world in history, and an

04:06:17PM 13  epidemiologist?

04:06:17PM 14  A.   That is correct.

04:06:18PM 15  Q.   Does he -- do you and he share similar opinions on this

04:06:20PM 16  regarding safety and efficacy, or I should say, lack thereof?

04:06:26PM 17  A.   Yes, sir.  In fact, he's one of the first people that

04:06:29PM 18  called me and warned me about the emergency meeting by the CDC

04:06:37PM 19  and the risk of myocarditis and the need for informed consents,

04:06:43PM 20  especially given that the population that I take care of meets

04:06:49PM 21  the billet and is most at risk for myocarditis, that young 16-

04:06:55PM 22  to 30-, 40-year-old male.  So...

04:06:59PM 23  Q.   Are there any final comments that you want to make that we

04:07:02PM 24  haven't touched on?

04:07:14PM 25  A.   I think that we have not set this precedent of

THERESA MARIE LONG - DIRECT EXAM BY MR. STAVER

04:07:20PM 1  preemptively kicking people out because they might get sick,

04:07:26PM 2  because they might, you know, have a problem.

04:07:31PM 3       Now, if we go down the road where people's religion does

04:07:37PM 4  not -- their deeply religious held beliefs don't matter, I ask

04:07:41PM 5  you, sir, what is the difference if one of our young female

04:07:49PM 6  plaintiffs was pregnant and I could argue she has to get an

04:07:53PM 7  abortion because she is affecting medical readiness.  And I'm

04:07:57PM 8  not going to tolerate it, because I will tell you that this is

04:08:01PM 9  an issue that every commander has faced, where they have

04:08:06PM 10  females in critical positions -- and maybe they're a linguist

04:08:10PM 11  or maybe there's something else -- and they get pregnant.  And

04:08:15PM 12  it's sometimes, a lot of times, unpredictable.  But then if we

04:08:20PM 13  get to trump -- if we get to trump people's faith for this,

04:08:28PM 14  which has a negative efficacy, which has significant adverse

04:08:35PM 15  events, the likes of which people are going to be blown away

04:08:41PM 16  when they understand the magnitude of, if we say that we can

04:08:46PM 17  trample over people's deeply held religious beliefs in the name

04:08:50PM 18  of medical readiness, then we open that door for sterilizing --

04:08:57PM 19  and this seems extreme, but it is true -- sterilizing people in

04:09:01PM 20  the name of medical readiness and demanding abortions and

04:09:05PM 21  demanding that any vaccine made for profit or any drug made for

04:09:12PM 22  profit be injected or administered to a service member.

04:09:18PM 23       And we have no -- perhaps the biggest intersection that I

04:09:24PM 24  see is -- of a physician and a person of faith who has studied

04:09:29PM 25  this, is the potential impact on families, the ability to

**THERESA MARIE LONG - CROSS-EXAM BY MS. YANG**

04:09:34PM  1  procreate and have children.  I raised my right hand to serve

04:09:40PM  2  in the military, but my children did not.  And the potential

04:09:44PM  3  for this vaccine to impact people's families and their children

04:09:49PM  4  and their children's children is there, and that can never be

04:09:53PM  5  undone.

04:09:55PM  6      But if we go down this road, where faith does not matter

04:10:01PM  7  and we purge out from the military everybody of faith and

04:10:07PM  8  ethics who is concerned and has a deeply held religious belief,

04:10:16PM  9  I cringe.  I cringe at what it is going to do to the morale,

04:10:21PM  10  and I cringe -- I don't know how it's compatible to swear to

04:10:27PM  11  uphold the constitution against all enemies foreign and

04:10:31PM  12  domestic and then also let our institution trample on our most

04:10:40PM  13  sacred rights as an American.

04:10:44PM  14          MR. STAVER:  Thank you.

04:10:45PM  15          I don't have any other questions, Your Honor.

04:10:47PM  16          THE COURT:  All right.  Thank you, Mr. Staver.

04:10:49PM  17          Has the defense cross-examination for this witness?

04:10:54PM  18          MS. YANG:  Yes, Your Honor.

04:10:56PM  19          THE COURT:  You're recognized for that purpose.

04:11:00PM  20          MS. YANG:  I am.

04:11:01PM  21                  CROSS-EXAMINATION

04:11:01PM  22  BY MS. YANG:

04:11:02PM  23  **Q.**   Good afternoon, ma'am.

04:11:04PM  24  **A.**   Afternoon.

04:11:06PM  25          THE COURT:  We came back at 2:30; is that right?

THERESA MARIE LONG - CROSS-EXAM BY MS. YANG

04:11:12PM  1          MS. YANG:  That's correct.

04:11:12PM  2          THE COURT:  We've been in session for a while.  Would

04:11:16PM  3  you like a brief recess?

04:11:16PM  4          MR. STAVER:  Sure.

04:11:17PM  5          THE COURT:  Ms. Yang?

04:11:17PM  6          MS. YANG:  That's fine with me.  I'm ready to

04:11:19PM  7  proceed, but I'm happy --

04:11:19PM  8          THE COURT:  All right.  You may.  Okay.

04:11:20PM  9          MS. YANG:  Thank you.  Okay.  Thank you.

04:11:21PM  10                    CROSS-EXAMINATION

04:11:21PM  11  BY MS. YANG:

04:11:22PM  12  Q.   Ma'am, there is an Army regulation that provides that Army

04:11:27PM  13  personnel will not disclose official information when they

04:11:33PM  14  get -- official information in response to a subpoena unless

04:11:37PM  15  they receive written authorization from the Army legal advisor;

04:11:43PM  16  is that correct?

04:11:43PM  17  A.   I'd have to see the regulation.

04:11:45PM  18  Q.   Are you independently aware of that regulation?

04:11:50PM  19  A.   Am I aware that the regulation exists --

04:11:53PM  20  Q.   Yes.

04:11:53PM  21  A.   -- covering the military?  Yes, I am.

04:11:56PM  22  Q.   Yes.  Okay.

04:11:57PM  23       And you're aware that that applies to the Army as a

04:12:00PM  24  component of the military?

04:12:02PM  25  A.   Yes, ma'am.

**THERESA MARIE LONG - CROSS-EXAM BY MS. YANG**

04:12:03PM 1 **Q.** Did you get that written authorization today to testify?

04:12:08PM 2 **A.** No, ma'am, I did not.

04:12:09PM 3 **Q.** Did you request that authorization to testify today?

04:12:13PM 4 **A.** I got the subpoena over the weekend and spoke to people

04:12:20PM 5 within my command on Monday.

04:12:23PM 6 **Q.** Did you request the written authorization from Army legal

04:12:27PM 7 department?

04:12:29PM 8 **A.** I went through my attorney.

04:12:33PM 9 **Q.** So I just want to make sure I understand. You did, either

04:12:37PM 10 through yourself or through your attorney, request

04:12:40PM 11 authorization from the Army legal advisor to testify?

04:12:45PM 12 **A.** I spoke with my attorney about it.

04:12:48PM 13 **Q.** I understand that you spoke with your attorney, and

04:12:50PM 14 believe me, I'm not trying to get into the contents of that

04:12:54PM 15 discussion.

04:12:54PM 16 But my more specific question is, did you, either through

04:12:58PM 17 yourself or through your attorney, request a written

04:13:01PM 18 authorization from the Army legal advisor to testify today?

04:13:06PM 19 **A.** I believe my attorney did do that, yes, ma'am.

04:13:08PM 20 **Q.** When did he do -- he or she do that?

04:13:11PM 21 **A.** I really -- I can't speak to what he does and the

04:13:16PM 22 timetable on which he does it.

04:13:17PM 23 **Q.** There's also an Army regulation that provides that in no

04:13:26PM 24 event may Army personnel furnish expert or opinion testimony in

04:13:29PM 25 a case in which the United States has an interest for a party

THERESA MARIE LONG - CROSS-EXAM BY MS. YANG

04:13:33PM  1  whose interest are adverse to the interests of the

04:13:36PM  2  United States.  Are you familiar with that regulation?

04:13:38PM  3  A.   Yes, ma'am.

04:13:42PM  4  Q.   And these two regulations that we just discussed, those

04:13:45PM  5  apply to all Army personnel, correct?

04:13:50PM  6  A.   Yes.  And I'm assuming the interest of the United States

04:13:52PM  7  is for their soldiers to be alive and healthy.

04:13:58PM  8  Q.   Today is the first time that we've heard from you in this

04:14:01PM  9  case, correct?

04:14:04PM  10  A.   Yes, ma'am.

04:14:05PM  11  Q.   You haven't provided any written report in this case?

04:14:09PM  12  A.   Are you asking me about my whistleblower complaint?

04:14:13PM  13  Q.   No.  I'm asking about any kind of written report that you

04:14:15PM  14  have provided for purposes of this case.

04:14:20PM  15  A.   I provided a whistleblower complaint to Senator Johnson.

04:14:27PM  16  I've submitted two affidavits.

04:14:31PM  17  Q.   Was any of that submitted in connection with this case?

04:14:35PM  18  A.   No.

04:14:36PM  19  Q.   And have you submitted any sort of other kind of writing

04:14:42PM  20  or declaration in support of this case?

04:14:49PM  21  A.   No, ma'am.

04:14:50PM  22  Q.   I believe you testified earlier that you have not ever

04:14:53PM  23  physically examined Navy Commander.  Is that correct?

04:14:57PM  24  A.   Physically examined him?

04:14:59PM  25  Q.   Correct.

## THERESA MARIE LONG - CROSS-EXAM BY MS. YANG

04:15:00PM 1   **A.**   No, ma'am.

04:15:01PM 2   **Q.**   That you've never provided medical treatment to Navy

04:15:06PM 3   Commander?

04:15:06PM 4   **A.**   This Navy commander?

04:15:07PM 5   **Q.**   Correct.  Yes, the individual who testified earlier today.

04:15:10PM 6   **A.**   No, I have not.

04:15:12PM 7   **Q.**   And the same is true for Lieutenant Colonel 2; you have

04:15:15PM 8   not examined Lieutenant Colonel?

04:15:18PM 9   **A.**   No, I have not.

04:15:19PM 10   **Q.**   Have not provided her any medical treatment?

04:15:21PM 11   **A.**   No.  And it is my understanding I was called here as a

04:15:30PM 12   fact witness, not an expert witness.

04:15:36PM 13   **Q.**   You yourself do not have any specialized medical training

04:15:43PM 14   in immunology; is that correct?

04:15:46PM 15   **A.**   Everyone who goes to medical school has training in

04:15:50PM 16   immunology.

04:15:50PM 17   **Q.**   Do you have specialized training in immunology?

04:15:52PM 18   **A.**   What would you quantify as specialized medical training?

04:15:56PM 19   **Q.**   Well, let me ask you this:  Are you board-certified in

04:15:58PM 20   immunology?

04:15:59PM 21   **A.**   No, I'm not.

04:15:59PM 22   **Q.**   And I believe you mentioned that you reviewed the

04:16:01PM 23   declaration of Colonel Rans.  Is that correct?

04:16:05PM 24   **A.**   Yes, I did.

04:16:06PM 25   **Q.**   You're aware of that Colonel Rans is board-certified in

**THERESA MARIE LONG - CROSS-EXAM BY MS. YANG**

04:16:10PM  1  immunology, yes?

04:16:11PM  2  A.   I believe she is.  But yet a family medicine -- or -- I'm

04:16:14PM  3  sorry -- an internal medicine doctor revoked an immunization

04:16:19PM  4  exemption that she gave.

04:16:21PM  5  Q.   Would you agree with me that board certification is

04:16:24PM  6  something that the medical profession places value in?

04:16:33PM  7  A.   Well, I'm not sure.  We have a number of service members

04:16:39PM  8  who've had board-certified specialists in immunology write that

04:16:43PM  9  they should not receive the vaccinations because they are

04:16:48PM 10  allergic to polyethylene glycol, and yet those exemptions have

04:16:54PM 11  been thrown in the trash, because people do not recognize their

04:16:58PM 12  board certifications because they do not like what they are

04:17:01PM 13  saying.

04:17:01PM 14  Q.   My question is if the medical profession, of which you are

04:17:04PM 15  a part, recognizes board certification as something that is of

04:17:10PM 16  value.

04:17:12PM 17  A.   Are we going to be consistent?  I mean, a value?  You

04:17:16PM 18  meaning that I should recognize -- for example --

04:17:22PM 19  Q.   Let me rephrase the question in case there is any --

04:17:22PM 20  A.   Yeah.

04:17:26PM 21  Q.   -- disagreement over the word "value."

04:17:27PM 22       Board certification is a very extensive process.  That's

04:17:31PM 23  fair to say, yes?

04:17:32PM 24  A.   I have a board certification, yes.

04:17:33PM 25  Q.   Right.

**THERESA MARIE LONG - CROSS-EXAM BY MS. YANG**

04:17:34PM  1      And there is extensive studies that you have to go through

04:17:37PM  2  in order to get it.  There's a whole test -- a series of tests

04:17:41PM  3  that you have to go through to obtain certification.  Is that

04:17:43PM  4  correct?

04:17:44PM  5  A.    Yes.

04:17:44PM  6  Q.    It's a rigorous process?

04:17:46PM  7  A.    Yes.  But yet I had a patient who had cardiac issues, and

04:17:54PM  8  the cardiologist was not abreast of the latest information on

04:18:02PM  9  cardiac MRIs and myocarditis.  And he ran an echo, a stress

04:18:05PM 10  test, and an EKG, all of which were normal, but I had to

04:18:09PM 11  educate a board-certified cardiologist on what the appropriate

04:18:15PM 12  test was.  And he was pretty shocked when the test came back

04:18:20PM 13  positive for myocarditis, when he had assured me that he was a

04:18:27PM 14  board-certified cardiologist and did not see the need for that

04:18:31PM 15  test.

04:18:31PM 16  Q.    You don't dispute that service members have died from

04:18:34PM 17  COVID, do you?

04:18:34PM 18  A.    No, I don't.

04:18:35PM 19  Q.    That thousands have required hospitalizations from COVID?

04:18:40PM 20  A.    I don't know exactly what the number of active duty

04:18:43PM 21  service members who required hospitalization, no.

04:18:46PM 22  Q.    Do you dispute that hundreds of thousands have contracted

04:18:49PM 23  COVID?

04:18:52PM 24  A.    In the military?

04:18:54PM 25  Q.    In the military.

**THERESA MARIE LONG - CROSS-EXAM BY MS. YANG**

04:18:56PM 1   **A.**   I've been advised not to answer on that.

04:18:58PM 2   **Q.**   Okay.  And that includes -- the people who have contracted

04:19:03PM 3   COVID in the military includes people who are otherwise young

04:19:06PM 4   and in good physical condition; is that correct?

04:19:11PM 5   **A.**   Again, are you asking me to -- to answer on information

04:19:17PM 6   contained within the DoD?

04:19:20PM 7   **Q.**   I'm asking you whether you -- whether you dispute the

04:19:25PM 8   facts that have been offered in this litigation that hundreds

04:19:29PM 9   of thousands of service members have contracted COVID,

04:19:32PM 10  including people who are young and in good physical condition.

04:19:35PM 11  **A.**   It is my understanding that of all the people who -- per

04:19:40PM 12  Colonel -- board-certified immunology, Colonel Rans, the people

04:19:44PM 13  who have contracted COVID in the military, 90 of them have --

04:19:51PM 14  93 of them have died.

04:19:53PM 15  **Q.**   And my question wasn't about deaths in that instance but

04:19:57PM 16  rather that hundreds of thousands have contracted COVID,

04:20:01PM 17  period, correct?

04:20:03PM 18  **A.**   Yes, ma'am.

04:20:05PM 19  **Q.**   You talked earlier about myocarditis.  And just so I'm

04:20:13PM 20  clear -- actually, let me ask you first about VAERS, since

04:20:17PM 21  there was some discussion of that.

04:20:23PM 22         All right.  So you talked about the data that was

04:20:28PM 23  reflected in VAERS.  Do you remember that?

04:20:31PM 24  **A.**   Yes.

04:20:32PM 25  **Q.**   And you are aware, right, that the FDA requires healthcare

**THERESA MARIE LONG - CROSS-EXAM BY MS. YANG**

04:20:38PM  1  providers to report any adverse event after a COVID-19

04:20:46PM  2  vaccination to VAERS, even if it's unclear whether the two

04:20:49PM  3  things are connected?  You're aware of that?

04:20:51PM  4  A.   I'm aware in the clinical study with the DoD -- I think it

04:20:55PM  5  is Clinical Study 3491011 -- where healthcare providers are

04:21:04PM  6  advised that even if the vaccine adverse event is not

04:21:09PM  7  attributable to the vaccine, if a serious event occurs, it must

04:21:14PM  8  be reported.  The only reason I know that is because I read

04:21:17PM  9  that, not because it's ever been pushed down through

04:21:21PM 10  communications.

04:21:24PM 11  Q.   Okay.  And you would agree with me, as a general

04:21:26PM 12  principal, that there is a difference between correlation and

04:21:30PM 13  causation, yes?

04:21:32PM 14  A.   Yes, ma'am.

04:21:34PM 15  Q.   So now moving on to myocarditis, just so I'm clear, you

04:21:41PM 16  are not board-certified in cardiology, correct?

04:21:44PM 17  A.   I think we've established that.

04:21:47PM 18  Q.   That's a "you are not"?

04:21:49PM 19  A.   Right.

04:21:56PM 20  Q.   Could you turn to tab 3 in front of you.  And then flip to

04:22:13PM 21  the study that plaintiffs' counsel and you were discussing.

04:22:19PM 22  You're familiar with this study titled Myocarditis Following

04:22:26PM 23  Immunization, published by the *JAMA Cardiology*?

04:22:30PM 24  A.   Yes, I am.

04:22:30PM 25  Q.   And if you turn to page 2 of this study.  Do you see in

THERESA MARIE LONG - CROSS-EXAM BY MS. YANG

04:22:36PM 1  the upper right-hand corner there's a square box with the

04:22:39PM 2  heading "Key Points"?

04:22:42PM 3  A.   Yes, I do.

04:22:42PM 4  Q.   And a subheading under that with the word "meaning" in

04:22:47PM 5  red?

04:22:48PM 6  A.   Yes.

04:22:48PM 7  Q.   And do you see there that it says, "Vigilance for rare

04:22:52PM 8  adverse events, including myocarditis, after a COVID-19

04:22:56PM 9  vaccination is warranted but should not diminish overall

04:23:01PM 10  confidence in vaccination during the current pandemic"?

04:23:04PM 11  A.   Yes.  That --

04:23:04PM 12  Q.   Do you see that?

04:23:04PM 13  A.   That's an opinion.  It's not a fact.

04:23:08PM 14  Q.   Right.

04:23:09PM 15      That is the meaning drawn from this study, yes, as

04:23:13PM 16  reflected in the -- on the text here?

04:23:15PM 17  A.   No, I wouldn't say that's the meaning of the study.  I

04:23:19PM 18  would say that's someone's opinion in the study.

04:23:22PM 19  Q.   Okay.  If you turn to the next page, page 3 of this

04:23:27PM 20  report.

04:23:27PM 21  A.   Yes.

04:23:28PM 22  Q.   Do you see Table 3 in the upper right-hand corner?

04:23:32PM 23  A.   Yes.

04:23:33PM 24  Q.   And this is a table showing -- oh, excuse me -- a table

04:23:34PM 25  showing expected versus observed cases of myocarditis in

**THERESA MARIE LONG - CROSS-EXAM BY MS. YANG**

04:23:40PM   1  Military Health System patients?

04:23:43PM   2  **A.**   Yes.

04:23:45PM   3  **Q.**   And do you see where it says that 544,000 -- out of

04:23:52PM   4  544,000 second doses to military members, there were 19 cases

04:23:59PM   5  of myocarditis observed?

04:24:02PM   6  **A.**   Yes.

04:24:03PM   7  **Q.**   Do you see on the line below that that out of 436,000

04:24:08PM   8  second doses to male military members, that there were 19

04:24:12PM   9  instances of myocarditis observed?

04:24:15PM  10  **A.**   What I see is that the observed was double the number

04:24:19PM  11  expected on both of -- almost both of those.

04:24:22PM  12  **Q.**   The observed is 19 out of 436,000, yes?

04:24:26PM  13  **A.**   The observed is twice as many as what was expected with

04:24:30PM  14  the normal incidence.

04:24:33PM  15  **Q.**   Ma'am, I'm -- with respect, that's not my question.  My

04:24:36PM  16  question is, yes or no, the number is 19 out of 436,000 doses?

04:24:42PM  17  **A.**   Yes, that's what it says.

04:24:44PM  18  **Q.**   If you turn to the next page, in the "Conclusions"

04:24:51PM  19  heading.

04:24:51PM  20  **A.**   Yes.

04:24:51PM  21  **Q.**   Do you see where the last sentence reads, "Concerns about

04:24:55PM  22  rare adverse events following immunization should not diminish

04:25:00PM  23  overall confidence in the value of vaccinations"?

04:25:03PM  24  **A.**   Again, that's an opinion.

04:25:04PM  25  **Q.**   Do you see that in the conclusions section?

**THERESA MARIE LONG - CROSS-EXAM BY MS. YANG**

04:25:08PM  1   A.   Yes, I do.

04:25:10PM  2   Q.   You can go ahead and set that aside.

04:25:16PM  3   A.   (Complies.)

04:25:17PM  4   Q.   You also discussed instances of death following the COVID

04:25:26PM  5   vaccine.  Do you remember that?

04:25:27PM  6   A.   Yes.

04:25:27PM  7   Q.   And I can't remember exactly the number of events that you

04:25:32PM  8   said were reported in VAERS.  But are you aware that -- are you

04:25:40PM  9   aware that the CDC and FDA have actually just attributed nine

04:25:46PM  10  deaths, out of all of the doses that have been administered, to

04:25:50PM  11  the COVID-19 vaccine?

04:25:52PM  12  A.   Nine deaths for who, ma'am?

04:25:54PM  13  Q.   Nine deaths out of the entire population of individuals

04:25:58PM  14  who have received a dose of the COVID-19 vaccine.

04:26:01PM  15  A.   In the United States?

04:26:03PM  16  Q.   Yes, ma'am.

04:26:11PM  17  A.   I would love to see that.

04:26:13PM  18  Q.   Certainly.

04:26:31PM  19          MS. YANG:  Would you like a copy too?

04:26:38PM  20          THE COURT:  Yes, please.

04:26:41PM  21          THE WITNESS:  (Reviewing document.)

04:26:42PM  22  Q.   (By Ms. Yang)  Ma'am, do you see on the upper left-hand

04:26:46PM  23  corner of the first page --

04:26:48PM  24          THE COURT:  Can I get you to just pause a moment.

04:26:51PM  25          MS. YANG:  Of course.

THERESA MARIE LONG - CROSS-EXAM BY MS. YANG

04:27:54PM 1        THE COURT:  Is this just my copy, or does this have

04:27:57PM 2   something deleted on page 2?

04:27:59PM 3        THE WITNESS:  It does.

04:27:59PM 4        MS. YANG:  That's the way that it printed off the

04:28:00PM 5   website.  I'm sure it's just a formatting error on my part.

04:28:05PM 6   But the HTML website information is on the bottom header.

04:28:11PM 7        THE COURT:  I see it.  All right.  Go ahead.

04:28:16PM 8        MS. YANG:  Thank you.

04:28:16PM 9   Q.   (By Ms. Yang)  Ma'am, do you see on the upper left-hand

04:28:19PM 10  corner of this document that there's the CDC logo and

04:28:22PM 11  identifies it as Centers for Disease Control and Prevention?

04:28:25PM 12  A.   Yes, I do.

04:28:26PM 13  Q.   And do you see on the bottom footer that there's a website

04:28:30PM 14  that starts with https://www.cdc.gov and it goes on?

04:28:38PM 15  A.   Yes.

04:28:38PM 16  Q.   Have you seen, you know -- have you seen this document,

04:28:42PM 17  you know -- this document before or some variation of this

04:28:48PM 18  document before on the CDC website?

04:28:52PM 19  A.   No.  I generally don't get my scientific information from

04:28:57PM 20  the CDC.

04:28:58PM 21  Q.   I see.  Okay.

04:28:59PM 22       So do -- is it fair to say you don't regularly visit the

04:29:03PM 23  CDC website for information on COVID?

04:29:07PM 24  A.   No, I do not.

04:29:08PM 25  Q.   Okay.

THERESA MARIE LONG - CROSS-EXAM BY MS. YANG

04:29:08PM  1  **A.**   I don't consider them reputable, and I think there are

04:29:11PM  2  conflicts of interest.

04:29:13PM  3  **Q.**   The title of this web page is Selected Adverse Events

04:29:18PM  4  Reported After COVID-19 Vaccination, correct?

04:29:21PM  5  **A.**   Selected, yes.

04:29:22PM  6  **Q.**   Right.

04:29:22PM  7      And do you see that it was last updated March 1, 2022?

04:29:27PM  8  **A.**   Yes.

04:29:28PM  9  **Q.**   And just -- you know, there's other information on this

04:29:31PM  10  page.  But since we were just discussing the -- your testimony

04:29:35PM  11  on the deaths, if you flip to the second page, do you see the

04:29:40PM  12  bullet point on the bottom half of that page that starts with,

04:29:44PM  13  "Reports of deaths after COVID-19 vaccination are rare"?

04:29:48PM  14  **A.**   That's what it says.

04:29:49PM  15  **Q.**   Do you see in that same paragraph where it's in bolded

04:29:55PM  16  font, "Reports of adverse events to VAERS following

04:29:58PM  17  vaccination, including deaths, do not necessarily mean that a

04:30:02PM  18  vaccine caused a health problem"?

04:30:03PM  19  **A.**   I do see that.

04:30:04PM  20  **Q.**   Do you see the next sentence?  It says, "More than

04:30:07PM  21  553 million doses of COVID-19 vaccines were administered in the

04:30:11PM  22  United States from December 14, 2020, through February 22,

04:30:17PM  23  2022"?

04:30:17PM  24  **A.**   I do.

04:30:18PM  25  **Q.**   And that during this time, the next sentence, "VAERS

THERESA MARIE LONG - CROSS-EXAM BY MS. YANG

04:30:23PM 1   received 12,775 preliminary reports of death (0.0023 percent)

04:30:33PM 2   among people who received a COVID-19 vaccine"?

04:30:38PM 3   **A.**   Yes.

04:30:40PM 4   **Q.**   And then there's more information, but for our purposes

04:30:43PM 5   today, can you go to the concluding paragraph there.  It's a

04:30:48PM 6   very short paragraph, but it says, "Continued monitoring has

04:30:54PM 7   identified nine deaths causally associated with J&J/Janssen

04:30:59PM 8   COVID-19 vaccination."

04:31:00PM 9   **A.**   I don't think you read that correctly, ma'am.

04:31:02PM 10  **Q.**   Oh, I did not read that correctly?

04:31:04PM 11  **A.**   No, you didn't.

04:31:05PM 12  **Q.**   Okay.  Let me try one more time.

04:31:06PM 13  **A.**   "Continued" --

04:31:07PM 14  **Q.**   "Continued monitoring has identified nine" --

04:31:09PM 15            THE COURT:  I can read it for myself, and it's in the

04:31:12PM 16  record.  What is the question?

04:31:14PM 17  **Q.**   (By Ms. Yang)  Whether you're familiar with this data.

04:31:16PM 18  **A.**   But you just said that only nine deaths have been

04:31:21PM 19  attributable to Johnson & Johnson or the messenger RNA

04:31:29PM 20  vaccines.  "Continuing monitoring has identified nine deaths

04:31:33PM 21  causally associated with J&J COVID-19 vaccines."

04:31:37PM 22       That does not say that they have investigated all

04:31:43PM 23  24,000 cases and only nine of them are attributable to the

04:31:48PM 24  vaccine.  That is not what that says, ma'am.

04:31:50PM 25  **Q.**   I see.  Okay.

**THERESA MARIE LONG - CROSS-EXAM BY MS. YANG**

04:31:51PM  1        So you dispute this report that only nine deaths have been

04:31:57PM  2   causally associated with --

04:31:57PM  3   **A.**   No, ma'am --

04:31:58PM  4   **Q.**   -- the J&J 19 -- the --

04:32:00PM  5   **A.**   -- it does not say what you are inferring it says.  It

04:32:02PM  6   says what it says:  "Continuing monitoring has identified..."

04:32:07PM  7   It doesn't tell you continuing monitoring from the date the

04:32:12PM  8   vaccines were rolled out until today.  "Continuing monitoring,"

04:32:16PM  9   that could be continuing monitoring last week.  That could be

04:32:20PM 10   continuing monitoring a month ago.  That doesn't give you any

04:32:25PM 11   time period.  It doesn't tell you -- like, normally in an

04:32:28PM 12   epidemiologic report, we would normally see a breakdown where

04:32:32PM 13   they would say 24- -- 25,000 deaths were reported, 2,000 of

04:32:38PM 14   those were from strokes, 2,000 were from heart attacks, there

04:32:43PM 15   were confounding factors in this many, this many could not be

04:32:47PM 16   verified, autopsies weren't obtained on this many, this many

04:32:53PM 17   just didn't have any identifying information in which they

04:32:57PM 18   could be further investigated.

04:33:00PM 19        This does not tell you that only nine deaths have occurred

04:33:08PM 20   from the vaccine, and I'm sorry if that is your interpretation

04:33:14PM 21   of that sentence, because it is factually inaccurate.

04:33:20PM 22   **Q.**   Ma'am, have you yourself conducted any studies to

04:33:22PM 23   determine the number of deaths that are causally associated

04:33:25PM 24   with the COVID-19 vaccine?

04:33:27PM 25   **A.**   Yes, but I'm not allowed to talk about those.

**THERESA MARIE LONG - CROSS-EXAM BY MS. YANG**

04:33:29PM    1    **Q.**    Have you conducted peer-reviewed studies on that topic?

04:33:34PM    2    **A.**    Yes, I have.

04:33:36PM    3    **Q.**    Peer-reviewed by whom?

04:33:41PM    4    **A.**    Peer-reviewed journal articles.

04:33:43PM    5              THE COURT:  Are you suggesting that this CDC report

04:33:45PM    6    that you're looking at is peer-reviewed?

04:33:48PM    7              MS. YANG:  I am not certain, Your Honor, to be

04:33:53PM    8    honest.  I'm working --

04:33:53PM    9              THE COURT:  Well, I think you can be pretty sure that

04:33:55PM   10    it has not been, can't you?

04:33:58PM   11              MS. YANG:  I'm sorry?

04:33:59PM   12              THE WITNESS:  Yes.  The CDC doesn't -- this isn't --

04:33:59PM   13    this hasn't gone through publication.

04:34:01PM   14              MS. YANG:  Okay.

04:34:02PM   15              THE WITNESS:  This isn't published in a journal.

04:34:03PM   16    It's published on a website for the CDC, the same CDC that told

04:34:08PM   17    us we didn't have to wear masks, that masks didn't make any

04:34:11PM   18    difference, the same CDC that --

04:34:12PM   19              THE COURT:  All right.  All right.  Let's respond to

04:34:15PM   20    a question.

04:34:16PM   21    **Q.**    (By Ms. Yang)  So it's fair to say, ma'am, that you

04:34:19PM   22    disagree with any of the conclusions or data that CDC has put

04:34:22PM   23    out about the COVID-19 vaccine?

04:34:24PM   24    **A.**    No.  I'm telling you I disagree with your interpretation

04:34:27PM   25    of what that sentence says.  And, no, I think that there --

**THERESA MARIE LONG - CROSS-EXAM BY MS. YANG**

04:34:36PM  1   that does not tell you that they have fully investigated a

04:34:40PM  2   million adverse events and that they have only attributed nine

04:34:45PM  3   to the vaccines.

04:34:46PM  4   **Q.**   Okay.  And if you turn back to the first page, under the

04:34:49PM  5   "What You Need to Know" heading, do you see the first bullet

04:34:54PM  6   reads, "COVID-19 vaccines are safe and effective"?

04:34:57PM  7   **A.**   Yes, I do.

04:34:58PM  8   **Q.**   And you would dispute that conclusion, yes?

04:35:00PM  9   **A.**   Well, this isn't a peer-reviewed journal article.  I mean,

04:35:05PM  10  just because someone puts something on the web and says it's

04:35:08PM  11  safe and effective -- I got a whole bunch of people with

04:35:14PM  12  strokes and heart problems and other issues that would strongly

04:35:20PM  13  contest "safe and effective."

04:35:22PM  14  **Q.**   And you also --

04:35:22PM  15  **A.**   So --

04:35:23PM  16  **Q.**   Would you also dispute the conclusion of the FDA that the

04:35:27PM  17  COVID vaccines are safe and effective?

04:35:31PM  18  **A.**   The FDA that just -- they -- I don't know if they mean

04:35:35PM  19  "safe" the way I mean "safe," but when I tell a patient

04:35:38PM  20  something is safe, it doesn't contain over 1200 adverse events

04:35:42PM  21  that could possibly occur.  I don't recommend things that could

04:35:49PM  22  have devastating outcomes on my patients, that have eight

04:35:55PM  23  pages, single-space, tiny print, adverse events.

04:35:59PM  24      So the FDA says "safe and effective," and then only by

04:36:04PM  25  court order do they release documents that they did not want

**THERESA MARIE LONG - REDIRECT EXAM BY MR. STAVER**

04:36:07PM 1  released for over 75 years, that show the public what their

04:36:12PM 2  idea of safe and effective mean.  I have soldiers and I have

04:36:18PM 3  people that prove it is not safe.

04:36:23PM 4  Q.   And if I were to show you the statements issued by various

04:36:28PM 5  health professional organizations, medical organizations,

04:36:33PM 6  contending -- concluding and advising individuals to get

04:36:36PM 7  vaccinated because the COVID-19 vaccines are safe and

04:36:39PM 8  effective, you would dispute those conclusions as well?

04:36:43PM 9  A.   I could bring just as many, if not more, peer-reviewed

04:36:46PM 10  journal articles, Nobel laureates, specialists, board-certified

04:36:51PM 11  in everything, that would dispute that, and that is called

04:36:55PM 12  science.

04:36:57PM 13          MS. YANG:  Okay.  Thank you, ma'am.

04:37:00PM 14          No further questions, Your Honor.

04:37:01PM 15          THE COURT:  All right.  Thank you, Ms. Yang.

04:37:05PM 16          Mr. Staver?

04:37:06PM 17          MR. STAVER:  Very little, very little.

04:37:10PM 18                    REDIRECT EXAMINATION

04:37:10PM 19  BY MR. STAVER:

04:37:15PM 20  Q.   Whatever the value of this document, as you read it, it

04:37:21PM 21  refers only to one vaccine, Janssen and Janssen, which is

04:37:25PM 22  Johnson & -- or Janssen, which is Johnson & Johnson, right?

04:37:28PM 23  A.   Yes, sir.

04:37:28PM 24  Q.   It's not referring to Pfizer or Moderna?

04:37:32PM 25  A.   No, sir, it's not.

THERESA MARIE LONG - REDIRECT EXAM BY MR. STAVER

04:37:33PM 1  **Q.**   But the document that Pfizer released, which is part of --

04:37:37PM 2  I should say, the FDA released, that it has in its possession,

04:37:43PM 3  regarding Pfizer, which is part of tab 5, are you familiar with

04:37:47PM 4  that document that has 1291 adverse events, including

04:37:56PM 5  demyelination, which is the adverse event from which

04:38:01PM 6  Dr. Chambers is now suffering subsequent to taking Moderna?

04:38:04PM 7  **A.**   I'm familiar with that, sir.  I'm also familiar with the

04:38:07PM 8  page on here that discuss pregnancy outcomes.

04:38:11PM 9         THE COURT:  Mr. Staver, respectfully, let's not

04:38:13PM 10 repeat.

04:38:14PM 11        MR. STAVER:  Yeah.  I'm done.

04:38:14PM 12        THE COURT:  I pretty much --

04:38:15PM 13        MR. STAVER:  I'm good.

04:38:15PM 14        THE COURT:  -- have a grasp of what's been --

04:38:17PM 15        MR. STAVER:  That was all -- that was my last

04:38:18PM 16 question anyway.  So I have no further questions for this

04:38:21PM 17 witness.

04:38:21PM 18        THE COURT:  All right.  Thank you very much.

04:38:21PM 19        MR. STAVER:  Thank you.

04:38:24PM 20        THE COURT:  With that -- and we need to remember to

04:38:26PM 21 disconnect that --

04:38:26PM 22        THE WITNESS:  Yes, sir.

04:38:27PM 23        THE COURT:  -- that little microphone.  You may step

04:38:30PM 24 down, and you're excused with our thanks.

04:38:42PM 25        Let me inquire if the plaintiffs intend to offer any

**THERESA MARIE LONG - REDIRECT EXAM BY MR. STAVER**

04:38:46PM   1   further witnesses or evidence.

04:38:48PM   2          MR. STAVER:  One more, Your Honor.

04:38:50PM   3          THE COURT:  And what is the expected duration?

04:38:53PM   4          MR. STAVER:  I would say, from my standpoint,

04:38:55PM   5   45 minutes, max.

04:38:57PM   6          THE COURT:  All right.  Well, we will take a brief

04:38:59PM   7   recess, since we've been over two hours, I think, at this

04:39:03PM   8   point.  We'll take a brief recess, and then we'll come back in

04:39:06PM   9   about 15 minutes or so and hear that testimony.

04:39:07PM  10          MR. STAVER:  Okay.  Thank you.

04:39:10PM  11      (Proceedings in recess from 4:39 p.m. until 5:00 p.m.)

05:00:48PM  12          THE COURT:  Please be seated.  Thank you.

05:00:50PM  13          All right.  The plaintiffs are recognized to call

05:01:01PM  14   their next witness.

05:01:02PM  15          MR. STAVER:  Thank you, Your Honor.  I'll call

05:01:04PM  16   Dr. Stewart Tankersley.

05:01:13PM  17          THE COURT:  Good afternoon, sir.

05:01:14PM  18          THE WITNESS:  Good afternoon.  Thank you.

05:01:15PM  19          THE COURT:  Let me ask you to pause just one moment

05:01:17PM  20   and raise your right hand.

05:01:21PM  21              STEWART HILL TANKERSLEY,

05:01:21PM  22      having been sworn or affirmed under oath, was examined and

05:01:23PM  23   testified as follows:

05:01:23PM  24          THE COURT:  State your name, please.

05:01:25PM  25          THE WITNESS:  Stewart Hill Tankersley,

STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER

05:01:29PM  1  T-a-n-k-e-r-s-l-e-y.

05:01:32PM  2           THE COURT:  L-e-y?

05:01:34PM  3           THE WITNESS:  L-e-y, correct.

05:01:34PM  4           THE COURT:  Please have a seat in the witness stand.

05:01:38PM  5  You need to connect that microphone to some useful spot.

05:01:55PM  6           And I'll recognize Mr. Staver for your direct

05:01:59PM  7  examination.

05:01:59PM  8           MR. STAVER:  Thank you, Your Honor.

05:02:00PM  9                      DIRECT EXAMINATION

05:02:00PM  10  BY MR. STAVER:

05:02:00PM  11  Q.    Can you state your full name.

05:02:01PM  12  A.    Stewart Hill Tankersley.

05:02:04PM  13  Q.    For the benefit of the Court, can you give a background of

05:02:07PM  14  your medical training and education?

05:02:11PM  15  A.    Yes, sir.  I was enlisted in '91; did OCS.  I graduated in

05:02:18PM  16  '93, on Saturday, and on Monday I started at UAB.  Finished

05:02:22PM  17  there, then went to two years of OB residency, took a year

05:02:27PM  18  missionary training.  And then I finished family medicine

05:02:30PM  19  residency 2 1/2 years later.  I've been in private practice

05:02:35PM  20  since.  I was, as family medicine, boarded, and I have been in

05:02:43PM  21  the military.  After OCS, I came in the medical corp after

05:02:49PM  22  graduating medical school.  I've been deployed three times.  I

05:02:52PM  23  reached the rank of colonel at 18 years, and I am a flight

05:02:56PM  24  surgeon as well.

05:02:59PM  25  Q.    Have you recently retired from the Army as a colonel?

**STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER**

05:03:02PM  1   **A.**   I did.

05:03:03PM  2   **Q.**   And --

05:03:03PM  3   **A.**   On September -- end of September.

05:03:05PM  4   **Q.**   2021?

05:03:06PM  5   **A.**   Yes, sir.

05:03:09PM  6   **Q.**   In your medical practice, do you treat COVID patients?

05:03:13PM  7   **A.**   I do.  I am unfortunately one of the few in our community

05:03:18PM  8   that does treat and doesn't do what the CDC has advised all

05:03:23PM  9   along, basically go home and if you get bad enough, come on

05:03:26PM 10   back.  They have in the last several months advocated the

05:03:29PM 11   monoclonal antibodies.

05:03:31PM 12        I also have been associated the last 20 months with a

05:03:34PM 13   group of doctors around the state -- it started with four or

05:03:37PM 14   five of us, we've grown to approximately 50 -- we're on weekly

05:03:41PM 15   calls together at least once a week, and we're keeping each

05:03:45PM 16   other updated, and about a dozen of us have accumulated -- this

05:03:50PM 17   data is from, like, six weeks ago -- have accumulated about

05:03:54PM 18   18,000 patients we've treated.

05:03:57PM 19        Personally I've treated several hundred.  A couple of the

05:04:00PM 20   doctors in our group own medical clinics, urgent care

05:04:05PM 21   facilities, and we've treated over 18,000.  None of my personal

05:04:09PM 22   patients have died.  And of the eight of the 18,000 or more

05:04:13PM 23   patients that have died, all of them came to us after day 8 --

05:04:18PM 24   no, correction, after day 5, and they did not follow the

05:04:21PM 25   treatment plans that we've advocated for the other patients.

**STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER**

05:04:27PM  1   **Q.**   As a result of your treatment in practice, in general

05:04:30PM  2   practice, but also specifically in treating COVID patients,

05:04:33PM  3   have you been asked to serve in any task force related to

05:04:37PM  4   COVID?

05:04:37PM  5   **A.**   Yes, sir.   I was initially -- this is what led to my

05:04:41PM  6   jumping in the deep end in COVID in February of '20.   I'm one

05:04:46PM  7   of five -- I was one of five colonels in the Alabama

05:04:48PM  8   National -- Army National Guard, and we were put on a task

05:04:53PM  9   force in order to come up with contingency plans to give to our

05:04:58PM 10   governor.   As a civilian, I went to them and talked to the

05:05:02PM 11   governor about 45 minutes -- this was at the end of March --

05:05:06PM 12   advocated, based on the data we knew then, we did not need to

05:05:09PM 13   close the state.   They said I was the only one that --

05:05:12PM 14   **Q.**   Okay.   Let me back up.

05:05:14PM 15          THE COURT:  Hold on one second.

05:05:14PM 16          MR. STAVER:  I'm sorry.

05:05:16PM 17          THE COURT:  You live where?

05:05:17PM 18          THE WITNESS:  In Montgomery, Alabama.

05:05:19PM 19          THE COURT:  All right.  And that's where you're --

05:05:21PM 20   you're in the Alabama National Guard?

05:05:24PM 21          THE WITNESS:  I retired last September.

05:05:26PM 22          THE COURT:  I see.

05:05:26PM 23          From the Guard?

05:05:27PM 24          THE WITNESS:  Yes, sir.

05:05:27PM 25          THE COURT:  All right.

## STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER

05:05:28PM   1          Excuse me.  Go ahead.

05:05:30PM   2          MR. STAVER:  No problem.  Thank you.

05:05:31PM   3   **Q.**   (By Mr. Staver)  So you have been asked to serve on a

05:05:34PM   4   COVID task force?

05:05:35PM   5   **A.**   Yes, sir.  And so that led to a big awakening in the

05:05:40PM   6   Governor's office at the end of March, because they didn't

05:05:42PM   7   follow my advice, they closed things down, they realized things

05:05:44PM   8   weren't going well.  So they started calling me more and more

05:05:46PM   9   that summer.  That led to, in October of that -- of '20, the

05:05:50PM   10  CDC put out a directive to all the states that they come up a

05:05:55PM   11  vaccine working group.

05:05:57PM   12         A couple of days after that directive, the State of

05:06:01PM   13  Alabama's health officer put forward their list of 65

05:06:04PM   14  personnel.  Three of those are clergy.  Of the -- besides those

05:06:08PM   15  three, all of them are affiliated with the State.  And so the

05:06:11PM   16  Governor then said, "Dr. Tankersley, will you" -- as a

05:06:15PM   17  civilian, not as a guardsmen -- "will you go serve on that task

05:06:18PM   18  force?"  I was their sole appointee to it.  And --

05:06:21PM   19  **Q.**   So is that something that you have been doing over the

05:06:23PM   20  last several months?

05:06:25PM   21  **A.**   I have been -- I started that next week and was appalled

05:06:30PM   22  by what I -- all the things I saw that were done so improperly.

05:06:34PM   23  And as a result of this -- I've been an -- always an advocate

05:06:38PM   24  for vaccines, but then I saw about the evidence coming out

05:06:41PM   25  about this, really --

STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER

05:06:43PM  1  **Q.**  When you say "this," you're talking about COVID vaccines?

05:06:46PM  2  **A.**  COVID vaccines, yes, sir.  That was the test.

05:06:47PM  3  **Q.**  So you've been a vaccine advocate but have changed your

05:06:52PM  4  position with regards to COVID vaccines?

05:06:54PM  5  **A.**  Amen.  Yes, sir, because --

05:06:55PM  6  **Q.**  All right.  Let me ask you --

05:06:56PM  7         MR. STAVER:  Let me present Dr. Tankersley as a

05:06:59PM  8  expert in family medicine who also is an expert in treating

05:07:04PM  9  COVID patients.  I want to tender him to the Court.

05:07:08PM 10         THE WITNESS:  Outpatient.  Yes, sir.  Outpatient --

05:07:09PM 11         MR. STAVER:  In outpatient situations.

05:07:12PM 12         THE COURT:  All right.  Would the defense like to

05:07:13PM 13  voir dire this witness?

05:07:15PM 14         MS. POWELL:  Yes.  And we're happy to hold that until

05:07:18PM 15  it's done, or we can do it now.  It's your preference.

05:07:21PM 16         THE COURT:  It's your preference.

05:07:23PM 17         MR. STAVER:  Do you want to wait for -- whatever.

05:07:27PM 18  I'm okay either way.

05:07:27PM 19         MS. POWELL:  We'll wait.

05:07:28PM 20         MR. STAVER:  All right.

05:07:28PM 21         THE COURT:  All right.

05:07:28PM 22         MR. STAVER:  All right.  Very good.  Thank you.

05:07:29PM 23  **Q.**  (By Mr. Staver)  All right.  I want you to -- just because

05:07:32PM 24  of time, we have to move through this fairly quickly.  I want

05:07:35PM 25  you to look at page -- or tab 9, the notebook in front of you.

**STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER**

05:07:49PM  1  Have you, in your research with regards to treating COVID,

05:07:53PM  2  researched this particular article under tab 9?

05:07:58PM  3  **A.**   Yes, sir.

05:08:00PM  4  **Q.**   And in this particular article, it talks about the

05:08:10PM  5  mRNA-LNP platform that's in the Pfizer and Moderna shots; is

05:08:16PM  6  that correct?

05:08:16PM  7  **A.**   Yes, sir.

05:08:17PM  8  **Q.**   And the LNP is what?

05:08:19PM  9  **A.**   The lipid nanoparticle.  It is the designed envelope in

05:08:24PM 10  which the SARS2 is injected into the body.

05:08:29PM 11  **Q.**   And the lipid nanoparticle, as it relates to mRNA, is

05:08:35PM 12  designed to be a transmitter of the mRNA into the cells in a

05:08:41PM 13  quicker way than just having the mRNA by itself?

05:08:45PM 14  **A.**   Exactly.  And that's a very important point you make,

05:08:47PM 15  because the lipid nanoparticle envelope that is in the Pfizer

05:08:52PM 16  did not release it to other countries, but Japan required them

05:08:56PM 17  to get -- release that data initially in order to get the

05:08:59PM 18  approval in Japan.

05:09:00PM 19      When they gave them the data, it was then transcribed into

05:09:05PM 20  English.  A few months later, somebody found out about it,

05:09:09PM 21  Dr. Brown -- it showed that the -- that this nanoparticle, this

05:09:13PM 22  lipid nanoparticle, accumulates within hours throughout the

05:09:17PM 23  body, in every organ.

05:09:18PM 24  **Q.**   So it doesn't stay in the injection site?

05:09:21PM 25  **A.**   It does not.

**STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER**

05:09:21PM 1    **Q.**   And did that Japanese study, with regards to the mRNA

05:09:26PM 2    vaccines with the lipid nanoparticle, indicate that it had a

05:09:30PM 3    high concentration in the liver and, I believe, spleen but at

05:09:34PM 4    least liver and also the ovaries?

05:09:36PM 5    **A.**   Not as much the liver.  This is not a study that was done

05:09:39PM 6    by Japan.  This was Pfizer's own data, and so it showed that

05:09:44PM 7    the -- accumulates.  This lipid nanoparticle, which was studied

05:09:47PM 8    differently than the -- the outside of the messenger RNA inside

05:09:55PM 9    of it, but it itself accumulates.  And not only that -- and

05:09:55PM 10   this study points to it -- it is highly inflammatory.

05:09:59PM 11   **Q.**   I want you to look at page 8 of that article.  It talks

05:10:07PM 12   about the vaccination, the mRNA vaccination with the LNP, the

05:10:14PM 13   delivery mechanism --

05:10:14PM 14   **A.**   The lipid --

05:10:15PM 15   **Q.**   -- that bypasses your typical immune system, that it is

05:10:19PM 16   likely associated with robust innate inflammation --

05:10:19PM 17   **A.**   That's right.

05:10:25PM 18   **Q.**   -- introduced by the LNPs.  Do you see that?

05:10:27PM 19   **A.**   I -- yes, sir.  And that's important because of -- it's

05:10:30PM 20   the innate system that is inflamed and that can lead to other

05:10:35PM 21   problems like what we're fearful of.  The evidence in prior

05:10:38PM 22   studies before 2021 -- before 2020 that if you -- that these,

05:10:47PM 23   in other messenger RNA studies, can potentiate a change in

05:10:52PM 24   cells in the human body, and that inflammation that the

05:10:56PM 25   envelope allows for is what adds to the potential downside.

**STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER**

05:11:02PM  1   **Q.**   It increases the inflammation?

05:11:04PM  2   **A.**   Yes, sir.

05:11:04PM  3   **Q.**   So mRNA had never been used before in human vaccinations?

05:11:09PM  4   **A.**   I think they have been used in -- in the 60s tried it with

05:11:13PM  5   RSV, and it was a failure.  More children died from the -- that

05:11:17PM  6   were vaccinated than without it.

05:11:18PM  7   **Q.**   And then adding to the mRNA, which is Pfizer and Moderna,

05:11:21PM  8   you have the delivery mechanism, which is the lipid

05:11:25PM  9   nanoparticles?

05:11:25PM 10   **A.**   Yes, sir.  But it's super important that you understand

05:11:28PM 11   what you're -- what -- of this article.  The inflammation

05:11:31PM 12   caused by the lipid nanoparticle and the potential changes that

05:11:36PM 13   it results in that can lead to -- and we're very fearful of --

05:11:40PM 14   an increase in cancers.

05:11:42PM 15   **Q.**   I want to get to that in a few moments.

05:11:45PM 16              MR. STAVER:  I'd like to introduce that as another

05:11:47PM 17   plaintiffs' exhibit, which is tab 9, that may be -- I don't

05:11:51PM 18   have the numbers in front of me, Your Honor.  It may be 12.  I

05:11:54PM 19   don't know what the next one is there.

05:11:55PM 20              THE COURT:  The article is 9.

05:11:57PM 21              MR. STAVER:  Yes, the article is tab 9.

05:12:03PM 22              THE WITNESS:  Exhibit 11.

05:12:03PM 23              THE COURT:  So Plaintiffs' 9 is received --

05:12:03PM 24              MR. STAVER:  Okay.

05:12:05PM 25              THE COURT:   -- subject to the earlier ruling.

**STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER**

05:12:05PM 1          (Plaintiffs' Exhibit 9 admitted.)

05:12:05PM 2          MR. STAVER:  Thank you.

05:12:09PM 3   Q.   (By Mr. Staver)  I want to take you to tab 10, continuing

05:12:11PM 4   on the inflammation and the mRNA and the LNP.  Have you

05:12:18PM 5   reviewed that article as part of your --

05:12:18PM 6   A.   Yes, sir.

05:12:19PM 7   Q.   -- research and treatment?

05:12:21PM 8   A.   And this is a Dr. Seneff, I've followed her, read many of

05:12:27PM 9   her articles.  She's a brilliant lady out of --

05:12:27PM 10          THE COURT:  Let me ask you to stop just a second.

05:12:29PM 11  You're going to need to slow down just a little bit.  And I

05:12:32PM 12  know everybody's conscious of time, but we can't blitz through

05:12:36PM 13  this.  And we need to wait until he finishes the question --

05:12:39PM 14          THE WITNESS:  Yes, sir.

05:12:40PM 15          THE COURT:  -- before you begin the answer, and then

05:12:42PM 16  it might be good to just let a little bit of a second pass

05:12:45PM 17  between the two.

05:12:45PM 18          THE WITNESS:  Yes, sir.  I'm sorry.

05:12:46PM 19          THE COURT:  All right.  Can you resume?

05:12:50PM 20  Q.   (By Mr. Staver)  So the question is, have you reviewed

05:12:54PM 21  this article regarding innate immune suppression by SARS-CoV-2

05:13:01PM 22  mRNA vaccinations?

05:13:02PM 23  A.   Yes, sir.

05:13:02PM 24  Q.   You've done that as part of your research and treatment?

05:13:05PM 25  A.   Yes, sir.  I've read plenty of her articles.  She's out of

STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER

05:13:08PM 1    MIT and is very, very well respected.

05:13:11PM 2    Q.   Now, this article says that the mRNA vaccinations in this

05:13:15PM 3    context of infections has no prior precedent.

05:13:20PM 4    A.   That is correct.

05:13:20PM 5    Q.   Do you agree with that?

05:13:22PM 6    A.   I would definitely agree with that.

05:13:24PM 7    Q.   Let me just hit some of the highlights, because it's too

05:13:29PM 8    much for us to go through in the short time that we have.  But

05:13:33PM 9    I want you to -- I want you to go to page 6 of that article,

05:13:48PM 10   beginning of the second paragraph.  This goes back to the first

05:13:51PM 11   article about the delivery mechanism.

05:13:56PM 12       It says, "For a successful mRNA vaccine design, the mRNA

05:13:59PM 13   needs to be encapsulated in carefully constructed particles

05:14:02PM 14   that can protect the RNA from degradation by RNA

05:14:11PM 15   depolymerases."  Do you see that?

05:14:12PM 16   A.   I do, yes, sir.

05:14:13PM 17   Q.   Is that the same thing we were talking about in the

05:14:15PM 18   previous article?  To deliver the mRNA, it has to have this

05:14:18PM 19   encapsulation?

05:14:20PM 20   A.   Yes, sir.

05:14:21PM 21   Q.   Now, the article also says, on page 13, under the

05:14:30PM 22   Section 9, regarding impaired DNA repair and adaptive immunity.

05:14:30PM 23   You see that?

05:14:38PM 24   A.   Yes, sir.

05:14:38PM 25   Q.   And in the natural course of situations without the mRNA

STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER

05:14:40PM 1   introduced into your system with the lipid nanoparticle, does

05:14:44PM 2   your DNA fray or get damaged?

05:14:48PM 3   A.   That's right.  Our DNA normally, just in everyday --

05:14:55PM 4   pre-COVID, you know -- it has nothing to do with whether we're

05:14:58PM 5   in COVID or not.  It's just that's the way we are -- I mean

05:15:01PM 6   the -- our body normally -- it's normal part of every cell,

05:15:08PM 7   that it can potentially be injured.

05:15:11PM 8   Q.   Okay.  So then when you have the mRNA with this delivery

05:15:14PM 9   mechanism of the lipid nanoparticle, does that interfere with

05:15:20PM 10  your body's innate ability to repair damaged DNA?

05:15:24PM 11  A.   Exactly.  The innate ability of our body the Lord's given

05:15:28PM 12  us is, if it sees in -- if we have breaks in the DNA that are

05:15:33PM 13  abnormal, we have reparative processes that our body does all

05:15:38PM 14  the time.

05:15:40PM 15  Q.   Now, this article also talks about damaged DNA and the

05:15:44PM 16  development of thrombocytopenia, as well as the developments of

05:15:49PM 17  cancer post the RNA vaccine.  Are you aware of that?

05:15:54PM 18  A.   Yes, sir.

05:15:54PM 19  Q.   And is that because your innate immune system is damaged

05:15:58PM 20  by the introduction of this vaccines with regards to RNA?

05:16:03PM 21  A.   It is potentially for one of the types of thrombocytopenia

05:16:07PM 22  but not for the other one that has one of the -- it's one of

05:16:08PM 23  the four prevent- -- four causes of not receiving the vaccine.

05:16:14PM 24  It's vaccine-induced thrombocytopenia.

05:16:19PM 25  Q.   Okay.  And are you aware of individuals getting cancer

## STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER

05:16:23PM 1  that were not cancer-symptomatic prior to these mRNA and that

05:16:28PM 2  the cancer rapidly advanced after the mRNA injected into their

05:16:32PM 3  body?

05:16:33PM 4  A.    The signals are there, but, once again, we don't get to

05:16:36PM 5  have the end-up study that we would normally expect from the

05:16:40PM 6  bigger larger scientific community.  But the pathological

05:16:44PM 7  process, we believe, is firm.

05:16:47PM 8  Q.    So the pathological process is there to allow something

05:16:50PM 9  like that to happen, is what you're saying?

05:16:52PM 10 A.    Yes, sir.  We think the science -- I believe the science

05:16:54PM 11 to be firm on that.

05:16:55PM 12 Q.    Now, when you're seeing somebody in your office, as a

05:16:59PM 13 family practice, general medicine doctor, and they say, "I

05:17:02PM 14 didn't have any back pain, but I lifted, I turned something.

05:17:07PM 15 Now I have back pain that is radiating into my sciatica," do

05:17:14PM 16 you, based on that, develop a causal relationship just by

05:17:18PM 17 clinical examination without an empirical study?

05:17:21PM 18 A.    Are you referring to somebody after the vaccine or just in

05:17:23PM 19 general?

05:17:23PM 20 Q.    I'm just talking about in general.

05:17:25PM 21 A.    Sure.

05:17:25PM 22 Q.    You don't need a --

05:17:25PM 23 A.    Exactly, yes.

05:17:26PM 24 Q.    -- clinical study for every diagnosis in your office, do

05:17:29PM 25 you?

## STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER

05:17:29PM 1    A.   That's right.  No, you don't.

05:17:30PM 2    Q.   You listen to the clinical findings -- the clinical

05:17:33PM 3    presentation?

05:17:34PM 4    A.   Yes, sir.

05:17:34PM 5    Q.   And you look at time before and after an event happened --

05:17:38PM 6    A.   Yes, sir.

05:17:38PM 7    Q.   -- that didn't happen before, and now you're seeing a

05:17:41PM 8    patient because of an event that interceded --

05:17:43PM 9    A.   That is correct.

05:17:44PM 10   Q.   -- is that right?

05:17:45PM 11   A.   That is correct.

05:17:46PM 12   Q.   That being the case, have you seen or are you aware of

05:17:49PM 13   those situations in which mRNA was introduced into somebody who

05:17:53PM 14   was cancer-free or nonsymptomatic and developed a rapid onset

05:17:57PM 15   of cancer?

05:17:58PM 16   A.   I've had patients and this group of doctors we speak of --

05:18:01PM 17   with every week, multiple times a week obviously, we have seen

05:18:07PM 18   cases since, but the whole point is that the evidence for --

05:18:12PM 19   it's not my opinion -- the evidence for this type of mechanism

05:18:16PM 20   to occur --

05:18:16PM 21   Q.   Right.

05:18:17PM 22        It's already been established?

05:18:19PM 23   A.   Right.

05:18:19PM 24   Q.   Okay.  So on page 16, down at the bottom, the condition

05:18:25PM 25   from which Dr. Chambers testified he's suffering from following

**STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER**

05:18:30PM 1   the mRNA Moderna vaccine, is that listed there, with regards to

05:18:33PM 2   a demyelinating disease happening within 21 days of the

05:18:38PM 3   introduction?

05:18:39PM 4   A.   It is.  Chronic neuroinflammation mediated by -- yes, sir.

05:18:43PM 5   Q.   On page 17, is -- toward the bottom of that second

05:18:48PM 6   paragraph, does it also indicate that as a result of the mRNA

05:18:54PM 7   vaccines, that -- increase risk of myocarditis?

05:18:59PM 8   A.   It sure does.  And I believe that some countries in Europe

05:19:03PM 9   have already banned it in those under 30.

05:19:06PM 10  Q.   What would be in terms of your final conclusion as to how

05:19:09PM 11  you as a physician would practice with regards to these

05:19:14PM 12  vaccines and treatment of patients, based upon this article

05:19:17PM 13  and -- particularly this article?

05:19:19PM 14  A.   Right.  This article validates several other articles.

05:19:23PM 15  And this gets to one of the two biggest problems that this --

05:19:28PM 16  that has been revealed, in my opinion, in the last two years,

05:19:30PM 17  and that is the lack of dialogue.

05:19:32PM 18  Q.   Could I ask you to, while you're doing that, look at the

05:19:34PM 19  conclusions section on page 21.

05:19:37PM 20  A.   Yes, sir.  So the lack of dialogue in science, it's a --

05:19:42PM 21  Q.   In terms of the conclusion that's listed there?

05:19:46PM 22  A.   Right.

05:19:47PM 23  Q.   It says, "It is imperative that worldwide administration

05:19:49PM 24  of the mRNA vaccinations be stopped immediately until further

05:19:53PM 25  studies are conducted to determine the extent of the potential

STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER

05:19:58PM  1  pathologic consequences outlined in this paper."

05:20:02PM  2      And do you agree with that?

05:20:07PM  3  **A.**    Absolutely.   It should have been --

05:20:07PM  4  **Q.**    And you were talking about the lack of dialogue when you

05:20:10PM  5  have papers that are written in scientific journals like this,

05:20:15PM  6  raising alarms, and yet there's suppression of dialogue.   Is

05:20:18PM  7  that what you were getting ready to refer to?

05:20:21PM  8  **A.**    That's exactly right, because I was asked to be -- to come

05:20:24PM  9  before the Alabama board of medical association in May by the

05:20:28PM 10  president, because I'd been talking to him, I'd known him for

05:20:32PM 11  years, and he said, "I finally understand what you've been

05:20:35PM 12  telling me."

05:20:36PM 13      When I made the presentation, he invited me to come, I

05:20:39PM 14  went with three of the -- my colleagues, and we presented

05:20:42PM 15  evidence for 2 1/2 hours.   This has never been done on the

05:20:45PM 16  board, and they sat there for 2 1/2 hours receiving the data.

05:20:49PM 17  We begged for dialogue; they refused.

05:20:53PM 18  **Q.**    At the conclusion paragraph, in the end it says, "We are

05:20:58PM 19  not exaggerating to say that billions of lives are at stake.

05:21:02PM 20  We call upon the public health institutions to demonstrate with

05:21:06PM 21  evidence why the issues discussed in this paper are not

05:21:09PM 22  relevant to public health or to acknowledge that they are and

05:21:13PM 23  to act accordingly."

05:21:15PM 24      That is what you're referring to in terms of scientific

05:21:18PM 25  medical dialogue that is necessary?

**STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER**

05:21:20PM 1  **A.**   They refused to ask why nine people or 25,000 or 250,000

05:21:28PM 2  in the CDC VAERS site have died.  Because there has to be --

05:21:33PM 3  it's not the needle in the arm.  There's a pathophysiological

05:21:38PM 4  process going on, and they refused to dialogue about what that

05:21:42PM 5  that process may be.  And we think there's evidence that that

05:21:47PM 6  is clearly the spike protein and the lipid nanoparticle.

05:21:52PM 7  **Q.**   Has there been any kind of suppression of this kind of

05:21:53PM 8  dialogue, in the history of your medical practice, that you've

05:21:55PM 9  seen with regards to COVID?

05:21:57PM 10 **A.**   I've never seen anything like this.  Both in the military

05:22:01PM 11 and in the civilian world, I've never seen anything like this.

05:22:06PM 12 **Q.**   You've had your feet in both worlds for some time until

05:22:09PM 13 September of 2021, correct?

05:22:10PM 14 **A.**   Yes, sir.

05:22:11PM 15 **Q.**   Military and civilian?

05:22:13PM 16 **A.**   Yes, sir.

05:22:13PM 17 **Q.**   And have you seen it both in the military as well as the

05:22:13PM 18 civilian?

05:22:16PM 19 **A.**   Yes, sir.  A good friend of mine who is a state surgeon

05:22:19PM 20 and been -- I've known him for 25 years.  I begged him to look

05:22:22PM 21 at the data.  He knew my background.  He knew what I knew about

05:22:25PM 22 it.  He said, "I can't.  This is from NGB, National Guard

05:22:29PM 23 Bureau, the order.  Everybody is going to get the jab."

05:22:32PM 24 **Q.**   All right.  I want you to turn to what's tab 18, and I

05:22:38PM 25 want you to identify what that document is, the first part of

## STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER

05:22:42PM 1  it.  There's two documents under tab 18.  First one is entitled

05:22:47PM 2  COVID-19 Early Treatment, Real-Time Analysis of 1514 Studies.

05:22:54PM 3  Are you familiar with that?

05:22:54PM 4  A.    I do.  Yes, sir.

05:22:55PM 5  Q.    And where is that from?

05:22:57PM 6  A.    This is on tab 17 -- 18?

05:23:00PM 7  Q.    Tab 18.

05:23:00PM 8  A.    Oh, great.  Yes.

05:23:01PM 9  Q.    Who produces that?

05:23:03PM 10  A.    This is the most important website to medicine, I believe,

05:23:08PM 11  that's been created in the last year and a half.  This is the

05:23:11PM 12  association -- the American Association of Physicians and

05:23:17PM 13  Surgeons' c19data -- c19study.com.  This is a repository of all

05:23:24PM 14  agents that are being looked at for treating COVID.  It is

05:23:29PM 15  daily updated.

05:23:31PM 16  Q.    And, in fact, while it's -- you're looking at it daily

05:23:33PM 17  updated, I want you to look quickly toward the -- these pages

05:23:38PM 18  aren't numbered, but if you flip to the end, you'll see recent

05:23:43PM 19  studies, March 8, March 7, March 4, March 4, March 3, March 2,

05:23:48PM 20  March 2.  Do you see that?

05:23:50PM 21  A.    Yes, sir.  And that's of any of these 30 or so agents.

05:23:53PM 22  Q.    All right.  So that -- whenever a new study worldwide

05:23:57PM 23  comes out in any of these 30 medications, it adds to this --

05:24:01PM 24  A.    They review and --

05:24:02PM 25        THE COURT:  One at a time.

## STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER

05:24:02PM 1      THE WITNESS:  Yes, sir.  I'm sorry.

05:24:02PM 2      THE COURT:  One at a time, and slow down just a bit

05:24:03PM 3  so we can follow you and so we don't --

05:24:05PM 4      THE WITNESS:  I'm so sorry.  Yeah.

05:24:08PM 5      THE COURT:  -- don't completely exhaust the reporter.

05:24:10PM 6      THE WITNESS:  Yeah, I'm sorry.

05:24:10PM 7  Q.   (By Mr. Staver)  So anytime a study globally comes out in

05:24:14PM 8  any one of these 30 medications with regards to treatment of

05:24:19PM 9  COVID-19, they review it, and when that is reviewed, it is

05:24:24PM 10  added to this database?

05:24:26PM 11  A.   If they believe it to be credible, which the vast majority

05:24:29PM 12  of times, they do.

05:24:30PM 13  Q.   Okay.  So the very first one is Paxlovid, and it says

05:24:35PM 14  there's an 83 percent improvement, but there's only two

05:24:39PM 15  studies; is that right?

05:24:41PM 16  A.   Paxlovid, yes, sir.

05:24:41PM 17  Q.   And is that because those are Pfizer studies?

05:24:45PM 18  A.   Well, they are both -- both of the Paxlovid studies are --

05:24:48PM 19  Q.   Are Pfizer.  In other words, there's no other study yet on

05:24:51PM 20  Paxlovid, except for Pfizer?

05:24:52PM 21  A.   That's correct.

05:24:52PM 22  Q.   And that is a -- Paxlovid is a Pfizer product?

05:24:55PM 23  A.   Yes, sir.

05:24:55PM 24  Q.   Okay.  On the same page, ivermectin.  We've heard that

05:24:59PM 25  several times.  81 studies, and it has 64 -- 65 percent

**STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER**

05:25:06PM 1  improvement with regards to treating of COVID.  Do you see

05:25:11PM 2  that?

05:25:11PM 3  **A.**   I'm familiar with ivermectin being very effective.

05:25:14PM 4  **Q.**   So the rest of the column, without going through each one

05:25:18PM 5  of these, of course, it gives, based upon the cumulative

05:25:20PM 6  studies that come in for each one of these medications, the

05:25:26PM 7  percentage of improvement that that particular medication has

05:25:30PM 8  evidenced, combined with the others that are already in

05:25:34PM 9  existence in this database; is that right?

05:25:37PM 10  **A.**   Yes, sir.

05:25:39PM 11  **Q.**   So the one that Dr. Fauci has recommended is remdesivir

05:25:45PM 12  once you get hospitalized, and yet that shows it almost at the

05:25:48PM 13  bottom of effectiveness?

05:25:50PM 14  **A.**   Yes, sir.

05:25:51PM 15  **Q.**   The point is, are there other kinds of treatment, other

05:25:55PM 16  than the vaccine itself, to introduce the mRNA or the DNA-type

05:26:00PM 17  of version of the Janssen into your body -- are there other

05:26:06PM 18  kinds of ways to treat and prevent COVID than the vaccines that

05:26:11PM 19  are in existence?

05:26:13PM 20  **A.**   Absolutely, yes, sir.  And the safety profile is

05:26:18PM 21  staggeringly different.

05:26:19PM 22  **Q.**   What do you mean by that?

05:26:20PM 23  **A.**   The safety profile of ivermectin has been around for

05:26:26PM 24  50 years.  Some studies say zero, some studies say 340 people

05:26:31PM 25  in the world, in 4 billion doses, have died from it -- as a

STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER

05:26:36PM 1   result of it in its history.  And yet remdesivir, on -- in the

05:26:42PM 2   middle of September last year, there was a large study done

05:26:44PM 3   that should have put the nail in the coffin for remdesivir, but

05:26:49PM 4   it is a huge moneymaking medicine.  There are too many -- I

05:26:57PM 5   think it would be appropriate to say unethical contractual

05:27:04PM 6   obligations between the hospitals to give this medication that

05:27:08PM 7   has so poor of a record -- track record with the evidence, but

05:27:11PM 8   they are obligated by -- under NIH protection to giving it to

05:27:16PM 9   their patients.

05:27:17PM 10  Q.   So any physician, whether in the military or in civilian

05:27:21PM 11  practice, can have access to this and determine what's the most

05:27:24PM 12  effective medication that's been on the market other than

05:27:28PM 13  Paxlovid, because that's new, and remdesivir is new.  But many

05:27:32PM 14  of these have been on the market for a long time in terms of

05:27:35PM 15  treating COVID; is that right?

05:27:36PM 16  A.   That is what we've had wonderful success with, yes.

05:27:39PM 17       MR. STAVER:  I'd like to introduce that article

05:27:41PM 18  there -- that document there, which is tab 18 as the next

05:27:48PM 19  plaintiffs' exhibit, and then --

05:27:49PM 20       THE COURT:  In accord with the earlier ruling --

05:27:49PM 21       MR. STAVER:  Okay.

05:27:51PM 22       THE COURT:  -- the Plaintiffs' 18 is received.

05:27:55PM 23       (Plaintiffs' Exhibit 18 admitted.)

05:27:55PM 24  Q.   (By Mr. Staver)  The next one behind that c19 document, in

05:28:00PM 25  the same tab 18, is an article from ScienceDirect.  Have you

## STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER

05:28:07PM 1 read that article?  And this is an abstract of it.  Have you

05:28:10PM 2 read the full article?

05:28:11PM 3 A.   It came out last Friday, I believe.

05:28:14PM 4 Q.   So this is brand-new?

05:28:15PM 5 A.   (Nods head.)

05:28:16PM 6 Q.   And it says -- at the conclusion on the second, it says,

05:28:21PM 7 for example, that this study included 1,761,060 patients,

05:28:31PM 8 COVID-19 patients.  You see that at the top of page 2?

05:28:35PM 9 A.   I hear what -- yes, sir.

05:28:39PM 10 Q.   That's one of the largest studies of this kind in the

05:28:42PM 11 world?

05:28:42PM 12 A.   It is.  But it's a little different than just that

05:28:46PM 13 1.7 million stunning, huge number.  This is a -- an intentional

05:28:51PM 14 look at its effect on -- because part of that number comes from

05:28:58PM 15 2009 until now.

05:28:58PM 16 Q.   Okay.

05:28:59PM 17 A.   So when you dial down into it, you see that it is being

05:29:04PM 18 directly compared in the last two years -- or in the last year

05:29:08PM 19 and a half to remdesivir.

05:29:10PM 20 Q.   So, in fact, the conclusion is that ivermectin was

05:29:13PM 21 associated with decreased mortality in patients with COVID-19

05:29:16PM 22 compared to remdesivir?

05:29:19PM 23 A.   Absolutely.  70 percent.

05:29:21PM 24 Q.   Okay.

05:29:22PM 25 A.   70 percent.

## STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER

05:29:24PM   1        MR. STAVER:  I want to introduce that as our

05:29:26PM   2   plaintiffs' next exhibit, Your Honor.

05:29:29PM   3        THE COURT:  Is this 19?

05:29:30PM   4        MR. STAVER:  This would be our tab 19.  That's -- I'm

05:29:33PM   5   sorry -- our tab 18 at the very end.  It's a two-page document,

05:29:38PM   6   just before tab 19.

05:29:38PM   7        THE COURT:  Yeah, it's just before tab 19.  All

05:29:38PM   8   right.

05:29:38PM   9        MR. STAVER:  Yeah, yeah.

05:29:41PM  10        THE COURT:  So that -- 18 is received, in accord with

05:29:45PM  11   the earlier ruling.

05:29:48PM  12   Q.   (By Mr. Staver)  And I think the final one,

05:29:51PM  13   Dr. Tankersley, is -- if you can turn to tab 19.  Is this an

05:29:59PM  14   article that you also, as part of your practice and research,

05:30:01PM  15   have reviewed with regards to treating COVID patients?

05:30:06PM  16   A.   Yes, sir.

05:30:07PM  17   Q.   Now, what is the conclusion of that article, in your

05:30:13PM  18   opinion?

05:30:13PM  19   A.   It's unequivocal, its benefit -- ivermectin's benefit in

05:30:16PM  20   the prophylaxis and treatment.

05:30:18PM  21        You might note that this is the *American Journal of*

05:30:22PM  22   *Therapeutics*.  It was printed last year.  I think it was around

05:30:25PM  23   the -- in the summertime of last year.  But more importantly

05:30:27PM  24   than this, even, is the state -- it came out of Brazil at the

05:30:32PM  25   end of the year, December 28th, I believe.  220,000 people.

**STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER**

05:30:37PM 1   220,000 people is a huge population showed as prophylaxis early
05:30:44PM 2   and late treatment.
05:30:46PM 3        For prophylaxis, it's hard to win on patients that have
05:30:48PM 4   diabetes because their immune system.  In that study, if they
05:30:53PM 5   took it prophylactically, it reduced the diabetics' mortality
05:30:57PM 6   81 percent.  30, 40 percent is a big win with diabetics.
05:31:04PM 7   81 percent in that study.  And this validates -- of course, it
05:31:07PM 8   validates what this study is talking about.
05:31:09PM 9   Q.   Are you familiar with the term "meta-analysis"?
05:31:12PM 10  A.   Yes, sir.
05:31:12PM 11  Q.   And a meta-analysis is an analysis of other studies?
05:31:16PM 12  A.   It's a combination evaluation.
05:31:20PM 13  Q.   So this conclusion is, "Meta-analysis based on 18
05:31:23PM 14  randomized controlled treatment trials of ivermectin and
05:31:30PM 15  COVID-19 have found large statistically significant reductions
05:31:34PM 16  in mortality, time to clinical recovery, and time to viral
05:31:41PM 17  clearance.  Furthermore, the results from numerous controlled
05:31:45PM 18  prophylaxis trials report significantly reduced risk of
05:31:49PM 19  contracting COVID-19 with the regular use of ivermectin.
05:31:54PM 20  Finally, the many examples of ivermectin distribution campaigns
05:31:59PM 21  leading to rapid population-wide decreases in morbidity and
05:32:04PM 22  mortality indicate that an oral agent effective in all phases
05:32:08PM 23  of COVID-19 has been identified."
05:32:10PM 24       Do you agree with that assessment, based upon your
05:32:13PM 25  research and your clinical experience in treating COVID

**STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER**

05:32:17PM  1  patients?

05:32:18PM  2  A.   Absolutely, yes, sir.

05:32:19PM  3       MR. STAVER:  I would like to introduce that as our

05:32:22PM  4  next exhibit, Your Honor.

05:32:23PM  5       THE COURT:  And that is 19?

05:32:25PM  6       MR. STAVER:  That is our tab 19.  That's correct.

05:32:27PM  7       THE COURT:  And Plaintiffs' 19 is received, again,

05:32:30PM  8  subject to the earlier ruling.

05:32:32PM  9       MR. STAVER:  Thank you, Your Honor.

05:32:33PM 10       (Plaintiffs' Exhibit 19 admitted.)

05:32:33PM 11  Q.   (By Mr. Staver)  With regards to the issues of safety, do

05:32:44PM 12  you agree with the testimony that has been before you that

05:32:49PM 13  there are significant risks with regards to all of the COVID

05:32:54PM 14  vaccines?

05:32:54PM 15  A.   I don't see how anybody can look at last Monday's data

05:32:58PM 16  that was released about Pfizer's own knowledge of a year ago --

05:33:05PM 17  could conclude anything other than that.

05:33:07PM 18  Q.   With regards to the testimony with respect to efficacy,

05:33:10PM 19  whether it's preventing transmission or serious conditions of

05:33:13PM 20  COVID, do you agree with the previous testimony that it is

05:33:20PM 21  lacking effectiveness in preventing transmission, particularly

05:33:23PM 22  with Omicron?

05:33:25PM 23  A.   There is, without doubt, if you look at just within the

05:33:28PM 24  last month -- you mentioned it, but I don't think you went into

05:33:31PM 25  it -- very briefly -- that Israel had the -- one of the highest

**STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER**

05:33:35PM  1  vaccination rates and during the two-week period that I know

05:33:38PM  2  of, in looking at the data, had the highest per capita

05:33:43PM  3  positivity in the world.  And that brings to a very important

05:33:47PM  4  point.  If America is so adamant about getting this right --

05:33:52PM  5  and this was my presentation to Senator Tuberville before he

05:33:58PM  6  spoke to -- he's on the health committee in the Senate.  And I

05:34:00PM  7  started with, "How are we" -- "What would you grade America's

05:34:03PM  8  response?"

05:34:03PM  9      He said an F.  He -- an F.  I said I agree.  Why are we

05:34:07PM 10  still on Johns Hopkins website -- it's updated weekly.  We are

05:34:13PM 11  still in the bottom 20.  We range from 17 to 20 out of 185

05:34:18PM 12  countries in the world that -- on mortality rate.  This is

05:34:24PM 13  Johns Hopkins data.  We are abysmal.  This is not the

05:34:28PM 14  United States I thought we were.

05:34:30PM 15  **Q.**   You've heard the testimony of the commander.  You heard

05:34:35PM 16  the -- and you reviewed these affidavits that were filed --

05:34:40PM 17  well, let me ask -- go back.

05:34:41PM 18      You heard the testimony of the commander today, correct?

05:34:44PM 19  **A.**   Yes, sir.

05:34:44PM 20  **Q.**   Did you review the declarations that were filed by the

05:34:49PM 21  defendants?  I'm not going to, because of time, go into those.

05:34:52PM 22  **A.**   I did.

05:34:53PM 23  **Q.**   That would include Lescher, Yun, Rans, and Marks?

05:34:59PM 24  **A.**   Yes, sir.

05:35:01PM 25  **Q.**   Do you have an opinion as to whether COVID vaccination is

## STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER

05:35:05PM  1  the only way, particularly in the military for our plaintiffs

05:35:09PM  2  here, to be protected from COVID?

05:35:13PM  3  **A.**   Apparently, they have no view outside of that, based on

05:35:16PM  4  what I read.  But I think that the evidence --

05:35:18PM  5  **Q.**   What is your opinion?

05:35:19PM  6  **A.**   -- yes, it is case --

05:35:20PM  7  **Q.**   Do you disagree with their opinion that everyone would

05:35:24PM  8  have to be vaccinated in order to have military readiness?

05:35:28PM  9  **A.**   When I was deployed in '04, '05, and '08, several of the

05:35:33PM 10  people who came through did not get the anthrax.  We did not

05:35:37PM 11  turn them around and send them home.  I don't know why that

05:35:40PM 12  would be the case here, when anthrax is more lethal.

05:35:45PM 13  **Q.**   And, in fact, the anthrax vaccinations was rushed, was it

05:35:49PM 14  not?

05:35:49PM 15  **A.**   It was.

05:35:51PM 16  **Q.**   And was there not injuries, people still suffering --

05:35:51PM 17  **A.**   Absolutely.

05:35:54PM 18  **Q.**   -- from it today?

05:35:54PM 19  **A.**   Sorry.

05:35:54PM 20  **Q.**   Is that correct?

05:35:54PM 21  **A.**   That is correct.

05:35:55PM 22  **Q.**   In the military?

05:35:56PM 23  **A.**   Yes, sir.

05:35:57PM 24  **Q.**   And, finally, based upon your clinical experience and your

05:36:00PM 25  expertise and your research, are there other alternative ways

STEWART TANKERSLEY - DIRECT EXAM BY MR. STAVER

05:36:04PM  1  to prevent and treat COVID than vaccination?

05:36:08PM  2  **A.**   The first data came out that the saline nasal rinse that's

05:36:12PM  3  been mentioned, it's -- now we add Betadine to it.  Two

05:36:15PM  4  studies, one in Italy, one in France, showed that if you used

05:36:19PM  5  it in hospitalized patients, it decreased their

05:36:22PM  6  hospitalizations.  Saline nasal rinse, just adding that,

05:36:27PM  7  decreased their hospitalization by 2.8 days.  And their other

05:36:29PM  8  study showed ICU patients -- I don't know how -- ICU patients

05:36:33PM  9  decreased their hospitalization by two days, 2.0 days.

05:36:39PM 10  **Q.**   And in addition to nasal rinse, other medications that

05:36:43PM 11  you're using as a physician --

05:36:43PM 12  **A.**   Ivermectin --

05:36:43PM 13  **Q.**   Wait until I finish.

05:36:43PM 14  **A.**   Sorry.

05:36:50PM 15  **Q.**   In addition to the nasal rinse, other medications that are

05:36:54PM 16  in existence are effective that are on that list for treating

05:36:59PM 17  COVID?

05:37:00PM 18  **A.**   Yes, sir.

05:37:01PM 19          MR. STAVER:  I don't have any other questions.

05:37:03PM 20          THE COURT:  All right.  Thank you, Mr. Staver.

05:37:05PM 21          Has the defense cross-examination of this witness?

05:37:10PM 22          MS. POWELL:  Yes, Your Honor.

05:37:12PM 23          THE COURT:  You're recognized for that purpose,

05:37:15PM 24  Ms. Powell.

05:37:15PM 25          MS. POWELL:  Yes.

**STEWART TANKERSLEY - CROSS-EXAM BY MS. POWELL**

CROSS-EXAMINATION

05:37:17PM 1

05:37:17PM 2   BY MS. POWELL:

05:37:20PM 3   **Q.**   Dr. Tankersley, have you submitted in this case a

05:37:22PM 4   declaration?

05:37:23PM 5   **A.**   I have not.

05:37:24PM 6   **Q.**   Or an expert report?

05:37:26PM 7   **A.**   No, I have not.

05:37:27PM 8   **Q.**   Any other written material by you?

05:37:29PM 9   **A.**   No.

05:37:32PM 10   **Q.**   Have you ever medically examined Navy Commander, the

05:37:36PM 11   plaintiff in this --

05:37:37PM 12   **A.**   No.

05:37:39PM 13   **Q.**   Have you ever treated him?

05:37:39PM 14   **A.**   No.

05:37:40PM 15   **Q.**   Have you ever medically examined Lieutenant Colonel 2?

05:37:42PM 16   **A.**   No.

05:37:42PM 17   **Q.**   Or treated her?

05:37:44PM 18   **A.**   No.

05:37:46PM 19   **Q.**   You did your residency in family medicine, correct?

05:37:49PM 20   **A.**   Yes.  Yes.

05:37:50PM 21   **Q.**   Did you also do a residency in obstetrics?

05:37:53PM 22   **A.**   Two years.

05:37:54PM 23   **Q.**   Okay.  Do you have residency or certification in

05:38:01PM 24   immunology?

05:38:03PM 25   **A.**   Not --

STEWART TANKERSLEY - CROSS-EXAM BY MS. POWELL

05:38:03PM   1   **Q.**   Or --

05:38:04PM   2   **A.**   -- other than what we would normally be trained with.

05:38:07PM   3   **Q.**   Sure, sure.

05:38:07PM   4        Genetics?

05:38:09PM   5   **A.**   Other than what we would normally be trained with.  But in

05:38:11PM   6   OB, we got a little more than normal.

05:38:14PM   7   **Q.**   Or epidemiology?

05:38:17PM   8   **A.**   I do not have.

05:38:21PM   9   **Q.**   The plaintiffs, I believe, said they were qualifying you

05:38:25PM   10   as an expert on family medicine and COVID treatment.  Are COVID

05:38:36PM   11   vaccines a treatment for COVID?

05:38:38PM   12   **A.**   They've turned into that.  They usually weren't

05:38:41PM   13   considered -- vaccines weren't considered that, but apparently

05:38:44PM   14   some people now view the vaccines as treatment.

05:38:46PM   15   **Q.**   They're considered a preventative, right, not a

05:38:50PM   16   therapeutic?

05:38:51PM   17   **A.**   That's what they have traditionally been.

05:38:54PM   18   **Q.**   You talked a little bit about data you've collected on

05:38:58PM   19   your patients and other patients of doctors.  That's not

05:39:01PM   20   something that is here for us to examine, right?  It's not

05:39:05PM   21   submitted to the Court?

05:39:06PM   22   **A.**   That is correct.

05:39:12PM   23   **Q.**   I want to ask you -- it's always dangerous when I start

05:39:18PM   24   asking questions about things I don't know much about, but I

05:39:22PM   25   did want to ask you questions about a couple of these articles

**STEWART TANKERSLEY - CROSS-EXAM BY MS. POWELL**

05:39:27PM  1   you talked about before.  If you flip to Article 9.  Please

05:39:39PM  2   correct me if I mischaracterize your testimony.  But I

05:39:42PM  3   understood you to say that this stood for the proposition that

05:39:45PM  4   the liquid nanoparticles used in some mRNA vaccines are highly

05:39:51PM  5   inflammatory.  Correct?

05:39:52PM  6   A.   In all of the mRNA vaccines, yes, that is correct.

05:39:58PM  7   Q.   And this study is based on certain preclinical studies in

05:40:02PM  8   mice?

05:40:02PM  9   A.   That's what this study is based off of, yes.

05:40:05PM  10  Q.   Where they use much higher doses and volumes than would be

05:40:10PM  11  used in humans?

05:40:12PM  12  A.   The volume in mice would be higher than humans.  I doubt

05:40:17PM  13  they put a hundred micrograms of Moderna or 40 micrograms of

05:40:24PM  14  Pfizer in this.  I do not recall that at all.

05:40:26PM  15  Q.   I'm sorry, can you say that again?

05:40:30PM  16  A.   I don't agree that they put more in these mice than they

05:40:33PM  17  did in humans.  In fact, it says here we injected

05:40:38PM  18  10 micrograms, 5 micrograms, and 2.5 micrograms.

05:40:43PM  19  Q.   But if you compare, say -- okay.  If you turn to page 8,

05:40:50PM  20  under "Limitations of the Study."  The second sentence reads,

05:40:55PM  21  "Vaccines -- Because vaccine doses and volumes utilized in

05:40:58PM  22  rodents are much higher than those in humans, detailed dose

05:41:02PM  23  volume response studies would be required."

05:41:06PM  24  A.   Mm-hmm.

05:41:06PM  25  Q.   Doesn't that indicate that the doses and volumes were

**STEWART TANKERSLEY - CROSS-EXAM BY MS. POWELL**

05:41:09PM 1   higher in rodents?

05:41:10PM 2   A.   The volumes were not higher, but per mass they were.

05:41:14PM 3   Q.   That makes sense.

05:41:16PM 4        Does this study conclude that the mRNA vaccines are

05:41:31PM 5   therefore too dangerous to use?

05:41:36PM 6   A.   This study does not prove that messenger RNA vaccines are

05:41:41PM 7   too dangerous to use.

05:41:44PM 8   Q.   You stated at one point, I thought, that you weren't aware

05:41:47PM 9   of any previous use of mRNA vaccines in humans prior to these

05:41:52PM 10   vaccines.  Is that correct?

05:41:53PM 11   A.   I did not say that.

05:41:54PM 12   Q.   Okay.  Because there have been previous human trials of

05:41:59PM 13   mRNA vaccines, correct?

05:42:00PM 14   A.   Correct.

05:42:00PM 15   Q.   Including for Zika virus and, I think, some others as

05:42:04PM 16   well?

05:42:05PM 17   A.   Right.

05:42:16PM 18   Q.   The -- if you'd -- the article at tab 10 about innate

05:42:23PM 19   immune suppression --

05:42:24PM 20   A.   Right.

05:42:25PM 21   Q.   -- I honestly could not tell from looking at it.  Is this

05:42:28PM 22   published in a medical journal?

05:42:43PM 23   A.   (No oral response.)

05:42:45PM 24   Q.   "I don't know" is a fine response, too, if you don't know,

05:42:48PM 25   because I don't know.

## STEWART TANKERSLEY - CROSS-EXAM BY MS. POWELL

05:42:53PM 1    A.    (Reviewing document.)  I do not know.

05:42:58PM 2    Q.    Okay.  You indicated that you reviewed Colonel Rans'

05:43:15PM 3    declaration, among others, correct?

05:43:18PM 4    A.    Yes, ma'am.

05:43:19PM 5    Q.    And I take it that you disagree with large swaths of it.

05:43:24PM 6    Do you dispute that COVID-19 is a highly infectious disease

05:43:28PM 7    that the military has to take seriously?

05:43:31PM 8    A.    We have.

05:43:33PM 9    Q.    Sorry.  The question was whether you disagree with that

05:43:35PM 10   statement.

05:43:35PM 11   A.    Oh, I agree we -- with that we should take it seriously.

05:43:40PM 12   Q.    And that at the very least, dozens of service members have

05:43:44PM 13   died from COVID?

05:43:45PM 14   A.    Per her testimony.

05:43:48PM 15   Q.    Would you dispute that thousands have been hospitalized

05:43:51PM 16   from COVID?  Service members --

05:43:54PM 17   A.    No.

05:43:54PM 18   Q.    -- to be specific.

05:43:55PM 19         And that those numbers include people who are otherwise

05:43:58PM 20   young and in good physical condition?

05:44:00PM 21   A.    Yes.

05:44:05PM 22   Q.    You do generally -- did I understand you to conclude that

05:44:10PM 23   in your opinion, the COVID-19 vaccines are not safe and

05:44:14PM 24   effective?  Is that your testimony?

05:44:16PM 25   A.    I think the evidence that we have is, without doubt -- is

STEWART TANKERSLEY - CROSS-EXAM BY MS. POWELL

05:44:19PM  1   not true -- that is a true statement.  They are not safe and

05:44:23PM  2   effective.

05:44:23PM  3   **Q.**   And you certainly recognize that your conclusion is

05:44:26PM  4   contrary to that of, say, the FDA?

05:44:29PM  5   **A.**   And the CDC.  Yes, I know that.

05:44:31PM  6   **Q.**   And also the American College of Physicians?

05:44:33PM  7   **A.**   Okay.

05:44:34PM  8   **Q.**   And also the American Board of Family Medicine?

05:44:39PM  9   **A.**   Yes.

05:44:39PM 10   **Q.**   And Colonel Rans?

05:44:41PM 11   **A.**   Yes.

05:44:42PM 12   **Q.**   And Major Stanley?

05:44:42PM 13   **A.**   Yes --

05:44:42PM 14   **Q.**   And --

05:44:45PM 15   **A.**   -- whoever -- I don't know Major Stanley.

05:44:47PM 16   **Q.**   Oh.  Fair.

05:44:48PM 17          Were you ever disciplined by the Alabama medical board?

05:45:01PM 18   **A.**   Yes.

05:45:03PM 19   **Q.**   When was that?

05:45:05PM 20   **A.**   Three or four years ago.

05:45:07PM 21   **Q.**   Okay.

05:45:11PM 22          MS. POWELL:  I think those are all the questions I

05:45:13PM 23   have.

05:45:16PM 24          THE COURT:  All right.  Thank you, Ms. Powell.

05:45:18PM 25          Anything further, Mr. Staver?

STEWART TANKERSLEY - REDIRECT EXAM BY MR. STAVER

05:45:26PM  1          MR. STAVER:  Just a --

05:45:31PM  2                    REDIRECT EXAMINATION

05:45:31PM  3  BY MR. STAVER:

05:45:31PM  4  Q.    Are you a physician licensed to practice in Alabama in

05:45:34PM  5  good standing?

05:45:36PM  6  A.    I am.

05:45:36PM  7  Q.    Are there any disciplinary actions against you?

05:45:39PM  8  A.    Yes, there were, three or four years ago when I was three

05:45:42PM  9  days late in turning in my fees for a controlled substance that

05:45:51PM  10  was a administrative -- my fault.  Paid a heavy fine for it,

05:45:57PM  11  $2500.

05:45:58PM  12  Q.    Because you have to turn in certain fees once you --

05:46:02PM  13  A.    Every year.

05:46:03PM  14  Q.    Every year.

05:46:03PM  15          With regards to prescribing controlled substances?

05:46:08PM  16  A.    Yes, sir.

05:46:09PM  17  Q.    And that was just missed, and that's what that was about?

05:46:13PM  18  A.    Three days late, yes, sir.

05:46:15PM  19  Q.    Has your expertise or your ethics in medicine ever been

05:46:20PM  20  questioned or disciplined?

05:46:22PM  21  A.    No, sir.

05:46:22PM  22          MR. STAVER:  I don't have any other questions.

05:46:24PM  23          THE COURT:  All right.  Thank you, Mr. Staver.

05:46:26PM  24          Then, sir, remembering to disconnect that microphone

05:46:32PM  25  wherever it is, you may step down and you're excused with our

**CLOSING ARGUMENTS BY MS. POWELL**

05:46:35PM  1   thanks.

05:46:53PM  2           Has the plaintiff any further evidence to offer by

05:46:57PM  3   live testimony or otherwise?

05:46:59PM  4           MR. STAVER:  No, Your Honor, no other evidence, just

05:47:01PM  5   some brief closing arguments.

05:47:03PM  6           THE COURT:  Let me just double check and make sure

05:47:06PM  7   that the defense has no evidence or witnesses to offer.

05:47:10PM  8           MS. POWELL:  No other evidence.  A couple of quick

05:47:13PM  9   points I'd like to make at some point before we close.

05:47:16PM 10           THE COURT:  Well, why don't you make them now.

05:47:18PM 11           MS. POWELL:  Thank you, Your Honor.

05:47:22PM 12           There were a few points that came up in testimony I

05:47:24PM 13   wanted to respond to very briefly.  I have a list of six points

05:47:27PM 14   here, but feel free to cut me off or direct my attention.

05:47:30PM 15           THE COURT:  I'm not going cut you off or anything

05:47:33PM 16   like that.

05:47:33PM 17           MS. POWELL:  The first was in Navy Commander's

05:47:37PM 18   testimony.  He testified that foreign countries could not tell

05:47:40PM 19   the U.S. what to do on its warships; that is true insofar as it

05:47:44PM 20   goes.  But they can make requirements about who can enter their

05:47:46PM 21   ports and about who can disembark from those ships, and they

05:47:49PM 22   do.  That's set forth in both the Dwyer declaration and the

05:47:53PM 23   Merz declaration we've submitted in connection with this

05:47:56PM 24   matter.

05:47:56PM 25           Second, Navy Commander made much of the fact that his

CLOSING ARGUMENTS BY MS. POWELL

05:48:01PM  1  ship has been underway, and that -- in his opinion, that the

05:48:06PM  2  COVID risks from that would be much the same as under

05:48:09PM  3  deployment.  His ship -- to be clear, his ship has continued

05:48:16PM  4  making preparations for eventual deployment and has continued

05:48:20PM  5  certification so that it is not simply sitting idle, that is

05:48:24PM  6  true, but it has only gone underway with additional supervision

05:48:28PM  7  on the board, and the Navy feels strongly that it can only go

05:48:32PM  8  underway with additional supervision onboard.  And of course

05:48:34PM  9  the risks associated with those training exercises, while not

05:48:39PM 10  zero by any means, are significantly less than those that would

05:48:42PM 11  occur on an actual deployment.

05:48:45PM 12       Plaintiffs made mention of the statement by Admiral

05:48:52PM 13  Merz in the *Navy Times* that the Navy was functioning just fine

05:48:56PM 14  under the threat of Omicron.  That is true, but it is also true

05:49:00PM 15  on the face of the article that he says that is specifically

05:49:03PM 16  because the operational vehicles are fully vaccinated.  It's

05:49:07PM 17  apparent from the face of the article where he's talking about

05:49:10PM 18  the incident on the USS Milwaukee, and he confirms as much in

05:49:12PM 19  the declaration we submitted to this Court, that the reason

05:49:15PM 20  that operational vehicles are so much more effective now than

05:49:18PM 21  they were during the Delta surge is because those units are

05:49:21PM 22  fully vaccinated.  That would not have been the case had there

05:49:24PM 23  been unvaccinated people onboard that ship.  And he makes the

05:49:28PM 24  point that even a single unvaccinated sailor can change the

05:49:32PM 25  outcome.

**CLOSING ARGUMENTS BY MS. POWELL**

05:49:32PM 1        I wanted to touch very briefly on the VAERS data.  I

05:49:41PM 2  think these points were made during the cross-examination, but

05:49:44PM 3  I wanted to make sure they were clearly laid out as well.  It

05:49:47PM 4  is true that there is VAERS data about adverse vaccine events.

05:49:51PM 5  That does not mean that each one of those reports corresponds

05:49:53PM 6  to an actual adverse vaccine event.

05:49:56PM 7        Unlike previous vaccines and unlike previous VAERS

05:50:00PM 8  reports, the emergency use authorization connected with the

05:50:02PM 9  COVID 19 vaccines required healthcare providers to report all

05:50:07PM 10  adverse events, even if they don't believe that they're

05:50:10PM 11  connected to the vaccine, and without any time limitation as

05:50:14PM 12  between when the adverse event occurred.

05:50:16PM 13        Also unlike previous VAERS reports and previous

05:50:21PM 14  vaccines, the health authorities have ruled out a program in

05:50:26PM 15  which pretty much anyone who gets the vaccine is asked to

05:50:30PM 16  provide their email address and directly email the link where

05:50:33PM 17  they can report adverse events, and then in fact email the

05:50:36PM 18  followup link in a few weeks to follow up with any adverse

05:50:40PM 19  events, so you see significantly more self-reporting than has

05:50:43PM 20  been true in the past.

05:50:44PM 21        Between those two things, it's not possible to

05:50:46PM 22  compare the current reporting with past reporting and conclude

05:50:49PM 23  that there is more of a problem with their vaccine.  Point of

05:50:53PM 24  fact, hundreds of millions of people have gotten doses of the

05:50:56PM 25  vaccines; serious adverse events are exceedingly rare.

**CLOSING ARGUMENTS BY MS. POWELL**

05:51:00PM  1          And the final -- well, two things.  I did want to

05:51:07PM  2    touch briefly on the pressure that Lieutenant Colonel Long

05:51:14PM  3    claimed she felt not to testify today.  It was my understanding

05:51:17PM  4    that she was counseled as to Army regulations and DoD ethics

05:51:21PM  5    guidelines that prevent someone --

05:51:25PM  6          THE COURT:  Feel free to get some water if you want,

05:51:28PM  7    Ms. Powell.

05:51:28PM  8          MS. POWELL:  Thank you.

05:51:28PM  9          THE COURT:  That's fine.

05:51:44PM  10          MS. POWELL:  -- does prevent Army personnel from

05:51:46PM  11    testifying in an official capacity as an expert against the

05:51:49PM  12    government; it's a matter of ethics, regulations, and conflicts

05:51:54PM  13    of interest do not constitute witness tampering.  We've not

05:51:56PM  14    asked the Court to exclude her testimony on that basis today.

05:52:03PM  15          THE COURT:  And I didn't receive her as an expert,

05:52:09PM  16    and I don't think she was proffered that way.  I think a couple

05:52:12PM  17    of the questions may have been in that form, but if they called

05:52:17PM  18    for an opinion, a mere opinion and by a nonexpert witness, then

05:52:24PM  19    I would treat it accordingly.

05:52:26PM  20          MS. POWELL:  I certainly gathered that several of

05:52:28PM  21    these witnesses were attempting to walk that line without

05:52:31PM  22    providing expert testimony, but it seemed to be based on their

05:52:34PM  23    expert conclusions on how safe and effective the vaccine was.

05:52:40PM  24          THE COURT:  Well, that's a recurrent problem in

05:52:42PM  25    litigation, because it's certainly possible for someone who has

**CLOSING ARGUMENTS BY MS. POWELL**

05:52:45PM  1   expertise to testify as a fact witness without the need for

05:52:53PM  2   qualifying as a so-called expert and responding to questions

05:52:58PM  3   and testifying in the form of an opinion.  And it's possible,

05:53:01PM  4   as you know, for certain laypersonnel to provide opinion

05:53:05PM  5   testimony depending upon what the circumstances are.

05:53:08PM  6          MS. POWELL:  Sure.

05:53:09PM  7          THE COURT:  But typically someone can provide

05:53:14PM  8   observational fact-based witness testimony without qualifying

05:53:21PM  9   as an expert, as you know.

05:53:24PM 10          MS. POWELL:  So my last two points is -- are -- oh,

05:53:31PM 11   one, plaintiffs' counsel claims that he asked us to bring

05:53:36PM 12   witnesses here today.  To my knowledge, the only witness they

05:53:39PM 13   asked us to bring was Captain Brandon, who is at sea today, and

05:53:44PM 14   in any event was not subject to a Rule 45 subpoena.  For policy

05:53:49PM 15   reasons, we generally don't offer up witnesses outside the

05:53:53PM 16   subpoena power, especially at this preliminary stage.  But they

05:53:57PM 17   certainly didn't ask us to bring anyone other than Captain

05:54:01PM 18   Brandon.  I do realize that the Court suggested as much, that

05:54:05PM 19   the Court might want to hear from some of our declarants.

05:54:08PM 20          And I did want to just sort of reiterate what we've

05:54:14PM 21   said before, because I think it's important, that we feel like

05:54:19PM 22   the record is adequate as it is, because these declarants are

05:54:24PM 23   entitled to substantial deference on their expert military

05:54:28PM 24   judgment, but on the other issues on which they've offered

05:54:31PM 25   meaningful opinions in which they speak on behalf of the

**CLOSING ARGUMENTS BY MR. GANNAM**

05:54:36PM 1   military.  The Supreme Court has said in *Rostker*, and in *Hawaii*

05:54:40PM 2   *versus Trump*, and other cases we've cited in our briefs that

05:54:43PM 3   other expert opinions, other opinions from within the military

05:54:46PM 4   even are quite beside the point in cases like this and should

05:54:50PM 5   be disregarded.

05:54:51PM 6           Here, the evidence shows -- the evidence shows the

05:55:06PM 7   military has an extremely strong interest in vaccinating these

05:55:10PM 8   two particular officers and that less restrictive means offered

05:55:14PM 9   do not allow the military to address those concerns.

05:55:17PM 10          I welcome any questions from the Court.

05:55:20PM 11          THE COURT:  All right.  Thank you very much.  Thank

05:55:22PM 12  you, Ms. Powell.

05:55:26PM 13          Mr. Gannam.

05:55:48PM 14          MR. STAVER:  Your Honor, I'll have just a short

05:55:50PM 15  argument after his, and we'll be done.

05:55:56PM 16          MR. GANNAM:  May it please the Court:

05:55:57PM 17          Your Honor, the defendants have not met their burden

05:56:00PM 18  to obtain a stay of the Court's preliminary injunction.  As we

05:56:04PM 19  showed in our response -- in our written response, it's quite

05:56:08PM 20  unusual for a court to enter a stay of its own preliminary

05:56:11PM 21  injunction because the standard or the factors are so similar.

05:56:16PM 22  This is not the kind of extraordinary case where there's

05:56:19PM 23  something new or something compelling presented by the defense

05:56:22PM 24  to justify this Court staying its own injunction.

05:56:26PM 25          On the first point, the defense hasn't made a strong

**CLOSING ARGUMENTS BY MR. GANNAM**

05:56:29PM  1   showing that they're likely to succeed on the merits.  They

05:56:33PM  2   didn't meet their evidentiary burden at the PI hearing.  We

05:56:36PM  3   think the Court has recognized that and said so explicitly both

05:56:40PM  4   in the PI order itself and in the preparatory order that the

05:56:44PM  5   Court entered after the emergency motion.

05:56:47PM  6           Their evidence is insufficient, to quote the Court's

05:56:50PM  7   March 2nd order, to answer the question that RFRA burdens them

05:56:54PM  8   to answer.  And this is all despite the Court extending an

05:56:57PM  9   explicit invitation for the defendants to bring their witnesses

05:57:01PM 10   to be subjected to cross-examination, to address particular

05:57:05PM 11   items of proof that the Court viewed were deficient, and the

05:57:09PM 12   defense has declined to do any of those things.

05:57:11PM 13           There is no reliable empirical evidence in the record

05:57:16PM 14   that any unvaccinated service member is more likely to transmit

05:57:20PM 15   the COVID-19 virus to another service member.  And apparently

05:57:24PM 16   in recognition of this point, the defense -- the defendants

05:57:27PM 17   focus mainly on an alleged higher likelihood of severe illness

05:57:31PM 18   being caused or hospitalization being experienced by

05:57:36PM 19   unvaccinated service members as compared to vaccinated.

05:57:39PM 20           But even if they can claim that at some point in time

05:57:43PM 21   it was ten times higher or 20 times higher for the unvaccinated

05:57:47PM 22   service member, the question that the defendants don't really

05:57:50PM 23   answer is:  Ten times or 20 times higher than what?  And that

05:57:54PM 24   "what" is a really small number that is declining

05:57:59PM 25   precipitously.  Just last week, according to the CDC, the risk

**CLOSING ARGUMENTS BY MR. GANNAM**

05:58:03PM   1    of severe illness and hospitalization and death has been

05:58:07PM   2    greatly reduced for most people.  And that's not just for

05:58:12PM   3    vaccinated people, that's for most people, including the

05:58:14PM   4    unvaccinated.

05:58:15PM   5            In the exhibit we put into evidence today, the

05:58:18PM   6    commander of U.S. SPACECOM adopted that very language in

05:58:22PM   7    notifying the 18,000 or so under his command that we don't need

05:58:27PM   8    to -- the mask policies were changing, and it's because there

05:58:31PM   9    is much lower risk for most people of hospitalization or severe

05:58:35PM   10   illness from COVID.

05:58:37PM   11           The defendants' evidence does not account for any

05:58:42PM   12   individualized risk factors that any plaintiff, either the two

05:58:46PM   13   that we're here about today, any other named plaintiff, or any

05:58:50PM   14   class member.  The defendants are utterly unable to account for

05:58:53PM   15   any individualized risk factors that would make their already

05:58:57PM   16   speculative future harms either better or worse.

05:59:01PM   17           For example, the defendants can't say that an

05:59:04PM   18   unvaccinated Navy commander is any times more likely to be

05:59:08PM   19   hospitalized or severely ill than any vaccinated service

05:59:13PM   20   member.  The defendants can't say that an unvaccinated

05:59:13PM   21   lieutenant colonel is any times more likely to be hospitalized

05:59:17PM   22   or experience severe illness than a vaccinated service member

05:59:22PM   23   either now or in the future.  In fact, the defendants can't

05:59:25PM   24   rule out that either the Navy commander or the lieutenant

05:59:29PM   25   colonel are less likely to become severely ill or hospitalized

**CLOSING ARGUMENTS BY MR. GANNAM**

05:59:33PM 1   as compared to vaccinated service members, because their

05:59:37PM 2   evidence doesn't -- they don't attempt to take into account any

05:59:41PM 3   of the individualized factors that requires them to consider --

05:59:46PM 4   they've never attempted to do this, the defendants are utterly

05:59:48PM 5   unable, they have no process, they have no intent to evaluate

05:59:52PM 6   these individualized considerations.

05:59:58PM 7          The defense makes the argument that they are excused

06:00:02PM 8   from proving a strong likelihood of success on the merits, that

06:00:07PM 9   they only have to prove a substantial case, and they cite a

06:00:11PM 10  case, the *LabMD, Inc.*, case.  But the full quote says that they

06:00:16PM 11  are only able to make this lower showing if the other three

06:00:20PM 12  factors, factors two, three, and four, weigh heavily in their

06:00:24PM 13  favor.

06:00:24PM 14         Well, that's not going to work here.  Well, first of

06:00:27PM 15  all, the defendants don't even make a substantial case of

06:00:30PM 16  likelihood of success on the merits, but beyond that, the other

06:00:33PM 17  three factors all weigh very heavily against the stay in this

06:00:38PM 18  case, and so their burden on the likelihood-of-success factor

06:00:42PM 19  cannot be lowered.

06:00:43PM 20         Factor number two is irreparable harm to the

06:00:47PM 21  government.  The government hasn't shown any irreparable harm

06:00:51PM 22  that it will suffer if the Court does not enter a stay.  The

06:00:54PM 23  evidence shows that the Navy commander is doing his job and

06:00:56PM 24  he's doing it well, he's doing it with excellence, he's doing

06:00:59PM 25  it on schedule, he's doing it even with distinction as

**CLOSING ARGUMENTS BY MR. GANNAM**

06:01:03PM  1   communicated to him by the superior officer who accompanied him

06:01:07PM  2   at the direction of Captain Brandon.

06:01:10PM  3           And so there's no evidence in the record that

06:01:14PM  4   Lieutenant Colonel 2 is unable to perform her duties that are

06:01:17PM  5   assigned to her right now justifying some emergency stay of the

06:01:23PM  6   preliminary injunction.  All we have are the defendants'

06:01:25PM  7   speculations and say-so that things might go bad in the future

06:01:29PM  8   and therefore they must get a stay now so that they can take

06:01:32PM  9   action against these two.

06:01:35PM  10          The evidence here that the defendants have put on

06:01:38PM  11  only in the form of declarations is really self-defeating.  The

06:01:44PM  12  first Brandon declaration, which appears in the record at

06:01:48PM  13  Document 74-12, in paragraph 4, makes a statement that "I have

06:01:54PM  14  not lost trust and confidence in Plaintiff because of his

06:01:58PM  15  religious beliefs.  Rather, once his religious accommodation

06:02:01PM  16  appeal was denied, he was issued an order giving him five days

06:02:04PM  17  to receive the COVID-19 vaccine, but he refused to do so."  So

06:02:09PM  18  as of the time of that first declaration, the loss of

06:02:12PM  19  confidence was because his appeal was denied and he didn't get

06:02:15PM  20  vaccinated.

06:02:16PM  21          Well, if we fast forward just a short while later to

06:02:20PM  22  February 9th and the second Brandon declaration at

06:02:25PM  23  Document 81-1, in paragraph 19, he says, "My loss of confidence

06:02:31PM  24  in Plaintiff Navy Commander is not based on his vaccination

06:02:34PM  25  status or his denied request for religious exemption."

**CLOSING ARGUMENTS BY MR. GANNAM**

06:02:40PM 1          So just a few days later, the loss of confidence was

06:02:42PM 2    because of something that happened back in November; a false

06:02:45PM 3    accusation that the commander didn't report COVID symptoms and

06:02:50PM 4    went about his day, when the unrefuted testimony shows that he

06:02:53PM 5    had no COVID symptoms as confirmed by the ship's doc.  He had a

06:02:59PM 6    loss of voice, which isn't listed in any Navy regulation or

06:03:03PM 7    guidance as a COVID symptom.  So the target is always moving

06:03:08PM 8    for why Captain Brandon supposedly has lost confidence in the

06:03:13PM 9    Navy commander.

06:03:13PM 10          And that brings us to the unequivocal statements in

06:03:17PM 11   the government's motion -- in the defendants' motion for

06:03:21PM 12   emergency stay that says that the ship was essentially -- it

06:03:26PM 13   was indefinitely sidelined and effectively out of commission.

06:03:31PM 14   When they filed that declaration, he was literally underway at

06:03:35PM 15   sea, driving his ship, doing everything right, meeting his

06:03:38PM 16   qualifications, getting recognized by his superior officer.

06:03:43PM 17   There is simply no excuse for telling the Court that the reason

06:03:48PM 18   for -- that an emergency stay is needed because the ship's out

06:03:53PM 19   of commission and sidelined when the ship is literally out at

06:03:56PM 20   sea.

06:03:57PM 21          Here, I'm going to take issue with a statement -- or

06:03:59PM 22   with an argument that the defendants made both in their motion

06:04:02PM 23   and in closing argument.  There is no case that stands for the

06:04:06PM 24   proposition that military officer declarations are

06:04:10PM 25   automatically due deference or automatically to be believed.

**CLOSING ARGUMENTS BY MR. GANNAM**

06:04:13PM   1          The case *Coburn v. McHugh*, cited by the defendants,
06:04:18PM   2   was an Administrative Procedure Act case where the Court made
06:04:21PM   3   an unremarkable observation that when reviewing administrative
06:04:27PM   4   agency actions that military administrators are due the same
06:04:32PM   5   deference as other public administrators in carrying out agency
06:04:36PM   6   action.  There's nothing in that case that says that military
06:04:40PM   7   officer declarations are entitled to be believed and shouldn't
06:04:43PM   8   be subjected to scrutiny or cross-examination.  We don't get
06:04:47PM   9   the opportunity to cross-examine any of these witnesses,
06:04:49PM  10   because the defendants declined the Court's invitation to bring
06:04:53PM  11   them.  So what that leaves us with is there is no irreparable
06:04:58PM  12   harm to the government to satisfy the second requirement.  The
06:05:02PM  13   only harm here is to the government's hubris in thinking that
06:05:05PM  14   it can do whatever it wants and continually move the target.
06:05:09PM  15          That brings us to the third element, which is, will
06:05:13PM  16   there be irreparable harm to the plaintiffs if the stay is
06:05:19PM  17   entered, and clearly there will be.  We know just from the
06:05:22PM  18   course of proceedings since the Court's preliminary injunction
06:05:27PM  19   was entered that Captain Brandon wants to get Navy Commander
06:05:31PM  20   off of that ship, wants to remove him from command, and has
06:05:34PM  21   done a lot of things since the preliminary injunction was
06:05:37PM  22   entered to make life hard on him, even to the point of sending
06:05:40PM  23   someone to constantly watch over his shoulder.  It hasn't
06:05:42PM  24   affected the commander's performance, but it's pretty clear
06:05:46PM  25   that, both in the case of Navy Commander and the lieutenant

**CLOSING ARGUMENTS BY MR. GANNAM**

06:05:50PM 1  colonel, their careers have been marked for death.

06:05:52PM 2         They have been given this stain of order disobeyers
06:05:56PM 3  that will not leave them if this Court enters a stay -- or
06:06:00PM 4  stays its injunction and allows the military to do what it will
06:06:04PM 5  with these two officers.  It's clear that this stain of
06:06:08PM 6  disobeying an order can't be removed and won't be removed, it's
06:06:12PM 7  going to follow them, even if takes a couple of months for the
06:06:15PM 8  military to finally kill their careers instead of just holding
06:06:20PM 9  them in place where they are now.

06:06:21PM 10        The fourth factor is the public interest factor, and
06:06:24PM 11 there's absolutely no public interest in dismissing these
06:06:29PM 12 officers from the service.  The public interest favors keeping
06:06:33PM 13 honorable, well-trained, loyal, excellent officers in service,
06:06:39PM 14 and it also favors stopping the military from burdening their
06:06:43PM 15 religious exercise when there are demonstrably effective, less
06:06:48PM 16 restrictive means of protecting the health and safety of the
06:06:50PM 17 military that have been working and will continue to work.

06:06:53PM 18        So in sum, Your Honor, the defendants have not met
06:06:56PM 19 their burden of obtaining a stay.  The requirement for them
06:07:02PM 20 showing a strong likelihood of success on the merits is not
06:07:06PM 21 relaxed, because the other three factors don't weigh in the
06:07:09PM 22 defendants' favor, in fact they all weigh in favor of the
06:07:13PM 23 plaintiffs.

06:07:13PM 24        Thank you.

06:07:14PM 25        THE COURT:  Did you want to comment on the

**CLOSING ARGUMENTS BY MR. GANNAM**

06:07:19PM  1   argument -- let me just use a generic term -- the argument

06:07:23PM  2   about deployability?

06:07:27PM  3          MR. GANNAM:  Well, Your Honor --

06:07:27PM  4          THE COURT:  I hesitate to say anything, because I'll

06:07:29PM  5   use the wrong word or something and set off dynamite capsules.

06:07:33PM  6   But in general, I understand the defendants to say that,

06:07:37PM  7   setting aside the issue about the alleged deception of the

06:07:46PM  8   commander and setting aside the issue about not reporting the

06:07:50PM  9   COVID symptoms last September, but that there is available to

06:07:54PM 10   them and within their discretion a neutral principle of

06:07:59PM 11   deployability.  And that even if granted a religious exemption,

06:08:08PM 12   the Navy commander would not be deployable on the vessel,

06:08:15PM 13   couldn't enter a foreign port, and I certainly heard what Navy

06:08:21PM 14   Commander said about that.

06:08:22PM 15          But what do you say about that that is not a facially

06:08:30PM 16   retaliatory reason to remove him from his command and it is one

06:08:36PM 17   that is based on a neutral principle generally applicable in

06:08:40PM 18   the Armed Forces?  So what do you say to that?

06:08:43PM 19          MR. GANNAM:  Well, Your Honor, it's no different from

06:08:49PM 20   the military simply saying he can't be accommodated because we

06:08:52PM 21   say so.  Whether he's deployable is a decision that's entirely

06:08:55PM 22   up to the U.S. military.  They have not put on any evidence to

06:09:00PM 23   the contrary.  As the Navy commander testified, if the port

06:09:05PM 24   they pull up to doesn't let unvaccinated sailors off the boat,

06:09:09PM 25   he stays on the boat.  There's nothing that says he can't enter

**CLOSING ARGUMENTS BY MR. GANNAM**

06:09:13PM  1    a port because there are unvaccinated sailors on his ship.

06:09:17PM  2    He's demonstrated his deployability throughout the pandemic,

06:09:23PM  3    because it is a -- he's been able to be underway for 300 out of

06:09:29PM  4    400 days during a time when there was no vaccine available.

06:09:34PM  5              So the deployability argument, it's really pretextual

06:09:36PM  6    and it's just the military saying, well, we can't accommodate

06:09:39PM  7    him because we say so.  The military could accommodate him by

06:09:42PM  8    allowing him to be deployed, by applying COVID protocols that

06:09:47PM  9    are constantly now being relaxed.  The military can accommodate

06:09:51PM  10   him by letting him do what he's been doing this entire time.

06:09:54PM  11             So the deployability principle, it's not subject to

06:09:58PM  12   any outside factors that are outside the control of the

06:10:01PM  13   military.  If RFRA requires an accommodation, then

06:10:06PM  14   deployability is on the table and the military can't just say,

06:10:09PM  15   well, we're going to avoid RFRA by saying we have this neutral

06:10:14PM  16   principle over here of deployability and we simply can't

06:10:16PM  17   accommodate him.

06:10:17PM  18             But this would also be a much different case if the

06:10:21PM  19   military said everyone who asks for a religious accommodation

06:10:24PM  20   got one, we're just going to move you into a nondeployable

06:10:28PM  21   position for a period of time, or even permanently.  The

06:10:31PM  22   military isn't even offering that.  The military is saying

06:10:35PM  23   we're going to separate you from the service if you don't get

06:10:38PM  24   vaccinated.  So the deployability issue, it's really a red

06:10:42PM  25   herring, because the military has never even considered or

**CLOSING ARGUMENTS BY MR. GANNAM**

06:10:44PM  1   offered, like they do, for example, for temporary medical

06:10:47PM  2   exemptions, let's give temporary religious exemptions, give

06:10:51PM  3   them the same treatment, and in six months see how COVID's

06:10:54PM  4   going, see if there's really a need for continuing to require

06:10:56PM  5   this vaccination.

06:10:58PM  6          So the military has done nothing short of simply

06:11:01PM  7   saying we're going to separate people who are denied a

06:11:06PM  8   religious accommodation; that falls short of what RFRA

06:11:09PM  9   requires.  And by calling it a deployability decision instead

06:11:14PM 10   of just refusing accommodation we don't think changes anything

06:11:17PM 11   in the analysis, and that's also why we think this

06:11:21PM 12   loss-of-confidence idea is really the same thing.  If we can't

06:11:24PM 13   get them with -- we can't say we're going to kick you out

06:11:29PM 14   for -- because you're not vaccinated, we'll just come up with

06:11:32PM 15   something else.  Or we'll say, you know, you didn't follow this

06:11:35PM 16   order to get vaccinated, even though you had an injunction from

06:11:38PM 17   a federal court against enforcement of that order, we're going

06:11:42PM 18   to say that we've lost confidence in you, and that just gives

06:11:46PM 19   the military the ability to get rid of somebody anyway.  And in

06:11:50PM 20   both cases, there's kind of two sides of the same coin.  It's a

06:11:53PM 21   blanket policy that's really a pretext for not granting the

06:11:57PM 22   accommodation that RFRA requires.

06:11:59PM 23          And it's -- if the military had simply treated

06:12:08PM 24   religious accommodation the same as it's treated medical

06:12:11PM 25   accommodations, we probably wouldn't be here.  Or if the

**CLOSING ARGUMENTS BY MR. GANNAM**

06:12:11PM  1   military had --

06:12:14PM  2          THE COURT:  Say that again.

06:12:15PM  3          MR. GANNAM:   If the military had simply treated

06:12:18PM  4   religious accommodations the same as it treated medical

06:12:21PM  5   accommodations, we probably wouldn't be here.  If the military

06:12:25PM  6   had done anything that provided meaningful accommodation to

06:12:27PM  7   service members, we probably wouldn't be here.  But there's

06:12:29PM  8   really only two choices, it's either get vaccinated or get

06:12:31PM  9   kicked out.  That doesn't satisfy RFRA.

06:12:34PM 10          And so apart from the merits of the case, the

06:12:38PM 11   defendants certainly haven't shown that they're entitled to a

06:12:41PM 12   stay of the Court's preliminary injunction.  We think that

06:12:45PM 13   preliminary injunction ought to be extended to the entire

06:12:47PM 14   class, because they're all in the same position, they're all in

06:12:52PM 15   a -- not getting an individualized determination.  All members

06:12:55PM 16   of the class are being refused an accommodation based on a

06:13:00PM 17   blanket policy, whether it's called nondeployability or

06:13:03PM 18   something else, they're all getting the same treatment, and

06:13:06PM 19   that's why we think that that's the way to manage the case

06:13:09PM 20   going forward, is to extend that preliminary injunction to all.

06:13:11PM 21          But for today's purposes, the defendants certainly

06:13:14PM 22   aren't entitled to a stay.  They didn't prove their case to

06:13:18PM 23   avoid the preliminary injunction as the burden was shifted to

06:13:21PM 24   them by well-covered case law, and they haven't done anything

06:13:26PM 25   different today to justify a stay.

**CLOSING ARGUMENTS BY MR. GANNAM**

06:13:35PM   1      THE COURT:  Begging the pardon of everyone present

06:13:38PM   2   and not suggesting there's any truth to this matter, you

06:13:42PM   3   don't -- or do you interpret the injunction in its present form

06:13:48PM   4   to require the Navy, if Navy Commander hypothetically disobeyed

06:13:58PM   5   some other order, or showed up drunk, if that's a typical

06:14:05PM   6   reason for relieving someone of command, I don't know, I assume

06:14:08PM   7   it might be at least temporarily, you don't interpret the

06:14:13PM   8   injunction in its present form to require the military, if that

06:14:17PM   9   occurred, say, tomorrow, to come here and get permission from

06:14:21PM  10   me to discipline Navy Commander?

06:14:26PM  11      MR. GANNAM:  I think I agree with the point.  I think

06:14:29PM  12   if it is a legitimate situation -- a legitimate charge of

06:14:33PM  13   disobeying an order and not something that, you know, we would

06:14:37PM  14   say -- really just arises from the same continuing effort to

06:14:40PM  15   get rid of him, but if it's a legitimate, you know, violation

06:14:43PM  16   of an order, violation of a policy, something that would

06:14:46PM  17   justify removing him from command entirely independent from not

06:14:51PM  18   only his vaccination status but these proceedings, then I think

06:14:54PM  19   that could be justified.  Were that to happen, we would

06:14:58PM  20   certainly scrutinize it and would look to see whether it would

06:15:02PM  21   be something in contempt of the Court's order.  But we would

06:15:05PM  22   never assert that it's impossible for the military to take such

06:15:09PM  23   action against the commander if that's justified.

06:15:14PM  24      THE COURT:  All right.  Thank you.

06:15:17PM  25      MR. GANNAM:  Thank you, Your Honor.

**CLOSING ARGUMENTS BY MR. STAVER**

06:15:17PM  1          THE COURT:  Mr. Staver.

06:15:23PM  2          MR. STAVER:  Your Honor, I would add if the commander

06:15:25PM  3   showed up drunk on his ship, we would be here to ask you to

06:15:28PM  4   remove him from that position.  I don't think that's going to

06:15:32PM  5   happen.

06:15:32PM  6          But what we have here is the, quote, nondeployability

06:15:36PM  7   is related to his vaccinated status.  That's clear.  And it was

06:15:43PM  8   clear also before this Court issued a TRO on February the 2nd

06:15:49PM  9   protecting him temporarily as this Court considered it with

06:15:52PM  10  regards to his impending discipline and removal on February

06:15:59PM  11  the 3rd because his appeal for vaccination had been denied.

06:16:03PM  12  Everything changed since then.  There was no problem before

06:16:08PM  13  February 2, 3.  In fact, he went out and took the ship out on

06:16:12PM  14  February the 4th, that Friday.  But he was threatened by the

06:16:16PM  15  commodore.  "The next time I see you -- I can't do anything to

06:16:21PM  16  you right now.  The next time I see you, I will remove you from

06:16:24PM  17  command."

06:16:24PM  18         This Court then issued a preliminary injunction, and,

06:16:27PM  19  again, the commodore said, "The reason why I lost confidence in

06:16:31PM  20  him as my colleague is because of his vaccination status.  He

06:16:35PM  21  lost his appeal and he refused to get the vaccination."  That's

06:16:38PM  22  why they are now saying he's nondeployable.

06:16:41PM  23         The commander tells me right now that there are

06:16:44PM  24  female commanders, similar to what he does, piloting,

06:16:47PM  25  captaining these ships; they are childbearing age.  They have

CLOSING ARGUMENTS BY MR. STAVER

06:16:52PM  1   the probability or possibility of being pregnant during the

06:16:56PM  2   time of war.  They may have to be temporarily removed from that

06:17:01PM  3   while they're pregnant because of obviously pregnancy reasons,

06:17:06PM  4   but they're not separated from the Navy.

06:17:10PM  5          And in this particular situation, the only means that

06:17:14PM  6   they say is, number one, everyone has to be universally

06:17:19PM  7   vaccinated, and that vaccination is the magic stroke that will

06:17:25PM  8   prevent the degradation of military readiness.  And absent

06:17:31PM  9   that, there is no middle ground, there is no middle ground,

06:17:34PM 10   there is no temporary assignments, there's nothing, there's no

06:17:36PM 11   other kinds of alternative, less restrictive means, as the

06:17:41PM 12   commander testified to it today, went through many of those

06:17:43PM 13   less restrictive means.

06:17:44PM 14          We talked about it today, about less restrictive

06:17:47PM 15   means in terms of treating COVID as well.  There's no middle

06:17:51PM 16   ground.  If you don't get the vaccination, you are permanently

06:17:55PM 17   separated, even if we're on the failing side, the opposite side

06:17:59PM 18   of the bell curve, and Omicron, we're hopefully looking at that

06:18:03PM 19   in our rearview mirror.  That may be gone pretty quickly.  It's

06:18:07PM 20   really on the downside now, but they want to permanently remove

06:18:10PM 21   this 17-, 18-year veteran, who loves God, loves the Navy and

06:18:16PM 22   wants to serve our country, and does it very well.

06:18:18PM 23          They have continually ignored this Court's

06:18:22PM 24   instruction with regards to RFRA.  Because even if you have a

06:18:25PM 25   neutral nondeployability issue, it's not being applied in this

CLOSING ARGUMENTS BY MR. STAVER

06:18:30PM 1  case.  It's being applied because of his vaccination status,

06:18:34PM 2  because he made that decision based upon his religious beliefs

06:18:37PM 3  which has been sincerely held and burdened, and they've

06:18:41PM 4  acknowledged that, and they have refused to this day to

06:18:45PM 5  individualize the compelling interest and the least restrictive

06:18:49PM 6  means to this commander and to this lieutenant colonel.  And,

06:18:52PM 7  frankly, as this Court has observed already, they're using

06:18:55PM 8  magic words and they are doing rubber stamp across all branches

06:18:59PM 9  of the military, and we respectfully request this Court to

06:19:04PM 10  continue to require the United States military to comply by the

06:19:09PM 11  Constitution and the federal Religious Freedom Restoration Act.

06:19:15PM 12  They are not above the law, Your Honor.

06:19:16PM 13          THE COURT:  Mr. Staver, you mentioned a moment ago

06:19:19PM 14  the compelling interest question.  Two part question:  A, do

06:19:28PM 15  you understand compelling interest to mean compelling interest

06:19:32PM 16  in vaccinating the force, or do you understand it to mean a

06:19:36PM 17  compelling interest in vaccinating, for example, Navy Commander

06:19:41PM 18  or Lieutenant Colonel 2 individually; and, two, does it make

06:19:45PM 19  any difference?

06:19:46PM 20          MR. STAVER:  I understand compelling interest that

06:19:51PM 21  would be in the safety and military readiness, they've narrowed

06:19:56PM 22  that down to a blanket compelling interest of universal

06:20:00PM 23  vaccination.  I don't think they have a compelling interest in

06:20:06PM 24  universal vaccination, but I think specifically RFRA requires,

06:20:09PM 25  as this Court has noted, is not this generic compelling

CLOSING ARGUMENTS BY MR. STAVER

06:20:11PM  1    interest that may apply as a blanket, but as it relates to the

06:20:17PM  2    person.

06:20:17PM  3            And I think it does make some difference with regards

06:20:21PM  4    to these two individuals, they haven't shown it, but I think

06:20:24PM  5    they lack a blanket compelling interest as well with regards to

06:20:28PM  6    all the branches of the military based upon what we have

06:20:32PM  7    presented by declaration from one of the world's recognized

06:20:37PM  8    experts, Dr. Peter McCullough -- we did that with his 38-page

06:20:42PM  9    affidavit and about 200 pages of exhibits in October when we

06:20:46PM 10    filed the case -- Dr. Robert Malone, the inventor the mRNA

06:20:50PM 11    platform.

06:20:51PM 12            The testimony today with regards to what is happening

06:20:56PM 13    in terms of the lack of safety, the lack of efficacy and

06:21:00PM 14    alternative means, I think they don't even have a compelling

06:21:03PM 15    interest across the board to enforce this as the only way to

06:21:08PM 16    deal with COVID.  They have a singular way to deal with COVID,

06:21:11PM 17    and it's universal vaccination.  And I don't think that they

06:21:15PM 18    have a compelling interest on that universal vaccination

06:21:18PM 19    without other alternative ways that they can accomplish the

06:21:22PM 20    same purpose.  So I think they fail -- as a blanket matter, I

06:21:28PM 21    think they fail even worse as an individualized matter.

06:21:32PM 22            THE COURT:  So you don't think the statute -- you

06:21:36PM 23    think the statutory term is directed to both -- in other words,

06:21:43PM 24    when the statute talks about a compelling governmental

06:21:48PM 25    interest, you think it applies both to what I've characterized

**CLOSING ARGUMENTS BY MR. STAVER**

06:21:52PM 1   as their interest in -- I don't think I said universal, but

06:21:58PM 2   completely or substantially completely vaccinating the force,

06:22:04PM 3   or does the statute refer to compelling interest in our

06:22:10PM 4   instance, for example, in vaccinating Navy Commander?

06:22:19PM 5          MR. STAVER:  The statute.

06:22:20PM 6          THE COURT:  Or does it make a difference?

06:22:22PM 7          MR. STAVER:  For purposes of this motion, I don't

06:22:26PM 8   think it makes a difference.  But for purposes of a broader

06:22:29PM 9   motion --

06:22:29PM 10          THE COURT:  Well, for purposes of understanding what

06:22:31PM 11   the statute is talking about.

06:22:32PM 12          MR. STAVER:  Well, the statute -- the *Gonzales*

06:22:36PM 13   case -- or the *O Centro* case --

06:22:39PM 14          THE COURT:  *O Centro*, yes.

06:22:40PM 15          MR. STAVER:  -- said RFRA -- as you're familiar with

06:22:42PM 16   that --

06:22:42PM 17          THE COURT:  I am.

06:22:42PM 18          MR. STAVER:  -- says "that the compelling interest

06:22:46PM 19   test is satisfied through application of the challenged law,"

06:22:51PM 20   quote within a quote, "'to the person.'"

06:22:53PM 21          THE COURT:  Right.  That's the language I used in my

06:22:55PM 22   order.

06:22:55PM 23          MR. STAVER:  That's the language that you used in

06:22:57PM 24   your order.

06:22:58PM 25          THE COURT:  Yes.

**CLOSING ARGUMENTS BY MS. POWELL**

06:22:58PM  1       MR. STAVER:  And I think that language actually -- if

06:22:59PM  2  you don't mind, I can get the RFRA statute, but the language

06:23:05PM  3  actually uses that language "to the person," which this is what

06:23:08PM  4  it is quoting.

06:23:09PM  5       THE COURT:  All right.  Thank you, Mr. Staver.

06:23:12PM  6       MR. STAVER:  Thank you.

06:23:12PM  7       THE COURT:  Ms. Powell, did you want -- I'll give you

06:23:14PM  8  the last word if you want it.

06:23:18PM  9       MS. POWELL:  Only one final point -- to return to my

06:23:24PM 10  ask -- that the Court exclude the testimony of the three

06:23:27PM 11  witnesses I talked about earlier today who I don't think spoke

06:23:30PM 12  to any issue that is properly before the Court in the stay

06:23:34PM 13  motion.

06:23:35PM 14       THE COURT:  I'll have to give that some thought.  I

06:23:37PM 15  received the testimony, so at least at the moment I'm going to

06:23:39PM 16  leave it the way it is.  How much probative value it had and as

06:23:45PM 17  to exactly what point, we'll leave that unspecified for the

06:23:48PM 18  moment.

06:23:49PM 19       So thank you very much.  I appreciate everyone's

06:23:52PM 20  patience today.  You're going to see Judge Porcelli and perhaps

06:23:55PM 21  me tomorrow morning at 10.  So given the fact that it's almost

06:23:59PM 22  6:30, we'll leave it at that.  So we are in recess.

06:24:04PM 23       I will, and think I can, rule before dark tomorrow.

06:24:08PM 24  If not, keep an eye on your inbox Saturday.  But I'll get it

06:24:14PM 25  tomorrow or soon thereafter.

06:24:17PM 1          MR. STAVER:  Your Honor, before the mediation

06:24:18PM 2  tomorrow at 10, you'll be there before the mediation starts?

06:24:25PM 3          THE COURT:  If I'm going to be involved before you

06:24:28PM 4  talk to -- I'm going to talk to Judge Porcelli and see whether

06:24:32PM 5  he'd prefer me to begin with you at 10 and him defer a few

06:24:36PM 6  minutes, or whether he'd want me to come in afterwards.  I'm

06:24:40PM 7  going to leave that to him.

06:24:41PM 8          MR. STAVER:  We would like to present to you and/or

06:24:44PM 9  Judge Porcelli the outstanding motions that are paramount of

06:24:50PM 10  importance so we don't keep coming back with TROs.

06:24:53PM 11          THE COURT:  We're aware of the motions, can I just

06:24:57PM 12  say, painfully aware of.

06:24:58PM 13          MR. STAVER:  I understand.

06:24:59PM 14          THE COURT:  We're in recess.  We're in adjournment.

06:24:59PM 15          (Whereupon, the Court adjourned at 6:25 p.m.)

06:24:59PM 16                   --oo0oo--

17

18

19

20

21

22

23

24

25

1    <u>REPORTER'S CERTIFICATE</u>

2    I, REBECCA M. SABO, a Registered Merit Reporter and

3    Certified Realtime Reporter, certify that the foregoing

4    transcript is a true and correct record of the proceedings

5    given at the time and place hereinbefore mentioned; that the

6    proceedings were reported by me in machine shorthand and

7    thereafter reduced to typewriting using computer-assisted

8    transcription; that after being reduced to typewriting, a

9    certified copy of the transcript will be filed electronically

10   with the Court.

11   I further certify that I am not attorney for, nor

12   employed by, nor related to any of the parties or attorneys to

13   this action, nor financially interested in this action.

14   IN WITNESS WHEREOF, I have set my hand at Tampa,

15   Florida, this 31st day of March, 2022.

16

17                              <u>/s/ Rebecca M. Sabo</u>

18                              Rebecca M. Sabo, RMR, CRR
                                United States Court Reporter

19

20

21

22

23

24

25